**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, )<br>     On behalf of herself and all others )<br>     similarly situated, )<br>         )<br>        Plaintiffs, )<br>         )<br>v.     )<br>         )<br>HARRIS COUNTY, TEXAS, )<br>         )<br>SHERIFF RON HICKMAN, )<br>         )<br>ERIC STEWART HAGSTETTE, )<br>JOSEPH LICATA III, )<br>RONALD NICHOLAS, )<br>BLANCA ESTELA VILLAGOMEZ, )<br>JILL WALLACE, )<br>         )<br>         )<br>         )<br>     Defendants. )<br> | Case No. 4:16-cv-1414<br>(Class Action)<br><br>**Expedited Hearing Requested** |

## CLASS ACTION COMPLAINT

### Introduction

      This case is about Harris County jailing some of its poorest people because they cannot afford to make a monetary payment.  Named Plaintiff Maranda Lynn ODonnell is currently being held in the Harris County jail because she cannot pay a $2,500 money bail after being arrested for Driving While License Invalid.  The Named Plaintiff's money bail was imposed pursuant to Harris County's predetermined money bail schedule and without any inquiry into or findings concerning her ability to pay.  Because she is impoverished and cannot afford the payment required by the County for her release, she will be kept in a Harris County jail cell.

In Harris County, wealthier arrestees are released from custody almost immediately upon payment of money to the County.  Arrestees who are too poor to purchase their release remain in jail because of their poverty.  On any given night, over 500 people arrested for misdemeanors languish in the Harris County Jail because of a money bail that they cannot afford.  Between 2009 and 2015, 55 human beings died in the Harris County Jail awaiting trial after being unable pay the amount of money demanded by the County for their release.

On behalf of the many other arrestees subjected to Harris County's unlawful and ongoing post-arrest wealth-based detention scheme, Plaintiff challenges in this action the use of secured money bail to detain only the most impoverished of misdemeanor arrestees.  Harris County's wealth-based pretrial detention system violates the Equal Protection and Due Process Clauses of the United States Constitution.  It has no place in modern American law.

By and through her attorneys and on behalf of herself and all others similarly situated, Plaintiff seeks injunctive relief to enjoin the County's wealth-based post-arrest detention procedures and a declaration that Defendants cannot detain any person pursuant to secured money bail without an inquiry into and findings concerning the person's ability to pay.

## **Nature of the Action**[1]

1.      It is the policy and practice of Harris County to refuse to release misdemeanor arrestees from custody unless they pay a monetary sum.  The amount of money required is determined by a generic offense-based bail schedule, and it is the policy and practice of Harris County officials to detain arrestees in jail pursuant to the scheduled amount without considering the person's ability to pay.  Plaintiff seeks declaratory and injunctive relief prohibiting Defendants' wealth-based post-arrest detention scheme.

---

[1] Plaintiff makes the allegations in this Complaint based on personal knowledge as to matters in which she has had personal involvement and on information and belief as to all other matters.

**Jurisdiction and Venue**

2.      This is a civil rights action arising under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, *et seq*., and the Fourteenth Amendment to the United States Constitution.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

**Parties**

4.      Maranda Lynn ODonnell is a 22-year-old mother of a 4-year-old daughter.  She represents herself as an individual and a Class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.

5.      Defendant Harris County is a municipal corporation organized under the laws of the State of Texas.  The Harris County Sheriff's Department is a division of Harris County and operates the Harris County Jail and several other detention facilities.  The Sheriff's Department detains inmates at the Harris County Jail or one of these other facilities after their arrest.  The officers and employees of the Sheriff's Department are authorized by County policy to accept money bail, release an arrestee, and set a time for an arrestee's appearance in court.  The Sheriff's Department, by policy and practice, detains arrestees too poor to afford their money bail amount and releases arrestees who pay their money bail.

6.      The Sheriff's Department is run by the Harris County Sheriff, Defendant Ron Hickman.  The Sheriff is the final policymaker for all law enforcement decisions in Harris County.  He is sued in his official capacity.

7.      Eric Stewart Hagstette, Joseph Licata III, Ronald Nicholas, Blanca Estela Villagomez, and Jill Wallace are all Harris County Criminal Law Hearing Officers.  They are County employees and are charged with making probable cause determinations and setting bail

3

for arrestees pursuant to the County's money bail schedule.  The hearing officers do not conduct any inquiry into or make any findings concerning a person's ability to pay money bail.  They are sued in their individual and official capacities for declaratory relief only.

### Factual Background

**A.    The Named Plaintiff Will Be Held in Jail Because She Is Unable To Pay the Money Bail Demanded for Her Release**

8.     Maranda Lynn ODonnell is a 22-year-old woman.

9.     Ms. ODonnell was arrested on May 18, 2016 and taken into the custody of Harris County for allegedly driving while her license was invalid.  She was informed that, because of the Harris County bail schedule, she would be released immediately, but only if she paid a money bail of $2,500.  She was told that she will be detained by Harris County if she does not pay.  *See* Exhibit 1, Declaration of Maranda Lynn ODonnell.

10.    Ms. ODonnell appeared by video from the jail at a probable cause hearing, and a hearing officer found probable cause for her arrest.  She was told by Harris County Sheriff's Deputies not to speak at the hearing.  The hearing lasted approximately 60 seconds and, pursuant to the policies and practices described in this Complaint, no inquiry was made into her ability to pay.  The predetermined money bail amount required by the Harris County bail schedule was confirmed to be $2,500.

11.    Ms. ODonnell is the mother of a 4-year-old child.  She and her child struggle to meet the basic necessities of life.  She receives benefits from the federal government's Women, Infants, and Children (WIC) program to help meet the nutritional needs of her daughter.  Because she cannot afford shelter, she stays with a friend.  She recently obtained a job at a restaurant within the past few weeks, but she is worried that her current jailing will cause her to lose her job.

