United States District Court
Southern District of Texas
**ENTERED**
April 28, 2017
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, *et al.*, | § | |
| On behalf of themselves and all others similarly situated, | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. H-16-1414 |
| VS. | § | |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION SETTING OUT
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 A. Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
 B. The Evidence in the Record. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  1. The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  2. The Fact Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
  3. The Expert Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
  4. Overview of the Factual and Legal Issues. . . . . . . . . . . . . . . . . . . . 19
 C. The Historical Development of Bail in the United States and in Harris County
  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  1. The Constitutionalization of Bail. . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  2. Statutory and Judicial Bail Reform: Pretrial Services, Probable Cause Hearings, and "Meaningful" Alternatives to Secured Money Bail. . . . . . 25
  3. Bail at the Federal Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
  4. Bail under Texas Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
  5. Recent Distinctions Drawn Between Bail and Preventive Detention. . . . 38
   a. Washington, D.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
   b. New Mexico. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
   c. New Jersey. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   d. New Orleans. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
   e. Maryland. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
   f. Alabama. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
   g. Calhoun, Georgia. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
   h. Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

| | | | |
|---|---|---|---|
| | D. | The Use of Bail in Harris County Misdemeanor Pretrial Detention. . . . . . . . . . 50 |
| | | 1. | The Statutory Framework. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50 |
| | | 2. | Arrest and Booking. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55 |
| | | 3. | The Probable Cause and Bail-Setting Hearing.. . . . . . . . . . . . . . . . . . . . 63 |
| | | 4. | The First Appearance Before a County Judge. . . . . . . . . . . . . . . . . . . . . 77 |
| | | 5. | Disposition of Misdemeanor Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83 |
| | | 6. | The Use of Bail to Detain. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87 |
| | E. | The Population Statistics of Misdemeanor Detainees at Each Stage in the Post-arrest Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95 |
| | | 1. | Arrestees Detained More than 24 Hours Before the Probable Cause Hearing.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95 |
| | | 2. | Arrestees Detained More than 48 Hours Before a Bail Review. . . . . . . . 97 |
| | | 3. | Arrestees Detained Until Case Disposition. . . . . . . . . . . . . . . . . . . . . . . 99 |
| | | 4. | Arrestees Detained "Because of" Indigence. . . . . . . . . . . . . . . . . . . . . 100 |
| | | 5. | Bond Forfeitures and Re-Arrests for New Criminal Activity. . . . . . . . . 106 |
| | F. | The Effects of Pretrial Detention on Misdemeanor Defendants Who Cannot Pay Secured Money Bail.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112 |
| | G. | Comparisons to Other Jurisdictions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115 |
| | H. | Proposed Bail Reforms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117 |
| | | 1. | Changes to Risk Assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117 |
| | | 2. | Changes to the System's Efficiency.. . . . . . . . . . . . . . . . . . . . . . . . . . . 120 |
| | | 3. | Changes to the Probable Cause Hearings. . . . . . . . . . . . . . . . . . . . . . . 122 |
| | | 4. | Texas House Bill 3011 / Senate Bill 1338. . . . . . . . . . . . . . . . . . . . . . . 123 |
| | I. | Conclusions on Findings of Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126 |
| II. | Conclusions of Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132 |
| | A. | The Legal Standards.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132 |
| | B. | Likelihood of Success on the Merits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133 |
| | | 1. | The Standard of Review.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133 |
| | | | a. | Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134 |
| | | | b. | Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 142 |
| | | 2. | The Constitutional Requirements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143 |
| | | | a. | Equal Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143 |
| | | | b. | Due Process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145 |
| | | | c. | Excessive Bail. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156 |
| | | 3. | Harris County Policies that Violate Constitutional Requirements.. . . . . 158 |
| | | | a. | Municipal Liability under § 1983. . . . . . . . . . . . . . . . . . . . . . 158 |
| | | | b. | The County Judges' Policies and Customs: Equal Protection. . . 160 |
| | | | c. | The County Judges' Policies and Customs: Due Process. . . . . . 167 |
| | | | d. | The Sheriff's Policies under Equal Protection and Due Process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169 |
| | | 4. | Judicial Conduct that Violates Constitutional Requirements. . . . . . . . . 171 |
| | | 5. | Conclusion on Likelihood of Success on the Merits. . . . . . . . . . . . . . . 172 |
| | C. | Irreparable Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174 |

D.      Balancing the Harms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
E.      The Public Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
F.      Bond. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

III.    Remedy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

IV.     Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
A.      Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
B.      Preliminary Injunction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 192

**Introduction**

"Twenty years ago, not quite one-third of [Texas's] jail population was awaiting trial. Now the number is three-fourths. Liberty is precious to Americans, and any deprivation must be scrutinized. To protect public safety and ensure that those accused of a crime will appear at trial, persons charged with breaking the law may be detained before their guilt or innocence can be adjudicated, but that detention must not extend beyond its justifications. Many who are arrested cannot afford a bail bond and remain in jail awaiting a hearing. Though presumed innocent, they lose their jobs and families, and are more likely to re-offend. And if all this weren't bad enough, taxpayers must shoulder the cost—a staggering $1 billion per year." The Honorable Nathan L. Hecht, Chief Justice of the Texas Supreme Court, *Remarks Delivered to the 85th Texas Legislature*, Feb. 1, 2017.

This case requires the court to decide the constitutionality of a bail system that detains 40 percent of all those arrested only on misdemeanor charges, many of whom are indigent and cannot pay the amount needed for release on secured money bail. These indigent arrestees are otherwise eligible for pretrial release, yet they are detained for days or weeks until their cases are resolved, creating the problems that Chief Justice Hecht identified. The question addressed in this Memorandum and Opinion is narrow: whether the plaintiffs have met their burden of showing a

likelihood of success on the merits of their claims and the other factors necessary for a preliminary injunction against Harris County's policies and practices of imposing secured money bail on indigent misdemeanor defendants.  Maranda Lynn ODonnell, Robert Ryan Ford, and Loetha McGruder sued while detained in the Harris County Jail on misdemeanor charges.  They allege that they were detained because they were too poor to pay the amount needed for release on the secured money bail imposed by the County's policies and practices.  (Docket Entry Nos. 3, 41, 54).  They ask this court to certify a Rule 23(b)(2) class and preliminarily enjoin Harris County, the Harris County Sheriff, and—to the extent they are State enforcement officers or County policymakers—the Harris County Criminal Court at Law Judges, from maintaining a "wealth-based post-arrest detention scheme." (Docket Entry No. 143 at 2).

This case is difficult and complex.  The Harris County Jail is the third largest jail in the United States.  Pls. Ex. 12(aa) at 1.  Although misdemeanor arrestees awaiting trial make up about 5.5 percent of the Harris County Jail population on any given day, *see id*. at 13, about 50,000 people are arrested in Harris County on Class A and Class B misdemeanor charges each year.  Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8.[1]  The arrests are made by a number of law-enforcement agencies, including the Houston Police Department and the police forces of smaller municipalities, the Texas Department of Public Safety, and the Harris County Sheriff's Office.  *Id*. Harris County's bail system is regulated by State law, local municipal codes, informal rules,

---

[1]  The plaintiffs have not given each of their exhibits a unique number.  When clarity requires, the opinion identifies the plaintiffs' exhibits by category number and unique title.  After the motion hearing, the defendants produced the *2016 Pretrial Services Annual Report*.  (Docket Entry No. 290, Ex. 1).  When the opinion discusses or refers to the annual reports, the text uses the 2015 figures the parties' experts and briefing relied on, and the recently reported 2016 data is generally supplied in footnotes.  The numbers do not differ significantly from year to year.  In 2015, for example, 50,947 people were arrested only on misdemeanor charges, compared to 49,628 in 2016.  (*Id*. at 8); Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8.

unwritten customary practices, and the actions of judges in particular cases. The legal issues implicate intertwined Supreme Court and Fifth Circuit precedents on the level of judicial scrutiny in equal protection and due process cases and on the tailoring of sufficient means to legitimate ends.

Bail has a longstanding presence in the Anglo-American common law tradition. Despite this pedigree, the modern bail-bond industry and the mass incarceration on which it thrives present important questions that must be examined against current law and recent developments. Extrajudicial reforms have caused a sea change in American bail practices within the last few years. Harris County is also in the midst of commendable and important efforts to reform its bail system for misdemeanor arrests. The reform effort follows similar work in other cities and counties around the country. This work is informed by recent empirical data about the effects of secured money bail on a misdemeanor defendant's likely appearance at hearings and other law-abiding conduct before trial, as well as the harmful effects on the defendant's life.

The plaintiffs contend that certainly before, and even with, the implemented reforms, Harris County's bail system for misdemeanor arrests will continue to violate the Constitution. This case is one of many similar cases recently filed around the country challenging long-established bail practices. Most have settled because the parties have agreed to significant reform. This case is one of the first, although not the only one, that requires a court to examine in detail the constitutionality of a specific bail system for misdemeanor arrestees. This case is also one of the most thoroughly and skillfully presented by able counsel on all sides, giving the court the best information available to decide these difficult issues.

One other complication is worth noting at the outset. Since this case was filed, the 2016 election replaced the Harris County Sheriff and the presiding County Judge of Criminal Court at Law

No. 16.  (Docket Entry Nos. 158, 168).  The new Sheriff and County Judge have taken positions adverse to their codefendants, although each continues to oppose certain aspects of the plaintiffs' request for preliminary injunctive relief.[2]  Nonparty County officials, including the newly elected Harris County District Attorney and one of the Harris County Commissioners, have filed amicus briefs supporting the plaintiffs.  (Docket Entry Nos. 206, 272).  Harris County's Chief Public Defender has filed a declaration supporting the defendants.  Def. Ex. 23.  The lines of affinity and adversity between the defendants and their nonparty County colleagues are not always clear.

Even with the factual and legal complexities, at the heart of this case are two straightforward questions: Can a jurisdiction impose secured money bail on misdemeanor arrestees who cannot pay it, who would otherwise be released, effectively ordering their pretrial detention?  If so, what do due process and equal protection require for that to be lawful?  Based on the extensive record and briefing, the fact and expert witness testimony, the arguments of able counsel, and the applicable legal standards, the answers are that, under federal and state law, secured money bail may serve to detain indigent misdemeanor arrestees only in the narrowest of cases, and only when, in those cases, due process safeguards the rights of the indigent accused.

Because Harris County does not currently supply those safeguards or protect those rights, the court will grant the plaintiffs' motion for preliminary injunctive relief.  The reasons and the precise, limited relief granted are set out in detail below.

---

[2] Judge Jordan disagrees with the approach of his County Judge colleagues to setting secured money bail and believes that he operates his court in a constitutionally sound manner.  He argues that relief against him as a judicial officer in a judicial capacity would be "overbroad."  (Docket Entry No. 162 at 9–10).  Although Sheriff Gonzalez believes that Harris County's bail system is unconstitutional and is unlikely to change without an injunction from this court, he argues for additional time for the parties to negotiate with the hope of resolving the plaintiffs' claims through ongoing reforms or settlement.  (*Id*. at 23); Hearing Tr. 3-2:9–10, 22–23.

More specifically, the court finds that:

- Harris County has a consistent and systematic policy and practice of imposing secured money bail as de facto orders of pretrial detention in misdemeanor cases.

- These de facto detention orders effectively operate only against the indigent, who would be released if they could pay at least a bondsman's premium, but who cannot.  Those who can pay are released, even if they present similar risks of nonappearance or of new arrests.

- These de facto detention orders are not accompanied by the protections federal due process requires for pretrial detention orders.

- Harris County has an inadequate basis to conclude that releasing misdemeanor defendants on secured financial conditions is more effective to assure a defendant's appearance or law-abiding behavior before trial than release on unsecured or nonfinancial conditions, or that secured financial conditions of release are reasonably necessary to assure a defendant's appearance or to deter new criminal activity before trial.

- Harris County's policy and practice violates the Equal Protection and Due Process Clauses of the United States Constitution.

The court accordingly orders that:

- Harris County and its policymakers—the County Judges in their legislative and rulemaking capacity and the Harris County Sheriff in his law-enforcement capacity—are enjoined from detaining misdemeanor defendants who are otherwise eligible for release but cannot pay a secured financial condition of release.

- Harris County Pretrial Services must verify a misdemeanor arrestee's inability to pay bail on a secured basis by affidavit.

- The Harris County Sheriff must release on unsecured bail those misdemeanor defendants whose inability to pay is shown by affidavit, who would be released on secured bail if they could pay, and who have not been released after a probable cause hearing held within 24 hours after arrest.

The court does *not* order: relief in cases involving felony charges or a mix of misdemeanor and felony charges; the elimination of secured money bail; changes to Texas State law; changes to the written Harris County Criminal Courts at Law Rules of Court; modification of prior federal court orders, including the consent decree in *Roberson v. Richardson*; or a right to "affordable bail" under the Eighth Amendment. Instead, the relief ordered is consistent with Texas state and Harris County law as written, is required by the Equal Protection and Due Process Clauses, and is justified by the plaintiffs' evidence. The relief is narrow so as not to interfere with the improvements the County is working to implement by July 1, 2017.

The reasons for these rulings are set out in the detailed findings and conclusions below.

## I.     Findings of Fact

### A.       Procedural Background

Ms. ODonnell filed suit while she was in custody in the Harris County Jail on May 19, 2016. (Docket Entry No. 3). Ms. McGruder and Mr. Ford filed suit while they were in custody on May 21, 2016. Civil No. 16-1436. The court consolidated the actions in August 2016. (Docket Entry No. 41). The plaintiffs filed an amended complaint on September 1, 2016. (Docket Entry No. 54). After extensive briefing and two lengthy hearings on August 18 and November 28, 2016, the court issued a Memorandum and Opinion on the defendants' motions to dismiss. (Docket Entry No. 125); *ODonnell v. Harris Cty., Tex.*, — F.Supp.3d —, 2016 WL 7337549 (S.D. Tex. Dec. 16, 2016). The

court dismissed the claims against the Harris County Sheriff and the sixteen Harris County Criminal Court at Law Judges in their personal capacities. The court denied the motions to dismiss the claims against the County, the personal-capacity claims against five Harris County Hearing Officers, and the official-capacity claims against the Sheriff and the County Judges. (*Id*.). The court reset the preliminary injunction hearing scheduled for December 15, 2016 at the parties' request, to facilitate settlement negotiations between the parties and newly elected Harris County officials. (Docket Entry No. 109). The parties did not settle. The court held an eight-day hearing in March 2017, and the parties filed voluminous records, lengthy video recordings, and numerous briefs.

The pending motions are the plaintiffs' motion for class certification, (Docket Entry No. 146), the defendants' motion for summary judgment, (Docket Entry Nos. 101, 104, 108), the plaintiffs' motion for a preliminary injunction, (Docket Entry No. 143), and the defendants' contingent motion for a stay pending appeal should the court grant preliminary injunctive relief, (Docket Entry No. 252). The defendants argue, principally, that there is no constitutional right to "affordable bail," that Harris County's post-arrest policies are subject to rational basis review, and that Harris County's policies are constitutional under any level of judicial scrutiny. (*See* Docket Entry Nos. 101, 161, 162, 166, 193, 256, 286). The plaintiffs argue that Harris County's system of pretrial bail and detention in misdemeanor cases violates the Equal Protection and Due Process Clauses of the United States Constitution. (*See* Docket Entry Nos. 143, 145, 188, 189). They do not believe their claims raise an Eighth Amendment challenge, but they argue in the alternative that the County's bail system for misdemeanor arrestees fails under the Eighth Amendment as well. (Docket Entry No. 92 at 18 n.19; No. 188 at 14 n.13).

This Memorandum and Opinion addresses the parties' disputes on summary judgment and

the plaintiffs' entitlement to preliminary injunctive relief.  Separate orders address class certification and the defendants' motion to stay.

### B.    The Evidence in the Record

The motion for a preliminary injunction requires balancing the expediency demanded by the request for emergency relief with a full and fair consideration of the voluminous record.  The parties submitted nearly 300 written exhibits, in addition to 2,300 video recordings of bail-setting hearings conducted within the last year in Harris County, all admitted without objection.  (Docket Entry Nos. 244, 267).  Thirteen witnesses testified at the eight-day hearing, including four expert witnesses.  The court admitted depositions and declarations from many other witnesses as well.

The parties largely agree on the facts of the procedures Harris County follows after the arrest of misdemeanor defendants.  Both parties' statistical experts used the same data from the County's administrative sources and largely agreed on the raw numbers produced by, and the gaps found in, the Harris County data.  The parties' experts disagree about how to interpret the data.  The parties disagree about the constitutional significance of the evidence about the County's bail procedures in misdemeanor cases and their effects.

The court reviews the factual record under the applicable legal framework to resolve these disagreements and to enter the findings of fact and conclusions of law.[3]

### 1.    The Parties

Maranda Lynn ODonnell, a 22-year-old single mother, was arrested on May 18, 2016 at 5:00 p.m. and charged with driving with an invalid license.  Pls. Ex. 7(a).  After she was booked into the Harris County Jail, she was informed that she would be released promptly if she paid a secured

---

[3]  Any findings of fact that are also, or only, conclusions of law are so deemed.  Any conclusions of law that are also, or only, findings of fact are so deemed.

money bail of $2,500 set according to the County's bail schedule, but that she would remain in jail if she did not pay either the full bail amount to the County or a premium to a bail bondsman up front. *Id*. Ms. ODonnell and her child struggled to meet the basic necessities of life. She received benefits from the federal government's Women, Infants, and Children program to feed her daughter. She could not afford housing, so she stayed with a friend. *Id*. At the time of her arrest, Ms. ODonnell was working, but it was at a new job she had held for only seven days. *Id*. She had no money to buy her release from detention. *Id*. She was otherwise eligible for release.

Harris County Pretrial Services interviewed Ms. ODonnell at 11:52 p.m. on May 18. Pls. Ex. 8(c)(1), ODonnell Pretrial Services Report. At 3:00 a.m., on May 19, Pretrial Services completed a risk-assessment report recommending her release on a personal bond—that is, an unsecured appearance bond requiring no up-front payment for release. *Id*. Ms. ODonnell appeared before a Hearing Officer at 7:00 a.m., by videolink from the Harris County Jail. Pls. Ex. 4(c)(1), ODonnell Docket Sheet. The Sheriff's deputies present ordered her not to speak. Pls. Ex. 7(a). Without explanation, the Hearing Officer told her that she did not "qualify" for release on personal bond and imposed the $2,500 scheduled amount as secured bail, meaning that she had to pay the full bail amount or a bondman's premium to be released. Pls. Ex. 8(c), ODonnell Hearing Video. When asked if she would hire her own lawyer or would be seeking help from a court-appointed lawyer, Ms. ODonnell responded, "Seeking help." These were her only words during her 50-second hearing. *Id*.

On the morning of May 20, Ms. ODonnell appeared before a County Criminal Court at Law Judge. (Docket Entry No. 31, Ex. 1). She completed an affidavit declaring her lack of assets and was found indigent for the purpose of appointing counsel. (*Id*.). Her bail amount was not changed or set on an unsecured basis, even though she declared on her affidavit that she remained in jail.

11

(*Id*.).  That same day, but after Ms. ODonnell filed this suit, an insurance underwriter for a commercial bondsman posted her bail amount.  Pls. Ex. 11 at *5.  This third-party payment looks like an attempt to moot her claim.  *See id*.  Ms. ODonnell was released from jail after three days in pretrial detention on the charge of driving with an invalid license.  Pls. Ex. 8(c), ODonnell Docket Sheet.

Robert Ryan Ford was arrested on May 18, 2016 at 8:00 p.m.  He was charged with shoplifting from a Wal-Mart.  Pls. Ex. 7(c).  Mr. Ford could not pay the $5,000 secured money bail imposed as the condition for his release from pretrial detention.  *Id*.  This was the amount specified in the bail schedule.  Mr. Ford was interviewed by Pretrial Services at 10:00 a.m. the morning after his arrest, but Pretrial Services did not complete Mr. Ford's risk assessment until the next day, May 20, at 2:00 a.m.  Pls. Ex. 8(c)(iii), Ford Pretrial Services Report.  The risk-assessment report recommended "Detain," stating that Mr. Ford had "[s]afety issues that conditions can't mitigate." *Id*. at *16.  The form did not explain these issues nor why some combination of conditions of release could not address them.  Notwithstanding the recommendation to detain, had Mr. Ford paid the $5,000 bail—or paid a bondsman a $500 premium[4]—he would have been promptly released, regardless of "safety issues."  He could not pay the $5,000 secured money bail or the bondsman's premium, so he remained in jail.  Pls. Ex. 7(c).  As intended by Pretrial Services, the secured money bail served as a pretrial detention order because Mr. Ford was too poor to pay.

Mr. Ford did not see a Hearing Officer until May 20, 2016 at 4:00 a.m., 32 hours after his arrest.  Pls. Ex. 8(c)(iii), Ford Docket Sheet.  His hearing lasted less than 50 seconds.  Pls. Ex. 8(c),

---

[4] The complaint alleges, and the record shows, that commercial sureties in Harris County typically charge a nonrefundable premium of 10 percent of the total value of the bond, but for low money bail amounts, such as those at the lower end of the misdemeanor bail schedule, bondsmen charge a premium higher than 10 percent.  (Docket Entry No. 54 ¶ 44 n.8); Hearing Tr. 2-1:56.

Ford Hearing Video.  He did not speak except to ask for a court-appointed lawyer.  *Id*.  His bail was confirmed at $5,000 on a secured basis.  *Id*.

On May 23, 2016, Mr. Ford appeared before a County Criminal Court at Law Judge, pleaded guilty, and was sentenced to time served.  Pls. Ex. 8(c)(iii), Ford Docket Sheet.  He was released at 12:30 a.m. on May 24, 2016.  *Id*.  Mr. Ford was continuously detained on his misdemeanor charge for over five days, until the final disposition of his case.

Loetha Shanta McGruder, a pregnant 22-year-old mother of two, was arrested on May 19, 2016 at 5:20 p.m.  She was charged with failing to identify herself to a police officer.  Pls. Ex. 7(b).  Ms. McGruder was indigent.  *Id*.  She depended on federal benefits to care for her older son, who has Down's Syndrome and other medical needs, and she depended on child-support payments for her other children.  *Id*.  Ms. McGruder was not working when she was arrested.  She avoided homelessness by living with her boyfriend.  *Id*.  She could not pay the $5,000 secured money bail imposed as the condition for her release from pretrial detention.  *Id*.

Ms. McGruder was interviewed by Pretrial Services the morning after her arrest, at 8:40 a.m.  Pls. Ex. 8(c)(ii), McGruder Pretrial Services Report.  Pretrial Services completed its risk-assessment report around 1:00 p.m. with no recommendation for either release or detention.  *Id*.  Ms. McGruder appeared before a Hearing Officer at 1:00 p.m. on May 20.   Pls. Ex. 8(c)(ii), McGruder Docket Sheet.  She did not speak at her hearing except to discuss her need for a court-appointed lawyer.  Pls. Ex. 8(c)(ii), McGruder Hearing Video.  Her bail was confirmed at $5,000 on a secured basis.  *Id*.

After about 87 hours in jail, Ms. McGruder appeared before a County Criminal Court at Law Judge.  Pls. Ex. 8(c)(ii), McGruder Docket Sheet.  She was ready to enter a guilty plea because she believed it was the fastest way to be released.  Hearing Tr. 2-1:80–81, 108.  Her lawyer convinced

her to seek a personal bond instead.  *Id.*  At her first counseled hearing before a County Judge, Ms. McGruder was granted a personal bond—an unsecured $5,000 bond with no up-front payment required.  She was released at 7:30 p.m. the same day.  Pls. Ex. 8(c)(ii), McGruder Docket Sheet. Ms. McGruder spent four full days in pretrial detention on her misdemeanor charge of failing to identify herself to a police officer.

The plaintiffs sued Harris County under 42 U.S.C. § 1983, alleging that the County's policies have deprived them and others similarly situated of due process and equal protection by detaining them before trial on misdemeanor charges because of their inability to pay a secured money bail, and without a meaningful or timely inquiry into their inability to pay.  (Docket Entry No. 54).  The motions to dismiss resulted in earlier rulings on the claims against the various defendants.

- The court denied Harris County's motion to dismiss.  The County may face municipal liability under § 1983 for the law-enforcement policies of its Sheriff, to the extent the Sheriff knowingly enforces invalid detention orders, and for the legislative and administrative policies of the County Judges to the extent those policies are not directly mandated by Texas law.  *ODonnell*, 2016 WL 7337549 at *22–31.

- The court dismissed the plaintiffs' personal-capacity claim against the Harris County Sheriff but denied the motion to dismiss the official-capacity claim.  *Id.* at *32.  To the extent the Sheriff enforces facially valid but unconstitutional detention orders, the Sheriff may be liable for prospective relief under *Ex parte Young*, 209 U.S. 123 (1908).  *Id.*

- The court dismissed personal-capacity claims against the sixteen Harris County Criminal Court at Law Judges, but denied the motion to dismiss the official-capacity claims against them.  *ODonnell*, 2016 WL 7337549 at *27–28.  To the extent the County Judges

14

administratively enforce facially constitutional Texas laws, such as the Texas Code of Criminal Procedure, in an unconstitutional manner, the County Judges may be liable for prospective relief. *Id*. at *28, 36–37.

- The court granted the motion to dismiss the official-capacity claims against five Harris County Hearing Officers. *Id*. at *34–35. They remain in the suit in their personal capacities for declaratory relief only. *Id*.

### 2.     The Fact Witnesses

The fact witnesses testified about the post-arrest process for misdemeanor defendants in Harris County, as well as the reforms to the bail system the County expects to implement by July 1, 2017. The fact witnesses and their testimony are summarized below.

- Assistant District Attorney JoAnne Musick. Ms. Musick was appointed the Sex Crime Unit Chief at the Harris County District Attorney's Office in January 2017. She has practiced criminal defense privately for over thirteen years and has served as the vice-chair of the Criminal Law & Procedure Committee of the Houston Bar Association and as a board member of the Texas Criminal Defense Lawyers Association. Ms. Musick testified about her extensive experience with Harris County pretrial processes, both as a criminal defense lawyer and as an Assistant District Attorney. Ms. Musick filed a declaration stating her observation that Harris County consistently detains misdemeanor arrestees, who are otherwise eligible to be released, because they cannot pay a secured financial condition of release. As a consequence, many indigent misdemeanor arrestees plead guilty at their first appearance as the only way to be released from pretrial detention without waiting days or weeks for another hearing. Pls. Ex. 7(g) at 4–5.

15

- Sheriff Ed Gonzalez.  Sheriff Gonzalez was elected Harris County Sheriff in November 2016 and assumed office in January 2017.  He served eighteen years with the Houston Police Department and was a Houston City Council member for three terms before his election as Sheriff.  Sheriff Gonzalez testified about his experience with the post-arrest process in Harris County.  Sheriff Gonzalez also filed a declaration stating his observation that Harris County consistently detains misdemeanor arrestees, who are otherwise eligible to be released, because they are too poor to pay a secured financial condition of release.  Pls. Ex. 7(r) at 1–2.

- Major Patrick Dougherty.  Major Dougherty was appointed as a major with the Harris County Sheriff's Office in January 2017 after serving thirty-five years with the Houston Police Department.  Major Dougherty testified about his experiences with the post-arrest processes in the City of Houston and in Harris County.  Major Dougherty reviewed the technology limits and overcrowded conditions in the Harris County Jail that complicate the timely transfer and presentment of misdemeanor arrestees.

- Director of Pretrial Services Kelvin Banks.  Mr. Banks began work as the Director of Pretrial Services for Harris County in October 2016.  He served previously as the Director of Pretrial Services for the Third Circuit Court in Wayne County, Michigan, primarily overseeing pretrial services for the City of Detroit.  Mr. Banks testified about the County's current Pretrial Services program, the planned changes to Pretrial Services's risk-assessment tool, and other changes impacting the use of secured money bail in misdemeanor cases.  These changes are expected to be implemented by July 1, 2017.

- Chief Hearing Officer Blanca Villagomez.  Judge Villagomez has been a Harris County Hearing Officer since the position was created in 1993.  She testified about her own and

others' practices as Hearing Officers.

- Hearing Officer Eric Hagstette.  Judge Hagstette has been a Harris County Hearing Officer for over eleven years.  He was a Harris County Assistant District Attorney for ten years and a criminal defense attorney for ten years.  Judge Hagstette testified about his practices as a Hearing Officer and his impressions of the pretrial process from his time as a practicing criminal lawyer.

- County Judge Darrell Jordan.  Judge Jordan was elected to be the presiding judge of County Criminal Court at Law No. 16 in November 2016.  He assumed office in January 2017. Judge Jordan previously practiced as a criminal defense attorney for eight years.  Judge Jordan testified about his practices as a County Judge and about his past experiences as a lawyer defending misdemeanor arrestees in Harris County.

- County Judge Paula Goodhart.  Judge Goodhart was appointed to be the presiding judge of County Criminal Court at Law No. 1 in 2010.  She was an Assistant District Attorney for Harris County for fourteen years and a criminal defense attorney for three years.  Judge Goodhart testified about her practices as a County Judge and about her past experiences practicing in the Harris County Criminal Courts at Law.

- County Judge Margaret Harris.  The defendants offered the testimony of Judge Harris, the presiding judge of County Criminal Court at Law No. 5 since 2003.  The parties stipulated that Judge Harris's testimony would be consistent in material respects with Judge Goodhart's testimony.  Hearing Tr. 5:152.

- Dr. Marie VanNostrand.  Dr. VanNostrand is a project manager for Luminosity, a consulting firm that advises pretrial services programs.  Dr. VanNostrand is a former probation and

parole officer and pretrial services provider.  She began working as a consultant for pretrial services agencies in 2003 and through Luminosity has been consulting with Harris County to reform its pretrial processes and services since February 2015.  Hearing Tr. 6-1:131.  Dr. VanNostrand testified about her statistical studies on pretrial detention and about the reforms to the Harris County pretrial process planned for implementation by July 1, 2017.

### 3.    The Expert Witnesses

The plaintiffs presented Dr. Stephen Demuth to testify under Rule 702 of the Federal Rules of Evidence on sociology and criminal pretrial procedure.  Dr. Demuth has a doctorate in sociology with a concentration in chronology and quantitative methods of research.  He is a professor of sociology at Bowling Green State University in Ohio.  He has published extensively in peer-reviewed journals on pretrial criminal processes and on the appropriate use of large data sets.  Dr. Demuth testified that he received no compensation for his consultation and testimony in this case.  He has invested at least 150 hours of work analyzing the data Harris County has produced since the plaintiffs retained him on February 9, 2017.

The plaintiffs also presented Judge Truman Morrison to testify under Rule 702.  Judge Morrison is a Senior Judge of the Superior Court of the District of Columbia.  He has served on that court for over thirty-seven years.  After taking senior status in 2000, Judge Morrison has focused on misdemeanor cases.  Since the late 1980s, he has led reform efforts in his court to eliminate the use of secured money bail in the D.C. criminal justice system.  He has also worked to educate judicial officers and others around the country on the benefits of eliminating money bail and the harms of continuing to use it in misdemeanor cases.

The defendants offered the testimony of Dr. Robert Morris as a Rule 702 witness in

18

criminology.  Dr. Morris holds a doctorate in criminal justice and was a professor of criminology at the University of Texas in Dallas for nine years.  Since August 2016, he has been the cofounder and chief executive officer of Predicto, a company that uses machine learning to predict failures in industrial equipment.  Dr. Morris testified that he has worked 45 to 50 hours analyzing data produced by Harris County since his retention and has invoiced the County $325 per hour.   Hearing Tr. 4-2:156.

The defendants also offered the testimony of Mr. Bob Wessels as a Rule 702 witness with specialized knowledge in court administration and pretrial procedures, particularly in Harris County. Mr. Wessels was the court manager of the Harris County Criminal Courts at Law for thirty-five years, until he retired in 2011.  He has received numerous awards and national recognition for his work on court administration and is a former president of the National Association of Court Administrators.

The court finds that Drs. Demuth and Morris meet the Rule 702 requirements to testify about Harris County's pretrial arrest data and system and that Judge Morrison and Mr. Wessels are qualified to testify about court administration.  Specific findings about the reliability, helpfulness, and credibility of their opinions are set out in detail below.

### 4.     Overview of the Factual and Legal Issues

The parties dispute three broad issues: (1) whether Harris County impermissibly sets secured money bail to serve as de facto orders of pretrial detention in misdemeanor cases; (2) whether Harris County provides misdemeanor defendants due process and equal protection in their bail settings; and (3) whether planned reforms will sufficiently address the plaintiffs' allegations of constitutional violations.  Each issue raises complex questions of fact and law.

The defendants argue that Harris County judicial officers do not intentionally use secured money bail to detain and are not recklessly indifferent to that effect of secured money bail.  Instead, the defendants argue, Hearing Officers and County Judges apply the Texas Code of Criminal Procedure's requirement to consider five factors—only one of which relates to a defendant's ability to pay—in setting bail.  *See* TEX. CODE CRIM. PRO. art. 17.15.  The plaintiffs respond that the evidence shows Harris County judicial officers do not in fact give individualized consideration of the five factors in setting bail in each misdemeanor case, but instead routinely set secured money bail to conform to a predetermined schedule, even when it is clear that the effect will be pretrial detention.

The parties' disputes extend beyond whether the facts show rare, occasional, or frequent individual consideration of bail in particular cases.  The parties also dispute whether imposing secured money bail on an indigent or impecunious misdemeanor arrestee is a *but-for cause* or a *proximate cause* of pretrial detention if an arrestee with financial means could pay and secure prompt release.  The defendants argue that virtually no misdemeanor defendant is detained before trial "solely by"  or "because of" an inability to pay secured money bail.  Instead, the defendant's past criminal history, prior failures to appear, or other risk factors all contribute to a judicial officer's decision to impose secured money bail at a particular amount.  Under this view, the arrestee's criminal history, prior failures to appear, or other risk factors—not just the bail amount—are among the reasons for pretrial detention.  (*See, e.g.*, Docket Entry No. 162 at 15–16; No. 164 at 8–9); Hearing Tr. 1:99–100.

The plaintiffs counter with a but-for argument.  A judicial officer's decision to set secured money bail means that the misdemeanor defendant has been found eligible for release and would be

released but for their inability to make the up-front payment of the secured money bail bond. The plaintiffs argue that detaining misdemeanor defendants before trial solely because of their inability to pay violates the Equal Protection Clause, because defendants with similar histories and risks but with access to money are able to purchase pretrial release. The plaintiffs contend that all rigorous studies of pretrial release in misdemeanor cases show that release on secured money bail does no more to mitigate the risk of nonappearance or of new criminal activity during pretrial release than release on unsecured or nonfinancial conditions. (*See, e.g.*, Docket Entry No. 143 at 15–17; No. 188 at 4–7); Hearing Tr. 4-2:15–16.

For the reasons set out below, the court finds and concludes that the plaintiffs have the better understanding of the case. A misdemeanor defendant's criminal background or risk factors may give the County a persuasive reason to detain that defendant. But an order imposing secured money bail is effectively a pretrial preventive detention order only against those who cannot afford to pay. It is not a detention order as to defendants who can pay, even if they present a similar risk of failing to appear or of committing new offenses before trial as those who cannot pay. And the reliable record evidence shows that release on secured money bail does not mitigate those risks for misdemeanor defendants better than release on unsecured or nonfinancial conditions, in Harris County or elsewhere. The issue is not a right to "affordable bail," as the defendants insist, but a violation of the Equal Protection and Due Process Clauses.

The plaintiffs allege that Harris County's pretrial misdemeanor bail system violates procedural due process because: (1) misdemeanor arrestees who cannot pay the up-front amount for release on secured money bail are frequently held longer than 24 hours before any meaningful bail review, contrary to Texas law and to federal court orders; (2) misdemeanor arrestees are not able

21

even to ask for a review of their bail in a counseled, adversarial proceeding, with an opportunity to present evidence and a right to findings on the record, until at least two or three days and often up to two weeks after their arrests; (3) misdemeanor arrestees who cannot afford their secured money bail are jailed for more than 48 hours if they do not plead guilty at their first court appearances; and (4) the County imposes secured money bail to serve as de facto detention orders, without affording misdemeanor defendants the due process protections the Constitution requires for detention orders. (*See, e.g.*, Docket Entry No. 144 at 13–14; No. 145 at 7–9; No. 188 at 13–15).

The defendants argue that Harris County's pretrial process is among the fastest in the nation and that its bail practices are not out of step with the majority of other United States jurisdictions. (*See, e.g.*, Docket Entry No. 286). While insisting that the County's current system is legal, the defendants acknowledge that it needs improvement. They argue that the planned reforms will make the County's pretrial system more efficient, more rational, and more equal across classifications of wealth and risk factors. (Docket Entry No. 162 at 23); Hearing Tr. 1:100–01, 8-2:30–32. The plaintiffs respond that until the expected reforms are implemented, serious constitutional violations will continue to occur, affecting hundreds of individuals every day. Even under the reforms, the plaintiffs contend, Harris County will continue its policy of imposing secured money bail as de facto pretrial detention orders in violation of federal due process requirements. (Docket Entry No. 188 at 26–27).

The court finds and concludes that, based on the credible, reliable evidence in the present record, the plaintiffs are likely to succeed on the merits of at least some of their claims that the present system violates due process and equal protection, and that the plaintiffs are likely to succeed in part in their challenges to the new pretrial system as currently proposed by Harris County. The

22

plaintiffs are entitled to a preliminary injunction, as set out in detail below.

**C.      The Historical Development of Bail in the United States and in Harris County**

**1.      The Constitutionalization of Bail**

Bail originated in medieval England "as a device to free untried prisoners."  Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* 1 (1964); *see* 4 William Blackstone, *Commentaries on the Laws of England* (Rees Welsh & Co. [1769] 1902) ("By the ancient common law, before and since the [Norman] conquest, all felonies were bailable, till murder was excepted by statute; so that persons might be admitted to bail before conviction almost in every case." (footnotes omitted)); *see generally* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 ALB. L. REV. 33, 34–66 (1977); Elsa de Haas, *Antiquities of Bail* 128 (1940).  In 1275, the English Parliament enacted the Statute of Westminster, which defined bailable offenses and provided criteria for determining whether a particular person should be released, including the strength of the evidence against the accused and the accused's criminal history.  *See* Note, *Bail: An Ancient Practice Reexamined*, 70 YALE L.J. 966, 966 (1961); June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 SYRACUSE L. REV. 517, 523–26 (1983).  In 1679, Parliament adopted the Habeas Corpus Act to ensure that an accused could obtain a timely bail hearing.  In 1689, Parliament enacted an English Bill of Rights that prohibited excessive bail.  *See* Carbone, *supra*, at 528.

Early American constitutions codified a right to bail as a presumption that defendants should be released pending trial.  *See* Note, *Bail*, *supra*, at 967.  One commentator who surveyed the bail laws in each state found that forty-eight states have protected, by constitution or statute, a right to bail "by sufficient sureties, except for capital offenses when the proof is evident or the presumption

great."  Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 ARIZ. L.

REV. 909, 916 (2013).  States modeled these provisions on the Pennsylvania Constitution of 1682.

*See* Carbone, *supra*, at 531–32.  Texas substantially incorporated that language into its Constitution

in 1845, and it remains.[5]  TEX. CONST. art. 1 § 11.

Texas law interprets Article I, § 11 to prohibit preventive pretrial detention except in specific

and narrow circumstances set out in constitutional amendments.  *Id*. § 11a *et seq.*  "The exceptions

contained in Article I, § 11a, supra, to the constitutional right to bail proclaimed by Article I, § 11,

supra, include the seeds of preventive detention urged by many to be abhorrent to the American

system of justice.  It is obvious that for these reasons the provisions of said § 11a contain strict

limitations and other safeguards."  *Ex parte Davis*, 574 S.W.2d 166, 169 (Tex. Cr. App. 1978).  The

exceptions are narrow.  All but one are limited to felonies.  The one exception is under §§ 11b and

11c, which permit a denial of bail and pretrial preventive detention for those accused of a crime of

family violence, including misdemeanors, if: (1) the accused has violated a condition of pretrial

release or a protective order; and (2) a magistrate determines at an adversary hearing by a

preponderance of the evidence that the accused violated the condition of release or protective order

in a manner "related to the safety of a victim of the alleged offense or the safety of the community."

TEX. CONST. art. 1, §§ 11b–11c.

Historians and jurists confirm that from the medieval period until the early American

republic, a bail bond was typically based on an individualized assessment of what the arrestee or his

surety could pay to assure appearance and secure release.  In medieval England, an arrestee was

forbidden to pay his sureties for obtaining his release.  If an accused failed to appear, the sureties

---

[5] The Texas Constitution contains an additional provision making bail available even in capital cases
after indictment.  TEX. CONST. art. 1 § 11.

were "amerced" with a fine, but there were "maximum amercements depending on the wrong-doer's rank; the baron [did] not have to pay more than a hundred pounds, nor the routier more than five shillings." 2 Frederick William Polluck & Frederic William Maitland, *The History of English Law Before the Time of Edward I* 514 (2d ed. 1984 [1898]).  Joseph Chitty, an eminent proceduralist, summarized the English practice when the United States Constitution was ratified: "The rule is, where the offence is prima facie great, to require good bail; moderation nevertheless is to be observed, and such bail only is to be required as the party is able to procure; for otherwise the allowance of bail would be a mere colour for imprisoning the party on the charge."  1 J. Chitty, *A Practical Treatise on the Criminal Law* 88–89 (Philadelphia ed. 1819); *see also Bates v. Pilling*, 149 Eng. Rep. 805, 805 (K.B. 1834) ("a defendant might be subjected to as much inconvenience by being compelled to put in bail to an excessive amount, as if he had been actually arrested"); *Rex v. Bowes*, 99 Eng. Rep. 1327, 1329 (K.B. 1787) (per curiam) ("[e]xcessive bail is a relative term; it depends on the nature of the charge for which bail is required, upon the situation in life of the parties, and on various other circumstances") & (Archbald, J.) (permitting a "lessening" of bail if there were "difficulty" procuring the decreed sum); *Neal v. Spencer*, 88 Eng. Rep. 1305, 1305–06 (K.B. 1698) (collecting cases showing a diversity of bail amounts given for the same offense).  The pre-Texas history of bail confirms the modern holdings of Texas courts, that bail is a mechanism for pretrial release and not for continued pretrial preventive detention.

### 2.    Statutory and Judicial Bail Reform: Pretrial Services, Probable Cause Hearings, and "Meaningful" Alternatives to Secured Money Bail

In the mid-nineteenth century, bail reform was crucial to abolishing imprisonment for debt. In Massachusetts, the 1831 survey of the Prison Discipline Society noted that the availability of bail in debtors' prisons created class distinctions between "poor seamen, poor laborers, and poor

mechanics" who could not find sureties and remained in jail, "while there is scarcely an instance on record of a poor minister, a poor physician, or a poor lawyer in Prison for debt."  Sixth Annual Rep. of the Prison Discipline Society 22 (1831).  After Massachusetts abolished imprisonment for debt in 1855, the State permitted those jailed on mesne[6] process in contract cases to swear an oath of indigence and to be released on personal recognizance as an alternative to secured money bail.  1857 Mass. L. 489–97.  From 1831 to 1833, Congress passed legislation abolishing imprisonment for debt at the federal level.  4 STAT. 467, 594, 676.  Ultimately, forty-one states, including Texas, constitutionally banned imprisonment for debt.[7]  *See* TEX. CONST. art. 1 § 18.

Another wave of bail reform began with the 1960s Manhattan Bail Project, conducted by the Vera Foundation in New York City.  *See* Wayne H. Thomas, Jr., *Bail Reform in America* 3, 20–27 (1976); Ronald Goldfarb, *Ransom* 150–72 (1965).  The Project interviewed defendants before their first court appearance to evaluate whether they were good candidates for pretrial release on recognizance; that is, release "on one's honor pending trial."  Goldfarb, *supra*, at 153–54.  The standard interview questions asked about a defendant's personal background, community ties, and criminal history.  *Id*.  The interviewer scored a defendant's answers using a point-weighting system and verified the answers, usually by telephone, with references the defendant provided.  *Id*. at 154–55, 174–75.  The interviewers gave the information to the court and recommended which defendants should be released on nonfinancial conditions.  *Id*. at 155.  During the first three years

---

[6] "Mesne" is a medieval French legal term meaning "intermediate," or process issued after a suit began but before it ended.  It often referred to a writ issued during a civil case.  The word remained in the Federal Rules of Civil Procedure until 2007, despite the fact that few knew what it meant and fewer ever used it.

[7] For an up-to-date collection of state constitutional provisions banning imprisonment for debt, see Note, *State Bans on Debtors' Prisons and Criminal Justice Debt*, 129 HARV. L. REV. 1024, 1035 n.95 (2016).

of the Project, defendants released on nonfinancial conditions at the recommendation of the Vera Foundation were about three times more likely to appear for trial than were defendants in control groups who were found eligible for release on nonfinancial conditions but who were instead released on secured money bail. *Id*. at 155, 157. The success of the Manhattan Bail Project inspired the creation of pretrial services programs across the country. *See* Timothy R. Schnacke *et al*., Pretrial Justice Inst., *The History of Bail and Pretrial Release* 10 (2010).

In the 1970s, a major prisoners' class action challenged the facial and as-applied constitutionality of Florida's pretrial detention system. The litigation led to two foundational opinions, one by the United States Supreme Court and one by the former Fifth Circuit. In *Gerstein v. Pugh*, 410 U.S. 103 (1975), the Supreme Court ruled that criminal defendants arrested without a warrant and then detained before trial had to be taken "promptly" before a judicial officer to determine probable cause for the arrest. 410 U.S. at 127. The Court did not specify what would meet the promptness standard, instead noting that "the nature of the probable cause determination usually will be shaped to accord with a State's pretrial procedure viewed as a whole. . . . It may be found desirable, for example, to make the probable cause determination at the suspect's first appearance before a judicial officer, or the determination may be incorporated into the procedure for setting bail or fixing other conditions of pretrial release." *Id*. at 124 (internal citations omitted).

In *Pugh v. Rainwater*, 572 F.2d 1053 (1978) (en banc), the Fifth Circuit considered the same class's challenge to Florida's pretrial bail system. The en banc court vacated as moot the panel decision finding the system unconstitutional, because Florida had amended its rules while the appeal was pending. *Id*. at 1058–59. The en banc court ruled that the Constitution did not require the statute to include a presumption that indigent arrestees would be released without financial

27

conditions to be facially valid. *Id*. at 1057–58.  But the court noted that while "[u]tilization of a master bond schedule provides speedy and convenient release for those who have no difficulty in meeting its requirements[, t]he incarceration of those who cannot, without meaningful consideration of other possible alternatives, infringes on both due process and equal protection requirements." *Id*. at 1057.

In the decade following *Gerstein* and *Rainwater*, the City of Houston and Harris County were sued in two lawsuits disputing how to apply those precedents locally.  In *Sanders v. City of Houston*, 543 F.Supp. 694 (S.D. Tex. 1982), the court ruled after a bench trial that *Gerstein*'s promptness standard required a probable cause hearing for those arrested without a warrant by the City of Houston within 24 hours of arrest.  *Id*. at 702.  The court also ruled that bail had to be set within 24 hours of arrest to avoid an unconstitutional denial of bail under the Texas Constitution.[8]  *Id*. at 704.

In *Roberson v. Richardson*, Agreed Final Judgment, Civil No. 84-2974 (S.D. Tex. Nov. 25, 1987), the court entered a final agreed judgment that applied the 24-hour time limit to misdemeanor cases throughout the County.[9]  The *Roberson* order's stated purpose was to ensure that misdemeanor arrestees in Harris County had "the right to a prompt, fair and reliable determination of Probable Cause as set out in *Gerstein v. Pugh*, 420 U.S. 103 (1978), a meaningful review of alternatives to pre-scheduled bail amounts as set out in *Rainwater v. Pugh*, 572 F.2d 1053 (5th Cir. 1978) (*en banc*), and the right to the prompt appointment of counsel."  *Id*. at 1.  The *Roberson* order required the County Criminal Courts at Law Judges to provide probable cause hearings within 24 hours of

---

[8]  The *Sanders* plaintiffs challenged the City of Houston's practices under the Fourth Amendment, and the court ruled that the permissible period for the "administrative steps incident to arrest" concluded at 24 hours.  543 F.Supp. 699.  The plaintiffs did not raise, and the court did not decide, challenges under the Equal Protection and Due Process Clauses of the Constitution.

[9]  The order is available at Def. Ex. 95.

misdemeanor arrests, allowing the hearings to be by videolink rather than in person.  *Id*. at 2

(videolink), 3 (24 hours).

The *Roberson* order required judicial officers at the probable cause hearing to "set the amount

of bail required of the accused for release and determine the accused's eligibility for release on

personal bond or alternatives to prescheduled bail amounts." *Id*. at 3.  Substantially repeating Article

17.15 of the Texas Code of Criminal Procedure, Section D of the *Roberson* order stated:

> Such bail determinations shall be according to the following criteria:
>
> 1.  The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with;
>
> 2.  The nature of the offense for which Probable Cause has been found and the circumstances under which the offense was allegedly committed are to be considered, including both aggravating and mitigating factors for which there is reasonable ground to believe shown, if any;
>
> 3.  The ability to make bail is to be regarded, and proof may be taken upon this point;
>
> 4.  The future safety of the victim may be considered, and if this be a factor, release to a third person should also be considered; and
>
> 5.  The Judicial Officer shall also consider the accused's employment history, residency, family affiliations, prior criminal record, previous court appearance performance and any outstanding bonds.

*Id*. at 3.

The *Roberson* order required the County Judges to "implement and maintain a bond schedule

for all misdemeanor offenses within their jurisdiction." *Id*. at 4.  The schedule had to "establish the

initial amounts of bail required in each type or category of offense." *Id*.  The *Roberson* order

required that:

> At the Probable Cause hearing the [Hearing] Officer shall use the Bail Schedule, in addition to the criteria in Section D, in determining the appropriate bail in a given case.  The [Hearing] Officer shall have the authority to order the accused released on personal bond or

released on other alternatives to prescheduled bail amounts. The [County] Judges shall direct the Pretrial Services Agency to make every effort to insure that sufficient information is available at the time of the hearings required herein for the [Hearing] Officer to determine an accused's eligibility for a personal bond or alternatives to prescheduled bail amounts.

*Id*.

Nothing in the *Roberson* order contemplated detention based on a misdemeanor arrestee's inability to pay the scheduled bail amount set on a secured basis. Rather, the order required Hearing Officers to make individualized adjustments to the bail schedule in each case to provide a mechanism for release, either by lowering the scheduled amount when setting a secured bond; setting nonfinancial conditions of release; or granting release on unsecured "personal bonds" without additional conditions. *See id*. at 4, 1 (the purpose of the order is to provide "a meaningful review of *alternatives* to pre-scheduled bail amounts" (emphasis added)).

Finally, the *Roberson* order required the County Judges to appoint counsel "prior to any adversarial judicial proceedings" or "where the Judge concludes that the interests of justice require representation, for all accused indigents who do not refuse the appointment of counsel." *Id*. at 4. In determining indigency for the purpose of appointing counsel, the *Roberson* order required the County Judges to consider the accused's income and expenses, assets and debts, dependents, and "whether the accused has posted or is capable of posting bail." *Id*. In no case could a County Judge "deny appointed counsel to an accused solely because the accused has posted, or is capable of posting bail." *Id*.

Efforts to comply with the *Roberson* order have produced the system Harris County has in place today, examined in greater detail below.[10]   (Docket Entry No. 101 at 11); Hearing Tr. 4-2:222–29; 5:6–20. Harris County operates a Pretrial Services Agency that interviews

---

[10]  *See* Part I.D.2–3 *infra*.

misdemeanor arrestees to provide criminal risk and financial background information to the Hearing Officers.  The Hearing Officers hold videolink hearings for those arrested, charged, and booked into the Harris County Jail on misdemeanor charges.[11]  These hearings usually, but far from always, are held within 24 hours of arrest.  The Hearing Officers usually jointly determine probable cause and set bail.

### 3.    Bail at the Federal Level

At the federal level, the Judiciary Act of 1789 provided an absolute right to bail in noncapital cases and bail at the judge's discretion in capital cases. *See* 1 STAT. 73, 91.  The first Congress also proposed the Eighth Amendment to the United States Constitution, which, like the Texas Constitution and the English Bill of Rights, prohibits excessive bail.  *See* U.S. CONST. amend. VIII; TEX. CONST. art. 1, § 13.  But unlike the Texas Constitution, the United States Constitution does not explicitly state a right to bail.  The Eighth Amendment guarantees only that "[e]xcessive bail shall not be required." U.S. CONST. amend. VIII; *see Carlson v. Landon*, 342 U.S. 524, 545–46, (1952) (the Eighth Amendment does not provide a "right to bail").  But the United States Supreme Court has made clear that "[b]ail set at a figure higher than an amount reasonably calculated to fulfill [the] purpose [of assuring the defendant's appearance at trial] is 'excessive' under the Eighth Amendment."  *Stack v. Boyle*, 342 U.S. 1, 5 (1951). As the Court explained,

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a noncapital offense shall be admitted to bail.  This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves

---

[11]  The Harris County Hearing Officers also hold hearings, determine probable cause, and set bail in felony cases under rules and a bail schedule promulgated by the Harris County District Judges.  Hearing Tr. 4-1:115.  The *Roberson* order applied to procedures in Class A and B misdemeanor cases only.  *See, e.g.*, Def. Ex. 160 at 6.  The Hearing Officers' practices with regard to felony cases are not a subject of this litigation.

to prevent the infliction of punishment prior to conviction. See Hudson v. Parker, 1895, 156 U.S. 277, 285 . . . .   Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Id.* at 4; *see also Bandy v. United States*, 81 S.Ct. 197, 198 (1960) (Douglas, J., in chambers) ("It would be unconstitutional to fix excessive bail to assure that a defendant will not gain his freedom. Yet in the case of an indigent defendant, the fixing of bail in even a modest amount may have the practical effect of denying him release." (citing *Stack*, 342 U.S. at 1)); *United States v. Leathers*, 412 F.2d 169, 171 (D.C. Cir. 1969) ("the setting of bond unreachable because of its amount would be tantamount to setting no conditions at all").

The Bail Reform Act of 1966 became "the first major reform of the federal bail system since the Judiciary Act of 1789."  *State v. Brown*, 338 P.3d 1276, 1286 (N.M. 2014); *see* Bail Reform Act of 1966, 80 STAT. 214 (repealed 1984).  The stated purpose of the Bail Reform Act of 1966 was "to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges . . . when detention serves neither the ends of justice nor the public interest."  *Id.* § 2.  The Act required: (1) a presumption of release on personal recognizance unless the court determined that release would not reasonably assure the defendant's appearance in court; (2) the option of conditional pretrial release under supervision or other terms designed to decrease the flight risk; and (3) a prohibition on using money bail when nonfinancial release options such as supervisory custody or restrictions on "travel . . . or place of abode" could reasonably assure the defendant's appearance.  *See id.* § 3, § 3146(a).

Congress again revised federal bail procedures with the Bail Reform Act of 1984, enacted as part of the Comprehensive Crime Control Act of 1984.  *See* Bail Reform Act of 1984, 98 STAT. 1837, 1976 (codified at 18 U.S.C. §§ 3141–3150 (2012)). The legislative history of the 1984 Act

32

states that Congress wanted to "address the alarming problem of crimes committed by persons on release" and to "give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released." S. Rep. 98–225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185. The 1984 Act, as amended, retains most of the 1966 Act but "allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . the safety of any other person and the community.'" *United States v. Salerno*, 481 U.S. 739, 741 (1987) (omission in original) (quoting the Bail Reform Act of 1984) (upholding the preventive detention provisions in the 1984 Act).

The federal history of bail reform confirms that bail is a mechanism of pretrial release, not of preventive detention. Pretrial preventive detention in federal cases requires counseled, adversarial hearings with findings stated on the record that, by clear and convincing evidence, no less restrictive alternative can reasonably assure the defendant's presence at trial. *See id*. In *United States v. McConnell*, 842 F.2d 105 (5th Cir. 1988), the Fifth Circuit held that "a bail setting is not constitutionally excessive merely because a defendant is financially unable to satisfy the requirement." *Id*. at 107. The magistrate judge in *McConnell* had initially ordered the felony defendant detained before trial with no release condition under the provision of the Bail Reform Act recently upheld in *Salerno*. *See id*. at 106. The district court replaced the detention order with a set of conditions for release, including weekly check-ins with pretrial services, travel restrictions, and secured money bail of $750,000. *Id*. The defendant moved for reconsideration, alleging that he did not have the assets to pay the secured money bail. The defendant appealed the district court's denial of his motion for reconsideration, and the Fifth Circuit remanded to the district court for a written

opinion with findings on the record. *Id*. The court issued written findings, and a second appeal followed. *Id*.

The Fifth Circuit recognized that under the Bail Reform Act, Congress "proscrib[ed] the setting of a high bail as a *de facto* automatic detention practice." *Id*. at 109. The Fifth Circuit relied on the Senate Report of the Bail Reform Act, which explained that:

> section 3142(c) provides that a judicial officer may not impose a financial condition of release that results in the pretrial detention of the defendant. The purpose of this provision is to preclude the sub rosa use of money bond to detain dangerous defendants. However, its application does not necessarily require the release of a person who says he is unable to meet a financial condition of release which the judge has determined is the only form of conditional release that will assure the person's future appearance. Thus, for example, if a judicial officer determines that a $50,000 bond is the only means, short of detention, of assuring the appearance of a defendant who poses a serious risk of flight, and the defendant asserts that, despite the judicial officer's finding to the contrary, he cannot meet the bond, the judicial officer may reconsider the amount of the bond. If he still concludes that the initial amount is reasonable and necessary then it would appear that there is no available condition of release that will assure the defendant's appearance. This is the very finding which, under section 3142(e), is the basis for an order of detention, and therefore the judge may proceed with a detention hearing pursuant to section 3142(f) and order the defendant detained, if appropriate. The reasons for the judicial officer's conclusion that the bond was the only condition that could reasonably assure the appearance of the defendant, the judicial officer's finding that the amount of the bond was reasonable, and the fact that the defendant stated that he was unable to meet this condition, would be set out in the detention order as provided in section 3142(i)(1). The defendant could then appeal the resulting detention pursuant to section 3145.

*Id*. at 108–09 (quoting S.Rep. No. 225, 98th Cong.2d Sess. 16, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3199). The Fifth Circuit concluded that the district court could set a secured money bail amount beyond the defendant's ability to pay, but "[i]n such an instance, the court must explain its reasons for concluding that the particular financial requirement is a necessary part of the conditions for release. It is sufficient for the court to find by a preponderance of evidence that the defendant poses a serious risk of flight." *Id*. at 110. When federal bail functions as an order of detention because of the defendant's inability to pay, the court must treat the bail as an order of detention under

§ 3142(e) and must provide the procedural protections that section requires, with a preponderance-of-the-evidence standard.  *See also United States v. Mantecon-Zayas*, 949 F.2d 548, 550 (1st Cir. 1991) ("once a court finds itself in this situation—insisting on terms in a 'release' order that will cause the defendant to be detained pending trial—it must satisfy the procedural requirements for a valid *detention* order").

### 4.    Bail under Texas Law

The Texas state appellate court practice is similar to federal court practice.  Texas courts have imposed or confirmed high money bail after a judicial officer holds an adversarial hearing, with defense counsel present, and issues a reasoned opinion with written findings permitting secured money bail despite inability to pay in felony cases in which pretrial preventive detention without bail is available under Article I, § 11 of the Texas Constitution.  *See, e.g.*, *Jobe v. State*, 482 S.W.3d 300 (Tex. App.—Eastland 2016) (charge of capital murder); *Ex parte Ragston*, 422 S.W.3d 904 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (capital murder, first-degree murder, and aggravated robbery); *Ex parte Vasquez*, 558 S.W.2d 477 (Tex. Cr. App. 1977) (capital murder).  In cases in which preventive detention is not available, Texas appellate courts have confirmed high money bail in felony cases when the evidence did not show the defendant's inability to pay.  *See, e.g.*, *Ex parte Dupuy*, 498 S.W.3d 220, 233 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("Appellant offered no evidence, and we see none in the record, suggesting the trial court set his bail at $200,000 for each case in order to keep him incarcerated."); *Cooley v. State*, 232 S.W.3d 228, 235 (Tex. App.—Houston [1st Dist.] 2007) ("Cooley owns half of a multi-million dollar air freight business and did not introduce evidence that revenues from it were unavailable to him."); *Ex parte Charlesworth*, 600 S.W.2d 316, 317 (Tex. Cr. App. 1980) (evidence showed the defendants "live

in a style inconsistent with poverty"); *Ex parte Welch*, 729 S.W.2d 306, 310 (Tex. App.—Dallas 1987, no pet.) (incomplete and conflicting evidence on ability to pay in a case charging solicitation of capital murder committed while the defendant was already on pretrial release on a secured money bail).

In a narrow set of felony cases, Texas courts have imposed or confirmed high money bail despite evidence of inability to pay the amount needed for pretrial release. "When the offense is serious and involves aggravating factors that may result in a lengthy prison sentence," a higher money bail than the defendant can pay is permissible, but only after satisfying the same due process requirements as an actual detention order. *Dupuy*, 498 S.W.3d at 230; *see, e.g.*, *Maldonado v. State*, 999 S.W.2d 91 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (charges of possessing cocaine with a street value of $11–72 million with a possible sentence of 99 years); *Ex parte Miller*, 631 S.W.825 (Tex. App.—Ft. Worth 1982) (charges of murder and rape carrying life sentence); *Ex parte Runo*, 535 S.W.2d 188 (Tex. Cr. App. 1976) (bail set at $125,000 on a charge carrying a life sentence was not excessive, but bail set at $75,000 on a charge carrying a minimum two-year sentence was excessive and had to be reduced to $5,000). Even so, Texas courts are careful to distinguish between transparent pretrial preventive detention orders and de facto pretrial detention orders imposed by setting bail higher than the defendant can pay. *See, e.g.*, *Dupuy*, 498 S.W.3d at 230; *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.) (setting bail "on the obvious assumption that appellant could not afford bail in that amount and for the express purpose of forcing [the defendant] to remain incarcerated" was overturned for abuse of discretion); *Ex parte Nimnicht*, 467 S.W.3d 64, 70 (Tex. App.—San Antonio 2015) ("There is no evidence the trial court set bail with the intent to prolong Nimnicht's incarceration, especially in light of the fact the trial

court reduced the bail amount.").[12]

The defendants argue that, while Texas law forbids setting bail higher than a defendant can pay in order to impose a de facto pretrial detention order, if a judicial officer weighs all five factors of Article 17.15 of the Texas Code of Criminal Procedure and then imposes a bail amount that an indigent arrestee cannot pay, the bail is not a de facto detention order. (*See, e.g.*, Docket Entry No. 164 at 8–10, 18; No. 263 at 3–4; No. 266 at 7–8). The defendants overstate the Article 17.15 factors and their role. The Texas cases make clear that a judge may arrive at a bail amount that a defendant cannot pay when the defendant is facing a felony charge carrying an extended prison sentence. Even then, the bail setting requires an adversarial, counseled hearing at which the defendant can put on evidence of indigence and likelihood of compliance with nonfinancial conditions of release, and reviewable findings, stated on the record, that the secured financial condition is reasonably necessary to assure the defendant's appearance at trial or law-abiding conduct.[13] In misdemeanor cases, pretrial

---

[12] The unpublished, nonprecedential Texas cases the defendants cite are all along the same lines. The cases involve felony charges, most of them first-degree felonies. In each, the appellate court found that: the evidence did not support a finding of indigence; *see, e.g.*, *Ex parte Murray*, 2013 WL 5425312 (Tex. App.—Ft. Worth 2013, no pet.) (defendant's father owned several rental properties and did not disclose whether collateral would be available for bond); *Ex parte Cleveland*, 1997 WL 451601 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) (defendant had $200,000 in stocks and had filed a motion to unfreeze the assets to meet a bail of $200,000); *In re Flores*, 2003 WL 22682520 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (testimony from a bail bondsman insufficient to establish inability to pay); *Lawhon v. State*, 2015 WL 7424763 (Tex. App.—Austin 2015, no pet.) (testimony from defendant's mother did not establish whether defendant could pay the bail or not); or the fact of indigence was outweighed because the case charged either capital murder or multiple serious felonies, for which preventive detention was available; *see, e.g.*, *Ex parte Tomlinson*, 2002 WL 31008642 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Smith v. State*, 2001 WL 421236 (Tex. App.—Houston [14th Dist.] 2001, no pet.); *Peterson v. State*, 1993 WL 406758 (Tex. App.—Houston [14th Dist.] 1993, no pet.); or bail was irrelevant because the defendant was held for a probation violation; *see, e.g.*, *Ex parte Abdullah*, 2011 WL 2226153 (Tex. App.—Texarkana 2011, pet ref'd). In each case, the defendant was provided an adversarial hearing with the opportunity to present evidence and contest the State's evidence. And in many cases, the trial court lowered the initial bail amount after making specific findings on the balance of the state-law factors. *See, e.g.*, *Abdullah*, *Cleveland*, *Flores*, and *Lawhon*, *supra*.

[13] The Texas cases do not specify the evidentiary standard for bail-setting hearings. The burden of proof is on a defendant who claims bail is excessive. *Ex parte Rubac*, 611 S.W.2d 848, 849 (Tex. Crim. App.

preventive detention is permitted only when a defendant is facing a family violence charge after previously violating a release condition in an earlier family violence case.  In those cases, it is not necessary to use secured money bail to effect the detention of those who cannot pay.  The Texas Constitution permits a transparent order of pretrial preventive detention.

> **5.**      **Recent Distinctions Drawn Between Bail and Preventive Detention**

>> a.      *Washington, D.C.*

In 1994, Washington, D.C. amended its Code using language substantially similar to the federal Bail Reform Act.  The amended Code permits a judicial officer to set "a financial condition to reasonably assure the defendant's presence at all court proceedings that does not result in the preventive detention of the person, except as provided in" the Code's regulations of preventive pretrial detention orders.  D.C. CODE § 23-1321(c)(3).  The Code permits preventive detention only in cases involving a charge of violent or dangerous crime, as well as in cases presenting a "serious risk that the person will flee." *Id*. § 23-1322(b)(1).  To order preventive detention, a judge must: hold a hearing at the first appearance of the defendant before a judicial officer; appoint counsel for the defendant; permit the defendant to put on evidence, testify, and call witnesses; and make written findings "by clear and convincing evidence that no condition or combination of conditions will reasonably assure the appearance of the person as required, and the safety of any other person and the community." *Id*. § 23-1322(b)(2)–(d)(7).

---

1981); *Ex parte Martinez–Velasco*, 666 S.W.2d 613, 614 (Tex. App.—Houston [1st Dist.] 1984, no pet.). In reviewing a trial court's ruling for an abuse of discretion, an appellate court will not intercede as long as the trial court's ruling is at least within the zone of reasonable disagreement. *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990)).  But an abuse-of-discretion review requires more of the appellate court than simply deciding that the trial court did not rule arbitrarily or capriciously.  *Beard*, 92 S.W.3d at 573; *Montgomery*, 810 S.W.2d at 392.  The appellate court must instead measure the trial court's ruling against the relevant criteria by which the ruling was made.  *Id*.

Judge Truman Morrison of the D.C. Superior Court credibly testified at the motion hearing that until the 1994 amendment, the D.C. courts did not order preventive detention outright. The statutory prohibition on using secured money bail to assure community safety was also "a dead letter." Hearing Tr. 2-2:137. "So in cases of any seriousness, judges made an effort nontransparently, never saying what they were doing out loud, to immobilize high-risk people—who they thought were high-risk people—with money bonds that they hoped would be beyond their reach." *Id*. Judge Morrison testified that after the 1994 rule change, "[f]or the high-risk people that we used to immobilize nontransparently, we turned to this preventive detention statute that was moldering on the bookshelf, and prosecutors and judges began using that for high-risk people." *Id*. at 2-2:139. For "somewhat serious misdemeanors who we had been keeping in the jail on lower levels of money bond," judges began to order alternative nonfinancial conditions of release with supervision provided by D.C.'s pretrial services agency. *Id*. at 2-2:139–40. Based on a recent report by that agency, Judge Morrison testified that although secured money bail is still available under the D.C. Code, such bail is almost never imposed in misdemeanor cases. Transparent preventive detention orders are issued in only about 1.5 percent of misdemeanor cases, and then only after counseled, adversary hearings with findings on the record that there are no less restrictive conditions that will assure the defendant's presence at trial or the safety of the community.[14] *Id*. at 2-2:149, 154; D.C. CODE § 23-1322(b)(2)–(d)(7).

---

[14] Judge Morrison testified that one exception in his past practice was to automatically impose a $500 bond on pretrial arrest warrants with the intent of revisiting conditions of release at a counseled first appearance hearing, generally held within 24 hours of arrest. Hearing Tr. 2-2:163–64. Judge Morrison credibly testified that his participation in this litigation has caused him to rethink the practice and petition the chief judge of the D.C. Superior Court to have the practice changed across the court system. *Id*. at 2-2:164.

b.    *New Mexico*

In 2014, the New Mexico Supreme Court ruled that "[n]either the New Mexico Constitution nor our rules of criminal procedure permit a judge to set high bail for the purpose of preventing a defendant's pretrial release." *Brown*, 338 P.3d at 1292 (citing N.M. CONST. art. II, § 13—substantially the same language as TEX. CONST. art. I, § 11). The court explained that "[i]ntentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether." *Id.* The supreme court held that the trial court had abused its discretion by requiring secured money bail "solely on the basis of an accusation of a serious crime" and had failed to apply the New Mexico Code of Criminal Procedure requirement that trial courts impose the least restrictive bail and release conditions to reasonably assure a defendant's appearance and the public's safety. *Id.* at 1291–92.

In 2016, New Mexico voters codified the holding of *State v. Brown* in a constitutional amendment that passed with 87.2 percent of the vote.[15] The amendment provided that "[b]ail may be denied by a court of record pending trial for a defendant charged with a felony if the prosecuting authority requests a hearing and proves by clear and convincing evidence that no release conditions will reasonably protect the safety of any other person or the community. An appeal from an order denying bail shall be given preference over all other matters." Constitutional Amendment 1, New Mexico Senate Joint Resolution 1, March 1, 2016.[16] The amendment also required that "[a] person who is not detainable on grounds of dangerousness nor a flight risk in the absence of bond and is otherwise eligible for bail shall not be detained solely because of financial inability to post a money

---

[15] Official Results of the November 8, 2016 General Election, New Mexico Secretary of State, *available at* http://electionresults.sos.state.nm.us/resultsSW.aspx?type=SW&map=CTY.

[16] *Available at* http://www.sos.state.nm.us/uploads/files/CA1-SJM1-2016.pdf.

40

or property bond." *Id.*  Under the amendment, courts cannot order preventive detention for misdemeanor arrestees or accomplish the same effect by setting a secured money bail that an indigent defendant cannot pay.

c.   New Jersey

New Jersey recently amended its constitution and statutes to enact statewide bail reforms. The changes went into effect on January 1, 2017.  The New Jersey Constitution now provides that "[p]retrial release may be denied to a person if the court finds that no amount of monetary bail, non-monetary conditions of pretrial release, or combination of monetary bail and non-monetary conditions would reasonably assure the person's appearance in court when required, or protect the safety of any other person or the community, or prevent the person from obstructing or attempting to obstruct the criminal justice process."  N.J. CONST. art. 1, § 11.

In a detailed law-enforcement directive, the New Jersey Attorney General concluded that under New Jersey's prior practice, "in most cases the critical determination whether a defendant [was] released pending trial or instead incarcerated in a county jail [was] not made by a judge issuing a well-reasoned court order.  Rather, for all practical purposes, defendants [were] released or detained based on whether they happen[ed] to have the financial means to post bail."  N.J. Attorney General Law Enforcement Directive No. 2016-6 at 9.  New Jersey changed.  Its current system creates a presumption against the use of secured money bail unless the prosecutor can show that "no non-monetary release condition or combination of conditions would be sufficient to reasonably assure the defendant's appearance in court when required"; "the defendant is reasonably believed to have financial assets that will allow him or her to post monetary bail in the amount requested by the prosecutor without having to purchase a bond from a surety company or to obtain a loan"; and

41

"imposition of monetary bail set at the amount requested would . . . make it unnecessary for the prosecutor to seek pretrial detention." *Id*. at 56.  Secured money bail cannot be used to achieve or to have the effect of a pretrial detention order.  Out of 3,382 cases filed in the first month under the new law, judges imposed transparent orders of pretrial detention in 283 cases and denied pretrial detention when requested to do so in 223 cases.  Secured money bail was set in only 3 cases.  Pls. Ex. 7(k) at 1.

New Jersey does not distinguish between felony and misdemeanor cases but between numbered "categories" of offenses, making comparisons to the Texas misdemeanor bail system difficult.  The New Jersey numbers are for all case categories.  *Id*.  Because this approach clearly applies to more serious felony-level cases, the basis for applying it to misdemeanor cases is even stronger.

### d.    New Orleans

On January 12, 2017, the Council of the City of New Orleans, where the municipal courts have jurisdiction only over misdemeanor cases, passed a measure reforming its bail ordinance.  Pls. Ex. 12(tt).  The preamble states that "incarcerating people solely due to their inability to pay for their release through the payment of cash bond violates the Equal Protection Clause of the Fourteenth Amendment."  *Id*. at 1 (citing *Barnett v. Hopper*, 548 F.2d 550, 554 (5th Cir. 1977).  The new ordinance requires that except for four enumerated offenses—battery, possession of weapons, impersonating a peace officer, and domestic violence—all misdemeanor arrestees are to be released on personal recognizance.  *Id*. at 2–3.  For those charged with one of the enumerated offenses, the municipal courts must "impose the least restrictive non-financial release conditions." *Id*. at 3.  "For any person who qualifies for indigent defense, or does not have the present ability to pay, the Court

may not set" any financial condition of release or a nonfinancial condition of release "that requires fees or costs to be paid by the defendant." *Id*. Other than the four specific exceptions for offenses that involve violence or other public safety threats, all defendants must be released with no financial conditions. If a financial condition is imposed, the defendant must have "the present ability to pay the amount set." *Id*.

e.   *Maryland*

On February 17, 2017, the Maryland Court of Appeals adopted detailed changes to its court rules, the main source of criminal procedural law in Maryland. The rule changes will take effect on July 1, 2017. Pls. Ex. 12(p)(i), Court of Appeals of Maryland, Rules Order, Feb. 17, 2017 at 3. The rule changes are "designed to promote the release of defendants on their own recognizance or, when necessary, unsecured bond" by establishing a "[p]reference" for "additional conditions [of release] without financial terms." *Id*. at 33. All defendants—both felony and misdemeanor—must be released on personal recognizance or unsecured bond unless a judicial officer makes written findings on the record "that no permissible non-financial condition attached to a release will reasonably ensure (A) the appearance of the defendant, and (B) the safety of each alleged victim, other persons, or the community." *Id*. at 35. Even in those circumstances, the new rules require that "[a] judicial officer may not impose a special condition of release with financial terms in form or amount that results in the pretrial detention of the defendant solely because the defendant is financially incapable of meeting that condition." *Id*. at 39. Pretrial detention must not be the intended use or the incidental effect of secured money bail.

Before the rule change, the Maryland Attorney General wrote to the rules committee chairman that "[a]lthough Maryland law permits unconditional pretrial detention only where no

43

conditions of release will reasonably protect the public or ensure the defendant's appearance at trial, nearly every evaluation of Maryland's pretrial system has found no relationship between a pretrial detainee's perceived risk and the bond amount set. . . .   Lower risk defendants are detained because they cannot afford the bail, while higher risk defendants who have access to financial resources are able to make bail and are often permitted to do so without imposition of other conditions to protect the public."  Pls. Ex. 12(p) at 3 (citing reports).   An advisory memo from the then United States Attorney General stated that "[a]s a general proposition, Maryland's judicial officials . . . do not properly and consistently consider defendants' individual circumstances, and particularly their financial resources, in making bail determinations.  As a result, arrestees in Maryland habitually face extended periods of pretrial detention not as a result of their dangerousness to the community or because they pose a substantial risk of flight, but solely because they are unable to pay bail."  Pls. Ex. 12(p)(ii) at 7.  The memo concluded that this system, and those like it, violated both state law and the federal Constitution.  *Id*. at 4–11.

### f.     Alabama

Some of the same lawyers representing the plaintiffs in this case have brought similar actions challenging bail systems around the country.  Several actions were resolved with an agreed final judgment.  These judgments typically state that "[i]f the government offers release from custody after arrest upon the deposit of money pursuant to a bail schedule, it cannot deny release from custody to a person, without a hearing regarding the person's indigence and the sufficiency of the bail setting, because the person is unable to deposit the amount specified by the schedule."  *Jones v. City of Clanton, Alabama*, Civil No. 15-34, 2015 WL 5387219 at *4  (M.D. Ala. Sep. 14, 2015) (citing *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978); *Bearden v. Georgia*, 461 U.S. 660 (1983); *State*

*v. Blake*, 642 So.2d 959 (Ala. 1994)); *see also Jenkins v. City of Jennings*, Civil No. 15-252 (E.D. Mo. Dec. 14, 2016); *Bell v. City of Jackson*, Civil No. 15-252 (E.D. Mo. June 20, 2016); *Thompson v. Moss Point*, Civil No. 15-182 (S.D. Miss. Nov. 6, 2015); *Snow v. Lambert*, Civil No. 15-567 (M.D. La. Aug. 27, 2015); *Cooper v. City of Dothan*, Civil No. 15-425 (M.D. Ala. June 18, 2015); *Pierce v. City of Velda*, Civil No. 15-570 (E.D. Mo. June 3, 2015).  In *Jones*, the court independently confirmed the need for relief, reasoning that "[b]ail schemes such as the one formerly enforced in the municipal court result in the unnecessary pretrial detention of people whom our system of justice presumes to be innocent," and that "[c]riminal defendants, presumed innocent, must not be confined in jail merely because they are poor."  *Jones*, 2015 WL 5387219 at *3.

The U.S. Department of Justice filed a statement of interest in *Jones*, stating that "[i]ncarcerating individuals solely because of their inability to pay for their release, whether through the payment of fines, fees, or a cash bond, violates the Equal Protection Clause of the Fourteenth Amendment."[17]  *See Varden v. City of Clanton, Alabama*, Civil No. 15-34, Docket Entry No. 26 at 1 (M.D. Ala. Feb. 13, 2015).  The Justice Department reasoned that because rigidly adhering to a secured money bail schedule "do[es] not account for individual circumstances of the accused, [it] essentially mandate[s] pretrial detention for anyone who is too poor to pay the predetermined fee. This amounts to mandating pretrial detention only for the indigent."  *Id*. at 9.  After *Jones*, fifty of Alabama's largest cities, accounting for 40 percent of the population, voluntarily reformed their bail systems to either release misdemeanor defendants on personal recognizance or, at a minimum, to set

---

[17]  The following year, the Justice Department  issued a "Dear Colleague Letter" advising state and local courts that due process and equal protection principles forbid using "bail or bond practices that cause indigent defendants to remain incarcerated solely because they cannot afford to pay for their release."  Letter from Vanita Gupta to Colleagues at 2 (Mar. 14, 2016), *available at* https://www.justice.gov/crt/file/832461/download.

an early hearing to consider alternative methods of release to secured money bail.  Pls. Ex. 12(l).

        *g.*     *Calhoun, Georgia*

Some of the plaintiffs' counsel also represented the plaintiffs in *Walker v. City of Calhoun, Georgia*, Civil No. 15-170, 2016 WL 361612 (N.D. Ga. Jan. 28, 2016).  A putative class of misdemeanor arrestees alleged that Calhoun detained them on prescheduled amounts of secured money bail that were not reviewed except at court sessions held each Monday.  *Id.* at *1.  The trial court granted the plaintiffs' motion for a preliminary injunction, finding that "keeping individuals in jail solely because they cannot pay for their release, whether via fines, fees, or a cash bond, is impermissible." *Id.* at *10 (citations omitted).  The court ordered Calhoun to "implement postarrest procedures that comply with the Constitution," and directed that "until Defendant implements lawful postarrest procedures, Defendant must release any other misdemeanor arrestees in its custody, or who come into its custody, on their own recognizance or on unsecured bond in a manner otherwise consistent with state and federal law and with standard booking procedures."  *Id.* at *14.  The Eleventh Circuit vacated the injunction because requiring the defendant to implement constitutional procedures was "the archetypical and unenforceable 'obey the law' injunction" forbidden by Federal Rule of Civil Procedure 65.  *Walker v. City of Calhoun, Georgia*, — F.App'x —, 2017 WL 929750 at *2 (11th Cir. Mar. 9, 2017).  The panel did not consider the merits, instead remanding for the district court to enter a specific order consistent with Rule 65.  *See id.*

*Walker* attracted significant attention.  Ten amicus briefs were filed, including by the American Bar Association, the U.S. Department of Justice, the Pretrial Justice Institute and National Association of Pretrial Services Agencies, the Cato Institute, and various representatives of bail bonds associations, Georgia law-enforcement personnel, and other municipalities and their insurers.

46

The relevant amicus briefs are included in the record here.

The American Bar Association's amicus brief in *Walker* argued that "[m]onetary conditions of release should never be drawn from an inflexible schedule, should be imposed only after consideration of the defendant's individual circumstances, and should never prevent the defendant's release solely because the defendant is unable to pay."  Pls. Ex. 12(ff) at 12.  The Third Edition of the *ABA Standards for Criminal Justice, Pretrial Release* (3d ed. 2007), recommend "procedures designed to promote the release of defendants on their own recognizance or, when necessary, unsecured bond."  Standard 10-1.4(a).  Jurisdictions should impose financial conditions only "when no other conditions will ensure appearance," and financial conditions "should not be employed to respond to concerns for public safety."  Standard 10-1.(4c)–(d).  The *Standards* also emphasize that "[t]he judicial officer should not impose a financial condition of release that results in the pretrial detention of a defendant solely due to the defendant's inability to pay." Standard 10-1.4(e).

The American Bar Association's brief emphasizes that "[u]nwarranted pretrial detention infringes on defendants' constitutional rights, 'making it difficult for the defendant to consult with counsel, locate witnesses, and gather evidence' and placing a particularly heavy burden on 'poor defendants and on racial and cultural minorities.'" Pls. Ex. 12(ff) at 14 (quoting *Standards* at 32–33). The commentary to the *Standards* states that "[i]f the court finds that unsecured bond is not sufficient, it may require the defendant to post bail; however, *the bail amount must be within the reach of the defendant* and should not be at an amount greater than necessary to assure the defendant's appearance in court."  *Id*. (quoting with emphasis *Standards* at 43–44).  The brief concludes that detaining a defendant solely for failure to pay a secured financial condition of release is unwarranted and unconstitutional.  *Id*.

47

The Justice Department's brief expanded the statement of interest it submitted in the *Jones* Alabama bail case. The brief reasoned that, based on Supreme Court precedent, "[i]f a court finds that no other conditions may reasonably assure an individual's appearance at trial, financial conditions may be constitutionally imposed—but 'bail must be set by a court at a sum designed to ensure that goal, and *no more*.'" Pls. Ex. 12(dd) at 18 (quoting with emphasis *Salerno*, 481 U.S. at 754). "Although the imposition of bail in such circumstances may result in a person's incarceration," the Department explained, "the deprivation of liberty in such circumstances is not based *solely* on inability to pay." *Id*. But adhering to "fixed bail schedules that allow for the pretrial release of only those who can pay, without accounting for ability to pay and alternative methods of assuring future appearance, do not provide for such individualized determinations, and therefore unlawfully discriminate based on indigence." *Id*.

The Justice Department's argument is stated less strongly than the American Bar Association's. While the American Bar Association argues that defendants must not be detained solely because of their inability to pay secured money bail, the Justice Department interprets "solely" to exclude those who cannot pay a secured money bail because it has been set beyond their reach due to their risk of flight. *See id*. Both arguments are consistent with the reforms surveyed above. Some jurisdictions, such as Washington, D.C., New Mexico, New Jersey, and New Orleans, do not permit secured money bail settings to result in pretrial detention or operate as de facto pretrial preventive detention orders in misdemeanor cases, in line with the American Bar Association's recommendations. Others, such as Maryland and Alabama, permit secured money bail to have the effect of detention only if the court follows the procedures required for pretrial preventive detention, in line with the Justice Department's argument. In those cases, a judicial officer must make written

findings after an adversarial, counseled hearing that secured money bail in the amount set is the only, or the least restrictive, condition that can reasonably assure the defendant's appearance at trial.

The Pretrial Justice Institute and the National Association of Pretrial Services Agencies submitted a brief in *Walker* using empirical data to argue that secured money bail, as opposed to an unsecured appearance bond, is never the only reasonable condition that will assure an individual's appearance at trial or community safety.  Pls. Ex. 12(hh).  The brief presented data showing that those released on secured money bail do not appear at greater rates or commit new crimes at lower rates than those released on unsecured bonds.  *Id.*  Secured money bail schedules can effectively increase rates of appearance when they operate as detention orders, but "the use of such schedules inevitably leads to the detention of some persons who pose little threat to public safety, but are too poor to afford release, while releasing others that pose a higher safety risk (but can afford to post bond)."  *Id.* at 25.

### h.    Conclusion

In addition to the policy changes that a number of jurisdictions have already implemented or are in the process of implementing, even more jurisdictions have announced that they are examining or are about to reform their bail systems.[18]  A common theme among these reformed and reforming jurisdictions is that, before recent rule changes, each jurisdiction as a matter of routine practice either intentionally used or indifferently permitted the use of secured money bail as de facto detention orders against those financially unable to pay.  *See, e.g.*, *Brown*, 338 P.3d at 1292 ("We

---

[18] *See, e.g.*, Arizona Supreme Court, *Justice for All: Report and Recommendations of the Task Force on Fair Justice for All: Court-Ordered Fines, Penalties, Fees, and Pretrial Release Policies* (Oct. 31, 2016), *available at* Pls. Ex. 12(vv); Utah Auditor General, *A Performance Audit of Utah's Monetary Bail System* (Jan. 2017), *available at* Pls. Ex. 12(uu); *see also* "Foxx agrees to release of inmates unable to post bonds of up to $1,000 cash," *Chicago Tribune*, Mar. 1, 2017; "Committee Announces Sweeping Code Reforms, Changes to Bail," *Delaware Law Weekly*, Mar. 22, 2017.

understand that this case may not be an isolated instance and that other judges may be imposing bonds based solely on the nature of the charged offense without regard to individual determinations of flight risk or continued danger to the community."); Pls. Ex. 12(p); Hearing Tr. 2-2:137.  The other theme is that this practice did not hold up to historical, empirical, political, or legal scrutiny.

Whether by legislative enactment, judicial rulemaking, or court order, there is a clear and growing movement against using secured money bail to achieve a misdemeanor arrestee's continued detention.  Of course, it is not a federal court's role in any way to make policy judgments. *See, e.g.*, *Brown v. Plata*, 563 U.S. 493 at 537–38 (2011).  The question this case presents is not what is the best or even a good bail policy.  The question is what bail system the Constitution requires and what system it prohibits.  The Constitution sets minimum standards of due process and protects basic rights such as the presumption of innocence and the ability to prepare for trial.  State and local governments may add to, but may not detract from, these basic protections. *See, e.g.*, *Gerstein*, 420 U.S. at 124.  The question is whether Harris County meets the constitutionally minimum standards and procedures.

### D.     The Use of Bail in Harris County Misdemeanor Pretrial Detention

#### 1.     The Statutory Framework

The Texas Code of Criminal Procedure defines "bail" as "the security given by the accused that he will appear and answer before the proper court the accusation brought against him, and includes a bail bond or a personal bond." TEX. CODE CRIM. PRO. art. 17.01.  Except for certain types of felonies, "a magistrate may, in the magistrate's discretion, release the defendant on his personal bond without sureties or other security."[19] *Id*. art. 17.03(a).  A personal bond requires the defendant

---

[19] Felony defendants may be released on personal bond only by the "court before whom the case is pending." TEX. CODE CRIM. PRO. art. 17.03(b).  The Texas Code of Criminal Procedure designates the

to swear an oath that if he or she fails to appear, the principal sum the court sets becomes due. *Id*. art. 17.04. The magistrate granting a personal bond may assess a nonrefundable bond fee "of $20 or three percent of the amount of the bail fixed for the accused, whichever is greater." *Id*. art. 17.42, § 4(a). Magistrates may postpone, reduce, or waive the fee. *Id*. art. 17.03(g).

Texas law does not facially provide for release on no financial conditions. The "personal bond" defined in Texas law differs from what other jurisdictions call a personal bond or a personal recognizance bond by requiring a principal sum that becomes due if the defendant fails to appear. *See, e.g.*, Goldfarb, *supra*, at 153–54 (personal recognizance in New York is release solely "on one's honor pending trial"); *Brown*, 338 P.3d at 1289 (distinguishing release on "personal recognizance" from release "upon the execution of an unsecured bond," which makes a sum due if the defendant fails to appear).[20]

The Texas Code of Criminal Procedure states that "[t]he amount of bail to be required in any case is to be regulated by the court, judges, magistrate or officer taking the bail; they are to be governed in the exercise of this discretion" by five rules:

1.  The bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with.

2.  The power to require bail is not to be so used as to make it an instrument of

---

Harris County Hearing Officers and County Criminal Court at Law Judges as magistrates. *Id*. art. 2.09.

[20] Texas's scheme points up a flaw in the amicus brief filed by the American Bail Coalition, the Professional Bondsmen of Texas, and the Professional Bondsmen of Harris County. (Docket Entry No. 182). The brief consistently and ahistorically assumes that references to "bail" always mean secured money bail with a monetary payment required up front as a condition of release. (*See id*. at 4–6). But in many instances, sureties would provide no payment unless the principal failed to appear—what many jurisdictions in modern parlance call an unsecured appearance bond (and what Texas calls a "personal bond" to indicate that the surety and principal are the same person). *See* Part I.C.1 *supra*. By assuming that all pretrial release must either be conditioned on secured money bail with an up-front financial payment or on no financial condition at all, the bondsmen's brief provides little relevant argument or evidence for this case in Texas, in which all release is on one sort of financial condition or another.

oppression.

3.     The nature of the offense and the circumstances under which it was committed are to be considered.

4.     The ability to make bail is to be regarded, and proof may be taken upon this point.

5.     The future safety of a victim of the alleged offense and the community shall be considered.

TEX. CODE CRIM. PRO. art. 17.15.

In Harris County, "magistrates" include Hearing Officers and County Judges. *See id*. art. 2.09. In addition to a magistrate's discretion to issue a personal bond, the Texas Code of Criminal Procedure permits the arresting officer to release defendants accused of certain misdemeanors by citation only. *Id*. art. 14.06. The Code permits the arresting officer to cite-and-release those arrested for Class A or B misdemeanors for possessing small amounts of marijuana or certain other controlled substances, criminal mischief causing damage up to $2,500, graffiti, theft of property or service up to the value of $2,500, supplying contraband to prisoners, or driving without a license. *Id*. Major Patrick Dougherty testified that the Houston Police Department and Harris County follow the cite-and-release practice only for traffic-related Class C misdemeanor arrestees. Hearing Tr. 3-2:47–48 ("All Houston police officers basically book all their prisoners in the City Jail, regardless of whether it is a felony, misdemeanor or a Class C offense."), 52. The Harris County District Attorney has recently implemented a cite-and-release policy, as well as a diversionary program, for misdemeanor arrests for possessing small amounts of controlled substances. Hearing Tr. 3-2:178. Under the County's diversionary program, the District Attorney's office postpones charges for misdemeanor arrestees who agree to complete educational courses. These arrestees are not subjected to the booking and bail setting processes described below because

the District Attorney declines charges at that time.  Hearing Tr. 4-1:21–22.

The Texas Government Code permits the County Judges to "adopt rules consistent with the Code of Criminal Procedure . . . for practice and procedure in the courts.  A rule may be adopted by a two-thirds vote of the judges."  TEX. GOV'T CODE ANN. § 75.403(f).  At least three times since the beginning of 2016, the Harris County Criminal Courts at Law Judges, sitting en banc and voting by two-thirds majority, adopted or amended the Harris County Criminal Courts at Law Rules of Court.[21] The current version is the Rules of Court as amended on February 9, 2017.  The Rules of Court contain a misdemeanor bail schedule, *id.* Rule 9, and provide that "[t]he initial bail amount may be changed on motion of the court, the hearing officer, or any party subject to the following criteria":

> 4.2.3.1.1.  the bail shall be sufficiently high to give reasonable assurance that the defendant will comply with the undertaking;
>
> 4.2.3.1.2.  the nature of the offense for which probable cause has been found and the circumstances under which the offense was allegedly committed are to be considered, including both aggravating and mitigating factors for which there is reasonable ground to believe shown, if any;
>
> 4.2.3.1.3.  the ability to make bail is to be regarded, and proof may be taken upon this point;
>
> 4.2.3.1.4.  the future safety of the victim and the community may be considered, and if this is a factor, release to a third person should also be considered; and
>
> 4.2.3.1.5.  the criminal law hearing officer shall also consider the employment history, residency, family affiliations, prior criminal record, previous court appearance performance, and any outstanding bonds of the accused.

*Id*. Rule 4.2.3.  The County Rules of Court state that "all law enforcement officials in Harris County shall cause the pretrial detainees in their respective custody, who have been charged with a class A or class B misdemeanor, to be delivered to the criminal law hearing officer not later than 24 hours

---

[21] *See* Rules of Court, *as amended* March 7, 2016; Rules of Court, *as amended* August 12, 2016; Rules of Court, *as amended* February 9, 2017.

after arrest." *Id.* Rule 4.2.1.1.  Misdemeanor defendants arrested without a warrant who are not

given a probable cause hearing within 24 hours after arrest must be released on a personal bond of

no more than $5,000 when the 24 hours have expired.[22]  *See* TEX. CODE CRIM. PRO. art. 17.033;

*Sanders v. City of Houston*, 543 F.Supp. 694, 705–06 (S.D. Tex. 1982); *Roberson v. Richardson*,

Agreed Final Judgment, Civil No. 84-2974 (S.D. Tex. Nov. 25, 1987).[23]

At the 24-hour hearing, commonly referred to as the probable cause hearing, in addition to

finding probable cause for the arrest, Hearing Officers are to "set the amount of bail required of the

accused for release and shall determine the eligibility of the accused for release on personal bond,

cash bond, surety bond, or other alternative to scheduled bail amounts, and shall issue a signed order

remanding the defendant to the custody of the sheriff."  Rules of Court 4.2.2.1.11.  On August 12,

2016, the County Judges amended the County Rules of Court to provide that "personal

bonds"—unsecured appearance bonds—"are favored" in twelve specific misdemeanor categories.[24]

*Id*. Rule 12.  Rule 12 lists five circumstances in which personal bonds "are disfavored," including

when "the defendant has demonstrated a risk to reoffend or harm society" or "has previously failed

to appear in court as instructed."  *Id*.

The next step in the process is scheduling cases for arraignment, referred to as the "first

appearance settings."  Arrestees released on secured money bail before booking are scheduled for

---

[22]  The detention is permitted to extend, regardless of whether bond has been set or paid, for an additional 48 hours if the charge is a crime of family violence, and if a magistrate issues written findings that the violence is likely to continue if the defendant is released.  TEX. CODE CRIM. PRO. art. 17.29.

[23]  The *Roberson* order is available at Def. Ex. 95.

[24]  The twelve misdemeanors for which personal bonds are favored include: (1) theft by check; (2) driving with an invalid license; (3) gambling offenses; (4) illegal dumping; (5) fictitious vehicle license plate or registration; (6) prostitution; (7) violation of laws regulating sexually oriented businesses; (8) public intoxication; (9) driving without a license; (10) class B criminal trespass; (11) class B retail theft; (12) possessing marijuana or certain other controlled substances. Rules of Court, Rule 12.

arraignment one week from the day of their arrests (or on a Friday if the arrest was over a weekend). *Id*. Rule 4.1.2. Those released on a personal bond are scheduled for arraignment the same day, or the next business day if released after 9:00 a.m. *Id*. Rule 4.1.4. Those booked into the County Jail who request counsel are scheduled for arraignment the next business day, when counsel may be appointed. *Id*. Rule 24.9.1.

On February 9, 2017, the County Judges amended the County Rules of Court to provide first appearance settings for all misdemeanor arrestees booked into the County Jail the next business day after booking, "regardless of whether the defendant has been released from custody." *Id*. Rule 4.1.2. At this first appearance, the County Judge must "review conditions of release, bail amount set, and personal bond decision and modify if good cause exists to do so." *Id*.

## 2. Arrest and Booking

According to the 2015 annual report of Harris County Pretrial Services, 50,947 people were arrested in Harris County on only Class A or Class B misdemeanor charges in 2015. Pls. 10(c), *2015 Pretrial Services Annual Report* at 8. In that year, 27.9 percent were arrested by the Harris County Sheriff's Office. The rest were arrested by other law-enforcement agencies, principally the Houston Police Department.[25] *Id*.

Major Dougherty testified based on his thirty-five years of service with the Houston Police Department that those arrested without a warrant by the City of Houston are taken to the City Jail, tested for drugs or alcohol if applicable, and fingerprinted. Hearing Tr. 3-2:48–49. Either at the site of the arrest or at the City Jail, the arresting office calls a District Attorney hotline that is staffed 24 hours a day by an Assistant District Attorney, who decides whether to accept the charge. *Id*. at 3-

---

[25] In 2016, 49,628 people were arrested on only Class A or B misdemeanor charges. (Docket Entry No. 290, Ex. 1 at 8). Of those, 28.2 percent were arrested by the Sheriff's Office. (*Id*.).

2:50–51.  If the Assistant District Attorney declines the charge, the arrestee is promptly released.

*Id*. at 3-2:50.  If the charge is accepted, an officer prepares a District Attorney Intake Management System (DIMS) report and electronically forwards it to the District Attorney's office, where the formal charge is prepared.  *Id*. at 3-2:48–49.  Major Dougherty testified that by this point in the process, 1 to 3 hours have elapsed, depending on the time spent transporting arrestees from outlying areas of Houston to the City Jail.  *Id*. at 3-2:49.

The District Attorney's office prepares a formal charging document and applies a secured money bail using the County Judges' bail schedule to set the amount.  *Id*. at 3-2:51; *see* Rules of Court 2.3.  The scheduled bail amount is set based on the charge and the defendant's criminal history.  *See* Rules of Court 9.1.  The document is forwarded to the District Clerk's office, which assigns the case to a County Judge's court and sets a first-appearance date.  Major Dougherty testified that the Clerk's assignment makes the case "paper-ready" and is completed about 12 to 16 hours after arrest.  Hearing Tr. 3-2:52.  Once the case is paper-ready, a misdemeanor defendant with access to enough money may pay the amount necessary for release and be promptly released from custody.[26]  *Id*. at 3-2:54.  A defendant may pay the entire bond amount into the registry of the court, to be refunded at case disposition if the defendant makes all scheduled appearances—a "cash bond." Or, and most often, the defendant pays a nonrefundable premium to a commercial bondsman, who

---

[26] If an Assistant District Attorney wants a misdemeanor defendant to be detained until a magistrate can set a bail amount, he or she will enter "88888888" as the bail amount.  Hearing Tr. 2-1:100–01.  While that is technically a bail amount that, if paid, would permit release, in practical effect it is a code indicating that the misdemeanor defendant should not be released until a magistrate can set bail and issue a protective order if necessary.  *Id*.  In 2015, bail was set under the 88888888 code in 4,059 cases—8.0 percent of all misdemeanor arrests.  Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8.  In 2016, the 88888888 code was used in 2,535 cases—5.1 percent of all misdemeanor arrests.  (Docket Entry No. 290, Ex. 1 at 8).

posts the principal with the court—a "surety bond."[27]  *See* Pls. 10(c), *2015 Pretrial Services Annual Report* at 9; 2-1:55–58.

Harris County Pretrial Services personnel have offices at the City Jail.  Hearing Tr. 3-2:57, 59.  Arrestees who have not bonded out at the earliest opportunity and who have not already been taken from the City to the County Jail have their interview with a Pretrial Services officer while at the City Jail.  *Id.* at 3-2:56–58.  Harris County Director of Pretrial Services Kelvin Banks testified that interviews typically take 15 to 20 minutes.  *Id.* at 3-2:170.  In the interview, Pretrial Services asks for the defendant's background information, including residence, employment, education level, and past criminal history.  *See, e.g.*, Pls. Ex. 8(d).  After the interview, Pretrial Services tries to verify the information by calling references and running internet searches.  Hearing Tr. 3-2:171.

Before this suit was filed, an unwritten policy required Pretrial Services to obtain two verified references before a defendant could be released on a personal bond.  (*See* Docket Entry No. 162 at 5; No. 166 at 10 n.13); *see also* Def. Ex. 52.  In August 2016, the County Judges sent a letter to the Hearing Officers changing the policy to permit release on personal bond with only one verified reference.  Def. Ex. 52.  The verification requirement is not codified in the County Rules of Court or in State law.  Until the August 2016 letter, the requirement appears to have been an unwritten policy promulgated by County Judges and enforced as a practice or custom by Hearing Officers and by Pretrial Services personnel.[28]

---

[27]  The court uses "secured money bail" or "secured financial conditions of release" to mean both surety bonds and cash bonds.  Both are "secured" by having collateral paid up front before release, either by a bondsman (who charges a defendant a nonrefundable premium) or by the defendant (who can have the collateral refunded after case disposition).  The court uses "unsecured or nonfinancial conditions" to mean personal bonds, with or without additional nonfinancial conditions of supervised release, such as GPS monitoring.

[28]  The Pretrial Services verification requirement is an example of a policy systematically applied across the board as an unwritten practice or custom established by "multiple and overlapping authorities."

Pretrial Services officers complete a validated risk-assessment form, which uses a point-weighting system to itemize and evaluate the defendant's risk of flight or risk of new criminal activity during pretrial release. Hearing Tr. 3-2:172; Pls. Ex. 8(d). A risk-assessment tool is "validated" when its risk indicators have been empirically shown to reliably predict outcomes such as nonappearance or new criminal activity. Hearing Tr. 3-2:172.

The current risk-assessment tool that Harris County Pretrial Services uses assigns points to seventeen different risk indicators. *See, e.g.*, Pls. Ex. 8(d). Under "Criminal Risk Items," arrestees are given a point if the current charge involves a crime of violence, a point if the defendant is on probation, a point if the defendant is on parole, a point for a prior misdemeanor conviction and another point for multiple prior convictions, a point for a prior felony conviction and another point for multiple prior convictions, a point for a past failure to appear, and a point if the defendant has a formal "hold," such as an outstanding warrant from another jurisdiction. *See id*; Hearing Tr. 2-1:134–37.

Under "Background Risk Items," a defendant receives a point for being male, a point for lacking a high school diploma or GED, a point for not having a land line phone, a point for living with someone other than a spouse or family, a point for not owning an automobile, a point for lacking full-time employment, and a point for being under 30 years of age.[29] Hearing Tr. 2-1:134–37; *see generally* Pls. Ex. 8(d).

The point totals from both the Criminal Risk Items and Background Risk Items are added to

___

*ODonnell*, 2016 WL 7337549 at *38. The County Judges' policy and practice support finding that the plaintiffs have sufficiently alleged and shown a local policymaker for the purposes of § 1983 liability. *See Monell v. Dept. of Social. Serv.*, 436 U.S. 658 (1978); *ODonnell*, 2016 WL 7337549 at *22–27.

[29] If the defendant is under 21 and has a prior juvenile adjudication, he or she is given a point under that category rather than the under-30 category. Pls. Ex. 8(d); Hearing Tr. 2-1:134–37.

reach a single score which is set on a risk scale.  *Id*.  Defendants with three points or fewer are scored as low risk, four to five points are scored as "low moderate risk," six to seven points are scored as moderate risk, and eight points or above are scored as high risk.  *Id*.  Criminal risk points are weighted the same way as background risk points.  A 29-year-old man who works part-time and rents and apartment with a roommate, who does not own a car or a land line phone, but who has no criminal history would receive the same risk score as an older woman on probation who has multiple felony convictions, a past failure to appear, an outstanding warrant and a current charge involving a crime of violence.  Both cases would be assigned at least six points and be categorized as "moderate" risk.  *See id*.  Mr. Banks testified that for defendants whose risk scores are increased because of the background factors that correlate with poverty rather than criminal activity, the standard Pretrial Services procedure is to recommend release on personal bond, notwithstanding the higher risk score.  Hearing Tr. 4-1:55.

The collected information, verified references, risk-assessment score sheet, and the Pretrial Services recommendation for release are all gathered into a report and transmitted to a Hearing Officer for the defendant's probable cause hearing.  *See generally* Pls. Ex. 8(d).  Mr. Banks testified that currently, if Pretrial Services makes a recommendation, it recommends either that a Hearing Officer grant a personal (unsecured) bond with standard conditions (such as supervision by Pretrial Services), grant a personal (unsecured) bond with additional conditions (such as geographic restrictions), or "detain."  *Id*. at 3-2:173.  Mr. Banks explained that Pretrial Services makes a recommendation to "detain" misdemeanor arrestees with immigration or other warrant holds on their record.  *Id*. at 3-2:173–75; 4-1:41–44.  A recommended high bail setting is intended to keep arrestees detained to address the hold.  *Id*. at 3-2:175; 4-1:41–42.  But, as explained below, secured money

59

bail, if unpaid, prevents the defendant from addressing the hold or from being transferred to the agency imposing the hold, extending the overall time spent in custody.[30]  Mr. Banks testified that Pretrial Services also recommends "detain" for "high risk" arrestees.  *Id*. at 3-2:173–75; 4-1:41–44. Because Texas law prohibits pretrial preventive detention in most misdemeanor cases, a recommendation to "detain" is a recommendation to set a high secured bail in order to detain until a judicial officer considers the case or the case is terminated.  *Id*. at 3-2:175; 4-1:41–42.  A defendant who pays the bail is released, despite the "high risk" category and the recommendation to detain.

Pretrial Services does not directly ask defendants whether they can pay the bail amount set or what amount they could pay.  Hearing Tr. 4-1:47.  Mr. Banks testified that instead, Pretrial Services asks a "litany" of questions about a defendant's assets, income, and expenses.  *Id*. at 4-1:48. Defendants sometimes refuse to be interviewed, and the record indicates that they may do so because they do not understand that the interview is non-adversarial and that providing responsive answers is the only way they can be released on nonfinancial conditions.  Hearing Tr. 2-2:29–30; 3-2:125. Other defendants are confused by the questions.  For instance, "Do you have a place to stay?" may be taken to mean "Can you afford rent or housing?"  But it could also mean "Are you likely to leave the jurisdiction because you do not have a place to live here?"  Answering the first question in the negative when the second question is the one asked can—and in Harris County does[31]—become the basis for detention rather than release on unsecured financial conditions.  Hearing Tr. 2-2:12–13.

---

[30]  *See* Part I.E.4 *infra*.

[31]  The example is drawn from a recorded probable cause hearing.  Pls. Ex. 3, May 16, 2016, 6.46 at 14:40 (L. P.).  After answering that she does not have a place to stay, the defendant learns that she could be released on an unsecured personal bond if she has a place to stay.  The Hearing Officer cuts her off as she tries to explain that she does in fact have a place to stay but misinterpreted his earlier question.  The Hearing Officer does not let her explain and confirms her bond at the prescheduled amount with the clear understanding that she will not be able to purchase her release on a secured basis.  *Id*.

If Pretrial Services officers at the City Jail determines that an arrestee is a good candidate for release on personal bond, they may forward the interview papers to their counterparts at the County Jail for "early presentment" to a Hearing Officer.  Hearing Tr. 3-2:182–83.  The Hearing Officer may approve or deny release on personal bond using only the charging papers (the DIMS report) and interview papers prepared for the early presentment.  *Id*.  If the Hearing Officer approves release on personal bond, the arrestee can be released from the City Jail without being transported to or booked in the County Jail.  *Id*. 3-2:57–58.  Early presentment depends on the availability of Pretrial Services personnel.  The record evidence clearly shows that early presentments are rare.  In 2015, only 90 out of 21,748 Houston Police Department arrestees were released on personal bonds after early presentment.[32]  Pls. Ex. 4(d), Second Rebuttal Report at 15; Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8.

Arrestees who do not pay for release or obtain release on personal bond by early presentment at the City Jail are taken to and booked in the Harris County Jail.  Hearing Tr. 3-2:65.  Transport buses run every two hours, but Major Dougherty testified that capacity limits at the County Jail Inmate Processing Center create significant delays.  These limits prevent paper-ready misdemeanor arrestees from being transported to the County Jail on the next available bus.  *Id*. at 3-2:67–68. Because the Inmate Processing Center is the only holding facility for County arrestees, they are given priority over arrestees waiting for transport from the City Jail, which adds to the delays.  *Id*. at 3-2:69–70.

Major Dougherty testified that those arrested without a warrant by the County are taken either

---

[32]  In 2016, the number of those released on a personal bond instead of transported to and booked in the County Jail rose to 240.  Pls. Ex. 4(d), Second Rebuttal Report at 15).  The total number of misdemeanor arrestees by the Houston Police Department in 2016 was 21,274.  (Docket Entry No. 290, Ex. 1 at 8).

directly to the County Jail or to one of four outlying County detention centers, with transport to the County Jail within 4 hours. *Id*. at 3-2:54–55.  Once at the County Jail, County arrestees go through the same process as City arrestees—they are charged, fingerprinted, drug and alcohol tested, and interviewed by Pretrial Services in the Inmate Processing Center next to the Jail. *Id*. at 3-2:84–85. The Inmate Processing Center runs 24 hours a day, 7 days a week.  The booking process takes between 8 and 12 hours. *Id*. at 2-1:38.  Booking at the County Jail relies on a paper, rather than an electronic, system. *Id*. at 3-2:85.  Arrestees with the financial means to do so may pay their money bonds or a bondsman's premium while still in the Inmate Processing Center and be released, usually within 12 to 15 hours of arrest. *Id*.  While in the Processing Center, arrestees do not have access to counsel or family members. *Id*. at 2-1:43.  Those who do not pay their secured money bonds while in the Processing Center are assigned and transferred to a housing unit in the County Jail. *Id*.

About 7 percent of misdemeanor arrests annually are arrested after a warrant has issued.  Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8; (*see also* Docket Entry No. 290, Ex. 1 at 8). When Harris County magistrates—Hearing Officers or County Judges—issue warrants, they affix the prescheduled secured money bail amount to the warrant.  Hearing Tr. 2-1:216–17; 3-2:55; 8-2:108.  Misdemeanor defendants with access to money can pay the secured amount or a bondsman's premium and be processed without being arrested. *Id*.  Misdemeanor defendants who are arrested on a warrant but cannot pay are subject to the same procedures as warrantless arrests. *Id*.  Although a magistrate has already found probable cause to issue the warrant, the Texas Code of Criminal Procedure requires each arrestee to appear before a magistrate to be informed of his or her rights and to request counsel. TEX. CODE CRIM. PRO. art. 15.17.  What Harris County calls "probable cause hearings" fulfill the function of informing arrestees of their rights, finding probable cause for

warrantless arrests, and setting bail or, more often, confirming the prescheduled amount of bail on a secured basis.

### 3.    The Probable Cause and Bail-Setting Hearing

The Hearing Officers hold probable cause hearings every 2 hours, 24 hours a day, 7 days a week.  Hearing Tr. 4-1:160.  Defendants arrested without a warrant who have completed processing at the Inmate Processing Center are put on the next available docket for a probable cause hearing. *Id.* at 2-1:93.  Probable cause hearings are conducted by videolink connecting a Hearing Officer's courtroom, an Assistant District Attorney's office, and a large room in the County Jail.  *See generally* Pls. Ex. 2.  Up to forty-five arrestees may be adjudicated at a single probable cause hearing.  Hearing Tr. 4-1:161.  When an arrestee's case is called, the arrestee stands on a marked square in the center of the room and faces a screen showing the Hearing Officer and Assistant District Attorney.  *See* Pls. Ex. 2.  The hearings are recorded.  *Id.*

Hearings typically last about one to two minutes per arrestee.[33] *See generally* Pls. Ex. 2. During this brief period, the Assistant District Attorney reads the charge, and the Hearing Officer determines probable cause and sets bail.  *Id.*  Hearing Officers have discretion to release arrestees on personal bond, to impose additional conditions of release (such as geographical restrictions), or to raise or lower the bail amount from the scheduled amount. *See* TEX. CODE CRIM. PRO. art. 17.03, 17.15, 17.40–44.  For those misdemeanor arrestees who have not had their Pretrial Services papers given to a Hearing Officer for early presentment—the vast majority—the first setting is their earliest

---

[33]   In their Exhibit 3, the plaintiffs have provided 121 videos of individual hearings, with lengths ranging from 20 to 28 seconds for in absentia hearings (D. N., J. H., J. L.) to nearly six minutes for a hearing that involved a lengthy recitation to enter a family violence protective order (J. P.).  (A sixteen-minute hearing is an extreme outlier where the hearing was suspended while County personnel tended to a defendant in the background having a seizure (D. S.)).  Of the 121 individual videos, 26 are under one minute, 98 are at or under two-and-a-half minutes, and 115 are at or under 4 minutes.  Pls. Ex. 3.

opportunity to be considered for release on a personal bond.  Hearing Tr. 2-1:45–46.

As noted, under Texas law, misdemeanor defendants arrested without a warrant must be released on an unsecured personal bond if a magistrate does not find probable cause within 24 hours of arrest.  TEX. CODE CRIM. PRO. art. 17.033.  The Houston City Jail is not equipped to provide videolink hearings and does not provide opportunities for live presentment to the Hearing Officers. Hearing Tr. 3-2:61–63.  When the Inmate Processing Center at the County Jail is at capacity and arrestees cannot be transported promptly from the City Jail, those who have not paid and been released may wait at the City Jail more than 24 hours before they are transported to the County Jail and can have their probable cause and bail-setting hearing before a Hearing Officer.  *Id*. at 4-1:9, 136.  To avoid releasing these arrestees on unsecured personal bonds at the 24-hour time limit, the customary unwritten practice is to hold in absentia "paper hearings." *Id*. at 2-1:92–93.  At a paper hearing, the Hearing Officer finds probable cause based on the DIMS report that the arresting officer prepared and that the Assistant District Attorney used to draw up the charge. *Id*.  Pretrial Services forms are not made available at paper hearings.  The DIMS report does not provide any of the defendant's financial information.  Hearing Officers do not set bail or consider eligibility for unsecured personal bonds at paper hearings.  *Id*. at 4-1:133–35.

Defendants almost never have counsel at the probable cause and bail-setting hearing.  *See* Def. Ex. 23.  Those who are indigent have not yet had counsel appointed.  Those who can afford counsel have either paid their bonds and been released or have not been able to arrange their counsel's presence.  *See id*.  Both the Sheriff's deputies and the Hearing Officers instruct the defendants not to speak except to answer specific questions, lest they incriminate themselves. Hearing Tr. 4-1:178.  Because the Hearing Officers are not judges of courts of record, they do not

make written findings or issue reasoned opinions explaining why they set bail on a secured or unsecured basis, or why they select the bail amount imposed.  (Docket Entry No. 138 ¶ 72); Hearing Tr. 4-1:145.  The video recordings show that Hearing Officers occasionally state that bail is set at a certain level or that a personal bond is denied "based on your priors" (see below).  Hearing Officers occasionally make notes on the Pretrial Services forms, such as "Criminal History"; "Safety of Community"; or "Safety."  *See* Pls. Ex. 9, e.g., (M. W.), (A. G.), (H. P.).  These cryptic, one-to-three word notations are just that.  They do not show that Hearing Officers weighed the statutory factors in setting bail, much less how they did so.

Chief Hearing Officer Blanca Villagomez testified that before granting an unsecured personal bond, she "look[s] at the five factors obviously that are set out in Article 17.15.  I listen to the prosecutor and whatever allegations that led to their charge, secondly.  I will look at all of the information that is available to me that is provided by Pretrial Services and reach a conclusion on that."  Hearing Tr. 4-1:117.  She testified that on occasion, based on the circumstances and the evidence presented, she has denied release on an unsecured personal bond to defendants who score low on the risk scale because she perceived a threat to public safety.  On other occasions, she disregards a high risk score based on background resource factors, such as not owning a land line phone or a car.  *Id*. at 4-1:126.  Judge Villagomez testified that she does not reach a conclusion on whether secured money bail will operate as a condition of detention, but that she does realize that detention, rather than release, will be the outcome of setting secured money bail for indigent defendants more than "rare[ly]."  *Id*. at 4-1:140–42.  She nevertheless sets bail on a secured basis at the scheduled amounts in those cases.  *Id*.  She testified that she believes it is lawful under Texas law to require a secured money bail she knows a defendant cannot pay "if I have taken in all of the

factors in 17.15 into consideration because [ability to pay] is not the only one." *Id*. at 4-1:144–45.

Hearing Officer Eric Hagstette testified that he discounts high risk scores when they are based on background factors showing poverty rather than a history of nonappearance or criminal activity. *Id*. at 4-1:163–65. He did not disagree with Judge Villagomez's approach. He testified that the Hearing Officers "all go about our job pretty much the same way, do what we are statutorily required to do during these hearings and then make the decision with the information that is available and is presented at the hearing." *Id*. at 4-1:168–69. He explained that he does not impose secured money bail with an intent to detain but that "[t]he intent is to set a bond that is sufficiently high based on the factors I'm obligated to consider." *Id*. at 4-1:171. When asked how he would approach a defendant with no job, no income, no assets, and a history of failing to appear, for whom the scheduled bond amount would be $4,000, he testified that he would not release that defendant on an unsecured $4,000 bond because "[i]t depends again on the other factors being balanced." *Id*. at 4-1:172.

Judge Villagomez testified that she does not and cannot keep track of how many times she raises or lowers a bond, how often she rejects a Pretrial Services recommendation, or whether, and how often, defendants she releases on unsecured personal bonds fail to appear at hearings. *Id*. 4-1:126–27, 132, 150. Judge Hagstette testified that he raises and lowers bail amounts in roughly equal numbers—"I knock them down and I raise them up"—but he does not know how often those he releases on unsecured personal bonds fail to appear. *Id*. at 4-1:163, 167–68, 173.

The Pretrial Services Annual Report provides system-wide statistics on how often Hearing Officers implement or reject Pretrial Services recommendations. Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 14. In 2015, for the 9,388 defendants for whom Pretrial Services

66

recommended release on unsecured personal bond with standard conditions of supervision, Hearing

Officers denied a personal bond 56.3 percent of the time.[34]  *Id*.  In 1,831 cases, Hearing Officers

granted release on unsecured personal bonds on the condition that Pretrial Services could verify the

references.  *Id*.  The data do not show in how many cases that did or did not happen.[35]  For the 4,816

defendants for whom Pretrial Services recommended release on personal bond with enhanced

supervisory conditions, Hearing Officers denied a personal bond 84.8 percent of the time.[36]  *Id*.  For

the 11,935 defendants for whom Pretrial Services made no recommendation, Hearing Officers denied

a personal bond 96.9 percent of the time.[37]  *Id*.  For the 4,716 defendants for whom Pretrial Services

recommended "detain" (15.3 percent of all defendants interviewed by Pretrial Services), Hearing

---

[34]  The report lists "total reports reviewed" as well as a higher number for "total cases reviewed," apparently reflecting the fact the some defendants (who receive only one recommendation) may have more than one charge pending (each of which is counted as a separate case outcome).  Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 14.  The tables break down personal bond denials into several categories, including "PB denied," "PB denied, bond lowered," "PB denied, bond raised," "Reviewed, no action on personal bd," and so forth.  *Id*.  The percentages in the court's findings are based on dividing the total number of personal bond denials by the total number of cases.

In 2016, Hearing Officers rejected Pretrial Services recommendations for release on personal bond with standard conditions 50.4 percent of the time.  (Docket Entry No. 290, Ex. 1 at 14).

[35]  Pretrial Services does track the number of defendants granted a personal bond but not released from jail, which may indicate an inability to verify references.  In 2015, 798 misdemeanor defendants were granted a personal bond but not released until case disposition or until they posted a secured money bail.  Pls. Ex. 10(c) at 18.  In 2016, the Hearing Officers followed Pretrial Services recommendations for granting a personal bond, but on the condition references could be verified, in 2,404 cases.  That year, 685 misdemeanor defendants were granted a personal bond but not released until case disposition or until they posted a secured money bail.  (Docket Entry No. 290, Ex. 1 at 14, 18).

[36]  In 2016, for the 4,493 defendants for whom Pretrial Services recommended release on a personal bond with enhanced supervisory conditions, Hearing Officers denied a personal bond 78.9 percent of the time.  (Docket Entry No. 290, Ex. 1 at 14).

[37]  In 2016, for the 12,335 defendants for whom Pretrial Services made no recommendation, Hearing Officers denied a personal bond 95.9 percent of the time.  (Docket Entry No. 290, Ex. 1 at 14).

Officers denied a personal bond 97.1 percent of the time.[38]  *Id*.  Overall, Hearing Officers reject Pretrial Services recommendations for release on a personal bond 66.3 percent of the time.  *Id*. Pretrial Services acknowledges the wide discrepancy between what they recommend based on the County's validated risk-assessment tool and what the Hearing Officers order based on the preset bail schedule.  The Frequently Asked Questions page on the Pretrial Services public website asks, "Why aren't there more Personal Bonds approved?"  The answer: "Good question!"[39]  Hearing Tr. 4-1:57.

Among all cases in which Pretrial Services interviewed the misdemeanor defendant, whether Hearing Officers granted release on secured or on unsecured financial conditions, the Hearing Officers lowered the bail amount from what was stated on the charging document in 7.2 percent of cases and raised the bail amount in 10.7 percent of cases.[40]  Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 14.  In 2015, Hearing Officers lowered the amount below $500—the minimum amount on the bail schedule—in 4 cases, out of nearly 51,000 arrests with bail set.[41]  *Id*. at 8.  The plaintiffs' expert, Dr. Stephen Demuth, credibly testified that from the beginning of 2015 to the end of January 2017, Hearing Officers adhered to the prescheduled bail amount stated on the charging documents in 88.9 percent of all misdemeanor cases.[42]  Pls. Ex. 4(d), Second Rebuttal Report at 10;

---

[38]  In 2016, for the 2,263 defendants for whom Pretrial Services recommended "detain," Hearing Officers denied a personal bond 96.2 percent of the time.  (Docket Entry No. 290, Ex. 1 at 14).

[39]  *Available at* https://pretrial.harriscountytx.gov/Pages/FAQs.aspx (last accessed April 24, 2017).

[40]  Among all cases in which Pretrial Services interviewed the misdemeanor defendant in 2016, Hearing Officers lowered the bond from that posted on the charging document in 5.9 percent of cases and raised the bond amount in 9.2 percent of cases.  (Docket Entry No. 290, Ex. 1 at 14).  Altogether, the year-to-year rates hardly changed from the end of 2015 to the end of 2016.

[41]  In 2016, Hearing Officers lowered the bail amount below $500 in 6 cases, out of nearly 50,000 arrests with bail set.  (Docket Entry No. 290, Ex. 1 at 8).

[42]  The defendants' expert, Dr. Robert Morris, disagrees.  He found that Hearing Officers adhered to the prescheduled bail amount on the charging documents in 80.7 percent of all cases.  Def. Ex. 28A at 4.

Hearing Tr. 6-2:119–21.  When they do change the amount, they raise it about 67 percent of the time.

*Id*.

Dr. Demuth presented credible evidence based on Harris County's administrative data that from January 2015 through January 2017, only 9.7 percent of all misdemeanor arrestees were granted release on an unsecured personal bond, with or without additional nonfinancial conditions.  Pls. Ex. 8(d), Second Rebuttal Report at 9.  That figure is consistent with the Pretrial Services annual reports, which show that 8.5 percent of misdemeanor arrestees were granted an unsecured personal bond in 2015, and 10.8 percent in 2016.[43]  Pls. Ex. 10(c) at 9; (Docket Entry No. 290, Ex. 1 at 9).  In 2015,

---

His method for arriving at that number is not clear.  His report states that the figure is based on a mislabeled defendants' exhibit showing bond activity only in January 2017.  *See* Def. Ex. 28A at 4 (relying on Def. Ex. 36); Hearing Tr. 2-2:85 (Def. Ex. 36 mislabeled).  At the hearing, he testified that he reviewed the underlying data set which covers the period from January 2015 through January 2017.  Hearing Tr. 6-2:17–19.  Dr. Demuth testified that he performed the same calculations on the underlying data as Dr. Morris but arrived at the higher figure.  *Id*. at 6-2:119–21.

The 8-point difference in the experts' figures is not significant.  Either way, Hearing Officers adhere to the bail schedule over 80 percent of the time—a high majority of cases.  The inconsistencies between Dr. Morris's written report and his testimony leads the court to find that Dr. Demuth's calculation of 88.9 percent is the more reliable figure.

[43]  The defendants argue that the relevant figure is that Hearing Officers granted personal bonds in over 25 percent of the cases they heard in November and December 2016, showing an increase in granting personal bonds based on recent rule changes dropping the number of verified references from two to one and presuming release on personal bonds in twelve categories of misdemeanor cases.  (Docket Entry No. 286 at 9).  The proper denominator, however, is the total number of misdemeanor cases.  All misdemeanor defendants arrested by the City of Houston are eligible for early presentment to a Hearing Officer for release on personal bond.  Under the forthcoming reforms, all misdemeanor defendants arrested by any agency in Harris County will be eligible for early presentment.  *See* Part I.D.2 *supra*; Part I.H.2 *infra*.  Even defendants who are released before their probable cause hearings without early presentment are effectively denied a personal bond by Pretrial Services and the Hearing Officers.  In addition, under Fifth Circuit law, the payment of a secured money bail does not moot a claim that the bail amount, or the requirement of the bail on a secured basis, is unreasonable.  *Simon v. Woodson*, 454 F.2d 161, 166 n.8 (5th Cir. 1972).

Even accepting the defendants' higher figure for grants of personal bonds, the same reports the defendants rely on show that personal bonds are almost never granted to misdemeanor arrestees scored as "high risk," including those whose risk scores are high because of poverty indicators like not owning a car or a land line phone.  In 2015, of all personal bonds granted, only 2.9 percent were granted to arrestees scored as high risk and most likely unable to pay any secured bail because of indigence.  Pls. Ex. 10(c) at 17.  Over 72 percent of personal bonds were granted for low and low-moderate risk defendants who, at least as measured by the assessment tool, would have had more resources.  *Id*.  In 2016, the comparative figures were

46.1 percent of arrestees were released on a surety bond, 5.1 percent on a cash bond, and the remaining 40.3 percent were detained until case disposition.   In 2016, the figures were nearly identical: 43.4 percent released on a surety bond, 5.6 percent on a cash bond, and 40.1 percent detained until case disposition.   *Id*.   Virtually all misdemeanor arrestees detained until disposition have a secured bail amount set that, if paid, would result in the prompt release of the arrestee.   *See* Pls. Ex. 10(c) at 8; (Docket Entry No. 290, Ex. 1 at 8).

The court credits the Hearing Officers' testimony that they consider the Article 17.15 factors in some way.   But their impressions about how frequently certain case outcomes occur is not reliable and not worthy of greater weight than the data presented in the Pretrial Services Annual Report.   The Hearing Officers' testimony that they do not "know" whether imposing secured money bail will have the effect of detention in any given case, *e.g.*, Hearing Tr. 4-1:141, 4-2:16, and their testimony that they do not intend that secured money bail have that effect, is not credible.   Other record evidence, including the Pretrial Services public reports; the high number and percentage of misdemeanor defendants detained rather than released because they are subject to secured money bail at the scheduled amount; the high number and percentage whose bail is set by the schedule rather than by an individualized inquiry; the infrequency of deviations from imposing the scheduled bail amount on a secured basis; and the video recordings of probable cause hearings, which consistently show an indifference as to whether pretrial detention will result from setting secured bail, all weigh heavily in favor of finding little to no credibility in the Hearing Officers' claims of careful case-by-case

---

5.8 percent for high-risk defendants and 68.7 percent for low- and low-moderate-risk defendants.   (Docket Entry No. 290, Ex. 1 at 17).   These figures show that Hearing Officers are not granting personal bonds out of a consideration of inability to pay, as the defendants argue, but are instead systematically using secured money bail to address risk, even when the secured money bail operates to detain defendants who are scored as high-risk because of their indigence.

consideration under the *Roberson* order and the Article 17.15 factors.

This is not a personal criticism of any one or all of the Hearing Officers.  To say that their job is difficult is a dramatic understatement.  The sheer numbers of defendants the Hearing Officers confront on a daily basis makes individual consideration extraordinarily difficult.  The absence of counsel adds to the difficulty.  The Hearing Officers clearly work steadily and hard.  They see a difficult population—including both misdemeanor and felony defendants—every day and all day.  It is unsurprising that a system of virtually automatic adherence to a bail schedule has developed, given the large number of defendants, the small number of Hearing Officers, and the limited time for hearings.

The record contains 2,300 recordings of misdemeanor probable cause hearings before the Hearing Officers.  The recordings begin in March 2016—before the lawsuit was filed—and continue through early November 2016.  Pls. Ex. 2.  The court has reviewed many hours of footage.  The results are consistent and support this court's findings and conclusions.  Two hearings are illustrative.  The court chooses them not because they are extreme examples of any particular feature, but because they appear pretty ordinary.  Neither hearing is procedurally unusual.  The parties did not cite or play either one at the motion hearing.[44]

---

[44]   Unsurprisingly, both parties emphasized video recordings that were most favorable to their arguments.  The plaintiffs, for instance, displayed one recording in which the Hearing Officer doubled a defendant's secured bail amount when the defendant answered "yeah" instead of "yes," a penalty clearly unrelated to the defendant's risk of nonappearance or of new criminal activity before trial.  Pls. Ex. 3, May 14, 2016, 15.58 at 8:15, B. J.; *see also id*., May 21, 2016, 12.45 at 43:59, E. P. (Hearing Officer raises bond from $5,000 to $25,000 on a misdemeanor charge because the defendant answers "yeah" instead of "yes").  The plaintiffs highlight 121 recordings, pretty evenly distributed across the five defendant Hearing Officers.  *See generally* Pls. Ex. 3.

The defendants highlight only 6 recordings, which show hearings before only two of the defendant Hearing Officers.  *See* Def. Ex. 70.  All 6 recordings involve defendants with minor, nonviolent charges and little or no criminal history—what Pretrial Services calls low-risk defendants.  *Id*.  In each case, the Hearing Officer grants the defendant's release on an unsecured personal bond before asking whether the defendant needs a court-appointed lawyer.  *Id*.  The Hearing Officer's decision is apparently based on the low-risk

D. M. was arrested early in the morning of August 24, 2016 and charged with possessing less than two ounces of marijuana. *See* Pls. Ex. 4(b), Working Database. His probable cause hearing was at 4:00 p.m. the same day. *Id*. The recording shows the following:

- The Hearing Officer finds probable cause and tells the defendant, "Your bond is incorrect based on" his five prior felony and nine misdemeanor convictions. Pls. Ex. 3, August 24, 2016, 15.22 at 37:25.

- The defendant responds that he has only one prior felony conviction. The Hearing Officer spends the bulk of the unusually long four-and-a-half minute hearing thumbing through the defendant's record and counting convictions. The Hearing Officer counts as prior felony convictions two felony charges that were reduced to misdemeanor convictions but still does not arrive at five felony convictions. He tells the defendant, "Either way your bond was incorrectly set, so it's now set at $5,000, which is what it should have been set at. [I'm] going to deny your personal bond based on all your priors." *Id*.

- The defendant requests a personal bond because his fiancée is pregnant and he is the only income earner in the household. The Hearing Officer responds, "I take all that into consideration" but again points to the defendant's prior convictions. The defendant points out that he has never missed a court appearance for any of those prior arrests and convictions. The Hearing Officer cuts him off, stating, "That is one factor, the other factor is everything else. . . . Based on the nature of the offenses for which you were charged, I'm not going to consider you" for a personal bond. *Id*.

- The defendant confirms he will need a court-appointed lawyer. The Hearing Officer

profile of the defendant, and not on whether the defendant could pay a secured financial condition of release.

concludes that if the defendant would like a personal bond, he can ask the County Judge for one in the morning at his first appearance. *Id.*

If the defendant had been able to pay a bondsman's premium, he would have been released notwithstanding his criminal history. D.M. appeared before a County Judge the next day and pleaded guilty. He was released later that day. *See* Pls. Ex. 4(b), Working Database.

A. G. was arrested on October 1, 2016 at 9:30 p.m. for unlawfully wielding a five-inch knife. *See id.* His probable cause hearing was held the next afternoon. It is one of the more recent recordings in evidence. *Id.* The recording shows the following:

- The Hearing Officer finds probable cause and confirms the scheduled secured money bail amount of $2,500. Pls. Ex. 3, October 2, 2016, 12.16 at 27:39.

- The defendant confirms that he will need a court-appointed lawyer and tries to ask a question. The Hearing Officer cuts him off, stating, "Nobody who's got the criminal history you have out of Florida is going to get a pretrial [bond] from me, for fear of what would happen to the safety of the community." The defendant again tries to speak. The Hearing Officer again cuts him off: "I have more people to consider than you in this, and the safety of the public is one of them." The defendant tries a third time to speak, and again the Hearing Officer shouts over him, saying "You're not going to be able to talk to me because I'm not letting you talk, because I'm going by what I feel is best for the community." *Id.*

- After a pause, the defendant quietly asks if he may speak. The Hearing Officer shouts "No!" The defendant pauses again and then states that his only criminal history is a 25-year-old matter in Florida and that he is nearly finished with his exams to become a medical professional. The Hearing Officer responds that "your 25 year ago tendencies seem to be

revisiting me, and I am afeared for the people in the State of Texas." *Id*.

• The Hearing Officer again confirms that the defendant will need a court-appointed attorney, then dismisses him. As the defendant leaves the room, the Hearing Officer quips to the Assistant District Attorney that it "makes me feel better" that the defendant is returning to detention. The Assistant District Attorney laughs. *Id*.

The defendant's first appearance before a County Judge was held the next day but then reset for October 7, 2016. Pls. Ex. 4(b), Working Database. At the rescheduled hearing, after seven continuous days in detention, A.G. was released on an unsecured personal bond. *See id*. His case remained pending at the time of the most recent data production from the County. There is no indication that he has failed to appear or has been re-arrested since October 2016. *See id*.

The two recordings illustrate what many other recordings confirm. Hearing Officers treat the bail schedule, if not as binding, then as a nearly irrebuttable presumption in favor of applying secured money bail at the prescheduled amount.[45] Amounts that deviate from the schedule are treated as "incorrect,"[46] and requests for a personal bond, if not denied outright, are deferred until

---

[45] *See, e.g.*, Pls. Ex. 3, September 1, 2016, 9.25 at 39:23, R. W. (bail raised "based on the [County] Judges' bail schedule"; Mr. W.: "My bond has already been posted, so what does that mean?" Hearing Officer: "That means that they'll have to make up the difference, if you're going to get out on the bonds."); November 2, 2016, 6.06 at 1:00:02, B. J. ("Bond was set at $1,000. However, you are on probation. Based on the schedule, the [County] Judges' schedule, bond is set at $5,000. Your pretrial bond release is denied.").

[46] *See, e.g.*, Pls. Ex. 3, May 14, 2016, 15.58 at 50:55, V. V. (bond "corrected" to $6,000); March 15, 2016, 16.06 at 20:28, B. G. (raising secured bond because it was "incorrectly set" at $1,000, and stating that: "The correct bond should be $2,500 so I have to raise your bond to $2,500."); May 12, 2016, 15.48 at 16:57, W.S.T. ("Your bond is incorrectly set."; raising bail to $2,000 based on prior convictions); November 2, 2016, 22.07 at 18:17, T. S. ("Your bond is incorrectly set at $3,000. . . . It's $500 for the four misdemeanors each so that's $2,000 makes $3[,000], and $1,000 for the felony prior, is $4[,000], so I'm going to raise your bond to $4,000.")

the County Judge holds a later hearing.[47]   Hearing Officers routinely adjust initial bail settings to conform to, not to deviate from, the bail schedule.  Defendants who try to speak are commanded not to, shouted down, or ignored.[48]

The Hearing Officers testified that they cannot let one factor—the inability to pay—control their bail determination.   Hearing Tr. 4-1:124, 171.   But they frequently cite only one factor—criminal history—as controlling their decision to set secured money bail that the defendant clearly cannot pay.[49]   And although the Hearing Officers testified that they do not "know" in any given case whether a defendant can pay secured money bail, they routinely set secured scheduled money bail amounts despite: (1) being informed of a defendant's indigence on the Pretrial Services report; (2) being told of a defendant's indigence by the defendant; (3) being aware that a defendant's charge clearly relates to poverty (such as begging or sleeping at a bus stop); and (4) recording that

---

[47]  *See, e.g.*, Pls. Ex. 3, March 18, 2016, 18.03 at 1:37, H. W. ("If no one bonds you out of jail, on Monday morning, he [the County Judge] can determine if he will grant you a personal bond."); October 2, 2016, 1.14 at 24:48, K.L.M. (denying request for nonfinancial conditions of release, stating, "It's not happening today."); May 22, 2016; 15.45 at 39:15, N. R. (Mr. R.: "I got a question, sir. Do you think it's possible I could get a PR bond, because my job is on the line and my apartment, too.  Do you think that's possible?"  Hearing Officer: "It's possible, but you're going to have to ask Judge Standley when you get to him. It's not happening today."); May 17, 2016, 17.45 at 5:02, W. F. (Mr. F.: "I just want to get released."  Hearing Officer: "That's not going to happen immediately, Mr. F[.]").

[48]  *See, e.g.*, Pls. Ex. 3, May 12, 2016, 15.48 at 18:36, K. C. (Hearing Officer: "We're not here to have a conversation.  You're here to listen to what she says and I'm here to determine whether I feel probable cause exists or not."); May 16, 2016, 3.44 at 26:05, T.D.E. (Hearing Officer: "No, you don't say anything Mr. E[.]  You get to say that to your court-appointed lawyer.  Thank you and you can go with the deputy."); October 2, 2016, 9.12 at 12:30, L. R. (Mr. R.: "Your Honor, may I speak?"  Hearing Officer: "No."); J.L.A. (Mr. A.: "I have no way of getting out of here, like, I swear, the $5,000—"; cut off by Hearing Officer).

[49]  *See, e.g.*, Pls. Ex. 3, May 12, 2016, 15.48 at 16:57, W.S.T. (raising bail to $2,000 based on prior convictions and "for the same reason deny your personal bond"); August 23, 2016, 15.46 at 40.29, J. B. (Mr. B.: "I was asking for leniency on my bond, sir."  Hearing Officer: "Based on your priors, that's as lean as I can get."); November 2, 2016, 22.07 at 18:17, T. S. (based on "priors," "going to deny your personal bond.").

a defendant needs court-appointed counsel because of indigence.[50]  The evidence that this occurs is overwhelming.  The Hearing Officer's wisecrack that setting a $2,500 bond for reasons of community safety "makes me feel better" clearly shows intent to use secure money bail to detain that defendant indefinitely.[51]

The court finds and concludes that in the typical case, Hearing Officers set secured money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than as a mechanism for pretrial release.  In the vast majority of cases, the Hearing Officers

---

[50] *See, e.g.*, Pls. Ex. 3, May 12, 2016, 9.49 at 24:41, F. C., (Hearing Officer: "I would consider you for release on a personal bond, but you've indicated you have no residence. Is that correct?"  Mr. C.: "Yes, ma'am."  Hearing Officer: "Okay, your pretrial bond release is denied."); May 16, 2016, 6.46 at 14:40, L. P. (Ms. P.: "What is a personal bond?"  Hearing Officer: "A personal bond is where you have a place to stay. You just told me you don't have any other place to stay, so I'm not going to consider you for a personal bond."); May 18, 2016, 19.48 at 8:10, K. H. ("You indicated to Pretrial [Services] that you were living in a car, so I'm not going to be able to consider you for a personal bond."); October 7, 2016, 22.15 at 18:45, C.D.D. (Mr. D.: "Currently, I'm mostly living out of my car."  Hearing Officer: "A little too unstable for a personal bond.  I'm setting your bond at, well it's as low as it goes, $500."); October 2, 2016, 1.14 at 24:48, K.L.M. (arrested for shoplifting $54 worth of clothing from a Goodwill thrift store); August 24, 2016, 6.21 at 4:55, F. O. (arrested for "camping" at a bus shelter); May 21, 2016, 22.52 at 32:15, A. C. (soliciting money at a gas station and sleeping at the carwash; "You don't qualify for a personal bond."); May 12, 2016, 3.48 at 40:40, J. M. ("bothering customers, begging for money" outside of a shopping center); May 21, 2016, 3.55 at 25:43, R. L. ("begging" for money outside a gas station; "You don't qualify for a personal bond."); August 23, 2016, 3.18 at 31:21, E. B. ("begging" at Wal-Mart); August 25, 2016, 15.27 at 48:44, J.L.A. (arrested for soliciting money outside a Walgreens); August 26, 2016, 12.25 at 17:38, A.C.R.W. (panhandling at a gas station); November 1, 2016, 3.06 at 20:33, J. G. (panhandling outside a store); November 2, 2016, 1.03 at 28:54, C. T. (arrested for panhandling at a gas station); November 2, 2016 9.09, 31:42, T. O.  (arrested for sleeping in an abandoned bank); February 8, 2017, 6.41 at 37:36, J. H. (arrested for asking for money outside of a Shop N Go); October 6, 2016, 15.18 at 30:42, R. W. (arrested for attempting to use a bathroom at a hospital); May 22, 2016, 3.47 at 22:58, R. J. ("You do not qualify for a personal bond. . . .  Will you be hiring your own attorney or seeking help?"  Mr. J.: "Seek help. I ain't got no money.").  November 3, 2016, 12.14 at 13:38, T. P. (in absentia; "She appears to be homeless. I'm going to leave the bond at $1,000."; requesting appointed counsel on her behalf, stating, "I'm going to make the assumption that she's indigent.").

[51] *See also* Pls. Ex. 3, November 3, 2016, 01.04 at 26:20, L. I. (after lowering bond from $50,000 to $5,000, Hearing Officer threatens to re-raise the bond to $50,000 if Mr. I. does not have a place to stay, stating "The order says you can't go there, so here's how we're going to work it out.  It'll be your choice. If you get out on bond, you're going to tell me you got someplace else to go.  Now if you don't have any place else to go then I have to give you a place to stay.  My place, I'm going to give you the address, it's 701 San Jacinto [the County Jail]. . . .  So I'll raise your bond back where it was, and I'll leave you in jail.  So either you got another place to stay, or you're going to stay in jail.").

use their discretion to consider the five Article 17.15 factors to almost automatically impose the prescheduled secured bail amounts, notwithstanding Pretrial Services recommendations to release defendants on unsecured personal bonds and notwithstanding clear evidence of indigence.  Hearing Officers make these decisions in brief, uncounseled hearings at which the defendants are actively discouraged from speaking, and no reviewable findings are made on the record.

### 4.     The First Appearance Before a County Judge

Before the most recent change to the County Rules of Court in February 2017, any "incarcerated person" who remained in detention after the probable cause hearing would be scheduled to appear before a County Judge "the next business day" after the probable cause hearing. At this first appearance before a County Judge, counsel was appointed if requested.  Rules of Court, Rule 24.9.  The plaintiffs offered unrebutted testimony that, although misdemeanor defendants were taken to the County Courthouse on the scheduled day, they usually did not appear in the courtroom before the County Judge unless they offered to plead guilty at that time.  Hearing Tr. 2-1:59–61, 63; 3-1:8–9.  Bail review was at the County Judge's initiative, and done only in a minority of the cases. In some cases, the review was prompted by a Pretrial Services recommendation or by defense counsel.  *See* Pls Ex. 10(c), *2015 Pretrial Services Annual Report* at 15; Hearing Tr. 5:108; 7-2:56–61.  One County Judge testified that in his experience as a former criminal defense attorney, seeking a bail reduction before a County Judge was formally available, but practically futile. Hearing Tr. 2-1:10.  Defendants who did not plead guilty but wanted to contest their bail settings depended on court-appointed counsel filing a formal motion for bail review.  That motion would not be considered until a later hearing, usually held one or two weeks later.  *Id*. at 3-1:10–11.  The only way to gain release earlier was to pay the bail or to plead guilty.

77

The February 9, 2017 amendment took effect on March 9, 2017.  The amended County Rules of Court require "any arrestee that is booked into the Harris County Jail" to be presented at a "Next Business Day Setting," even if that arrestee is released from custody between booking and the next business day.  Rules of Court, Rule 4.3.1.  If the probable cause hearing has not been held by the Next Business Day Setting, the County Judge rather than the Hearing Officer will determine probable cause and set bail.  *Id*.  The amended Rules state that "[a]bsent a waiver by the defendant and defense counsel, the court will review conditions of release, bail amount set, and personal bond decision and modify if good cause exists to do so."  *Id*.

Judge Darrell Jordan, the presiding judge of County Criminal Court at Law No. 16, testified that in e-mail exchanges, some County Judges have objected that because the new Rule 4.3.1 is not based on the Texas Code of Criminal Procedure, County Judges do not have to review bail at the Next Business Day Setting.  Hearing Tr. 3-1:98, 117.  Whether County Judges do or do not review the bail that the Hearing Officers set, Judge Jordan testified that in his experience as a criminal defense attorney on many misdemeanor cases, seeking a bail review at the first appearance was futile because County Judges "stick to the bond schedule.  That would be the answer.  What does the bond schedule say?"  *Id*. at 3-1:10.

Judge Jordan testified that he takes a different approach to bail from his fifteen County Judge colleagues.  *Id*. at 3-1:16–17.  The Hearing Officers and other County Judges who testified agreed. *Id*. at 3-2:176–77; 4-1:113–16, 180–81; 5:62, 120.  Judge Jordan testified that in his interpretation of the *Roberson* order and Article 17.15 factors, the first factor—that "the bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with"—means that a person who has the funds available for a secured money bail should post security within his or her financial

means to assure appearance at trial. *Id*. at 3-1:62–63. The fourth factor—requiring consideration of ability to pay—means that bail should be set at an amount and on terms the defendant can meet to be released. That may mean a $2,000 secured bail if the defendant can afford the $200 commercial surety premium, and an unsecured personal bond if the defendant cannot pay the premium. *Id*. at 3-1:65–66. "Otherwise, I[ would be] keeping them in jail because they can't afford the bond." *Id*. at 3-1:66.

As for the nature of the offense and consideration of community safety, Judge Jordan testified that he reviews charging documents with the assigned Assistant District Attorney before the first appearance hearings. *Id*. at 3-1:66–67. For cases that present troubling charges or circumstances, Judge Jordan has the defendants appear in his courtroom and engages them in a colloquy. *Id*. "I want to talk to them and fully understand what is going on so then I can make a decision on what we should do with their bond." *Id*. at 3-1:66. "But at no time in my analysis do I say setting a money bond is going to make them a better person or make the victim safer because the person had $500. . . . Money does not make somebody safe." *Id*. at 3-1:71. Instead, Judge Jordan testified that he orders additional, nonfinancial conditions of release on personal bond, such as GPS monitoring for those at risk of violating a protective order. *Id*. at 3-1:73–74.

Judge Jordan has experienced the Harris County misdemeanor pretrial justice system both as a lawyer representing defendants and as a County Judge ruling on defendants' cases. He does not believe that the Texas Code or County Rules of Court are unconstitutional as written. He testified that judges can apply the rules in a constitutional manner, and that the way he applies them is constitutional. *Id*. at 3-1:87–88. But he also believes that outside of his jurisdiction over those assigned to County Court No. 16, the County engages in a widespread practice of detaining

misdemeanor defendants before trial on secured bail amounts County personnel know the defendants cannot pay because they are indigent. *Id.* at 3-1:61. Judge Jordan testified that without an injunction from this court, that practice will continue. *Id.*

Testifying on behalf of herself and County Judge Margaret Harris, Judge Paula Goodhart, the presiding judge of County Criminal Court at Law No. 1, testified that she believes Judge Jordan "consider[s] one factor and one factor only, which is the ability to pay." *Id.* at 5:115, 120. She interprets the *Roberson* order and Article 17.15 to require her to "look at a person's individual liberty and weigh that with the risk to the community and the risk that they are not going to appear and consider it altogether with all of those factors and set a reasonable and rational bond that we believe is going to secure their reappearance and it is going to minimize their risk to reoffend." *Id.* at 5:116. She testified that "[a]fter going through the whole process, I have set a bond that I did not think it was likely that the person could make, not as an instrument of oppression or with the intent to detain, but because after considering all of the factors, that was the reasonable and rational non-excessive thing to do." *Id.* at 3-1:121.

Judge Goodhart disagreed with Judge Jordan's conclusions about the incentives resulting from the secured money bail system. She testified to her understanding that under Texas law, having a bond revoked for new criminal activity creates a financial incentive for those who post secured money bail to comply with the conditions of their release. *Id.* at 3-1:123. Judge Goodhart apparently did not know that Texas does not permit a financial forfeiture when a defendant released on bond commits a new offense. *See* TEX. CODE CRIM. PRO. art. 22.01–02 (permitting forfeiture with a right to collect the financial security only in cases of failure to appear). In fact, the re-arrest of a defendant during pretrial release guarantees that the bond will not be forfeited. *Id.* art. 22.13(5).

80

Judge Goodhart testified that no Harris County policymaker, so far as she is aware, has examined Harris County data to compare pretrial failure-to-appear rates or bond forfeiture rates between those released on secured or unsecured financial conditions. Hearing Tr. at 5:137–38. Her impression was confirmed by Director of Pretrial Services Kelvin Banks and the Hearing Officers. *See id.* at 3-2:146; 4-1:149–50, 162–63. Dr. Marie VanNostrand, the County's consultant on pretrial reform, testified that Harris County may collect the data that would allow this study but has never undertaken such a study or compiled the data to do so. *Id.* at 6-1:111. Judge Goodhart testified on behalf of herself and another County Judge that even if she learned from such a study that secured money bail provides no financial incentive to comply with the conditions of release, it would not change her subjective belief that secured money bail is better for community safety than unsecured bail. *Id.* at 5:131.

The court finds and concludes that the Harris County policymakers with final authority over the County's bail system have no adequate or reasonable basis for their belief that for misdemeanor defendants, release on secured money bail provides incentives for, or produces, better pretrial behavior than release on unsecured or nonfinancial conditions. The policymakers are apparently unaware of important facts about the bail-bond system in Harris County, yet they have devised and implemented bail practices and customs, having the force of policy, with no inquiry into whether the bail policy is a reasonable way to achieve the goals of assuring appearance at trial or law-abiding behavior before trial. In addition to the absence of any information about the relative performance of secured and unsecured conditions of release to achieve these goals, the policymakers have testified under oath that their policy would not change despite evidence showing that release on unsecured personal bonds or with no financial conditions is no less effective than release on secured money bail

at achieving the goals of appearance at trial or avoidance of new criminal activity during pretrial release.

Dr. Demuth presented uncontroverted and reliable evidence that in 2015 and 2016, the County Judges changed the bond amount and type from that set by the Hearing Officers in fewer than 1 percent of misdemeanor cases. Pls. Ex. 4(d), Second Rebuttal Report at 10; *see also* Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 15. That is compelling evidence that, like the Hearing Officers, County Judges presiding over Court Nos. 1 through 15 are not making individualized bail assessments under either the *Roberson* Order or the Article 17.15 factors.

The County's rule change to require a bail review at a defendant's first appearance within one business day of booking, rather than within one business day of the probable cause and bail-setting hearing, has been in effect only since March 9, 2017. *See* Rules of Court 4.3.1. The record evidence does not show whether this earlier bail review has had any effect. Mr. Bob Wessels, who served as court administrator for the County Criminal Courts at Law for decades, testified that the bail review is not a new change to the rules but a codification of prior consistent practice. Hearing Tr. 5:29. Judge Jordan credibly testified that some of his colleagues have refused to conduct bail reviews, even under the new rule. *Id*. at 3-1:98. Judge Jordan also testified that bail reviews are usually futile because the County Judges adhere to the bail schedule on a secured basis. *Id*. at 3-1:10. Assistant District Attorney JoAnne Musick testified that, before the rule change, County Judges typically presumed that a misdemeanor defendant was indigent and appointed counsel if the defendant was still detained at the first appearance. *Id*. at 2-1:60–61. Only those who had posted bond to be released were made to submit an affidavit of indigence before counsel could be appointed. *Id*. That means that for years, under a consistent practice now codified in the County Rules of Court, the

County Judges have presumed misdemeanor defendants to be indigent because they remained detained by their inability to pay a secured financial condition of release, yet in about 99 percent of the cases, the County Judges have neither adjusted the bail nor granted release on unsecured or nonfinancial conditions.  There is no basis in the record to find or conclude that the rule change requiring bail review at the Next Business Day Setting has altered or will alter these practices.

## 5.    Disposition of Misdemeanor Cases

Unless a district attorney declines a charge or a Hearing Officer finds no probable cause, the earliest opportunity to dispose of a misdemeanor case is at the defendant's first appearance before a County Judge, if the defendant pleads guilty and is sentenced.[52]  Ms. Musick testified based on her lengthy experience as a criminal defense attorney that many misdemeanor defendants "don't really want to plead guilty, but sometimes they want to get out of jail, return to family, return to work, what have you.  So they will inquire about a plea so that they can get out."  Hearing Tr. 2-1:65.  Judge Jordan testified that in his experience, Assistant District Attorneys would make a plea offer in 85 or 90 percent of the misdemeanor cases at a defendant's first appearance.  *Id.* at 3-1:14.  Both testified that the typical sentence for those pleading guilty at a first appearance is either the time already served in pretrial detention, or some number of days that with a two-for-one or three-for-one credit for the time served would allow release within a day of the first appearance.  *Id.* at 2-1:67; 3-1:12.  Judge Goodhart testified that prosecutors sometimes threaten to seek sentencing enhancements for certain offenses to convince misdemeanor defendants to plead and receive a time-served sentence

---

[52]  According to the *2015 Pretrial Services Annual Report*, Hearing Officers did not find probable cause in 1.5 percent of the cases reviewed by Pretrial Services.  Pretrial Services reviewed about 81 percent of the total cases of misdemeanor arrestees in 2015.  Pls. Ex. 10(c) at 10, 14.

According to the *2016 Pretrial Services Annual Report*, Hearing Officers did not find probable cause in 1.7 percent of the cases reviewed by Pretrial Services.  Pretrial Services interviewed about 79 percent of the total cases of misdemeanor arrestees in 2016.  (Docket Entry No. 290, Ex. 1 at 10, 14).

at their first appearances.  *Id*. at 5:114.

Another indication that misdemeanor defendants abandon valid defenses and plead guilty to obtain faster release than if they contested their charges is a report from the National Registry of Exonerations showing that Harris County has led the United States in the total number of criminal exonerations each of the last two years.  Def. Ex. 110.  Most of Harris County's exonerations come from misdemeanor drug offenses that evidence samples conclusively prove the defendant did not commit.  *See id*.  But rather than wait for lab tests that may exonerate them, misdemeanor arrestees who cannot pay for release before their first appearances plead guilty in order to end their pretrial detention and be released.  *See id*.; Pls. Ex. 13(a); 7(h) at 2.

Defendants who do not plead guilty at the first appearance have a hearing set, generally two or three weeks later.  *Id*. at 2-1:10.  Defendants who cannot pay their bail during this time remain in pretrial detention.  *Id*. at 2-1:10–11.  Defendants released on bond typically have their hearings set much later.  Dr. Demuth presented uncontroverted and reliable testimony that from 2015 to early 2017, for misdemeanor arrestees who did not bond out—40 percent of all misdemeanor arrestees—the median time between arrest and case disposition was 3.2 days.  Of those, 72 percent resolved their cases within 7 days; 90 percent resolved their cases within 30 days.  Pls. Ex. 4(d), Second Rebuttal Report at 4.  Over the same period, for misdemeanor arrestees released on bond (either secured or unsecured)—60 percent of misdemeanor arrestees—the median time to disposition was 120 days.  Of those, 5 percent resolved their cases within 7 days; 13 percent resolved their cases within 30 days.  *Id*.

Dr. Demuth presented uncontroverted and reliable testimony, based on the County's own data, that the likelihood of a conviction differs dramatically depending on whether a defendant is

detained before trial.   In 2015 and 2016, 84 percent of misdemeanor arrestees detained at case disposition pleaded guilty, while 49 percent of those released before disposition pleaded guilty.   *Id*. at 4.   Only 13 percent of those still detained at case disposition had their cases dismissed, and 2 percent received deferred adjudications.   *Id*.   For those released before case disposition, 32 percent had their cases dismissed and 12 percent received deferred adjudications.   *Id*.; Pls. Ex. 4(b), First Rebuttal Report at 16–18.   These figures are consistent with, and support, the plaintiffs' theory that for misdemeanor defendants unable to pay secured money bail, Harris County maintains a "sentence first, conviction after" system that pressures misdemeanor defendants to plead guilty at or near their first appearances because that is the only way to secure timely release from detention.   Hearing Tr. 6-2:172–73.

In one of the most sophisticated and rigorous studies of bail and pretrial detention in misdemeanor cases to date,[53] researchers at the University of Pennsylvania examined hundreds of thousands of Harris County misdemeanor arrest cases.   The results are presented in a peer-reviewed

---

[53]   Dr. Demuth credibly testified that the Heaton Study, along with a study by Arpit Gupta *et al*., discussed in Part I.F below, are "the most rigorous studies available on this kind of question of trying to isolate a causal effect of detention or money bail on these outcomes [failure to appear and recidivism] later on."   Hearing Tr. 6-2:137.   The Heaton Study not only ran multiple regression analyses, controlling for all relevant variables available in Harris County's data, it also treated the data as a natural experiment in which the weekday of an arrest acted as a random sorting tool to isolate time in detention as the only significant variable between like cases.   *Id*. at 6-2:125–130.   The Gupta *et al*. study observed a similar natural experiment based on the random variable of judicial case assignments in Philadelphia.   Pls. Ex. 12(h).

Dr. Morris criticized the Heaton Study principally for not controlling for specific charge types in its natural experiment, and for overstating the causal effects of detention.   Def. Ex. 28A at 5.   Dr. Morris's criticism is not credible.   The Heaton Study specifically states that, and explains how, it controlled for the charged offense in its regression analysis, *id*. at 18, and in the natural experiment, *id*. at 28.   In fact, the Study criticized other researchers who failed "to control for the particular offense charged."   *Id*. at 9.   The Study carefully distinguished between correlational estimates offered by regression analysis and causal estimates that derive from the natural experiment.   *Id*. at 46.   As Dr. Demuth credibly explained, no study ever perfectly proves causation, but experimental studies can approach causal inferences that simple regression studies cannot.   Hearing Tr. 6-2:125.   Dr. Morris's criticisms of the Heaton Study are particularly weak given his own analytical shortcomings in studying Harris County's data, as discussed in Part I.E.4 below.   The court finds that Dr. Morris's criticisms of the Heaton Study are unpersuasive and lack record support.

study forthcoming in the *Stanford Law Review*.  Pls. Ex. 12(d), Paul Heaton *et al*., *The Downstream Consequences of Misdemeanor Pretrial Detention* 69 STAN. L. REV. (forthcoming) (July 2016) ("Heaton Study"); Pls. Ex. 12(d)(i) (peer-review policy for empirical research).  The Heaton Study analyzed the differences in case outcomes between misdemeanor defendants who did not post bond within the seven days following the probable cause hearing, and those who did post bond within that period and were released.  The researchers found that the still-detained defendants were 25 percent (14 percentage points) more likely to be convicted, and 43 percent (17 percentage points) more likely to be sentenced to jail than those who bonded out earlier.  *Id*. at 4.  Detained defendants received sentences nine days longer on average, more than double the average sentence of similar, released defendants.  *Id*.  The researchers concluded that the fact of detention itself, rather than the defendant's charge, criminal history, or other variables, causally affects these outcomes.  *Id*. at 3–4.

The findings of Dr. Demuth and of the Heaton Study are supported by the record, case law, and commentary.  The case law and commentary recognizes that those released from pretrial detention are better able to consult with counsel and prepare a defense without hazarding their employment, housing, or family obligations.  *See, e.g.*, *Brown*, 338 P.3d at 1287 ("Congress attempted to remediate the array of negative impacts experienced by defendants who were unable to pay for their pretrial release, including the adverse effect on defendants' ability to consult with counsel and prepare a defense, the financial impacts on their families, a statistically less-favorable outcome at trial and sentencing, and the fiscal burden that pretrial incarceration imposes on society at large.") (citing 1966 U.S.C.C.A.N. at 2293, 2299); (*see also* Docket Entry No. 182 at 7; No. 272 at 9).  Above all, they are free from the pressure to plead guilty as the only way to be released from detention in a reasonably short period.  Ms. Musick credibly testified that many of her misdemeanor

clients chose to abandon valid defenses by pleading guilty at the first appearance so they could get out of jail instead of remaining detained for the two or three weeks it would take even to raise those defenses—or their inability to pay secured bail—in court.  Hearing Tr. 2-1:68–69.  Judge Jordan credibly testified that it was common to have misdemeanor clients who professed their innocence and had valid defenses to nevertheless plead guilty in order to be released much earlier than if they sought an unsecured bond based on indigence or challenged the prosecution's case. *Id*. at 3-1:11–12.

The defendants note that every misdemeanor defendant who pleads guilty affirms under oath that he or she does so voluntarily.  That is true.  It is also true that the County Judges engage the misdemeanor defendant in a counseled colloquy to affirm that the plea is made voluntarily.  *Id*. at 2-1:83–84; 3-1:98–99; 5:112–13.  But these arguments miss the point.  The credible, reliable, and well-supported testimony of the witnesses and the statistical studies in the record overwhelmingly prove that thousands of misdemeanor defendants each year are voluntarily pleading guilty knowing that they are choosing a conviction with fast release over exercising their right to trial at the cost of prolonged detention.  This Hobson's choice is, the evidence shows, the predictable effect of imposing secured money bail on indigent misdemeanor defendants.

### 6.    The Use of Bail to Detain

The consistent testimony of the plaintiffs' witnesses, including Assistant District Attorney Musick, Sheriff Gonzalez, and Judge Jordan, is that Harris County routinely detains misdemeanor defendants, who would be released if they could pay secured money bail, because they are unable to pay the amount needed for release.  Hearing Tr. 2-1:68–69; 3-1:51–52, 61; 3-2:9; *see also* Pls. Ex. 7(h) ¶ 5; (Docket Entry No. 206).  The consistent testimony of the Hearing Officers and other County Judges is that they do not detain misdemeanor defendants solely because they cannot pay but

because the balance of state-law factors, including the need to ensure future appearances and to protect community safety, require money bail that is secured and generally (in 90 percent or more of the cases) set at the scheduled bail amount, calculated based on the charge and the defendant's criminal history and no other factors.  These requirements, the defendants testified, can and frequently do outweigh the misdemeanor defendant's inability to pay the bail on a secured basis.  *Id*. at 4-1:117–18, 123–25, 144–45, 168–69; 5:34, 58, 71–72; Def. Ex. 23.  At the motion hearing, the parties agreed with the court's characterization of this conflict as one between a *but-for cause* and a *proximate cause* view of detention.  *Id*. at 1:99–100; 4-2:15–16.  In the plaintiffs' theory, thousands of defendants are detained but for their ability to pay secured money bail.  (*See, e.g.*, Docket Entry No. 143 at 15–17; No. 188 at 4–7).  In the defendants' view, secured money bail for many defendants is out of reach because of the defendants' problematic criminal history, the serious nature of the charges, the need for mental health evaluations, or other factors.  (*See, e.g.*, Docket Entry No. 162 at 15–16; No. 164 at 8–9).

Closer examination of the record evidence and the hearing testimony undermines the defendants' proximate-cause explanation for detention.  First, there is the overwhelming credible evidence that, with the exception of Judge Jordan, Harris County Hearing Officers and County Judges do not make individualized determinations of bail based on each defendant's circumstances, but instead consistently adhere to the predetermined bail schedule.  Second, the facts established by other overwhelming evidence undermines the judicial defendants' position that in many cases, their individualized review shows that the public interest in the misdemeanor defendant's appearance in court and law-abiding behavior before trial requires secured money bail at the scheduled amount, notwithstanding the misdemeanor defendant's apparent indigence and the state-law prohibition on

preventive detention orders in misdemeanor cases. *See, e.g.*, Hearing Tr. 5:71–72.

The defendants argue that secured money bail provides incentives not delivered by unsecured personal bonds to induce appearance at trial. *See, e.g.*, Hearing Tr. 5:127–28. The defendants cite what they call the "indemnitor effect": commercial sureties and acquaintances of a defendant who put up the money for the defendant's pretrial release on secured bail have an incentive to ensure that defendant's return to court. *See, e.g.*, *id*. at 4-2:79–80; 6-2:68. Under Texas law and the County Rules of Court, however, unsecured personal bonds provide similar incentives, or lack thereof. Texas law requires those released on unsecured personal bonds to swear to appear or forfeit the principal bond amount. *See* TEX. CODE CRIM. PRO. art 17.04. Harris County Pretrial Services is required by its policies to supervise misdemeanor defendants released on unsecured personal bond, keep them informed of court dates, administer drug tests and other appropriate monitoring services, and send out an investigator when a defendant fails to appear. Hearing Tr. 3-2:148; 4-1:18–19; Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 5. Pretrial Services is required by its policies to supply the "indemnitor effect" for those released on unsecured bonds. At most, commercial sureties and a defendant's social network can prompt the defendant to appear at hearings, or, in the case of sureties, petition the courts to revoke the release on bond. But these are the same actions that Pretrial Services may—and under its policies, must—take for those released on unsecured personal bonds. *Compare* Hearing Tr. 5:127–28, *with id*. at 4-1:18–19; Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 5.

Formally, the financial incentives are the same across bond types. Those who are released and fail to appear either forfeit a cash bond, become civilly liable to Harris County for the principal

bail amount, or become civilly liable to a bondsman for the principal bail amount.[54]  In each case and

for each category of bond, nonfinancial incentives provide more powerful reasons to appear.  These

reasons include fear of a warrant for re-arrest and the possibility of being charged with, and

convicted of, an additional misdemeanor for failure to appear.  *See* TEX. PENAL CODE § 38.10.

At bottom, even if there were a difference between the indemnitor effects of having a

commercial bondsman paid by the defendant's friends or family monitor and encourage the

defendant's appearance,[55] versus having Harris County Pretrial Services provide the monitoring and

encouragement, that difference cannot be the basis for imposing secured, rather than unsecured, bail

without making indigence at least the proximate cause of the differential treatment.  The defendants

essentially argue that co-indemnitors—family and friends with access to money—makes secured bail

a better assurance of appearance than unsecured bail.  *See, e.g.*, Hearing Tr. 3-1:16, 129.  On that

basis, the homeless and the friendless are denied release on personal bond because they lack co-

indemnitors.[56]  *See id*. at 3-1:43–44; Pls. Ex. 1, Appendix E at 6.  An indigent homeless individual's

lack of co-indemnitors is, however, both a cause and a consequence of indigence.  The rigid demand

for secured, rather than unsecured, money bail from a homeless individual is indistinguishable from

---

[54]  In fact, the incentives are somewhat stronger for defendants released on cash bonds and personal bonds, since they can avoid financial liability and loss altogether by appearing at their hearings.  Those released on surety bonds suffer the permanent loss of the nonrefundable premium they pay to the surety, whether or not they appear.  *See* Hearing Tr. 5:126.

[55]  *But see* Hearing Tr. 3-2:154 (Mr. Banks: "It's my understanding the bail bondsman doesn't monitor anything or enforce anything unless a person does not show.").

[56]  Mr. Banks testified that Harris County follows an "[u]nwritten custom" of recommending detention for the homeless.  Hearing Tr. 4-1:43–44; *see also* Pls. Ex. 1 at 6 (County defendants' response to interrogatory: "The Hearing Officers, in considering all five factors under 17.15, as well as using common sense, generally find that a homeless person is ineligible for a personal bond in that if such a person lacks a sufficient connection to Houston or lacks a reasonable means of being contacted in the event that they fail to appear in court, judicial experience leads to the reasonable conclusion that such a person is ineligible for a personal bond.").

an order that a misdemeanor defendant so indigent as to be homeless be detained because of that indigence.

Other than a fully-paid-up-front cash bond, the unsecured personal bond and the secured surety bond provide an equivalent lack of financial incentives to appear during pretrial release. Harris County personnel testified that the County does not try to collect unsecured bonds forfeited for nonappearance. Hearing Tr. 3-1:36; 3-2:148; 5:24. Even if commercial bondsmen file civil suits to collect forfeited bond amounts, for misdemeanor defendants who lack assets—who are judgment-proof—that civil liability does not create a meaningful incentive. *See id*. at 1:190; 3-2:148–49; 4-1:170. The up-front payment of the bondsman's premium is a sunk cost, and is not recoverable even if the defendant appears for every court date. *Id*. at 2-1:53; 4-2:13–14. Neither secured nor unsecured bonds provide meaningfully different financial incentives.

The incentive argument fares no better with respect to deterring new criminal activity during pretrial release. The evidence is that neither a secured nor unsecured bond is subject to forfeiture for new criminal activity. *See* TEX. CODE CRIM. PRO. art. 22.01–02; 22.13(5); Hearing Tr. 4-1:58–59. The record establishes that requiring secured money bail provides no incentive to law-abiding behavior during pretrial release that is not equally provided by unsecured personal bonds—the main incentive, of course, being the threat of re-arrest and extended sentences for new criminal activity, incentives that apply equally across all classes of released defendants. *See* TEX. PENAL CODE § 38.10.

Secured money bail ensures better results than unsecured appearance bonds only when the secured money bail operates as an order of detention because the defendant cannot pay. Those who are detained because they cannot pay secured money bail necessarily make their court appearances

and do not re-offend.  But that success is because of the detention, not because of the financial security.  And it applies only to those who cannot pay the secured financial conditions of release.[57]

The defendants argue that even if judges gave greater consideration to a misdemeanor defendant's inability to pay, the defendants argue, some indigent defendants would still be detained under other state-law factors, such as a history of prior failures to appear or criminal convictions. The defendants cite Ms. ODonnell and Mr. Ford as examples.  (Docket Entry No. 164 at 18).  The problem is that although there is no meaningful difference in the financial or other incentives provided between secured and unsecured money bail, those with "priors" will be detained on secured bail, *only* if they are too poor to pay it.  *See also* Hearing Tr. 5:33–34.  The defendants repeatedly argue that because Texas law does not permit pretrial preventive detention in most misdemeanor cases, the only way to address serious concerns about nonappearance or new criminal activity is with a secured money bail too high for the defendant to pay.  Hearing Tr. 1:115–16; 3-1:72–73; 5:43–44, 70; (Docket Entry No. 166 at 13–14).  But it is the fact of pretrial detention, not the secured money amount, that addresses these concerns, and only for those too poor to pay.  An arrestee with access to money but with similar present charges, similar prior failures to appear, and similar criminal history could pay the secured bond and be released, despite the risks to public safety or of nonappearance.  That arrestee would face no meaningfully different incentives than if released on an unsecured bond for the same amount.

Both Judge Goodhart and Judge Villagomez testified that one reason they reject Pretrial

---

[57]  The record provides no support for defense counsel's argument that some defendants choose remain detained, meaning they are able but unwilling to pay the secured bail amount.  *See* Hearing Tr. 5:79–80; Def. Ex. 28 at 18; (Docket Entry No. 162 at 15–16).  The credible testimony from every witness and declarant with experience representing criminal misdemeanor defendants is that no one remains in the Harris County Jail out of a desire to be there.  *See, e.g.*, Hearing Tr. 2-1:60; 3-1:13; Pls. Ex. 7(h) ¶ 6. Nevertheless, the court's relief permits defendants to remain in pretrial custody if they choose to do so.

Services recommendations to release defendants on unsecured financial conditions in some cases is that the judges are able to access and consider the charging documents and other information that make the misdemeanor offense worse than the charge makes it appear, while Pretrial Services is limited to resource and criminal-history information obtained in the interview with the defendant. Hearing Tr. 4-1:125–26; 5:69–70; *see also id.* at 5:6–7.  This is not a credible explanation for why the Hearing Officers and County Judges adhere to the bail schedule nearly 90 percent of the time. That aside, the judges' reasoning assumes at the least that if the circumstances surrounding the crime appear graver than the misdemeanor charge on its own indicates, imposing secured money bail at the scheduled amount will induce better pretrial behavior from the defendant.  That assumption has no basis in evidence or experience in misdemeanor cases when the defendant is released.  In effect, the defendants' position is that misdemeanor defendants should be incarcerated for the risks they pose, but only if a secured financial condition beyond the their ability to pay accomplishes the incarceration.

The fact that the defendants consistently interpret the *Roberson* order and Article 17.15 of the Texas Code of Criminal Procedure to refer only to secured bail is telling.  The order and the Code provision refer only to "the amount of bail." The Code defines "bail" as both secured and unsecured bonds.  *See* TEX. CODE CRIM. PRO. art. 17.01; 17.15.  While the defendants may increase the bail amount based on a misdemeanor defendant's past conduct, neither the Code nor the *Roberson* order require the higher level of bail to be imposed only on a secured basis.   Judge Hagstette acknowledged that on occasion he has, consistent with the order and Code, set misdemeanor bail at the maximum scheduled amount of $5,000 but on an unsecured basis, so that the defendant could be released on a personal bond.  Hearing Tr. 4-1:169; *see also Ex parte Gentry*, 615 S.W.2d 228, 231

(Tex. Cr. App. 1981) (confirming bail at $2,500 but ordering release on "the security of a personal bond in the amount fixed").  The fact that Hearing Officers and County Judges rarely engage in this practice shows they set secured money bail not with an eye to the incentives provided by higher bail amounts, but with the understanding and expectation that secured bail will detain outright.  Their shorthand for personal bonds as "PR bonds," meaning "pretrial release bonds," betrays the same understanding.  *Id*. at 3-2:86–87; 4-1:75, 169; *see also* Pls. Ex. 3, February 8, 2017, 6.41 at 37:36; November 2, 2016, 6.06 at 1:00:02; May 12, 2016, 9.49 at 24:41.

Although the Texas Code consistently states that the purpose of the probable cause hearing is to "determine[] whether probable cause exists to believe that the person committed the offense," *see, e.g.*, TEX. CODE CRIM. PRO. art. 17.033, the orders the Hearing Officers issue are titled "probable cause for further detention," *see generally* Pls. Ex. 9.  On these orders, Hearing Officers check a box stating that "[t]he Court FINDS PROBABLE CAUSE for further detention EXISTS" and requiring that the "Defendant shall remain in the Sheriff's custody until he posts [secured] bail in this cause."  *Id*.  In Harris County, secured money bail is not just a de facto pretrial detention order; it is literally a pretrial detention order.

The plaintiffs' understanding of those detained "solely" because they are financially unable to pay secured money bail at the scheduled amount more accurately describes the current reality in Harris County.  While Texas law guides the judicial officers' discretion in setting bail amounts, it does not require bail to be set on a secured basis.  Judicial officers in Harris County follow a custom and practice, without sufficient basis in data or experience, of setting bail on a secured basis to address concerns about a defendant's risk of failing to appear or of committing new criminal activity. The only way that secured bail addresses those concerns is by effectively ordering pretrial preventive

94

detention.  This occurs only when, and because, the defendant is too poor to pay the amount of bail imposed.  In Harris County, secured financial conditions of release in misdemeanor cases effectively function as detention orders only against the indigent.

### E.    The Population Statistics of Misdemeanor Detainees at Each Stage in the Post-arrest Process

In mid-February 2017, Harris County produced data drawn from its administrative records purporting to account for all adults booked into the Harris County Jail from January 1, 2015 to February 14, 2017.  Def. Ex. 28 at 2.  The data set included 106,055 case entries.  Pls. Ex. 4(b), Second Supplemental Report at 1.  *Id.* at *2–3.  Both parties' experts relied principally on this data set to reach their conclusions about the misdemeanor population in the Harris County Jail.

### 1.    Arrestees Detained More than 24 Hours Before the Probable Cause Hearing

From 2015 to early 2017, nearly 67 percent of misdemeanor arrestees were detained from arrest until the probable cause hearing.  Pls. Ex. 4(b), Expert Report at *2, Second Supplemental Report at 2.  Almost all of the remaining 33 percent paid a secured money bond to be released before the probable cause hearing.   Only 90 people were released on personal bond through early presentment to a Hearing Officer in 2015, and 240 in 2016.  That is around 1 percent of arrestees held in custody by the City of Houston Police Department.  *Id*; (Docket Entry No. 207-1 at 15; No. 290, Ex. 1 at 8).

Of those still detained at the probable cause and bail-setting hearing, more than 14,000 misdemeanor defendants—a little over 20 percent of those detained at that point[58]—waited more

---

[58]  Dr. Demuth arrived at these numbers from the available data from January 1, 2015 to November 25, 2016 and from December 1, 2016 to January 31, 2017.  Pls. Ex. 4(b), Expert Report at *2, Second Supplemental Report at 2.  Dr. Demuth calculated that after removing duplicate entries for multiple charges filed at the same time, the sample includes 97,715 misdemeanor arrestees.  Pls. Ex. 4(b), First Supplemental

than 24 hours after arrest for the hearing.  Pls. Ex. 4(d), Second Rebuttal Report at 1.  Over 600

people—1.0 percent of those detained—waited more than 72 hours after arrest for the hearing.[59]  *Id*.

The plaintiff Robert Ryan Ford was detained 32 hours after his arrest before he appeared before a

Hearing Officer.  *See* Pls. Ex. 8(c)(iii), Ford Docket Sheet.

Under Texas law, Harris County is required to release misdemeanor defendants if they have

not had a probable cause hearing within 24 hours of arrest.  TEX. CODE CRIM. PRO. art. 17.033.

Release must be on an unsecured personal bond if the defendant cannot pay secured money bail.  *Id*.

at 17.033(b).  Probable cause hearings for those arrested by the City of Houston Police Department

may be delayed because of crowded conditions at the County Jail, causing backups in transporting

arrestees from the City to the County Jail and booking them there.[60]  For some whose probable cause

hearings are delayed more than 24 hours after their arrests, the Hearing Officers may hold hearings

in absentia or "on the papers."  Hearing Tr. 2-1:92–93.  The Hearing Officers find probable cause

based on the DIMS report provided in the charging documents. *Id*.  That situation rarely occurs.  The

parties' experts agreed that only 3 to 4 percent of the entire arrest population has probable cause

determined on the papers.  *See* Def. Ex. 28A; Hearing Tr. 6-2:31–32, 121–22.  That means Harris

County has over the last two years detained more than 10,000 misdemeanor arrestees more than 24

hours after arrest without either a probable cause hearing or a probable cause determination on the

---

Report at *2.  That is, misdemeanor defendants arrested and charged with multiple offenses on the same arrest are not double-counted, but defendants who were arrested multiple times on different charges may appear multiple times in the sample.  *Id*. at *2–3.

[59]  The parties do not meaningfully dispute the basic numbers.  The parties dispute whether the average or median length of detention is less than 25 hours, Hearing Tr. 1:152; 2-2:61–64; 4-2:42, 52–53, but the average and median periods are not critical.  The issue is not whether Harris County complies with the law on average, but the extent to which it violates its legal obligations.  Meeting a due process standard 50.1 percent of the time would not save the defendants' case.

[60]  *See* Part I.D.2 *supra*.

papers.   And on the relatively few occasions when Hearing Officers make probable cause determinations on the papers, they testified that they do not consider the amount of bail or eligibility for release on unsecured personal bond at that time.  *Id*. at 4-1:133–35.

The court finds and concludes that Harris County is not providing a bail-setting hearing within 24 hours in thousands of cases.

### 2.        Arrestees Detained More than 48 Hours Before a Bail Review

From 2015 to early 2017, nearly 50 percent of misdemeanor arrestees were detained from arrest until their first appearance before a County Judge.  Pls. Ex. 4(d), Second Rebuttal Report at 2.  In April 2016, one month before the plaintiffs filed suit, only 7.5 percent of all misdemeanor arrestees were released on personal bond, almost all of them by Hearing Officers at the probable cause hearing.  Def. Ex. 47; Pls. Ex. 4(d), Second Rebuttal Report at 10.  By the end of 2016, seven months after the plaintiffs filed suit and three months after the County Judges changed the Rules of Court to instruct the Hearing Officers to presume that unsecured personal bonds for twelve offense categories,[61] 16 percent of all misdemeanor arrestees were released on personal bond.  Def. Ex. 47; Pls. Ex. 10(b), *December 2016 Pretrial Services Monthly Report*.  The overall rate of release of misdemeanor defendants on unsecured personal bonds from 2015 to early 2017 was 9.7 percent—10.8 percent in 2016 alone.  Pls. Ex. 4(d), Second Rebuttal Report at 9; (Docket Entry No. 290, Ex. 1 at 9).

Over the last two years, around 52,000 misdemeanor arrestees were still detained after their probable cause hearings before the Hearing Officers.  Pls. Ex. 4(d), Second Rebuttal Report at 2.  The next hearing, before a County Judge, is generally within one business day after the probable

---

[61]  *See* Part I.D.1 *supra*.

cause hearing.   But more than 26,000 misdemeanor arrestees—over 51 percent of those still detained—waited more than 48 hours after their arrests before their first appearances before a County Judge.  *Id*.  Over 6,800 people—just over 13 percent of the detained population—were held longer than 96 hours after arrest before their first appearance.  Pls. Ex. 4(b), Second Supplemental Report at 1.   The plaintiff Loetha McGruder was detained 87 hours after her arrest before her first appearance before a County Judge.  Pls. Ex. 8(c)(ii), McGruder Docket Sheet.

The defendants dispute these numbers, but their expert, Dr. Morris, provided no alternative figures on the length of detention between arrest and first appearances.  *See* Def. Ex. 28A at 1–3. He argued that Harris County's data contains too many gaps, clerical errors, and problematic distributions to provide a basis for reliable calculations or conclusions.  *Id*.; Hearing Tr. 4-2:201–03. Dr. Morris specifically cited a distribution chart showing hours-to-release as containing too many sharp peaks and valleys, indicating that the data did not accurately reflect the length of detention. Def. Ex. 28A at 1–3; Hearing Tr. 6-2:79.

The plaintiffs' expert, Dr. Demuth, accounted for the problems Dr. Morris identified. Dr. Demuth excluded arrestees who had holds, had prior failures to appear, were on probation, faced multiple charges, faced concurrent felony charges, had prior convictions, were admitted for mental health or medical evaluations, or had high-risk designations.  Pls. Ex. 4(b), Rebuttal Report at 3. Dr. Demuth found the same rates and distribution of delays across the remaining population.  *Id*. Dr. Demuth testified that the peaks and valleys in the distribution are likely caused by the fact that Harris County does not record the time of first appearance.  Hearing Tr. 6-2:112–16.  Dr. Demuth adjusted for this by assuming that first appearances occur for all defendants at 9:00 a.m., when the County Courts open their sessions for the day.  *Id*. at 6-2:115–16.  This is a realistic estimate and a

conservative approach.   Rather than the smoother distribution that actually occurs as arrestees make

their first appearances throughout the day, the 9:00 a.m. assumption makes the distribution reflect

and   exaggerate   the   rhythms   of   the   County's   arrest   cycle.      The   relatively   more   numerous

misdemeanor defendants arrested in the afternoon and evening appear to have their first appearances

all at once at 24-hour intervals of 9:00 a.m. on the days after their arrest.   The relatively smaller

number arrested late at night make their assumed 9:00 a.m. appearances seem relatively scarcer.   *Id.*

at 6-2:112–16.   Dr. Demuth's calculations and conclusions are reliable and helpful, even with the

gaps and flaws in the Harris County records and data.   Of course, Harris County is welcome to

provide more accurate information at the merits trial.   On the present record, Dr. Demuth has

sufficiently addressed Dr. Morris's concerns by basing his calculations on realistic and conservative

assumptions.

The court finds and concludes that at least half of the detained misdemeanor population in

Harris County wait 48 hours or longer after arrest before seeing a County Judge, and at least 13

percent wait 96 hours or longer.

### 3.      Arrestees Detained Until Case Disposition

Harris County's annual and monthly Pretrial Services reports show that a remarkably stable

40 percent of misdemeanor arrestees remained detained until case disposition.   *See generally* Pls.

Ex. 10(b), 10(c).   In both the 2014 and 2015 annual reports, the rate is identical: 40.3 percent.   Pls.

Ex. 10(c).   The *2016 Pretrial Services Annual Report*, released after the motion hearing, shows that

40.1 percent of misdemeanor arrestees were detained until case disposition in 2016.   (*See* Docket

Entry No. 290, Ex. 1 at 8).   The 2016 change in the County Rules of Court to presume release on

personal bond in twelve offense categories has apparently had little impact.[62]

Of the 84 percent of detained arrestees who plead guilty at their first appearance,[63] 67 percent are released within a day.  Pls. Ex. 4(d), Second Rebuttal Report at 3.  About 83 percent are released within five days of their first appearance.  *Id.*  Those who do not plead guilty typically wait for one to three weeks or more before a second hearing before a County Judge.  *See* Hearing Tr. 2-1:68; 6-2:168–69.

Dr. Demuth testified that the likelihood a misdemeanor defendant will be detained at disposition correlates strongly with the indicators of poverty Pretrial Services uses to assess risk. Those who had one point for criminal risk on the assessment but no points for background, or resource, factors were detained at disposition 14 percent of the time.  *Id.* at 7-1:9–10.  Those with one point for criminal risk and seven points for background risk—meaning young males who did not own a home, an automobile, or a land line and who were unemployed or underemployed, or poorly educated—were detained at disposition 53 percent of the time.  *Id.*  At two points of criminal risk, those with no background risk points were detained until case disposition 33 percent of the time; those with seven background risk points were detained until case disposition 74 percent of the time. *Id.* at 7-1:10–13.

### 4.    Arrestees Detained "Because of" Indigence

The defendants argue that the plaintiffs' statistical reports do not prove that large numbers of misdemeanor arrestees are detained solely because of indigence and that the plaintiffs are assuming that if those detained could pay for release, they would.  (Docket Entry No. 162 at 15–16);

---

[62]  *See* Part I.D.1 *supra*.

[63]  *See* Part I.D.5 *supra*.

Hearing Tr. 8-2:53.  Both parties' experts tried to discern from Harris County data whether and to what extent misdemeanor defendants are detained because they cannot pay a secured money bail. Dr. Demuth relied on a computer program the plaintiffs developed that took "snapshots" of the data on the Harris County Jail's misdemeanor population at particular times on particular dates, pulled each defendant's public records from the County's public-facing online interface, and excluded those with nonfinancial reasons for detention on misdemeanor charges, such as concurrent pending felony charges.  Hearing Tr. 2-2:5–7; 7-1:38–39.  The most recent series of snapshots showed that on average, between February 15, 2017 and March 14, 2017, every day in the Harris County Jail there were:

- 328 people charged only with misdemeanors.

- 240 people charged only with misdemeanors and not subject to formal holds, such as warrants from another jurisdiction.

- 154 people charged only with misdemeanors, not subject to holds, who had been in jail for 3 or more days.

- 126 people charged only with misdemeanors, not subject to holds, who had been in jail for 5 or more days.

- 84 people charged only with misdemeanors, not subject to holds, who had been in jail for 10 or more days.

Pls. Ex. 4(d), Second Rebuttal Report at 9.  The plaintiffs contend that at the very least, the 154 people in the County Jail every day who have been detained for three days or more on misdemeanor charges and are not subject to other holds have been found eligible for pretrial release and would be

released if they paid the secured money bail.[64]  (Docket Entry No. 145 at 6; 146 at 13; No. 188 at 11).

Dr. Demuth credibly testified that only the arrestees' inability to pay keeps them detained.  6-2:168,

180–81; 7-1:39.

The defendants' cross-examination of Dr. Demuth demonstrated that in a handful of entries

for February 15, 2017, the plaintiffs' computer program had failed to capture the fact that a

misdemeanor arrestee was also charged with a felony or was about to be released on bond.  *Id*. at

7-1:41–58.  In some instances, these additional docket activities took place the same day as the

snapshot and may have occurred hours after the snapshot captured the data.  This would indicate that

the program worked as designed, including that it captured data only for a particular point in time

and did not track cases over time.  *Id*. at 7-1:33–34, 43.  In a few other instances, the program did

not work as designed in that an entry was miscoded.  *Id*. at 7-1:43, 45.

The defendants also demonstrated that certain entries in the "snapshot" included

misdemeanor arrestees who were detained for mental-health evaluations or had formal "holds," such

as flags indicating that the arrestee was subject to extradition to another jurisdiction.  *Id*. at

7-1:57–74.  The court finds that the defendants' focus on mental-health status and other holds is

misplaced.  Article 16.22 of the Texas Code of Criminal Procedure permits magistrates—including

the Harris County Hearing Officers and County Judges—to collect information about, and order the

assessment of, an arrestee's mental-health status.  But Article 16.22(d) clearly states that "[t]his

---

[64]  The data on arrestees detained in the Harris County Jail for three days or more undermines the declaration and testimony of Bob Wessels, the defendants' expert on Harris County court administration. Mr. Wessels testified that most misdemeanor defendants who have not bonded out are detained only because they are still in "processing," and that only a few high-risk defendants are detained on money bail they cannot pay.  Def. Ex. 26 at 10; Hearing Tr. 5:31–34.  The court finds that Mr. Wessels is knowledgeable about the history of the Harris County courts and the implementation of the *Roberson* order, but because he has been retired from the position of court administrator for over six years, his knowledge of the present system, especially the detailed statistics on the prison population, is entitled to substantially less weight.

article does not prevent the applicable court from, before, during, or after the collection of information regarding the defendant as described by this article: (1) releasing a mentally ill or mentally retarded defendant from custody on personal bond or surety bond. . . ." TEX. CODE CRIM. PRO. art 16.22. Article 16.22 is the only legal basis the defendants identified to detain misdemeanor arrestees for mental-health evaluations. Hearing Tr. 8-2:16. Judge Jordan testified that while misdemeanor arrestees who are ordered to have a mental-health evaluation ordinarily are detained pending the evaluation, the only way to ensure detention is to order secured money bail and refuse to grant a personal bond, knowing that the arrestee cannot pay the secured bail. *Id*. at 3-1:46–48. If the court ordered the arrestee evaluated but the arrestee had access to money, he or she could pay for prompt release, despite the evaluation order. *Id*. Misdemeanor arrestees waiting for mental-health information to be collected or evaluated are detained by secured money bail because they cannot pay.

As for "holds," the plaintiffs offered unrebutted testimony that misdemeanor arrestees subject to holds, such as immigration detainers or pending warrants in other counties, are released "to their holds" only when they have either posted bond or disposed of the misdemeanor case. *Id*. at 2-2:30–32; 4-1:154–57. For instance, if an arrestee has a warrant pending in a neighboring county, that county has ten days to take custody of the arrestee. But the ten days do not begin to run until the arrestee has either paid the secured money bail set in the misdemeanor case, been granted a personal bond, or resolved that case by pleading guilty, being convicted, or having the charges dismissed. *Id*. Misdemeanor arrestees who have secured money bail imposed for their misdemeanor charges are detained in Harris County not because of the hold, which they are legally unable to address, but because they are unable to pay the secured money bail.

Excluding bail-as-detention-orders for mental-health evaluations and holds that are irrelevant to this case (because they do not prevent release for a defendant who can pay the secured money bail), the defendants have shown that Dr. Demuth's estimated average of those detained because they are unable to pay is inflated at most by a dozen entries in each category of the "snapshot." On the present record, the court finds and concludes that more than 100 individuals are detained in the Harris County Jail each day, who have judicially been found eligible for release and who would be released but for their inability to pay secured money bail.

The defendant's expert, Dr. Morris, attempted a different method of counting who was detained in the Harris County Jail solely due to indigence. Def. Ex. 28. Dr. Morris drew on the Pretrial Services risk assessments for all interviewed misdemeanor defendants from January 1, 2015 to February 14, 2017, a total of 92,941 risk-assessment reports. *Id*. at 10. He excluded those with prior arrests or higher risk scores, because "[t]hose who have more of a criminal history are of a higher risk to have some unmeasured legal factor delaying release." *Id*. Dr. Morris concluded that over the nearly 26-month period, no defendants who had all five indicators of indigence tracked by Pretrial Services—no employment, no car, no land line phone, no high school education, and no family residence—were detained solely by inability to pay. *Id.* He found only 65 detained individuals who had one Pretrial Services resource factor of indigence who were low risk, had no other reasons for detention, were eligible for release on a secured bond, but had not paid the bond and been released. *Id.*

Dr. Morris's study is critically flawed in at least two ways. It first adopts the defendants' mistaken outlook that Texas law allows misdemeanor-only defendants to be detained before trial. *See id*. ("some unmeasured legal factor delaying release"). With a narrow exception for certain

family violence cases, Harris County uses no other mechanism to detain misdemeanor defendants before trial than by imposing secured money bail.  By excluding defendants with prior arrests or high-risk scores from consideration, Dr. Morris excluded a significant population of misdemeanor arrestees who were judicially deemed eligible for pretrial release and would have been released if they could have paid the up-front amount needed under the secured money bail set.[65]

An even more basic flaw in Dr. Morris's study was his exclusion of all misdemeanor defendants who had "moderate" or "high" risk scores from the population he considered.  As explained above, Pretrial Services current risk-assessment tool counts resource factors such as the lack of a land line phone or an automobile as the same type of risk points as prior convictions or failures to appear.[66]  A misdemeanor defendant with no criminal history who met all of the poverty indicators would have at least five risk points—for not having a car, a family residence, a land line phone, a high school diploma, and for being unemployed or underemployed—and up to seven points if the defendant were a young male.  *See generally* Pls. Ex. 8(d).  But Dr. Morris excluded these defendants from his survey.

In sum, Dr. Morris excluded indigent defendants from his survey to conclude that, of the misdemeanor defendants surveyed, none was detained because of indigence.  Dr. Morris's conclusion is not entitled to any weight.  These critical flaws undermine his credibility and diminishes the court's confidence in the reliability of the opinions he expressed, whether deriving from his own research or criticizing the analytic methods and conclusions of others.

In his supplemental report, Dr. Morris ran his calculations including those with low-moderate

---

[65]  *See* Part I.D.6 *supra*.

[66]  *See* Part I.D.2 *supra*.

and moderate risk scores.  Def. Ex. 28, Supplemental Report at 3.  Dr. Morris's attempt to salvage his report is not successful.  He again excluded "high risk" defendants, which automatically excludes many young misdemeanor defendants who have all five poverty indicators on the Pretrial Services current risk-assessment form.   His exclusion of defendants with prior arrests, mental-health evaluations, or assault charges again assumes that people are being detained for those reasons when the only mechanism under Texas law to detain them is to impose secured money bail that they are unable to pay.  Even with all of these exclusions, Dr. Morris found that 1,623 people with at least one poverty indicator were detained in Harris County solely because of their inability to pay the secured bail imposed.  *Id*.

### 5.    Bond Forfeitures and Re-Arrests for New Criminal Activity

Harris County does not track the comparative failure-to-appear or new-criminal-activity rates of misdemeanor defendants released on different types of bonds.  Pls. Ex. 4(d), Second Rebuttal Report at 11; Hearing Tr. 3-2:146; 4-1:88; 5:138; 6-1:127.  Harris County has not coded, collected, or analyzed data on the different types of pretrial misconduct.  It cannot, as other jurisdictions have, determine whether new misconduct by those released on surety bond or on personal bond is violent or is the type of nonviolent offense for which release on unsecured personal bond is presumed.  *See id*.  The defendants' expert, Dr. Morris, agreed that "it's a shame we don't have good data on court appearance."  Hearing Tr. 6-2:50.  Dr. VanNostrand noted that Harris County does not currently compile the data to know how many defendants fail to appear for hearings when released on different types of bonds.  The County will have to compile data on failures to appear as part of the Arnold Tool's risk assessment.  *Id*. at 6-1:110–12, 127–28.  But for now, the County is imposing secured money bail, usually at prescheduled amounts, for almost all misdemeanor defendants, with no ability

106

to tell how effective this type of bond is to prevent failures to appear or new criminal activity compared to release on unsecured or nonfinancial conditions.

Harris County does keep, and was able to produce, data coded as "bond forfeiture," "bond revocation," and "bond surrender." But this data is not consistently kept or recorded. *See* Pls. Ex. 4(d), Second Rebuttal Report at 11. Some County Judges "forfeit" a bond after a single failure to appear. Others reset hearings and do not record a bond as forfeited until after multiple failures to appear. A single entry in the "forfeiture" data may mean one failure to appear or many. Hearing Tr. 3-1:105. A bond may be revoked because a defendant failed a drug test, even if the defendant appeared at every court setting and is never arrested or charged with another offense, or revoked because the defendant failed to appear. *Id.* at 3-1:105; 3-2:148, 154. Similarly, one "revocation" entry may indicate one failure to appear, many, or none at all, and may or may not indicate new criminal activity. Commercial sureties can ask for bond surrender for a variety of reasons. Judges may rely on a variety of factors to grant or deny the request. Hearing Tr. 5:132–33.

The parties' experts nonetheless tried to compare the "failure" rates of misdemeanor defendants released on different kinds of bonds. Dr. Demuth treated all coded forfeitures, revocations, and surrenders as a general proxy for pretrial misconduct, without distinguishing between failures to appear or new criminal activity. Pls. Ex. 4(d), Second Rebuttal Report at 12; Hearing Tr. 6-2:157–58. Dr. Morris apparently examined coded forfeitures as a straightforward proxy for failures to appear. Def. Ex. 28A at 11. Using this approach, Dr. Demuth calculated that those released at any stage in the pretrial process on a surety bond have a failure rate of 11.1 percent; those released on an unsecured personal bond have a failure rate of 13.7 percent; and those released on a cash bond have a failure rate of 5.9 percent. Pls. Ex. 4(d), Second Rebuttal Report at 12.

Dr. Demuth credibly explained that this comparison of these general populations is misleading, because it does not control for the fact that many released early in the arrest process on surety bonds are, because of their relatively greater access to money or credit, likely to be an inherently less risky population than those released later in the arrest process, whether on a surety or a personal bond. *See id.*; Hearing Tr. 6-2:157–58; *see also id.* at 6-1:113. Dr. Demuth tried to account for this difference by comparing misdemeanor defendants released on different types of bonds only after a probable cause hearing. That is, he considered and compared those who could not afford to bond out right away on secured money bail, but who were able to come up with the money to post bond at a later stage in the process. *Id.* Dr. Demuth found that among these populations with a more similar risk profile, those released on surety bond have a failure rate of 14.4 percent, while those released on unsecured personal bond have a failure rate of 13.6 percent. Pls. Ex. 4(d), Second Rebuttal Report at 12. That is, even with Harris County's incomplete data, those released on unsecured personal bond have slightly *better* pretrial success rates than those released on a commercial surety bond.

Dr. Morris also tried to control for the different risk profiles by rejecting a general comparison of populations and using a propensity score matching algorithm that "pairs" criminal defendants who share background characteristics but who are released under different conditions. *See* Def. Ex. 28A at 11–12. Using this method, Dr. Morris concluded that for female misdemeanor arrestees, there was no difference in the pretrial performance between those released on surety bonds and those released on unsecured personal bonds. *Id.* For male defendants, those released on surety bonds had a failure rate of 14.0 percent, while those released on personal bonds had a failure rate of

16.2 percent.[67]  Def. Ex. 28A at 12; Hearing Tr. 6-2:43–44.

Dr. Morris's decision to disaggregate his findings by gender and provide no overall failure rates is puzzling, to say the least.  Dr. Morris's earlier reports did not disaggregate by gender.  His broader past work in the field of pretrial studies did not disaggregate by gender.  None of the studies that Dr. Morris seeks to rebut disaggregate by gender.  Harris County's forthcoming reforms specifically aim to be gender-blind in their risk assessments and prescriptions.  *See* Hearing Tr. 6-2:40–41; 6-1:78–79.  Dr. Morris found identical failure rates among women.  His decision to disaggregate his findings had the effect of inflating the slight difference in failure rates between secured and unsecured bonds among men and made it appear greater than the overall rate of failure, which Dr. Morris did not provide.

On the credible, reliable evidence in the present record, the court finds and concludes that: (1) Harris County has not compiled the data it has to compare failure-to-appear or new-criminal-activity rates by bond type among misdemeanor defendants during pretrial release;  and (2) to the extent the information is available, it shows that those released on personal bond have substantially similar—or even somewhat better—pretrial failure rates as those released on surety bonds.[68]  Secured money bail in Harris County does not meaningfully add to assuring misdemeanor defendants'

---

[67] Dr. Morris excluded from his calculations defendants who could not be paired by the propensity score matching algorithm.  *See* Def. Ex. 28A at 12.  His total sample size of paired defendants was 5,667 male misdemeanor defendants and 2,684 female misdemeanor defendants.  *Id.*

[68] The defendants tried to show that the misdemeanor defendants Judge Jordan released on personal bond fail to appear at higher rates than those released on personal bond by the other County Judges.  *See* Def. Ex. 128A.  Their exhibit contains numerous errors.  It counts cases rather than people, so the real number of defendants who fail to appear is unknown.  Hearing Tr. 4-1:94–95.  It tracks only cases that have been disposed in each Criminal Court at Law since January 1, 2017.  Def. Ex. 128A.  But many, if not most, cases *disposed* in that time would have had release conditions set by the presiding judge who preceded Judge Jordan in Court No. 16.  Hearing Tr. 4-1:92.  It is not clear if the exhibit tracks actual failures to appear or only bond forfeitures, which may include multiple failures to appear per forfeiture.  The exhibit is entitled to no weight.

appearance at hearings or absence of new criminal activity during pretrial release.

This finding is consistent with recent empirical work in other jurisdictions.  According to the most recent and credible evidence, secured financial conditions of pretrial release do not outperform alternative nonfinancial or unsecured conditions of pretrial release in ensuring the appearance of misdemeanor defendants at hearings.  *See, e.g.*, Pls. Ex. 12(h), Arpit Gupta *et al.*, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 J. LEG. STUDIES 471, 475 (2016) ("We find no evidence that money bail increases the probability of appearance.").  One landmark study examined appearance rates in Colorado, where courts presume that misdemeanor defendants should be released on unsecured bonds and, unlike Harris County, track comparative rates of pretrial failures to appear.  This study found that unsecured appearance bonds are equally effective as secured money bail, at both assuring appearance at trial as well as law-abiding behavior before trial.  Pls. Ex. 7(q), Ex. 2, Claire M.B. Brooker *et al.*, *The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds* (Pretrial Justice Institute, June 2014).

In New York City, which holds bail-setting hearings every day from 9:00 a.m. to 1:00 a.m., *see* Pls. Ex. 17, two large charitable bail-fund programs have paid the secured money bail amounts in misdemeanor cases for thousands of defendants for years.  *See* Pls. Ex. 7(u).  None of those defendants has a financial incentive to return to court.  Only the bail funds lose money if the arrestee fails to appear.  But the bail funds have consistently achieved 95 to 96 percent appearance rates.  *Id.*  The bail funds achieve these rates of appearance through simple and relatively inexpensive supervision methods, like sending text message reminders of hearings to the misdemeanor defendants.  *Id.*; Pls. Ex. 12(ss).

These studies are consistent with Harris County's own data. Although Harris County does not track pretrial failures-to-appear or new criminal activity by secured versus unsecured conditions of release, the parties' experts found only slight, if any, differences in pretrial failure rates between those released on secured money bail and those released on unsecured personal bonds.

The defendants rely on a single study comparing rates of failures to appear and new criminal activity for misdemeanor defendants: that of their expert, Dr. Morris.[69] In a study that has not yet been published or completed the peer-review process, Dr. Morris compared failure-to-appear rates and rates of new criminal activity for misdemeanor defendants released on different categories of bond in Dallas County, Texas in 2008. Def. Ex. 30; *see also* Def. Ex. 163 (2012 update). Dr. Morris found that those released on a commercial surety bond failed to appear 26.7 percent of the time and were charged with a new offense 26 percent of the time within 12 months of their initial arrest. Def. Ex. 30 at 7–8. Those released on personal bond failed to appear 39.6 percent of the time and were charged with a new offense 29.1 percent of the time within 12 months of arrest. *Id*. Those released on cash bond failed to appear 30.2 percent of the time and were charged with new offenses 13.7 percent of the time within the 12-month period. *Id*. Dr. Morris testified that the difference in recidivism was not statistically significant. Hearing Tr. 6-2:53.

The court finds that Dr. Morris's study is entitled to substantially less weight than the

---

[69] The court considers, but does not give significant weight to, the studies that compare case outcomes in felony cases only. *E.g.*, Def. Ex. 115, Eric Helland, *The Fugitive: Evidence on Public Versus Private Law Enforcement from Bail Jumping*, 47 J. OF L. & ECON. 93 (2004); Def. Ex. 116, Thomas Cohen & Brian Reaves, *Pre-trial Release of Felony Defendants in State Courts, Bureau of Justice Statistics, Special Report* (Nov. 2007). Felony cases present risks of flight and greater risks of failures to appear and to reoffend than misdemeanor cases. Nor does the court give particular weight to anecdotal impressions of how release on secured money bail compares to completely unsupervised release. *E.g.*, Def. Ex. 83, Cynthia Kent, *Security and Success of the Surety Bond: A View from the Bench* (Aug. 12, 2008) (impressionistically comparing failure-to-appear rates in Smith County, Texas); *but see Travis County: No Place for Bondsmen*, AUSTIN MONITOR, Mar. 30, 2017, *available at* https://www.austinmonitor.com/stories/2017/03/travis-county -no-place-bondsmen/ (impressions arriving at the opposite conclusion for Travis County, Texas).

published, peer-reviewed articles in the record that rigorously compare pretrial failure rates among misdemeanor arrestees released on different categories of bond.  Dr. Morris testified that, as is true of Harris County, Dallas County does not compile comparative data on failures to appear.  Instead, Dallas County tracks "forfeitures," which may include multiple failures per entry.  *Id*. at 6-2:50, 55.  Dr. Morris did not provide the court or opposing counsel with access to the underlying data tables his calculations generated.  The reason he gave—to protect the peer-review process the article is still undergoing—does not take into account the availability of a confidentiality or protective order, or a partially sealed filing, to achieve this same protection.  *Id*. at 6-2:67–69.

The plaintiffs offered reliable evidence that in Dallas County, only those posting commercial surety bonds may be released within the first 24 hours after arrest on misdemeanor charges.  Commercial bondsmen use the time to offer secured bonds to the least risky defendants.  Pls. Ex. 7(i).  Although Dr. Morris used his proximity score matching algorithm to attempt to control for background risk factors, it is unclear without the underlying data whether or to what extent it is possible to control for the significant dissimilarities between the two populations created by the commercial sureties' "head start" on selecting the least risky and most financially secure misdemeanor defendants for surety bonds.  *See* Pls. Ex. 4(d), Rebuttal Report at 13–14.  And unlike Harris County's extensive Pretrial Services program, Dallas County provides almost no supervision and therefore no incentives or reminders to those released on personal bond.  Hearing Tr. 6-2:53–54.  In sum, the court finds that Dallas County's procedures, and Dr. Morris's study of them, do not offer an effective or reliable comparison to Harris County.

F.     **The Effects of Pretrial Detention on Misdemeanor Defendants Who Cannot Pay Secured Money Bail**

Recent studies of bail systems in the United States have concluded that even brief pretrial

detention because of inability to pay a financial condition of release increases the likelihood that misdemeanor defendants will commit future crimes or fail to appear at future court hearings.  *See, e.g.*, Pls. Ex. 12(c), Christopher T. Lowenkamp *et al.*, *The Hidden Costs of Pretrial Detention* (Laura and John Arnold Foundation, Nov. 2013).  A study co-authored by Dr. VanNostrand, who is helping Harris County reform its bail system, found that for misdemeanor defendants, even two to three days of pretrial detention correlated at statistically significant levels with recidivism.  *See id.* at 26.  Pretrial detention made it more likely that misdemeanor defendants would fail to appear at future hearings.  *See id.* at 14.  Other studies have confirmed these findings and shown that the likelihood of recidivism and failure to appear correlates with the imposition of secured money bail, not with a particular bail amount.  *See* Pls. Ex. 12(h), Gupta *et al.*, *supra*, at 473; *see also* Heaton Study at 19–24; Pls. Ex. 12(g), Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes* (Working Paper, University of Pennsylvania, Nov. 2016).

The Heaton Study found that if, during the six years between 2008 to 2013, Harris County had given early release on unsecured personal bonds to the lowest-risk misdemeanor defendants—those receiving secured bail amounts of $500 or less—40,000 more people would have been released pretrial; nearly 6,000 convictions and 400,000 days in jail at County expense would have been avoided; those released would have committed 1,600 fewer felonies and 2,400 fewer misdemeanors in the eighteen months following pretrial release; and the County would have saved $20 million in supervision costs alone.  *See* Heaton Study at 45–46.  Sheriff Gonzalez credibly testified that the research showing the "criminogenic" effects of even a short period of pretrial detention and the high public costs of extended detention is consistent with his own experience as a Harris County law-enforcement officer.  Hearing Tr. 3-2:11, 14.

A growing literature examines empirical data on "cumulative disadvantage" in pretrial detention.  "Cumulative disadvantage" is a "sequence of undesirable events whereby the occurrence of earlier negative events increases the odds of subsequent negative events."  Hearing Tr. 6-1:66 (referencing Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees*, 41 CRIMINOLOGY 873 (2003)).  "Bail exacerbates and perpetuates poverty because of course only people who cannot afford the bail assessed or to post a bond—people who are already poor—are held in custody pretrial.  As a consequence, they often lose their jobs, may lose their housing, be forced to abandon their education, and likely are unable to make their child support payments."  Pls. Ex. 12(f), Lisa Foster, Office for Access to Justice, *Remarks at the American Bar Association's 11th Annual Summit on Public Defense* (Feb. 6, 2016); *see also* Pls. Ex. 12(a)(iii), Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* at 15 (National Institute of Corrections, Apr. 2007); (Docket Entry No. 182 at 7; No. 272 at 9).

Money-based pretrial systems exacerbate the racial disparities in pretrial detention and posttrial outcomes.  *See* Pls. Ex. 12(mm), Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations*, 16 LEGISLATION & PUB. POL'Y 919 (2013).  An amicus filing by Harris County Commissioner Rodney Ellis and the NAACP Legal Defense and Educational Fund notes that African-Americans make up 18 percent of Harris County's adult population but 48 percent of the Harris County Jail's adult population.  (Docket Entry No. 272 at 8).  A 2011 study found that in Harris County, 70 percent of white misdemeanor defendants obtain early pretrial release from detention, but only 52 percent of Latino misdemeanor defendants and 45 percent of African-

American misdemeanor defendants do so.  (*Id*.).  The defendants did not dispute this data.

### G.    Comparisons to Other Jurisdictions

The parties supplied additional briefing comparing, when possible, Harris County's pretrial misdemeanor system to systems used in other jurisdictions.  (Docket Entry Nos. 233, 237, 255).  The parties agree that "relatively little attention has been paid to analyzing bail determinations in misdemeanor cases" across the country.  (Docket Entry No. 233 at 1; *see also* No. 255 at *8–9).  Most large urban centers appear to hold daily bail hearings, at which arrestees appear before judicial officers within 24 hours of arrest.  These occur in New York City; Cook County, Illinois; Maricopa County, Arizona; and Miami-Dade County, Florida.  (*See* Docket Entry No. 237).  Washington, D.C., holds daily bail hearings except on Sunday, when the courts are closed.  Hearing Tr. 2-2:194.  Some bail courts run 24 hours a day, (*see* Docket Entry No. 237 (Maricopa County)); others operate during business hours, (*see id*. (Cook County; Miami-Dade County)).  New York City holds bail hearings between 9:00 a.m. and 1:00 a.m. every day.  (Docket Entry No. 233 at 1).

The defendants note that all of these jurisdictions permit secured money bail.  Some broadly permit preventive detention in misdemeanor cases, and all, according to the defendants, permit secured money bail to result in detaining defendants "who pose a risk to the community that cannot be mitigated by conditions or are likely to fail to appear."  (Docket Entry No. 255 at *2).  The defendants claim that the plaintiffs seek to hold Harris County to an anomalous standard by eliminating secured money bail, while even those jurisdictions that no longer impose secured money bail as a matter of practice still permit it as a matter of law.  Hearing Tr. 5:41; (Docket Entry No. 166 at 13–14; No. 255).

As the court surveyed above, some jurisdictions permit secured money bail to result in

pretrial detention, but *only* when that satisfies the due process required of actual detention orders.[70]

Although other jurisdictions have timetables and procedures similar to Harris County's, the practical effect of the bail hearings and resulting orders is dramatically different. In Washington, D.C., only 1.5 percent of misdemeanor arrestees are detained until case disposition and virtually none on secured money bail. Hearing Tr. 2-2:149, 154. In New York City, only 3 percent of misdemeanor arrestees are detained until case disposition. (Docket Entry No. 233 at 2). Under New Jersey's recent reforms, statewide, only 8.4 percent of arrestees across all charge categories—including felonies—were detained until case disposition. Pls. Ex. 7(k) at 1. In Kentucky, statewide, 25 percent of both felony and misdemeanor arrestees are detained until case disposition. Pls. Ex. 12(m)(i). The defendants do not identify a jurisdiction that, like Harris County, detains over 40 percent of those charged only with misdemeanor offenses until their cases are resolved. *See* Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 8. If there is an anomalous standard here, it is set by Harris County.

The defendants argue, and presented witnesses who testified, that Harris County leads most other jurisdictions in the timeliness of its proceedings because of how quickly district attorneys file charges and make release on secured money bail available. (*See* Docket Entry No. 286 at 3–5); Hearing Tr. 2-1:34–36; 3-2:50; 5:12–13. Arresting officers consult with Assistant District Attorneys over a 24-hour hotline. The Assistant District Attorneys decide whether to accept charges before an arrestee is even booked. Hearing Tr. 2-1:34–36. In other jurisdictions, no arrestees, whether they can make bail or not, are even given the opportunity of release until a next-day or subsequent arraignment hearing, at which district attorneys decide whether to accept charges. *Id*. at 5:12–13;

---

[70] *See* Part I.C.3–5 *supra*.

(Docket Entry No. 255 at *3–4).

Harris County's speed at processing charges is commendable. When paired with the automatic imposition of secured money bail, however, it exacerbates the wealth-based differential treatment between those able to pay a bondsman to purchase early release and those who cannot. Those who can pay secured bonds are released within hours of arrest. Those who cannot are detained for days or weeks and face intense pressures to accept a guilty plea to end their pretrial detentions.

### H.    Proposed Bail Reforms

Dr. Marie VanNostrand, who the County has retained as a consultant on reforming its pretrial processes, testified about the policy changes the County expects to implement between July 1, 2017 and March 2018. For ease of analysis, those changes can be divided into three groups: policy changes affecting the County's risk assessment of misdemeanor defendants; policy changes to enhance the efficiency of the Harris County pretrial system; and policy changes that will affect the combined probable cause and bail-setting hearings.

### 1.    Changes to Risk Assessment

The centerpiece of Harris County's proposed bail reforms is the adoption of the Arnold Tool, a nationally validated risk-assessment tool that will replace the County's current validated risk-assessment tool. While the current risk-assessment tool relies on seventeen indicators of risk, including "background risk factors" such as home and automobile ownership,[71] the Arnold Tool uses only nine indicators of risk. Almost all relate to either past criminal history, past failure to appear, or the severity of the current charge. The only "background factor" is the defendant's age at time

---

[71] *See* Part I.D.2 *supra*.

117

of arrest.[72]  Def. Ex. 157.  Instead of simply adding all indicators up into a single risk score, the Arnold Tool scales and weights the indicators and provides three different scores on a 1- to 6-point scale.  The scores are for risk of failure to appear, risk of new criminal activity, and risk of violence. *Id*.; Hearing Tr. 6-1:86–87.

Unlike the County's current risk-assessment tool, the Arnold Tool would not score a misdemeanor defendant as a "moderate" risk based on poverty indicators such as the defendant's educational level, or the lack of a car or land line phone.  Def. Ex. 157.  Dr. VanNostrand characterized the County's current risk-assessment tool as "resource-based."  By contrast, the Arnold Tool is a "risk-based" assessment.  Hearing Tr. 6-1:17–19.  The substantial research behind the Arnold Tool shows that relying on resource-based factors does not predict failure-to-appear rates or new criminal activity better than excluding those factors and relying instead on the Arnold Tool's nine risk-based indicators.  *Id*. at 6-1:77–78.

As a condition of using the Arnold Tool, local jurisdictions must agree that they will not change it or put it to unintended uses.  Def. Ex. 62.  Local jurisdictions cannot change the risk indicators or how they are scored.  *Id*.; Hearing Tr. 6-1:51.  What local jurisdictions can control is the consequences that attach to each risk level.  Whether a defendant with a low risk score is released without any supervision or with some supervisory conditions, or released on secured money bail, unsecured bail, or no financial conditions, is a matter of local policy.  Whether to detain a defendant who has a high risk score, release that defendant on secured money bail, or release that defendant with unsecured or nonfinancial conditions but with demanding supervisory conditions, such as GPS

---

[72]  The nine factors are: current charge of a crime of violence; a pending charge at the time of the offense; a prior misdemeanor conviction; a prior felony conviction; a prior violent conviction; a prior failure to appear in the past two years; a prior failure to appear older than two years; a prior sentence to incarceration; and age at time of arrest.  Def. Ex. 157.

118

monitoring, is also a matter of local policy.  Hearing Tr. 6-1:51–52.

At the time of the motion hearing, Harris County had not yet decided what outcomes Pretrial Services would recommend based on various risk scores.  *Id*.  In general, under the new system, low-risk defendants will be recommended for release on unsecured personal bonds well in advance of their probable cause hearings.  High-risk defendants will not have bail set at all until the probable cause hearing.  *Id*. at 6-1:52–53.  What constitutes low or high risk is not yet defined.  *Id*. at 6-1:52, 134.  For moderate-risk misdemeanor arrestees, the County plans to continue the current system of setting secured money bail at a scheduled amount when the arrestee is charged.  *Id*. at 6-1:141–42.  Moderate-risk defendants with access to funds will be able to pay the secured money bail and be released before the probable cause hearing.  Moderate-risk defendants without the means to pay a secured money bail will be detained until the hearing.  If no changes are made to the bail setting, that misdemeanor arrestee will be detained until case disposition.  *Id*.  County policymakers have also stated their intention to continue to set secured money bail as a condition of release for high-risk misdemeanor defendants.  *Id*. at 6-1:136.  After the probable cause hearing, even the highest-risk defendants with the means to do so will be able to purchase release.  For those without the means to pay, the secured financial condition will keep them detained, operating as a detention order in all but name and process.  *Id*. at 6-1:71.

Like Harris County's current risk-assessment tool, the Arnold Tool is designed only to inform Pretrial Services recommendations.  At most, recommendations such as release on personal bonds for low-risk defendants will be presumed in certain cases but required in none.  *Id*. at 6-1:53.  If judicial officers decide to reject the Arnold Tool's recommendations for release on personal bond—as they currently do in nearly 67 percent of all misdemeanor cases using the County's current

risk-assessment tool[73]—they will not be acting contrary to Harris County policy.  The wealth-based disparities will continue, with no empirical basis to conclude that imposing secured money bail promotes better rates of appearance or of law-abiding behavior for those on pretrial release.

### 2.      Changes to the System's Efficiency

Unlike the County's current risk-assessment tool, the Arnold Tool will not require a Pretrial Services interview for a bail recommendation.  *Id*. at 6-1:123–24.  Once an arrestee has been identified, Pretrial Services can pull any prior criminal record, assess the risk score, and generate a release recommendation, in some cases even before the arrestee has been transported from the scene of the arrest to the City or County Jail.  *Id*. at 6-1:124.  Early presentment of low-risk defendants for a personal bond will no longer depend on the availability of Pretrial Services personnel.  Instead, it will be automatic.  *Id*. at 6-1:136–37.  Dr. VanNostrand estimated that early presentments on paper will allow Hearing Officers to release low-risk defendants on personal bonds within 4 hours of arrest. This would be among the fastest processing speeds in the nation.  *Id*. at 6-1:138–39.

Dr. VanNostrand testified that increasing the number of arrestees released at early presentment will reduce jail crowding and speed pretrial release determinations and hearings for other misdemeanor defendants.[74]  *Id*. at 6-1:145–46.  The County has hired two additional Hearing Officers and will be hiring more Pretrial Services personnel to handle the expedited processing.  Def.

---

[73]  *See* Part I.D.3 *supra*; *see also* Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 14.

[74]  Whether the number of arrestees released on personal bond will actually increase is unclear.  The County's policymakers testified inconsistently on this point.  On behalf of herself and another County Judge, Judge Goodhart testified that under the current system, all misdemeanor defendants who "are appropriate for release" on personal bond are released on personal bond, and that she did not know if "once you apply the Arnold Tool if that is going to make a difference."  Hearing Tr. 5:142–43.  Yet she also testified that she anticipates "a whole lot" more people will be released under the reformed system using the Arnold Tool, even though the population of misdemeanor arrestees in Harris County will not change in terms of charges or risk profile between now and then.  *Id*. at 5:139–140, 143.

Ex. 58; Hearing Tr. 3-2:128–30, 6-1:130.  For the past year, Harris County has been redesigning its technology infrastructure to support the more streamlined system and to integrate information sources that diverse County agencies rely on.  Hearing Tr. 6-1:119, 125, 130.  Dr. VanNostrand testified that the current Harris County system "is very paper transport heavy."  Information is entered and reentered by hand as cases pass from arresting officers to district attorneys, to court clerks, and to Pretrial Services officers.  Hearing Tr. 6-1:139.  Infrastructure changes expected by July 1 are designed to cut down on paper transport and centralize more processes online.

Because the new system will aim to make early-release determinations based on a defendant's record rather than on an interview, the current Pretrial Services requirement of having to contact references to verify a defendant's self-reported financial, employment, or other circumstances will apparently be eliminated, at least for defendants determined to be low-risk.[75]  *Id*. at 6-1:139–40.  Dr. VanNostrand testified that Pretrial Services will continue to interview misdemeanor defendants who are not released at early presentment.  Hearing Tr. 6-1: 155–56.  Instead of verifying references, however, Pretrial Services will obtain an affidavit of indigence similar to the affidavit used now to determine eligibility for appointment of counsel at a defendant's first appearance before a County Judge.  *Id*. at 4-1:48–49; 6-1:136, 161.  Under the new system, the same affidavit of indigence will be used for both appointing counsel as well as setting release conditions, including bail.  *Id*.

The County is also building a new inmate processing center, scheduled to open in March

---

[75]  As described above, *see* Part I.D.2 *supra*, under the current system, misdemeanor arrestees are not released on personal bond until references verify the arrestee's information provided in the Pretrial Services interview.  (Docket Entry No. 162 at 5).  Until recently, Pretrial Services and Hearing Officers required two verified references.  (Docket Entry No. 166 at 10 n.13).  The current unwritten policy is to require one verified reference.  (*Id*.); *see also* Def. Ex. 52.

2018. (Docket Entry No. 166 at 19 n.23); Hearing Tr. 3-2:74. The new center will process arrestees both from the City of Houston and from Harris County. It is designed to avoid the current bottlenecks that occur in transporting defendants from one Jail to the other. Hearing Tr. 3-2:71–75.

### 3.    Changes to the Probable Cause Hearings

With the adoption of the Arnold Tool, the Harris County policymakers intend to amend the County Rules of Court to issue a new money bail schedule. Def. Ex. 67. While the current bail schedule is calibrated to the defendant's current charge and criminal history, the new schedule will likely be calibrated to the predictive risk scores generated by the Arnold Tool. Hearing Tr. 6-1:151–52. The amended bail schedule will call for release on unsecured personal bonds for defendants with low-risk scores. *Id*. Those with moderate-risk scores will have a secured money bail set pending the probable cause hearing. Pretrial Services will recommend conditions of supervision during release, which the Hearing Officers may impose at the hearing. *Id*. at 6-1:142–43, 151–55. Those with high-risk scores will have no bond set pending the probable cause hearing, with more stringent conditions of supervised release and the possible imposition of secured money bail to be considered at the hearing. *Id*. at 6-1:143, 153–54.

On February 28, 2017, the Harris County Commissioners approved a pilot program to provide public defenders at the probable cause hearings before the Hearing Officers. Def. Ex. 59. As presently conceived, the public defender will help misdemeanor arrestees raise objections and provide relevant information about their inability to pay money bail, without risking incriminating statements.[76] Hearing Tr. 1:103, 145–46. The pilot program is expected to launch by July 1, 2017,

---

[76]  The current plan is for a public defender to staff all cases at the probable cause and bail-setting hearing, regardless of a defendant's indigence. The attorney assigned to a defendant's case will continue to be appointed to represent indigent defendants at their first appearances before a County Judge. *See* Hearing Tr. 1:145.

the same date the Arnold Tool and new bail schedule are planned to go into effect.  Def. Ex. 59.

It is unclear whether having defense counsel at the probable cause and bail-setting hearing will significantly change the procedures or outcomes.  Hearing Officers do not conduct proceedings of record under Texas law.  Hearing Tr. 1:145–46. The Hearing Officers do not have to state findings or conclusions on the record for review by another judicial officer.  Sheriff Gonzalez and Judge Jordan testified that the practical sustainability and impact of having counsel at probable cause hearings is doubtful.  *Id*. at 3-1:113–14, 3-2:22.  Judge Jordan opined that until Hearing Officers stop treating the County Judges' bail schedule as a requirement to be applied in almost all cases on a secured basis, having defense counsel at the bail-setting hearing is unlikely to make a meaningful difference in the availability of release on unsecured or nonfinancial conditions.  *Id*. at 3-1:114.

### 4.     Texas House Bill 3011 / Senate Bill 1338

Bills have been introduced in the Texas Legislature proposing wide-ranging amendments to Article 17 of the Texas Code of Criminal Procedure, which regulates bail.  House Bill 3011, and its companion Senate Bill 1338, if enacted as proposed, would permit pretrial preventive detention if a magistrate "determines by clear and convincing evidence that requiring bail and conditions of pretrial release are insufficient to ensure" the defendant's appearance in court or the safety of the community.  Pls. Ex. 16 at 1.

Proposed Article 17.028 would set a statewide standard of 48 hours after arrest, within which a magistrate would have to make an initial release decision, considering "any credible information provided by the defendant."  *Id*. at 3.  Magistrates would be required to impose "the least restrictive conditions and the minimum amount or type of bail necessary to reasonably ensure" the defendant's appearance and the safety of the community.  *Id*. at 4.  The legislation would forbid "requir[ing] a

defendant to provide a monetary bail bond for the sole purpose of preventing the defendant's pretrial release." *Id.* A magistrate who denied pretrial release would have to issue a reasoned opinion with written findings within 24 hours of the decision, subject to review on appeal. *Id.*

Under proposed Article 17.034, defendants who are released and fail to appear must again be released on personal bond if they can show good cause for their failure to appear. *Id.* at 8. Even if they cannot show good cause, magistrates "must set the amount of bail at the minimum amount" need to assure reappearance. *Id.*

"As soon as practicable" after a magistrate denies release, but no later than ten days after the decision, all defendants still detained would be entitled to an adversarial, counseled bail-review hearing, at which they would be able to put on evidence, testify, and call witnesses. *Id.* at 8–10. The reviewing judge must find by clear and convincing evidence "that monetary bail and conditions of release are insufficient to reasonably ensure the defendant's appearance in court as required or the safety of the community" for the pretrial detention to continue. *Id.* at 11. The judge would have to issue that finding in a reasoned opinion, subject to appellate review. *Id.* at 12.

Proposed Article 17.20 provides that in misdemeanor cases, "[n]otwithstanding a bail schedule or any standing order entered by a judge," a sheriff or other jailer "after considering the defendant's pretrial risk assessment, may . . . take the bail of the defendant in accordance with [proposed] Article 17.028." *Id.* at 14. Proposed Article 17.028 is the article that requires release on the least restrictive condition. *See id.* at 4. Article 17.20 would confirm that sheriffs have independent judgment and authority to release misdemeanor arrestees on less restrictive conditions than provided by a secured money bail schedule. *Cf. id.* at 14–15 (providing that in felony cases, a sheriff must deliver an arrestee to a court to make the pretrial-release decision under Article 17.028

and permitting the sheriff to take the defendant's bail only if the court so orders).

If enacted as proposed, the legislation would likely address many of the plaintiffs' concerns. Under the Code as revised, Hearing Officers would not be authorized to exclaim "based on your priors!" at a one-to-two-minute hearing before imposing secured money bail that the defendant cannot pay, resulting in that defendant's detention. The Hearing Officers would have to find and state the clear and convincing evidence supporting the specific reasons why paying a nonrefundable premium to a bail bondsman is reasonably necessary to ensure that the misdemeanor defendant will appear and refrain from new criminal activity while on pretrial release, and why no less restrictive condition is reasonable. The written findings would be reviewed in an adversarial, counseled hearing before County Judges, who must also apply the exacting clear-and-convincing evidence standard. Notwithstanding the County's bail schedule, the Sheriff would be authorized to assess a misdemeanor defendant's risk and release the defendant on an unsecured personal bond, with or without enhanced conditions for supervision. Bail could not be set to achieve pretrial detention without following the procedures required for a valid detention order under State law.

The defendants argue that because the Texas legislature has proposed these changes, it is the only body that can make them. (Docket Entry No. 266 at 9); *see also* Hearing Tr. at 3-1:72–73. But nothing in the current Code of Criminal Procedure prevents Harris County from imposing the least restrictive conditions on pretrial release, deciding those conditions by clear and convincing evidence, or making written findings and issuing reasoned opinions at bail reviews. Nothing in Texas state law permits, much less requires, Harris County judges to impose secured money bail for the purpose of detaining those who cannot pay it. A sheriff's role in releasing misdemeanor defendants on bail

is already provided for under the current version of Article 17.20.[77]  The proposed legislation represents an acknowledgment that at least some jurisdictions in Texas are imposing secured money bail to detain misdemeanor arrestees because they cannot pay it, without the process a detention order requires.  The proposed legislation makes explicit the due process requirements for setting bail under Texas law and sets boundaries on the procedures and time frames to meet those requirements.

## I.    Conclusions on Findings of Fact

Historically, bail has served as a mechanism of release from pretrial detention.  Recently, many jurisdictions have acknowledged and repudiated long-standing practices of imposing, whether by intent or indifference, secured money bail that misdemeanor defendants are clearly unable to pay, resulting in pretrial detention of defendants otherwise eligible for release.  Encouraged in their reforms by the American Bar Association and the U.S. Department of Justice, among others, these jurisdictions have followed two approaches to reforming the use of secured money bail for misdemeanor defendants.  Some take the approach that a secured financial condition cannot result in the pretrial detention of misdemeanor defendants who cannot pay it, and who are otherwise eligible to be released.  Other jurisdictions permit secured financial conditions of release to result in detention only when the process due before imposing a pretrial preventive detention order is

---

[77] "BAIL IN MISDEMEANOR.  In cases of misdemeanor, the sheriff or other peace officer, or a jailer licensed under Chapter 1701, Occupations Code, may, whether during the term of the court or in vacation, where the officer has a defendant in custody, take of the defendant a bail bond." TEX. CODE CRIM. PRO. art. 17.20; *cf. id.* art. 17.21 ("BAIL IN FELONY.  In cases of felony, when the accused is in custody of the sheriff or other officer, and the court before which the prosecution is pending is in session in the county where the accused is in custody, the court shall fix the amount of bail, if it is a bailable case and determine if the accused is eligible for a personal bond; and the sheriff or other peace officer, unless it be the police of a city, or a jailer licensed under Chapter 1701, Occupations Code, is authorized to take a bail bond of the accused in the amount as fixed by the court, to be approved by such officer taking the same, and will thereupon discharge the accused from custody.  The defendant and the defendant's sureties are not required to appear in court."); *see also* Texas Attorney General Opinion No. H–856 (1976) ("[S]ince article 17.20 authorizes the sheriff or other peace officer to take bail in misdemeanor cases, article 17.15 compels the conclusion that such officer is also to regulate the amount of bail in such cases.").

provided.  This includes timely, counseled, adversarial hearings at which the defendant may present evidence and the judge must issue a reasoned opinion with written findings explaining why the secured financial condition of release is the only reasonable way to assure the defendant's appearance at hearings and law-abiding behavior before trial.  The first approach recognizes that releasing those who can pay while detaining those who cannot pay would violate the Equal Protection Clause.  The second approach recognizes that when secured money bail functions as a detention order against an indigent defendant, procedural protections are required under the Due Process Clause.

Texas law does not provide for pretrial release on no financial conditions.  Texas law permits Harris County's Hearing Officers and County Judges to choose between making financial release conditions secured—requiring a misdemeanor defendant or a surety to pay the amount up front to be released from jail—or unsecured—allowing release with the bond coming due only if the defendant fails to appear at hearings and a magistrate orders the bond forfeited.  In setting the bail amount, whether secured or unsecured, Texas law requires Hearing Officers to consider five factors, including the defendant's ability to pay, the charge, and community safety.  A federal court consent decree requires Hearing Officers to make individualized assessments of each misdemeanor defendant's case and adjust the scheduled bail amount or release the defendant on unsecured or nonfinancial conditions.

Harris County Hearing Officers and County Judges follow a custom and practice of interpreting Texas law to use secured money bail set at prescheduled amounts to achieve pretrial detention of misdemeanor defendants who are too poor to pay, when those defendants would promptly be released if they could pay.  Complying with the County Judges' policy in the bail

schedule and the County Rules of Court, Harris County Assistant District Attorneys apply secured bail amounts to the charging documents.  The schedule is a mechanical calculation based on the charge and the defendant's criminal history.  Although Texas and federal law require the Hearing Officers and County Judges to make individualized adjustments to the scheduled bail amount and assess nonfinancial conditions of release based on each defendant's circumstances, including inability to pay, the Harris County Hearing Officers and County Judges impose the scheduled bail amounts on a secured basis about 90 percent of the time.  When the Hearing Officers do change the bail amount, it is often to conform the amount to what is in the bail schedule, if the Assistant District Attorneys have set it "incorrectly."  The Hearing Officers and County Judges deny release on unsecured bonds 90 percent of the time, including in a high majority of cases in which Harris County Pretrial Services recommends release on unsecured or nonfinancial conditions based on a validated risk-assessment tool.  When Hearing Officers and County Judges do grant release on unsecured bonds, they do so for reasons other than the defendant's inability to pay the bail on a secured basis.

The Hearing Officers and County Judges follow this custom and practice despite their knowledge of, or deliberate indifference to, a misdemeanor defendant's inability to pay bail on a secured basis and the fact that secured money bail functions as a pretrial detention order.  The Hearing Officers follow an unwritten custom and practice of denying release on unsecured bonds to all homeless defendants.  Those arrested for crimes relating to poverty, such as petty theft, trespassing, and begging, as well as those whose risk scores are inflated by poverty indicators, such as the lack of a car, are denied release on unsecured financial conditions in the vast majority of cases, when it is obvious that pretrial detention will result.  Hearing Officers style their orders as findings of "probable cause for further detention," when the only condition of further detention is the

misdemeanor defendant's inability to pay secured money bail.  Pls. Ex. 9.

As a result of this custom and practice, 40 percent of all Harris County misdemeanor arrestees every year are detained until case disposition.  Most of those detained—around 85 percent—plead guilty at their first appearance before a County Judge.  Reliable and ample record evidence shows that many abandon valid defenses and plead guilty in order to be released from detention by accepting a sentence of time served before trial.  Those detained seven days following a bail-setting hearing are 25 percent more likely to be convicted, 43 percent more likely to be sentenced to jail, and, on average, have sentences twice as long as those released before trial.

Harris County is required by Texas and federal law to provide a probable cause and bail-setting hearing for those arrested on misdemeanor charges without a warrant within 24 hours of arrest.  At the hearing, Hearing Officers are supposed to provide "a meaningful review of alternatives to pre-scheduled bail amounts." *Roberson* Order at 1.  Although Texas law requires Harris County to release misdemeanor defendants who have not had a hearing within 24 hours, over 20 percent of detained misdemeanor defendants wait longer than 24 hours for a hearing.  In some, but not all, of these cases, the Hearing Officers determine probable cause in the defendant's absence, but the Hearing Officers admit that they do not provide a meaningful bail setting in absentia.  For those misdemeanor arrestees who are detained for significant periods by the City of Houston Police Department before they are transported to the Harris County Jail, or for those booked into the Harris County Jail on a Friday, the Next Business Day Setting before a County Judge will not occur until after three or four days in pretrial detention.

The record shows that County Judges adjust bail amounts or grant unsecured personal bonds in fewer than 1 percent of the cases.  Prosecutors routinely offer, and County Judges routinely accept,

129

guilty pleas at first setting and sentence the misdemeanor defendants to time served, releasing them from detention within a day of pleading guilty. Those who do not plead guilty remain detained until they have a lawyer who can file a motion to contest the charge or the bail setting and request a motion hearing. These hearings are generally held one or two weeks later. The record shows that the motion hearing is the first opportunity a misdemeanor defendant has to present evidence of inability to pay and to receive a reasoned opinion explaining the bail setting. Testimony from the defendants' expert on Harris County court administration establishes that the Next Business Day Setting rule codifies, rather than alters, these customs and practices.

The court finds and concludes that Harris County has a custom and practice of using secured money bail to operate as de facto orders of detention in misdemeanor cases. Misdemeanor arrestees who can pay cash bail up front or pay the up-front premium to a commercial surety are promptly released. Indigent arrestees who cannot afford to do so are detained, most of them until case disposition. Because the County Judges know and acquiesce in this custom and practice in their legislative capacity as rulemakers, this consistent custom and practice amounts to an official Harris County policy.

Harris County does not compile comparative data on failures to appear by release on different bond types. No Harris County policymaker or judicial officer has attempted to examine the relative pretrial success or failure rates of misdemeanor defendants released on secured money bail versus those released on unsecured bail. The reliable, credible evidence in the record from other jurisdictions shows that release on secured financial conditions does not assure better rates of appearance or of law-abiding conduct before trial compared to release on unsecured bonds or nonfinancial conditions of supervision. Harris County's proxy data for failure-to-appear is consistent

with these studies. The information Harris County does keep shows no significant difference in appearance rates between those released on secured money bail and those released on unsecured appearance bonds, when properly controlling for the differences in risk profiles of the population.

The reliable evidence in the present record shows no meaningful difference in pretrial failures to appear or arrests on new criminal activity between misdemeanor defendants released on secured bond and on unsecured financial conditions. But even a few days in pretrial detention on misdemeanor charges correlates with—and is causally related to—higher rates of failure to appear and new criminal activity during pretrial release and beyond. Misdemeanor pretrial detention is causally related to the snowballing effects of cumulative disadvantage that are especially pronounced and pervasive for those who are indigent and African-American or Latino.

Harris County commendably plans to revise its pretrial processes and bail schedule by July 1, 2017. The County proposes to provide early release on unsecured bonds to "low-risk" misdemeanor defendants and to hold "high-risk" defendants—regardless of ability to pay money bail—until the probable cause hearing. "Moderate-risk" defendants will be granted release on a secured money bail, if they can pay the scheduled amount. The County plans to implement the Arnold Risk-Assessment Tool and integrate its information technology systems to avoid the delays that booking procedures and Pretrial Services interviews create. But Harris County's policymakers and judicial officers have made clear their intent to continue imposing secured money bail on "high-risk" and "moderate-risk" defendants, categories as yet undefined. Those who can pay the secured money bail, no matter their level of risk, will be released. Those who cannot will remain detained.

Except in the narrow case of defendants charged with a crime of family violence after violating a previously imposed condition of release, Texas law does not permit orders of pretrial

preventive detention.  Proposed legislation would permit magistrates to order preventive detention in certain cases, but only with procedural safeguards, and would forbid the use of secured money bail to accomplish preventive detention based on inability to pay.  But for now, Harris County effectively gets around the Texas prohibition on pretrial detention by imposing secured money bail against indigent misdemeanor defendants knowing that they cannot pay.  Harris County has its own extra-legal system of pretrial preventive detention through secured money bail that operates on the basis of wealth.  It accomplishes this without providing the procedural safeguards typically required of pretrial preventive detention orders.

## II.    Conclusions of Law

### A.    The Legal Standards

To obtain a preliminary injunction, the plaintiffs must establish "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011); *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).  "[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."  *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir. 1993).

Summary judgment is appropriate if "no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which the party will bear the burden of proof at trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "The movant bears the burden of identifying those portions of the record it believes demonstrates the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).

In deciding a motion for summary judgment, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008). When the moving party has met its Rule 56 burden, the nonmoving party must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden is not satisfied with some metaphysical doubt as to the material facts, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (internal quotation marks and citations omitted). Factual controversies resolve in the nonmoving party's favor, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Id*.

## B.    Likelihood of Success on the Merits

### 1.    The Standard of Review

Federal courts "generally analyze the fairness of relations between the criminal defendant and

the State under the Due Process Clause, while [they] approach the question whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Bearden v. Georgia*, 461 U.S. 660, 665 (1983). The Supreme Court has noted that in cases of detaining the indigent, "[d]ue process and equal protection principles converge in the Court's analysis." *Id*. (citing *Griffin v. Illinois*, 351 U.S. 12, 17 (1956)).

Although the legal standards and analysis overlap, the plaintiffs present one claim that is more appropriately analyzed under equal protection principles, and another claim more appropriately analyzed under due process. First, the plaintiffs allege that Harris County maintains a "wealth-based detention system" by setting secured money bonds higher than indigent misdemeanor defendants can pay, creating de facto orders of detention. (Docket Entry No. 54 at 9; No. 92 at 19). These detention orders operate only against the indigent, because defendants who receive the same or similar secured bail but who can pay the bond or bondsman's premium can be promptly released, regardless of the risk of nonappearance or new criminal activity. (Docket Entry No. 54 ¶ 42). Second, the plaintiffs allege that Harris County delays or fails to provide procedural protections required for a meaningful bail review. They allege that misdemeanor arrestees are frequently detained for days or even weeks before they can obtain any meaningful review of their bail setting in a counseled, adversarial hearing with findings on the record. (Docket Entry No. 54 ¶¶ 51, 82, 104; No. 92 at 21). Many plead guilty to obtain release rather than wait for a bail review that may, but likely will not, result in release.

The threshold question is what standard of review applies under either equal protection or due process analysis—rational basis, strict scrutiny, or something in between.

### a.    Equal Protection

In its Memorandum and Opinion on the defendants' motions to dismiss, the court reviewed

the Supreme Court's trilogy of cases, *Williams v. Illinois*, 399 U.S. 235 (1970), *Tate v. Short*, 401

U.S. 395 (1971), and *Bearden v. Georgia*, 461 U.S. 660 (1983), along with the Fifth Circuit's panel

and en banc decisions in *Pugh v. Rainwater*, 557 F.2d 1189 (5th Cir. 1977), *vacated at* 572 F.2d

1053 (5th Cir. 1978) (en banc), to conclude that "[t]he 'careful inquiry' the [Supreme] Court requires

in this type of case calls for a more demanding review" than rational basis.  *ODonnell*, 2016 WL

7337549 at *15.  The court invited briefing from the parties on the standard of review.  *Id.* at *39.

The County argues that rational basis review is the appropriate standard because the

*Williams-Tate-Bearden* line of cases is limited to detention for defendants who do not pay post-

conviction fines, and does not extend to detention for those who do not pay secured pretrial bail.

(Docket Entry No. 162 at 12).  The County relies on cases holding that wealth-based distinctions are

subject only to rational basis review because "[g]enerally speaking, an individual's indigence does

not make that individual a member of a suspect class for equal protection purposes."  *Driggers v.*

*Cruz*, 740 F.3d 333, 337 (5th Cir. 2014) (citing *Maher v. Roe*, 432 U.S. 464 (1977)); *see also San*

*Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973); *Carson v. Johnson*, 112 F.3d 818, 821–22 (5th

Cir. 1997) ("neither prisoners nor indigents constitute a suspect class").

The Supreme Court and Fifth Circuit cases reviewed at the dismissal stage make clear that

detention based on wealth is an exception to the general rule that rational basis review applies to

wealth-based classifications.  In *Williams*, the Supreme Court ruled that "[o]nce the State has defined

the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not

then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory

maximum solely by reason of their indigency."  399 U.S. 241–42.  In *Tate*, the Court extended the

rule, holding that

135

the same constitutional defect condemned in *Williams* also inheres in jailing an indigent for failing to make immediate payment of any fine, whether or not the fine is accompanied by a jail term and whether or not the jail term of the indigent extends beyond the maximum term that may be imposed on a person willing and able to pay a fine.  In each case, the Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.

401 U.S. at 671 (quoting *Morris v. Schoonfield*, 399 U.S. 508, 509 (1970) (plurality)).  The *Bearden* Court reaffirmed that "if the State determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it."  461 U.S. at 667–68.   *Bearden* made finding the least-restrictive alternative a constitutional requirement in cases in which inability to pay a fine results in imprisonment.  "[T]he court must consider alternative measures of punishment other than imprisonment.  Only if alternative measures are not adequate to meet the State's interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay."  *Id*. at 672; *see also Frazier v. Jordan*, 457 F.2d 726 (5th Cir. 1972) (invalidating a law requiring certain defendants to choose between "a $17 fine or 13 days in jail" because it created two disparately treated classes defined by wealth without a compelling state interest justifying the practice).

When the Supreme Court ruled in *San Antonio School District v. Rodriguez* that wealth-based classifications ordinarily require rational basis review, the Court specifically excepted the wealth-based detentions at issue in *Williams* and *Tate*.  411 U.S. at 20.  The Court recognized that in *Williams* and *Tate*, "[t]he individuals, or groups of individuals, who constituted the class discriminated against . . . shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit." *Id*.  The *Williams-Tate*

exception did not apply to a case in which some could afford better schooling than others, but no one was completely cut off from public education by poverty. *Id.* at 25. In that case, wealth classifications did not create a suspect class and rational basis review applied. *Id.* at 28–29. But here, the plaintiffs' claim is not that some are able to afford better conditions of pretrial release than others. The claim is that misdemeanor defendants who can pay secured money bail are able to purchase pretrial liberty, while those who are indigent and cannot pay are absolutely denied pretrial liberty and detained by their indigence. Under *Williams*, *Tate*, and *Bearden*, an absolute deprivation of liberty based on wealth creates a suspect classification deserving of heightened scrutiny.[78]

The defendants' argument that *Williams*, *Tate*, and *Bearden* are limited to detention for failure to pay post-conviction fines is unpersuasive. Although state and local governments have compelling interests in punishing and deterring violations of court orders, including the failure to pay court-ordered fines, the Supreme Court limits post-conviction detention of indigent defendants who cannot pay fines. The Court held that detention may be imposed only as a last resort, after a court carefully reviews the alternatives and makes findings on the record that detention is the least restrictive option. *Bearden*, 461 U.S. 671–72. By contrast, pretrial bail is not intended to be punitive. *See, e.g.*, *Brown*, 338 P.3d. at 1291 ("Bail is not pretrial punishment and is not be set solely on the basis of an accusation of a serious crime."). The defendants have argued that the government's interest in setting bail is to ensure that misdemeanor arrestees return for court appearances, not to protect public safety or to deter crime. (*See* Docket Entry No. 101 at 7, 13). In the absence of a greater penological interest, and given the presumption of innocence for those

---

[78] As the court noted in its earlier Memorandum and Opinion, this distinction arises in the due process analysis as well. *ODonnell*, 2016 WL 7337549 at *17 n.19. Challenges to the conditions of detention receive rational basis review. *Bell v. Wolfish*, 441 U.S. 520 (1979). Challenges to the decision to detain itself are accorded the full complement of due process protections. *Salerno*, 481 U.S. at 748–51.

awaiting trial, a government policy of wealth-based classifications for pretrial detention for misdemeanor offenses deserves, if anything, less deference than post-conviction detention.[79]

That conclusion is supported by the Fifth Circuit's *Rainwater* decisions. The class plaintiffs in *Pugh v. Rainwater* alleged that Florida's imposition of secured money bail without regard for an arrestee's ability to pay violated equal protection. 557 F.2d at 1190. The panel decision explicitly applied strict scrutiny, reasoning that "the [Supreme] Court has been extremely sensitive to classifications based on wealth in the context of criminal prosecutions" and concluding from *Williams-Tate* that "the wealth classification in the instant case warrants close judicial scrutiny" by creating a suspect class. 557 F.2d at 1197. The panel also stated that "[s]trict scrutiny is appropriate also because the inability to raise money bail necessarily affects fundamental rights of the indigent defendant. Foremost among these rights is the presumption of innocence." *Id*. Pretrial detention based on inability to pay money bail also implicated and threatened "an accused's right to a fair trial," because "the 'right to freedom before conviction permits the unhampered preparation of a defense.'" *Id*. (quoting *Stack*, 342 U.S. at 4).

The en banc court vacated the panel decision as moot because, while the appeal was pending, Florida issued a new written bail policy. 572 F.2d 1053. Although the en banc court did not comment on the scrutiny standard to be applied, it cited *Williams* and *Tate*, stating that "[a]t the outset we accept the principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Id.* at 1056. The court viewed pretrial

---

[79] *See* U.S. Dept. of Justice Statement of Interest, *Varden v. City of Clanton, Alabama*, Civil No. 15-34, Docket Entry No. 26 at 8 (M.D. Ala. Feb. 13, 2015) ("Although much of the Court's jurisprudence in this area concerns sentencing or early release schemes, the Court's Fourteenth Amendment analysis applies in equal, if not greater force to individuals who are detained until trial because of inability to pay fixed-sum bail amounts.").

confinement "of one who is accused but not convicted of a crime as presenting a question having broader effects and constitutional implications than would appear from a rule stated solely for the protection of indigents." *Id.*

*Williams*, *Tate*, *Bearden*, and *Rainwater* remain good law, neither overruled nor limited. The Supreme Court in *San Antonio School District v. Rodriguez* specifically excepted *Williams* and *Tate* from the general rule that wealth-classifications are reviewed under a rational basis standard. 411 U.S. at 20. *Bearden*, decided a decade after *San Antonio School District*, confirmed that using wealth-based classifications that result in detention for inability to pay a fine "requires a careful inquiry into such factors as 'the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose.'" 461 U.S. at 666–67 (quoting *Williams*, 399 U.S. at 260 (Harlan, J., concurring)). The en banc court in *Rainwater*—also decided well after *San Antonio School District*—applied *Williams* and *Tate* to the pretrial bail context. *Rainwater* supports applying a standard of review more exacting than rational basis.[80]

At a minimum, heightened scrutiny requires a court to evaluate the government's legitimate interest in a challenged policy or practice and then inquire whether there is a sufficient "fit" between

---

[80] The defendants note that in *Broussard v. Parish of Orleans*, 318 F.3d 644 (5th Cir. 2003), the Fifth Circuit applied rational basis review to a § 1983 challenge to "bail-fee statutes" that imposed $5 to $15 fees for filing and serving process, including the processing of bail bonds. *Id.* at 647. The court found that in many cases the nominal fees were refunded upon request, mitigating due process concerns. *Id.* at 566. Most importantly, the arrestees challenging the fees did not allege, and the evidence did not show, that they were detained or that their release was even delayed by the imposition of the fees. *Id.* at 662.

 *Broussard* does not help the defendants here. Like the Louisiana jurisdictions challenged in *Broussard*, Harris County imposes nominal fees of $20 or 3 percent of the bond principal on arrestees released on personal bond. Hearing Tr. 1:121; 2-1:47. The witnesses consistently testified that these fees are discretionary, and no arrestee is denied release for failure to pay the fee up front. *Id.* at 2-1:47, 53, 102–03; 3-2:145. Because these fees do not absolutely deprive indigent arrestees of liberty before trial, they would not be reviewed under heightened scrutiny. *San Antonio Sch. Dist.*, 411 U.S. at 20. But the plaintiffs do not challenge these fees. *Broussard* does not apply.

the government's means and ends.  *Cf. Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016) ("Classifications survive rational basis review 'even when there is an imperfect fit between means and ends.'" (quoting *Heller v. Doe by Doe*, 509 U.S. 312, 321 (1993))).   At a maximum, "[c]lassifications created by state action which disadvantage a 'suspect class' or impinge upon the exercise of a 'fundamental right' are subject to strict scrutiny, and will be upheld only when they are precisely tailored to serve a compelling state interest." *Clark v. Prichard*, 812 F.2d 991, 995 (5th Cir. 1987).

State and local governments have "a compelling interest in assuring the presence at trial of persons charged with a crime."[81]  *Rainwater*, 572 F.2d at 1056 (citing *Stack*, 342 U.S. at 1).  As a matter of law, Harris County has met its burden to show a compelling state interest.  The question is what level of tailoring heightened scrutiny requires in this case, and whether the plaintiffs have

---

[81]  It is unclear whether community safety is also a compelling government interest in setting bail for misdemeanor defendants.  The defendants did not brief public safety as a government interest, but they frequently pressed that point at the preliminary injunction hearing.  *See, e.g.*, Hearing Tr. 1:95–96, 194–95; 4-1:140–42; 144–45; 5:34, 69–70; (*cf*. Docket Entry No. 101 at 2, 13; No. 161 at 1; No. 162 at 2, 22).  The defendants note that one of the five Article 17.15 factors judicial officers must consider is the safety of the alleged victim and of the community.  Hearing Tr. 4-1:17–18, 144; 5:69–71.

The U.S. Department of Justice argues that "[i]f a court finds that no other conditions may reasonably assure an individual's appearance at trial, financial conditions may be constitutionally imposed—but 'bail must be set by a court at a sum designed to ensure that goal, and *no more*.'" Pls. Ex. 12(dd) at 18 (quoting *Salerno*, 481 U.S. at 754).  The American Bar Association's *Standards for Criminal Justice, Pretrial Release* emphasize that financial conditions of release "should not be employed to respond to concerns for public safety." Pls. Ex. 12(ff) at 12, (quoting Standard 10-1.4(d)).  The vacated *Pugh v. Rainwater* panel concluded based on still-valid Supreme Court precedent that "[t]he sole governmental interest served by bail is to assure the presence of the accused at trial." 557 F.2d at 1198, *vacated by* 572 F.2d 1053 (citing *Stack*, 342 U.S. at 5; *Duran v. Elrod*, 542 F.2d 998, 999 (7th Cir. 1976)).

The court need not decide at this stage whether protecting the community from new criminal activity during pretrial release is a compelling government interest in setting money bail for misdemeanor defendants.  The government's compelling interest in assuring the defendants' appearance satisfies the government's burden under heightened scrutiny.  The government's interest does not become more compelling by having an additional policy reason for setting bail, and the tailoring analysis is not affected.  Appearing at hearings and refraining from criminal activity are two forms of pretrial law-abiding behavior.  The present record does not show that financial conditions of release addresses one better than the other.  Whether the government's interest is in law-abiding behavior broadly defined or only in a defendant's appearance, the government's policies must be narrowly tailored to meet that interest.

demonstrated a likelihood of showing that Harris County does not meet that standard.  In *Bearden*, after the parties extensively argued about whether rational basis review or strict scrutiny applied, the Supreme Court cautioned that "[w]hether analyzed in terms of equal protection or due process, the issue [of detention based on indigence] cannot be resolved by resort to easy slogans or pigeonhole analysis, but rather requires a careful inquiry into such facts as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose."  461 U.S. at 666–67 (internal footnotes, quotation marks, and citation omitted).  The *Rainwater* panel interpreted *Williams* and *Tate* to require strict scrutiny in a challenge to a pretrial system of detaining indigent defendants because they could not pay secured money bail.  557 F.2d at 1197.  The en banc court vacated on other grounds, without commenting on the scrutiny standard.  *See* 572 F.2d at 1053.

The plaintiffs have suggested that "intermediate" scrutiny is the most conservative application of these precedents that recognizes both the government's and the individual arrestee's weighty interests.  Hearing Tr. 1:73–75; *see also Salerno*, at 750–51 ("On the other side of the scale, of course, is the individual's strong interest in liberty.  We do not minimize the importance and fundamental nature of this right.  But, as our cases hold, this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society.")  "Narrow tailoring under intermediate scrutiny is different from strict scrutiny's narrow-tailoring requirement.  Strict scrutiny requires the government to show that it has used the least restrictive means of advancing a compelling interest."  *Lauder, Inc. v. City of Houston, Texas*, 751 F.Supp.2d 920, 933 (S.D. Tex. 2010).  As applied in free expression First Amendment case law, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial

government interest that would be achieved less effectively absent the regulation." *Id*. (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989)).

In light of the plaintiffs' burden to show a likelihood of success on the merits, the court applies the tailoring requirement of intermediate scrutiny. This standard is appropriately deferential towards the County and appropriately protective of the misdemeanor defendants.

### b. Due Process

In reviewing facial challenges to statutes regulating pretrial-confinement conditions, the Supreme Court evaluates whether "conditions and restrictions of pretrial detainment" impermissibly "amount to punishment of the detainee." *Bell*, 441 U.S. at 533, 535. The Court focuses "on whether the restrictions were imposed for a punitive purpose and, if not, on whether the restrictions are excessive in relation to a legitimate regulatory purpose." *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 778 (9th Cir. 2014) (en banc) (collecting cases).

In *United States v. Salerno*, 481 U.S. at 739, the Court reviewed a challenge to a provision of the federal Bail Reform Act of 1984 that permitted pretrial detention of arrestees charged with serious felonies if the government demonstrated by clear and convincing evidence, at an adversarial hearing, that no release conditions would "reasonably assure" the safety of the community. 18 U.S.C. § 3142(e). Under *Bell*'s first prong, the Court found no evidence that Congress had intended pretrial detention to operate for a punitive purpose. 481 U.S. at 747. Under *Bell*'s second prong, the Court upheld the preventive detention portion of the Act because it "carefully limits the circumstances under which detention may be sought to the most serious of crimes." *Id*.

Having concluded that the challenged provision of the Bail Reform Act was regulatory and not punitive, the Court evaluated whether the Act's procedures sufficiently protected "the

142

individual's strong interest in liberty." *Id.* at 750.  The Court upheld the provision under this standard because: (1) "[d]etainees have a right to counsel at their detention hearing; (2) "[t]hey may testify in their own behalf, present information by proffer or otherwise, and cross-examine witnesses who appear at the hearing"; (3) the judicial officer "is guided by statutorily enumerated factors"; (4) "[t]he Government must prove its case by clear and convincing evidence"; and (5) "the judicial officer must include written findings of fact and a written statement of reasons for a decision to detain." *Id.* at 751.

The Ninth Circuit, sitting en banc, interpreted *Salerno* to require strict scrutiny of pretrial detention conditions.  *Lopez-Valenzuela*, 770 F.3d at 781 & n.3 (*Salerno*'s "heightened scrutiny" standard requires that pretrial detention policies be "narrowly tailored to serve a compelling state interest").  The *Salerno* Court itself did not describe its analysis as strict scrutiny or invoke the narrow-tailoring standard.  But the Court did make clear that under the Due Process Clause, "liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  481 U.S. at 755.  *Salerno* involved a facial challenge to a federal law under the Due Process Clause, requiring a more demanding burden for the plaintiffs than that involved here.[82]  Here, the plaintiffs' due process challenge is to Harris County's bail system as applied.

## 2.     The Constitutional Requirements

### a.     Equal Protection

"The rule of *Williams* and *Tate*, then, is that the State cannot 'impos[e] a fine as a sentence

---

[82] "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."  *Salerno*, 481 U.S. at 745 (citing *Schall v. Martin*, 467 U.S. 253, 269 n.18 (1984)).

and then automatically conver[t] it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full.'" *Bearden*, 461 U.S. at 667 (quoting *Tate*, 401 U.S. at 398) (alterations in original).  The *Bearden* Court concluded that while a state has broad discretion to decide what penalties satisfy its clear interest to deter and punish crime, once the state "determines a fine or restitution to be the appropriate and adequate penalty for the crime, it may not thereafter imprison a person solely because he lacked the resources to pay it," unless a court finds either that (1) the defendant was not actually indigent and was refusing to pay in bad faith, or (2) "alternative measures are not adequate to meet the State's interests in punishment and deterrence." *Id.* at 667–68, 674.

Applying *Williams* and *Tate* to the pretrial bail context, as *Rainwater* did, (and by extension, the post-*Rainwater Bearden* decision), the court concludes that Harris County has broad discretion to impose pretrial release conditions that meet the compelling interest of assuring a misdemeanor defendant's appearance at trial.  But once the County has chosen to impose a financial condition of pretrial release, the County may not use that condition to imprison defendants before trial because they lack the means to pay it.  *Rainwater*, 572 at 1056.  To do so impermissibly conditions "an absolute deprivation of a meaningful opportunity to enjoy [the] benefit" of liberty before trial or conviction on the basis of a defendant's poverty.  *San Antonio School District*, 411 U.S. at 20.

Under the Equal Protection Clause as applied in the Fifth Circuit, pretrial detention of indigent defendants who cannot pay a financial condition of release is permissible only if a court finds, based on evidence and in a reasoned opinion, either that the defendant is not indigent and is refusing to pay in bad faith, or that no less restrictive alternative can reasonably meet the government's compelling interest.  *Bearden*, 461 U.S. at 674.  In this case, the plaintiffs bear the

burden of meeting the preliminary injunction requirements, but at the trial on the merits, the County will have the burden under heightened scrutiny to show that there is no reasonable alternative to a policy, custom, and practice of setting money bail on a secured basis in misdemeanor cases. *See, e.g.*, *Lauder*, 751 F.Supp.2d at 933. The judicial defendants bear the burden to show that they make a finding of no reasonable alternative to imposing money bail on a secured, prescheduled basis for indigent defendants.

### b.    Due Process

In *Turner v. Rogers*, 564 U.S. 431 (2011), the Supreme Court held that a state court's detention order for civil contempt violated the Due Process Clause. *Id.* at 449.  The Court reasoned that while a civil contempt proceeding exposing the defendant to detention for up to one year did not require the assistance of counsel, the state had to provide "alternative procedural safeguards" such as "adequate notice of the importance of ability to pay [as an element to prove at the hearing], fair opportunity to present, and to dispute relevant information, and court findings." *Id.* at 448.  The Court made clear that these were examples, not a complete description of what was needed for due process.  The state could provide different procedures "equivalent" to those the Court listed. *Id.*

*Turner* is a helpful starting point for examining the plaintiffs' likelihood of succeeding on their due process claim.  Although the Supreme Court has not defined with precision the federal due process requirements for pretrial detention of misdemeanor defendants, at a minimum, state or local governments must provide notice of the importance of ability to pay in the judicial determination of detention, a fair opportunity to be heard and to present evidence on inability to pay, and a judicial finding on the record of ability to pay or a reasoned explanation of why detention is imposed despite an inability to pay the financial condition. *Turner* clarified that these procedures are required by the

Due Process Clause even when the Sixth Amendment does not guarantee a right to counsel. Courts are divided over whether an initial bail-setting is a "critical stage" in the criminal process requiring counsel. *See, e.g.*, *Ditch v. Grace*, 479 F.3d 249 (3rd Cir. 2007); *Gonzalez v. Comm'r of Corr.*, 68 A.3d 624 (Conn. 2013); *Hurrell-Harring v. State*, 930 N.E.2d 217 (N.Y. 2010); *State v. Fann*, 571 A.2d 1023 (N.J.Super.L. 1990). Harris County does not currently provide counsel at the probable cause and bail-setting hearing but is exploring a pilot program to do so in July 2017.[83]

The defendants cite many cases for the proposition that "a bail setting is not constitutionally excessive merely because a defendant is financially unable to satisfy the requirement." *See, e.g.,* *McConnell*, 842 F.2d at 107. These cases in fact support the plaintiffs' due process claims. The cases the defendants cite involve serious felony charges with potentially lengthy sentences. The appellate courts affirmed the imposition of secured money bail that a defendant could not pay. But the bail was imposed only *after* at least one counseled adversarial hearing, at which the defendant had an opportunity to present evidence and to be heard, with the court stating its findings on the record that either the defendant had not presented evidence of indigence or that no other condition could reasonably assure the defendant's appearance at future hearings or protect the community from additional felony crimes.[84]

---

[83] *See* Part I.H.3 *supra*.

[84]*See, e.g.*, *United States v. Cordero*, 166 F.3d 334 (Table), 1998 WL 852913 at *2 (4th Cir. 1998) (statutory presumption that defendant was a flight risk when the potential sentence exceeded ten years; district court expressly addressed ability to make bail in a reasoned opinion); *Lee v. Evans*, 41 F.3d 1513 (Table), 1994 WL 651959 (9th Cir. 1994) (defendant presented no evidence on ability to pay at the hearing); *Hood v. Evans*, 37 F.3d 1505 (Table), 1994 WL 526973 (9th Cir. 1994) (same); *United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1133 (7th Cir. 1984) ("In this case [charging attempted murder and armed robbery], the amount of the petitioner's bail was reviewed twice by Illinois trial courts and twice by the Illinois Supreme Court."); *State v. Pratt*, — A.3d —, 2017 WL 894414 (Vt. 2017) ("bail requirements at a level a defendant cannot afford should be rare" and "courts should be particularly circumspect in exercising their discretion to set bail at a level that a defendant cannot meet"; a defendant with fourteen pending charges, including violent felonies fell within the rare exception); *see also* Part I.C.2–3 *supra* and

The defendants cite only one case relating to detention on a misdemeanor charge, *Fields v. Henry County, Tennessee*, 701 F.3d 180 (6th Cir. 2012). But in *Fields*, the defendant could afford to pay money bail, and he was not detained because he was unwilling or unable to pay. *See id.* at 183 (the defendant was released on a $5,000 bail bond). Instead, the defendant objected to Tennessee's policy of detaining all those charged with family-violence offenses for 12 hours and the county's policy of using a bail schedule. *Id.* at 184–85. Because the misdemeanor defendant failed "to point to any inherent problem with the dollar amount set in his case," the Sixth Circuit held that the bail schedule was not per se unconstitutional. *Id.* at 184 ("That is not to say that using a bond schedule can never violate the Excessive Bail Clause.").

The plaintiffs here do not challenge the bail schedules as per se unconstitutional. *See also Terrell v. City of El Paso*, 481 F.Supp.2d 757, 766–67 (W.D. Tex. 2007) (use of a bail schedule not inherently unconstitutional). Nor do the plaintiffs challenge the Texas statute allowing transparent pretrial detention orders in certain family-violence cases. Aside from this one case involving a misdemeanor defendant but not involving the same issues, the defendants rely exclusively on serious felony cases that permitted detention for failure to pay a financial condition only after a counseled, adversarial hearing with findings on the record that no alternative to secured money bail could reasonably assure the defendant's appearance given the potential for a prison sentence of ten years to life and the resulting risk of flight.

Most importantly, in almost every case the defendants cite, the trial court could have—and sometimes did—order preventive detention, but ultimately set a secured financial condition with the

cases cited therein.

147

possibility of release as a less restrictive alternative to preventive detention.[85]   In Texas, however, pretrial preventive detention is not available in misdemeanor cases except for those arrested on charges of family violence who have already violated a condition of pretrial release.   *See* TEX. CONST. art. 1 §§ 11b–11c.

The defendants argue that the Texas ban on preventive pretrial detention in most misdemeanor cases is not relevant because the plaintiffs are alleging violations only of federal law and have not pleaded state-law claims.  (Docket Entry No. 266 at 3–5); Hearing Tr. 8-2:69–71.  But federal due process protects state-created liberty interests.  Liberty interests protected by the Due Process Clause "may arise from two sources—the Due Process Clause itself and the laws of the States."  *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).  The Supreme Court recognizes "that states may, under certain circumstances, create liberty interests which are protected by the Due Process Clause" and which entitle prisoners "to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that this state-created right is not arbitrarily abrogated."  *Madison v. Parker*, 104 F.3d 765, 767 (5th Cir. 1997) (citing *Sandin v. Conner*, 515 U.S. 472 (1995); *Wolff v. McDonnell*, 418 U.S. 539, 557 (1974)).

"The Supreme Court has adopted a two-step analysis to examine whether an individual's procedural due process rights have been violated. The first question 'asks whether there exists a

---

[85]  *See, e.g.*, *McConnell*, 842 F.2d at 105; *United States v. Tirado*, 72 F.3d 130 (Table), 1995 WL 684553 (6th Cir. 1995); *Mantecon-Zayas*, 949 F.2d at 550 ("because the Bail Reform Act authorizes judicial officers to order pretrial detention where no condition or combination of conditions can 'reasonable assure' the defendant's presence," the court may set an unpayable bail if it concludes "that detention is necessary until trial"); *United States v. Jessup*, 757 F.2d 378, 388–89 (1st Cir. 1985) ("the basic purpose of the [Bail Reform] Act [is] to detain those who present serious risks of flight or danger *but not* to detain those who simply cannot afford a bail bond"), *abrogated on other grounds by United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990).

148

liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010) (quoting *Ky. Dep't of Corr.*, 490 U.S. at 460).  "State law creates protected liberty interests only when (1) the state places substantive limitations on official conduct by using explicitly mandatory language in connection with requiring specific substantive predicates," and (2) the state law requires a specific outcome if those substantive predicates are met." *Fields*, 701 F.3d at 186.  A "narrowly limited modicum of discretion" permitted to judicial officers does not deprive prisoners of a constitutionally protected right to be released.  *Teague v. Quarterman*, 482 F.3d 769, 776 (5th Cir. 2007).

The Texas Constitution prohibits pretrial preventative detention orders in most misdemeanor cases.  TEX. CONST. art. 1 §§ 11, 11b–11c; *Ex parte Davis*, 574 S.W.2d at 169.  Texas has created a liberty interest in misdemeanor defendants' release from custody before trial.  Under Texas law, judicial officers, as all parties admit, have no authority or discretion to order pretrial preventive detention in misdemeanor cases with a narrow exception for certain family-violence cases.[86]

To determine whether the procedures used sufficiently protect state-created liberty interests under the Due Process Clause, the Fifth Circuit applies the balancing test articulated in *Matthews v. Eldridge*, 424 U.S. 319 (1976).  *See Meza*, 607 F.3d at 402.  A federal court must consider:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

---

[86]  To use the Sixth Circuit's terms, the substantive predicates are clear: any misdemeanor charge outside of the single enumerated exception.  And the required outcome is specific: no pretrial preventive detention.  *See Fields*, 701 F.3d at 186.

*Id*. (quoting *Matthews*, 424 U.S. at 335).

In this case, the private interest affected by Harris County's policy is the misdemeanor defendant's interest in release from custody before trial. That interest implicates fundamental constitutional guarantees: the presumption of innocence and the right to prepare for trial. *See Salerno*, 481 U.S. at 749–51; *Stack*, 342 U.S. at 4; *Rainwater*, 572 F.3d at 1056–57. The record evidence shows that misdemeanor defendants in Harris County who are detained until case disposition are convicted at higher rates and given sentences twice as long as those released before trial.[87] They plead guilty at rates much higher than those who are able to secure early release from pretrial detention.[88] Detained misdemeanor defendants experience the multiplying effects of "cumulative disadvantages" when they lose jobs, places to live, or family visitation rights because of pretrial detention.[89]

The risk of an erroneous deprivation of this liberty interest through the imposition of secured money bail is high. For the indigent, the risk of pretrial liberty deprivation because of the inability to pay secured money bail is certain. That deprivation is erroneous because the record evidence shows that secured money bail is not more effective at increasing the likelihood of appearance or law-abiding behavior before trial than release on an unsecured or nonfinancial condition. The record evidence shows that nearly 85 percent of those released in Harris County on an unsecured personal bond or other nonfinancial conditions do not forfeit their bonds for failing to appear or for

---

[87] *See* Part I.D.5; Part I.E.3 *supra*.

[88] *See id*.

[89] *See* Part I.F *supra*.

committing new criminal activity.[90]  The rate is substantially the same as those released on secured money bail.[91]

As for the third factor, the defendants argue that alternatives to their system of detaining misdemeanor arrestees on secured financial conditions would be prohibitively expensive for the County.  The defendants argue that adopting the Washington, D.C. system of releasing almost all misdemeanor arrestees before trial would cost the County tens or hundreds of millions of dollars. Def. Ex. 26 at 13–14; (Docket Entry No. 166 at 13–14).  Mr. Banks testified that implementing the relief the plaintiffs seek would cost Harris County Pretrial Services $30 million annually.  The current Harris County Pretrial Services budget is $7.5 million.  Def. Ex. 46; Hearing Tr. 4-1:29–38.

The testimony relating to this argument is far from credible.  Mr. Banks's calculations assumed that this court would order *every* misdemeanor defendant released on personal bond, even if a defendant could pay a secured money bond.  *See* Def. Ex. 46; Hearing Tr. 4-1:36–37.  Mr. Banks not only assumed that the County would absorb the costs of supervising every arrestee before trial, he also made the unwarranted assumption that 58.7 percent of those released would require GPS monitoring—the most restrictive form of supervision—and that over 10,000 arrestees—18.4 percent of all arrestees—would require alcohol-intake ignition locks, even though only about 6,000 arrestees—15 percent—are charged with misdemeanor driving-while-intoxicated offenses each year. Def. Ex. 46; Hearing Tr. 4-1:37–38; Pls. Ex. 10(c), *2015 Pretrial Services Annual Report* at 12.

Mr. Banks greatly overstated the costs of pretrial supervision of misdemeanor defendants. Dr. VanNostrand's work has shown that low-risk defendants require little to no supervision.  Indeed,

---

[90] *See* Part I.E.5 *supra*.

[91] *See id*.

oversupervising misdemeanor defendants on pretrial release by, for example, subjecting them to frequent check-ins and drug tests, increases nonappearance rates. Pls. Ex. 12(j), Marie VanNostrand, *Pretrial Risk Assessment in the Federal Court* at 5 (U.S. Department of Justice, Apr. 2009). Dr. VanNostrand criticized Harris County Pretrial Services because of unnecessary—and unnecessarily costly—oversupervision. Hearing Tr. 6-1:155. Mr. Banks testified that the County likely oversupervises by automatically requiring drug tests of every defendant released on personal bond, even if the defendant's misdemeanor charge is unrelated to drugs and his background shows no prior drug offenses. *Id*. at 3-2:143–44; 4-1:32. Neither Texas law nor the County Rules of Court require this approach.

The credible evidence shows that, while Pretrial Services might incur some additional costs in supervising those who are now detained on a secured money bail they cannot pay, those costs are far less than the costs of detention. The issue is not added costs, but, more precisely, shifted costs. *See, e.g.*, Pls. Ex. 12(kk), 12 (jj), 12(ww); Pls. Ex. 13(k); Heaton Study at 45–46; Hearing Tr. 3-2:19. Mr. Banks estimated costs only for Harris County Pretrial Services. He did not estimate the costs the County would save by detaining far fewer people and for shorter periods. The contrary testimony relating to this factor is credible. Judge Morrison testified that most of the costs of the D.C. system arise from running a state-of-the-art drug-testing lab and paying all D.C. pretrial services officers at the federal salary payscale. Hearing Tr. 2-2:165–68. Neither is required for Harris County. The court concludes that the defendants' testimony and evidence on the County's costs of releasing misdemeanor defendants on alternatives to secured financial conditions is unreliable.

In *Meza*, the Fifth Circuit ruled that a parolee who had not been convicted of a sex offense had a Texas-created liberty interest in being free from requirements to register as a sex offender and

to participate in sex-offender therapy.  507 F.3d at 401.  Applying the *Matthews* balancing test, the court concluded that the parolee was owed "at least the same [due] process of an inmate, but as a parolee, he should generally be entitled to more favorable treatment than inmates."  *Id*. at 409. Applying *Wolff v. McDonnell*, 418 U.S. at 539, on the process required to protect an inmate's state-created liberty interests, the Fifth Circuit held that the parolee was owed "at a minimum: (1) written notice that sex offender conditions may be imposed as a condition of his mandatory supervision, (2) disclosure of the evidence being presented against [him] to enable him to marshal the facts asserted against him and prepare a defense, (3) a hearing at which [the parolee] is permitted to be heard in person, present documentary evidence, and call witnesses, (4) an impartial decision maker, and (5) a written statement by the factfinder as to the evidence relied on and the reasons it attached sex offender conditions to his mandatory supervision."  (citing *Wolff*, 418 U.S. at 560–62).

Under the federal case law defining due process for detention orders in general, as well as case law defining due process for state-created liberty interests, the court concludes that Harris County, in order to detain misdemeanor defendants unable to pay a secured financial condition of pretrial release, must, at a minimum, provide: (1) notice that the financial and other resource information its officers collect is for the purpose of determining the misdemeanor arrestee's eligibility for release or detention; (2) a hearing at which the arrestee has an opportunity to be heard and to present evidence; (3) an impartial decisionmaker; and (4) a written statement by the factfinder as to the evidence relied on to find that a secured financial condition is the only reasonable way to assure the arrestee's appearance at hearings and law-abiding behavior before trial.

The due process required for pretrial detention orders based on an indigent misdemeanor defendant's failure to pay a secured financial condition of release is similar to the equal protection

standard that prevents the government from converting financial conditions or penalties into detention orders without the following: a hearing with notice that pretrial liberty is at stake; with the opportunity to present evidence and to be heard; before a judge who must make findings on the record that either the arrestee has the ability to pay the amount needed for release, or that the government has no reasonable alternative to imposing detention for the failure to pay.

Due process also requires timely proceedings. In the context of misdemeanor arrests, pretrial detention of even three or four days can significantly increase the rates of nonappearance, recidivism, and the cumulative disadvantages of lost employment, leases, and family custody rights.[92] Due process protections are meaningless if they are provided only after defendants effectively serve their sentences.

Texas and federal law provide guidance that due process requires the necessary hearing to be within 24 hours of arrest in misdemeanor cases. Texas law requires that a misdemeanor defendant arrested without a warrant must be released "not later than the 24th hour after the person's arrest" if a probable cause hearing has not been provided. TEX. CODE CRIM. PRO. art. 17.033(a). "If the person is unable to obtain a surety for the bond or unable to deposit money in the amount of the bond, the person must be released on personal bond." *Id*. In *Sanders*, the federal district court applied the 24-hour standard to setting bail in the City of Houston. 543 F.Supp. at 704. In the *Roberson* order, the federal district court required "a meaningful review of alternatives to pre-scheduled bail amounts" to be held within 24 hours from arrest. Agreed Final Judgment, No. 84-2974 at 1.

The defendants argue that evidentiary hearings with findings on the record are generally not

---

[92] *See* Part I.F *supra*.

possible within 24 hours because the available "information is necessarily limited" when the bail-setting hearings occur.  They also argue that evidentiary hearings are not required because *Gerstein* permits jurisdictions to meet a less demanding due process standard in finding probable cause and in setting bail.  (Docket Entry No. 166 at 16; No. 286 at 15).  These arguments are unpersuasive. *Sanders* and *Roberson* were issued thirty years ago, before networked computing and communications technologies made it relatively fast and easy to transmit information.  Those orders nonetheless set a 24-hour boundary on the time to complete the administrative incidents to arrest in misdemeanor cases in the City of Houston and in Harris County.  Under *Roberson*, the County Judges are supposed to direct Pretrial Services "to make every effort to insure that sufficient information is available . . . to determine an accused's eligibility for a personal bond or alternatives to prescheduled bail amounts" for a hearing to be held within 24 hours of arrest.  Agreed Final Judgment, No. 84-2974 at 4.  Thirty years later, this 24-hour period is enough for Harris County to gather information on a misdemeanor defendant's ability to pay secured money bail, compile his or her criminal history and any other pending charges or holds, and make a finding as to whether secured money bail or a less restrictive alternative is needed to meet the government's interests.

As for *Gerstein*, the defendants conflate two separate parts of the Supreme Court's opinion. The Court reasoned that "[b]ecause of its limited function and its nonadversary character, the probable cause determination is not a 'critical stage' in the prosecution that would require appointed counsel."  420 U.S. at 123.  Elsewhere, the Court noted that states are free to develop different pretrial processes.  Some states may choose "to make the probable cause determination at the suspect's first appearance before a judicial officer, or the determination may be incorporated into the procedure for setting bail or fixing other conditions of pretrial release."  *Id*. at 123–24 (internal

citations omitted).  That does not mean, as the defendants appear to assume, that the minimal procedural protections for finding probable cause under the Fourth Amendment become the maximum procedures required for arraignments, bail-settings, or other proceedings a state chooses to combine with probable cause determinations.  *See id*. at 125 n.27 (explaining that the majority opinion addressed due process only under the Fourth Amendment and that the "probable cause determination is in fact only the *first* stage of an elaborate system, unique in jurisprudence, designed to safeguard the rights of those accused of criminal conduct").

Harris County may combine probable cause and bail-setting determinations in the same hearing.  But the County must provide the procedures necessary *both* under the Fourth Amendment for the probable cause determination *and* under the Due Process and Equal Protection Clauses for setting bail and for ordering detention for indigent misdemeanor defendants unable to pay secured money bail.

### c.      Excessive Bail

As they did at the dismissal stage, the parties dispute whether this case is properly analyzed under the Eighth Amendment's prohibition on excessive bail.  (*See* Docket Entry No. 101 at 18; No. 263).  For the same reasons stated in its Memorandum and Opinion on the motions to dismiss, the court concludes that this is not an Eighth Amendment case.  *See ODonnell*, 2016 WL 7337549 at *13.  As explained above, Texas law does not facially provide for release on no financial conditions.  *See* TEX. CODE CRIM. PRO. arts. 17.01, 17.03.  The requirement that magistrates consider five factors in setting the bail amount applies equally to secured and unsecured financial conditions of release.  *See id*. arts. 17.01, 17.15.  The plaintiffs do not challenge the existence of Harris County's bail schedule, the scheduled amounts, or the amounts the Hearing Officers and County

Judges arrive at in applying the Texas-law factors.  The plaintiffs do object to Harris County's customs, practices, and policies of setting money bail amounts on a secured basis for all but a few misdemeanor defendants, effectively detaining without due process those who would be released if they could pay, but who cannot and so are deprived of their pretrial liberty.  These claims are not about the scheduled bail amounts in themselves.  The claims are about the necessary procedures for requiring those amounts on a secured basis, the fact that those who can pay are promptly released, and the fact that those who cannot pay the secured bail suffer pretrial detention for their misdemeanor charges as a result.

The County Judges argue that the plaintiffs' claims must be analyzed under the Eighth Amendment because when "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994).  But the plaintiffs' claims and the court's conclusions do not rely on substantive due process.  *Williams*, *San Antonio School District*, and *Rainwater* make clear that detention based on wealth classifications triggers heightened scrutiny for suspect class discrimination under the Equal Protection Clause.  *See* 399 U.S. at 242; 411 U.S. at 21–22; 572 F.2d at 1056.  *Salerno*, *McConnell* and the cases on state-created liberty interests require procedural, not substantive, due process analysis.  *See* 481 U.S. at 746; 842 F.2d at 109 n.5; *see also Matthews*, 418 U.S. at 560–62.

Even if the plaintiffs were bringing an excessive bail claim, the analysis and outcome remain the same.  *Salerno* and *McConnell* applied due process principles to analyze an Eighth Amendment claim that bail was excessive when it resulted in the automatic detention of a defendant who could

not afford to pay.  *See generally* 481 U.S. at 739; 842 F.2d at 105.  *Rainwater* applied equal

protection principles to scrutinize a pretrial bail system that allegedly resulted in the system-wide

detention of indigent arrestees.   572 F.2d at 1056–57.  The defendants assume that if this is an

Eighth Amendment case, the plaintiffs' claims are defeated by *McConnell*'s reasoning that "a bail

setting is not constitutionally excessive merely because a defendant is financially unable to satisfy

the requirement."  842 F.2d at 107; (*see* Docket Entry No. 101 at 18; No. 262 at 3).  But the Eighth

Amendment cases consistently hold that detention for failure to pay a financial assessment is

permissible: (1) for dangerous felonies, in which the potential sentence ranges from ten years to life

in prison to capital punishment; (2) after a judicial officer provides due process, including a

counseled, adversarial, evidentiary hearing with findings on the record and a reasoned opinion; (3)

with a finding that no alternative to the secured financial condition can reasonably meet the

government's interests.[93]   To the extent they apply, the Eighth Amendment cases support the

plaintiffs' arguments.  Nonetheless, these cases are not the basis of the claims or of the court's

findings and conclusions.

### 3.      Harris County Policies that Violate Constitutional Requirements

### a.      Municipal Liability under § 1983

A local government may be sued under § 1983 "when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

represent official policy, inflicts the [plaintiffs'] injury. . . ."  *Monell v. New York City Dept. of Soc.*

*Servs.*, 436 U.S. 658, 691 (1978).  Relief under § 1983 against a municipality requires "a plaintiff

[to] show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the

---

[93]  *See* Part I.C.2–3, Part II.B.2.b *supra*.

moving force behind the violation of a constitutional right." *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009).

An official policy can be "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers," or a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 690–91.  "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[A] municipal judge acting in his or her judicial capacity to enforce state law does not act as a municipal official or lawmaker" for purposes of § 1983 liability.  *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).  A municipality may be held liable for "deprivations resulting from the decisions of its duly constituted legislative body." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997).  A claim against a municipal defendant in her official capacity is the equivalent of a claim against the municipality itself.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

"Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)) (internal quotation marks omitted).  "[S]tate and local positive law, as well as 'custom or usage' having the force of law" determine whether a person is final policymaker. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (quoting *Praprotnik*, 485 U.S. at 124 n.1).  "[M]unicipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from

among various alternatives by the official or officials responsible for establishing the final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483.

### b.    The County Judges' Policies and Customs: Equal Protection

Harris County is not liable for the actions of the Hearing Officers or County Judges taken in a judicial capacity in adjudicating individual cases. *See Johnson*, 958 F.2d at 94. Nor is the County liable for policies that are set by the State of Texas and do not allow County officials to choose among alternatives. *Pembaur*, 475 U.S. at 483. The County argues that it has no liability because the policies at issue are created by judges acting in their judicial capacities or are required by Texas law. (Docket Entry No. 266 at 9–11).

The record evidence, however, shows customs and practices, amounting to policy, that are neither created by judges in their judicial capacity nor mandated by Texas state law. By an uncodified policy and practice, the County does not permit misdemeanor arrestees to be released on unsecured personal bonds until references are verified.[94] By unwritten policy and practice, Pretrial Services asks misdemeanor arrestees for information on their ability to pay without informing them that the purpose is to determine their eligibility for release on nonfinancial or unsecured financial conditions.[95] Pretrial Services does not ask what bond arrestees are able to pay.[96] None of these unwritten rules, customs, or practices is required by State law.

In its Memorandum and Opinion on the County's motion to dismiss, the court ruled that the County can be liable under § 1983 for the policy choices made by the County Judges in their capacity

---

[94] *See* Part I.D.2 *supra*.

[95] *See id*.

[96] *See id*.

as legislators and as administrative rulemakers. *ODonnell*, 2016 WL 7337549 at *27, 34–35. The County's August 2016 letter changing the unwritten rule from requiring two verified references to requiring one verified reference of financial resources shows that the County Judges are final policymakers over this rule and that the policy is promulgated in their legislative or administrative capacity, not their judicial capacity in adjudicating specific cases in their courts.[97] *See* Def Ex. 52; *ODonnell*, 2016 WL 7337549 at *33 n.33. The *Roberson* order—which ran against the County Judges only—required the County Judges to "direct the Pretrial Services Agency to make every effort to insure that sufficient information is available at the time of the hearings required herein for the Judicial Officer to determine an accused's eligibility for a personal bond or alternatives to prescheduled bail amounts." Agreed Final Judgment, No. 84-2974 at 4; Def Ex. 159. The *Roberson* order shows that the County Judges are final policymakers who, in an administrative capacity, direct Pretrial Services to gather misdemeanor arrestees' financial information and present it to the Hearing Officers.

The plaintiffs allege that the County Judges promulgate an unwritten policy by knowingly acquiescing in and ratifying the Hearing Officers' systemic custom and practice of setting money bail on a secured basis, following the bail schedule, without considering the misdemeanor arrestee's inability to pay. (Docket Entry No. 54 ¶¶ 19, 56, 84–85, 103). The defendants argue that the Hearing Officers do consider ability to pay as one of the state-law factors in setting bail. (Docket Entry No. 166 at 9, 17–18). But because the record evidence showed that the Hearing Officers almost automatically set secured money bail at unpayable amounts in cases clearly involving indigent misdemeanor defendants, the plaintiffs argue that the County Judges promulgate an unwritten policy

---

[97] *See* Part I.D.2 *supra*.

permitting Hearing Officers to use secured money bail as de facto pretrial detention orders, without providing due process and contrary to Texas's ban on pretrial detention in all but one category of misdemeanor cases.[98]  (Docket Entry No. 161 at 7; No. 189 at 4–5; No. 190 at 11).

The court finds and concludes on the present record that the plaintiffs have demonstrated a clear likelihood of success on the merits of their allegations.  Based on the Pretrial Services monthly and annual public reports, the court finds and concludes that the County Judges know that Harris County detains over 40 percent of all misdemeanor defendants until the disposition of their cases.[99] The County Judges know that Hearing Officers deny Pretrial Services recommendations for release on unsecured and nonfinancial conditions around 67 percent of the time.[100]  They know that Hearing Officers deviate from the bail schedule—up or down—only about 10 percent of the time.[101]  The County Judges understand—because all but one of them share the same view—that what Hearing

---

[98]   The defendants argue that the plaintiffs have shifted their grounds between their amended complaint and the evidence and arguments presented at the preliminary injunction hearing. *See, e.g.*, Hearing Tr. 8-2:36–37; (Docket Entry No. 260 at 9; No. 266 at 2–3).  The argument is overstated.  The plaintiffs have not altered their essential claims—that Harris County's policies violate the Equal Protection and Due Process Clauses—or the relief they seek—a preliminary injunction to restrain those violations.  All parties had ample notice of the issues raised in the briefing, including the plaintiffs' argument that if Harris County judges were in fact "considering" misdemeanor defendants' ability to pay but setting secured financial conditions of release beyond the defendants' ability to pay, such policies, customs, and practices amounted to invalid pretrial detention orders under the Equal Protection and Due Process Clauses.  (*See* Docket Entry No. 143 at 9).  The court permitted all parties ample opportunity to conduct discovery and revise and rebut expert reports over the course of the eight-day hearing, with a week-long recess in between sessions.  What has changed since the plaintiffs' amended complaint is not the plaintiffs' essential legal theories, but the factual evidence produced at trial.  Under Rule 15(b), pleadings may be freely amended to conform to the evidence at trial.  FED. R. CIV. PRO. 15(b)(1)–(2).  The defendants' argument is without merit.

[99]   *See* Part I.D.5 *supra*.  *Cf. Peterson*, 237 F.3d at 579 (twenty-seven incidents of excessive force "do not suggest a pattern so common and well-settled as to constitute a custom that fairly represents municipal policy" (internal quotation marks and citation omitted).  The evidence here shows tens of thousands of constitutional violations.

[100]   *See* Part I.D.3 *supra*.

[101]   *See id*.

Officers mean when they say they "consider" an arrestee's ability to pay is that they disregard inability to pay if any other factor in the arrestee's background provides a purported basis to confirm the prescheduled bail amount and set it on a secured basis.[102]  Harris County's Director of Pretrial Services testified that there is an "[u]nwritten custom" to deny all homeless arrestees release on unsecured or nonfinancial conditions.  The County Judges know that Pretrial Services and the Hearing Officers treat homeless defendants' risk of nonappearance as a basis to detain them on a secured financial condition of release they cannot pay.[103]  Hearing Tr. 4-1:43–44. The County Judges testified that they could change these customs and practices legislatively in their Rules of Court, but that they choose not to.  Hearing Tr. 5:49–50, 150–51.

These legislative rulemaking choices are not required by Texas law.  The Texas Code of Criminal Procedure makes ability to pay one of five factors to consider in setting the bail amount, but the Code does not require bail to be set on a secured basis and does not require that the five factors be used to decide whether to set bail on a secured basis.  *See* TEX. CODE CRIM. PRO. art. 17.01, 17.15.  The parties agreed that in County Court No. 16, Judge Jordan follows a different practice.[104]  Judge Jordan does not set bail on a secured basis if it would operate to detain an indigent misdemeanor defendant.  If a defendant has the means to pay some bail on a secured basis, Judge Jordan considers the five factors to set bail within an amount the defendant can pay.  If a defendant cannot pay a financial condition up front, Judge Jordan considers the five factors, sets the bail amount on an unsecured basis, and orders nonfinancial conditions of pretrial supervision to release

---

[102]  *See* Part I.D.6 *supra*.

[103]  *See id*.

[104]  *See* Part I.D.4 *supra*.

the defendant while addressing the defendant's risk of nonappearance or of new criminal activity.[105]

Judge Jordan's judicial practice is consistent with Texas law and, when done timely, is consistent with equal protection and due process. But as a legislative body that votes to enact policy by a two-thirds majority, the County Judges knowingly acquiesce in and ratify customs and practices so consistent and widespread as to have the force of a policy. That policy is to detain misdemeanor defendants before trial who are otherwise eligible for release, but whose indigence makes them unable to pay secured financial conditions of release.

This policy is not narrowly tailored to meet the County's compelling interest in having misdemeanor defendants appear for hearings or refrain from new criminal activity before trial. Even applying the less stringent standard of intermediate scrutiny, the present record does not show that rates of court appearance or of law-abiding behavior before trial would be lower absent the use of secured money bail against misdemeanor defendants. *See Lauder*, 751 F.Supp.2d at 933 (under intermediate scrutiny, "the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation") (internal quotations marks and citation omitted). Recent rigorous, peer-reviewed studies have found no link between financial conditions of release and appearance at trial or law-abiding behavior before trial.[106] Harris County policymakers have not attempted to collect, much less review, the County's own data to determine whether secured financial conditions of release work better in Harris County than unsecured or nonfinancial conditions.[107] That lack of inquiry is one indication

---

[105] *See id*.

[106] *See* Part I.F *supra*.

[107] *See* Part I.E.5 *supra*.

the policy is not narrowly tailored.  The other indication is that both parties' experts evaluated Harris County's data and found no significant difference in appearances at hearings or in new arrests between misdemeanor defendants released on secured money bail and those released on unsecured personal bonds.[108]

To be sure, requiring secured money bail for misdemeanor defendants does not run afoul of equal protection principles when those defendants are actually released.  If two defendants take advantage of similarly timed opportunities for pretrial release on secured money bail, the fact that it may be harder for one to come up with the money than the other does not create a suspect classification between the two and does not trigger heightened scrutiny.  *See San Antonio Sch. Dist*, 411 U.S. at 23–24.  But when a secured financial condition of release works an absolute deprivation of pretrial liberty because a defendant is indigent or so impecunious that he or she cannot pay even a bondsman's premium required for release, the County must show that requiring a secured money bail is at least more effective than a less restrictive alternative at meeting the County's interests, even if it is not the least restrictive means to do so.  *See id*. at 20–22; *Bearden*, 461 U.S. at 672.

Based on the present record, the court finds and concludes that, as a matter of law, Harris County cannot make this showing.  The cases in which the government is able to show no reasonable less restrictive alternative to detaining an indigent defendant by imposing a secured money bail all involve charges for serious felonies that carry lengthy potential sentences.  The Harris County Criminal Courts at Law have jurisdiction only over misdemeanor cases.  The plaintiffs were charged only with misdemeanor offenses and have no pending felony charges.  Texas law forbids pretrial preventive detention of misdemeanor arrestees in all but one category of cases—those who are

---

[108]  *See id*.

arrested on family violence charges and who have violated a prior family violence protective order while released before trial. In that narrow category, the State provides enhanced procedures to protect the defendant's liberty interests. *See* TEX. CONST. art. 1, §§ 11b–11c; TEX. CODE CRIM. PRO. art. 17.29–292. Outside that category, Texas law does not distinguish among misdemeanor arrestees in terms of their eligibility for pretrial release. Hearing Officers recognize this approach whenever they permit release on secured money bail. A defendant who can pay is released regardless of risk. Once deemed eligible for release, indigent misdemeanor defendants who cannot pay the secured financial condition of release cannot be detained on that basis without a hearing and judicial findings on the record that no other reasonable alternative is available. In Harris County misdemeanor cases, reasonable alternatives to continued detention are readily available for indigent defendants unable to pay a secured money bail. Those alternatives include reducing the bail amount, as Judge Jordan does, imposing unsecured money bail, or releasing on nonfinancial conditions of pretrial supervision. Hearing Tr. 3-1:62–66.

Harris County is not liable for the individual adjudications of its Hearing Officers and County Judges in specific cases, even if those orders detain indigent arrestees because these cannot pay secured money bail. *See Johnson*, 958 F.2d at 94. But the County is liable for the legislative and administrative policies of its County Judges who knowingly or with reckless indifference acquiesce in and ratify a custom and practice that achieves pretrial preventive detention on secured financial conditions that defendants cannot pay in over 40 percent of all Harris County misdemeanor cases. *See ODonnell*, 2016 WL 7337549 at *27, 34–35. The court concludes that the plaintiffs are likely to succeed in proving that the County has a policy of violating equal protection by detaining indigent misdemeanor arrestees before trial.

### c.      The County Judges' Policies and Customs: Due Process

Due process requires: (1) notice that the financial and other resource information Pretrial Services officers collect is for the purpose of determining a misdemeanor arrestee's eligibility for release or detention; (2) a hearing at which the arrestee has an opportunity to be heard and to present evidence; (3) an impartial decisionmaker; (4) a written statement by the factfinder as to the evidence relied on to find that a secured financial condition is the only reasonable way to assure the arrestee's appearance at hearings and law-abiding behavior before trial; and (5) timely proceedings within 24 hours of arrest.[109]  (Docket Entry No. 286 at 12-13, 16).

The court concludes that the plaintiffs are likely to succeed on at least parts of their due process claim.  Of the requirements listed above, Harris County meets only one at the probable cause and bail-setting hearing: an impartial decisionmaker.  The County usually provides the hearing within 24 hours, but 20 percent of misdemeanor defendants who remain detained until the hearing wait longer than 24 hours for that hearing.[110]  The record evidence shows that misdemeanor defendants are sometimes confused about the financial and other resource information they are asked to provide and how it will affect their eligibility for release,[111] and Hearing Officers do not make written findings or give reasons for their decisions.[112]

The rule requiring a Next Business Day Setting before a County Judge recently came into effect.  *See* Rules of Court 4.3.1.  Depending on the timing of arrest and booking, this first

---

[109]  *See* Part II.B.2.b *supra*.

[110]  *See* Part I.E.1 *supra*.

[111]  *See* Part I.D.2 *supra*.

[112]  *See* Part I.D.3 *supra*.

appearance may occur within 24 hours after arrest, but the record does not indicate how often that happens.  Harris County's former court administrator testified that the Next Business Day setting is not a rule change, but a codification of prior practice.[113]  The record shows that the practice is for County Judges to routinely deny reductions in the bail amount and to refuse release on unsecured financial conditions in more than 99 percent of cases.[114]  The record does not show written findings made by County Judges explaining why money bail must be imposed on a secured basis in any specific case.

Except for the Texas Code requirement that misdemeanor defendants be released 24 hours after arrest if probable cause has not been found, the timing of County procedures is regulated by the County Judges' Rules of Court promulgated by the County Judges in their legislative capacity.  *See* TEX. CODE CRIM. PRO. art. 17.033.  The record evidence shows that thousands of misdemeanor defendants each year are detained longer than 24 hours before they have a bail-setting hearing.[115]  Instead of releasing defendants who have not had a probable cause hearing within 24 hours, the County follows an unwritten policy of determining probable cause in absentia, using only the charging papers.  The Harris County judicial officers agreed that bail is not meaningfully considered at these in absentia hearings.[116]

The court concludes that Harris County does not provide due process for indigent or impecunious misdemeanor defendants it detains for their inability to pay a secured financial

---

[113]  *See id.*

[114]  *See* Part I.E.2 *supra.*

[115]  *See* Part I.E.1 *supra.*

[116]  *See* Part I.D.2, I.E.1 *supra.*

condition of release.  Those who cannot pay the secured money bail set at the probable cause hearing before a Hearing Officer must wait days, sometimes weeks, before a County Judge provides a meaningful hearing to review the bail determination.[117]  Harris County is liable for the County Judges' policies issued in their legislative or rulemaking capacities that result in systemwide delays in any meaningful determination of the conditions for release.

If the County complied with equal protection requirements, part of the plaintiffs' concerns about due process would be mitigated.  If Hearing Officers, as they are supposed to do under the *Roberson* order, tailored nonfinancial release conditions to address through supervision each defendant's risk of nonappearance or new criminal activity, and then released those defendants, the need to present evidence and make written findings about financial conditions would be less urgent. Hearing Officers do not need to issue reasoned opinions explaining their decision to detain someone using secured money bail if the Officers cannot use secured money bail to detain indigent defendants in the first place.

### d.    The Sheriff's Policies under Equal Protection and Due Process

"The sheriff's acquiescence in unsound and legally insufficient procedures effectively create[s] a county policy for which the county is liable" under § 1983.  *Doe v. Angelina County*, 733 F.Supp. 245, 257 (E.D. Tex 1990).  Whether a sheriff's deliberate indifference gives rise to liability for a municipal policy, including an unconstitutional custom or practice, is determined by "an

---

[117]  Because it can take days or weeks for misdemeanor defendants to receive a formal adversarial hearing with the opportunity to present evidence and receive a reasoned opinion with findings on the record, this case is not, as the defendants argue, meaningfully different from other cases finding due process violations in the timing of bail settings and bail review.  *See Walker*, 2016 WL 361612 (weekly bail hearings); *Cooper*, 2015 WL 10013003 at *1 (detention "for as long as a week" before meaningful bail hearing); *Snow*, No. 15-567 (M.D. La. 2016) (detention up to five days before a meaningful bail hearing); *Jones*, 2015 WL 5387219 (weekly bail hearings); *Thompson*, No. 15-182 (S.D. Miss. 2015) (weekly bail hearings); *Pierce*, No. 15-570 (E.D. Mo. 2015) (detention for three days awaiting a bail hearing).

objective [standard]; it considers not only what the policymaker actually knew, but what he should have known, given the facts and circumstances surrounding the official policy and its impact on the plaintiff's rights." *De Luna v. Hidalgo County*, 853 F.Supp.2d 623, 641 (S.D. Tex. 2012) (quoting *Lawson v. Dallas County*, 286 F.3d 257, 264 (5th Cir. 2002)); *see also Dodds v. Logan County Sheriff's Dept*, Civil No. 8-333, 2009 WL 8747487 (W.D. Okla. Aug. 3, 2009) (the sheriff was liable for his "deliberate indifference to the due process rights of arrestees whose bail had been pre-set" by acquiescing in a policy set by the local judges); *Blumel v. Mylander*, 954 F.Supp. 1547, 1557 (M.D. Fla. 1997) (a sheriff and jailer were liable for violating the right to pretrial release after 48 hours from arrest with no probable cause finding when they were "actually and constructively aware" that the 48-hour requirement had been exceeded).

In its Memorandum and Opinion on the County's motion to dismiss, the court held that under Fifth Circuit case law, a Texas county may be liable for its sheriff's policies of detaining arrestees and enforcing orders the sheriff knows or should reasonably know are unconstitutional. *ODonnell*, 2016 WL 7337549 at *30–31. At the hearing on the plaintiffs' application for a preliminary injunction, the Harris County Sheriff testified that he knows that every day, misdemeanor arrestees who would be released if they could pay a secured financial condition of release are detained in the Harris County Jail solely because poverty prevents them from paying. Hearing Tr. 3-2:8–9, 18–19, 22–24. A major from the Sheriff's Office testified about the delays in presenting arrestees at their probable cause hearings and confirmed that in many cases of arrest by the City of Houston Police Department, the Harris County Sheriff may not even take custody of arrestees within 24 hours and does not present those arrestees at probable cause and bail-setting hearings within 24 hours. *Id*. at 3-2:64, 67–71, 83. In his declaration, Sheriff Gonzalez stated that "[i]ndividuals should not be held

170

in our Harris County jail just because they cannot pay an amount of money set according to an arbitrary schedule.  In my view, this practice violates the U.S. Constitution."  Pls. Ex. 7(r) at 2.

The Sheriff's detention of misdemeanor defendants while knowing: (1) that the misdemeanor defendants are detained because their indigence prevents them from paying secured money bail to obtain release, and (2) that this practice violates equal protection and due process principles, is a policy choice the Sheriff makes on Harris County's behalf.  That policy is not narrowly tailored to meet the County's compelling interests in ensuring misdemeanor defendants' court appearances and law-abiding conduct before trial.  The plaintiffs have demonstrated a clear likelihood of success on the merits of their claim that the Sheriff, as a County policymaker, knowingly detains misdemeanor defendants on constitutionally invalid bases.

### 4.    Judicial Conduct that Violates Constitutional Requirements

Section 1983 does not permit injunctive relief against judicial officers acting in a judicial capacity unless either: (1) they violate a declaratory decree; or (2) declaratory relief is unavailable. 42 U.S.C. § 1983.  Declaratory relief is available in this case; preliminary injunctive relief is not.[118] *See, e.g.*, *MacPherson v. Town of Southampton*, 664 F.Supp.2d 203, 211–12 (E.D.N.Y. 2009) ("Plaintiffs cannot allege that declaratory relief is unavailable because Plaintiffs can, and indeed have, pursued a claim seeking a declaration"); *Besaro Mobile Home Park, LLC v. City of Fremont*,

---

[118] In *Family Trust Foundation of Ky., Inc. v. Volnietzek*, 345 F.Supp.2d 672 (E.D. Ky. 2004), the court granted preliminary injunctive relief against judicial officers on the reasoning that declaratory relief was "unavailable" until after a trial on the merits.  *Id*. at 682, 689.  *Family Trust* involved a claim for relief against an ethical provision in a state code of judicial conduct.  *Id*. at 676–77.  The court assumed the rule was enforced in a judicial capacity for the purpose of § 1983, but out-of-court conduct by judicial officers is clearly different from the in-court adjudications that are at issue in this case.  A merely temporal unavailability of declaratory relief in this case would defeat Congress's purpose in amending § 1983 to prohibit injunctive relief against judges except in extraordinary cases of recalcitrance against clearly defined court declarations.  *See* S. Rep. No. 104-66 at 36–37 (1996) ("[t]his section restores the doctrine of judicial immunity to the status is occupied prior to the Supreme Court's decision" in *Pulliam v. Allen*, 466 U.S. 522 (1984)).

Civil No. 10-478, 2010 WL 2991592 at *2 (N.D. Cal. July 29, 2010) (declaratory relief is unavailable when as a matter of law no cause of action for declaratory relief is provided by statute). The record evidence shows that in individual adjudications, Harris County Hearing Officers and County Judges set secured financial conditions of release in order to detain misdemeanor defendants before trial. These de facto orders of pretrial preventive detention operate only against indigent misdemeanor defendants who are unable to pay the financial condition. The minimum due process protections required to issue a pretrial detention order are not provided in these hearings. The plaintiffs have demonstrated a clear likelihood of success on their claims for declaratory relief, but a preliminary injunction against the judicial officers in their judicial capacity is not available.

### 5.    Conclusion on Likelihood of Success on the Merits

Harris County is liable for the unconstitutional acts of the County Judges when they act as final policymakers in their legislative and administrative capacities. The County Judges are final policymakers who administratively direct Pretrial Services to gather information on misdemeanor arrestees and to present the information to the Hearing Officers. As a legislative and administrative body, the County Judges sitting en banc knowingly acquiesce in and ratify customs and practices so consistent and widespread as to have the force of policy. These policies systematically detain misdemeanor defendants who are otherwise eligible for release before trial but whose indigence makes them unable to pay a secured financial condition of release. These de facto detention orders are not narrowly tailored to meet a compelling government interest. The evidence shows that secured financial conditions of release are not more effective at meeting the County's interests than unsecured or nonfinancial conditions of release in misdemeanor cases. Instead, secured money bail operates to detain the impoverished while releasing those able to pay. This liberty deprivation based

172

on wealth violates the Equal Protection Clause.

Harris County does not provide misdemeanor defendants notice of the significance of the financial information they are asked to give in order to even be considered for release from pretrial detention on unsecured or nonfinancial conditions. Harris County does not provide timely hearings at which misdemeanor defendants can be heard, can present evidence of their inability to pay, or can receive reasoned opinions with written findings on why a secured financial condition of release, and not a less restrictive condition, is the only reasonable means to assure their appearance at trial or law-abiding conduct before trial. The lack of adequate procedures violates the Due Process Clause.

Harris County is also liable for the unconstitutional acts of its Sheriff when he acts as a final policymaker for, and administrator of, the Harris County Jail. The Sheriff's policy and practice of detaining misdemeanor defendants knowing that they are eligible for release, but are detained on secured money bail, is not narrowly tailored to meet the County's compelling interests in assuring misdemeanor defendants' appearance at trial and law-abiding conduct before trial.

The plaintiffs have demonstrated a clear likelihood of success on the merits of their equal protection and due process claims against Harris County. That showing weighs heavily in favor of granting the requested preliminary injunctive relief.[119] *See Rodriguez v. Providence Comm. Corr., Inc.*, 155 F.Supp.3d 758, 771 (M.D. Tenn. 2015), *appeal dismissed*, No. 16-5057 (6th Cir. Mar. 15,

---

[119] The County Judge defendants summarily re-urge all of their arguments from their motion to dismiss. (Docket Entry No. 166 at 8 n.9, 25 n.26). The court denied the motion to dismiss on grounds of *Younger* abstention, the plaintiffs' standing, and the identification of municipal policymakers with prejudice. *ODonnell*, 2016 WL 7337549 at *39. The County Judges' arguments fail for all the reasons identified in the court's Memorandum and Opinion on the motion to dismiss. In particular, the defendants' claim that the plaintiffs have adequate remedies at law—both for purposes of *Younger* abstention as well as for irreparable injury analysis—is denied because "the adequacy of a timely hearing[] is precisely what the plaintiffs are challenging in this case." *ODonnell*, 2016 WL 7337549 at *20. "*Gerstein* stands for the principle that when it comes to the adequacy of the state court proceedings as an opportunity to address constitutional harms, the opportunity must be available *before* the harm is inflicted." *Rodriguez*, 155 F.Supp.3d at 766 (citing *Gerstein*, 420 U.S. at 107 n.9).

2016) ; *Walker*, 2016 WL 361612 at \*14, *rev'd on other grounds*, — F.App'x —, 2017 WL 929750;

*see also Jones*, 2015 WL 5387219; *Cooper*, Civil No. 15-425 (M.D. Ala. June 18, 2015); *Pierce*,

Civil No. 15-570 (E.D. Mo. June 3, 2015); *Thompson*, Civil No. 15-182 (S.D. Miss. Nov. 6, 2015).

## C.     Irreparable Injury

"When an alleged deprivation of a constitutional right is involved, . . . most courts hold that

no further showing of irreparable injury is necessary." 11A WRIGHT & MILLER, FEDERAL PRACTICE

& PROCEDURE, § 2948.1 (3d ed. 1998).   The plaintiffs have shown that Harris County detains

misdemeanor defendants who are otherwise eligible for release because they cannot pay the secured

financial condition necessary for release.   Both the Harris County Sheriff and a County Judge

credibly testified that without an injunction from this court, Harris County's policies, practices, and

customs will continue and misdemeanor defendants will be unnecessarily incarcerated.   Hearing

Tr. 3-1:52–53; 3-2:22–24. The incarceration deprives misdemeanor defendants of their state-created

liberty interest.   "Freedom from imprisonment—from government custody, detention, and other

forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."

*Zadvydas v. Davis*, 533 U.S. 678, 690 (2001); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)

("Freedom from bodily restraint has always been at the core of the liberty protected by the Due

Process Clause from arbitrary governmental action.").

The record evidence shows that the plaintiffs' injury is irreparable.   Misdemeanor defendants

detained before trial face significant pressure to plead guilty, and in fact do so at much higher rates

than those released before trial, in order to obtain release.[120]   Pretrial detention of misdemeanor

defendants, for even a few days, increases the chance of conviction and of nonappearance or new

---

[120]   *See* Part I.D.5 *supra*.

criminal activity during release.[121]  Cumulative disadvantages mount for already impoverished misdemeanor defendants who cannot show up to work, maintain their housing arrangements, or help their families because they are detained.[122]  This factor weighs strongly in favor of granting the plaintiffs' request for the injunctive relief.  *See also Rodriguez*, 155 F.Supp.3d at 771 (irreparable harm from jailing probationers on secured money bonds for probation violations supported injunction); *Walker*, 2016 WL 361612 at *14 (irreparable harm from jailing a misdemeanor defendant "simply because he could not afford to post money bail"), *rev'd on other grounds*, — F.App'x —, 2017 WL 929750.

### D.    Balancing the Harms

Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Village of Gambell, AK*, 480 U.S. 531, 542 (1987).  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982) (citation omitted).

The defendants argue that proposed reforms expected to be implemented by July 1, 2017 will adequately address the plaintiffs' injuries and that a court order could disrupt implementing these reforms.  (Docket Entry No. 166 at 17–23); Hearing Tr. 8-2:25–26.  The defendants note that they have been working on the reforms for eighteen months.  The reforms require a bottom-up "buy-in" from Harris County's "various criminal justice stakeholders" to be successful, not a top-down order

---

[121]  *See* Part I.F *supra*.

[122]  *See id*.

imposed from outside.[123]  (Docket Entry No. 166 at 17–18); Hearing Tr. 8-2:95.

Harris County's adoption of the Arnold Tool and other reforms are commendable.[124]  But, as noted above, the reforms will not address the plaintiffs' allegations that Harris County imposes secured financial conditions of release to detain indigent misdemeanor defendants who cannot pay, despite Texas state-law prohibitions of pretrial detention orders for all but one narrow category of misdemeanor defendants.[125]  The use of bail to detain, rather than release, misdemeanor defendants based on their poverty is not just a possibility under the new system; it is Harris County's stated policy purpose to use secured money bail to detain "high-risk" defendants, an as yet undefined category.[126]

The record evidence also calls into question the extent to which the forthcoming reforms will remedy the County's due process violations.  The Harris County Sheriff and one County Judge testified that counseled hearings are unlikely to change the Hearing Officers' practice and custom of ordering indigent misdemeanor defendants to pay secured money bail, knowing that the orders operate as de facto pretrial detention orders.  Hearing Tr. 3-1:113–14, 3-2:22.  The record evidence shows that despite changing the County Rules of Court to presume release on personal bonds is appropriate in twelve offense categories, Hearing Officers and County Judges continue to detain misdemeanor defendants, including the indigent, at the same rate as they did in the two years before

---

[123]  Among the Harris County criminal justice stakeholders the defendants list the Public Defender's Office, the District Attorney's Office, the County Attorney's Office, the District Court Judges, the County Judges, the Sheriff's Office, the Houston Police Department, and the County Budget Office.  (Docket Entry No. 166 at 22).

[124]  *See* Part I.H *supra*.

[125]  *See id*.

[126]  *See* Part 1.H.1 *supra*.

the rule change.[127]   Hearing Officers and County Judges reject the recommendations the Pretrial Services officers make using the County's current validated risk-assessment tool to release misdemeanor defendants on unsecured personal bonds about 67 percent of the time.[128]   The reformed system will permit Hearing Officers and County Judges to continue rejecting the recommendations that result from the County's new validated Arnold Risk-Assessment Tool at the same rate.[129]   Although the new inmate-processing center may help the County to provide bail-setting hearings in 24 hours after arrests for more, or even all, misdemeanor defendants, the center will not be complete until March 2018.[130]

The court does not intend or want to interfere with the laudable reforms that will improve the fairness of the County's pretrial arrest system.   The proposed reforms will not take effect for months. The present system will continue during that time, detaining over 100 misdemeanor defendants every day in the Harris County Jail, defendants who are eligible for release but whose indigence makes them unable to pay a secured financial condition of release.   The record shows that after July 1 (or the date the reforms are in fact implemented), the County's system will not remedy the constitutional infirmities of its current policies.   The County Judges suggest that the court should "craft any relief to work in conjunction with these new changes, rather than . . . wholly enjoining the present system." (Docket Entry No. 166 at 28).   That is the better approach.   With carefully tailored relief, the balance of the harms between granting or denying a preliminary injunction strongly favors the plaintiffs.

---

[127]   *See* Part I.E.3 *supra*.

[128]   *See* Part I.H.1 *supra*.

[129]   *See id*.

[130]   *See* Part I.H.2 *supra*.

### E.    The Public Interest

"It is always in the public interest to prevent the violation of a party's constitutional rights."

*Simms v. District of Columbia*, 872 F.Supp.2d 90, 105 (D.D.C. 2012) (collecting cases).   In an

amicus brief, the Harris County District Attorney emphasizes that "[h]olding un-adjudicated

misdemeanor offenders in the Harris County Jail solely because they lack the money or other means

of posting bail is counterproductive to the goal of seeing that justice is done. . . .   It makes no sense

to spend public funds to house misdemeanor offenders in a high-security penal facility when the

crimes themselves may not merit jail time."   (Docket Entry No. 2016 at 1–2).   The court agrees.

Texas state law treats misdemeanor defendants, with one narrow exception, as eligible for pretrial

release.   The public interest is not served by incarcerating misdemeanor defendants who, because

of poverty, are unable to pay secured money bail.   This factor weighs strongly in favor of granting

the plaintiffs' request for relief.

### F.    Bond

A federal court may waive the bond requirement.   FED. R. CIV. PRO. 65(c); *City of Atlanta

v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981); *Corrigan

Dispatch Co. v. Casaguzman, F.A.*, 569 F.2d 300, 303 (5th Cir.1978).   The court finds that waiving

the bond is appropriate in this case; the plaintiffs are indigent, *see Wayne Chem., Inc. v. Columbus

Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977), and the plaintiffs have brought this suit to

enforce constitutional rights, *see City of Atlanta*, 636 F.2d at 1094.   No bond is imposed.

## III.   Remedy

"In view of the fact that plaintiffs established a constitutional violation, . . . the task of

fashioning a proper remedy is one that should be performed by the District Court after all interested

178

parties have had an opportunity to be heard.  The judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at large." *Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 309 n.22 (1986); *see also Swamm v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15–16 (1971); *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974).  "Every order granting an injunction . . . must: (A) state the reasons why it issued; (B) state its terms specifically; and (C), describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." FED. R. CIV. P. 65(d)(1). "Rule 65 protects those who are enjoined by informing them of . . . exactly what conduct is proscribed and ensures informed and intelligent appellate review." *Walker*, 2017 WL 929750 at *2 (internal quotation marks and citation omitted; alteration in original); *see also Hornbeck Offshore Serv., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).  The court has explained in detail its reasons for issuing preliminary injunctive relief.  Several principles inform and guide the court in exercising its discretion and adhering to the record evidence and the law to fashion a suitable remedy.

First, because the plaintiffs have not alleged the facial unconstitutionality of Texas statutes or the County Rules of Court, the court will not require relief that is inconsistent with Texas law or the County Rules as written.  (*See* Docket Entry No. 145 at 7; No. 288 at 10–11).  Both Texas law and the County Rules provide for setting money bail in specific amounts, but neither requires that money bail be set in misdemeanor cases on a secured, rather than unsecured, basis.[131]  Using a bail schedule is not inherently unconstitutional.  *See Fields*, 701 F.3d at 184; *Terrell*, 481 F.Supp.2d at 766–67.  The constitutional problem in this case arises from rigid adherence to imposing secured

---

[131]  *See* Part II.B.2.b *supra*.

money bail when that will obviously result in, and is often intended to effect, pretrial detention of indigent defendants charged only with misdemeanors who are eligible for release under Texas law.

Second, the court does not enjoin judicial officers acting in a judicial capacity, as prohibited by 42 U.S.C. § 1983.  The County Judges argue that they are immune from an injunction in their legislative capacity as well.  (Docket Entry No. 166 at 15 n.20).  The court rejected that argument in its Memorandum and Opinion on the County Judges' motion to dismiss.  *ODonnell*, 2016 WL 7337549 at *36.  Nevertheless, the only relief against the County Judges in their legislative capacity required at this time is that they do not legislate policy that contradicts this court's order.

Third, as much as possible, the court avoids interfering with the salutary reforms the County is proposing to implement by July 2017.  The court has worked with the parties' briefs and arguments as guidance in fashioning relief that is consistent with, and can be implemented alongside, the proposed reforms.  Additionally, the court will provide the County over fourteen days from the date of the Order of Preliminary Injunction to implement the ordered relief.

Fourth, the relief must be effective to address the serious constitutional violations proven at the motion hearing.  The defendants propose that the court should substantially repeat the *Roberson* order and require the Hearing Officers to "consider[] an arrestee's ability to pay if they impose secured bail." (Docket Entry No. 259 at 3).  That approach appears to enjoin judicial officers acting in judicial capacities, contrary to 42 U.S.C. § 1983.  The approach would also permit Harris County to continue imposing secured money bail in order to detain indigent misdemeanor defendants who, if they could pay, would be released.  These bail orders operate as de facto orders of pretrial preventive detention, without the procedures due process requires and in violation of equal protection.  Adequate relief requires that those eligible for release before trial under state and federal

law are released and not detained because their indigence makes them unable to pay a secured financial condition required for release.

Fifth, while relief must be effective, it must also balance the competing interests. The plaintiffs contend that no amount of differential treatment is tolerable under the Equal Protection Clause and that indigent misdemeanor arrestees must be released at substantially the same time as those who are able to pay secured money bail. (*See* Docket Entry No. 257, Ex. 1 at 1, 4). Various parties also suggest changing the timeline of the arrest process. The County Judges argue that the Sheriff should be compelled to book misdemeanor arrestees at the County Jail within 18 hours of their arrest. (Docket Entry No. 259 at 3). The plaintiffs suggest various limits on sobriety periods and on the time it takes to process misdemeanor arrestees when they bond out of jail. (Docket Entry No. 257, Ex. 1 at 4–5). The parties did not provide detail on how to set and implement the precise timing and speed of various procedures. Those questions are more appropriately resolved at the trial on the merits.

With these principles in mind, the court will order the following relief, to take effect by May 15, 2017, unless those enjoined move for more time and show good cause for a reasonable, brief extension. Any motions for extension will be set for prompt hearing and resolution.

- Harris County and its policymakers—the County Judges in their legislative and rulemaking capacity and the Harris County Sheriff in his law-enforcement capacity—are enjoined from detaining indigent misdemeanor defendants who are otherwise eligible for release but are unable because of their poverty to pay a secured money bail.

- Pretrial Services officers, as County employees and subject to its policies, must verify an arrestee's ability to pay a secured financial condition of release by an affidavit, and must

explain to arrestees the nature and significance of the verification process.

• The purpose of the explanation is to provide the notice due process requires that a misdemeanor defendant's right to liberty before trial is at stake in the proceedings. Pretrial Services may administer either the form of the affidavit currently used to determine eligibility for appointed counsel or the adapted form that Dr. VanNostrand testified is being prepared for Pretrial Services to be administered by July 1, 2017. *See* Hearing Tr. 6-1:136; *see also id*. at 4-1:48–49. Pretrial Services must deliver completed affidavits to the Harris County Sheriff's Office before a declarant's probable cause hearing.

• The affidavit must give the misdemeanor arrestee sufficient opportunity to declare under penalty of perjury, after the significance of the information has been explained, the maximum amount of financial security the arrestee would be able to post or pay up front within 24 hours of arrest. The question is neither the arrestee's immediate ability to pay with cash on hand, nor what assets the arrestee could eventually produce after a period of pretrial detention. The question is what amount the arrestee could reasonably pay within 24 hours of his or her arrest, from any source, including the contributions of family and friends.

• The purpose of this requirement is to provide a better, easier, and faster way to get the information needed to determine a misdemeanor defendant's ability to pay. The Hearing Officers and County Judges testified that they presently do not know who has the ability to pay. Hearing Tr. 4-1:141; 4-2:16; 5:72. The requirement is for a form of verification that Harris County already uses to determine who is indigent and therefore eligible for appointed counsel. Hearing Tr. 2-1:60–61. The affidavit can be completed within 24 hours after arrest; the current process of verifying references by phone extends for days after arrest. (*See*

182

Docket Entry No. 166 at 10 n.13).

- The court does not order relief against the Hearing Officers or against the County Judges in their judicial capacities.  The court does not order relief against the County Judges or Sheriff in their capacities as state actors, except that they may not legislate policies that directly conflict with this court's order.

- Misdemeanor defendants who are not subject to: (1) formal holds preventing their release from detention; (2) pending mental-health evaluations to determine competency; or (3) pretrial preventive detention orders for violating a condition of release for a crime of family violence, have a constitutionally protected state-created liberty interest in release before trial.  If a misdemeanor defendant has executed an affidavit showing an inability to pay secured money bail and the Hearing Officer does not order release either: (1) on an unsecured personal bond with nonfinancial conditions of release; or (2) on a secured money bond for which the defendant could pay a commercial surety's premium, as indicated on the affidavit, then the Harris County Sheriff must treat the financial condition as unsecured and release the misdemeanor defendant promptly after the probable cause hearing.   All nonfinancial conditions of release ordered by the Hearing Officers, including protective orders, drug testing, alcohol intake ignition locks, or GPS monitoring, will remain in effect. The bail amount determined by the Hearing Officer will remain the bail required of the misdemeanor defendant, but the Sheriff must require it on an unsecured, rather than a secured, basis.  An indigent defendant's inability to pay  secured money bail cannot be the basis for the Sheriff to continue to detain that defendant.

- The purpose of this requirement is to provide timely protection for the state-created liberty

interest in pretrial release and to prevent the pretrial detention of a misdemeanor defendant on a financial condition when that defendant would be able to obtain release by paying but is unable to do so.  By "promptly," the court means on the same time frame of release that a defendant who paid a secured money bail would receive.

- The Sheriff must release on unsecured or nonfinancial conditions misdemeanor defendants identified above—those without holds preventing prompt release; pending competency evaluations; or preventive family violence detention orders—who have not had a bail-setting hearing before a Hearing Officer within 24 hours of arrest.  In absentia hearings "on the papers" will not satisfy this requirement.  If the City of Houston Police Department has detained a misdemeanor defendant more than 24 hours after arrest, the Sheriff must promptly release the defendant on unsecured or nonfinancial conditions when he takes custody of the defendant, on the same time frame and procedures as if the defendant had paid a secured financial condition of release.  The bail amount set by Assistant District Attorneys according to the County Judges' bail schedule will remain the bail required of the misdemeanor defendant, but the Sheriff must require it on an unsecured, rather than a secured, basis.

- The purpose of this requirement is to give timely protection to the state-created liberty interest in release before trial and to enforce state and federal standards holding that, in Harris County, 24 hours is the outer boundary for completing the administrative incidents to arrest in misdemeanor cases.  *Sanders*, 543 F.Supp. at 704; *Roberson*, Agreed Final Judgment, No. 84-2974 at 1.  The 24-hour requirement is particularly intended to address the endemic problem of misdemeanor arrestees being detained until case disposition and pleading guilty to secure faster release from pretrial detention.

184

- The Sheriff may not alter nonfinancial conditions of release ordered by Harris County judicial officers. The Sheriff may not alter the bail amount determined by Harris County judicial officers. The only determination the Sheriff must make under this order is the decision to require bail on a secured or unsecured basis. The decision is an objective one. If the misdemeanor defendant's affidavit shows that the defendant is unable pay the bail up front or pay a bondman's premium for the principal sum required by the Hearing Officers, the Sheriff must require the bail amount, but on an unsecured basis. The Sheriff may release misdemeanor defendants on an unsecured bond without a Hearing Officer's signature on the release order. The Sheriff's acceptance of bail on an unsecured basis accords with his authority to accept bail and release misdemeanor defendants under Article 17.20 of the Texas Code of Criminal Procedure.[132]

- Texas law provides a significant role for sheriffs in setting and taking bail in misdemeanor cases. Sheriffs ordinarily defer to magistrates in setting bail, unless "no magistrate is available." *Hokr*, 545 S.W.2d at 463. And a sheriff executes "legal process which it is made his duty by law to execute." TEX. CODE CRIM. PRO. art. 2.16; *see also* TEX. LOCAL GOV'T CODE § 85.021. The purpose of this order is to inform the Harris County Sheriff that,

---

[132] *See Burkett v. City of El Paso*, 513 F.Supp.2d 800, 815 (W.D. Tex. 2007) ("[T]he State of Texas, among other states, allows persons other than a neutral and detached magistrate to set bail. In Texas, individuals allowed to set bail include police officers, in various situations) (citing TEX. CODE CRIM. PRO. arts. 17.20, 17.22); *State v. Martin*, 833 S.W.2d 129, 133 (Tex. Cr. App. 1992) (officers can release misdemeanor defendants on unsecured bonds without a magistrate's order); Texas Attorney General Opinion No. H–856 (1976) ("[S]ince article 17.20 authorizes the sheriff or other peace officer to take bail in misdemeanor cases, article 17.15 compels the conclusion that such officer is also to regulate the amount of bail in such cases."). In *Hokr v. State*, 545 S.W.2d 463 (Tex. Cr. App. 1977), the Texas Court of Criminal Appeals held that, ordinarily, "an officer's authority to set the amount of bail should be limited to situations in which no magistrate is available." *Id*. at 465. For purposes of this order, the Harris County Sheriff must deem a magistrate to be unavailable if a Harris County magistrate has not provided release on unsecured or nonfinancial conditions to a misdemeanor defendant who cannot pay a secured financial condition of release as evident in the affidavit.

as Sheriff Gonzalez recognized in his declaration, orders to detain misdemeanor defendants on a secured financial condition of release that they cannot pay because of their poverty are unconstitutional and invalid under federal law. *See* Pls. Ex. 7(r). Harris County and Sheriff Gonzalez as its policymaker are liable for, and enjoined from, executing invalid orders from the Hearing Officers or County Judges that operate to detain indigent misdemeanor defendants who are otherwise eligible for release if they cannot pay a secured financial condition of release.

- For misdemeanor defendants who are subject to formal holds and who have executed an affidavit showing an inability to pay the secured financial condition of release, the Sheriff must treat the limitations period on their holds as beginning to run the earliest of: (1) after the probable cause hearing; or (2) 24 hours after arrest. The purpose of this requirement is to ensure that misdemeanor defendants are not prevented from or delayed in addressing their holds because they are indigent and therefore cannot pay a secured financial condition of release.

- Misdemeanor defendants who do not appear competent to execute an affidavit may be evaluated under the procedures set out in the Texas Code of Criminal Procedure Article 16.22. If competence is found, the misdemeanor defendant is covered by the relief the court orders, with the exception that the 24-hour period begins to run from the finding of competence rather than from the time of arrest. As under Article 16.22, nothing in this order prevents the misdemeanor arrestee from being released on secured bail or unsecured personal bond pending the evaluation.

- The court's relief applies to misdemeanor arrestees who are re-arrested on misdemeanor

186

charges only or on warrants for failure to appear while on pretrial release for their misdemeanor charges.  Texas does not permit preventive pretrial detention orders in misdemeanor cases, even for multiple failures to appear or for new criminal activity before trial.  Misdemeanor defendants unable to pay a secured financial condition of release do not lose their state-created liberty interest in release before trial by failing to appear or by committing new misdemeanor criminal activity.  Those defendants may, of course, face additional charges and exposure to longer sentences, as well as enhanced nonfinancial conditions of release, such as more demanding supervisory techniques, for their pretrial misconduct.

The court concludes that this relief strikes an equitable balance between the parties' interests in this case.  The plaintiffs seek to eliminate entirely any differential treatment between those able to pay secured money bail and those unable to do so.  (*See* Docket Entry No. 188 at 19; No. 257, Ex. 1 at 1, 4).  The defendants argue that a judicial officer should assess nonfinancial conditions of release and that both the judicial officer and the misdemeanor defendant require time to prepare for a full bail-setting hearing.  (Docket Entry No. 260 at 5; No. 286 at 6–7, 15–16).  Under the court's relief, some misdemeanor defendants may be able to pay a secured financial condition and be released between having their charges formalized (about 15 hours after arrest, *see* Hearing Tr. 3-2:85) and appearing before a Hearing Officer (usually within 19 to 24 hours after arrest, if the defendant remains detained, *see* Def. Ex. 28 at 14–15).  The court considers this difference de minimis at this stage, although the plaintiffs may re-urge their position at the merits trial.  The time frames are expected to substantially decrease as the County implements its reforms.  *See* Hearing Tr. 6-1:138–39, 145–46.  And the court has tailored relief to address one significant cause of the

differential treatment—extended periods of detention by the City of Houston Police Department before Harris County takes custody of arrestees.

The defendants' many objections to relief as proposed by the plaintiffs do not apply to the relief as ordered by the court. The court is not striking down the use of secured money bail. (*Cf.* Docket Entry No. 161 at 8; No. 26 at 23–24). The court is not permitting arrestees to "set their own bail." (*Cf.* Docket Entry No. 266 at 7; Hearing Tr. 6-1:159–60). Bail amounts—and the County's right to collect forfeited bail—remain within the discretion Harris County officers have under state law. The County may continue to release defendants on secured financial conditions if those conditions serve to release, rather than detain, misdemeanor defendants before trial. What the County is enjoined from doing is setting the amount of bail on a secured basis in a way that detains, rather than releases, misdemeanor defendants who would be released if they could pay but who are unable to do so, in violation of the Constitution. And Harris County has long used affidavits of indigence as the basis to appoint publicly funded counsel. Hearing Tr. 2-1:60–61; 6-1:160–61. That is not a means of letting defendants confer public benefits on themselves. *See, e.g.*, *Adkins v. E.I. DuPont de Nemours & Co.*, 335 U.S. 331, 339 (1948). In the context of pretrial bail, affidavits of indigence have been used in the United States for over 150 years.[133]

The defendants argue that the administration of criminal justice is a police power granted to state and local governments by the Tenth Amendment. (Docket Entry No. 259 at 4). It is. They argue that judicial officers must exercise discretion in setting conditions of release before trial. (*Id.* at 6, 9–10). They must. But neither police power nor judicial discretion are boundless. "Congress enacted § 1983 to enforce provisions of the Fourteenth Amendment against those who carry a badge

---

[133] *See* Part I.C.2 *supra*; 1857 Mass. L. 489–97.

of authority and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Hafer v. Melo*, 502 U.S. 21, 28 (1991) (internal quotation marks and citation omitted). That enactment would be meaningless if the Tenth Amendment exempted state officers from liability under the Fourteenth Amendment.

The defendants argue that the putative plaintiff class is bound by the *Roberson* order issued in 1987 and that the consent decree can only be modified under Rule 60(b).  (Docket Entry No. 264 at 10–11).  But a consent decree does not bind nonparties.  *See, e.g.*, *Martin v. Wilks*, 490 U.S. 755, 761–62 (1989).  On the defendants' side, Harris County, the Hearing Officers, and the Sheriff were not parties to the *Roberson* litigation.  *See* Def. Ex. 159.  The *Roberson* defendants were twelve County Judges sued in their personal and official capacities.  *See id*.  The plaintiffs in this case do not seek relief against the *Roberson* County Judges in their personal capacities, and the number of County Judges acting in an official capacity has grown by four since 1987.  On the plaintiffs' side, the *Roberson* class did not include misdemeanor defendants arrested on a warrant, as this one does. *See* Def. Ex. 160.  The *Roberson* class did include misdemeanor defendants asserting Fourth and Sixth Amendment claims against the County Judges; this class does not.  *See id*.

For the reasons explained above, the *Roberson* order does not require the conduct the plaintiffs challenge.[134]  The relief ordered here is not inconsistent with *Roberson* and is not a modification of the consent decree.  And even if the parties were identical and the relief here was inconsistent with that ordered in *Roberson*, courts have held that, in the context of civil-rights litigation, a "modern successor" class action better serves the public interest and is better at resolving the parties' disputes than a Rule 60(b) modification of a decades-old consent decree.  *See Coffey v.*

---

[134]  *See* Part I.C.2, Part I.D.6 *supra*.

*Braddy*, 88 F.Supp.3d 1283, 1299 (M.D. Fla. 2015), *aff'd*, 834 F.3d 1184, 1193 (11th Cir. 2016).

Finally, the defendants object that they cannot implement a rule against using secured financial conditions of release as de facto orders of pretrial preventive detention, as other jurisdictions do, because Texas does not permit transparent orders of pretrial preventive detention in misdemeanor cases that are available in other jurisdictions. (*See, e.g.*, Docket Entry No 159 at 9–10; No. 166 at 13; Hearing Tr. 8-2:24–25). The defendants' dissatisfaction is with Texas law, not with the plaintiffs' claims or the relief this court ordered. It may indeed be wise to keep risky defendants, including misdemeanor defendants, in jail from arrest forward. But Texas law makes a different choice. It prohibits pretrial preventive detention of all but one category of misdemeanor cases, and in that exceptional category it provides nonfinancial conditions of pretrial detention with extra procedural safeguards. Jailing the indigent by setting secured money bail that they cannot pay makes an end run around a Texas-created liberty interest without providing due process. If the defendants believe that some misdemeanor defendants present such a high risk of nonappearance or of new criminal activity as to require pretrial preventive detention, the defendants' proper recourse is to petition the Texas Legislature to amend the Texas Constitution, not to accomplish a de facto amendment through imposing secured financial conditions of release that operate as detention orders only against those who cannot pay.

## IV.  Conclusion

### A.    Summary Judgment

In their motion for summary judgment, the defendants argue that: (1) there is no constitutional right to "affordable bail"; (2) the Harris County Rules of Court pass rational basis review; and (3) the County's arrest procedures satisfy due process as a matter of law. (Docket Entry

No. 101).  The court has addressed at length the standard of review required by the Supreme Court and the Fifth Circuit in this case,[135] and the reasons that Harris County's procedures violate the Equal Protection and Due Process Clauses as a matter of law.[136]

As explained in detail above, the issue in this case is not the right to "affordable bail."  As cases and commentaries make clear, courts may impose secured money bail beyond a defendant's ability to pay: (1) in cases of dangerous felony; (2) after finding that no alternative to secured money bail can reasonably assure the defendant's appearance or public safety; (3) with the due process of a detention order if the secured money bail in fact operates to detain the defendant.  Those factors do not apply to this case.[137]  Misdemeanor charges are not dangerous felonies.  The credible and reliable record evidence shows that, in misdemeanor cases, secured money bail is not the only reasonable alternative to assure appearance and law-abiding conduct before trial.

That does not amount to a "right to affordable bail."  Under Texas law, Harris County magistrates—the Hearing Officers and County Judges—may weigh the state-law factors to arrive at a high amount of bail.  TEX. CODE CRIM. PRO. art. 17.15.  But they cannot, consistent with the federal Constitution, set that bail on a secured basis requiring up-front payment from indigent misdemeanor defendants otherwise eligible for release, thereby converting the inability to pay into an automatic order of detention without due process and in violation of equal protection.  *See Bearden*, 461 U.S. at 672; *Rainwater*, 572 F.2d at 1056.  The motion for summary judgment is denied.

---

[135]  *See* Part II.B.1 *supra*.

[136]  *See* Part II.B.3 *supra*.

[137]  *See* Part I.C.3–4, Part II.B.2 *supra*.

**B.  Preliminary Injunction**

"Rules under which personal liberty is to be deprived are limited by the constitutional guarantees of all, be they moneyed or indigent, befriended or friendless, employed or unemployed, resident or transient, of good reputation or bad." *Rainwater*, 572 F.2d at 1057.  Misdemeanor arrestees are often, as Judge Truman Morrison testified, people "living on the edge at the point in their lives that intersects with getting involved in an arrest." Hearing Tr. 2-2:135.  In Harris County, they may be homeless.  They may lack family, friends, and "co-indemnitors."  Some are, no doubt, of bad reputation and present a risk of nonappearance or of new criminal activity.  But they are not without constitutional rights to due process and the equal protection of the law.

The court has considered an extensive record consisting of hundreds of exhibits, thousands of hearing recordings, and eight days of arguments and briefing at the motion hearing.  The record evidence, the arguments of able counsel, and the extensive case law and commentary on bail and pretrial detention all show that the plaintiffs are entitled to preliminary injunctive relief.  Harris County's policy is to detain indigent misdemeanor defendants before trial, violating equal protection rights against wealth-based discrimination and violating due process protections against pretrial detention without proper procedures or an opportunity to be heard.

This case is not easy.  Institutions charged with safeguarding the public have an extraordinary trust and a difficult task.  The difficulty and importance of the task cannot defeat an equally important public trust, which the court and the defendants share—to enforce the Constitution.  The court has done its best to recognize and work toward both.  Harris County is changing its bail procedures.  That is commendable.  The relief ordered here is intended to fit into that work, to discharge the responsibilities the court and the parties share.

The plaintiffs' clear likelihood of success on the merits of their claims at trial, the irreparable injuries they will suffer without an order of relief from this court, the public interest, and the relative weight of the harms should the court refuse relief all weigh strongly in the plaintiffs' favor.  The Order of Preliminary Injunction is separately entered.

SIGNED on April 28, 2017, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge