# PX 4(b)
# Expert Report of Stephen Demuth and Supporting Documents

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

## EXPERT REPORT OF STEPHEN DEMUTH, Ph.D, M.A., B.S.

### Background

1. My name is Stephen Demuth. I have been asked to review data produced and collected in connection with *ODonnell, et al. v. Harris County, et al.* I am not being compensated for this matter. Only travel-related expenses are being covered.

2. I earned a Master's degree in Sociology in 1997 and a Ph.D. in Sociology with a Major in Criminology and a Minor in Methods/Statistics in 2000 from The Pennsylvania State University. I graduated Phi Beta Kappa from Virginia Tech with a B.S. in Sociology and Psychology in 1995.

3. I am currently the Director of Graduate Studies in the Department of Sociology at Bowling Green State University, a position I have held since 2010, and an Associate Professor of Sociology, a position I have held since 2006. I was an Assistant Professor of Sociology at Bowling Green from 2000–2006.

4. My research has primarily focused on quantitative data analysis related to the criminal justice system including especially at the pretrial and sentencing stages, and the effects of race, ethnicity, and gender on case outcomes. A detailed summary of my professional experience is attached as Exhibit A.

### Material Reviewed

5. I have attached as Exhibit B a list of materials that I reviewed in preparing this report.

**Methodology and Opinions**

**Data spreadsheets**

6.  I have reviewed the data produced by the County in the form of spreadsheets.

7.  The data shows that for arrestees from January 1, 2015 to November 25, 2016:

   a.  Out of a total of 97,715 people, 65,208 (66.7%) were held after arrest until a probable cause determination. The average time held until a probable cause hearing determination was 38.7 hours (or 1.61 days).

   b.  Of people held until a probable cause determination, 13,194 (20.2%) were held for 24 hours or longer after arrest.

   c.  945 (1.5%) were held for 48 hours or longer after arrest prior to having a probable cause determination.

   d.  658 (1.0%) people were held for 72 hours or longer after arrest prior to having a probable cause determination.

   e.  Out of a total of 97,715 people arrested, 49,524 (50.7%) were held after arrest until a first setting. The average time held until a first setting was 90.7 hours (or 3.78 days) and the median time was 50.3 hours (or 2.09 days).

   f.  Of people held until a first setting, 25,602 (51.7%) were held for 48 hours or longer after arrest.

   g.  12,750 (25.8%) were held for 72 hours or longer after arrest prior to having a first setting.

   h.  6,442 (13.0%) were held for 96 hours or longer after arrest prior to having a first setting.

8.  I used the following process to reach these findings:

**For all**

- I conducted the analysis using SAS 9.3 for Windows (code is included).

- The original dataset contained 107,081 observations. Each observation represents an arrest charge. Because some arrestees had multiple arrest charges, I removed duplicate observations that were identical on both Defendant_Name and Arrest_Date. This excludes duplicates without excluding people who were arrested multiple times but on different dates within the data set. Removing duplicates is important because we do not want the delays of people with two or three charges on the same date to be double or triple counted. When excluding duplicates, I kept the observation with the earliest Probable_Cause_Date

– usually they differ by a matter of a few minutes for the different charges, but sometimes they are missing. After removing duplicates, the analytic sample included 97,715 arrestees.

- The first setting does not have a time within the dataset. In order to get more precise calculations, I enter a time of 9:00AM as the first setting time for each arrestee, and combine the date and time into a date-time variable. I understand 9:00 AM to be the first setting time for detained defendants that is recorded on the District Court Clerk's website, even though the jail dockets can last several hours, and 9:00 AM is earlier than most detained defendants would ever see a County Court at Law Judge.

**Delays Between Arrest and First Setting**

- We know the date-time of arrest and the date-time of first setting for each arrestee. Because we are interested in determining how many people were continuously held from arrest until first setting, we need to exclude those people who were released in the interim. (There are people represented in the dataset who were not held continuously from arrest until first setting, but were held for 48+, 72+, and 96+ hours prior to release and, upon release, had not yet had a first setting. The dataset did not include release times. Therefore, to avoid choosing arbitrary release times, I limited my analysis to people who were detained continuously from arrest until their first setting.)

- There are 3 variables in the dataset that indicate release: Reported_first_Release_date_Prior_to_Judgment, Bond_Approved_Date, and Release_date_After_Judgment. I created a variable that indicates "first release date" to equal the "Reported first Release date Prior to Judgment" unless NULL. Else, it is the "Bond Approved Date" unless NULL. Else, it is the "Release Date after Judgment." If none of the three variables contain dates, the earliest release date is assumed to be at first setting.

- If the first setting date is missing, then I assume that the person was released and no longer detained at first setting. If the first setting date is less than or equal to the first release date, then the arrestee is detained at first setting. I **include** people as detained who bonded out or were released on **the same day** as their first setting.

- I created a variable that counts the time interval (in minutes) between the arrest date-time and the first setting date-time for those people who were detained at first setting.

- I calculated an average, median, and indicators for people held for 48+, 72+, and 96+ hours between arrest and first setting.

**Delay Between Arrest and Probable Cause Hearing**

- We know the date-time of arrest and the date-time of probable cause determination for each arrestee. Because we are interested in determining how many people were continuously held from arrest until probable cause, we need to exclude those people who were released in the interim. (There are people represented in the dataset who were not held continuously from arrest until probable cause determination, but were held for 24+, 48+, and 72+ hours

prior to release and, upon release, had not yet had a probable cause determination.  The data set did not include release times.  Therefore, to avoid using arbitrary release times, I limited my analysis to people who were detained continuously from arrest until their probable cause determination.)

- There are 3 variables in the dataset that indicate release: Reported_first_Release_date_Prior_to_Judgment,   Bond_Approved_Date,   and Release_date_After_Judgment. I created a variable that indicates "first release date" to equal the "Reported first Release date Prior to Judgment" unless NULL. Else, it is the "Bond Approved Date" unless NULL. Else, it is the "Release Date after Judgment". If none of the three variables contain dates, the earliest release date is assumed to be at the probable cause hearing.

- If the probable cause hearing date is missing, then I assume that the person was released and no longer detained. If the probable cause hearing date is less than or equal to the first release date, then the arrestee is detained at the probable cause hearing. I include people as detained who bonded out or were released on the same day as their probable cause hearing.

- I created a variable that counts the time interval (in minutes) between the arrest date-time and the probable cause hearing date-time for those people who were detained at the hearing. I consider to be released those cases with a negative time interval in which the probable cause date is before the arrest date. These are likely warrant cases.

- I finally calculated an average time held and indicators for people held for 24+, 48+, and 72+ hours between arrest and the probable cause hearing.

**Snapshot spreadsheet**

9. I have also reviewed information collected by counsel of record showing snapshots of jail populations on August 14, 2016; December 24, 2016; January 8, 2017; January 9, 2017; January 22, 2017; January 23, 2017; February 5, 2017; February 6, 2017. This data is summarized in a spreadsheet and supported by screenshots that were taken contemporaneously with the information-gathering. The spreadsheet and screenshots were shared with me by Plaintiffs' counsel.

The spreadsheet lists each person who met the following criteria on one of the above-listed dates:

   a. was assigned to County Court at Law 1 or County Court at Law 2;
   b. was required to satisfy a secured financial condition in order to be released;
   c. had not satisfied that condition;
   d. had no holds that were indicated on the online case records;
   e. had no pending felony charges;
   f. did not have a pending deferred adjudication;
   g. had been arrested within the previous five days;
   h. had not yet seen a County Court at Law Judge; and

    i.  had not yet been appointed or retained counsel.

10. Because the spreadsheet excludes anyone who has seen a judge or been appointed an attorney, it dramatically undercounts the number of people who are in jail solely because they have not satisfied a secured financial condition of release.

11. The spreadsheet shows the following:

    a.  On August 14, 2016, there were 13 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release.

    b.  On December 24, 2016, there were 9 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    c.  On January 8, 2017, there were 9 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    d.  On January 9, 2017, there were 3 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    e.  On January 22, 2017, there were 10 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    f.  On January 23, 2017, there were 3 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    g.  On February 5, 2017, there were 14 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

    h.  On February 6, 2017, there were 3 people in the Harris County Jail who were assigned to County Courts at Law 1 or 2 who were in jail solely because they had not satisfied a secured financial condition of release;

**Video spreadsheet**

12. I have also reviewed certain information produced by the Defendants in the form of videos of probable cause hearings conducted on numerous dates between March and November 2016, as well as information compiled by counsel of record summarizing these videos in the form of a spreadsheet. The spreadsheet covers the following hearings:

- March 14: 13.04
- March 15: 16.06
- March 16: 18.01
- March 17: 10.07
- March 18: 18.03
- March 19: 2.03
- March 21: 18.05; 22.57
- March 22: 20.03; 22.58
- May 12–22 (every hearing for a misdemeanor arrestee)
- August 22–26 (every hearing for a misdemeanor arrestee)
- September 1 (every hearing for a misdemeanor arrestee)
- October 1–7 (every hearing for a misdemeanor arrestee)
- November 1 (every hearing for a misdemeanor arrestee)

I personally watched the following videos:

- December 3, 2015, at 22:17, Edward Izquierda (setting bail at $5,000 for a person arrested for sleeping under a bridge; HO states, "That was a silly question for me. [laughing] You gotta sleep under a bridge, the poor gentleman can't afford a lawyer that's for sure.") - $5,000

