# PX 7(a)
# Declaration of Maranda Lynn ODonnell

1) I, Maranda Lynn ODonnell, am a 22-year-old woman.

2) I was arrested yesterday, May 18 2016, by the Harris County Police for a misdemeanor offense.

3) I was told by the Sheriff's deputies that my money bail is $2500. I know that because I cannot afford to pay that amount, I have to stay in jail.

4) I saw a TV judge this morning and he said, "I find probable cause," or something like that. He said my bail will stay at $2500. He told me my next court date would be on May 26. I was never asked if I could afford my bail. A sheriff's deputy told me not to say anything during my hearing. It took about 60 seconds.

5) I have one 4-year-old daughter. I receive assistance from WIC to support her. WIC stands for "women infants and children." I struggle to afford basic necessities for myself and my daughter. I can't afford rent so I stay with a friend.

6) I just started working at a restaurant a few weeks ago. I live paycheck to paycheck I'm worried about whether my job will still be there when I get out.

7) I cannot afford to buy my release from jail.

I declare under penalty of perjury that the foregoing is true and correct.

Name

5.19.16

Date

# PX 7(b)
# Declaration and Supplemental Declaration of Loetha McGruder

1) I, Loetha Shanta McGruder, am a 22-year-old woman.

2) I was arrested on May, 19, 2016, for a misdemeanor in Jacinto, Texas.

3) I was taken to the Harris County Jail early on Friday morning, May 20. A sheriff's deputy told me that my bond was $5,000, and that if I could post the bond I would be released. I can't afford to pay.

4) I saw a judge on a TV screen who said he found probable cause and told me my bail is $5,000. I was told my court date would be on Monday, May 23. I knew that because I cannot afford to pay that amount, I would have to stay in jail until then. I was never asked if I could afford my bail.

5) I have two children, one who is 4 years old and another who is almost ten months old. My older child has Downs syndrome along with other medical needs.

6) I am pregnant. I am going to apply for Medicaid so I can get an OB/GYN.

7) I am indigent. I have no money or savings. My only sources of income are disability payments and child support. The disability payments are to help support my son with Downs syndrome. I have no job. I am going to apply for food stamps. I live with my boyfriend. We share household expenses. When I find work, I contribute what I can.

8) I cannot afford to buy my release from jail.

I declare under penalty of perjury that the foregoing is true and correct.

_Loetha Meynk_ _May 21, 2016_
Name   Date

1. My name is Loetha McGruder.

2. I was arrested in May 2016 for a misdemeanor offense.

3. I was unable to pay the bail amount, which was set at $5,000 when I was arrested.

4. Because I couldn't pay, I was detained in the Harris County Jail.

5. As a result of my detention in Harris County Jail, I missed a job interview at Subway. That interview was never rescheduled.

6. After my arrest, the police had my car towed.

7. I remember being told after I got out of jail that it would cost hundreds of dollars to reclaim my car from the towing company. I was unable to afford both those fees and my car note after I got out of jail.

8. As a result of my detention, I was unable to pay my car note on time and my car was later repossessed by the car dealership.

9. I never got my car back, even though I had been making payments on it for several months before I was arrested.

10. It was very difficult to find a job because I didn't have access to my own vehicle.

I swear under penalty of perjury that the foregoing is true and correct.

Loetha McGruder                    1-26-17
Loetha McGruder                    Date

# PX 7(c)
# Declaration of Robert Ryan Ford

1) I, Robert Ford, am a 26-year-old man.

2) I was arrested on May 18, 2016 in Houston, Texas.

3) I was taken to the Harris County Jail ~~on~~ early on Friday morning, May 20.

4) I saw a judge on a TV screen who said she found probable cause and told me my bail is $5,000. I knew that to be released, I would have to pay that amount of money or else I would be kept in jail. No one asked me if I could afford to pay money bail.

5) I am indigent. I'm not currently working. I have no bank account or real property or any other assets. I live with my girlfriend at her ~~friends~~ parents' house. I try to help with household responsibilities to compensate her family for letting me live there.

6) I was told my next court date is Monday.

7) I cannot afford to buy my release from jail.

I declare under penalty of perjury
that the foregoing is true and correct.

5-21-16
_____
Date

_____
Name

# PX 7(d)
# Declaration of Bough Zeerip
# (Supporting Documents 7(d)(i) and 7(d)(ii))

<div align="center">

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

</div>

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

<div align="center">

**DECLARATION OF BOUGH ZEERIP**

</div>

1.  My name is Bough (Bo) Alan Zeerip.

2.  I am a Senior Trial Deputy District Attorney for Mesa County, Colorado.  My current duties include managing a caseload of high level felony cases including property crimes, drug distribution, assault, burglaries, sexual assaults, and homicides, as well as training younger attorneys and law enforcement officers.  I am also assigned as the District Attorney's representative to the Western Colorado Drug Task Force, and to the Mesa County pretrial/bail/bond committee.

3.  I have been a prosecutor for approximately 10 years.  Prior to being a prosecutor I practiced law in a variety of areas including criminal defense.  I have also educated myself in the area of bail/bond law and practices, and have developed an interest and passion for advancing pretrial justice.  Accordingly, I have been asked to serve on various pretrial justice committees, I have testified at the legislature regarding bond reform, and I have presented to various criminal justice groups regarding pretrial justice issues in at least eight different states across the nation.

4.  In 2010 Mesa County, Colorado (the 21st Judicial District) participated as one of seven jurisdictions selected by the National Institute of Corrections (NIC) to consider how we could implement criminal justice research and evidence based decision making (EBDM) principles in our local criminal justice system.  EBDM is primarily concerned with using verifiable data, research, and statistics to make rational decisions that produce the desired outcomes.

<div align="center">1</div>

5. I was assigned to represent the District Attorney's Office on the Mesa County pretrial/bail/bond reform subcommittee and have served on that committee since 2010. I also currently serve on the "standards committee" revising the black letter and best practices standards for pretrial for the National Association of Pretrial Agencies (NAPSA), in cooperation with the National Institute of Corrections (NIC).

6. Throughout 2010–2012 the Mesa County pretrial subcommittee reviewed the pertinent law, research, evidence, and data that was available to inform decision making during the pretrial period of a criminal case.

7. We also discussed our various priorities and we ultimately decided that all stakeholders on the committee agreed on three common pretrial goals: 1) maximize release, 2) maximize public safety, and 3) maximize court appearance. We recognized the tension and competition among these three goals, but believed that policies and procedures could be adopted to optimize all three at the same time, although we knew we could not achieve 100% realization of any one of them.

8. At the same time that our committee was educating ourselves and discussing possible reforms, various empirically developed and validated pretrial risk assessment tools were becoming available to assist pretrial decision makers when evaluating which defendants were low, medium, or high risk to either fail to appear in court, or to commit new crimes if released. One of these empirical and validated tools was the Colorado Pretrial Assessment Tool (CPAT).

9. Four years ago, in 2012, we abolished our offense-based money bond schedule, and we began to use the Colorado Pretrial Assessment Tool (CPAT) to make risk-based and individualized decisions regarding who should be released, who should be detained pretrial, and if release was appropriate, what non-monetary bond conditions should be imposed to maximize public safety and court appearance.

10. Among the various specific principles and policies we agreed upon include:

   a. Focus our limited criminal justice resources on high risk defendants and "high stakes" crimes, and develop policies and practices that result in very few low-to-medium risk defendants being detained pretrial.

   b. Minimize the number of people actually arrested and booked into jail through the use of a short 3-question risk assessment or "proxy" used by the law enforcement officer when making a decision about whether to arrest or give a summons/citation. Only arrest those individuals who are required by law to be arrested, or who pose a danger to the community.

   c. The strong presumption for all traffic, petty, and misdemeanor offenses is to release on a summons/citation. Law enforcement officers may only arrest such individuals if the law requires an arrest (such as in a domestic violence case), or where there is a clear danger to the community if a person was released on a summons/citation.

   d. "Universal screening": All persons arrested and booked into jail have a full CPAT risk assessment completed to determine their level of pretrial risk. High risk defendants may no longer hire a bondsman to sign them out of jail based on an offense-based money bond schedule prior to seeing a judge who makes a determination regarding release and bond conditions.

   e. Minimize the amount of time low-to-medium risk defendants are in jail by directing pretrial service agency professionals to release such defendants on a personal recognizance bond without a monetary condition immediately after completing the risk assessment.

   f. Judges, not bondsmen, should decide who is released into the community, and under what bond conditions.

   g. Low-to-medium risk individuals should be released as soon as possible (within 24 hours at the most) with appropriate bond conditions, and without any monetary condition of bond.

11. My personal observations and experiences in prosecuting hundreds of cases over the past decade, both pre-reform and post-reform, indicate that monetary conditions of release do not enhance public safety or increase court appearance. The overwhelming research and evidence in this area confirms my own personal experience.

12. As we tracked the data over the past 10+ years we have seen a dramatic increase in the release of defendants with non-monetary conditions, which we call personal recognizance bonds, or PR bonds. In 2011, prior to the reforms in Mesa County, approximately 30% of the bonds issued by judges were PR bonds, and 70% required a monetary amount be posted by the defendant prior to securing their pretrial release. In 2015 and 2016 (through October) over 60% of the bonds issued were PR bonds.

13. In addition to issuing dramatically more bonds without monetary conditions we have increased the use of summons/citations for all levels of offenses, including for felony charges, such that approximately 80% of defendants in Mesa County are immediately at liberty pretrial on either a PR bond or a summons/citation.

14. Some of the remaining defendants who do have monetary conditions of bond also secure their release such that approximately 90% of defendants in Mesa County are at liberty pretrial.

15. This number includes all felonies, misdemeanors, and some serious traffic cases such as driving under the influence.

16. The outcomes and results of the reforms have been encouraging.

17. The first significant outcome is that in 2015-2016 only about 3-4% of our pretrial jail population was categorized as "low risk." That number includes only felony defendants, and is primarily individuals who have unavoidable "holds" on them, or who are charged with the most serious felony crimes such as homicide or violent sexual offenses.

18. As for public safety, even while we more than doubled the use of non-monetary PR bonds, the pretrial "perfect law abiding rate" actually increased from 80% in 2011 to 82% in 2015 and 84% in 2016 (through October).   "Perfect law abiding rate" means that a defendant had no new arrests for any jailable offense during the pretrial period.

19. Court appearance rates have also not been significantly negatively affected by the reforms and the doubling of PR bonds.  In 2015 (the last year for which we have complete data) the Mesa County system court appearance rate was approximately 92%, compared with about 93% in pre-reform 2011.

20. Even though the Failure to Appear (FTA) rate has increased slightly in the last 4 years, this result was not disappointing to us, or surprising, and in some sense was expected.  As a local criminal justice system we *purposefully* decided to take more risk with low to medium risk individuals by granting them release using non-monetary bonds to secure their liberty pretrial, reduce the negative impacts to the community of incarcerating low to medium risk defendants, and to save tax dollars by reducing jail use.

21. We were fully aware that the reforms might result in additional FTAs if more defendants were release pretrial, and we were willing to accept that risk and the possible increased FTA rate in exchange for a higher rate of pretrial release, and reduction in jail use.

22. As a committee we discussed the nature of different failures to appear (FTA). Experience and research indicates that over 90% of all FTAs are not actual attempts to flee prosecution, but rather are due to irresponsibility or simple mistakes.   The overwhelming majority of FTAs are due to transportation problems, sickness, forgetfulness, substance use/abuse, employment, mixing up court dates,

miscommunication, etc. The majority of such FTAs usually resolve themselves within a short period of time without harm to the prosecution of the case.

23. Mesa County is also now working to implement a process whereby defendants who missed a court date and have a warrant out for their arrest can come forward within a certain short time period (possibly 30 days) and they will simply receive a new court date to appear in the near future and the warrant would be quashed. It is believed that this will save significant law enforcement and jail resources, and will assist defendants who missed court to get "back on track" with a new court date.

24. It is also very important to note that none of these reforms or outcomes could have been achieved without a professional and independent pretrial services agency staffed with sufficiently educated and well-trained criminal justice professionals. Such professionals are responsible for properly administering the CPAT risk assessment every day prior to bond hearings, as well as supervising the majority of defendants released on PR bonds. Supervision includes helping ensure that supervised defendants appear in court (through court reminder calls/emails/text messages), conducting drug and/or alcohol substance testing, administering GPS/EHS/SCRAM ankle monitoring when appropriate, and having periodic case management meetings with certain medium-to-high risk defendants. Much could be said about appropriate pretrial supervision (NAPSA has excellent pretrial supervision standards), but at a minimum it is crucial to not over supervise defendants, and to not supervise every defendant in the same manner, but rather to tailor pretrial supervision conditions to the defendant's particular individual risks and needs. Pretrial supervision agencies can help a jurisdiction to effectively implement pretrial justice reforms, and pretrial agencies pay for themselves through lower jail costs.

25. We certainly still have room for much improvement in Mesa County and in Colorado to achieve true pretrial justice. And we must all acknowledge that no system will ever be 100% safe and perfect when human beings are involved. However, the research, evidence, data, and our own experience and results demonstrate that the use of non-financial bond alternatives can lead to significant overall improvements in pretrial justice by maximizing release, public safety, and court appearance.

I declare under penalty of perjury that the foregoing is true and correct.


Bo A. Zeerip                                              2-6-17
                                                         Date

5

# 7(d)(i)
# Joel Bishop - Risk Assesments

# Risk Assessments
# *Methods and Strategies*

Joel Bishop

[joel.bishop@mesacounty.us](mailto:joel.bishop@mesacounty.us)

970-244-3309

# Potential Uses of Risk Assessments

- Creates an Evidence-Based Framework to Enhance Pretrial Justice Strategies such as,
    - Arrest Decisions (Proxy)
    - Release Decisions
    - Release Rates, Safety Rates, Appearance Rates, Compliance Rates
    - Supervision Strategy Continuum
    - Effects of Supervision – supervised versus unsupervised
    - Jail Population Evaluation
    - Violation Response Protocol Continuum
    - Outcomes of PR bonds, versus secured bonds, etc.

# 2016 Success Rates by Risk Level in Mesa County

- Local data demonstrates that the instrument is predicting accurately.
- Alleviates skepticism about local validity of the instrument.



*supervised defendants only*



# Who are we supervising?
# Risk Assessment Levels



# 2016 Release Rates by Risk Category



# Success Rate Scale By Case – The Reality Checker



*Success rate by case, not defendant.  Therefore, higher risk defendants may be likely to have more than one case, driving the overall success rates down further.*

# Arapahoe County

| Risk Category | FTA | | | Rearrest | | |
|---|---|---|---|---|---|---|
| | Unsupervised | Supervised | Difference | Unsupervised | Supervised | Difference |
| Low | 24% | 10% | 14% | 18% | 10% | 8% |
| Moderate | 37% | 17% | 20% | 26% | 16% | 10% |
| High | 54% | 30% | 24% | 38% | 18% | 20% |
| Very High | 69% | 32% | 37% | 53% | 17% | 36% |
| Total | 48% | 22% | 26% | 34% | 15% | 19% |

| Risk Category | Total Number of Defendants | |
|---|---|---|
| | Unsupervised | Supervised |
| Low | 333 | 937 |
| Moderate | 234 | 892 |
| High | 162 | 606 |
| Very High | 224 | 498 |
| Total | 953 | 2933 |

# Boulder County, Colorado PR versus Secured – Lower Risk Defendants



**Outcomes for Supervised CPAT**
**Lower Risk - Cat 1s and 2s**
**by Bond Type, 2016**

# 7(d)(ii)
# Pretrial Outcome Summary

**CJS Pretrial Outcomes for Supervised and Unsupervised Defendants: Preliminary Findings**
**Sample: Cases with CPAT interviews and complete records that closed between Oct 2013 and Sep 2015**

**Finding #1: Supervised defendants have better outcomes than unsupervised defendants**



**Finding #2: The CPAT is effective at predicting risk in our pretrial population.**

| Outcomes by Risk Category | | | | |
|---|---|---|---|---|
| | Supervised (n=2,104) | | Unsupervised (n=763) | |
| | Court Appearance | Public Safety | Court Appearance | Public Safety |
| CPAT Cat 1 | 97% | 97% | 88% | 86% |
| CPAT Cat 2 | 94% | 92% | 72% | 78% |
| CPAT Cat 3 | 94% | 88% | 65% | 68% |
| CPAT Cat 4 | 84% | 76% | 66% | 58% |

**Finding #3: Defendants released on PR bonds have equal or better court appearance outcomes than defendants released on secured bonds**

| Court Appearance by Risk Category and Bond Type | | | | | |
|---|---|---|---|---|---|
| | Supervised | | Unsupervised | | |
| | Unsecured (PR) | Secured | Unsecured (PR) | | Secured |
| CPAT Cat 1 | 99% | 96% | | 88% | 87% |
| CPAT Cat 2 | 95% | 94% | | 77% | 74% |
| CPAT Cat 3 | 92% | 94% | n=8 | 50% | 69% |
| CPAT Cat 4 | n= 1  100% | 83% | n=0 | N/A | 67% |
| Average | 97% | 93% | | 85% | 75% |

**Finding #4: Defendants released on PR bonds have equal or better public safety outcomes than defendants released on secured bonds**

| Public Safety by Risk Category and Bond Type | | | | | |
|---|---|---|---|---|---|
| | Supervised | | Unsupervised | | |
| | Unsecured (PR) | Secured | Unsecured (PR) | | Secured |
| CPAT Cat 1 | 99% | 94% | | 86% | 86% |
| CPAT Cat 2 | 95% | 91% | | 80% | 77% |
| CPAT Cat 3 | 77% | 87% | n=8 | 75% | 68% |
| CPAT Cat 4 | n=1  100% | 76% | n=0 | N/A | 56% |
| Average | 96% | 89% | | 84% | 74% |

# PX 7(e)
# Declaration of Drew Willey

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF DREW WILLEY

1. My name is Drew Willey.

2. I am an attorney, barred in the State of Texas.

3. I regularly represent individuals who have been charged with crimes and are being prosecuted in Harris County.

4. On December 20, 2016, I learned that a client of mine had been arrested on December 19, 2016, and was being detained in the Harris County Jail.

5. Using the Harris County District Court Clerk's website, I searched for the exact location of my client, Caleb Linton, within the jail complex.

6. The website indicated that he was "in processing" at the jail.

7. I went to the bond windows at 49 San Jacinto Street, and was told my client was in processing and I could not see him unless I went to processing at 1201 Commerce Street.

8. I went to 1201 Commerce Street.

9. At the door to the building at 1201 Commerce Street, there is no window or personnel assigned. I had to push an intercom system to be let in the door. Once inside, the elevator only operates to one floor, which was indicated as the property room. I pushed another intercom near the elevator buttons. Eventually, a voice spoke from speakers in the ceiling asking why I was there. I asked to see my client. I was told that they could not hear me and the intercom must be broken. No one came to see me and no other form of contact was provided.

10. I rode the elevator to the only accessible floor in that building. It was the property room. The Sheriff's Department deputy working the property room desk told me there was no way I could see my client while he was in processing and that "it didn't work that way."

11. The Sheriff's deputy on duty at 1201 Commerce Street told me that my client was in the Inmate Processing Center and that I could not meet with him or speak with him.

12. The deputy told me that I could not have any contact with my client until my client was assigned to a housing unit within the jail. He told me I had to go wait for my client at the main jail facility at 701 San Jacinto Street.

13. I went to 701 San Jacinto Street.

14. Multiple Sheriff's deputies on duty at 701 San Jacinto Street told me that my client was in the Inmate Processing Center and that I could not meet with him or speak with him.

15. They told me that I could not have any contact with my client until my client was assigned to a housing unit within the jail, and that they did not know where or when that would be.

16. These deputies told me it could take anywhere from 48-72 hours for an inmate to go through processing and that at no time before that could attorneys see their clients.

17. These deputies told me they have never allowed an attorney to see a client while the inmate is "in processing." I understood this rule to apply to all attorneys regardless of whether they wanted to see a client charged with a misdemeanor a felony.

18. I told these deputies that I have a constitutional right to see my client.

19. One deputy mocked me and laughed while stating, "This guy has the Constitution."

20. Deputies at the bond windows at 49 San Jacinto Street, 1201 Commerce Street, and 701 San Jacinto Street, all independently told me that the Harris County Sheriff's Department policy was to disallow any attorney visits and any other visits while arrestees are "in processing," a period of time that lasts at least 48 hours.

21. The deputies also told me that even though my client was unavailable for an attorney visit, if someone posted bail for my client, he would be found and released from the processing center.

22. My client, Mr. Linton, was assigned to a housing unit on December 21, 2016.

23. I finally met with him on December 21, 2016, one day before he had a court appearance scheduled for December 22, 2016.

I declare under penalty of perjury that the foregoing is true and correct.

Drew Willey

Date

## EXHIBIT 1 TO DECLARATION OF ATTORNEY DREW WILLEY

1. I am an attorney, barred in the State of Texas.

2. I regularly represent individuals who have been charged with crimes and are being prosecuted in Harris County.

3. I have previously attempted to visit a client who was being detained in Harris County's Inmate Processing Center.

4. I was prohibited from accessing my client while s/he was in the processing center.

5. I was informed by at least one employee of the Sheriff's Office that no one in the processing center can be contacted by phone or in person, by an attorney or anyone else, for the entire period of detention in the processing center.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Name

_____
Date

e(i)
Second Declaration of Drew Willey

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

|  |  |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-cv-01414 |
| ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |
| ) | |

## DECLARATION OF DREW WILLEY

1. My name is Drew Willey.

2. I am a criminal defense attorney and represent misdemeanor defendants in the Harris County Criminal Courts at Law.

3. I submit this Declaration in an attempt to explain how an individual's inability to pay a monetary bail amount hinders her access to certain diversion programs in Harris County.

4. To be clear, I will not address specialty courts, which operate under their own sets of guidelines, eligibility requirements and rules.  I also will not address the more recent low-level marijuana charge diversion programs that former District Attorney Devon Anderson and current District Attorney Kim Ogg have established, which is now accessed prior to being charged and prior to having a monetary bail amount imposed at all.

5. First, I will address the DWI diversion program.

6. In order to be eligible for the County's formal DWI diversion program, a defendant must meet certain criteria, such as being a first offense, not having a suspended license, not getting into a wreck, etc. A defendant must also pay for and submit to screening and tests, at times at least a few hundred dollars. A defendant must also write a letter to the prosecutors laboring over their alleged guilt.

7. It is virtually impossible to satisfy these requirements if a person is not released on bond.

8. Prosecutors typically have discretion to determine who will be admitted into the program. Frequently, a prosecutor can be persuaded to recommend a defendant for diversion if the defendant has already satisfied some of the requirements of the diversion program, for

example, completing community service hours, submitting to drug and alcohol tests, having an ignition interlock device, or taking certain classes.

9. In my observation and experience, if some of these requirements are completed before the defendant is officially accepted into the diversion program, the person's chances of being accepted into the program are dramatically increased.

10. However, if a person is incarcerated pretrial on a monetary bond she cannot afford for a DWI offense, her opportunity to avail herself of the diversion program is extremely limited, if not forgone, because she cannot satisfy the requirements of the diversion program prior to being admitted to it.

11. People charged with other offenses may also be eligible for more informal diversion programs. Sometimes, these "programs" are not official programs, but rather are opportunities, provided solely in the prosecutor's discretion, for defendants to fulfill certain requirements in exchange for a dismissal of the charge.

12. Access to these diversion opportunities almost always hinge on a person's being released pretrial.

13. Many times, prior to even seeking this type of diversion, the defendant must provide proof of employment or school, community service hours completed, recommendation letters, drug and alcohol testing, etc.

14. If a defendant is incarcerated pre-trial due to her inability to pay a monetary bail amount, she will have no way to complete some of these requirements, and will therefore not be eligible for the diversion opportunity.

15. In practice, most defendants in custody are not even afforded an opportunity to request diversion programs, as prosecutors and defense attorneys forego eligibility.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

_____          _____
Drew Willey                               March 15, 2017

# PX 7 (f)
# Declaration of Jacob Sills

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. ) | (Consolidated Class Action) |
| ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |
| ) | |

## DECLARATION OF JACOB SILLS

1. My name is Jacob Sills.  I earned an M.B.A. from the Wharton School, University of Pennsylvania, and a B.A. from Cornell University.

2. I have previously worked as a Senior Associate with TEM Capital, a private equity fund focused on renewable energy and as an Investment Banking Analyst at Banc of America Securities.  In each of these positions I conducted financial analysis, provided strategic advice and analyzed potential investments.

3. I am Co-Founder and CEO of Uptrust, a company that uses cutting edge technology and behavioral research to help people charged with crimes show up for their court dates.

4. Our research has shown that the vast majority of people who miss court have not fled the jurisdiction.  Instead, they miss court for reasons that can be solved: for example, they forgot the court date, were unable to secure transportation or child care, were unable to take time off work or forgot to ask in advance, were scared or confused about going to court, or did not understand the consequences of failing to appear.

5. Failure-to-appear risk is different from flight risk.  Although flight risk is difficult to mitigate, most FTAs, and the bench warrants that issue as a result of failing to appear, can be avoided if assistance is provided to defendants to help them get to court.

6. Uptrust accomplishes this by sending text message reminders to people's cell phones.

7. In the counties where we are operating, we integrate our software with the jurisdiction's pre-existing case management system.  Arrestees provide their name, cell phone number, court date and time, whether they have a daily obligation, whether they have children under the age of 10, and how they plan to get to court (or if they are not sure).

1

8. Using that information, Uptrust sends text messages to defendants about a week, and then a few days, before their court dates, reminding the person of the court date and the fact that failing to appear could result in a bench warrant.

9. The technology permits two-way communication, so the person can text back to provide information about any conflict that has come up or any anticipated problems getting to court. That response will be forwarded to a case manager or the defendant's lawyer.

10. This simple technology has provided dramatic improvements in appearance rates in the jurisdictions where Uptrust is currently operating.

11. In Richmond, CA – a high-poverty city in Contra Costa County, CA – the FTA rate of Public Defender clients decreased from 20% to 3.9%. That 96.1% court appearance rate is a stellar accomplishment given my examination of typical appearance rates in large American jurisdictions.

12. In Luzerne County, Pennsylvania, the FTA rate of low-income defendants (clients of the public defender) dropped from an estimated 19% to less than 6% in under 45 days. Put another way, people showing up for court increased from approximately 81% to 94%.

13. Uptrust engages low-income defendants; approximately 30% of recipients of our text reminders reply to our messages. The top responses from defendants are "Thank You" and "Ok."

14. We launched in Philadelphia, PA the first week in February 2017, and will launch our services in San Francisco, CA in late February 2017. Uptrust is currently in discussions with several other large counties to provide its services.

15. We have offered our product to Harris County at a discounted rate of $3,000/month for six months.

16. We are also preparing to provide additional services in jurisdictions where we operate, such as providing people with free rides to Court. In a large city like Houston, certain transportation providers, such as Uber, could likely provide transportation for a few dollars per person, far cheaper than the cost of incarcerating someone for days or weeks prior to trial. Uptrust has experience identifying which defendants require extra assistance.


I declare under penalty of perjury that the foregoing is true and correct.


___*Jacob Sills*___                                    ___2/6/17___
Jacob Sills                                                    Date


2

# PX 7(g)
# Declaration of JoAnne Musick

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) | (Consolidated Class Action) |
| | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |

**DECLARATION OF JOANNE MUSICK, CHIEF**
**HARRIS COUNTY DISTRICT ATTORNEY'S OFFICE SEX CRIMES UNIT**

### I.    Background

1.    My name is JoAnne M. Musick.  I am Chief of the Sex Crimes Division at the Harris County District Attorney's Office.

2.    I began my legal career in 1998 as a Harris County Assistant District Attorney and worked as a prosecutor until April of 2003.

3.    In 2003, I co-founded a law firm, Musick & Musick, LLP, and was a Partner, specializing in criminal defense, juvenile law, and family law.

4.    In December of 2016, after thirteen years in private practice, I was appointed to my current position as Chief of the Sex Crimes Division in the Harris County District Attorney's Office.  I left my firm and was sworn in on January 1, 2017.

5.    I am Board Certified by the Texas Board of Legal Specialization in both Criminal Law and Juvenile Law.

6.    I have tried over 100 criminal cases in the state and federal courts.

7.    I served two terms as the President of the Harris County Criminal Lawyers Association, which is the nation's largest independent local criminal bar association. In addition to serving as President in 2008-2009 and 2015-2016, I served on the Board of Directors almost continuously from 2004 through 2016.

8.      I served as a Board member and CLE chair and speaker for the Texas Criminal Defense Lawyers Association.

9.      I have served on the Texas Board of Legal Specialization exam commission since 2005.

10.     I have spent my entire legal career — almost 20 years — practicing in the Harris County criminal legal system.

11.     I have spent a significant amount of time practicing in the County Criminal Courts at Law for many years.

12.     As an ADA, I was regularly assigned to prosecute individuals charged with misdemeanor offenses.

13.     As a criminal defense attorney, I represented individuals charged with misdemeanors in these courts.   I regularly accepted court-appointed cases, meaning I was assigned to represent defendants who could not afford to hire their own lawyers.

14.     Through these experiences in the County Criminal Courts at Law, I have developed a thorough understanding of the County's post-arrest, bail-related policies and practices as they relate to individuals arrested within Harris County.

15.     The observations in this affidavit regarding the County's post-arrest, bail-related policies and practices are based upon my experiences prior to the initiation of the *O'Donnell* litigation in Civil Action No. 16cv01414.   I express no opinion regarding the current policies and practices of the Harris County Criminal Courts at Law in the aftermath of the filing of that suit.

## II.     Harris County's Arrest and Bail-Setting Process Prior to the Initiation of the *O'Donnell* Lawsuit

16.     When an officer detains a person suspected of a crime, the officer calls the ADA intake line, tells the ADA on duty what she observed, and asks whether the ADA wants to accept charges.   If the ADA agrees to accept charges, the arrestee is transported to a police station or directly to the Harris County Jail.

17.     The arrestee will be told a monetary amount required for her release pursuant to the bail schedule, usually within a few hours of arrest.

18.     If the arrestee can pay the predetermined bail amount, she will be released.   If she cannot pay, she will be transferred to the Harris County Jail for booking.   If the arrestee is already at the Jail, the booking process continues.

19.     At some point during the booking process, arrestees are taken to a probable cause hearing where a Hearing Officer, via videolink, determines probable cause and usually sets bail pursuant to the Harris County bail schedule.

20.    Eventually, arrestees in the jail are assigned to a particular housing unit within the jail.

21.    Only after being assigned to a housing unit will a new arrestee appear in a County Criminal Court at Law.   These hearings are referred to in the County's online case records as "jail hearings."   The docket for jail hearings is routinely called the "jail docket."

22.    It can take several days from the day of arrest for an individual to be housed. Many factors appear to influence timing. If first placed in an outlying jail, the process does not begin until the person reaches the Harris County Jail via inmate processing. Sometimes inmate processing can take hours; other times, it could take a day or more, especially if there are medical or mental health issues requiring attention.

23.    Prior to housing, arrestees are detained in the Inmate Processing Center (IPC).   While there, they are unavailable for an attorney visit.   I have never visited anyone detained in the IPC.   Attorneys are denied access to any inmate who is in the IPC, though arrestees are regularly released if their bail amount is paid while they are being detained in the IPC.

## III.    Assignment of Court-Appointed Attorneys and First Setting

24.    Most misdemeanor defendants who are found indigent for purposes of appointing counsel are represented by court-appointed attorneys.[1]

25.    Each County Criminal Court at Law Judge handles attorney appointments slightly differently, but it typically works as follows.   The names of attorneys who are approved to take court-appointed cases are put on a so-called "wheel."   A group of attorneys is supposed to be randomly selected, on a periodic basis determined by each individual Judge, using the wheel to serve a specific period of time, which could be a day, a week, a month, or several months.

26.    While on duty in a particular courtroom, court-appointed attorneys are assigned new clients.

27.    Typically, there are three court-appointed attorneys on duty in a courtroom each day.

28.    Arrestees still in Harris County custody for their initial court setting are generally presumed indigent for purposes of appointing counsel, and one of the duty attorneys will be assigned to represent each detained defendant.

29.    When duty attorneys arrive in that courtroom for the jail docket, they learn the names of the newly arrested and still-detained defendants who will be their clients.

---

[1]    Indigent misdemeanor defendants with certain mental health issues are represented by the Harris County Public Defender's Office.

30.     In Harris County, court-appointed attorneys generally do not get prior notice of new clients. Court-appointed attorneys generally meet their new clients at the first setting. In my experience, clients generally do not know who their attorney will be until that setting, absent a pre-existing case with an appointed attorney already attached.

31.     At these hearings, arrestees who cannot afford the predetermined monetary bail are held in a lock-up outside of the courtroom.

32.     The lock-up is attached to the courtroom. All of the detained defendants are typically held together in a single room. Attorney-client conversations occur through glass and are not private. They are audible to other inmates, guards, and attorneys.

33.     Once an attorney knows who her new clients are, she can review the State's file and any discovery that may be available and then go back to the lock-up to meet and speak with her clients.

34.     When I was working in the County Criminal Courts at Law as a defense attorney, I often met with the prosecutor before meeting a client to find out whether the prosecutor intended to offer my client a plea deal and what the offer was.

35.     Prosecutors generally make plea offers at the jail hearing unless the case involves a victim whom the prosecutor has been unable to contact or if there is other missing discovery relevant to the plea offer.

36.     After learning the plea offer, I would meet with my client and (among other things) convey the offer, if any, made by the ADA. This is the typical practice of court-appointed attorneys practicing in the County Criminal Courts at Law.

37.     If my client wanted to accept the plea offer, I prepared the relevant paperwork, and my client was brought into the courtroom, in an orange jumpsuit and shackles, to appear before the judge to plead guilty.

38.     If several detained defendants were pleading guilty, they were usually brought into the courtroom together, shackled to each other. This is still the practice to the best of my knowledge, though each judge determines how many defendants are brought into the courtroom together.

39.     Defendants appear before the judge in shackles for guilty pleas even if they are accused only of non-violent misdemeanors, and even if they are detained only because they could not pay the monetary bail amount.

40.     In my experience, many misdemeanor defendants who plead guilty at the first setting do so because they know it is the quickest way to get released from jail.

41.     If a client rejects the plea offer, the case will be reset for some time in the future, usually in about three or four weeks.

42.  In the vast majority of misdemeanor cases, a detained defendant does not appear before the judge at the first court setting unless she is pleading guilty or is having a protective order or other bond condition order imposed.

43.  If a detained client does not want to accept a guilty plea, or if the prosecutor does not offer a guilty plea, then the client will typically not be brought into the courtroom.

44.  It is my belief that many of my indigent clients with valid defenses, after consultation regarding those defenses and length of time expected before a trial may be had, have pled guilty to get out of jail and return to their families, work, school, and communities.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

JoAnne M. Musick
Chief, Sex Crimes Division
Harris County District Attorney's Office

2-6-17
Date

5

# PX 7(h)
# Declaration of Alexander Bunin

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MARANDA LYNN O'DONNELL, et al.,
Plaintiffs,

vs.

HARRIS COUNTY, TEXAS, et al.,
Defendants.

Case No. 4:16-cv-01414
(Consolidated Class Action)

The Honorable Lee H. Rosenthal
U.S. District Judge

DECLARATION OF ALEXANDER BUNIN

1. My name is Alexander Bunin. I am over eighteen years of age, have personal knowledge of the facts set forth herein, and am competent to make this declaration.

2. I am the Chief Public Defender for Harris County, Texas, a position created by Harris County Commissioners Court in 2010. I am head of a department of 70 employees, including attorneys, investigators, social workers and administrative staff. We represent persons who are appointed to us by the County Criminal Courts at Law, Criminal District Courts and Juvenile District Courts of Harris County. Our adult misdemeanor clients are those determined to be significantly mentally ill, or intellectually disabled, by a computer algorithm that assesses their previous mental health and jail histories. Our lawyers appear in all 16 of the County Criminal Courts at Law almost every day.

3. I have been a practicing criminal defense attorney for 31 years. That career started in Harris County in 1986 when I began a private practice in state and federal courts. In 1993, I became an Assistant Federal Public Defender in the Eastern District of Texas, Beaumont Division. In 1995, I was chosen to establish a Community Defender Office for the Southern District of Alabama in Mobile. In 1999, I was appointed by the U.S. Court of Appeals for the Second Circuit to be the Federal Public Defender for the Northern District of New York and the District of Vermont. After 12 years there, I returned to Houston to start my present job. I am Certified in Criminal Law and Criminal Appellate Law by the Texas Board of Legal Specialization.

4. At the request of both parties, I have been asked to answer questions about the status of persons incarcerated in the Harris County Jail. The Plaintiffs asked whether there are persons detained because of their inability to pay money to obtain their release, or whether persons remain detained because they prefer to be in jail. I have been asked by both parties to describe whether implementing a new risk assessment, and other procedures, may assure defendants are individually assessed for the risk of flight and danger to the community, and their ability to pay bail.

5. My office has an internal electronic case management system that is separate from those of the County. I checked a list of our open misdemeanor cases and discussed them with our lawyers. We do have misdemeanor clients who remained in custody for days or weeks because they could not afford to pay the cost of bail or a fee that a surety bondsman would charge to obtain their release. I am excluding clients who were hospitalized for competency restoration. None were detained because they preferred to remain in jail.

6. I have not met a person who preferred to remain in the Jail as opposed to another safe and warm place. Occasionally, homeless persons will commit minor offenses to avoid freezing on the streets, but they are not a significant portion of the Harris County Jail population, and it is difficult to characterize their actions as voluntary.

7. It is also a mistake to believe that all persons choose to stay in jail and plead guilty because they are guilty of their charges. Recently, Harris County led the United States in exonerations because defendants pleaded guilty to drug offenses before alleged contraband were actually tested and found to be legal substances. In those cases, dozens of defendants pleaded guilty to get released more quickly, rather than remain in custody until a trial. There is no reason to think drug offenses are the only crimes where defendants plead guilty to crimes they did no commit in order to get out of jail.

8. I am familiar with the Laura and John Arnold Foundation's Public Safety Assessment for pretrial defendants. I know of its implementation in other jurisdictions and I have observed its efficacy through statistical studies and feedback I received from other public defenders. I am part of the implementation team in Harris County. I am very optimistic that it can be applied in Harris County to increase the number of misdemeanor defendants who are released on personal bonds, requiring no money to be posted.

9. The easiest part of the application will be for those misdemeanor defendants of low or even moderate risk who may be automatically recommended for personal bonds. Because the assessment does not require an interview, and it is based upon readily available data, those recommendations can be made by a pretrial officer directly to a criminal hearing officer, and approved, without a court appearance.

10. Less clear, is how the assessment of risk will translate to the setting of money bail. A strict bail schedule, even one contemplating risk, that fails to take into account individual circumstances of a defendant's case, including their ability to pay, may detain some persons solely because of their poverty. Therefore, under a system where money is used to assure appearance and compliance, a bail schedule should merely be one consideration among others. That is exactly what United States District Judge James DeAnda approved in a previous settlement order agreed to by Harris County on November 25, 1987. *See Roberson, et al vs. Richardson, et al*, Civil Action H-84-2974 (SDTX).

11. I have suggested to the parties in this case that a way to help assure compliance with the

principles approved by Judge DeAnda almost 30 years ago is to provide legal representation to defendants when there are bail hearings pursuant to TEX. CODE CRIM. PROC. ANN. ART. 15.17. Thirteen years before Judge DeAnda's order, United States District Judge Carl Bue found:

> [I]f counsel can review and cogently represent his incarcerated client, a court might reduce or eliminate a money bond, permitting the client to be released from incarceration pending trial. ... The accused are frequently ignorant of their legal rights and unaware of the steps which must be taken to trigger prompt processing of the case pending against them. It must also be recognized that courts are more readily able to communicate with attorneys than prisoners and are more likely to rely upon the representations of an attorney in deciding whether to release a defendant pending trial or to dismiss the charges against him. *Alberti v. Sheriff of Harris Cnty., Texas*, 406 F. Supp. 649, 660 (S.D. Tex. 1975).

12. There is now a national consensus among organizations who study pretrial release and detention that defendants should be represented by counsel at their initial bail hearings. I personally believe that an initial bail hearing is a critical stage of trial where counsel is required. *See* Alexander Bunin, "The Constitutional Right to Counsel at Bail Hearings," CRIMINAL JUSTICE (Spring 2016) (31-SPG Crim. Just. 23). As a Federal Public Defender, I represented hundreds of defendants at hearings pursuant to the Bail Reform Act of 1984 (18 U.S.C. §3142 *et seq.*). In upholding that law, the United States Supreme Court recognized that among its protections is that "the arrestee ... may request the presence of counsel at the detention hearing..." *United States v. Salerno*, 481 U.S. 739, 742 (1987).

13. I am prepared to work with Harris County to help create an efficient and cost-effective system to provide counsel to defendants appearing at ART. 15.17 hearings. I am open to any model, whether the lawyers work for my office or are private lawyers chosen as "managed assigned counsel." *See* TEX. CODE CRIM. PROC. ANN. ART. 26.047. I believe that adding representation by counsel of pretrial defendants will give the parties, and this Honorable Court, a strong assurance that when this lawsuit is resolved that the Court's order will be followed.

I certify under the penalty of perjury that the foregoing is true and correct.

_____          2/20/17
Alexander Bunin                           Date

Page 3 of 3

# PX 7(i)
# Declaration of John Clark

### Declaration of John Clark

1. My name is John Clark. I am a Senior Manager for Technical Assistance at the Pretrial Justice Institute (PJI), a non-profit organization, established in 1977, that works to advance safe, fair and effective pretrial justice practices.

2. I have been employed at the Pretrial Justice Institute since 1987. In that time, I have provided technical assistance, either on-site or remotely, to thousands of local and state jurisdictions across the country. That assistance has been aimed at helping officials in those jurisdictions enhance their pretrial justice policies or practices.

3. In 2007, the Dallas County Commissioners Court contracted with PJI, then called the Pretrial Services Resource Center, for an Evaluation of Dallas County's Jail Population and Identification of Population Reduction Opportunities. As part of that contract, PJI was asked to develop an Implementation Plan for the county's newly re-established pretrial services program. To complete this task, I visited Dallas County on two occasions in 2007 – March 12-14, and June 25-28.

4. During those visits, and in other conversations with local officials, I learned the following about the history of the Dallas County pretrial services program. The Dallas County Commissioners Court began funding the program in 1973. The program operated for the next 30 years by targeting for pretrial release those defendants who were still in custody on secured bonds the day after the bail hearing before a magistrate, and who met specific criteria set forth by the Commissioners Court. (The criteria were amended in 1999. The amended 1999 criteria are attached to this statement.) The pretrial services program had the authority to release the eligible defendants without a secured bond. The program was eliminated in the early 2000's in a budget cutting move. Within a few years, as the Dallas County jail population rose, the Commissioners Court decided to re-establish the program. The re-established program began operations in March 2007.

5. During my visits and subsequent contacts with Dallas County officials, I learned the following about the practices of the re-established pretrial services program. As with its predecessor, the new pretrial services program was to wait for at least one day after the bail hearing and then consult the 1999 eligibility criteria to identify which defendants it could target for release. Staff would interview those defendants and seek to verify the information provided, and then, if the information was verified, would release defendants. Staff informed me at that time that the reason for the delay in intervening with defendants was to give commercial bail bonding companies the chance to bond defendants who could pay the companies' fee.

6. As seen in this link to a November 2015 newspaper article, (http://www.dallasobserver.com/news/presumed-innocent-but-locked-up-dallas-countys-bail-system-punishes-the-poor-7774261), the pretrial services program was still following these historical practices.

7. In 2013, Professor Robert Morris published the results of a study that compared failure to appear and recidivism outcomes of pretrial defendants who were released pending trial by various mechanisms in Dallas County, Texas. Those release mechanisms included, among others, commercial surety bonds (67% of the study sample) and "pretrial services bonds" (11% of the study sample), which refer to those releases by the pretrial services program described in paragraphs 4 and 5. The sample for this study was drawn in 2008, a period during which the pretrial services practices described in paragraphs 4 and 5 were in effect. Based on his analysis, Professor Morris concluded that defendants released on commercial bonds were less likely to fail to appear than those released on all other bond types, and that commercial bonds were the most cost-effective release type in Dallas County. In the Study Limitations section of the report, Professor Morris stated: "The findings presented herein are limited to one county (Dallas County, Texas) and are not necessarily generalizable to counties other than those of similar demographic make-ups and those with similar pretrial release practices/proportions. Readers should use caution in any attempt to make inferences about other counties based on these findings." Robert G. Morris, *Pretrial Release Mechanisms in Dallas County, Texas: Differences in Failure to Appear (FTA), Recidivism/Pretrial Misconduct, and Associated Costs of FTA)*, University of Texas at Dallas, 2013, at 22.

8. In my 30 years' experience studying pretrial justice practices across the country, including having personally conducted three national surveys of such practices, I have not come across any other jurisdiction where the pretrial services program operates as it does in Dallas County, Texas. Most pretrial services programs conduct their investigations prior to a defendant's appearance in court before a judicial officer, and the role of these programs is to provide the judicial officer with information and an assessment of each defendant's risk of endangering the public or failing to appear. These are the practices that are called for in the American Bar Association's Standards for Criminal Justice: Pretrial Release-Third Edition (2007) (Standard 10-1.10). Some pretrial services programs conduct their investigation after the initial bail hearing, and target those who have secured bonds that they have not yet posted. But these programs report the results of their investigations to the court for a bond review hearing, which is conducted by a judicial officer. By contrast, in Dallas County, the magistrate sets a secured financial bond on one day, and the next day pretrial services program staff, assuming the defendant meets criteria that have not changed since 1999, in effect vacate the magistrate's bond order and release the defendant on what is called a "pretrial services bond." This practice could skew results to compare a population of people who are able to secure immediate release with those who had to remain in custody rather than comparing the effectiveness of particular conditions of release between two similarly situated populations.

9. I concur with Professor Morris that caution must be used in any attempt to generalize the findings of his study to other jurisdictions. Not only are the Dallas County bail practices unique, they also ignore the strong drive that is in place all across the country to bring evidence-based practices to bail, including the use of state-of-the-art actuarial risk assessments tools that have been shown to be highly effective in sorting defendants into categories showing probabilities of success on

pretrial release in terms of public safety and court appearance, and the deployment of supervision strategies designed to match supervision to the identified risk level of each defendant. The only assessment tool that was in place during the Morris study was the 1999 eligibility criteria, which simply listed charges that were not eligible for release by pretrial services staff. And those criteria were not consulted until at least one day after the bond hearing, when pretrial services staff would check for release eligibility. No supervision was being offered at all. By contrast, in a national survey of pretrial services programs that I conducted in 2009, 97% of programs reported offering pretrial supervision services. *2009 Survey of Pretrial Services Programs*, Pretrial Justice Institute, 2009. In my view, the Dallas County system seems to have been designed with the goal of giving the commercial bond industry first crack at each arrestee by requiring arrestees and pretrial services to wait an arbitrary and predetermined time period before even being allowed to begin the process of evaluating a person for non-financial release.

10. In conclusion, given that Professor Morris acknowledges that the results of his study are limited to "those (jurisdictions) with similar pretrial release practices," and since I know of no jurisdictions that have pretrial release practices that are similar to Dallas County's, I can point to no jurisdiction in the country where Professor Morris' findings might be relevant, including Harris County, Texas, where the pretrial services program's practices are consistent with the American Bar Association Standards.

I swear under penalty of perjury that the foregoing is true and correct to the best of my ability.

_John Clark_                              2/3/17

**Attachment:**

**Release Criteria – Dallas County Pretrial Services**

**COURT ORDER**

18

ORDER NO: **99 1951**

DATE: **OCT 1 9 1999**

| STATE OF TEXAS | § |
| COUNTY OF DALLAS | § |

**BE IT REMEMBERED** at a regular meeting of Commissioners Court of Dallas County, Texas, held on

the 19th day of October, 1999 on a motion made by Mike Cantrell, Comm. Dist. #2, and

seconded by Jim Jackson, Comm. Dist. #1, the following Court Order was adopted:

**WHEREAS**, the Dallas County Pre-Trial Release Program was initiated in 1973 in cooperation with the Dallas Bar Association to pursue three major goals:

      (1)  provide service to the public by allowing low risk persons an economical avenue for release from jail,

      (2)  assist in reduction/management of jail population by rapidly interviewing persons for release and executing bonds, and

      (3)  recover the maximum revenue possible without jeopardizing the safety of the community and provide a positive impact on the jail population; and

**WHEREAS**, on September 28, 1999 the Commissioners Court was briefed by the Office of Budget and Evaluation (OBE) regarding the Community Supervision and Corrections Department's contract to operate the Pre-Trial and Post Trial release programs for Dallas County; and

**WHEREAS**, OBE recommended changing the reference requirement for pre-trial release bonds from four (4) references to two (2) references as outlined in criteria #2 and #3 of the attached eligibility criteria; and

**WHEREAS**, the District Attorney's Office reviewed the list of excluded offenses set forth below and updated the list to reflect non-substantive changes in the Texas Penal Code, and

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that the attached eligibility criteria is hereby adopted and this court order supersedes Court Order 97 387 and any other previous court order that established Pre-Trial Release guidelines.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that all offenses are available with the following exclusions:

    1.  Aggravated Kidnapping;
    2.  Aggravated Manufacture, Delivery or Possession with the Intent to Manufacture or Deliver a Controlled Substance;

575   0949

3. Aggravated Promotion of Prostitution;
4. Aggravated Sexual Assault;
5. Aggravated Robbery;
6. Capital Murder;
7. Criminal Solicitation;
8. Aggravated Assault;
9. Enticing a Child;
10. Prohibited Sexual Conduct;
11. Indecency with a Child;
12. Injury to a Child, Elderly Individual or Disabled Individual;
13. Murder;
14. Sexual Assault;
15. Parole Violation;
16. Sale, Distribution or Display of Harmful Materials to a Minor;
17. Sale or Purchase of a Child;
18. Sexual Performance by a Child;
19. Criminal Solicitation of a Minor;
20. Any Charge Involving a Firearm;
21. Any Charge Involving Assault With Bodily Injury;
22. Stalking;
23. Family Violence (Including Associated Assaults);
24. Violation of Protective Order or Magistrate's Order; and
25. Harassment (Includes Telephone Harassment).

Pre-Trial Release shall consider for release any defendant booked into jail with the exception of those individuals charged with an excluded offense listed in this order. Any current charge or previous convictions resulting from an attempt to commit an offense listed on the exclusion list within this order shall be regarded as an excluded offense.

For purposes of this order a felony conviction, in the context of this order, is defined as any probation, jury or judicial sentence, deferred adjudication, plea or nolo plea given to or as a result of a sentence imposed in a felony offense.

**Eligibility for Pre-Trial Release** shall then be determined by the following criteria:

1. A defendant must currently be a resident of Dallas County or an ADJOINING county; however, no requirement shall be established for length of residency in the immediate area if a pattern of stability can be documented in a previous community or through local employment/ties.

2. A defendant must be able to provide Pre-Trial Release with names, addresses and telephone numbers of ~~four~~ two references who can confirm information relating to the defendant's current status (residence, employment, etc.) and who will be able to assist in locating the defendant if he/she fails to appear for court. Such references need not be local if contact can be established with them by telephone; however, charges for long distance telephone calls out of this area code must be paid for by the person(s) receiving the calls.

3. The ~~four~~ two references requirement is waived for Pre-Trial Release bonds for MHMR clients, upon the recommendation of MHMR, which will allow these detainees without sufficient references to receive a Pre-Trial bond.

575   0950

4.   A defendant must have no previous felony conviction of violent or assaultive offenses within the past ten years. Violent or assaultive offenses are defined as any offense which causes serious bodily injury or death or made a threat or threats, communicating the same.

5.   A defendant is ineligible if within the last year (twelve months) he/she has been convicted of a Class A or B misdemeanor involving PHYSICAL ASSAULT or ASSAULT WITH A WEAPON or if he/she is currently awaiting trial or on probation for such offense.

6.   A defendant must have no felony convictions within the past year. A defendant must have no more than two felony convictions within the past ten years.

7.   At least six years must have elapsed since the defendant's most recent release from the Texas Department of Criminal Justice Institution Division for EXCLUDED offenses listed within the order.

8.   At least three years must have elapsed since the defendant's most recent release from the Texas Department of Criminal Justice Institution Division for NON-EXCLUDED offenses.

9.   A defendant currently on probation or deferred adjudication is ineligible for release.

10.   A defendant must not have had any probation/parole revocation action within the past year.

11.   A defendant must not have any record of escape(s).

12. A defendant must not have any previous felony bond forfeiture. A defendant must not have had a previous misdemeanor bond forfeiture within the past three years or two misdemeanor bond forfeitures within ten years.

13. A defendant may not have a pending charge for a felony offense or more than three pending charges for misdemeanor offenses, excluding Class C misdemeanors.

14.   A defendant must exhibit a demeanor which implies a willingness to cooperate with the conditions of Pre-Trial Release.

15. A defendant is ineligible if he/she is charged with DWI or DUI and has a previous DWI or DUI conviction within the last two years from the date of the alleged offense or a lifetime total of three or more DWI or DUI convictions.

16. A defendant is ineligible if he/she is charged with possession of a controlled substance, if the substance in weight is 200 or more grams, including adulterants and dilutant.

In order to protect the community, the Dallas County Pre-Trial Release Unit will retrieve a criminal history through the use of NCIC and TCIC on every defendant being considered for Pre-Trial Release.

Any case in which the bond amount is in excess of $10,000.00 must be reviewed by the Manager or Supervisor. Any case in which the bond amount is in excess of $50,000.00 must be submitted to the District Attorney's office or an official from the filing agency for review and input.

575   0951

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the revised criteria BECOME EFFECTIVE upon the execution of this order.

DONE IN OPEN COURT this the ___19th___ day of _____October_____, 1999.

Lee F. Jackson
Dallas County Judge

Jim Jackson
Commissioner, District No. 1

Mike Cantrell
Commissioner, District No. 2

John Wiley Price
Commissioner, District No. 3

Kenneth A. Mayfield
Commissioner, District No. 4

Recommended by: _____
Philip B. Scheps, Budget Officer

575   0952

# PX 7(j)
# Declaration of Nathan Fennell

## DECLARATION OF NATHAN FENNELL

**Background**

1. My name is Nathan Fennell. I am a graduate student at the Lyndon B. Johnson School of Public Affairs at the University of Texas at Austin.

2. I have performed research on behalf of the American Bar Association's Subcommittee on Independent Correctional Oversight and have published a report on pretrial policies and practices across Texas.

3. Over the past year, I have also performed policy and fact research on behalf of the Texas Fair Defense Project. It is in this capacity that I performed the research presented in this declaration.

**Methods**

4. I have researched the deaths in custody at the Harris County Jail during the calendar years of 2014 and 2015.

5. I conducted this research using data from the Texas Attorney General's Office, which compiles data annually about deaths in custody throughout the state of Texas.

6. These data are sufficiently robust to distinguish between deaths physically in the county jail as well as other deaths in custody. My analysis considered only deaths of individuals in the custody of the Harris County Sheriff while that person was housed in the Harris County Jail.

7. The deaths I included for these findings include individuals who died while physically located inside a county jail facility, as well as individuals who died in a hospital to which they were transferred from the county jail while those individuals remained in custody of the Harris County Sheriff.

**Findings**

8. These data show that 30 people have died in the Harris County Jail between 2014 and 2015. The distribution of deaths is roughly equal, with 14 deaths occurring in 2014 and 16 deaths occurring in 2015.

9. Of those 30 deaths in custody between 2014 and 2015, 27 of the people who died in the Harris County Jail were awaiting trial.

10. Of the remaining 3 in-custody deaths, two had been convicted and one was in custody for a probation/parole violation.


I declare under penalty of perjury that the foregoing is true and correct.


Nathan A. Fennell

08/17/2016

Date

# PX 7(k)
# Declaration of Roseanne Scotti and Supporting Documents

## DECLARATION OF ROSEANNE SCOTTI

1. My name is Roseanne Scotti.  I am State Director for the State of New Jersey for the Drug Policy Alliance.  I began my career with Drug Policy Alliance in 2002 and, over the last 14 years I have managed successful criminal justice reform campaigns, including the *New Solutions Campaign* that worked to pass mandatory minimum sentencing reform and historic bail reform legislation in New Jersey.  I served from 2005-2007 on New Jersey's Gang Land Security Task Force.

   Before joining the Drug Policy Alliance, I was a research coordinator at the University of Pennsylvania's Center for Studies of Addiction in the HIV Prevention Research Division. I received my B.A. from the University of Pennsylvania, and my J.D. from Temple School of Law.  I have authored or co-authored articles on substance abuse and drug policy and lecture often on these topics.

2. As the New Jersey State Director for Drug Policy Alliance, I conceived and launched an advocacy campaign to reform New Jersey's pretrial system.  We launched the campaign in 2013 with the release of a report on New Jersey's jail population.  The report was commissioned by Drug Policy Alliance and produced by Luminosity under the supervision of Dr. Marie Van Nostrand, who is a leading expert on New Jersey pretrial issues and one of the architects of our statewide reform efforts.

3. Raw data for the report were provided by the New Jersey County Jail System.  In 2014, the campaign resulted in the enactment of bipartisan legislation to reform New Jersey's pretrial system and a successful ballot initiative overwhelmingly supported by New Jersey voters. New Jersey's new pretrial system went into effect on January 1, 2017.  The reform includes the use of validated risk assessments, the creation of a pretrial supervision unit, the possibility of preventative detention under limited circumstances, an emphasis on nonfinancial release options and drastically curtails use of money bail.

4. The attached press release lauding the new system's effectiveness was issued by New Jersey's Administrative Office of the Courts and contains statistics for the first month of New Jersey's new pretrial system.  The press release contains information on the number of cases handled by the system, the number of detentions granted, and the percentage of individuals released on various levels of nonfinancial supervision.

5. In addition to the statistics contained in the press release, I obtained, via email, additional information from the Communications Manager for the New Jersey Administrative Office of the Courts.  The Administrative Office of the Courts states that money bail was set in three (less than .001 percent) of 3,382 cases as of Jan. 30.  Motions for pretrial detention were granted in 283 cases and denied in 223.  These numbers generally include only higher level criminal cases because in New Jersey most lower level cases are now generally treated by Summons.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

1

_____          ____2-5-17_____
Roseanne Scotti                          Date

Exhibit 1

JUDGE GLENN A. GRANT
Acting Administrative Director of the Courts



# News Release

www.njcourts.com

For more information:
Winnie Comfort
Pete McAleer
609-815-2910

For immediate release:
Feb. 1, 2017

## First Month Statistics Show Criminal Justice Reform Off to Strong Start

One month into the start of Criminal Justice Reform, prosecutors have been successful in detaining potentially dangerous defendants until trial while defendants who present a low risk of violence are no longer remaining in jail solely because they lack financial resources.

"As would be expected with any change of this magnitude, we are closely observing the program to see if adjustments need to be made," said Judge Glenn A. Grant, acting administrative director of the courts "However, the results of the first month of Criminal Justice Reform show the transition has been effective in reaching its initial goals."

Under a constitutional amendment that went into effect on Jan. 1, a prosecutor is now able to file a motion requesting defendants be held until trial without bail. From Jan. 1 to Jan. 28, the state made successful motions for detention in 283 of 506 cases (56 percent). In the remaining 223 cases, the defendants were released under the supervision of pretrial services program with conditions imposed based on their level of risk.

State Attorney General Christopher S. Porrino noted that a recent sweep of 29 fugitives who were out on bail under the old system resulted in 22 of those defendants being held without bail until trial. The new law, he said, was instrumental in the issuance of a new directive aimed at preventing victim and witness intimidation.

"Criminal Justice Reform offers law enforcement a unique opportunity to address the issue of witness intimidation," Porrino said. "What we've seen so far is that Criminal Justice Reform is working the way it was intended to work."

New Jersey Public Defender Joseph Krakora also said the new system is "already working."

"Under the old system, many of our clients who were accused of non-violent offenses sat in jail for months because they could not afford minimal bail amounts while other defendants charged with serious violent offenses could buy their way out of jail if they had the means to do so. Defendants released on bail were not subject to any form of monitoring or supervision," Krakora said.

"The new law eliminates the discrimination against poor people inherent in a money bail system on one hand and allows for an intellectually honest determination by judges that certain individuals accused of crimes pose too great a risk to public safety to be released on the other."

As of Jan. 30, a total of 2,059 defendants were under the supervision of the Judiciary's Pretrial Services program. Of those:

- 40 percent were being monitored at the highest level of supervision, which ranges from weekly in-person visits with pretrial services staff to electronic monitoring and house arrest;
- 45.5 percent were being monitored at lower levels of supervision, ranging from monthly in-person visits to contact by phone; and
- 14.5 percent were released on their own recognizance.

Criminal Justice Reform has also resulted in the minimal use of cash bail in New Jersey.

"Like the bail system before it, Criminal Justice Reform does not eliminate the risk that defendants will fail to appear in court or commit new crimes while out on release," Grant said. "For the first time in our history, however, there is an opportunity to detain defendants until trial without regard to bail and, for the first time, we've created a system that provides for the monitoring of defendants released until trial. We look forward to continuing to work with prosecutors, public defenders and all of our criminal justice partners to ensure that this new system continues to work effectively."

Exhibit 2

Case 4:16-cv-01414 Document 342-1 Filed in TXSD on 06/12/17 Page 69 of 370

**The New York Times** | https://nyti.ms/2kH4IoI

## N.Y. / REGION

# New Jersey Alters Its Bail System and Upends Legal Landscape

By LISA W. FODERARO    FEB. 6, 2017

PATERSON, N.J. — Jamie Contrano squirmed at the defendant's table inside the Passaic County Court House here. She had been charged with possessing four envelopes of heroin, and, having failed to show up for more than a dozen court appearances over the years, she was a perfect candidate for a high bail — and a lengthy jail stay.

But under an overhaul of New Jersey's bail system, which went into effect Jan. 1, judges are now considering defendants' flight risk and threat to public safety in deciding whether to detain them while they await trial. Otherwise, they are to be released, usually with certain conditions.

Judge Ernest M. Caposela, who oversees Passaic County, noted that Ms. Contrano, 39, had a job at a carwash and was seeing a doctor specializing in addiction. He decided to let her out. "Will she fall off the wagon?" Judge Caposela said in an interview after the hearing. "She might. But sitting in jail is only going to hurt her. She has a disease, so is that a person I want to keep in jail for five to six weeks?"

The hearing illustrated the sharply altered legal landscape after voters in 2014 supported amending New Jersey's Constitution to nearly eliminate cash bail, a move that has placed the state in the forefront of a national movement aimed at changing a bail system that critics say discriminates against poor defendants, many of whom are blacks and Latinos. Defendants languishing in jail, unable to come up **with**

**modest bails** for low-level offenses, often have their lives upended, losing jobs or having children taken away from them.

New Jersey's changes, which were backed by Gov. Chris Christie, closely mirror those adopted by the federal judicial system and the District of Columbia, which have long shunned monetary bail in criminal proceedings. While a handful of other states like Kentucky and Colorado have pursued bail changes, New Jersey stands apart as having the most far-reaching overhaul.

Bail is still an option, but the reality is that judges have nearly done away with it. In the 3,382 cases statewide that were processed in the first four weeks of January, judges set bail only three times. An additional 283 defendants were held without bail because they were accused of a serious crime or were a significant flight risk, or both.

"A year ago, a defendant who appeared in court would have been forced to post bail in a majority of cases," said the state's chief justice, Stuart Rabner. "And one in eight inmates were being held because they couldn't post bail of up to $2,500." That is the typical amount for a minor offense, and bail bond agents would usually seek 10 percent, or $250 in cash. Some defendants cannot afford even that.

The new approach, perhaps not surprisingly, has provoked protest from the bail bond industry, which says the system is allowing dangerous criminals out on the streets. "The system is just overloaded," said Richard Blender, a lawyer in New Jersey who represents several bail bond agents. "They can't process these defendants fast enough. They are just pushing people out the door. You're talking about child pornography, carjacking and aggravated sexual assault."

But experts argue that a system relying on bail does not guarantee public safety. "There is nothing that says you can't be a serial killer and a millionaire," said Joseph E. Krakora, the state's public defender.

E. Rely Vilcica, an assistant professor of criminal justice at Temple University, pointed out that drug dealers often had the means to post high bails and continued plying their trade. "Basically people who have money can buy their freedom," Professor Vilcica said. "So cash bail doesn't address the danger."

Though not having to hold defendants in jails reduces spending, judicial officials said that cost savings did not motivate the changes to the system. (In some jurisdictions, like a county in North Carolina, jails have closed as pretrial detentions plummet.) Instead, they said, the overhaul was driven by a desire to address one of the ways in which the nation's criminal justice system tends to fall hardest on poor and minority defendants.

A study by the **Drug Policy Alliance** in New Jersey, released in 2013, found that 39 percent of inmates were eligible to be released on bail, but that many could not meet amounts as low as $2,500.

"Large numbers of people were in our jails for weeks or months for low-level offenses," said Roseanne Scotti, the New Jersey state director of the Drug Policy Alliance, a nonprofit advocacy group. "They are innocent until proven guilty, but their whole lives are derailed. While they are in there, they lose homes and jobs and contact with their families. But if you have money, you can walk."

The new system assigns defendants scores of one to six, with one being the least risky. They receive a risk assessment within 48 hours of their arrests, though some judges, like Mr. Caposela, are striving to complete assessments within 24 hours.

Ms. Contrano, who was charged with heroin possession, had the worst score, both because of her 17 failures to appear in previous court cases and because of an outstanding assault charge. "I made a bad judgment call," she said to the judge, referring to her recent arrest. "I'm sorry."

Judge Caposela said the computer-generated scores did not tell the whole story and were a guide, not a directive. He ordered her to stay out of Paterson, which he said had the "purest and cheapest" heroin on the East Coast; to check in with the court officials; and to report for drug testing. "If I just let the computer make this call, she's out of luck," he said after Ms. Contrano's detention hearing. "There's a lot of careful consideration and contemplation."

But the hundreds of bail bond agents in New Jersey see the new system differently. As their industry faces collapse, they are rallying the public to bring back cash bail, posting examples of what they call the release of dangerous defendants to

a Facebook page, "NJ Bail Reform — Why New Jersey is Less Safe at the Taxpayers Expense."

They have highlighted cases like burglaries and sexual assaults. In one, a 20-year-old sex offender in Ocean County, Christopher Wilson, was charged with attempted sexual assault after he offered a gaming console to a 12-year-old girl in exchange for sex. He was placed under house arrest with an electronic monitoring bracelet pending trial. The local police chief, Richard J. Buzby Jr., then issued an emotional warning to parents, saying he "could not sleep tonight" if he remained silent.

Kirk Shaw, whose grandfather started Shaw Bail Bonds Agency in Hackensack in 1969, said the system had driven a stake through a four-generation business that now included his son. "We're basically out of business," he said. "We're expected to monitor the defendants we do have out on bail, but we have no money coming in. This is all I've done since I was 18."

Judicial officials reject the idea that dangerous criminals are flooding communities. "There is no system that eliminates all risk," Chief Justice Rabner said. "Last year, there was a risk that anyone released on bail could go out and commit a serious crime pending trial. What we are attempting to do is evaluate the level of risk with objective measures."

Still, he acknowledged: "There will be a crisis one day, where a single defendant will violate conditions and does something that grabs the public's attention. But that's no different than before."

Daniel Palazzo, a public defender in Passaic County and the lawyer for Ms. Contrano, points to recent cases as examples of how he believes the new system is more effective. A client charged with murder was detained pending trial. Under the old system, Mr. Palazzo said, the defendant, 20, who is accused in a fatal shooting in Paterson in September, could have theoretically posted a $500,000 to $1 million bail to win his release, because judges were obligated to set bail no matter the crime.

But another client charged with attempted murder was released under certain conditions. Before Jan. 1, the defendant, who is accused of a stabbing, would have

faced bail of about $200,000 and most likely would have spent a year and a half in jail awaiting trial. "But there was a viable self-defense argument to be made," Mr. Palazzo said, "because the victim had been the aggressor in the past."

Some elected officials complain that a bail overhaul amounts to an unfunded mandate for counties, which have had to spend tens of millions of dollars on new sheriffs' officers and prosecutorial investigators to escort defendants to court and to weigh seeking a motion to detain them.

But judicial reform advocates lauded New Jersey's willingness to pursue a wholesale revision, rather than take baby steps. "It certainly is ambitious to take on a whole state at once," said Cherise Fanno Burdeen, chief executive of the Pretrial Justice Institute, a nonprofit in Maryland. "We are incredibly proud of the seemingly successful arrival at a system that has moved away from money."

A version of this article appears in print on February 7, 2017, on Page A1 of the New York edition with the headline: Mercy vs. Risk as New Jersey Cuts Cash Bail.

# The New York Times

Truth. It's hard to find.
But easier with 1000+ journalists looking. Subscribe to The Times.
Basic
$2.75/week
Billed as $143 every year
Get basic
Basic Digital Access includes:
Access to NYTimes.com and all NYTimes apps

Unlimited article access, anytime, anywhere

Learn more ▶

All Access
$3.75/week
Billed as $195 every year
Get All Access
Includes everything in Basic, plus:
Times Insider Access, including behind-the-scenes stories, exclusive events, podcasts, and e-books

Case 4:16-cv-01414 Document 342-1 Filed in TXSD on 06/12/17 Page 74 of 370

1 complimentary digital subscription to give anyone you'd like

Learn more ►

Home Delivery
+ All Access
$6.93/week
Billed as $360 every year
Get Home Delivery
Includes everything in All Access, plus:
Customized delivery options such as Sunday only, Fri.-Sun., weekday delivery, or daily delivery

The weekly Sunday magazine and monthly T Magazine

2 complimentary digital subscriptions to give anyone you'd like

Learn more ►

*Home delivery price based on Sunday delivery.
Prices vary based on delivery location and frequency.

© 2017 The New York Times Company

# k(i)
# Second Declaration of Roseanne Scotti

## DECLARATION OF ROSEANNE SCOTTI

1.  My name is Roseanne Scotti.  I am State Director for the State of New Jersey for the Drug Policy Alliance.  I began my career with Drug Policy Alliance in 2002 and, over the last 14 years I have managed successful criminal justice reform campaigns, including the *New Solutions Campaign* that worked to pass mandatory minimum sentencing reform and historic bail reform legislation in New Jersey.  I served from 2005-2007 on New Jersey's Gang Land Security Task Force.

    Before joining the Drug Policy Alliance, I was a research coordinator at the University of Pennsylvania's Center for Studies of Addiction in the HIV Prevention Research Division. I received my B.A. from the University of Pennsylvania, and my J.D. from Temple School of Law.  I have authored or co-authored articles on substance abuse and drug policy and lecture often on these topics.

2.  As the New Jersey State Director for Drug Policy Alliance, I conceived and launched an advocacy campaign to reform New Jersey's pretrial system.  We launched the campaign in 2013 with the release of a report on New Jersey's jail population.  The report was commissioned by Drug Policy Alliance and produced by Luminosity under the supervision of Dr. Marie Van Nostrand, who is a leading expert on New Jersey pretrial issues and one of the architects of our statewide reform efforts.

3.  Raw data for the report were provided by the New Jersey County Jail System.  In 2014, the campaign resulted in the enactment of bipartisan legislation to reform New Jersey's pretrial system and a successful ballot initiative overwhelmingly supported by New Jersey voters. New Jersey's new pretrial system went into effect on January 1, 2017.  The reform includes the use of validated risk assessments, the creation of a pretrial supervision unit, the possibility of preventative detention under limited circumstances, an emphasis on nonfinancial release options and drastically curtails use of money bail.

4.  The attached press release lauding the new system's effectiveness was issued by New Jersey's Administrative Office of the Courts and contains statistics for the first month of New Jersey's new pretrial system.  The press release contains information on the number of cases handled by the system, the number of detentions granted, and the percentage of individuals released on various levels of nonfinancial supervision.

5.  In addition to the statistics contained in the press release, I obtained, via email, additional information from the Communications Manager for the New Jersey Administrative Office of the Courts.  The Administrative Office of the Courts states that money bail was set in three (less than .001 percent) of 3,382 cases as of Jan. 30.  Motions for pretrial detention were granted in 283 cases and denied in 223.  These numbers generally include only higher level criminal cases because in New Jersey most lower level cases are now generally treated by Summons.

6.  On March 9, 2017 the New Jersey Administrative Office of the Courts released updated statistics (attached) for bail reform implementation.  The state jail population for

February 2017 is down 27% compared to February 2016.  The jail population is down 10% since the bail reform was implemented on January 1.  I believe the difference in the percentages is due to the work the New Jersey Administrative Office of the Courts did to release low-level offenders being held on money bail in the year leading up to implementation.   Less than 10% of people were detained pending trial.

Municipal level statistics were not released, so I cannot comment on statistics for the City of Newark, but the jail population for Essex County, in which Newark is situated, is down 38.7% in February 2017 compared to February 2016, and down 24.7% since January 2017 (attached).

The number of money bails imposed in the last month was not included in the released statistics but I confirmed via email with the Communications Manager for the New Jersey Administrative Office of the Courts that the number continues to be "not many."

The statistics released by the New Jersey Administrative Office of the Courts include all individuals charged on CDR-2 warrants.  In New Jersey, people can be charged via one of two charging documents. A CDR-1 is a summons which requires the person to appear in court at some future date.  A CDR-2 is a warrant that leads to the person's arrest. Generally speaking someone will be charged on a CDR-1 if the charge is for a disorderly persons or petty disorderly persons' offense (generally comparable to a misdemeanor or petty misdemeanor in other jurisdictions).   A person will generally be charged on a CDR-2 for higher level offenses, that is, 4th through 1st degree offenses (generally comparable to a felony in other jurisdictions).  As with any charging scheme, there are exceptions (see New Jersey Attorney General's directive on the implementation of bail reform section 4 at http://www.nj.gov/oag/dcj/agguide/directives/2016-6_Law-Enforcement.pdf, starting on page 25.)

Under New Jersey's bail reform, an individual charged on a CDR-1 is still released with a summons requiring them to appear in court at a future date.  An individual charged on a CDR-2 is arrested, given a risk assessment and then released on nonfinancial conditions or detained pending trial.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.


_____                    _____3-14-17_____
Roseanne Scotti                                                        Date


2

# k(ii)
# New Jersey Bail Reform Statistics
# January - February 2017

**Defendants in Pretrial Monitoring System on March 1, 2017**

| | ROR | | Monitoring Level | | | | | | | | Total |
| | | | 1 | | 2 | | 3 | | 3+ | | |
| | number | percent | number | percent | number | percent | number | percent | number | percent | number |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlantic | 11 | 12.1% | 20 | 22.0% | 15 | 16.5% | 19 | 20.9% | 26 | 28.6% | 91 |
| Bergen | 67 | 24.6% | 79 | 29.0% | 51 | 18.8% | 52 | 19.1% | 23 | 8.5% | 272 |
| Burlington | 56 | 18.5% | 60 | 19.9% | 44 | 14.6% | 96 | 31.8% | 46 | 15.2% | 302 |
| Camden | 101 | 18.2% | 59 | 10.6% | 88 | 15.8% | 179 | 32.2% | 129 | 23.2% | 556 |
| Cape May | 12 | 17.4% | 20 | 29.0% | 10 | 14.5% | 17 | 24.6% | 10 | 14.5% | 69 |
| Cumberland | 6 | 4.9% | 22 | 18.0% | 24 | 19.7% | 52 | 42.6% | 18 | 14.8% | 122 |
| Essex | 36 | 4.7% | 252 | 32.9% | 135 | 17.6% | 195 | 25.5% | 147 | 19.2% | 765 |
| Gloucester | 21 | 11.6% | 28 | 15.5% | 28 | 15.5% | 77 | 42.5% | 27 | 14.9% | 181 |
| Hudson | 51 | 13.5% | 76 | 20.1% | 91 | 24.1% | 100 | 26.5% | 60 | 15.9% | 378 |
| Hunterdon | 4 | 11.1% | 16 | 44.4% | 5 | 13.9% | 9 | 25.0% | 2 | 5.6% | 36 |
| Mercer | 108 | 26.9% | 105 | 26.1% | 64 | 15.9% | 114 | 28.4% | 11 | 2.7% | 402 |
| Middlesex | 13 | 4.8% | 92 | 34.2% | 40 | 14.9% | 84 | 31.2% | 40 | 14.9% | 269 |
| Monmouth | 29 | 6.5% | 144 | 32.4% | 68 | 15.3% | 83 | 18.7% | 120 | 27.0% | 444 |
| Morris | 5 | 4.5% | 39 | 35.5% | 25 | 22.7% | 31 | 28.2% | 10 | 9.1% | 110 |
| Ocean | 11 | 4.6% | 77 | 32.4% | 28 | 11.8% | 50 | 21.0% | 72 | 30.3% | 238 |
| Passaic | 20 | 5.9% | 122 | 35.9% | 79 | 23.2% | 95 | 27.9% | 24 | 7.1% | 340 |
| Salem | 3 | 7.1% | 11 | 26.2% | 8 | 19.0% | 15 | 35.7% | 5 | 11.9% | 42 |
| Somerset | 3 | 4.0% | 35 | 46.7% | 14 | 18.7% | 19 | 25.3% | 4 | 5.3% | 75 |
| Sussex | 3 | 11.5% | 6 | 23.1% | 2 | 7.7% | 6 | 23.1% | 9 | 34.6% | 26 |
| Union | 25 | 13.5% | 61 | 33.0% | 21 | 11.4% | 63 | 34.1% | 15 | 8.1% | 185 |
| Warren | 3 | 6.0% | 22 | 44.0% | 8 | 16.0% | 13 | 26.0% | 4 | 8.0% | 50 |
| Unknown County* | 1 | 50.0% | 1 | 50.0% | | 0.0% | | 0.0% | | 0.0% | 2 |
| Total | 589 | 11.9% | 1,347 | 27.2% | 848 | 17.1% | 1,369 | 27.6% | 802 | 16.2% | 4,955 |

* System is being corrected to no longer permit entry without identifying a county.

Note: Table includes defendants with a status of "notification only," "active," "inactive," or "in jail."  Defendants that have been discharged are not included.

These numbers provide a preliminary summary of defendants in the Pretrial Monitoring System. Criminal Justice Reform data and statistics continue to be reviewed, revised, and validated.

**Number in Jail - Pretrial**
**February 28, 2017**

| | Annual | | | | January 1, 2017 to February 28, 2017 | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Change | | | | Change | |
| | February 29, 2016 | February 28, 2017 | Number | Percent | January 1, 2017 | February 28, 2017 | Number | Percent |
| Atlantic | 394 | 284 | -110 | -27.9% | 348 | 284 | -64 | -18.4% |
| Bergen | 444 | 372 | -72 | -16.2% | 347 | 372 | 25 | 7.2% |
| Burlington | 368 | 312 | -56 | -15.2% | 321 | 312 | -9 | -2.8% |
| Camden | 852 | 516 | -336 | -39.4% | 640 | 516 | -124 | -19.4% |
| Cape May | 155 | 159 | 4 | 2.6% | 166 | 159 | -7 | -4.2% |
| Cumberland | 312 | 253 | -59 | -18.9% | 266 | 253 | -13 | -4.9% |
| Essex | 1,464 | 897 | -567 | -38.7% | 1,192 | 897 | -295 | -24.7% |
| Gloucester | 214 | 168 | -46 | -21.5% | 164 | 168 | 4 | 2.4% |
| Hudson | 778 | 433 | -345 | -44.3% | 541 | 433 | -108 | -20.0% |
| Hunterdon | 51 | 46 | -5 | -9.8% | 43 | 46 | 3 | 7.0% |
| Mercer | 550 | 381 | -169 | -30.7% | 433 | 381 | -52 | -12.0% |
| Middlesex | 664 | 567 | -97 | -14.6% | 617 | 567 | -50 | -8.1% |
| Monmouth | 641 | 547 | -94 | -14.7% | 542 | 547 | 5 | 0.9% |
| Morris | 141 | 96 | -45 | -31.9% | 98 | 96 | -2 | -2.0% |
| Ocean | 304 | 234 | -70 | -23.0% | 266 | 234 | -32 | -12.0% |
| Passaic | 708 | 597 | -111 | -15.7% | 592 | 597 | 5 | 0.8% |
| Salem | 74 | 58 | -16 | -21.6% | 63 | 58 | -5 | -7.9% |
| Somerset | 195 | 121 | -74 | -37.9% | 124 | 121 | -3 | -2.4% |
| Sussex | 95 | 49 | -46 | -48.4% | 48 | 49 | 1 | 2.1% |
| Union | 517 | 434 | -83 | -16.1% | 456 | 434 | -22 | -4.8% |
| Warren | 79 | 49 | -30 | -38.0% | 56 | 49 | -7 | -12.5% |
| State | 9,000 | 6,573 | -2,427 | -27.0% | 7,323 | 6,573 | -750 | -10.2% |

# PX 7 (l)
# Declaration of Salil Dudani

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, <br>     On behalf of herself and all others <br>     similarly situated, <br><br>             Plaintiffs, <br><br> v. <br><br> HARRIS COUNTY, TEXAS, <br><br> SHERIFF RON HICKMAN, <br><br> ERIC STEWART HAGSTETTE, <br> JOSEPH LICATA III, <br> RONALD NICHOLAS, <br> BLANCA ESTELA VILLAGOMEZ, <br> JILL WALLACE, <br><br><br><br>            Defendants. | Case No. <br><br> (Class Action) |

**DECLARATION IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1.  My name is Salil Dudani, and I am an investigator with Equal Justice Under Law.

2.  I traveled to Houston, Texas, during the week of March 14–18, 2016 to conduct an investigation into Harris County's money bail system.  I also spent May 13–19, 2016, in Harris County, conducting additional investigation. I have conducted similar investigations in other jurisdictions and am therefore familiar with the money bail and pretrial policies and practices of many cities and counties.

3.  On my first trip to Harris County, I observed numerous probable cause hearings over the course of five days.  I asked the hearing officers questions about how they set bail in each case, their use of a money bail schedule, and whether they ever consider an arrestee's ability to pay when setting a person's bail.

1

4.  My colleague and I also spoke with assistant district attorneys who were present during the probable cause hearings and asked them questions about their role in the bail setting process.

5.  I have met with numerous individuals who have outstanding warrants, some of whom were previously arrested by Harris County and held on money bail.

6.  I have spoken with Harris County commercial bonding agents about money bail procedures in the County, the process of bailing someone out of jail, and the practice of issuing "non-arrest bonds," which permits a person to clear an outstanding warrant without actually being arrested, booked, or jailed at all.

7.  Equal Justice Under Law has also conducted an extensive investigation into the use of secured money bail to detain impoverished people in Harris County, including the use of the fixed "bail schedule." This investigation has included interviews with witnesses, experts in the local criminal legal system, government employees, inmates, prosecutors, hearing officers, local attorneys, community members, statewide experts in the functioning of Texas courts and jails, and national experts in post-arrest procedures and constitutional law.

8.  The information in this declaration is based on my conversations with individuals I met during these trips, as well as information I have learned by reading research reports and news articles on Harris County's money bail system and our organization's interviews with local officials and experts.

9.  When a police officer conducts a warrantless arrest of someone in Harris County for a misdemeanor offense, the officer takes the person into custody, usually at one of Harris County's satellite detention facilities, and contacts a hotline that is staffed by assistant district attorneys.

10. The police officer describes the basis of the arrest to the prosecutor on duty, who decides whether to pursue charges. If no charges are to be filed, the arrestee is released. If the prosecutor decides to pursue charges, law enforcement imposes money bail pursuant to the Harris County misdemeanor bail schedule.

11. If the arrestee can pay the money bail immediately, she is released, without ever being admitted into the jail.

12. If the person cannot pay the amount of money required, she can attempt to hire a for-profit bonding agent. These bonding agents, if they choose to accept an arrestee in their discretion, typically demand 10% of the money bail from the arrestee, although the industry standard in Harris County is to charge a higher rate on low money bail amounts (e.g., a fee of $125 to $150 when money bail is $500). The bonding agent keeps the 10% payment, even if the case is dismissed or the person is acquitted.

13. If the arrestee cannot pay, she will be transferred to and booked into the jail.

14. Individuals who are arrested pursuant to warrants are subjected to a similar practice. In these cases, the district attorney again makes a charging decision on the basis of allegations by a

police officer or another complainant and imposes money bail according to the schedule. The money bail amount is written on the warrant.

15. As a matter of policy, the judicial officer imposes the money bail listed on the schedule.

16. If a person becomes aware of an outstanding warrant, she can sometimes avoid arrest altogether by either paying a commercial bonding agent for a "non-arrest bond," or by hiring an attorney who will arrange a so-called "walk-through" at the courthouse. Each option is only available to those who can afford it. If a person cannot afford these options, she will have to submit to arrest and will be subjected to Harris County's money bail policies and practices.

17. When a person is arrested for a misdemeanor offense, pursuant to a warrant or a warrantless arrest, that person can pay the amount of money determined by the bail schedule and be released immediately.

18. If a person is unable to pay the money bail, or even to pay the required fee to a bonding agent, the person will be admitted into the Harris County Jail.

19. More than 80% of arrestees are booked into the jail.

20. The Harris County Sheriff's Department, through its jail personnel, assembles groups of roughly 20 to 45 people, many of whom were arrested for minor misdemeanors, throughout the day.

21. Generally within 24 hours of arrest, those arrestees appear via videolink before one of five hearing officers. The hearing officer determines probable cause and ensures that the bail amount imposed by the district attorney conforms to the bail schedule. These hearings are referred to locally as "magistrations," "Article 15.17. hearings," or "probable cause hearings."

22. Although the County generally holds these magistration hearings within 24 hours of arrest, the length of time between arrest and probable cause hearing depends on how long the Sheriff's booking process takes and on the number of arrestees. On occasion, the hearings do not take place within 24 hours of arrest. If a person pays, she is released prior to the hearing and a probable cause determination in her case is made at a subsequent court appearance. If she does not, she waits in jail.

23. An assistant district attorney participates in the probable cause hearings by arguing for a finding of probable cause and sometimes asking the hearing officer to impose bail in an amount higher than the amount on the schedule or on the warrant. One prosecutor stated recently at a probable cause hearing that, pursuant to Harris County's bail schedule scheme, if an arrestee "can't pay, they sit in jail." The County does not provide defense attorneys at the probable cause hearings.

24. When the videolink is turned on, arrestees appear on a television screen, sitting in rows of chairs in a room at the jail. The hearing officer, who is in a courtroom in the courthouse, calls an individual's name and reads the charge. That individual gets up and stands in the middle of a red

3

square on the floor of the room in the jail. An assistant district attorney then reads from the charging document.

25. The hearing officer decides whether there is probable cause, finding probable cause in almost every case, and, almost always, sets bail according to the schedule. Sometimes the hearing officer increases the money bail. As a matter of routine, hearings last approximately one minute. They often last even less than one minute.

26. Hearing officers make no attempt to determine an arrestee's financial situation, and they make no inquiry into or findings concerning an arrestee's ability to pay the money bail amount they impose pursuant to the bail schedule. In no case that we have observed is money bail set with reference to an arrestee's ability to pay. My colleague and I have been informed by officials, and a hearing officer has confirmed to me, that in no case is money bail set with any reference to an arrestee's ability to pay.

27. In addition to making no affirmative inquiry into or findings concerning ability to pay, hearing officers refuse to hear any argument or evidence that an arrestee raises about her ability to pay.

28. If an arrestee tells the hearing officer that she cannot pay the money bail, the hearing officer tells the arrestee that considering a reduction of money bail from the schedule is not the purpose of the hearing, and that the arrestee should raise the issue with the County Judge handling her case at her first court date after an attorney is assigned.

29. As one hearing officer explained, probable cause hearings are "not the forum" for discussing a person's ability to pay money bail or raising any related issues, because such questions should be addressed in an adversarial setting after appointment of counsel.

30. In almost all cases, the hearing officer affirms the money bail that was set pursuant to the bail schedule.

31. If, however, the district attorney erred in setting the money bail (i.e., the monetary amount did not conform to the bail schedule), the hearing officer will alter the money bail so that it meets the schedule and satisfies individual court judges' instructions.

32. In Harris County, money bail is imposed based solely on the alleged offense and the person's criminal history and without reference to a person's ability to pay, resulting in the detention of arrestees based on their poverty.

I certify under penalty of perjury that the foregoing is true and accurate.

_____                    _____
Salil Dudani                                                                   Date

5/19/16

4

# PX 7(m)
# Declaration of Timothy Murray

## AFFIDAVIT OF TIM MURRAY

Tim Murray, having been duly sworn according to law, deposes and states as follows:

**Background**

1.      My name is Tim Murray, and I currently serve as Director Emeritus of the Pretrial Justice Institute.  I have worked as a criminal justice practitioner at the local, state, and federal levels for 40 years.  I have held management and executive positions with the pretrial services systems in Washington, D.C. and Miami-Dade County, Florida.  While in Miami, I was the principal architect and administrator of the nation's first drug court.  I served as the first director of the Drug Court Program Office for the United States Department of Justice.  Following that appointment, I held the positions of Director of Policy and Planning and Director of Program Development at the Bureau of Justice Assistance.  I also worked as part of the start-up team for the Transportation Security Administration (now part of the United States Department of Homeland Security).

2.      In 2006, I was selected to be director of the Pretrial Justice Institute.  I am a lifetime member of the National Association of Pretrial Services Agencies and the proud recipient of the Association's most prestigious honor, the Ennis J. Olgiati Award.  I have served as faculty at the National Judicial College and numerous State Judicial Training Institutes over the past three decades.  I have testified before the United States Congress as well as state and local legislatures across the nation on the issues of pretrial justice and bail.

**Overview**

3.      In this affidavit, I will express opinions on the harm caused to criminal defendants by the use of money bail, the lack of harm to jurisdictions that forego the use of money bail, and the public interest that is served by the eradication of money bail.

4.      In forming my opinions, I have relied on personal experience gained during my 40 years of work as a criminal justice practitioner as well as numerous studies authored by researchers and scholars in the field of pretrial justice.

5.      I am receiving no compensation for the preparation of this affidavit.

**Analysis**

**A.      The Use of Money Bail to Detain People Based on Wealth Status Causes Harm to Indigent Arrestees**

6.      Detention due to money bail leads to worse outcomes at trial and sentencing.  A recent study[1] that analyzed records of over 60,000 arrestees in Kentucky in 2009 and 2010 found that

---

[1] Christopher T. Lowenkamp *et al.*, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura and John Arnold Foundation, 3 (November 2013) available at http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_hidden-costs_FNL.pdf.

defendants who were detained for the entire pretrial period were over four times more likely to be sentenced to jail and over three times more likely to be sentenced to prison than defendants who were released at some point pending trial — even when charged with the same offenses. These defendants' sentences were also significantly longer: defendants sentenced to jail received sentences almost three times longer if they were detained pretrial; those sentenced to prison were sentenced more than twice as long if detained pretrial — again, even for the same offenses as their peers who were released pretrial.

7.    Another study[2] examined similar questions in the context of federal courts.  Drawing on 1,798 cases from two United States District Courts, the research found that defendants detained pretrial are given longer sentences than those released pretrial, even when charged with the same offenses.  Indeed, detained defendants' sentences are, on average, nearly two times longer than those of released defendants.  And while defendants who were released and later revoked received longer sentences than defendants who completed pretrial release without incident, their sentences were still shorter than defendants who were never released at all.  These findings were obtained while controlling for known variables.

8.    Other research confirms that pretrial detention alone leads to harsher treatment and outcomes than pretrial release.  Relatively recent research from both the Bureau of Justice Statistics[3] and the New York City Criminal Justice Agency[4] continues to confirm studies conducted over the last 60 years demonstrating that, controlling for all other factors, defendants detained pretrial are convicted more often, and are sentenced to prison and receive harsher sentences than similar defendants who are released.  Perhaps most disturbingly, defendants who are detained pretrial are more likely to plead guilty, suggesting that even some defendants who are innocent plead guilty solely because of their pretrial detention.

9.    Being incarcerated prior to trial makes it more difficult for arrestees to take an active role in preparing their defense.  For incarcerated arrestees, it is more difficult to meet with their attorneys and to gather witnesses and evidence.

10.    Being incarcerated pretrial can have disruptive or disastrous consequences for arrestees. People detained pretrial experience instability in employment, housing, and care for dependent relatives.

11.    Added to these costs are dollars associated to lost wages, economic mobility (including intergenerational effects), possible welfare and foster care costs for defendants' families, and a variety of social costs, including the possibility of imposing punishment prior to conviction,

---

[2] James C. Oleson *et al.*, *The Sentencing Consequences of Federal Pretrial Supervision*, Crime & Delinquency, 1:21, 2014.

[3] *See* Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics Online, Table 5.22.2010, http://www.albany.edu/sourcebook/pdf/t5222010.pdf; *and* S. Rosenmerkel, M. Durose, and D. Farole, Felony Sentences in State Courts, 2006–Statistical Tables (Washington, DC: Bureau of Justice Statistics, 2009), 1.

[4] Mary T. Phillips, *Pretrial Detention and Case Outcomes, Part 1: Nonfelony Cases*, New York Criminal Justice Agency, Inc., 55–56 (November 2007) available at http://www.nycja.org/lwdcms/docview.php?module=reports&module_id=669&doc_name=doc.

denying the defendant the ability to assist with his or her own defense, and eroding justice system credibility due to its complacency with a wealth-based system of pretrial detention.

12.     Very few persons arrested or admitted to jail are ultimately sentenced to significant incarceration post-trial.  Indeed, some studies[5] suggest that only 3–5% of jail inmates nationally are sent to prison.  In one statewide study,[6] only 14% of those defendants detained for the entire duration of their case were sentenced to prison.  Thirteen percent had their cases dismissed (or the cases were never filed), and 37% were sentenced to noncustodial sanctions.  This means that half of arrestees detained pretrial were never sentenced to jail as punishment — their only period of incarceration was, ironically, while they were presumed innocent pending trial.  Another study[7] showed that more than 25% of felony pretrial detainees were acquitted or had their cases dismissed, and approximately 20% were ultimately sentenced to a noncustodial sentence. Despite the fact that these detainees are never sentenced to any jail time, all of them languish in jail awaiting disposition of their cases simply because they lack the financial means to secure their release.

## B.     Non-Financial Pretrial Release Policies Will Not Harm Cities and Counties that Currently Rely on Money Bail

13.     In 1968, the American Bar Association[8] openly questioned the presumption that money bail serves as a motivator for court appearance.  Since then, no valid study has suggested that money bail improves court appearance rates.  Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money bail does not improve either public safety or court appearance rates.

14.     The Lowenkamp study[9] demonstrated that keeping low-risk defendants in jail pre-trial correlates with *increased* likelihood that they will fail to appear at court hearings.  Low-risk defendants held for 2–3 days are 22% *more likely* to fail to appear than similar defendants (in terms of criminal history, charge, background, and demographics) held for less than 24 hours. The increased failure-to-appear rate jumps to 41% for defendants held 15–30 days.  For low-risk defendants held for more than 30 days, the study found a 31% increase in failure to appear.  In other words, pretrial detention actually hurts court appearance rates.  The arrestees most likely to show up for their court dates are those detained for the shortest amount of time.

15.     Money bail is not necessary to protect public safety or ensure court appearance.  A comprehensive study by the Pretrial Justice Institute[10] of nearly 2,000 arrests in Colorado found that unsecured bonds are as effective as secured bonds at achieving public safety and ensuring court appearance.  In fact, when relevant statistical factors are controlled, defendants who are

---

[5] Department of Justice, National Institute of Corrections, *Fundamentals of Bail*, 26 (2014) available at http://www.clebp.org/images/2014-09-04_Fundamentals_of_Bail.pdf.
[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] Lowenkamp, *supra*, note 1.
[10] Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, 16, available at http://www.pretrial.org/download/research/Unsecured%20Bonds,%20The%20As%20Effective%20and%20Most%20Efficient%20Pretrial%20Release%20Option%20-%20Jones%202013.pdf.

detained 2 to 3 days pretrial are more likely to fail to appear than defendants who are detained 1 day.

16.     Ending the use of money bail would actually benefit jurisdictions by saving them money. Pretrial detention imposes costs on counties, and unnecessary pretrial detention does so wastefully.  In a purely monetary sense, these costs can be estimated, such as the comparative cost of incarceration (from \$50–\$150 per day) versus community supervision (from as low as \$3–\$5 per day).  Other monetary costs — such as the loss of jobs, instability in housing, lack of care for dependent relatives, and higher recidivism rates resulting from pretrial detention— are harder to calculate, but are still borne by the community as a whole.

17.     Some jurisdictions successfully operate their criminal justice systems without using money bail.  For example, Washington, D.C. uses virtually no money at all in its bail setting process.  Instead, using an "in or out," "bail/no bail" scheme, the District of Columbia releases over 85% of all defendants — detaining the rest through rational, fair, and transparent detention procedures — and yet maintains high court appearance and public safety (no new crime) rates.[11] Rather than using money bail to determine who is detained, Washington, D.C. releases everyone who is not determined to be an unmanageable flight risk or a danger to others.

18.     The federal system also eschews money bail.  The federal system employs a risk-based model, detaining only those individuals who show either a flight risk or danger to others.  The federal system forbids wealth-based detention by prohibiting the imposition of any monetary condition that would result in detention.

**C.     Ending Reliance on Money Bail Benefits the Public Interest**

19.     The use of money bail actually has a negative impact on public safety.  Even for relatively short periods of detention, the longer a low-risk defendant is detained before trial, the more likely she is to commit a new crime within two years of case disposition.[12]  Pretrial detention increases long-term recidivism, particularly for low-risk defendants.

20.     Evidence suggests that an alarming percentage of those arrestees who are empirically measured as most likely to fail to appear and/or to reoffend during the pretrial phase of their cases easily secure their release under the current system.  Even more disturbingly, once these high-risk defendants have purchased their freedom, they return to the community unfettered by appropriate supervision or monitoring.

21.     Secured money bail also leads to significantly higher pretrial detention rates at taxpayer expense.  Pretrial detainees account for more than 60% of the inmate population in our jails.[13] The cost to incarcerate defendants pretrial has been estimated at over \$9 billion per year.[14]

---

[11] Fundamentals of Bail, *supra*, note 5, at 25–26.

[12] Lowenkamp, *supra*, note 1.

[13] Laura and John Arnold Foundation, *Pretrial Criminal Justice Research Summary*, 1, available at http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF-Pretrial-CJ-Research-brief_FNL.pdf.

[14] *Id.*

22.     Given the volume of defendants and their varying lengths of stays, an individual jail can spend millions of dollars per year simply to house low-risk defendants who are also presumed innocent by the law.  Jails that are crowded can create an even more costly scenario for taxpayers, as new jail construction can easily reach $75,000 to $100,000 per inmate bed.

**Conclusions**

23.     The use of money bail to detain people causes irreparable harm.  Detention due to money bail leads to worse outcomes at trial and sentencing.  Being incarcerated prior to trial makes it more difficult for arrestees to take an active role in preparing their defense.  People detained pre-trial experience instability in employment, housing, and care for dependent relatives.  Pretrial detention results in real dollar costs and social costs as people are kept from their jobs and families.

24.     A jurisdiction that ends its reliance on money bail is unlikely to suffer any irreparable harm.  Unsecured bonds are as effective as secured bonds at achieving public safety and ensuring court appearance.  Because pretrial detention imposes costs on cities and counties, ending the use of money bail would actually benefit jurisdictions by saving them money.  The lack of harm is demonstrated by jurisdictions such as Washington, D.C. and the federal system, both of which operate successfully without relying on secured money bail to detain people who are poor.

25.     The current system of money bail is neither safe, fair, nor effective.  For the most part, pretrial release under cash-based systems is reserved for the privileged few who have the means to purchase their liberty, regardless of their risk of flight or their threat to the community, while pretrial detention is inevitable for even the safest defendant who lacks the financial means to post bond.  Cash-based pretrial release is fundamentally incapable of achieving the purposes of bail by its very design.  Ending reliance on money bail benefits the public interest.  The use of money bail has a negative impact on public safety because pretrial detention increases long-term recidivism, particularly for low-risk defendants.  Conversely, an alarming percentage of those classified as the most dangerous risks are simply purchasing their release under the current system, making the public less safe.  Secured money bail leads to significant and needless pretrial detention rates that far exceed the risk of many who are detained at considerable taxpayer expense.

Tim Murray

SWORN AND SUBSCRIBED BEFORE ME
This  14  day of  March        , 2016
Washington, D.C.

_____
NOTARY PUBLIC

LARISSA LESIW
NOTARY PUBLIC STATE OF MARYLAND
My Commission Expires October 30, 2018

# PX 7(n)
# Declaration of Timothy Schnake

## Declaration of Timothy R. Schnacke

1.      My name is Timothy R. Schnacke. I am currently the Executive Director of the Center for Legal and Evidence-Based Practices, a Colorado nonprofit corporation that provides research, education, and consulting to American jurisdictions exploring and/or implementing changes to the administration of bail.

2.      Although I have 30 years of experience as an attorney, I have spent the last ten years exclusively studying issues related to pretrial release and detention. I have worked with municipalities, counties, states and even other countries on these issues, and I have helped these jurisdictions to change policies, practices, and laws, including state constitutional right to bail provisions, to better reflect what we know today about the law and the research.

3.      I helped create the curriculum and currently serve as faculty of the National Institute of Correction's Orientation for New Pretrial Executives. I helped create the curriculum for the National Judicial College's pretrial training. I have written numerous foundational documents about the fundamentals of bail and legal and evidence-based practices. I have presented to numerous State Supreme Court Chief Justices, and I have recently begun helping State Supreme Courts that have created commissions or task forces to look into issues associated with pretrial release and detention.

4.      My work takes me around the country to speak with and train judges, prosecutors, defense attorneys, law enforcement, pretrial practitioners, legislators, governors, and other criminal justice stakeholders in the intricacies of changing from the current bail system to something that is more rational, fair, and transparent.   In 2014, the National Association of Pretrial Services Agencies gave me the John C. Hendricks Pioneer Award for my work in pretrial justice, and I was also selected as 2014-15 Co-Chair of the American Bar Association's Pretrial Justice Committee.

5.      From the time I began writing about bail ten years ago, I encountered vigorous opposition – primarily from the American Bail Coalition (ABC), which represents American bail insurance companies that profit from the current system of pretrial release and detention. Through their lobbyists, websites, and social media accounts, ABC and the insurance companies it represents amass arguments designed to keep the status quo in bail setting, and they routinely disseminate those arguments to bail agents and others across America. Most recently, ABC and the insurance companies it represents have been helping lawyers to write briefs and other documents in active bail litigation to incorporate those same arguments.

6.      In my role as lawyer, researcher, and bail educator, I have done extensive research on these arguments to assess their validity, and I have found many of them to be false and misleading. I constantly monitor the bail industry's various websites to gauge which of these arguments are being spread. In the Harris County case, attorneys have advanced many of those arguments, one of which I will address: the efficacy of secured money bail.

7.      In doing my initial research into bail in 2006-07, I encountered various statistics reported by the Bureau of Justice Statistics ostensibly showing that defendants released on

commercial surety bonds have lower fugitive rates than other types of release (such as personal recognizance bonds). In the pretrial literature, researchers would occasionally use the BJS data to make "evaluative" statements, that is, statements declaring that a particular type of release was superior to another based on the data showing pretrial misbehavior associated with each type. Moreover, when these studies favored the commercial bail bonding and insurance industry, that industry would repeat the researcher's evaluative statements (as well as make their own statements based on their own reading of the BJS data), and claim that the data demonstrated that the use of a commercial surety bond was a superior form of release. Looking deep into those statistics, however, I uncovered many reasons for why those statistics could never be used to make evaluative statements as to which type of money-based release is better than others. In wrote up my concerns and published them in a local county document in early 2009, found at http://www.clebp.org/images/2009-02-19_Jeffco_Bail_Proposal.pdf, at pages 51-52. Soon after, other organizations began raising concerns about using the BJS data to make evaluative statements, and in 2010 BJS itself issued a relatively unprecedented "data advisory," which listed the limitations of the BJS data, and specifically warned that, "Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading." *See* Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010), found at https://www.bjs.gov/content/pub/pdf/scpsdl_da.pdf. In a paper written by Bechtel, et al., the authors explain that it was the bail industries claims that led to the BJS data advisory. *See* Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research, passim* (PJI, 2012), found at https://www.pretrial.org/download/pji-reports/Dispelling%20the%20Myths%20(November%202012).pdf.

8.     BJS personally warned bail industry executives at ABC about the misleading nature of their claims, which can be seen in an October 2010 newsletter, in which ABC complains about not being able to use the BJS data. *See American Bail Coalition Newsletter,* at 7-9, found at http://www.asc-usi.com/userfiles/BailResources/ABC_Newsletter%20V1.pdf. Nevertheless, within approximately 6 months of this newsletter, ABC and other insurance companies began, once again, to make evaluative statements favoring commercial surety release using the BJS data, and to disseminate those arguments and discredited studies to bail agents and others nationwide. In fact, ABC currently does this on its active website, which I accessed on February 2, 2017. It is my opinion that, despite the fact that it would mislead others, the bail industry simply does not see any negative effects in violating the advisory. I personally believe that the bail industry's advancement of this issue across America is a primary factor in the current state of confusion over the bail research that I encounter in my travels. I wrote a brief summary of the issue in the National Institute of Corrections paper titled, *Fundamentals of Bail,* found at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf, an excerpt of which is attached.

9.     The BJS data advisory has effectively stopped researchers from making the mistake of drawing evaluative conclusions or articulating correlative relationships based on the BJS data. Nevertheless, because it is extremely hard to do so in the age of the Internet, studies that made this mistake in the past have not been wiped from the literature base. Accordingly, there exist a few studies that make the error of using the limited BJS data in ways that could be

misinterpreted, and those studies are continually cited by the bail industry to help their cause. Two of those studies – by Eric Helland and Thomas Cohen – are cited on page 13 in the *Judges for Harris County's Criminal Courts at Law Nos. 1-15 Opposition to Plaintiff's Motion for Preliminary Injunction*.

10.     The BJS advisory has also effectively stopped others from making the same mistake as the researchers in the cited studies, and today I rarely if ever see experts in the criminal justice field using this data improperly with the sole exception of the commercial bail industry. I occasionally see someone seemingly innocently citing to these studies, but often when I dig into those documents, I see that the bail industry has provided most of the arguments, including the misleading ones, to the innocent person.  An example is on page 13 of the same document cited in paragraph 9, above, in which Judge DeArmond made certain claims currently being used by the bail industry also to argue for the status quo. I do not believe the judge intended to mislead, but he made the same basic mistake of citing to the discredited studies. After his letter was published, I was asked to write a response, which provides reasons for why I believe the judge was guided by national bail insurance lobbyists in crafting his arguments. That response is attached to this declaration.

11.     Contrary to the bail industry's misinformation campaign, the only rigorous and valid studies on the question have actually shown that commercial surety is *not* associated with higher court appearance rates.

12.     In addition to their misleading conclusions, these studies further mislead the court and others studying bail when they only focus on one particular outcome – court appearance. As I wrote in the *Fundamentals* document, cited above, pretrial research is only helpful when it assesses all three purposes of bail: release, court appearance, and public safety. Studies that focus only on the effectiveness of surety bonds on court appearance leave courts and others thinking that, if the studies are true, surety bonds must be valuable to the bail process. Unfortunately, however, gauged against all three purposes or outcomes of the bail process, overwhelming research in recent years has proven that surety bonds do nothing for public safety and drastically hinder release of people who are eligible for release but for their poverty. Accordingly, even if they were effective at getting defendants back to court – a premise of which I personally disagree based on my comprehensive evaluation of the available scientific research – they would be useless and potentially harmful when considering all the variables of the bail process.

13.     By citing to the Helland and Cohen studies as well as by making evaluative statements about the efficacy of secured (especially commercial surety) bonds using the BJS data, it is my opinion that defendants in this case have misled the court. To the extent that they had assistance from the American Bail Coalition or otherwise knew about the BJS data advisory, then they have potentially misled the court intentionally.

I swear under penalty of perjury that the foregoing is true and correct to the best of my ability.

02/05/17

**Attachment:**

Excerpt from *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform,* http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf.

### An Unusual, But Necessary, Research Warning

Since 1988, the Bureau of Justice Statistic's (BJS) State Court Processing Statistics (SCPS) program (formerly the National Pretrial Reporting Program) has been an important source of data on criminal processing of persons charged with felonies in the 75 most populous American counties. Issues surrounding pretrial release, in particular, have been tempting topics for study due to the SCPS's inclusion of data indicating whether defendants were released pretrial, the type of release (e.g., personal recognizance, surety bond), and whether the defendant misbehaved while on pretrial release. In some cases, researchers would use the SCPS data to make ,evaluative' statements, that is, statements declaring that a particular type of release was superior to another based on the data showing pretrial misbehavior associated with each type. Moreover, when these studies favored the commercial bail bonding and insurance industry, that industry would repeat the researcher's evaluative statements (as well as make their own statements based on their own reading of the SCPS data), and claim that the data demonstrated that the use of a commercial surety bond was a superior form of release.

According to Bechtel, et.al, (2012) ,The bonding industry's claims based on the SCPS data became so widespread that BJS was compelled to take the unusual and unprecedented step of issuing a 'Data Advisory." That advisory, issued in March of 2010, listed the limitations of the SCPS data, and specifically warned that, "Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading." Despite the warning, there are those who persist in citing SCPS data to convince policy makers or others about the effectiveness of one type of release over another. Both Bechtel, et al., and VanNostrand, et al., have listed flaws in the various studies using the data and have given compelling reasons for adopting a more discriminating attitude whenever persons or entities begin comparing one type of release with another.

As mentioned in the body of this paper, the best research at bail, which will undoubtedly include future efforts at comparing release types, must not only comply with the rigorous standards necessary so as not to violate the BJS Data Advisory, but should also address all three legal and evidence-based goals underlying the bail decision, which include maximizing release while maximizing public safety and court appearance.

**Sources and Resources:** Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (PJI/BJA 2011).

**Attachment:**

Response to Judge DeArmond's letter written by Timothy R Schnacke to Illinois judges:

I read with interest Judge DeArmond's memo concerning bail reform in Illinois. The following are my comments about that memo.

First, I should explain that I do not consider myself a "progressive," nor do I know George Soros. I came at the issue of bail in America as a researcher, determined simply to find the answers to the overall questions of, "Who should we release, who should we detain, and how should we do it?" When I started, I had no knowledge of bail practices (indeed, I did not even want to know any – I wished to remain blissfully ignorant of the pretrial system), and so my "agenda," if you can call it that, was simply to come up with some neutral answers to the pressing questions. Normally, I find that when I research an area of criminal justice I discover some percentage of things are done right and some percentage of things are done wrong. In bail, I found that most everything we were doing was wrong, and that conclusion led me to begin advocating for changes to our American system of bail. I am a fourth generation lawyer, infinitely concerned with how America shapes and follows its laws, and so I became deeply concerned with bail practices that in many ways seemed unfair and ineffective.

Because I came to the issue of bail with little or no knowledge, I believe I have an advantage of those coming to the issue after participating in it for their entire professional lives. In 1973, Alan Dershowitz said, "Twenty years of experience . . . is often one year of experience repeated twenty times. The unknown mistakes of the past become the foundation for a confident, but erroneous, prediction of the future." This is compounded by recent research showing that when given correcting, objective facts about a particular issue, people will more often become even more strongly set in their beliefs. Indeed, facts can make misinformation even stronger and cause people to entrench themselves even deeper into flawed notions. Cognitive dissonance in bail is rampant, and the only cure is often only retirement.

Thus, I can understand how Judge DeArmond can be drawn to the same information that the bail industry uses to justify its own existence, for it is less threatening to do so. Unfortunately, the history of bail points forcefully at problems with both bail (release) and no bail (detention) that began in earnest in about 1900, when America changed from a largely personal surety system managing mostly what we call today "unsecured bonds" (i.e., those bonds that only require a promise to appear for court – no one had to pay anything up front), to a largely commercial surety system managing mostly what we call today "secured bonds" (i.e., those bonds that require someone to pay something up front to obtain release). Historically speaking, interfering with release or detention causes bail reform, and secured money bonds have been interfering with both release and detention in America for over 100 years. That is why our bail practices have not exhibited anything even nearly resembling "proven results," as the judge mentioned; instead, secured money's interference with release and detention has caused two

decades-long generations of bail reform attempting to fix the numerous problems associated with the current system.

I suppose I have done more research on the issue of bail and no bail in America than most other people today, and I can say, in broad terms, that throughout his memo, Judge DeArmond mostly misses the forest for the trees. No, bail reform is not seen as inevitable based on parsing various cases and bail industry supported studies. It is inevitable due to certain markers of bail reform – markers that have been antecedents to bail reform for centuries in both England and America. Likewise, the very premise of his memo, as articulated in his title "Is There Another Side to the Argument," is misplaced. Bail reform does not simply have two sides. It has twenty, nineteen of which are articulating different perspectives by various legitimate members of the criminal justice system, and one that is articulating the perspective of the bail insurance companies, the same companies that have claimed there is no presumption of innocence, that there are no poor people in jail, and that if a defendant can "make" a bail bond, he cannot possibly be dangerous (otherwise, they claim, why would his family have helped him?). Put another way, there is one side that weighs a ton, and one side that is light as a feather. Most of Judge DeArmond's memo follows the current arguments of the industry, which I have spent time easily refuting over the years.

His claim that it is understandable to use so much of the bail industry's arguments and reports is unfortunate, as virtually every other entity examining these same arguments and reports knows of their flaws. Indeed, the bail industry itself has even been recorded mentioning its attempts to mislead jurisdictions by creating industry-favorable research and putting other organizations' titles on it to make it look "neutral." By the way, I published a document citing to that particular recording, found in footnote 117 at https://www.pretrial.org/download/pji-reports/PJI-History%20of%20Bail%20Revised.pdf. Since then, the industry took it down, and so I keep a copy of this fairly incriminating recording in my own library.

In any event, while it would be less tiresome to hear a judge's completely original arguments, but I will nonetheless address each of the arguments from the memo in turn.

1.      The Bail Reform Act of 1966 did, indeed, leave money in the federal system, and thus retained a bond modification provision to deal with unattainable conditions. But leaving money in the system was recognized as one of the chief errors of the 1966 Act, when Congress later passed the Bail Reform Act of 1984. That Act removed a judge's ability to set a financial condition leading to the detention of the defendant, and it remains a key component of a rational in-or-out system based on risk and not wealth. By the way, the 1966 Act tried hard to reduce the use of money by specifically articulating the notion that money was the most restrictive condition, to be used only after other conditions were considered. Unfortunately, judges across America tended to ignore that provision, taking money for granted and continuing to use it as a part of their customary bail practices.

2.      Following "evidence-based practices" is not a progressive agenda aimed at social engineering – indeed, following the evidence might lead to outcomes unfavorable to any progressive agenda. Evidence-based decision-making means merely following the research to make decisions. The law, itself, is evidence-based in the sense that we use legal research to

decide cases. Unfortunately, there are certain things that the law cannot tell us, such as whether a particular condition of release actually works. For that, we need a different kind of research, which is typically social science research. This, too, is not unheard of in the law. Starting in 1908, when Louis Brandies submitted a 100 page brief to the United States Supreme Court consisting mostly of scientific and social science research to support restricting the number of hours required of women workers, we have used social science and other research to fill in crucial gaps. A prime example of this is found in the famous footnote 11 of *Brown v. Board of Education,* in which the Supreme Court used social science research to end the separate but equal doctrine in public schools. If we are to condition pretrial freedom in bail, we must know if those conditions work; a study of evidence-based practices allows us to assess what works to achieve our goals. And if something does not work, it suggests illegality simply because it would be irrational and unfair to impose a condition of release that did not work.

3.     Throughout the memo, the Judge cites to various studies advanced by the bail industry to give an opposing position. I know each of the studies, I have published documents analyzing those studies, and I am still quite mystified when they are used by anyone who understands the full story behind them. To be brief, since 1988, the Bureau of Justice Statistics has released data concerning pretrial release and detention in the 75 largest counties. Based on that data, certain researchers would make evaluative statements indicating that one type of release was better than another. In some of those documents, researchers concluded that release on surety bonds was more effective to any other "type" of release, such as to a pretrial services agency. The bail industry began touting these studies, and making their own statements about the data. When confronted with these claims, however, BJS issued a "data advisory" saying that you absolutely could not use their data to make such evaluative statements. In short, the data did not support saying that one type of release was better than another. Indeed, making such claims, according to BJS, would be "misleading." The bail industry complained, and then briefly stopped making the claims, but after about six months decided that ignoring the data advisory would do them nothing but good. Despite it being misleading, they still push these discredited studies. Unfortunately, Judge DeArmond relies on these very studies *even as he cites to the data advisory.* Had he read and fully understood the advisory, however, he would undoubtedly have removed any reference to the various studies which were the main aim of the advisory to begin with. Indeed, his concern of being given "bad data" is truly manifested by his reliance upon these various surety bond studies. They used bad data, and the bail industry and the Judge repeats it. All of this has been fully documented in my Fundamentals of Bail paper, *see* Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* at 96 (NIC 2014) as well as others, *see* Kristin Bechtel, et al., *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012), because of the particularly egregious intentional misrepresentations that go along with it. It is simply hard to respond to lies.

Indeed, had the Judge read my paper, he would instead have been urged not only to assess these studies against the data advisory, but also to hold them up to the threefold purpose of pretrial release, which is to maximize release, maximize court appearance, and maximize public safety. Money is touted as an effective way to maximize court appearance, but it has absolutely nothing to do with public safety and dramatically hinders release. Based on the balance of bail, surety bonds fail even if the research were valid.

4.     Yes, risk assessment instruments have their own problems, including the potential to exacerbate existing bias in the criminal justice system. Nevertheless, we have assessed risk at bail since 400 A.D., and these instruments simply represent the best way to measure certain things today. Moreover, the overall concept is much better than assessing risk by primarily using charge and wealth – the most discriminatory way I can think to measure it. The bigger issue with risk instruments is not even mentioned by the Judge, which involves what, exactly, they measure. This argument, however, requires a much more exacting examination of the issues than the one performed by Judge DeArmond.

5.     Indeed, *Salerno* did not say that cash bail was bad. But *Salerno* does instruct both the federal government and the states on how to do "no bail," or detention. I assume the quote mentioned by the Judge is Justice Rehnquist's most famous quote concerning liberty being the "norm" and detention being the "carefully limited exception." The quote may seem like dicta, but the entire opinion explained, in fact, how to make sure that detention is "carefully limited." Indeed, since *Salerno*, at least one U.S. Court of Appeals ruling relied entirely upon *Salerno's* notion that detention be carefully limited to strike down an Arizona constitutional no bail provision. Thus, the quote is not taken out of context; instead, it is the very essence of the opinion, which explains how to make detention lawful. When I teach on *Salerno,* I do not have to make much of an argument to say that if detention must be "carefully limited" in the way the opinion suggests, then detention using money likely violates this notion in fundamental ways. Using money to do release and detention is not careful. It is random and careless.

6.     The Judge apparently hopes to discredit various bail reformers' use of *Stack v. Boyle* by quoting certain language from the opinion. To be sure, *Stack* is not the panacea for release that anyone might hope from a Supreme Court opinion; it was issued in 1951, before any real reform to the secured money system had been done. But the case is important for a few reasons, which is why the Court in *Salerno* felt compelled to include discussion of it in its opinion. Looking through the lens of history, we see that the Court in *Stack* was simply re-affirming certain key concepts common to our American bail system. Bail was supposed to be release, and the Court in *Stack* equated the right to bail with a right to release pretrial. Bail needed to be individualized, and the Court in *Stack* made repeated reference to the need to have individualized standards. Bail should not be used to detain defendants, and the Court in *Stack* referenced in passing that doing so would be against the spirit and philosophy of the bail procedure. *Stack* is important, but its importance cannot be gleaned merely from reading the opinion in a vacuum. Instead, it must be read with knowledge of the history of bail to determine its true worth. Understanding how we got from pre-*Stack* bail cases, to *Stack* itself, to the detention cases of the 1960s, to the Bail Reform Act of 1984, to *Salerno*, is the key to truly understanding American bail reform.

7.     The various cases filed by Equal Justice Under Law are often parsed in attempts to show that they simply do not apply to various other states' practices. The state of Missouri did the same thing, only to learn, from me, that the cases have more to do with the future of bail and no bail than they thought. Equal Justice Under Law started small, suing cities using secured money conditions on bail schedules where court was only held once every week. Virtually all of these cases were settled, and the settlement agreements almost all included the disuse of secured

money bail in those cities. The misconception appears to be that the organization is only targeting bail schedules. While bail schedules are, indeed, a most egregious way to do release, Equal Justice Under Law is seeking the total elimination of secured money bail in its complaints. It is suing bigger and bigger jurisdictions, *with and without bail schedules*. The legal theories are the same, and are based on the notion that people should not be kept in jail due to lack of money. And while mostly unnecessary to each settlement, district court judges are nonetheless commenting on the unlawfulness of using secured money bail to detain defendants pretrial. By the way, in addition to Equal Justice Under Law, other national organizations are developing litigation strategies using other legal theories to be used in other forums. The cases are coming.

8.      The bail industry paid former Solicitor General Paul Clement to file a brief in an 11th Circuit interlocutory appeal in one of the Equal Justice Under Law cases. In that brief, Clement argues that the history of bail favors commercial sureties, that commercial sureties are more effective than other types of release (making the same error as the Judge in relying on the studies erroneously using the BJS data), and that the law favors keeping the status quo. As a student of bail's history, I personally felt his statement of the history and effectiveness of commercial sureties was so egregiously wrong that I filed my own brief making numerous corrections. Other entities, including the American Bar Association, the United States Department of Justice, the Cato Institute (one of the most conservative think tanks in America), the Pretrial Justice Institute, the National Association of Pretrial Services Agencies, and even appellee himself all filed brief and made equally compelling arguments for why Clement's stance concerning the law is wrong. Saying the fact that Clement's brief being sponsored by the bail industry is "not our issue" simply because Illinois has no commercial bail bonding is obviously false. Judge DeArmond's entire memo, as I read it, sets out exactly the bail industry's entire argument against moving from the status quo of using money bail, and is obviously tied to Illinois' current system of money without bail bondsmen. Again, this is the lone voice of a profit-driven industry up against a chorus of voices of sheriffs, chiefs of police, state courts, chief justices, prosecutors (including the U.S. Department of Justice), defenders, jail administrators, victims' representatives, researchers, foundations, law schools, criminal justice think tanks, counties, and even the White House. If, as Judge DeArmond suggests, you read the bail industry brief, then by all means read all of the briefs and then also read the various policy statements issued by these important national groups who desire changes to the way America does pretrial release and detention.

9.      Judge DeArmond misapprehends the importance of the New Mexico Supreme Court's decision in *Brown*. Indeed, if you ask Chief Justice Charles Daniels (who authored the opinion), he will be the first to tell you that all he did was require judges in his state to follow current law. Unfortunately, following current law in New Mexico meant not using money to detain a high risk defendant – a practice common throughout the state – and making sure that money did not interfere with the right to bail, which the New Mexico Supreme Court equated to "a right to be released from custody." As Judge DeArmond points out, through its ruling, the New Mexico Supreme Court did not herald the end of cash bail. It did, however, herald the end of using cash bail leading to detention, which is much the same thing. Again, understanding *Brown* requires knowledge of the history of bail, and, indeed, the evolution of the Excessive Bail Clause in America. And, contrary to what the Judge believes, it did herald the complete overhaul of the cash bail system in New Mexico. If judges cannot detain using money, then the legal

scheme must be changed to allow purposeful detention based on pretrial risk. That is why the Chief Justice is helping to enact a constitutional right to bail provision that allows risk based detention as well as court rules reducing or eliminating money's ability to detain pretrial.

10.     I do not pretend to know what various premises the Judge refers to on page 10 of his memo. These are obviously the premises believed to currently exist by whatever group gave whatever presentation. I do know, however, that our society does operate under certain false assumptions and perceptions about bail. That is precisely why it is so difficult to persuade any official who has operated with those perceptions to change. It is simply not within our nature to admit the need to change something in which we have participated for decades. Moreover, I also know that when Judge DeArmond says that using a defendant's bond to provide a source for restitution or paying fees or costs is proper, he is offering up unconstitutional purposes for setting financial conditions. There are only two constitutionally valid purposes for limiting a defendant's pretrial freedom: court appearance, and public safety. If bond is set for any other purpose – including using it as a potential source for restitution, fees, or costs – then those purposes would be unlawful. I understand the fine line between the reason for setting the bond to begin with versus the ultimate use of the money down the line, and this I believe the presenters used the idea that "crime has a price" to instead refer to the public's perception that the public often feels that judges need to indicate their seriousness about crime by setting a high number at bail. This perception is dangerous, and obviously leads to bail reform.

11.     One study referred to by the Judge that does not contain the same problems as the others when it comes to BJS data is the Dallas County Research Report. This particular report has been used by the bail industry, once again, to argue that surety bonds are superior to any other type of release even though the report's author himself cautions persons not to generalize the findings beyond Dallas County. There is reason for that; the peculiarities of the Dallas County system simply make a comparison to other places an "apples to oranges" comparison. For example, the author compared release on surety bonds to release on so-called "pretrial services bonds," but the list of offenses excluded from pretrial services supervision in Dallas County makes it unlike virtually every other jurisdiction in America that does not contain those restrictions. Despite the author's own warnings not to make comparisons to other jurisdictions, the bail industry (and now apparently Judge DeArmond) has decided to do so. This report was issued only after the author was forced to retract an earlier bail report favoring the bail industry after complaints of bias. I believe that this report was "published" only in a newspaper, and a disclaimer explains that the author refuses to explain his findings or reasons for anything. It should not even be considered in the same category of other, potentially legitimate studies. Once again, even if this study were not biased and misleading, one should recognize the fact that surety bonds only affect court appearance. Because they have nothing to do with public safety and hinder release, the balance of bail suggests not using them.

12.     Despite his disdain for progressive "evidence-based practices," the Judge appears to want evidence and citations for the Arnold Foundations' findings supporting the common sense notion that we tend to release high risk persons when we base the release decision on money (in another sense, he is willing to adopt the insurance company's position with little, no, or flawed data, but does not believe the Arnold Foundation when they say they found what they found. In fact, that particular finding was not necessarily a direct finding from a study in the

sense that they were looking for it. Instead, it was simply noticed that while controlling for risk when studying the effects of pretrial supervision versus no pretrial supervision on a group of released defendants, about half of the highest risk released defendants had been released. It was not a driver of the study, but it was shown in the numbers. It tends to reinforce the notion that in a money-based system, we tend to see low, medium, and high risk people both in and out of jail. That particular study was called Exploring the Effect of Supervision on Pretrial Outcomes, by Christopher T. Lownkamp and Marie VanNostrand, two of the country's top bail researchers, and is found at http://www.arnoldfoundation.org/wp-content/uploads/2014/02/LJAF_Report_Supervision_FNL.pdf. The Judge's comments about definitions of high risk are valid, but he should realize that the money-based system typically uses charge as a proxy for risk and otherwise does not define it at all. The science about what goes into the concepts of risk is likewise valid, but has its own issues of which I believe this Judge is likely completely unaware.

13.     The Judge wants to be pointed to research and statistics, and so I would recommend he read my Fundamentals (Timothy R. Schnacke, *Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform* 36-37 (NIC 2014), found at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf), and Money papers (Timothy R. Schnacke, *Money as a Criminal Justice Stakeholder,* at 34-38 (NIC 2014), found at http://www.clebp.org/images/2014-11-05_final_nic_money_as_a_stakeholder_september_8,_2014_ii.pdf), which contain numerous studies and citations to support the information contained therein. Again, however, his overall premise that there are two relatively equal sides to this debate is simply wrong. There is overwhelming evidence pointing toward change and mostly only nominal and biased evidence toward keeping the status quo. The only "alternative perspective" in this debate is the one offered by the bail insurance companies, which was basically presented in the memo. That perspective, in my and most other researchers' opinions, is erroneous and biased. As I mentioned before, with no particular agenda, I began researching bail ten years ago and came away with the understanding that our current bail system is flawed and in need of near complete reform. The history of bail tells us that this system has been flawed since about 1900 (the system has *not* been in operation for hundreds of years, as the Judge notes; that, too, is an industry claim designed to mislead people into believing that it has worked), and that we only recently figured out a way to fix it.

14.     Overall, the Judge's memo reminds me of that initial research into bail. Before reading the memo, I assumed I might find something in it that was not mistaken or flawed, but instead I saw the same erroneous arguments articulated by the one group dedicated to keep money in the system. There are currently valid and important discussions about real issues with current bail reform movement, but none of those issues were even raised by the Judge.

Finally, there are others who would no doubt caution you to be gentle in trying to convince this Judge to come to a different conclusion, but I am not one of them. After roughly five years of facing this sort of unthinking opposition (or worse, opposition parroted from the bail industry) I have decided that only force through federal litigation will lead to a national "fix." Frankly, I no longer have the patience anymore for the laborious process of gaining

unanimous support from the bench. Instead, I have decided to help those people who are forcing judges through federal litigation to follow the United States Constitution. It that's being a progressive, then so be it.

# Exhibit 1

# Fundamentals
# of Bail



A Resource Guide for Pretrial Practitioners and
a Framework for American Pretrial Reform



National Institute of Corrections



U.S. Department of Justice
National Institute of Corrections

# Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Reform

Authors: Timothy R. Schnacke

August 2014

Robert Brown
Acting Director

Harry Fenstermaker
Acting Deputy Director

Jim Cosby
Chief, Community Services
Division

Lori Eville
Project Manager

DISCLAIMER

This document was funded by cooperative agreement number 13CS02GK04 from the National Institute of Corrections, U.S. Department of Justice. Points of view or opinions stated in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice. The National Institute of Corrections reserves the right to reproduce, publish, translate, or otherwise use and to authorize others to publish and use all or any part of the copyrighted material contained in this publication.

ACCESSION NUMBER

NIC Accession Number: 028360

NIC's mission is to provide training, information and technical assistance to the nation's jails, prisons, and community corrections facilities. More information can be found at www.nicic.gov.



National Institute of Corrections

## Table of Contents

Preface ........................................................................................................................ i

Acknowledgments ................................................................................................... ii

Executive Summary ................................................................................................ iii

    Why Do We Need Pretrial Improvements? ....................................................... iii

    The History of Bail ............................................................................................ iv

    The Legal Foundations of Pretrial Justice ......................................................... v

    Pretrial Research ................................................................................................ v

    The National Standards on Pretrial Release ...................................................... vi

    Pretrial Terms and Phrases ................................................................................ vi

    Guidelines for Pretrial Reform ......................................................................... vi

Introduction ............................................................................................................. 1

Chapter 1: Why Do We Need Pretrial Improvements? ............................................ 7

    The Importance of Understanding Risk ............................................................ 7

    The Importance of Equal Justice ....................................................................... 8

    Negative Outcomes Associated with the Traditional Money Bail System ........ 10

    Unnecessary Pretrial Detention ........................................................................ 12

    Other Areas in Need of Pretrial Reform ........................................................... 17

    The Third Generation of Bail/Pretrial Reform .................................................. 18

Chapter 2: The History of Bail ................................................................................ 21

    The Importance of Knowing Bail's History ...................................................... 21

    Origins of Bail ................................................................................................... 23

    The Evolution to Secured Bonds/Commercial Sureties ..................................... 26

    The "Bail/No Bail" Dichotomy ......................................................................... 29

    "Bail" and "No Bail" in America ....................................................................... 31

    Intersection of the Two Historical Phenomena ................................................. 36

    The Current Generation of Bail/Pretrial Reform .............................................. 40

    What Does the History of Bail Tell Us? ............................................................ 42

Chapter 3: Legal Foundations of Pretrial Justice .................................................... 45

History and Law ............................................................................................. 45

Fundamental Legal Principles.......................................................................... 48

    The Presumption of Innocence ................................................................... 48

    The Right to Bail ........................................................................................ 51

    Release Must Be the Norm.......................................................................... 56

    Due Process ................................................................................................ 56

    Equal Protection ........................................................................................ 57

    Excessive Bail and the Concept of Least Restrictive Conditions ................... 59

    Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose) . 64

    The Bail Process Must Be Individualized ..................................................... 65

    The Right to Counsel .................................................................................. 66

    The Privilege Against Compulsory Self-Incrimination ................................... 67

    Probable Cause .......................................................................................... 67

Other Legal Principles..................................................................................... 68

What Do the Legal Foundations of Pretrial Justice Tell Us? ............................. 68

Chapter 4: Pretrial Research ........................................................................... 71

    The Importance of Pretrial Research .......................................................... 71

    Research in the Last 100 Years: The First Generation ................................... 75

    The Second Generation .............................................................................. 78

    The Third Generation ................................................................................. 80

    Current Research – Special Mention ........................................................... 88

    Empirical Risk Assessment Instruments ..................................................... 88

    Effects of Release Types and Conditions on Pretrial Outcomes ........................ 91

    Application and Implications....................................................................... 92

    What Does the Pretrial Research Tell Us? .................................................... 93

Chapter 5: National Standards on Pretrial Release ................................................. 96

    The ABA Standards .................................................................................... 96

Chapter 6: Pretrial Terms and Phrases ................................................................. 99

    The Importance of a Common Vocabulary .................................................. 99

    The Meaning and Purpose of "Bail" ......................................................... 100

Other Terms and Phrases........................................................................... 105

Chapter 7: Application – Guidelines for Pretrial Reform ..................................... 107

Individual Action Leading to Comprehensive Cultural Change .................... 107

Individual Decisions .................................................................................. 108

Individual Roles ........................................................................................ 109

Judicial Leadership ................................................................................... 112

Conclusion .................................................................................................... 115

# Preface

Achieving pretrial justice is like sharing a book – it helps when everyone is on the same page. So this document, "Fundamentals of Bail: A Resource Guide for Pretrial Practitioners and a Framework for American Pretrial Justice," is primarily designed to help move America forward in its quest for pretrial reform by getting those involved in that quest on the same page. Since I began studying, researching, and writing about bail I (along with others, including, thankfully, the National Institute of Corrections) have seen the need for a document that figuratively steps back and takes a broader view of the issues facing America when it comes to pretrial release and detention. The underlying premise of this document is that until we, as a field, come to a common understanding and agreement about certain broad fundamentals of bail and how they are connected, we will see only sporadic rather than widespread improvement. In my opinion, people who endeavor to learn about bail will be most effective at whatever they hope to do if their bail education covers each of the fundamentals – the history, the law, the research, the national standards, and its terms and phrases.

Timothy R. Schnacke

Executive Director

Center for Legal and Evidence-Based Practices

# Acknowledgments

Many different people contributed to this paper in different ways, and it is not possible to list and thank them all by name. Nevertheless, a few entities and people warrant special mention. The first is the National Institute of Corrections, and especially Lori Eville and Katie Green, for conceiving the idea for the paper and allowing me the time to flesh it out. The NIC has been in the forefront of pretrial justice for many years, and I am honored to be able to add to their long list of helpful pretrial literature.

Cherise Fanno Burdeen and the National Association of Pretrial Services Agencies, through the helpful assistance of John Clark and Ken Rose, provided invaluable input on the draft, and Spurgeon Kennedy saved the day with his usual excellent editorial assistance. Also, I am especially grateful to my friend Dan Cordova and his staff at the Colorado Supreme Court Law Library. Their extraordinary expertise and service has been critical to everything I have written for the past seven years. Special thanks, as well, go to my friend and mentor, Judge Truman Morrison, who continues daily to teach and inspire me on issues surrounding bail and pretrial justice.

I would also like to thank my dear friend and an extraordinary criminal justice professor, Eric Poole, who patiently listened and helped me to mold the more arcane concepts from the paper. Moreover, I am also indebted to my former boss, Tom Giacinti, whose foresight and depth of experience in criminal justice allowed him to forge a path in this generation of American bail reform.

Finally, I give my deepest thanks and appreciation to Claire Brooker (Jefferson County, Colorado) and Mike Jones (Pretrial Justice Institute), who not only inspired most of the paper, but also acted (as usual) as my informal yet indispensable editors. It is impossible to list all of their contributions to my work, but the biggest is probably that Claire and Mike have either conceived or molded – through their intellectual and yet practical lenses – virtually every thought I have ever had concerning bail. If America ever achieves true pretrial justice, it will be due to the hard work of people like Claire Brooker and Mike Jones.

# Executive Summary

Pretrial justice in America requires a common understanding and agreement on all of the component parts of bail. Those parts include the need for pretrial justice, the history of bail, the fundamental legal principles underlying bail, the pretrial research, the national standards on pretrial release and detention, and how we define our basic terms and phrases.

## Why Do We Need Pretrial Improvements?

If we can agree on why we need pretrial improvements in America, we are halfway toward implementing those improvements. As recently as 2007, one of the most frequently heard objections to bail reform was the ubiquitous utterance, "If it ain't broke, don't fix it." That has changed. While various documents over the last 90 years have consistently pointed toward the need to improve the administration of bail, literature from this current generation of pretrial reform gives us powerful new information from which we can articulate exactly why we need to make changes, which, in turn, frames our vision of pretrial justice designed to fix what is most certainly broken.

Knowing that our understanding of pretrial risk is flawed, we can begin to educate judges and others on how to embrace risk first and mitigate risk second so that our foundational American precept of equal justice remains strong. Knowing that the traditional money-based bail system leads both to unnecessary pretrial detention of lower risk persons and the unwise release of many higher risk persons, we can begin to craft processes that are designed to correct this illogical imbalance. Knowing and agreeing on each issue of pretrial justice, from infusing risk into police officer stops and first advisements to the need for risk-based bail statutes and constitutional right-to-bail language, allows us as a field to look at each state (or even at all states) with a discerning eye to begin crafting solutions to seemingly insoluble problems.

## The History of Bail

Knowing the history of bail is critical to understanding why America has gone through two generations of bail reform in the 20th century and why it is currently in a third. History provides the contextual answers to virtually every question raised at bail. Who is against pretrial reform and why are they against it? What makes this generation of pretrial reform different from previous generations? Why did America move from using unsecured bonds administered through a personal surety system to using mostly secured bonds administered through a commercial surety system and when, exactly, did that happen? In what ways are our current constitutional and statutory bail provisions flawed? What are historical solutions to the dilemmas we currently see in the pretrial field? What is bail, and what is the purpose of bail? How do we achieve pretrial justice? All of these questions, and more, are answered through knowledge of the history of bail.

For example, the history tells us that bail should be viewed as "release," just as "no bail" should be viewed as detention. It tells us that whenever (1) bailable defendants (or those whom we feel should be bailable defendants) are detained, or (2) unbailable defendants (or those whom we feel should be unbailable defendants) are released, history demands a correction to ensure that, instead, bailable defendants are released and unbailable defendants are detained. Knowledge of this historical need for correction, by itself, points to why America is currently in a third generation of pretrial reform.

The history also tells us that it is the collision of two historical threads – the movement from an unsecured bond/personal surety system to a secured bond/commercial surety system colliding with the creation and nurturing of a "bail/no bail" dichotomy, in which bailable defendants are released and unbailable defendants are detained – that has led to the acute need for bail reform in the last 100 years. Thus, the history of bail instructs us not only on relevant older practices, but also on the important lessons from more recent events, including the first two generations of bail reform in America in the 20th century. It tells us how we can change state laws, policies, and practices so that bail can be administered in a lawful and effective manner, thereby greatly diminishing, if not avoiding altogether, the need for future reform.

## The Legal Foundations of Pretrial Justice

The history of bail and the law underlying the administration of bail are intertwined (with the law in most cases confirming and solidifying the history), but the law remains as the framework and boundary for all that we do in the pretrial field. Unfortunately, however, the legal principles underlying bail are uncommon in our court opinions; rarely, if ever, taught in our law schools and colleges; and have only recently been resurrected as subjects for continuing legal education. Nevertheless, in a field such as bail, which strives to follow "legal and evidence-based practices," knowledge of the fundamental legal principles and why they matter to the administration of bail is crucial to pretrial justice in America. Knowing "what works" – the essence of following the evidence in any particular field – is not enough in bail. We must also know the law and how the fundamental legal principles apply to our policies and practices.

Each fundamental principle of national applicability, from probable cause and individualization to excessiveness, due process, and equal protection, is thus a rod by which we measure our daily pretrial practices so that they further the lawful goals underlying the bail process. In many cases, the legal principles point to the need for drastic changes to those practices. Moreover, in this generation of bail reform we are beginning to learn that our current state and local laws are also in need of revision when held up to the broader legal foundations. Accordingly, as changing concepts of risk are infused into our knowledge of bail, shedding light on practices and local laws that once seemed practical but now might be considered irrational, the fundamental legal principles rise up to instruct us on how to change our state constitutions and bail statutes so that they again make sense.

## Pretrial Research

The history of bail and the law intertwined with that history tell us that the three goals underlying the bail process are to maximize release while simultaneously maximizing court appearance and public safety. Pretrial social research that studies what works to effectuate all three of these goals is superior to research that does not, and as a field we must agree on the goals as well as know the difference between superior and inferior research.

Each generation of bail reform in America has had a body of literature supporting pretrial improvements, and while more research is clearly needed (in

all genres, including, for example, social, historical, and legal research) this generation nonetheless has an ample supply from which pretrial practitioners can help ascertain what works to achieve our goals. Current research that is highly significant to today's pretrial justice movement includes research used to design empirical risk assessment instruments and to gauge the effectiveness of release types or specific conditions on pretrial outcomes.

## The National Standards on Pretrial Release

The pretrial field benefits significantly from having sets of standards and recommendations covering virtually every aspect of the administration of bail. In particular, the American Bar Association Standards, first promulgated in 1968, are considered not only to contain rational and practical "legal and evidence-based" recommendations, but also to serve as an important source of authority and have been used by legislatures and cited by courts across the country.

As a field we must recognize the importance of the national standards and stress the benefits from jurisdictions holding up their practices against what most would consider to be "best" practices. On the other hand, we must recognize that the rapidly evolving pretrial research may ultimately lead to questioning and possibly even revising those standards.

## Pretrial Terms and Phrases

A solid understanding of the history of bail, the legal foundations of bail, the pretrial research, and the national standards means, in many jurisdictions, that even such basic things as definitions of terms and phrases are in need of reform. For example, American jurisdictions often define the term "bail" in ways that are not supported by the history or the law, and these improper definitions cause undue confusion and distraction from significant issues. As a field seeking some measure of pretrial reform, we must all first agree on the proper and universally true definitions of our key terms and phrases so that we speak with a unified voice.

## Guidelines for Pretrial Reform

Pretrial justice in America requires a complete cultural change from one in which we primarily associate bail with money to one in which we do not. But cultural change starts with individuals making individual decisions to act. It may seem daunting, but it is not; many persons across America have decided to follow the

research and the evidence to assess whether pretrial improvements are necessary, and many of those same persons have persuaded entire jurisdictions to make improvements to the administration of bail. What these persons have in common is their knowledge of the fundamentals of bail. When they learn the fundamentals, light bulbs light, the clouds of confusion part, and what once seemed impossible becomes not only possible, but necessary and seemingly long overdue.

This document is designed to help people come to the same epiphany that has led so many to focus on pretrial reform as one of the principle criminal justice issues facing our country today. It is a resource guide written at a time when the resources are expanding exponentially and pointing in a single direction toward reform. More importantly, however, it represents a mental framework – a slightly new and interconnected way of looking at things – so that together we can finally and fully achieve pretrial justice in America.

# Introduction

It is a paradox of criminal justice that bail, created and molded over the centuries in England and America primarily to facilitate the release of criminal defendants from jail as they await their trials, today often operates to deny that release. More unfortunate, however, is the fact that many American jurisdictions do not even recognize the paradox; indeed, they have become gradually complacent with a pretrial process through which countless bailable defendants are treated as unbailable through the use of money. To be paradoxical, a statement must outwardly appear to be false or absurd, but, upon closer examination, shown to be true. In many jurisdictions, though, a statement such as, "The defendant is being held on $50,000 bail," a frequent tagline to any number of newspaper articles recounting a criminal arrest, seems to lack the requisite outward absurdity to qualify as paradoxical. After all, defendants are "held on bail" all the time. But the idea of being held or detained on bail is, in fact, absurd. An equivalent statement would be that the accused has been freed and is now at liberty to serve time in prison.

Recognizing the paradox is paramount to fully understanding the importance of bail, and the importance of bail cannot be overstated. Broadly defined, the study of bail includes examining all aspects of the non-sentence release and detention decision during a criminal defendant's case.[1] Internationally, bail is the subject of numerous treaties, conventions, rules, and standards. In America, bail has been the focus of two significant generations of reform in the 20th century, and appears now to be firmly in the middle of a third. Historically speaking, bail has existed since Roman times and has been the catalyst for such important criminal jurisprudential innovations as preliminary hearings, habeas corpus, the notion of "sufficient sureties," and, of course, prohibitions on pretrial detention without charge and on "excessive" bail as foundational to our core constitutional rights. Legally, decisions at bail trigger numerous foundational principles, including

---

[1] A broad definition of the study of criminal bail would thus appropriately include, and has in the past included, discussion of issues occasionally believed to be outside of the bail process, such as the use of citations in order to avoid arrest altogether or pretrial diversion as a dispositional alternative to the typical pretrial release or detention/trial/adjudication procedure. A broad definition would certainly include discussions of post-conviction bail, but because of fundamental differences between pretrial defendants and those who have been convicted, that subject is beyond the scope of this paper. For purposes of this paper, "bail" will refer to the pretrial process.

due process, the presumption of innocence, equal protection, the right to counsel, and other key elements of federal and state law. In the realm of criminal justice social science research, bail is a continual source of a rich literature, which, in turn, helps criminal justice officials as well as the society at large to decide the most effective manner in which to administer the release and detention decision. And finally, the sheer volume and resulting outcomes of the decisions themselves – decisions affecting over 12 million arrestees per year – further attest to the importance of bail as a topic that can represent either justice or injustice on a grand scale.

## Getting Started – What is Bail? What is Bond?

Later in this paper we will see how the history, the law, the social science research, and the national best practice standards combine to help us understand the proper definitions of terms and phrases used in the pretrial field. For now, however, the reader should note that the terms "bail" and "bond" are used differently across America, and often inaccurately when held up to history and the law. In the 1995 edition to his Dictionary of Modern Legal Usage, Bryan Garner described the word "bail" as a "chameleon-hued" legal term, with strikingly different meanings depending on its overall use as a noun or a verb. And indeed, depending on the source, one will see "bail" defined variously as money, as a person, as a particular type of bail bond, and as a process of release. Occasionally, certain definitions will conflict with other definitions or word usage even within the same source. Accordingly, to reflect an appropriate legal and historical definition, the term "bail" will be used in this paper to describe a process of releasing a defendant from jail or other governmental custody with conditions set to provide reasonable assurance of court appearance or public safety.

The term "bond" describes an obligation or a promise, and so the term "bail bond" is used to describe the agreement between a defendant and the court, or between the defendant, a surety (commercial or noncommercial), and the court that sets out the details of the agreement. There are many types of bail bonds – secured and unsecured, with or without sureties, and with or without other conditions – that fall under this particular definition. Later we will also see how defining types of bonds primarily based on their use of money in the process (such as a "cash" bond or a "personal recognizance bond") is misleading and inaccurate.

This paper occasionally mentions the terms "money bail," and the "traditional money bail system." "Money bail" is typically used as a shorthand way to describe the bail process or a bail bond using secured financial conditions (which

necessarily includes money that must be paid up-front prior to release). The two central issues concerning money bail are: (1) its tendency to cause unnecessary incarceration of defendants who cannot afford to pay secured financial conditions either immediately or even after some period of time; and (2) its tendency to allow for, and sometimes foster, the release of high-risk defendants, who should more appropriately be detained without bail.

The "traditional money bail system" typically describes the predominant American system (since about 1900) of primarily using secured financial conditions on bonds administered through commercial sureties. More broadly, however, it means any system of the administration of bail that is over-reliant on money, typically when compared to the American Bar Association's National Standards on Pretrial Release. Some of its hallmarks include monetary bail bond schedules, overuse of secured bonds, a reliance on commercial sureties (for-profit bail bondsmen), financial conditions set to protect the public from future criminal conduct, and financial conditions set without consideration of the defendant's ability to pay, or without consideration of non-financial conditions or other less-restrictive conditions that would likely reduce risk.

**Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 2nd ed. 1995); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011).

The importance of bail foreshadows the significant problems that can arise when the topic is not fully understood. Those problems, in turn, amplify the paradox. A country founded upon liberty, America leads the world in pretrial detention at three times the world average. A country premised on equal justice, America tolerates its judges often conditioning pretrial freedom based on defendant wealth – or at least on the ability to raise money – versus important and constitutionally valid factors such as the risk to public and victim safety. A country bound by the notion that liberty not be denied without due process of law, America tolerates its judges often ordering de-facto pretrial detention through brief and perfunctory bail hearings culminating with the casual utterance of an arbitrary and often irrational amount of money. A country in which the presumption of innocence is "axiomatic and elementary" [2] to its administration of criminal justice and foundational to the right to bail,[3] America, instead, often projects a presumption of guilt. These issues are exacerbated by the fact that the type of pretrial justice a person gets in this country is also determined, in large part, on where he or she is, with some jurisdictions

---

[2] *Coffin v. United States*, 156 U.S. 432, 453 (1895).
[3] *See Stack v. Boyle*, 342 U.S. 1, 4 (1951).

endeavoring to follow legal and evidence-based pretrial practices but with others woefully behind. In short, the administration of bail in America is unfair and unsafe, and the primary cause for that condition appears simply to be: (1) a lack of bail education that helps to illuminate solutions to a number of well-known bail problems; and (2) a lack of the political will to change the status quo.

> *"It is said that no one truly knows a nation until one has been inside its jails. A nation should not be judged by how it treats its highest citizens, but its lowest ones."*
>
> Nelson Mandela, 1995

Fortunately, better than any other time in history, we have now identified, and in many cases have actually illustrated through implementation, solutions to the most vexing problems at bail. But this knowledge is not uniform. Moreover, even where the knowledge exists, we find that jurisdictions are in varying stages of fully understanding the history of bail, legal foundations of bail, national best practice recommendations, terms and phrases used at bail, and legal and evidence-based practices that fully implement the fair and transparent administration of pretrial release and detention. Pretrial justice requires that those seeking it be consistent with both their vision and with the concept of pretrial best practices, and this document is designed to help further that goal. It can be used as a resource guide, giving readers a basic understanding of the key areas of bail and the criminal pretrial process and then listing key documents and resources necessary to adopt a uniform working knowledge of legal and evidence-based practices in the field.

Hopefully, however, this document will serve as more than just a paper providing mere background information, for it is designed, instead, to also provide the intellectual framework to finally achieve pretrial justice in America. As mentioned previously, in this country we have undertaken two generations of pretrial reform, and we are currently in a third. The lessons we have learned from the first two generations are monumental, but we have not fully implemented them, leading to the need for some "grand unifying theory" to explore how this third generation can be our last. In my opinion, that theory comes from a solid consensus understanding of the fundamentals of bail, why

they are important, and how they work together toward an idea of pretrial justice that all Americans can embrace.

The paper is made up of seven chapters designed to help jurisdictions across America to reach consensus on a path to pretrial justice. In the first chapter, we will briefly explore the need for pretrial improvements as well as the reasons behind the current generation of reform. In the second chapter, we will examine the evolution of bail through history, with particular emphasis on why the knowledge of certain historical themes is essential to reforming the pretrial process. In the third chapter, we will list and explain fundamental legal foundations underpinning the pretrial field. The fourth chapter will focus on the evolution of empirical pretrial research, looking primarily at research associated with each of the three generations of bail reform in America in the 20th and 21st centuries.

The fifth chapter will briefly discuss how the history, law, and research come together in the form of national pretrial standards and best practice recommendations. In the sixth chapter, we will further discuss how bail's history, law, research, and best practice standards compel us to agree on certain changes to the way we define key terms and phrases in the field. In the seventh and final chapter, we will focus on practical application – how to begin to apply the concepts contained in each of the previous sections to lawfully administer bail based on best practices. Throughout the document, through sidebars, the reader will also be introduced to other important but sometimes neglected topics relevant to a complete understanding of the basics of bail.

Direct quotes are footnoted, and other, unattributed statements are either the author's own or can be found in the "additional sources and resources" sections at the end of most chapters. In the interest of space, footnoted sources are not necessarily listed again in those end sections, but should be considered equally important resources for pretrial practitioners. Throughout the paper, the author occasionally references information that is found only in various websites. Those websites are as follows:

The American Bar Association: http://www.americanbar.org/aba.html;

The Bureau of Justice Assistance: https://www.bja.gov/;

The Bureau of Justice Statistics: http://www.bjs.gov/;

The Carey Group: http://www.thecareygroup.com/;

The Center for Effective Public Policy: http://cepp.com/;

The Crime and Justice Institute: http://www.crj.org/cji;

The Federal Bureau of Investigation Crime Reports: http://www.fbi.gov/about-us/cjis/ucr/ucr;

Human Rights Watch: http://www.hrw.org/;

Justia: http://www.justia.com/;

The Justice Management Institute: http://www.jmijustice.org/;

The Justice Policy Institute: http://www.justicepolicy.org/index.html;

NACo Pretrial Resources, http://www.naco.org/programs/csd/Pages/PretrialJustice.aspx;

The National Association of Pretrial Services Agencies: http://napsa.org/;

The National Criminal Justice Reference Service: https://www.ncjrs.gov/;

The National Institute of Corrections, http://nicic.gov;

The National Institute of Justice: http://www.nij.gov/Pages/welcome.aspx;

The Pretrial Justice Institute: http://www.pretrial.org/;

The Pretrial Services Agency for the District of Columbia, http://www.psa.gov/;

The United States Census Bureau, http://www.census.gov/;

The Vera Institute of Justice: http://www.vera.org/;

The Washington State Institute for Public Policy: http://www.wsipp.wa.gov/.

# Chapter 1: Why Do We Need Pretrial Improvements?

## The Importance of Understanding Risk

Of all the reasons for studying, identifying, and correcting shortcomings with the American system of administering bail, two overarching reasons stand out as foundational to our notions of freedom and democracy. The first is the concept of risk. From the first bail setting in Medieval England to any of a multitude of bail settings today, pretrial release and detention has always been concerned with risk, typically manifested by the prediction of pretrial misbehavior based on the risk that any particular defendant will not show up for court or commit some new crime if released. But often missing from our discussions of pretrial risk are the reasons for why we allow risk to begin with. After all, pretrial court appearance rates (no failures to appear) and public safety rates (no new crimes while on pretrial release) would most certainly hover near 100% if we could simply detain 100% of defendants.

The answer is that we not only allow for risk in criminal justice and bail, we demand it from a society that is based on liberty. In his Commentaries on the Laws of England (the eighteenth century treatise on the English common law used extensively by the American Colonies and our Founding Fathers) Sir William Blackstone wrote, "It is better that ten guilty persons escape than that one innocent suffer,"[4] a seminal statement of purposeful risk designed to protect those who are governed against unchecked despotism. More specifically related to bail, in 1951, Justice Robert H. Jackson succinctly wrote, "Admission to bail always involves a risk . . . a calculated risk which the law takes as the price of our system of justice."[5] That system of justice – one of limited government powers and of fundamental human rights protected by the Constitution, of defendants cloaked with the presumption of innocence, and of increasingly arduous evidentiary hurdles designed to ensure that only the guilty suffer punishment at the hands of the state – inevitably requires us to *embrace* risk at bail as fundamental to maintaining our democracy. Our notions of equality, freedom, and the rule of law demand that we embrace risk, and embracing risk requires us

---

[4] William Blackstone, *Commentaries on the Laws of England*, Book 4, ch. 27 (Oxford 1765-1769).

[5] *Stack v. Boyle*, 342 U.S. 1, 8 (1951) (Jackson, J., concurring).

to err on the side of release when considering the right to bail, and on "reasonable assurance," rather than complete assurance, when limiting pretrial freedom.

Despite the fact that risk is necessary, however, many criminal justice leaders lack the will to undertake it. To them, a 98% court appearance rate is 2% too low, one crime committed by a defendant while on pretrial release is one crime too many, and detaining some large percentage of defendants pretrial is an acceptable practice if it avoids those relatively small percentage failures. Indeed, the fears associated with even the smallest amount of pretrial failure cause those leaders to focus first and almost entirely on mitigating perceived risk, which in turn leads to unnecessary pretrial detention.

> *"All too often our current system permits the unfettered release of dangerous defendants while those who pose minimal, manageable risk are held in costly jail space."*
>
> Tim Murray, Pretrial Justice Institute, 2011

But these fears misapprehend the entire concept of bail, which requires us first to embrace the risk created by releasing defendants (for the law presumes and very nearly demands the release of bailable defendants) and then to seek to mitigate it only to reasonable levels. Indeed, while the notion may seem somewhat counterintuitive, in this one unique area of the law, everything that we stand for as Americans reminds us that when court appearance and public safety rates are high, we must at least consider taking the risk of releasing more defendants pretrial. Accordingly, one answer to the question of why pretrial improvements are necessary, and the first reason for correcting flaws in the current system, is that criminal justice leaders must continually take risks in order to uphold fundamental precepts of American justice; unfortunately, however, many criminal justice leaders, including those who administer bail today, often fail to fully understand that connection and have actually grown risk averse.

## The Importance of Equal Justice

The second foundational reason for studying and correcting the administration of bail in America is epitomized by a quote from Judge Learned Hand uttered during a keynote address for the New York City Legal Aid Society in 1951. In his

speech, Judge Hand stated, "If we are to keep our democracy, there must be one commandment: Thou shalt not ration justice."[6] Ten years later, the statement was repeated by Attorney General Robert Kennedy when discussing the need for bail reform, and it became a foundational quote in the so-called "Allen Committee" report, the document from the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice that provided a catalyst for the first National Conference on Bail and Criminal Justice in 1964. Judge Hand's quote became a rallying cry for the first generation of American bail reform, and it remains poignant today, for in no other area of criminal procedure do we so blatantly restrict allotments of our fundamental legal principles. Like our aversion to risk, our rationing of justice at bail is something to which we have grown accustomed. And yet, if Judge Hand is correct, such rationing means that our very form of government is in jeopardy. Accordingly, another answer for why pretrial improvements are necessary, and a second reason for correcting flaws in the current system, is that allowing justice for some, but not all Americans, chips away at the founding principles of our democracy, and yet those who administer bail today have grown content with a system in which justice capriciously eludes persons based on their lack of financial resources.

Arguably, it is America's aversion to risk that has led to its complacency toward rationing pretrial justice. That is because bail, and therefore the necessary risk created by release, requires an in-or-out, release/no release decision. As we will see later in this paper, since at least 1275, bail was meant to be an in-or-out proposition, and only since about the mid to late 1800s in America have we created a process that allows judges to delegate that decision by merely setting an amount of up-front money. Unfortunately, however, setting an amount of money is typically not a release/no release decision; indeed, it can often cause both unintended releases and detentions. Setting money, instead, creates only the illusion of a decision for when money is a precondition to release, the actual release (or, indeed, detention) decision is then made by the defendant, the defendant's family, or perhaps some third party bail bondsman who has analyzed the potential for profit. This illusion of a decision, in turn, has masked our aversion to risk, for it appears to all that some decision has been made. Moreover, it has caused judges across America to be content with the negative outcomes of such a non-decision, in which pretrial justice appears arbitrarily rationed out only to those with access to money.

---

[6] *See* The Legal Aid Society website at http://www.legal-aid.org/en/las/thoushaltnotrationjustice.aspx.

## Negative Outcomes Associated with the Traditional Money Bail System

Those negative outcomes have been well-documented. Despite overall drops in total and violent crime rates over the last twenty years, jail incarceration rates remain high – so high, in fact, that if we were to jail persons at the 1980 incarceration rate, a rate from a time in which crime rates were actually higher than today, our national jail population would drop from roughly 750,000 inmates to roughly 250,000 inmates. Moreover, most of America's jail inmates are classified as pretrial defendants, who today account for approximately 61% of jail populations nationally (up from approximately 50% in 1996). As noted previously, the United States leads the world in numbers of pretrial detainees, and detains them at a rate that is three times the world average.

## Understanding Your Jail Population

Knowing who is in your jail as well as fundamental jail population dynamics is often the first step toward pretrial justice. Many jurisdictions are simply unaware of who is in the jail, how they get into the jail, how they leave the jail, and how long they stay, and yet knowing these basic data is crucial to focusing on particular jail populations such as pretrial inmates.

A jail's population is affected not only by admissions and lengths of stay, but also by the discretionary decisionmaking by criminal justice officials who, whether on purpose or unwittingly, often determine the first two variables. For example, a local police department's policy of arresting and booking (versus release on citation) more defendants than other departments or to ask for unusually high financial conditions on warrants will likely increase a jail's number of admissions and can easily add to its overall daily population. As another example, national data has shown that secured money at bail causes pretrial detention for some defendants and delayed release for others, both increasing the lengths of stay for that population and sometimes creating jail crowding. Accordingly, a decision by one judge to order mostly secured (i.e., cash or surety) bonds will increase the jail population more than a judge who has settled on using less-restrictive means of limiting pretrial freedom while mitigating pretrial risk.

Experts on jail population analysis thus advise jurisdictions to adopt a systems perspective, create the infrastructure to collect and analyze system data, and collect and track trend data not only on inmate admissions and lengths of stay, but also on criminal justice decisionmaking for policy purposes.

**Sources and Resources:** David M. Bennett & Donna Lattin, *Jail Capacity Planning Guide: A Systems Approach* (NIC, Nov. 2009); Cherise Fanno Burdeen, *Jail Population Management: Elected County Officials' Guide to Pretrial Services* (NACo/BJA/PJI, 2009); Mark A. Cunniff, *Jail Crowding: Understanding Jail Population Dynamics,* (NIC, Jan. 2002); Robert C. Cushman, *Preventing Jail Crowding: A Practical Guide* (NIC, 2nd ed., May 2002); Todd D. Minton, *Jail Inmates at Midyear- 2012 Statistical Tables*, (BJS, 2013 and series). **Policy Documents Using Jail Population Analysis:** Jean Chung, *Baltimore Behind Bars, How to Reduce the Jail Population, Save Money and Improve Public Safety* (Justice Policy Institute, Jun. 2010); Marie VanNostrand, *New Jersey Jail Population Analysis: Identifying Opportunities to Safely and Responsibly Reduce the Jail Population* (Luminosity/Drug Policy Alliance, Mar. 2013).

These trends are best explained by the justice system's increasing use of secured financial conditions on a population that appears less and less able to afford them. In 2013, the Census Bureau announced that the poverty rate in America was 15%, about one in every seven persons and higher than in 2007, which was

just before the most recent recession. Nevertheless, according to the Bureau of Justice Statistics, the percentage of cases for which courts have required felony defendants to post money in order to obtain release has increased approximately 65% from 1990 to 2009 (from 37% to 61% of cases overall, mostly from the large increase in use of surety bonds), and the amounts of those financial conditions have steadily risen over the same period.

## Unnecessary Pretrial Detention

The problem highlighted by these data comes from the fact that secured financial conditions at bail cause unnecessary pretrial detention. In a recent and rigorous study of 2,000 Colorado cases comparing the effects between defendants ordered to be released on secured financial conditions (requiring either money or property to be paid in advance of release) and those ordered released on unsecured financial conditions (requiring the payment of either money or property only if the defendant failed to appear and not as a precondition to release), defendants with unsecured financial conditions were released in "statistically significantly higher" numbers no matter how high or low their individual risk.[7] Essentially, defendants ordered to be released but forced to pay secured financial conditions: (1) took longer to get out of jail (presumably for the time needed to gather the necessary money or to find willing sureties); and (2) in many cases did not get out at all. In short, using secured bonds leads to the detention of bailable defendants by delaying or preventing pretrial release. These findings are consistent with comparable national data; indeed, the federal government has estimated the percentage of felony defendants detained for the duration of their pretrial period nationally to be approximately 38%, and the percentage of those defendants detained simply due to the lack of money to be approximately 90% of that number.

There are numerous reasons to conclude that anytime a bailable defendant is detained for lack of money (rather than detained because of his or her high risk for pretrial misbehavior), that detention is unnecessary. First, secured money at bail is the most restrictive condition of release – it is typically the only precondition to release itself – and, in most instances, other less-restrictive alternatives are available to respond to pretrial risk without the additional financial condition. Indeed, starting in the 1960s, researchers have demonstrated that courts can use alternatives to release on money bonds that have acceptable

---

[7] Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option,* 12 (PJI 2013).

outcomes concerning risk to public safety and court appearance. Second, the money itself cannot serve as motivation for anything until it is actually posted. Until then, the money merely detains, and does so unequally among defendants resulting in the unnecessary detention of releasable inmates. This problem is exacerbated by the fact that the financial condition of a bail bond is typically arbitrary; even when judges are capable of expressing reasons for a particular amount, there is often no rational explanation for why a second amount, either lower or higher, might not arguably serve the same purposes. Third, money set with a purpose to detain is likely unlawful under numerous theories of law, and is also unnecessary given the Supreme Court's approval of a lawful detention scheme that uses no money whatsoever. Financial conditions of release are indicators of decisions to release, not to detain; accordingly, any resulting detention due to money bonds used outside of a lawful detention process makes that money-based detention unnecessary or potentially unlawful. Fourth, no study has ever shown that money can protect the public. Indeed, in virtually every American jurisdiction, financial conditions of bail bonds cannot even be forfeited for new crimes or other breaches in public safety, making the setting of a money bond for public safety irrational. Given that irrationality, any pretrial detention resulting from that practice is per se unnecessary.

Fifth, ever since 1968, when the American Bar Association openly questioned the basic premise that money serves as a motivator for court appearance, no valid study has been conducted to refute that uncertainty. Instead, the best research to date suggests what criminal justice leaders have long suspected: secured money does not matter when it comes to either public safety or court appearance, but it is directly related to pretrial detention. This hypothesis was supported most recently by the Colorado study, mentioned above, which compared outcomes for defendants released on secured bonds with outcomes for defendants released on unsecured bonds. In 2,000 cases of defendants from all risk categories, this research showed that while having to pay the money up-front led to statistically significantly higher detention rates, whether judges used secured or unsecured money bonds did not lead to any differences in court appearance or public safety rates.

A sixth reason for concluding that bailable defendants held on secured financial conditions constitutes unnecessary pretrial detention is that we know of at least one jurisdiction, Washington D.C., that uses virtually no money at all in its bail setting process. Instead, using an "in or out," "bail/no bail" scheme of the kind contemplated by American law, the District of Columbia releases 85-88% of all defendants – detaining the rest through rational, fair, and transparent detention

procedures – and yet maintains high court appearance (no FTA) and public safety (no new crime) rates. Moreover, that jurisdiction does so day after day, with all types of defendants charged with all types of crimes, using almost no money whatsoever.

Unnecessary pretrial detention is also suggested whenever we look at the adjudicatory outcomes of defendants' cases to see if they are the sorts of individuals who must be absolutely separated from society. When we look at those outcomes, however, we see that even though we foster a culture of pretrial detention, very few persons arrested or admitted to jail are ultimately sentenced to significant incarceration post-trial. Indeed, only a small fraction of jail inmates nationally (from 3-5%, depending on the source) are sent to prison. In one statewide study, only 14% of those defendants detained for the *entire duration* of their case were sentenced to prison. Thirteen percent had their cases dismissed (or the cases were never filed), and 37% were sentenced to noncustodial sanctions, including probation, community corrections, or home detention. Accordingly, over 50% of those pretrial detainees were released into the community once their cases were done. In another study, more than 25% of felony pretrial detainees were acquitted or had their cases dismissed, and approximately 20% were ultimately sentenced to a noncustodial sentence. Clearly, another disturbing paradox at bail involves the dynamic of releasing presumptively innocent defendants back into the community only after they have either pleaded or been found guilty of a particular crime.

In addition, and as noted by the Pretrial Justice Institute (PJI), these statistics vary greatly across the United States, and that variation itself hints at the need for reform. According to PJI:

> Looking at the counties individually shows the great disparity in pretrial release practices and outcomes. In 2006, pretrial release rates ranged from a low of 31% in one county to a high of 83% in another. Non-financial release rates ranged from lows of zero in one county, 3% in another, and 5% in a third to a high of 68%.[8]

---

[8] *Important Data on Pretrial Justice* (PJI 2011).

## Different Laws/Different Practices

Bail laws are different among the states, often due to the extent to which those states have fully embraced the principles and practices evolving out of the two previous generations of bail reform in the 1960s and 1980s. Even in states with similar laws, however, pretrial practices can nonetheless vary widely. Indeed, local practices can vary among jurisdictions under the same state laws, and, given the great discretion often afforded at bail, even among judges within individual jurisdictions. Disparity beyond that needed to individualize bail settings can rightfully cause concerns over equal justice, through which Americans can be reasonably assured that the laws will not have widely varying application depending on their particular geographical location, court, or judge.

Normally, state and federal constitutional law would provide adequate benchmarks to maintain equal justice, but with bail we have an unfortunate scarcity of language and opinions from which to gauge particular practices or even the laws from which those practices derive. Fortunately, however, we have best practice standards on pretrial release and detention that take fundamental legal principles and marry them with research to make recommendations concerning virtually every issue surrounding pretrial justice. In this current generation of pretrial reform, we are realizing that both bail practices and the laws themselves – from court rules to constitutions – must be held up to best practices and the legal principles underlying them to create bail schemes that are fair and applied somewhat equally among the states.

The American Bar Association's (ABA's) Criminal Justice Standards on Pretrial Release can provide the benchmarks that we do not readily find in bail law. When followed, those Standards provide the framework from which pretrial practices or even laws can be measured, implemented, or improved. For example, the use of monetary bail schedules (a document assigning dollar amounts to particular charges regardless of the characteristics of any individual defendant) are illegal in some states but actually required by law in others. There is very little law on the subject, but the ABA standards (using fundamental legal principles, such as the need for individuality in bail setting as articulated by the United States Supreme Court), research (indicating that release or detention based on individual risk is a superior practice to any mechanism based solely on charge and wealth), and logic (the standards call schedules "arbitrary and inflexible") reject the use of monetary bail schedules, thus suggesting that any state that either mandates or permits their use should consider statutory amendment.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice – Pretrial Release* (3rd ed. 2007).

Pretrial detention, whether for a few days or for the duration of the case, imposes certain costs, and unnecessary pretrial detention does so wastefully. In a purely monetary sense, these costs can be estimated, such as the comparative cost of incarceration (from $50 to as much as $150 per day) versus community supervision (from as low as $3 to $5 per day). Given the volume of defendants and their varying lengths of stays, individual jails can incur costs of millions of dollars per year simply to house lower risk defendants who are also presumed innocent by the law. Indeed, the United States Department of Justice estimates that keeping the pretrial population behind bars costs American taxpayers roughly 9 billion dollars per year. Jails that are crowded can create an even more costly scenario for taxpayers, as new jail construction can easily reach $75,000 to $100,000 per inmate bed. Added to these costs are dollars associated with lost wages, economic mobility (including intergenerational effects), possible welfare costs for defendant families, and a variety of social costs, including denying the defendant the ability to assist with his or her own defense, the possibility of imposing punishment prior to conviction, and eroding justice system credibility due to its complacency with a wealth-based system of pretrial freedom.

Perhaps more disturbing, though, is research suggesting that pretrial detention alone, all other things being equal, leads to harsher treatment and outcomes than pretrial release. Relatively recent research from both the Bureau of Justice Statistics and the New York City Criminal Justice Agency continues to confirm studies conducted over the last 60 years demonstrating that, controlling for all other factors, defendants detained pretrial are convicted and plead guilty more often, and are sentenced to prison and receive harsher sentences than those who are released. Moreover, as recently as November 2013, the Laura and John Arnold Foundation released a study of over 150,000 defendants finding that – all other things being equal – defendants detained pretrial were over four times more likely to be sentenced to jail (and with longer sentences) and three times more likely to be sentenced to prison (again with longer sentences) than defendants who were not detained.[9]

While detention for a defendant's entire pretrial period has decades of documented negative effects, the Arnold Foundation research is also beginning to demonstrate that even small amounts of pretrial detention – perhaps even the few days necessary to secure funds to pay a cash bond or fee for a surety bond – have negative effects on defendants and actually makes them more at risk for

---

[9] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, at 10-11 (Laura & John Arnold Found. 2013).

pretrial misbehavior.[10] Looking at the same 150,000 case data set, the Arnold researchers found that low- and moderate-risk defendants held only 2 to 3 days were more likely to commit crimes and fail to appear for court before trial than similar defendants held 24 hours or less. As the time in jail increased, the researchers found, the likelihood of defendant misbehavior also increased. The study also found similar correlations between pretrial detention and long-term recidivism, especially for lower risk defendants. In a field of paradoxes, the idea that a judge setting a condition of bail intending to protect public safety might be unwittingly *increasing* the danger to the public – both short and long-term – is cause for radically rethinking the way we administer bail.

## Other Areas in Need of Pretrial Reform

Unnecessary pretrial detention is a deplorable byproduct of the traditional money bail system, but it is not the only part of that system in need of significant reform. In many states, the overreliance on money at bail takes the place of a transparent and due-process-laden detention scheme based on risk, which would allow for the detention of high-risk defendants with no bail. Indeed, the traditional money bail system fosters processes that allow certain high-risk defendants to effectively purchase their freedom, often without being assessed for their pretrial risk and often without supervision. These processes include using bail schedules (through which defendants are released by paying an arbitrary money amount based on charge alone), a practice of dubious legal validity and counter to any notions of public safety. They include using bail bondsmen, who operate under a business model designed to maximize profit based on getting defendants back to court but with no regard for public safety. And they include setting financial conditions to help protect the public, a practice that is both legally and empirically flawed. In short, the use of money at bail at the expense of risk-based best practices tends to create the two main reasons cited for the need for pretrial reform: (1) it needlessly and unfairly keeps lower risk defendants in jail, disproportionately affecting poor and minority defendants and at a high cost to taxpayers; and (2) it too often allows higher risk defendants out of jail at the expense of public safety and integrity of the justice system. Both of these reasons were illustrated by the Colorado study, cited above, which documented that when making bail decisions without the benefit of an empirical risk instrument, judges often set financial conditions that not only

---

[10] *See* Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013).

kept lower risk persons in jail, but also frequently allowed the highest risk defendants out.

While the effect of money at bail is often cited as a reason for pretrial reform, research over the last 25 years has also illuminated other issues ripe for pretrial justice improvements. They include the need for (1) bail education among all criminal justice system actors; (2) data-driven policies and infrastructure to administer bail; (3) improvements to procedures for release through citations and summonses; (4) better prosecutorial and defense attorney involvement at the front-end of the system; (5) empirically created pretrial risk assessment instruments; (6) traditional (and untraditional) pretrial services functions in jurisdictions without those functions; (7) improvements to the timing and nature of first appearances; (8) judicial release and detention decision-making to follow best practices; (9) systems to allocate resources to better effectuate best practices; and (10) changes in county ordinances, state statutes, and even state constitutions to embrace and facilitate pretrial justice and best practices at bail.

> *"What has been made clear . . . is that our present attitudes toward bail are not only cruel, but really completely illogical. . . . '[O]nly one factor determines whether a defendant stays in jail before he comes to trial [and] that factor is, simply, money."*
>
> Attorney General Robert Kennedy, 1962
>
> *Many pretrial inmates "are forced to remain in custody . . . because they simply cannot afford to post the bail required – very often, just a few hundred dollars."*
>
> Attorney General Eric Holder, 2011

## The Third Generation of Bail/Pretrial Reform

The traditional money bail system that has existed in America since the turn of the 20th century is deficient legally, economically, and socially, and virtually every neutral and objective bail study conducted over the last 90 years has called for its reform. Indeed, over the last century, America has undergone two generations of bail reform, but those generations have not sufficed to fully achieve what we know today constitutes pretrial justice. Nevertheless, we are

entering a new generation of pretrial reform with the same three hallmarks seen in previous generations.

First, like previous generations, we now have an extensive body of research literature – indeed, we have more than previous generations – pointing uniformly in a single direction toward best practices at bail and toward improvements over the status quo. Second, we have the necessary meeting of minds of an impressive number of national organizations – from police chiefs and sheriffs, to county administrators and judges – embracing the research and calling for data-driven pretrial improvements. Third, and finally, we are now seeing jurisdictions actually changing their laws, policies, and practices to reflect best practice recommendations for improvements. Fortunately, through this third generation of pretrial reform, we already know the answers to most of the pressing issues at bail. We know what changes must be made to state laws, and we know how to follow the law and the research to create bail schemes in which pretrial practices are rational, fair, and transparent.

A deeper understanding of the foundations of bail makes the need for pretrial improvements even more apparent. The next three parts of this paper are designed to summarize the evolution and importance of three of the most important foundational aspects of bail – the history, the law, and the research.

**Additional Sources and Resources:** American Bar Association Standards for Criminal Justice – Pretrial Release (3rd ed. 2007); Spike Bradford, *For Better or for Profit: How the Bail Bonding Industry Stands in the Way of Fair and Effective Pretrial Justice* (JPI 2012); E. Ann Carson & William J. Sabol, *Prisoners in 2011* (BJS 2012); *Case Studies: the D.C. Pretrial Services Agency: Lessons From Five Decades of Innovation and Growth* (PJI), found at http://www.pretrial.org/download/pji-reports/Case%20Study-%20DC%20Pretrial%20Services%20-%20PJI%202009.pdf; Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties*, 2006 (BJS 2010); Jean Chung, *Bailing on Baltimore: Voices from the Front Lines of the Justice System* (JPI 2012); Thomas H. Cohen & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts* (BJS 2007); Jamie Fellner, *The Price of Freedom: Bail and Pretrial Detention of Low Income Nonfelony Defendants in New York City* (Human Rights Watch 2010); *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012); Robert F. Kennedy, *Address by Attorney General Robert F. Kennedy to the American Bar Association House of Delegates, San Francisco, Cal.*, (Aug. 6, 1962) available at http://www.justice.gov/ag/rfkspeeches/1962/08-06-1962%20Pro.pdf; Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Barry

Mahoney, Bruce D. Beaudin, John A. Carver, III, Daniel B. Ryan, & Richard B. Hoffman, *Pretrial Services Programs: Responsibilities and Potential* (NIJ 2001); Todd D. Minton, *Jail Inmates at Midyear 2012 – Statistical Tables* (BJS 2013); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJA 2011); Melissa Neal, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail* (JPI 2012); Mary T. Phillips, *Bail, Detention, and Non-Felony Case Outcomes, Research Brief Series No. 14* (NYCCJA 2007); Mary T. Phillips, *Pretrial Detention and Case Outcomes, Part 2, Felony Cases, Final Report* (NYCCJA 2008); *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process* (PJI/MacArthur Found. 2012); Brian A. Reaves, *Felony Defendants in Large Urban Counties, 2009 – Statistical Tables* (BJS 2013); *Report of the Attorney General's Committee on Poverty and the Administration of Federal Criminal Justice* (Univ. of Mich. 2011) (1963); *Responses to Claims About Money Bail for Criminal Justice Decision Makers* (PJI 2010); Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, *The Third Generation of Bail Reform* (Univ. Den. L. Rev. online, 2011); Standards on Pretrial Release (NAPSA, 3rd ed. 2004); Bruce Western & Becky Pettit, *Collateral Costs: Incarceration's Effect on Economic Mobility* (The PEW Charitable Trusts 2010).

# Chapter 2: The History of Bail

According to the American Historical Association, studying history is crucial to helping us understand ourselves and others in the world around us. There are countless quotes on the importance of studying history from which to draw, but perhaps most relevant to bail is one from philosopher Soren Kierkegaard, who reportedly said, "Life must be lived forward, but it can only be understood backward." Indeed, much of bail today is complex and confusing, and the only way to truly understand it is to view it through a historical lens.

## The Importance of Knowing Bail's History

Understanding the history of bail is not simply an academic exercise. When the United States Supreme Court equated the right to bail to a "right to release before trial," and likened the modern practice of bail with the "ancient practice of securing the oaths of responsible persons to stand as sureties for the accused,"[11] the Court was explaining the law by drawing upon notions discernible only through knowledge of history. When the commercial bail insurance companies argue that pretrial services programs have "strayed" beyond their original purpose, their argument is not fully understood without knowledge of 20th century bail, and especially the improvements gained from the first generation of bail reform in the 1960s. Some state appellate courts have relied on sometimes detailed accounts of the history of bail in order to decide cases related to release under "sufficient sureties," a term fully known only through the lens of history.

> *"This difference [between the U.S. and the Minnesota Constitution] is critical to our analysis and to fully understand this critical difference, some knowledge of the history of bail is necessary. Therefore, it is important to examine the origin of bail and its development in Anglo-American jurisprudence."*
>
> *State v. Brooks*, 604 N.W.2d 345 (Minn. 2000)

In short, knowledge of the history of bail is necessary to pretrial reform, and therefore it is crucial that this history be shared. Indeed, the history of bail is the

---

[11] *Stack v. Boyle,* 342 U.S. 1, 4-5 (1951).

starting point for understanding all of pretrial justice, for that history has shaped our laws, guided our research, helped to mold our best practice standards, and forced changes to our core definitions of terms and phrases. Fundamentally, though, the history of bail answers two pressing questions surrounding pretrial justice: (1) given all that we know about the deleterious effects of money at bail, how did America, as opposed to the rest of the world, come to rely upon money so completely?; and (2) does history suggest solutions to this dilemma, which might lead to American pretrial justice?

### Civil Rights, Poverty, and Bail

Anyone who has read the speeches of Robert F. Kennedy while he was Attorney General knows that civil rights, poverty, and bail were three key issues he wished to address. Addressing them together, as he often did, was no accident, as the three topics were, and continue to be, intimately related.

In 1961, philanthropist Louis Schweitzer and magazine editor Herbert Sturz took their concerns over the administration of bail in New York City (a system "that granted liberty based on income") to Robert Kennedy and Daniel Freed, Department of Justice liaison to the newly created Committee on Poverty and the Administration of Federal Criminal Justice, known as the "Allen Committee." Schweitzer's and Sturz's efforts ultimately led to the creation of the Vera Foundation (now the Vera Institute of Justice), whose pioneering work on the Manhattan Bail Project heavily influenced the first generation of bail reform by finding effective alternatives to the commercial bail system. Freed, in turn, took the Vera work and incorporated it into an entire chapter of the Allen Committee's report, leading to the first National Conference on Bail and Criminal Justice in 1964.

At the same time that these bail and poverty reformers were working to change American notions of equal justice, civil rights activists were taking on a traditionally difficult hurdle for Southern blacks – the lack of money to bail themselves and others out of jail – and using it to their advantage. Through the "jail, no bail" policy, activists refused to pay bail or fines after being arrested for sit-ins, opting instead to have the government incarcerate them, and sometimes to force them to work hard labor, to bring more attention to their cause.

The link between civil rights, poverty, and bail was probably inevitable, and Kennedy set out to rectify overlapping injustices seen in all three areas. But despite promising improvements encompassed in the war on poverty, the civil rights movement, and the first generation of bail reform in the 1960s, we remain unfortunately tolerant of a bail process inherently biased against the poor and disproportionately affecting persons of color. Studies continue to demonstrate that bail amounts are empirically related to increased (and typically needless)

pretrial detention, and other studies are equally consistent in demonstrating racial disparity in the application of bail and detention.

Fortunately, however, just like those persons pursuing civil rights and equal justice in the 20th century, the current generation of pretrial reform is fueled by committed individuals urging cultural changes to a system manifested by disparate state laws, unfair practices, and irrational policies that negatively affect the basic human rights of the most vulnerable among us. The commitment of those individuals, stemming from the success of past reformers, remains the catalyst for pretrial justice across the nation.

**Sources and Resources:** Thomas H. Cohen and Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts, 1990-2004* (BJS Nov. 2007); Cynthia E. Jones, *"Give Us Free": Addressing Racial Disparities in Bail Determinations,* 16 N.Y.U. J. Legis. & Pub. Pol'y 919 (2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (PJI Oct. 2013); Besiki Kutateladze, Vanessa Lynn, & Edward Liang, *Do Race and Ethnicity Matter in Prosecution? Review of Empirical Studies* (1st Ed.) (Vera Institute of Justice 2012) at 11-12; *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 35-35 and citations therein (PJI/BJA 2011) (statement of Professor Cynthia Jones).

## Origins of Bail

While bail can be traced to ancient Rome, our traditional American understanding of bail derives primarily from English roots. When the Germanic tribes the Angles, the Saxons, and the Jutes migrated to Britain after the fall of Rome in the fifth century, they brought with them the blood feud as the primary means of settling disputes. Whenever one person wronged another, the families of the accused and the victim would often pursue a private war until all persons in one or both of the families were killed. This form of "justice," however, was brutal and costly, and so these tribes quickly settled on a different legal system based on compensation (first with goods and later with money) to settle wrongs. This compensation, in turn, was based on the concept of the "wergeld," meaning "man price" or "man payment" and sometimes more generally called a "bot," which was a value placed on every person (and apparently on every person's property) according to social rank. Historians note the existence of detailed tariffs assigning full wergeld amounts to be paid for killing persons of various ranks as well as partial amounts payable for injuries, such as loss of limbs or other wrongs. As a replacement to the blood feud between families, the wergeld system was also initially based on concepts of kinship and private justice, which

meant that wrongs were still settled between families, unlike today, where crimes are considered to be wrongs against all people or the state.

With the wergeld system as a backdrop, historians agree on what was likely a prototypical bail setting that we now recognize as the ancestor to America's current system of release. Author Hermine Meyer described that original bail process as follows:

> Since the [wergeld] sums involved were considerable and could rarely be paid at once, the offender, through his family, offered sureties, or *wereborh*, for the payment of the *wergeld*. If accepted, the injured party met with the offender and his surety. The offender gave a *wadia*, a *wed*, such as a stick, as a symbol or pledging or an indication of the assumption of responsibility. The creditor then gave it to the surety, indicating that he recognized the surety as the trustee for the debt. He thereby relinquished his right to use force against the debtor. The debtor's pledge constituted a pledging of person and property. Instead of finding himself in the hands of the creditor, the debtor found himself, up to the date when payment fell due, in the hands of the surety.[12]

This is, essentially, the "ancient practice of securing the oaths" referred to by the Supreme Court in *Stack v. Boyle,* and it has certain fundamental properties that are important to note. First, the surety (also known as the "pledge" or the "bail") was a person, and thus the system of release became known as the "personal surety system." Second, the surety was responsible for making sure the accused paid the wergeld to avoid a feud, and he did so by agreeing in early years to stand in completely for the accused upon default of his obligations ("body for body," it was reported, meaning that the surety might also suffer some physical punishment upon default), and in later years to at least pay the wergeld himself in the event of default. Thus, the personal surety system was based on the use of recognizances, which were described by Blackstone as obligations or debts that would be voided upon performance of specified acts. Though not completely the same historically, they are essentially what we might now call unsecured bonds using co-signors, with nobody required to pay any money up-front, and with the

---

[12] Hermine Herta Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139, 1146 (1971-1972) (citing and summarizing Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275,* 3-15 (NY, AMS Press, 1966).

security on any particular bond coming from the sureties, or persons, who were willing to take on the role and acknowledge the amount potentially owed upon default.

Third, the surety was not allowed to be repaid or otherwise profit from this arrangement. As noted above, the wadia, or the symbol of the suretyship arrangement, was typically a stick or what historians have described as some item of trifling value. In fact, as discussed later, even reimbursing or merely promising to reimburse a surety upon default – a legal concept known as indemnification – was declared unlawful in both England and America and remained so until the 1800s.

Fourth, the surety's responsibility over the accused was great and was based on a theory of continued custody, with the sureties often being called "private jailers" or "jailers of [the accused's] own choosing."[13] Indeed, it was this great responsibility, likely coupled with the prohibition on reimbursement upon default and on profiting from the system, which led authorities to bestow great powers to sureties as jailers to produce the accused – powers that today we often associate with those possessed by bounty hunters under the common law. Fifth, the purpose of bail in this earliest of examples was to avoid a blood feud between families. As we will see, that purpose would change only once in later history. Sixth and finally, the rationale behind this original bail setting made sense because the amount of the payment upon default was identical to the amount of the punishment. Accordingly, because the amount of the promised payment was identical to the wergeld, for centuries there was never any questioning whether the use of that promised amount for bail was arbitrary, excessive, or otherwise unfair.

The administration of bail has changed enormously from this original bail setting, and these changes in America can be attributed largely to the intersection during the 20th century of two historical phenomena. The first was the slow evolution from the personal surety system using unsecured financial conditions to a commercial surety system (with profit and indemnification) primarily using secured financial conditions. The second was the often misunderstood creation and nurturing of a "bail/no bail" or "release/no release" dichotomy, which continues to this day.

---

[13] *Reese v. United States*, 76 U.S. (9 Wall.) 13, 21 (1869).

## The Evolution to Secured Bonds/Commercial Sureties

The gradual evolution from a personal surety system using unsecured bonds to the now familiar commercial surety system using secured bonds in America began with the Norman Invasion. When the Normans arrived in 1066, they soon made changes to the entire criminal justice system, which included moving from a private justice system to a more public one through three royal initiatives. First, the crown initiated the now-familiar idea of crimes against the state by making certain felonies "crimes of royal concern." Second, whereas previously the commencement of a dispute between families might start with a private summons based upon sworn certainty, the crown initiated the mechanism of the presentment jury, a group of individuals who could initiate an arrest upon mere suspicion from third parties. Third, the crown established itinerant justices, who would travel from shire to shire to exert royal control over defendants committing crimes of royal concern. These three changes ran parallel to the creation of jails to hold various arrestees, although the early jails were crude, often barbaric, and led to many escapes.

These changes to the criminal justice process also had a measurable effect on the number of cases requiring bail. In particular, the presentment jury process led to more arrests than before, and the itinerant justice system led to long delays between arrest and trial. Because the jails at the time were not meant to hold so many persons and the sheriffs were reluctant to face the severe penalties for allowing escapes, those sheriffs began to rely more frequently upon personal sureties, typically responsible (and preferably landowning) persons known to the sheriff, who were willing to take control of the accused prior to trial. The need for more personal sureties, in turn, was met through the growth of the parallel institutions of local government units known as tithings and hundreds – a part of the overall development of the frankpledge system, a system in which persons were placed in groups to engage in mutual supervision and control.

While there is disagreement on whether bail was an inherent function of frankpledge, historians have frequently documented sheriffs using sureties from within the tithings and hundreds (and sometimes using the entire group), indicating that that these larger non-family entities served as a safety valve so that sheriffs or judicial officials rarely lacked for "sufficient" sureties in any particular case. The fundamental point is that in this period of English history, sureties were individuals who were willing to take responsibility over defendants – for no money and with no expectation of indemnification upon default – and the sufficiency of the sureties behind any particular release on bail

came from finding one or more of these individuals, a process that was made exceedingly simpler through the use of the collective, non-family groups.

All of this meant that the fundamental purpose of bail had changed: whereas the purpose of the original bail setting process of providing oaths and pledges was to avoid a blood feud between families while the accused met his obligations, the use of more lengthy public processes and jails meant that the purpose of bail would henceforth be to provide a mechanism for release. As before, the purpose of conditioning that release by requiring sureties was to motivate the accused to face justice – first to pay the debt but now to appear for court – and, indeed, court appearance remained the sole purpose for limiting pretrial freedom until the 20th century.

Additional alterations to the criminal process occurred after the Norman Invasion, but the two most relevant to this discussion involve changes in the criminal penalties that a defendant might face as well as changes in the persons, or sureties, and their associated promises at bail. At the risk of being overly simplistic, punishments in Anglo-Saxon England could be summed up by saying that if a person was not summarily executed or mutilated for his crime (for that was the plight of persons with no legal standing, who had been caught in the act, or persons of "ill repute" or long criminal histories, etc.), then that person would be expected to make some payment. With the Normans, however, everything changed. Slowly doing away with the wergeld payments, the Normans introduced first afflictive punishment, in the form of ordeals and duels, and later capital and other forms of corporal punishment and prison for virtually all other offenses.

The changes in penalties had a tremendous impact on what we know today as bail. Before the Norman Invasion, the surety's pledge matched the potential monetary penalty perfectly. If the wergeld was thirty silver pieces, the surety was expected to pay exactly thirty silver pieces upon default of the primary debtor. After the Invasion, however, with increasing use of capital punishment, corporal punishment, and prison sentences, it became frequently more difficult to assign the amount that ought to be pledged, primarily because assigning a monetary equivalent to either corporal punishment or imprisonment is largely an arbitrary act. Moreover, the threat of these seemingly more severe punishments led to increasing numbers of defendants who refused to stay put, which created additional complexity to the bail decision. These complexities, however, were not enough to cause society to radically change course from its use of the personal surety system. Instead, that change came when both England and America began running out of the sureties themselves.

As noted previously, the personal surety system generally had three elements: (1) a reputable person (the surety, sometimes called the "pledge" or the "bail"); (2) this person's willingness to take responsibility for the accused under a private jailer theory and with a promise to pay the required financial condition on the back-end – that is, only if the defendant forfeited his obligation; and (3) this person's willingness to take the responsibility without any initial remuneration or even the promise of any future payment if the accused were to forfeit the financial condition of bail or release. This last requirement addressed the concept of indemnification of sureties, which was declared unlawful by both England and America as being against the fundamental public policy for having sureties take responsibility in the first place. In both England and America, courts repeatedly articulated (albeit in various forms) the following rationale when declaring surety indemnification unlawful: once a surety was paid or given a promise to be paid the amount that could potentially be forfeited, that surety lost all interest and motivation to make sure that the condition of release was performed. Thus, a prohibition on indemnifying sureties was a foundational part of the personal surety system.

And indeed, the personal surety system flourished in England and America for centuries, virtually ensuring that those deemed bailable were released with "sufficient sureties," which were designed to provide assurance of court appearance. Unfortunately, however, in the 1800s both England and America began running out of sureties. There are many reasons for this, including the demise of the frankpledge system in England, and the expansive frontier and urban areas in America that diluted the personal relationships necessary for a personal surety system. Nevertheless, for these and other reasons, the demand for personal sureties gradually outgrew supply, ultimately leading to many bailable defendants being unnecessarily detained.

It is at this point in history that England and the United States parted ways in how to resolve the dilemma of bailable defendants being detained for lack of sureties. In England (and, indeed, in the rest of the world), the laws were amended to allow judges to dispense with sureties altogether when justice so required. In America, however, courts and legislatures began chipping away at the laws against surety indemnification. This transformation differed among the states. In the end, however, across America states gradually allowed sureties to demand re-payment upon a defendant's default and ultimately to profit from the bail enterprise itself. By 1898, the first commercial surety was reportedly opened for business in America. And by 1912, the United States Supreme Court wrote, "The distinction between bail [i.e., common law bail, which forbade

indemnification] and suretyship is pretty nearly forgotten. The interest to produce the body of the principal in court is impersonal and wholly pecuniary."[14]

Looking at court opinions from the 1800s, we see that the evolution from a personal to a commercial surety system (in addition to the states gradually increasing defendants ability to self-pay their own financial conditions, a practice that had existed before, but that was used only rarely) was done in large part to help release bailable defendants who were incarcerated due only to their inability to find willing sureties. However, that evolution ultimately virtually assured unnecessary pretrial incarceration because bondsmen began charging money up-front (and later requiring collateral) to gain release in addition to requiring a promise of indemnification. While America may have purposefully moved toward a commercial surety system from a personal surety system to help release bailable defendants, perhaps unwittingly, and certainly more importantly, it moved to a secured money bail system (requiring money to be paid before release is granted) from an unsecured system (promising to pay money only upon default of obligations). The result has been an increase in the detention of bailable defendants over the last 100 years.

## The "Bail/No Bail" Dichotomy

The second major historical phenomenon involved the creation and nurturing of a "bail/no bail" dichotomy in both England and America. Between the Norman Invasion and 1275, custom gradually established which offenses were bailable and which were not. In 1166, King Henry II bolstered the concept of detention based on English custom through the Assize of Clarendon, which established a list of felonies of royal concern and allowed detention based on charges customarily considered unbailable. Around 1275, however, Parliament and the Crown discovered a number of abuses, including sheriffs detaining bailable defendants who refused or could not pay those sheriffs a fee, and sheriffs releasing unbailable defendants who were able to pay some fee. In response, Parliament enacted the Statute of Westminster in 1275, which hoped to curb abuses by establishing criteria governing bailability (largely based on a prediction of the outcome of the trial by examining the nature of the charge, the weight of the evidence, and the character of the accused) and, while doing so, officially categorized presumptively bailable and unbailable offenses.

---

[14] *Leary v. United States,* 224 U.S. 567, 575 (1912).

Importantly, this statutory enactment began the legal tradition of expressly articulating a bail/no bail scheme, in which a right to bail would be given to some, but not necessarily to all defendants. Perhaps more important, however, are other elements of the Statute that ensured that bailable defendants would be released and unbailable defendants would be detained. In 1275, the sheriffs were expressly warned through the Statute that to deny the release of bailable defendants or to release unbailable defendants was against the law; all defendants were to be either released or detained (depending on their category), and without any additional payment to the sheriff. Doing otherwise was deemed a criminal act.

> *"And if the Sheriff, or any other, let any go at large by Surety, that is not replevisable . . . he shall lose his Fee and Office for ever. . . . And if any withhold Prisoners replevisable, after that they have offered sufficient Surety, he shall pay a grievous Amerciament to the King; and if he take any Reward for the Deliverance of such, he shall pay double to the Prisoner, and also shall [be in the great mercy of] the King."*
>
> Statute of Westminster 3 Edward I. c. 15, *quoted in* Elsa de Haas, Antiquities of Bail, Origin and Historical Development in Criminal Cases to the Year 1275 (NY AMS Press 1966).

Accordingly, in 1275 the right to bail was meant to equal a right to release and the denial of a right to bail was meant to equal detention, and, generally speaking, these important concepts continued through the history of bail in England. Indeed, throughout that history any interference with bailable defendants being released or with unbailable (or those defendants whom society deemed unbailable) defendants being lawfully detained, typically led to society recognizing and then correcting that abuse. Thus, for example, when Parliament learned that justices were effectively detaining bailable defendants through procedural delays, it passed the Habeas Corpus Act of 1679, which provided procedures designed to prevent delays prior to bail hearings. Likewise, when corrupt justices were allowing the release of unbailable defendants, thus causing what many believed to be an increase in crime, it was rearticulated in 1554 that unbailable defendants could not be released, and that bail decisions be held in open session or by two or more justices sitting together. As another example, when justices began setting financial conditions for bailable defendants in prohibitively high amounts, the abuse led William and Mary to consent to the

English Bill of Rights in 1689, which declared, among other things, that "excessive bail ought not to be required."[15]

## "Bail" and "No Bail" in America

Both the concept of a "bail/no bail" dichotomy as well as the parallel notions that "bail" should equal release and "no bail" should equal detention followed into the American Colonies. Generally, those Colonies applied English law verbatim, but differences in beliefs about criminal justice, customs, and even crime rates led to more liberal criminal penalties and bail laws. For example, in 1641 the Massachusetts Body of Liberties created an unequivocal right to bail to all except for persons charged with capital offenses, and it also removed a number of crimes from its list of capital offenses. In 1682, Pennsylvania adopted an even more liberal law, granting bail to all persons except when charged with a capital offense "where proof is evident or the presumption great," adding an element of evidentiary fact finding so as to also allow bail even for certain capital defendants. This provision became the model for nearly every American jurisdiction afterward, virtually assuring that "bail/no bail" schemes would ultimately find firm establishment in America.

Even in the federal system – despite its lack of a right to bail clause in the United States Constitution – the Judiciary Act of 1789 established a "bail/no bail," "release/detain" scheme that survived radical expansion in 1984 and that still exists today. Essentially, any language articulating that "all persons shall be bailable . . . unless or except" is an articulation of a bail/no bail dichotomy. Whether that language is found in a constitution or a statute, it is more appropriately expressed as "release (or freedom) or detention" because the notion that bailability should lead to release was foundational in early American law.

---

[15] English Bill of Rights, 1 W. & M., 2nd Sess., Ch. 2 (1689).

## "Bail" and "No Bail" in the Federal and District of Columbia Systems

Both the federal and the District of Columbia bail statutes are based on "bail/no bail" or "release/no release" schemes, which, in turn, are based on legal and evidence-based pretrial practices such as those found in the American Bar Association's Criminal Justice Standards on Pretrial Release. Indeed, each statute contains general legislative titles describing the process as either "release" or "detention" during the pretrial phase, and each starts the bail process by providing judges with four options: (1) release on personal recognizance or with an unsecured appearance bond; (2) release on a condition or combination of conditions; (3) temporary detention; or (4) full detention. Each statute then has provisions describing how each release or detention option should function.

Because they successfully separate bailable from unbailable defendants, thus allowing the system to lawfully and transparently detain unbailable defendants with essentially none of the conditions associated with release (including secured financial conditions), both statutes are also able to include sections forbidding financial conditions that result in the preventive detention of the defendant – an abuse seen frequently in states that have not fully incorporated notions of a release/no release system.

The "bail" or "release" sections of both statutes use certain best practice pretrial processes, such as presumptions for release on recognizance, using "least restrictive conditions" to provide reasonable assurance of public safety and court appearance, allowing supervision through pretrial services entities for both public safety and court appearance concerns, and prompt review and appeals for release and detention orders.

The "no bail" or "detention" sections of both statutes are much the same as when the United States Supreme Court upheld the federal provisions against facial due process and 8th Amendment claims in *United States v. Salerno* in 1987. The *Salerno* opinion emphasized key elements of the existing federal statute that helped it to overcome constitutional challenges by "narrowly focusing" on the issue of pretrial crime. Moreover, the Supreme Court wrote, the statute appropriately provided "extensive safeguards" to further the accuracy of the judicial determination as well as to ensure that detention remained a carefully limited exception to liberty. Those safeguards included: (1) detention was limited to only "the most serious of crimes;" (2) the arrestee was entitled to a prompt hearing and the maximum length of pretrial detention was limited by stringent speedy trial time limitations; (3) detainees were to be housed separately from those serving sentences or awaiting appeals; (4) after a finding of probable cause, a "fullblown adversary hearing" was held in which the government was required to convince a neutral decision maker by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure court appearance or the safety of the community or any person; (5) detainees had a

right to counsel, and could testify or present information by proffer and cross-examine witnesses who appeared at the hearing; (6) judges were guided by statutorily enumerated factors such as the nature of the charge and the characteristics of the defendant; (7) judges were to include written findings of fact and a written statement of reasons for a decision to detain; and (8) detention decisions were subject to immediate appellate review.

While advances in pretrial research are beginning to suggest the need for certain alterations to the federal and D.C. statutes, both laws are currently considered "model" bail laws, and the Summary Report to the National Symposium on Pretrial Justice specifically recommends using the federal statute as a structural template to craft meaningful and transparent preventive detention provisions.

**Sources and Resources**: District of Columbia Code, §§ 23-1301-09, 1321-33; Federal Statute, 18 U.S.C. §§ 3141-56; *United States v. Salerno,* 481 U.S. 739 (1987); *National Symposium on Pretrial Justice: Summary Report of Proceedings,* at 42 (PJI/BJA 2011).

Indeed, given our country's foundational principles of liberty and freedom, it is not surprising that this parallel notion of bailable defendants actually obtaining release followed from England to America. William Blackstone, whose Commentaries on the Laws of England influenced our Founding Fathers as well as the entire judicial system and legal community, reported that denying the release of a bailable defendant during the American colonial period was considered itself an offense. In examining the administration of bail in Colonial Pennsylvania, author Paul Lermack reported that few defendants had trouble finding sureties, and thus, release.

This notion is also seen in early expressions of the law derived from court opinions. Thus, in the 1891 case of *United States v. Barber*, the United States Supreme Court articulated that in criminal bail, "it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time."[16] Four years later, in *Hudson v. Parker*, the Supreme Court wrote that the laws of the United States "have been framed upon the theory that [the accused] shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment."[17] Indeed, it was *Hudson* upon which the Supreme

---

[16] *United States v. Barber*, 140 U.S. 164, 167 (1891).
[17] *United States v. Hudson*, 156 U.S. 277, 285 (1895).

Court relied in *Stack v. Boyle* in 1951, when the Court wrote its memorable quote equating the right to bail with the right to release and freedom:

> From the passage of the Judiciary Act of 1789, to the present Federal Rules of Criminal Procedure, Rule 46 (a)(1), federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.[18]

In his concurring opinion, Justice Jackson elaborated on the Court's reasoning:

> The practice of admission to bail, as it has evolved in Anglo-American law, is not a device for keeping persons in jail upon mere accusation until it is found convenient to give them a trial. On the contrary, the spirit of the procedure is to enable them to stay out of jail until a trial has found them guilty. Without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense. To open a way of escape from this handicap and possible injustice, Congress commands allowance of bail for one under charge of any offense not punishable by death . . . providing: 'A person arrested for an offense not punishable by death shall be admitted to bail' . . . before conviction.[19]

And finally, in perhaps its best known expression of the right to bail, the Supreme Court did not explain that merely having one's bail set, whether that setting resulted in release or detention, was at the core of the right. Instead, the Court wrote that "liberty" – a state necessarily obtained from actual release – is the American "norm."[20]

Nevertheless, in the field of pretrial justice we must also recognize the equally legitimate consideration of "no bail," or detention. It is now fairly clear that the

---

[18] 342 U.S. 1, 4 (1951) (internal citations omitted).

[19] *Id.* at 7-8.

[20] *United States v. Salerno,* 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception").

federal constitution does not guarantee an absolute right to bail, and so it is more appropriate to discuss the right as one that exists when it is authorized by a particular constitutional or legislative provision. The Court's opinion in *United States v. Salerno* is especially relevant because it instructs us that when examining a law with no constitutionally-based right-to-bail parameters (such as, arguably, the federal law), the legislature may enact statutory limits on pretrial freedom (including detention) so long as: (1) those limitations are not excessive in relation to the government's legitimate purposes; (2) they do not offend due process (either substantive or procedural); and (3) they do not result in a situation where pretrial liberty is not the norm or where detention has not been carefully limited as an exception to release.

It is not necessarily accurate to say that the Court's opinion in *Salerno* eroded its opinion in *Stack,* including *Stack's* language equating bail with release. *Salerno* purposefully explained *Stack* and another case, *Carlson v. Landon*, together to provide cohesion. And therefore, while it is true that the federal constitution does not contain an explicit right to bail, when that right is granted by the applicable statute (or in the various states' constitutions or statutes), it should be regarded as a right to pretrial freedom. The *Salerno* opinion is especially instructive in telling us how to create a fair and transparent "no bail" side of the dichotomy, and further reminds us of a fundamental principle of pretrial justice: both bail and no bail are lawful if we do them correctly.

Liberalizing American bail laws during our country's colonial period meant that these laws did not always include the English "factors" for initially determining bailability, such as the seriousness of the offense, the weight of the evidence, and the character of the accused. Indeed, by including an examination of the evidence into its constitutional bail provision, Pennsylvania did so primarily to allow bailability despite the defendant being charged with a capital crime. Nevertheless, the historical factors first articulated in the Statute of Westminster survived in America through the judge's use of these factors to determine *conditions* of bail.

Thus, technically speaking, bailability in England after 1275 was determined through an examination of the charge, the evidence, and the character or criminal history of the defendant, and if a defendant was deemed bailable, he or she was required to be released. In America, bailability was more freely designated, but judges would still typically look at the charge, the evidence, and the character of the defendant to set the only limitation on pretrial freedom available at that time – the amount of the financial condition. Accordingly, while bailability in America was still meant to mean release, by using those factors traditionally used to

determine bailability to now set the primary condition of bail or release, judges found that those factors sometimes had a determining effect on the actual release of bailable defendants. Indeed, when America began running out of personal sureties, judges, using factors historically used to determine bailability, were finding that these same factors led to unattainable financial conditions creating, ironically, a state of unbailability for technically bailable defendants.

> *"Bail is a matter of confidence and personal relation. It should not be made a matter of contract or commercialism. . . . Why provide for a bail piece, intended to promote justice, and then destroy its effect and utility? Why open the door to barter freedom from the law for money?"*
>
> *Carr v Davis* 64 W. Va. 522, 535 (1908) (Robinson, J. dissenting).

## Intersection of the Two Historical Phenomena

The history of bail in America in the 20th century represents an intersection of these two historical phenomena. Indeed, because it involved requiring defendants to pay money up-front as a prerequisite to release, the blossoming of a secured bond scheme as administered through a commercial surety system was bound to lead to perceived abuses in the bail/no bail dichotomy to such an extent that history would demand some correction. Accordingly, within only 20 years of the advent of commercial sureties, scholars began to study and critique that for-profit system.

In the first wave of research, scholars focused on the inability of bailable defendants to obtain release due to secured financial conditions and the abuses in the commercial surety industry. The first generation of bail reform, as it is now known, used research from the 1920s to the 1960s to find alternatives to the commercial surety system, including release on recognizance and nonfinancial conditional release. Its focus was on the "bail" side of the dichotomy and how to make sure bailable defendants would actually obtain release.

The second generation of bail reform (from the 1960s to the 1980s) focused on the "no bail" side, with a wave of research indicating that there were some defendants whom society believed should be detained without bail (rather than by using money) due to their perceived dangerousness through documented instances of defendants committing crime while released through the bail process. That generation culminated with the United States Supreme Court's

approval of a federal detention statute, and with states across America changing their constitutions and statutes to reflect not only a new constitutional purpose for restricting pretrial liberty – public safety – but also detention provisions that followed the Supreme Court's desired formula.

## Three Generations of Bail Reform: Hallmarks and Highlights

Since the evolution from a personal surety system using unsecured bonds to primarily a commercial surety system using secured bonds, America has seen two generations of bail or pretrial reform and is currently in a third. Each generation has certain elements in common, such as significant research, a meeting of minds, and changes in laws, policies, and practices.

**The First Generation – 1920s to 1960s: Finding Alternatives to the Traditional Money Bail System; Reducing Unnecessary Pretrial Detention of Bailable Defendants**

**Significant Research –** This generation's research began with Roscoe Pound and Felix Frankfurter's *Criminal Justice in Cleveland* (1922) and Arthur Beeley's *The Bail System in Chicago* (1927), continued with Caleb Foote's study of the Philadelphia process found in *Compelling Appearance in Court: Administration of Bail in Philadelphia* (1954), and reached a peak through the research done by the Vera Foundation and New York University Law School's Manhattan Bail Project (1961) as well as similar bail projects such as the one created in Washington D.C. in 1963.

**Meeting of Minds –** The meeting of minds for this generation culminated with the 1964 Attorney General's National Conference on Bail and Criminal Justice and the Bail Reform Act of 1966.

**Changes in Laws, Policies and Practices –** The Supreme Court's ruling in *Stack v. Boyle* (1951) had already guided states to better individualize bail determinations through their various bail laws. The Bail Reform Act of 1966 (and state statutes modeled after the Act) focused on alternatives to the traditional money bail system by encouraging release on least restrictive, nonfinancial conditions as well as presumptions favoring release on recognizance, which were based on information gathered concerning a defendant's community ties to help assure court appearance. The American Bar Association's Criminal Justice Standards on Pretrial Release in 1968 made legal and evidence-based recommendations for all aspects of release and detention decisions. Across America, though, states have not fully incorporated the full panoply of laws, policies, and practices designed to reduce unnecessary pretrial detention of bailable defendants

**The Second Generation – late 1960s to 1980s: Allowing Consideration of Public Safety as a Constitutionally Valid Purpose to Limit Pretrial Freedom; Defining the Nature and Scope of Preventive Detention**

**Significant Research –** Based on discussions in the 1960s, the American Bar Association Standards on Pretrial Release first addressed preventive detention (detaining a defendant with no bail based on danger and later expressly encompassing risk for failure to appear) in 1968, a position later adopted by other organizations' best practice standards. Much of the "research" behind this wave of reform focused on: (1) philosophical debates surrounding the 1966 Act's inability to address public safety as a valid purpose for limiting pretrial freedom; and (2) judges' tendencies to use money to detain defendants due to the lack of alternative procedures for defendants who pose high risk to public safety or for failure to appear for court. The research used to support Congress's finding of "an alarming problem of crimes committed by persons on release" (noted by the U.S. Supreme Court in *United States v. Salerno*) is contained in the text and references from Senate Report 98-225 to the Bail Reform Act of 1984. Other authors, such as John Goldkamp (*see Danger and Detention: A Second Generation of Bail Reform*, 76 J. Crim. L. & Criminology 1 (1985)) and Senator Ted Kennedy (*see A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform*, 48 Fordham L. Rev. 423 (1980)), also contributed to the debate and relied on a variety of empirical research in their papers.

**Meeting of Minds –** Senate Report 98-225 to the Bail Reform Act of 1984 cited broad support for the idea of limiting pretrial freedom up to and including preventive detention based on public safety in addition to court appearance. This included the fact that consideration of public safety already existed in the laws of several states and the District of Columbia, the fact that the topic was addressed by the various national standards, and the fact that it also had the support from the Attorney General's Task Force on Violent Crime, the Chief Justice of the United States Supreme Court, and even the President.

**Changes in Laws, Policies and Practices –** Prior to 1970, court appearance was the only constitutionally valid purpose for limiting a defendant's pretrial freedom. Congress first allowed public safety to be considered equally to court appearance in the District of Columbia Court Reform and Criminal Procedure Act of 1970, and many states followed suit. In 1984, Congress passed the Bail Reform Act of 1984 (part of the Comprehensive Crime Control Act), which included public safety as a valid purpose for limiting pretrial freedom and procedures designed to allow preventive detention without bail for high-risk defendants. In 1987, the United States Supreme Court upheld the Bail Reform Act of 1984 against facial due process and excessive bail challenges in *United States v, Salerno*. However, as in the first generation of bail reform, states across America have not fully implemented the laws, policies, and practices needed to adequately and lawfully detain defendants when necessary.

**The Third Generation – 1990 to present: Fixing the Holes Left by States Not Fully Implementing Improvements from the First Two Generations of Bail Reform; Using Legal and Evidence-Based Practices to Create a More Risk-Based System of Release and Detention**

**Significant Research –** Much of the research in this generation revisits deficiencies caused by the states not fully implementing adequate "bail" and "no bail" laws, policies, and practices developed in the previous two generations. Significant legal, historical, and empirical research sponsored by the Department of Justice, the Pretrial Justice Institute, the New York City Criminal Justice Agency, the District of Columbia Pretrial Services Agency, the Administrative Office of the U.S. Courts, various universities, and numerous other public, private, and philanthropic entities across America have continued to hone the arguments for improvements as well as the solutions to discreet bail issues. Additional groundbreaking research involves the creation of empirical risk assessment instruments for local, statewide, and now national use, along with research focusing on strategies for responding to predicted risk while maximizing release.

**Meeting of Minds –** The meeting of minds for this generation has been highlighted so far by the Attorney General's National Symposium on Pretrial Justice in 2011, along with the numerous policy statements issued by national organizations favoring the administration of bail based on risk.

**Changes in Laws, Policies and Practices –** Jurisdictions are only now beginning to make changes reflecting the knowledge generated and shared by this generation of pretrial reform. Nevertheless, changes are occurring at the county level (such as in Milwaukee County, Wisconsin, which has implemented a number of legal and evidence-based pretrial practices), the state level (such as in Colorado, which passed a new bail statute based on pretrial best practices in 2013), and even the national level (such as in the federal pretrial system, which continues to examine its release and detention policies and practices).

## The Current Generation of Bail/Pretrial Reform

The first two generations of bail reform used research to attain a broad meeting of the minds, which, in turn, led to changes to laws, policies, and practices. It is now clear, however, that these two generations did not go far enough. The traditional money bail system, which includes heavy reliance upon secured bonds administered primarily through commercial sureties, continues to flourish in America, thus causing the unnecessary detention of bailable defendants. Moreover, for a number of reasons, the states have not fully embraced ways to fairly and transparently detain persons without bail, choosing instead to maintain a primarily charge-and-money-based bail system to respond to threats to public safety. In short, the two previous generations of bail reform have instructed us on how to properly implement both "bail" (release) and "no bail" (detention), but many states have instead clung to an outmoded system that leads to the detention of bailable defendants (or those whom we believe should be bailable defendants) and the release of unbailable defendants (or those whom we believe should be unbailable defendants) – abuses to the "bail/no bail" dichotomy that historically demand correction.

Fortunately, the current generation of pretrial reform has a vast amount of relevant research literature from which to fashion solutions to these problems. Moreover, like previous generations, this generation also shaped a distinct meeting of minds of numerous individuals, organizations, and government agencies, all of which now believe that pretrial improvements are necessary.

At its core, the third generation of pretrial reform thus has three primary goals. First, it aims to fully implement lawful bail/no bail dichotomies so that the right persons (and in lawful proportions) are deemed bailable and unbailable. Second, using the best available research and best pretrial practices, it seeks to lawfully effectuate the release and subsequent mitigation of pretrial risk of defendants deemed bailable and the fair and transparent detention of those deemed unbailable. Third, it aims to do this primarily by replacing charge-and-money-based bail systems with systems based on empirical risk.

## Generations of Reform and the
## Commercial Surety Industry

The first generation of bail reform in America in the 20th century focused almost exclusively on finding alternatives to the predominant release system in place at the time, which was one based primarily on secured financial conditions administered through a commercial surety system. In hindsight, however, the second generation of bail reform arguably has had more of an impact on the for-profit bail bond industry in America. That generation focused primarily on public safety, and it led to changes in federal and state laws providing ways to assess pretrial risk for public safety, to release defendants with supervision designed to mitigate the risk to public safety, and even to detain persons deemed too risky.

Despite this national focus on public safety, however, the commercial surety industry did not alter its business model of providing security for defendants solely to help provide reasonable assurance of court appearance. Today, judges concerned with public safety cannot rely on commercial bail bondsmen because in virtually every state allowing money as condition of bail, the laws have been crafted so that financial conditions cannot be forfeited for breaches in public safety such as new crimes. In those states, a defendant who commits a new crime may have his or her bond revoked, but the money is not lost. When the bond is revoked, bondsmen, when they are allowed into the justice system (for most countries, four American states, and a variety of other large and small jurisdictions have ceased allowing profit at bail), can simply walk away, even though the justice system is not yet finished with that particular defendant. Bondsmen are free to walk away and are even free re-enter the system – free to negotiate a new surety contract with the same defendant, again with the money forfeitable only upon his or her failing to appear for court. Advances in our knowledge about the ineffectiveness and deleterious effects of money at bail only exacerbate the fundamental disconnect between the commercial surety industry, which survives on the use of money for court appearance, and what our society is trying to achieve through the administration of bail.

There are currently two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Commercial bail agents and the insurance companies that support them are concerned with only one – court appearance – because legally money is simply not relevant to public safety. Historically speaking, America's gradual movement toward using pretrial services agencies, which, when necessary, supervise defendants both for court appearance and public safety concerns, is due, at least in part, to the commercial surety industry's purposeful decision not to take responsibility for public safety at bail.

## What Does the History of Bail Tell Us?

The history of bail tells us that the pretrial release and detention system that worked effectively over the centuries was a "bail/no bail" system, in which bailable defendants (or those whom society deemed should be bailable defendants) were expected to be released and unbailable defendants (or those whom society deemed should be unbailable defendants) were expected to be detained. Moreover, the bail side of the dichotomy functioned most effectively through an uncompensated and un-indemnified personal surety system based on unsecured financial conditions. What we in America today know as the traditional money bail system – a system relying primarily on secured financial conditions administered through commercial sureties – is, historically speaking, a relatively new system that was encouraged to solve America's dilemma of the unnecessary detention of bailable defendants in the 1800s. Unfortunately, however, the traditional money bail system has only exacerbated the two primary abuses that have typically led to historical correction: (1) the unnecessary detention of bailable defendants, whom we now often categorize as lower risk; and (2) the release of those persons whom we feel should be unbailable defendants, and whom we now often categorize as higher risk.

The history of bail also instructs us on the proper purpose of bail. Specifically, while avoiding blood feuds may have been the primary purpose for the original bail setting, once more public processes and jails were fully introduced into the administration of criminal justice, the purpose of bail changed to one of providing a mechanism of conditional release. Concomitantly, the purpose of "no bail" was and is detention. Historically speaking, the only purpose for limiting or conditioning pretrial release was to assure that the accused come to court or otherwise face justice. That changed in the 1970s and 1980s, as jurisdictions began to recognize public safety as a second constitutionally valid purpose for limiting pretrial freedom.[21]

---

[21] Occasionally, a third purpose for limiting pretrial freedom has been articulated as maintaining or protecting the integrity of the courts or judicial process. Indeed, the third edition of the ABA Standards changed "to prevent intimidation of witnesses and interference with the orderly administration of justice" to "safeguard the integrity of the judicial process" as a "third purpose of release conditions." ABA Standards *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.2 (a) (history of the standard) at 107. The phrase "integrity of the judicial process," however, is one that has been historically misunderstood (its meaning requires a review of

The American history of bail further instructs us on the lessons of the first two generations of bail and pretrial reform in the 20th century. If the first generation provided us with practical methods to better effectuate the release side of the "bail/no bail" dichotomy, the second generation provided us with equally effective methods for lawful detention. Accordingly, despite our inability to fully implement what we now know are pretrial best practices, the methods gleaned from the first two generations of bail reform as well as the research currently contributing to the third generation have given us ample knowledge to correct perceived abuses and to make improvements to pretrial justice. In the next section, we will see how the evolution of the law and legal foundations of pretrial justice provide the parameters for those improvements.

**Additional Sources and Resources:** William Blackstone, *Commentaries on the Laws of England* (Oxford 1765-1769); June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail,* 34 Syracuse L. Rev. 517 (1983); Stevens H. Clarke, *Pretrial Release: Concepts, Issues, and Strategies for Improvement,* 1 Res. in Corr. 3:1 (1988); Comment, *Bail: An Ancient Practice Reexamined,* 70 Yale L. J. 966 (1960-61); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Praeger Pub. 1991); Jonathan Drimmer, *When Man Hunts Man: The Rights and Duties of Bounty Hunters in the American Criminal Justice System,* 33 Hous. L. Rev. 731 (1996-97); William F. Duker, *The Right to Bail: A Historical Inquiry,* 42 Alb. L. Rev. 33 (1977-78); Caleb Foote, *The Coming Constitutional Crisis in Bail: I and II,* 113 Univ. Pa. L. Rev. 959 and 1125 (1965); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Ronald Goldfarb, *Ransom: A Critique of the American Bail System* (Harper & Rowe 1965); James V. Hayes, *Contracts to Indemnify Bail in Criminal Cases,* 6 Fordham L. Rev. 387 (1937); William Searle Holdsworth, *A History of English Law* (Methuen & Co., London, 1938); Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 (1977); Evie Lotze, John Clark, D. Alan Henry, & Jolanta Juszkiewicz, *The Pretrial Services Reference Book: History, Challenges, Programming* (Pretrial Servs. Res. Ctr. 1999); Hermine Herta

---

appellate briefs for decisions leading up to the Supreme Court's opinion in *Salerno*), and that typically begs further definition. Nevertheless, in most, if not all cases, that further definition is made unnecessary as being adequately covered by court appearance and public safety. Indeed, the ABA Standards themselves state that one of the purposes of the pretrial decision is "maintaining the integrity of the judicial process by securing defendants for trial." *Id.* Std. 10-1.1, at 36.

Meyer, *Constitutionality of Pretrial Detention,* 60 Geo. L. J. 1139 (1971-72); Gerald P. Monks, *History of Bail* (1982); Luke Owen Pike, *The History of Crime in England* (Smith, Elder, & Co. 1873); Frederick Pollock & Frederic Maitland, *The History of English Law Before the Time of Edward I* (1898); Timothy R. Schnacke, Michael R. Jones, Claire M. B. Brooker, *The History of Bail and Pretrial Release* (PJI 2010); Wayne H. Thomas, Jr. *Bail Reform in America* (Univ. CA Press 1976); Peggy M. Tobolowsky & James F. Quinn, *Pretrial Release in the 1990s: Texas Takes Another Look at Nonfinancial Release Conditions,* 19 New Eng. J. on Crim. & Civ. Confinement 267 (1993); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 320 (1987-88). **Cases:** *United States v. Edwards,* 430 A. 2d 1321 (D.C. 1981) (en banc); *State v. Brooks,* 604 N.W. 2d 345 (Minn. 2000); *State v. Briggs,* 666 N.W. 2d 573 (Iowa 2003).

# Chapter 3: Legal Foundations of Pretrial Justice

## History and Law

History and the law clearly influence each other at bail. For example, in 1627, Sir Thomas Darnell and four other knights refused to pay loans forced upon them by King Charles I. When the King arrested the five knights and held them on no charge (thus circumventing the Statute of Westminster, which required a charge, and the Magna Carta, on which the Statute was based), Parliament responded by passing the Petition of Right, which prohibited detention by any court without a formal charge. Not long after, however, officials sidestepped the Petition of Right by charging individuals and then running them through numerous procedural delays to avoid release. This particular practice led to the Habeas Corpus Act of 1679. However, by expressly acknowledging discretion in setting amounts of bail, the Habeas Corpus Act also unwittingly allowed determined officials to begin setting financial conditions of bail in prohibitively high amounts. That, in turn, led to passage of the English Bill of Rights, which prohibited "excessive" bail. In America, too, we see historical events causing changes in the laws and those laws, in turn, influencing events thereafter. One need only look to events before and after the two American generations of bail reform in the 20th century to see how history and the law are intertwined.

And so it is that America, which had adopted and applied virtually every English bail reform verbatim in its early colonial period, soon began a process of liberalizing both criminal laws generally, and bail in particular, due to the country's unique position in culture and history. Essentially, America borrowed the best of English law (such as an overall right to bail, habeas corpus, and prohibition against excessiveness) and rejected the rest (such as varying levels of discretion potentially interfering with the right to bail as well as harsh criminal penalties for certain crimes). The Colonies wrote bail provisions into their charters and re-wrote them into their constitutions after independence. Among those constitutions, we see broader right-to-bail provisions, such as in the model Pennsylvania law, which granted bail to all except those facing capital offenses (limited to willful murder) and only "where proof is evident or the presumption

great."[22] Nevertheless, some things remained the same. For example, continuing the long historical tradition of bail in England, the sole purpose of limiting pretrial freedom in America remained court appearance, and the only means for doing so remained setting financial conditions or amounts of money to be forfeited if a defendant missed court.

> *"The end of law is not to abolish or restrain, but to preserve and enlarge freedom. For in all the states of created beings capable of law, where there is no law, there is no freedom."*
>
> John Locke, 1689

In America, the ultimate expression of our shared values is contained in our founding documents, the Declaration of Independence and the Constitution. But if the Declaration can be viewed as amply supplying us with certain fundamental principles that can be interwoven into discussions of bail, such as freedom and equality, then the Constitution has unfortunately given us some measure of confusion on the topic. The confusion stems, in part, from the fact that the Constitution itself explicitly covers only the right of habeas corpus in Article 1, Section 9 and the prohibition on excessive bail in the 8th Amendment, which has been traced to the Virginia Declaration of Rights. There is no express right to bail in the U.S. Constitution, and that document provides no illumination on which persons should be bailable and which should not. Instead, the right to bail in the federal system originated from the Judiciary Act of 1789, which provided an absolute right to bail in non-capital federal criminal cases. Whether the constitutional omission was intentional is subject to debate, but the fact remains that when assessing the right to bail, it is typical for a particular state to provide superior rights to the United States Constitution. It also means that certain federal cases, such *United States v. Salerno*, must be read realizing that the Court was addressing a bail/no bail scheme derived solely from legislation. And it means that any particular bail case or dispute has the potential to involve a fairly complex mix of state and federal claims based upon any particular state's bail scheme.

---

[22] June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 531 (1983) (quoting 5 American Charters 3061, F. Thorpe ed. 1909).

> **The Legal "Mix"**
>
> There are numerous sources of laws surrounding bail and pretrial practices, and each state – and often a jurisdiction within a state – has a different "mix" of sources from that of all other jurisdictions. In any particular state or locality, bail practices may be dictated or guided by the United States Constitution and United States Supreme Court opinions, federal appellate court opinions, the applicable state constitution and state supreme court and other state appellate court decisions, federal and state bail statutes, municipal ordinances, court rules, and even administrative regulations. Knowing your particular mix and how the various sources of law interact is crucial to understanding and ultimately assessing your jurisdiction's pretrial practices.

The fact that we have separate and sometimes overlapping federal and state pretrial legal foundations is one aspect of the evolution of bail law that adds complexity to particular cases. The other is the fact that America has relatively little authoritative legal guidance on the subject of bail. In the federal realm, this may be due to issues of incorporation and jurisdiction, but in the state realm it may also be due to the relatively recent (historically speaking) change from unsecured to secured bonds. Until the nineteenth century, historians suggest that bail based on unsecured bonds administered through a personal surety system led to the release of virtually all bailable criminal defendants. Such a high rate of release leaves few cases posing few constitutional issues that require an appellate court's attention. But even in the 20th century, we really have only two (or arguably three) significant United States Supreme Court cases discussing the important topic of the release decision at bail. It is apparently a topic that lawyers, and thus federal and state trial and appellate courts, have largely avoided. This avoidance, in turn, potentially stands in the way of jurisdictions looking for the bright line of the law to guide them through the process of improving the administration of bail.

On the other hand, what we lack in volume of decisions is made up to some extent by the importance of the few opinions that we do have. Thus, we look at *Salerno* not as merely one case among many from which we may derive guidance; instead, *Salerno* must be scrutinized and continually referenced as a foundational standard as we attempt to discern the legality of proposed improvements. The evolution of law in America, whether broadly encompassing all issues of criminal procedure, or more narrowly discussing issues related directly to bail and pretrial justice, has demonstrated conclusively the law's

importance as a safeguard to implementing particular practices in the criminal process. Indeed, in other fields we speak of using evidence-based practices to achieve the particular goals of the discipline. In bail, however, we speak of "legal and evidence-based practices,"[23] because it is the law that articulates those disciplinary goals to begin with. The phrase legal and evidence-based practices acknowledges the fact that in bail and pretrial justice, the empirical evidence, no matter how strong, is always subservient to fundamental legal foundations based on fairness and equal justice.

## Fundamental Legal Principles

While all legal principles affecting the pretrial process are important, there are some that demand our particular attention as crucial to a shared knowledge base. The following list is derived from materials taught by D.C. Superior Court Judge Truman Morrison, III, in the National Institute of Corrections' Orientation for New Pretrial Executives, and occasionally supplemented by information contained in Black's Law Dictionary (9th ed.) as well as the sources footnoted or cited at the end of the chapter.

### The Presumption of Innocence

Perhaps no legal principle is as simultaneously important and misunderstood as the presumption of innocence. Technically speaking, it is the principle that a person may not be convicted of a crime unless and until the government proves guilt beyond a reasonable doubt, without any burden placed on the defendant to prove his or her innocence. Its importance is emphasized in the Supreme Court's opinion in *Coffin v. United States*, in which the Court wrote: "a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."[24] In *Coffin*, the Court traced the presumption's origins to various extracts of Roman law, which included language similar to the "better that ten guilty persons go free" ratio articulated by Blackstone. The importance of the presumption of innocence has not waned, and the Court has expressly quoted the "axiomatic and elementary" language in just the last few years.

---

[23] Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

[24] *Coffin v. United States,* 156 U.S. 432, 453 (1895).

Its misunderstanding comes principally from the fact that in *Bell v. Wolfish*, the Supreme Court wrote that the presumption of innocence "has no application to a determination of the rights of a pretrial detainee during confinement before his trial has even begun,"[25] a line that has caused some to argue, incorrectly, that the presumption of innocence has no application to bail. In fact, *Wolfish* was a "conditions of confinement" case, with inmates complaining about various conditions (such as double bunking), rules (such as prohibitions on receiving certain books), and practices (such as procedures involving inmate searches) while being held in a detention facility. In its opinion, the Court was clear about its focus in the case: "We are not concerned with the initial decision to detain an accused and the curtailment of liberty that such a decision necessarily entails. . . . Instead, what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment, and his understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point."[26] Specifically, and as noted by the Court, the parties were not disputing whether the government could detain the prisoners, the government's purpose for detaining the prisoners, or even whether complete confinement was a legitimate means for limiting pretrial freedom, all issues that would necessarily implicate the right to bail, statements contained in *Stack v. Boyle*, and the presumption of innocence. Instead, the issue before the Court was whether, after incarceration, the prisoners' complaints could be considered punishment in violation of the Due Process Clause.

Accordingly, the presumption of innocence has everything to do with bail, at least so far as determining which classes of defendants are bailable and the constitutional and statutory rights flowing from that decision. And therefore, the language of *Wolfish* should in no way diminish the strong statements concerning the right to bail found in *Stack v. Boyle* (and other state and federal cases that have quoted *Stack*), in which the Court wrote, "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning."[27] The idea that the right to bail (that is, the right to release when the accused is bailable) necessarily triggers serious consideration of the presumption of innocence is also clearly seen

---

[25] *Bell v. Wolfish*, 441 U.S. 520, 533 (1979).

[26] *Id.* at 533-34 (internal citations omitted).

[27] 342 U.S. 1, 4 (1951) (internal citation omitted).

through Justice Marshall's dissent in *United States v. Salerno,* in which he wrote, albeit unconvincingly, that "the very pith and purpose of [the Bail Reform Act of 1984] is an abhorrent limitation of the presumption of innocence."[28]

As explained by the Court in *Taylor v. Kentucky*, the phrase is somewhat inaccurate in that there is no true presumption – that is, no mandatory inference to be drawn from evidence. Instead, "it is better characterized as an 'assumption' that is indulged in the absence of contrary evidence."[29] Moreover, the words "presumption of innocence" themselves are found nowhere in the United States Constitution, although the phrase is linked to the 5th, 14th, and 6th Amendments to the Constitution. *Taylor* suggests an appropriate way of looking at the presumption as "a special and additional caution" to consider beyond the notion that the government must ultimately prove guilt. It is the idea that "no surmises based on the present situation of the accused"[30] should interfere with the jury's determination. Applying this concept to bail, then, the presumption of innocence is like an aura surrounding the defendant, which prompts us to set aside our potentially negative surmises based on the current arrest and confinement as we determine the important question of release or detention.

> *"Here we deal with a right, the right to release of presumably innocent citizens. I cannot conceive that such release should not be made as widely available as it reasonably and rationally can be."*
>
> *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (Gee, J. specially concurring)

---

[28] *United States v. Salerno*, 481 U.S. 739, 762-63 (1987).

[29] *Taylor v Kentucky*, 436 U.S. 478, 483 n. 12 (1978).

[30] *Id.* at 485 (quoting 9 J. Wigmore, Evidence § 2511 (3d ed. 1940) at 407).

**The Right to Bail**

*When granted by federal or state law,* the right to bail should be read as a right to release through the bail process. It is often technically articulated as the "right to non-excessive" bail, which goes to the reasonableness of any particular conditions or limitations on pretrial release.

The preface, "when granted by federal or state law" is crucial to understand because we now know that the "bail/no bail" dichotomy is one that legislatures or the citizenry are free to make though their statutes and constitutions. Ever since the Middle Ages, there have been certain classes of defendants (typically expressed by types of crimes, but changing now toward categories of risk) who have been refused bail – that is, denied a process of release altogether. The bail/no bail dichotomy is exemplified by the early bail provisions of Massachusetts and Pennsylvania, which granted bail to some large class of persons "except," and with the exception being the totality of the "no bail" side. These early provisions, as well as those copied by other states, were technically the genesis of what we now call "preventive detention" schemes, which allow for the detention of risky defendants – the risk at the time primarily being derived from the seriousness of the charge, such as murder or treason.

The big differences between detention schemes then and now include: (1) the old schemes were based solely on risk for failure to appear for court; we may now detain defendants based on a second constitutionally valid purpose for limiting pretrial freedom – public safety; (2) the old schemes were mostly limited to findings of "proof evident and presumption great" for the charge; today preventive detention schemes often have more stringent burdens for the various findings leading to detention; (3) overall, the states have largely widened the classes of defendants who may lawfully be detained – they have, essentially, changed the ratio of bailable to unbailable defendants to include potentially more unbailable defendants than were deemed unbailable, say, during the first part of the 20th century; and (4) in many cases, the states have added detailed provisions to the detention schemes (in addition to their release schemes). Presumably, this was to follow guidance by the United States Supreme Court from its opinion in *United States v. Salerno,* which approved the federal detention scheme based primarily on that law's inclusion of certain procedural due process elements designed to make the detention process fair and transparent.

How a particular state has defined its "bail/no bail" dichotomy is largely due to its constitution, and arguably on the state's ability to easily amend that

constitution. According to legal scholars Wayne LaFave, et al., in 2009 twenty-three states had constitutions modeled after Pennsylvania's 1682 language that guaranteed a right to bail to all except those charged with capital offenses, where proof is evident or the presumption is great. It is unclear whether these states today choose to remain broad "right-to-bail" states, or whether their constitutions are simply too difficult to amend. Nevertheless, these states' laws likely contain either no, or extremely limited, statutory pretrial preventive detention language.[31]

Nine states had constitutions mirroring the federal constitution – that is, they contain an excessive bail clause, but no clause explicitly granting a right to bail. The United States Supreme Court has determined that the federal constitution does not limit Congress' ability to craft a lawful preventive detention statute, and these nine states likewise have the same ability to craft preventive detention statutes (or court rules) with varying language.

The remaining 18 states had enacted in their constitutions relatively recent amendments describing more detailed preventive detention provisions. As LaFave, et al., correctly note, these states may be grouped in three ways: (1) states authorizing preventive detention for certain charges, combined with the requirement of a finding of danger to the community; (2) states authorizing preventive detention for certain charges, combined with some condition precedent, such as the defendant also being on probation or parole; and (3) states combining elements of the first two categories.

There are currently two fundamental issues concerning the right to bail in America today. The first is whether states have created the right ratio of bailable to unbailable defendants. The second is whether they are faithfully following best practices using the ratio that they currently have. The two issues are connected.

---

[31] *See* Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009). Readers should be vigilant for activity changing these numbers. For example, the 2010 constitutional amendment in Washington State likely adds it to the category of states having preventive detention provisions in their constitutions. Moreover, depending on how one reads the South Carolina constitution, the counts may, in fact, reveal 9 states akin to the federal scheme, 21 states with traditional right to bail provisions, and 20 states with preventive detention amendments.

American law contemplates a presumption of release, and thus there are limits on the ratio of bailable to unbailable defendants. The American Bar Association Standards on Pretrial Release describes its statement, "the law favors the release of defendants pending adjudication of charges" as being "consistent with Supreme Court opinions emphasizing the limited permissible scope of pretrial detention."[32] It notes language from *Stack v. Boyle*, in which the Court equates the right to bail to "[the] traditional right to freedom before conviction,"[33] and from *United States v. Salerno*, in which the Court wrote, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[34] Beyond these statements, however, we have little to tell us definitively and with precision how many persons should remain bailable in a lawful bail/no bail scheme.

We do know, however, that the federal "bail/no bail" scheme was examined by the Supreme Court and survived at least facial constitutional attacks based on the Due Process Clause and the 8th Amendment. Presumably, a state scheme fully incorporating the detention-limiting elements of the federal law would likely survive similar attacks. Accordingly, using the rest of the *Salerno* opinion as a guide, one can look at any particular jurisdiction's bail scheme to assess whether that scheme appears, at least on its face, to presume liberty and to restrict detention by incorporating the numerous elements from the federal statute that were approved by the Supreme Court. For example, if a particular state included a provision in either its constitution or statute opening up the possibility of detention for all defendants no matter what their charges, the scheme should be assessed for its potential to over-detain based on *Salerno's* articulated approval of provisions that limited detention to defendants "arrested for a specific category of extremely serious offenses."[35] Likewise, any jurisdiction that does not "carefully" limit detention – that is, it detains carelessly or without thought possibly through the casual use of money – is likely to be seen as running afoul of the foundational principles underlying the Court's approval of the federal law.

The second fundamental issue concerning the right to bail – whether states are faithfully following the ratio that they currently have – is connected to the first. If states have not adequately defined their bail/no bail ratio, they will often see money still being used to detain defendants whom judges feel are extreme risks,

---

[32] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.1 (commentary) at 38.

[33] 342 U.S. 1, 4 (1951).

[34] 481 U.S. 739, 755 (1987).

[35] *Id.* at 750.

which is essentially the same practice that led to the second generation of American bail reform in the 20th century. Simply put, a proper bail/no bail dichotomy should lead naturally to an in-or-out decision by judges, with bailable defendants released pursuant to a bond with reasonable conditions and unbailable defendants held with no bond. Without belaboring the point, judges are not faithfully following any existing bail/no bail dichotomy whenever they (1) treat a bailable defendant as unbailable by setting unattainable conditions, or (2) treat an unbailable defendant as bailable in order to avoid the lawfully enacted detention provisions. When these digressions occur, then they suggest either that judges should be compelled to comply with the existing dichotomy, or that the balance of the dichotomy must be changed.

This latter point is important to repeat. Among other things, the second generation of American bail reform was, at least partially, in response to judges setting financial conditions of bail at unattainable levels to protect the public despite the fact that the constitution had not been read to allow public safety as a proper purpose for limiting pretrial freedom. Judges who did so were said to be setting bail "sub rosa," in that they were working secretively toward a possibly improper purpose of bail. The Bail Reform Act of 1984, as approved by the United States Supreme Court, was designed to create a more transparent and fair process to allow the detention of high-risk defendants for the now constitutionally valid purpose of public safety. From that generation of reform, states learned that they could craft constitutional and statutory provisions that would effectively define the "bail" and "no bail" categories so as to satisfy both the Supreme Court's admonition that liberty be the "norm" and the public's concern that the proper persons be released and detained.

Unfortunately, many states have not created an appropriate balance. Those that have attempted to, but have done so inadequately, are finding that the inadequacy often lies in retaining a charge-based rather than a risk-based scheme to determine detention eligibility. Accordingly, in those states judges continue to set unattainable financial conditions at bail to detain bailable persons whom they consider too risky for release. If a proper bail/no bail balance is not crafted through a particular state's preventive detention provisions, and if money is left as an option for conditional release, history has shown that judges will use that money option to expeditiously detain otherwise bailable defendants. On the other hand, if the proper balance is created so that high-risk defendants can be detained through a fair and transparent process, money can be virtually eliminated from the bail process without negatively affecting public safety or court appearance rates.

Despite certain unfortunate divergences, the law, like the history, generally considers the right to bail to be a right to release. Thus, when a decision has been made to "bail" a particular defendant, every consideration should be given, and every best practice known should be employed, to effectuate and ensure that release. Bailable defendants detained on unattainable conditions should be considered clues that the bail process is not functioning properly. Judicial opinions justifying the detention of bailable defendants (when the bailable defendant desires release) should be considered aberrations to the historic and legal notion that the right to bail should equal the right to release.

---

### What Can International Law and Practices Tell Us About Bail?

Unnecessary and arbitrary pretrial detention is a worldwide issue, and American pretrial practitioners can gain valuable perspective by reviewing international treaties, conventions, guidelines, and rules as well as reports documenting international practices that more closely follow international norms.

According to the American Bar Association's Rule of Law Initiative,

"International standards strongly encourage the imposition of noncustodial measures during investigation and trial and at sentencing, and hold that deprivation of liberty should be imposed only when non-custodial measures would not suffice. The overuse of detention is often a symptom of a dysfunctional criminal justice system that may lack protection for the rights of criminal defendants and the institutional capacity to impose, implement, and monitor non-custodial measures and sanctions. It is also often a cause of human rights violations and societal problems associated with an overtaxed detention system, such as overcrowding; mistreatment of detainees; inhumane detention conditions; failure to rehabilitate offenders leading to increased recidivism; and the imposition of the social stigma associated with having been imprisoned on an ever-increasing part of the population. Overuse of pretrial detention and incarceration at sentencing are equally problematic and both must be addressed in order to create effective and lasting criminal justice system reform."

International pretrial practices, too, can serve as templates for domestic improvement. For example, bail practitioners frequently cite to author F.E. Devine's study of international practices demonstrating various effective alternatives to America's traditional reliance on secured bonds administered by commercial bail bondsmen and large insurance companies.

**Sources and Resources:** David Berry & Paul English, *The Socioeconomic Impact of Pretrial Detention* (Open Society Foundation 2011); F.E. Devine, *Commercial Bail Bonding: A Comparison of Common Law Alternatives* (Greenwood Publishing Group 1991); Anita H. Kocsis, *Handbook of International Standards on Pretrial Detention Procedure* (ABA, 2010); Amanda Petteruti & Jason Fenster, *Finding Direction:*

*Expanding Criminal Justice Options by Considering Policies of Other Nations* (Justice Policy Institute, 2011). There are also several additional documents and other resources available from the Open Society Foundation's Global Campaign for Pretrial Justice online website, found at http://www.opensocietyfoundations.org/projects/global-campaign-pretrial-justice.

### Release Must Be the Norm

This concept is part of the overall consideration of the right to bail, discussed above, but it bears repeating and emphasis as its own fundamental legal principle. The Supreme Court has said, "In our society, liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[36] As noted previously, in addition to suggesting the ratio of bailable to unbailable defendants, the second part of this quote cautions against a release process that results in detention as well as a detention process administered haphazardly. Given that the setting of a financial bail condition often leaves judges and others wondering whether the defendant will be able to make it – i.e., the release or detention of that particular defendant is now essentially random based on any number of factors – it is difficult to see how such a detention caused by money can ever be considered a "carefully limited" process.

### Due Process

Due Process refers generally to upholding people's legal rights and protecting individuals from arbitrary or unfair federal or state action pursuant to the rights afforded by the Fifth and Fourteenth Amendments of the United States Constitution (and similar or equivalent state provisions). The Fifth Amendment provides that "No person shall be . . . deprived of life, liberty, or property, without due process of law."[37] The Fourteenth Amendment places the same restrictions on the states. The concept is believed to derive from the Magna Carta, which required King John of England to accept certain limitations to his power, including the limitation that no man be imprisoned or otherwise deprived of his rights except by lawful judgment of his peers or the law of the land. Many of the original provisions of the Magna Carta were incorporated into the Statute of Westminster of 1275, which included important provisions concerning bail.

---

[36] *Id.* at 755.
[37] U.S. Const. amend. V.

As noted by the Supreme Court in *United States v. Salerno*, due process may be further broken down into two subcategories:

> So called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.' When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process.[38]

In *Salerno,* the Court addressed both substantive and procedural fairness arguments surrounding the federal preventive detention scheme. The substantive due process argument dealt with whether detention represented punishment prior to conviction and an ends-means balancing analysis. The procedural issue dealt with how the statute operated – whether there were procedural safeguards in place so that detention could be ordered constitutionally. People who are detained pretrial without having the benefit of the particular safeguards enumerated in the *Salerno* opinion could, theoretically, raise procedural due process issues in an appeal of their bail-setting.

A shorthand way to think about due process is found in the words "fairness" or "fundamental fairness." Other words, such as "irrational," "unreasonable," and "arbitrary" tend also to lead to due process scrutiny, making the Due Process Clause a workhorse in the judicial review of bail decisions. Indeed, as more research is being conducted into the nature of secured financial conditions at bail – their arbitrariness, the irrationality of using them to provide reasonable assurance of either court appearance or public safety, and the documented negative effects of unnecessary pretrial detention – one can expect to see many more cases based on due process clause claims.

### Equal Protection

If the Due Process Clause protects against unfair, arbitrary, or irrational laws, the Equal Protection Clause of the Fourteenth Amendment (and similar or equivalent state provisions) protects against the government treating similarly situated persons differently under the law. Interestingly, "equal protection" was not mentioned in the original Constitution, despite the phrase practically embodying what we now consider to be the whole of the American justice

---

[38] 481 U.S 739, 746 (internal citations omitted).

system. Nevertheless, the Fourteenth Amendment to the United States Constitution now provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[39] While there is no counterpart to this clause that is applicable to the federal government, federal discrimination may be prohibited as violating the Due Process Clause of the Fifth Amendment.

> *"The only stable state is the one in which all men are equal before the law."*
>
> Aristotle, 350 B.C.

Over the years, scholars have argued that equal protection considerations should serve as an equally compelling basis as does due process for mandating fair treatment in the administration of bail, especially when considering the disparate effect of secured money bail bonds on defendants due only to their level of wealth. This argument has been bolstered by language from Supreme Court opinions in cases like *Griffin v. Illinois*, which dealt with a defendant's ability to purchase a transcript required for appellate review. In that case, Justice Black wrote, "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has."[40] Moreover, sitting as circuit justice to decide a prisoner's release in two cases, Justice Douglas uttered the following dicta frequently cited as support for equal protection analysis: (1) "Can an indigent be denied freedom, where a wealthy man would not, because he does not happen to have enough property to pledge for his freedom?";[41] and (2) "[N]o man should be denied release because of indigence. Instead, under our constitutional system, a man is entitled to be released on 'personal recognizance' where other relevant factors make it reasonable to believe that he will comply with the orders of the Court."[42] Overall, despite scholarly arguments to invoke equal protection analysis to the issue of bail (including any further impact caused by the link between income and race), the courts have been largely reluctant to do so.

---

[39] U.S. Const. amend. XIV, § 1.

[40] 351 U.S. 12, 19 (1956).

[41] *Bandy v. United States*, 81 S. Ct. 197, 198 (1960).

[42] *Bandy v. United States*, 82 S. Ct. 11, 13 (1961).

**Excessive Bail and the Concept of Least Restrictive Conditions**

Excessive bail is a legal term of art used to describe bail that is unconstitutional pursuant to the 8th Amendment to the United States Constitution (and similar or equivalent state provisions). The 8th Amendment states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."[43] The Excessive Bail Clause derives from reforms made by the English Parliament in the 1600s to curb the abuse of judges setting impossibly high money bail to thwart the purpose of bail to afford a process of pretrial release. Indeed, historians note that justices began setting high amounts on purpose after King James failed to repeal the Habeas Corpus Act, and the practice represents, historically, the first time that a condition of bail rather than the actual existence of bail became a concern. The English Bill of Rights of 1689 first used the phrase, "Excessive bail ought not to be required," which was incorporated into the 1776 Virginia Declaration of rights, and ultimately found its way into the United States and most state constitutions. Excessiveness must be determined by looking both at federal and state law, but a rule of thumb is that the term relates overall to reasonableness.

"Excessive bail" is now, in fact, a misnomer, because bail more appropriately defined as a process of release does not lend itself to analysis for excessiveness. Instead, since it was first uttered, the phrase excessive bail has always applied to conditions of bail or limitations on pretrial release. The same historical factors causing jurisdictions to define bail as money are at play when one says that bail can or cannot be excessive; hundreds of years of having only one condition of release – money – have caused the inevitable but unfortunate blurring of bail and one of its conditions. Accordingly, when we speak of excessiveness, we now more appropriately speak in terms of limitations on pretrial release or freedom.

Looking at excessiveness in England in the 1600s requires us to consider its application within a personal surety system using unsecured amounts. Bail set at a prohibitively high amount meant that no surety (i.e., a person), or even group of sureties, would willingly take responsibility for the accused. Even before the prohibition, however, amounts were often beyond the means of any particular defendant, requiring sometimes several sureties to provide "sufficiency" for the bail determination. Accordingly, as is the case today, it is likely that some indicator of excessiveness at a time of relatively plentiful sureties for any particular defendant was continued detention of an otherwise bailable

---

[43] U.S. Const. amend. VIII.

defendant. Nevertheless, before the abuses leading to the English Bill of Rights and Habeas Corpus Act, there was no real indication that high amounts required of sureties led to detention in England. And in America, "[a]lthough courts had broad authority to deny bail for defendants charged with capital offenses, they would generally release in a form of pretrial custody defendants who were able to find willing custodians."[44] In a review of the administration of bail in Colonial Pennsylvania, author Paul Lermack concluded that "bail . . . continued to be granted routinely . . . for a wide variety of offenses . . . [and] [a]lthough the amount of bail required was very large in cash terms and a default could ruin a guarantor, few defendants had trouble finding sureties."[45]

The current test for excessiveness from the United States Supreme Court is instructive on many points. In *United States v. Salerno*, the Court wrote as follows:

> The only arguable substantive limitation of the Bail Clause is that the Government's proposed conditions of release or detention not be 'excessive' in light of the perceived evil. Of course, to determine whether the Government's response is excessive, we must compare that response against the interest the Government seeks to protect by means of that response. Thus, when the Government has admitted that its only interest is in preventing flight, bail must be set by a court at a sum designed to ensure that goal, and no more. *Stack v. Boyle, supra*. We believe that, when Congress has mandated detention on the basis of a compelling interest other than prevention of flight, as it has here, the 8th Amendment does not require release on bail.[46]

Thus, as explained in *Galen v. County of Los Angeles,* to determine excessiveness, one must

> look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests. The state may not set bail to achieve invalid interests . . . nor in an amount

---

[44] Betsy Kushlan Wanger, *Limiting Preventive Detention Through Conditional Release: The Unfulfilled Promise of the 1982 Pretrial Services Act,* 97 Yale L. J. 323, 323-24 (1987-88) (internal citations omitted).

[45] Paul Lermack, *The Law of Recognizances in Colonial Pennsylvania,* 50 Temp. L. Q. 475 at 497, 505 (1977).

[46] 481 U.S. 739, 754-55 (1987).

that is excessive in relation to the valid interests it seeks to
achieve.[47]

*Salerno* thus tells us at least three important things. First, the law of *Stack v. Boyle*
is still strong: when the state's interest is assuring the presence of the accused,
"[b]ail set at a figure higher than an amount reasonably calculated to fulfill this
purpose is 'excessive' under the 8th Amendment."[48] The idea of "reasonable"
calculation necessarily compels us to assess how judges are typically setting bail,
which might be arbitrarily (such as through a bail schedule) or irrationally (such
as through setting financial conditions to protect the public when those
conditions cannot be forfeited for breaches in public safety, or when they are
otherwise not effective at achieving the lawful purposes for setting them, which
recent research suggests).

Second, financial conditions (i.e., amounts of money) are not the only conditions
vulnerable to an excessive bail claim. Any unreasonable condition of release,
including a nonfinancial condition, that has no relationship to mitigating an
identified risk, or that exceeds what is needed to reasonably assure the
constitutionally valid state interest, might be deemed constitutionally excessive.

Third, the government must have a proper purpose for limiting pretrial freedom.
This is especially important because scholars and courts (as well as Justice
Douglas, again sitting as circuit justice) have indicated that setting bail with a
purpose to detain an otherwise bailable defendant would be unconstitutional. In
states where the bail/no bail dichotomy has been inadequately crafted, however,
judges are doing precisely that.

While the Court in *Salerno* upheld purposeful pretrial detention pursuant to the
Bail Reform Act of 1984, it did so only because the statute contained "numerous
procedural safeguards" that are rarely, if ever, satisfied merely through the act of
setting a high money bond. Therefore, when a state has established a lawful
method for preventively detaining defendants, setting financial conditions
designed to detain otherwise bailable defendants outside of that method could
still be considered an unlawful purpose. Purposeful pretrial detention through a
process of the type endorsed by the United States Supreme Court is entirely
different from purposeful pretrial detention done through setting unattainable
financial conditions of release.

---

[47] 477 F.3d 652, 660 (9th Cir. 2007) (internal citations omitted).
[48] 342 U.S. 1, 5 (1951).

When the United States Supreme Court says that conditions of bail must be set at a level designed to assure a constitutionally valid purpose for limiting pretrial freedom "and no more," as it did in *Salerno,* then we must also consider the related legal principle of "least restrictive conditions" at bail. The phrase "least restrictive conditions" is a term of art expressly contained in the federal and District of Columbia statutes, the American Bar Association best practice standards on pretrial release, and other state statutes based on those Standards (or a reading of *Salerno*). Moreover, the phrase is implicit through similar language from various state high court cases articulating, for example, that bail may be met only by means that are "the least onerous" or that impose the "least possible hardship" on the accused.

Commentary to the ABA Standard recommending release under the least restrictive conditions states as follows:

> This Standard's presumption that defendants should be released under the least restrictive conditions necessary to provide reasonable assurance they will not flee or present a danger is tied closely to the presumption favoring release generally. It has been codified in the Federal Bail Reform Act and the District of Columbia release and pretrial detention statute, as well as in the laws and court rules of a number of states. The presumption constitutes a policy judgment that restrictions on a defendant's freedom before trial should be limited to situations where restrictions are clearly needed, and should be tailored to the circumstances of the individual case. Additionally, the presumption reflects a practical recognition that unnecessary detention imposes financial burdens on the community as well as on the defendant.[49]

The least restrictive principle is foundational, and is expressly reiterated throughout the ABA Standards when, for example, those Standards recommend citation release or summonses versus arrest. Moreover, the Standards' overall scheme creating a presumption of release on recognizance, followed by release on nonfinancial conditions, and finally release on financial conditions is directly tied to this foundational premise. Indeed, the principle of least restrictive conditions transcends the Standards and flows from even more basic

---

[49] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-1.2 (commentary) at 39-40 (internal citations omitted).

understandings of criminal justice, which begins with presumptions of innocence and freedom, and which correctly imposes increasing burdens on the government to incrementally restrict one's liberty.

More specifically, however, the ABA Standards' commentary on financial conditions makes it clear that the Standards consider secured financial conditions to be more restrictive than both unsecured financial conditions and nonfinancial conditions: "When financial conditions are warranted, the least restrictive conditions principle requires that unsecured bond be considered first."[50] Moreover, the Standards state, "Under Standard 10-5.3(a), financial conditions may be employed, but only when no less restrictive non-financial release condition will suffice to ensure the defendant's appearance in court. An exception is an unsecured bond because such a bond requires no 'up front' costs to the defendant and no costs if the defendant meets appearance requirements."[51] These principles are well founded in logic: setting aside, for now, the argument that money at bail might not be of any use at all, it at least seems reasonably clear that secured financial conditions (requiring up-front payment) are always more restrictive than unsecured ones, even to the wealthiest defendant. Moreover, in the aggregate, we know that secured financial conditions, as typically the only condition precedent to release, are highly restrictive compared to all nonfinancial conditions and unsecured financial conditions in that they tend to cause pretrial detention. Like detention itself, any condition causing detention should be considered highly restrictive. In sum, money is a highly restrictive condition, and more so (and possibly excessive) when combined with other conditions that serve the same purpose.

---

[50] *Id.* Std. 10-1.4 (c) (commentary) at 43-44.
[51] *Id.* Std. 10-5.3 (a) (commentary) at 112.

<div style="border:1px solid black; padding:1em;">

### What Can the Juvenile Justice System Tell Us About Adult Bail?

In addition to the fact that the United States Supreme Court relied heavily on *Schall v. Martin*, a juvenile preventive detention case, in writing its opinion in *United States v. Salerno*, an adult preventive detention case, the juvenile justice system has an impressive body of knowledge and research that can be used to inform the administration of bail for adults.

Perhaps most relevant is the work being done through the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI), an initiative to promote changes to juvenile justice policies and practices to "reduce reliance on secure confinement, improve public safety, reduce racial disparities and bias, save taxpayers' dollars, and stimulate overall juvenile justice reforms."

In remarks at the National Symposium on Pretrial Justice in 2011, Bart Lubow, Director of the Juvenile Justice Strategy Center of the Foundation, stated that JDAI used cornerstone innovations of adult bail to inform its work with juveniles, but through collaborative planning and comprehensive implementation of treatments designed to address a wider array of systemic issues, the juvenile efforts have eclipsed many adult efforts by reducing juvenile pretrial detention an average of 42% with no reductions in public safety measures.

**Sources and Resources**: *National Symposium on Pretrial Justice: Summary Report of Proceedings* at 23-24 (Statement of Bart Lubow) (PJI/BJA 2011); *Schall v. Martin*, 467 U.S 253 (1984); *United States v. Salerno*, 481 U.S. 739 (1987); Additional information may be found at the Annie E. Casey Foundation Website, found at http://www.aecf.org/.

</div>

**Bail May Not Be Set For Punishment (Or For Any Other Invalid Purpose)**

This principle is related to excessiveness, above, because analysis for excessiveness begins with looking at the government's purpose for limiting pretrial freedom. It is more directly tied to the Due Process Clause, however, and was mentioned briefly in *Salerno* when the Court was beginning its due process analysis. In *Bell v. Wolfish*, the Supreme Court had previously written, "The Court of Appeals properly relied on the Due Process Clause, rather than the 8th Amendment, in considering the claims of pretrial detainees. Due process

requires that a pretrial detainee not be punished."[52] Again, there are currently only two constitutionally valid purposes for limiting pretrial freedom – court appearance and public safety. Other reasons, such as punishment or, as in some states, to enrich the treasury, are clearly unconstitutional. And still others, such as setting a financial condition to detain, are at least potentially so.

### The Bail Process Must Be Individualized

In *Stack v. Boyle*, the Supreme Court wrote as follows:

> Since the function of bail is limited, the fixing of bail for any individual defendant must be based upon standards relevant to the purpose of assuring the presence of that defendant. The traditional standards, as expressed in the Federal Rules of Criminal Procedure [at the time, the nature and circumstances of the offense, the weight of the evidence against the defendant, and the defendant's financial situation and character] are to be applied in each case to each defendant.[53]

In his concurrence, Justice Jackson observed that if the bail in *Stack* had been set in a uniform blanket amount without taking into account differences between defendants, it would be a clear violation of the federal rules. As noted by Justice Jackson, "Each defendant stands before the bar of justice as an individual."[54]

At the time, the function of bail was limited to setting conditions of pretrial freedom designed to provide reasonable assurance of court appearance. Bail is still limited today, although the purposes for conditioning pretrial freedom have been expanded to include public safety in addition to court appearance. Nevertheless, pursuant to *Stack*, there must be standards in place relevant to these purposes. After *Stack,* states across America amended their statutes to include language designed to individualize bail setting for purposes of court appearance. In the second generation of bail reform, states included individualizing factors relevant to public safety. And today, virtually every state has a list of factors that can be said to be "individualizing criteria" relevant to the proper purposes for limiting pretrial freedom. To the extent that states do not use these factors, such as when over-relying on monetary bail bond schedules that

---

[52] 441 U.S. 520, 535 and n. 16 (1979).
[53] 342 U.S. 1, 5 (1951) (internal citations omitted).
[54] *Id.* at 9.

merely assign amounts of money to charges for all or average defendants, the non-individualized bail settings are vulnerable to constitutional challenge.

The concept of requiring standards to ensure that there exists a principled means for making non-arbitrary decisions in criminal justice is not without a solid basis under the U.S. Constitution. Indeed, such standards have been a fundamental precept of the Supreme Court's death penalty jurisprudence under the cruel and unusual punishment clause of the 8th Amendment.

> *"The term [legal and evidence-based practices] is intended to reinforce the uniqueness of the field of pretrial services and ensure that criminal justice professionals remain mindful that program practices are often driven by law and when driven by research, they must be consistent with the pretrial legal foundation and the underlying legal principles."*
>
> Marie VanNostrand, Ph.D., 2007

### The Right to Counsel

This principle refers to the Sixth Amendment right of the accused to assistance of counsel for his or her defense. There is also a 5th Amendment right, which deals with the right to counsel during all custodial interrogations, but the 6th Amendment right more directly affects the administration of bail as it applies to all "critical stages" of a criminal prosecution. According to the Supreme Court, the 6th Amendment right does not attach until a prosecution is commenced. Commencement, in turn, is "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[55] In *Rothgery v. Gillespie County*, the United States Supreme Court "reaffirm[ed]" what it has held and what "an overwhelming majority of American jurisdictions" have understood in practice: "a criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction, marks the start of adversary judicial proceedings that trigger attachment of the Sixth Amendment right to counsel."[56]

---

[55] *See United States* v. *Gouveia*, 467 U. S. 180, 188 (1984) (quoting *Kirby* v. *Illinois*, 406 U. S. 682, 689 (1972) (plurality opinion)).
[56] 554 U.S. 191, 198, 213 (2008).

Both the American Bar Association's and the National Association of Pretrial Services Agencies' best practice standards on pretrial release recommend having defense counsel at first appearances in every court, and important empirical data support the recommendations contained in those Standards. Noting that previous attempts to provide legal counsel in the bail process had been neglected, in 1998 researchers from the Baltimore, Maryland, Lawyers at Bail Project sought to demonstrate empirically whether or not lawyers mattered during bail hearings. Using a controlled experiment (with some defendants receiving representation at the bail bond review hearing and others not receiving representation) those researchers found that defendants with lawyers: (1) were over two and one-half times more likely to be released on their own recognizance; (2) were over four times more likely to have their initially-set financial conditions reduced at the hearing; (3) had their financial conditions reduced by a greater amount; (4) were more likely to have the financial conditions reduced to a more affordable level ($500 or under); (5) spent less time in jail (an average of two days versus nine days for unrepresented defendants); and (6) had longer bail bond review hearings than defendants without lawyers at first appearance.

### The Privilege Against Compulsory Self-Incrimination

This foundational principle refers to the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment (in addition to similar or equivalent state provisions), which says that no person "shall be compelled, in any criminal case, to be a witness against himself . . ." At bail there can be issues surrounding pretrial interviews as well as with incriminating statements the defendant makes while the court is setting conditions of release. In that sense, the principle against compulsory self-incrimination is undoubtedly linked to the right to counsel in that counsel can help a particular defendant fully understand his or her other rights.

### Probable Cause

Black's Law Dictionary defines probable cause as reasonable cause, or a reasonable ground to suspect that a person has committed or is committing a crime or that a place contains specific items connected with a crime. Probable cause sometimes refers to having more evidence for than against. It is a term of art in criminal procedure referring to the requirement that arrests be based on probable cause. Probable cause to arrest is present when "at that moment [of the

arrest] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person] had committed or was committing an offense."[57] In *County of Riverside v. McLaughlin*,[58] the Supreme Court ruled that suspects who are arrested without a warrant must be given a probable cause hearing within 48 hours.

As the arrest or release decision is technically one under the umbrella of a broadly defined bail or pretrial process, practices surrounding probable cause or the lack of it are crucial for study. Interestingly, because a probable cause hearing is a prerequisite only to "any significant pretrial restraint of liberty,"[59] jurisdictions that employ bail practices that are speedy and result in a large number of releases using least restrictive conditions (such as the District of Columbia) may find that they need not hold probable cause hearings for every arrestee prior to setting bail.

## Other Legal Principles

Of course, there are other legal principles that are critically important to defendants during the pretrial phase of a criminal case, such as certain rights attending trial, evidentiary rules and burdens of proof, the right to speedy trial, and rules affecting pleas. Moreover, there are principles that arise only in certain jurisdictions; for example, depending on which state a person is in, using money to protect public safety may be expressly unlawful and thus its prohibition may rise to the level of other, more universal legal principles beyond its inferential unlawfulness due to its irrationality. Nevertheless, the legal foundations listed above are the ones most likely to arise in the administration of bail. It is thus crucial to learn them and to recognize the issues that arise within them.

## What Do the Legal Foundations of Pretrial Justice Tell Us?

Pretrial legal foundations provide the framework and the boundaries within which we must work in the administration of bail. They operate uniquely in the pretrial phase of a criminal case, and together should serve as a cornerstone for all pretrial practices; they animate and inform our daily work and serve as a visible daily backdrop for our pretrial thoughts and actions.

---

[57] *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

[58] 500 U.S. 44 (1991).

[59] *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975).

For the most part, the legal foundations confirm and solidify the history of bail. The history of bail tells us that the purpose of bail is release, and the law has evolved to strongly favor, if not practically demand the release of bailable defendants as well as to provide us with the means for effectuating the release decision. The history tells us that "no bail" is a lawful option, and the law has evolved to instruct us on how to fairly and transparently detain unbailable defendants. History tells us that court appearance and public safety are the chief concerns of the bail determination, and the law recognizes each as constitutionally valid purposes for limiting pretrial freedom.

The importance of the law in "legal and evidence-based practices" is unquestioned. Pretrial practices, judicial decision making (for judges are sworn to uphold the law and their authority derives from it), and even state bail laws themselves must be continually held up to the fundamental principles of broad national applicability for legal legitimacy. Moreover, the law acts as a check on the evidence; a pretrial practice, no matter how effective, must always bow to the higher principles of equal justice, rationality, and fairness. Finally, the law provides us with the fundamental goals of the pretrial release and detention decision. Indeed, if evidence-based decision making is summarized as attempting to achieve the goals of a particular discipline by using best practices, research, and evidence, then the law is critically important because it tells us that the goals of bail are to maximize release while simultaneously maximizing court appearance and public safety. Accordingly, all of the research and pretrial practices must be continually questioned as to whether they inform or further these three inter-related goals. In the next section, we will examine how the evolution of research at bail has, in fact, informed lawful and effective bail decision making.

**Additional Sources and Resources:** Black's Law Dictionary (9th ed. 2009); Douglas L. Colbert, Ray Paternoster, & Shawn Bushway, *Do Attorneys Really Matter? The Empirical and Legal Case for the Right to Counsel at Bail,* 32 Cardozo L. Rev. 1719 (2002); *Early Appointment of Counsel: The Law, Implementation, and Benefits* (Sixth Amend. Ctr./PJI 2014); Wayne R. LaFave, Jerold H. Israel, Nancy J. King and Orin S. Kerr, *Criminal Procedure* (3rd ed. 2007 & 5th ed. 2009); Jack K. Levin & Lucan Martin, 8A American Jurisprudence 2d, *Bail and Recognizance* (West 2009); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011); Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services*

(CJI/NIC 2007); 3B Charles Allen Wright & Peter J. Henning, Federal Practice and Procedure §§ 761-87 (Thomson Reuters 2013).

# Chapter 4: Pretrial Research

## The Importance of Pretrial Research

Research allows the field of bail and pretrial justice to advance. Although our concepts of proper research have certainly changed over the centuries, arguably no significant advancement in bail or pretrial justice has ever occurred without at least some minimal research, whether that research was legal, historical, empirical, opinion, or any other way of better knowing things. This was certainly true in England in the 1200s, when Edward I commissioned jurors to study bail and used their documented findings of abuse to enact the Statute of Westminster in 1275. It is especially true in America in the 20th century, when research was the catalyst for the first two generations of bail reform and has arguably sparked a third.

While other research disciplines are important, the current workhorse of the various methods in bail is social research. According to noted sociologists Earl Babbie and Lucia Benaquisto, social research is important because we often already know the answers to life's most pressing problems, but we are still unable to solve them. Social science research provides us with the solutions to these problems by telling us how to organize and run our social affairs by analyzing the forms, values, and customs that make up our lives. This is readily apparent in bail, where many of the solutions to current problems are already known; social science research provides help primarily by illuminating how we can direct our social affairs so as to fully implement those solutions. By continually testing theories and hypotheses, social science research finds incremental explanations that simplify a complex life, and thus allows us to solve confounding issues such as how to reduce or eliminate unnecessary pretrial detention.

> *"We can't solve our social problems until we understand how they come about, persist. Social science research offers a way to examine and understand the operation of human social affairs. It provides points of view and technical procedures that uncover things that would otherwise escape our awareness."*
>
> Earl Babbie & Lucia Benaquisto, 2009

Like history and the law, social science research and the law are growing more and more entwined. In the 1908 case of *Muller v. Oregon*,[60] Louis Brandeis submitted a voluminous brief dedicated almost exclusively to social science research indicating the negative effects of long work hours on women. This landmark instance of the use of social research in the law, ultimately dubbed a "Brandeis brief," became the model for many legal arguments thereafter. One need only read the now famous footnote 11 of the Supreme Court's opinion in *Brown v. Board of Education*,[61] which ended racial segregation in America's schools and showed the detrimental effects of segregation on children, to understand how social science research can significantly shape our laws.

Social science research and the law are especially entwined in criminal justice and bail. Perhaps no single topic ignites as deep an emotional response as crime – how to understand it, what to do about it, and how to prevent it. And bail, for better or worse, ignites the same emotional response. Moreover, bail is deceptively complex because it superimposes notions of a defendant's freedom and the presumption of innocence on top of our societal desires to bring defendants to justice and to avoid pretrial misbehavior. Good social science research can aid us in simplifying the topic by answering questions surrounding the three legal and historical goals of bail and conditions of bail. Specifically, social science pretrial research tells us what works to simultaneously: (1) maximize release; (2) maximize public safety; and (3) maximize court appearance.

Because of the complex balance of bail, research that addresses all three of these goals is superior to research that does not. For example, studies showing only the effectiveness of release pursuant to a commercial surety bond at ultimately reducing failures to appear (whether true or not) is less helpful than also knowing how those bonds do or do not affect public safety and tend to detain otherwise bailable defendants. It is helpful to know that pretrial detention causes negative long-term effects on defendants; it is more helpful to learn how to reduce those effects while simultaneously keeping the community safe. It is helpful to know a defendant's risk empirically; it is more helpful to know how to best embrace risk so as to facilitate release and then to mitigate known risk to further the constitutionally valid purposes for limiting pretrial freedom.

Nevertheless, some research is always better than no research, even if that research is found on the lowest levels of an evidence-based decision making

---

[60] *Muller v. Oregon,* 208 U.S. 412 (1908).
[61] *Brown v. Board of Education,* 347 U.S. 483 (1954).

hierarchy of evidence pyramid. And that is simply because we are already making decisions every day at bail, often with no research at all, and typically based on customs and habits formed over countless decades of uninformed practice. To advance our policies, practices, and laws, we must at least become informed consumers of pretrial research. We must recognize the strengths and limitations of the research, understand where it is coming from, and even who is behind creating it. Ultimately, however, we must use it to help solve what we perceive to be our most pressing problems at bail.

### Research in the Context of Legal and Evidence-Based Practices

The term "evidence-based practices" is common to numerous professional fields. As noted earlier, however, due to the unique nature of the pretrial period of a criminal case as well as the importance of legal foundations to pretrial decision making, Dr. Marie VanNostrand has more appropriately coined the term "legal and evidence-based practices" for the pretrial field. Legal and evidence-based practices are defined as "interventions and practices that are consistent with the pretrial legal foundation, applicable laws, and methods research has proven to be effective in decreasing failures to appear in court and danger to the community during the pretrial stage."

In addition to holding up practices and the evidence behind them to legal foundations, to fully follow an evidence-based decision making model jurisdictions must also determine how much research is needed to make a practice "evidence-based." According to the U.S. Department of Health and Human Services (HHS), this is done primarily by assessing the strength of the evidence indicating that the practice leads to the desired outcome. To help with making this assessment, many fields employ the use of graphics indicating the varying "strength of evidence" for the kinds of data or research they are likely to use. For example, the Colorado Commission on Criminal and Juvenile Justice, a statewide commission that focuses on evidence-based recidivism reduction and cost-effective criminal justice expenditures, refers to the strength of evidence pyramid, below, which was developed by HHS's Substance Abuse and Mental Health Services Administration's Co-Occurring Center for Excellence (COCE).



As one can see, the levels vary in strength from lower to higher, with higher levels more likely to illuminate research that works better to achieve the goals of a particular field. As noted by the COCE, "Higher levels of research evidence derive from literature reviews that analyze studies selected for their scientific merit in a particular treatment area, clinical trial replications with different populations, and meta-analytic studies of a body of research literature. At the highest level of the pyramid are expert panel reviews of the research literature."

**Sources and Resources:** Marie VanNostrand, *Legal and Evidence-Based Practices: Applications of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007); Information gathered from the Colorado Commission on Criminal and Juvenile Justice website, found at http://www.colorado.gov/cs/Satellite/CDPS-CCJJ/CBON/1251622402893; *Understanding Evidence-Based Practices for Co-Occurring Disorders* (SAMHSA's CORE) contained in SAMHSA's website, found online at http://www.samhsa.gov/co-occurring/topics/training/OP5-Practices-8-13-07.pdf.

Research in the Last 100 Years: The First Generation

If we focus on just the last 100 years, we see that major periods of bail research in America have led naturally to more intense periods of reform resulting in new policies, practices, and laws. Although French historian Alexis de Tocqueville informally questioned America's continued use of money bail in 1835, detailed studies of bail practices in America had their genesis in the 1920s, first from Roscoe Pound and Felix Frankfurter's study of criminal justice in Cleveland, Ohio, and then from Arthur Beeley's now famous study of bail in Chicago, Illinois. Observing secured-money systems primarily administered through the use of commercial bail bondsmen (that had really only existed since 1898), both of those 1920s studies found considerable flaws in the current way of administering bail. Beeley's seminal statement of the problem in 1927, made at the end of a painstakingly detailed report, is still relevant today:

> [L]arge numbers of accused, but obviously dependable persons are needlessly committed to Jail; while many others, just as obviously undependable, are granted a conditional release and never return for trial. That is to say, the present system, in too many instances, neither guarantees security to society nor safeguards the rights of the accused. The system is lax with those with whom it should be stringent and stringent with those with whom it could safely be less severe.[62]

Pound, Frankfurter, and Beeley began a period of bail research, advanced significantly by Caleb Foote in the 1950s, that culminated in the first generation of bail reform in the 1960s. That research consisted of several types – for example, one of the most important historical accounts of bail was published in 1940 by Elsa de Haas. But the most significant literature consisted of social science studies observing and documenting the deficiencies of the current system. As noted by author Wayne H. Thomas, Jr.,

> [These] studies had shown the dominating role played by bondsmen in the administration of bail, the lack of any meaningful consideration to the issue of bail by the courts, and the detention of large numbers of defendants who could and should have been released but were not because bail, even in modest amounts, was

---

[62] Arthur L. Beeley, *The Bail System in Chicago*, at 160 (Univ. of Chicago Press, 1927).

beyond their means. The studies also revealed that bail was often used to 'punish' defendants prior to a determination of guilt or to 'protect' society from anticipated future conduct, neither of which is a permissible purpose of bail; that defendants detained prior to trial often spent months in jail only to be acquitted or to receive a suspended sentence after conviction; and that jails were severely overcrowded with pretrial detainees housed in conditions far worse than those of convicted criminals.[63]

Clearly, the most impactful of this period's research was so-called "action research," in which bail practices were altered and outcomes measured in pioneering "bail projects" to study alternatives to the secured bond/commercial surety system of release. Perhaps the most well-known of these endeavors was the Manhattan Bail Project, conducted by the Vera Foundation (now the Vera Institute of Justice) and the New York University Law School beginning in 1960. The Manhattan Bail Project used an experimental design to demonstrate that given the right information, judges could release more defendants without the requirement of a financial bond condition and with no measurable impact on court appearance rates. At that time in American history, bail had only two goals – to release defendants while simultaneously maximizing court appearance – because public safety had not yet been declared a constitutionally valid purpose for limiting pretrial freedom. The Manhattan Bail Project was significant because it worked to achieve both of the existing goals. Based on the information provided by Vera, release rates increased while court appearance rates remained high.

---

[63] Wayne H. Thomas, Jr., *Bail Reform in America* at 15 (Univ. Cal. Press 1976).

---

### Caleb Foote's Unfulfilled Prediction Concerning Bail Research

At the National Conference on Bail and Criminal Justice in 1964, Professor of Law Caleb Foote explained to attendees that courts would likely move from their "wholly passive role" during the first generation of bail reform to a more active one, saying, "Certainly courts are not going to be immune to the sense of basic unfairness which alike has motivated scholarly research, foundation support for bail action projects, the Attorney General's Committee on Poverty, and your attendance at this Conference." Noting the lack of any definitive empirical evidence showing that pretrial detention alone adversely affected the quality of treatment given to criminal defendants, Foote nonetheless cited current studies attempting to show that very thing, and predicted:

"If it comes to be generally accepted that in the outcome of his case the jailed defendant is prejudiced compared with the defendant who has pretrial liberty, such a finding will certainly have a profound impact upon any judicial consideration of constitutional bail questions. It was such impermissible prejudicial effects, stemming from poverty, which formed the basis of the due process requirement of counsel in *Gideon v. Wainwright*."

Since then, numerous studies have highlighted the prejudicial effects of pretrial detention, with the research consistently demonstrating that when compared to defendants who are released, defendants detained pretrial – all other things being equal – plead guilty more often, are convicted more often, get sentenced to prison more often, and receive longer sentences. And yet, despite this overwhelming research, Foote's prediction of increased judicial interest and activity in the constitutional issues of bail has not come true.

**Sources and Resources:** *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* at 29 n. 1 (2007) (citing studies); John Clark, *Rational and Transparent Bail Decision Making: Moving From a Cash-Based to a Risk-Based Process,* at 2 (PJI/MacArthur Found. 2012) (same); *The National Conference on Bail and Criminal Justice, Proceedings and Interim Report,* at 224-25 (Washington, D.C. April 1965);

---

The Manhattan Bail Project was the center of discussion of bail reform at the 1964 National Conference on Bail and Criminal Justice, which in turn led to changes in both federal and state laws designed to facilitate the release of bailable defendants who were previously unnecessarily detained. Those changes included presumptions for release on recognizance, release on unsecured bonds (like those used for centuries in England and America prior to the 1800s), release on "least restrictive" nonfinancial conditions, and additional constraints on the

use of secured money bonds. The improvements were, essentially, America's attempt to solve the early 20th century's dilemma of bailable defendants not being released – a dilemma that, historically speaking, has always demanded correction.

## The Second Generation

Research flowing toward the second generation of pretrial reform in America followed the same general pattern of identifying abuses or areas in need of improvement and then gradually creating a meeting of minds on practical solutions to those abuses. In that generation, though, the identified "abuse" dealt primarily with the "no bail" side of the "bail/no bail" dichotomy – the side that determines who should not be released at all. As summarized by Senator Edward Kennedy in 1980,

> Historically, bail has been viewed as a procedure designed to ensure the defendant's appearance at trial by requiring him to post a bond or, in effect, make a promise to appear. Current findings, suggest, however, that this traditional approach, though noble in design, has one important shortcoming. It fails to deal effectively with those defendants who commit crimes while they are free on bail.[64]

Indeed, for nearly 1,500 years, the only acceptable purpose for limiting pretrial freedom was to assure that the defendant performed his or her duty to face justice, which ultimately came to mean appearing for court. Even when crafting their constitutional and statutory exceptions to any recognized right to bail, the states and the federal government had always done so with an eye toward court appearance. To some, limiting freedom based on future dangerousness was un-American, more akin to tyrannical practices of police states, and contrary to all notions of fundamental human rights. Indeed, there was considerable debate over whether it could *ever* be constitutional to do so.

Nevertheless, many judges felt compelled to respond to legitimate fears for public safety even if the law did not technically allow for it. Accordingly, those judges often followed two courses of action when faced with obviously dangerous defendants who perhaps posed virtually no risk of flight: (1) if those

---

[64] Edward M. Kennedy, *A New Approach to Bail Release: The Proposed Federal Criminal Code and Bail Reform,* 48 Fordham L. Rev. 423, 423 (1980) (internal footnotes omitted).

defendants happened to fall in the categories listed as "no bail," judges could deny their release altogether; (2) if they did not fall into a "no bail" category, judges could and would set high monetary conditions of bail to effectively detain the defendant. The practice of detaining persons for public safety, or preventive detention, was known at the time as furthering a "sub rosa" or secret purpose for limiting freedom, and it was done with little interference from the appellate courts.

The research leading to reform in this area was multifaceted. Law reviews published articles on the right to bail, the Excessive Bail Clause, and on due process concerns. Historians examined the right to bail in England and America to determine if and how it could be restricted or even denied altogether for purposes of public safety. Politicians and others looked to the experiences of states that had already changed their laws to account for public safety and danger. And social scientists documented what Congress ultimately called "the alarming problem of crimes committed by persons on release"[65] by conducting empirical studies of pretrial release and re-arrest rates in a number of American jurisdictions.

Ultimately, this research led to dramatic changes in the administration of bail. Congress passed the Bail Reform Act of 1984, which expanded the law to allow for direct, fair, and transparent detention of certain dangerous defendants after a due process hearing. In *United States v. Salerno*, the Supreme Court upheld the Act, giving constitutional validity to public safety as a limitation on pretrial freedom. If they had not already done so, many states across the country changed their statutes and constitutions to allow consideration of dangerousness in the release and detention decision and by re-defining the "no bail" side of their schemes to better reflect which defendants should be denied the right to bail altogether.

---

[65] S. Rep. No. 98-225, P. L. 98-473 p. 3 (1983).

## The Third Generation

The previous generations of bail research have followed the pattern of identifying abuses or issues of concern and then finding consensus on solutions, and the current generation is no different. Some of the research in this generation of bail reform is merely a continuation of studies begun in previous generations. For example, a body of literature examining the effects of pretrial detention on ultimate outcomes of cases (guilty pleas, sentences, etc.) began in the 1950s and has continued to this day. As another example, after Congress passed the Bail Reform Act of 1966, pretrial services programs gradually expanded from the "bail projects" of the early 1960s to more comprehensive agencies designed to carry out the mandates of new laws requiring risk assessment and often supervision of pretrial defendants. As these programs evolved, a body of research began to develop around their practices. In 1973, the National Association of Pretrial Services Agencies (NAPSA) was founded to, among other things, promote research and development in the field. In 1976, NAPSA and the Department of Justice created the Pretrial Services Resource Center (PSRC, now the Pretrial Justice Institute), an entity also designed to, among other things, collect and disseminate research and information relevant to the pretrial field. The data collected by these entities over the years, in addition to the numerous important reports they have issued analyzing that data, have been instrumental sources of fundamental pretrial research.

---

### A Meeting of Minds – Who is Currently In Favor of Pretrial Improvements?

The following national organizations have produced express policy statements generally supporting the use of evidence-based and best pretrial practices, which include risk assessment and fair and transparent preventive detention, at the front end of the criminal justice system:

The Conference of Chief Justices

The Conference of State Court Administrators

The National Association of Counties

The International Association of Chiefs of Police

The Association of Prosecuting Attorneys

The American Council of Chief Defenders

The National Association of Criminal Defense Lawyers

The American Jail Association

The American Bar Association

The National Judicial College

The National Sheriff's Association

The American Probation and Parole Association

The National Association of Pretrial Services Agencies

In addition, numerous other organizations and individuals are lending their support or otherwise partnering to facilitate pretrial justice in America. For a list of just those organizations participating in the Pretrial Justice Working Group, created in the wake of the National Symposium on Pretrial Justice, go to http://www.pretrial.org/infostop/pjwg/

---

As another example, in 1983, the PSRC – with funding from the Bureau of Justice Statistics (BJS) – initiated the National Pretrial Reporting Program, which was designed to create a national pretrial database by collecting local bail data and aggregating it at the state and national levels. In 1994, that program became BJS's State Court Processing Statistics (SCPS) program, which collected data on felony defendants in jurisdictions from the 75 most populous American counties. Research documents analyzing that data, including the *Felony Defendants from Large Urban Counties* series, and *Pretrial Release of Felony Defendants in State Courts*,

have become crucial, albeit sometimes misinterpreted sources of basic pretrial data, such as defendant charges and demographics, case outcomes, types of release and release rates, financial condition amounts, and basic information on pretrial misconduct. Most recently, BJS asked the Urban Institute to re-design and re-develop the National Pretrial Reporting Program as a replacement to SCPS.

## An Unusual, But Necessary, Research Warning

Since 1988, the Bureau of Justice Statistic's (BJS) State Court Processing Statistics (SCPS) program (formerly the National Pretrial Reporting Program) has been an important source of data on criminal processing of persons charged with felonies in the 75 most populous American counties. Issues surrounding pretrial release, in particular, have been tempting topics for study due to the SCPS's inclusion of data indicating whether defendants were released pretrial, the type of release (e.g., personal recognizance, surety bond), and whether the defendant misbehaved while on pretrial release. In some cases, researchers would use the SCPS data to make "evaluative" statements, that is, statements declaring that a particular type of release was superior to another based on the data showing pretrial misbehavior associated with each type. Moreover, when these studies favored the commercial bail bonding and insurance industry, that industry would repeat the researcher's evaluative statements (as well as make their own statements based on their own reading of the SCPS data), and claim that the data demonstrated that the use of a commercial surety bond was a superior form of release.

According to Bechtel, et.al, (2012) "The bonding industry's claims based on the SCPS data became so widespread that BJS was compelled to take the unusual and unprecedented step of issuing a 'Data Advisory.'" That advisory, issued in March of 2010, listed the limitations of the SCPS data, and specifically warned that, "Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading."



Despite the warning, there are those who persist in citing SCPS data to convince policy makers or others about the effectiveness of one type of release over another. Both Bechtel, et al., and VanNostrand, et al., have listed flaws in the various studies using the data and have given compelling reasons for adopting a more discriminating attitude whenever persons or entities begin comparing one type of release with another.

As mentioned in the body of this paper, the best research at bail, which will undoubtedly include future efforts at comparing release types, must not only comply with the rigorous standards necessary so as not to violate the BJS Data Advisory, but should also address all three legal and evidence-based goals underlying the bail decision, which include maximizing release while maximizing public safety and court appearance.

**Sources and Resources:** Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision* (PJI/BJA 2011).

Finally, a related body of ongoing research derives simply from pretrial services agencies and programs measuring themselves, which can be a powerful way to present and use data to affect pretrial practices. In 2011, the NIC published *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field,* which proposed standardized definitions and uniform suggested measures consistent with established pretrial standards to "enable pretrial services agencies to gauge more accurately their programs' effectiveness in meeting agency and justice system goals."[66] Broadly speaking, standardized guidelines and definitions for documenting performance measures and outcomes enables better communication and leads to better and more coordinated research efforts overall.

Other research flowing toward this current generation of pretrial reform, akin to Arthur Beeley's report on Chicago bail practices, has been primarily observational. That research, such as some of the multifaceted analyses performed in Jefferson County, Colorado, in 2007-2010, merely examines system practices to assess whether those practices or even the current laws can be improved. Other entities, such as Human Rights Watch and the Justice Policy Institute, have created similar research documents that include varying ratios of observational and original research. On the other hand, another body of this generation's research goes far beyond observation and uses large data sets and complex statistical tests to create empirical pretrial risk instruments that provide scientific structure and meaning to current lists dictating the factors judges must consider in the release and detention decision.

---

[66] *Measuring What Matters: Outcome and Performance Measures for the Pretrial Services Field* (NIC 2011) at v.

In between is a body of research most easily identified by topic, but sometimes associated best with the person or entity producing it. For example, throughout the years researchers have been interested in analyzing judicial discretion and guided discretion in the decision to release, and so one finds numerous papers and studies examining that issue. In particular, though, Dr. John Goldkamp spent much of his distinguished academic career focusing on judicial discretion in the pretrial release decision, and published numerous important studies on his findings. Likewise, other local jurisdictions have delved deep into their own systems to look at a variety of issues associated with pretrial release and detention, but perhaps none have done so as consistently and thoroughly as the New York City Criminal Justice Agency, and its research continues to inspire and inform the nation.

Other topics of interest in this generation of reform include racial disparity, cost benefit analyses affecting pretrial practices, training police officers for first contacts and effects of that training on pretrial outcomes, citation release, the legality and effectiveness of monetary bail schedules, pretrial processes and outcomes measurements, re-entry from jail to the community, bail bondsmen and bounty hunters, special populations such as those with mental illness or defendants charged with domestic violence, and gender issues. Prominent organizations consistently working on publishing pretrial research literature include various agencies within the Department of Justice, including the National Institute of Corrections, the Bureau of Justice Assistance, the Bureau of Justice Statistics, and the National Institute of Justice. Other active entities include the Pretrial Justice Institute, the National Association of Counties, the United States Probation and Pretrial Services, the Pretrial Services Agency for the District of Columbia, the Vera Institute, the Urban Institute, and the Justice Policy Institute. Other organizations, such as the International Association of Chiefs of Police, the National Association of Drug Court Professionals, National Council on Crime and Delinquency, the Council of State Governments, the Pew Research Center, the American Probation and Parole Association, and various colleges and universities have also become actively involved in pretrial issues.

Along with these entities are a number of individuals who have consistently led the pretrial field by devoting much or all of their professional careers on pretrial research, such as Dr. John Goldkamp, D. Alan Henry, Dr. Marie VanNostrand, Dr. Christopher Lowenkamp, Dr. Alex Holsinger, Dr. James Austin, Dr. Mary Phillips, Dr. Brian Reaves, Dr. Thomas Cohen, Dr. Edward J. Latessa, Timothy Cadigan, Spurgeon Kennedy, John Clark, Kenneth J. Rose, Barry Mahoney, and Dr. Michael Jones. Often these individuals are sponsored by generous

philanthropic foundations interested in pretrial justice, such as the Public Welfare Foundation and the Laura and John Arnold Foundation.

---

### Public Opinion Research

An important subset of criminal justice research is survey research, which can include collecting data to learn how people feel about crime or justice policy. For example, in 2012 the PEW Center on the States published polling research by Public Opinion Strategies and the Mellman Group showing that while people desire public safety and criminal accountability, they also support sentencing and corrections reforms that reduce imprisonment, especially for non-violent offenders. In 2009, the National Institute of Corrections reported a Zogby International poll similarly showing that 87% of those contacted would support research-based alternatives to jail to reduce recidivism for non-violent persons.

Very little of this type of research had been done in the field of pretrial release and detention, but in 2013 Lake Research Partners released the results of a nationwide poll focusing on elements of the current pretrial reform movement. That research found "overwhelming support" for replacing a cash-based bonding system with risk-based screening tools. Moreover, that support was high among all demographics, including gender, age, political party identification, and region. Interestingly too, most persons polled were unaware of the current American situation, with only 36% of persons understanding that empirical risk assessment was not currently happening in most places.

**Sources and Resources:** *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems* (NIC, 2010); *Support for Risk Assessment Programs Nationwide* (Lake Research Partners 2013) found at http://www.pretrial.org/download/advocacy/Support%20for%20Risk%20Assessment%20Nationwide%20-%20Lake%20Research%20Partners.pdf. Public Opinion on Sentencing and Corrections Policy in America (Public Opinion Strategies/Mellman Group 2012) found at http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/PEW_NationalSurveyResearchPaper_FINAL.pdf;

---

All of this activity brings hope to a field that has recently been described as significantly limited in its research agenda and output. In 2011, the Summary Report to the National Symposium on Pretrial Justice listed four recommendations related to a national research agenda: (1) collect a comprehensive set of pretrial data needed to support analysis, research, and reform through the Bureau of Justice Statistics; (2) embark on comprehensive research that results in the identification of proven best pretrial practices through the National Institute of Justice; (3) develop and seek funding for research proposals relating to pretrial justice; and (4) prepare future practitioners and leaders to effectively address pretrial justice issues in a fair, safe, and effective manner.

In the wake of the Symposium, the Department of Justice's Office of Justice Programs (OJP) convened a Pretrial Justice Working Group, a standing, multidisciplinary group created to collaboratively address national challenges to moving toward pretrial reform. The Working Group, in turn, established a "Research Subcommittee," which was created to stimulate detailed pretrial data collection, increase quantitative and qualitative pretrial research, support existing OJP initiatives dealing with evidence-based practices in local justice systems, and develop pretrial justice courses of studies in academia. Due in part to that Subcommittee's purposeful focus, its members have begun a coordinated effort to identify pretrial research needs and to develop research projects designed specifically to meet those needs. Accordingly, across America, we are seeing great progress in both the interest and the output of pretrial research.

> *"Research is formalized curiosity. It is poking and prying with a purpose."*
>
> Zora Neale Hurston, 1942

However, there are many areas of the pretrial phase of a defendant's case that are in need of additional helpful research. For example, while Professor Doug Colbert has created groundbreaking and important research on the importance of defense attorneys at bail, and while the Kentucky Department of Public Advocacy has put that research into practice through a concentrated effort toward advancing pretrial advocacy, there is relatively little else on this very important topic. Similarly, other areas under the umbrella of pretrial reform, such as a police officer's decision to arrest or cite through a summons, the prosecutor's decision to charge, early decisions dealing with specialty courts, and diversion, suffer from a relative lack of empirical research. This is true in the legal field as well, as only a handful of scholars have recently begun to focus

again on fundamental legal principles or on how state laws can help or hinder our intent to follow evidence-based pretrial practices. In sum, there are still many questions that, if answered through research, would help guide us toward creating bail systems that are the most effective in maximizing release, public safety, and court appearance. Moreover, there exists today even a need to better compile, categorize, and disseminate the research that we do have. To that end, both the National Institute of Justice and the Pretrial Justice Institute have recently created comprehensive bibliographies on their websites.

## Current Research – Special Mention

One strand of current pretrial research warranting special mention, however, is research primarily focusing on one or both of the two following categories: (1) empirical risk assessment; and (2) the effect of release type on pretrial outcomes, including the more nuanced question of the effect of specific conditions of release on pretrial outcomes. The two topics are related, as often the data sets compiled to create empirical risk instruments contain the sort of data required to answer the questions concerning release type and conditions as well as the effects of conditional release or detention on risk itself. The more nuanced subset of how conditions of release affect pretrial outcomes can become quite complicated when we think about differential supervision strategies including questions of dosage, e.g., how much drug testing must we order (if any) to achieve the optimal pretrial court appearance and public safety rates?

## Empirical Risk Assessment Instruments

Researchers creating empirical pretrial risk assessment instruments take large amounts of defendant data and identify which specific factors are statistically related and how strongly they are related to defendant pretrial misconduct. Ever since the mid-20th century, primarily in response to the United States Supreme Court's opinion in *Stack v. Boyle,* states have enacted into their laws factors judges are supposed to consider in making a release or detention decision. For the most part, these factors were created using logic and later some research from the 1960s showing the value of community ties to the pretrial period. Unfortunately, however, little to no research existed to demonstrate which of the many enacted factors were actually predictive of pretrial misconduct and at what strength. Often, judges relied on one particular factor – the current charge or sometimes the charge and police affidavit – to make their decisions. Over the years, single jurisdictions, such as counties, occasionally created risk instruments

using generally accepted social science research methods, but their limited geographic influence and sometimes their lack of data from which to test multiple variables meant that research in this area spread slowly.

In 2003, however, Dr. Marie VanNostrand created the Virginia Pretrial Risk Assessment Instrument, most recently referred to by Dr. VanNostrand and others as simply the "Virginia Model," which was ultimately tested and validated in multiple Virginia jurisdictions and then deployed throughout the state. Soon after, other researchers developed other multi-jurisdictional risk instruments, including Kentucky, Ohio, Colorado, Florida, and the federal system, and now other American jurisdictions, including single counties, are working on similar instruments. Still others are "borrowing" existing instruments for use on local defendants while performing the process of validating them for their local population. Most recently, in November 2013, researchers sponsored by the Laura and John Arnold Foundation announced the creation of a "national" risk instrument, capable of accurately predicting pretrial risk (including risk of violent criminal activity) in virtually any American jurisdiction due to the extremely large database used to create it.

In its 2012 issue brief titled, *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants,* PJI and BJA summarize the typical risk instrument as follows:

> A pretrial risk assessment instrument is typically a one-page summary of the characteristics of an individual that presents a score corresponding to his or her likelihood to fail to appear in court or be rearrested prior to the completion of their current case. Instruments typically consist of 7-10 questions about the nature of the current offense, criminal history, and other stabilizing factors such as employment, residency, drug use, and mental health.
>
> Responses to the questions are weighted, based on data that shows how strongly each item is related to the risk of flight or rearrest during pretrial release. Then the answers are tallied to produce an overall risk score or level, which can inform the judge or other decisionmaker about the best course of action.[67]

---

[67] *Pretrial Risk Assessment 101: Science Provides Guidance on Managing Defendants* (PJI/BJA 2012) (internal footnote omitted).

Using a pretrial risk assessment instrument is an evidence-based practice, and to the extent that it helps judges with maximizing the release of bailable defendants and identifying those who can lawfully be detained, it is a legal and evidence-based practice. Nevertheless, it is a relatively new practice – it is too new for detailed discussion in the current ABA Criminal Justice Standards on Pretrial Release – and so the fast-paced research surrounding these instruments must be scrutinized and our shared knowledge constantly updated to provide for the best application of these powerful tools. In 2011, Dr. Cynthia Mamalian authored *The State of the Science of Pretrial Risk Assessment*, and noted many of the issues (including "methodological challenges") that surround the creation and implementation of these instruments.[68]

---

### Bail and the Aberrational Case

Social scientists primarily deal with aggregate patterns of behavior rather than with individual cases, but the latter is often what criminal justice professionals are used to. Cases that fall outside of a particular observable pattern might be called "outliers" or "aberrations" by social scientists and thus disregarded by the research that is most relevant to bail. Unfortunately, however, it is often these aberrational cases – typically those showing pretrial misbehavior – that drive public policy.

Thus, when making policy decisions about bail it is important for decision makers to embrace perspective by also studying aggregates. By looking at a problem from a distance, one can often see that the single episode that brought a particular case to the pretrial justice discussion table may not present the actual issue needing improvement. If the single case represents an aggregate pattern, however, or if that case illustrates some fundamental flaw in the system that demands correction, then that case may be worthy of further study.

In the aggregate, very few defendants misbehave while released pretrial (for example, the D.C. Pretrial Services Agency reports that in 2012, 89% of released defendants were arrest-free during their pretrial phase, and that only 1% of those arrested were for violent crimes; likewise, Kentucky reports a 92% public safety rate), and yet occasionally defendants will commit heinous crimes under all forms of supervision, including secured detention. In the aggregate, most people show up for court (again, D.C. Pretrial reports that 89% of defendants did not miss a single court date; likewise, Kentucky reports a 90% court appearance rate), and yet occasionally some high profile defendant will not appear, just as fifty may not show up for traffic court on the same day. In the aggregate, virtually all defendants will ultimately be released back into our communities and thus can be safely supervised within our communities while awaiting the disposition of

---

[68] *See* Cynthia A. Mamalian, *State of the Science of Pretrial Risk Assessment*, at 26 (PJI/BJA 2011).

their cases, and yet occasionally there are defendants who are so risky that they
must be detained.

**Sources and Resources:** Tara Boh Klute & Mark Heyerly, *Report on Impact of
House Bill 463: Outcomes, Challenges, and Recommendations* (KY Pretrial Servs.
2012); Michael G. Maxfield & Earl Babbie, Research Methods for Criminal Justice
and Criminology (Wadsworth, 6th ed. 2008); D.C. Pretrial statistics found at
http://www.psa.gov/.

Beyond those issues, however, is the somewhat under-discussed topic of what
these "risk-based" instruments mean for states that currently have entire bail
schemes created without pure notions of risk in mind. For example, many states
have preventive detention provisions in their constitutions denying the right to
bail for certain defendants, but often these provisions are tied primarily to the
current charge or the charge and some criminal precondition. The ability to
better recognize high-risk defendants, who perhaps should be detained but who,
because of their charge, are not detainable through the available "no bail"
process, has caused these states to begin re-thinking their bail schemes to better
incorporate risk. The general move from primarily a charge-and-resource-based
bail system to one based primarily on pretrial risk automatically raises questions
as to the adequacy of existing statutory and constitutional provisions.

## Effects of Release Types and Conditions on Pretrial Outcomes

The second category of current research – the effect of release type as well as the
effect of individual conditions on pretrial outcomes – continues to dominate
discussions about what is next in the field. Once we know a particular
defendant's risk profile, it is natural to ask "what works" to then mitigate that
risk. The research surrounding this topic is evolving rapidly. Indeed, during the
writing of this paper, the Pretrial Justice Institute released a rigorous study
indicating that release on a secured (money paid up front) bond does nothing for
public safety or court appearance compared to release on an unsecured (money
promised to be paid only if the defendant fails to appear) bond, but that secured
bonds have a significant impact on jail bed use through their tendency to detain
defendants pretrial. Likewise, in November 2013, the Laura and John Arnold
Foundation released its first of several research studies focusing on the impact of
pretrial supervision. Though admittedly lacking detail in important areas, that
study suggested that moderate and higher risk defendants who were supervised
were significantly more likely to show up for court than non-supervised
defendants.

In 2011, VanNostrand, Rose, and Weibrecht summarized the then-existing research behind a variety of release types, conditions, and differential supervision strategies, including court date notification, electronic monitoring, pretrial supervision and supervision with alternatives to detention, release types based on categories of bail bonds, and release guidelines, and that summary document, titled *State of the Science of Pretrial Release Recommendations and Supervision*, remains an important foundational resource for anyone focusing on the topic. Nevertheless, as the Pretrial Justice Institute explained in its conclusion to that report, we have far to go before we can confidently identify legal and evidence-based conditions and supervision methods:

> Great strides have been made in recent years to better inform [the pretrial release decision], both in terms of what is appropriate under the law and of what works according to the research, and to identify which supervision methods work best for which defendants.

> As this document demonstrates, however, there is still much that we do not know about what kinds of conditions are most effective. Moreover, as technologies advance to allow for the expansion of potential pretrial release conditions and the supervision of those conditions, we can anticipate that legislatures and courts will be called upon to define the limits of what is legally appropriate.[69]

## Application and Implications

Applying the research has been a major component of jurisdictions currently participating in the National Institute of Correction's (NIC's) Evidence-Based Decision Making Initiative, a collaborative project among the Center for Effective Public Policy, the Pretrial Justice Institute, the Justice Management Institute, and the Carey Group. The seven jurisdictions piloting the NIC's collaborative "Framework," which has been described as providing a "purpose and a process" for applying evidence-based decision making to all decision points in the justice system, are actively involved in applying research and evidence to real world issues with the aim toward reducing harm and victimization while maintaining certain core justice system values. Those Framework jurisdictions focusing on the

---

[69] Marie VanNostrand, Kenneth J. Rose, & Kimberly Weibrecht, *State of the Science of Pretrial Release Recommendations and Supervision*, at 42 (conclusion by PJI) (PJI/BJA 2011).

pretrial release and detention decision are learning first hand which areas have sufficient research to fully inform pretrial improvements and which areas have gaps in knowledge, thus signifying the need for more research. Their work will undoubtedly inform the advancement of pretrial research in the future.

Finally, the weaving of the law with the research into pretrial application has the potential to itself raise significantly complex issues. For example, if GPS monitoring is deemed by the research to be ineffective, is it not then excessive under the 8th Amendment? If a secured money condition does nothing for public safety or court appearance, is it not then irrational, and thus also a violation of a defendant's right to due process, for a judge to set it? If certain release conditions actually increase a lower risk defendant's chance of pretrial misbehavior, can imposing them ever be considered lawful? These questions, and others, will be the sorts of questions ultimately answered by future court opinions.

## What Does the Pretrial Research Tell Us?

Pretrial research is crucial for telling us what works to achieve the purposes of bail, which the law and history explain are to maximize release while simultaneously maximizing public safety and court appearance. All pretrial research informs, but the best research helps us to implement laws, policies, and practices that strive to achieve all three goals. Each generation of bail or pretrial reform has a body of research literature identifying areas in need of improvement and creating a meeting of minds surrounding potential solutions to pressing pretrial issues. This current generation is no different, as we see a growing body of literature illuminating poor laws, policies, and practices while also demonstrating evidence-based solutions that are gradually being implemented across the country.

Nevertheless, in the field of pretrial research there are still many areas requiring attention, including areas addressed in this chapter such as risk assessment, risk management, the effects of money bonds, cost/benefit analyses, impacts and effects of pretrial detention, and racial disparity as well as areas not necessarily addressed herein, such as money bail forfeitures, fugitive recovery, and basic data on misdemeanor cases.

Most of us are not research producers. We are, however, research consumers. Accordingly, to further the goal of pretrial justice we must understand how rapidly the research is evolving, continually update our knowledge base of relevant research, and yet weed out the research that is biased, flawed, or

otherwise unacceptable given our fundamental legal foundations. We must strive to understand the general direction of the pretrial research and recognize that a change in direction may require changes in laws, policies, and practices to keep up. Most importantly, we must continue to support pretrial research in all its forms, for it is pretrial research that advances the field.

**Additional Sources and Resources:** Steve Aos, Marna Miller, & Elizabeth Drake, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (WSIPP 2006); Earl Babbie & Lucia Benaquisto, *Fundamentals of Social Research: Second Canadian Edition* (Cengage Learning 2009); Bernard Botein, *The Manhattan Bail Project: Its Impact on Criminology and the Criminal Law Processes,* 43 Tex. L. Rev. 319 (1964-65); Kristin Bechtel, John Clark, Michael R. Jones, & David J. Levin, *Dispelling the Myths, What Policy Makers Need to Know About Pretrial Research* (PJI, 2012); John Clark, *A Framework for Implementing Evidence-Based Practices in Pretrial Services,* Topics in Cmty. Corr. (2008); Thomas H. Cohen & Tracey Kyckelhahn, *Felony Defendants in Large Urban Counties, 2006* (BJS 2010); Thomas Cohen & Tracey Kyckelhahn, *Data Advisory: State Court Processing Statistics Data Limitations* (BJS 2010); Elsa de Haas, *Antiquities of Bail: Origin and Historical Development in Criminal Cases to the Year 1275* (AMS Press, Inc., New York 1966); *Evidence-Based Practices in the Criminal Justice System (Annotated Bibliography)* (NIC updated 2013); Caleb Foote, *Compelling Appearance in Court: Administration of Bail in Philadelphia,* 102 Univ. of Pa. L. Rev. 1031 (1954); Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* (DOJ/Vera Found. 1964); Michael R. Jones, *Pretrial Performance Measurement: A Colorado Example of Going from the Ideal to Everyday Practice* (PJI 2013); Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (PJI Oct. 2013); *Laura and John Arnold Foundation Develops National Model for Pretrial Risk Assessments* (Nov. 2013) found at [http://www.arnoldfoundation.org/laura-and-john-arnold-foundation-develops-national-model-pretrial-risk-assessments](http://www.arnoldfoundation.org/laura-and-john-arnold-foundation-develops-national-model-pretrial-risk-assessments); Christopher T. Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes* (Laura & John Arnold Found. 2013); Christopher T. Lowenkamp, Marie VanNostrand, & Alexander Holsinger, *The Hidden Costs of Pretrial Detention* (Laura & John Arnold Found. 2013); Michael G. Maxfield & Earl Babbie, *Research Methods for Criminal Justice and Criminology* (Wadsworth, 6th ed. 2008); *National Conference on Bail and Criminal Justice, Proceedings and Interim Report* (Washington, D.C. 1965); *National Symposium on Pretrial Justice: Summary Report of Proceedings* (PJI/BJS 2011); Mary T. Phillips, *A Decade of Bail Research in*

*New York City* (N.Y. NYCCJA 2012); Roscoe Pound & Felix Frankfurter (Eds.), *Criminal Justice in Cleveland* (Cleveland Found. 1922); Marie VanNostrand, *Assessing Risk Among Pretrial Defendants In Virginia: The Virginia Pretrial Risk Assessment Instrument* (VA Dept. Crim. Just. Servs. 2003); Marie VanNostrand, *Legal and Evidence-Based Practices: Application of Legal Principles, Laws, and Research to the Field of Pretrial Services* (CJI/NIC 2007).

# Chapter 5: National Standards on Pretrial Release

Pretrial social science research tells us what works to further the goals of bail. History and the law tell us that the goals of bail are to maximize release while simultaneously maximizing public safety and court appearance, and the law provides a roadmap of how to constitutionally deny bail altogether through a transparent and fair detention process. If this knowledge was all that any particular jurisdiction had to use today, then its journey toward pretrial justice might be significantly more arduous than it really is. But it is not so arduous, primarily because we have national best practice standards on pretrial release and detention, which combine the research and the law (which is intertwined with history) to develop concrete recommendations on how to administer bail.

In the wake of the 1964 National Conference on Bail and Criminal Justice and the 1966 Federal Bail Reform Act, various organizations began issuing standards designed to address relevant pretrial release and detention issues at a national level. The American Bar Association (ABA) was first in 1968, followed by the National Advisory Committee on Criminal Justice, the National District Attorneys Association, and finally the National Association of Pretrial Services Agencies (NAPSA). The NAPSA Standards, in particular, provide important detailed provisions dealing with the purposes, roles, and functions of pretrial services agencies.

## The ABA Standards

Among these sets of standards, however, the ABA Standards stand out. Their preeminence is based, in part, on the fact that they "reflect[] a consensus of the views of representatives of all segments of the criminal justice system,"[70] which includes prosecutors, defense attorneys, academics, and judges, as well as various groups such as the National District Attorneys Association, the National Association of Criminal Defense Lawyers, the National Association of Attorneys General, the U.S. Department of Justice, the Justice Management Institute, and other notable pretrial scholars and pretrial agency professionals.

More significant, however, is the justice system's use of the ABA Criminal Justice Standards as important sources of authority. The ABA's Standards have been

---

[70] Martin Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence,* 23 Crim. Just. (Winter 2009).

either quoted or cited in more than 120 U.S. Supreme Court opinions, approximately 700 federal circuit court opinions, over 2,400 state supreme court opinions, and in more than 2,100 law journal articles. By 1979, most states had revised their statutes to implement some part of the Standards, and many courts had used the Standards to implement new court rules. According to Judge Martin Marcus, Chair of the ABA Criminal Justice Standards Committee, "[t]he Standards have also been implemented in a variety of criminal justice projects and experiments. Indeed, one of the reasons for creating a second edition of the Standards was an urge to assess the first edition in terms of the feedback from such experiments as pretrial release projects."[71]

> *"The Court similarly dismisses the fact that the police deception which it sanctions quite clearly violates the American Bar Association's Standards for Criminal Justice – Standards which the Chief Justice has described as 'the single most comprehensive and probably the most monumental undertaking in the field of criminal justice ever attempted by the American legal profession in our national history,' and which this Court frequently finds helpful."*
>
> *Moran v. Burbine*, 475 U.S. 412 (1986) (Stevens, J. dissenting)

The ABA's process for creating and updating the Standards is "lengthy and painstaking," but the Standards finally approved by the ABA House of Delegates (to become official policy of the 400,000 member association) "are the result of the considered judgment of prosecutors, defense lawyers, judges, and academics who have been deeply involved in the process, either individually or as representatives of their respective associations, and only after the Standards have been drafted and repeatedly revised on more than a dozen occasions, over three or more years."[72]

Best practices in the field of pretrial release are based on empirically sound social science research as well as on fundamental legal principles, and the ABA Standards use both to provide rationales for its recommendations. For example, in recommending that commercial sureties be abolished, the ABA relies on numerous critiques of the money bail system going back nearly 100 years, social science experiments, law review articles, and various state statutes providing for its abolition. In recommending a presumption of release on recognizance and

---

[71] *Id.* (internal quotation omitted).

[72] *Id.*

that money not be used to protect public safety, the ABA relies on United States Supreme Court opinions, findings from the Vera Foundation's Manhattan Bail Project, discussions from the 1964 Conference on Bail and Criminal Justice, Bureau of Justice Statistics data, as well as the *absence* of evidence, i.e., "the absence of any relationship between the ability of a defendant to post a financial bond and the risk that a defendant may pose to public safety."[73]

The ABA Standards provide recommendations spanning the entirety of the pretrial phase of the criminal case, from the decision to release on citation or summons, to accountability through punishment for pretrial failure. They are based, correctly, on a "bail/no bail" or "release/detain" model, designed to fully effectuate the release of bailable defendants while providing those denied bail with fair and transparent due process hearing prior to detention.

Drafters of the 2011 Summary Report to the National Symposium on Pretrial Justice recognized that certain fundamental features of an ideal pretrial justice system are the same features that have been a part of the ABA Standards since they were first published in 1968. And while that Report acknowledged that simply pointing to the Standards is not enough to change the customs and habits built over 100 years of a bail system dominated by secured money, charge versus risk, and profit, the Standards remain a singularly important resource for all pretrial practitioners. Indeed, given the comprehensive nature of the ABA Standards, jurisdictions can at least use them to initially identify potential areas for improvement by merely holding up existing policies, practices, and even laws to the various recommendations contained therein.

---

[73] *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007), Std. 10-5.3 (a) (commentary) at 111.

# Chapter 6: Pretrial Terms and Phrases

## The Importance of a Common Vocabulary

It is only after we know the history, the law, the research, and the national standards that we can fully understand the need for a common national vocabulary associated with bail. The Greek philosopher Socrates correctly stated that, "The beginning of wisdom is a definition of terms." After all, how can you begin to discuss society's great issues when the words that you apply to those issues elude substance and meaning? But beyond whatever individual virtue you may find in defining your own terms, the undeniable merit of this ancient quote fully surfaces when applied to dialogue with others. It is one thing to have formed your own working definition of the terms "danger" or "public safety," for example, but your idea of danger and public safety can certainly muddle a conversation if another person has defined the terms differently. This potential for confusion is readily apparent in the field of bail and pretrial justice, and it is the wise pretrial practitioner who seeks to minimize it.

Minimizing confusion is necessary because, as noted previously, bail is already complex, and the historically complicated nature of various terms and phrases relating to bail and pretrial release or detention only adds to that complexity, which can sometimes lead to misuse of those terms and phrases. Misuse, in turn, leads to unnecessary quibbling and distraction from fundamental issues in the administration of bail and pretrial justice. This distraction is multiplied when the definitions originate in legislatures (for example, by defining bail statutorily as an amount of money) or court opinions (for example, by articulating an improper or incomplete purpose of bail). Given the existing potential for confusion, avoiding further complication is also a primary reason for finding consensus on bail's basic terms and phrases.

As also noted previously, bail is a field that is changing rapidly. For nearly 1,500 years, the administration of bail went essentially unchanged, with accused persons obtaining pretrial freedom by pledging property or money, which, in turn, would be forfeited if those persons did not show up to court. By the late 1800s, however, bail in America had changed from the historical personal surety system to a commercial surety system, with the unfortunate consequence of solidifying money at bail while radically transforming money's use from a condition subsequent (i.e., using unsecured bonds) to a condition precedent (i.e.,

using secured bonds) to release. Within a mere 20 years after the introduction of the commercial surety system in America, researchers began documenting abuses and shortcomings associated with that system based on secured financial conditions. By the 1980s, America had undergone two generations of pretrial reform by creating alternatives to the for-profit bail bonding system, recognizing a second constitutionally valid purpose for the government to impose restrictions on pretrial freedom, and allowing for the lawful denial of bail altogether based on extreme risk. These are monumental changes in the field of pretrial justice, and they provide further justification for agreeing on basic definitions to keep up with these major developments.

Finally, bail is a topic of increasing interest to criminal justice researchers, and criminal justice research begins with conceptualizing and operationalizing terms in an effort to collect and analyze data with relevance to the field. For example, until we all agree on what "court appearance rates" mean, we will surely struggle to agree on adequate ways to measure them and, ultimately, to increase them. In the same way, as a field we must agree on the meaning and purpose of so basic a term as "bail."

More important than achieving simple consensus, however, is that we agree on meanings that reflect reality or truth. Indeed, if wisdom begins with a definition of terms, wisdom is significantly furthered when those definitions hold up to what is real. For too long, legislatures, courts, and various criminal justice practitioners have defined bail as an amount of money, but that is an error when held up to the totality of the law and practice through history. And for too long legislatures, courts, and criminal justice practitioners have said that the purpose of bail is to provide reasonable assurance of public safety and/or court appearance, but that, too, is an error when held up against the lenses of history and the law. Throughout history, the definition of "bail" has changed to reflect what we know about bail, and the time to agree on its correct meaning for this generation of pretrial reform is now upon us.

## The Meaning and Purpose of "Bail"

For the legal and historical reasons articulated above, bail should never be defined as money. Instead, bail is best defined in terms of release, and most appropriately as a process of conditional release. Moreover, the purpose of bail is not to provide reasonable assurance of court appearance and public safety – that is the province and purpose of conditions of bail or limitations on pretrial freedom. The purpose of bail, rather, is to effectuate and maximize release. There

is "bail" – i.e., a process of release – and there is "no bail," – a process of detention. Constitutionally speaking, "bail" should always outweigh "no bail" because, as the U.S. Supreme Court has explained, "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."[74]

Historically, the term bail derives from the French "baillier," which means to hand over, give, entrust, or deliver. It was a delivery, or bailment, of the accused to the surety – the jailer of the accused's own choosing – to avoid confinement in jail. Indeed, even until the 20th century, the surety himself or herself was often known as the "bail" – the person to whom the accused was delivered. Unfortunately, however, for centuries money was also a major part of the bail agreement. Because paying money was the primary promise underlying the release agreement, the coupling of "bail" and money meant that money slowly came to be equated with the release process itself. This is unfortunate, as money at bail has never been more than a condition of bail – a limitation on pretrial freedom that must be paid upon forfeiture of the bond agreement. But the coupling became especially misleading in America after the 1960s, when the country attempted to move away from its relatively recent adoption of a secured money bond and toward other methods for releasing defendants, such as release on recognizance and release on nonfinancial conditions.

Legally, bail as a process of release is the only definition that (1) effectuates American notions of liberty from even colonial times; (2) acknowledges the rationales for state deviations from more stringent English laws in crafting their constitutions (and the federal government in crafting the Northwest Territory Ordinance of 1787); and (3) naturally follows from various statements equating bail with release from the United States Supreme Court from *United States v. Barber*[75] and *Hudson v. Parker*,[76] to *Stack v. Boyle*[77]

---

[74] *United States v. Salerno*, 481 U.S. 739, 755 (1987).

[75] 140 U.S. 164, 167 (1891) ("[I]n criminal cases it is for the interest of the public as well as the accused that the latter should not be detained in custody prior to his trial if the government can be assured of his presence at that time . . . .").

[76] 156 U.S 277, 285 (1895) ("The statutes of the United States have been framed upon the theory that a person accused of a crime shall not, until he has been finally adjudged guilty . . . be absolutely compelled to undergo imprisonment or punishment, but may be admitted to bail . . . .").

[77] 342 U.S. 1, 4 (1951) ("[F]ederal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction . . . .").

and *United States v. Salerno*.[78]

Bail as a process of release accords not only with history and the law, but also with scholars' definitions (in 1927, Beeley defined bail as the release of a person from custody), the federal government's usage (calling bail a process in at least one document), and use by organizations such as the American Bar Association, which has quoted Black's Law Dictionary definition of bail as a "process by which a person is released from custody."[79] States with older (and likely outdated) bail statutes often still equate bail with money, but many states with newer provisions, such as Virginia (which defines bail as "the pretrial release of a person from custody upon those terms and conditions specified by order of an appropriate judicial officer"),[80] Colorado (which defines bail as security like a pledge or a promise, which can include release without money),[81] and Florida (which defines bail to include "any and all forms of pretrial release"[82]) have enacted statutory definitions to recognize bail as something more than simply money. Moreover, some states, such as Alaska,[83] Florida,[84] Connecticut,[85] and Wisconsin,[86] have constitutions explicitly incorporating the word "release" into their right-to-bail provisions.

> *"In general, the term 'bail' means the release of a person from custody upon the undertaking, with or without one or more persons for him, that he will abide the judgment and orders of the court in appearing and answering the charge against him. It is essentially a delivery or bailment of a person to his sureties—the jailers of his own choosing—so that he is placed in their friendly custody instead of remaining in jail."*
>
> Arthur Beeley, 1927

A broad definition of bail, such as "release from governmental custody" versus simply release from jail, is also appropriate to account for the recognition that

---

[78] 481 U.S. 739, 755 (1987) ("In our society, liberty is the norm . . . .").

[79] *Frequently Asked Questions About Pretrial Release Decision Making* (ABA 2012).

[80] Va. Code. § 19.2-119 (2013).

[81] Colo. Rev. Stat. § 16-1-104 (2013).

[82] Fla. Stat. § 903.011 (2013).

[83] Alaska Const. art. I, § 11.

[84] Fla. Const. art. I, § 14.

[85] Conn. Const. art. 1, § 8.

[86] Wis. Const. art. 1, § 8.

bail, as a process of conditional release prior to trial, includes many mechanisms – such as citation or "station house release" – that effectuate release apart from jails and that are rightfully considered in endeavors seeking to improve the bail process.

---

### The Media's Use of Bail Terms and Phrases

Much of what the public knows about bail comes from the media's use, and often misuse, of bail terms and phrases. A sentence from a newspaper story stating that "the defendant was released without bail," meaning perhaps that the defendant was released without a secured financial condition or on his or her own recognizance, is an improper use of the term "bail" (which itself means release) and can create unnecessary confusion surrounding efforts at pretrial reform. Likewise, stating that someone is being "held on $50,000 bail" not only misses the point of bail equaling release, but also equates money with the bail process itself, reinforcing the misunderstanding of money merely as a condition of bail – a limitation of pretrial freedom which, like all such limitations, must be assessed for legality and effectiveness in any particular case. For several reasons, the media continues to equate bail with money and tends to focus singularly on the amount of the financial condition (as opposed to any number of non-financial conditions) as a sort-of barometer of the justice system's sense of severity of the crime. Some of those reasons are directly related to faulty use of terms and phrases by the various states, which define terms differently from one another, and which occasionally define the same bail term differently at various places within a single statute.

In the wake of the 2011 National Symposium on Pretrial Justice, the Pretrial Justice Working Group created a Communications Subcommittee to, among other things, create a media campaign for public education purposes. To effectively educate the public, however, the Subcommittee recognized that some measure of media education also needed to take place. Accordingly, in 2012 the John Jay College Center on Media, Crime, and Justice, with support from the Public Welfare Foundation, held a symposium designed to educate members of the media and to help them identify and accurately report on bail and pretrial justice issues. Articles written by symposium fellows are listed as they are produced, and continue to demonstrate how bail education leads to more thorough and accurate coverage of pretrial issues.

**Sources and Resources:** John Jay College and Public Welfare Foundation Symposium resources, found at http://www.thecrimereport.org/conferences/past/2012-05-jailed-without-conviction-john-jaypublic-welfare-sym. Pretrial Justice Working Group website and materials, found at http://www.pretrial.org/infostop/pjwg/.

To say that bail is a process of release and that the purpose of bail is to maximize release is not completely new (researchers have long described an "effective" bail decision as maximizing or fostering release) and may seem to be only a subtle shift from current articulations of meaning and purpose. Nevertheless, these ideas have not taken a firm hold in the field. Moreover, certain consequences flow from whether or not the notions are articulated correctly. In Colorado, for example, where, until recently, the legislature incorrectly defined bail as an amount of money, bail insurance companies routinely said that the sole function of bail was court appearance (which only makes sense when bail and money are equated, for legally the only purpose of money was court appearance), and that the right to bail was the right merely to have an amount of money set – both equally untenable statements of the law. Generally speaking, when states define bail as money their bail statutes typically reflect the definition by overemphasizing money over all other conditions throughout the bail process. This, in turn, drives individual misperceptions about what the bail process is intended to do.

Likewise, when persons inaccurately mix statements of purpose for bail with statements of purpose for conditions of bail, the consequences can be equally misleading. For example, when judges inaccurately state that the purpose of bail is to protect public safety (again, public safety is a constitutionally valid purpose for any particular condition of bail or limitation of pretrial freedom, not for bail itself), those judges will likely find easy justification for imposing unattainable conditions leading to pretrial detention – for many, the safest pretrial option available. When the purpose of bail is thought to be public safety, then the emphasis will be on public safety, which may skew decisionmakers toward conditions that lead to unnecessary pretrial detention. However, when the purpose focuses on release, the emphasis will be on pretrial freedom with conditions set to provide a reasonable assurance, and not absolute assurance, of court appearance and public safety.

Thus, bail defined as a process of release places an emphasis on pretrial release and bail conditions that are attainable at least in equal measure to their effect on court appearance and public safety. In a country, such as ours, where bail may be constitutionally denied, a focus on bail as release when the right to bail is granted is crucial to following *Salerno's* admonition that pretrial liberty be our nation's norm. Likewise, by correctly stating that the purpose of any particular bail condition or limitation on pretrial freedom is tied to the constitutionally valid rationales of public safety and court appearance, the focus is on the particular

condition – such as GPS monitoring or drug testing – and its legality and efficacy in providing reasonable assurance of the desired outcome.

## Other Terms and Phrases

There are other terms and phrases with equal need for accurate national uniformity. For example, many states define the word "bond" differently, sometimes describing it in terms of one particular type of bail release or condition, such as through a commercial surety. A bond, however, occurs whenever the defendant forges an agreement with the court, and can include an additional surety, or not, depending on that agreement. Prior definitions – and thus categories of bail bonds – have focused primarily on whether or how those categories employ money as a limitation on pretrial freedom, thus making those definitions outdated. Future use of the term bond should recognize that money is only one of many possible conditions, and, in light of legal and evidence-based practices, should take a decidedly less important role in the agreement forged between a defendant and the court. Accordingly, instead of describing a release by using terms such as "surety bond," "ten percent bond," or "personal recognizance bond," pretrial practitioners should focus first on release or detention, and secondarily address conditions (for release is always conditional) of the release agreement.

Other misused terms include: "pretrial" and "pretrial services," which are often inaccurately used as a shorthand method to describe pretrial services agencies and/or programs instead of their more appropriate use as (1) a period of time, and (2) the actual services provided by the pretrial agency or program; "court appearance rates" (and, concomitantly, "failure to appear rates") which is defined in various ways by various jurisdictions; "the right to bail," "public safety," "sureties" or "sufficient sureties," and "integrity of the judicial process." There have been attempts at creating pretrial glossaries designed to bring national uniformity to these terms and phrases, but acceptance of the changes in usage has been fairly limited. Until that uniformity is reached, however, jurisdictions should at least recognize the extreme variations in definitions of terms and phrases, question whether their current definitions follow from a study of bail history, law, and research, and be open to at least discussing the possibility of changing those terms and phrases that are misleading or otherwise in need of reform.

**Additional Sources and Resources:** Black's Law Dictionary (9ᵗʰ ed. 2009); *Criminal Bail: How Bail Reform is Working in Selected District Courts*, U.S. GAO Report to the Subcomm. on Courts, Civ. Liberties, and the Admin. of Justice (1987); Bryan A. Garner, A Dictionary of Modern Legal Usage (Oxford Univ. Press, 3rd ed. 1995); Timothy R. Schnacke, Michael R. Jones, & Claire M. B. Brooker, *Glossary of Terms and Phrases Relating to Bail and the Pretrial Release or Detention Decision* (PJI 2011) (currently available electronically on the PJI website).

# Chapter 7: Application – Guidelines for Pretrial Reform

In a recent op-ed piece for *The Crime Report,* Timothy Murray, then Executive Director of the Pretrial Justice Institute, stated that "the cash-based model [relying primarily on secured bonds] represents a tiered system of justice based on personal wealth, rather than risk, and is in desperate need of reform."[87] In fact, from what we know about the history of bail, because a system of pretrial release and detention based on secured bonds administered primarily through commercial sureties causes abuses to both the "bail" and "no bail" sides of our current dichotomy, reform is not only necessary – it is ultimately inevitable. But how should we marshal our resources to best accomplish reform? How can we facilitate reform across the entire country? What can we do to fully understand pretrial risk, and to fortify our political will to embrace it? And how can we enact and implement laws, policies, and practices aiming at reform so that the resulting cultural change will actually become firmly fixed?

## Individual Action Leading to Comprehensive Cultural Change

The answers to these questions are complex because every person working in or around the pretrial field has varying job responsibilities, legal boundaries, and, presumably, influence over others. Nevertheless, pretrial reform in America requires all persons – from entry-level line officers and pretrial services case workers to chief justices and governors – to embrace and promote improvements within their spheres of influence while continually motivating others outside of those spheres to reach the common goal of achieving a meaningful top to bottom (or bottom to top) cultural change. The common goal is collaborative, comprehensive improvement toward maximizing release, public safety, and court appearance through the use of legal and evidence-based practices, but we will only reach that goal through individual action.

---

[87] Timothy Murray, *Why the Bail Bond System Needs Reform,* The Crime Report (Nov. 19, 2013) found at http://www.thecrimereport.org/viewpoints/2013-11-why-the-bail-bond-system-needs-reform

Individual Decisions

Individual action, in turn, starts with individual decisions. First, every person working in the field must decide whether pretrial improvements are even necessary. It is this author's impression, along with numerous national and local organizations and entities, that improvements are indeed necessary, and that the typical reasons given to keep the customary yet damaging practices based on a primarily money-based bail system are insufficient to reject the national movement toward meaningful pretrial reform. The second decision is to resolve to educate oneself thoroughly in bail and to make the necessary improvements by following the research, wherever that research goes and so long as it does not interfere with fundamental legal foundations. Essentially, the second decision is to follow a legal and evidence-based decision making model for pretrial improvement. By following that model, persons (or whole jurisdictions working collaboratively) will quickly learn (1) which particular pretrial justice issues are most pressing and in need of immediate improvement, (2) which can be addressed in the longer term, and (3) which require no action at all.

Third, each person must decide how to implement improvements designed to address the issues. This decision is naturally limited by the person's particular job and sphere of influence, but those limitations should not stop individual action altogether. Instead, the limitations should serve merely as motivation to recruit others outside of each person's sphere to join in a larger collaborative process. Fourth and finally, each person must make a decision to ensure those improvements "stick" by using proven implementation techniques designed to promote the comprehensive and lasting use of a research-based improvement.

Learning about improvements to the pretrial process also involves learning the nuances that make one's particular jurisdiction unique in terms of how much pretrial reform is needed. If, for example, in one single (and wildly hypothetical) act, the federal government enacted a provision requiring the states to assure that no amount of money could result in the pretrial detention of any particular defendant – a line that is a currently a crucial part of both the federal and District of Columbia bail statutes – some states would be thrust immediately into perceived chaos as their constitutions and statutes practically force bail practices that include setting high amounts of money to detain high-risk yet bailable defendants pretrial. Other states, however, might be only mildly inconvenienced, as their constitutions and statutes allow for a fairly robust preventive detention process that is simply unused. Still others might recognize that their preventive detention provisions are somewhat archaic because they rely primarily on

charge-based versus risk-based distinctions. Knowing where one's jurisdiction fits comparatively on the continuum of pretrial reform needs can be especially helpful when crafting solutions to pretrial problems. Some states underutilize citations and summonses, but others have enacted statutory changes to encourage using them more. Some jurisdictions rely heavily on money bond schedules, but some have eliminated them entirely. There is value in knowing all of this.

## Individual Roles

The process of individual decision making and action will look different depending on the person and his or her role in the pretrial process. For a pretrial services assessment officer, for example, it will mean learning everything available about the history, fundamental legal foundations, research, national standards, and terms and phrases, and then holding up his or her current practices against that knowledge to perhaps make changes to risk assessment and supervision methods. Despite having little control over the legal parameters, it is nonetheless important for each officer to understand the fundamentals so that he or she can say, for example, "Yes, I know that bail should mean release and so I understand that our statute, which defines bail as money, has provisions that can be a hindrance to certain evidence-based pretrial practices. Nevertheless, I will continue to pursue those practices within the confines of current law while explaining to others operating in other jobs and with other spheres of influence how amending the statute can help us move forward." This type of reform effort – a bottom to top effort – is happening in numerous local jurisdictions across America.

> *"Once you make a decision, the universe conspires to make it happen."*
>
> Ralph Waldo Emerson

For governors or legislators, it will mean learning everything available about the history, legal foundations, research, national standards, and terms and phrases, and then also holding up the state's constitution and statutes against that knowledge to perhaps make changes to the laws to better promote evidence-based practices. It is particularly important for these leaders to know the fundamentals and variances across America so that each can say, for example, "I now understand that our constitutional provisions and bail statutes are somewhat outdated, and thus a hindrance to legal and evidence-based practices

designed to fully effectuate the bail/no bail dichotomy that is already technically a part of our state bail system. I will therefore begin working with state leaders to pursue the knowledge necessary to make statewide improvements to bail and pretrial justice so that our laws will align with broad legal and evidence-based pretrial principles and therefore facilitate straightforward application to individual cases." This type of reform effort – a top to bottom effort – is also happening in America, in states such as New York, New Jersey, Delaware, and Kentucky.

Everyone has a role to play in pretrial justice, and every role is important to the overall effort. Police officers should question whether their jurisdiction uses objective pretrial risk assessment and whether it has and uses fair and transparent preventive detention (as the International Chiefs of Police/PJI/Public Welfare Foundation's Pretrial Justice Reform Initiative asks them to do), but they should also question their own citation policies as well as the utility of asking for arbitrary money amounts on warrants. Prosecutors should continue to advocate support for pretrial services agencies or others using validated risk assessments (as the Association of Prosecuting Attorneys policy statement urges them to do), but they should also question their initial case screening policies as well as whether justice is served through asking for secured financial conditions for any particular bond at first appearance. Defense attorneys, jail administrators, sheriffs and sheriff's deputies, city and county officials, state legislators, researchers and academics, persons in philanthropies, and others should strive individually to actively implement the various policy statements and recommendations that are already a part of the pretrial justice literature, and to question those parts of the pretrial system seemingly neglected by others.

Everyone has a part to play in pretrial justice, and it means individually deciding to improve, learning what improvements are necessary, and then implementing legal and evidence-based practices to further the goals of bail. Nevertheless, while informed individual action is crucial, it is also only a means to the end of a comprehensive collaborative culture change. In this generation of pretrial reform, the most successful improvement efforts have come about when governors and legislators have sat at the same table as pretrial services officers (and everyone else) to learn about bail improvements and then to find comprehensive solutions to problems that are likely insoluble through individual effort alone.

## Collaboration and Pretrial Justice

In a complicated justice system made up of multiple agencies at different levels of government, purposeful collaboration can create a powerful mechanism for discussing and implementing criminal justice system improvements. Indeed, in the National Institute of Corrections document titled *A Framework for Evidence-Based Decision Making in Local Criminal Justice Systems*, the authors call collaboration a "key ingredient" of an evidence-based system, which uses research to achieve system goals.

Like other areas in criminal justice, bail and pretrial improvements affect many persons and entities, making collaboration between system actors and decision makers a crucial part of an effective reform strategy. Across the country, local criminal justice coordinating committees (CJCCs) are demonstrating the value of coming together with a formalized policy planning process to reach system goals, and some of the most effective pretrial justice strategies have come from jurisdictions working through these CJCCs. Collaboration allows individuals with naturally limited spheres of influence to interact and achieve group solutions to problems that are likely insoluble through individual efforts. Moreover, through staff and other resources, CJCCs often provide the best mechanisms for ensuring the uptake of research so that full implementation of legal and evidence-based practices will succeed.

The National Institute of Corrections currently publishes two documents designed to help communities create and sustain CJCCs. The first, Robert Cushman's *Guidelines for Developing a Criminal Justice Coordinating Committee* (2002), highlights the need for system coordination, explains a model for a planning and coordination framework, and describes mechanisms designed to move jurisdictions to an "ideal" CJCC. The second, Dr. Michael Jones's *Guidelines for Staffing a Criminal Justice Coordinating Committee* (2012), explains the need and advantages of CJCC staff and how that staff can help collect, digest, and synthesize research for use by criminal justice decision makers.



Judicial Leadership

Finally, while everyone has a role and a responsibility, judges must be singled out as being absolutely critical for achieving pretrial justice in America. Bail is a judicial function, and the history of bail in America has consistently demonstrated that judicial participation will likely mean the difference between pretrial improvement and pretrial stagnation. Indeed, the history of bail is replete with examples of individuals who attempted and yet failed to make pretrial improvements because those changes affected only one or two of the three goals associated with evidence-based decision making at bail, and they lacked sufficient judicial input on the three together. Judges alone are the individuals who must ensure that the balance of bail – maximizing release (through an understanding of a defendant's constitutional rights) while simultaneously maximizing public safety and court appearance (through an understanding of the constitutionally valid purposes of limiting pretrial freedom, albeit tempered by certain fundamental legal foundations such as due process, equal protection, and excessiveness, combined with evidence-based pretrial practices) – is properly maintained. Moreover, because the judicial decision to release or detain any particular defendant is the crux of the administration of bail, whatever improvements we make to other parts of the pretrial process are likely to stall if judges do not fully participate in the process of pretrial reform. Finally, judges are in the best position to understand risk, to communicate that understanding to others, and to demonstrate daily the political will to embrace the risk that is inherent in bail as a fundamental precept of our American system of justice.

Indeed, this generation of bail reform needs more than mere participation by judges; this generation needs judicial leadership. Judges should be organizing and directing pretrial conferences, not simply attending them. Judges should be educating the justice system and the public, including the media, about the right to bail, the presumption of innocence, due process, and equal protection, not the other way around.

Fortunately, American judges are currently poised to take a more active leadership role in making the necessary changes to our current system of bail. In February of 2013, the Conference of Chief Justices, made up of the highest judicial officials of the fifty states, the District of Columbia, and the various American territories, approved a resolution endorsing certain fundamental

recommendations surrounding legal and evidence-based improvements to the administration of bail. Additionally, the National Judicial College has conducted focus groups with judges designed to identify opportunities for improvement. Moreover, along with the Pretrial Justice Institute and the Bureau of Justice Assistance, the College has created a teaching curriculum to train judges on legal and evidence-based pretrial decision making. Judges thus need only to avail themselves of these resources, learn the fundamentals surrounding legal and evidence-based pretrial practice, and then ask how to effectuate the Chief Justice Resolution in their particular state.

The Chief Justice Resolution should also serve as a reminder that all types of pretrial reform include both an evidentiary and a policy/legal component – hence the term legal and evidence-based practices. Indeed, attempts to increase the use of evidence or research-based practices without engaging the criminal justice system and the general public in the legal and policy justifications and parameters for those practices may lead to failure. For example, research-based risk assessment, by itself, can be beneficial to any jurisdiction, but only if implementing it involves a parallel discussion of the legal parameters for embracing and then mitigating risk, the need to avoid other practices that undermine the benefits of assessment, and the pitfalls of attempting to fully incorporate risk into a state legal scheme that is unable to adequately accommodate it. On the other hand, increasing the use of unsecured financial conditions, coupled with a discussion of how research has shown that those conditions can increase release without significant decreases in court appearance and public safety – the three major legal purposes underlying the bail decision – can move a jurisdiction closer to model bail practices that, among other things, ensure bailable defendants who are ordered release are actually released.

**Additional Sources and Resources:** Association of Prosecuting Attorneys, *Policy Statement on Pretrial Justice* (2012) found at http://www.apainc.org/html/APA+Pretrial+Policy+Statement.pdf. Conference of Chief Justices Resolution 3: *Endorsing the Conference of State Court Administrators Policy Paper on Evidence-Based Pretrial* Release (2013), found at http://www.pretrial.org/wp-content/uploads/2013/05/CCJ-Resolution-on-Pretrial.pdf; William F. Dressell & Barry Mahoney, *Pretrial Justice in Criminal Cases: Judges' Perspectives on Key Issues and Opportunities for Improvement* (Nat'l. Jud. College 2013); *Effective Pretrial Decision Making: A Model Curriculum for Judges* (BJA/PJI/Nat'l Jud. Coll. (2013) http://www.pretrial.org/download/infostop/Judicial%20Training.pdf; Dean L. Fixsen, Sandra F. Naoom, Karen A. Blase, Robert M. Friedman, and Frances Wallace, *Implementation Research: A Synthesis of the Literature* (Univ. S. Fla. 2005); International Chiefs of Police Pretrial Justice Reform Initiative, found at http://www.theiacp.org/Pretrial-Justice-Reform-Initiative.

# Conclusion

Legal and evidence-based pretrial practices, derived from knowing the history of bail, legal foundations, and social science pretrial research, and expressed as recommendations in the national best practice standards, point overwhelmingly toward the need for pretrial improvements. Fortunately, in this third generation of American bail reform, we have amassed the knowledge necessary to implement pretrial improvements across the country, no matter how daunting or complex any particular state believes that implementation process to be. Whether the improvements are minor, such as adding an evidence-based supervision technique to an existing array of techniques, or major, such as drafting new constitutional language to allow for the fair and transparent detention of high-risk defendants without the need for money bail, the only real prerequisites to reform are education and action. This paper is designed to further the process of bail education with the hope that it will lead to informed action.

As a prerequisite to national reform, however, that bail education must be uniform. Accordingly, achieving pretrial justice in America requires everyone both inside and outside of the field to agree on certain fundamentals, such as the history of bail, the legal foundations, the importance of the research and national standards, and substantive terms and phrases. This includes agreeing on the meaning and purpose of the word "bail" itself, which has gradually evolved into a word that often is used to mean anything but its historical and legal connotation of release. Fully understanding these fundamentals of bail is paramount to overcoming our national amnesia of a system of bail that worked for centuries in England and America – an unsecured personal surety system in which bailable defendants were released, in which non-bailable defendants were detained, and in which no profit was allowed.

> *"A sound pretrial infrastructure is not just a desirable goal – it is vital to the legitimate system of government and to safer communities."*
>
> Deputy Attorney General James M. Cole (2011).

Moreover, while we have learned much from the action generated by purely local pretrial improvement projects, we must not forget the enormous need for pretrial justice across the entire country. We must thus remain mindful that meaningful American bail reform will come about only when entire American

states focus on these important issues. Anything less than an entire state's complete commitment to examine all pretrial practices across jurisdictions and levels of government – by following the research from all relevant disciplines – means that any particular pretrial practitioner's foremost duty is to continue communicating the need for reform until that complete commitment is achieved. American pretrial justice ultimately depends on reaching a tipping point among the states, which can occur only when enough states have shown that major pretrial improvements are necessary and feasible.

In 1964, Robert Kennedy stated the following:

> [O]ur present bail system inflicts hardship on defendants and it inflicts considerable financial cost on society. Such cruelty and cost should not be tolerated in any event. But when they are *needless*, then we must ask ourselves why we have not developed a remedy long ago. For it is clear that the cruelty and cost of the bail system *are* needless.[88]

Fifty years later, this stark assessment remains largely true, and yet we now have significant reason for hope that this third generation of bail reform will be America's last. For in the last 50 years, we have accumulated the knowledge necessary to replace, once and for all, this "cruel and costly" system with one that represents safe, fair, and effective administration of pretrial release and detention. We have amassed a body of research literature, of best practice standards, and of experiences from model jurisdictions that together have created both public and criminal justice system discomfort with the status quo. It is a body of knowledge that points in a single direction toward effective, evidence-based pretrial practices, and away from arbitrary, irrational, and customary practices, such as the casual use of money. We now have the information necessary to recognize and fully understand the paradox of bail. We know what to do, and how to do it. We need only to act.

---

[88] Attorney General Robert F. Kennedy, Testimony on Bail Legislation Before the Subcommittee on Constitutional Rights and Improvements in the Judicial Machinery of the Senate Judiciary Committee 4 (Aug. 4, 1964) (emphasis in original) *available at* http://www.justice.gov/ag/rfkspeeches/1964/08-04-1964.pdf.

Exhibit 2

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



Bureau of Justice Statistics

# DATA ADVISORY

MARCH 2010

## State Court Processing Statistics Data Limitations

For 22 years the Bureau of Justice Statistics (BJS) has supported the State Court Processing Statistics (SCPS) project—a statistical series describing the characteristics of felony defendants and the processing of their cases by state courts. The SCPS data are routinely used by pretrial practitioners, bail bondsmen, criminal justice policymakers, district attorneys, state courts, lawmakers, academics, journalists, and members of the public. Inherent in the SCPS design are a number of limitations in the uses and capabilities of these data. In particular, the following limitations must be considered when analyzing SCPS data, drawing any conclusions based on the data, and citing BJS reports.

### LIMITATIONS

**SCPS data are insufficient to explain causal associations between the patterns reported.**

BJS reports and analyses describe patterns associated with case processing, such as misconduct during pretrial release. However, the data are insufficient to explain causal associations between the patterns reported, such as the efficacy of one form of pretrial release over another. To understand whether one form of pretrial release is more effective than others, it would be necessary to collect information relevant to the pretrial release decision and factors associated with individual misconduct. Some of the relevant factors include a defendant's community ties, employment status, income, educational background, drug abuse history, and mental health status. For reasons related to cost and data accessibility, these measures are not currently collected in SCPS.

**Evaluative statements about the effectiveness of a particular program in preventing pretrial misconduct may be misleading.**

BJS does not support the use of SCPS data for such evaluative statements. Detailed measures of pretrial monitoring practices are critical to any evaluation of the efficacy of a pretrial release program. SCPS does not have the capacity to distinguish highly functioning pretrial diversionary programs from those operating under limited staffing and budgetary constraints. Also, SCPS cannot distinguish defendants released under conditions that involve intensive pretrial monitoring from defendants released under less stringent pretrial conditions. Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading. BJS does not support such use of these data.

**The potential for misconduct is only one of many factors that jurisdictions consider in developing and implementing pretrial release policies.**

Many complex issues are involved in determining a jurisdiction's policy for release or detention of the criminally accused and the best method for releasing defendants.  State and local officials consider an array of interrelated factors when developing and implementing pretrial release policies, including jail overcrowding, pretrial incarceration of individuals accused of minor offenses, the utility of pretrial risk assessments, and the capacity of pretrial diversion programs. BJS reports and SCPS data, as currently collected, cannot be used to evaluate such factors.

## RELATED BJS REPORTS

BJS reports based on SCPS data routinely describe the limitations of the data and factors that must be considered when analyzing SCPS. A full list of SCPS products can be found at http://bjs.ojp.usdoj.gov/index.cfm?ty=dcdetail&iid=282, and include:

Felony Defendants in Large Urban Counties, 2004
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=891

Felony Defendants in Large Urban Counties, 2002
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=896

Felony Defendants in Large Urban Counties, 2000
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=897

Felony Defendants in Large Urban Counties, 1998
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=899

Juvenile Felony Defendants in Criminal Courts: Surveyof 40 Counties, 1998
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=1039

Pretrial Release of Felony Defendants in State Courts, 1990–2004
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=834

Pretrial Release of Felony Defendants, 1992: National Pretrial Reporting Program
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=835

Violent Felons in Large Urban Counties
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=596

## SCPS DATA COLLECTION MANAGERS

Thomas Cohen,  Statistician, BJS,
thomas.cohen@usdoj.gov

Tracey Kyckelhahn, Statistician, BJS
tracey.kyckelhahn@usdoj.gov



Exhibit 3



# DISPELLING THE MYTHS: WHAT POLICY MAKERS NEED TO KNOW ABOUT PRETRIAL RESEARCH

**Kristin Bechtel, M.S.**

**John Clark**

**Michael R. Jones, Ph.D.**

**and**

**David J. Levin, Ph.D.**

November 2012

*This project was supported by Grant No. 2010-DB-BX-K034 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, the Community Capacity Development Office, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Points of view or opinions in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.*

## INTRODUCTION

The for-profit bail bonding industry has relied upon several recent studies to make the claim that commercial surety bonds are the most effective type of pretrial release. This paper provides an overview of those studies and explains why they cannot be used for this purpose because they do not answer questions about the effectiveness of any one type of pretrial release over that of others. This paper also cautions policy makers when the for-profit bail bonding industry presents them with these studies, and concludes that researchers should engage in objective and methodologically sound research that informs cost-effective and evidence-based pretrial public policy.

## BACKGROUND

Historically, jail populations in this country were evenly divided between pretrial and sentenced inmates. Beginning in 1996, however, the number of pretrial inmates in local jails started growing at a much faster pace than sentenced inmates, despite falling crime rates. Currently, 61% of inmates have not been convicted, compared to 39% who are serving sentences (Minton, 2012). This shift has resulted in a dramatic change in how jails are being used today.

One major policy shift corresponding with the rise in the pretrial detainee population has been the increase in the use of secured money bonds. When a person is arrested, the court can release the defendant with non-financial conditions or set a secured money bond that must be posted before the defendant can be released. Existing laws in most states establish a presumption of release on the least restrictive conditions necessary to reasonably assure the safety of the community and a defendant's appearance in court. Those laws also identify non-financial release options as being the least restrictive and secured money bonds being more restrictive. Despite these presumptions, historically secured money bonds have been used in the majority of cases, and its use has been on the rise. In 1990, money bonds were set in 53% of felony cases. By 2006, that figure had jumped to 70%. As the use of secured money bonds has



**Jail Population at Midyear by Status**

Pretrial Detainee Population — Sentenced Population

increased, pretrial release rates have gone down. In 1990, 65% of felony defendants were released while awaiting trial compared to 58% in 2006 (Cohen & Reaves, 2007; Cohen & Kyckelhahn, 2010).

The practice of using money to decide which defendants are released pretrial has played a significant role in contributing to the mass incarceration phenomena that has swept the nation for the past three decades. Research dating back 50 years has consistently shown that pretrial detention increases post-conviction incarceration (Rankin, 1964; Wald, 1972; Landes, 1974; Zeisel, 1979; Goldkamp, 1979; Clarke & Kurtz, 1983; Gottfredson & Gottfredson, 1988; Phillips, 2007; Phillips, 2008). These studies show that defendants detained in jail while awaiting trial plead guilty more often, are convicted more often, are sentenced to prison more often, and receive harsher prison sentences than those who are released during the pretrial period. These findings hold true when controlling for other factors, such as current charge, prior criminal history, and ties to the community. As one of these studies noted, "Although no statistical study can prove causality, the findings of this research are fully consistent with the argument that something about detention (awaiting trial) itself leads to harsher outcomes" (Phillips, 2007).

Since the early 2000s, stakeholders who work in or with the criminal justice system have increased their attention to the pretrial part of the system.[1] Judges, prosecutors, defense attorneys, law enforcement, jail officials, victims' advocates, pretrial services programs, researchers, grantors, foundations, and national professional organizations have been working to determine the most legal, research-based, and cost-effective way to further the purpose of bail: to maximize the release of defendants on the least restrictive conditions that reasonably assure the safety of the public and defendants' appearance in court (American Bar Association, 2007).

In the quest for such improvement, one question frequently arises: What data and research exist to show which type of pretrial release is the most cost effective for government? That is, which release type maximizes the probability of both public safety (as measured by defendants not picking up new charges during pretrial release) and defendants making their court appearances while maximizing pretrial release?[2] Indeed, long-time experts in the pretrial field developed a simple but comprehensive "effectiveness" formula to assess jurisdictions' pretrial release practices. An effective pretrial release occurs when a defendant is released from jail, does not commit a new crime, and makes all court appearances (Goldkamp et al., 1995). Thus, this formula evaluates the effectiveness of the pretrial process by

---

1 Schnacke et al. make the case that the American criminal justice system began a third wave of bail reform beginning in the early 2000s. The first wave began in the 1960s and the second wave began in the 1980s. For a description of these reform efforts, refer to two publications: Goldkamp, J. S. (1993). *Judicial Responsibility for Pretrial Release Decisionmaking and the Information Role of Pretrial Services*, 57 Fed. Probation 28, 34 n.3; and Schnacke, T. R., Jones, M. R., & Brooker, C. M. B., & (2011). *The Third Generation of Bail Reform. DULR Online, the Online Supplement to the Denver University Law Review*. Denver, CO: University of Denver Sturm College of Law.

2 Similar research limitations have been noted for other important criminal justice topics, such as the death penalty. Apart from the moral arguments, top criminal justice researchers have concluded that the science shows no evidence that the death penalty deters homicide more than other penalties (e.g., life in prison) do, even though some death penalty proponents continue to make this claim. See Nagin, D. S., & Pepper, J. V. (Eds.). (2012). *Deterrence and the Death Penalty*. Washington, DC: The National Academies Press.

including metrics for all three important factors: release from custody, public safety, and court appearance. This formula is more valid for evaluating the effectiveness of any type of pretrial release than are formulas that consider only one or two of these factors, because this formula includes both cost and effectiveness components and it comports closely with U.S. Supreme Court case law[3] and the American Bar Association's national pretrial standards.[4]

A few researchers (e.g., Helland and Tabarrok, 2004; Block, 2005; Krahl, 2009) have published studies in recent years in an attempt to determine the most effective pretrial release types. For-profit bail bondsmen and/or insurance company lobbyists have distributed copies of these studies, often accompanied with their own interpretations, to policy-makers involved in local or state pretrial improvement efforts. They have claimed that these studies provide empirical evidence that for-profit bail bonding is more cost-effective than other types of pretrial release, such as recognizance or supervision by a pretrial services agency.[5]

## THE BUREAU OF JUSTICE STATISTICS' DATA ADVISORY

Several of the studies that the for-profit bail bonding industry has been citing as evidence of the surety bonds' effectiveness are based on the State Court Processing Statistics (SCPS) Project of the Bureau of Justice Statistics (BJS) of the U.S. Department of Justice (Cohen & Reaves, 2007). The SCPS project has collected data on felony case processing in 40 of the 75 largest counties in the country every other year since 1988. Included in the data are whether the defendant was released during the pretrial period and by what type (e.g., personal recognizance, surety bond), and whether the defendant was arrested on a new charge or failed to appear in court.

The bonding industry's claims based on the SCPS data became so widespread that BJS was compelled to take the unusual and unprecedented step of issuing a "Data Advisory" (Cohen & Kyckelhahn, 2010). The Advisory states that the following three limitations must be considered when using the SCPS data in research, drawing conclusions from studies that use these data, and in citing BJS reports:

---

3 See, for example, Chief Justice Rehnquist's statement in *U.S. v. Salerno* that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." 481 U.S. at 755 (1987).

4 See American Bar Association Standards for Criminal Justice, Third Edition, Pretrial Release, (2007), Standards 10-1.1 and 10-1.6.

5  Courts have a range of legally permissible pretrial release or bonding options, such as release on recognizance or citation, unsecured bond, full cash bond, property bond, deposit bond, surety bond, conditional bond, and emergency releases. For definitions of these release types, see Cohen & Reaves, 2007, p. 3.

4

## Limitation 1

- SCPS data are insufficient to explain causal associations between the patterns reported.

In explaining this statement, the Data Advisory states:

> BJS reports and analyses describe patterns associated with case processing, such as misconduct during pretrial release. However, the data are insufficient to explain causal associations between the patterns reported, such as the efficacy of one form of pretrial release over another. To understand whether one form of pretrial release is more effective than others, it would be necessary to collect information relevant to the pretrial release decision and factors associated with individual misconduct. Some of the relevant factors include a defendant's community ties, employment status,



income, educational background, drug abuse history, and mental health status. For reasons related to cost and data accessibility, these measures are not currently collected in SCPS.

That is, readers must be cautious when assuming research shows causation when it does not. For example, a study may find that defendants released on surety bond may indeed fail to appear less often than do defendants released on their own recognizance. However, this finding may not have occurred because a surety bond is more effective than release on recognizance, but because defendants released on surety bond in the study may have had certain characteristics (e.g., more financial resources to hire a private attorney or to get to court), and it is these characteristics and not the release type that affects their court appearance. The limitation with prior research based on the SCPS data is that these other characteristics are not available in the data. Therefore, the causal relationship between the release type and failure to appear cannot be concluded.

**Limitation 2**

- Evaluative statements about the effectiveness of a particular program in preventing pretrial misconduct may be misleading.

In explaining this statement, the Data Advisory states:



BJS does not support the use of SCPS data for such evaluative statements. Detailed measures of pretrial monitoring practices are critical to any evaluation of the efficacy of a pretrial release program. SCPS does not have the capacity to distinguish highly functioning pretrial diversionary programs from those operating under limited staffing and budgetary constraints. Also, SCPS cannot distinguish defendants released under conditions that involve intensive pretrial monitoring from defendants released under less stringent pretrial conditions. Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading. BJS does not support such use of these data.

**Limitation 3**

- The potential for misconduct is only one of many factors that jurisdictions consider in developing and implementing pretrial release policies.

In explaining this statement, the Data Advisory states;

Many complex issues are involved in determining a jurisdiction's policy for release or detention of the criminally accused and the best method for releasing defendants. State and local officials consider an array of interrelated factors when developing and implementing pretrial release policies, including jail overcrowding, pretrial incarceration of individuals accused of minor offenses, the utility of pretrial risk assessments, and the capacity of pretrial diversion programs. BJS reports and SCPS data, as currently collected, cannot be used to evaluate such factors.

## REVIEW OF STUDIES CITED BY THE BONDING INDUSTRY THAT USE SCPS DATA

### *The Bureau of Justice Statistics' "Pretrial Release of Felony Defendants in State Courts" (Cohen and Reaves, 2007)*

### Purpose

The purpose of this Department of Justice report was to describe the volume, similarities, and differences in factors associated with pretrial release in large jurisdictions across the United States.

### Method

Data relevant to pretrial release were selected from the Bureau of Justice Statistics' State Court Processing Statistics series, which at that time covered felony cases filed in May of even-numbered years from 1990 through 2006 in a sample of 40 of the United States' 75 most populous counties. The counties participating in the SCPS varied somewhat each year because of changing national population patterns. Data were collected on defendants' demographics, criminal history, and court processing characteristics from pretrial release through sentencing.

### Findings

This report does not examine the effectiveness of various types of pretrial release. Rather, it summarizes various case processing characteristics, such as the frequency of and associations among different types of release, bond amounts, offense types, demographics, criminal history factors, case processing times, and pretrial misconduct.[6]

### Authors' Interpretation

The analyses showed many statistically significant relationships among multiple variables. These relationships are based on correlations and do not include any causation or explanation of why the relationships might have been observed.[7]

---

6 The various descriptive analyses are too numerous to summarize here. The reader is encouraged to read the brief report, as it contains many illustrations and explanations of the findings.

7 Correlation refers to the situation when there is a linear relationship between two variables, such that there is some degree of predictable increase or decrease in the scores on one variable as the scores on the other variable change. Causation, in contrast, involves two variables that are correlated, with the additional requirement that one occurs temporally after the other and that other plausible explanations are ruled out. To illustrate the difference between correlation and causation, an example occurs when an increase in the amount of crime is observed in conjunction with an increase in the amount of ice cream consumed (both tend to occur more frequently in summer months). They can be positively correlated. However, there is no research or theory from which one can conclude that the amount of ice cream consumed *causes* an increase in crime. Indeed, the occurrences of either higher temperatures or longer daylight hours during summer months are possible alternate explanations for increases in crime.

## Limitations

The authors state that the analyses are limited because they reflect variables only available in the SCPS data and that other factors not in the data could affect both pretrial release rates and pretrial misconduct. In addition, only approximately 20% of the jurisdictions that contributed data did so every year of the program, so the variance observed as trends over time may be partially caused by the unique characteristics of the 80% of jurisdictions that rotate in and out of the sample over time. Finally, it may appear that the for-profit bail bonding industry's message regarding research supporting the superior performance of surety release is credible because several different studies (summarized below) that used different analytical methods still arrived at similar conclusions. However, these similar findings occur not because the studies are measuring reality despite the various research methods used, but because these studies all use the same limited data (see the Bureau of Justice Statistics' advisory above). That is, any number of studies could use different analyses, but they would still arrive at very similar conclusions because they use the same limited data. The studies simply replicate the problem of using these limited data in the first place.

## *"The Fugitive: Evidence on Public versus Private Law Enforcement from Bail Jumping" (Helland and Tabarrok, 2004)*

### Purpose

The authors' purpose was to compare the effectiveness of surety bond releases to own recognizance, unsecured bond, cash bond, and deposit bond releases. The three outcomes of failure to appear, fugitive/recapture, and new arrest were used.

### Method

The study used data from the 1990-1996 SCPS, supplemented by 1988 data from the SCPS's predecessor project, the National Pretrial Reporting Program. A statistical technique of propensity score matching[8] to pair defendants released on surety bond with those released through the other non-surety methods was used. Defendants in the surety and non-surety groups were matched on demographics (sex and age), current criminal justice involvement, current felony charge, prior felony arrests, and past failure to appear.

### Findings

The study found that surety bonding had lower failure to appear rates than did own recognizance/unsecured bonds and deposit bonds but was equal to cash bonding. Surety bonding also had lower fugitive and higher recapture rates after one year than did the other types of bonds. For new arrests, the public safety measure, the study found no differences among pretrial release types.

---

8 Propensity score matching is a method for statistically reducing the existing differences in members of two groups, so that any outcome differences in the two groups can be attributed to the treatment one group received that the other did not. In this study, treatment was surety bonding.

**Authors' Interpretation**

The authors concluded that defendants released on surety bond are less likely to fail to appear than similar defendants released on their own recognizance, and if defendants do fail to appear, they are more likely to be captured. They state that "bond dealers" and bounty hunters are effective at discouraging flight and at recapturing defendants, and that bounty hunters, and not government-funded law enforcement, "appear to be the true long arms of the law" (pg. 118).

**Limitations**



This study was based on the SCPS data which, for the reasons described above, are inappropriate for drawing causal conclusions about pretrial release options (i.e., inferring that the type of release is the determining factor in defendants' pretrial performance). Moreover, this study does not account for release rates, which on the average are much lower and take longer to occur for surety bonds than they are for non-financial methods, thus increasing the amount of pretrial detention and its associated costs caused by surety bonds. Indeed, Cohen & Reaves (2007) showed that financial forms of pretrial release (which includes surety bonds) take several days to weeks longer to occur than do non-financial forms of pretrial release (pg. 5), and that financial bonds result in fewer defendants bonding out than do non-financial bonds (i.e., 49% compared to close to 100%; pg. 2). Finally, surety bonds showed no increase in public safety compared to non-financial bonding methods. In sum, although this study used more advanced statistical methods, the findings do not account for differences among the various types of pretrial release in release rates, which are necessary for determining the most effective pretrial release type.

*"The Effectiveness and Cost of Secured and Unsecured Pretrial Release in California's Large Urban Counties: 1990-2000" (Block, 2005)*

**Purpose**

The author's purpose was to compare the characteristics and performance of California defendants released on surety bond to defendants released on recognizance or conditional/supervised release.

**Method**

The study used SCPS data on over 20,000 cases from 12 large urban California counties for the years 1990 through 2000. No controls for a defendant's propensity to engage in pretrial misconduct were utilized.

## Findings

The study found that defendants released on surety bond were less likely to have failed to appear and remain a fugitive than were defendants who were released on recognizance or conditional/supervised release. The monetary costs of a failure to appear were estimated.

## Author's Interpretation

After presenting the above findings, the author presented different scenarios showing the estimated reduction in failures to appear and monetary cost savings that would have occurred over the study's time period had surety bonds been more frequently used than release on recognizance or conditional/supervised release.

## Limitations

Similar to the limitations in the Helland and Tabarrok (2004) study, this study used SCPS data to infer the greater effectiveness of surety bonds over and above that of non-surety bonds. In addition, this study did not attempt to match defendants in the two groups on other relevant characteristics, which further allows for the possibility that these other characteristics, and not necessarily the type of release, account for the observed findings. Finally, any findings from this study would only generalizable to jurisdictions within California given the sometimes high degree of variability between states in pretrial laws and case processing.

## *"Commercial Surety Bail and the Problem of Missed Court Appearances and Pretrial Detention" (Cohen, 2009)*

### Purpose

The author conducted this study to measure the impact of selection effects and monitoring practices on pretrial outcomes. Specifically, the author examined whether surety bond defendants were released at lower rates than were non-surety bond defendants, and whether surety bond defendants had lower instances of flight than did non-surety bond defendants.

### Method

Data from the 2000-2004 SCPS were used from jurisdictions that either predominantly used surety bond releases (Dallas, El Paso, Harris, and Tarrant Counties, TX; and Shelby County, TN) or that used them minimally (Philadelphia, PA; Montgomery County, MD; Wayne County MI; Pima County, AZ; and Cook County, IL). Data were analyzed using the statistical technique of binary logistic regression.[9]

---

9 Binary logistic regression is a statistical procedure used to determine which set of factors most efficiently and comprehensively predicts an outcome of interest while accounting for the influence the various factors might have on one another. For example, it helps determine the unique contribution that several simultaneously considered factors (e.g., criminal history, ties to the community, drug use) have in predicting the likelihood of failure to appear in court.

### Findings

The study found that the likelihood of pretrial release in the high-surety-use counties was statistically significantly less than that in the counties that used surety bonds less frequently. Bail bondsmen in surety counties were more likely to post a surety bond for defendants with a history of failure to appear than in minimal-surety-release counties. The study also found that surety bond defendants were less likely to fail to appear or remain a fugitive than were non-surety defendants, when the effects of demographics, charge severity, and failure to appear history were accounted for.

### Author's Interpretation

The author concludes that the study provides support for two possible explanations for the observation that surety bond defendants have fewer failures to appear than do non-surety defendants. One possible explanation is that bail bondsmen select defendants who have a lower risk of failure to appear by not posting bond for higher risk defendants, and the other explanation is that some characteristic unique to the bondsman-defendant relationship (e.g., bondsmen's monitoring services, defendants' financial incentive to appear) results in more court appearances. The author stated that the data does not allow for a determination of which of the two explanations is superior over the other.

### Limitations

The author cautions that any conclusions about the effectiveness of surety bonds from this study can only apply to the five counties analyzed, and even then, it is not possible to determine the extent which surety bonds are affecting court appearance over and above other factors, such as the defendant being supervised by a pretrial services program. Because factors that can affect both the pretrial release decision and defendants' performance on pretrial release, such as residence status, employ-  ment, substance use/abuse, mental health issues, and supervision conditions are not included in the SCPS, the SCPS data cannot be used to definitively determine whether bail bondsmen are selecting lower risk defendants or whether they utilize more effective monitoring techniques than that which is associated with non-surety defendants.

## REVIEW OF STUDIES CITED BY THE BONDING INDUSTRY THAT DO NOT USE SCPS DATA

*"An Analysis of the Financial Impact of Surety Bonding on Aggregate and Average Detention Costs and Cost Savings in the State of Florida for 2008 by a Single Florida Insurance Company: A Follow-Up Study to Earlier Research" (Krahl, 2009)*

### Purpose

The author's purpose was to assess the estimated financial savings to Florida counties by one insurance company writing surety bonds.

### Method

This study used data from Roche Surety and Casualty, Inc. on the length of time on pretrial release of over 36,000 cases that had surety bonds written by bail agents in 60 of Florida's 67 counties. Data on most counties' jail population and costs were also obtained.

### Findings

The study reports that the use of for-profit bail bonding by this one insurance company saved Florida county governments hundreds of millions of dollars by releasing defendants on surety bonds instead of the defendants remaining in detention during the pretrial period of their case. In addition, the study also estimated the added jail construction costs to house these defendants if surety bonds were not used.

### Author's Interpretation

The author interpreted the findings to indicate that for-profit bail bonding is a "financially pragmatic alternative to pretrial detention as well as other types of pretrial release mechanisms"[10] because of the savings to both jail per diem and construction costs.

### Limitations

This study includes several limitations or methodologically faulty assumptions that render this study's findings not evaluable or not useful for informing public policy. First, the study compares estimated cost savings of for-profit bail bonding versus detention. Not surprisingly, surety bonding costs less than continuous detention; however, *any* form of pretrial release costs less than detention. Second, the study assumes that surety bond defendants would have had the same length of stay in detention that they would have had if they remained in detention for the duration of their case. This assumption cannot be supported because, as Cohen & Reaves (2007; pg. 7) showed, released defendants' cases took nearly three times as long to reach disposition as did detained defendants' cases. Third, in calculating potential cost savings realized by surety bond releases, the estimated costs of detaining these defendants were used. However, this calculation necessarily assumes that if surety

---

10 The inclusion of the phrase, "as well as other types of pretrial release mechanisms" in the study's findings is misleading because no method of pretrial release other than surety bonding was evaluated in this study.

bonding were not available, the defendants would have been detained. This assumption is likely false because in jurisdictions in which surety bonding is not used, other forms of both financial and non-financial release are used in lieu of detention. So, it is likely that many of the defendants who were released on surety bonds in this study would have been released by another method. Thus, the argument that there would have been additional costs for these defendants if they were detained instead of released on surety bonds is not supported. Fourth, the study does not address the effectiveness of surety bonds in either preventing failures to appear or in returning defendants to court after a failure to appear, both of which would be necessary for assessing cost-effectiveness (see, for example, Helland and Tabarrok, 2004, and Cohen, 2009).

*"An Analysis of the Financial Impact of Surety Bonding on Aggregate and Average Detention Costs and Cost Savings in the State of Florida for 2010 by a Single Florida Insurance Company: Continuities From Earlier Research and Extensions in the Development and Utilization of Statistical Models to Determine the Utility and Effectiveness of Surety Bonding" Krahl and New Direction Strategies (2011)[11]*

### Purpose

The author's purpose was to update the author's written report and findings from his 2009 study (summarized above), and additionally assess the strength and nature of the differences between counties that release defendants on unsecured bonds and under the supervision of a pretrial services program and counties that do not have such programs.

### Method

Similar to the 2009 study, this study used data on length of time on pretrial release from over 52,000 cases that had surety bonds written by bail agents from Roche Surety and Casualty, Inc., in 66 of Florida's 67 counties. Data on most counties' jail population and costs were also obtained. The statistical techniques of t-tests, regression, and discriminant analysis were used to compare characteristics of counties with pretrial services programs to those without such a program.

---

11 New Direction Strategies is a Florida-based marketing and strategy organization whose mission includes "We'll help you develop a sound legislative strategy that makes sense. After that, we'll walk you through step-by-step the process that will help get you to your desired result. We'll put you and your message front and center with key government decision makers - in Washington, your state legislature, or your local government leaders. We'll position you and your message to be successful." See http://www.newdirectionstrategies.org.

### Findings

Similar to the 2009 study, this study again reports that the use of for-profit bonding by the one insurance company saved Florida county governments hundreds of millions of dollars by releasing defendants on surety bonds instead of the defendants remaining in detention. In addition, the study also again estimated the added construction costs to house these defendants if surety bonds were not used. The dollar amounts were higher than those reported in the 2009 study. The additional statistical tests showed that most of the counties with larger resident populations had pretrial services programs while most of the less populated counties did not.



### Authors' Interpretation

Similar to the interpretations stated in the 2009 study, the author interpreted the findings to indicate that "one surety bonding company in the state of Florida saved Florida tax-payers and Florida counties over 404 million dollars in detention costs through the use of surety bonding as a mechanism of secured pretrial release for criminal defendants." The author stated that counties that have pretrial services programs fund them using tax revenues and counties that do not have the programs do not use tax revenues for this purpose.

### Limitations

The problems present in one of the author's 2009 study remain uncorrected in this study (see discussion above). Furthermore, the inclusion of a marketing firm as an author on a seemingly scientific paper is uncommon in the scientific community. This raises questions about the scientific purposes for which the research was conducted. Finally, the authors do not state the rationale and significance of the additional analyses showing larger counties are more likely to have pretrial services programs compared to smaller counties.

## MORE COMPLETE RESEARCH IS NEEDED

The research comparing forms of financial to non-financial pretrial release is clearly limited. No study to date has effectively separated out individual defendant characteristics that lead to a pretrial release decision (whether the type of release or the simple "yes/no" of any form of pretrial release at all) from the outcomes of a release decision (i.e., the probability of pretrial misconduct). In addition, no study to date has controlled for differences in the timing and events that different courts use to process cases, the types of supervision conditions imposed on a released defendant, the ability of a pretrial program to implement supervision conditions, or the activities employed by bail bondsmen.

The time has come for researchers to conduct such studies in order to properly inform pretrial public policy. This research needs to have the methodological rigor needed to make causal inferences about various types of pretrial release and the conditions under which defendants' performance on pretrial release can be maximized. Future evaluation designs should implement a quasi-experimental design to the extent possible.[12] Quasi-experimental designs can make use of known differences in release types, as well as the degree of implementation of conditions available in multiple jurisdictions that are similar to parse out the effects of supervision conditions and the effects of poor, good, and excellent degrees of implementation. Quasi-experimental designs can also help determine the impact of selection rules on pretrial release outcomes. For example, some jurisdictions do not release defendants charged with violent crimes or drug trafficking while others do. By comparing similar jurisdictions, research can begin to separate out the impact of various laws or policies on pretrial release outcomes.

Unlike most of the studies this paper reviewed, the public safety outcome must be included. The purpose of bail, again, is to assure court appearance and public safety, and to do so while maximizing releases. However, only one study included a public safety outcome measure.[13] Many government officials argue that a defendant's appearance in court is important, but that it pales in comparison to the public's safety. Thus, researchers must begin including public safety in evaluating the role of surety bonding, cash bonding, own recognizance bonding, and pretrial services programs in improving *both* public safety and court appearance outcomes, and doing so while maximizing pretrial release.

Additionally, and as importantly, any research that compares the effectiveness of financial versus non-financial bonds has to include the release rates to be valid. To date, only the Cohen and Reaves (2007) study included pretrial release rates by the various types of pretrial release. That study showed that over half of all defendants who have a financial bond set are not likely to post it and thus remain in jail until their case is adjudicated. In contrast, defendants who are given a non-financial bond are not likely to remain in jail because of the inability to post the bond (pg. 2). Without a full understanding of the nature of the denominator (defendants under pretrial release type X), any evaluations of the numerator (e.g., failure to appear, fugitive status, arrest for a new offense) will not be sufficiently grounded to make assertions about the applicability of the findings to other jurisdictions.

Studies of the costs of various types of pretrial release need to account for all financial and social costs. These costs include, but are not limited to, those arising from prolonged detention caused by certain types of release or when defendants are never released, as well as the costs associated with return to detention after failures to appear. Costs associated with additional court hearings, law enforcement arrests, and returning fugitives to custody should also be included. The realization of a cost-effective justice system can only be achieved when several quality studies are completed and made available to policy-makers.

---

12 See, for example, Austin, J., Krisberg, B., & Litsky, P. (1985). The effectiveness of supervised pretrial release. *Crime and Delinquency*, 31(4), 519-537.

13 Helland and Tabarrok (2004) included the public safety outcome of defendants' new arrests while on pretrial release, and found no differences between surety bonds and non-surety bonds.

Finally, researchers should convene themselves and decide together which kinds of studies are needed and which kinds of research methods and statistical tests meet accepted scientific standards. They then can conduct a research program that produces research that can inform pretrial policy-making.

## SUMMARY

Policy-makers are cautioned about accepting at face value statements about the cost-effectiveness of financial, including surety, forms of pretrial release when presented with interpretations from any of the six studies reviewed in this paper. Because the Helland and Tabarrok (2004), Block (2005), Cohen and Reaves (2007), and Cohen (2009) studies rely on SCPS data, the findings from these studies cannot be scientifically used to make causal statements about the effectiveness of one type of pretrial release over that of another. The two studies reviewed that do not use SCPS data (Krahl, 2009; Krahl and New Direction Strategies, 2011) do not directly address this question. By neglecting release options other than surety bonding, the Krahl studies draw comparisons that have no public policy application.

Because financial bonds, including surety bonds, cannot be legally forfeited because of an arrest for a new crime allegedly committed while a defendant is on pretrial release, there is no legal link between financial types of release and public safety. Therefore, all financial types of release, both secured and unsecured, are inadequate to fulfilling the legal purposes of bail (see previous discussion). Even if surety bonds were to increase court appearance rates or decrease fugitive rates more than non-financial forms of pretrial release do for certain kinds of defendants, research has shown that the maximization of release would not be realized and the law states that public safety is not considered compared to non-financial forms of release, where the potential for the maximization of public safety, court appearance, and release are simultaneously present.

Finally, additional research is needed to continue to inform policies regarding the most cost-effective forms of pretrial release. Although a few instances of this research are being planned, studies are needed to address the many complex issues around pretrial release and to increase the research's applicability to many jurisdictions nationwide. Research that compares the impact of different types and conditions of release with defendants whose risk scores are known would be the most informative. Careful methodology is needed because many jurisdictions order blanket release conditions and money bonds for nearly all defendants. Policy makers are encouraged to support research that uses the methods necessary to allow the question of which type and conditions of pretrial release are most cost-effective in achieving all three purposes of the bail decision: (1) maximizing public safety and (2) maximizing court appearance while (3) maximizing pretrial release.

# REFERENCES

Block, M. K. (2005). *The effectiveness and cost of secured and unsecured pretrial release in California's large urban counties: 1990-2000*. Unpublished manuscript, University of Arizona.

Clarke, S. H., & Kurtz, S. T. (1983). The Importance of Interim Decisions to Felony Trial Court Dispositions. *Journal of Criminal Law and Criminology, 74.*

Cohen, T. (2009). *Commercial surety bail and the problem of missed court appearances and pretrial detention*. 9 Institutum Iurisprudentia (Preparatory Office) Academia Sinica. Taipei, Taiwan.

Cohen T. H. & Kyckelhahn, T. (2010). *Data advisory: State court processing statistics data limitations*. Washington, DC: US Department of Justice.

Cohen, T. H. & Reaves, B. A. (2007). *Pretrial release of felony defendants in state courts.* Washington, DC: U.S. Department of Justice.

Goldkamp, J. S. (1979). *Two Classes of Accused: A Study of Bail and Detention in American Justice*. Cambridge, MA: Ballinger Publishing Company.

Goldkamp, J. S., Gottfredson, M. R., Jones, P. R., & Weiland, D. (1995). *Personal liberty and community safety: Pretrial release in the criminal court.* New York: Plenum Press.

Gottfredson, M. R., & and Gottfredson, D. M. (1988). *Decision Making in Criminal Justice: Toward a Rational Exercise of Discretion*. New York, NY:  Plenum Press.

Helland, E., & Tabarrok, A. (2004). The fugitive: Evidence on public versus private law enforcement from bail jumping. *Journal of Law and Economics*, *47,* 93-122.

Krahl, D. E. (2009). *An analysis of the financial impact of surety bonding on aggregate and average detention costs and cost savings in the state of Florida for 2008 by a single Florida insurance company: A follow-up study to earlier research*. Unpublished manuscript, University of Tampa.

Krahl, D. E., & New Direction Strategies. (2011). *An analysis of the financial impact of surety bonding on aggregate and average detention costs and cost savings in the state of Florida for 2010 by a single Florida insurance company: Continuities from earlier research and extensions in the development and utilization of statistical models to determine the utility and effectiveness of surety bonding*. Unpublished manuscript, University of Tampa.

Landes, W. M. (1974). Legality and Reality: Some Evidence on Criminal Procedure. *Journal of Legal Studies, 3.*

Minton, T. (2012). Jail Inmates at Midyear 2011 - Statistical Tables. Washington, DC: Bureau of Justice Statistics.

Phillips, M. T. (2007). *Bail, Detention, and Non-Felony Case Outcomes*. Research Brief Series No. 14. New York, NY: New York City Criminal Justice Agency.

Phillips, M. T. (2008). *Pretrial Detention and Case Outcomes, Part 2, Felony Cases, Final Report*. New York, NY: New York City Criminal Justice Agency

Rankin, A. (1964). The Effects of Pretrial Detention. *New York University Law Review, 39*.

Wald, P. (1972). The Right to Bail Revisited: A Decade of Promise Without Fulfillment. In Stuart S. Nagel (ed.), *The Rights of the Accused*. Beverly Hills, CA: Sage Publications.

Zeisel, H. (1979). Bail Revisited. *American Bar Foundation Research Journal*.

## ACKNOWLEDGEMENTS

The authors thank Cynthia Lum, PhD, George Mason University; Thomas Cohen, PhD, Bureau of Justice Statistics; KiDeuk Kim, MA, The Urban Institute; and Avi Bhati, PhD, Maxarth Inc., for their review of this paper.

## ABOUT THE AUTHORS

**Kristin Bechtel** serves as a Senior Research Associate at the Crime and Justice Institute at Community Resources for Justice. Her research background focuses on risk and needs assessment including pretrial, special offender populations and screening tools, and program and policy development and evaluation. She has authored several publications in the areas of juvenile, adult, and pretrial risk assessment, juvenile justice programming, domestic violence, implementation evaluation, the risk principle and managing low risk offenders. She has written numerous research and technical assistance reports on a variety of subjects, including program evaluation, risk and needs assessment instruments, domestic violence, and program evaluation.

**John Clark** serves as a senior project associate for PJI. He has worked closely with officials in hundreds of jurisdictions to gain support for and implement pretrial justice reforms. He has extensive experience in conducting system assessments, gathering and analyzing data, and presenting findings both orally and in writing, as well as in training judges, prosecutors, defense attorneys, pretrial services program administrators, and others on pretrial justice-related topics. His expertise includes identifying causes of jail crowding, implementing validated pretrial risk assessment instruments, identifying alternatives to detention, and pretrial services program development. Prior to joining PJI in 1987, John worked at the D.C. Pretrial Services Agency for eight years.  He has a Master's Degree in the Administration of Justice from American University.

**Michael R. Jones** serves as a Senior Project Associate for PJI, staffing PJI's Colorado office. Mike assists states and local jurisdictions in understanding and implementing more legal and empirically-based pretrial policies and practices by providing technical assistance, writing publications, and designing strategic initiatives. He has extensive criminal justice experience both within Colorado and nationally through his work as a private consultant and technical resource provider for the National Institute of Corrections. Prior to joining PJI, Mike worked as the Criminal Justice Planning Manager for Jefferson County, Colorado, where he and his team of criminal justice planners worked for the local criminal justice coordinating committee. Mike has a Ph.D. in Clinical Psychology.

**David Levin** is a Senior Consultant at LMI Government Consulting. Prior to LMI he was the Chief of the Drug Enforcement Administration (DEA) Headquarters Statistical Analysis Unit. Before the DEA, he was a senior research associate at the Pretrial Justice Institute, an Assistant Professor of Political Science and Criminal Justice at the University of Texas at El Paso, and a Social Science Statistician at the Bureau of Justice Statistics, USDOJ. He has a BA in political science from the University of Illinois, Urbana-Champaign, and a Ph.D. in government from American University.

# PX 7(o)
# Declaration of Carol Oeller

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. | ) |
| | ) |
|      Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Case No. 16-cv-01414 |
| HARRIS COUNTY, TEXAS, et al. | ) (Consolidated Class Action) |
| | ) The Honorable Lee H. Rosenthal |
|      Defendants. | ) U.S. District Judge |
| | ) |
| _____ | ) |

### Declaration of Carol Oeller

1.     My name is Carol Oeller, and I worked in the Harris County Pretrial Services office for over 34 years. I was Pretrial Services Director for Harris County, Texas for approximately fourteen years, from 1999 to 2013. I retired in 2013.

2.     I started in the Harris County Pretrial Services Department in 1979 as a pretrial officer and became a shift supervisor five months later.

3.     In 1979, the Pretrial Services Department did not use a validated risk assessment tool but used a modified Vera Point System, which was borrowed from New York City.

4.     After a few years as a shift supervisor I became a division manager responsible for the supervision office. I became Assistant Director of the Pretrial Services Department in the mid-1980s.

5.     In 1992, the Pretrial Services Department put in a grant application for its first validated risk assessment tool. The validated risk assessment tool was implemented in 1993. The first risk assessment tool was revalidated in 1996. A new validated tool was researched and produced in 2007.

6.     After my appointment as Director in 1999, I answered to the Harris County Commissioners Court through the Budget Office.

7.     In my experience, the Criminal District Court and County Court at Law Judges generally appreciated the Pretrial Services Department. The criminal law judges liked the Pretrial Services Department for the information it provided, both on the screening and the supervision side. Based on comments that the Judges made, I came to believe that the judges were not fond of all of the things I had to say as Director, but on the whole they thought the Department did an excellent job.

8.     However, based on my experiences and conversations with the judges, the judges did not subscribe to one of the primary objectives of the Pretrial Services Department, which was to get more people out of jail without using financial conditions and the for-profit bail industry. Despite the available empirical evidence, though, initial bail decisions were always established by default according to the bail schedule's prescribed amounts instead of consideration for an individual defendant's circumstances or predicted risk for pretrial misconduct.

9.     Over the years, when I attended meetings with my colleagues from around the United States, my other colleagues told me that they felt bad for me because Harris County was so tough to administer pretrial justice.

10.     When I was Director of Pretrial Services, I was aware of low-risk people being routinely held in jail solely because they could not afford to pay a set monetary bail amount. I spoke out about this problem and was quoted in the newspaper. I routinely made public comments about how Harris County could have been and should have been releasing far more people than we were. I also stated publicly that I believed the post-arrest system to be unconstitutional.

11.     Based on my personal experience in Harris County and personal interactions with many of the officials involved in this case over many years, it is my opinion that the County Court at Law Judges, Criminal Justice Coordinating Council and other key stakeholders will not fix the problems plaguing the Harris County pretrial system on their own, in spite of the MacArthur grant and involvement from the Laura and John Arnold Foundation.

12.     Harris County has had validated risk assessments since 1992. There is no reason to think that the availability of different validated tools will resolve the current problems on their own. They have not done so in 25 years. In fact, over many of those years, the detention of low-risk defendants has gotten worse, in spite of the availability of a validated risk assessment tool.

13.     The MacArthur grant process is a case study in these systemic failures. Despite money bail issues being a significant cause of the jail overcrowding problems, the MacArthur grant plan focused on expedited case processing of felonies and diversion. In the end, Harris County does not even propose to use the grant to increase its use of non-financial conditions of release.

14.     It is my impression that the judges have begun signing a few more personal bonds very recently. Without the pressure of having grant money or litigation, I do not think this trend would have happened or will continue.

15.     I once had an exchange with now Chief Administrative Judge Susan Brown, in which she said to me: "We are friends but I don't think people should get personal bonds." I understand that even she is signing a few personal bonds now. In my

opinion, her actions are attributable to increased exposure of her bail practices from grant monitors.

16.     On the other hand, I believe Harris County is in a good position to implement reforms, if the will to make those reforms existed. We already have a lot of the infrastructure in place to operate a much better system. Based on my experience in Harris County and my examination of pretrial services programs around the country for many years, I believe Harris County can implement a system where many more individuals are released with its current pretrial resources.

17.     When I served as Pretrial Services Director, the District and County Court at Law Judges discounted the risk assessment and based most of their decisions regarding pretrial release on the defendant's charge and priors, regardless of what the evidence-based the risk assessment tool recommended. Some of the judges said outright that they did not have confidence in a risk assessment tool and would not rely on it.

18.     Based on my experience, I observed the general actions of the Criminal Court at Law Judges to be that they did not want to allow non-financial conditions of release unless an arrestee was really clean. By being really clean, I mean that a person was charged with a non-violent offense and was a first-time offender. There was a criminal court hearing officer named Al Thomas who lasted one year in his position. This was before the Pretrial Services Department had a validated risk assessment tool, before 1992. Mr. Thomas would approve personal bonds for people with prior criminal offenses, especially if they had no indication of failure to appear in prior cases. My impression, and the impression of other employees, was that Mr. Thomas did not get his contract renewed because he granted too many personal bonds, particularly for individuals with prior offenses. Based on my conversations, this view was shared by many people who worked in and around the Probable Cause Hearing Court. This is an example of the kinds of pressures that hearing officers face in a world where they know that the people who have control over their jobs want to limit personal bonds to defendants without prior offenses or defendants charged with less serious offenses.

19.     Based on my extensive experience, my understanding of the hearing officer decision-making process during my time as Director is that the hearing officers relied primarily on the charge and the prior offenses to make up their mind about money bond. When I spoke to my staff about advocating for the pretrial services report and non-financial conditions of release with the hearing officers, they would push back and say that, in their experience, the hearing officers didn't want to hear from them during the consideration period during a hearing.

20.     A new Pretrial Services defendant report was being implemented around the time that I retired. We were working on modifications to ensure that information the hearing officers thought was most important was prominent. The new defendant report was supposed to have a summary on the front page. I wanted staff to draft a summary explaining our recommendation for the front of the report. Staff thought that was

pointless because the hearing officers probably weren't going to read it based on their experience.

21.     For many years including up until I retired, there was an informal practice among the County Court at Law Judges that you shouldn't get "two freebees," meaning that a person couldn't both get personal bond and an appointed attorney. In general, if you got personal bond, you would eventually get your bond revoked if you failed to hire an attorney. Simultaneous with bond revocation, the court would an appointed attorney.

22.     Because of the comments and actions of the judges, appointed attorneys also had the impression that, if they fought for a client to get a personal bond, they might be removed from a case. As a result, pretrial services officers came to believe that many appointed attorneys would not advocate for personal bond for their clients in misdemeanor cases in the County Courts at Law.

23.     The financial information collected as part of the pretrial services report is collected for the purposes of helping the judges determine who is "indigent" for the purposes of appointment of counsel pursuant to the Fair Defense Act. The Fair Defense Act includes a list of things judges are supposed to consider, and this was incorporated into the pretrial services report.

24.     The financial information in the pretrial services report is not collected for the purpose of assisting the hearing officer in determining the bail amount. In my experience, the hearing officers never ask questions that fill-in or complete incomplete financial information on the pretrial services report.

25.     One of the reasons the financial information may be blank for some pretrial services reports is that pretrial services officers are instructed to explain to defendants that they only need to provide the information if they plan to request appointed counsel. Defendants who do not intend to request appointed counsel may choose not to provide this information.

26.     The financial information may also be incomplete or inaccurate because pretrial officers found asking the financial questions to be time consuming; when they were pressed for time, they did not ask the financial questions or did not ask all of them.

27.     Also, it is easy for the financial questions to be asked in a way that results in useless answers if a pretrial officer is in a hurry. Many of the financial questions are easily misunderstood by defendants when a pretrial officer does not take his or her time to explain them.

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge.

_____                      __2/8/2017___
Carol Oeller                                                   Date

# PX 7(p)
# Declaration of Spurgeon Kennedy

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

MARANDA LYNN ODONNELL, et al.    )
                                   )

      Plaintiffs,             )

v.                                   )     Case No. 16-cv-01414
                                   )     (Consolidated Class Action)

HARRIS COUNTY, TEXAS, et al.      )     The Honorable Lee H. Rosenthal
                                   )     U.S. District Judge

      Defendants.         )
                                   )

**DECLARATON OF SPURGEON KENNEDY**

1. My name is Spurgeon Kennedy. I am Vice President of the National Association of Pretrial Services Agencies. I also am the former Director of Strategic Development with the Pretrial Services Agency for the District of Columbia (PSA), and a past Senior Associate with the Pretrial Services Resource Center.

2. I am submitting this statement to address the claim that funding a comprehensive pretrial services agency is prohibitive for most localities.

3. I encounter this argument frequently in my work. I personally rebutted claims made by the American Bail Coalition and its paid consultant, Dr. Darius Irani, about the "exorbitant" operating costs of PSA in testimony before the New Jersey State Assembly's Appropriation Committee in 2014.

4. In his follow-up testimony before the New Jersey Assembly Appropriations Committee, Dr. Irani, Executive Director of the Regional Economic Studies Institute at Towson University, estimated that a statewide pretrial services agency would cost more than $379 million annually.[1] Irani saw little to no savings in corrections or other criminal justice operations to offset these costs.

5. In his report, Irani argues that any pretrial agency performing the same functions as PSA—universal screening of all arrestees; application of risk assessments and recommendations for release or detention; drug testing;[2] supervision and monitoring of released defendants;

---

[1] Testimony of Dr. Darius Irani Regional Economic Studies Institute Towson University Regarding Assembly Bill 1910.

[2] PSA's drug testing laboratory plays a unique and vital role in the D.C. criminal justice system, providing services far beyond the pretrial population. The lab performs forensic drug testing for pretrial defendants, probationers and parolees, and respondents ordered into testing by the D.C. Superior Court's Family Division. The lab also is involved with various local law enforcement, research, health and policy partners as well as the federal Office of

integration of behavioral health services into high-risk supervision; and outcome and performance measurement—also must bear that agency's structure and budget. (For FY2016, PSA's budget was $62,357.00, supporting 373 full time equivalent positions).

6. Yet, the argument that the "D.C. Model" must apply to any high-functioning pretrial agency ignores key organizational and budgetary differences between PSA and the typical locally-based pretrial services agency, such as the Harris County program.

7. I have reviewed the assertions of the Defendants in this case regarding the cost of D.C.'s pretrial services agency, and their suggestion that a similar agency in Harris County would have a hugely detrimental effect on the County's budget. I would like to specifically address this claim raised by the Defendants in this case:

> Plaintiffs also ignore the exorbitant cost of the D.C. system. The Pretrial Services department in D.C. alone costs over $63 million for a population of roughly 680,000. Harris County's Pretrial Services budget is only $7.5 million for a population of over 4.3 million. A recent study analyzed the cost to implement the D.C. system in the state of New Jersey, which has roughly double the population of Harris County, and found that it would have a net cost of $215 million. See Ex. L, Dr. Dariaus Irani & Zachary Jones, Estimating the Cost of the Proposed New Jersey Pretrial Service Unit and the Accompanying Legislation, Regional Economic Studies Institute (2014). Docket Entry No. 166 at 18.

8. I believe that claim to be demonstrably false. Irani's attempt to conclude, based on PSA's budget and structure, that providing in another jurisdiction the same services PSA provides in D.C. would be cost-prohibitive overlooks important, unique characteristics of PSA.

9. First, as a federal entity, PSA's staffing costs are higher than those of local pretrial agencies due to various federal pay scale requirements. Like other criminal justice agencies, the bulk of PSA's funding goes to staffing. In FY2016, over 80 percent of the agency's budget went to salaries and benefits for full time equivalent staff positions. The median salary for non-supervisory staff was $72,115.00.[3] This is higher than the median salary that Harris County and other locally-funded pretrial services agencies offer their line staffs.

10. Second, as a Federal entity, PSA must bear administrative costs local pretrial services agencies will not assume and staffing costs that nearly all would not have to meet.

11. In FY2016, almost $33 million of PSA's budget went to information technology, human resources, drug testing (including testing for populations *other than* the pretrial services population), and finance and administration components. These functions are borne in most localities by agencies other than pretrial services who perform them for many different County agencies at once.

---

National Drug Control Policy to assess the prevalence of emerging drugs in the District of Columbia. This would not be the scope nor function of local pretrial services agencies like Harris County with drug testing capacity.

[3] This figure includes an additional "locality pay" increase for the Washington, D.C. area.

12. PSA's core risk assessment, risk management, and behavioral health intervention functions make up $29.4 million of its budget—or the equivalent of $18 a day for each defendant supervised.[4]

13. Even with these costs considered, the District's pretrial services agency is far less expensive than the city's other community corrections programming. For example, the pretrial agency's budget in FY 2014 budget was 35 percent that of the probation authority and 48 percent of the city's department of corrections. The D.C. jail's estimated $207 a day cost to house a pretrial detainee is over ten times higher than the pretrial services agency's $18 a day supervision costs.

14. Irani has written two reports using the "D.C. model" to calculate the costs of proposed statewide pretrial agencies in Maryland and New Jersey. (Both reports are attached).

15. I spoke with Irani and representatives of the American Bail Coalition in New Jersey about Irani's misapplication of PSA's budget to other pretrial agencies.

16. Privately, he acknowledged that PSA was unique among pretrial agencies in scope of administrative services and staffing costs. Nonetheless, he repeated these inaccuracies quite freely in his Appropriations Committee testimony.

17. It's worth noting that, for now, Irani's estimates about New Jersey have been quite over-stated. New Jersey Association of Counties Executive Director John Donnadio estimates the costs of pretrial services for the state's 21 counties to be $50 million a year.

18. It also is enlightening that, after considering Irani's argument, New Jersey instituted major reforms of its justice system to restrict the use of money in pretrial release and detention decision-making.

19. Harris County and any other locality that wants to determine the real costs of a highly-functioning pretrial services agency should look to the dozens of locally-based pretrial agencies whose structures and budgets conform more to county and local budgets.

20. For example, the Commonwealth of Kentucky employs 294 employees and maintains 49 local program districts and a central office. Kentucky Pretrial Services operates in all 120 of the Commonwealth's counties and provides seven day a week, 24-hour services to the local justice systems. Per state statute, pretrial staff conducts pretrial interviews and investigations within 24 hours of arrest of all persons eligible for pretrial release, assesses defendants for pretrial release using a validated risk instrument, and maintains pretrial supervision and diversion programming in all jurisdictions.

21. Like PSA, Kentucky Pretrial Services has adopted evidence-based practices such as a risk assessment, notification to defendants of upcoming court dates, and supervision levels that

---

[4] PSA Director Cliff Keenan outlines the costs of PSA D.C.'s core functions in *It's About Results, Not Money*, at http://www.psa.gov/?q=node/499.

track consistently with assessed risk levels. Defendant rates for court appearance and arrest-free behavior consistently are in the high 80 to low 90 percent range.

22. Kentucky Pretrial Services Agency achieves these impressive results all on an annual budget of $12 million that is in line with the staffing costs of other justice systems in the state and supports an agency structured without the internal administrative and drug testing functions found in the DC pretrial agency. The Kentucky example illustrates that the costs of pretrial programming are calculated best using local economic indicators and trends, not poorly constructed comparisons to a Federal agency.

23. Whatever the cost of a pretrial services system, my experience in D.C. and with agencies all over the country has shown me believe it would not be higher or more detrimental than the already exorbitant and often unnecessary cost of pretrial detention.

24. Harris County annually spends millions of dollars on pretrial detention, mostly to incarcerate low to medium-risk inmates who could be released safely—and far less expensively—in a risk-based pretrial assessment and supervision system.

25. PSA is an exceptional criminal justice agency. It conforms to all the essential elements of high-functioning evidence-based pretrial programming recognized by most experts in the field.

26. The agency helps the most important system actor in criminal justice—the judge—make one of the most important decisions in criminal justice in a more informed and rational manner and provides the Court with supervision and monitoring options to make release decisions practical and safe.

27. As a result, over the past five years, an average 88 percent of D.C.'s pretrial defendants secure release pending trial, with 89 percent remaining arrest-free, 88 percent making all scheduled court appearances, and 88 percent remaining in the community on release. These results include all felony and misdemeanor cases.

28. PSA's mission, processes, and outcomes are models for other pretrial agencies to emulate. However, as other high-functioning pretrial services agencies have demonstrated, impressive results can be achieved under budget structures more consistent with most states and localities.

29. As PSA Director Cliff Keenan notes in his publication, *It's About Results, Not Money*, at available at http://www.psa.gov/?q=node/499:

> If you want to establish, improve or expand your pretrial services program to more effectively administer pretrial justice, my message is this: Don't be discouraged. If you look at how PSA's budget compares to those of other pretrial agencies, you would see that much of what we do to administer true pretrial justice is possible for smaller agencies, and it is not about the money.

4

I declare under penalty of perjury that the forgoing is true and correct to the best of my ability.

Spurgeon Kennedy

February 9, 2017

# PX 7(q)
# Declaration of Sheriff Ed Gonzalez

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| MARANDA LYNN ODONNELL, et al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>HARRIS COUNTY, TEXAS, et al. )<br><br>Defendants. ) | Case Nos. 16-cv-01414, 16-cv-01436<br>(Consolidated Class Action)<br>The Honorable Lee H. Rosenthal<br>U.S. District Judge |

## DECLARATION OF SHERIFF-ELECT ED GONZALEZ
## IN SUPPORT OF PLAINTIFFS' MOTION TO STAY A RULING ON
## SHERIFF HICKMAN'S MOTION TO DISMISS

1. My name is Ed Gonzalez, and I am the Sheriff-Elect for Harris County. I am a life-long Houston resident. I have served as a Houston police officer and a member of the Houston City Council.

2. I defeated incumbent Sheriff Ron Hickman, a defendant in the above-captioned lawsuit, in the November 8, 2016, election for Harris County Sheriff and will assume office on January 1, 2017.

3. As the official charged with running the Harris County jail in a lawful manner, the Sheriff of Harris County should play an important role in reforming any unjust or unconstitutional aspects of the County's current system of money bail. The County's widespread detention of arrestees because they are too poor to pay arbitrary amounts of money is a waste of public resources and actually undermines public safety. These policies and practices also create unnecessary health and safety risks for both our inmates and our guards and other jail personnel.

4. Though I respect Sheriff Hickman, I respectfully disagree with his and his lawyers' position that the Sheriff should not even be a party to this case. I believe that the current operation of the money bail system, including the Sheriff's active participation in that system, violates the United States Constitution. I believe that the Sheriff *should* be a party to the current lawsuit, and I look forward to participating in the lawsuit in my official capacity once I am sworn into office on January 1, 2017.

5. A person's access to money should not be a determining factor in whether he or she is jailed or released after arrest and pending trial. There is no public safety justification for basing the law enforcement decision of detention or release on money. Individuals should not be held in our Harris County jail just because they cannot pay an amount of money set according to an arbitrary schedule. In my view, this practice violates the U.S. Constitution.

6. Reforming Harris County's post-arrest system will be an urgent priority of mine as soon as I assume office. I owe that to all our citizens, including our jail inmates, our deputies, the taxpayers of Harris County, and to the Constitution I must swear to uphold.

7. As a defendant in this case, I would instruct my lawyers to withdraw the Sheriff's motion to dismiss. I will work with my lawyers, the Plaintiffs' lawyers, and any other willing local officials to resolve the lawsuit in a way that ensures that Harris County has a constitutional post-arrest system. A reformed system should fully addresses public safety concerns but also protects the dignity and civil rights of every individual — rich or poor — who comes into contact with the jail and my deputies. Our current money bail system does not achieve these goals.

I certify under penalty of perjury that the foregoing is true and correct.

_____        ___11-22-16_____
Sheriff-Elect Ed Gonzalez                              Date

_____
Notary Public in and for the State of Texas

MICHELLE REEVES
Notary Public, State of Texas
Commission Expires 03-17-2017
Notary ID 00788954-6

# PX 7(r)
# Declaration of Mike Jones

**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DECLARATON OF MICHAEL R JONES**

1. My name is Michael R. Jones. I am the Director of Implementation for the Pretrial Justice Institute (PJI), a nonprofit that has existed for the past 40 years to advance safe, fair, and cost-effective adult and juvenile pretrial justice processes.

2. I have worked since 2010 at PJI, where I direct the U.S. Department of Justice's, Bureau of Justice Assistance's Smart Pretrial Demonstration Initiative, oversee technical assistance for states, localities, and various criminal justice stakeholder organizations, and assist states and local jurisdictions in understanding and implementing more legal and empirically-based pretrial policies and practices. I design strategic, system-change initiatives, deliver training and technical assistance, perform empirical research, and publish resource materials. In performing these activities, I have worked with several hundred city, county, or state jurisdictions or national organizations. I have also worked since 2004 as a technical resource provider/consultant for the U.S. Department of Justice's National Institute of Corrections providing criminal justice technical assistance.

3. Before my work at PJI, I served for nine years as a county employee working for a local criminal justice coordinating committee in Colorado. I received my Ph.D. in Clinical Psychology from the University of Missouri-Columbia.

4. I am submitting this statement to address the state of empirical research about the use of financial conditions as a tool to affect the pretrial outcomes of court appearance and public safety.

5. Judges, prosecutors, defense attorneys, sheriffs, police chiefs, pretrial services agency directors, and other criminal justice decision-makers have been asking me or the other staff at PJI for several decades about which interventions (i.e., bond/release conditions) are the most effective at simultaneously achieving the three goals of the pretrial release-or-

1

detention decision; that is, how simultaneously to (1) maximize public safety, (2) maximize court appearance, and (3) maximize the pretrial release of defendants from custody.

6. When answering this question, I talk about two types of bond conditions: (1) non-financial (e.g., court date reminders, pretrial supervision, substance testing, electronic monitoring, curfew, no contact orders, etc.); and (2) financial bond conditions. Financial bond conditions can be either (a) secured (financial transaction in the form of cash, surety, property, or deposit to the court that occurs prior to release from custody), or (b) unsecured (financial transaction that may occur after release from custody if the defendant fails to appear).

7. In late 2012, to more thoroughly answer the question about the most effective bond conditions, I co-authored with three other researchers and pretrial experts a literature review of the effectiveness of financial bond conditions (*see* Plaintiffs' Exhibit 12.t, "Dispelling the Myths: What Policy Makers Need to Know about Pretrial Research" (Bechtel et al., 2012)). In that report, we reviewed the studies that had been performed to date and that were the most relevant, most inquired about, or the most cited by persons discussing the issue of managing pretrial risk through financial bond conditions.

8. We found that although a few published studies did look at whether secured financial conditions were associated with pretrial outcomes, all of them had one of three serious limitations that rendered them not useful for pretrial policymaking purposes. First, some studies relied exclusively on data from the Bureau of Justice Statistics' State Court Processing Statistics data series, which the Bureau itself said in 2010 should not be used for evaluating the effectiveness of various pretrial release methods (see Plaintiff's Exhibit 7.n.1 and 7.n.2, "Data Advisory, State Court Processing Statistics Data Limitations" Bureau of Justice Statistics (2010)). Second, some studies investigated the link between financial conditions on only one (court appearance), or occasionally two (court appearance and public safety), pretrial outcomes. No study also simultaneously looked at the link between secured financial conditions and pretrial release/detention. Finally, some of the studies had such a poor methodological design that they did not meet social science conventions. Thus, we concluded that these studies were insufficient for pretrial policy-making because they failed to show that secured financial conditions were effective at maximizing court appearance while also maximizing public safety and maximizing release from custody.

9. Since the 2012 literature review, only three studies on the link between financial bond conditions and pretrial outcomes have been published, to my knowledge: (1) "Pretrial Release Mechanisms in Dallas County, Texas: Differences in Failure to Appear (FTA), Recidivism/Pretrial Misconduct, and Associated Costs of FTA" (Morris, 2013) (including this study's data update in 2014); (2) "Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option" (Jones, 2013), for which I was the researcher and author; and (3) "The Jefferson County Bail Project: Impact Study Found Better Cost Effectiveness for Unsecured Recognizance Bonds Over Cash and Surety Bonds" (Brooker et al., 2014).

10. Morris' study (and data update) has some of the same shortcomings as the studies in the literature review: Most importantly, the study did not analyze the impact of secured financial conditions on release rates. Moreover, despite the title of the study and because release rates and pretrial jail bed use were not measured, an adequate and useful pretrial cost-benefit analysis could not have been performed (see "A Cost-Benefit Model for Pretrial Justice," Community Resources for Justice (2015), for details). Finally, the author cautions against generalizing the study's findings to other counties. This caution is prudent because Dallas County, Texas, had at the time of Morris' study unique pretrial case processing practices (e.g., limiting non-financial releases initiated by a pretrial services agency to defendants who did not post bond the previous day(s) with a commercial bail bonding company). This practice would likely affect research results comparing bond-type releases, rendering the findings non-generalizable to other counties, including others in Texas.

11. Because of the important shortcomings of all these studies, I conducted a study in 2013, the first of its kind until the Brooker et al. (2014) study, that addressed these shortcomings. Specifically, while matching defendants on their pretrial risk levels as measured by an actuarial pretrial risk tool, I measured the link between secured financial conditions (mostly surety bonds) and unsecured financial conditions and the outcomes of court appearance, public safety, and release from custody, simultaneously in one study.

12. I found that: For defendants of all (lower, moderate, or higher) risk levels of pretrial failure:
   ➢ Unsecured financial conditions are as effective at achieving public safety as are secured financial conditions.
   ➢ Unsecured financial conditions are as effective at achieving court appearance as are secured financial conditions.
   ➢ Unsecured financial conditions free up more jail beds than do secured financial conditions because: (a) more defendants with unsecured financial conditions post their financial conditions; and (b) defendants with unsecured financial conditions have faster release-from-jail times.
   ➢ Higher monetary amounts of secured financial conditions are associated with more pretrial jail bed use but not increased court appearance rates.
   ➢ Unsecured financial conditions are as effective at "fugitive-return" for defendants who have failed to appear as are secured financial conditions.
   ➢ Many defendants are incarcerated for the pretrial duration of their case and then released to the community upon case disposition.

13. I concluded, based on these results, that: (1) jurisdictions can make data-guided changes to local pretrial case processing that would achieve their desired public safety and court appearance results while reserving more jail beds for unmanageably high risk defendants and sentenced offenders; (2) judicial officers now have data, in addition to law, to support changing their bail setting practices to maintain their effectiveness for public safety and court appearance while increasing the efficiency of their jail bed use; and (3) *if* monetary release conditions enhance defendants' court appearance, this study indicates that an unsecured financial condition can achieve the same court appearance rates as does a

secured condition; however, they do so while increasing the pretrial release rates of defendants and using far fewer jail beds.

14. In 2014, also because of the important shortcomings of all but the Jones (2013) study, Brooker et al. (2014) conducted a separate study to try to replicate the findings of the Jones (2013) study. Brooker was the primary researcher and author of this study, and I served as a contributor. This study used a dataset and methodology different from the Jones (2013) study, but found a similar pattern of findings when investigating the link between secured and unsecured financial conditions and court appearance, public safety, and release from custody/jail bed use, simultaneously in one study.

15. We found that: For similarly situated defendants:
   ➢ Judges who more frequently used unsecured financial conditions achieved the same public safety rates as did judges who more frequently used secured cash or surety financial conditions.
   ➢ Judges who more frequently used unsecured financial conditions achieved the same court appearance rates as did judges who more frequently used secured cash or surety financial conditions.
   ➢ Judges who more frequently used unsecured financial conditions had a higher release-from-jail-custody rate than did judges who more frequently used secured cash or surety financial conditions, thus using fewer jail beds.
   ➢ Judges who more frequently used unsecured financial conditions had faster release-from-jail-custody times than did judges who more frequently used secured cash or surety financial conditions, thus using fewer jail beds.

16. In light of these two studies' findings that show that bonds with secured financial conditions detain more defendants in jail and delay their release if they are released compared to bonds with secured financial conditions, I have reviewed other research studies, published in the past four to five years by reputable and academic criminal justice researchers, investigating the impact of pretrial detention on various outcomes for the justice system and for defendants. These studies are of sound, adequate research methodology.

17. These studies have found the same patterns of findings – that for similarly situated defendants (e.g., demographics, charges, criminal history), pretrial detention, sometimes for as brief as a few days, is associated with defendants' increased pretrial criminal activity, defendants' increased failure to appear, in-custody defendants' increased pleading guilty, increased sentences to jail and prison incarceration and for longer lengths of time, defendants' longer-term recidivism, and disruption of defendants' employment, financial situation, residential stability, and caring for dependent children.

18. Furthermore, I reviewed the Amici Curiae brief of the Pretrial Justice Institute and the National Association of Pretrial Services Agencies for *Walker v. City of Calhoun* in the U.S. Court of Appeals for the Eleventh Circuit. The cited research is of sound methodology and the authors' summary of that research is accurate.

19. In summary, pretrial research to date, taken as a whole, does not support that secured financial bond conditions improve the effectiveness or efficiency of the justice system. Regarding effectiveness, there is evidence that secured financial bond conditions do not improve court appearance, or public safety, over that achieved by unsecured financial bond conditions. Regarding efficiency, secured financial bond conditions do, however, prevent releasable defendants of any pretrial risk level from ever leaving jail pretrial, and if defendants with secured financial bond conditions are released, it takes them substantially longer to be released. Research has shown that this delay in release is associated with additional short-term and long-term criminal activity and failure to appear.

I declare under penalty of perjury that the forgoing is true and correct to the best of my ability.

*Michael R. Jones*   March 1, 2017

Michael R Jones

March 1, 2017

5

Exhibit 1




# A Cost-Benefit Model for Pretrial Justice

Pretrial justice in the United States is a multi-billion dollar investment. Despite all of the money flowing through the system, however, there is very little information about the cost effectiveness of pretrial justice strategies. To shed light on this issue, the Public Welfare Foundation partnered with the Crime and Justice Institute at Community Resources for Justice to develop a pretrial cost-benefit model. The model examines the cost implications for taxpayers and victims when pretrial defendants are detained or released, and allows local jurisdictions to explore the impact of policy change on these costs.

### The Cost-Benefit Model

The pretrial cost-benefit model monetizes the two key outcomes of pretrial justice: new crime and failures to appear in court. The model also considers system costs (e.g., jail bed days), and costs beyond the pretrial period, such as post-conviction incarceration. Monetary impact for these outcomes is calculated based on budget data from a local county, and is supplemented when needed by state and national data.

For example, if a county wishes to know the impact of releasing high-risk defendants from jail prior to trial, it can calculate the cost savings to the jail while also accounting for the risk that the defendant will commit a new crime. The results of the analysis will demonstrate whether the cost of additional crime would outweigh the benefit of decreased incarceration.

## Cost-Benefit Analysis

A cost-benefit analysis estimates the cost of the program or policy and monetizes the impact of that program or policy. Cost-benefit analyses can be used to compare the monetary impact of different outcomes and allows policy makers to assess programs or policies based on the estimated return on investment.

To populate the model, a jurisdiction must be able to provide current local data on:

- Pretrial screening and supervision
- Length of time on pretrial release, failures to appear, and pretrial misconduct, stratified by risk
- Court processing costs, including costs for prosecution, defense, and warrant administration
- Jail incarceration costs
- Dispositions by type
- Costs and lengths of stay for probation, prison, and parole

Jail cost estimates must account for costs that fluctuate with small changes in the population (e.g., food, clothing, and healthcare), as well as costs that change with moderate or large population changes, which could lead to staffing

reductions or fewer facilities. To fill gaps in local cost data, the model uses data from national sources on the costs of crime to victims, as well as the cost of arrest if it cannot be calculated locally.

The model requires a risk profile for the local pretrial population. Because the likelihood of failure to appear and pretrial misconduct varies by risk level, and because that risk can be actuarially assessed, the model is able to produce more precise results when stratifying by risk.

The initial data calculations in the model present the cost-benefit of "business as usual" in the jurisdiction—demonstrating the fiscal impact of current decision making regarding pretrial release and detention. Subsequently, the model can be used to demonstrate the impact of policy changes. What if more high risk defendants were held, and more low risk defendants released? What if lengths of stay in jail were reduced for low risk defendants? Pulling these policy "levers" in the model allows jurisdictions to explore policy options using their own data.

Figures 1 and 2 below highlight these projections for a fictional jurisdiction considering different options for high risk defendants. In Figure 1, projections show that releasing low risk individuals more quickly while also detaining high risk defendants would result in overall system cost savings as well as lower costs related to new crime. In Figure 2, projections show that if release rates are increased for high risk individuals, the costs of new crimes and failures to appear outweigh the decreased jail expenses. Projections like these can guide policymakers in considering the balance between jail utilization and public safety.





The model has been piloted in two jurisdictions: Johnson County, Kansas and Boulder County, Colorado. The pretrial systems in both counties have undergone significant change in recent years, including implementing pretrial risk assessment instruments.

---

### Pilot Jurisdictions

**Johnson County, Kansas**
County Population: **566,933**
Current Jail Capacity: **1,081 beds**
Pretrial assessments in 2014: **2,118**

**Boulder County, Colorado**
County Population: **310,048**
Current Jail Capacity: **536 beds**
Pretrial assessments in 2014: **3,692**

---

Piloting the cost-benefit model has provided insight into the cost implications of this new way of doing business, and both sites are planning to use the model for policy planning. Boulder County found evidence that their recent adoption of risk assessment and new supervision strategies are proving beneficial, and Johnson County plans to evaluate the costs and benefits of pretrial system change within the context of broader justice reinvestment efforts.

### Limitations of the Model

The complexity of the pretrial justice system is difficult to capture comprehensively in a cost-benefit model which relies on quantifiable outcomes associated with policy options. As a result, the model has some limitations.

Though the model is able to account for impacts to taxpayers and victims, it does not account for collateral costs to defendants, such as lost wages or loss of child custody. More research is needed to quantify these costs so that they can be incorporated into this and other decision making and projection models.

The model accounts for the cost of pretrial supervision, but it does not monetize the impact of pretrial supervision generally or at different dosage levels. Research on the benefit of pretrial supervision is incomplete, and there are not enough data on specific amounts and types of supervision and their outcomes to include them in the model. As the research evolves in this area, so can this model.

### Local Implementation: Questions to Ask

Jurisdictions considering a pretrial cost-benefit analysis stand to gain a unique and beneficial perspective on their system, but they must also commit to gathering specific and detailed data. To ensure that local stakeholders are able to make best use of the model, consider the questions below.

#### How will this information be used?

Very few criminal justice systems have participated in a cost-benefit analysis, and virtually no pretrial systems have experienced this process. Though most of the cost data that are being requested are a matter of public record, stakeholders may hesitate to put a price tag on their work out of concern for how the information is used. For example, if they estimate a per-case cost to prosecute a felony, will that mean budget cuts if felony rates decrease?

Before developing a data collection plan for a cost-benefit analysis, local stakeholders should discuss what the analysis is trying to achieve, the questions that it can and cannot answer, and any concerns about the process.

#### What are our marginal costs?

Cost-benefit analysis considers marginal costs, which are costs that vary with a change in

utilization. For example, one fewer jail inmate may result in reduced costs for health care and food, but would not change costs for staffing or utilities. These fixed costs only change if facilities are closed or units are shut down.

Often, counties talk about the average cost of the jail, which is calculated from the total operating cost divided by the number of bed-days used (e.g., a jail with a budget of $36M that is filled to its 1,000 bed capacity costs about $99 per inmate per day to run). If the county is able to reduce its population by 10 inmates per day, it does not save $360,000 per year in operating costs; the true savings are only a fraction of that. However, the $360,000 number often makes the headlines as an opportunity for reinvestment or budget reductions.

To successfully complete a cost-benefit analysis, officials must examine marginal costs—if the population is reduced by a small number, what do they save in jail costs? If the released population commits new crimes in the community, what will the price tag be for victims and the court? Answering these marginal cost questions requires a more careful examination of agency budgets, but offers a more accurate result.

### What does "risk-based decision making" mean for us?

The cost-benefit model assumes that jurisdictions are taking a risk-based approach to pretrial decision making for two reasons: the model attempts to align with the most recent research in the pretrial field, and the defendant's risk for pretrial misconduct or failure to appear has significant cost implications.

As mentioned above, sites can populate the model based on the risk profile of their population, but this doesn't require a transition to risk-based decision making. The model is designed to show the contrast between "business as usual" and future practice changes, so it can be very useful to jurisdictions that are about to transition to a risk-based pretrial system. However, for jurisdictions that plan to continue using a charge-based approach, the model will not be as useful at predicting costs and benefits. Before deciding to use the model, stakeholders should discuss if and how they would like to use risk in decision-making, and how they will use the model to guide risk-based policy development.

### What would happen if we changed our pretrial policies?

The most powerful element of the pretrial cost-benefit model is the ability to model changes in policy and practice and see their cost implications prior to implementation. Once the model has been populated, jurisdictions should take advantage of the opportunity to explore improvements to their system. What would happen if average lengths of stay were reduced? If the released population were lower risk, what would that look like for public safety costs?

Of course, dollars and cents aren't the only consideration when making decisions about pretrial justice policy and practice. Among multiple competing interests, however, cost-benefit information provides an objective anchor to discussions of short- and long-term implications for defendants, the court system, victims, and taxpayers.

*Published May 2015*

*For more information, contact Lisa Brooks at lbrooks@crj.org or visit CJI's website at www.crj.org/cji.*

Exhibit 2

# THE JEFFERSON COUNTY BAIL PROJECT: IMPACT STUDY FOUND BETTER COST EFFECTIVENESS FOR UNSECURED RECOGNIZANCE BONDS OVER CASH AND SURETY BONDS



## PRETRIAL JUSTICE INSTITUTE

CLAIRE M.B. BROOKER
MICHAEL R. JONES
TIMOTHY R. SCHNACKE

JUNE, 2014

# SUMMARY

In early 2010, Jefferson County, Colorado, conducted a Bail Impact Study, which was a pilot project to determine, among other things, the impact of using fewer secured money bonds on four bail outcomes: (1) public safety; (2) court appearance; (3) compliance with supervision; and (4) pretrial jail use.[1] This study was part of the larger Jefferson County Bail Project, a comprehensive undertaking to understand and improve the County's bail administration.[2] Results showed that the increased use of secured financial conditions of bond did not enhance court appearance, public safety, or compliance with other conditions of supervision. Secured bonds did, however, increase pretrial jail bed use. These findings suggest that when secured money bonds are set, it results in higher taxpayer cost with no public safety, court appearance, or compliance with supervision benefits.

*This project was supported by Grant No. 2012-DB-BX-K001 awarded by the Bureau of Justice Assistance. The Bureau of Justice Assistance is a component of the Office of Justice Programs, which also includes the Bureau of Justice Statistics, the National Institute of Justice, the Office of Juvenile Justice and Delinquency Prevention, the Office for Victims of Crime, and the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking. Points of view or opinions in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.*

# INTRODUCTION

In 2007, Jefferson County's Criminal Justice Coordinating Committee[3] embarked on a comprehensive review of the way local justice officials administered bail (the "Jefferson County Bail Project") and directed its staff, the Criminal Justice Planning Unit (CJP), to research the topic. A review of the current legal and empirical research led County criminal justice leaders to question the existing traditional money bail system it had used for decades and to consider making changes. The characteristics of the traditional money bail system in Jefferson County, and as described generally in the literature, were a heavy reliance on secured money bonds, particularly surety bonds, and the use of a charge-only based money bond schedule that enabled many defendants to be released from jail custody prior to an assessment of their risk to public safety and for failing to appear in court. County criminal justice leaders wanted to test proposed changes to this system to ensure that the impact of change at the local level would not negatively impact their system's pretrial operations or outcomes, and therefore requested a pilot project be conducted before changes might be made permanent.[4]

Several changes were implemented for the Bail Impact Study, based on national best-practice standards.[5] The judges suspended the existing money bail bond schedule for fourteen weeks and set bonds pursuant to a "process and schedule," which was modeled after best-practices in the administration of bail.[6] The County's Pretrial Services Unit conducted risk assessments on all defendants arrested and booked into the detention facility. That information was provided to the court, which held bond-setting advisements every day (including

---

1 This paper presents only the final analysis of the Study's pretrial outcomes. It does not describe the lengthy, detailed analyses or discussions of the Study's impacts on criminal justice agency operations.

2 For an overview of the Project in its entirety, see Timothy R. Schnacke, Michael R. Jones, Claire M.B. Brooker, and Hon. Margie Enquist, *The Jefferson County Bail Project: Project Summary Presented to the Attorney General's National Symposium on Pretrial Justice* (May 23, 2011) found at http://pretrial.org/Success/The%20Jefferson%20County%20CO%20Bail%20Project%20Summary%20May%202011.pdf.

3 At the time of the Bail Project, the CJCC (formerly the "Jefferson County Criminal Justice Strategic Planning Committee" or "CJSPC") was a coordinating committee similar to that described by Robert Cushman in the document, *Guidelines for Developing a Criminal Justice Coordinating Committee*, U.S. Dep't of Justice, Nat'l Inst. of Corr., NIC Accession No. 017232 (Jan. 2002).

4 The Jefferson County Justice Services Division successfully applied for a Byrne/Justice Assistance Grant from the Colorado Division of Criminal Justice to help fund the pilot project. *See Colorado Division of Criminal Justice, Justice Assistance Grant Program - 2009 Recovery Application*, available from the Jefferson County Criminal Justice Planning Unit.

5 See generally, *American Bar Association Standards for Criminal Justice (3rd Ed.) Pretrial Release* (2007). Because the ABA Standards are based on legal and evidence-based practices, those Standards served as a basis for the Jefferson County Bail Project and its Impact Study (*see also*, Marcus, *The Making of the ABA Criminal Justice Standards, Forty Years of Excellence*, 23 Crim. Just. (2009)).

6 *See* Chief Judge Order 2009-09: *In the Matter of the Jefferson County Bail Impact Study* (Dec. 22, 2009).

weekends and holidays) for the duration of the pilot project. Prosecutors were present at each advisement, and public defenders represented all felony defendants during the hearings. Due to a provision in Colorado statute (which was amended in 2013), public defenders could not represent misdemeanor defendants, but they gave these defendants general instructions on making a more meaningful bond argument. Pursuant to the "process and schedule," judicial discretion was not diminished, but judges were encouraged through both the new process and schedule's guidelines and during en banc discussions to set more unsecured bonds and fewer secured bonds. Although 96% of cases were legally eligible for unsecured (PR) bonds, and 66% of cases remained statutorily eligible without needing prosecutor consent, overall, judges set PR bonds in 30% of cases during the Study. However, this represented roughly a doubling of PR bonds set by judges from a baseline observation the previous fall.

# METHOD

During the Study, planning staff and pretrial services staff tracked every case with a bond set at advisements held each day from January 4th through April 9th, 2010.[7] Planning staff analyzed a total of 1,277 cases, 1,202 (94%) of which had reached disposition and closed by March of 2011. Of these 1,202 cases, 80 cases were excluded (33 for which no bond was set, 1 for which a "no bond hold" was set, 44 for which cash and surety bonds were concurrently set in different monetary amounts, and 2 for which bond-post status was unclear) leaving 1,122 cases in the final sample for analysis.

The effect of secured (cash or surety-option) versus unsecured (personal recognizance) money bonds on pretrial outcomes of public safety, court appearance, compliance with supervision, and pretrial jail use was measured using a quasi-experimental design.[8] The efficacy of one bond type typically cannot be directly compared to another on the outcome measures of public safety, court appearance, or compliance with supervision because in the traditional money bond system, a judge likely orders different types of bond for different types of defendants, which makes any attribution of defendant behavior to the bond type difficult to ascertain empirically. However, the quasi-experimental design with systematic case assignment employed for the Study allowed for such a comparison. The bond type definitions and outcome measurement methods are summarized below.

### Bond Type Definitions

**Secured Bond**
A bond where money has to be paid upfront before a defendant can be released from custody. It can be in the form of a cash-only or surety-option bond. The money can be forfeited if the defendant fails to appear for court.

**Cash-Only Bond**
A type of secured bond where the full amount of the bond must be paid to the court prior to release and is returned if all court appearances are made.

**Surety-Option Bond**
A surety bond is a type of secured bond where a fee is paid, and often collateral is given, to a commercial bail bonding business which, in turn, promises full payment of the bond to the court in the event that the defendant fails to appear for court. In Jefferson County, this type of bond was typically set as an option by the judge. That is, a defendant can either use a commercial surety agent or personally post the full amount in cash to the court.

**Unsecured Bond**
A bond where money is promised to be paid if the defendant fails to appear for court, but money does not have to be paid to gain release from custody. In Colorado this is called a personal recognizance (PR) bond. This type of bond may or may not have a co-signer who promises to pay the court the full monetary bond amount if the defendant fails to appear.

7 Jefferson County Pretrial Services Program supervisors, Leslie Holmes and Jessie Masciotro, were instrumental to the Study's completion, as well as the 2011 bond review analysis, through the extensive work they and their staff provided in designing, gathering, and entering case-level data.

8 In Colorado, the amount of money on any bond (secured or unsecured) cannot be legally forfeited for a new arrest, having new charges filed with the court, or for failing to comply with supervision conditions other than not appearing in court. Money bonds therefore have no legal relationship to public safety or compliance with other supervision conditions other than appearing for court. However, both types of money bonds (secured and unsecured) carry the potential penalty of paying money to the court in the event that a defendant fails to appear for court while on bond.

## Case and Pretrial Outcome Measurement Methods:

**Case**
Measured by counting each docket number from the advisement date to the case closure date as indicated in Colorado's online court information system.

**Court Appearance**
Measured by counting the number of defendants who attended all court events for their case after initially posting bond and being released from jail. If the court's online data records indicated that the "party failed to appear," the defendant was not counted as appearing in the court appearance statistic.

**Pretrial Jail Use**
Measured by counting the time from bond setting to bond posting, or from bond setting to case closure if the bond was never posted.

**Public Safety**
Measured by counting a defendant's new arrests/filings for offenses with dates that occurred between the initial bond posting date and court case closure date according to Colorado's online court information system.

**Technical-Only Violations (compliance with supervision)**
Measured by counting whether the defendant had a technical-only bond violation while under supervision. These violations exclude court appearance or public safety violations.

Judges in Jefferson County rotate through the task of setting bond at first advisement, with each judge taking either a full day or a full week at a time.[9] This systematic rotation and case assignment created, in effect, random assignment of cases because each judge was required to set bond on all cases entering the court while the judge was on duty. Nevertheless, while all judges saw similar cases, a review of the data illustrated that judges set more or less different bond types for their defendants. One group of judges set more unsecured bonds and fewer surety-option and cash-only bonds (the "Many Unsecured Bonds Group"), and another group set more surety-option and cash-only bonds (with more frequent surety-option bonds) and fewer unsecured bonds (the "Many Secured Bonds Group").[10] These two groups formed the comparison samples for the Study's quasi-experiment. Charts 1 and 2 show the distribution of bond types by judge and the cutoffs used for choosing which judges were included in the two groups used in subsequent analyses. The "Many Unsecured Bonds" group includes judges R, M, N, O and P and the "Many Secured Bonds" group includes judges S and T.[11] Judges who set bond types in a "more hybrid" manner were excluded from the Study.

9 The seven county court (misdemeanor-level) judges primarily had the task of holding advisements on a rotating weekly basis. The 14-week Study allowed each of those judges to have two "duty weeks" to test the new bail administration procedure. Seven district court (felony-level) judges also participated in the Study by sharing the responsibility of holding advisements on the weekends.

10 The comparison groups were selected based on the initial bond setting. The judge who sets bond at first advisement does not necessarily remain the judge through case disposition. Likewise, the bond set at initial advisement can later be modified.

11 The letters associated with the different judges are arbitrary labels used for this study and do not indicate a real-life court division.



**Chart 1: Unsecured Bonds Set**



**Chart 2: Secured Bonds Set**

We compared these two groups of judges using statistical significance tests. Each group of judges set bond, and had defendants post bond, in over 200 cases. To answer different research questions, the two judge groups were compared using all cases with a bond set (n=536) and also using just those cases where bond was posted (n=422). The statistical test employed on the major research questions was the chi-square test using a confidence interval of 95% (i.e., we can be at least 95% confident that the results found were not due to chance). We were not able to conduct statistical tests on all data as the nature of some of the data in the Study is not normally distributed or bi-modal and has high standard deviations. Additional descriptive analysis is provided on all 1,122 cases in the results section regarding pretrial jail use due to delayed and prevented release by bond type, the affordability of cash bonds, and the inevitability of a sentence to detention for those who do not post bond and remain in custody for their entire pretrial period.

In Jefferson County, it was common judicial practice at the time of the Study to order the vast majority of cases to supervision, regardless of the bond type set. Accordingly, the analysis of the two judge groups included only cases that were also ordered to pretrial supervision at advisement.[12] Moreover, because of the lack of cases posting bond that were not ordered to pretrial supervision, this study did not test the effectiveness of supervision itself (i.e., do defendants with similar case characteristics and bond types have different pretrial outcomes if they were ordered to pretrial supervision compared to those who were not). Finally, this study did not test the impact of the type and amount of pretrial supervision used. The study only tested the impact of bond type on pretrial release outcomes when supervision was held constant (i.e., pretrial supervision was ordered at advisement on all cases).[13]

12 The "Many Unsecured Bonds" judge group ordered supervision on 81% of all bonds set and of those who posted bond, 89% were ordered to pretrial services supervision at advisement. The "Many Secured Bonds" judge group ordered supervision on 86% of all bonds set and of those who posted bond, 88% were ordered to pretrial services supervision at advisement.

13 Some defendants may not have remained under pretrial services supervision for the entire duration of their court case.

## RESULTS

### Quasi-Experimental Design Results

Using the chi-square test, we determined that the comparison judge groups were statistically similar in the types of cases they saw, but discovered that the groups had statistically different bond types set and posted (see Tables 1, 2, and 3). Chi-square tests showed no statistically significant difference between the number of felony and misdemeanor/traffic cases in each judge group (p>0.05) for the comparisons made using both bonds set and bonds posted. However, there was a significant difference in the types of bonds set and posted for those cases (p<0.0005). This finding held true when the groups were compared using all three bond types (unsecured, cash-only, and surety-option) and when only two bond types, unsecured versus secured (cash-only and surety-option combined) were analyzed for the comparisons using both bonds set and bonds posted.

Given that these two groups of judges saw the same types of cases but set different types of bonds, we applied the chi-square test to determine the impact of those bonding decisions on public safety, court appearance, compliance with other conditions of supervision, and pretrial jail use. In order to answer the question of whether the type of bond posted impacts the pretrial outcomes of a defendant, Table 1 presents the comparison of the two judge groups for all bonds posted (n=422). In order to answer the question of whether setting a particular bond type at advisement has an impact on pretrial outcomes, regardless of whether that bond is posted or not, Tables 2 and 3 present the comparison of the two judge groups for all bonds set (n=536). We found the following:

### Outcome Measure: Public Safety

There was no significant difference in the public safety rate between the two judge-groups for defendants who posted bond (see Table 1). Although the judge groups did differ significantly in the percentage of defendants who never posted bond (see Table 2), there was no significant difference in the overall public safety rate between the two judge groups for all bonds set, including those who did and did not post bond (see Table 3).

### Outcome Measure: Court Appearance

There was no significant difference in the court appearance rate between the two judge-groups for defendants who posted bond (see Table 1). Although the judge groups did differ significantly in the percentage of defendants who never posted bond (see Table 2), there was no significant difference in the overall court appearance rate between the two judge groups for all bonds set, including those who did and did not post bond (see Table 3).

### Outcome Measure: Compliance with Supervision

There was no significant difference in the compliance with supervision rate between the two judge-groups for those who posted bond (see Table 1).

### Outcome Measure: Pretrial Jail Use

There was a significant difference in the percentage of defendants who did not post bond between the two judge-groups (see Table 2). As a result, the estimated pretrial jail cost for those who did not post bond was higher for the "Many Secured Bonds" group (see Table 2).

**Table 1: Public Safety and Court Appearance for Those who Posted Bond, by Judge Group**

| Judge Group | Total # of Cases | Charge Type * | | Bond Type ** | | | Court Appearance Rate * | Public Safety Rate (No New Arrest/Filing)* | Technical-Only Violation Rate* |
| | | Felony | Misd./T | Unsecured (PR) Bond Posted | Cash-Only Bond Posted | Surety-Option Bond Posted | | | |
|---|---|---|---|---|---|---|---|---|---|
| "Many Unsecured Bonds" | 211 | 43% (91) | 57% (120) | 56% (119) | 30% (64) | 13% (28) | 90% (189) | 79% (166) | 40% (85) |
| "Many Secured Bonds" | 211 | 46% (98) | 54% (113) | 39% (82) | 27% (58) | 34% (71) | 85% (180) | 77% (163) | 45% (95) |

Study Data Analyzed: Cases closed by March 2011 (up to a 14-month pretrial time period), ordered to Pretrial Services supervision at advisement, initial bond posted (rates calculated by person).
* Chi-square test showed no statistically significant difference between the comparison groups (p>0.05).
** Chi-square test showed a statistically significant difference between the comparison groups (p<0.05).

**Table 2: Pretrial Jail Bed Use, by Judge Group, for All Bonds Set**

| Judge Group | Total # of Cases | Charge Type* | | Bond Type** | | | % of Defendants Not Posting Bond by Case Closure** | Estimated Pretrial Jail Cost for Defendants Not Posting Bond @ $65/Day* |
| | | Felony | Misd./T | Unsecured (PR) Bond Set | Cash-Only Bond Set | Surety-Option Bond Set | | |
|---|---|---|---|---|---|---|---|---|
| "Many Unsecured Bonds" | 244 | 42% (102) | 58% (142) | 47% (114) | 32% (77) | 22% (53) | 19% (47) | $385,000 |
| "Many Secured Bonds" | 292 | 50% (145) | 50% (147) | 27% (80) | 26% (75) | 47% (137) | 29% (85) | $685,000 |

Study Data Analyzed: Cases closed by the end of March 2011 (up to a 14-month pretrial time period), ordered to Pretrial Services supervision at advisement, posted and not posted bond.
*Chi-square test showed no statistically significant difference between the comparison groups (p>0.05).
**Chi-square test showed a statistically significant difference between the comparison groups (p<0.05).
a. This calculation uses the average pretrial period for those not posting bond in the "Many Unsecured Bonds" and "Many Secured Bonds" judge groups, which was 126 days and 124 days, respectively. The judge may have intended for some of these defendants to remain in custody, which may reduce the estimated savings.

**Table 3: Public Safety and Court Appearance for All Bonds Set, by Judge Group[14]**

| Judge Group | Total # of Cases | Charge Type* | | Bond Type** | | | Court Appearance Rate* | Public Safety Rate (No New Arrest/Filing)* |
| | | Felony | Misd./T | Unsecured (PR) Bond Set | Cash-Only Bond Set | Surety-Option Bond Set | | |
|---|---|---|---|---|---|---|---|---|
| "Many Unsecured Bonds" | 244 | 42% (102) | 58% (142) | 47% (114) | 32% (77) | 22% (53) | 92% (224) | 82% (201) |
| "Many Secured Bonds" | 292 | 50% (145) | 50% (147) | 27% (80) | 26% (75) | 47% (137) | 90% (262) | 83% (242) |

Study Data Analyzed: Cases closed by March 2011 (up to a 14-month pretrial time period), ordered to Pretrial Services supervision at advisement, posted and not posted bond (rates calculated by person).
*Chi-square test showed no statistically significant difference between the comparison groups (p>0.05).
**Chi-square test showed a statistically significant difference between the comparison groups (p<0.05).

14 The technical-only violation rate was not included in this analysis because it is a measure that is only relevant for those who post bond.

### Descriptive Analysis

#### Detention and Delayed Release

Additional descriptive analysis of the data for all judges during the Study period showed a notable difference between bond types in the percentage of defendants who did not post bond as well as the delayed release of defendants who did post bond (see Table 4).[15] Pretrial detention and delayed release was higher for both types of secured bonds (cash-only and surety-option) compared to unsecured bonds. Table 5 shows an annualized estimate of the cost of this delayed pretrial release and detention. This is consistent with national data showing that release on a secured bond takes longer on average than release on a non-financial bond.[16]

### Table 4: Detention Rates and Release Times, by Bond Type

| Bond Type | Total # of Cases | Defendants' Bond Posting Status by Case Closure: | | Average # of Days to Post Bond When Bond Was Posted |
|---|---|---|---|---|
| | | % Posted | % Not Posted | |
| Unsecured (PR) | 348 | 97% (337) | 3% (11) | 0.2 |
| Cash-Only | 400 | 64% (254) | 37% (146) | 6.9 |
| Surety-Option | 374 | 51% (189) | 49% (185) | 9.1 |
| Total or Average | 1,122 | 70% (780) | 30% (342) | 4.5 |

Study Data Analyzed: Cases closed by the end of March 2011, for all judges, single bond type set at advisement, ordered and not ordered to Pretrial Services supervision at advisement, posted and not posted bond.

### Table 5: Annualized Estimate of Pretrial Jail Costs, by Bond Type

| Bond Type | # of Cases Extrapolated Annually | Estimated Avg. Daily # of Pretrial Beds Needed[b] for Defendants Who: | | Annual Estimated Total Pretrial Cost (at $65 Per Day in Jail) For Defendants Who: | |
|---|---|---|---|---|---|
| | | Post Bond | Do Not Post Bond | Post Bond | Do Not Post Bond[c] |
| Unsecured (PR) | 1,291 | 1 | 13 | $23,725 | $308,000 |
| Cash-Only | 1,484 | 18 | 172 | $427,050 | $4.1M |
| Surety-Option | 1,388 | 17 | 218 | $403,325 | $5.2M |
| Total | 4,163 | 36 | 403 | $854,100 | $9.6M |

Annualized Estimate Using Data from Table 4 (multiplier = 3.71).
b. The estimated average daily number of beds needed is calculated by multiplying the total number of cases by the percentage of cases with or without a posted bond from Table 4 and by the average number of days to post for each bond type (or the overall average pretrial period calculated in the Study for those who did not post bond (116 days)), and dividing by 365 (see, Mark A. Cunniff, Jail Crowding: Understanding Jail Population Dynamics, U.S. Dep't of Justice, Nat'l Inst. of Corr., NIC Accession No. 017209 (Jan. 2002)).
c. The judge may have intended for some of these defendants to remain in custody, which may somewhat reduce the estimated savings.

15 Due to the large standard deviations in each group, we were unable to use a t-test to determine if the difference between the average number of days to post bond for the comparison judge groups was statistically significant (the average time to post for all cases with a bond set was 2.7 days for the "Many Unsecured Bonds" judge group and 4.0 days for the "Many Secured Bonds" judge group).

16 Thomas H. Cohen & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Court, State Court Processing Statistics*, 1990-2004 (BJA 2007) at 5.

Study data illustrate that pretrial detention and delayed release occurred across the range of cash-only bond amounts in our study period with a trend of higher detention percentages and longer posting times associated with higher bond amounts (see Chart 3 and Table 6). This is consistent with national data showing a direct relationship between bail amount and probability of pretrial release for felony defendants.[17]

### Chart 3: Pretrial Detention by Cash-Only Bond Amount



Data includes initial cash-only bonds set during the Study for all cases closed by September 2010.

### Table 6: Detention and Delayed Release by Cash-Only Bond Amount

| Cash-Only Bond Amount | Total # of Cases | % Posted | % Not Posted | Avg. Time to Post in Days When Bond Was Posted |
|---|---|---|---|---|
| $1-50* | 6 | 83% (5) | 17% (1) | 8 |
| $51-100 | 48 | 60% (29) | 40% (19) | 2 |
| $101-150 | 19 | 79% (15) | 21% (4) | 1 |
| $151-200 | 34 | 82% (28) | 18% (6) | 2 |
| $201-250 | 40 | 65% (26) | 35% (14) | 1 |
| $251-300 | 19 | 58% (11) | 42% (8) | 2 |
| $301-400* | 12 | 50% (6) | 50% (6) | 0 |
| $401-500 | 72 | 58% (42) | 42% (30) | 2 |
| $501-750 | 17 | 59% (10) | 41% (7) | 8 |
| $751-1000 | 37 | 32% (12) | 68% (25) | 8 |
| $1001-5000 | 23 | 35% (8) | 65% (15) | 11 |
| $5001+* | 9 | 33% (3) | 67% (6) | 18 |

Data includes initial cash-only bonds set during the Study for all cases closed by September 2010.
* Statistics may be unreliable due to small sample size.

17 Cohen & Reaves, *supra* note 16, at 3.

Data collection performed in 2011 revealed that seventy-four percent of 934 defendants interviewed who were still in custody 48 hours after they were advised said they had no ability to post the secured amount of their bond. Similarly, a further review of presentenced inmates in September 2012 found that approximately 100 defendants were being held in jail due to a bond amount of $500 or less and 90 additional inmates were held on a bond amount of $1,000 or less.

### Disposition of Detained Cases Pretrial

Finally, we looked at the case outcome of the 229 closed cases that were ordered to supervision at advisement but never posted bond (see Table 7). Forty-two percent of those incarcerated for the entirety of their pretrial period were released to the community upon case disposition.

### Table 7: Disposition of Detained Cases Pretrial[18]

| Sentence Type | Outcome Frequency |
|---|---|
| **No Incarceration or No Community Supervision**<br>(Charges Dismissed, Charges Not Filed, Found Not Guilty at Trial, or Sentenced to Fines and Costs Only) | 14% (33) |
| **Community Based Sanction (No Incarceration)**<br>(Diversion, Community Corrections, or Probation) | 28% (63) |
| **Jail** | 37% (85) |
| **Department of Corrections** | 18% (42) |
| **Other** | 3% (6) |
| Data include cases closed by the end of March 2011, for all judges, single bond type set at advisement, ordered to Pretrial Services supervision at advisement, no bond posted.<br>Note: Full or partial credit for time served did not affect the sentence-type coding. | |

18 A bond type and amount was set at advisement for these 229 cases. Art. II, Section 19 of the Colorado Constitution and Colorado Revised Statute Section 16-4-101 sets forth limited criteria for denying bail.

# CONCLUSION

The Jefferson County Bail Impact Study did not identify any public safety, court appearance, or compliance with supervision benefits to requiring defendants to post a secured money bond (cash-only or surety-option) before they were released. For the Study and in Colorado today, judges have a choice to order either an unsecured personal recognizance bond or a secured bond, in the form of cash or surety, for almost all defendants, and to add conditions (such as pretrial supervision) to both types of bond. The Study's findings suggest that judges who use more unsecured bonds in lieu of secured bonds are more cost-effective because they use fewer pretrial jail resources to achieve the same public safety rate, court appearance rate, and compliance with other bond conditions. Moreover, the findings revealed that almost half of the defendants detained in the Jefferson County Detention Facility for their entire pretrial period were released to the community upon the disposition of their case. Policy makers exploring ways to improve their administration of bail can reduce their use of secured money bonds and still achieve an appropriate balance between a defendant's constitutional liberty interest with society's interest in court appearance, public safety, and saving taxpayer dollars incurred from pretrial jail incarceration.

## Study Generalizability and Limitations

This was a robust yet local study. While the results are specific to Jefferson County, they likely apply to other jurisdictions, especially those in Colorado, to the extent that those jurisdictions see similar types of cases, set similar types of bonds, and have a similar pretrial services program that supervises defendants. To ensure broad generalizability, this study's methods can be tested in and across multiple jurisdictions.

This study controlled for potential differences in defendants' risk by using near random assignment of defendants to the various judges and by matching groups on defendants' charge type, the only variable available in the data.[19] Defendants' risk level was not tested directly as was done in a similar study by Jones (2013) that examined the role of financial bond type on public safety, court appearance, and jail bed use.[20] Nonetheless, although the current study and the Jones study used different methods, they found nearly the same pattern of results. Finally, because all bonds in Colorado had a monetary condition, either secured or unsecured, the current study did not test the impact of having no financial condition of bond on pretrial outcomes.

19 The two groups did not significantly differ when looking at charge type.

20 Jones, M. R. (2013). *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option.* Washington, DC: Pretrial Justice Institute.

## ABOUT THE AUTHORS

**Claire M.B. Brooker** has served as a criminal justice planner/analyst for the Jefferson County Criminal Justice Planning Unit since 2007. She has a bachelor's degree in political science from St. Norbert College and a master's degree in public policy from the University of Colorado at Boulder.

**Michael R. Jones** served as the criminal justice planning manager for the Jefferson County Criminal Justice Planning Unit during the Jefferson County Bail Project. He partnered with Tim Schnacke and Claire Brooker to serve as staff support to the jurisdiction's criminal justice coordinating committee as it worked on the Bail Project. Before the Project was completed, he left his position to join the Pretrial Justice Institute to work on similar efforts nationwide. He has a Ph.D. in clinical psychology from the University of Missouri-Columbia.

**Timothy R. Schnack**e served as a planner/analyst for the Jefferson County Criminal Justice Planning Unit during the Jefferson County Bail Project. He is currently the Executive Director of the Center for Legal and Evidence-Based Practices in Golden, Colorado. He has a law degree from the University of Tulsa, a master of laws degree from the George Washington University, and a master of criminal justice degree from the University of Colorado at Denver.

Exhibit 3

# RESEARCH REPORT

## PRETRIAL RELEASE MECHANISMS IN DALLAS COUNTY, TEXAS:

DIFFERENCES IN FAILURE TO APPEAR (FTA) AND ASSOCIATED COSTS OF FTA[*]

## *2012 DATA UPDATE*

**Prepared by:**

**Robert G. Morris, Ph.D.,**
**Associate Professor of Criminology**
**Director, Center for Crime and Justice Studies**

**The University of Texas at Dallas**
**800 West Campbell Rd, GR 31**
**Richardson, Texas 75080-3021**

**(972) 883-6728**
**morris@utdallas.edu**

**December 2014**

[*] **This study was completed on behalf of the Dallas County Criminal Justice Advisory Board (CJAB) and was funded exclusively by Dallas County, Texas.**

## EXECUTIVE SUMMARY

Relative to other elements of the criminal justice system, pretrial release and the mechanisms by which it operates has received little attention from scholars and empirical research is lacking. This study is a follow-up to a previous undertaking that explored the effect of specific pretrial release mechanisms on likelihood of a bond forfeiture (i.e., failure to appear or FTA) among defendants, and associated costs. The findings from the previous study, which analyzed data from those jailed during 2008, will be compared with new data from 2012 defendants.

The purpose of this study was to further address a number of very important issues that underlie pretrial release from jail specific to varying mechanisms of release including: attorney bonds, cash bonds, commercial bonds, and pretrial services bonds.[1] Archival data was culled from official records collected by the Dallas County criminal justice system as well as from the Texas Department of Public Safety (DPS). The analyses presented here were based on all defendants booked into the Dallas County jail at any time during 2012 for a crime/s in which the defendant was not previously arrested/jailed, and who were released via one of the above noted release mechanisms (n = 12,071). Specifically, this study addresses the following questions: (1) Do failure to appear (FTA) rates vary across release mechanisms and if so, by how much? (2) What are the additional court costs (observed and estimated) associated with FTA rates across release types? (3) How do the estimates for 2012 defendants differ from those of 2008?

***Methods and Findings***. Regarding FTA, this study approximated an experimental research design to provide for an objective "apples-to-apples" empirical analysis (propensity score matching) in a manner equivalent to the 2008 undertaking. This analysis suggested that net of other effects (e.g., criminal history, age, indigence, etc.—see technical appendix), similarly situated defendants released via commercial bonds in 2012 remained the least likely to fail to appear in court compared to any other specific mechanism, as was the case in 2008. This finding was consistent when assessed for all charge categories combined and when the data were stratified by felony and misdemeanor offenses, respectively. For felony defendants (among the matched pairs), those *not* released on commercial bond were between 0 and 41 percent more likely to fail to appear in court, with the largest difference being between cash and commercial, followed by pretrial. No differences in FTA rates were found between attorney and commercial bonds among felony or misdemeanor defendants when analyzed separately. For misdemeanors, differences were similar, ranging between 19 and 37 percent with pretrial services bonds being the most different from commercial, followed by cash bonds. Overall, analyses based on the data explored here suggest that commercial bonds were the most successful in terms of FTA.

However, it is interesting to note that the magnitude of differences in FTA rates between commercial bonds and other bond types was reduced for the 2012 analysis as compared to the 2008 study. This was particularly the case when comparing FTA among misdemeanor defendants released via commercial to those via pretrial services. This reduced difference was primarily driven by a major decrease in the conditional FTA rate by pretrial services for misdemeanor defendants (from 40 to 26 percent), though FTAs for commercial bonds for this category were also improved (from 27 to 21 percent).

---

[1] Personal recognizance was not analyzed here due to its very limited use in release for new crimes (less than 1%).

For felonies, the differences in FTA rates between release type were generally reduced, however, each mechanism tended to have a higher rate of FTA for 2012 compared to 2008.

By request of Dallas County, the 2012 study was extended to present supplemental detail to the findings specific to pretrial services releases. Using pretrial services as a reference category, significant differences in FTA tended to be in comparison to commercial bonds, with the sole exception of attorney bonds for felonies. In short, commercial bonds were less likely result in FTA compared to pretrial services for any charge type, and attorney bonds tend to FTA less than pretrial services for felony defendants. There appears to be no difference in FTA rates between pretrial services bonds and cash bonds when comparing like defendants.

Regarding the costs associated with FTA across each release type, model estimates suggest that commercial bond releases were again the most cost-effective in Dallas County, based on the group of defendants captured by the study for 2012. This finding was corroborated by the observed data, which suggested that for the 12,000+ defendants captured by this study, assuming a public cost of $1,775 per FTA[2], the use of commercial bonds saved over $7.6 million (or ~$350k per 1,000 defendants) among felony defendants and over $3.5 million (or $160k per 1,000 defendants) among misdemeanor defendants, as compared to attorney bonds, cash bonds, and pretrial services bonds. For misdemeanors and felonies, the largest differences in costs were found between commercial bonds and cash bonds suggesting that between these two forms of release, commercial bonds are more cost effective when it comes to losses resulting from FTA.

---

[2] Estimate adjusted for inflation from 1997 dollars. Base estimate taken from Block and Twist (1997), who conduced a complete cost-benefit analysis of failure to appear in Los Angeles, CA.

TABLE OF CONTENTS

Executive Summary…………………………………………………………………… 2

Study Highlights………………………………………………………………………  5

Study Findings…………………………………………………………………………  6

    Descriptive Statistics…………………………………………………………………  6

    Comparative Analysis and Results……………………………………………….  7

        Notable Findings for FTA…………………………………………………… 9

        Findings Specific to Pretrial Services  …………………………………… 10

    Cost-benefit Analysis for Failure to Appear……………………………………… 13

Recommendations for Policy…………………………………………………………16

Study Limitations……………………………………………………………………  17

Technical Appendix…………………………………………………………………  18

References………………………………………………………………..…..…..…  25

Acknowledgements…………………………………………………………………  26

About the Author……………….………….…………….……………….…………. 27

STUDY HIGHLIGHTS

- This study explored failure to appear (FTA) based on longitudinal data for 12,071 defendants released from the county jail during 2012 for the first new offense occurring during that year and compares such statistics to findings from 2008 data.

- The analyses isolated the effect of particular bond types by statistically controlling for many correlates (i.e., predictors of) FTA by approximating an experimental research design (see appendix for a complete listing and definitions).

- When comparing similarly situated defendants' probability of FTA for all case types, defendants released via a commercial bond (i.e., a bail bond company) were significantly and substantively less likely to fail to appear in court compared to attorney bonds, cash bonds, and pretrial services bonds, respectively. This finding held when analyzing all defendants simultaneously and when assessing felony and misdemeanor defendants separately.

- Differences in FTA between release mechanisms were reduced for 2012.

- FTA for felonies increased for among each mechanism for 2012 while FTA for misdemeanors decreased among each mechanism for 2012.

- For pretrial services misdemeanor defendants, FTA were substantively reduced from 08' to 12' by 33%, however, for felony defendants, the rate of FTA was substantively increased by 44%. Pretrial services accounts for roughly 11% of releases for new crimes.

- Release on their own recognizance (OR) was rarely used for an initial release (less than 1% of defendants). For this reason, OR was excluded from the analysis.

- A basic cost-benefit analysis suggested that commercial bonds tend to be a more cost effective method in terms of reducing the likelihood of FTA in Dallas County. Based on the observed data for every 1,000 comparable felony defendants, assuming a public cost (i.e., justice administration) of $1,775 per FTA[3], the use of commercial bonds cost the county approximately $392k compared to $536k, $591k, and $682k for attorney, cash, and pretrial services bonds, respectively. This finding is further substantiated by the fact that commercial bonds accounted for 66% (or 2/3[rd]) of all releases for new crimes.

- Overall, the estimated costs due to FTA in 2012 were less than that from 2008 however this was driven by reductions in misdemeanor FTAs, despite the fact that felony FTAs increased for 2012. This was particularly the case for pretrial services defendants.

- The strongest predictor variables of FTA across release mechanisms were also explored and did not change from the 2008 study. Readers interested in predictor variable influence should visit the 2008 report.

- The number of eligible defendants in the 2012 data was less than half of that from 2008. The reasoning behind this change is unclear at this time, but may have to do with changes in arrest policies.

---

[3] Estimate adjusted for inflation from 1997 dollars. Base estimated taken from Block and Twist (1997), who conduced a complete cost-benefit analysis of failure to appear in Los Angeles, CA.

**STUDY FINDINGS**

**Descriptive Statistics for Bond Forfeiture/FTA among Defendants Jailed on New Charges**

| All Charge Types | 2008 | | | 2012 | | | Change Statistics | |
|---|---|---|---|---|---|---|---|---|
| Release Mechanism | # of Defendants | % | Raw FTA Rate | # of Defendants | % | Raw FTA Rate | Actual Δ | Relative Δ |
| Attorney | 684 | 3.1 | 34.1 | 521 | 4.3 | 30.3 | -3.8 | -11% |
| Cash | 4,219 | 19.2 | 29.2 | 1,742 | 14.4 | 32.9 | 3.7 | 13% |
| Commercial | 14,705 | 66.8 | 23.0 | 8,604 | 71.3 | 23.5 | 0.5 | 2% |
| Pretrial | 2,411 | 10.9 | 37.0 | 1,204 | 10.0 | 30 | -7.0 | -19% |
| Total / Overall | 22,019 | 100.0 | 26.1 | 12,071 | 100 | 25.8 | -0.3 | -1% |

| Felony FTA | 2008 | | | 2012 | | | Change Statistics | |
|---|---|---|---|---|---|---|---|---|
| Release Mechanism | # of Defendants | % | Raw FTA Rate | # of Defendants | % | Raw FTA Rate | Actual Δ | Relative Δ |
| Attorney | 326 | 5.1 | 28.2 | 301 | 6.7 | 30.2 | 2.0 | 7% |
| Cash | 339 | 5.3 | 30.7 | 261 | 5.8 | 33.3 | 2.6 | 8% |
| Commercial | 5,048 | 78.9 | 16.6 | 3,615 | 80.2 | 22.1 | 5.5 | 33% |
| Pretrial | 682 | 10.7 | 26.1 | 331 | 7.3 | 38.4 | 12.3 | 47% |
| Total / Overall | 6,395 | 100.0 | 19.0 | 4,508 | 100 | 24.5 | 5.5 | 29% |

| Misd. FTA | 2008 | | | 2012 | | | Change Statistics | |
|---|---|---|---|---|---|---|---|---|
| Release Mechanism | # of Defendants | % | Raw FTA Rate | # of Defendants | % | Raw FTA Rate | Actual Δ | Relative Δ |
| Attorney | 342 | 2.4 | 37.4 | 220 | 2.9 | 30.5 | -6.9 | -18% |
| Cash | 3,529 | 25.2 | 30.2 | 1,462 | 19.4 | 33.2 | 3.0 | 10% |
| Commercial | 8,548 | 61.0 | 26.7 | 4,988 | 66.1 | 24.5 | -2.2 | -8% |
| Pretrial | 1,589 | 11.3 | 39.6 | 873 | 11.6 | 26.6 | -13.0 | -33% |
| Total / Overall | 14,008 | 100.0 | 29.3 | 7,543 | 100 | 26.6 | -2.7 | -9% |

**NOTE**: Unconditioned (Raw) FTA Rates are not appropriate for direct comparison to an alternative release mechanism. Use as a reference only within a single release type. The reason behind non-comparability with these raw rates is that some defendants may not be eligible for one or more release types (e.g., pretrial services bonds are reserved for less serious offenses). Comparable conditioned FTA rates are presented in the analyses below.

*- Actual Δ: The actual (i.e., percentage point) change in FTA rate from 08' to 12'.*
*- Relative Δ: The relative change in the FTA rate from 08' to 12' (i.e., [2008 – 2012] / 2008)*

ANALYTICAL FINDINGS

**PROPENSITY SCORE MATCHING ANALYSIS: FAILURE TO APPEAR**

The below findings represent an "apples-to-apples" approach to exploring differences in FTA rates among similarly situated defendants, across the release mechanisms. These estimates have been conditioned (i.e., statistically adjusted on other influence factors) based on the defendant/crime characteristics outlined in the technical appendix, by means of a counterfactual statistical modeling strategy known as propensity score matching (PSM).

PSM was used to assess the effect sizes of different combinations of release mechanisms on 1) whether a defendant fails to appear (FTA) in court. This counterfactual model approximates an experimental design by allowing for comparisons to be made between defendants that had an equivalent probability of receiving some treatment (here the treatment being a release mechanism) over an alternative treatment. Similar analytical designs where the focus has been on multiple treatment effects are not uncommon in the social sciences (see Lechner, 1999; 2001)

***NOTE: Prior to presenting the results, readers unfamiliar with PSM are encouraged to read the information provided in the technical appendix to get a basic idea of what the technique does and how to interpret the findings presented in the below tables.

The below table presents the statistically significant findings on FTA stemming from the propensity score matching analysis and using commercial bonds as a reference category (comparison) group, comparing the findings from the 2012 data with those from the 2008 report. This approach was taken because significant differences were found only for comparisons that included similarly situated (matched) defendants released on a commercial bond defendants. Also presented are findings from the 2012 data using pretrial services as the reference category.

Overall, the findings from the 2012 data generally resemble those from the 2008 analyses, favoring commercial bonds in terms of lower FTA rates. However, several notable differences emerged and are outlined below. Of note, the gaps in rates of FTA between commercial bonds and other bonds were often found to be closed by a sizable margin. Other differences were reduced to a degree of which was no longer found to be statistically significant.

Pretrial Release Mechanisms 2012 – Dallas County, Texas    8

**Multi-treatment Propensity Score Matching Results on Failure to Appear: VERSUS COMMERCIAL**

| Treated vs. Matched Controls released on Commercial Bonds | 2008 | | | | 2012 | | | | Relative Δ from 08' to 12' | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Raw (Unmatched) FTA Rate | Mean FTA Rate 08 (Treated) | Mean FTA Rate 08 (Controls) | Relative Difference in FTA vs. Commercial | Raw (Unmatched) FTA Rate | Mean FTA Rate 12 (Treated) | Mean FTA Rate 12 (Controls) | Relative Difference in FTA vs. Commercial | *Matched Δ* | *Raw Δ* |
| **All Defendants** | | | | | | | | | | |
| Commercial | 0.23 | - | - | - | 0.24 | - | - | - | - | +4.3% |
| Attorney | 0.34 | 0.34 | 0.27 | 21% | 0.30 | 0.30 | 0.23 | 23% | +9.5% | -11.8% |
| Cash | 0.29 | 0.29 | 0.20 | 31% | 0.33 | 0.32 | 0.24 | 25% | -19.4% | +13.8% |
| Pretrial | 0.37 | 0.37 | 0.23 | 39% | 0.30 | 0.30 | 0.22 | 27% | -30.8% | -18.9% |
| **Felony** | | | | | | | | | | |
| Commercial | 0.17 | - | - | - | 0.22 | - | - | - | - | +29.4% |
| Attorney | 0.28 | 0.28 | 0.17 | 39% | 0.30 | No Significant Difference | | | - | +7.1% |
| Cash | 0.31 | 0.32 | 0.14 | 56% | 0.33 | 0.33 | 0.22 | 33% | -41.1% | +6.5% |
| Pretrial | 0.26 | 0.26 | 0.15 | 42% | 0.38 | 0.39 | 0.23 | 41% | -2.4% | +46.2% |
| **Misdemeanor** | | | | | | | | | | |
| Commercial | 0.27 | - | - | - | 0.25 | - | - | - | - | -7.4% |
| Attorney | 0.37 | 0.38 | 0.27 | 29% | 0.31 | No Significant Difference | | | - | -16.2% |
| Cash | 0.30 | 0.31 | 0.23 | 26% | 0.33 | 0.33 | 0.24 | 27% | +3.8% | +10.0% |
| Pretrial | 0.40 | 0.40 | 0.27 | 32% | 0.27 | 0.26 | 0.21 | 19% | -40.6% | -32.5% |

Note: All findings are compared to Commercial Bonds (the reference category). Only statistically significant comparisons shown where equivalent findings were demonstrated between alternated reference categories (p < .05).

*Relative Δ: The relative change in the FTA rate from 08' to 12' (i.e., [2008 – 2012] / 2008)*

**Notable Findings:**

• For 2012, the gap between conditioned FTA rates for commercial bonds versus other types was narrowed in most comparisons, however commercial bonds tended to have lower rates compared to most other types. The gap in relative difference increased between commercial and attorney bonds when analyzing all defendants simultaneously, yet this finding was confounded when stratifying between felonies and misdemeanors (i.e., any difference in FTA between commercial and attorney bonds disappeared).

• The relative difference in felony FTA between cash bonds and commercial bonds was dramatically reduced for 2012; commercial out performed cash by 33% in 2012 compared to 56% in 2008. This is an improvement by cash bonds of 23 percentage points (or a relative change of 41%— *[How was this calculated? (56-33)/56=.41)]).*

• The difference in misdemeanor FTA between commercial and pretrial services was dramatically reduced for 2012; commercial bonds outperformed pretrial services by 19% compared to 32% in 2008, a 41 percent change. FTA rates for pretrial services misdemeanor defendants was improved dramatically for 2012.

• Raw FTA rates increased across all release types among felonies, with the biggest increases from pretrial and commercial bonds. Raw FTA rates for misdemeanors increased for cash bonds, but were reduced considerably among pretrial services bonds and for attorney b

• When comparing all defendants, the difference in FTA between commercial and pretrial services bonds was dramatically reduced for 2012; commercial bonds outperformed pretrial services by 27% compared to 39%. This is an improvement by pretrial services of 12 percent points (or a relative change of 31%).

• Cash bonds performed worst among misdemeanor defendants, and in comparison to commercial bonds for equivalent defendants, they pose a much increased risk for FTA (27-3 percent).

Multi-treatment Propensity Score Matching Results on Failure to Appear: VERSUS PRETRIAL SERVICES 2012

| Treated vs. Matched Controls released via Pretrial Services | Mean FTA Rate (Treated) | Mean FTA Rate (Controls) | FTA Rate Difference | % Difference in FTA vs. Pretrial |
|---|---|---|---|---|
| **All Defendants** | | | | |
| Commercial | 0.24 | 0.30 | -0.06 | 25% Lower |
| | | | | |
| **Felony** | | | | |
| Commercial | 0.24 | 0.38 | -0.14 | 58% Lower |
| Attorney | 0.24 | 0.40 | -0.16 | 67% Lower |
| | | | | |
| **Misdemeanor** | | | | |
| Commercial | 0.21 | 0.26 | -0.05 | 24% Lower |

Treated vs. Matched Controls released on Pretrial Service Bonds (the reference category). Only statistically significant comparisons shown ($p < 0.05$).

**Notable Findings:**

- At a high level (i.e., among all defendants), and among misdemeanor defendants, FTA rates were significantly different only between pretrial services and commercial bonds.

- No statistically significant differences were found in rates of FTA between cash bonds and pretrial services bonds.

**Failure to Appear Analysis – Propensity Score Matching Results**

*How are the below tables interpreted?*

The below tables represent all differences between release types (unlike the above table which illustrates the same findings, but for statistically significant findings only). The PSM findings are presented to illustrate the differences in FTA rates between those treated and their matched controls for all releases, felonies, misdemeanors, and state jail felonies, respectively. On the diagonal of these tables are the unadjusted FTA rates for each release type. These statistics are presented for reference only. The off-diagonal statistics are the mean (average) difference in FTA rates (i.e., the treatment effect) between those released via a particular treatment (i.e., release mechanism)--which is identified by the left-hand column--compared to a particular alternative, identified by the top row of the table. Note that the percent range displayed (if statistically significant) reflects the estimated difference for matching based on an inverted treatment outcome (e.g., commercial vs. attorney compared to attorney vs. commercial)(Non-significant findings are indicated as such in the table).

As an example, looking at the top category, "Attorney Bond" on the far left column of the first table below (for 2008), we can see that the unadjusted FTA rate for this release type is 34 percent. Following this row to the right, we see that there is no statistically significant difference in FTA rates between comparable (i.e., similarly situated) defendants released by an attorney bond compared to cash bonds. However, the conditioned difference in FTA rate for attorney bonds is 7-13 percentage points higher than for Commercial bonds; this is the conditioned actual difference. Further, we find no significant difference between attorney bond FTA rates and pretrial services bonds.

**2012 <u>All Defendants</u>: Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)**

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | **.30** | *NS* | .07 Higher | *NS* |
| Cash Bond |  | **.33** | .09 to .10 Higher | *NS* |
| Commercial Bond |  |  | **.23** | -.06 to .08 Lower |
| Pretrial Services |  |  |  | **.30** |

2008 Findings

|  | *Attorney Bonds* | *Cash Bonds* | *Commercial Bonds* | *Pretrial Services* |
|---|---|---|---|---|
| *Attorney Bond* | *.34* | *NS* | *.07-.13 higher* | *NS* |
| *Cash Bond* |  | *.29* | *.09-.10 higher* | *NS* |
| *Commercial Bond* |  |  | *.23* | *.14-.15 lower* |
| *Pretrial Services* |  |  |  | *.37* |

*Note: Unadjusted failure to appear (FTA) rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

---

**2012 <u>Felony</u> Defendants: Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)**

| Bail Type | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | **0.30** | *NS* | 0.08 Higher* | 0.16 to 0.17 Lower |
| Cash Bond |  | **0.33** | 0.11 Higher | *NS* |
| Commercial Bond |  |  | **0.22** | 0.14 to 0.16 Lower |
| Pretrial Services |  |  |  | **0.38** |

\* Indicates partial support

*2008*

| *Bail Type* | *Attorney Bond* | *Cash Bond* | *Commercial Bond* | *Pretrial Services* |
|---|---|---|---|---|
| *Attorney Bond* | *0.29* | *NS* | *.11-.12 higher* | *NS* |
| *Cash Bond* |  | *0.3* | *.15-.18 higher* | *NS* |
| *Commercial Bond* |  |  | *0.17* | *.10-.11 lower* |
| *Pretrial Services* |  |  |  | *0.26* |

\* Indicates partial support

*NS: No statistically significant difference.*

**2012 <u>Misdemeanor</u> Defendants: Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)**

| Bail Type | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | **0.30** | *NS* | *NS* | *NS* |
| Cash Bond | | **0.33** | 0.09 Higher | *NS* |
| Commercial Bond | | | **0.24** | 0.05 Lower |
| Pretrial Services | | | | **0.27** |
| | | | | |
| *2008* | | | | |
| *Bail Type* | *Attorney Bond* | *Cash Bond* | *Commercial Bond* | *Pretrial Services* |
| *Attorney Bond* | *0.37* | *NS* | *.10-.11 higher* | *NS* |
| *Cash Bond* | | *0.3* | *.08 higher* | *NS* |
| *Commercial Bond* | | | *0.27* | *.12-.13 lower* |
| *Pretrial Services* | | | | *0.4* |
| *NS: No statistically significant difference.* | | | | |

## COSTS OF FAILURE TO APPEAR

The below matrices represent a basic cost-benefit analysis based on the treatment effect of each release mechanism for treated versus matched controls. Since no exact figures were available on the cost of a single FTA, <u>it was conservatively assumed that the public cost for an FTA is $1,775 per FTA (see Block and Twist (1997))</u>.

**For this example, the below figures represent the costs associated with the processing of FTAs per 1,000 defendants. These numbers do not reflect the subsequent social costs that may stem from FTA. These differences (i.e., between release types) are based on the mean (average) treatment effect size differences presented in the propensity score matching analysis outlined above.**

**The table immediately below presents the results from the 2012 analysis. Further below are the 2008 results for reference.**

INTERPRETATION OF TABLES: The on-diagonal numbers are the costs for dollars spent on FTA processing for a particular release type based on the FTA rates from the matched pairs of defendants resulting from the PSM analysis. The off-diagonals represent the *differences* in cost between release types (row versus column). Note that positive (+) numbers reflect extra costs and negative (-) numbers represent savings. For example, in the first row of the further table below for 2008, we expect that for every 1,000 defendants released by way of an attorney bond an extra 7 to 13 percent of defendants will FTA, compared to similar defendants released via a commercial bond. The mid-point (half the distance between the range) of that estimate being 10% or (10 = [6/2] + 7). This equates to an additional cost of $60,350 for FTA processing *($603,500 x .10 = $60,350)* for those 1,000 defendants released via an attorney bond who were equally likely to have been released on a commercial bond. An alternative interpretation would be that if these same individuals were released via a commercial bond, the savings in FTA processing costs would have been -$60,350. Because there was no difference in the effect of release type on FTA between attorney bonds and cash bonds, the cost difference was assumed to be $0.

**2012 COSTS of Failure to appear for 1,000 similar defendants released from jail.**

**All Charge Types**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | **$537,825** | $0 | $37,648 | $0 |
| Cash | $0 | **$583,975** | $55,478 | $0 |
| Commercial | -$37,648 | -$55,478 | **$417,125** | -$29,199 |
| Pretrial | $0 | $0 | $29,199 | **$532,500** |

**Felonies**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | **$536,050** | $0 | $42,884 | |
| Cash | $0 | **$591,075** | $65,018 | $0 |
| Commercial | -$42,884 | -$65,018 | **$392,275** | -$58,841 |
| Pretrial | $0 | $0 | $58,841 | **$681,600** |

**Misdemeanors**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | **$541,375** | $0 | $0 | $0 |
| Cash | $0 | **$589,300** | $53,037 | $0 |
| Commercial | $0 | -$53,037 | **$434,875** | -$21,744 |
| Pretrial | $0 | $0 | $21,744 | **$472,150** |

**2008 COSTS of Failure to appear for 1,000 similar defendants released from jail.**

**All Charge Types**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$603,500* | $0 | $60,350 | $0 |
| Cash | $0 | *$514,750* | $48,901 | $0 |
| Commercial | -$60,350 | -$48,901 | *$408,250* | -$59,196 |
| Pretrial | $0 | $0 | $59,196 | *$656,750* |

**Felonies**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$514,750* | $0 | $59,196 | $0 |
| Cash | $0 | *$532,500* | $87,863 | $0 |
| Commercial | -$59,196 | -$87,863 | *$301,750* | -$31,684 |
| Pretrial | $0 | $0 | $31,684 | *$461,500* |

**Misdemeanors**

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$656,750* | $0 | $68,959 | $0 |
| Cash | $0 | *$532,500* | $42,600 | $0 |
| Commercial | -$68,959 | -$42,600 | *$479,250* | -$59,906 |
| Pretrial | $0 | $0 | $59,906 | *$710,000* |

From this analysis, which was based on model estimated differences that compared similarly situated defendants (i.e., apples-to-apples) for 2012, commercial bonds represent the most cost-effective mechanism in terms of preventing FTA, as compared to other release types. These differences hold for similar defendants charged with either a misdemeanor or a felony charge. Where the differences were $0, there was no statistically significant difference between the two types of release.

Highlights from the Above Analysis:

- Commercial bonds tend to be the most cost effective for the 2012 data, in terms of FTA as defined here.

- For misdemeanors, pretrial services ranks 2nd in cost effectiveness based on the 2012 data, followed by cash, then attorney bonds. This was a major improvement in comparison to the 2008 study.

- For felony defendants, commercial bonds are considerably more cost effective, though FTAs for this group of defendants increased across the board for 2012.

- The rank order of cost effectiveness for felonies changed in 2012 to: 1) Commercial, 2) Attorney, 3) Cash, and 4) Pretrial Services bonds.

RECCOMENDATIONS FOR POLICY

- FTA is a complex issue. The measurement of FTA available in Dallas County at present could be improved considerably. FTA is driven by non-appearances to scheduled court data, then ultimately (and in the most serious cases) to a formal change in bond status (i.e., bond forfeiture). Dallas County would be wise to mandate standardized data collection on court appearance via a range of measures to better understand the true costs associated with FTA. A State mandate required courts to record and maintain this information would be ideal.

- Formal change in bond status is highly discretionary. Courts do not have a standard to follow other than what they deem most appropriate, and this is contextualized on an *ad hoc* basis. This level of discretion, while important, should be captured by data collection and made available for "best practices" assessments.

- These findings, in tandem with those from 2008, are highly suggestive that FTA is much more likely among felony released via pretrial services bonds. Conversely, these 2012 results indicate a sizeable improvement in performance by pretrial services for misdemeanor defendants. With further validation, it may be worth considering limiting pretrial services releases to lower risk misdemeanants only, focusing all efforts therein, should the pretrial services department not undergo major operational modifications in the near future. Through this approach, pretrial services may be able to both reduce the jail population and be successful in ensuring that their defendants are present in court and their bonds are not forfeited.

- Commercial bonds continue to be successful in terms of reducing the likelihood of FTA/bond forfeiture. Based on these results, like defendants released via cash bonds are between 27 and 33 percent more likely to FTA in comparison to commercial bonds. Further, the gap in performance between cash and commercial bonds increased by 10 percent from 2008 to 2012. It may be worth discussing a scenario where courts recommend/required that the highest risk misdemeanor defendants are released via commercial bond since commercial bonds at least deliver some form of supervision and the responsibility of appearance falls to the bonding company.

- Dallas County IT is strongly encourage to maintain the data explore queries and establish consistency in field/column names to ease future studies and validation, along with a standard export file type; we recommend explore in comma delimited (.csv) files only or pipe delimited only "|".

- Pretrial Services has mentioned the possibility of moving to increased levels of supervision among defendants (e.g., telephone reminders, risk assessment tools, etc.). These tactics are well advised and the effects of such interventions should be appropriately evaluated to ensure success.

- It is recommended that the county focus efforts on ensuring that individuals are available for justice (i.e., appear in court). The focus should be on maximizing appearance and not on collecting fees from forfeitures due to potentially unseen costs associated with FTA.

STUDY LIMITATIONS

- The findings presented herein are limited to one county (Dallas County, Texas) and are not necessarily generalizable to counties other than those of similar demographic make-ups and those with similar pretrial release practices/proportions. Readers should use caution in any attempt to make inferences about other counties based on these findings.

- Release on recognizance is an important mechanism of release but was rarely used by Dallas County for new crimes (less than 1% defendants). For this reason, own recognizance releases are not analyzed.

- Pretrial services bonds may involve a diversionary program for some defendants. The data provided no indication of whether this was the case, thus no information is provided in terms of FTA for any particular diversion program.

- While the statistics presented here from the propensity score matching analysis are relatively robust, there are indicators of release type and FTA that were not collected by, or made available from, Dallas County. These include employment status, residential status, as well as pre-release and risk assessment measures. However, the Dallas County data are unique in the fact that they do include many measures that other data sources do not include, such as drug offense history, mental illness, and indigence.

- Analyses were not carried out specific to any particular criminal offense (e.g., DWI). The findings may change when exploring particular offenses.

- The indicator of FTA for pretrial services releases was limited to bonds that were held "insufficient" rather than an official indicator of non-appearance in court. This was due to limits on the data collection procedures currently in practice by the County. It is possible that some bonds held insufficient do not reflect a failure to appear, however, in discussion with Dallas County Pretrial Services, it was determined that this possibility was minimal.

## TECHNICAL APPENDIX

### What is propensity score matching (PSM)?

PSM is a well-known statistical matching procedure that approximates an experimental design by matching cases, (i.e., defendants), based on a near equivalent probability of having been released from jail by way of one mechanism versus a possible alternative. (For this study, within a maximum difference of 0.1% (caliper = .001) probability, which is considered very conservative). Here, the varying release types can be considered treatments, just like in an experiment. Since there are multiple treatments under study (i.e., the four release types), comparisons are made from one release-type to another, for every possible combination of treatments, respectively. The goal is to end up with an estimate of the "treatment effect." This is the difference in average probability for defendants failing to appear, or recidivating, between two specific release mechanisms. Again, these comparisons are based on statistically matched (i.e., similarly situated) defendants equally likely to have received the treatment.

Restated, a series of predictor variables (outlined in the technical appendix) are used to estimate a defendant's probability of receiving one treatment over another particular treatment. This estimate is the conditioned probability of receiving the treatment–also known as the propensity score. Upon establishing the quality and robustness of the propensity score, mean (average) levels of a final outcome (e.g., failure to appear in court) can be compared between the treated (i.e., those receiving the treatment) and the matched controls (i.e., those who did not receive the treatment, but who had an equal probability of having received it). *In the end, comparisons are made not between all defendants released by way of a particular method, but only between statistically matched pairs.*

### How robust are these findings and how was this determined?

The quality of the matching procedure was assessed in multiple ways, using contemporary statistical methods. These include 1) an assessment of balance on covariates between matched and unmatched samples, 2) a sensitivity analysis to determine how strong an unmeasured covariate (i.e., something not available in the data such as employment history) would need to be to change the results (Rosenbaum Bounds), and 3) a complementary weighted regression analysis that involved both matched and unmatched defendants (Inverse Probability of Treatment Weighting, IPTW).

These procedures resulted in a strong level of confidence that these PSM analysis findings are robust to the influence of unmeasured covariates and that the matching procedure was very good at finding suitable matches to those actually treated. The specific details on these diagnostics are available via the Center for Crime and Justice Studies webpage (www.utdallas.edu/epps/ccjs) and/or can be requested via email (morris@udallas.edu).

ANALYSIS OVERVIEW

There are four major types of release (bonds) used in Dallas County that are explored here. Such bonds include: (1) cash bonds, (2) attorney bonds, (3) commercial bonds, and (4) pretrial services bonds. Note that release on recognizance and "other" release types (e.g., release to TDCJ for incarceration)

are not assessed. The PSM approach will assess the effect of each bond compared to an alternative bond, respectively, across all combinations of bond types. This is illustrated in Figure 1 below.

```
Figure 1: Counterfactual Comparison Groups

    (1) Attorney            vs.        (2) Cash
    (1) Attorney            vs.        (3) Commercial
    (1) Attorney            vs.        (4) Pretrial

    (2) Cash                vs.        (3) Commercial
    (2) Cash                vs.        (4) Pretrial

    (3) Commercial          vs.        (4) Pretrial
```

As noted, PSM matches individuals who received a treatment, here a type of bond, to others who did not receive the treatment, but who had a statistically identical probability of having received such. In other words, these are similarly situated defendants (e.g., similar offense, criminal history, demographics, etc.) This approach allows for the isolation of a particular bond effect as compared to every alternative. For example, this approach allows us to determine whether cash bonds do better at reducing the probability of FTA compared to an attorney bond, net of other predictive variables on FTA.


***Measurement/Definition of Variables***

This section outlines and defines all data variables used in this study. The section is broken down by outcome variables, treatment variables (i.e., bond types) and control variables.

*Outcome Variables*

Failure to Appear (FTA) is defined differently depending on the type of bond. For attorney, cash, and commercial bonds, FTA is defined by whether the Court passes a judgment *NISI* against the defendant. A *NISI* is a judicial declaration that a bond is forfeited unless s/he can provide a suitable reason why there was no court appearance. While it is not uncommon for a judgment *NISI* to be overturned, this is an indication of FTA in Court and was easily identified in the `bond_forfeiture` data file provided by Dallas County.

FTA for personal recognizance and pretrial services rarely results in a judgment *NISI* being entered by the Court. Unfortunately, there was not a specific data indicator provided by Dallas County indicative of FTA for these two bond types. In order to gather this information, data on FTA were extracted from court comments through a character extraction algorithm constructed by Dr. Morris, and approved by Mr. Ron Stretcher (the Director of Criminal Justice for Dallas Co.). The comment information was provided in the `dc_bonds` data file. For personal recognizance and pretrial services bonds, FTA was indicated by the issuance of a bond forfeiture, however, most personal bonds are not formally identified as being forfeited. Rather a bond is held "insufficient" when a defendant out on a personal bond does not appear in court. The specific terms used in the character extraction algorithm are available upon request (email morris@utdallas.edu).

*Control Measures*

In addition to FTA, a series of variables serve as control variables for the present study. The variables outlined below are limited to what was available within the data provided by Dallas County. Definitions are provided as needed.

## SOCIODEMOGRAPHIC VARIABLES

| | |
|---|---|
| **Age** | (in years) at Time of Arrest |
| **Age$^2$** | Age squared (i.e., age as a non-linear effect) |
| **Gender** | (Female=1, Male=0) |
| **Race** | (Black, White, Hispanic) – Those indicated as "other" on race were less than 3% of all defendants. |
| **Marital Status** | (Married=1, otherwise=0) |
| **Mental Illness History** | (1=yes, 0=no) |
| **Medical Problems** | (1=yes, 0=no) |
| **Indigence** | (1=yes, 0=no) |
| **Born in the United States** | (1=US born; 0=foreign born) |

## CRIMINAL HISTORY VARIABLES

**Number of Prior Arrests** – refers to the number of arrests that a defendant has on file with either Dallas County or Texas Department of Public Safety (DPS). Reporting error exists between the arrests reported to DPS from Dallas County. In order to minimize such error, the number of prior arrests was based on the total number of unique arrests occurring prior to the book-in of record stemming from Dallas Co., DPS, or both (whichever was highest).

**Type of Offense for Book-in of Record** – refers to the offense/s for which a defendant was charged underlying the primary 2008 book-in (i.e., the book-in of record). This was codified in part by UCR Index Crime definitions. Each of these 16 crime types was indicated by a binary variable to allow for multiple charge types to be included in the analysis simultaneously. For example, someone arrested for burglary may also have a charge of aggravated assault for the same arrest (or book-in). The offense categories include: drug related crimes, family violence, homicide (not present in data), robbery, aggravated assault, burglary, larceny, auto theft, fraud, obstruction of justice, weapons related offenses, and driving while intoxicated (DWI or DUI).

**Offense of Record Category** (OOR; misdemeanor vs. felony) – The category of offense was used at times to produce results stratified between misdemeanors and felonies.

**Failure to Appear History** (1=at least one previous FTA; 0=no previous FTAs)

**Year of First Arrest** on File – This variable serves as a proxy for the amount of time that an individual has been criminally active, as far as it is indicated in official police records.

**Days in Jail** for the OOR – The number of days spent in jail for the offense of record.

**Celerity** – Celerity refers to the amount of time between the date of the offense and the date of arrest (in days). This variable was log-transformed prior to analyses to correct for skewness.

**Dallas County Jail History** – An indicator of whether a defendant had been booked into the County jail at any time prior to the book-in of record

*Treatment Variables*

There are four main categories of bonds (release mechanisms) explored here. These include attorney bonds, cash bonds, commercial bonds, and pretrial services bonds.

The 2012 Texas Association of Counties (TAC) Bail Bond Handbook (p. 9) provides a detailed explanation of the bond process in Texas, which may vary between counties and defines a bail bond as:

> *A "bail bond" is a written undertaking entered into by the defendant and the defendant's sureties for the appearance of the principal therein before a court or magistrate to answer a criminal accusation; provided, however, that the defendant on execution of the bail bond may deposit with the custodian of funds of the court in which the prosecution is pending current money of the United States in the amount of the bond in lieu of having sureties signing the same. Any cash funds deposited under this article shall be receipted for by the officer receiving the funds and, on order of the court, be refunded, after the defendant complies with the conditions of the defendant's bond, to:*
>
> *(1) any person in the name of whom a receipt was issued, in the amount reflected on the face of the receipt, including the defendant if a receipt was issued to the defendant; or*
>
> *(2) the defendant, if no other person is able to produce a receipt for the funds.*

Attorney Bond - In Texas Bail Bond Board Counties, a state licensed attorney may post bonds as a surety for official clients in a criminal case, without the need to be licensed as a bail bond agent. The Sheriff of a County may inquire as to the security of the attorney in his/her ability to write a bond in accordance with TEXAS Code of Crim. Proc. Ch 17.

Cash Bond - A "cash bond" occurs when the criminal defendant executes the bond himself as principal and posts the entire amount of the bond in cash with the "custodian of funds of the court" in lieu of having sureties sign the bond.' A cash bond is "unsecured" and if the defendant fails to appear for trial, s/he is liable for the full bond amount.

Commercial Bond - A commercial bond is one type of surety bond wherein the bond is made by a corporate surety (an insurance company), via a bonding company. In Texas, only a specially licensed insurance company can write such bonds. This form of bond occurs when a jailed defendant contacts a bail bond company and applies for bail. If approved, the defendant is released to the bonding company for a fee (generally 10-20% of the bail amount set by the court).

**Personal Recognizance (not analyzed here)**, or release on recognizance, is one form of personal bond wherein the court releases an individual from jail without sureties or other security (i.e., financial penalty), but with the promise of the defendant that s/he will reappear for trial.

**Pretrial Services bonds** involve the release of a defendant under an unpaid, or $20 fee, bond held accountable to the Pretrial Services Division. These bonds are intended for low-risk defendants who

are unable to secure release solely to the fact that they cannot access funding needed for a financial bond. A pretrial services bond is technically a type of personal recognizance bond.

In Dallas County, pretrial services eligibility is determined by reviewing a list of inmates booked in the jail the previous business day (or over the weekend), who have yet to be released, and who reside in Dallas and the surrounding counties. Among these inmates, the current offense is checked for eligibility (see below list of exclusions), along with the set bond amount (Dallas County Pretrial Services, 2012). If an inmate is eligible, his/her criminal background is checked via TCIC and NCIC. If still eligible and incarcerated, the inmate is interviewed by Pretrial Services that day. The inmate is then required to provide reference information, which must be confirmed by two personal references. The inmate also has to agree to abide by the program rules. The references are given the information of the amount of the pretrial fee (20 dollars or 3% of the bond, whichever is greater). Information is entered into the computer that the pretrial bond has been approved and once the fee is paid, the inmate is released. If the fee is not paid, a determination is made whether or not the fee should be waived in order to keep the jail population down. The financial status (i.e., indigence) of an inmate is not considered in Dallas Co. pretrial services releases. Inmates released via pretrial services tend to be those who cannot access funding to secure a financial bond.*

Specific eligibility requirements for pretrial services in Dallas Co. were determined via a Court Order in 1999 (Dallas County Court Order No. 99-1951), and were revised in 2007. Serious and violent offenses preclude an inmate's eligibility for pretrial services release as are inmates with a history of felony/assaultive offenses. In some cases, exceptions can be made with approval from a supervisor and/or the District Attorney's office. Pretrial services tend to include individuals charged with minor non-violent (e.g., thefts and fraud) and/or lesser drug possession offenses.

Formal risk assessment tools are not used by Dallas County Pretrial Services in making release decisions.

During the period of observation for this study, Dallas County's Pretrial unit was staffed by four pretrial services officers who operate during normal business hours only. Therefore, potential defendants are screened the next business day after book-in to the jail. The monitoring of defendants other than the required regular check-ins took place solely by telephone.

The offenses that are excluded by Pretrial Services are outlined in the following page:

*Above paragraph paraphrased from in-person and email correspondence with Dallas County Pretrial Services (December, 2012).

Offenses Excluded by Pretrial Services Releases

1. Aggravated kidnapping
2. Aggravated Manufacture, Delivery or possessions of Controlled Substances
3. Aggravated Promotion of Prostitution
4. Aggravated Sexual Assault
5. Aggravated Robbery
6. Capital Murder
7. Criminal Solicitation

8.  Aggravated Assault
9.  Enticing a child
10. Prohibited Sexual Conduct
11. Indecency with a child
12. Injury to a child, elderly or disabled individual
13. Murder
14. Sexual assault
15. Parole violation
16. Sale, distribution or display of harmful materials to a minor
17. Sale or purchase of a child
18. Sexual performance by a child
19. Criminal solicitation of a minor
20. Any charge involving a firearm
21. Any charge involving assault with bodily injury
22. Stalking
23. Family violence
24. Violation of protective order or Magistrate's order; and
25. Harassment (includes telephone harassment)

**References**

Block, M. K. & Twist, S. J. (May, 1997). *Report Card on Crime-Runaway Losses: Estimating the Costs of Failure to Appear in the Los Angeles County Criminal Justice System.* American Legislative Exchange Council.

Dallas County Pretrial Services (personal communication, December 10, 2012).

Lechner, M. (1999a). Earnings and Employment Effects of Continuous Off-the-job Training in East Germany after Unification. *Journal of Business and Economic Statistics, 17,* 74-90.

Lechner, M (2001) Identification and Estimation of Causal Effects of Multiple Treatments under the Conditional Independence Assumption. In: Lechner M, Pfeiffer P (eds.) Econometric Evaluation of Labour Market Policies. Heidelberg and New York, Physica.

Texas Association of Counties. (2012). Bail Bond Handbook: Basic Information for County Officers, 2012 Update. Available at https://www.county.org/member-services/legal-resources/publications/Documents/Bail-Bond-Handbook.pdf

Acknowledgements

The authors of this study would like to thank Dallas County, Texas and its agents in providing cooperation in the data-gathering phase of this project and for funding the project. Special thanks to Dr. Elba Garcia (Dallas County Commissioner, District 4), Ron Stretcher (Director of Criminal Justice), Stanley Victrum and the Dallas Co. IT Department for their time, support, and guidance. It should be noted that Dallas County IT was very responsive to all needs in terms of providing data and adapting to changes in an expedited manner; they should be commended for their performance in helping see this project through. In addition, Mr. Duane Steele has continued to be absolutely instrumental to this research, including the previous (2008) study. His professionalism and efforts are of tremendous benefit to the county and he is deserving of special recognition. Special thanks also to the Texas Department of Public Safety, for expediting the delivery of statewide arrest records for Dallas County jail inmates. Mr. Stephen Clipper, the doctoral research assistant on the project, is also deserving of thanks for all of his time and effort with this project.

ABOUT THE AUTHOR

**Robert G. Morris**, Ph.D. is Associate Professor of Criminology as well as the Director of the Center for Crime and Justice Studies at the University of Texas at Dallas. He also serves as the Chair of the CJAB Subcommittee on Research. Dr. Morris specializes in quantitative analytics, criminological theory, and contemporary issues in criminal justice, having published dozens of peer reviewed scholarly studies in top-ranked scientific journals such as *Justice Quarterly*, *Crime and Delinquency*, *Intelligence*, and *Journal of Quantitative Criminology*. He teaches doctoral level statistics/analysis courses at UT Dallas as well as undergraduate courses surrounding criminal justice and criminology. He is the recent recipient of numerous research and teaching awards including the prestigious UT System Regents' Outstanding Teaching Award (2011) and the Academy of Criminal Justice Sciences Outstanding Research Paper Award (2012). Dr. Morris received his Ph.D. in Criminal Justice from Sam Houston State University in 2007.

Exhibit 4

# RESEARCH REPORT

## PRETRIAL RELEASE MECHANISMS IN DALLAS COUNTY, TEXAS:

DIFFERENCES IN FAILURE TO APPEAR (FTA), RECIDIVISM/PRETRIAL MISCONDUCT, AND ASSOCIATED COSTS OF FTA[*]

---

**Prepared by:**

**Robert G. Morris, Ph.D.,**
**Associate Professor of Criminology**
**Director, Center for Crime and Justice Studies**

**The University of Texas at Dallas**
**800 West Campbell Rd, GR 31**
**Richardson, Texas 75080-3021**

**(972) 883-6728**
**morris@utdallas.edu**

**January 2013**

[*] **This study was completed on behalf of the Dallas County (Texas) Criminal Justice Advisory Board (CJAB).**

**DISCLAIMER**
No attempt by the research investigator, Professor Robert Morris, or the University of Texas at Dallas, will be made to explain the reasons behind the findings presented within this report. Nor will recommendations be made as to how the county should, or should not, respond to these findings. The information presented is driven solely by the data provided by Dallas County and caution should be used in any attempt to generalize these findings to other counties. The computer programming written to extract the data for analysis, as well as those used to established model estimates, will be made publically available upon request to ensure research transparency and objectivity. Any audit of this programming by a qualified professional/s is welcomed. Contact Robert G. Morris, Ph.D. with questions: morris@utdallas.edu

# EXECUTIVE SUMMARY

Relative to other elements of the criminal justice system, pretrial release and the mechanisms by which it operates, has received little attention from scholars and empirical research is lacking. To date, no study has been carried out that has focused on pretrial release mechanisms at the county level and their isolated effects on failure to appear (FTA) and recidivism/pretrial misconduct. Further, it remains unclear whether the costs associated with one particular form of release outweigh the costs of another. While a handful of studies have explored failure to appear and recidivism across release types, they have been limited by data problems or problematic research designs.

The purpose of this study was to address a number of very important issues that underlie pretrial release from jail, specific to varying mechanisms of release including: attorney bonds, cash bonds, commercial bonds, and pretrial services bonds.[1] Archival data was culled from official records collected by the Dallas County criminal justice system as well as from the Texas Department of Public Safety (DPS). The analyses presented here were based on all defendants booked into the Dallas County jail during 2008 for a crime/s in which the defendant was not previously arrested/jailed, and who were released via one of the above noted release mechanisms (n = 22,019). Specifically, this study addresses the following questions: (1) Do failure to appear (FTA) rates vary across release mechanisms and if so, by how much?  (2) Does recidivism/pretrial misconduct vary across release mechanisms and if so, by how much? (3) What are the additional court costs (observed and estimated) associated with FTA rates across release types? and (4) What are the strongest predictors of FTA across each release mechanism?

***Methods and Findings***. Regarding FTA and recidivism/pretrial misconduct, this study approximated an experimental research design to provide for an objective "apples-to-apples" empirical analysis (propensity score matching). This analysis suggested that net of other effects (e.g., criminal history, age, indigence, etc.—see technical appendix), defendants released via commercial bonds were least likely to fail to appear in court compared to any other specific mechanism. This finding was consistent when assessed for all charge categories combined and when the data were stratified by felony and misdemeanor offenses, respectively. For felony defendants (among the matched pairs), those *not* released on commercial bond were between 39 and 56 percent more likely to fail to appear in court, with the largest difference being between cash and commercial, followed by pretrial and then attorney bonds. For misdemeanors, differences were similar, ranging between 26 and 32 percent with pretrial bonds being the most different from commercial, followed by attorney bonds, then cash bonds. Overall, analyses based on the data explored here suggest that commercial bonds were the most successful in terms of defendant appearance rates, followed by attorney bonds, cash bonds, and pretrial services releases.

Findings for the remaining bond type comparisons were mixed. For felonies and misdemeanors, limited/inconsistent support was found favoring FTA rates for pretrial services over cash bonds; other differences were not statistically significant.

---

[1] Personal recognizance was not analyzed here due to its very limited use in release for new crimes (less than 1%).

Regarding recidivism (or pretrial misconduct), analyses were carried out for new crimes occurring within 9 and 12 months of release for the book-in of record. It is important to note that such crimes may or may not have occurred during the pretrial phase for the book-in of record as this data was not readily available. The findings for recidivism were mixed and more commonly null (i.e., no difference was found between release types). Note: Extreme caution should be used in interpreting the recidivism/pretrial misconduct analysis due to the situational factors associated with recidivism that are completely external to the associated release mechanism.

As to the costs associated with FTA across each release type, model estimates suggest that commercial bond releases were the most cost-effective in Dallas County, based on the group of defendants captured by the study. This finding was corroborated by the observed data, which suggested that for the 22,000+ defendants captured by this study, assuming a public cost of $1,775 per FTA[2], the use of commercial bonds saved over $7.6 million (or ~$350k per 1,000 defendants) among felony defendants and over $3.5 million (or $160k per 1,000 defendants) among misdemeanor defendants, as compared to attorney bonds, cash bonds, and pretrial services bonds. The largest differences in costs were seen between commercial bonds and pretrial services bonds.

---

[2] Estimate adjusted for inflation from 1997 dollars. Base estimate taken from Block and Twist (1997), who conduced a complete cost-benefit analysis of failure to appear in Los Angeles, CA.

TABLE OF CONTENTS

Executive Summary………………………………………………………………… 2

Study Highlights…………………………………………………………………  5

Study Findings……………………………………………………………………  6

    Descriptive Statistics..……………………………………………………………  6

    Comparative Analysis and Results………………………………………………  9

        Failure to Appear……………………………………………………………  10

        Recidivism…………………………………………………………………… 13

    Cost-benefit Analysis for Failure to Appear……………………………………… 17

    Predictors of Failure to Appear…………………………………………………… 20

Study Limitations………………………………………………………………… 22

Technical Appendix……………………………………………………………………23

References……………………………………………………………....…......……  30

Acknowledgements………………………………………………………………  31

About the Author……..…………..…………………………………..…………………32

STUDY HIGHLIGHTS

- The study explored failure to appear (FTA) and recidivism (at 9 and 12 months) based on longitudinal data for 22,019 defendants released from the county jail during 2008 for the first new offense occurring during that year.

- The analyses isolated the effect of particular bond types by statistically controlling for many correlates (i.e., predictors of) of FTA and recidivism/pretrial misconduct and approximating an experimental research design (see appendix for a complete listing and definitions).

- When comparing similarly situated defendants' probability of FTA for all case types, defendants released via a commercial bond (i.e., a bail bond company) were significantly and substantively less likely to fail to appear in court compared to attorney bonds, cash bonds, and pretrial services bonds, respectively. This finding held when analyzing all defendants simultaneously and when assessing felony and misdemeanor defendants separately.

- Regarding recidivism/pretrial misconduct (at 9 and 12 months) among misdemeanor defendants, no statistically/practically significant differences were found between any combination of the release mechanisms.

- Regarding recidivism/pretrial misconduct (9 and 12 months) for felony defendants, the findings supported cash and attorney bonds, however, there may be qualitative differences in how the recidivism relationship operates for these particular release mechanisms, as they are the most expensive form of financial bail.

- Differences for 12 month recidivism/pretrial misconduct were found between commercial bonds and pretrial services bonds for the model including running data for all charge categories combined, favoring pretrial services, however, the differences were nullified when assessing felonies and misdemeanors separately.

- Release on their own recognizance (OR) was rarely used for an initial release (less than 1% of defendants). For this reason, OR was excluded from the analysis.

- A basic cost-benefit analysis suggested that commercial bonds are the most cost effective release type in Dallas County, in terms of the court costs associated with FTA. Based on the observed data for the 22,000+ defendants captured by this study (all initial releases for a new crime in 2008), assuming a public cost (i.e., justice administration) of $1,775 per FTA[3], the use of commercial bonds saved over $7.6 million (or ~$350k per 1,000 defendants) among felony defendants and over $3.5 million (or $160k per 1,000 defendants) among misdemeanor defendants, as compared to attorney bonds, cash bonds, and pretrial services bonds. The largest differences in costs were seen between commercial bonds and pretrial services bonds.

- The strongest predictor variables of FTA across release mechanisms were also explored. Such variables were limited to those made available by Dallas County. The factors predicting FTA varied considerably across release mechanisms and are outlined within.

---

[3] Estimate adjusted for inflation from 1997 dollars. Base estimated taken from Block and Twist (1997), who conduced a complete cost-benefit analysis of failure to appear in Los Angeles, CA.

STUDY FINDINGS

Descriptive Statistics for Study Defendants

Release Mechanisms Studied (All Charge Types)

| Release Mechanism | Freq. | % |
|---|---|---|
| Attorney Bond | 684 | 3.1 |
| Cash Bond | 4,219 | 19.2 |
| Commercial Bond | 14,705 | 66.8 |
| Pretrial Bond | 2,411 | 10.9 |
| Total | 22,019 | 100.0 |

Release Mechanisms Studied (Felony Defendants)

| Release Mechanism | Freq. | % |
|---|---|---|
| Attorney Bond | 326 | 5.1 |
| Cash Bond | 339 | 5.3 |
| Commercial Bond | 5,048 | 78.9 |
| Pretrial Bond | 682 | 10.7 |
| Total | 6,395 | 100.0 |

Release Mechanisms Studied (Misdemeanor Defendants)

| Release Mechanism | Freq. | % |
|---|---|---|
| Attorney Bond | 342 | 2.5 |
| Cash Bond | 3,529 | 25.2 |
| Commercial Bond | 8,548 | 61.0 |
| Pretrial Bond | 1,589 | 11.3 |
| Total | 14,008 | 100.0 |

Descriptive Statistics for **Failure to Appear (FTA)** in Court

**All Charge Types**

|  | # of Defendants | % FTA |
|---|---|---|
| Attorney Bond | 684 | 34.1 |
| Cash Bond | 4,219 | 29.2 |
| Commercial Bond | 14,705 | 23.0 |
| Pretrial Services Bond | 2,411 | 37.0 |

TOTAL   16,274          Overall FTA Rate = 26.1%

**Felonies**

|  | # of Defendants | % FTA |
|---|---|---|
| Attorney Bond | 326 | 28.2 |
| Cash Bond | 339 | 30.7 |
| Commercial Bond | 5,048 | 16.6 |
| Pretrial Services Bond | 682 | 26.1 |

TOTAL   6,359          Overall FTA Rate = 19.0%

**Misdemeanors**

|  | # of Defendants | % FTA |
|---|---|---|
| Attorney Bond | 342 | 37.4 |
| Cash Bond | 3,529 | 30.2 |
| Commercial Bond | 8,548 | 26.7 |
| Pretrial Services Bond | 1,589 | 39.6 |

TOTAL   14,008          Overall FTA Rate = 29.3%

Descriptive Statistics for **Recidivism/Pretrial Misconduct** (9 months / 12 Months)

**All Charge Types**

| | # of Defendants | % Recidivating (9 Months/12 Months) |
|---|---|---|
| Attorney Bond | 684 | 19.0 / 22.4 |
| Cash Bond | 4,219 | 11.7 / 13.8 |
| Commercial Bond | 14,705 | 23.5 / 27.3 |
| Pretrial Services Bond | 2,411 | 24.4 / 28.5 |

TOTAL   16,274          Overall Recidivism/Pretrial Misconduct Rate = 21.2% / 24.7%

**Felonies**

| | # of Defendants | % Recidivating (9 Months/12 Months) |
|---|---|---|
| Attorney Bond | 326 | 17.5 / 20.3 |
| Cash Bond | 339 | 9.7 / 12.1 |
| Commercial Bond | 5,048 | 26.2 / 29.7 |
| Pretrial Services Bond | 682 | 25.2 / 28.9 |

TOTAL   6,359          Overall Recidivism/Pretrial Misconduct Rate = 24.7% / 28.2%

**Misdemeanors**

| | # of Defendants | % Recidivating (9 Months/12 Months) |
|---|---|---|
| Attorney Bond | 342 | 20.2 / 24.0 |
| Cash Bond | 3,529 | 11.5 / 13.7 |
| Commercial Bond | 8,548 | 22.1 / 26.0 |
| Pretrial Services Bond | 1,589 | 24.6 / 29.1 |

TOTAL   14,008          Overall Recidivism/Pretrial Misconduct Rate = 19.7% / 23.2%

ANALYTICAL FINDINGS

**PROPENSITY SCORE MATCHING ANALYSIS: FAILURE TO APPEAR**

The below findings represent an "apples-to-apples" approach to exploring differences in FTA rates among similarly situated defendants, across the release mechanisms. These estimates have been conditioned (i.e., statistically adjusted on other influence factors) based on the defendant/crime characteristics outlined in the technical appendix, by means of a counterfactual statistical modeling strategy known as propensity score matching (PSM).

PSM was used to assess the effect sizes of different combinations of release mechanisms on 1) whether a defendant fails to appear (FTA) in court and on 2) whether the defendant recidivated within a specified time period post-release (9 or 12 months). This counterfactual model approximates an experimental design by allowing for comparisons to be made between defendants that had an equivalent probability of receiving some treatment (here the treatment being a release mechanism) over an alternative treatment. Similar analytical designs where the focus has been on multiple treatment effects are not uncommon in the social sciences (see Lechner, 1999; 2001)

***NOTE: Prior to presenting the results, readers unfamiliar with PSM are encouraged to read the information provided in the technical appendix to get a basic idea of what the technique does and how to interpret the findings presented in the below tables.

The below table presents the statistically significant findings on FTA stemming from the propensity score matching analysis and using commercial bonds as a reference category (comparison) group. This approach was taken because significant differences were found only for comparisons that included similarly situated (matched) defendants released on a commercial bond defendants.

In short, the findings clearly demonstrate that when comparing similarly situated defendants against one another (apples-to-apples), commercial bonds were much less likely to fail to appear in court after release for the first time for a new offense. The differences are fairly consistent when analyzing all defendants and also when assessing felony and misdemeanor cases separately. Differences in FTA rates between defendants released via other release types (e.g., attorney bonds vs. pretrial bonds) were not statistically or substantively different from one another (i.e., FTA rates were equivalent for those comparison groups).

For felony defendants (among the matched pairs), those **_not_** released on commercial bond were between 39 and 56 percent more likely to fail to appear in court, with the largest difference between cash and commercial, followed by pretrial and then attorney bonds. For misdemeanors, difference were similar, ranging between 26 and 32 percent, with pretrial bonds being the most different from commercial, followed by attorney bonds, then cash bonds.

**Multi-treatment Propensity Score Matching Results on Failure to Appear: Attorney, Cash, and Pretrial Bonds as compared to Commercial Bonds.**

| Treated vs. Matched Controls released on Commercial Bond | Mean FTA Rate (Treated) | Mean FTA Rate (Controls) | FTA Rate Difference | % Difference in FTA vs. Commercial |
|---|---|---|---|---|
| **All Defendants** | | | | |
| Attorney | 0.34 | 0.27 | 0.07 | 21% higher |
| Cash | 0.29 | 0.20 | 0.09 | 31% higher |
| Pretrial | 0.37 | 0.23 | 0.14 | 39% higher |
| **Felony** | | | | |
| Attorney | 0.28 | 0.17 | 0.11 | 39% higher |
| Cash | 0.32 | 0.14 | 0.18 | 56% higher |
| Pretrial | 0.26 | 0.15 | 0.11 | 42% higher |
| **Misdemeanor** | | | | |
| Attorney | 0.38 | 0.27 | 0.11 | 29% higher |
| Cash | 0.31 | 0.23 | 0.08 | 26% higher |
| Pretrial | 0.40 | 0.27 | 0.13 | 32% higher |

Note: All findings are compared to Commercial Bonds (the reference category). Only statistically significant comparisons shown where equivalent findings were demonstrated between alternated reference categories ($p < .05$).

**Failure to Appear Analysis – Propensity Score Matching Results**

*How are the below tables interpreted?*

The below tables represent all differences between release types (unlike the above table which illustrates the same findings, but for statistically significant findings only). The PSM findings are presented to illustrate the differences in FTA rates between those treated and their matched controls for all releases, felonies, misdemeanors, and state jail felonies, respectively. On the diagonal of these tables are the unadjusted FTA rates for each release type. These statistics are presented for reference only. The off-diagonal statistics are the mean (average) difference in FTA rates (i.e., the treatment effect) between those released via a particular treatment (i.e., release mechanism)--which is identified by the left-hand column--compared to a particular alternative, identified by the top row of the table. Note that the percent range displayed (if statistically significant) reflects the estimated difference for matching based on an inverted treatment outcome (e.g., commercial vs. attorney compared to attorney vs. commercial)(Non-significant findings are indicated as such in the table).

As an example, looking at the top category, "Attorney Bond" on the far left column of the first table below, we can see that the unadjusted FTA rate for this release type is 34 percent. Following this row to the right, we see that there is no statistically significant difference in FTA rates between comparable (i.e., similarly situated) defendants released by an attorney bond compared to cash bonds. However, the conditioned difference in FTA rate for attorney bonds is 7-13% higher than for Commercial bonds. Further, we find no significant difference between attorney bond FTA rates and pretrial services bonds.

ALL DEFENDANTS - Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)

|  | Attorney Bonds | Cash Bonds | Commercial Bonds | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.34* | No Significant Difference | .07-.13 higher | No Significant Difference |
| Cash Bond | | *.29* | .09-.10 higher | No Significant Difference |
| Commercial Bond | | | *.23* | .14-.15 lower |
| Pretrial Services | | | | *.37* |

*Note: Unadjusted failure to appear (FTA) rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

FELONY DEFENDANTS - Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)

| | Attorney Bonds | Cash Bonds | Commercial Bonds | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.29* | No Significant Difference | .11-.12 higher | No Significant Difference |
| Cash Bond | | *.30* | .15-.18 higher | Partial support favoring Pretrial |
| Commercial Bond | | | *.17* | .10-.11 lower |
| Pretrial Services | | | | *.26* |

*Note: Unadjusted failure to appear (FTA) rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

MISDEMEANOR DEFENDANTS - Average Treatment Effects: Failure to Appear (Unconditioned rates on the diagonal)

| | Attorney Bonds | Cash Bonds | Commercial Bonds | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.37* | No Significant Difference | .10-.11 higher | No Significant Difference |
| Cash Bond | | *.30* | .08 higher | Partial support favoring Pretrial |
| Commercial Bond | | | *.27* | .12-.13 lower |
| Pretrial Services | | | | *.40* |

*Note: Unadjusted failure to appear (FTA) rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

## Recidivism/Pretrial Misconduct Analysis – Propensity Score Matching Results

### 12 Months

*Note: Unadjusted Failure to appear (FTA) rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

ALL DEFENDANTS - Average Treatment Effects: Recidivism/Pretrial Misconduct w/in12 months (Unconditioned rates on the diagonal)

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.22* | No Significant Difference | No Significant Difference | No Significant Difference |
| Cash Bond |  | *.14* | .02-.03 lower | No Significant Difference |
| Commercial Bond |  |  | *.27* | .14-.15 lower |
| Pretrial Services |  |  |  | *.29* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

FELONY DEFENDANTS - Average Treatment Effects: Recidivism/Pretrial Misconduct w/in 12 months (Unconditioned rates on the diagonal)

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.21* | No Significant Difference | .09-.13 lower | Partial support favoring Attorney |
| Cash Bond |  | *.12* | .06-.07 lower | .16-.19 lower |
| Commercial Bond |  |  | *.30* | No Significant Difference |
| Pretrial Services |  |  |  | *.29* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

(Continued from previous page)

MISDEMEANOR DEFENDANTS - Average Treatment Effects: Recidivism/Pretrial Misconduct w/in 12 months (Unconditioned rates on the diagonal)

| | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.24* | Partial support favoring Cash | Partial support favoring Commercial | No Significant Difference |
| Cash Bond | | *.14* | .01-.02 lower | No Significant Difference |
| Commercial Bond | | | *.26* | No Significant Difference |
| Pretrial Services | | | | *.29* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

**Recidivism Analysis – Propensity Score Matching Results**

**9 Months**

ALL DEFENDANTS - Average Treatment Effects: Recidivism/Pretrial Misconduct w/in 9 months (Unconditioned rates on the diagonal)

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.19* | No Significant Difference | No Significant Difference | No Significant Difference |
| Cash Bond |  | *.12* | .03 lower | No Significant Difference |
| Commercial Bond |  |  | *.24* | No Significant Difference |
| Pretrial Services |  |  |  | *.24* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

FELONY DEFENDANTS - Average Treatment Effects: Recidivism/Pretrial Misconduct w/in 9 months (Unconditioned rates on the diagonal)

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.19* | No Significant Difference | .08-.12 lower | Partial support favoring Attorney |
| Cash Bond |  | *.12* | .05-.08 lower | .16-.19 lower |
| Commercial Bond |  |  | *.24* | No Significant Difference |
| Pretrial Services |  |  |  | *.24* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

(Continued from previous page)

MISDEMEANOR DEFENDANTS - Average Treatment Effects:
Recidivism/Pretrial Misconduct w/in 9months (Unconditioned rates on the diagonal)

|  | Attorney Bond | Cash Bond | Commercial Bond | Pretrial Services |
|---|---|---|---|---|
| Attorney Bond | *.20* | No Significant Difference | No Significant Difference | No Significant Difference |
| Cash Bond |  | *.12* | Weak support favoring cash | No Significant Difference |
| Commercial Bond |  |  | *.22* | No Significant Difference |
| Pretrial Services |  |  |  | *.25* |

*Note: Unadjusted recidivism rate for first 2008 release on diagonal. Off diagonal statistics are between-release-type ESTIMATED TREATMENT EFFECT differences (row compared to column). All treatment effect differences shown are statistically significant.*

## COSTS OF FAILURE TO APPEAR

The below matrices represent a basic cost-benefit analysis based on the treatment effect of each release mechanism for treated versus matched controls. Since no exact figures were available on the cost of a single FTA, <u>it was conservatively assumed that the public cost for an FTA is $1,775 per FTA (see Block and Twist (1997)</u>.

**For this example, the below figures represent the costs associated with the processing of FTAs per 1,000 defendants. These numbers do not reflect the subsequent social costs that may stem from FTA. These differences (i.e., between release types) are based on the mean (average) treatment effect size differences presented in the propensity score matching analysis outlined above.**

INTERPRETATION OF TABLES: The on-diagonal numbers are the costs for dollars spent on FTA processing for a particular release type, based on the FTA rates from the matched pairs of defendants resulting from the PSM analysis. The off-diagonals represent the *differences* in cost between release types (row versus column). Note that positive (+) numbers reflect extra costs and negative (-) numbers represent savings. For example, in the first row of the table immediately below, for every 1,000 defendants released by way of either an attorney bond or a commercial bond, we expect that an extra $117,683 will be spent on FTA processing for those released via an attorney bond. An alternative interpretation would be that if these same individuals were released via a commercial bond, the savings in FTA processing costs would have been -$117,683. Because there was no difference in the effect of release type on FTA between attorney bonds and cash bonds, the cost difference was $0.

**COSTS of Failure to appear for 1,000 similar defendants released from jail.**

### All Charge Types

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$603,500* | $0 | $117,683 | $0 |
| Cash | $0 | *$514,750* | $48,901 | $0 |
| Commercial | -$117,683 | -$48,901 | *$408,250* | -$59,196 |
| Pretrial | $0 | $0 | $59,196 | *$656,750* |

### Felonies

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$514,750* | $0 | $59,196 | $0 |
| Cash | $0 | *$532,500* | $87,863 | $0 |
| Commercial | -$59,196 | -$87,863 | *$301,750* | -$31,684 |
| Pretrial | $0 | $0 | $31,684 | *$461,500* |

### Misdemeanors

|  | Attorney | Cash | Commercial | Pretrial |
|---|---|---|---|---|
| Attorney | *$656,750* | $0 | $68,959 | $0 |
| Cash | $0 | *$532,500* | $42,600 | $0 |
| Commercial | -$68,959 | -$42,600 | *$479,250* | -$59,906 |
| Pretrial | $0 | $0 | $59,906 | *$710,000* |

(Continued from above)

From this analysis, which was based on model estimated differences, commercial bonds represent the most cost-effective mechanism in terms of preventing FTA, as compared to other release types. These differences hold for similar defendants charged with either a misdemeanor or a felony charge. No differences in cost are predicted between attorney bonds and cash bonds, attorney bonds and pretrial services bonds, or cash bonds and pretrial services bonds.

**Cost Estimates Based on Actual FTA Records**

Other costs, based on the actual (historical) numbers may also be of interest. The below tables reflect the costs of FTA (assuming $1,775 per FTA) across each release mechanism observed for the inmates represented in the study (i.e., those entering jail for a new offense in 2008). Commercial bonds are used as a reference category (i.e., as compared to) for percent differences due to it being the most common release mechanism. NOTE: These numbers reflect only NEW CRIMES for 2008 and NOT ALL releases from jail or FTAs occurring during 2008.

**All Charge Types**

|  | # of Defendants | % FTA | Cost per 1000 Defendants | Rate Difference | $ Difference |
|---|---|---|---|---|---|
| Attorney Bonds | 684 | 34.1 | $605,275 | +11 | $197,025 |
| Cash Bonds | 4,219 | 29.2 | $518,300 | +6 | $110,050 |
| Commercial Bonds | 14,705 | 23.0 | $408,250 | Ref. Category | Ref. Category |
| Pretrial Services | 2,411 | 37.04 | $656,750 | +14 | $248,500 |

**Felonies**

|  | # of Defendants | % FTA | Cost per 1000 Defendants | Rate Difference | $ Difference |
|---|---|---|---|---|---|
| Attorney Bonds | 236 | 28.2 | $500,550 | +12 | $205,900 |
| Cash Bonds | 339 | 30.7 | $544,925 | +14 | $461,925 |
| Commercial Bonds | 5,048 | 16.6 | $294,650 | Ref. Category | Ref. Category |
| Pretrial Services | 682 | 26.1 | $463,275 | +10 | $380,275 |

**Misdemeanors**

|  | # of Defendants | % FTA | Cost per 1000 Defendants | Rate Difference | $ Difference |
|---|---|---|---|---|---|
| Attorney Bonds | 342 | 37.4 | $663,850 | +11 | $189,925 |
| Cash Bonds | 3,529 | 30.2 | $536,050 | +4 | $62,125 |
| Commercial Bonds | 8,548 | 26.7 | $473,925 | Ref. Category | Ref. Category |
| Pretrial Services | 1,589 | 39.6 | $702,900 | +13 | $228,975 |

**Estimating the "strongest" predictors of FTA and Recidivism/Pretrial Misconduct among Absconders across release types.**

This analysis was based on a logistic regression modeling approach assessing two outcomes (FTA and FTA plus recidivism at 12 months). These estimates are conditioned on the type of offense charged with the 2008 book-in. Variables with (+) next to them are positive findings, (-) are negative. Here, the meaning of positive is that for an increase in the variable, there is an increased chance (odds) of failure to appear. Negative refers to a reduction in the chance of failure to appear.

**Attorney Bonds:**

*Failure to Appear*:

Celerity (+)
Felony (-)
Indigence (+)
Time Criminally Active (-)
Days in Jail (+)

*Recidivism*/Pretrial Misconduct *among Absconders:*

Felony (-)
Celerity (-)
Jail history (-)

**Cash Bonds:**

*Failure to Appear*:

Felony (-)
Age (-)
Indigence (+)
Celerity (+)
Days in Jail (+)
Jail History (+)
FTA History (+)
US Born (-)

*Recidivism*/Pretrial Misconduct *among Absconders:*

Age (-)
Celerity (-)
Jail history (-)
US Born (-)
Criminal History (+)

**Commercial Bonds:**

Felony (-)
Male (+)
Indigence (+)
Celerity (+)
Days in Jail (+)
Mental Illness (+)
Jail History (+)
Hispanic vs. all other (+)
Year of First Arrest (+)
Criminal History (+)
FTA History (+)

*Recidivism*/Pretrial Misconduct *among Absconders:*

Age (-)
Celerity (-)
Hispanic vs. White (-)
Criminal History (+)


**Pretrial Services Bonds:**

Felony (-)
Male (+)
Indigence (+)
Jail History (+)
Married (-)
Hispanic vs. all other (+)

*Recidivism*/Pretrial Misconduct *among Absconders:*

Felony (+)
Mental Illness (+)
US Born (-)
Criminal History (+)


(+) Positive association with FTA (i.e., increased odds of occurrence)
(-) Negative association with FTA (i.e., reduced odds of occurrence)

STUDY LIMITATIONS

- The findings presented herein are limited to one county (Dallas County, Texas) and are not necessarily generalizable to counties other than those of similar demographic make-ups and those with similar pretrial release practices/proportions. Readers should use caution in any attempt to make inferences about other counties based on these findings.

- Release on recognizance is an important mechanism of release but was rarely used by Dallas County for new crimes (less than 1% defendants). For this reason, own recognizance releases are not analyzed.

- Pretrial services bonds may involve a diversionary program for some defendants. The data provided no indication of whether this was the case, thus no information is provided in terms of FTA for any particular diversion program.

- While the statistics presented here from the propensity score matching analysis are relatively robust, there are indicators of release type and FTA that were not collected by, or made available from, Dallas County. These include employment status, residential status, as well as pre-release and risk assessment measures. However, the Dallas County data are unique in the fact that they do include many measures that other data sources do not include, such as drug offense history, mental illness, and indigence.

- Analyses were not carried out specific to any particular criminal offense (e.g., DWI). The findings may change when exploring particular offenses.

- The measure of recidivism/pretrial misconduct does not exclusively account for rearrests for a new crime during the pretrial phase for the book-in of interest. Crimes that occurred after the pretrial phase, but within the window of opportunity (here 9 or 12 months) are also counted as recidivism. Additional data will be required to develop a recidivism measure that is exclusively representative of pretrial misconduct.

- The indicator of FTA for pretrial services releases was limited to bonds that were held "insufficient" rather than an official indicator of non-appearance in court. This was due to limits on the data collection procedures currently in practice by the County. It is possible that some bonds held insufficient do not reflect a failure to appear, however, in discussion with Dallas County Pretrial Services, it was determined that this possibility was minimal.

## TECHNICAL APPENDIX

### *What is propensity score matching (PSM)?*

PSM is a well-known statistical matching procedure that approximates an experimental design by matching cases, (i.e., defendants), based on a near equivalent probability of having been released from jail by way of one mechanism versus a possible alternative. (For this study, within a maximum difference of 0.1% probability, which is considered very conservative). Here, the varying release types can be considered treatments, just like in an experiment. Since there are multiple treatments under study (i.e., the four release types), comparisons are made from one release-type to another, for every possible combination of treatments, respectively. The goal is to end up with an estimate of the "treatment effect." This is the difference in average probability for defendants failing to appear, or recidivating, between two specific release mechanisms. Again, these comparisons are based on statistically matched (i.e., similarly situated) defendants equally likely to have received the treatment.

Restated, a series of predictor variables (outlined in the technical appendix) are used to estimate a defendant's probability of receiving one treatment over another particular treatment. This estimate is the conditioned probability of receiving the treatment–also known as the propensity score. Upon establishing the quality and robustness of the propensity score, mean (average) levels of a final outcome (e.g., failure to appear in court) can be compared between the treated (i.e., those receiving the treatment) and the matched controls (i.e., those who did not receive the treatment, but who had an equal probability of having received it). *In the end, comparisons are made not between all defendants released by way of a particular method, but only between statistically matched pairs.*

### *How robust are these findings and how was this determined?*

The quality of the matching procedure was assessed in multiple ways, using contemporary statistical methods. These include 1) an assessment of balance on covariates between matched and unmatched samples, 2) a sensitivity analysis to determine how strong an unmeasured covariate (i.e., something not available in the data such as employment history) would need to be to change the results (Rosenbaum Bounds), and 3) a complementary weighted regression analysis that involved both matched and unmatched defendants (Inverse Probability of Treatment Weighting, IPTW).

These procedures resulted in a strong level of confidence that these PSM analysis findings are robust to the influence of unmeasured covariates and that the matching procedure was very good at finding suitable matches to those actually treated. The specific details on these diagnostics are available via the Center for Crime and Justice Studies webpage (www.utdallas.edu/epps/ccjs) and/or can be requested via email (morris@udallas.edu).

ANALYSIS OVERVIEW

There are four major types of release (bonds) used in Dallas County that are explored here. Such bonds include: (1) cash bonds, (2) attorney bonds, (3) commercial bonds, and (4) pretrial

services bonds. Note that release on recognizance and "other" release types (e.g., release to TDCJ for incarceration) are not assessed. The PSM approach will assess the effect of each bond compared to an alternative bond, respectively, across all combinations of bond types. This is illustrated in Figure 1 below.

```
Figure 1: Counterfactual Comparison Groups

    (1) Attorney              vs.       (2) Cash
    (1) Attorney              vs.       (3) Commercial
    (1) Attorney              vs.       (4) Pretrial

    (2) Cash                  vs.       (3) Commercial
    (2) Cash                  vs.       (4) Pretrial

    (3) Commercial            vs.       (4) Pretrial
```

As noted, PSM matches individuals who received a treatment, here a type of bond, to others who did not receive the treatment, but who had a statistically identical probability of having received such. In other words, these are similarly situated defendants (e.g., similar offense, criminal history, demographics, etc.) This approach allows for the isolation of a particular bond effect as compared to every alternative. For example, this approach allows us to determine whether cash bonds do better at reducing the probability of FTA compared to an attorney bond, net of other predictive variables on FTA.


### Measurement/Definition of Variables

This section outlines and defines all data variables used in this study. The section is broken down by outcome variables, treatment variables (i.e., bond types) and control variables.

Statistical Model Output will be made available via Professor Morris's webpage, and/or can be requested via email (morris@utdallas.edu)

### Outcome Variables

Failure to Appear (FTA) is defined differently depending on the type of bond. For attorney, cash, and commercial bonds, FTA is defined by whether the Court passes a judgment *NISI* against the defendant. A *NISI* is a judicial declaration that a bond is forfeited unless s/he can provide a suitable reason why there was no court appearance. While it is not uncommon for a judgment *NISI* to be overturned, this is an indication of FTA in Court and was easily identified in the `bond_forfeiture` data file provided by Dallas County.

FTA for personal recognizance and pretrial diversion rarely results in a judgment *NISI* being entered by the Court. Unfortunately, there was not a specific data indicator provided by Dallas County indicative of FTA for these two bond types. In order to gather this information, data on FTA were extracted from court comments through a character extraction algorithm constructed by Dr. Morris, and approved by Mr. Ron Stretcher (the Director of Criminal Justice for Dallas Co.). The comment information was provided in the `dc_bonds` data file. For personal recognizance and pretrial diversion bonds, FTA was indicated by the issuance of a bond forfeiture, however, most personal bonds are not formally identified as being forfeited. Rather a

bond is held "insufficient" when a defendant out on a personal bond does not appear in court. The specific terms used in the character extraction algorithm are available upon request (email morris@utdallas.edu).

Recidivism/Pretrial Misconduct is defined by a new arrest occurring after the offense of record for the study (i.e., an individual's first arrest occurring in 2008). The recidivism measures here specifically exclude re-arrest for failure to appear (absconding) only; only "new" crimes are counted as part of the measure. This issue is important because we should expect higher return to jail rates for absconders since either the system or a surety actively attempts to capture absconders. It is important to note that the measure of recidivism/Pretrial Misconduct here does not exclusively reflect pretrial misconduct as such data (i.e., court hearing dates) were not readily available. Recidivism researchers agree that differing lengths of time be used to assess any effect on recidivism, generally at no more than 36 months. However, since these release mechanisms should impact recidivism sooner rather than later (if ever), recidivism was assessed at 9 and 12 months, respectively, to help account for new crimes during the pretrial phase. The reason for this approach is that the context of a release mechanism stays with a defendant only to the disposition of a criminal case. After that point, the relationship is terminated.

Data for the recidivism/Pretrial Misconduct measure stem from supplementary data provided by the Texas Department of Public Safety (DPS), as well as those from Dallas County. DPS arrest data were required as Dallas County does not have in its possession arrest data for arrests occurring in other jurisdictions and are not tied to a Dallas County arrest. Using both of these data sources for the same set of defendants, recidivism represents any "new crime" arrest occurring in Dallas County or elsewhere, provided it is on file with DPS, which took place after the first 2008 book in and occurred prior to January 1st, 2012.

*Control Measures*

In addition to FTA, a series of variables serve as control variables for the present study. The variables outlined below are limited to what was available within the data provided by Dallas County. Definitions are provided as needed.

## SOCIODEMOGRAPHIC VARIABLES

| | |
|---|---|
| **Age** | (in years) at Time of Arrest |
| **Age$^2$** | Age squared (i.e., age as a non-linear effect) |
| **Gender** | (Female=1, Male=0) |
| **Race** | (Black, White, Hispanic) – Those indicated as "other" on race were less than 3% of all defendants. |
| **Marital Status** | (Married=1, otherwise=0) |
| **Mental Illness History** | (1=yes, 0=no) |

**Medical Problems**          (1=yes, 0=no)

**Indigence**          (1=yes, 0=no)

**Born in the United States**    (1=US born; 0=foreign born)

## CRIMINAL HISTORY VARIABLES

**Number of Prior Arrests** – refers to the number of arrests that a defendant has on file with either Dallas County or Texas Department of Public Safety (DPS). Reporting error exists between the arrests reported to DPS from Dallas County. In order to minimize such error, the number of prior arrests was based on the total number of unique arrests occurring prior to the book-in of record stemming from Dallas Co., DPS, or both (whichever was highest).

**Type of Offense for Book-in of Record** – refers to the offense/s for which a defendant was charged underlying the primary 2008 book-in (i.e., the book-in of record). This was codified in part by UCR Index Crime definitions. Each of these 16 crime types was indicated by a binary variable to allow for multiple charge types to be included in the analysis simultaneously. For example, someone arrested for burglary may also have a charge of aggravated assault for the same arrest (or book-in). The offense categories include: drug related crimes, family violence, homicide (not present in data), robbery, aggravated assault, burglary, larceny, auto theft, fraud, obstruction of justice, weapons related offenses, and driving while intoxicated (DWI or DUI).

**Offense of Record Category** (OOR; misdemeanor vs. felony) – The category of offense was used at times to produce results stratified between misdemeanors and felonies (and sometimes state jail felonies).

**Failure to Appear History** (1=at least one previous FTA; 0=no previous FTAs)

**Year of First Arrest** on File – This variable serves as a proxy for the amount of time that an individual has been criminally active, as far as it is indicated in official police records.

**Days in Jail** for the OOR – The number of days spent in jail for the offense of record. This variable was not included in analyses of release for time served.

**Celerity** – Celerity refers to the amount of time between the date of the offense and the date of arrest (in days). This variable was log-transformed prior to analyses to correct for skewness.

**Dallas County Jail History** – An indicator of whether a defendant had been booked into the County jail at any time prior to the book-in of record

*Treatment Variables*

There are four main categories of bonds (release mechanisms) explored here. These include attorney bonds, cash bonds, commercial bonds, and pretrial services bonds.

The 2012 Texas Association of Counties (TAC) Bail Bond Handbook (p. 9) provides a detailed explanation of the bond process in Texas, which may vary between counties and defines a bail bond as:

> *A "bail bond" is a written undertaking entered into by the defendant and the defendant's sureties for the appearance of the principal therein before a court or magistrate to answer a criminal accusation; provided, however, that the defendant on execution of the bail bond may deposit with the custodian of funds of the court in which the prosecution is pending current money of the United States in the amount of the bond in lieu of having sureties signing the same. Any cash funds deposited under this article shall be receipted for by the officer receiving the funds and, on order of the court, be refunded, after the defendant complies with the conditions of the defendant's bond, to:*
>
> *(1)  any person in the name of whom a receipt was issued, in the amount reflected on the face of the receipt, including the defendant if a receipt was issued to the defendant; or*
>
> *(2) the defendant, if no other person is able to produce a receipt for the funds.*

Attorney Bond
In Texas Bail Bond Board Counties, a state licensed attorney may post bonds as a surety for official clients in a criminal case, without the need to be licensed as a bail bond agent. The Sheriff of a County may inquire as to the security of the attorney in his/her ability to write a bond in accordance with TEXAS Code of Crim. Proc. Ch 17.

Cash Bond
'A "cash bond" occurs when the criminal defendant executes the bond himself as principal and posts the entire amount of the bond in cash with the "custodian of funds of the court" in lieu of having sureties sign the bond.' A cash bond is "unsecured" and if the defendant fails to appear for trial, s/he is liable for the full bond amount.

Commercial Bond
A commercial bond is one type of surety bond wherein the bond is made by a corporate surety (an insurance company), via a bonding company. In Texas, only a specially licensed insurance company can write such bonds. This form of bond occurs when a jailed defendant contacts a bail bond company and applies for bail. If approved, the defendant is released to the bonding company for a fee (generally 10-20% of the bail amount set by the court).

*Personal Bonds*

**Personal Recognizance (not analyzed here)**, or release on recognizance, is one form of personal bond wherein the court releases an individual from jail without sureties or other security (i.e., financial penalty), but with the promise of the defendant that s/he will reappear for trial.

**Pretrial Services bonds** involve the release of a defendant under an unpaid, or $20 fee, bond held accountable to the Pretrial Services Division. These bonds are intended for low-risk defendants who are unable to secure release solely to the fact that they cannot access funding needed for a financial bond. A pretrial services bond is technically a type of personal recognizance bond.

In Dallas County, pretrial services eligibility is determined by reviewing a list of inmates booked in the jail the previous business day (or over the weekend), who have yet to be released, and who reside in Dallas and the surrounding counties. Among these inmates, the current offense is checked for eligibility (see below list of exclusions), along with the set bond amount (Dallas County Pretrial Services, 2012). If an inmate is eligible, his/her criminal background is checked via TCIC and NCIC. If still eligible and incarcerated, the inmate is interviewed by Pretrial Services that day. The inmate is then required to provide reference information, which must be confirmed by two personal references. The inmate also has to agree to abide by the program rules. The references are given the information of the amount of the pretrial fee (20 dollars or 3% of the bond, whichever is greater). Information is entered into the computer that the pretrial bond has been approved and once the fee is paid, the inmate is released. If the fee is not paid, a determination is made whether or not the fee should be waived in order to keep the jail population down. The financial status (i.e., indigence) of an inmate is not considered in Dallas Co. pretrial services releases. Inmates released via pretrial services tend to be those who cannot access funding to secure a financial bond.*

Specific eligibility requirements for pretrial services in Dallas Co. were determined via a Court Order in 1999 (Dallas County Court Order No. 99-1951), and were revised in 2007. Serious and violent offenses preclude an inmates eligibility for pretrial services release as are inmates with a history of felony/assaultive offenses. In some cases, exceptions can be made with approval from a supervisor and/or the District Attorney's office. Pretrial services tend to include individuals charged with minor non-violent (e.g., thefts and fraud) and/or lesser drug possession offenses.

Formal risk assessment tools are not used by Dallas County Pretrial Services in making release decisions.

During the period of observation for this study, Dallas County's Pretrial unit was staffed by four pretrial services officers who operate during normal business hours only. Therefore, potential defendants are screened the next business day after book-in to the jail. The monitoring of defendants other than the required regular check-ins took place solely by telephone.

The offenses that are underlined excluded by Pretrial Services are outlined in the following page:

*Above paragraph paraphrased from in-person and email correspondence with Dallas County Pretrial Services (December, 2012).

Offenses Excluded by Pretrial Services Releases

1. Aggravated kidnapping
2. Aggravated Manufacture, Delivery or possessions of Controlled Substances
3. Aggravated Promotion of Prostitution
4. Aggravated Sexual Assault
5. Aggravated Robbery
6. Capital Murder
7. Criminal Solicitation
8. Aggravated Assault
9. Enticing a child
10. Prohibited Sexual Conduct
11. Indecency with a child
12. Injury to a child, elderly or disabled individual
13. Murder
14. Sexual assault
15. Parole violation
16. Sale, distribution or display of harmful materials to a minor
17. Sale or purchase of a child
18. Sexual performance by a child
19. Criminal solicitation of a minor
20. Any charge involving a firearm
21. Any charge involving assault with bodily injury
22. Stalking
23. Family violence
24. Violation of protective order or Magistrate's order; and
25. Harassment (includes telephone harassment)

# References

Block, M. K. & Twist, S. J. (May, 1997). *Report Card on Crime-Runaway Losses: Estimating the Costs of Failure to Appear in the Los Angeles County Criminal Justice System*. American Legislative Exchange Council.

Dallas County Pretrial Services (personal communication, December 10, 2012).

Lechner, M. (1999a). Earnings and Employment Effects of Continuous Off-the-job Training in East Germany after Unification. *Journal of Business and Economic Statistics, 17,* 74-90.

Lechner, M (2001) Identification and Estimation of Causal Effects of Multiple Treatments under the Conditional Independence Assumption. In: Lechner M, Pfeiffer P (eds.) Econometric Evaluation of Labour Market Policies. Heidelberg and New York, Physica.

Texas Association of Counties. (2012). Bail Bond Handbook: Basic Information for County Officers, 2012 Update. Available at https://www.county.org/member-services/legal-resources/publications/Documents/Bail-Bond-Handbook.pdf

Acknowledgements

The author of this study would like to thank Dallas County, Texas and its agents in providing cooperation in the data-gathering phase of this project. Special thanks to Dr. Elba Garcia (Dallas County Commissioner, District 4), Ron Stretcher (Director of Criminal Justice), Jill Reese (fmr. Jail Population Manager), Mark Crooks (Dallas Co. IT Department), and Leah Gamble for their time, support, and guidance. Mr. Crooks was particularly instrumental to the data collection component and deserves special recognition for his mastery of the County's data infrastructure, which was sufficiently complex. Thanks are also deserved by the Dallas County District Attorney, Craig Watkins, and his staff, particularly Mr. Gordon Hikel, for their support and cooperation in establishing an MOU between the County and the University so that this study could be made possible. Recognition is also deserved by the Texas Department of Public Safety, for expediting the delivery of statewide arrest records for Dallas County jail inmates. Ms. Amanda Russell, the graduate research assistant on the project, is also deserving of thanks for all of her time and effort with this project. Finally, thanks to the University of Texas at Dallas's School of Economic, Political and Policy Sciences (EPPS) and (former) Dean James Marquart for providing financial and graduate student support for the completion of this project.

ABOUT THE AUTHOR

**Robert G. Morris**, Ph.D. is Associate Professor of Criminology as well as the Director of the Center for Crime and Justice Studies at the University of Texas at Dallas. Dr. Morris' specializes in quantitative analytics, criminological theory, and contemporary issues in criminal justice, having published dozens of peer reviewed scholarly studies in top-ranked scientific journals such as *Justice Quarterly*, *Crime and Delinquency*, *Intelligence*, and *Journal of Quantitative Criminology*. He teaches doctoral level statistics/analysis courses at UT Dallas as well as undergraduate courses surrounding criminal justice and criminology. He is the recent recipient of numerous research and teaching awards including the prestigious UT System Regents' Outstanding Teaching Award (2011) and the Academy of Criminal Justice Sciences Outstanding Research Paper Award (2012). Dr. Morris received his Ph.D. in Criminal Justice from Sam Houston State University in 2007.

# Exhibit 5

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*



Bureau of Justice Statistics

# DATA ADVISORY

MARCH 2010

# State Court Processing Statistics Data Limitations

For 22 years the Bureau of Justice Statistics (BJS) has supported the State Court Processing Statistics (SCPS) project—a statistical series describing the characteristics of felony defendants and the processing of their cases by state courts. The SCPS data are routinely used by pretrial practitioners, bail bondsmen, criminal justice policymakers, district attorneys, state courts, lawmakers, academics, journalists, and members of the public. Inherent in the SCPS design are a number of limitations in the uses and capabilities of these data. In particular, the following limitations must be considered when analyzing SCPS data, drawing any conclusions based on the data, and citing BJS reports.

## LIMITATIONS

### SCPS data are insufficient to explain causal associations between the patterns reported.

BJS reports and analyses describe patterns associated with case processing, such as misconduct during pretrial release. However, the data are insufficient to explain causal associations between the patterns reported, such as the efficacy of one form of pretrial release over another. To understand whether one form of pretrial release is more effective than others, it would be necessary to collect information relevant to the pretrial release decision and factors associated with individual misconduct. Some of the relevant factors include a defendant's community ties, employment status, income, educational background, drug abuse history, and mental health status. For reasons related to cost and data accessibility, these measures are not currently collected in SCPS.

### Evaluative statements about the effectiveness of a particular program in preventing pretrial misconduct may be misleading.

BJS does not support the use of SCPS data for such evaluative statements. Detailed measures of pretrial monitoring practices are critical to any evaluation of the efficacy of a pretrial release program. SCPS does not have the capacity to distinguish highly functioning pretrial diversionary programs from those operating under limited staffing and budgetary constraints. Also, SCPS cannot distinguish defendants released under conditions that involve intensive pretrial monitoring from defendants released under less stringent pretrial conditions. Any evaluative statement about the effectiveness of a particular program in preventing pretrial misconduct based on SCPS is misleading. BJS does not support such use of these data.

### The potential for misconduct is only one of many factors that jurisdictions consider in developing and implementing pretrial release policies.

Many complex issues are involved in determining a jurisdiction's policy for release or detention of the criminally accused and the best method for releasing defendants.  State and local officials consider an array of interrelated factors when developing and implementing pretrial release policies, including jail overcrowding, pretrial incarceration of individuals accused of minor offenses, the utility of pretrial risk assessments, and the capacity of pretrial diversion programs. BJS reports and SCPS data, as currently collected, cannot be used to evaluate such factors.

## RELATED BJS REPORTS

BJS reports based on SCPS data routinely describe the limitations of the data and factors that must be considered when analyzing SCPS. A full list of SCPS products can be found at http://bjs.ojp.usdoj.gov/index.cfm?ty=dcdetail&iid=282, and include:

Felony Defendants in Large Urban Counties, 2004
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=891

Felony Defendants in Large Urban Counties, 2002
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=896

Felony Defendants in Large Urban Counties, 2000
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=897

Felony Defendants in Large Urban Counties, 1998
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=899

Juvenile Felony Defendants in Criminal Courts: Survey of 40 Counties, 1998
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=1039

Pretrial Release of Felony Defendants in State Courts, 1990–2004
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=834

Pretrial Release of Felony Defendants, 1992: National Pretrial Reporting Program
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=835

Violent Felons in Large Urban Counties
http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=596

## SCPS DATA COLLECTION MANAGERS

Thomas Cohen,  Statistician, BJS,
thomas.cohen@usdoj.gov

Tracey Kyckelhahn, Statistician, BJS
tracey.kyckelhahn@usdoj.gov



EXHIBIT 7(s)



# District Court

FIRST JUDICIAL DISTRICT
100 JEFFERSON COUNTY PARKWAY
GOLDEN, COLORADO 80401-6002

**MARGIE L ENQUIST**
JUDGE

1. My name is Margie Enquist, and I am a District Court Judge in Colorado's First Judicial District, comprised of Jefferson and Gilpin Counties. I received my law degree from the University of Minnesota Law School, graduating *magna cum laude*. Before being appointed to the bench in 2004, I served as Deputy District Attorney for the First Judicial District, handling felony cases, with an emphasis on crimes against children.

2. I have provided training to law enforcement academies and continuing legal education seminars to attorneys in Colorado. I have occasionally been asked to speak outside of Colorado (to other judges and policy makers), primarily on issues surrounding pretrial release and detention as well as research on the impact of those decisions. I co-authored a paper on the topic of release and detention in Jefferson County for the Attorney General's National Symposium on Pretrial Justice in 2011.

3. As a Colorado judge, I am bound by a judicial code of conduct that limits my ability to provide testimony. Accordingly, I will not be commenting on the merits of this particular case. Instead, I will only respond to a letter dated December 22, 2016, titled "Proposed Amendment by Standing Committee on Practice and Procedure Regarding Rules of Criminal Procedure on Pretrial Release." To be clear, I do not speak for the Colorado Judicial Branch or any other judges in my district.

4. As an initial matter, you should be aware that three signatories of the above-mentioned letter were not in their present positions during the years-long process research and implementation of a project that we named the "Jefferson County Bail Project." From what I recall, none of them were present during the many meetings during which we compromised to reach consensus, they did not participate in or contribute to the research, they did not help with the various documents produced during the process, and, in my opinion, that impairs their ability to fairly evaluate the success or failure of either the Jefferson County Bail Project, or a sub-study titled the "Bail Impact Study."

5. Jefferson County began discussions concerning the effectiveness of our pretrial release and detention practices in 2008 and 2009. Those discussions culminated in our local Criminal Justice Coordinating Committee (CJCC), comprised of all the criminal justice stakeholder groups and chaired by our then-Chief Judge Brooke Jackson, voting to further explore the issues. In 2009, after a lengthy period of study, the County's Criminal Justice Planning Unit (staff to the CJCC) produced a series of recommendations for making changes to our then-existing pretrial processes.

6.    Based on those recommendations, judges in the First Judicial District chose to engage with the rest of the County in discussions surrounding what we called the Jefferson County Bail Project, which involved a collaborative process of reworking our first advisement bail settings and examining all aspects of the pretrial process. I was asked to serve as one of two Judge Representatives during that process. The overall project was a complicated but collaborative process of change involving representation from multiple stakeholders from the entire criminal justice system.

7.    One component of this long process was a study titled the Bail Impact Study, which was a fourteen-week pilot project designed to measure the impact of many of the proposed recommendations for change. The Bail Impact Study (BIS) was designed merely to provide local data, specifically concerning outcomes from the various changes made to local practices during the fourteen weeks.

8.    The Bail Project was much broader, and included meetings, papers, the creation of new pretrial supervision practices and responses to violations, and numerous policy level discussions over various proposals (such as having all defendants appear before a judge prior to bond settings, and having defense attorneys at bail hearings, at least in felony cases). The differences between the BIS and the overall Bail Project have been documented and published in 2014 in two separate papers found here: https://www.pretrial.org/download/pji-reports/Jefferson%20County%20Bail%20Project-%20Impact%20Study%20-%20PJI%202014.pdf (impact study); and here: http://www.pretrial.org/download/pji-reports/Jefferson%20County%20Bail%20Project-%20Lessons%20Learned%20-%20PJI%202014.pdf.

9.    The CJCC (including the Sheriff and County Commissioner on the committee) voted nearly unanimously (the one vote cast against was by the District Attorney) to attempt to fully implement the studied and recommended changes.

10.   In my opinion, and as someone who was present throughout the Jefferson County Bail Project, that Project had an overall positive impact. It led to the elimination of the County's arbitrary monetary bail schedule (which was arguably unconstitutional because it was based solely on charged offense and not ability to pay or risk to the community), to having public defenders at first advisements, to having Saturday advisements, and overall to fostering a more thoughtful and educated process of bail settings in our District. The data collected by the planners showed that judges could release more people on unsecured bonds and still retain the same court appearance and public safety rates, a finding that has helped countless jurisdictions in America struggling to find solutions to pretrial issues.

11.   The Bail Project also led the statewide Colorado Commission on Criminal and Juvenile Justice to examine bail practices, and to discuss alternatives to the traditional money bail system. I was a Co-Chair of the Subcommittee tasked with leading those discussions, which ultimately led to revisions to our state laws changing the definition of bail, and encouraging the use of unsecured bonds, an actuarial pretrial risk assessment, and pretrial services supervision where available.

12.    The letter of December 22, 2016, states that "the county shifted toward an unsecured bond system," but that now "the use of financial bail, including the use of commercial sureties, has been re-introduced into the system." In fact, despite the findings of the BIS, the county never completely "shifted" to an unsecured bond system, and money and commercial sureties were never eliminated from the system to begin with (even during the BIS). Then, as now, judges have been able to use their discretion (within constitutional limits) to set types and amounts of bond, under Colorado state law.

13.    The letter of December 22, 2016, also states that "the program did not work as intended," citing budget issues. In fact, while budget concerns (related to an anticipated need for more jail space) led to initial discussions over pretrial changes, to me, as a person asked to represent the judges during this project, budget issues ultimately became secondary to issues of fairness and effectiveness in the administration of justice. Moreover, as stated, some judges then and today choose secured bonds despite the empirical evidence. Accordingly, any claims concerning the current budget cannot be easily attributed to changes in bond types made during the pilot project. And surety bonds have not solved the problem.

14.    The letter of December 22, 2016, further states that "the program did not work as intended," citing accountability issues. In fact, the BIS study, cited above, demonstrated that secured bonds did not increase "accountability," as measured by court appearance despite the fact that failure to appear is the only basis for bond forfeiture in Colorado. Secured bonds are also not correlated with improved public safety rates in Colorado because those bonds are not forfeit in the event of a new offense. Secured bonds are effective in increasing public safety and court appearance when they result in detention, but I am unaware of any research showing that the use of secured bonds decreases recidivism, increases public safety, or decreases failures to appear after release.

15.    Overall, the Bail Project worked as intended as a necessary first step in the iterative process toward more just and effective bail practices in Jefferson County. In sum, the Jefferson County Bail Project provided an overall benefit in that it educated Jefferson County judges and stakeholders about bail setting, helped the County in making significant changes to pretrial practices, and informed state lawmakers when changing Colorado's bail laws. Moreover, the BIS portion of the Project was highly successful in showing that judges could release more persons pretrial while keeping the same court appearance and public safety rates. To the extent that the implementation of the recommendations was not successful, the reasons therefor extend far beyond the scope of the statements in the letter of December 22, 2016.

I swear under penalty of perjury that the foregoing is true and correct to the best of my ability.

March 6, 2017

Signed & sworn before me
this 6th day of March 2017
in Jefferson County, CO.

_Engquist_

_Judy A. Cross_

JUDY A. CROSS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20004034328
My Commission Expires 11-20-2020

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATON OF PENNY STINSON

1. My name is Penny Stinson.  I am the President of the National Association of Pretrial Services Agencies.  I have worked in the criminal justice field in pretrial, probation and court management for the past 34 years. I am a retired executive from Maricopa County, Arizona. Since 2000, I have worked primarily in the field of pretrial services and pretrial justice reform. I was instrumental in program development and implementation for Maricopa Superior Court and Scottsdale City Court. I have an undergraduate degree from the University of Arizona, a Master's Degree in Organizational Management from the University of Phoenix, and a Fellowship from the National Center for State Courts' Institute of Court Management.  I serve on numerous national boards and committees as a representative of pretrial issues in criminal justice.

2. NAPSA is the professional association for pretrial professionals.  NAPSA has served the pretrial community for 45 years as a non-profit, membership-based organization. NAPSA's membership consists of national and international pretrial practitioners, judges, defense attorneys, prosecutors, and criminal justice researchers.  NAPSA's mission is to promote pretrial justice and public safety through rational pretrial decision-making and practices informed by evidence.  Our vision is to make "pretrial justice the norm in America's courts". NAPSA's objectives are to provide education and support regarding effective pretrial practices, so that jurisdictions can realize informed and empowered pretrial professionals in every court system; smarter pretrial practices in communities; assessments and supervision done with best practice; release decisions based on defendants' risk levels; the elimination of money bond and "for profit" entities in release determinations; reduction of mass incarceration in jails; elimination of system reliance on fines and fees; and reduced recidivism.  NAPSA develops professional training content and testing procedures for pretrial practitioners in the release and diversion field and produces pretrial/diversion related publications and subject matter that is disseminated by NAPSA and through their partners, to include: the National Institute of Corrections; the Pretrial Justice Institute and the American Probation and Parole Association.

For over 40 years, NAPSA has served as a national forum for ideas and issues in the area of pretrial services. We are the sole source association made up of pretrial practitioners. Provide the only system-wide premier pretrial specific annual training institute and have co-authored a number of the fundamentals publications in partnership with NIC and the Pretrial Executive Network. We maintain a strong relationship with existing statewide pretrial associations and have been instrumental in supporting the development of statewide associations.

3. I was just informed that Kelvin Banks is testifying incorrectly on NAPSA's stand on money bail. From what I have been told, Mr. Banks is contending that the National Association of Pretrial Services Agencies supports the imposition of secured financial conditions of release.

4. Mr. Banks' position is diametrically opposed to NAPSA's stand on this important issue. Our newly revised standards call for the elimination of secured financial conditions of release. We have long been particularly opposed to the position that money has played throughout history in criminal justice in contributing to mass incarceration and discriminatory practices targeted at the poor, mentally ill, people of color and the disenfranchised. This indiscriminate practice serves to keep individuals in custody for no other reason than their inability to pay monetary amounts that are not supported by science nor comport with our constitutional principles. Mr. Banks is on the NAPSA education committee, and he knows what our position is on this issue.

5. NAPSA recently jointly filed an amicus brief in the United State Court of Appeals for the Eleventh Circuit that further sets out our position, which is based on all of the available empirical evidence and the wealth of experience of our federal and state agency members around the country.

I declare under penalty of perjury that the forgoing is true and correct to the best of my ability.

_____

Penny Stinson

March 9, 2017

# PX 7(u)
# Declaration of Insha Rahman

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |

### DECLARATON OF INSHA RAHMAN

1. My name is Insha Rahman. I am a senior planner at the Vera Institute of Justice, a non-profit criminal justice organization that harnesses the power of evidence to drive effective criminal justice policy and reform. The Vera Institute (Vera) works with jurisdictions across the United States to implement bail and pretrial practices that prevent unnecessary pretrial detention. In New Orleans, Vera developed and operated the first pretrial services program until March 6, 2017, when it was transferred to the local court. In New York City, Vera partners with government and non-profit criminal justice stakeholders to improve the use of bail through research, training, and piloting new programs. I lead Vera's work on pretrial justice in New York City and serve as an expert on bail reform. I received my B.A. from Vassar College and my J.D. from the City University of New York School of Law.

2. According to statistics published online by the New York City Mayor's Office of Criminal Justice (http://www.justice-data.nyc/safely-reducing-the-jail-population/), New York City's jail incarceration rate is one of the lowest in the country, at 194 per 100,000 residents, compared to the national rate of 341 per 100,000 residents. In a city of over 8.5 million people, the average daily population held at Rikers Island and other city jails hovers under 10,000. People detained pretrial on misdemeanor and non-felony charges comprise approximately 6% of the jail population on any given day.

3. A recent study by Judith Greene and Vincent Schiraldi in the *Federal Sentencing Reporter*, attached, found that New York City's relatively infrequent use of jail is the product of over two decades of deliberate policy decisions that favor pretrial release over detention and non-custodial sentences over jail without compromising public safety. As a result, the average daily population in New York City's jails has dropped from an all-time high of 21,688 in 1991 to 9,762 in 2016. This dramatic drop by 55% in the jail population coincides with a similarly sharp decline of 58% in index crime rates in that same period.

1

4. Arraignment is the first court appearance after arrest in the New York City courts. At arraignment, a person is formally arraigned, may resolve their case if it involves a misdemeanor or other low-level charge, and for cases that continue past arraignment a decision will be made about pretrial release or detention. In the Bronx, Manhattan, Queens, and Brooklyn, arraignment court parts are open sixteen hours a day from 9am-1am daily, including on weekends and holidays, 365 days a year. In Staten Island Criminal Court, which processes significantly fewer cases than the other four boroughs, an arraignment part is open every day from 9am-5pm, excluding Sundays. According to the 2015 Annual Report of the New York City Criminal Court, attached, the average time from arrest to arraignment citywide is under 20 hours.

5. The most recent publicly available data on the New York City bail system is from 2015 in the New York City Criminal Justice Agency (CJA) Annual Report, attached. The CJA, a non-profit organization that provides pretrial services in all five boroughs, annually publishes data on rates of pretrial release, bail-setting, bail-making, and failure to appear.

6. According to the 2015 CJA Annual Report, 242,464 cases were arraigned in 2015 where the top charge was a non-felony offense of a misdemeanor or a violation, a non-criminal class of offenses under New York law. Of those 242,464 cases, approximately 114,209, or 47%, were resolved at arraignment with a dismissal or plea to a misdemeanor or violation charge.

7. In New York City, monetary bail is not set prior to arraignment. In 2015, of the remaining 128,255 non-felony cases that continued past arraignment and for which bail was at issue, bail was set on 17,427 cases, approximately 14% of the time. Eighty-six percent of people charged with non-felony cases that continued past arraignment were released on recognizance (ROR) with no conditions of release other than to appear on future court dates.

8. Of the 17,427 non-felony cases where bail was set, 57%, or 9,934, either made bail or were RORed before the disposition of the case. Only 3%, or 7,493 of all 242,464 arraigned non-felony cases, remained in detention throughout the duration of the case until disposition.

9. The 3% detention rate on non-felony cases does not include a small percentage of misdemeanors and violations in which there was a guilty plea to an incarceratory sentence at arraignment. There are no publicly available statistics on the number of cases that are disposed of with a jail sentence at arraignment, but unofficial estimates suggest that this number includes approximately 4,000-5,000 non-felony cases annually.

10. The CJA 2015 Annual Report notes that the overall failure to appear rate is 14% in cases where a person is RORed or makes bail and the top charge is a misdemeanor or violation. For people released at arraignment, the CJA provides automated text and phone reminders about upcoming court dates.

11. The harms of pretrial detention and incarceration, even for short periods of time, are well documented. In *A Decade of Bail Research*, attached, the CJA found that 92% of people

detained pretrial in New York City plead guilty to a criminal conviction when held in on bail.

12. Over the past five years, several pretrial programs and interventions have been introduced to reduce the numbers of people charged with non-felony offenses held in New York City's jails. In March 2016, the Mayor's Office established a citywide supervised release program to serve 3,000 New Yorkers annually. Given the infancy of the program, no published data is available yet.

13. Two charitable bail funds, the Bronx Freedom Fund and the Brooklyn Community Bail Fund, were established under the 2012 New York State Charitable Bail Act. They pay bail for people held on misdemeanor and violation charges when bail is set at $2,000 or less. In neither Bail Fund's operations is any client financially liable if they fail to appear in court. By paying bail as a matter of charity, the Bail Funds assume the financial risk of non-appearance.

14. The Bronx Freedom Fund has paid bail for almost 800 people in the Bronx who otherwise would have been incarcerated because they could not make bail. Of their clients, 95% return for all court appearances, with some appearing for over 15 court dates in a row. The Freedom Fund provides effective reminders of upcoming court dates through phone calls and text messages, and offers limited, voluntary assistance to connect people with support services. Fifty percent of Freedom Fund cases result in a dismissal, and an additional 26% result in a non-criminal disposition.

15. The Brooklyn Community Bail Fund has paid bail for nearly 1,500 low-income New Yorkers. While 70% of the Bail Fund's clients are deemed moderate or high risk of failure to appear by the CJA, 95% have made all required court dates. The Bail Fund provides clients with a reminder of upcoming court dates. Forty-four percent of Bail Fund cases result in a dismissal, and an additional 24% result in a non-criminal disposition.

I declare under penalty of perjury that the forgoing is true and correct to the best of my ability.

_____

Insha Rahman

March 14, 2017

3