PX 13(a)

10/30/2016     Police Use Roadside Drug Tests Based on Flawed Forensic Tests to Jail Innocent People Behind Bars - ProPublica

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/17 Page 2 of 201

**Donate**



Tens of thousands of people every year are sent to jail based on the results of a $2 roadside drug test. Widespread evidence shows that these tests routinely produce false positives. Why are police departments and prosecutors still using them?

*by Ryan Gabrielson and Topher Sanders, ProPublica*

*Graphics by Fathom  |  Photography by Todd Heisler, The New York Times*

July 7, 2016

*This story was co-published with The New York Times Magazine.*

---

AMY ALBRITTON can't remember if her boyfriend signaled when he changed lanes late that August afternoon in 2010. But suddenly the lights on the Houston Police patrol car were flashing behind them, and Anthony Wilson was navigating Albritton's white

ncorde to a stop in a strip-mall parking lot. It was an especial
n was in Houston to see about an oil-rig job; Albritton, volunteering her car,
had come along for what she imagined would be a vacation of sorts. She managed an
apartment complex back in Monroe, La., and the younger of her two sons — Landon, 16,
who had been disabled from birth by cerebral palsy — was with his father for the week.
After five hours of driving through the monotony of flat woodland, the couple had
checked into a motel, carted their luggage to the room and returned to the car, too
hungry to rest but too drained to seek out anything more than fast food. Now two officers
stepped out of their patrol car and approached.

Albritton, 43, had dressed up for the trip — black blouse, turquoise necklace, small silver
hoop earrings glinting through her shoulder-length blond hair. Wilson, 28, was more
casually dressed, in a white T-shirt and jeans, and wore a strained expression that
worried Albritton. One officer asked him for his license and registration. Wilson said he
didn't have a license. The car's registration showed that it belonged to Albritton.

The officer asked Wilson to step out of the
car. Wilson complied. The officer leaned in
over the driver's seat, looked around, then
called to his partner; in the report Officer
Duc Nguyen later filed, he wrote that he
saw a needle in the car's ceiling lining.
Albritton didn't know what he was talking
about. Before she could protest, Officer
David Helms had come around to her
window and was asking for consent to

## Email Updates

Sign up to get ProPublica's major investigations
delivered to your inbox.

> you@example.com

SUBSCRIBE

search the car. If Albritton refused, Helms said, he would call for a drug-sniffing dog.
Albritton agreed to the full search and waited nervously outside the car.

Helms spotted a white crumb on the floor. In the report, Nguyen wrote that the officers
believed the crumb was crack cocaine. They handcuffed Wilson and Albritton and stood
them in front of the patrol car, its lights still flashing. They were on display for rush-hour
traffic, criminal suspects sweating through their clothes in the 93-degree heat.

As Nguyen and Helms continued the search, tensions grew. Albritton, shouting over the
sound of traffic, tried to explain that they had the wrong idea — at least about her. She
had been dating Wilson for only a month; she implored him to admit that if there were
drugs, they were his alone. Wilson just shook his head, Albritton now recalls. Fear

Donate

shouted that there weren't any drugs in her car even as she insisted a
that Wilson had brought drugs. The search turned up only one other item of
interest — a box of BC Powder, an over-the-counter pain reliever. Albritton never saw the
needle. The crumb from the floor was all that mattered now.

At the police academy four years earlier, Helms was taught that to make a drug arrest on
the street, an officer needed to conduct an elementary chemical test, right then and
there. It's what cops routinely do across the country every day while making thousands
upon thousands of drug arrests. Helms popped the trunk of his patrol car, pulled out a
small plastic pouch that contained a vial of pink liquid and returned to Albritton. He
opened the lid on the vial and dropped a tiny piece of the crumb into the liquid. If the
liquid remained pink, that would rule out the presence of cocaine. If it turned blue, then
Albritton, as the owner of the car, could become a felony defendant.

Helms waved the vial in front of her face and said, "You're busted."



*Albritton, then a 41-year-old mother of two boys, was strip searched at the Harris County Jail in 2010. "Oh, yes, with the bend over, cough," she recalled.*

...s booked into the Harris County jail at 3:37 a.m., nine hours ...e ... lson had been detained for driving without a license but would soon be released. Albritton was charged with felony drug possession and faced a much longer ordeal. Already, she was terrified as she thought about her family. Albritton was raised in a speck of a town called Marion at the northern edge of Louisiana. Her father still drove lumber trucks there; her mother had worked as a pharmacy technician until she died of colon cancer. Albritton was 15 then. She went through two unexpected pregnancies, the first at age 16, and two ill-fated marriages. But she had also pieced together a steady livelihood managing apartment complexes, and when her younger son was born disabled, she worked relentlessly to care for him. Now their future was almost certainly shattered.

The officers allowed her to make a collect call on the coinless cellblock pay phone. She had a strained relationship with her father and with her son's father as well; instead she dialed Doug Franklin, an old friend who once dated her sister. No one answered. Near dawn the next morning, guards walked Albritton through a tunnel to the Harris County criminal-justice tower's basement, where they deposited her in a closet-size holding room with another woman, who told Albritton that she had murdered someone. Albritton prayed someone would explain what would happen next, tell her son she was alive and help her sort out the mess. She had barely slept and still hadn't eaten anything. She heard her name called and stepped forward to the reinforced window. A tall man with thinning hair and wire-rim glasses approached and introduced himself as Dan Richardson, her court-appointed defense attorney.

Richardson told Albritton that she was going to be charged with possession of a controlled substance, crack cocaine, at an arraignment that morning. Albritton recalls him explaining that this was a felony, and the maximum penalty was two years in state prison. She doesn't remember him asking her what actually happened, or if she believed she was innocent. Instead, she recalls, he said that the prosecutor had already offered a deal for much less than two years. If she pleaded guilty, she would receive a 45-day sentence in the county jail, and most likely serve only half that.



*Of Dan Richardson, her court-appointed attorney, Albritton said: "You could tell he was very rushed, busy."*

Donate

d Richardson that the police were mistaken; she was innoce███
she says, was unswayed. The police had found crack in her car. The test
proved it. She could spend a few weeks in jail or two years in prison. In despair, Albritton
agreed to the deal.

Albritton was escorted to a dark wood-paneled courtroom. A guilty plea requires the
defendant to make a series of statements that serve as a confession and to waive multiple
constitutional rights. The judge, Vanessa Velasquez, walked her through the recitation,
Albritton recalls, but never asked why she couldn't stop crying long enough to speak in
sentences. She had managed to say the one word that mattered: "guilty."

POLICE OFFICERS ARREST more than 1.2 million people a year in the United States on
charges of illegal drug possession. Field tests like the one Officer Helms used in front of
Amy Albritton help them move quickly from suspicion to conviction. But the kits —
which cost about $2 each and have changed little since 1973 — are far from reliable.

The field tests seem simple, but a lot can go wrong. Some tests, including the one the
Houston police officers used to analyze the crumb on the floor of Albritton's car, use a
single tube of a chemical called cobalt thiocyanate, which turns blue when it is exposed
to cocaine. But cobalt thiocyanate also turns blue when it is exposed to more than 80
other compounds, including methadone, certain acne medications and several common
household cleaners. Other tests use three tubes, which the officer can break in a specific
order to rule out everything but the drug in question — but if the officer breaks the tubes
in the wrong order, that, too, can invalidate the results. The environment can also present
problems. Cold weather slows the color development; heat speeds it up, or sometimes
prevents a color reaction from taking place at all. Poor lighting on the street — flashing
police lights, sun glare, street lamps — often prevents officers from making the fine
distinctions that could make the difference between an arrest and a release.

There are no established error rates for the field tests, in part because their accuracy
varies so widely depending on who is using them and how. Data from the Florida
Department of Law Enforcement lab system show that 21 percent of evidence that the
police listed as methamphetamine after identifying it was not methamphetamine, and
half of those false positives were not any kind of illegal drug at all. In one notable Florida
episode, Hillsborough County sheriff's deputies produced 15 false positives for

tamine in the first seven months of 2014. When we examine the lab's records, they showed that officers, faced with somewhat ambiguous directions on the pouches, had simply misunderstood which colors indicated a positive result.

## Over half of those proven innocent pleaded guilty within a week



ProPublica examined some 300 cases of those arrested and wrongly convicted in Houston. Those defendants often pleaded guilty at their first court hearing, having been incarcerated since their arrest.

No central agency regulates the manufacture or sale of the tests, and no comprehensive records are kept about their use. In the late 1960s, crime labs outfitted investigators with mobile chemistry sets, including small plastic test tubes and bottles of chemical reagents that reacted with certain drugs by changing colors, more or less on the same principle as a home pregnancy test. But the reagents contained strong acids that leaked and burned the investigators. In 1973, the same year that Richard Nixon formally established the Drug

Donate

t Administration, declaring "an all-out global war on the dr                               a
ornia inventors patented a "disposable comparison detector kit." It was far
simpler, just a glass vial or vials inside a plastic pouch. Open the pouch, add the
compound to be tested, seal the pouch, break open the vials and watch the colors change.
The field tests, convenient and imbued with an aura of scientific infallibility, were
ordered by police departments across the country. In a 1974 study, however, the National
Bureau of Standards warned that the kits "should not be used as sole evidence for the
identification of a narcotic or drug of abuse." Police officers were not chemists, and
chemists themselves had long ago stopped relying on color tests, preferring more reliable
mass spectrographs. By 1978, the Department of Justice had determined that field tests
"should not be used for evidential purposes," and the field tests in use today remain
inadmissible at trial in nearly every jurisdiction; instead, prosecutors must present a
secondary lab test using more reliable methods.

But this has proved to be a meaningless prohibition. Most drug cases in the United States
are decided well before they reach trial, by the far more informal process of plea
bargaining. In 2011, RTI International, a nonprofit research group based in North
Carolina, found that prosecutors in nine of 10 jurisdictions it surveyed nationwide
accepted guilty pleas based solely on the results of field tests, and in our own reporting,
we confirmed that prosecutors or judges accept plea deals on that same basis in Atlanta,
Boston, Dallas, Jacksonville, Las Vegas, Los Angeles, Newark, Philadelphia, Phoenix, Salt
Lake City, San Diego, Seattle and Tampa.

This puts field tests at the center of any discussion about the justice of plea bargains in
general. The federal government does not keep a comprehensive database of
prosecutions in county and state criminal courts, but the National Archive of Criminal
Justice Data at the University of Michigan maintains an extensive sampling of court
records from the 40 largest jurisdictions. Based on this data, we found that more than 10
percent of all county and state felony convictions are for drug charges, and at least 90
percent of those convictions come by way of plea deals. In Tennessee, guilty pleas
produce 94 percent of all convictions. In Kansas, they make up more than 97 percent. In
Harris County, Tex., where the judiciary makes detailed criminal caseload information
public, 99.5 percent of drug-possession convictions are the result of a guilty plea. A
majority of those are felony convictions, which restrict employment, housing and — in
many states — the right to vote.

ADVERTISEMENT



Donate

Demand for the field tests is strong enough to sustain the business of at least nine different companies that sell tests to identify cocaine, heroin, marijuana, methamphetamine, LSD, MDMA and more than two dozen other drugs. The Justice Department issued guidelines in 2000 calling for test-kit packaging to carry warning labels, including "a statement that users of the kit should receive appropriate training in its use and should be taught that the reagents can give false-positive as well as false-negative results," but when we checked, three of the largest manufacturers — Lynn Peavey Company, the Safariland Group and Sirchie — had not printed such a warning on their tests. (Lynn Peavey Company did not respond to our request for comment. A spokesman for the Safariland Group said the company provides law-enforcement agencies with extensive training materials that are separate from the tests and their packaging. We asked John Roby, Sirchie's chief executive, about the missing warnings and requested an interview in May. He responded in writing a month later saying that the boxes carrying Sirchie's cocaine tests had been updated and now display a warning that reactions may occur with both "legal and illegal substances." After our inquiry, Sirchie added another warning to its packaging, listing at the bottom of its printed instructions: "ALL TEST RESULTS MUST BE CONFIRMED BY AN APPROVED ANALYTICAL LABORATORY!")

Even trained lab scientists struggle with confirmation bias — the tendency to take any new evidence as confirmation of expectations — and police officers can see the tests as affirming their decisions to stop and search a person. Labs rarely notify officers when a false positive is found, so they have little experience to prompt skepticism. As far as they know, the system works. By our estimate, though, every year at least 100,000 people nationwide plead guilty to drug-possession charges that rely on field-test results as evidence. At that volume, even the most modest of error rates could produce thousands of wrongful convictions.

Donate



*The crime lab in Houston was not obligated to test the samples of alleged drugs used in gaining guilty pleas. And yet it did, with life-changing results.*

AFTER HE ARRESTED Amy Albritton, Officer Helms sent what remained of the crumb he found on the floor of her car to the Houston Police Department crime laboratory. He listed it as ".02 grms crack cocaine" and noted on the submission form that he was also sending a "syringe w/ unknown substance .01 gr" — presumably the needle Officer Nguyen reported pulling from the ceiling lining and that Albritton had not seen and still could not explain. (Helms's submission form, which was separate from the arrest report, said it came not from the ceiling but from the "suspect visor.") The last item Helms turned in was a ziploc bag of the "unknown wht powder" that had been removed from the BC Powder package.

"HOLD + ANALYZE FOR COURT," Helms wrote by hand. And then, with no court case pending, the evidence sat on hold, one of several thousand samples in the laboratory's backlog of untested pills, plants, powders and assorted crumbs and pebbles.

rved 21 days of her 45-day sentence. When she was released, she went to the motel where she had planned to stay with Wilson, whom she never saw again after the arrest. (Helms and Nguyen would not comment for this article; Wilson did not respond to requests.) The manager had kept her clothes, so she took a room again and waited for her friend Doug Franklin to fly in from Louisiana. The plan was that he would lend her the money to get her impounded car and keep her company on the drive home. When they retrieved the car, it had been sitting in the summer heat for more than three weeks. Albritton was overwhelmed by the smell of rotting hamburgers.



*Albritton hands her son, Landon Jinks, medications to take one morning at their apartment in April. Since her conviction, she's only been able to get work as a bartender and waitress, making it far harder to care for her son, who was disabled at birth by cerebral palsy.*

When Albritton pleaded guilty, she asked Franklin to explain the situation to her bosses at the rental-property firm, but Franklin decided it was safer to say nothing. She was going to be fired in any case, he reasoned, and alerting an employer about the drug felony would only hurt her future prospects. Albritton had managed the Frances Place Apartments, a well-maintained brick complex, for two years, and a free apartment was part of her compensation. But as far as the company knew, Albritton had abandoned her job and her home. She was fired, and her furniture and other belongings were put out on the side of the road. "So I lost all that," she says.

Albritton's older son, Adam, then 24, had been living on his own for years and learned of his mother's arrest only after she had begun her sentence. While Albritton was incarcerated, her younger son, Landon, remained with his father, who had threatened in the past to seek custody but never followed through. Albritton's father, Tommy Franklin (no relation to Doug), was openly skeptical about her claim of innocence. "If the law said you had crack, you had crack," she recalls him telling her.

Donate

ve up trying to convince people otherwise. She focused inste̶a̶d̶ ̶o̶n̶ ̶L̶a̶n̶d̶
elchair, he needed regular sessions of physical and occupational therapy, and
Albritton's career managing the rental complex had been an ideal fit, providing a free
home that kept her close to her son while she was at work, and allowing her the flexibility
to ferry him to his appointments. But now, because of her new felony criminal record,
which showed up immediately in background checks, she couldn't even land an
interview at another apartment complex. With a felony conviction, she couldn't be
approved as a renter either. Doug Franklin allowed Albritton and Landon to move in with
him temporarily, and Albritton took a minimum-wage job at a convenience store.

Through all of this, the crumb of evidence remained in storage in the Houston crime lab.
It was a closed case, and the prosecutor, as was standard practice, had filed a motion to
destroy the evidence. Only some final paperwork — a request from the lab and a judge's
signature — was needed. But this was an extremely low priority in a complex
bureaucracy.

By 2010, the lab had been discredited by a decade of botched science and scandal.
Thousands of untested rape kits were shelved from unsolved assaults. Errors in
fingerprint matches were discovered in more than 200 cases. The lab had lost key blood
samples; employees had tampered with or falsified other evidence. And it was continuing
to struggle with a significant backlog of drug-test evidence — one that stemmed from
what amounted to an epic experiment in field testing.

When Hurricane Katrina struck the Gulf Coast in August 2005, more than 250,000 mostly
black refugees streamed into Houston, and local authorities openly anticipated a crime
surge in which the refugees were portrayed as would-be perpetrators. Charles
McClelland, who retired in February as Houston's police chief and was then an assistant
chief, says the department decided that pursuing drug-possession charges would also
help suppress the number of predicted robberies and burglaries. "Anecdotally, it makes
sense: Where does a person who has a substance-abuse problem get the money to buy
drugs?" McClelland argues. "One could easily make the connection that they're
committing crimes." The city distributed thousands more of the color field tests than
usual to patrol officers, and drug evidence swamped the controlled-substances section of
the lab. Even as the Katrina refugees gradually left Houston, the emphasis on low-level
drug enforcement remained. By 2007, annual submissions to the lab had climbed to
22,000, even as budget cuts had reduced the staff, leaving the scientists with far more
samples than they could competently analyze.

Department of Justice [training guide](#) for forensic chemists in the nation's crime labs, emphasizing that they were "the last line of defense against a false accusation," but 40 years later, that line had largely vanished. A [federal survey](#) in 2013 found that about 62 percent of crime labs do not test drug evidence when the defendant pleads guilty. But the Houston crime lab, for all its problems, would not be among them.



*"Police officers aren't chemists. We shouldn't be doing field tests on the hood of patrol cars." —Charles McClelland, former Houston police chief*

James Miller, the lab's controlled-substances manager, had long practiced a kind of evidentiary triage. Evidence tied to pending drug manufacturing, sale or possession cases — 50 a year on average — would receive immediate attention, because only laboratory analysis would be admissible in court. But evidence from cases in which the defendants pleaded guilty before going to trial — the overwhelming majority of the remaining thousands of submitted drugs samples — would also be tested. The city had no legal requirement to confirm that the substances were the illegal drugs the police claimed they were. But in Miller's lab, everything would be checked, even if it took years. "All along, we've said we're about the science," he says — not securing convictions. So the evidence sat, waiting.

The forensic scientists in Miller's lab keep untested samples in Manila envelopes locked in cabinets below their work benches. Some sat there for as long as four years, lab records show. Albritton's evidence stayed locked up for six months. On Feb. 23, 2011 — five months after Albritton completed her sentence and returned home as a felon — one of Houston's forensic scientists, Ahtavea Barker, [pulled the envelope](#) up to her bench. It contained the crumb, the powder and the still-unexplained syringe. First she weighed everything. The syringe had too little residue on it even to test. It was just a syringe. The remainder of the "white chunk substance" that Officer Helms had tested positive with his field kit as crack cocaine totaled 0.0134 grams, Barker wrote on the examination sheet, about the same as a tiny pinch of salt. Barker turned to gas chromatography-mass spectrometry analysis, or GC-MS, the gold standard in chemical identification, to figure out what was in Albritton's car that evening. She began with the powder. First the gas chromatograph vaporized a speck of the powder inside a tube. Then the gas was heated, causing its core chemical compounds to separate. When the individual compounds reached the end of the tube, the mass spectrometer blasted them with electrons, causing

Donate

ment. The resulting display, called a fragmentation pattern, is the tell-tale fingerprint. The powder was a combination of aspirin and caffeine — the ingredients in BC Powder, the over-the-counter painkiller, as Albritton had insisted.

Then Barker ran the same tests on the supposed crack cocaine. The crumb's fragmentation pattern did not match that of cocaine, or any other compound in the lab's extensive database. It was not a drug. It did not contain anything mixed with drugs. It was a crumb — food debris, perhaps. Barker wrote "N.A.M." on the spectrum printout, "no acceptable match," and then added another set of letters: "N.C.S." No controlled substance identified. Albritton was innocent.



*Inger Chandler heads the Harris County District Attorney's conviction integrity unit and has worked to remedy hundreds of wrongful drug convictions.*

INGER CHANDLER OVERSEES the small conviction-integrity unit of the Harris County district attorney's office, where she has been a prosecutor for 12 years. Conviction-

Donate

its are a fairly new concept in law enforcement: Prosecutors in light of new evidence, often in the form of previously unavailable DNA tests. Conviction-integrity units originally focused on murder and rape cases, but they also increasingly investigate drug convictions.

In early 2014, Chandler took a call while sitting at her desk, encircled by stacks of case files and pictures of her toddler twins. Eric Dexheimer, a reporter at The Austin American-Statesman, told her he had noticed a series of unusual exonerations coming out of the Texas Court of Criminal Appeals. He'd tracked 21 drug convictions across Texas that had been reversed because labs had found that the drugs in question weren't really drugs. The laboratory results came after defendants had already pleaded guilty. Did Harris County have any other bad drug convictions beyond what the courts had overturned? Chandler didn't know, but she said she would try to find out.

Chandler called Miller, the controlled-substances manager at the lab, and asked him if there was something wrong with any of their drug convictions. Miller was not surprised to hear from Chandler. He explained that the lab had indeed found problems with their drug convictions; when his forensic scientists found discrepancies in the evidence — officially labeled "variants" — they sent the details by email to the district attorney's office, and they had been doing so for years. Chandler hadn't known any of this. She found the email inbox for lab notices, and it did indeed contain hundreds of messages that were sent from the lab. One after another, the lab notices said, "No Controlled Substance." In cases involving drug possession, that meant the defendants were not guilty. (Drug manufacturing and selling charges can hold even if the underlying substance is not illegal.)

It was unclear if anyone had ever followed up on the notices. When Chandler entered several of the court case numbers into the district attorney's records-search system, however, she found that a majority of the convictions remained in place. She started a list. Over the course of the following year, she found that the district attorney's office had failed to correct 416 "variants" between January 2004 and June 2015, all of them in cases that ended in guilty pleas. Some variants were legally ambiguous — the field test was positive, but for the wrong drug; the drug weights were incorrect; or there was too little of the evidence to analyze — but in 251 cases, the results were simple: "No Controlled Substance."

# 74 percent of the convicted didn't possess any drugs at the time of their arrest

Donate

Most of the unjustly jailed have spent seven years or more saddled with criminal convictions that damage their reputations and constrain their lives. To this day, scores of them have yet to learn they've been proven innocent.



0                                                                    13 YEARS

Gonzalo S.
Arrested at age 17
12 years with wrongful conviction

Under the 1963 Supreme Court opinion in Brady v. Maryland, prosecutors must provide defendants with exculpatory evidence, even after a conviction. Chandler could have met that mandate simply by alerting the convicting court and the defense attorneys to the lab reports — "Every other Brady situation, as long as I give notice, I'm done," she says — but in these cases, Chandler says, she knew very few of the wrongful drug convictions would be reversed if she let the system handle each of them individually. The exoneration effort needed to be centralized, so that someone would become responsible for finding the defendants themselves. Chandler took the list to Devon Anderson, Harris County's district attorney.

Anderson, a former district-court judge, had been the top prosecutor for only seven months. Her husband, Mike Anderson, who took office as district attorney in January 2013, died of cancer eight months into his term, and Gov. Rick Perry appointed her to replace him. Now, as Chandler described the problem, Anderson felt sickened. The litany of wrongful convictions was not just enormous — it was still growing. Her office, she says, was to blame for "a breakdown at every point in the system." She hired a former prosecutor to research the cases and find the defendants. "It may sound corny, but it's true: Our duty under Texas law is to seek justice," she says. "A lot of people think it's convictions, but it's justice."

In April 2014, The American-Statesman published Dexheimer's story, which focused on 21 wrongful drug convictions across Texas caused by lab delays. But prosecutors in Harris County were still uncovering the scale of their own problem.

Based in part on the information gathered by Marie Munier, the former prosecutor Anderson hired to examine the drug convictions, we determined that 301 of the 416 variants began as arrests by the Houston Police Department, with the rest coming from surrounding municipalities, and that 212 of those 301 arrests were based on evidence that lab analysis determined was not a controlled substance, or N.C.S.

In our own examination of those 212 cases — thousands of pages of arrest reports, court filings and laboratory-testing records, along with interviews of prosecutors, police executives, officers, defense attorneys and innocent defendants who pleaded guilty —

Donate



*The use of field tests is seen as a way of lightening the load for overwhelmed crime labs.*

we saw a clear story about who is being arrested and what is happening to them. The racial disparity is stark. Blacks made up 59 percent of those wrongfully convicted in a city where they are 24 percent of the population, reflecting a similar racial disparity in drug enforcement nationally. Patrol units, not trained narcotics detectives, appeared to be the most prolific field-test users.

The kits, or the officers interpreting them, got it wrong most often when dealing with small amounts of suspected drugs. Sixty-three percent of the N.C.S. cases involved less than a gram of evidence. The smallest possession cases are the ones in which a field test can be of greatest consequence; if officers find larger quantities of white powder in dozens of baggies or packaged in bricks, they have sufficient probable cause to make an arrest regardless of what a color test shows. (Though in those cases, too, they are generally required to test the drugs.) It's widely assumed in legal circles that these wrongfully convicted people are in fact drug users who intended to possess drugs. Barry Scheck, a founder of the Innocence Project, a nonprofit group that seeks to overturn wrongful convictions, says some who work toward exoneration have complained to him that those exonerated of drug charges often are just accidentally not guilty, and shouldn't be added to the National Registry of Exonerations. The assumption is not entirely without basis — 162 of the 212 N.C.S. defendants had criminal histories involving illegal drugs. However, 50 had no criminal history involving drugs at all.

All of the 212 N.C.S. defendants struck plea bargains, and nearly all of them, 93 percent, received a jail or prison sentence. Defendants with no previous convictions have a legal right in Texas to probation on drug-possession charges, even if they're convicted at trial. But remarkably, 78 percent of defendants entitled to probation agreed to deals that included incarceration. Perhaps most striking: A majority of those defendants, 58 percent, pleaded guilty at the first opportunity, during their arraignment; the median time between arrest and plea was four days. In contrast, the median for defendants in which the field test indicated the wrong drug or that the weight was inaccurate — that is, the defendants who actually did possess drugs — was 22 days. Not only do the innocent tend to plead guilty in these cases, but they often do so more quickly.

, 2014, Munier sent a letter to Amy Albritton. It was a form letter that Munier was sending to exonerated defendants, opening with the salutation "Dear Sir or Madam," but the contents were highly personal. It stated that the Harris County district attorney's office had learned that the drug evidence in Albritton's case was not a controlled substance: "Accordingly, you were prosecuted for a criminal drug offense and convicted in error." Munier mailed the letter to the address on Albritton's driver's license, but Albritton did not receive it. She had long since moved on.

# Over half were wrongfully convicted in early adulthood



A majority of the individuals were wrongfully convicted in their early 20s and 30s, often limiting educational and job opportunities.

Donate

...ggled to rebuild her life as a felon. The hours at the conveni... ...he started waiting tables and tending bar as she tried to find work in property management again. In 2013, she heard about a small set of rentals in Baton Rouge that needed someone to run them day to day. The pay was low compared with what she had made at Frances Place, and there was no free apartment. But the owner agreed to interview Albritton, even with her drug felony, and quickly hired her. She had almost nothing to pack besides her clothes and Landon's before relocating to the state capital. The reason this property owner was willing to hire a drug felon became apparent soon enough. The apartments were in disrepair, with broken heaters and plumbing, and the owner forced his property manager to deal with angry tenants. She had gone to work for a slumlord.

Albritton quit and took a bartending position at the restaurant attached to a Holiday Inn near Louisiana State University. Tips included, she was earning about $15,000 a year, but she liked her co-workers and impressed her bosses. One of them tried to promote her to shift supervisor, Albritton recalls, but the promotion was denied when a criminal-background check by the hotel chain's corporate office flagged the Houston conviction. She could pour drinks and do nothing more. She remembers how desperate she had been to leave her jail cell, naïvely believing that the punishment for pleading guilty would end with her sentence. "No," she says. "You're not ever free and clear of it. It follows you everywhere you go."

In the two years since the efforts to overturn wrongful convictions began at the Harris County district attorney's office, Inger Chandler and her colleagues at the integrity unit have struck 119 N.C.S. convictions from the record. At least 172 remain. They haven't been able to locate all of the wrongly convicted, at times even after hiring private investigators, and some defendants they have reached have declined to interact with the courts, even to clear their record. Last year, as we examined records in Harris County, we came upon Albritton's file and decided to search for her ourselves to find out what had happened to one representative figure out of hundreds. Her case fit the larger pattern of convictions for no controlled substance: It moved rapidly, with Albritton pleading guilty within 48 hours of her arrest, and it involved an exceedingly small amount of supposed drugs. We searched for Albritton in public databases, finding likely relatives but no phone numbers or a current address. We called her sister, who said that Albritton was in Baton Rouge and provided a cellphone number. It was disconnected. But knowing where Albritton lived now, we found a Facebook profile she had been updating regularly with details of her life, including her work. Interestingly, we also found that Albritton had pleaded guilty to a 2008 misdemeanor, a D.U.I. conviction in Louisiana, despite breathalyzer results showing her blood-alcohol level at 0.0. When we asked her about this, she said that she had caused

Donate

y pulling onto the wrong side of a two-lane highway, and because she signed it, she did not protest the other charges; she's still unable to explain why she confessed to a crime there was no evidence she committed.

In August, we called and left a brief message for Albritton at the Sporting News Grill. She returned the call a couple of hours later, her voice small, wondering what this was about. When we described the details from the lab report and the letter from the district attorney that she never received, Albritton gasped. She didn't make a sound for several seconds before shouting into the phone: "I knew it! I told them!"

If Albritton's case is one of hundreds in Houston, there is every reason to suspect that it is just one among thousands of wrongful drug convictions that were based on field tests across the United States. The Harris County district attorney's office is responsible for half of all exonerations by conviction-integrity units nationwide in the past three years — not because law enforcement is different there but because the Houston lab committed to testing evidence after defendants had already pleaded guilty, a position that is increasingly unpopular in forensic science.

Crime labs have been moving away from drug cases to focus on DNA and evidence from violent crimes. In some instances, the shift has been extreme. The Las Vegas Metropolitan Police Department's forensic laboratory analyzes the evidence in, on average, 1,757 drug cases a year. Many of its 8,000 annual possession arrests depend on field-test results.

The United States Department of Justice was once among the leading voices of caution regarding field tests, and encouraged all drug evidence go to lab chemists. But in 2008, the Justice Department funded a program developed by the National Forensic Science Technology Center, a nonprofit that provides crime-lab training, to reduce drug-evidence backlogs. Titled Field Investigation Drug Officer, the program consisted of a series of seminars that taught local police officers how to administer color field tests on a large scale. In its curriculum, the technology center states that field tests help authorities by "removing the need for extensive laboratory analysis," because "the field test may factor into obtaining an immediate plea agreement." The Justice Department declined repeated interview requests.

Field tests provide quick answers. But if those answers and confessions cannot be trusted, Charles McClelland, the former Houston police chief, says, officers should not be using them. During an interview in March, McClelland said that if he had known of the

10/30/2016    A Common Roadside Drug Test Routinely Produces False Positives That Send Innocent People to Jail – ProPublica

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/17 Page 22 of 201

Donate

es Houston's officers were generating, he would have ordered it done departmentwide. Police officers are not chemists, McClelland said. "Officers shouldn't collect and test their own evidence, period. I don't care whether that's cocaine, blood, hair."

