**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-cv-01414 |
| ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |

**JOINT MOTION AND MEMORANDUM IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF PROPOSED CONSENT DECREE AND
SETTLEMENT AGREEMENT AND FOR APPROVAL OF CLASS NOTICE**

The Parties jointly move this Court for an Order: (1) preliminarily approving the classwide Consent Decree and Settlement Agreement ("the proposed settlement") negotiated by Plaintiffs, Harris County, the Harris County Criminal Court at Law Judges, and the Harris County Sheriff and attached as Exhibits 1 and 2, respectively; and (2) approving the form and manner of class notice (Exhibit 3).

The final fairness hearing has been scheduled for August 21, 2019. Dkt. 615. In support of preliminary approval, this memorandum describes Plaintiffs' claims, the proceedings leading up to settlement, and the key provisions of the proposed settlement. It further demonstrates that the proposed settlement satisfies the requirements of Federal Rule of Civil Procedure 23(e).

**I.     Background of the Lawsuit**

**A.  Plaintiffs' Claims**

"In our society liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Plaintiffs filed this lawsuit to challenge Defendants' policy and practice of detaining approximately 40 percent of all

misdemeanor arrestees—tens of thousands of people every year—for the duration of their cases solely because they could not pay money bail. *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052, 1058 (S.D. Tex. 2017), *aff'd as modified,* 892 F.3d 147 (5th Cir. 2018). This automatic detention of impoverished people was not an "exception," let alone a "carefully limited" one.

Plaintiffs' constitutional claims have both substantive and procedural aspects. *See, e.g.*, *Washington v. Harper*, 494 U.S. 210, 220 (1990) (explaining the interaction between claims that share substantive and procedural aspects). Substantively, Plaintiffs' claims flow from two lines of precedent. First, equal protection and due process forbid jailing a person solely because of her inability to make a payment. *ODonnell,* 892 F.3d at 160–63; *Bearden v. Georgia*, 461 U.S. 660, 665 (1983); *Pugh v. Rainwater*, 572 F.2d 1053, 1057 (5th Cir. 1978); *Frazier v. Jordan*, 457 F.2d 726, 728–29 (5th Cir. 1972). Second, due process protects a "fundamental" interest in pretrial bodily liberty. *Salerno*, 481 U.S. at 750.

The two substantive constitutional rights at issue—the right against wealth-based detention and the fundamental right to pretrial liberty—cannot be infringed unless the government demonstrates that wealth-based pretrial detention is necessary to serve its compelling interests: that no less restrictive alternatives short of pretrial detention exist to reasonably mitigate against a risk to public safety or of flight from prosecution. Thus, before requiring a person to make a monetary payment in exchange for release, the government must make findings concerning the person's ability to pay. If the person cannot pay the amount required, such that the condition of release functions as a de facto detention order, then the government must justify the order to pay unattainable bail in the same way that it justifies a transparent order of detention.

Procedurally, the Constitution requires the government to provide safeguards to protect against the erroneous deprivation of these substantive rights. *Harper*, 494 U.S. at 228; *ODonnell*,

2

2018 WL 2465481, at *5 ("The first question [in a procedural-due-process analysis] asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.") (quoting *Meza v. Livingston*, 607 F.3d 392, 399 (5th Cir. 2010)). Here, the basic procedures required include notice, an opportunity to be heard and to present and confront evidence at a hearing with counsel, meaningful consideration of less-restrictive alternatives, and, before secured bail can be required as a condition of release, findings on the record by clear and convincing evidence that the person can afford to pay the amount required or that detention is necessary to meet a compelling government interest in public safety or to prevent flight from prosecution.

For decades prior to this lawsuit, Defendants evaded the substantive findings and procedural protections required for lawful pretrial detention by using predetermined secured financial conditions of release to detain arrestees solely because of their inability to pay.

### B.  Procedural History

Plaintiffs filed this case in May 2016, Dkt. 3, and amended their Complaint on September 1, 2016, Dkt. 51 (Agreed Motion for Leave to File First Amended Complaint and to Incorporate Previously-Filed Motions), Dkt. 53 (granting Motion to File First Amended Complaint), Dkt. 54 (First Amended Complaint). Following extensive briefing and argument, this Court largely denied the Defendants' motions to dismiss on December 16, 2016. Dkt. 125. The County filed a motion to reconsider, Dkt. 131, and the Court denied that motion, Dkt. 201.

In January 2017, Plaintiffs filed amended motions for class certification and preliminary injunctive relief. Dkt. 143 (Amended Motion for Preliminary Injunction), Dkt. 146 (Amended Motion to Certify Class). The Court conducted an eight-day evidentiary hearing on those motions

in March 2017 and granted them on April 28, 2017. Dkt. 302 (Memorandum and Opinion Setting out Findings of Fact and Conclusions of Law), Dkt. 303 (Memorandum and Order Certifying a Rule 23(b)(2) Class), Dkt. 304 (Order of Preliminary Injunction). After this Court, the Fifth Circuit, and the United States Supreme Court denied Defendants' motions to stay the preliminary injunction, the Order went into effect on June 6, 2017. *See ODonnell v. Harris County*, 260 F. Supp. 3d 810 (S.D. Tex. 2017) (Memorandum and Order Denying Stay); *ODonnell v. Harris Cty.*, 691 F. App'x. 816 (5th Cir. 2017) (Order Denying Application for Stay Pending Appeal); *Harris Cty. v. ODonnell*, No. 16A1204 (June 7, 2017) (Order by Justice Clarence Thomas Denying Application for Stay Pending Appeal). Defendants filed an interlocutory appeal of the preliminary injunction. Dkt. 334 (Amended Notice of Appeal by Harris County and the Hearing Officers), Dkt. 335 (Amended Notice of Appeal by County Criminal Court at Law Judges Nos. 1–15).[1]

While the preliminary injunction order was pending on appeal, on January 10, 2018, three Criminal Law Hearing Officers (who were Defendants in the lawsuit at the time) were admonished by the Texas State Commission on Judicial Ethics for "strictly following directives not to issue personal bonds to defendants per the instructions of the judges in whose court the underlying cases were assigned."[2] Based on the analysis in the admonishment opinions, Plaintiffs became concerned that Defendants had produced emails and documents to the Commission that were responsive to Plaintiffs' discovery requests but were withheld from Plaintiffs, and asked Defendants to provide

---

[1] In November 2016, Darrell Jordan was elected in November 2016 as presiding judge of the new County Criminal Court at Law Number 16. Because his legal positions differed from his fifteen colleagues, he rejected his colleagues' private retained counsel and was represented by separate counsel throughout the litigation. *See* Dkt. 137 (Notice of Appearance of Assistant County Attorney Laura Beckman Hedge on behalf of Judge Darrell Jordan); Dkt. 333 (Notice of Appearance of Michael R. Hull, Senior Assistant County Attorney); Dkt. 381 (Notice of Substitution of Counsel for Defendant Hon. Darrell Jordan, Judge of the Harris County Criminal Court at Law No. 16).

[2] The admonishments are available in the record. *See* Dkt. 523-2 (Exhibits to Plaintiffs' Response in Opposition to the Fourteen Judges' Motion to Postpone Discovery Hearing) at 9–24.

4

them with all of the evidence and information provided to the Commission.[3] After Defendants declined to produce the documents provided to the Commission, Dkt. 379 at 7–8 (proffer by Plaintiffs' counsel), Plaintiffs sought court intervention, *see* Dkt. 370 (Notice of Setting of Discovery Hearing on January 23, 2018); Dkt. 371 (Order Setting Premotion Hearing and requiring the personal attendance of the Judges and Hearing Officers).

At the hearing on January 23, 2018, when Plaintiffs raised the concern that Defendants had not produced documents in discovery, the district court expressed concerns about Defendants' lack of "transparency" in this case. Dkt. 379 at 5 (Transcript of Discovery Hearing) (THE COURT: "[T]ransparency is another feature that is in insufficient supply in many aspects of this case[.] . . . And the lack of transparency is not the Plaintiffs'."). The Court ordered Defendants "to produce any evidence, written or oral, of instructions, guidelines, rules, or directions given at any time by Harris County Criminal Courts at Law Judges or District Court Judges to Hearing Officers affecting bail, including financial and nonfinancial conditions . . . by February 23, 2017." Dkt. 376 (Minute Entry). The Court further stated that "[i]f the plaintiffs believe on reviewing the evidence that further relief is warranted, the plaintiffs may then file a motion to strike, or for sanctions, or for other relief. If a party believes that further discovery is warranted, a pre-motion conference must be sought." *Id.*

On February 14, 2018, the Fifth Circuit upheld this Court's factual findings and largely affirmed the Court's legal rulings. *ODonnell v. Harris Cty.*, 882 F.3d 528, 535 (5th Cir. 2018), *opinion withdrawn and superseded on reh'g*, 2018 WL 2465481 (No. 17-20333) (5th Cir. Jun. 1,

---

[3] *See* Dkt. 379 at 7 (Transcript of Discovery Hearing) (Counsel for Plaintiffs: "There was enough in the report and in the publicly available admonition itself, which we were able to quickly obtain—there was enough in it that caused us concern about whether we had been provided all of the relevant information we had requested in this court and whether testimony that was received by this Court was consistent with evidence and testimony given in that proceeding that we wrote to opposing counsel and simply requested their agreement to provide us quickly all of the evidence or other information that had been provided to the Commission").

2018). The panel held that the County's system violated equal protection, *id.* at 545, and affirmed the core of this Court's state-created-rights analysis, *id.* at 543, but did not consider the federal due process right to pretrial liberty. The Fifth Circuit vacated the preliminary injunction as overbroad in two respects relating to the Court's procedural due process holding, but stayed vacatur pending further proceedings in this Court to determine appropriate amended relief. *Id.* at 549. The court also dismissed the Sheriff as a Defendant. *Id.* Plaintiffs filed a petition for rehearing, asking the appellate court to clarify that the Sheriff remains in the case for injunctive relief as a state actor. Appellees' Pet. for Panel Reh'g, *ODonnell*, 2018 WL 2465481 (No. 17-20333) (5th Cir. Feb 28, 2018) ECF No. 00514367674. The County also filed a petition for rehearing, asking the court to reconsider the County's liability for the unconstitutional, jurisdiction-wide policies promulgated by the Judges *en banc*. Pet. for Panel Reh'g by Appellants Harris County et al., *ODonnell*, 2018 WL 2465481 (No. 17-20333) (5th^th Cir. Mar 13, 2018) ECF No. 00514386531.

