**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al.<br><br>Plaintiffs,<br><br>v.<br><br>HARRIS COUNTY, TEXAS, et al.<br><br>Defendants. | Case No. 16-cv-01414<br>(Consolidated Class Action)<br>The Honorable Lee H. Rosenthal<br>U.S. District Judge |

# DEFENDANTS' RESPONSE TO AMICUS BRIEFS

> *Of great importance to the public is the preservation of this personal liberty: for if once it were left in the power of any, the highest, magistrate to imprison arbitrarily whomever he or his officers thought proper…there would soon be an end of all other rights and immunities.…To bereave a man of life…without accusation or trial, would be so gross and notorious an act of despotism, as must at once convey the alarm of tyranny throughout the whole kingdom.*
>
> W. Blackstone, Commentaries on the Laws of England (1765).

## INTRODUCTION

On August 1, 2019, after seven months of lengthy and, at times, contentious negotiations, the parties filed a Joint Motion for Preliminary Approval of Proposed Consent Decree and Settlement Agreement and for Approval of Class Notice (the "Motion"). The Motion sets out in detail the history of this litigation.

Over the ensuing weeks, ten amici filed briefs or statements in opposition to parts or all of the proposed Consent Decree. The 10 amici can be divided into three categories as follows:

One category consists of law enforcement personnel who have a stake in the administration of criminal justice in this county: (1) Harris County Deputies' Organization, (2) Josh Bruegger, Chief of Police, City of Pasadena, and (3) Houston Area Police Chiefs' Association. In many ways, Defendants are on the same team with these law enforcement agents. We share their same goals, and we acknowledge and will address their well-meaning concerns about the proposal.

A second category contains outside groups interested in the criminal justice process: (4) Professional Bondsmen of Harris County, (5) Equal Justice Now, (6) Crime Stoppers, and (7) Harris County Domestic Violence. For the most part, these are single-issue objectors whose concerns are to be respected once placed in the larger context of the overall proposal.

The final category are county insiders—all elected officials who have participated in one way or another in the resolution of this lawsuit: (8) County Commissioner Steve Radack, (9) County Commissioner R. Jack Cagle, and (10) District Attorney Kim Ogg. The points now made by these insiders have largely been already expressed at various points in the process; that they are being expressed

again as objections now might best be viewed in light of the political arena in which all elected officials find themselves.

It would be impractical and unnecessary to respond to all of the objections. In this response, we will focus on two principal ones. First, is the proposed Consent Decree legal; that is, does it comply with Texas law and is it appropriately tailored to remedy the constitutional violation? And, second, does the proposed decree sufficiently protect the public safety?

A third concern, cited by a few of the objectors, is the cost of the proposed Consent Decree. There is no small irony that some of the voices now raising this concern authorized or acquiesced in the spending of millions of dollars on this litigation and might have spent even more had the litigation continued. But matters of the public budget are best left to the democratic process. The County has approved the proposed Consent Decree, which is all that need be said.

THE HISTORY OF THE NEGOTIATIONS

The proposed Consent Decree did not spring forth fully-developed at birth like Athena from the head of Zeus. It was instead the product of many months of give-and-take, not merely between the two sides of this case, but also among the various constituencies that make up the defendants. As our Supreme Court has stated:

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties

> waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus, the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve.

*United States v. Armour & Co*., 402 U.S. 673, 681-81 (1971) (emphasis in original).

The first step, after the 2018 election, was the promulgation in January 2019 by the County Criminal Court at Law ("CCCL") Judges of the new Local Rule 9, the centerpiece of the proposed Consent Decree.[1] We will have much more to say about the new Rule below; for now, it will suffice to say that the parties jointly asked this Court to order compliance with it, and in March 2019 the Court obliged. Dkt. 575.

Early in 2019, the plaintiffs presented a draft agreement which, as one might expect, contained their wish list of terms. Negotiations always start this way, with one side or the other staking out positions it knows might require compromise. The plaintiffs naturally lobbied for as expansive a deal as they could get. As the defendants began to consider the plaintiffs' draft, it became apparent they were not

[1] Notably, many of the amici support the new rule, including Commissioners Radack and Cagle, and District Attorney Ogg.

a monolithic group acting in unison. There were separate branches, each with its own priorities and concerns.

The CCCL Judges, for example, jealously guarded their judicial discretion. They objected to any provisions that purported to dictate how each of them would run her own docket. The Sheriff and his staff, who were in the midst of opening a new Joint Processing Center for arrestees, emphasized public safety and the need for procedures that were practical and workable. The Sheriff did not want obstructions that might cause delays in the orderly administration of the intake process. The County Attorneys' Office ("CAO"), for its part, provided advice on the limits of what the County could legally do and the approval procedure to be followed. At times, differing priorities clashed. A consensus could not be reached by one-on-one communications with each party.