**B.     Defendants' Wealth-Based Detention System Detains Arrestees Who Cannot Pay Their Money Bail Amount While Releasing Those Who Can Pay**

**i.     Arrest and the Initial Money Bail-Setting Process**

12.     Harris County uses a money bail schedule, promulgated through administrative order by the Harris County Criminal Court at Law Judges, to determine money bail for everyone who is arrested for a Class A or B misdemeanor in Harris County.  Ex. 2.  The bail schedule is the exclusive means of setting bail "unless otherwise directed by the Judges of the Harris County Criminal Courts at Law."  *Id.* ("The initial bail amount shall be determined by application of the bail schedule.").[2]

13.     When a person is arrested without a warrant, the arresting officer calls a hotline that is staffed 24 hours a day, 7 days a week by assistant district attorneys.  The arresting officer describes the allegations to the assistant district attorney on duty, who makes a charging decision over the phone.  If the district attorney decides to pursue the charges, money bail is imposed pursuant to the bail schedule.  *See* Ex. 1 ("The district attorney shall affix an initial bail amount at the time a complaint is filed in a county criminal court at law.").  At no point does any person perform any inquiry into the arrestee's ability to pay the money bail amount written on the schedule.

14.     If the assistant district attorney does not wish to pursue charges, she tells the officer to release the individual.  If the district attorney decides to pursue charges and the arrestee can pay the bail immediately, the arrestee is released without ever being booked into the jail.  If the district attorney decides to pursue charges, but the arrestee cannot pay the money bail, the County will book the arrestee into the jail.

---

[2] Texas law gives Harris County the authority to cite and release a person being charged with certain misdemeanor offenses.  Tex. C.C.P. Art. 14.06(b)–(d).  However, County officials have decided instead as a matter of policy to rely on the Harris County bail schedule for all individuals charged with any misdemeanor.  As a matter of policy, Harris County has rejected the cite-and-release option.

5

15.     Individuals who are arrested pursuant to warrants are also subjected to the money bail schedule.  In these cases, the district attorney again makes a charging decision on the basis of allegations by a police officer or another complainant and imposes a money bail amount according to the bail schedule.  The money bail amount is written on the warrant.  A judicial officer makes a finding of probable cause based on the allegations in the warrant and then signs the warrant.  As a matter of policy, the judicial officer imposes the monetary bail required by the schedule.

16.     When a person is arrested for a misdemeanor, pursuant to a warrant or pursuant to a warrantless arrest, that person can pay the secured money bail amount determined by the schedule and be released immediately, prior to booking.[3]  If the individual is unable to pay, she will be booked into the jail.[4]

17.     These policies have consistently, for years, resulted in the needless and devastating jailing of impoverished people accused of misdemeanor offenses.  In 2012, 81 percent of misdemeanor arrestees were booked into the jail because they were unable to immediately pay for their release.[5]  Other arrestees were able to pay their money bail and avoid

---

[3] The vast majority of arrestees use a bail bond agent to secure their release from jail.  Typically, if accepted by a for-profit bail agent, an arrestee will have to pay the for-profit agent a non-refundable fee of 10 percent of the value of the bond to be released, though the industry standard for low money bail amounts in Harris County exceeds 10 percent.  In 2012, the for-profit bail bond industry in Harris County collected at least $34.4 million dollars in fees. *See* Gerald R. Wheeler & Gerald Fry, Project Orange Jumpsuit Report #2, *Harris County's Two-Tier Justice System: Longitudinal Study of Effects of Harris County Felony and Misdemeanor Defendants' Legal & Extralegal Attributes on Pretrial Status and Case Outcome* (Apr. 23, 2014) at 4, available at http://www.pretrial.org/download/research/Harris%20County's%20Two-tier%20Justice%20System%20(Project%20Orange%20Jumpsuit)%20-%20Wheeler%20and%20Fry%202014.pdf [Wheeler & Fry, Report #2]; Michael Barajas, *Will Lawmakers Reform the System That Keeps Poor, Legally Innocent People in Lockup?* (Sept. 25, 2015), available at http://www.houstonpress.com/news/will-lawmakers-reform-the-system-that-keeps-poor-legally-innocent-people-in-lockup-7788583 (quoting bondsman saying that "being poor raises a red flag").

[4] Wheeler & Fry, Report #2, *supra* note 3, at 1.

[5] Gerald R. Wheeler & Gerald Fry, *Project Orange Jumpsuit: The Misdemeanor Report #1* (Jan. 22, 2016), available at http://themisresearch.org/files/MISD_2016_REPORT.pdf [Wheeler & Fry, Report #1].

the booking process altogether.  In 2014, 40 percent of misdemeanor arrestees were still sitting in jail cells at the time their case was resolved.

### ii. Probable Cause Hearings and Approval of Bail According to the Bail Schedule

18.     The Harris County Sheriff's Department, through its jail personnel, assembles groups of roughly 20 to 45 people, many of them charged with minor misdemeanors, throughout the day.[6]

19.     Generally within 24 hours of arrest, these groups of recent arrestees, dressed in orange jumpsuits or street clothes, appear via videolink before one of five Defendant Harris County hearing officers.  The hearing officer determines probable cause for the arrest and reviews the bail amount previously imposed to ensure that it conforms to the bail schedule and the instructions from Harris County Court at Law Judges.  Throughout the hearing, the arrestees remain in the Harris County jail, while the hearing officer and a prosecutor are in a courtroom in the Harris County Courthouse.

20.     These hearings are referred to locally as "magistrations," "Article 15.17 hearings," or "probable cause hearings."

21.     The County strives to hold these hearings within 24 hours of arrest for people charged with misdemeanors.  However, the length of time between arrest and probable cause hearing depends on how long the Sheriff's booking process takes and the number of arrestees. Hearing officers represent that, on occasion, the hearings do not take place within 24 hours of arrest.  At any point in the booking process, the arrestee can pay his or her predetermined money

---

[6] In 2014, an average of 144 people were admitted to the jail every day on misdemeanor charges.  *See* Harris County Pretrial Services, 2014 Annual Report (2014) at 3, available at http://www.harriscountytx.gov/CmpDocuments/59/Annual%20Reports/2014%20Annual%20Report.pdf (stating that 52,506 people whose most serious charge was a misdemeanor were admitted to the jail in 2013).

bail and be released.  If a person pays, a probable cause determination in her case will be made at a subsequent court appearance.

22.     An assistant district attorney participates in the probable cause hearings by arguing for the hearing officer to make a finding of probable cause and sometimes asking the hearing officer to impose bail in an amount higher than the amount on the schedule or on the warrant.  One prosecutor stated the policy recently at a probable cause hearing: pursuant to Harris County's bail schedule procedure, if an arrestee "can't pay, they sit in jail."