- May 22, 2016; 15.45 at 32:03, Alejandro Garby (Denying a request for a personal bond even though arrestee said he was going to college for culinary arts and was worried he would lose his job if he stayed in jail) (Hagstette)

- May 14, 2016; 15.58 at 57:00, Willie Love Watson (denying a request for a personal bond even though the arrestee said that he has to go to a custody hearing and he and his wife are trying to keep their family together, and said, "I promise you with everything in the world that I would be in court.") - $1,000 (Hagstette)

- May 16; 6.46 at 14:40, Laura Patterson (Hearing Officer stating that he is "not going to consider" the arrestee for a personal bond after the arrestee told the Hearing Officer that she had no place to go after her mother kicked her out of the house) $1500 bond - (Licata)

- May 14; 15.58 at 8:15, Brenda Jackson (doubling an arrestee's bond from $1,000 to $2,000 because the arrestee responded with "yeah" instead of "yes") (Hagstette)

- May 12, 2016; 15.48 at 18:36, Kareena Castro ("We're not here to have a conversation. You're here to listen to what she says and I'm here to determine whether I feel probable cause or not."; denying request for a personal bond based on priors; arrestee said she was trying to start at a job) - $1,500 (Licata)

- October 7, 2016; 22.15 at 18:45, Christopher Douglas Dehart (Mr. Dehart: "I'm mostly living out of my car." Hearing Officer: "That's a little too unstable. I'm setting your bond at $500. That's as low as it goes.") - $500 (Hagstette)

13. The spreadsheet includes information about roughly 2,300 probable cause hearings. It shows that no Hearing Officer ever asked a single arrestee whether he or she could pay the amount of money bail that the Hearing Officer was setting, and no Hearing Officer conducted any kind of inquiry or colloquy with an arrestee concerning the arrestee's ability to pay or the propriety of alternative non-financial conditions of release for those who could not afford to pay a particular amount of money.

14. The videos that I personally watched were shocking. They included instances where bail appeared to be set punitively (for an arrestee who answered a hearing officer "yeah" instead of "yes"), instances where a person explicitly said they were unable to afford any bail and were ignored by the Hearing Officer who imposed a money bail amount anyway, instances where individuals were prevented from speaking about the amount of their bail, and instances where personal bonds were refused solely because the accused was homeless or lacked a stable living arrangement.

15. I spoke with attorneys, staff, interns, and volunteers who contributed to the spreadsheet. They informed me that the videos I watched were typical of the videos they had seen, and each contributor confirmed that he or she had never seen a Hearing Officer inquire into an arrestee's ability to pay a particular bail amount set.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Stephen Demuth, Ph.D.

2-13-17
Date

# Exhibit A

Demuth 1

**CURRICULUM VITAE**

**STEPHEN DEMUTH**

**Fall 2016**

<u>**Office**</u>
234 Williams Hall
Department of Sociology
Bowling Green State University
Bowling Green, OH 43403
(419)372-7260/fax (419)372-8306
demuth@bgsu.edu

<u>**Education**</u>

| | | |
|---|---|---|
| 2000 | Ph.D. | The Pennsylvania State University, University Park, PA (Sociology, Major: Criminology, Minor: Methods/Statistics) |
| 1997 | M.A. | The Pennsylvania State University, University Park, PA (Sociology) |
| 1995 | B.S. | Virginia Tech, Blacksburg, VA (Sociology and Psychology)  Phi Beta Kappa, 1994 |

<u>**Employment**</u>

| | |
|---|---|
| 2010-present | Director of Graduate Studies, Sociology, Bowling Green State University |
| 2006-present | Associate Professor of Sociology, Bowling Green State University |
| 2000-2006 | Assistant Professor of Sociology, Bowling Green State University |

<u>**Publications**</u>

Dennison, Christopher R. and Stephen Demuth. Forthcoming. "The More You Have, The More You Lose: Criminal Justice Involvement, Ascribed Socioeconomic Status, and Achieved SES." *Social Problems.*

Doerner, Jill K. and Stephen Demuth. 2014. "Gender and Sentencing in the Federal Courts: Are Women Treated More Leniently?" *Criminal Justice Policy Review* 25:242-269.

Doerner, Jill K. and Stephen Demuth. 2010. "The Independent and Joint Effects of Race/Ethnicity, Gender, and Age on Sentencing Outcomes in U.S. Federal Courts." *Justice Quarterly* 27:1-27.

McGovern, Virginia and Stephen Demuth. 2010. "Race/Ethnicity and Recidivism Risk: The Importance of Considering Nativity When Examining White-Black-Hispanic Differences." *International Journal of Sociological Research* 3:19-34.

McGovern, Virginia, Stephen Demuth, and Joseph E. Jacoby. 2009. "Racial and Ethnic Recidivism Risks: A Comparison of Postincarceration Rearrest, Reconviction, and Reincarceration Among White,

Demuth 2

Black, and Hispanic Releasees." *Prison Journal* 89:309-327.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2007. "Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization, and Jury Decision Making." *Criminology* 45:865-892.

Steffensmeier, Darrell and Stephen Demuth. 2006. "Does Gender Modify the Effects of Race-Ethnicity on Criminal Sanctioning? Sentences for Male and Female White, Black, and Hispanic Defendants." *Journal of Quantitative Criminology* 22:241-261.

Demuth, Stephen and Darrell Steffensmeier. 2004. "Ethnicity Effects on Sentence Outcomes in Felony Cases: Comparisons Among White, Black, and Hispanic Defendants." *Social Science Quarterly* 85:994-1011.

Holcomb, Jefferson E., Marian R. Williams, and Stephen Demuth. 2004. "White Female Victims and Death Penalty Disparity Research." *Justice Quarterly* 21:877-902.

Demuth, Stephen and Darrell Steffensmeier. 2004. "The Impact of Gender and Race-Ethnicity in the Pretrial Release Process." *Social Problems* 51: 222-242.

Demuth, Stephen. 2004. "Understanding the Delinquency and Social Relationships of Loners." *Youth and Society* 35:366-392.

Demuth, Stephen and Susan L. Brown. 2004. "Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence versus Parental Gender." *Journal of Research in Crime and Delinquency* 41:58-81.

Demuth, Stephen. 2003. "Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees." *Criminology* 41:873-908.

Demuth, Stephen. 2002. "The Effect of Citizenship Status on Sentencing Outcomes in Drug Cases." *Federal Sentencing Reporter* 14: 271-275.

Steffensmeier, Darrell and Stephen Demuth. 2001. "Ethnicity and Judges= Sentencing Decisions: Hispanic-Black-White Comparisons." *Criminology* 39:145-178.

Steffensmeier, Darrell and Stephen Demuth. 2000. "Ethnicity and Sentencing Outcomes in U.S. Federal Courts: Who is Punished More Harshly?" *American Sociological Review* 65:705-729.

**Papers in Progress**
Finkeldey, Jessica and Stephen Demuth. "Skin Color and the Likelihood of Adult Arrest." Revise and Resubmit, *Social Problems*

Demuth, Stephen and Angela Kaufman. "An Examination of Hispanic-Black-White Differences in the Federal Pretrial Release Process."

Demuth, Stephen, Susan L. Brown, and Gregory C. Rocheleau. "How Important Is Self-Control as a Predictor of Delinquency?"

Demuth 3

**Proposals Funded**

Summer 2003        "Understanding the Causes of Hispanic Delinquency: An Examination of Adolescent Social Life." FRC Faculty Mentoring and Enrichment Grant, Bowling Green State University, Stephen Demuth, principal investigator. $3,000.

Summer 2002        "Citizenship, Race/Ethnicity, and Sentencing Outcomes in U.S. Federal Courts." FRC Research Incentive Grant, Bowling Green State University, Stephen Demuth, principal investigator. $5,500.

**Proposals Submitted but not Funded**

January 2003-
December 2004        "The Main and Interactive Effects of Citizenship Status and Race/Ethnicity on Sentencing Outcomes in U.S. Federal Courts." National Science Foundation, Stephen Demuth, principal investigator. $60,313.

July 2001-
December 2002        "Citizenship, Race/Ethnicity, and Sentencing Outcomes in U.S. Federal Courts." Bureau of Justice Statistics (Small Grants for Analysis of Data from Bureau of Justice Statistics, administered by American Statistical Association), Stephen Demuth, principal investigator. $37,320.

**Presentations**

Demuth, Stephen. 2016. "Race/Ethnicity, Class, and Pretrial (Justice?)." Invited speaker at the annual summer conference of the Ohio Association of Community Action Agencies, Huron, OH.

Demuth, Stephen. 2015. "Racial and Ethnic Disparities in Bail and Pretrial Detention." Invited speaker at the Pretrial Racial Justice Initiative Roundtable on Racial and Ethnic Disparities in Bail and Pretrial Detention, American University School of Law, Washington, DC.

Demuth, Stephen. 2015. "Understanding Racial and Ethnic Disparities at the Pretrial Stage." Invited speaker for Pretrial Justice Institute webinar to NJ (and other states') practitioners on December 16, 2015.