# 75 percent of the innocent continue to live with convictions on their records, some for as long as 13 years

The wrongfully convicted often pleaded guilty out of fear of significant time behind bars, yet the impact of their criminal records extends across the rest of their lives. Individuals with felony convictions face restricted employment, housing, voting rights and government benefits, among other limitations.

Donate



- ● Conviction still on record
- ● Record cleared

Judges, too, have the power, and a responsibility, some argue, to slow down the gears of the system. Patricia Lykos, the Harris County district attorney from 2009 to 2013, says that when she served as a criminal-court judge in the 1980s and 1990s, she would ask the defendants questions about their lives and the crimes they were accused of committing. If she wasn't satisfied that the defendant was guilty of the charge, Lykos says, she wouldn't accept the plea. At times the situation is even easier to decipher, says David LaBahn, president of the Association of Prosecuting Attorneys. The defendant can be heard arguing his or her innocence to the appointed attorney. In such drug-possession cases, when the prosecutor doesn't have a lab report, "if I'm that judicial officer, this case is continued" — adjourned — "until everybody can do their job," LaBahn says.

Donate

ans the defendant, depending on his or her custody status, once the case proceeds, presenting a significant dilemma. Last year, Devon Anderson, the current Harris County district attorney, prohibited plea deals in drug-possession cases before the lab has issued a report. The labs issue reports in about two weeks, but defendants typically wait three before they can see a judge — enough time to lose a job, lose an apartment, lose everything. And yet since Anderson implemented the rule, case dismissals have soared 31 percent, primarily because the lab has proved defendants not guilty. People plead guilty when they're innocent because they see no alternative. People who have just been arrested usually don't know their options, or even that they have an option. "There's a fail-safe in there, and it's called the defense lawyer," says Rick Werstein, the attorney now representing Albritton as she seeks to finalize her exoneration. Defense lawyers can demand a lab analysis, and they exist to help defendants navigate the consequences of the jail time while they wait, even as they explain the even higher costs of a felony conviction. They are fully authorized to pursue alternative deals.

In fact, Richardson, Albritton's original court-appointed lawyer, says the prosecutor offered her a deferred adjudication, in which she may have been able to wait for the results of a lab test outside the walls of a jail cell. Richardson, who first said he had no memory of their conversations, says he told her about the offer but she refused it. Albritton says she

### System Failures

The Houston cases shed light on a disturbing possibility: that wrongful convictions are most often not isolated acts of misconduct by the authorities but systemic breakdowns — among judges and prosecutors, defense lawyers and crime labs. Explore the graphic.

has never heard of anything called deferred adjudication. Neither could explain what actually happened. Perhaps they simply accepted that the field test, with its promise of scientific inevitability, would eventually convict her. "The entire country works on these field-test kits, right?" Richardson asks.

In the past three years, people arrested based on false-positive field tests have filed civil lawsuits in Sullivan County, Tenn.; Lehigh County, Pa.; Atlanta, Ga.; and San Diego, Calif. Three of the four cases also named the manufacturers Safariland Group or Sirchie as defendants. Three of the cases have already been settled. In one of them, the Sullivan County case, Safariland secured a gag order on the plaintiff, explicitly to prevent media coverage, before entering settlement negotiations. The plaintiffs in each of the suits were people who were arrested, refused to plead guilty and were detained for a month or longer. So far, we have been unable find anyone who pleaded guilty based on field-test results and later filed suit, though Werstein said he and Albritton are considering their additional legal options.

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/17 Page 25 of 201

riminal Court of Appeals overturned Albritton's conviction a record can be cleared, that reversal must be finalized by the trial court in Houston. Felony records are digitally disseminated far and wide, and can haunt the wrongly convicted for years after they are exonerated. Until the court makes its final move, Amy Albritton — for the purposes of employment, for the purposes of housing, for the purposes of her own peace of mind — remains a felon, one among unknown tens of thousands of Americans whose lives have been torn apart by a very flawed test.

PX 13(b)



**Menu**          Set Weather                                    Subscribe

Search

<u>NEW JERSEY OPINION</u>

# Chief justice: Bail reform puts N.J. at the forefront of fairness | Opinion

<u>Z</u>  Posted on January 9, 2017 at 9:33 AM



NJ Bail Reform Goes into Effect Jan. 1

<u>NJ Bail Reform Goes into Effect Jan. 1</u>

**By Stuart Rabner**

Before signing the Bail Reform Act of 1966, President Lyndon B. Johnson spoke of the need to reform a justice system in which some criminal defendants could post bail and buy their freedom while others would languish in jail before trial -- not because they were guilty or likely to flee, but because they were poor. The scales of justice, Johnson observed, were weighted "not with fact, nor law, nor mercy," but with money.

A half-century later, that problem is still with us. As recently as 2012, a study of New Jersey's county jail population revealed that 1 in 8 inmates were in jail because they couldn't make bail of $2,500 or less. They didn't pose a risk of danger or flight but sat in jail because they didn't have enough money to post even a modest amount of bail. Meanwhile, defendants who posed serious risks to public safety could be released if they had access to money.

In 2016 -- as in 1966 -- money typically decided who was released before trial and who sat in jail until trial began.

There is a better way.

On Jan. 1, New Jersey's criminal justice system started to adapt to its most significant transformation in decades. We shifted from a system that relied heavily on monetary bail to one that objectively measures the risk defendants pose on two levels: Will they show up for trial? Will they commit a crime while on release? Under the new risk-based system, those who present a substantial risk of danger or flight can be detained pending trial. Those who don't will be released on conditions that pretrial services officers will monitor.



**Sweeney just put more muscle behind bail reform. We hope Christie will too | Editorial**

Why does this matter? Because whether a defendant is released pretrial is one of the most significant decisions in the criminal justice system. There are real consequences for poor defendants -- often members of minority groups -- who pose little risk but sit in jail for weeks and months while they are presumed innocent. During that time, they may lose jobs when they fail to show up for work. They may lose contact with family members. They may lose custody of children. And the cost to taxpayers to house a low-risk defendant can amount to $100 or more per day.

In his speech in 1966, the president cited examples of how the bail system punished people simply for being poor. Johnson recalled a defendant who spent two months in jail and lost his job, his car and his family, only to later win an acquittal. Another defendant spent 54 days in jail because he could not post $300 bail for a traffic offense that carried a maximum sentence of five days.

Time spent in jail can also become an incentive for a defendant to plead guilty and receive a sentence for time served. Studies show that defendants held pretrial plead guilty more often, are convicted more often, are sentenced to prison more often and receive harsher prison sentences than those who are released pretrial.

The consequences are equally grave at the other end of the spectrum. Some defendants charged with serious offenses pose a great risk that they will commit new crimes or try to intimidate or retaliate against witnesses. Their pretrial release raises a genuine concern about public safety.

For those and other reasons, a national movement is underway to reform the criminal justice system. For several years, New Jersey has been at the forefront of that change.

Criminal justice reform in our state has had broad-based support. In 2012, Gov. Chris Christie publicly called for an amendment to the state constitution to allow for pretrial detention. In 2013, the Judiciary formed the Joint Committee on Criminal Justice, comprising representatives from all three branches of government. The committee's 33 members included the attorney general and county prosecutors, the public defender and private defense attorneys, counsel for the ACLU, judges and staff. A year later, many of the committee's recommendations were adopted by the Legislature, with the strong backing of Senate President Stephen Sweeney (D-Gloucester) and Assembly Speaker Vincent Prieto (D-Hudson), and signed into law by the governor.

The public took the next major step. In November 2014, more than 60 percent of New Jersey voters approved a constitutional amendment that gave judges, for the first time, the ability to detain defendants to ensure their appearance in court and protect the safety of the community.

New Jersey Criminal Justice Reform Overview



<u>New Jersey Criminal Justice Reform Overview</u>

Since then, all parts of the criminal justice system have been hard at work to make reform a reality. A risk-assessment tool has been developed in partnership with the Laura and John Arnold Foundation; that tool has been validated with data from thousands of actual New Jersey cases. Pilot programs in three vicinages trained staff and tested new technology. The Supreme Court adopted court rules to implement the law. The attorney general issued guidelines to law enforcement statewide. And the administrative director of the courts, public defender, director of the Division of Criminal Justice and others led 15 seminars for a total of more than 3,000 county officials throughout the state to train stakeholders about the new law and foster coordination across the justice system.

Here's how it will all work.

On Jan. 1, the court system began using the risk-assessment tool to help judges make more informed decisions about pretrial release. To predict whether a defendant poses a low, moderate or high level of risk, pretrial services officers now review each defendant's criminal history, record of prior court appearances and other objective information -- as they will in an estimated 70,000 cases per year. Officers then make a recommendation to the judge.

Most defendants will be released pretrial on a range of conditions that will not include money bail. For low-risk defendants, the court may simply direct an officer to send a text message or place a phone call to remind defendants when they must appear in court. Defendants who pose greater risks may be placed on electronic monitoring. Those considered a serious threat to public safety or risk of flight will be detained. Judges can also modify conditions of release based on new circumstances.

Defendants who are detained will be subject to the <u>new law's speedy trial provisions</u>, which impose time limits for when a defendant must be indicted and when a trial must begin.



<u>McGreevey: N.J.'s bail reform lacks the tools to help those released | Opinion</u>

In recent years, some jurisdictions have successfully implemented a risk-based approach. In Lucas County, Ohio, for example, nearly twice the number of defendants are being released pretrial on conditions without bail. During that time, the percentage of defendants who skipped a court date has been dramatically reduced, and the number of defendants arrested while on release has been cut in half. The rate of violent crimes committed by defendants on pretrial release has also gone down.

Like all changes, the reforms underway will be hard to achieve. They will succeed only with the continued cooperation among partners throughout the criminal justice system and the continued support of all branches of government. We have made great strides -- collectively -- so far, and there is more work ahead of us.

Together, we can build a better, fairer and safer system of criminal justice in New Jersey.

*Stuart Rabner is chief justice of the New Jersey Supreme Court. He chaired the Joint Committee on Criminal Justice.*

*Bookmark NJ.com/Opinion. Follow on Twitter @NJ_Opinion and find NJ.com Opinion on Facebook.*

## About Us

About NJ.com
Advertise with us
Contact Us
Visit OMJ.com

Jobs at NJ Advance Media
Newsletters
Frequently Asked Questions

## More on NJ.com

Interact
Weather
Site map
Claim your free business listing
Sponsor Content
Search

Place an ad
Sell your car
Sell/rent your home
Post a job
Post a free classified ad
Apartments & rentals

## NJ.com Sections

N.J. News
Local News
N.J. Politics
Sports
High School Sports
Entertainment
Food & Recipes
Living
Business
Opinion
Inside Jersey

Legal Notices
Obituaries
Jobs
Autos
Real Estate
Rentals
Classifieds
Shopping Good Deals
Local Businesses
Special Sections

## Contribute to NJ.com

Submit an event

## Follow Us

Twitter
Google+

Facebook
foursquare

## Newspaper stories and photos

The Star-Ledger | Subscribe
The Times of Trenton | Subscribe
The Jersey Journal | Subscribe
South Jersey Times | Subscribe
Hunterdon County Democrat | Subscribe
Star Gazette | Subscribe
The Warren Reporter
Suburban News
Horse News
Learn more about our newspapers

## Mobile

iPhone, Android apps | Tablet apps

Registration. Your use of this site constitutes acceptance of our User Agreement and Privacy Policy

© 2017 New Jersey On-Line LLC. All rights reserved (**About Us**).

The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of New Jersey On-Line LLC.

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

PX 13(c)


NOW
WAMU 88.5

**behind the bail bond system**

# < Bail Burden Keeps U.S. Jails Stuffed With Inmates

January 21, 2010 · 2:00 PM ET

Listen · 20:58    Queue  Download

MADELEINE BRAND, host:

From NPR News, this is ALL THINGS CONSIDERED. Im Madeleine Brand in California.

MELISSA BLOCK, host:

And I'm Melissa Block in Washington.

More than half a million inmates are sitting in U.S. jails right now, not necessarily because they're dangerous, not because a judge thinks they're flight risks, not even because they're guilty - they haven't even been tried yet. They're sitting in jail for a basic financial reason: They can't make bail, sometimes as little as $50. Some will wait behind bars for as along as a year before their cases may get to court.

BRAND: Most of these inmates are non-violent men and women charged with small crimes. This year alone, housing them will cost taxpayers $9 billion.

Today, we begin a three-part series examining bail in the U.S. NPR's Laura Sullivan has been exploring the powerful bail industry and she's found that it hurts defendants, their victims and taxpayers. Today's story looks at bail through the lens of one city: Lubbock, Texas. And it begins with one inmate Laura Sullivan first met this past June.

LAURA SULLIVAN: Leslie Chew grew up next to his father on the oil rigs of southern Texas. He still can't read or write. He's a handyman, often finding a place to sleep in the back of his old station wagon, but he gets by; that is, until one night last December when the station wagon got cold and he changed the course of his life.

Mr. LESLIE CHEW: Well, I stole some blankets to try to stay warm.

SULLIVAN: Where did you steal them from?

Mr. CHEW: And I stole them at United, inside of a grocery store. I walked in, got them and turned around and walked right back out of the store. And then he said, excuse me, sir. Come here. So when I turned around to come back, he said, planning to pay for these? I said, no, sir. I don't have no money. Then that's when he arrested me right then.

SULLIVAN: He's been here in a white concrete room at the Lubbock County jail ever since, for 185 days, more than six months altogether. He hasnt been convicted of his crime. He hasnt even been tried yet. He's here because he can't pay his bail. He doesnt have the $3,500 cash deposit he would need to leave with the court, nor does he have the $350 fee he would need to pay a bail bondsman to do it for him. If he did, he could stand up right now and walk out the door.

Is that a lot of money?

Mr. CHEW: To me it is. Like a million dollars to me.

SULLIVAN: When Leslie Chew headed down the grocery aisle and put four $30 blankets under his arm, he set in motion a process almost unique to the United States, a process that rewards the wealthy and punishes the poor, and NPR has found exists almost solely to protect the interests of a powerful bail bonding lobby.

The result is that people with money get out. They go back to their jobs, their families, pay their bills, fight their cases, and according to national studies, face far fewer consequences for their crimes. People without money stay in jail and are left to take whatever offer prosecutors feel like giving them.

Leslie Chew is still waiting for the offer. He's ready to plead guilty and accept his punishment, but court cases take time and prosecutors have only come to visit him only once. Through lunch today, it has cost $7,068 to house, clothe and feed Leslie Chew.

Mr. CHEW: Now, that's a lot of money. That's really too much money, really.

SULLIVAN: Nationwide, taxpayers spent $9 billion last year on people who have been granted bail but can't come up with the money to pay it. And each year that number increases as the nation's jails overflow with petty offenders counties have no room to house and budgets they can no longer afford.

Chew is sitting at a metal table in the middle of the room. The calluses on his hands are leaving marks on the painted steel. He says he's worried that his customers - the people who hire him to fix things, move things and pick things up - are turning to someone else. And he's worried about his car.

Mr. CHEW: It's a '87 station wagon Saturn. It's white with (unintelligible). I was going to get a regular car, but I figured a station wagon would be better, because if I ever get in a bind, I can lay down in the back seat, I have a place to sleep.

SULLIVAN: I can feel Chew's feet begin to tap under the table.

Mr. CHEW: If I lose that car, that's it. I don't know what I would do, 'cause that's how I get around.

SULLIVAN: Chew doesn't know it now, as he waits at this table waiting for lunch, but he's going to lose his customers. And he's going to lose his car. And across this barren room of orange jumpsuits, most of Chew's fellow inmates aren't going to fare much better.

Mr. DOUG CURRINGTON: This here is my bunk, right here.

SULLIVAN: Doug Currington, like Leslie Chew, tried to steal something: a television from Wal-Mart at 2:00 in the morning while high on meth. Currington's time in jail so

far: 75 days. Total cost to taxpayers: $2,850. Standing between him and the door: 150 bucks.

Sitting in here, Currington has lost his apartment and his job. His truck has been repossessed, and he has no money to pay child support. And perhaps even more importantly, when it comes to getting punished, he doesn't have the opportunity to show the court he's sorry.

Mr. CURRINGTON: If I can get out, I can go to rehab, I can get my job back, I can work, and I can - when I go to court, my lawyer has something to work with: This guy has been clean. He's voluntarily went to rehab. He hasn't committed another crime. He's had the same job. He's paying his child support. They're not going to throw you back in jail.

SULLIVAN: Currington's gut feeling about his situation is backed up by national statistics: Defendants who make bail do less time. Several defense lawyers in Lubbock told me that if Currington could get out, go to rehab, pay Wal-Mart for their trouble, he would likely get probation. Prosecutors right now are offering him five years in prison.

Mr. CURRINGTON: It's stressful knowing that your life is in over $150, could be swayed one way or another. You know, it's a matter of being free in two hours, if I had $150, to being free in three or four years down the road when I make parole on a 10-year sentence.

SULLIVAN: As I make my way through the jail, everyone seems to have a story like this: A daunting offer from prosecutors, a bail so small most people would just need to get to the ATM. In here, most inmates seem to think they're just hours away from someone - a friend, a relative, maybe a boss - coming to bail them out, like 34-year-old barber Raymond Howard.

Mr. RAYMOND HOWARD: Right now, my family is working on coming up with the bond for me to get out. So I'm praying, you know, not too much longer. Not too much longer.

SULLIVAN: Howard needs $500. He's been here for more than four months so far after he forged a check against a company. Like Doug Currington and Leslie Chew, Raymond Howard has no history of violence and has always shown up for court. That's why he was granted bail. And yet the city of Lubbock has already spent $5,054 to house him.

Lawyers say Howard would likely get time served and probation if he was on the outside. But in here, he has little bargaining power and nothing to show for himself. Prosecutors are offering Howard a sentence so long he catches his breath as he said it.

Mr. HOWARD: They started with seven. Seven years.

SULLIVAN: With three young boys at home, it's almost more than he can bear.

Mr. HOWARD: I love my boys to death. You know, thats pretty much all I have, you know?

SULLIVAN: But despite all his hoping, Raymond Howard's family isn't coming with the $500. In fact, he isn't going to see his three young boys for a very long time.

I took a walk through the jail with Lubbock's Sheriff David Gutierrez, who has since been promoted to the state parole board. In here, it's easy to see the impact of housing all these men.

Sheriff DAVID GUTIERREZ (Lubbock, Texas): We're out of room, completely out of room. Yeah.

SULLIVAN: There are corridors where there used to be windows, cells where there used to be closets.

Sheriff GUTIERREZ: It really needs to be closed. I think you'll see that it's not quite adequate. When you try to bring in today's technology and standards into a 1931 building, it's rather challenging.

SULLIVAN: It wasn't always like this. Twenty years ago, nationally and in Lubbock, most defendants were released on their own recognizance, trusted to show back up.

Now most defendants are given bail and most have to pay a bail bondsman to afford it. Considering that the vast majority of non-violent offenders released on their own recognizance have always shown up for trial, it seems like an easy solution for Lubbock. But that is not the solution Lubbock has chosen.

County officials have instead decided to spend $110 million on a brand-new mega jail. And Lubbock is not alone. At least 10 counties every year consider building new jails to ease a near-epidemic of jail overcrowding, according to industry experts.

There is one other solution. It's a county-funded program called pretrial release. Non-violent inmates are released under supervision, often with ankle bracelets, drug testing, or counseling. It costs only a couple dollars a day, compared with the national average of $60 a day in jail.

Lubbock's Chief Deputy Kelly Rowe says pretrial release is an important option and it operates out of the jail's intake area. So we head down there.

Chief Deputy KELLY ROWE (Lubbock, Texas): These are in-bound right here: the ones you sitting down, the ones on the phone, everything have just come in.

SULLIVAN: But when we walk over to the pretrial desk, it's empty - no papers, no pens.

Rowe leaves to inquire. In front of me, two dozen inmates are scattered near a line of pay phones. On the wall is a large sign with the number of every bail bond company in town, in bold letters. There's no phone number for the pretrial release office. Rowe returns and says no one staffed the desk for four, five months.

So where are they?

Chief Deputy�ROWE: It's like anything else we do. I mean, we've got, you know, a thousand functions that we oversee and watch and, you know, are doing and, you know, it stalled and the people responsible for that staff reassigned them or said, here, we want you doing this other job duty.

SULLIVAN: That's not exactly how Lubbock's pretrial officials describe what happened.

Mr.�STEVE HENDERSON: Follow the money. Usually whenever you've got questions of money, you follow the money and they'll help tell you the reasons why some things operate.

SULLIVAN: Steve Henderson runs Lubbock's parole and pretrial release program a block away from the jail, in a small, dark office. He says his shoestring budget can't afford an officer at the jail. He can't even afford to accept collect calls from inmates looking for pretrial help, and that, he says, is exactly how the bail bondsmen want it.

Mr.�HENDERSON: Yeah, they make money and they contribute their influence. I would do more if we had the funding to do more.

SULLIVAN: It's not that Lubbock's bondsmen even want Henderson's clients. Most of them can't afford a bondsman's fees. But Henderson says the bondsmen lobby to keep his program as small and unproductive as possible so no paying customers slip through, even if that means thousands of inmates like Raymond Howard and Leslie Chew wait in jail at taxpayer expense because they never find the money to become paying customers.

Mr.�HENDERSON: The bonding companies make a living. And so that's just the nature of Texas and Lubbock.

SULLIVAN: But it's not just Texas and Lubbock. A review of national lobbying efforts show pretrial release programs across the country are increasingly locked in a losing battle with bonding companies trying to either limit their programs or shut them down entirely.

As Henderson walks me back to his office's lobby, he stops and reads the sign above the door. It says: protecting our community by changing lives.

Mr.�HENDERSON: Jail doesn't do anybody any good. The only thing that jail is good for is to keep the dangerous people away from the people in the community who don't pose a risk.

SULLIVAN: But that is not who is in the nation's jails. Two-thirds of the people in the nation's jails are nonviolent offenders who are there for only one reason: They can't afford their bail.

(Soundbite of music)

BLOCK: That's NPR's Laura Sullivan. Her story continues in a moment. We'll hear about the business of bail bonds and how its close ties to politicians keep inmates in jail and push exorbitant costs onto taxpayers.

(Soundbite of music)

BLOCK: This is NPR.

(Soundbite of music)

BLOCK: This is ALL THINGS CONSIDERED from NPR News. I'm Melissa Block.

BRAND: And I'm Madeleine Brand. We return now to our examination of bail and the devastating impact it can have on defendants and taxpayers. NPR's Laura Sullivan continues the story from Lubbock, Texas.

SULLIVAN: Across the street from the Lubbock jail is a row of one-storey offices with painted ads: Student discounts. Lubbock's number one bonds. Inside one of them, Lubbock Bail Bond, three young women work the phones and visitors.

Unidentified Woman #1: Hi, there. Can I help you?

SULLIVAN: This is one of the biggest bonding shops in town. Here's how it works: You're arrested. A judge gives you a $5,000 bail. You don't have $5,000, so you pay Lubbock Bail a nonrefundable fee, at least 10 percent, probably about $500.

Mr.�KEN HERZOG (Office Manager, Lubbock Bail Bond): We put up the total amount, they pay us a premium, and as long as they show up for court, well, we make money.

SULLIVAN: Office manager Ken Herzog says there's about 13 companies for a rather small population of 250,000. He says it's cutthroat: There's no place for even a modest pretrial release program.

Mr.�HERZOG: I've had a little run-in with the pretrial people over here because I was going to make a bond and they went back in and interviewed the person, and they hadn't been in jail very long.

I went and took my bond over there to the jail. They said, well, pretrial's getting them. I said: Oh, no, they ain't. So I went to the judge that signed the motion for pretrial and I told her what was up. And I said they have no business even talking to this person. They pulled their bond, and I got the person out of jail.

SULLIVAN: I ask him if he was talking about Steve Henderson from the pretrial release office.

Mr.�HERZOG: I told him, I says, I do this for a living. I says, you don't do that. And I says, I'll work with you any way I can, but you're not going to get my business. And he backed off.

SULLIVAN: It's unlikely he had much choice. Steve Henderson works for county officials, and county officials are elected. Herzog anticipates my question before I ask it.

Mr.�HERZOG: We take care of the ones who take care of us. We don't want to pay anybody off, per se. We just want to support the people that are trying to help our business.

SULLIVAN: According to Lubbock campaign records, bondsmen make frequent donations to elected officials. Indigent jail inmates do not. We'll talk more about this tomorrow.

The disparity, though, has served the bondsmen well. Here's an example. Bondsmen's main job: bring defendants back to court if they fail to show up. But it turns out most bondsmen aren't doing this job.

Statistically, most bail jumpers are not caught by bondsmen or their bounty hunters. They're caught by sheriff's deputies. Listen to Beni Hemmeline from the Lubbock's district attorney's office.

Ms.�BENI HEMMELINE (District Attorney's Office; Lubbock, Texas): More often than not, the defendants are rearrested on a warrant that's issued after they fail to appear.

SULLIVAN: If the runners are more often than not hauled back in by the sheriff or the police department, how has the bond company provided any service at all?

Ms.�HEMMELINE: Well...

(Soundbite of laughter)

Ms.�HEMMELINE: You know, it may be that either they can't find them. Or, you know, there's no way - they can't camp at their door 24 hours a day. So they do the best that they can, I think.

SULLIVAN: And here's the other thing. If a defendant does run, the bondsman is supposed to pay up, but that doesn't happen either. Hemmeline says Lubbock usually settles for a far lower amount. In fact, according to the county treasurer, bondsmen usually only pay five percent of the bond when a client runs.

Consider that math for a minute. The bondsmen charge clients at least 10 percent. But if the client runs, they only have to pay the county five.

Are you concerned that it's an awfully good deal for the bail bondsman and maybe not such a good deal for the county?

Ms.�HEMMELINE: We don't want to put the bond companies out of business. Bond companies serve an important purpose.

SULLIVAN: NPR found bondsmen getting similar breaks in other states. In California, bondsmen owe counties $150 million; in New Jersey, a quarter of a million; in Erie, Pennsylvania, for a time, officials simply stopped collecting money.

It is possible to skip the commercial bail bonding business entirely by just paying cash. But it takes hours longer to post a cash bail, and many people don't even know that it's an option, like Sandy Ramirez, who came to Lubbock Bail Bond for her 18-year-old son.

Did you think about paying the full 750 to the court yourself and getting it back when he shows up for trial? You never heard about that?

Ms.�SANDY RAMIREZ: No, I didn't know that. That's awful not to know that.

SULLIVAN: I walked back over to the jail to find out just how many others were like Sandy Ramirez. Deputy Jerry Dossey was manning the bail window.

Deputy JERRY DOSSEY (Lubbock, Texas): How often do they put up a cash bond? Maybe two or three a month.

SULLIVAN: Two or three a month in a place taking 60 commercial bail bonds a day.

Deputy DOSSEY: Sometimes it's hard to scrape up the cash money when you got a family to feed and everything else.

SULLIVAN: Plus, most judges aren't setting bail at what you can afford to pay. They're setting bail 10 times higher than what you can afford to pay a bail bondsman. In the back of the room, I see Leslie Chew, the inmate who needs $350 for stealing blankets. He's mopping the floor. He waves.

Later, I take a ride out to the new jail with Sheriff Gutierrez.

Sheriff Gutierrez: This whole area here is larger than our old jail.

SULLIVAN: The main corridor is almost three football fields long.

Do you ever wonder if you had more people that you could let out on low bail or if you could let people out more on their personal recognizance, then maybe you wouldn't need this facility?

Sheriff GUTIERREZ: The last thing I want to do is continue to keep building beds. I think there should be some opportunities to be able to release them and put them back into society, allow them to do - go to classes or go back to work and report for trial when the trial date comes.

SULLIVAN: But as we're about to leave, Sheriff Gutierrez, who has been elected in three landslide victories over the past 11 years, pauses. And he puts his finger on the risk for any politician to suggest such an alternative even if it means taxpayers save money, even if it means victims will get restitution, even if it means the only reason he can fill this new jail is because the people filling it are poor. He still says it.

Sheriff GUTIERREZ: I don't want you to think that I'm soft on crime. I'm not soft on crime.

SULLIVAN: And the result of that for defendants is devastating.

Six months later and two hours north of Lubbock, the barbed wired of Formby State Prison rises from the cotton fields. In an empty visiting room, Raymond Howard, one of the inmates from the Lubbock jail, is sitting next to the prison's Coke machine.

So here you are.

Mr.�HOWARD: Here I am.

SULLIVAN: His family was never able to come up with his $500 bail for forging a check. His wife and three sons were barely making it themselves.

Mr.�HOWARD: I have a three-year sentence. My heart kind of dropped.

SULLIVAN: If he had made bail, defense attorneys say he would likely have gotten probation. But inside, he had nothing to show he could be trusted with a chance.

Mr.�HOWARD: It was something that I did. You know, it was my mistake, it was my fault. But I didn't have the opportunity to show them. I apologize for what I've done but didn't had a chance. And this is where you wind up.

SULLIVAN: Leslie Chew, the inmate who stole the blankets, didn't walk out of the Lubbock jail until eight months after he arrived, costing taxpayers $9,120. Prosecutors eventually gave him time served for his theft. But there was a condition: He had to plead guilty to a felony.

When he left, he found out his station wagon had been repossessed. Without a place to sleep, he wound up at a homeless shelter. A few months ago, he almost got a job as a maintenance man, but when the owners saw a felony conviction, they pulled the offer.

In October, he walked back into the Lubbock jail and asked the night officer if he could have his old job back, cleaning the jail's floors. But those jobs are reserved for the half a million people in this country who can't make bail. Nobody's seen Leslie Chew since. Laura Sullivan, NPR News.

BRAND: And Laura's series on bail continues tomorrow on MORNING EDITION.

(Soundbite of music)

BLOCK: You are listening to ALL THINGS CONSIDERED from NPR News.

*Copyright © 2010 NPR. All rights reserved. Visit our website terms of use and permissions pages at www.npr.org for further information.*

*NPR transcripts are created on a rush deadline by Verb8tm, Inc., an NPR contractor, and produced using a proprietary transcription process developed with NPR. This text may not be in its final form and may be updated or revised in the future. Accuracy and availability may vary. The authoritative record of NPR's programming is the audio record.*

# Popular on NPR.org

PX 13(d)

**HOUSTON**



# Harris County Jail considered 'unsafe and unhealthy' for inmates, public

**By James Pinkerton, Anita Hassan, and Lauren Caruba**  |

November 21, 2015  |  Updated: November 21, 2015 11:11pm

8



Photo: Jon Shapley

**IMAGE 1 OF 7**
Ahmed Elsweisy had successfully managed his diabetes since being diagnosed as a child at age 11. But he almost did not survive his first and only arrest. Here he poses for a portrait during an interview in his ... more

Ahmed Elsweisy felt nauseated, 24 hours into every diabetic's worst nightmare.

He'd been arrested on a DWI charge and booked into the Harris County Jail early one morning in September without insulin - and nobody seemed to care.

Elsweisy, 28, a muscular sales clerk at a big box store, had been managing his Type 1 diabetes since childhood without problems.

He barely survived his one and only stint in Harris County's troubled lockup, which is, by default, one of the area's largest medical institutions.