On February 26, 2018, while the rehearing petitions were pending, the Fourteen Judges asked this Court to vacate its preliminary injunction order and enter the sample provisions set forth in the panel decision. Dkt. 390. This Court denied the Motion. Dkt. 392. On May 3, 2018, fourteen[4] of the Judges sought the same relief from the Fifth Circuit. Mot. of Appellants Fourteen Judges of Harris County Criminal Courts at Law for Stay of the Prelim. Inj. and Entry of a Modified Inj. Reflecting This Ct.'s Ruling, *ODonnell*, 2018 WL 2465481, Case No. 17-20333 (5th Cir. May 3, 2018) ECF No. 00514458214. On June 1, 2018, the Fifth Circuit granted Plaintiffs' petition for rehearing, denied the County's petition for rehearing, and denied the Fourteen Judges' motion to require the Court to enter the sample provisions in the Fifth Circuit's decision. The court issued a

---

[4] On January 29, 2018, the Fifth Circuit granted a Motion by County Criminal Court at Law Judge Number 14, Mike Fields, to dismiss the appeal as to him only. Dkt. 378 (Fifth Circuit Order granting Judge Fields's motion to partially dismiss the appeal as to him).

revised opinion and issued the mandate. *ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018); Dkt. 396 (Judgment and Mandate Issued by the Fifth Circuit); Dkt. 397 (Revised Opinion). The same day, this Court ordered the parties to meet and confer and submit an agreed proposed revised injunction, or a redline version showing the disputed provisions, by June 11, 2018. Dkt. 398 (Order Resetting Hearing).[5] A status conference was held on June 14, 2018, to discuss the parties' proposals for a revised injunction. Dkt. 415 (Transcript of June 14, 2018, hearing). The Court ordered the Parties to confer on a scheduling order. *Id.* On June 25, 2018, the Court issued a scheduling order and set trial for December 3, 2018. Dkt. 423 (Amended Scheduling and Docket Control Order).[6] On June 29, 2018, the Court issued a memorandum opinion and an amended preliminary injunction order. Dkt. 426 (Memorandum and Opinion), Dkt. 427 (Amended Order of Preliminary Injunction).

On July 10, 2018, fourteen of the sixteen Defendant Judges filed a Notice of Appeal and a Motion to Stay provisions of the amended preliminary injunction order pending appeal. Dkt. 434 (Notice of Appeal of Defendants Judges of Harris County Criminal Court at Law No. 1–13 and 15), Dkt. 435 (Fourteen Judges' Motion for a Partial Stay of the Revised Preliminary Injunction Pending Appeal). The other Defendants (the County, the Sheriff, Judge Jordan, and Judge Fields) did not notice an appeal and did not join the motion to stay the revised injunction. On Friday, July 27, 2018, before this Court ruled on the Fourteen Judges' stay motion, the Fourteen Judges filed a motion for emergency stay of the amended preliminary injunction in the Fifth Circuit, seeking a ruling by Sunday (the amended preliminary injunction was scheduled to go into effect on Monday,

---

[5] On June 8, 2018, Plaintiffs filed a Motion and Memorandum in Support of Motion for Partial Summary Judgment. Dkt. 400.

[6] Among the deadlines set by the Court were deadlines for briefing on Plaintiffs' summary judgment briefing and for Defendants to file their own motions for summary judgment. Dkt. 423 at 5.

July 30, *see* Dkt. 427 at 9 (Amended Order of Preliminary Injunction)). *ODonnell v. Goodhart*, Case No. 18-20466 (5th Cir. July 27, 2018) ECF No. 00514574856. This Court denied the stay motion later that afternoon. Dkt. 461 (Memorandum and Order Denying Motion to Stay). Several hours later, the Fifth Circuit granted an administrative stay pending consideration of the stay motion. *ODonnell v. Goodhart*, Case No. 18-20466 (5th Cir. July 27, 2018) ECF No. 00514575529. Without full briefing from Plaintiffs-Appellees, but following oral argument one week later, a divided motions panel of the Fifth Circuit granted the Fourteen Judges' motion to stay several provisions of the amended preliminary injunction order pending consideration of the appeal. *ODonnell v. Goodhart*, 900 F.3d 220 (5th Cir. 2018).

The Parties engaged in extensive discovery in district court while briefing the merits of the appeal of the Court's amended preliminary injunction order. On October 29, 2018, pursuant the Court's January 25, 2018, Minute Entry, *see* Dkt. 376, Plaintiffs requested an opportunity "to conduct further depositions . . . crucial to discovering why and how Defendants destroyed relevant evidence for almost a year into this case, and then failed to disclose that fact when they learned it more than a year ago," so that Plaintiffs could "determine whether it would be appropriate to move for sanctions." Dkt. 523-1 (Plaintiffs' Pre-motion Letter Seeking Leave to Conduct Additional Depositions).[7] The Court scheduled a hearing to discuss Plaintiffs' request for November 13, 2018.

In elections that took place on November 6, 2018, Fifteen of the Sixteen Defendant Judges were defeated, and a new County Judge and a new Commissioner of Precinct 2 were elected. Given the new policymakers, at the hearing on November 13, the Court granted Defendants' motion to stay the case until February 1, 2019, and Plaintiffs agreed to defer their sanctions-related discovery

---

[7] The appeal of this Court's Amended Preliminary Injunction Order was fully briefed as of November 7, 2018.

requests pending settlement negotiations. Dkt. 532 (Minute Entry for proceedings before the Court on November 13, 2018); Dkt. 539 (Agreed Discovery Order).

On January 1, 2019, the new judges were sworn in. On January 7, 2019, they filed a motion in the Fifth Circuit withdrawing their predecessors' appeal of the amended preliminary injunction. *ODonnell v. Salgado*, Case No. 18-20466 (5th Cir. Jan. 7. 2019) ECF No. 00514575529.

On January 17, following extensive collaboration among the Parties and consultation with other stakeholders, the County Court at Law Judges amended Local Rule 9.1, eliminating the County's misdemeanor secured bail schedule. Dkt. 557 (Joint Notice and Explanation of New Local Rule); Dkt. 557-1 (Order Amending Local Rule); Dkt. 557-2 (Brief Explaining Amended Local Rule 9.1). On February 1, the Court reviewed the new local rule and approved its implementation. Dkt. 567 at 6–7 (Transcript of Status Conference). At that hearing, the Parties reported that settlement negotiations were ongoing and requested additional time to reach an agreement. *Id.* The Court scheduled another status conference for March 8, 2019, Dkt. 563. On February 16, 2019, amended Local Rule 9.1 went into effect. *See* Dkt. 573 (Joint Motion for Entry of Proposed Order, explaining that the rule went into effect on February 16); *see also* Dkt. 575 (March 7, 2019, Order requiring Defendants to comply with Local Rule 9.1 pending a final order of relief in the case). The March 8, 2019, hearing was continued several times to allow the parties additional time to negotiate. *See* Dkt. 575-1, Dkt. 580, Dkt. 590, Dkt. 606. On April 8, 2019, the Court granted the Plaintiffs' and the Hearing Officers' joint motion to dismiss the Hearing Officers as defendants in the litigation. Dkt. 587 (Order).

On July 25, 2019—following months of intensive negotiations among all of the Parties as well as other stakeholders in the County who will be charged with implementing any changes to jurisdiction-wide practices—the Parties reported to the Court that they had reached an agreement

in principle and that the County Commissioners would be considering and voting on the proposed settlement on Tuesday, July 30. Dkt. 615. The Court set an August 1, 2019, deadline to file a Motion for Preliminary Approval and scheduled a final fairness hearing for August 21, 2019. *Id*. On Tuesday, July 30, a majority of the Commissioners on the Commissioners Court voted to approve the proposed settlement.

### C. Factual Background

#### 1. The System Plaintiffs Challenged

During an eight-day evidentiary hearing in March 2017 on Plaintiffs' amended preliminary injunction motion, thirteen witnesses testified live—including five experts, Sheriff Ed Gonzalez, Judge Darrell Jordan, former Judge Paula Goodhart (on behalf of herself and former Judge Margaret Harris), and two of the Defendant Hearing Officers—and the Court admitted into evidence data analysis, declarations from additional fact and expert witnesses, and thousands of documents and videos of bail hearings. On the basis of that evidence, the Court issued "over 120 pages of factual findings, including not only the specific details of the County's bail-setting procedures, but also the history of bail and recent reform attempts nationwide." *ODonnell v. Harris County*, 892 F.3d 147, 153 (5th Cir. 2018). All of the Court's factual findings were affirmed by the Fifth Circuit. *Id*. Plaintiffs incorporate the District Court's findings herein, and summarize below certain key facts and evidence about the systemic constitutional violations Plaintiffs challenged and that the parties seek to remedy through the proposed settlement.[8]

On April 28, 2017, this Court found that Harris County has "a consistent and systematic policy and practice of imposing secured money bail as de facto orders of pretrial detention in

---

[8] Throughout this section, the Parties have omitted internal citations in the Court's opinion to the Parties' evidence.

misdemeanor cases."[9] Harris County's "de facto detention orders effectively operate only against the indigent, who would be released if they could pay at least a bondsman's premium, but who cannot. Those who can pay are released, even if they present similar risks of nonappearance or of new arrests."[10] Harris County's "de facto detention orders are not accompanied by the protections federal due process requires for pretrial detention orders."[11] The Court found:

> Harris County has an inadequate basis to conclude that releasing misdemeanor defendants on secured financial conditions is more effective to assure a defendant's appearance or law-abiding behavior before trial than release on unsecured or nonfinancial conditions, or that secured financial conditions of release are reasonably necessary to assure a defendant's appearance or to deter new criminal activity before trial.[12]

Harris County's system "detains 40 percent of all those arrested only on misdemeanor charges, many of whom are indigent and cannot pay the amount needed for release[.]"[13]

For decades, Harris County used a secured bail schedule to determine conditions of release.[14] The bail schedule was promulgated by the County Criminal Court at Law Judges, sitting *en banc* and voting by two-thirds majority.[15] Within hours of an arrest for a misdemeanor, an Assistant District Attorney makes a charging decision and assigns a bail amount based on the CCCL Judges' bail schedule, which considers only the arrestee's then-current charge and criminal history.[16] Once the case is paper-ready, a misdemeanor defendant with access to enough money

---

[9] *ODonnell*, 251 F. Supp. 3d at 1059.