It was at this juncture that the new County Judge Lina Hidalgo offered the resources of her office to bring the constituents on the defense side together. The County Judge's staff sponsored a series of meetings beginning in June 2019 to review, comment on, and redraft the plaintiffs' proposed agreement line-by-line. A representative of each defendant was present at every meeting, including the Judges, the Sheriff, representatives from each Commissioner (including Radack and Cagle, who only now dissent from the proposed agreement), and counsel, including the County Attorney. The group met almost daily for several hours per day. These

discussions were informed by the concerns of each defendant as well as this Court's extensive legal and factual findings, significant discovery and an eight-day evidentiary hearing, and developments that occurred while the preliminary injunction was in effect.

During the negotiation process, representatives of the County Judge's Office also met with non-party department heads (or their representatives) regarding the proposed terms of the Consent Decree. The District Attorney was among the non-party department heads invited to such meetings. Although the Consent Decree filed with the Court could not address every item raised by non-party department heads (or their representatives) during these meetings, the feedback they provided played a considerable role in the parties' negotiations.

The overall cost of the settlement was at the forefront of the debate. On the advice of the CAO, the County Judge's staff involved the County Budget Office to estimate the full cost of what was being considered for the entire proposed term of the deal. Before the Commissioners' Court considered the settlement, the Budget Office supplied such an estimate.

A new draft of the proposed consent decree resulted from the numerous defense meetings, cutting back significantly on the plaintiffs' proposal. Again, this is how negotiations typically proceed. Between the presentation to the plaintiffs of the new draft to the agreement on a final one, the defendants met several times

together with the plaintiffs, and several times separately, to consider amendments and counterproposals. Lists of sticking points were circulated to the defendants; each point was examined individually before resolution.

In the end, the parties compromised to reach a final deal. Neither side obtained the precise agreement it wanted, as that is always the conclusion of a hard-fought settlement process. No one would call it a perfect agreement. Yet, it is an agreement all of the participants in the process agreed upon.[2]

The settlement terms are not graven in stone. The parties recognized their proposed long-term deal needed flexibility in its administration. For that reason, they built into the agreement several provisions permitting changes or second looks in the event snags develop in the administration of the agreement. For instance, paragraph 31 contemplates that the CCCL Judges will audit the implementation of Rule 9 and may seek, with the approval of the Monitor and the Court, to update the rule from time to time. Moreover, the proposed Consent Decree contains a process in paragraph 137 to seek modifications of *any* of its provisions for good cause. *See*, *Williams v. Edwards*, 87 F.3d 126, 131 (5th Cir. 1996) (court has inherent power to

---

[2] A few of the objectors complain that the agreement resulted from collusion. Our brief description of the course of the negotiations ought to dispel that idea. More to the point, the type of collusion the case law decries differs from the usual settlement process involving communications between the parties. *See, e.g., Reed v. General Motors Corp.*, 703 F.2d 170 (5th Cir. 1983). Otherwise, every class action settlement could be attacked as collusive. Only when the parties (or their counsel) craft a deal that offers little or nothing for absent class members may a settlement be attacked as collusive. No objector claims the class of plaintiffs here receives short shrift in the settlement.

modify consent decree). This Court will receive regular reporting about the parties' compliance with the agreement and it retains continuing jurisdiction to ensure the process goes as smoothly as possible.

LOCAL RULE 9

From a review of the objectors' comments, misinformation and misapprehension about the new rule abounds. Some objectors point to specific examples of arrestees who have been released only to allegedly re-offend, as if such a possibility could not have occurred under the prior unconstitutional regime. Others promote fears of wide-spread assaults on public safety. We now set the record straight.

*First*, neither the CCCL Judges in particular nor the defendants in general brushed aside public safety concerns in making the new rule. Indeed, the defendants share the goal of many of the objectors to keep our community as safe as the constitutional limits will permit. For that reason, the new rule was carefully crafted to carve out a list of misdemeanor arrestees who would *not* be subject to automatic release on personal bond. The CCCL Judges created these carve-outs, with input from others, precisely because of the public safety concerns underlying many of the objections.

The carve-out list includes any persons arrested for misdemeanor domestic violence—the rule includes every single offense for which a court may issue a

Magistrate's Order of Emergency Protection under Article 17.292 of the Code of Criminal Procedure. The list also includes any persons arrested and charged with a new offense while on any form of pre-trial release, or who are on community supervision for a prior offense. Arrestees in those carve-out categories must be presented at a hearing before a judicial officer within 48 hours of arrest. At this bail hearing, the judicial officer determines the terms of any release, with the same discretion to release on personal bond or set affordable bail as under the old rule.