23.     Harris County does not provide defense attorneys at this hearing.

24.     Almost one-third of Harris County arrestees lack a high school education and one in five have serious mental health problems.[7]

25.     The prosecutor and hearing officers sometimes engage in ex parte conversations before the videolink is turned on.  For example, during one docket in March, outside the arrestees' hearing, the prosecutor and the hearing officer commented on the fact that one of the arrestees on the docket had been arrested multiple times in a two-week period for trespassing at the same place.  The hearing officer and the prosecutor agreed privately that the individual, who was homeless, would not be released without a money bail.  The hearing officer imposed a

---

[7] Pretrial Services 2014 Report, *supra* note 6, at 2. Harris County received $150,000 in May 2015 from the MacArthur Foundation to create a proposal that would lead to a more just and effective legal system.  *See* Press Release, *MacArthur Announces 20 Jurisdictions to Receive Funding to Reduce Jail Use* (May 26, 2015), available at https://www.macfound.org/press/press-releases/macarthur-announces-20-jurisdictions-receive-funding-reduce-jail-use/.  Harris County subsequently convened a Criminal Justice Coordinating Council, which investigated ways to reduce incarceration.  Among the most important reforms that participants discussed was to provide defense attorneys at the probable cause hearings. Early in January 2016, the Coordinating Counsel submitted its grant proposal to the MacArthur Foundation, seeking $4 million over two years to put its plans into effect.  The final document included a proposal for counsel only for individuals who are mentally ill.  Meagan Flynn, *Bail Hearings: Where Prosecutors and Magistrates Ensure Defenseless People Stay In Jail* (Jan. 11, 2016), available at http://www.houstonpress.com/news/bail-hearings-where-prosecutors-and-magistrates-ensure-defenseless-people-stay-in-jail-8058308.  On April 13, 2016, Harris County was awarded a $2 million MacArthur grant to reform its criminal justice system.  *See Harris County receives $2 million grant to reform criminal justice system* (Apr. 13, 2106), available at http://www.click2houston.com/news/watch-live-harris-county-receives-2-million-grant-to-reform-criminal-justice-system.

$5,000 money bail.  After the hearing, the hearing officer said, "He's a pest to society."  Unable to pay the money bail, the man appeared several days later at his first court date and pled guilty.

26.     In no case is a money bail determined with consideration for an arrestee's ability to pay.

27.     When the videolink is turned on, arrestees appear on a television screen, sitting in rows of chairs in a room at the jail.  The hearing officer calls an individual's name and reads the charge.  That individual gets up and stands in the middle of a red square on the floor of the room in the jail.  An assistant district attorney then reads from the complaint.  The hearing officer decides whether there is probable cause, finding probable cause in almost every case, and, almost always, sets money bail according to the schedule.  Sometimes the hearing officer increases the money bail from that applied earlier at the Harris County jail, where it was imposed pursuant to the schedule.

28.     The process of setting bail and finding probable cause is a rote exercise, and the hearings last approximately one minute as a matter of routine.

29.     As a matter of policy and practice, hearing officers make no attempt to determine an arrestee's financial situation, and they make no inquiry into or findings concerning an arrestee's ability to pay the money bail amount that they impose.

30.     In addition to making no affirmative inquiry into or findings concerning ability to pay, hearing officers affirmatively refuse to hear any argument that an arrestee raises about her ability to pay.  If an arrestee tells the hearing officer that she cannot pay the money bail, the hearing officer, as a matter of policy and practice, tells the arrestee that considering a reduction of money bail from the schedule is not the purpose of that hearing and that the arrestee should have her attorney raise the issue with the County Judge handling her case at her first court date

after an attorney is assigned.  As one hearing officer stated recently, probable cause hearings are "not the forum" for discussing a person's ability to pay money bail or raising any related issues, and hearing officers believe that such questions must be addressed in an adversarial setting after appointment of counsel.

31.     On one recent occasion that is typical of standard policy, after a hearing officer made a bail decision according to the money bail schedule, the arrestee asked the hearing officer, "Can I say something?"  The hearing officer responded, "You can talk to me all you want, but it's not going to change the outcome.  I'm setting it according to the schedule.  Talk to your lawyer about it in the morning."

32.     After completing a docket of probable cause hearings in March, another hearing officer was asked by an observer whether the officer is allowed to consider an arrestee's ability to pay when setting the money bail.  The hearing officer responded, "What can I do about that? They have a bail schedule.  I can't do anything about that."

33.     Pursuant to policy and practice, it is not possible for arrestees to challenge the constitutionality of their money bail before the hearing officer.  Hearing officers determining the question of probable cause refuse to consider deviation from the bail schedule based on indigence and refuse to hear evidence concerning ability to pay.

34.     In almost all cases, the hearing officer affirms the money bail previously set pursuant to the bail schedule.[8]  If, however, the district attorney or arresting officer erred in setting the money bail (i.e., the monetary amount did not conform to the bail schedule), the hearing officer will alter the money bail — by raising or lowering the monetary amount — so that it meets the schedule.

---

[8] Flynn, *supra* note. 7.

35.     Sometimes district attorneys will argue for a money bail that exceeds what the schedule requires.  One district attorney recently gave the following example: If someone is charged with unauthorized use of a vehicle, but is also being investigated for armed robbery of the same vehicle, the district attorney will ask the judge to impose a money bail commensurate with the more severe charge.  The district attorney stated that she would ask for the higher bail *to ensure that the person will be detained* because a person suspected of "something like armed robbery" should not be released on a low money bail like $2,000.

36.     If an individual does not appear at the probable cause hearing due to medical reasons, the hearing officer will make a finding of probable cause and set money bail in that person's absence according to the schedule.

37.     In Harris County, money bail is imposed based solely on the alleged offense and the person's criminal history and without reference to a person's ability to pay, resulting in the detention of arrestees based on their poverty.

### iii.  The Use of Personal Bonds

38.     Hearing officers sometimes recommend arrestees for release on "personal bonds," which means release without any financial conditions.

39.     Recommendations for release on personal bonds are based solely on the person's criminal charge and criminal history — they have nothing to do with indigence or a person's ability to pay a money bail.  The vast majority of arrestees, due to the charge against them or their criminal history, are deemed ineligible for personal bonds as a matter of policy.