Demuth, Stephen and Jessica Finkeldey. 2013. "The Joint Effects of Race/Ethnicity, Class, and Gender on the Likelihood of Pretrial Detention in the Federal Courts." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Demuth, Stephen and Angela Kaufman. 2013. "Ethnicity, Social Class, and Pretrial Detention in Federal Drug Cases: Are Latino Citizens Being Treated Like an Alien Other?" Invited presentation at Center for Family and Demographic Research, Bowling Green State University.

Demuth, Stephen and Angela Kaufman. 2011. "Do Social Class Differences Explain Racial and Ethnic Disparities in Federal Pretrial Detention?" Paper presented at the annual meeting of the American Society of Criminology, Washington, DC.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2007. "Understanding the Influence of

Demuth 4

Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-related Victimization, and Jury Decision-making." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2006. "The Independent and Joint Effects of Victim Gender and Race on Death Penalty Outcomes: Revisiting the Baldus Study." Paper presented at the annual meeting of the Midwestern Criminal Justice Association, Chicago, IL.

Demuth, Stephen and Darrell Steffensmeier. 2004. "Racial and Ethnic Differences in Age-Crime Curves." Paper presented at the annual meeting of the American Society of Criminology, Nashville, TN.

Steffensmeier, Darrell, Stephen Demuth, and Jennifer Van Hook. 2004. "Hispanic-Black-White Differences in the Age Distribution of Homicide Offending: Methodological and Substantive Issues." Paper presented at the annual meeting of the Population Association of America, Boston, MA.

Demuth, Stephen. 2004. "An Examination of Hispanic-Black-White Differences in the Federal Pretrial Release Process." Paper presented at the annual meeting of the Academy of Criminal Justice Sciences, Las Vegas, NV.

Demuth, Stephen and Peggy C. Giordano. 2003. "Understanding the Causes of Hispanic Delinquency: An Examination of Adolescent Social Life." Paper presented at the annual meeting of the American Society of Criminology, Denver, CO.

Demuth, Stephen. 2002. "Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees." Paper presented at the annual meeting of the American Society of Criminology, Chicago, IL.

Demuth, Stephen and Darrell Steffensmeier. 2002. "Modeling the Main and Interactive Effects of Gender and Race/Ethnicity on the Case Processing of Criminal Defendants in Large Urban Courts." Paper presented at the annual meeting of the American Society of Criminology, Chicago, IL.

Demuth, Stephen. 2001. "The Effects of Citizenship and Race/Ethnicity on Sentencing Outcomes in Federal Courts." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Brown, Susan L. and Stephen Demuth. 2001. "Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence Versus Parental Gender." Paper presented at the Add Health Users Workshop, National Institutes of Health, Bethesda, MD.

Demuth, Stephen and Susan L. Brown. 2000. "Family Structure Effects on Adolescent Delinquency." Paper presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

Demuth, Stephen. 1999. "Felony Defendant Processing in Large Urban Counties: Are Black, White, and Hispanic Defendants Processed Differently?" Paper presented at the annual meeting of the American Society of Criminology, Toronto, Canada.

Demuth, Stephen and Darrell Steffensmeier. 1998. "Ethnicity and Sentencing Outcomes in U.S. Federal Courts." Paper presented at the annual meeting of the American Society of Criminology,

Demuth 5

Washington, DC.

Demuth, Stephen. 1997. "Understanding the Peer-Delinquency Relationship: An Investigation of the Loner." Paper presented at the annual meeting of the American Society of Criminology, San Diego, CA.

**Teaching Experience**
Undergraduate: Corrections, Crime and Punishment, Criminology, Research Methods
Graduate: Research Methods, Sentencing, Social Responses to Crime, Crime Theory

**Research Interests and Specialization**
Race/Ethnicity, Crime, and the Criminal Justice System, Pretrial and Sentencing Processes, Research Methods, Statistics

**Student Theses and Dissertations**
Chair, Ph.D. committee:
      Jill Doerner (Sociology-2009-at University of Rhode Island)
      Jennifer Brown (Sociology-at NORC)
      Danielle Soto (Sociology-2010-at Southern Illinois University-Carbondale)
      April Holbrook (Sociology)

Chair, M.A. committee:
      Jill Doerner (2004)
      Patrick Seffrin (2006)
      Angela Kaufman (2011)
      Andrea Garber (2012)
      Tanya Leyman (2012)
      April Holbrook (2013)
      Jessica Finkeldey (2014)
      Jessica Ziegler (2014)
      Mitchell Gresham (2016)

Member, Ph.D. committee:
      Annette Hoffman (Psychology-2001)
      Virginia McGovern (Sociology-2004)
      Ryan Schroeder (Sociology-2005)
      Nathan Crook (American Cultural Studies-2009)
      Peter Meagher (Higher Education Administration-2009)
      Robert Lonardo (Sociology)
      Julia Mack (Sociology-2012)
      Nicole Shoenberger (Sociology-2012)
      Gregory Rocheleau (Sociology-2012)
      William Lally (Sociology-2014)
      Unique Shaw (Sociology-2013)
      Janelle Nannini (Sociology-2016)
      Andrea Krieg (Sociology-2015)
      Layal Abadi (Psychology-2016)
      Christopher Dennison (Sociology)
      Jesse Hotmire (Leadership Studies)

Demuth 6

Catherine Kimbrell (Criminology, Law and Society, George Mason University)
Mallory Minter (Sociology)

Member, M.A. committee:
Shawn Trusten (Sociology-2002)
Cheryl Lero (Sociology-2005)
Wendi Goodlin (Sociology-2005)
Danielle Soto (Sociology-2007)
Unique Shaw (Sociology-2011)
Janelle Nannini (Sociology-2011)
Katie Mead (Sociology-2012)
Emily Herbst (Sociology-2013)
William Clemens (Sociology-2016)
Marissa Landeis (Sociology)
Melissa Freitag (Sociology)

Mentor, Undergraduate Summer Research Scholar Project:
Ashley Schroeder (Psychology, 2011)

Member, Senior Honors committee:
Paige Chretien (Criminal Justice, 2014)
David Kuebeck (Sociology, 2006)
Jacob Castillo (Philosophy, 2005)
Brian Small (Psychology, 2003)

Chair, Senior research paper:
Chloe Hollingsworth (2009)
Brandon Smith (2006)
David Kuebeck (2005)
Vincent Staropoli (2004)
Brian Small (2003)
Andrew Wachter (2002)
Thomas Roether (2001)

**Service**
University:
Health Service Advisory Committee, 2016
Labor-Management Committee, 2016
Provost's Market Pool Committee, 2016
Chief Negotiator, BGSU-FA, 2015-16
How to Best Serve the Adult Population/Adult Student Program and Services Task Force, 2015
Vice President, BGSU-Faculty Association, AAUP, 2014-present
Project Search/Graduate Student Diversity Ad Hoc Committee, 2015
Faculty Senate Distinguished Service Award, 2014
Graduate Faculty Status Ad Hoc Committee, 2014
Health, Wellness, and Insurance Committee, 2014-2015
Residential Faculty Mentor Program (RAs: Danya Crow, Amanda Mutchler) 2014-2015
Allocated Market Pool Committee, 2013-2015

Demuth 7

Efficiency Task Force, 2012-2014
Graduate Council, 2010-present
Director of Graduate Enrollment Search Committee, 2013
Graduate Contracting Kaizen, 2013
Graduate Student Orientation Research Ethics Discussion Panel, 2012, 2013, 2014
Graduate Education Strategic Implementation Committees, 2012-13
Graduate Education Strategic Planning Committee, 2011-12
Social Science Curriculum Committee, 2007-2010
BGSU/OSPR Research & Creative Activity Conference Organizing Committee, 2009
Faculty Personnel and Conciliation Committee (Faculty Senate), 2006-07
Undergraduate Council, 2002-05
Union Advisory Committee, 2003-04
Honors and Awards Committee, 2002-03
Parking Committee, 2000-01

Department:
Chair, Criminology Faculty Search Committee, 2016
Director of Graduate Studies, 2010-present
Chair, Criminology Area Committee, 2008-2015
Member, Graduate Committee, 2006-07, 2004-05, 2002-03
Member, Executive Committee, 2005-06, 2003-04
Member, Undergraduate Committee, 2007-10, 2000-02

Profession:
Editorial Board, *Contemporary Sociology*, 2015-
Board of Directors, Pretrial Justice Institute, 2015-
Mentor and Affiliate, Racial Democracy, Crime and Justice Network, Ohio State University
    Summer 2012-Mia Ortiz, Bridgewater State University
    Summer 2013-Brian Starks, Delaware State University
Research Affiliate, Center for Family and Demographic Research, BGSU, 2001-present
Research Affiliate, Population Research Institute, The Pennsylvania State University, 2001-present
Member, ASA Crime and Deviance Graduate Student Paper Competition Jury, 2011
ASC Session Chair
    Race, Crime, and Corrections Across the Life-Course, 2004
    Testing Control Theories, 2003
    Understanding Juvenile Violence: Family, Firearms, and Societal Failure, 2000
Affiliate, Center for Research on Crime and Justice, Pennsylvania State University, 1998-2000

Reviewer, American Civil Liberties Union, National Institute of Justice, National Science Foundation, Office of Juvenile Justice and Delinquency Prevention