Hundreds of diabetics like Elsweisy face complications obtaining timely and proper

insulin injections during and after intake, jail critics say. Thousands of mentally ill inmates on psychotropic medications often overwhelm the jail's limited capacity to manage their drugs and administer proper care. Tuberculosis is prevalent and can be spread by inmates into the city's general population, medical experts say.



Sen. John Whitmire, D-Houston, set to hold legislative hearings in January, calls the jail "unsafe and unhealthy" and said the institution's inability to control the spread of tuberculosis and other infectious diseases not only endangers inmates but "overflows onto the streets of Houston" threatening public health once inmates are released.



Ahmed Elsweisy was forced to wait 36 hours for insulin in the Harris County Jail.

Media: Jon Shapley

"I'm alarmed," he said. "Every public official should be alarmed because those are the people you and your children are going to be exposed to. You're going to sit next to them on the Metro bus or train."

The Department of Justice targeted inadequate medical care at the jail in a 2009 report, finding that poor care and failures by jail medical staff to treat chronic conditions, including diabetes, tuberculosis and mental illness, had been factors in 20 deaths.

Six years later, a Houston Chronicle investigation has found that serious issues remain related to inmate care. Despite reforms in staffing and procedures that have improved medical care in key areas, the Justice Department continues to focus on shortfalls in mental health treatment and on jailers' use of force against disruptive prisoners, according to John Odam, general counsel for the Harris County attorney.

The jail, said Harris County Judge Ed Emmett, is "a glass with a hole in the bottom."

"It's not something you ever solve," said Emmett, who heads the Commissioner's Court, which approves the Sheriff's Office budget. "You keep working on it, and anytime you work with people in these circumstances there are going to be problems. And when there is an incident, we deal with it openly and swiftly."



Kenneth Beckett died after contracting the H1N1 virus in the Harris County Jail.

Media: Jon Shapley

---

**Read more:** Click here to read more about Beckett and others who have died at the jail.

Former sheriff Adrian Garcia, who oversaw the jail from January 2009 until he resigned from office in May to run for mayor of Houston, said Thursday in an interview that he strived to meet the recommendations made by the Justice Department and had been successful in correcting shortcomings identified in its report.

As part of its investigation, the Chronicle reviewed thousands of pages of autopsies, court records and sheriff's disciplinary files. Records show at least 75 inmates have died in jail custody since the Justice Department report, about three-quarters of whom were awaiting adjudication. The number of deaths decreased about 11 percent during Garcia's administration compared to the last five years under Garcia's predecessor, Tommy Thomas.

Most of the deaths since 2009 were attributed to natural causes. Ten died of hepatitis B or C. Ten were suicides. Eight had HIV or AIDS. Five died from the deadly "superbug" staph infection MRSA. Three were ruled homicides.

The Chronicle identified at least 19 cases in which inmates died of illnesses that were either treatable or preventable, or in which delays in care, or staff misconduct, could have played a role in their deaths.

"It's appalling, at this time with Houston being the medical center of the world, that we'd have people dying in the jail from diseases that are completely treatable," said James Douglas, president of the Houston Branch of the NAACP.

**RELATED**

**Some inmates who died in county jail had treatable conditions**



**Records: Guards often brutalize and neglect inmates in county**

Incarceration in Harris County, he said,
should not become "a death sentence."

County and union officials say the problems of delivering medical care in the jail are a
complex mix of insufficient staffing and training, jailer burnout and an aging physical
structure in need of more cells and space for a medical facility.

Tuberculosis presents serious screening and treatments problems, inside and outside the
jail, the Chronicle found. Jail officials reported 23 tuberculosis cases to the state health
department in 2013, nearly double the number in the entire Texas prison system.

"For sure I wouldn't want to be in that jail, because I have major concerns about how they
are doing TB skin tests," said professor Edward A. Graviss, director of the molecular
tuberculosis laboratory at the Methodist Hospital Research Institute. "It's like being in a
Third World country; you have to assume everyone is infected with TB. I would screen
them a little bit differently, but again, it's your tax dollars at work. Do you screen them
faster, or do you put fewer people in jail?"

The Chronicle also found that diabetics
like Elsweisy may face some of the
greatest risks of all. As one of the
largest county jails in America, with
capacity to hold 9,434 inmates, Harris

**MORE INFORMATION**

Second in a series.

County's lockup is home on any given day to about 680 diabetics, according to a 2015
Bureau of Justice Statistics estimate. Critics said jail staff has a troubling track record of
delivering adequate diabetic care, beginning with intake procedures in which any insulin a
diabetic may have in his possession is confiscated.

Over the past nine months, the Chronicle also reviewed more than 1,000 disciplinary
reports provided by the Sheriff's Office and found 35 failures to complete cell checks,
sometimes for inmates in solitary confinement. Additionally, jailers were disciplined more
than 120 times for misconduct involving abuse of authority or misuse of force since 2009,
including 13 instances in which jailers failed to seek medical attention for inmates.

One was detention officer Rima E. Fortune, who received a 10-day suspension in September 2012 for denying food to then- 48-year-old Barbara Hammond, a diabetic. Fortune admitted she withheld food from inmates as punishment for a previous fight and defended herself by saying she thought the jail served only two meals a day.

Garcia said cases of neglect were never acceptable, and he acknowledged that some cases of inmate care had been mishandled.

"There were always things that made me angry," he said. "But I remained at the table not to say look at the improvements I made, but can we still make improvements going forward?"

***

After 24 hours in jail without insulin, Ahmed Elsweisy said he made yet another desperate plea for the medication he normally takes five times a day.

" 'Hey look,' " he remembered telling a jailer. " 'This is getting really bad and I'm going to get sick.' He goes, 'There's about 22 diabetics in here, and if we let you have yours then we need to get theirs.' "

His pleas were ignored until it was almost too late. Jail staff made Elsweisy wait about 30 hours, giving him insulin only after he passed out in a cell and became violently ill a dozen times, he said. Finally, with Elsweisy vomiting and on the verge of a life-threatening coma, the jail had him taken to Ben Taub General Hospital, medical records show.

There, in the emergency room, doctors found his high blood glucose levels had resulted in diabetic ketoacidosis, a complication that can lead to coma and death.

Scott Siscoe, a criminal defense attorney who is representing Elsweisy on the DWI charge, called his client's experience a "totally avoidable medical crisis" that demonstrates a lack of adequate training and supervision.

Ryan Sullivan, a spokesman for Sheriff Ron Hickman, who replaced Garcia in May, said

Elsweisy was not seen by medical personnel for more than 16 hours after arriving at the jail. He disputed Elsweisy's account that he waited many additional hours for treatment but said it became necessary to send the inmate to a hospital.

"The medical records and the facts documented by the Sheriff's Office do not support his allegations," Sullivan said.

At the jail's main clinic at 1200 Baker St., inmates wait in line for care but often are displaced when other inmates become seriously ill or injured and need emergency treatments, said Richard Newby, a veteran sergeant who retired in March after a 28-year career.

"I don't think the medical system has expanded enough to meet the needs of the jail population - some areas have not increased in terms of size or staffing," he said.

State law prohibits Medicaid payments for jail inmates, shifting the cost of extensive medical treatments - $57 million out of the jail's overall $443 million budget - to local taxpayers, county officials noted.

Bob Goerlitz, president of the Harris County Deputies' Organization, said that to improve medical care in the jail, county officials must make a monetary investment, a move that often is difficult for the public and politicians to recognize as a benefit.

"It's a necessary evil that the government has to pay for," he said.

In terms of care for diabetics, problems stretch back to at least 2009, when state jail investigators were called to see why a diabetic inmate had not been given her insulin for two days in a row, according to Texas Commission on Jail Standard records.

Six diabetics are among the 75 jail deaths reviewed by the Chronicle.

Linda Pugh, one of the founders of the nonprofit Inmate Assistance League, said that jail medical staff employ a one-size-fits-all approach to diabetics and frequently limit insulin to a dosage once a day even if the inmate's blood sugar level crashes.

"It affects a lot of people," said Pugh, herself a diabetic. "They have to have better medical care because these people come in and they don't all take the same kind of insulin, and jail staff should provide the medication that the inmate ... was receiving, but they won't. They just switch."

She also said jail medical staff typically will conduct several tests of blood sugar, then decide on a proper dosage - though often diabetics' need for insulin fluctuates.

"They'll do three (blood) sticks in row, and they won't test them again," Pugh said. "They should never give insulin without testing their blood."

The American Diabetes Association recommends that inmates receive a blood glucose test within 1-2 hours of intake, a practice critics say is followed infrequently in the jail, where diabetics can wait up to 72 hours for an examination by a jail doctor.

Sullivan, Hickman's spokesman, said all inmates are screened by an intake nurse and, in some cases, are provided with insulin immediately.

***

Every year, about 100,000 people are processed by Harris County Jail officials. Most get released within 72 hours. A medical screening is supposed to identify mentally ill inmates and those with chronic or infectious diseases. The jail relies on the least-expensive TB skin tests, which cost about $1 apiece, and chest X-rays that only detect the disease's presence in the lungs, said Graviss of the Methodist Hospital Research Institute.

He had been part of an extensive study of tuberculosis in Harris County from 1995 to 2004 in which researchers found that 47 percent of the 5,748 TB cases were persons who had been in the Harris County Jail.

Graviss and three other researchers then published a study in 2011 that questioned whether TB was being spread from low-income Houston neighborhoods where it flourishes by passengers riding Houston's sprawling public bus system. During interviews with those TB patients riding the buses, they found the majority of those with the disease were African-American men between the ages of 40 and 59, 44 percent of whom had been in

the Harris County Jail.

Some people arrive sick when they get to jail, Graviss and other experts explained, but others could fall ill in an unhealthy environment that includes high numbers of active tuberculosis cases compared to other large Texas jails.

In 2013, when its 23 reported cases were more than all Texas prisons combined, more than 10 percent of the 28,161 inmates given a TB skin test did not stay in the jail long enough for a nurse to do the required follow-up observation, key to determining if the inmate had been exposed to the deadly disease. Graviss worries the inmates could have left the jail with an active TB case, leaving health workers to perform the difficult task of tracking a diseased inmate and making sure he takes his medication. In fact, that year 20 percent of the jail inmates who were released could not be located by city health workers to continue their treatment, city health officials confirmed.

He and other public heath experts advocate transition to using a more reliable TB screening blood test, because it avoids a subjective reading - using a ruler - of the reaction by a health worker days later. The blood test results, by contrast, are completed in 24 hours. The blood test also prevents a false positive in people who have had received a vaccine to prevent TB.

However, each blood test costs between $25 and $35, increasing the initial amount of money spent by the county jail on TB testing.

Graviss argues that the cheaper approach taken by Harris County could endanger inmates and contributes to the spread of the disease among the public.

"Of course you should be screening, and they do that at the jail, but the problem is they have so many people in and out of there so fast and they can't keep up," said Graviss. "So they need a better screening methodology or protocol so they can screen them fast."

Garcia said inmates often come into the jail with preexisting conditions, some so sick that they require almost immediate transfer to local hospitals. They are not always forthcoming or truthful about their medical conditions, he said.

"It goes back to the issue of when you come into a jail, people may not tell you exactly what they're complaining about," Garcia said. "It's not until you find them unresponsive that you find out what they were contending with."

One of his most important accomplishments, he noted, has been the digitization of all medical records in the jail, a multiyear endeavor funded by about $6 million in federal stimulus dollars, streamlining initial screenings and treatment.

***

Patrick Green, 27, a Baylor University graduate, had struggled with a heroin addiction but was otherwise healthy when he first went to Harris County Jail in December 2014 for violating the terms of his deferred adjudication for two earlier drug charges.

He died at Ben Taub General Hospital on March 24, after falling ill from bacterial meningitis in his cell block. His mother, Kathryn Green, a staff attorney with the 14th Court of Appeals in Houston, said hospital and EMS records do not indicate that her son had received any medical treatment for the bacterial infection while he was in jail. However, the family has not been able to review their son's jail medical records because the Harris County attorney is withholding them, claiming an exemption under Texas open records law for "possible litigation." When requesting the records, the family told officials they were considering a lawsuit.

Records show he and other Harris County inmates have died in jail from a variety of treatable infections, including swine flu, sepsis, peritonitis and pancreatitis. Bacterial meningitis, which can quickly become fatal, responds to antibiotics. Death can be averted if treatment is begun promptly, said Randall Kallinen, a civil rights attorney the family hired to obtain Green's medical records.

"We've heard he was feeling ill and couldn't get off his bunk," his mother said. "In fact, that is why the cell mate asked the jail personnel to come take him to the infirmary, because he was not able to get out of his bunk."

An inmate death report filed by sheriff's officials with the Texas Commission on Jail

Standards stated Green was taken to the jail infirmary at 7:25 p.m. that day after cell mates alerted jailers he was incoherent and could not get out of his bunk. There was no medical treatment noted by jail officials on the report, which they filed March 26.

An ambulance was called to the jail an hour later, and Green was driven to Ben Taub ,where he went into cardiac arrest at 11:20 p.m. and was pronounced dead a minute before midnight, the report states.

***

Andre Bonier was found dead in the mental health unit at the Harris County Jail early one morning in October 2014 from what appeared to be natural causes.

The 52-year-old suffered from bipolar disorder and schizophrenia since he was a young adult. Homeless, he was in and out of jail.

At first, his death did not seem suspicious.

Then, in September, two jail medical workers were charged with felonies for falsifying records that showed they'd checked on Bonier in his solitary cell the day of his death - monitoring required by state rules.

Suddenly, the circumstances surrounding his death were anything but routine, raising questions about both the mental health and medical care he received.

Bonier's mental illness - the cause of his erratic behavior - often led to him living on the streets of Houston, taking shelter beneath freeway overpasses, his family said. He was arrested in February 2013 by Metro Police Department officers for trespassing, interfering with the duties of a public servant and harassment of a public servant. After four months in the jail, a judge found him incompetent to stand trial and had him admitted to the Harris County Psychiatric Center. By August, his competency had been "restored," although he stopped taking his medications once he returned to the jail, court records show.

In November 2013, he pleaded guilty to the harassment charge and was sentenced to two years in state prison. But before he was transferred from the jail, he was charged in

January 2014 with assaulting a detention officer. Again, Bonier was found incompetent to stand trial, and he again was admitted to a psychiatric center.

Once more, his competency was restored. Bonier was sent back to the jail, where he again stopped taking his medications, forcing prosecutors in September to seek another court order asking him to do so. A little over a month later, he was found dead at 5 a.m. in the mental health unit on Oct. 14, 2014, according to his autopsy. The medical examiner determined that he died of acute pancreatitis - a sometimes severe but treatable condition that his brother, Michael, fears went undiagnosed for too long.

"My brother died by himself, and that was my worst nightmare. He suffered a horrible death," he said, questioning why his brother was not hospitalized. "I think since he was listed as homeless, they didn't care. They didn't do anything; they didn't check him."

\*\*\*

About 2,200 inmates at any given time taking psychotropic medication in Harris County Jail. Sheriff Hickman recently increased the number of mental health beds from 290 to 404. Still, the Justice Department has expressed ongoing concerns about how the mentally ill inmates are housed. The department also has requested that the jail cease the practice of charging inmates small co-pays for mental health care.

Overall, 23 inmates who died in jail between 2009 and mid-2015 had either a confirmed mental illness or had their competency questioned at some point, representing 31 percent of those who died in custody, according to court records and autopsies.

"We could use a [mental health unit] of 3,000 beds," said Garcia, who acknowledged the jail remains woefully short of space for the mentally ill.

Garcia said he made strides in mental health care, noting that enhanced training for six sergeants and 124 deputies assigned to the mental health unit won the department the top award in 2013 from the National Commission on Correctional Health Care.

Overall, Garcia said his administration was able to cut costs in appropriate areas of medical care - using generic medications whenever possible, for example - and reinvest

the savings into other medical services and more full-time staff. The move to generic drugs alone saved $3 million, he said,

"All these things, no doubt, helped us a great deal," Garcia said. "Did it prevent and solve everything? No. But it did create a better environment than the one I inherited."

 **James Pinkerton**

Reporter, Houston Chronicle

 **Anita Hassan**

Metro Desk Reporter, Houston Chronicle

 **Lauren Caruba**

Investigative Fellow, Houston Chronicle

---

**HEARST** *newspapers*

© 2013 Hearst Newspapers, LLC.

2/7/2017          Jailhouse jeopardy: Guards often brutalize and neglect inmates in Harris County Jail, records show - Houston Chronicle

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/1 Page 62 of 201

HC INVESTIGATIONS



HOUSTON ★ CHRONICLE
As low as $1 per week / Unlimited Digital Access
HoustonChronicle.com | App for iPhone and iPad | eEdition
SUBSCRIBE

# Jailhouse jeopardy: Guards often brutalize and neglect inmates in Harris County Jail, records show

**By James Pinkerton and Anita Hassan, Houston Chronicle**  |  October 3, 2015  |  Updated: October 3, 2015 10:58pm

16

*First in a series: The Chronicle reviewed more than 1,000 jail disciplinary reports and found guards used excessive force against inmates or abused their authority over 120 times.*



Support & Advice for Caregivers.
Ad Council          GET STARTED          AARP





**IMAGE 1 OF 22**

Family members hold a Norman Hicks Sr.  Norman Hicks Sr., 72, died after he was struck by a guard who failed to seek medical care or report the incident. The retired butcher had been placed in the jail's ... more

Norman Hicks, a retired butcher, had been in the Harris County Jail about 10 days when other inmates pleaded with jailers to have him transferred to the mental health unit.

Hicks, 72, had been placed in general population for violating probation in a family violence case even though intake workers determined he suffered from a combination of severe mental problems: bipolar disorder and schizophrenia. The inmates worried Hicks might be killed by others he annoyed, according to a federal lawsuit filed by Hicks' children.

Instead, Hicks died after being punched by a jail guard involved in 11 previous use-of-force incidents. The guard hit Hicks with a closed fist, breaking bones in his face. He fell and hit his head, and the guard left him bleeding on the floor of an interview room. The Harris County medical examiner ruled the 2011 death a homicide.

What happened to Hicks in one of the nation's largest county correctional facilities underscored its most glaring weaknesses.

He did not receive the care he needed in what sheriff's officials describe as the county's largest de facto mental health institution.

He found himself trapped in a violent milieu riven by thousands of fights each year.

He was struck by a guard who failed to seek medical care or report the incident.

Over the past nine months, the Houston Chronicle has reviewed more than 1,000 disciplinary reports provided by the Harris County Sheriff's Office. Nearly half of those internal affairs investigations from 2010 through May 2015 resulted in discipline against jail staff who often brutalize inmates and attempt to cover up wrongdoing but rarely lose their jobs. Court records show jailers seldom faced criminal charges even in cases where they used excessive force.



Photo: Billy Smith II, Chronicle

Jamarcus C. Hill was struck by a detention officer in Harris County in 2013 during a visit to the jail clinic.

"It was like an animal shelter," said Jamarcus Hill, who was jailed in 2013 as a 19-year-old on an auto theft charge. "You do anything - you get punished, you get pepper sprayed. You got to fight for your food, you even have to fight for your shoes."

In June 2009, the Justice Department concluded after its own yearlong investigation that inmates' constitutional protections had been violated by excessive violence and by substandard medical care that led to an "alarming" number of prisoner deaths. The Justice Department has taken no public action since then despite what records show are similar instances of unreported beatings, inmate deaths and medical neglect. Officials provided a letter indicating that the Civil Rights Division has an "ongoing law enforcement proceeding," but provided no specifics.

Adrian Garcia took over management of the jail in January 2009 as Harris County sheriff and promised reforms. He resigned in May to run for mayor of Houston. In a recent

### HARRIS COUNTY JAIL BY THE NUMBERS

**70 in-custody deaths since 2009.**

interview, he said that hundreds of
disciplinary cases reviewed by the Chronicle
resulted from his "commitment to
transparency and accountability." He said he
put systems in place that addressed Justice
Department findings and notes that the
average number of annual deaths dropped
from about 16 per year from 2001-2006 to

**1,441 incidents where staff used force on inmates 2009-13.**

**14,588 fights from 2012-July 2015.**

**5,367 inmate-on-inmate assaults 2012-July 2015.**

**1,106 inmate assaults on staff 2012-July 2015.**

roughly 11 during his administration. Still, the jail has become more violent in recent years, with
fights, assaults and attacks on staff escalating, the Chronicle's investigation has found, based on
the sheriff's own statistics as well as custodial death reports, autopsies, lawsuits and interviews
with current and former jail officials, former inmates and attorneys.

Among the findings:

Harris County jailers were disciplined more than 120 times for misconduct involving abuse of
authority or misuse of force, including beating, kicking and choking inmates. At least 15 were
handcuffed at the time. In 84 of those 120 cases, jailers or supervisors failed to file required
reports, lied or falsified documents. Stephen LaBoy, 25, was beaten by six jailers in his cell after
flashing a mirror at a guard station. Drissa Pickens, 28, was assaulted by an accused murderer
after a jailer unlocked a cell door and allowed the attack.

At least 70 inmates have died in custody since
2009. Three, including Hicks, died after
guards used force. Other elderly or ill inmates
were unable to make bond and died while
awaiting trial. Latoshia Clark, 36, died pre-
trial, of AIDS, after six weeks in jail for drug
possession. Ten who died committed suicide,
including Alex Guzman, 28, who hanged
himself while two jailers ate a Domino's pizza
and missed required cell checks. Guzman's
case was among 35 documented instances
where jailers skipped required cell checks, or
faked records to hide skipping them.

## HOUSTON



**After fire, neighbors in Trump country bridge a divide**

**So if you're not going to the big game ...**



**Freedom of Information fails**

**Human Trafficking reports on the rise**

Most jailers disciplined for abuse of authority or unnecessary force received only short suspensions. Since 2010, 33 of those jailers were fired for use of excessive force, unprofessional conduct, neglect of duties and lying or falsifying reports. Criminal charges were pursued against guards in only six of those cases. Jailer Brandon Whitaker grabbed inmate Tommy Maiden around the throat during a shouting match and squeezed so hard that he left bruises in the shape of handprints, jail photos show. Whitaker got a five-day suspension without being charged.





**Texas town's synagogue hands keys to Muslim worshipers after**

Dozens of jail employees were disciplined after they fraternized or had sex with inmates, brought in contraband or concealed relationships with prisoners and gang members. A training academy was disbanded and guards as young as 18 until recently completed only online courses as a cost-cutting measure. Former Deputy Tony G. Richards was prosecuted for having sex with an inmate in the jail laundry. His lawyer declined comment.

"It's thugs guarding thugs over there," said state Sen. Rodney Ellis, D-Houston.

He expressed frustration with jail management and said he has encouraged civil rights attorneys to sue Harris County over jail conditions.

Amin Alehashem, a lawyer for the Texas Civil Rights Project office in Houston, called for an intensive federal investigation of violence and neglect in the jail. "Looking at the issues we have seen come out of there, it completely warrants a Department of Justice probe to see where things are slipping through the cracks," he said.

***

Overview    Back To Beginning ↰





# INSIDE THE HARRIS COUNTY JAIL SYSTEM

Combined, the facilities can hold 9,434 inmates. Of those incarcerated, about 5,000 are pretrial inmates and 2,000 are on psychotropic medicine. There are 200 mental health beds.

Start Exploring

◆ **StoryMapJS** | Leaflet |

The Harris County Jail is an extremely violent place. Fights among inmates break out an average of 11 times a day. Assaults between inmates are reported about four times daily. Inmates assault staff about once each day. And guards report using force against inmates almost daily, according to official jail statistics.

But what often goes unreported is the use of excessive force against inmates. The jail holds up to 9,434 inmates and sprawls across five buildings along the Buffalo Bayou in downtown Houston.

Robert VanHorn cursed jailers for not bringing him a blanket, then stopped up his toilet and flooded his cell in protest in August 2013. He was taken to a holding cell, handcuffed and shackled. Then jailer Terryl Stoddard entered the cell and threw VanHorn against a metal bunk, opening a deep gash in his head that took nine staples to close. Stoddard's superior, Sgt. Kent Matthews, reported the injury, but he did not mention Stoddard's role. Instead, he wrote that VanHorn slipped on the wet floor.

An initial review cleared both officers, but when VanHorn filed a follow-up complaint Matthews received a three-day suspension for covering up the incident. Matthews still works at the jail, but could not be reached for comment.

Stoddard was fired, a tougher penalty than most guards received in cases related to excessive force. Investigators later determined that he had allegedly used unnecessary force on yet another inmate. He's awaiting trial on misdemeanor charges for official oppression in both cases. His attorney, Vivian King, said her client is innocent and jail officials did not consider all available evidence in a rush to judgment

Like VanHorn, about half of Harris County jail inmates on any given day haven't been convicted but are awaiting adjudication. VanHorn was in the jail on pending charges for allegedly stealing a DVD player.

Civil rights attorneys and other critics of the Harris County criminal justice system say jail violence and chronic overcrowding are symptoms of the deeper problem of local judges' strict bond practices Few accused offenders get released unless they can pay a non-refundable 10 percent commission charged by a Harris County-approved bondsman - a group that collectively makes millions from the county's tough lockup policies.

Hundreds of others are serving sentences of less than a year for minor crimes. Steven Laboy was serving a 60-day sentence for a possession of a switchblade when he was attacked in his cell by six jailers in March 2013, disciplinary records show. The onslaught began after he had flashed a mirror from his cell, hoping to signal a companion for a visit to the jail barbershop, he said.



Photo: Steve Gonzales, Houston Chronicle

Former Harris County jail inmate Steven Ray LaBoy, describes being assaulted by seven jailers in the Harris County Jail at an interview in Houston.

Laboy remembered one jail guard saying: "I got something for you. I'm going to come back and bring some people." The first of six guards who burst into his cell hit him in the face with a blast of pepper spray, an internal affairs investigation shows. Then they pushed the inmate into the corridor and slammed him against a wall. Laboy fell facedown, where he was pummeled and kicked.

"I thought I was going to black out, get my nose broken, or get a concussion. And at the same time, I couldn't breathe," Laboy said.

One jailer later took Laboy to a clinic with unexplained bumps and bruises, but no one reported the incident. An internal investigation began only because the beating was captured on a security camera.

The jailers were suspended, but none were fired or charged with any crime.

More menacing was what happened to Drissa Pickens, a soft-spoken woman with almond-shaped eyes who is now beginning college classes to become a drug counselor.



Photo: Billy Smith II

Drissa Pickens, a former inmate, was attacked while locked up at the Harris County Jail last year. A jail guard deliberately opened Pickens' electronic cell door to allow another inmate to attack her. That inmate pulled out a big clump of hair that is still growing back.

Jailed a year ago for violating probation in a domestic violence case, Pickens said she got angry when she wasn't given lunch and began shouting at jail guard Vanessa L. Salazar. The guard told Pickens "that if she did not 'shut up' or words to that effect," she would "allow the other inmates to attack her," according to disciplinary records.

Salazar then unlocked the electronic door to Pickens' cell. Within seconds, Khaundrica Williams, accused of murder, barreled toward Pickens, knocking her down, hitting her in the face and yanking handfuls of hair from her scalp. Pickens fought back as hard as she could.

Somehow, Pickens managed to escape her cell as the fight continued. She remembers looking up at Salazar, who stood in a control center, watching.

"I really couldn't believe it," she said. "I expect that kind of stuff from inmates, but not from the guards. They are supposed to protect us, and I did not feel protected."

Disciplinary records show that Salazar did not report the fight to a supervisor, as required. She admitted to unlocking the cell to allow Williams to fight Pickens.

"I have no explanation as to why I did not write a report, except that I know I did wrong and there was no way for me to explain why I did what I did," Salazar said in a sworn statement to the department's internal affairs division.

In February 2015, a little more than four months later, the sheriff fired Salazar and another guard found complicit in the attack. Salazar could not be reached for comment.

Pickens still suffers from anxiety attacks. "I feel like the guards let the inmates do their dirty work for them," she said. "They abuse their authority."

***

In one of his first acts as Harris County sheriff in 2009, Garcia consolidated two separate internal affairs operations - one that policed the jail and the other that investigated complaints against patrol officers. He formed an Office of Inspector General with a staff of nearly 50. Garcia said he needed to take action to show the Justice Department that his office would address alleged abuses. He also had inherited a "tremendous" backlog of 160 uninvestigated complaints that had piled up during the previous administration, he said. The deputies organization supported the move.

The OIG he created had a reputation for conducting thorough investigations.

In one of his final acts as sheriff before resigning to run for mayor, Garcia fired six supervisors, suspended 29 jailers and demoted a major for a neglect case involving a mentally disturbed inmate, Terry Goodwin. Initially jailed for marijuana possession, he was laterfound incompetent to stand trial.

A state jail compliance team discovered in 2013 that after he had assaulted a county psychiatric worker, Goodwin had been left unattended for weeks, surrounded by bug-infested food containers in a cell with a feces-clogged toilet. A grand jury in April indicted two of the six fired supervisors for falsifying jail logs to indicate that Goodwin was in good condition, despite essentially abandoning his care.

Garcia said he first learned about the case in 2014 when a whistleblower made it public and an internal investigation began. In a recent interview, Garcia said he was furious after learning of the long-term neglect.

"The framework was there, the system was there to protect the inmates," he said. "Had they followed those policies, we wouldn't be having this conversation."

Harris County recently settled a legal claim filed on Goodwin's behalf for $400,000. He is currently serving a three-year sentence in a Dallas-area prison for assaulting the jail employee.

\*\*\*

The indictments spawned by Goodwin's high-profile neglect case were unusual. The official response was far different after the 2014 death of inmate Kenneth Lucas.

Lucas, 38, a boilermaker at a refinery, was arrested in February 2014 for violating a child visitation order. He had spent four days in jail when guards came to believe he had broken a smoke alarm, possibly to fashion a shank, Garcia later said. Six jailers dressed in riot gear stormed his tiny segregation cell, pinning him to the ground. Video footage showed just a swath of Lucas' orange jumpsuit, while he lay under a pile of jailers clad inbody armor, helmets and combat boots.

One jailer straddled his back as four others cuffed his hands and shackled his legs behind him on the gurney. Lucas begged for help, his pleas echoing off concrete walls, the video shows.

"Right now, bro, I'm going to pass out," Lucas shouts. "Get off me: I'm not moving. … Help me please."

After a 30-minute struggle and the injection of a powerful depressant in the jail's clinic, Lucas stopped breathing. Clinic staff called 911, and Lucas was pronounced dead at a local hospital.

The medical examiner noted that Lucas suffered from extensive heart disease and said that the restraint used by jailers triggered a heart attack. The medical examiner nonetheless concluded that his death was a homicide. An autopsy describes more than a dozen cuts, bruises and abrasions from his head to ankles, including a broken finger from the struggle.

Garcia held a news conference at which he publicly defended officers whose actions had led to Lucas' death and released a video of the jailhouse struggle.

Despite the homicide ruling, not a single jailer was disciplined and a grand jury in March cleared all eight jail staff of any crime.

Widow Amber Lucas has watched the video of her husband's struggle so many times, she has it memorized. She says she can almost pinpoint the exact moment when he stopped breathing, the moment when she knew he wouldn't survive.

"I feel like it was a form of murder," she said. "They have him hog-tied, then you're sitting on him. Then you're smushing his face. He's screaming 'I can't breathe, I can't breathe, get off me! I feel like I'm going to pass out.' They heard that."