[10] *Id.* at 1060.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 1058.

[14] *See id.* at 1072 (County Criminal Court at Law Judges implemented and maintained a bond schedule for all misdemeanor offenses following entry of the Roberson consent decree in 1987); s*ee also id.* at 1100-01 ("The court finds and concludes that in the typical case, Hearing Officers set secured money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than as a mechanism for pretrial release.").

[15] *Id.* at 1086.

[16] *Id.* at 1088.

can pay the amount required for release and be promptly released from custody.[17] Arrestees who are unable to make the payment remain in custody and are transferred to and booked into the Harris County Jail, if they were not taken there directly.[18]

At the Harris County Jail, arrestees are taken to a room in the jail to appear by video at a legal proceeding during which a Harris County Criminal Law Hearing Officer determines probable cause for warrantless arrests and addresses bail.[19] "Hearings typically last about one to two minutes per arrestee. During this brief period, the Assistant District Attorney reads the charge, and the Hearing Officer determines probable cause and sets bail."[20] "Defendants almost never have counsel at the probable cause and bail-setting hearing. Those who are indigent have not yet had counsel appointed. Those who can afford counsel have either paid their bonds and been released or have not been able to arrange their counsel's presence."[21] "Defendants who try to speak are commanded not to, shouted down, or ignored."[22] The Hearing Officers "do not make written findings or issue reasoned opinions explaining why they set bail on a secured or unsecured basis, or why they select the bail amount imposed."[23]

The Court found that "from the beginning of 2015 to the end of January 2017," the Hearing Officers adhered to the bail schedule in 88.9 percent of misdemeanor cases.[24] When Hearing

---

[17] *See id.* at 1088 (regarding prompt release); *id.* at 1091 ("Arrestees who do not pay for release or obtain release on personal bond by early presentment at the City Jail are taken to and booked in the Harris County Jail."); *id.* at 1124 ("Those who can pay secured bonds are released within hours of arrest.").

[18] *See id.* at 1091, 1124.

[19] *Id.* at 1092.

[20] *Id.*

[21] *Id.* at 1093.

[22] *Id.* at 1099 & n.48.

[23] *Id* at 1093.

[24] *Id.* at 1095 & n. 42.

Officers did change the bail amount, "they raise[d] it about 67 percent of the time."[25] The Court found "little to no credibility in the Hearing Officers' claims of careful case-by-case consideration" of conditions of release other than the prescheduled money bail amounts,[26] and that the Hearing Officers set secured money bail intending to detain arrestees, stating: "The Hearing Officers' testimony that they do not 'know' whether imposing secured money bail will have the effect of detention in any given case, [] and their testimony that they do not intend that secured money bail have that effect, is not credible."[27]

> Hearing Officers treat the bail schedule, if not as binding, then as a nearly irrebuttable presumption in favor of applying secured money bail at the prescheduled amount. Amounts that deviate from the schedule are treated as 'incorrect,' and requests for a personal bond, if not denied outright, are deferred until the County Judge holds a later hearing. Hearing Officers routinely adjust initial bail settings to conform to, not to deviate from, the bail schedule. . . .[28]

> [I]n the typical case, Hearing Officers set secured money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than a mechanism for pretrial release. In the vast majority of cases, the Hearing Officers use their discretion to consider the five Article 17.15 factors to almost automatically impose the prescheduled secured bail amounts, notwithstanding Pretrial Services recommendations to release defendants on unsecured personal bonds and notwithstanding clear evidence of indigence. Hearing Officers make these decisions in brief, uncounseled hearings at which the defendants are actively discouraged from speaking, and no reviewable findings are made on the record.[29]

"Before the [] change to the County Rules of Court in February 2017, any 'incarcerated person' who remained in detention after the probable cause hearing would be scheduled to appear"

---

[25] Id. at 1096.

[26] *Id.* at 1097.

[27] *Id.*

[28] *Id.* at 1099 & nn. 45–47.

[29] *Id.* at 1100–01.

the next business day before a County Judge.[30] However, "[o]ver the last two years . . . more than 26,000 misdemeanor arrestees—over 51 percent of those still detained—waited more than 48 hours after their arrests before their first appearances before a County Criminal Court at Law Judge.[31] Over 6,800 people—just over 13 percent of the detained population—were held longer than 96 hours after arrest before their first appearance."[32] At this court appearance, arrestees were kept in a holding cell outside the courtroom unless they agreed to plead guilty.[33] "Defendants who did not plead guilty but wanted to contest their bail settings depended on court-appointed counsel filing a formal motion for bail review. That motion would not be considered until a later hearing, usually held one or two weeks later. The only way to gain release earlier was to pay the bail or to plead guilty."[34]

The Court credited testimony by prosecutor JoAnne Musick, who testified based on her lengthy experience as both a prosecutor and a criminal defense attorney, that many misdemeanor defendants "don't really want to plead guilty, but sometimes they want to get out of jail, return to family, return to work, what have you. So they will inquire about a plea so that they can get out."[35] The Court also credited testimony by Judge Darrell Jordan (Presiding Judge of the misdemeanor courts at the time the proposed agreement was negotiated and this Motion is filed) "that it was common to have misdemeanor clients who professed their innocence and had valid defenses to nevertheless plead guilty in order to be released much earlier than if they sought an unsecured

---

[30] *Id.* at 1101; *id.* ("The February 9, 2017 amendment took effect on March 9, 2017. The amended County Rules of Court require 'any arrestee that is booked into the Harris County Jail' to be presented at a 'Next Business Day Setting,' even if that arrestee is released from custody between booking and the next business day.").

[31] *Id.*

[32] *Id.* at 1113.

[33] *Id.* at 1101.

[34] *Id.* at 1101.

[35] *Id.* at 1104.

bond based on indigence or challenged the prosecution's case."[36] The Court concluded: "Those who can pay secured bonds are released within hours of arrest. Those who cannot are detained for days or weeks and face intense pressures to accept a guilty plea to end their pretrial detentions."[37]

A further "indication that misdemeanor defendants abandon valid defenses and plead guilty to obtain faster release than if they contested their charges is a report from the National Registry of Exonerations showing that Harris County … led the United States in the total number of criminal exonerations" in 2015 and 2016.[38] Most of Harris County's exonerations occurred in "misdemeanor drug offenses that evidence samples conclusively prove the defendant did not commit. But rather than wait for lab tests that may exonerate them, misdemeanor arrestees who cannot pay for release before their first appearances plead guilty in order to end their pretrial detention and be released."[39]

Additionally, "uncontroverted and reliable testimony" showed:

[F]rom 2015 to early 2017, for misdemeanor arrestees who did not bond out—40 percent of all misdemeanor arrestees—the median time between arrest and case disposition was 3.2 days. Of those, 72 percent resolved their cases within 7 days; 90 percent resolved their cases within 30 days. Over the same period, for misdemeanor arrestees released on bond (either secured or unsecured)—60 percent of misdemeanor arrestees—the median time to disposition was 120 days. Of those, 5 percent resolved their cases within 7 days; 13 percent resolved their cases within 30 days.[40]

"Of the 84 percent of detained arrestees who plead guilty at their first appearance, 67 percent are released within a day. About 83 percent are released within five days of their first appearance."[41]

---

[36] *Id.* at 1107.

[37] Id. at 1124.

[38] *Id.* at 1105.

[39] *Id.*

[40] *Id*.

[41] *Id.* at 1114.

The Court found these figures to be "consistent with, and support, the plaintiffs' theory that for misdemeanor defendants unable to pay secured money bail, Harris County maintains a 'sentence first, conviction after' system that pressures misdemeanor defendants to plead guilty at or near their first appearances because that was the only way to secure timely release from detention."[42]

Harris County's "custom and practice" of imposing money bonds on misdemeanor arrestees regardless of their ability to pay meant that:

> 40 percent of all Harris County misdemeanor arrestees every year are detained until case disposition. Most of those detained—around 85 percent—plead guilty at their first appearance before a County Judge. Reliable and ample record evidence shows that many abandon valid defenses and plead guilty in order to be released from detention by accepting a sentence of time served before trial. Those detained seven days following a bail-setting hearing are 25 percent more likely to be convicted, 43 percent more likely to be sentenced to jail, and, on average, have sentences twice as long as those released before trial.[43]

A peer-reviewed study led by the Quattrone Center at the University of Pennsylvania ("the Heaton-Stevenson-Mayson study") and found by the Court to be "one of the most sophisticated and rigorous" regarding "bail and pretrial detention in misdemeanor cases to date" studied the misdemeanor bail system in Harris County and determined that people detained at disposition "received sentences that were nine days longer on average, more than double the average sentence of similar, released defendants."[44] The study concluded that "the fact of detention itself, rather than the defendant's charge, criminal history or other variables, causally affects these outcomes."[45]

"Recent studies of bail systems in the United States have concluded that even brief pretrial detention because of inability to pay a financial condition of release increases the likelihood that

---

[42] *Id.* at 1105.

[43] *Id.* at 1130–31.

[44] *Id.* at 1105–06.