*Second*, the new rule has now been in effect for almost eight months. It has worked well. At the same time, it cured the constitutional infirmities of the old rule, it has reduced jail populations without endangering public safety. To be sure, there is no criminal justice scheme, short of blanket preventive detention (which itself would be unconstitutional), that could prevent all offenses by persons awaiting trial on prior misdemeanor charges. Critics will always be able to sensationalize isolated criminal acts of this nature,[3] but our free society with its presumption of innocence has opted to tolerate the risk of re-offending in exchange for "preservation of this personal liberty" (to quote Blackstone once again).

[3] A few of the objectors, notably Chief Bruegger, express understandable outrage at one aberrational case. A man arrested in Pasadena for misdemeanor family violence was released on personal bond only to return to his pregnant ex-wife to stab her to death. Missing from the account is the fact that the arrestee was released on personal bond only after a hearing before a magistrate, who granted a protective order barring the man from going near his ex-wife. The new rule had nothing to do with this incident. Even had bail been set and the man made to pay a surety or cash bond, no one could say the man would have been unable to bond out, disobey the protective order, and commit the crime.

*Third*, contrary to the objections, the new rule fully complies with state law. The CCCL Judges created a policy that directs the cases requiring immediate attention to magistrates and refers other cases for prompt release and rescheduling to see a judge in the assigned court. This is plainly within the power of the judges under state law, as are the policies regarding how cases are scheduled in the assigned court. Texas law does not require an individualized hearing before issuing a personal bond.

REDUCING NON-APPEARANCE

The District Attorney asserts that the non-appearance portions of the proposed Consent Decree violate state law. To understand why her assertion is mistaken, we should examine the fundamental legal principles at issue.

As a first principle, the United States Constitution guarantees a defendant the right to be present every critical stage of the proceeding. *See Illinois v. Allen*, 397 U.S. 337 (1970). Likewise, Texas law requires the presence of the defendant at trial for any misdemeanor case punishable by imprisonment. Tex. Code Crim. Proc. art. 33.03.

Regarding pre-trial matters, Texas law grants broad discretion to the courts to control their own dockets. Tex. Code Crim. Proc art. 33.08 ("The district courts and county courts shall have control of their respective dockets as to the settings of

criminal cases.”).[4] Pre-trial proceedings in Texas are largely controlled by Article 28.01 of the Texas Code of Criminal Procedure. A trial court may set any of ten substantive pre-trial matters for a hearing, including “arraignment of the defendant…and appointment of counsel,” motions for continuance, motions to suppress, and motions for change of venue. *Id.* The trial court, if it elects to hold such a hearing, must “direct the defendant and his attorney, if any of record, and the State’s attorney, to appear before the court.” *Id*.

The pre-trial procedures in Article 28.01, including the notice and personal appearance requirements, are triggered at the sole discretion of the trial judge: “by its terms, Article 28.01 comes into play only when the trial court exercises its discretion to ‘set’ a criminal case for a pre-trial hearing” using the specific procedures in Article 28.01. *State v. Velasquez*, 539 S.W.3d 289, 294–95 (Tex. Crim. App. 2018).

But the Code of Criminal Procedure contains no requirement that the defendant be present at *every* pre-trial court setting. While there are these substantive court settings that require the presence of the defendant, the proposed Consent Decree makes an unremarkable provision for less-formal meetings with

[4] A “trial court’s inherent power includes broad discretion over the conduct of its proceedings.” *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199 (Tex. Crim. App. 2003). Among a court’s inherent powers is setting its schedule and who is required to appear that day. *See Ex parte Krupps*, 712 S.W.2d 144. “[T]he judge’s control of the courtroom must be maintained with as little burden on him as possible.” *Id.* at 153 (Onion, P.J., concurring).

counsel that do not. Trial judges decide when a personal appearance by a defendant is necessary at a court date before trial.

Under the Consent Decree, when a judge schedules some court dates to be conferences between lawyers, the notices and data will accurately reflect that choice. Still, any CCCL Judge may, within her own discretion, require the defendant's appearance at every scheduled court date by classifying every scheduled date as one that requires the defendant's appearance.

Classification of court settings does not alone cure the constitutional deficiencies of the previous judges' bail practices, so the consent decree also standardizes procedures for rescheduling appearances, including rescheduling court dates after the defendant was required to appear and failed to do so. All of these proposed provisions will facilitate better communication with defendants. In addition, they will aid in the collection of data to insure greater transparency of court practices. Finally, the new provisions discourage repeated mandatory court appearances designed solely to coerce guilty pleas from defendants.

The scheduling procedures outlined in the proposed Consent Decree are also entirely consistent with the portions of Texas law regarding bond forfeitures. Courts are required to initiate forfeiture proceedings only when a person "is bound by bail to appear and fails to appear in any court in which such case may be pending and at any time when his personal appearance is required under this Code, or by any court

or magistrate…" Tex. Code Crim. Proc. art. 22.01. If personal appearance is neither required by the Code nor required by the court, no forfeiture shall commence. But if a person fails to appear when required, courts and prosecutors retain the power to engage in forfeiture procedure as before, subject, as always to the judges' power to schedule and re-schedule court dates.