40.     Only about 8 percent of misdemeanor arrestees were recommended for personal bonds in 2014.[9]  According to County policies, 92% of misdemeanor arrestees were deemed

---

[9] Pretrial Services 2014 Report, *supra* note 6, at 9.

ineligible for such release.  Personal bonds are not based on any inquiry into ability to pay, and hearing officers refuse to conduct such inquiries.

41.     Even when individuals are recommended for personal bonds, they are not released immediately, and they may not be released at all.  Pretrial Services must first "verify" the person's references.  Sometimes, references cannot be verified for days or a week.  Sometimes they cannot be verified at all.  In those cases, the person will not be released on a personal bond and will be detained unless she can pay the money bail.

42.     At any point in the verification process, the arrestee can pay the money set by the schedule and be released immediately.

43.     Recommendations for personal bonds are further constrained by the instructions of the County and District Court Judges, who provide strict directives to the hearing officers about the money bail-setting process.

44.     For example, hearing officers are instructed that they may never recommend homeless individuals for personal bonds.  Some judges have told hearing officers never to issue personal bonds for any defendant who is assigned to their courtroom at all,[10] or for individuals who have previously been given personal bonds in other cases.  Other judges have told hearing officers to consider personal bonds only for "students."[11]

45.     In all cases, personal bonds are not granted on the basis of inability to pay.

46.     One hearing officer, pursuant to policy, recently told a group of arrestees: "Don't ask me for a personal bond."  He informed them that he would consider release on a personal

---

[10] James Pinkerton and Laura Caruba, *Tough bail policies punish the poor and the sick, critics say* (Dec. 26, 2015), available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Tough-bail-policies-punish-the-poor-and-the-sick-6721984.php?t=373b57d418&cmpid=email-premium.

[11] *Id.*

bond if he was authorized to consider it, and "if I'm going to give you one, I will," warning them again, "Don't ask."

47.     An arrestee's indigence or ability to pay is never a factor in determining whether to recommend or approve a personal bond, and arrestees are not permitted to raise that issue.

### iv.  First Appearances

48.     If, after the probable cause hearing, an arrestee is still unable to purchase her release from jail, she will be taken to the County Court, usually within 24 to 48 hours of the probable cause hearing.  However, arrestees who have their probable cause hearings on Friday will not see a County Court Judge until the following Monday at the earliest.  Individuals who attend probable cause hearings on Friday afternoon or evening or over the weekend are unlikely to see a Judge until the following Tuesday.

49.     Some arrestees cannot be contacted, even by attorneys, between magistration and first appearance.  A sheriff's deputy at the jail building at 1201 Commerce Street was recently asked to produce for attorney visits several individuals who had had their probable cause hearings within the previous 24 hours.  After looking for the men for an hour, the deputy stated that the men could not be seen, even by an attorney, until after they had been assigned to a housing unit in the jail.  He said that the individuals were all in the basements of one of four buildings, but he did not know which one.

50.     Shortly after that conversation, a sheriff's deputy at the jail building at 1200 Baker Street confirmed that the same men could not be contacted until after they had been assigned to a housing unit.

51.     The deputies stated that it would take 24 to 36 hours for that to happen, during which time no one would be able to reach these men, including any attorney.  The sheriff's

deputy said that they could not be found for the purpose of an attorney visit, but they would be found and released if bond was posted.

52.    Detained individuals are assigned court-appointed attorneys at the first appearance hearing, but there is, as a matter of practice, no review of the money bail amount previously imposed.  County Judges reduce money bail amounts previously imposed in less than 1 percent of cases.[12]

53.    Detained individuals remain in lock-up outside of the courtroom and are usually not even brought into the courtroom on this court date unless they are pleading guilty, which many do because they are told that they can get out of custody more quickly by pleading guilty if they cannot afford to pay their money bail.

54.    One of the purposes and effects of Harris County's post-arrest detention is to coerce and process large numbers of guilty pleas prior to any person conducting any legal or factual investigation into the charges, let alone the complete and zealous defense required by professional standards and the Sixth Amendment to the United States Constitution.

55.    On one typical morning in March 2016, County Judge Pam Derbyshire accepted four guilty pleas from detained individuals in six minutes.  These individuals had just met their attorneys, and their attorneys had conducted no meaningful investigation into the facts or circumstances of the cases.  None of the defendants had been able to pay the scheduled money bail since their arrest several days prior.  They appeared before the judge in orange jumpsuits, handcuffed together.  Several of them were sentenced to three days in jail with credit for the three days they served between their arrest and guilty plea.  This is a routine, everyday occurrence in Harris County's misdemeanor criminal legal system.  Almost 80 percent of

---

[12] Pinkerton & Caruba, *supra* note 10.

individuals detained pretrial plead guilty, while only 56 percent of individuals who are released pretrial plead guilty.

56.     If a defendant does not plead guilty at this appearance, a defense attorney can file a motion for a reduction of the money bail amount.  It typically takes at least one week for that motion to be heard.

57.     This pretrial detention scheme means that an individual without financial means will be detained solely because of her inability to make a monetary payment for at least two days and usually three or four days without any opportunity for release or to raise any issues concerning her ability to pay.  Most impoverished arrestees are detained far longer.  At any moment in this process, an arrestee who can pay the money bail set by the schedule can walk out of the doors of the jail.

58.     In 2012, 22 percent of the most impoverished misdemeanor arrestees — those who were unable to pay even a $500 money bail — were detained at disposition, having been in jail an average of almost 9 days.[13]

59.     In 2014, 40 percent of misdemeanor arrestees with money bail imposed were still in jail when their case was disposed of.[14]  Individuals detained pretrial were more likely to be sentenced to jail, less likely to be sentenced to probation, and were given sentences more than twice as long as those received by individuals who were released pretrial.

C.     The Harris County Jail

---

[13] *See* Wheeler & Fry, Report #2, *supra* note 3, at 9.  Only 9.7 percent of individuals detained at disposition are not convicted, compared with 44.2 percent of individuals who are free when their case is resolved.  Moreover, for people given a $500 bail, 80.6 percent of people detained at disposition were given jail sentences, compared to 25.6 percent of defendants released on bail at disposition.  *Id.*

[14] Pretrial Services 2014 Report Report, *supra* note 6, at 8 (showing in Table B.1 that roughly 60 percent of misdemeanor arrestees post money bail); Pinkerton & Caruba, *supra* note 10 (stating that of arrestees pay bondsmen for their release).