Occasional reviewer, *American Journal of Criminal Justice, American Journal of Sociology, American Sociological Review, Crime and Delinquency, Crime, Law, and Social Change, Criminal Justice Review, Criminology, Criminology and Public Policy, Homicide Studies, International Criminal Justice Review, International Migration Review, Journal of Adolescence, Journal of Family Issues, Journal of Law and Courts, Journal of Quantitative Criminology, Journal of Research in Crime and Delinquency, Justice Quarterly, Latino Studies, Law and Society Review, Social Forces, Social Problems, Social Science Quarterly, Social Science Research, Sociological Forum, Sociological Quarterly, Youth and Society,*

Demuth 8

*Youth Violence and Juvenile Justice*

Member, American Sociological Association, American Society of Criminology, American Association of University Professors

Exhibit B

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

**EXHIBIT B**

1. Data spreadsheet (Produced in Discovery by Defendant Judges)
2. Video spreadsheet (Disclosed to Defendants on February 7, 2017)
3. Snapshot spreadsheet and supporting screenshots of relevant online case records (Disclosed to Defendants on February 7, 2017)
4. A data key (produced in Discovery by Defendant Judges) and list of steps provided by Plaintiffs' counsel that I used as a starting point in analyzing the dataset to determine the delays between arrest and first setting, and between arrest and probable cause determination (Appendix 1)
5. SAS programming code created by Demuth showing the steps used to analyze the data and produce results (Appendix 2)
6. Background information provided by Plaintiffs' counsel about the creation of the video and snapshot spreadsheets (Appendix 3)

# Appendix 1

**LIST OF STEPS**

**For all**

- I filter out all entries that are identical in the following categories: Defendant_Name, Arrest_Date, and First_Setting_Date. This excludes duplicates without excluding people who were arrested multiple times within the data set. These duplicates exist because people are listed multiple times for multiple charges, but we don't want the delays of people with two or three charges to be double or triple counted. With the data sets I use, I then handcheck to exclude duplicates that were not picked up in the last step – for example, a defendant whose name is entered with three slightly different spellings for his three different charges. I don't know if this manual checking would be feasible with the size of the data set you'll be working with. When excluding duplicates we want to use the earliest Probable_Cause_Date – usually they differ by a matter of a few minutes for the different charges.

- The first setting does not have a time within the spreadsheet, but if you were to check the first setting time on the District Clerk's website you'd always (in Beth and my experience) see a time of 9:00AM, because that is the time of the docket call for arrestees who are detained at first appearance. In order to get more precise calculations, I enter a time of 9:00AM into the spreadsheet as the first setting time, and combine the date and time into a separate column that I use for calculations.

**Delays Between Arrest and First Setting**

- I create two columns, one Reported_first_Release_date&time_Prior_to_Judgment minus First Setting Time & Date and one Bond_Filed_Date minus First Setting Time & Date, to exclude people who have been released before their first setting. We **include** people who bonded out or were released on **the same day** as their first setting. (NOTE: I had been working with this data prior to us receiving Release Dates with times from the defendants so there may be different criteria you'll want to use. Chris described his process with this new data as follows: "note that I've defined the First Release Date as the "Reported first Release date Prior to Judgment" unless NULL. Then it's the "Bond Approved Date" unless NULL. Then its the "Release Date after Judgment.")

- Exclude all people without a First_Setting_Date

- I then create another column with First Setting date & time minus Arrest_Date in order to get hours and minutes of each delay. I sort this column and exclude outliers.

- I finally calculate an average (or median or list, depending on what is requested) delay between Arrest and First Setting.

**Delay Between Arrest and Probable Cause Hearing**

- I first exclude cases that do not have a Probable_Cause_Date

- I then exclude cases where the first_Release_Date_Prior_to_Judgement or Bond_Filed_Date date is before the Probable_Cause_Date. We **include** people who were

1

released/bonded out **on the same day** as their probable cause hearing. See notes above regarding the new data that we received since I stopped working with this data.

- I create a column with Probable_Cause_Date minus Arrest_Date to remove cases where the Probable_Cause_Date is before the Arrest_Date (these are warrant cases).

- I then save this spreadsheet so I can use it as a starting point for finding delays between probable cause hearing and first setting.

- Then I sort the column that has Probable_Cause_Date minus Arrest_Date and remove outliers.

- I finally calculate an average (or median or list, depending on what is requested) delay between Arrest and Probable Cause Hearing.

**Delay Between Probable Cause Hearing and First Setting**
- I open the spreadsheet I had saved as an intermediary step in finding Delay Between Arrest and Probable Cause Hearing

- I create two columns, one Reported_first_Release_date&time_Prior_to_Judgment minus First Setting Time & Date and one Bond_Filed_Date minus First Setting Time & Date, to exclude people who have been released before their first setting. We **include** people who bonded out or were released on **the same day** as their first setting. See notes above regarding new data.

- I exclude all people without a First_Setting_Date

- I had several cases where the Probable Cause hearing was before First Setting, which didn't make sense. I checked these cases on an individual basis on the District Clerk's website—some had a PC hearing on the same day as their first setting in which case I put a delay of zero, some of them were data entry errors— but this may not be possible for your dataset. We should think of a systematic way to handle these.

- I finally calculate an average (or median or list, depending on what is requested) delay between PC Hearing and First Setting.

Appendix 2

```
libname in "C:\Users\demuth\Desktop\Civil Rights Corps";

data one; set in.Arr_1_1_2015_11_25_2016_work;
keep Defendant_Name Arrest_Date Bond_Approved_Date Probable_Cause_Date First_Setting_Date
Reported_first_Release_date_Prio
Release_date_After_Judgment;

if Probable_Cause_Date='.'DT then Probable_Cause_Date='01JAN2020:00:00:00'DT;

proc sort; by Defendant_Name Arrest_Date Probable_Cause_Date;

data two; set one;

proc sort nodupkey;
by Defendant_Name Arrest_Date;

data in.reduced; set two;

if Probable_Cause_Date='01JAN2020:00:00:00'DT then Probable_Cause_Date='.'DT;

run;

/*-----------------------------*/

data one; set in.reduced;
format rep1strel DATETIME18.;
format rep1strel2 DATETIME18.;

if Reported_first_Release_date_Prio ne . then rep1strel=Reported_first_Release_date_Prio;
else if Bond_Approved_Date ne . then rep1strel=Bond_Approved_Date;
else if Release_date_After_Judgment ne . then rep1strel=Release_date_After_Judgment;
else rep1strel=First_Setting_Date;

if Reported_first_Release_date_Prio ne . then rep1strel2=Reported_first_Release_date_Prio;
else if Bond_Approved_Date ne . then rep1strel2=Bond_Approved_Date;
else if Release_date_After_Judgment ne . then rep1strel2=Release_date_After_Judgment;
else rep1strel2=Probable_Cause_Date;


data two; set one;

if First_Setting_Date le rep1strel then fsdet=1; else fsdet=0;
if First_Setting_Date=. then fsdet=0;

proc freq;
tables fsdet;
run;

data three; set two;
First_Setting_Date=intnx("HOUR",First_Setting_Date,+9);

t_arr_fs=(intck('minute',Arrest_date, First_Setting_Date))/60;
```

```
if t_arr_fs>=48 then t_arr_fs48=1; else t_arr_fs48=0;
if t_arr_fs>=72 then t_arr_fs72=1; else t_arr_fs72=0;
if t_arr_fs>=96 then t_arr_fs96=1; else t_arr_fs96=0;


proc freq;
tables fsdet t_arr_fs48 t_arr_fs72 t_arr_fs96;
where fsdet=1;
run;


proc means;
var fsdet t_arr_fs t_arr_fs48 t_arr_fs72 t_arr_fs96;
where fsdet=1;
run;


data four; set one;

if datepart(Probable_Cause_Date) le datepart(rep1strel2) then pcdet=1; else pcdet=0;
if Probable_Cause_Date=. then pcdet=0;

t_arr_pc=(intck('minute',Arrest_date, Probable_Cause_Date))/60;

if t_arr_pc<0 then pcdet=0;

if t_arr_pc>=24 then t_arr_pc24=1; else t_arr_pc24=0;
if t_arr_pc>=48 then t_arr_pc48=1; else t_arr_pc48=0;
if t_arr_pc>=72 then t_arr_pc72=1; else t_arr_pc72=0;


proc freq;
tables pcdet;

run;


proc freq;
tables t_arr_pc24 t_arr_pc48 t_arr_pc72;
where pcdet=1;


proc means;
var pcdet t_arr_pc t_arr_pc24 t_arr_pc48 t_arr_pc72;
where pcdet=1;
run;
```

Appendix 3

## VIDEO SPREADSHEET

1) Every day, around the clock, Harris County Hearing Officers conduct hearings at which they determine probable cause and set bail for new arrestees.  There are usually about 10 dockets of hearings every day.  Dockets consist of approximately 20-45 new arrestees.

2) Hearing Officers are in a courtroom at the courthouse during the hearings, while arrestees are in the jail.  Arrestees "appear" at the hearings by videolink.  All of these hearings are videotaped and preserved for several months.

3) Plaintiffs received in discovery many thousands of videotaped hearings, including all of the hearings that took place in May and August 2016, and all of the hearings that took place the first week of each of the following months: September, October, November, December, and January.  Prior to filing the lawsuit, Plaintiffs requested videos of select dockets that occurred in March 2016.

4) Plaintiffs' counsel, along with a team of investigators, interns, and volunteers, have watched and recorded information about roughly 2,300 hearings that took place between March and November 2016.