Along with Kenneth Lucas' four children from previous relationships, she filed a wrongful death suit on July 28 against the sheriff's office and the jailers.



Photo: Billy Smith II, Chronicle

Widow Amber Lucas talks about the day her husband, Kenneth Lucas, died after a group of deputies hogtied him to a hospital gurne yin the Harris County jail and then sat on his back as he repeatedly cried out that he could not breathe. Lucas has watched the jail surveillance photo multiple times. She has filed a wrongful death lawsuit.

Harris County is fighting the lawsuit, claiming its employees were not responsible.

One day later, it was Jacqueline Smith's turn to sue the jail in the death of her son, Danarian Hawkins, a mentally ill 27-year-old who hanged himself with a bed sheet wrapped around a smoke detector after making a previous suicide attempt with another jail-issued sheet. "Harris County jail staff left a suicidal Mr. Hawkins alone with the exact same instruments that he eventually used to kill himself," said Alehashem, of the Texas Civil Rights Project who is representing his family.

The family of another inmate who died in the jail, Herman Young, also sued the county for gross negligence and malice. That suit was dismissed after the county argued that its employees were immune from liability.

Young, 68, became incoherent and was taken to the jail clinic late one night in May 2010. After midnight, jailer Nikolaus Laliotitis yanked Young off a stretcher, punched him in the stomach and dragged him across the floor, according to other jailers who witnessed the unprovoked attack. A motive was never explained. Young died later that day at a local hospital due to what the medical examiner's office said were natural causes. Still, Laliotitis resigned and pleaded guilty to a misdemeanor charge of official oppression. He was sentenced to one day in jail and given a $1,000 fine, according to court records.

A jail sergeant was suspended for three days for failing to thoroughly investigate Young's assault.

***

When members of the sheriff's gang unit stopped a 2012 Kia Soul last year being driven by a member of the Tempted Young Goons, a street gang, they found ski masks and a loaded pistol in the car. But what surprised them most: the car's registration showed it was owned by a Harris County jailer, who later admitted she had a child with the gang member behind the wheel, and they were expecting another child.

The jailer was terminated last October, one of at least 30 documented incidents of jailhouse fraternization.

Some jailers have seduced or become infatuated with inmates. One young female jailer admitted giving an inmate, who was awaiting trial for using an armed robbery, photos of her, having daily conversations in the jail and even buying him a cellphone.

In her termination letter, she admitted: "I wrote to him that I could not wait to have sex with him."

Five other guards were fired and charged with smuggling contraband into the jail, including prescription drugs, vodka, tobacco, cellphones, even home-cooked meals. Another group was fired for having sex with inmates inside the jail laundry unit. One female jailer allowed an inmate to get on a county computer in the laundry unit to help her fix her home Internet service.

The effect that poor training and high turnover have had on the jail's workplace culture has been at the center of a debate Adrian Garcia and Ron Hickman-- the man who replaced him as sheriff -- have waged in the media since Garcia resigned in May.

Both believe low pay is an issue. Detention officers' starting pay is $18 per hour, less than any other county worker except entry level clerks. The guards are forced to work mandatory overtime. Jailers need only 92 hours of training, which they must complete within a year.

In one cost-cutting effort as sheriff, Garcia closed the jail's training academy, saying the department wasted too much time and money on wanna-be jailers who flunked out. Instead, Garcia allowed new-hires to complete training online and slashed overtime pay for detention officers from $26 million in 2009 to $4 million in 2015, according to sheriff's records

Hickman said he believes that relying primarily on virtual training for newly hired jailers was a mistake. He immediately raised the detention officers' minimum hiring age from 18 to 21 and reopened the academy in August.

"The impact of hiring a young, immature work force will be felt for years to come," he said. "They do get on the job training, they do get senior people to work with. But when you're building the base of their value systems, proper training is absolutely essential. And relying primarily on virtual training does not establish that."

Garcia has touted many reforms he made that were designed to protect prisoners - including spending millions on additional security cameras inside the maximum security 1200 Baker Street facility. That building houses the jail's clinic, its mental health beds and inmates who might need protection, including teenagers, women and high profile prisoners. In a 2014 presentation, Garcia called the cameras an effective deterrent to inmate abuse. But Hickman said the security cameras inside Baker Street are ineffective since they do not archive videos

The two also have clashed over Garcia's hiring of a consultant, Port Arthur-based Griffith Moseley Johnson & Associates. The firm was paid $1.4 million from the jail's commissary fund to help address the Justice Department's 2009 findings. Garcia said the consultant helped him to reduce overcrowding by devising a credit system for "good time" for some inmates, and to develop suicide prevention strategies. Hickman said Garcia relied too heavily on consultants, noting the ex-sheriff hired another out-of-town firm to oversee jail chaplaincy services.

The one thing both men agree on is that the jail has far too few resources to deal with mental illness among its inmates. About 2,000 take psychotropic medications, while there are only 200 mental health beds.



\*\*\*

By all accounts, Norman Hicks, the retired butcher, 72, was an annoying presence as he walked through his cellblock at the Harris County Jail, swinging a towel and popping other inmates, the kind of horseplay more common to a high school locker room.

With the only separation cell on his floor already occupied, jailers placed Hicks in an attorney interview room with no bathroom and left him. Jail policy requires checking on inmates in separation cells every 30 minutes.

Two hours later, jailers smelled a foul odor and realized Hicks had soiled himself. He cleaned up with his own jail-issued shirt and then was escorted to a second attorney booth, where jailers told him to throw his shirt out into the hallway.

Christopher Pool, one of the jail guards on duty, later claimed Hicks hit him in the face with the shirt and said the inmate punched him.

Other jailers disputed that account, according to disciplinary files.

What is not in dispute: Pool then slugged the elderly man in the face. Hicks fell and hit his head. Pool stared at Hicks, who was not speaking or moving, according to an account he gave investigators, then left for the jail clinic to clean himself.

Other jailers locked the door, and no one alerted supervisors or medical staff. When a jail sergeant noticed Hicks a half-hour later, he was not breathing.

Six days later, on Jan. 22, Hicks died in a hospital.



Photo: Billy Smith II, Chronicle

(l-r) Jason Hicks, Marie Hicks-Fields, Evangeline Campbell, and Norman Hicks Jr. all hold on to a photo Norman Hicks Sr.  They have filed a wrongful death lawsuit against Harris County.

Pool's attorney, Carson Joachim, said Hicks was the aggressor.

"Christopher Pool and the other men involved acted appropriately, and within the parameters of how they were trained," he said. "Nor did their actions violate state or federal law.

"I want to make it clear that Mr. Hicks was the first aggressor in this incident, he struck Christopher Pool in the head with a closed fist. He threw a feces-laden shirt in Chris Pool's face and neck region, and simultaneously punched Chris Pool in the face."

A grand jury declined to indict Pool, though he was fired in August 2012 for failing to seek medical help and for failing to report the incident.

Pool later successfully appealed his firing, but by the time he was offered his jail job back by civil service commissioners, Pool had become a police officer in the Houston suburbs.

In a deposition Pool gave in a related civil lawsuit, he explained he didn't summon help because jail policy gave priority to cleaning up potentially hazardous bodily waste.

Pool described the blow delivered to Hicks as a routine event in the Harris County Jail.



**James Pinkerton**

Reporter, Houston
Chronicle



**Anita Hassan**

Metro Desk Reporter,
Houston Chronicle

HEARST *newspapers*

© 2017 Hearst Newspapers, LLC.

HOUSTON



# Tough bail policies punish the poor and the sick, critics say

## 55 died awaiting trial in Harris County jail since 2009

**By James Pinkerton and Lauren Caruba**  |  December 26, 2015  |  Updated: December 28, 2015 1:17pm

17



Photo: Jon Shapley, Staff

**IMAGE 1 OF 17**

Bond is set for defendants in probable cause court Thursday, Dec. 3, 2015, in Houston. ( Jon Shapley / Houston Chronicle )

Tung Nguyen survived a harrowing maritime escape from Vietnam, only to become trapped in the Harris County Jail.

Neighbors had called police one Valentine's Day when they heard Nguyen, 83, arguing with his wife of 60 years, Muon Vo. He was arrested and charged with aggravated assault for allegedly threatening her with a knife.

Suffering from mental illness and heart disease, Nguyen never got out of jail. His family was unable to raise the $40,000 bail set in his case even as they pleaded for his release to a mental facility or home.

The frail, failing fisherman who spoke only Vietnamese was ensnared in a Harris County

criminal justice system that warehouses far too many defendants awaiting adjudication thanks to a rigid bail system that a diverse mix of county officials, lawyers, legal experts and legislators say most likely violates both state law and the U.S. Constitution by failing to make meaningful individual assessments of risk and ability to pay.



Support & Advice for Caregivers.

GET STARTED

Ad  AARP

"The numbers clearly tell the story:
More than three-fourths of the people in Harris County Jail haven't been convicted of crime, and the majority of them are sitting in jail simply because they can't afford to get out - not because they're a threat to public safety," said state Sen. Rodney Ellis, D-Houston. "This means the indigent are more likely to be kept in jail pretrial, lose their jobs, affect their family lives, and receive harsher sentences solely because of their income status."

Harris County locks up more people pretrial than most other large counties utilizing a standardized schedule that sets bond amounts for specific crimes. Magistrates makes bond decisions based almost entirely on charges filed and prior convictions in hearings via video linkup at which few questions are asked and defendants have no attorneys - a process the county's public defender has described as potentially illegal in an upcoming law journal article.

**MORE INFORMATION**

*By the numbers*

**84,500: arrests in 2014**

**1/2: paid bondsmen for release**

**6 percent: released on personal recognizance**

**76 percent: of jail inmates are pretrial (as of November)**

**55: pretrial deaths in custody, 2009-15**

The magistrate's bond decisions are almost never altered by the county's elected district court judges, who reduced bonds in less than 1 percent of cases, court bond data from 2014-15 shows.

Case 4:16-cv-01414   Document 343-4   Filed in TXSD on 06/12/17   Page 84 of 201

Judges can, if they choose, grant personal bonds to defendants in which bail fees are waived in exchange for a promise to appear. But in 2014, they granted personal bonds to about 1 percent of felony offenders and only 9 percent of misdemeanor offenders, county statistics show.

Those rates are below those in other urban Texas counties, including Bexar and Travis, according to a related 2015 report. Several district court judges have told magistrates never to issue personal bonds for anyone assigned to their courts, while others specify such bonds be granted only to students, a former judge and other county officials told the Chronicle.

Once jailed, no mechanism exists to automatically alert elected judges even when an inmate falls severely ill or already has served more time pretrial than the punishment for the alleged crime, Harris County judges said.

In August 2009, after the U.S. Department of Justice found civil rights abuses at the Harris County Jail, a consulting firm hired by the county urged judges to increase the use of personal bonds to reduce crowding in the jail complex, then bursting with more than 11,000 inmates. More than six years later, jail population has decreased, but the proportion of inmates awaiting trial has grown, from 54 percent in August 2009 to 76 percent in November 2015.

Some judges defended their tough bond schedule, explaining that many defendants are repeat offenders or require high bail to guarantee court appearances and protect the public. But in a $2 million proposal the county is preparing to submit to the Chicago-based MacArthur Foundation, judges and attorneys alike have called for reforms. In interviews, many agreed the pretrial system is broken and the jail is regularly clogged with too many mentally ill and low-risk offenders arrested for crimes like smoking pot and trespassing.

Ultimately, the system most punishes the poorest and sickest defendants, defense attorneys and some legislators say.

Fifty-five inmates died in the jail while awaiting adjudication since 2009. Eight were too ill to appear at initial bail hearings. One was Nguyen.

Another was Sandra Oliver, 39, who began experiencing chest pains during her arrest for trespassing at a Spring apartment in October 2010. She missed a hearing where bond was set at $5,000. Two days later, she died from a pulmonary embolism, an autopsy shows.

***

For most people arrested in Harris County - around 84,500 last year alone - first contact with a court official comes via video in the first floor of a nondescript brick building at 49 San Jacinto Street, near the main jail complex. During hearings in November and December, inmates in orange jumpsuits and street clothes filed into a dingy room filled with rows of wooden benches. First, a video played explaining defendants' rights. Then, a hearing was held to determine if there was probable cause for detention and bail was set.

Magistrates don't actually meet defendants, who are jailed across the street. Instead, faces appear on a screen. Few questions are asked. Some hearings last less than a minute.

County pretrial employees pre-interview most defendants, and those reports are available to magistrates via computer. Their questionnaires are meant to help determine who merits release and who presents a risk. The form includes information about health history and disabilities. But it's been criticized as outdated: It penalizes male defendants and those who don't own a car, lack land lines at home or live with parents. It's unclear whether magistrates review responses.

In recent hearings, getting through the docket fast seemed to take precedence.

On one November afternoon, when Magistrate Judge Jill Wallace reached the end of a long docket, she declared. "Oh baby, we knocked it out. Pat yourselves - hey, thank y'all for doing that. We got everything done. Thank you for getting everybody in the courtroom. Thanks a lot. We got it done. We got 'em both done by 5."

She was handling two dockets back-to-back that afternoon - one for traffic tickets and the other for criminal charges.

Harris County Public Defender Alex Bunin, a former federal public defender with experience in three other states, has questioned whether the practice of setting bail for

defendants without defense attorneys present could survive a legal challenge in an article he wrote for an upcoming American Bar Association magazine.

In September, a U.S. District Court in Alabama approved a lawsuit settlement that struck down a similar schedule-based bond system. A review of that decision prompted Bunin to write about flaws in the process used in Harris County and other court systems.

"The poor suffer because their inability to pay money is not addressed. Persons of color are disproportionately affected. All suffer when their individual circumstances are not considered," Bunin wrote.

The pending MacArthur proposal includes support for revamping pretrial procedures to include lawyers and expanding options to divert the mentally ill from jail as well as other reforms.

Locating alternative placements - particularly for the mentally ill or others who need treatment - remains a serious interrelated problem, Bunin said.

\*\*\*

In the mug shot taken when Tung Nguyen first arrived at the jail on Valentine's Day 2009, he grimaces and slumps to one side, a medical clinic badge pinned to his shirt. He was initially denied bond in his absence, though District Court Judge Maria Jackson eventually approved a reduction to $40,000. This would have required the family to pay a non-refundable fee of $4,000 to a bondsman - 10 percent is standard - and then come up with collateral to cover the full debt, risking a car, house or other valuables. Nguyen's family never could meet those terms. Jackson said in a recent interview that she could find no record that she'd been asked to release him on a personal bond.

**Read more: Check out our investigation into problems at the Harris County Jail in our special section.**

Over the next two months, Nguyen was declared mentally ill and found incompetent to stand trial. Defendants found incompetent are supposed to be released from jail and transferred to some type of rehabilitative setting. But Nguyen remained jailed as his court-

appointed defense attorney debated with a prosecutor about placement at a mental health facility or with a family friend.

Nguyen was barely eating and cycling in and out of the hospital for recurrent pneumonia, according to a forensic investigator's report. He appeared at his April 24, 2009, court setting in a wheelchair, and then was absent on May 5 because he'd been hospitalized, a letter in the court file shows.

The file contains a copy of a letter Nguyen's defense attorney sent his son on May 27th: "I am alerting both the Judge and (the prosecutor) that, in light of your father's deteriorating health, I WILL SEEK A PERSONAL BOND FOR YOUR FATHER," adding that Nguyen's wife, Muon Vo, "wanted desperately for her husband to be released."

Vo said she could never understood why her husband of six decades could not just come home.

***

The county's tough bond practices lead to tougher sentences and a higher conviction rate for those who are jailed compared to those who can post bond, according to a review of 6,000 local cases by former Harris County Pretrial Services Director Gerald Wheeler. The studies, a collaboration between Wheeler, a defense attorney and a University of Texas researcher, are dubbed Project Orange Jumpsuit and show defendants with similar criminal histories who could not post bond received harsher punishments for crimes like drug possession than those who faced the same charges but bailed out.

"You have two completely different justice systems," Wheeler said. "One for the rich and one for the poor."

A $5,000 bond is the highest amount specified for misdemeanors. To afford that amount, defendants generally pay a non-refundable fee of $500 to a bondsman, then come up with collateral to cover the full debt. Those who can't pay face more pressure to plead guilty and can lose jobs, homes and relationships, Wheeler and others said.

One early December afternoon, a visiting magistrate asked a man charged with trespassing

for sleeping beneath an underpass if he'd ever been seen by mental health services. The man said no, but there was no discussion of his financial situation before bail was set at $5,000 due to a prior drug conviction.

At another hearing, another magistrate addressed a man described by prosecutors as a schizophrenic strung out on methamphetamine. He was charged with interfering with an emergency call, a misdemeanor. No questions were posed about mental health, and bail was fixed at $5,000 because of an older misdemeanor charge. He quickly pleaded guilty and got 20 days in jail.

About half of those accused of crimes in recent years used commercial bondsmen to secure release. From 2012 to 2014, more than $1 billion in bonds was posted, according to data supplied by Wheeler, generating about $100 million in commissions for the industry, whose work is overseen by a committee of county officials, including judges.

Michael Kubosh, a Houston City Council member and bondsman, says each day defendants released on bond are saving the county about $700,000 in housing costs.

But even Kubosh described the bail schedule as "faulty" because defendants can serve more time pretrial than the average punishment and because drug defendants and financial criminals are required to post higher bonds than those accused of violent acts.

"If you kill your spouse, you can get a bond for $50,000. If you have a bale of marijuana, it's an $80,000 bond and you haven't killed anyone. And what if you have a couple kilos of cocaine? It's over $200,000," Kubosh said.

Kubosh said elected judges are reluctant to approve personal bonds because they fear criticism for approving a bond for a defendant who is released and commits a violent crime.

"They have to run for office, and they're political animals," he said.

The Chronicle found dozens of offenders were jailed in the last five years despite serious illnesses or conditions, including being severely diabetic, HIV positive or so elderly that even a short jail stay proved life-threatening.

Defense lawyers can ask for personal bonds or bonds to be lowered based on hardships, errors, medical problems or other factors, but they need to present evidence and identify an alternative placement. Judges say such requests are uncommon.

"It's kind of dismissed - it's a pervasive institutional attitude that inmates' health problems are not taken seriously - or you're criminally accused so who cares if you are sick," said Shawna Reagin, a former judge who said she was not informed about life-threatening health problems two inmates in her court faced before they died in custody.

Another judge said she declined a request to speed up review of the case of a man who'd been arrested for DWI but was dying of AIDS because he had an immigration hold and likely would have been transferred to federal custody.

Judges said they should be automatically alerted to review bonds when mistakes are made, when inmates are so seriously ill that they could die in custody - or when they've "timed out" - served more time than the punishment for their alleged offense.

County Court at Law Judge Mike Fields has been criticized as hard on defendants, and his bond amounts appear twice as high as those of his counterparts who oversee misdemeanor cases, based on a review of county district clerk data from 2012-15.

But Fields claimed he regularly finds errors in case data. Some magistrates mistakenly set no bond at all for a misdemeanor offenders, he said. Other times, bond amounts are incorrectly recorded as $50,000 instead of $5,000 - the misdemeanor maximum. Fields said errors can cause defendants to be jailed longer than necessary or be required to post excessive amounts.

District Judge Mike McSpadden defended the county's schedule-driven bond decisions. But he and other judges have argued that too many low-level drug offenders are being prosecuted. The jail population could be cut dramatically if the district attorney's office used its discretion to prosecute low-level drug cases as misdemeanors instead of felonies. When a previous DA took that approach, the jail population plunged, he recalled.

The district attorney's office in October 2014 established its First Chance Intervention

Program, which allows first-time offenders detained with less than 2 ounces of marijuana to enroll in drug counseling and avoid jail. The program has enrolled nearly 2,300 offenders, with a 67 percent completion rate. But many low-level offenders don't qualify.

On Dec. 3, Betty Waite Cothran, 46, was charged with possession of less than a gram of cocaine but missed her bond hearing. Cothran, a severe Type I diabetic who normally checks her blood-sugar levels 10 times daily, was already in crisis from spending hours in a holding tank without access to insulin, she later told the Chronicle in a jailhouse interview.

After expressing confusion about whether the hearing should proceed without her - a form requires judges to indicate that they briefed defendants on their rights - a visiting judge set bond at $15,000. There was no discussion of alternatives or of health problems with the county officials present. Cothran who is legally blind, also was battling pneumonia at the time of her arrest. She said she was transported from the 1200 Baker Street jail to Ben Taub General Hospital twice this month for diabetic ketoacidosis, a life-threatening complication.

Sam A. Maida was appointed as Cothran's attorney four days after she missed her bail hearing.

"She (didn't) have an attorney to speak on her behalf," he said. "That raises some concerns."

But it was not the first time Cothran's bail was set in her absence. The same thing happened in January 2013, when she was charged with misdemeanor theft. And then again in October 2012. Each time, she experienced a health crisis.

"I've been coming to this jail for 20 years, and every time they almost killed me," Cothran said. Her wispy grey-blond hair was askew, and she appeared harried. "I can't even remember the last time I saw a bail judge."

Even when some very sick, dying or disabled inmates were released, the process took months, the Chronicle found. Some cases were delayed time after time because defendants

were too ill to attend court.

In a recent interview in the Nguyens' South Houston home, Nguyen's wife sat on an evergreen couch in a living room decorated with a crucifix and framed photos of her husband, their six children and grandchildren. Vo said she visited Nguyen in jail and in the hospital during the months he was in custody.

"We tried. We begged. … I tried to get him out," she said. "In the hospital, I also asked, 'Now that he's sick, can he come home?' And (the doctor) said no."

On June 1, 2009, Nguyen was rushed to the emergency room in respiratory distress. Over the next three days, he coded five times before succumbing to MRSA pneumonia, a deadly antibiotic-resistant staph infection. Because the disease is highly contagious, Vo watched his last moments from behind a window.

At 78, Vo remains muscular from a lifetime of working alongside her husband, cleaning red snapper and other catches. She married Vo as a teenager, and much of their life together was spent on a boat. Every Sunday, after church services, she still visits him - at the cemetery.

"I stop by to see him," she said, "every week."



**James Pinkerton**
Reporter, Houston Chronicle



**Lauren Caruba**
Investigative Fellow, Houston Chronicle

HEARST *newspapers*

© 2013 Hearst Newspapers, LLC.

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/17 Page 92 of 201

PX 13(e)

SUBSCRIBE

 Popular   Latest   Sections   Magazine   More

*The* Atlantic

# Harris County Jails Prove Impervious to Reform

Years after a federal investigation documented abuses in Houston-area lockups, a newspaper report finds that little has changed.



Guards in an acute unit of the mental-heath unit at the Harris County jail in 2014

Eric Gay / AP

**CONOR FRIEDERSDORF**

DEC 30, 2015    |    POLITICS

 Share    🐦 Tweet

TEXT SIZE

−  +

LinkedIn
Email
*Print*

Subscribe to *The Atlantic's* Politics & Policy Daily, a roundup of ideas and events in American politics.

Email     SIGN UP

Earlier this year, Lasswon Shannon, a 28-year-old jail guard, was putting a mentally ill inmate into a padded cell when an altercation occurred. The guard told superiors that the inmate spat on him, prompting him to reassert control of the situation by pinning the man against the wall with his forearm and taking him to the ground.

RELATED STORY



The Laws and Rules That Protect Police Who Kill

Normally, an inmate like Akrem Azzam could not have disproved that narrative. But in this case, video-surveillance footage exposed the jail guard's lies. As it turns out, Shannon shut the door on the inmate, saw the incarcerated man spit toward him, and then reentered the cell. Then he punched the inmate in the face until he hit the ground. In reporting the altercation, he denied punching the inmate at all. "This case illustrates the importance of having a video when complaints are made against law-enforcement officials," a prosecutor told the *Houston Chronicle,* who quoted him in its impressive series of articles on the jail. "We could not have proven this particular case without the video to disprove the justification given by the jailer."

Home        Share        Tweet

in America's jails and prisons, where the abuse of inmates is an epidemic. And it provides context for jail altercations in Harris County, Texas, where there is no video evidence. Roughly 10,000 inmates are in the county's jail system on a given day. There are honest guards who use legitimate force against inmates who are literally attacking them. But there's also a lot of inmate abuse, and the status quo makes inmates unacceptably vulnerable to being victimized—especially since inmates have reason to suspect that complaining about the guards' brutality may result in their being charged with crimes themselves.

Here's how the newspaper put it in one article:

> … a *Houston Chronicle* investigation has found misuse of force by staff against inmates is prevalent and hard to prove, especially when jail staff file charges against inmates in altercations during which their own actions have been called into question. Between 2009 and May of this year, the Harris County Sheriff's office has pursued charges more than 900 times against inmates for harassment, assault and other crimes against public servants stemming from incidents within the jail, according to court records.
>
> With the U.S. Department of Justice's Civil Rights Division continuing its review of excessive force by jail staff and pursuing an "ongoing law enforcement proceeding" in the jail, the *Chronicle* found that jail staff members have been disciplined in more than 120 incidents for misuse of force and other abuses of authority since 2009, records show. Several of those disciplined have been involved in dozens of inmate prosecutions.

These oft-disciplined guards are demonstrably untrustworthy. Yet their word is good enough to convict men of jailable offenses. Grave injustices are surely a result.

Home                                Share                                Tweet

disciplinary histories related to use of force incidents who filed charges in 50 separate cases in which inmates were charged with crimes against jail staff since 2009."

Keep that year in mind.

The series also found "eight cases in which inmates were choked, punched or kicked by detention officers and then ended up facing felony charges for alleged crimes against staff members, even though jailers were later disciplined for misconduct in connection with the same incidents." And it reported that since

2/7/2017

2009, "fifty-five inmates died in the jail while awaiting adjudication," never receiving the day in court that is their constitutional right. The jail system has failed to prevent suicides, too, sometimes due to breaches in protocol that violate federal law.

Summing up the status quo in Harris County, the criminal-justice blog *Grits for Breakfast* wrote:

> If you're too poor to post bond in Houston, your bail hearing will be a joke, with no lawyer to represent or speak up for you. You might get sick in jail or be beaten by a guard then convicted of a felony for assaulting him. Even if you're innocent. And if despair overtakes you and you attempt suicide, maybe no one will be there to stop you; perhaps they'll even falsify records to cover up their negligence.

It would be comforting to think that this jail system's problems are due to the myopia of local leaders, and that the revelation of these serious problems will directly lead to improvements.

But this same jail system was investigated by the Department of Justice back in 2009. And numerous shortcomings were documented in a formal report. The

Home                    Share                    Tweet

This one seems particularly relevant:

> Jail policy does not clearly require the individual using force to file a use of force report; nor does Jail policy provide for routine, systematic collection of witness statements. When supervisors review use of force incidents, they do not have ready access to important evidence. Instead, they appear to rely excessively on officer statements to determine what happened during an incident. While Jail staff were helpful and willing to

assemble use of force documents requested by our review team, we found it troubling that the Jail did not collect such documents as a matter of course. In other words, use of force occurs at the Jail without adequate review, and Jail data regarding use of force levels cannot be considered reliable. We believe that the incidents noted during our review may only reflect part of what is really occurring within the facility.

Despite being put on notice, jail administrators abjectly failed to bring the system up to acceptable standards. Local officials failed to provide adequate funding and oversight. And innocents have almost certainly suffered irreparable harms to life and liberty as a result of these failures. For them, there will be no happy ending.

f Share    Tweet    Comments

ABOUT THE AUTHOR



CONOR FRIEDERSDORF is a staff writer at *The Atlantic,* where he focuses on politics and national affairs. He lives in Venice, California, and is the founding editor of The Best of Journalism, a newsletter devoted to exceptional nonfiction.

Twitter    Email

From The Web

Ads by Revcontent

Home                    Share                    Tweet

DC Homeowners Are in for a Big Surprise in 2017
Finance Daily

Dan Blocker Kept This Hidden Throughout the Filming of 'Bonanza'
Definition

Tiger Woods' Daughter Was a Cute Kid, But What She Looks Like
Detonate.com

Quiz: Name the 1970s Sitcom
Topix

Case 4:16-cv-01414　Document 343-4　Filed in TXSD on 06/12/17　Page 99 of 201

- 

**SPONSOR CONTENT: DELOITTE CONSULTING**

## Cognitive Collaboration: Why Humans and Computers Think Better Together

---

Home　　　　　　　　Share　　　　　　　　Tweet

PX 13(f)



MENU

SIGN UP
LOG IN

**FORKLIFT OPERATORS NEEDED!** With or With out experience! Willing to train & certify In as little as 1 day! **CALL 281-875-988** Se habla españo

# Inmate Beaten To Death After Spending Less Than 48 Hours In Harris County Jail

**BY MEAGAN FLYNN**

WEDNESDAY, APRIL 13, 2016 AT 5 A.M.



Curtis Maxwell and Ebenezer Nah, who are charged with aggravated assault causing bodily injury.

*Harris County Jail*

223      0      1      ·      A A

**Getting stuck in the Harris County Jail because you can't afford to pay the bail amount listed on a chart can have immediate consequences that can be worse than losing a job or a scholarship.** In the past, a diabetic was booked without access to insulin, leading him to vomit dozens of times until he passed out three days later. A man arrested for visiting with his children for too long during a scheduled visit was smothered to death by guards in riot gear after they accused him of creating a weapon from a smoke detector.

And last week, according to authorities, two inmates beat a man to death in a holding cell. He was in jail for less than 48 hours.

*advertisement*



**RELATED STORIES**

Too Poor To Bail Out? Tough Luck In Harris County.

Lawsuit Claims Harris County Jailers Ignored Severely Ill Inmate Before He Died

Wrongful Death Suit Alleges Harris County Jailers Killed Detainee

Patrick Joseph Brown, 46, was booked on a misdemeanor theft charge on April 3, accused of stealing a guitar. Like the vast majority of people who appear before judges in Harris County, he was denied a personal bond, though he had no violent criminal history, and his bail was set at $3,000. Authorities say that on April 5, shortly after 12:30 a.m., Brown was discovered unresponsive on the floor of a holding cell, allegedly after two men beat him to death with their fists and feet. Brown would be transferred to Memorial Hermann Hospital, where he would die several hours later.

Harris County Sheriff's Office spokesman Ryan Sullivan said it is unclear for now what led to the fight, but both of Brown's alleged attackers, Curtis Maxwell and Ebenezer Nah, have been charged with aggravated assault causing serious bodily injury. Once Brown's cause of death is officially determined, Sullivan said the charges may be upgraded.

All three men had spent less than three days in jail, each booked on either April 2 or 3. But the fatal beating happened within a much smaller time frame: several hours, when they were idling in a temporary holding cell.

Sullivan said the only reasons they would all be in the holding cell at once – a cell separate from general population – is because they were either being booked, released or had just returned from their probable cause hearings, which each attended at some point on April 4. Only one man, Ebenezer Nah, charged

with felony possession of meth, posted bail on that day (his co-defendant, Curtis Maxwell, received no bond after being charged with assault of a family member). But because it generally takes six to eight hours before a person can be released on bail, Sullivan said, Nah was likely awaiting his release in this cell when he allegedly beat Patrick Brown.

Sullivan said guards check on the cells once every 15 minutes, and that there is one guard to every 48 inmates. In each cell, there are ten to 20 inmates.