[45] *Id.*

misdemeanor defendants will commit future crimes or fail to appear at future court hearings."[46]
One "landmark study" of Colorado practices found that "unsecured appearance bonds are equally
effective as secured money bail, at both assuring appearance at trial as well as law-abiding behavior
before trial."[47] The Heaton-Stevenson-Mayson study found that, had Harris County given early
release on unsecured bonds to the lowest-risk misdemeanor arrestees between 2008 and 2013,

> 40,000 more people would have been released pretrial; nearly 6,000 convictions
> and 400,000 days in jail at County expense would have been avoided; those
> released would have committed 1,600 fewer felonies and 2,400 fewer
> misdemeanors in the eighteen months following pretrial release; and the County
> would have saved $20 million in supervision costs alone[48]

"Sheriff Gonzalez credibly testified [at the preliminary injunction hearing] that the research
showing the 'criminogenic' effects of even a short period of pretrial detention and the high public
costs of extended detention is consistent with his own experience as a Harris County law-
enforcement officer."[49]

   "Secured money bail in Harris County does not meaningfully add to assuring
misdemeanor defendants' appearance at hearings or absence of new criminal activity during
pretrial release."[50] The Court found:

> Harris County does not track the comparative failure-to-appear or new-criminal-
> activity rates of misdemeanor defendants released on different types of bonds.
> Harris County has not coded, collected, or analyzed data on the different types of
> pretrial misconduct. It cannot, as other jurisdictions have, determine whether new
> misconduct by those released on surety bond or on personal bond is violent or is
> the type of nonviolent offense for which release on unsecured personal bond is
> presumed. . . . [F]or now, the County is imposing secured money bail, usually at
> prescheduled amounts, for almost all misdemeanor defendants, with no ability to

---

[46] *Id.* at 1121.

[47] *Id.* at 1120.

[48] *Id.* at 1122.

[49] *Id.* at 1122.

[50] *Id.* at 1119–20.

tell how effective this type of bond is to prevent failures to appear or new criminal activity compared to release on unsecured or nonfinancial conditions.[51]

Harris County does keep, and was able to produce, data coded as 'bond forfeiture,' 'bond revocation,' and 'bond surrender.' But this data is not consistently kept or recorded. Some County Judges 'forfeit' a bond after a single failure to appear. Others reset hearings and do not record a bond as forfeited until after multiple failures to appear. A single entry in the 'forfeiture' data may mean one failure to appear or many. A bond may be revoked because a defendant failed a drug test, even if the defendant appeared at every court setting and is never arrested or charged with another offense, or revoked because the defendant failed to appear. Similarly, one 'revocation' entry may indicate one failure to appear, many, or none at all, and may or may not indicate new criminal activity. Commercial sureties can ask for bond surrender for a variety of reasons. Judges may rely on a variety of factors to grant or deny the request.[52]

Judge Paula Goodhart, who was Presiding Judge of the misdemeanor courts at the time of the preliminary injunction hearing in this lawsuit, "testif[ied] on behalf of herself and County [Criminal Court at Law] Judge Margaret Harris," another misdemeanor judge who was in office when the lawsuit was filed until January 2019, "that no Harris County policymaker, so far as she is aware, has examined Harris County data to compare pretrial failure-to-appear rates or bond forfeiture rates between those released on secured or unsecured financial conditions. Her impression was confirmed by Director of Pretrial Services Kelvin Banks and the Hearing Officers."[53]

On the basis of the documentary evidence and testimony,

The court finds and concludes that the Harris County policymakers with final authority over the County's bail system have no adequate or reasonable basis for their belief that for misdemeanor defendants, release on secured money bail provides incentives for, or produces, better pretrial behavior than release on unsecured or nonfinancial conditions. The policymakers are apparently unaware of important facts about the bail-bond system in Harris County, yet they have devised and implemented bail practices and customs, having the force of policy, with no inquiry into whether the bail policy is a reasonable way to achieve the goals of

---

[51] *Id.* at 1117–18.

[52] *Id.* at 1118.

[53] *Id.* at 1102–03.

18

assuring appearance at trial or law-abiding behavior before trial. In addition to the absence of any information about the relative performance of secured and unsecured conditions of release to achieve these goals [of assuring appearance at trial or law-abiding behavior before trial], the policymakers have testified under oath that their policy would not change despite evidence showing that release on unsecured personal bonds or with no financial conditions is no less effective than release on secured money bail at achieving the goals of appearance at trial or avoidance of new criminal activity during pretrial release.[54]

The Court found that requiring payment for release from jail after arrest "exacerbates and perpetuates poverty because of course only people who cannot afford the bail assessed or to post a bond—people who are already poor—are detained in custody pretrial. As a consequence, they often lose their jobs, may lose their housing, be forced to abandon their education, and likely are unable to make their child support payments."[55] The Court further found that the County's practices had disparate racial and ethnic effects:

> Money-based pretrial systems exacerbate the racial disparities in pretrial detention and posttrial outcomes. An amicus filing by Harris County Commissioner Rodney Ellis and the NAACP Legal Defense and Educational Fund notes that African–Americans make up 18 percent of Harris County's adult population but 48 percent of the Harris County Jail's adult population. A 2011 study found that in Harris County, 70 percent of white misdemeanor defendants obtain early pretrial release from detention, but only 52 percent of Latino misdemeanor defendants and 45 percent of African–American misdemeanor defendants do so.[56]

---

[54] *Id.* at 1103.

[55] *Id.* at 1122.

[56] *Id.*

The Court rejected claims by the original Defendants[57] that "virtually no" arrestee is detained "'because of' an inability to pay secured money bail,"[58] concluding that "[t]he record provides no support for defense counsel's argument that some defendants choose [to] remain detained. . . . The credible testimony . . . is that no one remains in the Harris County Jail out of a desire to be there."[59]

---

[57] On February 8, 2017, Harris County argued through its privately retained lawyers that "[t]here are individuals . . . [t]hey do want to go to the jail and stay there, if it's a cold week," and "there are individuals who believe they have guilt." Transcript of 2/8/17 Hearing at 20–22, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) ECF No. 186 (oral argument by counsel for Harris County and the Hearing Officers at hearing on Defendants' Motion to Stay Preliminary Injunction Hearing); *id.* at 20 (THE COURT: "[I]t is uncomfortably reminiscent of a historical argument that used to be made that people enjoyed slavery, because they were afraid of the alternative. And there may have been individual cases in which that fear was tremendously powerful and real, but you didn't see a lot of people running toward enslavement. You don't see a lot of people volunteering for jail in order to get warm."). On November 9, 2016, the original Fifteen Defendant Judges asserted similarly that an arrestee might be in the jail because she or he "wishes to remain in custody (e.g., the Harris County jail provides a shelter, multiple meals per day, and medical services; the accused is guilty and is accruing credit towards an expected early, reasonable plea bargain)." Brief in Support of the Fifteen County Criminal Court at Law Judges' Motion to Dismiss at 28, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) ECF No. 80. At the preliminary injunction hearing, all Defendants offered testimony from an expert witness who asserted, "In the Harris County Jail, people are rarely held if indigent." ECF 336-2 (Defendants Exhibit 28, Expert Report of Dr. Robert Morris) ) at 70, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414); *see also* Transcript of 3/9/17 Hearing at 149, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-c-01414), ECF 282 (Plaintiffs' Counsel: "You don't explain to the Court that you created a mathematical impossibility and presented it as statistical analysis that, and I quote, 'In the Harris County Jail, people are rarely held if indigent." MORRIS: "So that statement I will stand by today. It is rare.").

   The Parties stipulate that the legal positions taken by the original Defendants differ significantly from those of the current Defendants who are entering into this Consent Decree. The Court, too, recognized that the elections in 2016 and 2018 changed the political landscape in such a way as to make an agreed resolution of the lawsuit a realistic possibility. For example, following the election of Defendant Sheriff Ed Gonzalez, County Criminal Court at Law Judge Number 16 Darrell Jordan, and District Attorney Kim Ogg in November 2016, the Court noted that "there is a new sheriff in town" and a "new D[istrict] A[ttorney]" who might have "a somewhat more open mind" about the legal issues in the case and how to resolve them. Transcript of 11/28/16 Hearing at 139–41, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) ECF No. 122; *id.* at 7–8 ("The sheriff has already made clear, sheriff elect, that he intends to negotiate. . . . [W]e have a number of people whose political approach to these issues, not legal, political, may influence the shape of the issues that are before me for legal analysis and decision under the applicable law. . . . I need to understand the best way, from my case management view, to take advantage of a political willingness of the policymakers to fashion a solution rather than have one imposed upon them."). Following the elections in November 2018, Defendants sought, and the Court granted, a stay of litigation "to allow the parties to discuss resolving the case without continued litigation based on the change in the political context." Transcript of 11/13/18 Hearing at 5, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) ECF No. 537.

[58] *ODonnell,* 251 F. Supp. 3d at 1067; *id.* at 1117 (finding Defendants' expert's analysis "critically flawed" and "not entitled to any weight" because he "excluded indigent defendants from his survey to conclude that, of the misdemeanor defendants surveyed, none was detained because of indigence.").

[59] *Id.* at 1109 n.57.

Between June 6, 2017 and August 15, 2018, approximately 12,742 people were released pursuant to the federal court's order who otherwise would have been detained due to their inability to pay secured bail. *See* Exhibit 4 (email from counsel for Sheriff Gonzalez to Plaintiffs' counsel).

## 2. The System That Existed While the Federal Court's First Injunction Was in Effect from June 2017 to August 2018[60]

While the preliminary injunction was in effect (and while the parties' petitions for rehearing were pending in the Fifth Circuit), Fourteen of the Defendant Judges argued to this Court that its preliminary injunction was causing an increase in "[bond] forfeit[ures] for failure to appear" and was a "public safety threat."[61] The Fourteen Judges repeated those arguments in their May 3, 2018, motion to the Fifth Circuit asking the appellate court to stay this Court's preliminary injunction and require entry of the sample provisions the court set forth in its February 14 opinion.[62] In support of Plaintiffs' response brief in the Fifth Circuit, Judge Jordan and then-Judge Fields presented sworn testimony based on their observations of the system.[63] Dr. Stephen Demuth[64] submitted a sworn affidavit corroborating the judges' testimony with data analysis.[65]

---

[60] This portion of the Memorandum is unopposed by Defendants.