THE PROPOSED CONSENT DECREE IS LEGAL

Some amici assert the proposed Consent Decree ought to be rejected because it goes beyond the relief that the Court could grant had the case been fully litigated. This Court's powers are not so limited.

So long as the terms of a consent decree come within the general scope of the case made by the pleadings and furthers the objectives of law upon which the complaint was based, it is within this Court's discretion to enter the decree. *See Local No. 93, Intern. Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986); *Sansom Committee by Cook v. Lynn*, 735 F.2d 1535, 1538 (3rd Cir. 1984). That the parties have voluntarily agreed to a broad scope of relief is no ground for rejecting their agreement. *See Local No. 93*, 478 U.S. at 525 (court not barred from entering consent decree merely because it could not grant such relief after a trial).

Our courts encourage settlements and are given wide discretion to approve of them. "[T]he parties' *consent* animates the legal force of a consent decree." *Local*

*No. 93*, 478 U.S. at 525 (emphasis added). And the Fifth Circuit has held that a Court should approve a class action so long as a consent decree is fair, adequate, and reasonable. *See U.S. v. City of Miami, Fla*., 614 F.2d 1322, 1330 (5th Cir. 1980). Indeed, any rule of scrutiny largely stems from a necessity "to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members or shareholders." *Id.*

The fundamental aim of the Consent Decree is to remedy the systemic and longstanding constitutional violations found by the Court in this litigation;[5] to safeguard arrestees' equal protection and due process rights; to reduce arbitrary incarceration; to promote court appearance; to require investments necessary for new systems to exist and function efficiently in a large jurisdiction; and to promote transparency, analysis, and accountability throughout the pretrial process so that constitutional practices will endure.

To achieve these goals, the parties agreed that systemic change beyond the adoption of a new judicial rule would be required. For example, by training

[5]The nature of the remedy for deprivation of federal constitutional rights is determined by the nature and scope of the constitutional violation. *Swann v. Charlotte Mecklenberg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971). As the Supreme Court has noted, "the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States,* 380 U.S. 145, 154, 85 S. Ct. 817, 822, 13 L. Ed. 2d 709 (1965). This case involves a long-standing system of intentional discrimination resulting in the deprivation of liberty and all of its attendant destructive consequences for countless citizens over many years.

participants in the criminal justice system and by collecting data about the administration of the system, the parties could ensure that the constitutional remedies mandated by this Court would be sustained. Moreover, to avoid disputes, back-sliding, or corner cutting, they agreed to the appointment of a Monitor to independently report, approve, and mediate disagreements between the parties. The parties believe each of the terms to be critical, dependent on the other terms, and sufficiently important that they should all be protected in a court order from the winds of political change.

## CONCLUSION

For all these reasons, Defendants ask the Court grant preliminary (and, ultimately, final) approval of the Consent Decree, and for such other relief to which they may be justly entitled.

Respectfully submitted,

*/s/ Murray Fogler*
Murray Fogler
State Bar No. 07207300
S.D. Tex. Bar No. 2003
mfogler@fbfog.com
**FOGLER, BRAR, FORD, O'NEIL & GRAY LLP**
909 Fannin Street, Suite 1640
Houston, Texas 77010
Tel: 713.481.1010
Fax: 713.574.3224

VICTORIA L. JIMENEZ
Assistant County Attorney
Federal I.D. No. 2522937
State Bar No. 24060021

1861 Old Spanish Trail
Houston, Texas 77054
Telephone: (832) 927-521
Facsimile: (713) 755-8924
E-mail: victoria.jimenez@cao.hctx.net

*Attorneys for Defendant Sheriff Ed Gonzalez*

*/s/ Melissa L. Spinks*
OF COUNSEL, VINCE RYAN
Harris County Attorney

MELISSA L. SPINKS
Assistant County Attorney
Federal I.D. 1312334
State Bar No. 24029431
1019 Congress, 15th Floor
Houston, Texas 77002
Telephone: (713) 274-5132
Facsimile: (713) 755-8924
melissa.spinks@cao.hctx.net

*Attorney for Defendant Harris County*

*/s/ A Van Fleet*

G. Allan Van Fleet
Texas Bar No. 20494700
allanvanfleet@gmail.com
G. Allan Van Fleet, P.C.
6218 Elm Heights LN, Suite 201
Houston, TX 77081
(713) 826-1954

*Attorney for Defendants Sixteen Harris County Criminal Courts at Law Judges*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Murray Fogler*
Murray Fogler