60.     The Harris County Jail is the largest jail in Texas and the third largest jail in the United States.[15]  It books on average 120,000 individuals per year and 330 individuals per day.[16] Most individuals arrested in Harris County are taken to the Harris County Jail, though others may be held at other Harris County-run facilities or a brief period of time before being transferred to the Jail.

61.     The vast majority of human beings in Harris County Jail cells are not there because they have been convicted of a crime.[17]  Instead, most inmates — 77 percent — are being kept in jail cells prior to trial, despite the presumption of innocence, because they cannot afford to pay money bail.  If they could pay the money bail assigned to them, they could walk out of the doors of the jail at any time.

62.     In March 2016, a typical month, the average daily population of the Harris County Jail was 8,579 individuals, 6,841 of whom were pretrial detainees.  About 8 percent of those pretrial detainees — 545 individuals — had been arrested for misdemeanors.  Almost all of these individuals were there only because they were unable to afford money bail of $5,000 or less.[18]

63.     Although the jail population fell by 2,500 individuals between 2009 and 2014, the pretrial population fell by only 15 inmates.[19]

64.     In the past year, the population of pretrial misdemeanor detainees grew by 29 percent.[20]

---

[15] Sarah R. Guidry, et al., *A Blueprint for Criminal Justice Policy Solutions in Harris County* at 1, http://www.americanbar.org/content/dam/aba/events/legal_aid_indigent_defendants/2015/ls_sclaid_summit_03_tcjc_2015_harris_county_blueprint.authcheckdam.pdf [ABA Report].

[16] *Id.* at 9.

[17] Office of Criminal Justice Coordination, *Harris County–Jail Population March 2016 Report* (April 4, 2016) at 1, on file with undersigned counsel.

[18] *Jail Population Report*, *supra* note 18, at 3, 1.

[19] ABA Report, *supra note 16*, at 3.

65.     Eight percent of the pretrial population regularly consists of misdemeanor offenders.  These individuals are in jail solely because they cannot afford their money bail.

66.     In 2008, the Department of Justice investigated the Harris County Jail and launched an era of federal oversight because of the serious and systemic violations of constitutional rights that pervaded the facility.[21]  The investigation led the County to form the Harris County Criminal Justice Coordinating Council in an effort to address the overcrowding in the jail.[22]  Since then, Harris County has struggled to stay within its operating capacity.[23]  In 2013, taxpayers spent almost $500,000 *per day* to operate the jail.[24]

67.     Between 2009 and 2015, 55 human beings died while in pretrial custody in the Harris County Jail.[25]

68.     Most recently, on April 5, 2016, arrestee Patrick Brown — who was being held on a $3,000 bail he could not afford after being charged with misdemeanor theft — died in the Harris County Jail.[26]

69.     In March 2016, 26 percent of the average daily population had a documented mental health history.[27]

---

[20] *Jail Population Report*, *supra* note 18 at 1.

[21] ABA Report, *supra note 16*, at 2.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] Pinkerton & Caruba, *supra* note 10.

[26] Ebenezer Nah, one of the inmates charged with aggravated assault in connection with the death, was eligible for release solely because he could afford to pay for his release.  He had just posted money bail and was being processed out of the jail at the time of the fatal assault.  Meagan Flynn, *Inmate Beaten To Death After Spending Less Than 48 Hours In Harris County Jail* (Apr. 13, 2016), available at  http://www.houstonpress.com/news/inmate-beaten-to-death-after-spending-less-than-48-hours-in-harris-county-jail-8319129.

[27] *Jail Population Report*, *supra* note 18, at 3.

70.     There is a documented history of inmate abuse by jail guards, deaths and suicides in the jail, inadequate training of jail staff, and lack of access to medications and medical services.  For years, the County has been aware of these intolerable conditions, which exist largely because of the overcrowding resulting from the volume of inmates who cannot afford to pay money bail.  It has failed to remedy them.[28]

71.     On a typical day, hundreds of new arrestees, presumed innocent, are arrested and booked into this jail.[29]  Between 40 and 50 percent of them will be unable to afford their money bail.[30]  Thus, at any given moment, there are hundreds of people charged only with misdemeanors who are being detained by Harris County solely because they cannot afford money bail.[31]  Every single one of these individuals could walk out of the jail if they were wealthy enough to pay their money bail amount.  None of them received any inquiry into their ability to pay.  Only those individuals who are too poor to purchase their release are subjected to these conditions and the health and safety risks of pretrial jailing.

### D.      Defendant's Wealth-Based Detention Scheme Will Cause Plaintiff To Be Jailed Solely Due To Her Inability To Pay Bail

72.     The named Plaintiff would not have to endure a minute of incarceration if she paid the amount of money required by Defendants.

---

[28] The Houston Chronical, *Jailhouse Jeopardy: Uncovering abuses at Harris County's jail* (Oct. 3, 2015–Mar. 6, 2016), available at http://www.houstonchronicle.com/local/investigations/jailhouse-jeopardy/ (providing links to a series of articles written by several reporters).

[29] ABA Report, *supra* note 16, at 13 (stating that there are 330 bookings per day); Pretrial Service 2014 Report (stating that, in 2014, 52,506 people were arrested on misdemeanor charges, which averages 144 per day).

[30] Pretrial Services 2014 Report, *supra* note. 6, at 8 (Table B.1.).

[31] *See* ABA Report, *supra* note 16, at 15 (noting that, in 2013 alone, there were 3,120 misdemeanor arrestees who could not post the $500 money bail that Harris County demanded of them).

73.     Individuals with outstanding warrants are frequently contacted by for-profit bonding agencies who offer them the opportunity to pay for "non-arrest bonds" approved and used by the County which allow them to avoid arrest altogether.[32]

74.     For individuals who are aware of outstanding warrants for their arrest and able to afford to hire counsel, lawyers are sometimes able to arrange "walk-throughs" for their clients, whereby the person charged with a crime goes to the courthouse, pays the money bail, and gets a court date without ever going through the arrest and booking process.  Arrestees able to pay for an attorney or for a non-arrest bond are able to pay to avoid detention.