5) Plaintiffs' team has coded the hearings for specific information, and entered the information into an Excel spreadsheet.  For each hearing, the spreadsheet indicates: the date and time of the docket during which the hearing occurred; the name of the arrestee (spelled phonetically based on the audio); timestamp of the hearing within the docket; the initials of the Hearing Officer who presided over the hearing; the charge; whether there was an inquiry into ability to pay; the amount of the bail set; whether the arrestee was recommended for a personal bond or pretrial release bonds (these are the terms Harris County uses to indicate an order of release on non-financial conditions); and whether the arrestee requested a court-appointed attorney.

6) Four of Plaintiffs' legal team contributed to the spreadsheet.  Counsel then trained other employees, interns, and volunteers retained by Plaintiffs' counsel to assist with watching hearings and entering data into the spreadsheet.  A total of 19 attorneys and law students contributed to the spreadsheet.

7) Plaintiffs' counsel instructed those who contributed to the spreadsheet to record information only about people who were charged only with misdemeanors, and to exclude anyone charged with a misdemeanor, subject to a hold, or arrested on an out-of-county warrant.

8) Every single person who watched the hearings made a notation in the spreadsheet, for each hearing watched, that there was no inquiry into the arrestee's ability to pay a particular bail amount set.  In other words, no one who contributed to the spreadsheet ever reported observing an inquiry into ability to pay in any hearing that he or she watched.

**SNAPSHOT SPREADSHEET**

1) Plaintiffs have alleged that there are hundreds of people in the jail every night who are charged only with misdemeanors who are there only because they cannot afford to satisfy a secured financial condition of release.

2) Defendants challenge this assertion.

3) Harris County maintains detailed case records online and updates them throughout the day as activities occur within a case. For example, the website shows when charges are filed, when a person was arrested, when a probable cause determination was made, and when an attorney was appointed.

4) The information on the website makes it possible to identify pretrial arrestees who have been assigned to specific County Court at Law Judges and who are detained in the Harris County Jail. In order to estimate the number of people in jail every night solely because they have not satisfied a secured financial condition of release, Plaintiffs selected a set of dates on which to take "snapshots" of the jail population.

5) Plaintiffs' counsel selected County Courts at Law 1 and 2 (out of 16 Courts in total), and reviewed pretrial defendants, assigned to those courtrooms, who were in jail on August 14, 2016; December 24, 2016; January 8, 2017; January 9, 2017; January 22, 2016; January 23, 2016; February 5, 2017; and February 6, 2017, and had been arrested within five days prior to the date the online records were reviewed.

6) Plaintiffs excluded from the spreadsheet any inmate who had been appointed an attorney, had had a first setting in a County Court at Law, had any apparent holds, or had been charged concurrently with a felony offense.

7) Plaintiffs intended for the spreadsheet to include only those pretrial detainees who were arrested within the previous five days, charged only with misdemeanor offenses, had not yet seen a Judge, were required to satisfy a secured financial condition to be released, had not satisfied the secured financial condition, and were not subject to any holds.

8) Because the website is constantly updated, and Plaintiffs wanted to preserve the records supporting the decision to include someone on the spreadsheet, Plaintiffs took screenshots of the relevant online case records at the same time the records were reviewed.

9) Plaintiffs' Counsel created the spreadsheet in August and recorded information about pretrial misdemeanor arrestees who were in jail on August 14, 2016, and December 24, 2016. Counsel also took snapshots of the relevant online case records. Counsel then trained Civil Rights Corps's investigator to enter information in the spreadsheet regarding on January 22 and 23, and February 5 and 6.

10) The spreadsheet for the snapshots described above does not provide a full picture of the pretrial misdemeanor jail population.  For example, it excludes everyone who had already seen a Judge or been appointed an attorney.

11) Plaintiffs' Counsel will be taking daily snapshots of the pretrial misdemeanor jail population between February 9, 2017, and March 4, 2017, and will continue to update the spreadsheet.

12) Going forward, the spreadsheet will include anyone charged with only misdemeanor offenses, arrested within the prior 30 days, who was assigned a secured financial condition of release, who has not paid the secured financial condition, and whose case is not yet resolved.

PX4(B)
First Supplemental Report of Stephen Demuth

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. ) | (Consolidated Class Action) |
| ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |
| ) | |

**SUPPLEMENT TO EXPERT REPORT OF STEPHEN DEMUTH, Ph.D, M.A., B.S.**

**Material Reviewed**

1.  I have attached as Exhibit B a list of materials that I reviewed in preparing this report.

**Methodology and Opinions**

**Data spreadsheet**

2.  I have reviewed the data produced by the County in the form of a spreadsheet.

3.  The data shows that for people arrested between May 12–22, 2016 and detained continuously until their first setting:
    a.  47.46% were held 48 hours or longer; and
    b.  24.12% were held 72 hours or longer.

4.  The data shows that for people arrested between August 12–22, 2016 and detained continuously until their first setting,
    a.  52.83% were held 48 hours or longer; and
    b.  20.83% were held 72 hours or longer.

5.  The data shows that for people arrested between November 12–22, 2016 and detained continuously until their first setting:
    a.  28.19% were held 48 hours or longer; and
    b.  10.57% were held 72 hours or longer.

6.  More specifically, the data shows that for people arrested between May 12–22, 2016:

    a.  Out of a total of 1490 people, 930 (62.42%) were held after arrest until a probable cause determination.

    b.  Of people held until a probable cause determination, 102 (10.97%) were held for 24 hours or longer after arrest.

    c.  Of people held until a probable cause determination, 16 (1.72%) were held for 48 hours or longer after arrest prior to having a probable cause determination.

    d.  Of people held until a probable cause determination, 9 (0.97%) people were held for 72 hours or longer after arrest prior to having a probable cause determination.

    e.  Out of a total of 1490 people arrested, 767 (51.48%) were held after arrest until a first setting.

    f.  Of people held until a first setting, 364 (47.46%) were held for 48 hours or longer after arrest.

    g.  Of people held until a first setting, 184 (24.12%) were held for 72 hours or longer after arrest prior to having a first setting.

    h.  Of people held until a first setting, 57 (7.43%) were held for 96 hours or longer after arrest prior to having a first setting.

7.  The data shows that for people arrested between August 12–22, 2016:

    a.  Out of a total of 1305 people, 844 (64.67%) were held after arrest until a probable cause determination.

    b.  Of people held until a probable cause determination, 176 (20.85%) were held for 24 hours or longer after arrest.

    c.  Of people held until a probable cause determination, 13 (1.54%) were held for 48 hours or longer after arrest prior to having a probable cause determination.

    d.  Of people held until a probable cause determination, 8 (0.95%) people were held for 72 hours or longer after arrest prior to having a probable cause determination.

    e.  Out of a total of 1305 people arrested, 672 (51.49%) were held after arrest until a first setting.

    f.  Of people held until a first setting, 355 (52.83%) were held for 48 hours or longer after arrest.

    g.  Of people held until a first setting, 140 (20.83%) were held for 72 hours or longer after arrest prior to having a first setting.

h. Of people held until a first setting, 48 (7.14%) were held for 96 hours or longer after arrest prior to having a first setting.

8. The data shows that for people arrested between November 12–22, 2016:

   a. Out of a total of 1359 people, 869 (63.94%) were held after arrest until a probable cause determination.

   b. Of people held until a probable cause determination, 120 (13.81%) were held for 24 hours or longer after arrest.

   c. Of people held until a probable cause determination, 6 (0.69%) were held for 48 hours or longer after arrest prior to having a probable cause determination.

   d. Of people held until a probable cause determination, 4 (0.46%) people were held for 72 hours or longer after arrest prior to having a probable cause determination.

   e. Out of a total of 1359 people arrested, 681 (50.11%) were held after arrest until a first setting.

   f. Of people held until a first setting, 192 (28.19%) were held for 48 hours or longer after arrest.

   g. Of people held until a first setting, 72 (10.57%) were held for 72 hours or longer after arrest prior to having a first setting.

   h. Of people held until a first setting, 30 (4.41%) were held for 96 hours or longer after arrest prior to having a first setting.

9. I used the following process to reach these findings:

**For all**

- I conducted the analysis using SAS 9.3 for Windows (code is included).

- The original dataset contained 107,081 observations. Each observation represents an arrest charge. Because some arrestees had multiple arrest charges, I removed duplicate observations that were identical on both Defendant_Name and Arrest_Date. This excludes duplicates without excluding people who were arrested multiple times but on different dates within the data set. Removing duplicates is important because we do not want the delays of people with two or three charges on the same date to be double or triple counted. When excluding duplicates, I kept the observation with the earliest Probable_Cause_Date – usually they differ by a matter of a few minutes for the different charges, but sometimes they are missing. After removing duplicates, the analytic sample included 97,715 arrestees.

- The first setting does not have a time within the dataset. In order to get more precise calculations, I enter a time of 9:00AM as the first setting time for each arrestee, and combine the date and time into a date-time variable.  I understand 9:00 AM to be the first setting time for detained defendants that is recorded on the District Court Clerk's website, even though the jail dockets can last several hours, and 9:00 AM is earlier than most detained defendants would ever see a County Court at Law Judge.