Meagan Flynn is a staff writer at the *Houston Press* who, despite covering criminal justice and other political squabbles in Harris County, drinks only one small cup of coffee per day.

CONTACT:        Meagan Flynn      FOLLOW:        Houston Press           Houston Press
READ MORE:      NEWS           CRIME

**COMMENTS**

# Get the ICYMI: Today's Top Stories Newsletter

Our daily newsletter delivers quick clicks to keep you in the know

someones.name@mail.com        GO



HoustonPress

POWERED BY WIBBITZ

PX 13(g)

**HoustonPress**

# Bail Hearings: Where Prosecutors And Magistrates Ensure Defenseless People Stay In Jail

BY **MEAGAN FLYNN**                                    MONDAY, JANUARY 11, 2016 AT 6 A.M.



*Steve Snodgrass/Flickr*

University of Houston law professor Sandra Thompson promises that bail hearings are not what you've seen on TV—especially in Harris County.

Here's what happens: You get arrested, spend the night in jail, and then, within 24 hours, you're sitting in a little room and speaking to a magistrate (no, not a black-robed judge), usually through a video monitor. You probably have no one representing you yet—although Harris County sends over a prosecutor. Even if you've never been charged with a violent crime and are only accused of a low-level misdemeanor, it likely won't matter to either the prosecutor or magistrate when your bail is set. Because in fact, to do so, the magistrate will almost always just look at a convenient chart—the bond schedule—that does not care if you are an otherwise good person, and rather only considers what crime you've been accused of committing. If you can't pay, then tough luck.

But now, Harris County criminal justice officials are considering a big change to that process: providing you a lawyer during that first hearing. That way, the defense will be able to present crucial information about you to the magistrate (such as why you are not a public safety threat, or that you only make $2,000 a month). Then, the lawyer can argue for either lowering your bail, securing a personal bond for you, or diverting you from jail entirely. And this matters not only because Harris County Jail is already overpopulated, and not only because taxpayers pick up the tab on housing inmates who may not need to be there–but also because sitting in jail, even for just for a couple of days, has been empirically proven to ruin people's lives, whether temporarily or permanently.

"The question of having counsel at the bail hearings, first appearance, is a really important one," Thompson said. "We have this crazy un-American system where people appear before a [magistrate] and there's a prosecutor but no defense lawyer. It's not consistent with the adversarial process we think of when we think of a fair judicial hearing.

"But I think the bottom line is, change is hard."

That's especially true here in Harris County, where the magic words "pilot program" seem to be the only way to convince officials it will all be okay–we just need to dip our toes in first.

Yet even though the Harris County Public Defenders Office has prepared a pilot program for this big idea, Harris County judges could not be sold–at least not all the way.

Last Thursday, officials unveiled several major changes to the criminal justice system as part of a proposal to the MacArthur Foundation, which will provide Harris County with funds to implement them should it accept the proposal. One of those big changes is providing public defenders at probable cause hearings–but only for mentally ill indigent defendants, so they can be diverted to treatment instead.

While that is certainly a step in the right direction, some who were involved with planning the MacArthur proposal are calling it a compromise.

For one, that critical reform was not added to the proposal until just four hours before the submission deadline Wednesday night, several sources confirmed to the *Houston Press*. Secondly, some attorneys on the proposal's planning committee thought all along that this reform would have applied to all people, not just the mentally ill. Texas Criminal Justice Coalition attorney Jay Jenkins was even asked to draft this portion of the proposal–only to find out in late December that they wouldn't be using it anymore. And Thompson, who served as an adviser to the committee, said she had discussed its inclusion with other members on a handful of occasions.

"It's the critical factor," Thompson said. "It's the most important consideration in determining if a person stays in jail pending their proceedings or not. When you look at a group of people with a lawyer and a group without, the one with a lawyer is two-and-a-half times more likely to be released on a personal bond or have their bond lowered. The difference is dramatic."

But it's not required by law, said State District Judge Susan Brown, who, as a result, told us she does not consider bail hearings to be a "critical stage." In addition, Harris County misdemeanor court Judge Margaret Harris said that the reason that counsel-for-all did not make the final cut is because there are too many "due process issues" and questions of "legality" that need to be sorted out with the Harris County Attorney's Office. It's certainly true that questions remain about whether the lawyer who shows up at a probable cause hearing would follow a defendant all the way to trial, or who will employ them. But Bunin confirmed that his pilot program did include those implementation plans (he declined to elaborate), and in a letter obtained by the *Press*, County Attorney Vince Ryan voiced firm support for Bunin's broader representation-for-all plan, which didn't make it into the MacArthur proposal: "A pilot program will also enable Harris County to determine whether representation at this stage will result in more persons being released on bail, reduce jail population, and more importantly, lead to better outcomes for the accused," he wrote.

Former judge Caprice Cosper, who heads the Harris County Criminal Justice Coordinating Council, said Ryan did not provide enough guidance.

But as long as the judges' concerns about how this will work are addressed, it appears they will finally hop on board ("If it's the right thing to do," Brown ultimately told us, "then it's gonna happen"). And if the prevailing attitude from local criminal justice officials during last Thursday's press conference is any indication, they plan to do a lot more than that.

At that press conference, criminal justice officials did something that you don't see happen often, whether on TV or in real life: They admitted the system, as it currently operates, is broken. They acknowledged that simply locking people up is not working, and that the changes they are about to make—many of them diversion and treatment opportunities for non-violent offenders— require "a culture change" from every body of law.

As for the judges, Brown explained that the reason so few defendants in Harris County are released on pretrial bonds (less than 6 percent of people in 2014) is because judges aren't comfortable with the current risk assessment tool (i.e., they can't be certain you'll show up for court if they let you go). So they're creating a new one. They are hiring more pretrial supervision officers so they can issue more pretrial bonds. They're going to rethink the bond schedule, too— because right now, magistrates are rarely straying from it because they do not have enough information about a defendant during that first hearing, Brown said.

Which seems to make perfect sense for why defense lawyers matter most in that stage. When

asked whether providing counsel here would solve magistrates' lack-of-info problem, Brown said she did not want to speculate.

Harris County District Attorney Devon Anderson, however, took care of that.

"Let me say this about having a defender at probable cause court," she began. " I think it's a great idea—exactly what you're saying: somebody to advocate for a defendant to show a magistrate, 'This is why you can let this person out, and they're gonna be okay.' I think we need them for that reason, and I really think it provides a huge opportunity to expand diversion even more, where we can offer it right then in probable cause court because they would be represented by counsel. We're for it, and I have every hope we're going to get that up and running this year."

While the supposed "culture change" may have an undetermined deadline, a committee currently studying how to best implement fair representation for all people at bail hearings may have to act much sooner. They're expected to have answers by March 1.

---

Sponsor Content



©2016 Houston Press, LP. All rights reserved.

# HoustonPress

# Group Sues Harris County Over Bail System That Keeps People in Jail Just Because They're Poor

**BY MEAGAN FLYNN**

FRIDAY, MAY 20, 2016 AT 8 A.M.



*Steve Snodgrass/Flickr*

On Wednesday, 22-year-old Maranda O'Donnell was driving to her mom's house to pick up her four-year-old daughter. Then she got pulled over, and she never made it there.

O'Donnell was hauled off to jail after being arrested for driving with an invalid license. She couldn't afford her bail amount, $2,500, an amount set according to a pre-determined bail schedule that did not consider O'Donnell's circumstances. O'Donnell had been living with a friend because she could not afford her own place. She obtained a job waiting tables about two weeks ago, but because she is sitting in jail, her attorneys say she fears that job won't be there for her when she gets out.

Yesterday, lawyers with the national organization Equal Justice Under Law filed a lawsuit on

O'Donnell's behalf against Harris County, Sheriff Ron Hickman and five bail-hearing magistrates. The lawsuit alleges that Harris County's use of a strict bail schedule is unconstitutional, given that magistrates rarely ever stray from it and therefore almost always fail to consider someone's ability to pay, as is required by law. The lawyers also asked a judge to immediately release O'Donnell and give her a proper bail hearing, one in which a judge would actually consider her circumstances and whether she can afford the amount on the chart. They are asking the same for more than 500 people who they say are in the same position.

"Harris county has really perfected and, in a lot of ways, epitomized the efficient processing of human beings in and out of cages," Equal Justice Under Law attorney Elizabeth Rossi told the *Houston Press.* "Shining a light on a place like Harris County really highlights the pervasiveness of money bail and the thoughtlessness with which criminal injustice systems throughout this country keep people in jail cells just because they're poor."

In Harris County, 77 percent of the jail population are people who have yet to be convicted of crimes, who are in jail because they cannot afford to get out. A recent study by Gerald Wheeler, retired director of Harris County Pretrial Services and a doctoral researcher, found that 81 percent of people charged with misdemeanors will spend time in jail, and of those, a quarter of them can't afford bail costing $500 or less. Only 7 percent were released on a personal bond.

Rossi said that she and other attorneys sat in on bail hearings about 20 different times. She said those hearings only lasted about one minute, and that the magistrate never even gave defendants a chance to speak. Curiously, the attorneys note in the lawsuit that one magistrate even told someone that a bail hearing was "not the forum" for discussing his ability to pay bail. When another asked, "Can I say something?" the magistrate responded: "You can talk to me all you want, but it's not going to change the outcome. I'm setting it according to the schedule."

Rossi said that, after watching enough of them, it was the "banality" of these hearings that struck her.

"Everybody who's involved in that process, from the judge to the deputies, just looked at it as another routine doldrum chore they have to do," she said, "and no one is thinking about the individual standing in that red square, maybe in an orange jumpsuit, who's about to be told whether he'll be released to his family or not based on whether he can pay an arbitrary dollar figure."

This is not the first time that Harris County has come under fire for practices that contribute to the county jail's longstanding overcrowding problem. Most recently, the Department of Justice concluded in a yearlong investigation in 2009 that jail conditions were bad enough to violate inmates' constitutional rights. It was a conclusion that echoed a federal lawsuit the county lost decades ago in 1972, when inmates claimed that the jail was so overcrowded that it led to inhumane conditions and treatment. After the county lost, Wheeler founded Harris County

inhumane conditions and treatment. After the county lost, Wheeler founded Harris County Pretrial Services, a department that would seek to provide pretrial supervision to people released on personal bonds, as opposed to keeping most of them in jail before their court date.

But it was a vision that simply never fully materialized. Judges instead were reluctant to accept the idea of letting defendants go home to their families before their court date, even if they were only accused of petty or non-violent crimes. Perhaps that's because of a bail bond industry that mounted a highly successful tough-on-crime campaign throughout the 1990s, urging judges not to grant anyone that trust. As a result, Harris County developed a reputation for its unparalleled stinginess when it comes to issuing personal bonds that has persisted over the years.

In recent months, however, criminal justice officials have begun signaling their openness to change. Administrative Judge Susan Brown said that judges have been uncomfortable with issuing personal bonds in the past because they don't trust the current risk-assessment test, a point system that Harris County Pretrial Services uses to determine whether you should be released without having to pay a bondsman hundreds or thousands of dollars. So, she said, they're developing a new one. They've also hired seven more pretrial supervision officers, apparently to prepare to give more people personal bonds. In addition, Harris County District Attorney Devon Anderson told the *Press* last week that the judges have also finally approved a pilot program for providing all people defense attorneys at their bail hearings, so they have someone to argue before the magistrate why they deserve a more affordable bail. (A spokesperson for Anderson and Sheriff Ron Hickman did not return a request for comment.)

That's something that may have mattered to Patrick Brown, a man accused of stealing a guitar, the most recent person to die in the Harris County Jail. A source with knowledge of the case told the *Press* that Harris County Pretrial Services had recommended Brown for a personal bond. Yet even though he had no violent criminal history, for some reason a judge still denied it, and Brown couldn't afford his $3,000 bail. Two men, one of whom had just posted bail and was on his way out of lockup, have been charged with beating Brown to death inside a holding cell later that night.

Since the start of 2015, Equal Justice Under Law has filed 17 lawsuits across the country, including this one, seeking to end the cash bail system. Where it has won, local jurisdictions — mostly midsize cities such as Montgomery, Alabama, or Velda, Missouri — have been forced to upend their bail systems and entirely ditch their existing bail schedules, which were found to be unconstitutional.

The group has won eight cases so far, and hasn't yet lost a single one.

Expand / Download

_____

Sponsor Content



©2016 Houston Press, LP. All rights reserved.

# Researchers Think Harris County's Bail System Is Unconstitutional

BY **MEAGAN FLYNN**                                    THURSDAY, AUGUST 4, 2016 AT 6 A.M.



*Steve Snodgrass/Flickr*

Just months after Harris County was sued for jailing poor people who can't afford bail, a group of law scholars from the University of Pennsylvania has swooped in and published a study that documents just how bad the problem is. And it's bad enough that the researchers concluded Harris County's bail system appears to be unconstitutional, since the poor endure overwhelmingly more negative consequences than the wealthy for the same crimes.

Looking at more than 380,000 misdemeanor cases from 2008 to 2013 (which is nearly all of them), the researchers found that if you're detained before trial because you can't make bail, you are 25 percent more likely to be convicted than somebody who could afford to buy his or her release. You are 43 percent more likely to be sentenced to jail time rather than probation, for example, and if you do get sentenced to jail, your sentence is generally nine days longer — or

double – than that of a person who bailed out.

And as we've written about many times in the past, even a short stay in jail can cause you to lose your job, college scholarship or even your home. It's why the findings in this study, said Paul Heaton, senior fellow at Penn's law school, should be troubling to "anyone who cares about fairness in Harris County courts."

Heaton said the group chose Harris County for the study both because of its large jail population – the third-highest in the nation – and because it has a money bail system, which is common among many counties in the United States. Harris County relies heavily on the bail schedule to set a person's bail, which allows people to move through the court system swiftly and efficiently. But this leaves judges and magistrates little time to consider a person's individual circumstances and ability to afford bail, as required by the Constitution, Heaton said.

"It's efficient in the sense that you can get a large number of cases running through the factory – but is it sufficiently individualized to meet constitutional muster?" Heaton said. "That's a real question. In this quest for efficiency, we sacrifice due process for individuals who just don't have the means to afford even small amounts of bail."

The researchers also sought some clarity as to why those detained pretrial are so much more likely to be convicted. They found the huge difference was mostly due to the much higher rate of guilty pleas among pretrial detainees: They take plea deals at a 25 percent higher rate than a person who bailed out. It makes sense, the study notes: People who have been stuck in jail awaiting trial are probably much more likely to want to go back to their families, jobs and lives than those who had been free all along.

And that's a large part of the reason the Harris County District Attorney's Office currently has 298 wrongful drug convictions as far back as 2004 sitting on its plate: Itching to get out of jail, many of those innocent people pleaded guilty to drug possession – only for lab results to come back weeks or months later testing negative for drugs.

What was the most troubling finding to Heaton, however, was that people detained pretrial are more likely to be charged with more crimes in the future. According to the findings, pretrial detention was linked to 30 percent more felonies and 20 percent more misdemeanors 18 months after those people were let out of jail.

It's a finding that challenges the conventional basis for jailing people at all, Heaton said.

"It's a particularly important pattern, given one of the reasons for detaining someone in the first place is public safety," Heaton said. "You don't want someone accused of a crime to potentially, while they're waiting for trial, commit other offenses. But what this finding demonstrates is that, in fact, detaining people might be worse for public safety than letting them go, because in the

near term, while they won't be a threat to the public while they're detained, afterward, they end up committing more crimes."

Harris County does have reforms on the way – such as a pilot program offering defense attorneys to people at bail hearings to advocate for a lower bail or personal bond, District Attorney Devon Anderson told us earlier this year. It also has a new risk assessment tool, used to determine whether judges can trust that, if they let you go, you will return for trial and not commit new crimes. Harris County judges said in May they think this will lead to more personal bonds. Only 7 percent of people are lucky enough to get a personal bond each year – which Heaton said was unusual compared to the rate in other counties. If judges really were to start giving pretrial bonds at a  much higher rate,  he said, a lot of these problems might be solved.

Until then, though, Heaton says he believes the system violates the Equal Protection Clause of the Constitution, given that poor people endure worse consequences than wealthy people just because they can't pay for that golden ticket out the door on day one.

Heaton and his colleagues' conclusions echo the arguments made in the lawsuit filed against the county in May by the national group Equal Justice Under The Law. The organization has sued 17 counties over their money bail systems that punish the poor, has won eight times – and has so far never lost. The group argues that at bail hearings in Harris County, magistrates almost never consider a person's ability to pay and would prefer to set bail according to the amount listed on their convenient chart, which they say is unconstitutional. (Their suit cites similar research from former Harris County Pretrial Services director Gerald Wheeler that, surprise, reached the same conclusion; see his findings here.)

Equal Justice Under The Law filed its lawsuit days after a 22-year-old mother was pulled over while on the way to pick up her daughter from her mom's house. She was hauled off to jail for driving with an invalid license and was unable to pay even 10 percent of her $2,500 bond. So instead she waited in jail, hoping her new job as a waitress would still be there for her when she got out.

---

Sponsor Content

©2016 Houston Press, LP. All rights reserved.

# The Houston Man Who Refused to Plead Guilty Does Not Want an Apology

BY **MEAGAN FLYNN**                                  MONDAY, AUGUST 15, 2016 AT 8 A.M.



*Victor/Flickr*

His attorney told him he could be out of jail in ten days if he took the plea deal — but 58-year-old Gilbert Cruz refused, saying he wasn't going to plead guilty to something he didn't do.

He had just been booked on charges of interfering with the duties of a public servant, after a former neighbor, whom Cruz says was recently homeless, called the police on him when Cruz told her he wouldn't allow her to stay with him. Then she accused Cruz of beating her.

The arrest that would lead to more than two months in Harris County Jail and cause Cruz to lose his job and his car and almost his home, however, had nothing to do with assault — an accusation police and prosecutors agreed did not withstand scrutiny.

On May 14, after a Harris County sheriff's deputy arrived at Cruz's northwest Houston apartment, he asked Cruz to leave the apartment so he could interview the woman alone. Cruz, explaining that the woman did not live there, said he did not feel comfortable leaving his own home, and he asked the deputy to interview the woman outside instead − an idea that apparently did not sit well with the officer. When Cruz would not leave, Deputy R. Delgado forcibly removed him − then punched him in the face. Delgado cuffed him, and backup showed up to haul Cruz off to jail for interfering with the investigation.

Despite the woman's clams that Cruz hit her in the face and threw her on the coffee table, Cruz was cleared of any wrongdoing: According to the deputy's offense report, the woman had not a mark to show for it, and everything on the table, including a chess set, was neatly in order. In his report, the deputy mentions he punched Cruz to "get control of the scene."

ADVERTISING

Replay

Learn more

6

inRead invented by Teads

"I thought once a judge saw me, and especially after seeing my eye, she would think, What was the reason for all that?" Cruz said. "I did not hurt that [officer] − I did nothing to him. When he punched me, I did not look at him as a police officer anymore. I looked at him as a thug."

Even though Cruz spent more than two months in jail before prosecutors dismissed the case against him for lack of evidence, Cruz would see a judge only one time. He would not even be present at his own bail hearing, where defendants are − in theory − constitutionally guaranteed the right to tell a magistrate they can't afford that bail amount or to ask for a personal bond. Unable to pay the $3,500 bail, Cruz waited in jail, and was actually quarantined in his pod with more than 20 others for the better of two months after one of them contracted shingles. Cruz could not leave to go to the rec room, the library, the chapel, not even to court, trusting that his court-appointed defense attorney would handle it.

Nine weeks later, he would find that his Infiniti car had been repossessed, that he owed $15,000 to the company that auctioned off the car because it sold undervalue, that the apartment management was threatening to evict him and he owed $954 in late fees, and that his job as a contractor with the U.S. Census Bureau was gone.

"When I'm accused of doing something wrong, they hit me in my pocket," Cruz said. "I feel the same thing should be done to them."

As countless attorneys and criminal justice advocates have told the *Houston Press* in the past, few people have the resolve to withstand months in as bleak and dangerous a setting as jail, away from their families and jobs and lives, to fight a conviction – even if they believe they are innocent. It's a big part of the reason the Harris County District Attorney's Office is sitting on nearly 300 wrongful drug convictions dating back to 2004: Innocent people, itching to get out of jail, pleaded guilty before the lab results that proved their innocence could be processed.

"On the misdemeanor side, people often feel a lot of pressure to plead," Amalia Beckner, a public defender, told us last week. "A lot of times, people can't afford to fight their cases because if they stay in jail they'll lose their homes, they'll lose their jobs, they'll lose their support system, which is often already somewhat tenuous. So it's difficult to watch when you realize we're keeping people just because their lack of ability to pay a few hundred dollars."

Cruz's case, however, also presented additional problems: For one, why was he never afforded a bail hearing, which, as Texas Criminal Justice Coalition attorney Jay Jenkins said, is supposed to be a constitutional right. Apparently, this happens to people every day, according to DA's office spokesman Jeff McShan. Here is how he explained it:

> "The *Houston Press* wants to rag on the DA's office and the criminal justice system, but this is actually good: For example, if you're arrested in Dallas on a Friday afternoon, your first court appearance is not until Monday. Here, it goes pretty freaking fast. Sometimes, though, it's too fast. It doesn't happen very often, but three or four times a day, there's a person who's still being booked and processing takes a while, or he went to the jail medical clinic, and his time came up for probable cause court. But [even if he was present at the hearing] they can't talk anyway. When they go in there and stand in front of a judge, they don't talk."

Yes, even if the defendant was afforded his right to this bail hearing, it is highly unlikely in Harris County that he or she would be given the chance to ask for a lower bail or a personal bond anyway, which is why a group called Equal Justice Under The Law has filed a lawsuit against Harris County.

The group, which has filed 17 such lawsuits across the country and won eight times and so far lost none, argues that Harris County magistrates at these hearings violate the constitution by

failing to consider each defendant's ability to pay bail. Instead, magistrates set bail according to a convenient bail schedule —apparently, whether or not the defendant is even present. And even if Harris County Pretrial Services recommends someone for a personal bond, according to Pretrial Services' 2014 report, magistrates ignore that recommendation 64 percent of the time for people charged with misdemeanors and 98 percent of the time for those charged with felonies, keeping roughly 15,000 people behind bars when Pretrial Services thought they were better suited to go home to their families.

Perhaps they, too, lost their jobs, cars and homes.

Gilbert Cruz said he does not want an apology from the Harris County sheriff's deputy who punched him in the face and arrested him. He said he does not want an apology from his court-appointed defense attorney, Abel Izaguirre, for failing to put more pressure on prosecutors to drop the case sooner. And he does not want an apology from anyone on the outside world who stripped him of his livelihood.

Cruz wants to win a civil lawsuit against the county so he can be repaid for everything he has lost, and he wants his arrest expunged from his record so that he can go on with his life.

Sponsor Content



©2016 Houston Press, LP. All rights reserved.

# Too Poor To Bail Out? Tough Luck In Harris County.

BY **MEAGAN FLYNN**

TUESDAY, DECEMBER 15, 2015 AT 7 A.M.



*Steve Snodgrass/Flickr*

When you get booked into jail in Harris County, you have the opportunity to leave nearly as soon as you arrive. That's thanks to the bail schedule that's been in place since 1979—a set of bail amounts automatically assigned to a defendantbased on the alleged crime. This way, you don't need to wait in jail for up to 24 hours before a judge or magistrate sets the bail, and you can stroll on out so you don't miss work.

Which is great—but only for those who can actually cough up the cash.

ADVERTISING

inRead invented by Teads

For those who can't, they might end up sitting in jail awaiting trial solely because they are poor, thanks to the bail schedule. And in Harris County, according to some experts, there's a risk that this may be happening often.

While magistrates and judges are required by law to consider a person's ability to pay bail and the circumstances of their case—not just what they've been charged with—the numbers show that rarely do Harris County magistrates or judges choose to lower a person's bond or stray from the bail schedule period. "As opposed to looking at the individual and saying what the proper bail should be given their life situation, they look at a chart," said Sarah Guidry, director of the law school at Texas Southern University who has been studying economic and racial disparity in bail for the past two years. "And if defendants cannot make the bail according to the chart, then they stand the possibility of losing their employment and destabilizing their household."

According to numbers from Pretrial Services' 2014 annual report, magistrates—who are the first to see a defendant in probable cause hearings—deviate from the bail schedule in misdemeanor cases just 16.7 percent of the time, but only lower bail 5.7 percent of the time; for felonies, bail is lowered in 8.3 percent of cases. Then, when the case goes before a judge in court the next day, according to data from the district clerk's office, judges appear to be modifying bails the magistrates set less than 6 percent of the time for felonies—and lower bail less than 1 percent of the time.

Judges the *Houston Press* spoke with said these numbers seemed off, and that they felt discretion was being used more regularly (though none of the three could give a rough estimate of how often they lower bonds on a weekly or monthly basis). In fact, that judges and magistrates are allowed to use discretion is the only reason bail schedules are legal.

Since January 2015, nine cities across the country have been sued in federal court for their too-strict use of a bail schedule and slim-to-none consideration of a person's individual circumstances; six of those have resulted in cities overhauling their bail system. The first suit was filed against the City of Clanton, Alabama, by a woman named Christy Varden, an

Case 4:16-cv-01414 Document 343-4 Filed in TXSD on 06/12/17 Page 124 of 201

unemployed mother who couldn't pay the $2,000 bail for four counts of shoplifting at Wal-Mart. So she stayed in jail. Equal Justice Under Law, a civil rights organization aiming to end the money bail system altogether, represented her in the case, which achieved national attention after the U.S. Department of Justice filed a statement of interest and denounced bail schedules based solely on arrest charges as unconstitutional practices. Varden won the case—and Clanton got rid of the bail schedule altogether, routinely allowing those charged with misdemeanors to go free without paying, and ensuring that inmates saw judges at least within 48 hours.

It's unclear whether Harris County might be open to such a lawsuit. While judges clearly aren't deviating from the bail schedule very often, it's impossible to get inside their heads—maybe they really think the bail schedule is almost always appropriate for someone's case. The question isn't just whether judges are listening, but whether defendants get the opportunity to argue that they can't afford bail in the first place, says Andrea Marsh, founder of the Texas Fair Defense Project and director of the University of Texas' pro-bono law program.

"At that magistrate hearing, do individuals have an opportunity to present their financial circumstances and have that considered?" Marsh said. "Are magistrates even looking at that?"

Our request for comment from a magistrate was not returned.

Marsh said that, if magistrates aren't looking at that, then the best way to make sure that they do is to get defense attorneys to start representing defendants in those initial probable cause hearings, something that the Harris County Public Defenders Office has pushed as well. Because all too often, Marsh said, defendants themselves are not aware that a fair bail is a constitutional right, that there are in fact alternatives to sitting in jail for being poor.

Sponsor Content



©2016 Houston Press, LP. All rights reserved.

PX 13(h)

DONATE  

| TV 8 | NEWS 88.7 | CLASSICAL | MIXTAPE |

### LISTEN LIVE

ELECTION 2016

# Harris County Jail Issues Loom Large In Race For Sheriff

Both the incumbent and his challenger agree there are serious problems with the Harris County Jail – but they differ on how to address them.

**FLORIAN MARTIN** | OCTOBER 25, 2016, 6:41 AM (LAST UPDATED: OCTOBER 28, 2016, 12:15 PM)

Case 4:16-cv-01414   Document 343-4   Filed in TXSD on 06/12/17   Page 127 of 201



Florian Martin | Houston Public Media

*Sheriff Ron Hickman, left, and his challenger, Ed Gonzalez, face off in a debate at UH Downtown.*



00:09 / 03:52

Much is being said about what's wrong with the local lockup, so we decided to take a look ourselves and went on a tour of 1200 Baker Street, one of the four buildings in the Harris County Jail system.

As expected, there are cold concrete floors and walls without windows and heavy doors. We get a look at the acute mental illness block and a few of the more notorious inmates, including Shannon Miles, who is accused of killing deputy Darren Goforth, and David Conley, who is awaiting trial for allegedly killing a family of eight.



**Houston Public Media's Coverage of Election 2016**

But you also get some positive sides of the jail, like the "Freedom Project," the sheriff's office's drug rehabilitation program. Inmates in this group meet on a daily basis and are provided resources to help for their time after their release.

The Harris County Jail houses nearly 10,000 inmates at any given time.  And that's one of the problem community activists want to see changed.



Florian Martin | Houston Public M

The Harris County Jail houses nearly 10,000 inmates, the biggest lockup in Texas.

"Whenever jails are overcrowded, there's a safety issue," said John Ogletree, a pastor and member of Metropolitan Organization, a church-based community institution. "And we of course want safety to be priority, but in that safety for inmates to be treated humanely."

Tackling overcrowding is high on Ed Gonzalez's list. The former Houston police officer and city council member is challenging Sheriff Ron Hickman in the upcoming election.

"Jail overcrowding, it's going to be a multi-dimensional problem," Gonzalez told News 88.7. "We have t at bail reform, we have to look at alternatives to incarceration, we have to look at other things that may able to provide relief, and so it's something that requires strong leadership and the will to really get this done."



Florian Martin | Houston Public M

Ed Gonzalez served 18 years in the Houston Police Department and three terms on City Council. He would be Harris County's secon Hispanic sheriff.

Hickman agrees overcrowding is a problem. But the Republican said it's not unique to Harris County a is part of a broader trend. And he said he's already doing all the things his Democratic opponent is proposing.

"Near-term solutions won't be found in those approaches," the sheriff told News 88.7 in an interview at office. "Are we advocating? Yes. We're one of the strongest proponents for bail reform. We know our b

Case 4:16-cv-01414   Document 343-4   Filed in TXSD on 06/12/17   Page 130 of 201

system is upside down."

Critics say judges in Harris County set bail in more cases than in other jurisdictions. That fills the jail and often punishes those who can't afford bail.

Hickman also says his office is working to lower the recidivism rate, for example by working with comm organizations and offering vocational training.

Still, critics say things haven't gotten better in the roughly 18 months Hickman has been sheriff.



Florian Martin | Houston Public M

The Harris County Commissioners Court appointed Ron Hickman as sheriff on May 12, 2015. He previously headed the Precinct 4 Constable's Office.

Gonzalez likes to talk about how jailers are being overworked, which puts stress on them, can lead to l interactions with inmates, and costs the county lots of money for overtime.

"One of the things that's draining is we don't have enough people," he said. "And the people that have those slots, we're paying them time-and-a-half. So we have to get that corrected."

But Hickman said, besides the budget restrictions, it's not easy to find enough people to replace the m jailers that are now starting to retire.

"So just hiring fast enough to keep up with attrition is very challenging," he said. "And you can imagine stressors of looking for and recruiting people who want to work inside a correctional setting, and that's getting harder all the time."

While it's important to find enough people, it's just as important to find the right ones. Other issues include inmate abuse – both by jailers and other inmates – and jail deaths.

Hickman has tried to address that by raising the minimum age for detention officers from 18 to 21 and expanding training. And he has added or upgraded hundreds of cameras to improve surveillance inside jail.

It'll be up to the voters to decide who is the better candidate to deal with these issues.

According to a University of Houston poll, Hickman and Gonzalez are in a statistical tie.

But the issues may be secondary in the final outcome, if Bob Stein is correct.

The political scientist at Rice University expects Democrats in Harris County to benefit from the low popularity of presidential candidate Donald Trump.