[61] *See* Dkt. 390 at 3, 6, Fourteen Judges' Response in Opposition to Motion to Continue and Cross-Motion for Stay of the Preliminary Injunction Pending Completion of Appellate Proceedings and Entry of a Modified Injunction Reflecting the Fifth Circuit's Ruling. The Fourteen Judges' brief was filed in response to Plaintiffs' motion to continue a status hearing that the Court scheduled after the Fifth Circuit's decision on February 14, 2018. The status conference had been scheduled for the purpose of discussing the contours of the revised injunction. *See* Dkt. 383 (Order requiring the parties to confer on a revised preliminary injunction and scheduling a status hearing for February 28, 2018); Dkt. 389 (Plaintiffs' Motion to Continue the status hearing in light of the parties' petitions for rehearing in the Fifth Circuit); Dkt. 392 (Order Granting Continuance).

[62] Motion of Appellants Fourteen Judges of Harris County Criminal Courts at Law for Stay of the Preliminary Injunction and Entry of a Modified Injunction Reflecting this Court's Ruling at 9, *ODonnell v. Harris County*, Case No. 17-20333 (5th Cir. May 3, 2018) ECF No. 00514458214.

[63] Appellees' Opposition to Motion of Appellants Fourteen Judges of Harris County Criminal Courts at Law for Stay of the Preliminary Injunction and Entry of a Modified Injunction Reflecting this Court's Ruling at 22–39 (Exhibits 1 and 2), *ODonnell v. Harris County,* Case No. 17-20333 (5th Cir. May 14, 2018) ECF No. 00514472378.

[64] This Court repeatedly found Dr. Demuth's expert testimony at the preliminary injunction hearing to be credible and reliable. *See, e.g.*, *ODonnell*, 251 F. Supp. 3d at 1095, 1096, 1104, 1105, 1106, 1114, 1118, 1096 n.42, 1105 n.53.

[65] *Id.* at 40–45 (Exhibit 3).

Those three affidavits, along with a second affidavit from Dr. Demuth, were subsequently filed in this Court the following month, after the Fifth Circuit decided the rehearing petitions, in support of Plaintiffs' request that this Court enter a revised injunction order that was jointly proposed by Plaintiffs, Judge Jordan, and Judge Fields. *See* Dkt. 402 (Plaintiffs' Brief in Support of the Amended Preliminary Injunction Order Proposed by Plaintiffs and Defendant Judges No. 14 and No. 16); Dkt. 402-1 (Expert Report of Dr. Stephen Demuth); Dkt. 402-2 (Declaration of Judge Darrell Jordan, also filed in the Fifth Circuit); Dkt. 402-3 (Declaration of County Criminal Court at Law No.14 Judge Michael Fields, also filed in the Fifth Circuit); Dkt. 402-4 (Expert Analysis of Dr. Stephen Demuth, also filed in the Fifth Circuit).

In their sworn testimony to the Fifth Circuit and this Court, Judge Jordan, Judge Fields, and Dr. Demuth testified as follows about the system as it existed while the Court's first preliminary injunction was in effect:

- Judge Jordan: "In my opinion, ever since the preliminary injunction went into effect, the Fourteen Judges have taken steps to sabotage the federal injunction and to manipulate the bond-forfeiture statistics to make it look like people released on unsecured bond pursuant to the federal order are failing to appear in droves, and that the federal court order is 'wreaking havoc' on the County. . . . The elevated bond-forfeiture rate for people released on unsecured bail, to the extent it exists, is readily explained by the Fourteen Judges' intentional policy decisions[.]" Dkt. 402-2 (Decl. of Judge Darrell Jordan) ¶ 5; *see also* Dkt. 402-3 (Decl. of Judge Michael Fields) ¶ 4. Dr. Demuth: "The statistics suggest a deliberate manipulation of the numbers and the post-arrest system to attempt to produce a desired outcome." Dkt. 402-4 (Demuth Analysis) ¶ 24.

- Judge Jordan testified that many people released pursuant to the injunction were subject to the Judges' "next-day setting" policy. Dkt. 402-2 ¶ 24. "[I]t is extremely difficult for people to get to court the day immediately after a bond is granted." *Id.* ¶ 25. "We who are in charge of these policies directly control and have created these missed court appearances." *Id.* ¶ 26; *see also* Dkt. 402-3 ¶ 20–22 (Fields Decl.); Dkt. 402-1 ¶¶ 28–29 (Demuth Report) ("It is likely that the next-day-setting policy contributes to a higher rate of nonappearance[.]").

- Judge Jordan: "The County and other Judges have also implemented policies that appear designed to funnel people who have the greatest likelihood of non-appearance into the group of people released pursuant to the federal court's order." Dkt. 402-2 ¶¶ 43, 44, 47; *see also* Dkt. 402-4 ¶ 10 (Demuth Analysis) ("[T]he FTA risk score for people released on

unsecured bonds [pursuant to the injunction] was 53% higher than the score for people released on surety bonds and 36% higher than for people released on personal bonds.").

- Judge Jordan: "Despite knowing that higher risk arrestees will be released on unsecured bond pursuant to the injunction, my colleagues have refused to require basic pretrial supervision and court reminders to the group of arrestees released on unsecured bond." Dkt. 402-2 ¶¶ 48–49; *see also* Dkt. 402-3 ¶¶ 39–41 (Fields Decl.); Dkt. 402-4 ¶ 11 (Demuth Analysis) ("I found that only 5.6% of people released on unsecured bonds were supervised by pretrial services and only 4.4% had additional non-financial conditions. In contrast, 67% of people released on personal bonds were supervised, and roughly 13% had additional non-financial conditions.").

- Judge Jordan: "People released on unsecured bond have been systemically misinformed of their next-day court settings dates." Dkt. 402-2 ¶¶ 34–36, 39–41; *see also* Dkt. 402-3 ¶ 27–29, 31–33 (Fields Decl.).

- Judge Jordan: "Despite knowing that many people miss court because they are in ICE detention, my colleagues forfeit bonds for people released on unsecured bond without inquiring into why they did not appear." Dkt. 402-2 ¶¶ 50–53; *see also* Dkt. 402-3 ¶¶ 42–43 (Fields Decl.) ("(T)o my knowledge, there is no system in place to adequately facilitate communication between the Harris County court system and ICE.").

- To determine whether people released pursuant to the injunction were "evading justice," Dr. Demuth analyzed the percent of cases filed in June 2017 that were resolved as of April 30, 2018, and concluded that "a slightly greater proportion of people released on unsecured or personal bonds in June 2017 had resolved their cases as of April 30, 2018, as compared to people released on surety or cash bonds that same month." Dkt. 402-1 ¶¶ 18–20 (Demuth Report).

- "Between June 7, 2017 and April 30, 2018, . . .92 percent of misdemeanor cases were released before disposition." Dkt. 402-1 ¶ 3 & nn. 1–2 (Demuth Report). Dr. Demuth compared people detained at disposition pre-injunction to people released pursuant to the preliminary injunction order and found that the rate of guilty pleas decreased from 81% to 57% of cases, and that the dismissal rate increased from 16% to 38%. Dkt. 402-1 ¶ 8. "These findings support what other research shows, which is that people who are released after arrest have better case outcomes: they are less likely to be convicted primarily because they are less likely to plead guilty." Dkt. 402-1 ¶ 10.

### D.  The Terms of the Parties' Agreement

On the basis of all of the foregoing evidence, the Parties have reached a comprehensive resolution of this litigation. The key terms of the Consent Decree and Settlement Agreement are summarized below.

1.  **Consent Decree**

    a.  **Basic Structure**

- The Consent Decree is designed to create and enforce a constitutional and transparent pretrial system in Harris County that protects the due process rights and equal protection rights of misdemeanor arrestees. (Sections 1–3, 10–12)
- The Consent Decree binds the defendants in this case—Harris County ("the County"), the Harris County Sheriff ("the Sheriff"), and the Harris County Criminal Court at Law Judges ("CCCL Judges")—and their employees, officers, and agents. (Section 1)
- A court-appointed Monitor will oversee initial implementation and compliance (Sections 95–133). Most provisions of the Consent Decree will be implemented within 180 days of either the entry of the Consent Decree (*e.g.*, Sections 41(a), 41(b), 43, 48(b), etc.) or the appointment of the Monitor (*e.g.*, Sections 48(d), 50(e), 60, 74, etc.). The new court rules governing the pretrial system ("Local Rule 9") will be implemented immediately upon entry of the Consent Decree.[66] (Section 30)

    b.  **Factual Findings**

- To explain and memorialize the system that Plaintiffs challenged, the Parties have summarized the Court's findings of facts, as set forth in its Memorandum Opinion granting Plaintiffs' Motion for Preliminary Injunction. (Sections 7–9)
- Each provision of the Consent Decree is intended to remedy aspects of the system that are described in the Court's opinion and summarized in the Consent Decree or that were described in the testimony of Judge Jordan, Judge Fields, and Dr. Demuth.

    c.  **Definitions and Abbreviations**

- The Parties agreed on definitions of key terms used throughout the Consent Decree, including "failure to appear," "nonappearance," and "indigent," as well as terms to describe three categories of court settings —"first appearance" or "first setting"; "regular setting" or "regular appearance"; and "required setting" or "required appearance"— that will be governed by the court policies set forth in Sections 57–72 . (Section 17)

    d.  **Compliance with Constitutional Standards (Rule 9)**

- The Consent Decree requires immediate implementation of amended Local Rule 9, which remains largely the same but which has been updated based on experience since the version implemented on February 16, 2019, and with which the Court ordered compliance on March 7, 2019.[67] (Section 30)

---

[66] Amended Local Rule 9.1 was promulgated in January 2019 and has been in effect since February 16, 2019. Since February, the Rule has been updated to reflect facts learned during the implementation period. The updated Rule appears at Section 30 of the Consent Decree.

[67] *See* Dkt. 575 (Order requiring compliance with Local Rule 9.1 as promulgated in January 2019).

- Rule 9 requires the prompt pretrial release of all misdemeanor arrestees on a personal (unsecured) bond as soon as practicable after arrest unless they fall into a carve-out category. (Rule 9.2)
- The carve-out categories include:

  o Individuals arrested for domestic violence, or for violating a protective order in a domestic violence case (Rule 9.4.1);
  o Individuals arrested for assault or terroristic threat (Rule 9.4.2);
  o Individuals arrested for a second or subsequent DUI (Rule 9.4.3);
  o Individuals arrested and charged with a new offense while on pretrial release (Rule 9.4.4);
  o Individuals arrested on a warrant issued after a bond forfeiture or bond revocation (Rule 9.4.5);
  o Individuals arrested while on any form of community supervision (Rule 9.4.6).