75.     Arrestees are given a right to release pending trial, but Defendant's wealth-based detention system conditions their release on their ability to afford money bail, thus tying their pretrial freedom to their wealth status.

76.     As a matter of policy and practice, when a new arrestee is brought to the Harris County Jail, county employees inform the arrestee that she will be released from jail immediately if she pays her money bail amount.  The arrestee is told that she will remain in jail if she is not able to make that payment.

77.     The Harris County Sheriff's Department collects arrestees' money bail payments. It is the policy and practice of the Harris County Sheriff's Department to release only those arrestees who pay their money bail amount.

78.     In a typical week, the Sheriff's Department releases hundreds of individuals who pay their money bail amount.

---

[32] All About Bail Bonds, *Services for Non-Arrest Bonds in Houston*, available at http://www.allaboutbailbondshouston.com/services/non-arrest-bail-bonds/; All Access Bail Bonds, *Services*, available at http://www.allaccessbailbonds.com/index.php/services ("A 'Non-Arrest' Bond lifts the warrant and initiates the process of scheduling your day in court.  This relieves the stress and worry about being arrested.").

79.     It is the policy and practice of the Sheriff's Department to detain individuals who do not pay their money bail amount.  Before an individual's probable cause hearing, it is the policy and practice of the Sheriff's Department to detain the individual based on a money bail amount set pursuant to a bail schedule.  After a probable cause hearing, it is the policy and practice of the Sheriff's Department to detain the individual based on a money bail amount approved by a hearing officer pursuant to the County's bail schedule.

80.     If a person cannot pay her money bail after her first court appearance before a County Court Judge, it is the policy and practice of the Sheriff's Department to continue to detain that individual unless and until she makes a monetary payment.

81.     Under Defendants' wealth-based procedures, those wealthy enough to pay are released from the County jail.  Some poorer arrestees eventually make arrangements with private bail bond companies, after spending hours, days, or weeks in jail.[33]  And many others who are poorer still are left to languish in jail until the resolution of their case.

**E.     Harris County's Use of Money Bail Is Not Narrowly Tailored — Nor Is It as Effective as Many Other Methods — in Securing Court Attendance or Public Safety**

82.     The empirical evidence is that there is no relationship between requiring money bail as a condition of release and defendants' rates of appearance in court.[34]

83.     While tying pretrial freedom to wealth status is the norm in Harris County, other jurisdictions throughout the country do not hold people in jail because of their poverty.  Instead

---

[33] Because of the common availability of commercial bail bonds, those who remain in the custody of Harris County are typically those that cannot even afford to pay a third-party bonding agent.  The amount charged by a bonding agent to post a $500 cash bail is typically $150, although such agents are free to refuse to pay for the release of an arrestee for any reason or for no reason.  Thus, the availability of third-party agents, at least for those arrestees who can afford $50 but not $500, is no guarantee.  The Named Plaintiffs cannot afford such a bail.

[34] Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization* (May 2, 2016) at 19, available at http://www.columbia.edu/~cjh2182/GuptaHansmanFrenchman.pdf; Wheeler & Fry, Report #1, *supra* note 5, at 4.

of relying on money, other jurisdictions release arrestees with pretrial supervision practices and procedures that can help increase court attendance and public safety without requiring detention.

84.     Other jurisdictions employ numerous less restrictive methods of maximizing public safety and court appearances when necessary to guard against a particular risk.   These include: unsecured bond, reporting obligations, phone and text message reminders of court dates, rides to court for those without transportation or a stable address, counseling, drug and alcohol treatment, batterer intervention programs, anger management courses, alcohol monitors, or, in extreme cases of particular risk, electronic monitoring, among other services.

85.     Other jurisdictions also employ non-monetary conditions of release, including unsecured or "signature" bonds (which do not require payment up front for release but instead allow immediate release upon a promise to pay the monetary amount if the person does not appear as required), stay-away orders, curfews, or even home detention.

86.     Harris County is permitted by law to use these alternatives but, as a matter of routine, choose not to for impoverished misdemeanor arrestees.   The vast majority of Harris County arrestees are processed and detained through Harris County's money bail scheme rather than non-monetary supervision methods.   As a matter of policy and practice, Harris County does not consider less restrictive alternatives rather than detention based on money bail that a person cannot afford.

87.     Jurisdictions with robust pretrial services and non-monetary conditions of release achieve court-appearance rates over 90 percent, with more than 85 percent of those released pretrial remaining arrest-free (and 98-99 percent remaining arrest-free for violent crimes).

88.     Empirical evidence proves that unsecured bond alone is just as effective at ensuring appearance in court as secured money bail.

89.     Detention on money bail increases the likelihood of conviction.  A person who is detained pretrial is 13 percent more likely to be convicted and 21 percent more likely to plead guilty.[35]  Additionally, individuals detained pretrial will be given longer jail sentences.[36]  Money bail is disproportionately imposed on non-white arrestees.[37]

90.     Individuals who are detained — instead of released on money bail or on a personal bond — when their case is resolved have worse case outcomes. [38]  For example, 7.2 percent of individuals who are detained at disposition in Harris County are not convicted, while 34.1 percent of individuals who are free at disposition resolve their case without a conviction. Additionally, individuals who are being confined on $500 money bail when their case is resolved will spend a median of three days in jail (which costs the County about $1,000), while individuals who are able to pay the $500 bail in cash (or the $150 non-refundable fee to a

---

[35] Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* (May 2, 2016) at 18, available at https://www.law.upenn.edu/cf/faculty/research/details.cfm?research_id=14047; *see also* Gupta, et. al, *supra* note 34, at 13 (finding a 12 percent increase in the likelihood of conviction using the same data).

[36] Stevenson, *supra* note 35 at 18; *see also* Gupta, et. al, *supra* note 34, at 18–19 ("Criminal defendants assessed bail amounts appear frequently unable to produce the required bail amounts, and receive guilty outcomes as a result. Entered guilty pleas by defendants unwilling to wait months prior to trial and unable to finance bail likely contribute to this result.").

[37] Gupta, et. al, *supra* note 34, at 18.