## Delays Between Arrest and First Setting

- We know the date-time of arrest and the date-time of first setting for each arrestee. Because we are interested in determining how many people were continuously held from arrest until first setting, we need to exclude those people who were released in the interim. (There are people represented in the dataset who were not held continuously from arrest until first setting, but were held for 48+, 72+, and 96+ hours prior to release and, upon release, had not yet had a first setting.  The dataset did not include release times.  Therefore, to avoid choosing arbitrary release times, I limited my analysis to people who were detained continuously from arrest until their first setting.)

- There are 3 variables in the dataset that indicate release: Reported_first_Release_date_Prior_to_Judgment,     Bond_Approved_Date,     and Release_date_After_Judgment. I created a variable that indicates "first release date" to equal the "Reported first Release date Prior to Judgment" unless NULL. Else, it is the "Bond Approved Date" unless NULL. Else, it is the "Release Date after Judgment." If none of the three variables contain dates, the earliest release date is assumed to be at first setting.

- If the first setting date is missing, then I assume that the person was released and no longer detained at first setting. If the first setting date is less than or equal to the first release date, then the arrestee is detained at first setting. I **include** people as detained who bonded out or were released on **the same day** as their first setting.

- I created a variable that counts the time interval (in minutes) between the arrest date-time and the first setting date-time for those people who were detained at first setting.

- I calculated an average, median, and indicators for people held for 48+, 72+, and 96+ hours between arrest and first setting.

## Delay Between Arrest and Probable Cause Hearing

- We know the date-time of arrest and the date-time of probable cause determination for each arrestee. Because we are interested in determining how many people were continuously held from arrest until probable cause, we need to exclude those people who were released in the interim. (There are people represented in the dataset who were not held continuously from arrest until probable cause determination, but were held for 24+, 48+, and 72+ hours prior to release and, upon release, had not yet had a probable cause determination.  The data set did not include release times.  Therefore, to avoid using arbitrary release times, I

limited my analysis to people who were detained continuously from arrest until their probable cause determination.)

- There are 3 variables in the dataset that indicate release: Reported_first_Release_date_Prior_to_Judgment, Bond_Approved_Date, and Release_date_After_Judgment. I created a variable that indicates "first release date" to equal the "Reported first Release date Prior to Judgment" unless NULL. Else, it is the "Bond Approved Date" unless NULL. Else, it is the "Release Date after Judgment". If none of the three variables contain dates, the earliest release date is assumed to be at the probable cause hearing.

- If the probable cause hearing date is missing, then I assume that the person was released and no longer detained. If the probable cause hearing date is less than or equal to the first release date, then the arrestee is detained at the probable cause hearing. I include people as detained who bonded out or were released on the same day as their probable cause hearing.

- I created a variable that counts the time interval (in minutes) between the arrest date-time and the probable cause hearing date-time for those people who were detained at the hearing. I consider to be released those cases with a negative time interval in which the probable cause date is before the arrest date. These are likely warrant cases.

- I finally calculated an average time held and indicators for people held for 24+, 48+, and 72+ hours between arrest and the probable cause hearing.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

_____                           2-15-17
Stephen Demuth, Ph.D.                         _____
                                                                Date

# PX 4(b)
# Second Supplemental Report of Stephen Demuth and Supporting Documents

FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |

## SECOND SUPPLEMENT TO EXPERT REPORT
## OF STEPHEN DEMUTH, Ph.D, M.A., B.S.

**Material Reviewed**

1.  I reviewed the materials listed in Exhibit A in preparing this report.

**Methodology and Opinions**

**Delays to First Setting and Delays to Probable Cause Determination**

2.  I have reviewed the data produced by the County in the form of a spreadsheet.

3.  I re-analyzed the delays from arrest to first setting for the full dataset from January 1, 2015 through January 31, 2017 (n=106,055 cases). Now that I have the release times and dates, which I obtained in the data produced with Dr. Morris's report, I was able to correctly identify the 1,245 people who were released on the day of first setting and prior to 9 a.m and designate them as released prior to first setting. My findings did not change in any meaningful way. The data show that between January 1, 2015 and January 31, 2017:

    a.  49.2% (52,194) of people were detained continuously from arrest to first setting.
    b.  51.4% (26,817) of people detained continuously from arrest until first setting were detained for 48 hours or longer.
    c.  25.7% (13,412) of people detained continuously from arrest until first setting were detained 72 hours or longer.
    d.  13.1% (6,846) of people detained continuously from arrest until first setting were detained 96 hours or longer.

1

4. I analyzed the cases that fell into the category of people who were detained continuously from arrest to first setting and who were held for 48 hours or longer prior to first setting. There were 26,817 in that group.  Of those:

   a. 100% (26,817) were held for 48 hours or longer.
   b. 70.5% (18,914) were held for 60 hours or longer.
   c. 50.0% (13,412) were held for 72 hours or longer.
   d. 37.4% (10,041) were held for 84 hours or longer.
   e. 25.5% (6,846) were held for 96 hours or longer.

5. I also analyzed the delays from arrest to probable cause determination, and from arrest to first setting for individuals arrested from December 1, 2016–January 31, 2017 (n=7,753 cases).

6. The data shows that, during that two-month period, 16.1% (838) were held for 24 hours or longer between arrest and probable cause determination.  The data also shows that, during those two months, 38.4% (1,137) of people were held for 48 hours or longer between arrest and first setting.

7. Specifically, the data shows that, in December 2016 and January 2017:

   a. Out of a total of 7,753 people arrested, 5,212 (67.2%) were held continuously after arrest until a probable cause determination.

   b. Of the people held until a probable cause determination, 838 (16.1%) were held 24 hours or longer after arrest.

   c. Of the people held until a probable cause determination, 49 (0.94%) were held 48 hours or longer.

   d. Of the people held until a probable cause determination, 33 (0.63%) were held 72 hours or longer.

   e. Out of a total of 7,753 people, 3,480 (44.9%) were held continuously after arrest until their first setting.

   f. Of the people held until first setting, 1,137 (38.4%) were held 48 hours or longer.

   g. Of the people held until first setting, 704 (20.2%) were held 72 hours or longer.

   h. Of the people held until first setting, 423 (12.2%) were held 96 hours or longer.

8. To reiterate, I now analyze the cases from January 1, 2015 through January 31, 2017. Also, now that I have the release times and dates, I am able to correctly identify the 1,245 people who were released on the day of first setting and prior to 9 a.m and designate them

as released prior to first setting. Because of the large size of the dataset and the small number of "re-designated" cases, these re-designated cases do not change the findings presented in my prior reports.  However, my analysis is ongoing.

**Personal bonds and Hearing Officer modification of bond amounts**

9. Of the 108,956 people who had bonds set when their complaint issued, 10,879 were released on personal bonds.

10. Hearing Officers confirmed the bail amount set on the Complaint in 89% of cases.

11. These findings suggest that Hearing Officers almost always set bail according to the bail schedule used to set the initial amount of bail, and rarely grant personal bonds.

**Daily Jail Population Reports**

12. I have reviewed Excel spreadsheets and HTML reports that are compiled from the results of daily queries to the Harris County District Clerk's public website.

13. A pro bono software engineer, Dan Rodney, developed a program that automated the queries and populated the spreadsheet.

14. The code used to run the program is included with this report, as well as instructions as to how to install and run the code.

15. These queries identify the online record for every individual held in jail at the time of the query for a misdemeanor offense that was filed in a Harris County Court at Law in the 30 days prior to, and inclusive of, the day of the query.

16. Each spreadsheet represents the summary of the results of a single day's queries while each HTML report represents the online record, from the County's district court clerk's website of a single individual on that day for a particular cause number.

17. Each spreadsheet includes the following fields for each individual held in jail at the time of the query according to the Clerk's public website: "arrestee name," "cause number," "date arrested," "bail amount," "charge," "next setting," "county court," "other holds" (which represents whether the clerk's website indicates there are any current holds at the time of the query on the individuals besides bail), "all misdemeanors" (if "Yes," it means the individual is not also being held in jail pretrial on a felony charge), and "has probable cause warnings" (which indicates whether the online record includes a probable cause and statutory warning form).

18. On February 22, 2017 the program was revised to extract additional information from the website.  Beginning on February 22, 2017, the spreadsheets also include the following fields: "time arrested," "race," "sex," "disposed m" (which represents prior

3

misdemeanors with a disposition of "disposed" in the "criminal history" portion of the Clerk's public site's information)

19. On February 18, 2017, an error occurred when the program ran and it only gathered complete information for 4 of the County Courts at Law. Information from February 18 is therefore excluded from the analysis.

20. The Excel spreadsheets and HTML reports show that, between February 15 and Feburary 26, 2017 (excluding February 18, when changes to the website caused errors in the program), an average of 353 people were being detained pretrial in the Harris County Jail solely on misdemeanor charges (i.e., with no pending felony charges).

21. An average of 251 of those people every day were not subject to any other hold, meaning, if they paid their money bail amounts, they would be immediately processed for release from the Jail.

22. An average of 193 of them were arrested two or more days before the day the query was run.

23. This means that, on any given day, there are hundreds of pretrial misdemeanor arrestees who have been in the jail for several days, charged only with misdemeanors and eligible for release from Harris County custody, and who would be released if they paid the money bail amounts imposed pursuant to the bail schedule.