Share



Florian Martin

**BUSINESS REPORTER**

 

Florian Martin is currently the News 88.7 business reporter.Florian's stories can frequently heard on other public radio stations throughout Texas and on NPR nationwide. Some of the have earned him awards from Texas AP Broadcasters and the Houston Press Club.Florian native of Germany. His studies in Leipzig...

More Information

RECENT STORIES

How Are OPEC Cuts Affecting The Price Of Oil?

Hundreds Protest Against President Trump Before Super Bowl In Houston

Protesters March On NRG Stadium

Minority Organizations Protest Trump's, Abbott's Policies at Galleria Area

Exposure During Super Bowl Likely To Attract Businesses To Houston

RELATED

New Harris County Officials Vow To Reform The Criminal Justice System

Nine Out Of 10 Teachers Surveyed Say Election Has Had A Negative Impact On Students

Sheriff-Elect Ed Gonzalez Wants To End Program That Leads To Deportations

Music In The Making: Election Blues

MOST VIEWED

So What Did Super Bowl Visitors Think Of Houston?

Cycling Advocates Call For Action After Two Fatal Crashes Involving Light Rail Trains

How Are OPEC Cuts Affecting The Price Of Oil?

Hundreds Protest Against President Trump Before Super Bowl In Houston

Normalcy At Houston's Airports Marked Departure Of Thousands Of Football Fans After Super Bowl 51

Support Comes From





    

**News**    **Arts & Culture**    **Education**    **TV 8**    **News 88.7**    **Classical**    **About**    **Contact Us**

Houston Public Media is supported with your gifts to the Houston Public Media Foundation and is licensed to the **University of Houston**

Copyright © 2017 | Privacy Policy

PX 13(i)

# Ed Gonzalez Opposes Proposed Cuts to Jail Inspectors and Investigators

Says Sheriff Hickman's lack of leadership on necessary reforms will compromise public safety

Jo-Carolyn Goode | 1/25/2016, 5:12 p.m.



Ed Gonzales

   

**Also of interest**



Houston Northwest Chamber of Commerce Hosts Public Safety Meeting



Immigrant Youth Force Issue of Racial Profiling Into Harris County Sheriff's Debate



Deaths in Harris County Jail Demand Attention



Gonzalez Elected City Council District H

HARRIS COUNTY, TX – Ed Gonzalez, a leading candidate for Harris County Sheriff, sharply criticized Sheriff Ron Hickman today for dismantling an investigative unit and slashing the number of jail inspectors at the Harris County jail.

"This is a very poor decision that shows a disappointing lack of judgment and leadership on the part of our current sheriff," said Gonzalez. "At a time when more incidents of abuse and neglect continue to surface, we should be increasing transparency and oversight at the jail, not taking a step backward."

Gonzalez pointed to a recent investigation by the Houston Chronicle that "exposed avoidable in-custody deaths, civil rights abuses, beatings, unjust prosecutions of prisoners and allegations of medical neglect" at the jail.

"Pulling back on reforms to increase transparency and accountability not only compromises public safety, but also erodes the public's trust in law enforcement and the hard-working deputies and staff who are working to keep our county safe," said Gonzalez.

Ed Gonzalez is a leading candidate in the March 1 Democratic Party primary election for Harris County Sheriff. A proven crime-fighter, Gonzalez served on the Houston Police Department for 18 years, becoming a Sergeant and leading murder investigations. He served two terms on the City Council, chairing the Public Safety and Homeland Security Committee and becoming Mayor Pro-Tem. On the City Council, he created the Houston Center for Sobriety to prevent crime and keep others from becoming repeat criminals.

Gonzalez has been endorsed by the Houston Chronicle, Houston Black American Democrats and the Latino Labor Leadership Council, among others.

For more information, visit EdForSheriff.com

PX 13(j)

CULTURAL BAGGAGE

AUGUST 26, 2016

TRANSCRIPT

DEAN BECKER: Broadcasting on the Drug Truth Network, this is Cultural Baggage.

DR. G. ALAN ROBISON: It is not only inhumane, it is really fundamentally un-American.

CROWD: No more! Drug war! No More! Drug War! No More! Drug War!

DEAN BECKER: My name is Dean Becker. I don't condone or encourage the use of any drugs, legal or illegal. I report the unvarnished truth about the pharmaceutical, banking, prison, and judicial nightmare that feeds on eternal drug war.

Hi friends, welcome to this edition of Cultural Baggage. I'm so glad you could be with us. We have in studio today a former sergeant with the Houston Police Department, Mister Ed Gonzalez. who is the Democratic candidate running for sheriff of Harris County, Houston, Texas. We're going to have a good discussion here in just a little bit, but I was proud that recently had a chance to speak with a US Congressman, and Shannon, go ahead and start that track, please.

You know, over the years, I've made a few good friends in my travels around the country, and one of those I met in El Paso, Texas, over the years, for the Caravan For Peace and other conferences, was then a city leader, but he's now gone on, been recognized by his constituents, and he's now a US Congressman, from El Paso. I consider him to be a good friend of the show, I would like to welcome Mister Beto O'Rourke. How are you, sir?

BETO O'ROURKE: I'm doing well, and thank you for saying all those kind words. I feel absolutely the same way about you, and I am so grateful and know so many people are for the work that you have been doing for so many years to ensure that people have the facts and can make decisions based on those facts, and I think the tide is changing on our country's drug laws, thanks in large part to the work that you and the others like you are doing. So, I really appreciate everything you've done, and thanks for giving me a chance to join you on your show again.

DEAN BECKER: Well, Congressman, I used the phrase that the drug war is losing its luster, that lots of politicians, even here locally, the DA and the sheriff candidates are speaking about the need for change, not too much what that change might be. But it is beginning to change, and even in the US Congress, there are more and more people stepping forward, especially recognizing medical marijuana. Am I correct, sir?

BETO O'ROURKE: Yeah, it's happening. I mean, the tide is only moving in one direction, and it's really simply a matter of time, and I think for all concerned, especially I think, as you know from when we first met, I think of the kids who literally, you know, were dying or killing other kids in Ciudad Juarez, to move marijuana into the United States through the plaza there.

And I think about the kids in US jails and prisons, and I think about people whose lives will forever be changed for the worse because of the way this country, at a federal level, designates marijuana and treats those who have used it, or are in some way involved in growing it or selling it, and the conclusion of this change in policy cannot come soon enough for us to help all those who've been harmed by it, and also to allow, you know, Americans to do what those in 25 states and the District of Columbia have already decided they should be able to do, which is in a reasonable way, whether medicinally or even recreationally in some states, be able to use a drug which is not, you know, without its challenges and problems, but challenges and problems which can be controlled, and in a much better, more sane way than we do now, in a regime that's totally focused on interdiction and imprisonment, and law enforcement, and not on public health and treatment.

So, yeah, it is moving in the right direction, but it couldn't move fast enough as far as I'm concerned.

DEAN BECKER: I agree with you, sir. Now, Congressman O'Rourke, one of the efforts that you've been focused on, and I think rightfully so, you have so many constituents that are military veterans in your district, whatever you call it. And the fact of the matter is, we have I think it's well over a million soldiers, servicemen, who have been to Afghanistan, who have been to Iraq, and our other wars, and many of them come back with severe injuries, post traumatic stress, and other maladies. And it's being proven more and more that medical marijuana can help these people with their problems, as well as perhaps for the 22 soldiers that kill themselves every day in these United States, if they had the chance to get outside of that regime of opioids and tranquilizers and alcohol, it might benefit them. Am I right, sir?

BETO O'ROURKE: Yeah, you're right about that. And, it's worth remembering that when marijuana was federally outlawed and criminalized, in the 1930s, in large part because of the association with Mexican Americans, African Americans, and populations that, you know, the then-powers that were, were afraid of them. One of the few groups to stand up in opposition to the criminalization of marijuana was the American Medical Association, because they said there was no scientific evidence supporting that policy.

And, in that same vein, I think today, we want to make sure that doctors, and medical professionals, and the providers for our veterans within the Veterans Health Administration, are able to discuss with their patients, those veterans who are in need of treatment, the best possible course of action for whatever afflicts them. And in some cases, some doctors, or some veterans, may want to discuss marijuana as a possible part of their treatment. And today, that is not possible, because we haven't changed the laws to reflect the times and the scientific and medical evidence.

So, we were able to work with, you know, a true champion on this issue, Representative Earl Blumenauer from Oregon, who was able to get an amendment into the Military Construction/Veterans Affairs bill, that would allow doctors to have those kind of conversations with their patients within the VA, and it passed, to some amazement, by a vote of 233 to 189.

On the Senate side, we had a Republican, Senator Steve Daines of Montana, who included almost identical language into that bill. And, somehow, as that Senate bill and that House bill were brought to conference, that language was stripped out. So it shows that we still have work to do. Even when the majority of House members, and that includes a lot of Republicans as well as Democrats, even when in the Senate you have identical legislation that is passed by a majority of Senators, we still have a challenge in actually getting that through into final passage and into law. But it's a good -- so there's good and bad that come with this. The good is, we've really crested a hill here in terms of the will of Congress to act on these issues. And the bad news is, we're not all the way there yet, and those at the very top are still holding back some of this necessary, incremental change.

But, it's a good sign, and I'm very confident that we can see the same or greater numbers next year, and be much more vigilant in the conference process to make sure that that language is not stripped.

DEAN BECKER: Yes sir. I want to make note, I think the bill you're speaking of, one of the Republicans, Steve Stockman, is also from Texas. So even in the south, people, Republicans, embrace this idea as well. You know, in the last week or two, been a couple of things that have broken. One is the Ninth Circuit ruling on marijuana and, you know, where the funds can be spent to go after those that may be growing it in the legal states, and I think that's a good thing. And that DEA ruling, I think you touched on. You know, it's, the cage has been rattled. Am I right, sir?

BETO O'ROURKE: Yeah, and I think, you know, you pointed this out several times, I mean, that public opinion, the popular will, is way ahead of the legislators and politicians, and yet, politicians are catching up, and it is reflected in that vote that I just talked about, it's reflected in some of the pressure that you're beginning to see come to bear on the DEA for the, you know, Schedule One decision. Perhaps reflected in some of these court decisions, and, you know, just, as I said at the beginning, I really think this is a matter of time, and you hope that this is not a slow roll, or a, you know, an incremental series of decisions. You hope that, as, you know, more of these states make these decisions, separately, reflecting the will of the voters and citizens in those state, that at the national level,

you know, that force and that popular will be carry through and be reflected in the policies that are adopted by, you know, what will unfortunately have to be at this point a future Congress, given that much of our business is over for this year. You can -- the elections and the lame duck session.

But, you know, the bright side of that is there's another opportunity beginning in January of 2017 with a new president, a new make up of Congress, and hopefully new legislators who are going to be closer to the people they represent who by ever increasing majorities want to see more rational drug policies, especially when it comes to marijuana, in this country. So, I'm the eternal optimist on this, and in large part because I have seen progress, and so much of that again has been pushed by people like you, who've been sharing the truth and the facts on this, and we just have to continue that work, because it is working. Not fast enough, but it is working, it is moving in the right direction.

DEAN BECKER: Once again, we've been speaking with US Congressman Beto O'Rourke out of El Paso, Texas.

I know you can get this one, it's on the TV every day. It's time to play Name That Drug By Its Side Effects! Runny noise, skin rash, swollen tongue, dizziness, vertigo, fainting, abnormal ejaculation, priapism, a persistent painful penile erection leading to permanent impotence. Time's up! The answer, from Boehringer Ingelheim: Flomax, for male urinary problems.

All right, folks, you are listening to Cultural Baggage on Pacifica Radio and the Drug Truth Network. Again, we have with us in studio today a former sergeant with the Houston Police Department, Mister Ed Gonzalez. He's now a recently retired as a city council member, but he's running for sheriff, right here in Houston, Harris County. Mister Gonzalez, how are you, sir?

ED GONZALEZ: I'm fantastic, thank you for having me. I appreciate all your work.

DEAN BECKER: Well, thank you sir. Yeah, I'm looking at, I got this off your website, and you, first thing I see here, you know, you certainly want new leadership at the sheriff's office, but you point out you want to root out cronyism, and corruption, in the agency. And I want to just preface this, your response, with this thought. The drug war, $370 billion a year and it's been reported that about half of that goes towards corruption. Now, I'm not pointing at the sheriff's department, I'm not pointing at any one person, but I'm just saying, that's a lot of money to corrupt the situation, is it not?

ED GONZALEZ: Oh, absolutely. There's a lot of wasteful spending, and definitely a lot of impacts, not only to society, but also to budgets, and so, that's why I definitely feel that reform is needed.

DEAN BECKER: Yes, sir. And that's the point. It's been reported that at least a trillion US taxpayer dollars have been invested into the drug war over the years, some say it's as much as three trillion. But the fact of the matter is, the results have not been the bonanza that we were anticipating. Am I right?

ED GONZALEZ: Absolutely, yeah, we spend approximately $80 billion a year in this country incarcerating folks for one thing or another, and that does not even include the full cost of the criminal justice system, that's basically just incarceration. It doesn't have anything to do with the judicial side, the police officers, and we still have crime. We still have drug use occurring, and so again, we need to definitely rethink what's happened, especially over the last 40 years.

DEAN BECKER: Yeah, and, okeh, the next one on your website says you want to clean up the jail and increase transparency, and I would applaud that, sir. Tell us how you would do it.

ED GONZALEZ: Absolutely. Well, I think sharing data, I think, is very important. There's very limited data to see where some of those arrests are coming from, because if you were to see the origin of a lot of those arrests, you would see how it disproportionately impacts for example minority communities. And so, no one's really making those arguments, and so there's a key policy need, you know, for change there, because it's really impacting a lot of, again, communities of color. And also, making sure that being inside the county jail should not be a death sentence. You know, they have a right to due process, we have individuals simply

awaiting bail, and half the time they're in on a simple misdemeanor while they await trail or couldn't make bond. We need to do better that that, it's the 21st century, we should have the right safeguards in place.

We see the situation with the rape victim that was recently incarcerated, and some of the abuse that occurred over those twenty plus days. You know, you would think that with all that's happened, that we would have the right checks and balances, and that something would sound an alarm to bring intervention quicker to eliminate some of those things, but yet we still see incidents like that occurring.

DEAN BECKER: Yeah. It's, it is an outrage, yes sir. You mentioned the word bail, and I saw a recent, I forget what level it was at, but a Justice Department ruling indicating that to prevent people from making bail because they don't have the money to make bail is unconstitutional. Your thought in that regard, please.

ED GONZALEZ: Yeah, I agree with that. I think there are simply many people inside the jail today that are just poor, you know, and can't make bail, and again, that impacts society because those that are gainfully employed perhaps lose their employment, and keep in mind that they're not yet proven guilty, you know. They should have their day in court. It just creates a lot of impacts, and it's kind of a debtor's prison, if you will, you know, and so, we definitely need reform on that front as well. And we need to see leadership. I don't hear a lot of leadership occurring, neither from the current administration or many others out there. We need voices that are speaking of reform and change.

DEAN BECKER: Yes, sir. Again, we're speaking with Mister Ed Gonzalez, he's the Democratic candidate for sheriff in Houston, Harris County. I wanted to bring up something that's a sticking point, a sore point for me. You know, we have many politicians now saying marijuana's too dangerous, we can't legalize it yet, we don't know enough. But the fact of the matter is, you know, like Beto was talking about in his interview, there's 22 US veterans dying every day of the week, 365 days a year, many of them addicted to alcohol, and tranquilizers, and opiates, and it's been proven that for many -- I'm not saying it's a, you know, carte blanche cure, but for many, it is a means where they can at least diminish their use, if not eliminate their use, of these other medicines, if you will. Your thought there, please.

ED GONZALEZ: Yes, I agree, I think too often politicians are just too stuck in the status quo, or the way that things have always been, and I think there is, we're seeing a new wave, if you will, of younger leaders, and I'm not talking in age, as maybe newer leaders out there, that are starting to open up the dialogue, being open to these thoughtful discussions about it, and being more practical, more realistic, to see the cost of simply incarcerating is way too costly, when we look at the real truth, you know, how many people are really dying from a marijuana overdose, for example, and so, let's speak with facts, you know, and not just, and -- again, I think that I'm encouraged by some of the conversations that are out there, you know, I'm very open to this as well, and we just need, again, I think that's why elections matter, because at the end of the day, the more we can bring these forward thinking, progressive thought leaders, that the more hopefully we could see the change that we need, in terms of drug policy.

DEAN BECKER: Yes, sir. And again, speaking of harms, right now, probably today, there's been five or six kids that are picked up by ambulances right here in our fair city, passed out, maybe twitching, maybe some of them have paralysis, because they have smoked that quote "synthetic marijuana" and folks, it has nothing to do with marijuana. But it's sold as Kush and K-2, and Spice, and all these other things. And nobody knows what's in it. We had a situation, what was it, a month and a half ago, I think it was 12 or 15 kids were found in our biggest park, Hermann Park. Passed out, laying in the hot sun, hundred degrees. And most of these kids are probationers, or on parole, homeless. There is a better way. Your thought in that regard, Mister Gonzalez.

ED GONZALEZ: Yeah, well, I think there has to be a better way. I think sometimes, you know, the knee-jerk reaction is always just to criminalize and just to, you know, we've got to start thinking of, you know, what's the education? You know, how do we inform the dangers of some of these dangers that as you said has no relation to marijuana. You know, these are dangerous chemicals that you have no idea what's come into your system, and you know, it's the equivalent almost of poison, you know, I mean, we wouldn't encourage anyone to consume poison, and so, but, the knee-jerk reaction is sometimes just to criminalize or to prohibit

instead of trying to see how do we educate, how do we bring other interventions, how do we look at managed care instead of just simply incarcerating, because we're not solving the problem. They simply come back out and are still either addicted or finding the drug of their choice instead of other options that, unfortunately, aren't available.

DEAN BECKER: Yeah. And to tie that thought with one we were talking about earlier, bail. Those kids, who get, you know, arrested, and can't make bail, many times they, you know, as you indicated, sit there for days, and, if not weeks, and meantime, their car's in the impound. They can't afford to get their car out of -- the cost to get their car out of impound may be worth more than their car. They could have lost their apartment, their job, their girlfriend, relationship with their parents. And then, perhaps, they have to pay probation fees and other fees, and don't have the money, and it just complicates their life, and I'm not saying it's an excuse, but, too often, that leads to other crimes, of burglary, shoplifting, and other such things, which makes your job even more difficult.

ED GONZALEZ: It does. One of the things I really think we need to focus on is just the recidivism rates, because those that are incarcerated tend to come back, and so we need to find a way to cut that flow back into the jail system, in addition to the long list of things you just mentioned, like financial aid, sometimes that could be impacted as well. There's, you know, the lesser educational opportunities, so what's their earning power over their life, and so, it just has so many impacts that we don't think about and we simply sweep them under the rug and, well, let's just incarcerate and not deal with the problem, but we're frankly not dealing with the problem.

DEAN BECKER: Exactly right, sir. Coming down your list here, from your website. Build stronger relationships between law enforcement and the community, and I would preface your response by saying this: it has been the drug war which has destroyed that relationship, which has alienated the two sides. Your thoughts, sir.

ED GONZALEZ: Yeah, I could see that happening. Again, as I mentioned earlier, a lot of the communities that are impacted through a lot of these arrests are minority communities. And so I think that instead of simply, you know, every time we see law enforcement coming it's going to mean some type of potential low level arrest for something minor, it's why not build bridges instead, and really get back to community oriented policing, where we get to know our police officers, our deputies, our law enforcement professionals, where we continue to develop that bond, on both sides as well, where they understand our work better, and we understand the community as well.

Because, look, there's a lot of communities out there that aren't, maybe, none of them would say they're not impacted through all this, but, you know, you're not going to see major arrests happening in certain neighborhoods compared to others, perhaps. And so those neighborhoods really need more of that handholding, more of the building those bridges, and we see across the country right now some of the friction that's occurring in law enforcement. It's very unfortunate, because we need to make sure we're supportive of law enforcement, and at the same time listening to the concerns of the communities.

DEAN BECKER: Yes, sir. Now, again, going down the list of your objectives from your website, I want to combine two of these if I will -- if you will. One is listed as, initiate reforms to offer education and job training to nonviolent offenders in the jail. I think that's great. And you also indicate you want to work together with the district attorney and other partners in law enforcement to increase diversion programs, that will keep us safer and focus our limited resources on violent and repeat offenders. I applaud both of those thoughts. Your continuation of that, please.

ED GONZALEZ: Yeah, I think in law enforcement, we've sort of been misguided now for some time. I think in law enforcement, we're trying to find a law enforcement solution to things that simply don't have a law enforcement solution. And three, to prove my point, are poverty, mental illness, and drug use slash addiction. And I think that we need to find other methods to better address that, not through law enforcement means, because our focus should be on rooting out the hardened criminals, the ones that we're truly afraid of, the ones that are, you know, intentionally harming us. We need to make our communities safer, and we're not seeing that, and so we need to find a way to reduce drug arrests, and return the focus. It's very costly, we -- right now in the county, it's a lot less safe because the current administration is siphoning moneys from patrol operations to move to jail operations, just to maintain it. It's creating bad morale because they're severely understaffed, and so we're

contributing to our own budget woes. And at the end of the day, not solving anything.

And so we need to reduce, you know, drug arrests, and a smart, practical approach to doing it, and at the same time making our community safer, because what's happening right now is not making our community safer.

DEAN BECKER: Not by any stretch.

ED GONZALEZ: It's not.

DEAN BECKER: I was wanting to, I don't know, okeh, I'm just going to jump to the next section here, and, this is something I want you to explain to the audience, please. You led the creation of Houston's Sobering Center. And again, I applaud you for that. Too often, we think people who use drugs and or alcohol are scumbags unworthy of respect. That's just not the case, is it?

ED GONZALEZ: Well, it's not the case. We've seen a great amount of success with the Houston Sobering Center. It's been college students, maybe it might be the homeless veteran, it could be a business professional. It could be, sometimes, just somebody that had one drink too many at one of the local special events that we have, like, you know, the rodeo, or cook-offs, and things like that. In the past, they would have been incarcerated. No need to be paying the cost -- into a costly system. Let them go sleep it off. It doesn't go on their criminal record. We're saving taxpayers money. And at the same time, we're at least dealing with a better intervention. And so, it's really been a great model. We've had people visiting it from all over the country, to see how we're doing it. It's not unique to Houston, other cities have tried it as well, and I think that that's a start.

We could also look at further interventions in the future, such as prostitution as well. I think that's another one that could simply, we could find an alternative to incarceration and deal with the root causes that leads to some of that behavior.

DEAN BECKER: Prohibition hardly works anywhere it's ever been tried. I'm Dean Becker, we have in studio with us Mister Ed Gonzalez, former sergeant with the Houston Police Department and a city councilmember. Ed, we're wrapping it up here, but I want to ask you, you know, what are some of the first things you would do, were you elected sheriff?

ED GONZALEZ: Well, you know, of course, immediately is getting our hands over the staffing issues. We're severely understaffed, especially in jail operations. I would, and I think that's important because it's really costing a great amount of overtime, that's being pulled from patrol operations, and so we're not keeping our community safer.

I would do a full evaluation as well about our current drug policy here, the type of arrests we have, and how could we continue to bring that back. You know, I know there's intervention programs that sometimes could be given as an alternative to incarceration. Seattle LEAD program is one that I would look at, that I'm a proponent for, and I know that studies have already been done that will show the cost savings here, to Harris County, so I would immediately try to implement programs like that. And seeing how we could continue to reduce trace amounts as well.

And so continuing down that track, and again, doing a full evaluation so the public knows we're being methodical about it, it's not just, you know, impulsive, and that we could show the data and the cost savings, and how we'll use those cost savings to put into more important operations, like clearing backlogs of cases that aren't being investigated, like robberies, and sexual assaults, and the like.

And I think that's what people want, and that's a better way of making things safer.

DEAN BECKER: Well, I hear the DA candidates, they talked about it last go around, and they're looking at it again, but you know, we have a law on the books here in Texas, you no longer have to arrest anybody for under four ounces of weed, which is a big, fat bag, y'all. And yet, and yet, we continue to do it, about a, well it's less than a thousand now a month, I hear the DA has given a few probably white folks a second chance. But the fact of the matter is, we still have somewhere near a thousand, every month, going into that jail, overcrowding it as you speak, and we could diminish that problem greatly if we were to just recognize the law that's on the books. Your thoughts, sir.

ED GONZALEZ: It's already on the books and we're not using this tool, and so when we talk about, you know, we're shipping inmates to other states, very costly, you know, we can't manage our current population. Well, that's because we're not using the tools available to us to reduce the population that we currently have. And there's a law available to do it. I'm going to use every tool available, and do it methodically. We're going to do an assessment of all the arrests we make, but, you know, we could do better.

DEAN BECKER: All right. Again, we've been speaking with Mister Ed Gonzalez, running for sheriff of Harris County. Next week, we'll have as our guest the current sheriff, the Republican candidate, Ron Hickman. We'll also hear from Neil Woods, he heads up Law Enforcement Against Prohibition in the UK and he's the author of a great new book, Good Cop, Bad War.

And that's about it, folks, as always I remind you, because of prohibition you don't know what's in that bag. Please be careful.

PX 13(k)



Make My Homepage          Sign In | Sign Up

# 'Freezing crook' arrested day after release — but Christie defends bail reform

By **Sergio Bichao** February 13, 2017 8:31 PM

---

| f  Share on Facebook | 🐦  Share on Twitter |

**Subscribe to New Jersey 101.5 FM on**

*New Jersey 101.5 video*

TRENTON — A few hours in jail wasn't enough to chill a burglary suspect rescued from a snow pile, who police say has vowed to commit more crimes after being released from custody.

George Pescavage Jr., 47, who was found **bleeding and nearly frozen to death** Friday after allegedly breaking into a South Brunswick liquor store, has become the latest poster boy for what some critics see as bail reform's failure.

A day after Pescavage was released from jail Saturday, police in North Brunswick say he went on to try to break into a Quick Aid Pharmacy in their township.

**In a post on Facebook**, police said Pescavage "indicated to Detectives that even he couldn't believe that he was plainly released after just four hours" and that "if he is again released so soon, he will again commit a similar crime in order to get by."

The department is among a growing number of **law enforcement officials who are sounding the alarm** about the state's bail reform efforts.

But Gov. Chris Christie says much of the criticism is "ridiculous" propaganda "crap" posted online by the state's bail bondsmen, who face extinction under the new rules.



George Pescavage Jr.'s South Brunswick mugshot, left, and North Brunswick mugshot.

"The bail bonds community has made a fortune over the years predominantly on the backs of poor people in New Jersey," Christie said Monday on New Jersey 101.5's Ask the Governor. "We are now stopping them from doing it and they're pissed. Too bad. You shouldn't be making money off the poor that way."

The state last month moved to a new bail system that allows judges to keep people accused of violent crimes behind bars before their trial. The rules also allow judges to release the vast majority of criminal defendants without bail.

The previous bail system only allowed judges to consider flight risk in setting bail. As a result, wealthy defendants charged in violent crimes were able to spring free from jail while poorer defendants facing nonviolent charges languished behind bars waiting for their trial.

Christie said the reforms are saving "tens of millions of dollars" for counties who now have to house fewer inmates.

"They are not being released on nothing more than a promise," Christie said. "They are given bracelets, where if they are not where they are supposed to and they break the bracelet they get arrested. They have officers they have to report to. And these are nonviolent people who are not causing problems when they get out."

*Sergio Bichao is deputy digital editor at New Jersey 101.5. Send him news tips: Call 609-438-1015 or email* **sergio.bichao@townsquaremedia.com**.

## Sign up for the NJ1015.com Newsletter

Get the best of NJ1015.com delivered to your inbox every day.

PX 13(l)

 (https://www.texasobserver.org/)

# Poor Judgment

*In Harris County, the indigent defense system works great — for everyone but the indigent.*

His Honor never showed.

Outside Judge Bill Harmon's courtroom, a few dozen men and women in jeans and thin slacks line the hallway. Most sit on the floor, knees propped up, gazing inertly at the opposite wall. A few look at their phones. They have the practiced patience of people often expected to wait.

ARTICLE CONTINUES AFTER ADVERTISEMENT



Down the a[...] toward us, the flat soles of his leather shoes slapp[...] the courtroom doors, which are recessed and shiny, the color of cherrywood. Only after finding them locked does he drop his eyes to the people at his feet. "He's not here yet?!" the suit demands. No one answers.

It's a Monday morning, a little past 9:00. Half an hour ago, this hallway on the eighth floor of the Harris County Criminal Justice Center in downtown Houston was swarmed with people. Now all the other courtrooms have opened, swallowed their subjects, and closed up again. Only the hall folk of Criminal Court at Law No. 2 remain, resigned citizens waiting at the gates of the Honorable Bill Harmon's grim little kingdom.

Harmon's court handles misdemeanors, though like all the cases heard in this building, the charges being leveled are serious enough to incur incarceration. A single day in jail can cost someone a job or create a child care crisis, but the consequences also activate powerful legal rights. The Sixth Amendment, as interpreted by several U.S. Supreme Court decisions in the mid-20th century, guarantees a right to counsel for all defendants charged with crimes punishable by confinement. Those who can't afford an attorney shall have one appointed, the Court ruled in the landmark 1963 case Gideon v. Wainwright. "In our adversary system of criminal justice," wrote Justice Hugo Black for the majority, "any person hauled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. This seems to us to be an obvious truth."

Most Texans hauled into court are indeed poor. Last year, the state appointed counsel in 71 percent of felony cases and 41 percent of misdemeanor cases, according to the Texas Indigent Defense Commission. More than 415,000 defendants qualified for indigent defense services in 2014, and nearly 65,000 of them passed through the Harris County Criminal Justice Center.

**"The horrible irony of this system, is that people are pleading guilty just to get their liberty. And it goes on every fucking day."**

But an unknown number of defendants qualified for help and were denied it. Likewise, an unknown number with appointed counsel were represented by attorneys too busy to do much more than communicate a prosecutor's plea deal. In either case, defendants are deprived of the Constitutional guarantee to what the U.S. Supreme Court describes as a "vigorous defense."

These injustices are hard to quantify for the same reason they're easy to commit: The state exercises almost no oversight of indigent defense, and most counties still administer their programs through an antiquated process rife with conflicts of interests. Most counties, including Harris, pass the responsibility down to individual courtrooms. The judicial appointment system lets judges decide which defendants will receive appointed lawyers, which lawyers will get indigent appointments, and how many cases these lawyers will be assigned. There are plenty of little administrative rules, of course, such as attorney pay rates and minimum qualification. And, as required by state law, Harris County has an official indigent defense plan that codifies exactly how judges are supposed to evaluate whether a person is poor enough to be entitled to appointed counsel. It instructs judges to consider a defendant's debts, expenses and dependents when determining indigency.

But that's all on paper. Here in the hallway, inside the courtroom, and even *in absentia*, Judge Harmon makes the rules. And Harmon's rules are among the harshest in Harris County, a place not known for its equitable criminal justice system. More than half the defendants now waiting for Harmon have come to court without an attorney, and many believe they'll be appointed one. None of them will.