- Individuals who are not immediately released on a personal bond must receive an individualized bail hearing within 48 hours after arrest. Arrestees must be represented by counsel at this hearing, provided notice, and given an opportunity to be heard on any evidence or legal factors relevant to their release decision, including the amount of money the person can afford to pay as of the time of the hearing and the adequacy of alternatives to detention. (Rule 9.8, 9.12.1–9.12.6)
- If a judicial officer contemplates requiring secured money bail as a condition of release, he or she must make substantive findings on the record by clear and convincing evidence either that the arrestee has the ability to pay the amount, or that no alternative conditions could reasonably assure the safety of the community or reasonably protect against flight from prosecution. (Rule 9.12.7)
- An arrestee who is indigent cannot be charged any pretrial supervision fees, including but not limited to fees for electronic monitoring or an interlock device so that such inability to pay is not a barrier to release. (Rule 9.12.8)
- Arrestees can seek review of conditions of release in the CCCL. (Rule 9.14)
- Money bail must not be required prior to an individualized hearing. (Rule 9.15, Rule 9.17)

### e. Representation at Bail Hearings

- The County must provide the funding and staffing necessary for the Public Defender's Office to adequately represent all misdemeanor arrestees at initial bail hearings. To this end and to maintain other existing necessary operations, the county must fund the Public Defender's Office at or above its 2019 fiscal year budget. (Section 38)
- The Judges must provide a list of qualified support staff, including social workers and investigators, that will be available to all private appointed counsel representing misdemeanor arrestees at bail hearings. (Section 41(a))
- The County must retain an expert with experience in indigent defense to evaluate the County's current indigent defense systems and determine the County's need for support

25

staff (as defined in Section 17(t)), including investigators and social workers, to assist defense counsel in gathering important information relevant to pretrial release and detention. The expert must make recommendations for necessary support staff that reflect national best practices and professional norms, and the County must fund at least the minimum number of support staff the expert recommends. (Section 41(b))

- Defendants must develop and implement a plan for providing defense counsel with adequate time, space, and other resources necessary to provide effective representation at bail hearings. (Section 43)

### f. Promoting Pretrial Release Through Programs to Increase Court Appearance

- Uniform Notice of Scheduled Appearances: The County must update any forms it uses to provide arrestees with information about their scheduled court dates to ensure that the forms are easy to read and understand. The new forms must incorporate evidence-based practices to minimize confusion about court dates and give clear information about how to reschedule a court date. (Sections 46–48)
- Court Date Reminder System: The county must implement a text-message reminder system, which must be informed by evidence-based practices, to adequately notify and remind defendants about their court dates. (Sections 49–50)
- Determination and Mitigation of Actual Causes of Nonappearance in Harris County: The County must engage a researcher to study the primary causes of nonappearance in the Harris County misdemeanor courts and to recommend policy solutions to mitigate those causes. The study will evaluate the extent to which factors such as lack of transportation, lack of childcare, lack of housing, substance use disorders, and mental health issues cause people to miss their court dates. (Sections 51–52) After the study concludes, the County must allocate at least $850,000 for each of the seven years following the study's conclusion toward mitigating the causes of nonappearance. (Section 54) While the study is ongoing, the county must allocate $250,000 annually to programs that help indigent misdemeanor arrestees appear for their court dates. (Section 53)

### g. Court Policies and Procedures Concerning Nonappearance for Scheduled Court Hearings

- The county must develop a website where arrestees can access their court dates, times, locations and attorney information. (Section 57)
- Arrestees may not be required to appear in court within 72 hours of their release from custody (Section 62)
- The CCCL judges will also hold at least one weekly "Open Hours Court" that provides arrestees who missed a court appearance an opportunity to reschedule their missed appearance. (Section 64)

- Arrestees will be permitted to waive their appearance for most court dates (i.e. "regular settings") through their attorneys (Section 65), and to reschedule regular settings through counsel at least twice without any consequence. (Section 66)
- Arrestees who miss a regular setting will have at least one week to appear in the assigned CCCL court or in Open Hours Court to reschedule the court appearance without fear of a warrant issuing. (Section 67(a))
- If an arrestee misses a first setting or required appearance, a warrant may issue only if the Judge determines that the arrestee had actual notice of the setting and that there was no good cause for nonappearance. (Section 68)
- After a warrant has issued, an arrestee may appear in the assigned court or the Open Hours Court to reschedule the appearance. If the court appearance that was missed was a regular setting or first appearance, and the person voluntarily appears in court, the warrant must be recalled. (Section 69(a)) If the court appearance that was missed was a required setting, and the person voluntarily appears in court, the warrant must be recalled unless the court finds after a hearing with counsel that there was actual notice and there was no good cause for nonappearance. (Section 69(b))
- All people with outstanding arrest warrants for nonappearance issued before January 1, 2019, will be allowed to appear at Open Hours Court or their assigned court to clear their warrants without consequence and will receive new court dates. (Section 70)
- The Judges will record nonappearances and failures to appear. (Section 71)

### h.  Continuing Training

- The county must provide training to the Judges and all of Defendants' agents and employees who are involved in implementing Rule 9. (Section 73)
- The training must cover the technical requirements for proper implementation of Rule 9, as well as research, data, and information concerning the effects of pretrial detention, the harms of money bail, and best practices locally and nationally for pretrial systems. The training program must include accounts and stories of people who have been affected by the bail system in Harris County or their families. (Section 76)

### i.  Data Collection, Analysis, and Transparency

- Defendants must ensure that data about the misdemeanor system from 2009 through the present is readily available to the public in a usable format upon request. (Sections 83–85)
- Defendants must collect data sufficient to perform basic analysis about the system relating to court appearance, compliance with Rule 9, conditions of release, detention rates, and disparate impacts on groups that are poor and/or minority. (Section 85)
- Defendants must transparently and reliably collect and report rates of nonappearance and failure to appear. (Section 86)
- Defendants must generate reports every 60 days that will provide basic information to the public necessary to evaluate how the Consent Decree is affecting the County's

27

misdemeanor pretrial system. (Sections 87, 89) The reports will be available publicly on a website (Section 87) and will also be available on a web-based data platform (Section 88).

- The County must create a website to house information relating to the lawsuit and the Consent Decree, including all of the data and information the County is required to collect and report on, as well as materials developed and used for training, implementation and monitoring. (Section 90)

### j.   Oversight and Accountability

- The county must hold at least two public meetings annually to report on the implementation of the Consent Decree and give community members the opportunity to ask questions and provide ongoing input on the implementation process. (Section 91–92)
- Representatives of the County, the Sheriff, and the Judges must attend the meetings as well as the Monitor. (Section 92(b))

### k.   Publication of Policies Enacted to Implement the Consent Decree

- Policies enacted to implement the Consent Decree must be made available online and in hard copy at the Joint Processing Center and the courthouse. (Sections 93–94)

### l.   Consent Decree Monitor

- The Consent Decree will be overseen by a court-appointed Monitor. The Monitor will be responsible for ensuring compliance with the Consent Decree consistent with the goals of maximizing pretrial liberty, court appearance, and public safety. The Monitor will conduct regular reviews and will consult, review, and in many cases, approve plans and policies submitted by the County, Sheriff, and/or Judges as required by the Consent Decree.  The Monitor position will be in place for seven years.  (Sections 95–133)
- The Monitor's reports will be filed publicly. (Section 117)

### 2.   <u>Settlement Agreement</u>

- The County agrees to pay and agrees not to oppose a fee request in the amounts listed. (Section 2)
- Susman Godfrey agrees not to collect the fees to which it is entitled in this case ($2,161,262) in consideration of the County's agreement to allocate that amount of money to its own efforts to meet the needs of class members, as described in the Consent Decree and in this Settlement agreement. (Section 2)
- Class Counsel agrees to forgo fees for any hours spent implementing or monitoring the Consent Decree. (Section 3)
- The County will preserve indefinitely all filings and evidence submitted in the litigation in a County library. (Section 5)

**II.     The Proposed Settlement Should Be Preliminarily Approved and Notice of Its Terms Provided to the Class, Which Has Been Certified Under Rule 23(b)(2)**

The public interest strongly favors the voluntary settlement of class actions. *See Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. 1981); 4 NEWBERG ON CLASS ACTIONS § 11:55 (4th ed.). For that reason, there is a strong presumption in favor of finding a settlement fair, reasonable and adequate, as Rule 23(e)(2) requires. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 910 F. Supp. 2d 891, 931 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). "As this motion is for preliminary approval of a class action settlement, the standards are not as stringent as those applied to a motion for final approval." *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 310 F.R.D. 300, 314 (E.D. La. 2015); *see* 21.61.Judicial Role in Reviewing a Proposed Class Action Settlement, Ann. Manual Complex Lit. § 21.61 (4th ed.).

The Fifth Circuit typically measures fairness, adequacy, and reasonableness by six factors drawn from *Reed v. Gen. Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983): (1) whether the settlement was a product of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the factual and legal obstacles to prevailing on the merits; (5) the possible range of recovery and the certainty of any damages; and (6) the respective opinions of the participants, including class counsel, class representatives, and the absent class members. *Hays v. Eaton Grp. Attorneys, LLC*, No. CV 17-88-JWD-RLB, 2019 WL 427331, at *9 (M.D. La. Feb. 4, 2019).

The *Reed* factors overlap with those set forth in the 2018 amendment to Rule 23(e)(2), which look to whether: (A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness

29

of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other. *See Hayes*, 2019 WL 427331 at \*9 (combining the two sets of factors in preliminarily approving a proposed settlement); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. 4:17-CV-3852, 2019 WL 387409, at \*3 (S.D. Tex. Jan. 30, 2019) (considering both sets of factors in finally approving settlement).

Because the settlement proposed here is fair, reasonable, and adequate when considered in light of these combined factors, it merits preliminary approval.