[38] *Id.* at 7; *See* ABA Report, *supra* note 16, at 13 ("[D]efendants who are not released pre-trial are more likely to be incarcerated following a conviction, and they generally receive longer sentences upon conviction."); Lise Olson, *Study: Inmates who can't afford bond face tougher sentences* (Sept. 15, 2013), available at http://www.houstonchronicle.com/news/houston-texas/houston/article/Study-Inmates-who-can-t-afford-bond-face-tougher-4817053.php (discussing Carlos Mathis, an African-American man, who was held in jail for seven months on minor drug and theft charges because he could not afford money bail, and whose charges were dismissed); Isami Arifuku & Judy Wallen, *Racial Disparities at Pretrial and Sentencing and the Effects of Pretrial Services Programs* (Mar. 11, 2013), available at http://www.pretrial.org/download/research/Racial%20Disparities%20at%20Pretrial%20and%20Sentencing%20and%20the%20Effects%20of%20Pretrial%20Services%20Programs%20-%20NCCD%202013.pdf; Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 N.Y.U. Legis. & Pub. Pol'y 919 (2013); Tina L. Freiburger, et. al, *The Impact of Race on the Pretrial Decision*, American Journal of Criminal Justice (2010), available at http://libres.uncg.edu/ir/asu/f/Marcum_CD_2010_Impact_of_Race.pdf.

commercial bonding agent) and are free at disposition will spend an average of only one day in jail.[39]

91.     Setting a secured money bail without an inquiry into ability to pay and in an amount higher than a person can afford by definition defeats the entire purpose of money bail and removes any legitimate (let alone compelling) state interest in the setting of a financial condition.  Nor is setting money bail without findings concerning ability to pay the most narrowly tailored way to meet any other legitimate or compelling government interest.[40]

92.     Harris County's money bail schedule leads disproportionately to the detention of people of color as compared to whites.  Regardless of the amount of money bail imposed, people of color are more likely to be detained at disposition than whites.[41]

93.     Unnecessary pretrial detention causes instability in employment, housing, and care for dependent relatives.  Studies show that those detained pretrial face worse outcomes at trial and sentencing than those released pretrial, even when charged with the same offenses.  Detained defendants are more likely to plead guilty just to shorten their jail time, even if they are innocent.  They have a harder time preparing for their defense, gathering evidence and witnesses, and meeting with their lawyers.  Studies also show that just two days of pretrial detention increases the likelihood of future arrests and increases the future risk level of low level offenders.

---

[39] Wheeler & Fry, Report #1, *supra* note 5, at 6–7; Lowenkamp, et al., *The Hidden Costs of Pretrial Detention* at 3, 19 (Nov. 2013), available at http://www.pretrial.org/download/research/The%20Hidden%20Costs%20of%20Pretrial%20Detention%20-%20LJAF%202013.pdf (studying 153,407 defendants and finding that "when held 2-3 days, low risk defendants are almost 40 percent more likely to commit new crimes before trial than equivalent defendants held no more than 24 hours"); Arnold Foundation, *Pretrial Criminal Justice Research Summary* (2013) at 5, *available at*: http://www.arnoldfoundation.org/sites/default/files/pdf/LJAF-Pretrial-CJ-Research-brief_FNL.pdf (finding that "low-risk defendants held 2-3 days were 17 percent more likely to commit another crime within two years" and that those detained "4-7 days yielded a 35 percent increase in re-offense rates.").

[40] Independently, none of the robust procedures required for a valid order of preventative detention exists, including that there is no inquiry, let alone an inquiry with counsel and basic evidentiary norms, into whether a compelling interest exists to detain a particular defendant, whether any particular identifiable danger or risk exists, and whether there are alternatives to the use of secured money bail that could mitigate any particularized risk.

[41] *Id.*; *see also* Wheeler & Fry, Report #1, *supra* note 5, at 3.

94.     Pretrial detention is more than ten times more expensive than effective pretrial supervision programs.   Through non-monetary tools, pretrial supervision programs can save taxpayer expense while maintaining high public safety and court appearance rates.

### Class Action Allegations

95.     The named Plaintiff brings this action, on behalf of herself and all others similarly situated, for the purpose of asserting the claims alleged in this Complaint on a common basis.

96.     A class action is a superior means, and the only practicable means, by which the named Plaintiff and unknown Class members can challenge the County's unlawful wealth-based post-arrest detention scheme.

97.     This action is brought and may properly be maintained as a Class action pursuant to Rule 23(a)(1)-(4) and Rule 23(b)(2) of the Federal Rules of Civil Procedure.

98.     This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

99.     The Plaintiff proposes a single Class seeking declaratory and injunctive relief. The Declaratory and Injunctive Class is defined as: All individuals who are or will be detained by Harris County for any amount of time after arrest because they are unable to pay money bail.

**A.      Numerosity.  Fed. R. Civ. P. 23(a)(1)**

100.     In March 2016, the average daily population of misdemeanor arrestees being held pretrial on money bails they could not afford was 545 individuals.[42]  This was a typical month. The population of pretrial misdemeanor detainees grew by 29 percent in the past year.[43]  Eight percent of the pretrial population, which numbers in the thousands on any given day, regularly consists of misdemeanor offenders unable to pay a money bail.

---

[42] *Jail Population Report*, *supra* note 18, at 1.

[43] *Id.*

101.    On any given day, there are thousands of outstanding misdemeanor arrest warrants issued by Harris County, and every day the County issues dozens more.

102.    Arrestees are held in jail for varying lengths of time depending on how long it takes them to make the cash payment that the County requires for their release.

103.    Some arrestees are able to pay immediately for their release.  Others are forced to wait one or two days until they or family members can make the payment.  Others will never be able to come up with any amount of money to pay for their release.

104.    The number of current and future arrestees subject to this policy — if it is not enjoined — numbers well into the thousands.

**B.      Commonality.  Fed. R. Civ. P. 23(a)(2).**

105.    The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.  The named Plaintiff seeks relief concerning whether the County's policies, practices, and procedures violate the rights of the Class members and relief mandating that the County change its policies, practices, and procedures so that the constitutional rights of the Class Members will be protected in the future.

106.    Common legal and factual questions arise from one central scheme and set of policies and practices: the County's post-arrest wealth-based detention scheme.  The County operates this scheme openly and in materially the same manner every day.   The material components of the scheme do not vary from Class Member to Class Member, and the resolution of these legal and factual issues will determine whether all of the members of the class are entitled to the constitutional relief that they seek.