## Additional Analysis Ongoing

24. I am continuing to supplement my findings with analysis of the data provided by Defendants, including the data I received more than a week after I filed my initial report. I will continue analyzing the data up through the hearing. I further intend to conduct analysis to rebut the assertions and findings in Dr. Morris's report.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Stephen Demuth, Ph.D.                                        2-27-17
                                                             Date

4

# Exhibit A

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

**SECOND SUPPLEMENT TO EXPERT REPORT**
**OF STEPHEN DEMUTH, Ph.D, M.A., B.S.**

**Material Reviewed**

1. Data spreadsheets covering January 1, 2015 – January 31, 2017 (Produced in Discovery by Defendant Judges)
2. Computer code used to create a program that scraped Harris County's District Clerk website for information about the jail population on certain days (Appendix 1)
3. Excel spreadsheets generated by the program described in Appendix 1, along with HTML reports of online case records for each person listed in the spreadsheets (Appendices 2-15; HTML reports will be made available via Dropbox, link forthcoming)
4. Summary chart of information in the Excel spreadsheets generated by the computer program described in Appendix 1 (Appendix 16)
5. Prisoner Booking / Releasing Process Changes (Appendix 17)

# Appendix 2

**Installation instructions (do this once)**

1. Download jailscraper.py and chromedriver to a folder on a Macintosh computer (laptop or desktop, version 10.6 or later; we have been testing on 10.10.)
2. If not already installed, download Google Chrome from http://www.google.com/chrome; open the downloaded DMG, and drag Chrome to the Applications folder to install it.
3. Download Python 2.7 from https://www.python.org/ftp/python/2.7.13/python-2.7.13-macosx10.6.pkg, and run it to install Python. Hit Continue repeatedly and Accept the agreement.
4. Open a Finder window. Under Utilities, run the Terminal app.
5. In the terminal window:
   a. Run "pip install selenium python-dateutil".
   b. Change the directory to the folder where you saved jailscraper.py and chromedriver, e.g. run "cd ~/Downloads".
   c. Run "chmod +x chromedriver"
   d. (If you want to run the program, you can skip to 2.b in the "Running instructions" below.)

**Running instructions**

1. Open a Finder window. Under Utilities, run the Terminal app.
2. In the terminal window:
   a. Change the directory to the folder where you saved jailscraper.py and chromedriver, e.g. "cd ~/Downloads".
   b. Run "python jailscraper.py" to run the program.

The program will then launch a Chrome window, log into http://www.hcdistrictclerk.com/, and begin searching for results for people who are in jail for misdemeanors in courts 1-16 and have a Filed date range of the past 30 days. It will then open pages for each cause number and save results as described below.

The program normally runs for about an hour. If you want to terminate the program before all 16 courts have been processed, go into the Terminal window and hit Ctrl-C. The results that have been gathered so far will be saved to the output folder.

**Description of output**

Each time the program runs, it creates an output folder under the folder containing jailscraper.py, with a name based on the date and time when the program started, e.g. "2017-02-24 23-49".

Inside the folder, HTML files are generated with names based off the name of a person in jail (e.g. "ADAMS, JOHN QUINCY.html"). Each file is the contents of the "Print All" page for the

person in question for a cause number. If the same person has multiple cause numbers in courts 1-16 that they are actively in jail for, multiple HTML files will be created for them, with a numeric suffix added for additional files.

Every fifth day, the program also downloads PDF files for probable cause warnings, linked to from the Images tab.

Additionally, a single summary CSV file is generated in the output folder with a name starting with "all" followed by the date and time, e.g. "all-2017-02-24 23-49.csv". You can import this CSV file into Excel, Google Sheets, etc.

The columns in the CSV, how they are derived, and when they were added to the output of the program, are described below.

| Column | Description | Source | Date added |
|---|---|---|---|
| Arrestee name | Name of the person who was arrested | Title | 2/15 |
| Cause number | Cause number of a misdemeanor | Title | 2/15 |
| Date arrested | The booking date | Second row in bookings table | 2/15 |
| Time arrested | The booking date and time | Second row in bookings table | 2/22 |
| Bail amount | Bail amount set | Case details table - Bond Amount | 2/15 |
| Charge | The charge / offense for the cause number | Case details table - Offense | 2/15 |
| Next setting | The next setting date | Case details table - Next/Last Setting date | 2/15 |
| County court | The court number (1-16) | Court number searched for | 2/15 |
| Other holds | "Y" if there were holds for the arrestee with no lifted date or a lifted date in the past 48 hours; N otherwise | Holds table | 2/15 |
| All misdemeanors | "N" if any entries in the criminal history table where defendant status is JAIL (J) have a (F) in in the Type of Action / Offense | Criminal history table | 2/15 |

| | column; "Y" otherwise | | |
|---|---|---|---|
| Has probable cause warnings | "Y" if there's a document in the Documents table with "PROBABLE CAUSE" in the name at the time the program runs; false otherwise | Documents table | 2/15 |
| Race | The race of the arrestee | Defendant details - Race/Sex | 2/22 |
| Sex | The sex of the arrestee | Defendant details - Race / Sex | 2/22 |
| Disposed M | The number of prior (non-JAIL) criminal history records where the disposition is DISP and the offense type is (M) | Criminal history table | 2/22 |
| Disposed F | The number of prior (non-JAIL) criminal history records where the disposition is DISP and the offense type is (F) | Criminal history table | 2/22 |
| Deferred M | The number of prior (non-JAIL) criminal history records where the disposition is DADJ and the offense type is (M) | Criminal history table | 2/22 |
| Deferred F | The number of prior (non-JAIL) criminal history records where the disposition is DADJ and the offense type is (F) | Criminal history table | 2/22 |
| Dismissed M | The number of prior (non-JAIL) criminal history records where the disposition is DISM and the offense type is (M) | Criminal history table | 2/22 |
| Dismissed F | The number of prior (non-JAIL) criminal history records where the disposition is DISP and the offense type is (F) | Criminal history table | 2/22 |
| Not guilty M | The number of prior (non-JAIL) criminal history records where the disposition is NOTG and the offense type is (M) | Criminal history table | 2/22 |

| Not guilty F | The number of prior (non-JAIL) criminal history records where the disposition is NOTG and the offense type is (F) | Criminal history table | 2/22 |
|---|---|---|---|
| Probation M | The number of prior (non-JAIL) criminal history records where the disposition is PROB and the offense type is (M) | Criminal history table | 2/22 |
| Probation F | The number of prior (non-JAIL) criminal history records where the disposition is DISP and the offense type is (F) | Criminal history table | 2/22 |

Appendix 16

| DATE and time[1] | Inmates with 1+ misD charges | Inmates with *only* misD charges (i.e., no pending felonies) | Inmates with only misD charges and no holds | Inmates with only misD charges, no holds, and in custody at least two days earlier | Inmates with only misD charges, no holds, and arrested at least three days earlier |
|---|---|---|---|---|---|
| 2/15/2017 | 472 | 348 | 243 | 167 arrested on or before 2/13/17 | 150 arrested on or before 2/12/17 |
| 2/16/2017 | 440 | 319 | 221 | 173 arrested on or before 2/14/17 | 145 arrested on or before 2/13/17 |
| 2/17/2017 at 7:28 p.m. | 452 | 335 | 239 | 167 arrested on or before 2/15/17 | 148 arrested on or before 2/14/17 |
| 2/19/2017 at 9:29 p.m. | 523 | 400 | 291 | 233 arrested on or before 2/17/17 | 205 arrested on or before 2/16/17 |
| 2/20/2017 6:35 p.m. | 483 | 360 | 251 | 209 arrested on or before 2/18/17 | 189 arrested on or before 2/17/17 |
| 2/21/2017 6:53 p.m. | 452 | 338 | 236 | 189 arrested on or before 2/19/17 | 180 arrested on or before 2/19/17 |
| 2/22/2017 2:33 p.m. | 432 | 322 | 223 | 171 arrested on or before 2/20/17 | 158 arrested on or before 2/19/17 |
| 2/23/2017 8:30 a.m. | 498 | 381 | 279 | 207 arrested on or before 2/21/17 | 177 arrested on or before 2/20/17 |
| 2/24/2017 | 453 | 339 | 244 | 191 arrested on or before 2/22/17 | 164 arrested on or before 2/21/17 |
| 2/25/2017 | 464 | 341 | 238 | 189 arrested on or before 2/23/17 | 162 arrested on or before 2/22/17 |
| 2/26/2017 | 527 | 402 | 294 | 228 arrested on or before 2/24/17 | 190 arrested on or before 2/23/17 |
| **Average** | 472 | 353 | 251 | 193 | 170 |

---

[1] Where noted, the time is the time the program began running.  It takes about an hour for the program to fully run and all of the data to be extracted.