After a while, the tension in the hallway begins to thaw. The group chats quietly about parking — one person had found a $7 spot while another, desperate not to be late, had pulled into the nearest lot and paid a despair-inducing $20. Several people had made sure to get here early, before 8:00, to be ready for docket calls at 8:30 and 9:00. Punctuality for this morning roll call of court cases is crucial. A defendant who gets caught in the snaking security line in the lobby and arrives a few minutes late could, at

the judge's discretion, be sucked speechless and be whisked back to jail without so much as a chance to explain, or they might be forgiven without a word. The hallway consensus is, better safe than sorry.



*Photo by Johnny Hanson*

Judge Bill Harmon sits next to a wall of family photographs in his judge's quarters at the Harris County Criminal Court at Law No. 2.

Some appointed lawyers and other advocates of the judicial appointment system say it's the best way to meet the enormous logistical and financial challenges posed by indigent defense. But critics claim it's deeply flawed, both in theory and in practice. Because judges are rewarded for clearing cases quickly and attorneys must stay in a judge's good graces to keep getting work, the judicial appointment system appears to pit the interests of judges and lawyers against the rights of the accused. In practice it's even worse, say many attorneys. When indigent defendants are denied counsel, they

have no recOthers keep coming back to court,
lawyer-less and ... back in jail, they're likelier to be
appointed counsel.

Around 9:30, the suited man from earlier returns and tries the doors again, apparently
not tipped off by the floor crowd. But finding everything still locked, he stalks away
again, snarling, "I've never seen such bullshit in my life…" He doesn't seem used to
waiting.

A spindly young woman sitting across from me smiles. "It's always like this," she says.
"I been to this court four times already and it always starts late." A few others nod. "He
won't even be there when the doors open, either," she adds.

A staffer unlocks the doors around 10:00. He offers neither reason nor apology for the
delay, and no one asks. The group rises, stretches and gathers itself, then crowds,
trudging, into the courtroom looking like a line for the world's bleakest roller coaster.
Inside, they settle on wooden benches and again put on their waiting faces. Harmon's
bench is vacant, as predicted, but along the right wall half a dozen staffers chat and
shuffle papers contentedly. About 6 feet in front of the benches, a passel of prosecutors
bustle over files and talk about their weekends. One informs another, "This court never
starts before 10."

**More than half the defendants now waiting for Harmon have come to
court without an attorney, and many believe they'll be appointed one.
None of them will.**

It's not too surprising that some judges make their own hours, but some also seem to
make their own rules. While state law lets counties decide on their own standards and
procedures for determining indigence, it specifies the county apply these standards "to
each defendant in the county equally, regardless of whether the defendant is in custody

or has been placed on bail." Arrest details can be considered in evaluating a defendant's ability to pay, but only alongside myriad other factors and only if the bail posted represents the defendant's own wealth. In other words, if your mom and friends scraped together the money to spring you from jail, that fact can't be considered.

But in Harmon's court, the origin of a defendant's bail — along with all the other criteria established by Harris County to determine indigence — seems to matter very little.

At nearly 10:30, court coordinator Rosario Khalaf announces that she is about to call docket. She asks defendants to stand when they hear their names and state whether they have an attorney present. "If you do not have an attorney, your case will be reset to give you time to hire one," Khalaf says.

Of the 36 people on the docket, only one-third have brought an attorney. Seventeen showed up alone, though two say they plan to represent themselves, and seven are absent.

After docket call, Khalaf summons each lawyerless defendant to her desk to schedule a new court date three weeks or a month away. One such defendant is Victory Holliday, a petite young woman with long dark hair and worried eyes. "What if we can't afford an attorney?" she asks. "I'm a student…" "Once you posted bond, it became your obligation to hire an attorney," Khalaf says. She hands Holliday a few papers and turns to the next defendant. Holliday walks back to her seat in a daze.

With that, she joins the ranks of broke defendants in Harris County left to scrape together enough money to hire their own attorneys, or slip down the path of least resistance to plea deals and jail.

T exas was once a pioneer of indigent defense. as early as 1857, the Texas Code of Criminal Procedure instructed courts to appoint attorneys for poor defendants in criminal cases — more than a century before the U.S. Supreme

Court would declare soon. But despite its statutory head start, Texas lagged behind most of the rest of the nation on indigent defense. The state government provided no administrative, regulatory or financial support to the counties, let alone accountability, until 2001, even as various studies ranked Texas among the worst in the nation at protecting the rights of poor defendants.

Only after three uniformly damning reports on Texas' indigent defense system came out in quick succession, around 2000, were state lawmakers sufficiently shamed or inspired to act. One report (http://docplayer.net/980366-Muting-gideon-s-trumpet-the-crisis-in-indigent-criminal-defense-in-texas.html), from the State Bar of Texas Committee on Legal Services to the Poor in Criminal Matters, summarized the findings of all three when it concluded, after four years of study, "Simply put, the state of Texas is a national embarrassment in the area of indigent legal services."

The Texas Legislature took its first stab at reform in 1999, passing a bill that would have begun dismantling the judicial appointment system. But it was vetoed by then-Governor George W. Bush. In the next session, lawmakers tried again, but much more gingerly. The Texas Fair Defense Act of 2001 didn't tell counties what their indigent defense plan had to be, but it instructed them to have a plan and to nail down particulars such as pay rates and attorney qualifications. The bill also established a legislative Task Force on Indigent Defense, which later became the Texas Indigent Defense Commission. This commission has some carrots to help counties improve their indigent defense programs, including gentle guidance and grant money, but it has no stick. It employs only three inspectors to monitor counties' compliance with the Fair Defense Act. Violations could, in theory, cost a county its grant money, but a representative for the commission said this has never happened.

State Senator Rodney Ellis, D-Houston, authored the Fair Defense Act of 2001. He recalls it almost bitterly. "That's what I could get passed," he said. Ellis and others have since eked out improvements but haven't come close to fixing what he says remains the fundamental problem: the judicial appointment system.

"There's an inherent conflict in the judge being in control of who represents an indigent person"  (https://www.texasobserver.org/) and the manager of one team. It's just inherently unfair. It's common sense."

Whenever judges' and defendants' interests conflict, Ellis says, appointed attorneys may have stronger incentives to keep judges happy than to serve their clients. Rub a judge the wrong way, Ellis says, "You won't get another case."

When I describe how Harmon's court staff told defendants that making bail disqualified them from being appointed counsel, Ellis looks dismayed but not surprised. He calls his chief of staff, Brandon Dudley.

"I'm assuming that's a violation of the Fair Defense Act," Ellis says.

"It's certainly supposed to be," Dudley says. "Lots of judges do it. It's just, you know, how do you enforce it? … It's a real problem. That gets into, how do you have that many enforcement tools to monitor this stuff around the state?"

Dudley sighs, concluding, "They use it as a way to make people plead."

Texas courtrooms are basically fiefdoms. Trial court judges such as Harmon win four-year terms in partisan elections, have no term limits, and are supervised by a single disciplinary body: the State Commission on Judicial Conduct, which is responsible for investigating complaints and monitoring the behavior of every judicial officer in Texas. Its 13 board members are volunteers appointed by the governor, the Texas Supreme Court and the State Bar of Texas. More than 3,200 magistrates, justices of the peace and municipal, probate, district, county, retired and associate judges in Texas answer to a commission with a staff of 14.

Guilty pleas are important because for some judges, speed is the name of the game, and nothing clears a case faster than a guilty plea. Trial court judges are assigned thousands of cases a year and are evaluated, formally and informally, on how quickly they dispose of them. Each year, the state Office of Court Administration quantifies how

efficiently a court disposes its cases. Harris County is very efficient. Last year, its misdemeanor courts had a clearance rate of more than 100 percent, meaning they disposed of cases faster than new ones came in. Felony district courts were almost as quick, with a clearance rate of 97 percent.

The purpose of the efficiency evaluation is to keep judges from accumulating giant backlogs, especially since such delays could leave defendants stuck in jail for months if they can't make bail. But every virtue, in excess, becomes a vice.

Robert Fickman has practiced defense law in Harris County for more than 30 years and served until recently on the board of directors of the Texas Criminal Defense Lawyers Association. He says judges have come to treat these numbers as objective measures of success.

"The way a lot of judges view themselves and compete with one another is by the size of their docket," Fickman says. "The smaller the docket, the better the judge. And in fact, it's probably the opposite. I've found the smaller docket oftentimes means the crummier the quality of justice."

Fickman is a vocal critic of the judicial appointment system. He says official and cultural bias toward small dockets can pressure judges to appoint attorneys who clear cases quickly, regardless of the quality of counsel they provide.

"There's a certain number of court-appointed lawyers who appear to be appointed primarily for their ability to move the docket," Fickman says. "The trade-off is that the judge is appointing Lawyer X to lots of cases, and in return for the appointments, Lawyer X is moving those cases, which meets the judge's objective."

According to data from the Texas Indigent Defense Commission (http://www.txcourts.gov/media/696160/TIDC-Directors-Report-111414.pdf), 422 attorneys accepted appointed cases in Harris County last year, but some received far



more than others. Ten percent of appointed attorneys took on more than a third of all indigent de... all attorneys who accepted appointments in Harris County last year was 189. For that prolific 10 percent, the average was 637.

In January, the Public Policy Research Institute at Texas A&M University published a groundbreaking study of indigent defense caseloads in Texas (http://texaswcl.tamu.edu/reports/ResearchPlan.pdf). In addition to researching how many cases appointed attorneys are currently accepting, it established a maximum caseload attorneys could be expected to carry while maintaining a minimum standard of quality defense.

The results were startling. The study, "Guidelines for Indigent Defense Caseloads," recommended that attorneys accept no more than 236 of the lowestgrade misdemeanors or 174 of the lowest-grade felonies each year.

According to an *Observer* analysis (https://www.texasobserver.org/study-shows-why-houstons-public-defender-program-is-worth-the-cost/) of Texas Indigent Defense Commission data, more than one-third of Harris County appointed attorneys exceeded these standards. The excesses weren't minor, either. Overall, attorneys who accepted misdemeanor appointments in Harris County last year handled an average of 216 such cases. That's lower than new guidelines, but not by much. It's also badly skewed, because attorneys who took on more than the recommended maximum of 236 cases tended to take on many, many more. In 2014, among attorneys who accepted more than 236 misdemeanors, the average caseload was 495.

In felony courts, the disparity was similar. The average caseload for all attorneys accepting felony cases last year was 119, comfortably under the new maximum of 174. But attorneys who exceeded the recommendation took more than twice the average — 266 felony cases.

CLARK, JOHN ARTHUR
CHEDNOT, GERARD IV

 (https://www.texasobserver.org/)

More than a dozen of the attorneys with felony caseloads above the recommended max in 2014 accepted misdemeanor appointments at the same time. Four also handled appointed capital cases.

To create the caseload guidelines, A&M researchers needed to figure out, for different case types, how much time it takes to develop an effective defense. Using a two-pronged approach, they asked a panel of experts to come up with one set of numbers while, separately, they surveyed hundreds of Texas lawyers and distilled their responses into another set. The two methods yielded impressively similar results. Misdemeanors need around 11 hours of work, the groups agreed, while low-level felonies take around 17 hours. A single high-level felony case usually eats up the better part of a week: 30 hours.

In this context, even one of Harris County's most prolific attorneys seems less ambitious than she appears: Vivian King Dickey, disposed of 44 felony and (https://www.texasobserver.org/) 528 misdemeanor appointed cases in Harris County last year. (Dickey did not respond to multiple requests for comment.) According to the A&M study, even if all the felony cases were lowlevel, that quantity of work should have taken her almost seven years.

At least, that would be the estimate if Dickey only worked assigned cases. But the same legislation that ordered the caseload study, Ellis' House Bill 1138, required attorneys who provide indigent defense to report how much of their work time is spent on assigned cases, as opposed to the more lucrative privately retained ones. Dickey told the Texas Indigent Defense Commission that last year, she dedicated a little less than two-thirds of her time to her 969 indigent clients.

One might assume such huge numbers are a product of lawyerly ambition — attorneys accepting modest numbers of assignments from individual courts but working several courts at once, racking up big caseloads. But an *Observer* analysis (https://www.texasobserver.org/study-shows-why-houstons-public-defender-program-is-worth-the-cost/) found that many attorneys with the biggest workloads took most or all of their assignments from a single judge. Misdemeanor judges have several options for how to distribute their indigent cases. Some rotate through a number of favorite attorneys; others contract with a few lawyers to handle all indigent cases each Monday for six months, or every day for two weeks, a month, or more.



(https://www.texasobserver.org/)

*Jen Reel*

Criminal defense lawyer Robert Fickman in his Harris County office.

Harmon keeps by far the smallest roster of appointed counsel in Harris County. Last
year, he distributed all 2,451 of his assigned cases among just 10 attorneys. The lion's
share went to Jorge Cantu and Mekisha Walker, who are contracted to represent
indigent clients in Harmon's courtroom every day it meets. In 2014, Cantu and Walker
accepted more than 750 misdemeanors each — more than three times the maximum
recommended by the Public Policy Research Institute study.

When asked about his huge 2014 caseload, Cantu concedes, "When you look at pure
numbers, they're high. I'm not going to argue with you or dispute that." But those
statistics don't tell the whole story, Cantu says. "It just depends on the kind of cases.
Probably half of them are, a driver's license was invalid or something like that. … We
want to make sure there was probable cause and just the basic stuff, but it's real simple
to ascertain which [cases] you're going to need to spend more time on."

Cantu says his income is not a secret, and neither are his totals as well. "We're in this court every day," he says... compared to other people." And he notes that he and Walker can't turn down cases unless they've hit the legal cap of seven new appointments per day. "That's part of the deal we have with the county," he says. "Only when we get to seven can we say no."

Cantu says that critics of high caseloads don't understand the role contract attorneys play in making indigent defense feasible. "The county's saving a lot of money" by paying him per day rather than per case, he says. Indeed, last year Cantu made a little more than $67,000 from Harmon's court, which averages out to about $88 per case. Meanwhile, non-contract appointed attorneys in Harris County misdemeanor courts were paid from $50 to $90 per hour.

If the county wants to set annual case limits or lower the daily cap on new cases, Cantu says, "That's fine. Don't give us seven cases." But limiting caseloads would mean hiring more attorneys. "Who's going to pay for it?" he asks. "That's the bigger question."

No matter how a lawyer gets so many cases, he or she better work them fast. And the fastest way to clear a case is for the defendant to plead guilty.

And plead they do. The indigent defense caseload study found that appointed attorneys had strong incentives to pressure their clients to accept plea deals regardless of actual guilt. "High caseloads contribute to a 'meet and plead' system that can result in serious incidents of attorney error," it notes.

Last year, defendants in 57 percent of Harris County's 69,000 trial-level misdemeanor cases pleaded guilty, as did almost half of the 40,000 felony defendants.

In some cases, appointed attorneys have more than incentive to urge their clients to plead. They also have leverage: jail.

"The way it [work] is, the [associate] lawyer will talk to the [district attorney], the DA will tell the [offer] [associate] lawyer. He'll go back and convey this offer to the defendant," Pickman says. "It almost always boils to this: that they're offering you X, which means if you plead guilty you'll get out of jail in so many days. Or we can reset [delay] your case, if you want to fight it, and you'll end up spending more days in jail. It's a hostage choice — it's not a choice at all. These are poor people who need to get back out and try to feed their families. So what do they do? They plead guilty. They're not pleading because they're necessarily guilty but because they're getting their liberty. The horror, the horrible irony of this system, is that people are pleading guilty just to get their liberty. And it goes on every fucking day."

Besides needing to keep judges happy by clearing dockets, appointed attorneys have powerful financial reasons to churn through cases. Appointed counsel earn a pittance compared with even the cheapest private attorneys' rates. So the only way to make a decent living doing indigent defense is to accept high caseloads. Because appointed attorneys are usually paid flat rates, every extra minute spent improving the quality of his defense hurts his bottom line.

Joshua Hill knows this from experience. Last year, Hill had one of the highest appointed caseloads in Harris County. He accepted two six-month contract assignments from county courts, served them back-to-back, and says he won't be repeating it any time soon. "Right now, I'm no longer doing misdemeanor appointment work," he says. "I don't know if I'm ever going to again."

Four or five days a week, every week, judges assigned Hill up to seven new clients a day. He says that with such a caseload, he had to fight to maintain his ethical standards. "I can't speak for everybody who does appointed work. Some of them are great. I'm sure some aren't as conscientious," Hill says. "But every case I was appointed on, I treated it the same as if it were somebody who had hired me, as if it were a close friend." He burned out after a single year.

Hill disposed of 736 misdemeanors in 2014. "With that kind of volume, it just wears on you.  (https://www.texasobserver.org) ing up and doing the work and not just pushing things through the system, it gets difficult. It takes too much out of you."

**The output of Harris County's most prolific attorneys seems less ambitious than impossible. One attorney, Jeanie Dickey, disposed of 441 felony and 528 misdemeanor appointed cases in Harris County last year.**

Fortunately, there are other ways to handle indigent defense. A few floors above Harmon's courtroom is the Harris County Public Defender's office. Founded in 2011, it handles a small percentage of indigent cases but gets impressive results. While misdemeanor judges have several options for distributing appointed cases, felony court judges in Harris County are supposed to use a "wheel system," meaning they pick attorneys to appoint from a randomized list of qualified counsel that's generated for each assigned case. The Harris County Public Defender appears on the "wheel" list like any other individual lawyer, so its attorneys handle a variety of felony cases. But it also takes on some juvenile and appellate cases, along with all of Harris County's misdemeanors that may involve mental illness.

The Harris County Public Defender gives its attorneys strictly enforced caseload limits and pays a salary independent of their caseload, taking away any incentive to accept more cases than they can effectively defend. Their office also pays for its own supplemental resources such as expert witnesses and outside investigators. Such resources can flip the fate of a case, but regular appointed counsel have to request them from the same judge that appointed them counsel and will hear the case — a judge that might consider these resources a waste of the court's time and money.

A 2013 evaluation (https://csgjusticecenter.org/wp-content/uploads/2013/09/Final.Reentry-and-Employment.pp_.pdf) by the Council of State Governments Justice Center revealed that these differences in administering

Case 4:16-cv-01414   Document 343-4   Filed in TXSD on 06/12/17   Page 163 of 201

indigent defendants affect case outcomes. Felony defendants represented by the Harr̶i̶s̶ ̶C̶o̶u̶n̶t̶y̶ ̶P̶u̶b̶l̶i̶c̶ ̶D̶e̶f̶e̶n̶d̶e̶r̶'̶s̶ ̶O̶f̶f̶i̶c̶e̶ ̶(https://www.texasobserver.org/) quitted three times as often and misdemeanor clients with mental illness saw their cases dismissed five times as often. And both felony and misdemeanor clients were more likely to have their cases fought at trial rather than pleaded.

Alex Bunin, chief public defender for the office, says the findings make sense. Besides the inherent conflicts of interest, putting judges in charge of assigning and evaluating appointed counsel is a time-consuming job if done correctly. "There's no oversight as to any individual lawyers except each judge's ability to say, 'I'm no longer going to appoint this lawyer,'" Bunin says.

So what's to stop judges from appointing attorneys they know violate clients' rights?

Bunin thinks for a moment. "Right now, there's no mechanism other than the judge's own conscience," he says.

Back in County Criminal Court No. 2, Khalaf finishes resetting the court dates of everyone who arrived without a lawyer. But they can't leave, because a judge must sign their paperwork and Harmon is still absent. They wait and wait. Around 12:30, Khalaf gets a call saying Harmon isn't coming today. She doesn't tell the defendants; I only know because I overhear her asking another staffer to call around and find a replacement. No one seems surprised or concerned. Khalaf doesn't volunteer a reason that Harmon is out, and nobody asks.

I made three trips to Harmon's court, months apart, to see if the procedures I originally witnessed were repeated. They were. Harmon himself was consistent, too, failing to appear on any of the days I attended. Nor did he respond to multiple phone calls. In late August, unable to reach him in person or by phone, I finally mailed a certified letter to his courtroom, but Judge Harmon was on vacation when the letter arrived. At press time, he remained so.

Emily DePrang is a freelance writer in Austin.

 (https://www.texasobserver.org/)

by Emily DePrang (https://www.texasobserver.org/author/emily-deprang/)

@deprangy (https://twitter.com/deprangy)

Published

Mon, Oct 12, 2015

at 8:56 am CST

Read More: criminal justice reform (https://www.texasobserver.org/tag/criminal-justice-reform/), Harris
County (https://www.texasobserver.org/tag/harris-county/), Rodney Ellis
(https://www.texasobserver.org/tag/rodney-ellis/), Texas A&M
(https://www.texasobserver.org/tag/texas-am/)

Load 3 Comments

# You May Also Like:



(https://www.texasobserver.org/locked-
limbo-immigrant-detention-trump-ankle-
monitors/)

**Locked In Limbo (https://www.texasobserver.org/locked-limbo-immigrant-
detention-trump-ankle-monitors/)**

*Ankle monitors are preferable to putting immigrant families behind bars. But the devices interfere with daily life and ~~can traumatize families~~ as ~~much as~~ an alternative to detention.* (https://www.texasobserver.org/)

by Gus Bova (h~~ttps://www.texasobserver.org/~~)



(https://www.texasobserver.org/texans-how-to-fight-back-trump/)

### Four Texans on How to Fight Back in the Age of Trump (https://www.texasobserver.org/texans-how-to-fight-back-trump/)

by Glenn W. Smith (https://www.texasobserver.org/author/glennsmith/) , Greg Casar (https://www.texasobserver.org/author/greg-casar/) , Ronnie Dugger (https://www.texasobserver.org/author/ronnie-dugger/) and Sarah Slamen (https://www.texasobserver.org/author/sarah-slamen/)



(https://www.texasobserver.org/response-observer-report-lawmaker-proposes-ban-donations-lieu-prosecution/)

### In Response to Observer Report, Lawmaker Proposes Ban on 'Donations' in Lieu of Prosecution (https://www.texasobserver.org/response-observer-report-lawmaker-proposes-ban-donations-lieu-prosecution/)

*A bill introduced Thursday by state Representative Mike Lang would ban prosecutors from accepting gifts and donations from defendants.*

by Patrick Michels (https://www.texasobserver.org/author/patrick-michels/)

Popular Articles Nav

 (https://www.texasobserver.org/)

**1**   Anatom[y] ...g/anatomy-tragedy/)

**2**   Texas Republicans No Longer Hiding Behind Claim of Women's Health in Effort To Criminalize
Abortion (https://www.texasobserver.org/texas-republicans-no-longer-hiding-behind-claim-
womens-health-effort-criminalize-abortion/)

**3**   Border Patrol Takes 'No' for an Answer at Internal Checkpoints
(https://www.texasobserver.org/border-patrol-takes-no-for-an-answer-at-internal-checkpoints/)

© 2017 The Texas Observer. All rights reserved.

Privacy Policy (https://www.texasobserver.org/privacy/)

Terms and Conditions (https://www.texasobserver.org/terms/)

f (https://www.facebook.com/texasobserver)   🐦 (https://twitter.com/TexasObserver)

✉ (https://www.texasobserver.org/contact/)   reddit (https://www.reddit.com/domain/texasobserver.org/)

g+ (https://plus.google.com/+texasobserver/posts)

PX 13(m)

HOUSTON

# Study: Inmates who can't afford bond face tougher sentences

**By Lise Olsen, Houston Chronicle**  |  September 15, 2013

Criminal defendants too poor to bail out of jail prior to trial typically end up with a harsher punishment in Harris County than those with resources to pay for their freedom, according to a new study of more than 6,500 cases.



Photo: Houston Police Department

Johnnnie Mason, then 55, declared his innocence in March 2012 after his girlfriend claimed he hit her with a board. Mason, an African American who was homeless, was held without bond for eight months before being acquitted of felony assault charges. A new study shows that African Americans spend more time in jail prior to disposition of their cases in Harris

County than other offenders. Photo: Houston Police Department

Real News.
Real Trust.
Real Community.

Finding the truth begins each day with the Houston Chronicle.

To continue reading this story

Subscribe Now

## SIGN IN

Email address

Password

☐ **Show password**                    **Forgot password?**

☑ **Keep me signed in**

**SIGN IN**

By signing in, you agree to our
**Terms of Service** and **Privacy Policy**

 **Lise Olsen**

 Investigative
Reporter, Houston Chronicle

---

**HEARST** *newspapers*

© 2017 Hearst Newspapers, LLC.

PX 13(o)

# Cash bail under fire as discriminatory while poor inmates languish in jail



Cook County Sheriff Tom Dart discusses the state's broken bail system and proposes ways to make the public safer and the criminal justice system more fair during a press conference at the Cook County Department of Corrections Division 11 on Nov. 15, 2016. (Antonio Perez/ Chicago Tribune)

By **Steve Schmadeke**
Chicago Tribune

NOVEMBER 15, 2016, 7:16 AM

A few days before last Thanksgiving, James Williams Jr. was arrested on charges of selling $40 worth of cocaine to an undercover Chicago police officer in the West Englewood neighborhood.

Low-level drug offenders in Cook County are typically freed on bail without posting cash, but in court the next day, a judge ordered Williams held on $10,000 bail. That meant he needed to come up $1,000 cash to win his freedom.

Nearly a year later, Williams, 44, is about to spend another Thanksgiving in Cook County Jail, still unable to pay the bail. In the year he's been incarcerated, he lost his job as a cook, his sister died, his

girlfriend gave birth to their son and the couple lost their car, according to his girlfriend, Kareem Williams.

"For $40, it seems like he's served his time," she said of Williams, who is still awaiting trial. "He needs to come home."

The cash-bail system has increasingly come under fire nationally and in Chicago as discriminatory, stranding largely indigent, minority defendants for months as they await trial for nonviolent offenses. It was designed to ensure that defendants don't flee before trial, but critics say judges, in deciding on the amount of the cash bail, don't always know a vital detail — how much money a defendant can raise.

On Tuesday, Sheriff Tom Dart, whose office runs the jail, is calling for abolishing the state's cash-bail system just days before the County Board has scheduled a hearing to overhaul how the county sets bond.

Cara Smith, Dart's policy director, confirmed that the sheriff's office is drafting legislation that would allow judges to assess whether a defendant should be held in custody or released under conditions that include electronic monitoring. The specifics are still being worked out, but Smith said the state would need to invest more in court services to help judges make better bail decisions and improve monitoring of those freed pending trial.

While persuading legislators, judges and other players statewide promises to be a mammoth task, Smith said the current system unfairly penalizes low-level offenders and allows freedom more violent offenders with access to cash.

She said the jail had a record 1,024 inmates last year who spent more time in custody than the length of their ultimate sentence.

"We need to use the jail for people who pose a risk to the public, not use tax dollars and jail space for people who don't have $100 or $500," Smith said.

Last month, on the heels of similar lawsuits in eight other states, advocates filed a proposed class-action lawsuit in Cook County Circuit Court alleging that criminal court judges routinely set cash bail at unaffordable levels, depriving arrestees of their constitutional right to pretrial liberty.

"This is wealth discrimination," said Locke Bowman, executive director of the MacArthur Justice Center at Northwestern University Pritzker School of Law and one of the attorneys involved in the lawsuit.

Days later, the Illinois Supreme Court quietly announced it would work with a national nonprofit over the next four years to launch pretrial screening programs — such as ones already underway in Cook County and a third of the state's 24 judicial circuits — throughout the state to help judges determine which defendants can safely be released while awaiting trial.

The expense for taxpayers has been significant — a year's stay in the jail for an inmate with no serious mental or health problems is estimated to cost about $60,000, according to a county study.

County and jail officials say the use of pretrial screening and the expanded use of electronic monitoring has helped drop the population at Cook County Jail to about 8,000 after swelling to more than 10,000 as recently as three years ago.

County Board President Toni Preckwinkle, who has been critical of too many nonviolent offenders clogging the jail, has said she believes further bond court reforms could bring the jail's population down to about 6,000.

Chief Judge Timothy Evans said the state's bond statutes lay out as many as three dozen factors for judges to consider in setting bail. Moving to no-cash bail would require legislative action to put less emphasis on keeping defendants locked up, he said.

"I know many people are jumping on this bandwagon now, but if I had my way, we wouldn't be relying on any money bails at all," Evans told County Board commissioners last month.

Two bond court judges, who asked not to be named because of the ongoing lawsuit, said they've unfairly been placed under a political spotlight. They took great offense at being labeled discriminatory or racist, saying each case is judged on its merits based on the law and the information given to them by prosecutors and defense attorneys.

Some blasted the County Board for spending $500,000 to remodel a busy bail hearing courtroom — construction is to begin in January — at a time when there aren't enough funds to fully staff necessary court services.

If the state moves to a no-cash bail system, they said, politicians should bolster electronic monitoring and back the judiciary when, inevitably, a defendant who is released commits a violent crime. Legislators also should allow judges to keep their discretion because new screening tools to help assess a defendant's risk of re-offending and failing to appear in court aren't perfect, the judges said.

"We shouldn't be computers — every case has a different set of facts," one judge said.

Even with cash bonds, defendants who win release sometimes commit violent crimes.

Jaques Bryant was arrested last fall after police on patrol heard several shots and found him on the West Side with a loaded .38 Special revolver. The assessment tools found that Bryant, then 19, was low risk for re-offending or failing to appear in court, records show.

The algorithm also did not flag Bryant, who had no violent convictions in his background, as more likely to commit a violent crime. A judge ordered him held on $40,000 bail, a high bail for such low risk factors. But Bryant was able to put up the cash.

Last month, Bryant, who has the words "God's Gift" tattooed on his chest, was arrested again and charged with attempted first-degree murder. He is accused of shooting a teenager on the West Side, records show. This time, a judge set his bail at $750,000.

Records show that the screening tool ranked James Williams Jr., the man charged with selling $40 worth of cocaine, as much more of a risk than Bryant. He has three prior violent convictions over the past 26 years, according to records.

Michael Tardy, director of the Administrative Office of the Illinois Courts, said the state Supreme Court hasn't taken a position on shifting to no-cash bail but noted the practical outcome of expanding the use of pretrial screening would "be less reliance on cash bail — so there will be an evolution in the system."

"The people who don't get out (of jail) are the people of color or in poverty," he said of the system now in place in many Illinois counties. "And that's the only risk that they (pose) ... they can't post bond."

As many as 300 inmates in Cook County Jail are locked up because they can't even come up with $100 cash to post bail, according to sheriff's officials.

The "raft of human misery that we see in some of these cases" should compel elected officials to find solutions "even a little outside our comfort zone," Cook County Commissioner Bridget Gainer, D-Chicago, said at the County Board hearing.

It's a stark contrast to the federal system in which defendants can post property as well as cash to win their freedom. If defendants flee, the court can order the property seized.

Even advocates acknowledge a switch from the cash-bail system won't be easily accomplished, in part because of necessary legislative changes and significant cost shifting.

The cash bonds are often used as payment to criminal defense lawyers once a case has been concluded — and to cover part of the fines or fees assessed by judges as well as the 10 percent that

goes to cover the expenses of the circuit court clerk's office. If defense attorneys lose that key revenue source, more cases could go to the taxpayer-funded public defender's office.

"From the judicial point of view, I think the argument is compelling," said Winnebago County Chief Judge Joseph McGraw, who chairs the Illinois conference of chief judges. "Looking at the other side of the coin ... a lot of other costs will be shifted if we don't have cash bond."

The lawsuit challenging the constitutionality of cash bonds said Illinois statutes mandate the pretrial release of all defendants except in cases in which a judge determines the release would "pose a real and present threat" to anyone's safety.