### A.  The Proposed Settlement Was Negotiated at Arm's Length by Experienced Counsel and Treats Class Members Equally

The proposed settlement is the product of intensive discussion and debate among the Parties and other stakeholders in Harris County. *See supra* Part I.B. The Parties have engaged in months of hard-fought, arms-length negotiation including numerous in-person meetings and regular telephone calls, many of which took place before and after business hours and on weekends. Plaintiffs and Defendants are represented by counsel who have substantial experience in litigating complex class actions and who are experts in the factual and legal issues of this case. Moreover, the proposed settlement requires County action that applies to all class members equally. *See* Exs. 1, 2.

### B.  This Case Is Complex, Expensive, and Lengthy

This case is already in its fourth year.  *See supra* Part I.B.  In addition to the significant work of numerous attorneys from the County Attorney's Office, the County spent more than $10 million on outside defense counsel in the first three years of litigation, before new officials took office in January 2019. Plaintiffs' counsel have worked more than 9,000 hours on this case to date.

The case has involved intensive investigation and expert analysis of important factual matters, as well as litigation of complex legal issues relating to the merits of Plaintiffs' claims and to a variety of procedural and jurisdictional doctrines. Were this case to proceed to trial, Plaintiffs would offer overwhelming evidence concerning the system in effect in Harris County while the first preliminary injunction was in effect, including efforts by several former Defendants to undermine the Court's preliminary injunction by creating an incorrect narrative about nonappearance rates and rates of new criminal activity, as detailed *supra* Part I.C.2. The Parties would also need to conduct additional depositions necessary to determine whether certain Defendants complied with their discovery and other obligations. *See supra* page 8.

By reaching a favorable agreement prior to summary-judgment motions or trial, the Parties seek to avoid further expense—including the tremendous time and resources that such litigation, including likely appeals, would consume for both the Parties and the Court—and to ensure that Plaintiffs' constitutional rights receive the protection the law demands, promptly and efficiently. *Cf. Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) (finding risks of protracted litigation and transaction costs in civil rights case weigh in favor of settlement); *Hohensee v. Divine Miracles, Inc.*, No. CV 18-1287, 2018 WL 6198370, at *2 (E.D. La. Nov. 14, 2018) (finding that the complexity factor favored approval of settlement where the case had been pending for more than seven months and the court had scheduled a five-day bench trial).

### C.  Significant Discovery Has Taken Place and Key Issues Have Been Litigated on Appeal

As recounted above, *supra* Part I.B, the parties have engaged in significant discovery. This Court's eight-day evidentiary hearing featured thirteen live witnesses and thousands of documents and videos. On the basis of that evidence, the Court issued over 120 pages of factual findings in support of the preliminary injunction, Dkt. 302, findings later affirmed by the Fifth Circuit,

*ODonnell*, 892 F.3d at 166. The preliminary injunction has been extensively litigated in and amended by the Fifth Circuit Court of Appeals. The new Judges have amended their Local Rule, and this Court has ordered them to comply with that rule pending resolution of this case. Dkt. 575. Given the extensive discovery and litigation of the central legal issues completed in this case, the Parties have ample factual and legal information with which to evaluate the merits of their competing positions and to "make a reasoned judgment about the desirability of settling the case on the terms proposed." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006) (citing *Ayers*, 358 F.3d at 369).

### D. The Proposed Settlement Contemplates Reasonable Fees and Costs

Rule 23(h) permits the court in a certified class action to award reasonable attorneys' fees and out-of-pocket litigation expenses authorized by the parties' agreement.[68] *See* Exhibit 2 (Settlement Agreement). Courts in the Fifth Circuit weigh the reasonableness of attorneys' fees in light of the factors set forth in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–20 (5th Cir. 1974), *overruled on other grounds*, *Blanchard v. Bergeron*, 489 U.S. 87 (1989), which themselves overlap with the approval factors drawn from *Reed* and Rule 23(e)(2). *See Al's Pals*, 2019 WL 387409, at *4 (confirming reasonableness of the requested fee through an analysis of the *Johnson* factors). Those factors are: (1) the time and labor required to prevail; (2) the novelty and

---

[68] Likewise, prevailing parties in actions brought under 42 U.S.C. § 1983 are entitled to a "reasonable attorney's fee," as well as compensation of their out-of-pocket litigation expenses. *See* 42 U.S.C. § 1988. Under § 1988, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (citation omitted). Although "the plain language of the statute grants district courts discretion to determine whether to award the prevailing party a reasonable attorney's fee, . . . . the judicial gloss on § 1988, and its legislative history, have constrained that discretion, in most cases converting the statute's 'may' into a 'must.'" *Sanchez v. City of Austin*, 774 F.3d 873, 880 (5th Cir. 2014) ("[A]bsent special circumstances, a prevailing plaintiff should be awarded section 1988 fees *as a matter of course*."). This "special circumstances" exception is "extremely limited." *Id*. (citing *Chronicle Publ'g Co. v. City of League City, Tex.*, 488 F.3d 613, 623 (5th Cir. 2007); *Espino v. Besteiro*, 708 F.2d 1002, 1005 (5th Cir. 1983)).

In this case, Defendants agree that Plaintiffs have prevailed. Plaintiffs have achieved sweeping reforms in Harris County's bail practices, affecting tens of thousands of class members each year. They are therefore entitled to an award of attorney's fees and costs.

difficulty of the question; (3) the skill requisite to perform the legal service; (4) the preclusion of other employment by the attorney due to the acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Von Clark v. Butler*, 916 F.2d 255, 258 n.3 (5th Cir. 1990).

The fees contemplated by the proposed settlement, *see* Exhibit 2, are reasonable in light of the *Johnson* factors. First, class counsel devoted substantial time and labor to prosecuting and settling this case—more than 9,700 hours, not including recent work finalizing the proposed settlement and the work that will be done to prepare for the fairness hearing. Second, the case presents novel and difficult legal issues concerning not only the nature of the constitutional rights at stake, but also federal jurisdiction, municipal liability, immunity, abstention, equitable remedies, and related state law. Third, class counsel exercised skill in securing and defending the preliminary injunction, as well as in monitoring and analyzing its implementation. Fourth, class counsel's representation of the class imposed a substantial opportunity cost on them, occupying large amounts of time that they could otherwise have spent on other matters.

Fifth, the proposed fee award is reasonable, customary, and standard for comparable litigation in this District.[69] Class counsel based their proposed rates on those paid by the County to its counsel, choosing slightly lower rates than the County paid for lawyers with comparable experience and expertise. In total, the County will have spent far more than the contemplated

---

[69] To establish the market value of class counsels' services, Plaintiffs submit the declaration of Attorney Craig Smyser. Exhibit 5. Mr. Smyser attests that class counsels' proposed rates are reasonable.

amount defending this case—over $10 million, not including the additional County lawyers and support staff who worked on the case. Throughout their prosecution of the case, class counsel were efficient in their staffing decisions, taking effort to assign non-legal work to non-lawyers billed at lower rates, and only sending the requisite number of attorneys to each appearance. *Cf. Johnson*, 488 F.2d at 717–720. Moreover, class counsel are choosing to forgo more than $2 million of their lodestar for work performed since 2016 so that the County may use that money to assist in its implementation of the consent decree to benefit class members. Exhibit 2 (Settlement Agreement) at 1. Class Counsel are also choosing to forgo all fees relating to implementation and monitoring of the Consent Decree.

Moreover, Plaintiffs' experts performed hundreds of hours of work for free. Neither of Plaintiffs' testifying experts was compensated. Dkt. 273 at 119–20 (Transcript of Hearing, March 7, 2017) (testimony of Dr. Stephen Demuth); Dkt. 328 at 131–32 (Transcript of Hearing, March 7, 2017) (testimony of The Honorable Truman A. Morrison, III). And Plaintiffs have not sought compensation on behalf of any of the other consulting experts who provided guidance, technical assistance, or supporting affidavits in this matter.

Sixth, by agreeing to pursue fees only in the event that Plaintiffs prevailed, and then only from Defendants pursuant to Rule 23(h) or 42 U.S.C. § 1988, class counsel faced a serious risk of going uncompensated for their work on this action in the event they did not prevail.

Seventh, the circumstances of this case—in particular, the urgency of addressing the irreparable harm that hundreds of class members suffered every day in the County's bail system— imposed significant time pressure on class counsel's prosecution of this case.

Eighth, the terms of the settlement are impressive. The preliminary injunction and the proposed settlement are landmark developments backed by intensive investigation and innovative

lawyering. The proposed settlement promises exceptional results for tens of thousands of class members each year.

Ninth, class counsel are highly experienced in class actions and have a history of success in civil rights suits like this one. Plaintiffs are represented by attorneys from Civil Rights Corps,[70] Susman Godfrey,[71] Wilmer Cutler Pickering Hale and Dorr LLP,[72] and the Texas Fair Defense Project.[73] Their work in this case and others has been widely recognized.[74]

Tenth, while this case was not "undesirable" to class counsel given their mission and the opportunity it presented to stop a large-scale constitutional harm, the significant and uncertain up-front investment for many years would have made it undesirable to the private bar, and it has drawn the ire of certain local officials, the bail industry, and their supporters.

The proposed settlement is a landmark vindication of Fourteenth Amendment rights in a context in which widespread injustices have become pervasive and normal. It honors the mandate issued by Harris County voters in electing new judges, a new Sheriff, and new County

---

[70] Civil Rights Corps is a non-profit civil rights organization based in Washington, D.C. Lawyers with Civil Rights Corps have been counsel in nearly 20 federal civil-rights class-action lawsuits concerning various forms of court debt-collection, wealth-based jailing, and post-arrest detention schemes. These cases have resulted in class-wide preliminary injunction rulings, jurisdiction-wide consent decrees, and class-wide distribution of monetary damages. *See* Exhibit 6 (Declaration of Alec Karakatsanis).

[71] Exhibit 7 (Declaration of Neal Manne).

[72] Wilmer Cutler Pickering Hale and Dorr LLP is an international law firm with over 1,000 attorneys across 12 offices in the United States and abroad. Its lawyers routinely and successfully litigate high-stakes lawsuits and class actions, including in civil rights and constitutional law. *See* Exhibit 8 (Declaration of Daniel Volchok).