Among the most important, but not the only, common questions of fact are:

- Whether Harris County has a policy and practice of using a predetermined schedule to determine the amount of money required to secure post-arrest release;

- Whether Harris County requires that scheduled amount of money to be paid up front before it will release a person from its jail;
- What standard post-arrest procedures Harris County performs on misdemeanor arrestees; for example, whether Harris County uses any other alternate procedures for promptly releasing indigent people determined otherwise eligible for release but who are unable to afford a monetary payment.

107.    Among the most important common questions of law is:

- Whether a secured "bail schedule" setting generic amounts of money required up front to avoid post-arrest detention without any inquiry or findings into a person's ability to pay violates the Fourteenth Amendment's Due Process and Equal Protection provisions.

**C.    Typicality.  Fed. R. Civ. P. 23(a)(3).**

108.    The named Plaintiff's claims are typical of the claims of the other members of the Class, and she has the same interests in this case as all other Class Members.  Each Class Member is threatened with imminent and/or ongoing confinement in jail because she cannot afford to pay the County's standardized cash bail amount.  The answer to whether the County's wealth-based detention scheme is unconstitutional will determine the claims of the named Plaintiff and every other Class member.

109.    If the named Plaintiff succeeds in the claim that the County's policies and practices concerning post-arrest detention violate her constitutional rights, that ruling will likewise benefit every other member of the Class.

**D.    Adequacy.  Fed. R. Civ. P. 23(a)(4).**

110.    The named Plaintiff is an adequate representative of the Class because her interest in the vindication of the legal claims that she raises is entirely aligned with the interests of the other Class members, each of whom has the same basic constitutional claims.  She is a member of the Class, and her interests do not conflict with those of the other Class members.

111.    There are no known conflicts of interest among members of the proposed Class,

all of whom have a similar interest in vindicating their constitutional rights in the face of Defendants' pay-for-freedom post-arrest detention system.

112.     Plaintiff is represented by attorneys from Equal Justice Under Law and Susman Godfrey who have experience in litigating complex civil rights matters in federal court and extensive knowledge of both the details of Defendants' scheme and the relevant constitutional and statutory law.    Counsels' relevant qualifications are more fully set forth in the contemporaneously filed Motion for Class Certification.

113.     The combined efforts of Class counsel have so far included extensive investigation into fixed money bail schemes over a period of months, including numerous interviews with witnesses, court employees, jail inmates, families, judges, attorneys practicing in courts throughout the region, community members, statewide experts in the functioning of state and local courts, empirical researchers, and national experts in constitutional law, post-arrest procedure, law enforcement, judicial procedures, criminal law, pretrial services, and jails.

114.     Class counsel has a detailed understanding of state law and practices as they relate to federal constitutional requirements.  Counsel have studied the way that these systems function in other cities and counties in order to investigate the wide array of lawful options in practice for municipalities.

115.     As a result, counsel have devoted enormous time and resources to becoming intimately familiar with Defendants' scheme and with all of the relevant state and federal laws and procedures that can and should govern it.  Counsel has also developed relationships with many of the individuals and families most victimized by unlawful wealth-based pretrial detention practices.  The interests of the members of the Class will be fairly and adequately protected by the Plaintiff and her attorneys.

### E.  Rule 23(b)(2)

116.    Class action status is appropriate because the County, through the policies, practices, and procedures that make up its wealth-based post-arrest detention scheme, has acted in the same unconstitutional manner with respect to all class members. The County enforces a wealth-based system of pretrial justice: some arrestees can purchase their immediate release, while other arrestees must remain in jail solely because they cannot pay.

117.    The Class therefore seeks declaratory and injunctive relief to enjoin the County from detaining arrestees who cannot afford cash payments.   Because the putative Class challenges the County's scheme as unconstitutional through declaratory and injunctive relief that would apply the same relief to every member of the Class, Rule 23(b)(2) is appropriate and necessary.

118.    Injunctive relief compelling the County to comply with these constitutional rights will similarly protect each member of the Class from being subjected to the City's unlawful policies and practices. A declaration and injunction stating that Defendants cannot detain arrestees due to their inability to make a monetary payment would provide relief to every Class Member.   Therefore, declaratory and injunctive relief with respect to the Class as a whole is appropriate.

119.    Plaintiff seeks the following relief.

### Claim for Relief

**Count One:  Defendants Violate Plaintiff's Rights By Jailing Her Because She Cannot Afford A Monetary Payment.**

120.    Plaintiff incorporates by reference the allegations in paragraphs 1-119.

121.    The Fourteenth Amendment's Equal Protection and Due Process Clauses prohibit jailing a person because of her inability to make a monetary payment.   Defendants violate

Plaintiff's fundamental right to pretrial liberty by keeping her in jail solely because she cannot afford to pay money bail without providing any inquiry into or findings concerning her ability to pay.

## Request for Relief

WHEREFORE, Plaintiff and the other Class members request that this Court issue the following relief:

a. A declaratory judgment that the Defendants violate the named Plaintiff's and Class Members' constitutional rights by keeping them in jail solely because they cannot make a monetary payment without an inquiry into and findings concerning their ability to pay;

b. An order and judgment preliminarily and permanently enjoining the Defendants — including all officers, employees, and agents of Harris County — from using money bail to detain any person without procedures that ensure an inquiry into and findings concerning the person's ability to pay any monetary amount set.

c. An order and judgment granting reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Lexie G. White*
Neal S. Manne
Lexie G. White
1000 Louisiana Street, Suite 5100
Houston, TX  77002
Phone:  (713) 651-9366
nmanne@susmangodfrey.com
lwhite@susmangodfrey.com
Michael Gervais (*Pro Hac Vice* Pending)
560 Lexington Avenue, 15th Floor
New York, NY  10022
Phone:  (212) 336-8330
mgervais@susmangodfrey.com

*/s/ Alec Karakatsanis*
Alec Karakatsanis (D.C. Bar No. 999294)
(*Pro Hac Vice* Application Pending)
Elizabeth Rossi (*Pro Hac Vice* Application Pending)
Attorneys, Equal Justice Under Law
601 Pennsylvania Ave. NW

South Building, 9th Floor
Washington, DC 20004
(202) 670-1004
alec@equaljusticeunderlaw.org
erossi@equaljusticeunderlawl.org

*Attorneys for Plaintiff*