# Appendix 17

# Prisoner Booking / Releasing Process Changes

## Harris County Sheriff's Office

# Previous Process







# Previous Process



# Previous Process



# Previous Process

- Deputy or Detention Officer currently completing the Mental Health Screening Forms are often having to use their best judgement in situations in which they have not been properly educated or trained (Additional training has since been implemented)

- Poor workflow and utilization of available space upon entry to the CWC causing arresting and transporting officers additional time to complete their tasks

- Lack of available holding cell space causing delay or cancellation of HPD prisoner transfers

- Unable to locate prisoners in holding cells throughout the process as no true process flow is designed to better track prisoners



# Previous Process

- Inconsistent court dockets for Probable Cause and JP courts

- Inconsistent times for Pre-Trial Services to conduct adequate interviews

- Losing and/or forgetting prisoners at different parts of the process leading to delayed releases and/or unacceptable amount of time until prisoners are housed

- Lack of available space to secure prisoners at certain times due to poor process flow

- No immediate medical assessments for prisoners entering the facility

- Delays in information received by Pre-Trial Services, Public Defender's Office

- Unacceptable amount of time to get prisoners through the process due to poor process workflow



# Recommendations

- The process flow within the Prisoner Logistics Division must be drastically changed in order to perform efficiently.

- The needed tasks to be performed by personnel should be evaluated and changed to provide the employee a better opportunity to effectively complete their respective tasks.

- A solution for locating specific prisoners must be established, as well a solution for ensuring prisoners do not get "lost" in the process.

- Build a consistent process where prisoners are received, booked, and go through the intake process in the order they are received, such as an assembly line.

- A method of moving prisoners out of PLD should be established to ensure compliance with Jail Standards and offer more reasonable accommodations for prisoners waiting for medical.

- Create a method that provides information to stakeholders on a more "real time" basis creating adequate time for stakeholders such as Pre-Trial Services, PC Court clerks and coordinators, Bonding, Mental Health, and the Public Defender's Office to efficiently conduct their tasks and operations.



# Required Components

- Re-purpose the use of the CWC
  - Reduce the geographic area where the Receiving and Booking process occurs
  - Eliminate the need for "Batching" prisoners
  - New process requires team work and can be better achieved in a single location
- Once the process was changed
  - We were successful in creating a better process to move prisoners through in a smaller area
  - We were successful in moving all prisoners traveling to TDC and other jurisdictions to the CWC



# Required Components

- Book all prisoners after receiving and before Pre-Trial Services interview

  - Prisoners are now processed through the system in the order they arrive
  - Creates a better method to locate prisoners as they move through the process
  - Gives Pre-Trial Services maximum time to conduct interviews
  - Creates more consistent court dockets



# Required Components

- Staff the outlying jails to operate 24/7
  - Arresting officers spend less time processing prisoners and more time on the street
  - Less officers in one location competing for work space and AFIS
  - Less tasks to be performed by personnel downtown creating more operational efficiency
- Personnel have been allocated to open all outlying jails 24/7
  - We are currently in the process of vetting appropriate personnel for this task
  - We anticipate full 24/7 operation of all outlying jails by March 1, 2016



# New Process



# New Process



# Results

- The process change at the Prisoner Processing Center was implemented on January 19, 2016.

  - Previous to this date, the average time to process a prisoner into the Harris County Jail was approximately 24.4 hours
  - Since the changes were implemented, the average time has dropped to 8.16 hours

# Additional Benefits

- By moving prisoners directly through the process as they arrive:
  - We are not "batching" prisoners leading to:
    - Maximum time for Pre-Trial Services to conduct interviews
    - More consistent PC Court Dockets
  - Allowing information to be sent sooner
    - Medical
    - Mental Health
  - Does not require as much space for holding
    - This has allowed our releasing process to become more efficient using the additional holding space to pull more prisoners for release

# Summary of Findings

| | All data (no dups--for people where bond approved date=first setting date and released before 9 am, code them as released before first setting) | | Column 1, but also no holds | | Column 2, but also no mhmr (any_mhr=0) | | Column 2, but also no mhmr (any_mhr=0 or missing) | | Column 4, but also no probation, no parole, no FTA, only 1 prior misd conv, only current misd case | |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | % | N | % | N | % | N | % | N | % |
| Detained until First Setting | 52194 | 49.21409 | 45284 | 46.28136 | 23016 | 44.83665 | 41384 | 47.15534 | 3678 | 56.56721 |
| Detained until First Setting >= 48 hours | 26817 | 51.37947 | 22920 | 50.6139 | 12248 | 53.21515 | 20816 | 50.29963 | 1608 | 43.71941 |
| Detained until First Setting >= 72 hours | 13412 | 25.69644 | 11674 | 25.77952 | 6496 | 28.22384 | 10470 | 25.29963 | 663 | 18.0261 |
| Detained until First Setting >= 96 hours | 6846 | 13.11645 | 6152 | 13.58537 | 3649 | 15.85419 | 5404 | 13.05819 | 234 | 6.362153 |
| Mean hours to First Setting | 88.5 | | 91.1 | | 100.8 | | 89.8 | | 64.8 | |
| | | | | | | | | | | |
| 10th percentile | 24.0 | | 23.5 | | 24.7 | | 23.4 | | 23.0 | |
| 25th percentile | 35.5 | | 35.1 | | 36.3 | | 35.0 | | 33.0 | |
| Median | 49.7 | | 48.6 | | 53.3 | | 48.3 | | 43.5 | |
| 75th percentile | 73.9 | | 74.3 | | 80.0 | | 72.6 | | 63.0 | |
| 90th percentile | 108.4 | | 110.9 | | 129.0 | | 108.8 | | 87.3 | |
| | | | | | | | | | | |
| Detained until Probable Cause Hearing | 70838 | 66.79364 | 63886 | 65.29307 | 31764 | 61.87832 | 58212 | 66.33015 | 5509 | 84.72778 |
| Detained until Probable Cause Hearing >= 24 hours | 14087 | 19.88622 | 13218 | 20.68998 | 7737 | 24.35776 | 11532 | 19.81035 | 565 | 10.25594 |
| Detained until Probable Cause Hearing >= 48 hours | 995 | 1.404613 | 917 | 1.435369 | 531 | 1.671704 | 817 | 1.403491 | 44 | 0.798693 |
| Detained until Probable Cause Hearing >= 72 hours | 692 | 0.976877 | 650 | 1.017437 | 382 | 1.202619 | 579 | 0.99464 | 31 | 0.562716 |
| Mean hours to Probable Cause Hearing | 37.2 | | 37.3 | | 39.0 | | 37.5 | | 35.2 | |
| | | | | | | | | | | |
| 10th percentile | 10.0 | | 10.0 | | 10.0 | | 10.0 | | 9.6 | |
| 25th percentile | 13.0 | | 13.0 | | 13.0 | | 13.0 | | 12.0 | |
| Median | 20.0 | | 19.8 | | 20.4 | | 19.6 | | 16.4 | |
| 75th percentile | 23.0 | | 23.1 | | 23.8 | | 23.0 | | 21.8 | |
| 90th percentile | 35.5 | | 36.0 | | 37.0 | | 35.3 | | 24.1 | |
| | 106055 | | 97845 | | 51333 | | 87761 | | 6502 | |

1245 cases were recoded as released because they were released before 9 am on the day of first setting

10084 cases where any_mhmr=1; 36428 cases where any_mhmr=missing

10084 cases where any_mhmr=1

| | All data (including dups) | | All data (no dups) | | All data (no dups--for people where bond approved date=first setting date and released before 9 am, code them as released before first setting) | |
|---|---|---|---|---|---|---|
| | N | % | N | % | N | % |
| Detained until First Setting | 59231 | 50.92511 | 53439 | 50.38801 | 52194 | 49.21409 |
| Detained until First Setting >= 48 hours | 30079 | 50.78253 | 27010 | 50.54361 | 26817 | 51.37947 |
| Detained until First Setting >= 72 hours | 14931 | 25.20808 | 13464 | 25.19508 | 13412 | 25.69644 |
| Detained until First Setting >= 96 hours | 7588 | 12.81086 | 6873 | 12.86139 | 6846 | 13.11645 |
| Mean hours to First Setting | 88.5 | | 88.0 | | 88.5 | |
| | | | | | | |
| 10th percentile | 23.5 | | 23.2 | | 24.0 | |
| 25th percentile | 35.0 | | 34.9 | | 35.5 | |
| Median | 48.8 | | 48.5 | | 49.7 | |
| 75th percentile | 72.4 | | 72.4 | | 73.9 | |
| 90th percentile | 107.1 | | 107.5 | | 108.4 | |
| | | | | | | |
| Detained until Probable Cause Hearing | 78119 | 67.16447 | 70838 | 66.79364 | 70838 | 66.79364 |
| Detained until Probable Cause Hearing >= 24 hours | 15470 | 19.80312 | 14087 | 19.88622 | 14087 | 19.88622 |
| Detained until Probable Cause Hearing >= 48 hours | 1101 | 1.409388 | 995 | 1.404613 | 995 | 1.404613 |
| Detained until Probable Cause Hearing >= 72 hours | 770 | 0.985676 | 692 | 0.976877 | 692 | 0.976877 |
| Mean hours to Probable Cause Hearing | 37.4 | | 37.2 | | 37.2 | |
| | | | | | | |
| 10th percentile | 10.0 | | 10.0 | | 10.0 | |
| 25th percentile | 13.0 | | 13.0 | | 13.0 | |
| Median | 20.0 | | 20.0 | | 20.0 | |
| 75th percentile | 23.0 | | 23.0 | | 23.0 | |
| 90th percentile | 35.6 | | 35.5 | | 35.5 | |
| | | | | | | |
| | 116310 | | 106055 | | 106055 | |

1245 cases were recoded as released because they were released before 9 am on the day of first setting

**notice that the % detained at first setting decreases by about 1%, but % of those people waiting longer increases