The statutes also instruct judges to set bail in an amount "considerate of the financial ability of the accused," but Cook County judges routinely do not inquire about a defendant's financial wherewithal, the lawsuit alleged.

Every afternoon on the first floor at the Leighton Criminal Court Building —— the city's busiest criminal courthouse, at 26th Street and California Avenue — a rotating cast of five judges presiding in two bond courts quickly make rulings with a huge affect on defendants — sorting out who will go home or sit in jail.

Depending on the day, the process can be calm and orderly or downright chaotic.

Last month, a defendant charged with aggravated reckless driving collapsed to the floor after a judge set his bail at $75,000. He would have to post 10 percent — or $7,500 — to be released.

Another shouted, "Crown Town — Latin Kings!" before screaming obscenities at the prosecutor.

In more than half of the cases over a recent two-day period, judges ordered defendants released on their own recognizance without having to post any cash.

"It's almost like trusting an altimeter on an airplane," McGraw, the Winnebago chief judge, said of the balancing act that judges must weigh in setting bond. "You can't see the ground, but you've got to trust your instrument because there is so much you can't see."

*Chicago Tribune's Katherine Rosenberg-Douglas contributed.*

*sschmadeke@chicagotribune.com*

*Twitter @SteveSchmadeke*

Copyright © 2017, Chicago Tribune

CHICAGO

# Class-action suit seeks reform to unjust jail bond system



The Cook County Jail, shown in September 2013. | Sun-Times file

**Mitchell Armentrout**

A class-action lawsuit has been filed by two men seeking reform to a justice system in Cook County that they say keeps minorities unfairly jailed before trial due to unreasonably high bond amounts set by criminal division judges.

The suit filed Friday in Cook County Circuit Court was brought by Zachary Robinson and Michael Lewis, black men who describe themselves as indigent. Robinson has been held at the Cook County Jail on a $10,000 bond since December 2015 for a theft arrest, and Lewis was jailed on Oct. 3 for retail theft, with bond set at $50,000.

Sign-Up for our News & Politics Newsletter  Sign-Up



Detainees must pay a 10-percent deposit to be released ahead of their trials.

This Week's Circulars





HOVER FOR CIRCULAR   HOVER FOR CIRCULAR   HOVER FOR CIRCULAR

They say their bond amounts were set "without a meaningful inquiry into the person's ability to pay" and are representative of many other jail detainees — usually people of color — who don't pose a threat to the community and are only in custody because they don't have the money.



Zachery Robinson (left) and Michael Lewis | Cook County sheriff's office photos



Sponsored by Intel

**Personalized Medicine Is The New Reality for Healthcare. Find out How Providers Can Prepare**

Intel's webinar looks at some of the challenges that personalized medicine will present for provi...

See More

"No alternative is provided for those arrestees who are unable to pay for the amount ordered for their release from custody even though they are eligible for pretrial release," the suit says. Those alternatives should include more releases on electronic monitoring as well as drug and mental health programs, the suit said.

Listed as defendants are judges LeRoy Martin Jr., E. Kenneth Wright Jr., Peggy Chiampas, Sandra G. Ramos and Adam Bourgeois Jr. A circuit court representative could not be reached for comment Tuesday.

The suit also names Cook County Sheriff Tom Dart, who manages the jail. Cara Smith, chief policy officer for the sheriff's office, said she expects that to be dismissed from the suit because they "have no choice but to accept people placed into our custody." She agreed with the suit's description of the bond system as "disgracefully unjust" and said she hopes the suit supports reforms the sheriff's office has pushed to ease overcrowding at the jail at 26th Street and California.

"We've gotten very far away from the purpose and intent of our bail statute, which says that if your presence in the community is a risk, you can't be released," Smith said. "What we instead done is operationalized our bond system in a way that has a crushing effect on the poor."

Smith cited the example of Ryan Hanley, a detainee who died of a terminal illness on Monday, four months after he had been charged with felony theft for stealing less than $300 worth of baby formula from an Avondale neighborhood Jewel-Osco and couldn't post $5,000 to bond out.



Ryan Hanley | Chicago Police photo

"For someone who is terminally ill and has no place to live, we've essentially put him in a no-bond status," Smith said.

As of Friday, 221 people were being detained on bonds that required deposits of $1,000 or less, including several who would need just $100 to get out.

"The system was not intended to be oppressive," Smith said.

# Cook County sheriff calls for scrapping cash-bond system

POSTED 3:15 PM, NOVEMBER 15, 2016, BY ASSOCIATED PRESS AND PATRICK ELWOOD, *UPDATED AT 04:58PM, NOVEMBER 15, 2016*



CHICAGO — The Cook County sheriff has called for abolishing Illinois' cash-bond system, saying it's unfair to low-level defendants who can't afford to pay and puts society in danger when defendants with violent backgrounds are freed until trial when posting bail.

Sheriff Tom Dart's statement Tuesday comes days before the County Board has scheduled a hearing to overhaul how the county sets bonds.

Dart spoke inside Division 11, a maximum secured unit of the jail and wants the legislature and Gov Rauner to get on board with his plan, a requirement to change the current state statute.

Dart cited 185 current inmates of 8,133 being housed, all of whom are charged with non-violent crime such as retail theft or criminal trespass as examples.  Those inmates have sat incarcerated for months, sometimes more than a year, because they could not post as little as $1000 bond while simultaneously costing taxpayers at least $150.00 a day.

Conversely, Dart cited Pierre Stokes, the father of 9-year-old Tyshawn Lee, who was gunned down in an alley last year in retaliation as part of ongoing gang war.  Stokes was charged in June of 2014 with aggravated assault and unlawful use of a weapon while on parole.

"He had a $90,000 bond set. He came up with the $9,000," Dart said.  "Then on March 8th of 2016 police say he shot three people at 79th and Ashland. He is now in jail attempted murder charges."

Under current state law, cash bail is to ensure defendants show up for court and don't pose a danger to the community.

Dart's policy director, Cara Smith, says the sheriff's office is drafting legislation that would allow judges to assess whether a defendant should be in custody or released under conditions including electronic monitoring. She says Illinois would need to invest in more court services to help judges make decisions and improve monitoring of those freed pending trial.

Make a difference on
the topic in this article.



SPONSORED CONTENT

# Chile & Argentina Feud

FEB 28, 2017, BY CONNATIX

# Foxx agrees to release of inmates unable to post bonds of up to $1,000 cash



Cook County State's Attorney Kim Foxx on Dec. 5, 2016. (Nancy Stone / Chicago Tribune)

By **Steve Schmadeke**
Chicago Tribune

MARCH 1, 2017, 8:22 PM

**I**n another sign of growing political momentum for bail reform, Cook County prosecutors will no longer oppose the release of some detainees held on nonviolent offenses simply because they cannot afford to pay cash bonds of up to $1,000 at a time.

The change was announced Wednesday by State's Attorney Kim Foxx, who has been in office for three months. It was quickly praised by a top aide to Sheriff Tom Dart, who has focused on the issue over the last two years as part of an effort to reduce the county jail's population.

"For the first time we have a state's attorney taking a powerful stand on bail," said Cara Smith, the sheriff's policy chief. "I think that's what's really significant here."

**Only 99¢ for 12 WEEKS**
Hurry! Spring Sale ends 3/23

**SAVE NOW ›**

While the immediate impact of the decision will be minimal — affecting just a few dozen of the more than 7,400 inmates now in the jail — Foxx and other county officials said it will make the criminal justice system fairer and more cost-effective.

The expense for taxpayers has been significant — a year's stay in the jail for an inmate is estimated to cost about $60,000, more if serious mental or health problems are at stake, according to a county study.

Foxx said she believes there's "a consensus" that "something (is) out of whack" when some inmates facing violent charges can bond out if they have the cash while indigent defendants charged with nonviolent offenses languish in jail despite bonds sometimes of only a few hundred dollars.

The cash-bail system has increasingly come under fire nationally and in Chicago as discriminatory, stranding largely poor, minority defendants for months as they await trial for often relatively minor offenses. It was designed to ensure that defendants don't flee or harm others before trial, but critics say judges, in deciding on the amount of the cash bail, don't always know crucial details.

Smith, along with top deputies and other staffers from Foxx and Public Defender Amy Campanelli's office, have already identified several dozen detainees who appear to qualify for I-bonds under the new policy, Foxx said in an interview.

The offices are also working together on a set of guidelines so prosecutors are clear when they can agree not to seek cash bond at the initial bond hearing in felony and misdemeanor cases, county officials said. Those changes could have "significant" impact on the jail population, Smith said.

Some 250 to 300 people are jailed every day on average because they can't post $1,000 cash or less, according to the sheriff's office.

County officials are backed in their efforts by Cook County Board President Toni Preckwinkle, who has made bail bond reform one of her top issues. State Rep. Christian Mitchell, D-Chicago, a Preckwinkle ally, introduced legislation last month calling for the end of the cash-bail system, four months after Dart publicly called for abolishing the practice.

Chief Judge Tim Evans has also expressed his preference for replacing the cash-bail system, telling county commissioners at a board meeting last year he would scrap it if he had his way.

Meanwhile, Foxx said prosecutors will agree that the several dozen detainees — many of them jailed on drug or retail theft charges — can be released without posting any cash. But they will ask that a judge — the only one who sets and can change bail — require the defendants to participate in drug or mental health treatment.

"This is a population who are disproportionately poor and also have some other underlying condition whether it's a drug addiction or mental illness," Foxx told the Tribune. "So we're asking ... that they actually go someplace to deal with those underlying conditions."

Foxx and other county officials acknowledged there is only so much capacity in those programs or even for release on electronic monitoring. But Campanelli said putting pressure to increase funding for those programs over jail beds is part of the point.

"We need to force the issue," said Campanelli, who supports replacing the county's cash-bail system with one that decides to hold people if they're deemed to be a danger to others or a risk to flee.

"I am trying to make a 180-degree turn," she said. "For the last 30 years, it's sort of been this idea in Cook County that we should operate on the premise that everybody should be locked up and we let a few out.

"But everybody has a right to bail. Right now we're trying to tweak the system, but we need to start at ground zero."

Late last year, on the heels of similar lawsuits in eight other states, advocates filed a proposed class-action lawsuit in Cook County Circuit Court alleging that criminal court judges routinely set cash bail at unaffordable levels, depriving arrestees of their constitutional right to pretrial liberty.

Days later, the Illinois Supreme Court quietly announced it would work with a national nonprofit over the next four years to launch pretrial screening programs — such as ones already underway in Cook County and a third of the state's 24 judicial circuits — throughout the state to help judges determine which defendants can safely be released while awaiting trial.

County and jail officials say the use of pretrial screening and the expanded use of electronic monitoring have helped drop the population at Cook County Jail to about 7,400 after swelling to more than 10,000 as recently as four years ago.

Preckwinkle has said she believes further bond court reforms could bring the jail's population down to about 6,000.

*sschmadeke@chicagotribune.com*

*Twitter @SteveSchmadeke*

Copyright © 2017, Chicago Tribune

**Only 99¢ for 12 WEEKS**
Hurry! Spring Sale ends 3/23                                    **SAVE NOW ›**

**This article is related to:** Jails and Prisons, Mental Health Research, Medical Research, Tom Dart



**Only 99¢ for 12 WEEKS**
Hurry! Spring Sale ends 3/23

SAVE NOW ›

Case 4:16-cv-01414    Document 343-4    Filed in TXSD on 06/12/17    Page 184 of 201

October 25, 2016

# Facts back Preckwinkle's call for easier bail for low-risk offenders



**GREG HINZ** ON POLITICS



 SHARE     Facebook **36**     Twitter     LinkedIn **0**     Google + **0**



Some critics

Photo by Thinkstock

mumbled that she just was hot-dogging. But Cook County Board President Toni Preckwinkle appears to have some facts on her side when she suggested too many low-level offenders sit in expensive jail cells because they're too poor to make bail.

Preckwinkle and County Commissioner Jesus "Chuy" Garcia **yesterday announced** they'll hold a public hearing aimed at putting some pressure on judges, and maybe lawmakers, to lighten up. Chief Judge Tim





▌ **Editors' Picks**   o


Of the 8,222 people behind bars on Oct. 24, Dart's office says, 298 were being held for failure to post $1,000 or less bond. Included are 62 that need $500, 17 that need $100 and one poor sap who needs just 50 bucks.

That last person is being held for allegedly shoplifting $118.26 worth of shrimp from a Mariano's grocery store. He's been in jail since Oct. 18, charged with retail theft under $300. His incarceration is costing taxpayers $162 a day. In other words, in terms of money, taxpayers would be better off to have reimbursed Mariano's and let the guy go on the first day.

Anyhow, more data:

In 2015, again according to Dart, the county had 1,024 "turnarounds." Those are cases in which a person was held so long awaiting trial that their eventual sentence was shorter than the time already served. Collectively, the excess "dead time" was a stunning 222 years in jail.

Adds Cara Smith, the sheriff's chief policy officer: "So the laws give us tools—to seek a reduction in bond and, if denied, an expedited appeal. We need to use these tools. . . .The bail statute itself directs, 'The amount of bail shall be . . . not oppressive.' I suggest too often we start at oppressive."

Evans' office declined to respond further but noted that its statement yesterday emphasized the use of things like individual recognizance bonds (in which an accused person skips jail time or paying to go free) and electronic monitoring is rising quickly, as much as 67 percent in 2016 from the previous year, and that the number of monetary bonds is decreasing.

| Cook County | Cook County Board | Jesus 'Chuy' Garcia | Tom Dart | More + |

**READ NEXT** ▲

# Man seeks to replace 'hostile' judge



*Anthony Stacey is seeking a new judge in his upcoming trial, saying his bond was unfairly boosted 2,400 percent.*

**Frank Main**

Sign-Up for our News & Politics Newsletter 

A southwest suburban man wants a new judge for his upcoming trial, saying his bond was unfairly hiked from $2,000 to $50,000 despite his inability to pay the original amount.

Anthony Stacey, 37, of Alsip, was arrested April 8 on charges of driving under the influence of alcohol and aggravated battery to an officer. The unemployed roofer remained in Cook County Jail because he couldn't afford to post 10 percent of his $2,000 bond.

Then on May 12, another judge, Kerry Kennedy, boosted Stacey's bail to $50,000, even after a public defender said his mother was ready to post the lower amount. The judge didn't give a reason for raising the bond, according to a transcript.

**This Week's Circulars**





Stacey stayed in jail until he appealed the bond to the state appeals court, which reduced it to $5,000 on Sept. 26. He was freed on electronic monitoring after coming up with $500 to pay 10 percent of the bond.

Stacey's predicament is the kind of case that critics of the current Cook County bond system point to when they say the process is out of whack. Last week, advocates filed suit against the county and others, arguing that the system discriminates against poor defendants.

Stacey's problems started earlier this year after he was allegedly caught speeding while driving under the influence of alcohol in Orland Park. He allegedly hit a guardrail and drove down a hill before stopping.

An Orland Park animal-control officer who was following Stacey with his emergency lights on asked if he was OK and whether he was drunk or high, authorities say. Stacey allegedly responded, "I just want to get in my car and go," and shoved the officer.

The officer pushed Stacey to the ground, but he got up, and the officer then pinned him against Stacey's vehicle until other officers arrived and Stacey was arrested, authorities say.

The officer refused medical treatment. Stacey, who wasn't hurt in the scuffle, had a blood-alcohol level more than twice the legal limit, police said.

This month, Stacey appeared at another hearing before Kennedy. According to a transcript, Kennedy asked Stacey's new lawyer, John Fotopoulos, which three justices were on the appeals panel that lowered the bond. When Kennedy learned the names, he remarked, "Three people who don't do criminal. Interesting."

The three justices were James Fitzgerald Smith, a former Des Plaines city attorney; Cynthia Cobbs, a former director of the administrative office of the Illinois courts, and Terrence Lavin, a former civil trial lawyer.

Kennedy ordered Stacey to undergo a drug test, a condition of his release from jail. The results aren't public, but no one has moved to revoke Stacey's bond based on the results, records show.

On Oct. 13, Fotopoulos filed a petition for Stacey to get a different judge based on Kennedy's "sarcastic comments" and his decision to order the drug test, which Fotopoulos said were evidence of the judge's "hostility" and "ill will" toward his client.

Fotopoulos also wrote that Kennedy didn't follow a recommendation from a bond assessment system that was put in place in mid-2015. The system was a court reform intended to make bond decisions more uniform.

When asked for comment, Kennedy's office referred questions to Cook County Chief Judge Timothy Evans. A spokesman for Evans said state court rules bar judges from commenting about a pending case.

Some critics of the bond system say even more reforms are needed to ensure fair bonds. The Cook County sheriff is proposing to change state law to allow sheriffs to make bond recommendations. Currently, only the judge, defendant and prosecutor have a say.

Cook County Sheriff Tom Dart says too many people are being held in jail because they can't afford the relatively small amounts of bail set in their cases. On Thursday, for example, nearly 300 people were being held in jail because they couldn't raise $1,000 or less to cover their bonds.

Last week, "someone needed $50 to bond out. He spent eight days in jail for trying to steal shrimp from Mariano's because he couldn't pay," said Cara Smith, policy chief for Dart. The man was then given court supervision and released, she said.

"We have to ask what message is being sent when you set a $5,000 bond or a $10,000 bond for someone who doesn't have two pennies to rub together," Smith said. "The law says bond should not be oppressive. I would argue that is the definition of oppressive."

PX 13(p)



HOUSTON

# Lawmakers, judges square off against bail bondsman in push to end cash bail for nonviolent offenders

By Lise Olsen and Gabrielle Banks  |  March 8, 2017  |  Updated: March 9, 2017 8:33am

4

A bipartisan coalition of lawmakers and judges is backing broad pretrial detention reforms in Texas that could eliminate cash bail for nonviolent offenders who are not deemed dangerous or a flight risk.

Legislation introduced this week in Austin would require judges statewide to determine within 48 hours whether a defendant accused of a nonviolent crime might be eligible for a so-called personal bond



SUBSCRIBE TODAY AND GET OUR
Free iPhone App
Get iPhone App

Under the legislation, nonviolent defendants who were detained after the first hearing within 48 hours would be re-evaluated within 10 days. Judges would be required to seek alternatives for those deemed mentally ill or disabled.

The legislation, introduced simultaneously by Sen. John Whitmire, D-Houston, and Rep. Andrew Murr, R-Junction, has been hammered out by jurists and legislators following reports that show more than 1,100 people died in Texas jails in the past decade - most of them pretrial detainees such as Sandra Bland, who committed suicide in the Waller County Jail after being locked up following a traffic stop.

Texas Supreme Court Chief Justice Nathan Hecht, who is backing the measures, said he and other members of the National Conference of Chief Justices of the United States generally have concluded that America's bail bond system "simply doesn't make any sense." He said he'd like to see Texas follow the model of New Jersey, Washington, D.C., Kentucky, Arizona and other states in pursuing reforms that restrict or eliminate monetary bail for defendants who pose no real risks.

Hecht said bail reforms elsewhere already have saved taxpayers' money by eliminating unnecessary jail expenses and spared hardships for low-risk defendants who often lose jobs, homes or their health while being locked up awaiting trial.

"There are constitutional problems, there are practical problems, there's a burden on taxpayers - change is just the right thing to do," he said. "We're just talking about low-level crimes - we're not talking about crimes of violence. So across the country, there's been an effort to change bail procedures to get away from high bond and jail time in all of these low-level crimes."

**TRANSLATOR**

To read this article in one of Houston's most-spoken languages, click on the button below.

Select Language ▼

SUBSCRIBE TODAY AND GET OUR
Free iPhone App
Get iPhone App

"We have a very conservative governor, lieutenant governor, Senate and House," said Michael Kubosh, a Houston City Council member and long-time commercial bondsman. "To get all that through, there's going to be a real battle, and our lobbyists are talking to them. They're not going to want to let crime run rampant and give everybody free bonds."

Kubosh and other industry supporters say bondsmen help make sure low-level defendants appear in court - and track them down when they fail to appear. They say they also get families involved, since relatives often must post cash or property to back bail bonds even when commercial bondsman are involved. He and other advocates are simultaneously monitoring a federal court challenge to a fairly rigid bail schedule used for years by Harris County judges even for low-level misdemeanor offenses.

The bills were introduced a day prior to Harris County Sheriff Ed Gonzalez's testimony in Houston on Wednesday in the federal civil rights case challenging the constitutionality of imposing monetary bail for minor offenses if defendants cannot afford to pay it. The sheriff is among a group of roughly a half-dozen top county officials - including County Judge Ed Emmett and the new district attorney, Kim Ogg - who say the bail system should be restructured so it doesn't differentiate between rich and poor defendants.

Gonzalez told Chief U.S. District Judge Lee H. Rosenthal the pretrial release program as it currently operates is arbitrary, unfair to poor defendants and undermines public safety.

"I personally do not believe it's a rational system," said Gonzalez, a former City Council member with nearly two decades of local law enforcement experience. "It should be equal protection for everyone."

Harris County Criminal Court at Law Judge Darrell Jordan, on the bench since January, also testified Wednesday before Rosenthal about his experience as a defense attorney and now as judge who must make dozens of bail decisions each day. He has begun releasing misdemeanor

SUBSCRIBE TODAY AND GET OUR
Free iPhone App
Get iPhone App

making immediate fixes so that bail is made easier for nonviolent defendants. Rosenthal asked Jordan if he believed the county would stop running a system in which people plead guilty because they are poor without an injunction.

His answer: "No."

In Harris County, 55 people died in pretrial detention from 2009-2015, including defendants arrested for misdemeanors such as trespassing and driving while intoxicated. Among them was a father detained after returning his kids late to his ex-wife in violation of a civil court order, the Houston Chronicle found.

"Had risk-based pretrial release been used a couple of years ago, it would surely have saved Sandra Bland's life," said Sandra Guerra Thompson, a University of Houston law professor in an email supporting the bills. "It might also have saved the life of Vincent Dewayne Young who committed suicide in the Harris County jail the day before Valentine's Day last month."

Whitmire, sponsor of the reform legislation in the Senate, said he is also proposing to seek a constitutional amendment that would empower Texas judges to deny bond to wealthy criminals considered to be extremely violent and dangerous but who under the current system frequently win release after posting bail as large as $100,000 or more. Typically, Texas judges can deny bond in only capital murder cases. Whitmire's proposal would expand that authority to deny bond.

"We've got a real serious problem in this state that we've got people being held in county jails because they can't come up with money for a bond," he said.

"They either sit in an overcrowded jail or something happens to them or they get a payday lender loan or they plead guilty to something they might or might not have done. On the flip side, you've got human traffickers and violent drug dealers that get a high bond but have resources."

×

SUBSCRIBE TODAY AND GET OUR
**Free iPhone App**
Get iPhone App

On any given day, the Harris County Jail is crowded with 1,500 or more misdemeanor offenders awaiting trial. The county has spent more than $1.2 million in legal fees so far defending county court-at-law judges and hearing officers in the federal civil rights case before Judge Rosenthal.

Kubosh, the commercial bondsman, said he agrees that truly indigent defendants often don't get personal bonds in Harris County. But he argues that bondsmen routinely save the county money by helping ensure that those who are released on commercial bond follow court conditions and by tracking down those who fail to appear. With fewer commercial bonds, he argues, "you're going to see a spike in people thumbing their noses at the courts ... you'll see huge increases in warrants."

Videotapes of 2016 Harris County bond hearings, held via videolink 24 hours a day, show that many defendants in misdemeanor cases were never questioned about their ability to pay. Those who ask for personal bonds because of family hardships, jobs or other valid reasons were routinely denied and sometimes treated rudely. The videotapes, including one in which a judge doubled a bond after a female defendant said "yeah" instead of yes," were presented in federal court this week as evidence of unconstitutional activity.

The videotapes also prompted Whitmire to file a formal judicial misconduct complaint that remains pending against several Harris County hearing officers.

✕

SUBSCRIBE TODAY AND GET OUR
**Free iPhone App**
Get iPhone App

TO UNLOCK ACCESS TO IN-DEPTH NEWS AND

PULITZER
PRIZE-WINNING

CONTENT, JUST CLICK HERE

UNLOCK ACCESS



**Lise Olsen**

Investigative Reporter,
Houston Chronicle

**Gabrielle Banks**

Reporter, Houston Chronicle

---

SUBSCRIBE TODAY AND GET OUR
**Free iPhone App**

Get iPhone App

SUBSCRIBE TODAY AND GET OUR
**Free iPhone App**

Get iPhone App

PX 13(q)

Case 4:16-cv-01414    Document 343-4    Filed in TXSD on 06/12/17    Page 196 of 201

DONATE    

| TV 8 | NEWS 88.7 | CLASSICAL | MIXTAPE |

**LISTEN LIVE**

NEWS

# Texas Lawmakers, Judges Push For Major Bail Reform

A major effort to overhaul the bail system in Texas was rolled out Thursday, and the reform have some powerful backers.

**CHRISTOPHER CONNELLY, KERA** | MARCH 10, 2017, 8:13 AM (LAST UPDATED: MARCH 10, 2017, 12:31 PM)



FORT WORTH STAR-TELEGRAM PHOTO

A major effort to overhaul the bail system in Texas was rolled out Thursday, and the reforms have som
powerful backers. The target is a system that releases people held in jail before trial based in part on t
ability to pay their bail or a fee to bond out. It's a system that leaves many of the state's poorest reside
wait in jail until their court date arrives, which advocates say wastes taxpayer dollars and unnecessaril
upends lives.

LISTEN: The KERA Radio story

According to the Texas Judicial Council, counties spend more than $900 million every year to lock peo
before their court date. Three quarters of people in Texas jails are being held pre-trial, which means th
haven't been convicted of a crime. That's way up from 25 years ago, when jails were filled mostly with
people who'd already been convicted of a crime and sentenced to be there.

Houston Sen. John Whitmire said many of those awaiting trial in jail could be safely released but are s
behind bars because they can't cobble together enough money to bond out. It's a broken system, he s
that also lets potentially dangerous people go because they have the cash.

"Today, if you're a violent offender and you can afford a very expensive bond, you pay it and you go ba
your, in my judgment, oftentimes criminal practice," Whitmire said.

Whitmire, a Democrat who chairs the Senate's criminal justice committee, joined up with Rep. Andy M
Republican from Kerrville, to introduce the sweeping bail reform package. The legislation is based on
recommendations proposed by the Texas Judicial Council.

It would require judges to use data to better assess the risk of a defendant not showing up for trial or
committing a crime in the meantime.  It would also make judges consider releasing low-risk, non-violen

defendants without an upfront fee.

Murr, a former judge who sits on the state's judicial council, said that the reforms will give judges more
without tying their hands.

**Powerful Allies**

Top Texas judges have thrown their weight behind the effort.

Judge Sharon Keller, presiding judge of the Texas Court of Criminal Appeals, and Supreme Court Chie
Justice Nathan Hecht both spoke at the announcement.

"Recent research has found a correlation between lengthy pre-trial detention, and an increased likelihc
recidivism," Keller said, adding that people of color are more likely to detained pretrial than white
defendants.

Hecht said the courts shouldn't punish people who before they've been convicted and aren't likely to ca
trouble, just because they're poor.

"These are people who would go back home, try to hold onto their jobs, try to hold onto their families, o
back for their court appearance, try to hopefully get their lives straightened out," Hecht said. "But they
wouldn't be a burden on society and on the taxpayers."

Hecht said that states across the country are enacting bail reforms, ending decades of what describes
system operating largely due to inertia.

"You get into a pattern, it's pretty much working, and you don't go back and see if it could be done bett
and lo and behold, one day you wake someday and you think 'why are we doing it this way?" Hecht sa

The proposal has been lauded by reform advocates. In an email newsletter, University of Houston law
professor Sandra Guerra Thompson said the current system likely played a role in the deaths of some
1,111 people who died in county jails between 2005 and 2015.

The reforms, had they been enacted, "would surely have saved Sandra Bland's life and might also hav
saved the life of Vincent Dewayne Young, who committed suicide in the Harris County jail the day befo
Valentine's day last month." Guerr Thompson wrote. Bland hanged herself in jail after she was unable
raise $515 to bond out of jail when she was arrested in 2015.

**Crunching The Numbers**

The chief justice also pointed to a new study commissioned by the Texas Judicial Council that compare
data from Tarrant and Travis counties, released Thursday.

Tarrant County primarily uses a traditional cash bail system: a judge said a defendant has to pay a set
amount of money to get out, based on how severe their crime was, and if they seem like a flight or pub
safety risk. Travis County requires the use of a data-based questionnaire to assess risk. Travis lets ma
low-risk defendants out on a personal bond, which has no upfront fee but carries a financial penalty if t
defendant doesn't show up for court.

Dottie Carmichael from Texas A&M led the study, and said Tarrant's system, requiring bail money, underperforms.

"In the financial-based release system, 12 percent more potentially dangerous people were being let o
detention. These are not just average offenders. These are disproportionately violent," Carmichael sai

Carmichael also finds a money-bail system holds low-risk defendants in jail more often, and for longer
periods of time. All of that costs taxpayers more.

**An Industry Under Threat**

The reform package won't do away with cash bail entirely, but the bail bond industry in Texas worries it
them out of business, and is gearing up for a major fight. In a <u>fundraising letter</u> sent to bond brokers, th
trade association Professional Bondsmen of Texas presented the legislation as an existential threat.

"Everyone will be negatively affected or put out of business this session," without the ability to mount a
effective lobbying effort in Austin, the letter said, asking for everyone to donate to the cause. It was wri
bright red, underlined, all capital letters.

Industry officials often argue that bail agents help ensure defendants make it to their court date, and th
financial stake is a necessary spur to keep some defendants in line.

Critics say the industry profits off of people too poor to pay their own bail, who must sacrifice a fee to a
broker even if they are found not-guilty. For-profit bail bond companies are <u>banned in most of the worl</u>

A request for comment from the Professional Bondsmen of Texas was not returned.

The letter also points to the threat to the industry imposed by a class action lawsuit in Houston arguing
the use of money bail for petty crimes unconstitutionally keeps people incarcerated because they can't
bail. Harris County's sheriff, county executive and district attorney <u>have all come out in favor of the litig</u>
<u>suing the county</u>.

Copyright 2017 KERA-FM. To see more, visit KERA-FM.

Image Credits: <u>FORT WORTH STAR-TELEGRAM PHOTO</u>.

Share



Support Comes From





RELATED



Commissioner Radack Proposes Hiring An Administrator For The Harris County Jail



Advocates Hope To End Policy In Texas Of Jailing Poor For Unpaid Fines



Senate Committee Approves Statewide Ban on Texting While Driving



Get By Without Planned Parenthood? One Texas Effort Stumbles

MOST VIEWED

City Of Houston Will Purchase $13.8 Million Property For H-E-B To Build A Grocery Store

MD Anderson Faces A Financial Challenge Following DePinho's Resignation

Commissioner Radack Proposes Hiring An Administrator For The Harris County Jail

Houston Pays Tribute To A Fallen Firefighter

New Home Library Project Aims To Close "Book Gap" In Houston

Support Comes From





A SERVICE OF THE **UNIVERSITY OF HOUSTON**

    

News    Arts & Culture    Education    TV 8    News 88.7    Classical    About    Contact Us

Houston Public Media is supported with your gifts to the Houston Public Media Foundation and is licensed to the **University of Houston**

Copyright © 2017 | Privacy Policy