[73] Texas Fair Defense Project is a non-profit law office based in Austin, Texas that works to improve the criminal justice system in Texas and ensure that all Texans have access to justice. Lawyers with Texas Fair Defense Project have been counsel in individual and class action lawsuits in state and federal courts in Texas challenging unconstitutional public defense systems, wealth-based jailing, and unlawful detention. *See* Exhibit 9 (Declaration of Emily Gerrick).

[74] *See, e.g.*, Richard A. Oppel Jr., *Defendants Can't be Jailed Solely Due to Inability to Post Bail, Judge Says*, N.Y. Times, (July 17, 2017), https://www.nytimes.com/2017/07/17/us/chicago-bail-reform.html; Meagan Flynn, *In Historic Decision, Federal Judge Says Harris County Bail System is Unfair to the Poor*, Houston Press, (April 28, 2017), https://www.houstonpress.com/news/federal-judge-says-harris-county-bail-system-is-unfair-to-poor-defendants-9397124.

Commissioners responsible for the County's bail system, and it will improve the lives of tens of thousands of class members each year. It merits preliminary approval.

### III.    The Proposed Class Notice Is Reasonable and Satisfies Due Process

If the Court finds approval sufficiently likely, it must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). In a class action certified under Rule 23(b)(2), like this one, the "mechanics of the notice process are left to the discretion of the district court subject only to the broad 'reasonableness' standards imposed by due process." *Fowler v. Birmingham News Co.*, 608 F.2d 1055, 1059 (5th Cir. 1979).[75] Due process is satisfied by notice that provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 197 (5th Cir. 2010).

More specific guidance can be found in the *Manual for Complex Litigation* (Third) § 30.212, according to which the Rule 23(e) notice of a proposed class action settlement should:

> (1) describe the essential terms of the proposed settlement; (2) disclose any special benefits provided to the class representatives; (3) provide information regarding attorneys' fees; (4) indicate the time and place of the hearing to consider approval of the settlement, and the method for objecting to (or, if permitted, for opting out of) the settlement; (5) explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set out those variations; and (6) prominently display the address and phone number of class counsel and the procedure for making inquiries.

*Smith v. Tower Loan of Mississippi, Inc.*, 216 F.R.D. 338, 352 (S.D. Miss. 2003), *aff'd sub nom.*

*Smith v. Crystian*, 91 F. App'x 952 (5th Cir. 2004).

---

[75] "This is because the interests in a [r]ule 23(b)(2) class action for declaratory and injunctive relief, [are] related primarily, if not exclusively, to adequacy of representation, since a judgment in the action would establish the obligations of [defendant] . . . to the entire class." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 302 (W.D. Tex. 2007) (internal quotation marks omitted & alterations in original).

The proposed class notice, attached as Exhibit 3, meets these requirements. It clearly and concisely states in plain, easily understood language: the nature of the action, the definition of the certified class, the class claims, the terms of the settlement, the effect of a class judgment on members, the process for objecting to and inquiring further about the proposed settlement, the contact information for class counsel, the proposed award of costs and attorneys' fees, and specific information about the date, time, and place of the approval hearing. *Cf. Cone v. Vortens, Inc.*, No. 4:17-CV-001-ALM-KPJ, 2019 WL 1970545, at *4 (E.D. Tex. May 3, 2019) (approving class notice with similar features).

The proposed method of distributing class notice also merits approval. *Cf. Jones v. Gusman*, 296 F.R.D. 416, 467 (E.D. La. 2013) (noting approval of notice procedure that involved distributing notice and a copy of the consent judgment to all inmates at the relevant prison on a given date; posting copies of the notice in common areas in prison facilities, indicating how imprisoned individuals could obtain a full copy of the consent judgment; running an abbreviated notice in the local paper on two different days; and posting notice on various websites). The Notice provides a clear, succinct summary of the claims in the case and the proposed settlement. It will be posted in the Joint Processing Center of the Harris County Jail, the lobby of the courthouse, and the "hold-over cells" outside of the judges' courtrooms. Class members who are in the class during the Notice period (the Plaintiffs class is a transitory class, and class members cycle into and out of the class every day), as well as their lawyers and families, are highly likely to see the Notice in one of these locations.

## IV.    The Proposed Consent Decree Is Squarely Within This Court's Power

Federal courts have broad discretion to enter consent decrees that are within the general scope of the cases before them. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v.*

*City of Cleveland*, 478 U.S. 501, 525–26 (1986). "Parties to a suit have the right to agree to any thing they please in reference to the subject-matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings." *Pacific R.R. v. Ketchum*, 101 U.S. 289, 297 (1879). "[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree." *Local No. 93*, 478 U.S. at 525. Accordingly, consent decrees need not be limited to the relief that a court could provide on the merits, *id.*, and "district courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 317 (3d Cir. 2011). So long as the terms of a consent decree come "within the general scope of the case made by the pleadings, it will be within the district court's power to enter the decree, if the pleadings state a claim over which a federal court has jurisdiction." *Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1538 (3d Cir. 1984) (citation omitted).

The proposed consent decree—informed not only by the pleadings but also by an eight-day evidentiary hearing, significant discovery, this Court's extensive legal and factual findings, and uncontested factual developments while the preliminary injunction was in effect—falls well within the scope of this case and this Court's power to order.

> This Consent Decree is tailored to remedy the systemic and longstanding constitutional violations found by the Court in this litigation; to safeguard arrestees' equal protection and due process rights, including the fundamental interest in pretrial liberty and the right against wealth-based detention; to promote court appearance and public safety; to require investments necessary for new systems to function efficiently in a large jurisdiction; and to promote transparency, rigorous analysis, and accountability throughout the pretrial process so that constitutional practices will endure. It is crafted to protect against a reversion to the pre-litigation system of mass, non-individualized pretrial detention of misdemeanor arrestees without lawful justification.

Ex. 1 ¶ 10. The proposed consent decree directs compliance with the bail policies set forth in Local Rule 9, which the Parties jointly negotiated and which the Judges promulgated, to protect the rights at issue in this case, *id.* ¶ 30, while providing means for Defendants to update Rule 9 as necessary to ensure compliance with the Fourteenth Amendment rights recognized in this case and consistent with other state and federal law, *id.* ¶¶ 31–32. It directs Defendants to provide arrestees representation by counsel at bail hearings and to ensure the adequacy and effectiveness of that representation through written policies and investment in defense services. *Id.* ¶¶ 37–45. It directs the County to study the causes of non-appearance and develop a plan for mitigating them, including updating court date notification forms, creating systems for text-message and telephone reminders of court dates, launching a website providing people access to information about their upcoming appearances, studying the leading causes of nonappearance in Harris County, and allocating money to fund evidence-based solutions to mitigate those causes, reduce unnecessary jailing, and improve court appearance rates. *Id.* ¶¶ 46–56. It sets forth uniform and transparent court policies on court appearance, waivers of appearance at unnecessary settings, rescheduling appearances, and the issuance, recall, and execution of warrants for nonappearance, and it directs the recording and reporting of data that can be used to understand and improve the system, *id.* ¶¶ 57–72. It requires training for Defendants and their employees and agents who will be charged with implementing Rule 9, *id.* ¶¶ 73–79, and data collection and reporting regarding pretrial release and detention in the County, *id.* ¶¶ 80–89. To ensure that residents of Harris County have opportunities to monitor the new system and provide input, the Consent Decree requires community meetings two times per year, *id.* ¶¶ 91–92. Finally, the decree provides for the appointment of a Monitor, who will be in place for at least seven years, to track and report on compliance with the agreement, *id.* ¶¶ 95–133, and for this Court's continuing jurisdiction to enforce it, *id.* ¶¶ 134–140.

Because its provisions come within the general scope of this case and "further the objectives of the law upon which" Plaintiffs' claims are based, *Local No. 93*, 478 U.S. at 525, the Court should enter the proposed Consent Decree in its equitable power.

## V.    Conclusion

For the reasons set forth above, the Parties respectfully ask this Court to grant their joint motion.

Date: August 1, 2019                                    Respectfully Submitted,

*/s/ Alec Karakatsanis*
*/s/ Elizabeth Rossi*
Alec George Karakatsanis
alec@civilrightscorps.org
Elizabeth Rossi
elizabeth@civilrightscorps.org
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Telephone: (202) 681-2721

*/s/ Neal S. Manne*
Neal S. Manne
Texas Bar No. 12937980
nmanne@susmangodfrey.com
Lexie G. White
Texas Bar No. 24048876
lwhite@susmangodfrey.com
Joseph S. Grinstein
Texas Bar No. 24002188
jgrinstein@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*/s/ Michael Gervais*
Michael Gervais
mgervais@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, #1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

*Attorneys for Plaintiffs*

VINCE RYAN, HARRIS COUNTY ATTORNEY

*/s/ Melissa L. Spinks*
Melissa L. Spinks
Assistant County Attorney
Federal I.D. 1312334
State Bar No. 24029431
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5132
Facsimile: (713) 755-8924
melissa.spinks@cao.hctx.net

*ATTORNEY FOR HARRIS COUNTY*

G. Allan Van Fleet, P.C.
Texas Bar No. 20494700
6218 Elm Heights LN, Suite 201
Houston, TX 77081-2409
(713) 826-1954
allanvanfleet@gmail.com

*ATTORNEY FOR DEFENDANTS*
*COUNTY CRIMINAL COURTS AT LAW*
*JUDGES*

*/s/ Victoria Jimenez*
OF COUNSEL, VINCE RYAN
Harris County Attorney

VICTORIA L. JIMENEZ
Assistant County Attorney
Federal I.D. No. 2522937
State Bar No. 24060021
1861 Old Spanish Trail
Houston, Texas 77054
Telephone: (832) 927-5211
Facsimile: (713) 755-8924
E-mail: victoria.jimenez@cao.hctx.net

*/s/ Murray Fogler*
Murray Fogler
FOGLER, BRAR, FORD,
O'NEIL & GRAY, LLP
2 Houston Center
909 Fannin St, Suite 1640
Houston, Texas 77010
(713) 481-1010
(713) 574-3224 (Fax)

*Attorneys for Defendant Sheriff Ed Gonzalez*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of August 2019, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Elizabeth Rossi*
Elizabeth Rossi