**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |

**PLAINTIFFS' RESPONSE TO AMICI**

Amici's concerns about the proposed Consent Decree are based on misunderstandings of the proposed provisions, misstatements of Texas law, unsupported assertions, political posturing for a larger audience, and anecdotes that are legally irrelevant, misleading, or contrary to the record already established in this case. None of the Amici's concerns provides a basis for rejecting or altering the proposed Consent Decree. Plaintiffs address the concerns below.

**I.      Rule 9 Is Consistent with Texas Law**

In February 2019, the County Court at Law Judges promulgated Rule 9, which amended their Local Rules of Court governing bail procedures. This Court approved Rule 9 approximately six months ago and required Defendants to follow it pending final resolution of this case. Doc. 575. The Consent Decree requires Defendants to continue following Rule 9.

The Amici are divided in their view of Rule 9. The District Attorney, whose staff helped to conceptualize and draft Rule 9, continues to support Rule 9 as promulgated. Doc. 641-1 at 5 (noting that the Rule resolves the constitutional violations and stating that the DA has no objection to "a settlement approved by this Court requiring and monitoring the continued enforcement of that rule"). The Republican County Commissioners Cagle and Radack, who opposed reforms like

Rule 9 when they were part of a controlling majority of Commissioners Court, now praise Rule 9 as the core of the Consent Decree designed to remedy the constitutional violations in this lawsuit. Doc. 634-1 at 7 (arguing that Rule 9 resolves the constitutional violations and that "[a] Court decree that orders Harris County to abide by [Rule 9] prevents any backtracking"); Doc. 638 at 1 ("Harris County specifically implemented amended Local Rule 9.1 to ameliorate and prevent the alleged federal violations at issue."). The for-profit bail industry ("the Bond Industry") and police unions, however, object to Rule 9 and the basic changes it makes in local bail procedures. Though Rule 9 was adopted unanimously by the judges, these Amici make a number of unsupported assertions that Rule 9 somehow violates Texas law. Their arguments are wrong.

These Amici initially argue that Texas law prohibits prompt release of misdemeanor arrestees prior to an individualized bail hearing. *See, e.g.*, Doc. 631-2 at 7. In their view, every arrestee must be detained until a bail hearing can be held. This is a surprising argument coming from the Bond Industry, whose business model prior to this lawsuit depended on local rules permitting wealthy arrestees to be released prior to an individualized hearing. The pre-hearing bail schedule system that the Bond Industry prospered under and that was in effect for many years lacked the same individualized hearing that the Bond Industry now claims Texas law requires. In the old regime, a misdemeanor defendant who could pay the amounts set forth in the County's bail schedule could obtain release before ever seeing a judicial officer (even if, for example, Amici would now consider those defendants "dangerous" individuals who should not be released). The problem for these Amici is that there has never been any suggestion in the case law or everyday practice that the pre-hearing bail schedules used in Harris County and in numerous other Texas counties for decades in both misdemeanor and felony cases violate Texas law because all arrestees must be detained until a formal hearing. Amici cite not a single legal provision that requires

detention until a bail hearing for all misdemeanor arrestees, nor do they cite any state court decision that interprets any provision of state law in that manner. Indeed, Amici previously filed a state-court lawsuit seeking to block implementation of Rule 9 and to revert to prior practice.[1]

The Bond Industry quickly moves to a second argument, more consistent with their prior business model: that Texas law permits misdemeanor arrestees to be released if they pay secured bond prior to a hearing but forbids unsecured or non-financial release. Doc. 631-2 at 7. In other words, arrestees who can pay may be released immediately, but Texas law requires detention until a bail hearing for those who cannot pay for their release. This self-serving argument has no support in Texas law. The fundamental difference between Rule 9 and the old system is that the amount of secured financial condition is set at $0 (instead of, say, $500 or $5,000) and there is an unsecured amount automatically set for each arrestee. As a threshold matter, the Bond Industry does not cite a case or explain why this arrangement violates any provision of Texas law, and Plaintiffs are not aware of any case that suggests that the Judges violated Texas law when they unanimously adopted Rule 9. Nothing in Texas law prohibits release on an unsecured financial condition prior to a formal bail hearing.

Second, Texas law allows judges to determine post-arrest policies for Harris County in ways that are consistent with federal and state rights. Nothing in Texas law limits the authority of local governments to craft their own policies so long as they are not inconsistent with federal or state law. As this Court explained three years ago, "The Texas Government Code permits County Judges to 'adopt rules consistent with the Code of Criminal Procedure . . . for practice and procedure in the courts. A rule may be adopted by a two-thirds vote of the judges.'" Doc. 125 at 5 (citing Tex. Gov. Code § 75.403(f)). Because nothing in Texas law prohibits the policies in Rule

---

[1] The Bond Industry initially filed a request for a preliminary injunction in February but then withdrew that request.

9, the Judges are within their discretion to promulgate the Rule as a lawful and prudent way to prevent constitutional violations from recurring.

Third, in the face of this authority and their own decades of unbroken practice, the Bond Industry points to Texas Code Crim. P. Art. 17.03 and 17.04. But the Bond Industry does not explain how Rule 9 violates them, let alone cite any authority to support its assertion. On its face, Rule 17.03 simply states that magistrates have the *authority* to release many arrestees on personal bond, but it limits that personal bond release authority to "the court before whom the case is pending" for certain serious *felonies*. No part of Rule 17.03 prohibits pre-hearing release on personal bond. No part of Rule 17.03 states that release by a magistrate is the exclusive form of release on personal bond (which would preclude even a judge from ordering such release). And no part of Rule 17.03 prohibits County Court at Law Judges from promulgating rules providing for prompt pre-hearing release within their jurisdiction. Rule 17.03 simply lists the types of cases in which magistrates (not County or District Judges) may not issue personal bonds and those in which they may. Similarly, Rule 17.04 merely describes the informational content of a personal bond form. It says nothing about requiring a person to remain in detention until a hearing.

Fourth, the Judges had very good reasons for exercising their discretion to remedy the federal constitutional violations in this case through the prompt-release provisions in Rule 9. By promptly releasing many arrestees, the Judges protect Plaintiffs' rights to pretrial liberty and against wealth-based detention, which were being violated en masse prior to this litigation. Doc. 302 at 162 & n.99 (describing "tens of thousands of constitutional violations" every year). By dramatically reducing the time spent in jail prior to bail hearings for thousands of people, the Judges save the County money; protect jobs, housing, medical care, and family relationships of arrestees; and prevent thousands of future crimes and missed court appearances. As this Court has

found, even a few days of post-arrest detention has negative effects on misdemeanor arrestees and increases future crime. *See* Doc. 302 at 112–14.

In adopting Rule 9, the Judges took note of this Court's factual findings that the County bureaucracy was repeatedly and continuously unable to comply not just with federal constitutional requirements of bail hearings, but also with Texas Code Crim. P. Art. 17.033, which requires misdemeanor arrestees to be released on personal bond within 24 hours of being detained if a magistrate has not determined probable cause.  Doc. 302 at 97 ("The court finds and concludes that Harris County is not providing a bail-setting hearing within 24 hours in thousands of cases."); *id.* at 167 (explaining that the 24-hour rule was violated in "20 percent" of the tens of thousands of cases).  Rule 9 was an attempt by the Judges to bring Harris County into compliance not only with federal law but also with this state law, which had been violated for years because of the practical and logistical difficulties of mass post-arrest processing.  By promptly releasing specific categories of misdemeanor arrestees on unsecured conditions that the evidentiary record in this case shows are just as effective as secured conditions, *see, e.g.*, Doc. 302 at 150, the Judges were able to significantly ameliorate one of the persistent factors causing the constitutional violations in this case: *busy and overwhelmed magistration dockets*.  As this Court noted after hearing testimony and watching videos of magistrations, the extraordinarily crowded dockets in Harris County led to enormous pressure to conduct brief and non-rigorous proceedings.  *See* Doc. 302 at 71–77.  The volume was so burdensome that, even though Defendants claimed repeatedly throughout the litigation that they were attempting in good faith to meet various local, state, and federal rules for conducting prompt adversarial bail hearings, thousands of people were still detained for more than four days without an opportunity for an adversarial bail hearing.  Doc. 302 at 97–98.  If the Bond Industry and police union Amici had their way, and *every* arrestee required

an individualized bail hearing before release, then Harris County's problems would be even *worse* than they were when this case was filed. And ironically, given various Amici's complaints about the supposed expense of the Consent Decree, the system they propose would be vastly more expensive than the settlement to which all Defendants have agreed.[2] The Judges rightly concluded that requiring individualized hearings for even more arrestees than the peak in 2016 (because in the old system about 33% of arrestees bought their way out of jail prior to a hearing by paying the Bond Industry, Doc. 302 at 95) would result inevitably in constitutional and state law violations. As a practical matter, such a system could not function.

The Judges recognized that requiring fewer hearings allows more attention to the cases that are most serious, more attention to the conditions of release in serious cases, more attention to individual constitutional rights that have a history of being brushed aside in seconds, more attention to cases in which a condition of release is violated, less strain on the Sheriff's Department resources, and significant cost savings for the County in providing deputies, magistrates, public defenders, prosecutors, and investigative services. In short, relieving the pressure of overwhelmed magistration dockets enables the important improvements that the Constitution requires be made to bail hearings at which class members' pretrial detention is at stake. But it also enables a more rigorous analysis of public safety to take place at the hearings that do occur, with more information presented about the offense, the arrested person, the relevant circumstances, and appropriate

---

[2] Some Amici argue in the alternative that more offenses should be included in the carve-out categories in Rule 9, meaning that detention until a hearing would be required for more arrestees. These Amici would substitute their judgment for those of the elected Judges, but they do not provide any sound basis for doing so. The Judges are within their discretion to promulgate Rule 9, and the Parties agree that Rule 9 is a prudent and reasonable set of procedures that protects Plaintiffs' rights while balancing the systemic pressures that led to the violation of Plaintiffs' rights in the past.

Amici also claim that the Consent Decree somehow interferes with the ability of law enforcement to protect people from crises caused by mental health or intoxication. As Rule 9 makes clear, the Sheriff is permitted to detain arrestees intoxicated after certain arrests, and nothing in the Rule's terms purports to interfere with any civil mechanisms that law enforcement has under Texas law to deal with such emergencies, including mental health crises.

public-safety related conditions.   Nothing in Texas law prohibits the Judges from using their discretion to make evidence-based changes in their approach to pretrial release conditions, in order to remedy the longstanding and entrenched constitutional violations and violations of Texas law found by the Court.  The Amici make no case for why the Defendants should instead be required to keep all arrestees in jail until at least four times as many bail hearings are held—something the Defendants and this Court know could not occur in a constitutionally permissible manner, given the reality of Harris County's manpower and physical space constraints.[3]

The Bond Industry makes several other arguments that Rule 9 violates Texas law.  None of them makes sense.  The Industry argues that Rule 9 improperly "prefers" personal bond and what it calls "differential" amounts.  Doc. 631-2 at 7.  But there is nothing illegal about "preferring" unsecured pretrial release.  Indeed, Plaintiffs' claim in this case that the *federal* Constitution requires that the least restrictive conditions of release be required for every presumptively innocent arrestee.  Amici do not explain how the Consent Decree requires "differential" bond amounts or why that would be illegal under state law.

Next, the Bond Industry argues that the Consent Decree requires the Sheriff to reject a "valid" surety bond.  Doc. 631-2 at 7–8.  It does not.  Rule 9 simply sets forth a framework by which the Judges give the Sheriff *different* orders to release certain arrestees on unsecured bonds.  Indeed, Rule 9 envisions the Sheriff complying with those orders, not rejecting them.  In any event,

---

[3] Even if the Bond Industry had shown that Texas law makes it illegal to release arrestees without secured bond prior to a hearing, critical provisions designed to prevent the continuation of decades of federal constitutional violations would take precedence, and the evidentiary record in this case demonstrates that Rule 9 is carefully designed and tailored to protect constitutional rights based on the most rigorous evaluation of the record evidence of best practices and the record evidence of Harris County's longstanding deficiencies.  Supremacy Clause, art. VI, cl. 2; *Armstrong v. Exceptional Child Center*, 135 S. Ct. 1378, 1383 (2015) ("[The Supremacy Clause] creates a rule of decision: Courts 'shall' regard the 'Constitution,' and all laws 'made in Pursuant thereof,' as 'the supreme Law of the Land.' . . . It instructs courts what to do when state and federal law clash[.]"); *North Carolina State Bd. of Educ. v. Swann*, 402 U.S. 43, 45 (1971) ("[S]tate policy must give way when it operates to hinder vindication of federal constitutional guarantees.").

the Consent Decree separately instructs the Sheriff, under a specific measure authorized by the Fifth Circuit in this case and serving to prevent the prior constitutional violations if a person falls through the cracks, to decline to enforce a secured bond order if it was issued in contravention of Rule 9.  It does so because such orders would violate federal law.  Moreover, state law explicitly relieves the Sheriff of any duty to enforce an order that he knows to be unlawful.[4]

The Bond Industry then objects to the heightened evidentiary standard required for an order of pretrial detention.  Doc. 631-2 at 8.  Nothing in Texas law prohibits the Judges from requiring a standard of clear and convincing evidence at pretrial detention hearings.  Plaintiffs have explained that this standard is required by the U.S. Constitution.  *See, e.g.*, Doc. 400 at 21–28 (explaining that this standard has been applied by every Supreme Court case to consider the question in the context of bodily liberty and by numerous lower courts to the pretrial detention decision).  The Bond Industry suggests that this standard must violate Texas law because magistrates have "discretion" to require whatever money bail amount they want.  Doc. 631-2 at 8. Although the argument is not explained, it appears that the Bond Industry believes that magistrates have unbridled "discretion" to order de facto pretrial detention without applying *any evidentiary standard at all* to the facts on which that decision is based.  But they do not point to a provision of Texas law for that proposition, and nothing in Texas law specifies that magistrates must apply a *lower* standard of proof to findings that result in pretrial detention.

The Pasadena police chief similarly objects to the procedural safeguards included in Rule 9 because having "evidentiary hearings" at the bail stage might require his officers to testify at

---

[4] *Soto v. Ortiz*, 526 F. App'x 370, 376 (5th Cir. 2013) (discussing § 351.041(a)) (quoting *Douthit v. Jones*, 641 F.2d 345, 346–47 (5th Cir. 1981), rehearing opinion of 619 F.2d 527 (5th Cir. 1980)); *McBeath v. Campbell*, 12 S.W.2d 118, 120 (Tex. Com. App. 1929).

pretrial detention hearings.  Doc. 637 at 3.[5]  He does not point to a provision of Texas law that this violates (nor could he), and federal law requires these safeguards prior to an order of pretrial detention.  The police chief apparently does not like the fact that an officer may need to provide hearsay or other evidence in a proceeding about whether a person that officer arrested must be detained prior to trial.  The State must meet the government's burden to justify pretrial detention under federal law, and providing for minimal adversarial hearings does not (and could not) violate Texas law.  Holding the type of bail hearings required by federal law in Harris County may indirectly impact the chief's "police budget for overtime pay," but that is not a meaningful basis for opposing the Consent Decree.

The Bond Industry next wrongly suggests that Rule 9 does not take into account funds available from "family members."  Doc. 631-2 at 8.  The Bond Industry does not explain why this would violate Texas law even if it were true (and the case it cites does not hold that), but it is not true regardless.  The Rule contemplates funds available from "any lawful source."  *See* Doc. 617-1 at Provision 9.12.5.  This obviously would include family members.

The Bond Industry next claims that Rule 9 violates a purported state law "right" that it has to its business livelihood.  The Bond Industry asserts that its members have a "right to earn a living writing bail bonds" and that they "have a protected property interest under the Texas Constitution in their bail bond license."  Doc. 631-2 at 10.  But the general rule that people are free to support themselves in the United States and in Texas does not help the Bond Industry here.  The cases it

---

[5] On August 29, 2019, a group of police chiefs filed a similar brief raising the same issues.  Doc. 646-1 at 3.  In addition to repeating the argument about the budgetary consequences of having individualized bail hearings that meet federal constitutional requirements, the police chiefs raise other issues already covered by the other amicus briefs and addresses below.  Although Rule 9 has been in effect since February and although the Consent Decree was filed more than four weeks ago (and they received an extension from this Court to file an amicus brief in opposition to the Consent Decree), the police chiefs ask for unspecified further time to evaluate the Consent Decree.  Further time is unwarranted.  They, just like all of the other Amici, have been able to make numerous arguments about the Consent Decree over the past month and have had ample time to analyze its provisions.

cites recognize a *general* federal constitutional "property right in making a living," which is not absolute, but rather can be infringed by "valid and subsisting regulatory statutes." *Smith v. Decker*, 312 S.W.2d 632, 634 (Tex. 1958); *id.* at 633 ("That a right to earn a living is a property right within the meaning of our Constitution was early established by the United States Supreme Court in the Slaughter House cases, 16 Wall 36 [(1872)] . . . .").

Of course, the general right of people to a make a lawful livelihood in a free society, the subject of the *Slaughter House Cases* on which Bond Industry's doctrine rests, is not what this case is about. The government regularly enacts laws that negatively affect people or companies financially. The mere fact that a law might diminish a person's future business does not mean that the government has violated that person's liberty or property rights. Texas regulates conduct in ways that affect people's finances all the time. Those regulations do not violate the general right to make a living. Like any other government action, those regulations are lawful unless they serve no rational basis. In this case, the prior bail practices that allowed the Bond Industry to profit from misdemeanor arrests also violated federal constitutional rights. To remedy that problem, elected local officials acted within their power to change their practices so as to stop violating those rights, and to promote public safety and court appearance based on an evidentiary record and their judgment. The fact that the new policies governing the local misdemeanor system might reduce the Bond Industry's profits in the future does not mean that a liberty or property right has been improperly infringed.[6]

Finally, even the property interest asserted by the Industry is illusory. Even if this Court accepted the Industry's new alternative argument that people must be detained until individualized

---

[6] To illustrate this point, consider the federal pretrial system. Because of changes to federal statutory law, the federal court in Houston has also virtually eliminated the use of secured money bail. Of course, that federal-court policy affects the Industry's bottom line as well, but it does not mean that their constitutional rights are violated.

bail hearings in every case under Texas law, judges and magistrates could choose to grant personal bonds in their discretion in each relevant case. Such a result would not violate some general right to profit from writing bail bonds. So requiring what the Bond Industry now proposes would not even help the Bond Industry; it would simply overwhelm Harris County's pretrial system in ways that would cause innumerable violations of the Constitution.

## II.     Amici's Anecdotes Are No Substitute for Evidence

Several Amici make impassioned statements suggesting that the Consent Decree would harm public safety. They offer anecdotes (usually unsupported by documentation) as support for these assertions. But none of the anecdotes captures a situation in which the result complained of was required by the Consent Decree. Instead, the examples are of instances in which Amici do not agree with how *individual judges* exercised judicial discretion in ways that are *not* dictated by the Consent Decree and, in two cases, situations in which the purportedly bad outcome was the result of *not* following the requirements of the Consent Decree prior to a judicial hearing.

Plaintiffs begin with several general points about the anecdotes offered by various Amici. First, each relevant portion of the Consent Decree was designed based on the evidentiary record in this case and overwhelming empirical evidence. *See* Doc. 617-1 at 2–11 (summarizing some of the most relevant facts); Doc. 617 at 10–23 (recounting relevant facts from the record in support of the Consent Decree's provisions). To the extent the anecdotes offered by Amici imply that secured money bail is superior at achieving public safety, they contradict that evidentiary record: Secured money bond does not encourage law abiding behavior, and detaining people for even a short period of time actually increases future crime and nonappearance. *See, e.g.*, Doc. 302 at 130, 150. Secured money bail can only affect public safety if it is used to accomplish pretrial detention, but *the Consent Decree explicitly allows for that outcome in each example offered by Amici*.

Second, no system will ever eliminate risk.  The Parties could fill volumes with anecdotes of people in Harris County committing crimes after having been given *surety* bonds.  The eight-day evidentiary hearing and this Court's factual findings developed the best available evidence as a platform on which to make reasonable policy judgments about how to administer a bail system, including the overwhelming evidence that pretrial detention for even short periods makes individuals *more* likely to commit crime in the future.  Amici might make different decisions in individual cases or tolerate more future crime for short-term talking points, but the evidentiary hearing debunked a similar parade of horribles made by prior Defendants without the benefit of empirical fact.  Doc. 617 at 10–23.  In a society that values liberty, we will not be able to prevent all harm or to predict all future behavior.  No matter what system is in place someone will always be able to write an Amicus brief that lists several examples of tragic incidents—in other words, unless the County locks up all misdemeanor defendants indefinitely, some released defendant is going to commit a crime.  Our task is instead to base decisions on the best available evidence we have, respecting constitutional rights while promoting public safety.

Third, the goal of these anecdotes appears not to be to criticize any portion of the Consent Decree, but the notion of bail reform and pretrial liberty generally.  This is evident because the anecdotes do not focus on any contested provision of the Consent Decree.  Instead, the anecdotes are apparently offered to complain about *individual exercises of judicial discretion* by Harris County magistrates or judges at individual bail hearings.  A secured bail schedule would not have prevented these incidents, and a hypothetical consent decree eliminating judicial discretion and requiring magistrates and judges to detain arrestees that Amici apparently want detained would be unlawful under Texas law and unjustifiable under federal law.  Many of these same Amici have emphasized the importance of "judicial discretion" for several years.  It is only when that discretion

12

is exercised to release more individuals that they decry the principle.  Nonetheless, the Consent Decree recognizes that Harris County Judges must exercise their discretion in individual cases while applying the correct legal standards, making appropriate findings, upholding constitutional rights, and basing their decisions on the best available information and evidence about public safety and court appearance.  They should not be bullied by political attacks into detaining large numbers of people at great public cost and future risk of crime.

The specific anecdotes require no detailed response, but it is useful to illustrate the dispositive flaws in the examples provided to the Court.  First, as noted, the DA offers the examples not to complain about any provision of the Consent Decree.  Not a single example cited by the DA is tied to a purported problem with the Consent Decree, and the outcome the DA disagrees with was not in any case required by the Consent Decree.  Instead, the DA frames the examples as instances in which individual judges exercised their "discretion" in an "unreasonable manner." Doc. 641-1 at 17.  This is a political disagreement about individual cases between the DA and Judges, each of whom was elected by the voters of Harris County to apply their judgment and discretion within their respective realms.  This political disagreement has no legal significance to whether any portion of the Consent Decree is appropriate.

Second, because Amici have not included explanations or actual records, it is impossible to verify their allegations.  Plaintiffs therefore accept the allegations as true as far as they go, because none of them, even taken on their own terms, implicate any portion of the Consent Decree. They are all cases in which the Consent Decree would have allowed the person to be detained.  But this is not a forum for complaining about individual judicial decisions to detain or not detain, especially because Amici provide *none* of the other factual circumstances that the individual judge in each case had before her when rendering the decision that Amici dislike:

- **Deonte Ramel Thomas:** As Amici concede, Rule 9 required him to be detained until an individualized bail hearing after each of his arrests. Amici profess anger that a magistrate decided in her discretion to release him at that individualized hearing. Even assuming Texas law would have permitted the magistrate to order his detention on these misdemeanor charges (one of Amici's complaints seems to be with Texas law on misdemeanor pretrial detention *not* the Consent Decree, which allows unaffordable bail to accomplish such detention), the outcome that Amici object to was *not* required by the Consent Decree. The Consent Decree and Rule 9 clearly allow a de facto order of pretrial detention to have been entered in his case. Amici state that "if this is the result required by the proposed Consent Decree, then the system is not working." Doc. 635-1 at 7. True enough. The Consent Decree provided for his detention until a hearing, but nothing in the Consent Decree required (or could lawfully require) the aspects of this case to which various Amici object.

- **Jamal Washington Jr.:** The District Attorney complains: "Notwithstanding this criminal history, a misdemeanor judge authorized Washington's release on a general order bond." Doc. 641-1 at 18. Again, this is a grievance with how a judge exercised her discretion in an individual case. The DA does not attempt to show how any provision of the Consent Decree required that outcome, and it did not. Another amicus, Equal Justice Now, has a different bone to pick. According to that Amicus, Mr. Washington was *not* released by a judge but instead was released from jail without an individualized hearing. Regardless of which contradictory view of the facts is correct, this result was *not* required by the Consent Decree. Because Mr. Washington had open felony and misdemeanor cases, Rule 9 provides that he would be detained until an individualized bail hearing as the DA suggests happened. Even if the DA is wrong and Rule 9 was not followed in this instance, that failure to follow Rule 9 would not be a reason to reject the procedures that require on their face the outcome Amici purport to want. (The same is true of the case of Pamela Turner, for whom Equal Justice Now claims "Harris County did not follow its own policy" from Rule 9, Doc. 635-1 at 10.) These are simply complaints that the Defendants did *not* follow the Consent Decree.

- **Ralph Waites:** The DA recites several purported facts about his case but does not explain why the Consent Decree, let alone a particular provision of it, caused any of the things that the DA believes to have been improper. Indeed, it seems Mr. Waites failed to appear after having paid a surety bond in one of the cases. Regardless, whether misdemeanor judges exercised their discretion properly in his cases is not relevant to accepting or rejecting any provision of the Consent Decree.

- **Rodderick Cooper:** The DA complains again about the simple exercise of judicial discretion that changing any portion of the Consent Decree would not resolve. In Mr. Cooper's case, a misdemeanor judge granted a personal bond in a domestic violence case even though Mr. Cooper was separately being detained in a felony case. Whether or not the DA agrees with the individualized determination of the misdemeanor judge on the full record before that judge (and not presented by the DA here), nothing in the Consent Decree required that outcome.

- **Alex Guajardo:** The DA complains that, after an individualized hearing, a magistrate judge released Mr. Guajardo on a personal bond with an emergency

14

order of protection.  Mr. Guajardo allegedly violated that order of protection by killing his pregnant wife.  The DA apparently disagrees, at least after the fact, with the individualized exercise of discretion by the magistrate, but this result was not required by the Consent Decree.  And the fact that a person later commits a crime does not mean that the judge who released the person was "unreasonable" in her "discretion" based on all the evidence presented at the time.  Rule 9 provided that Mr. Guajardo be detained until the bail hearing.  No provision of the Consent Decree required him to be released thereafter on a personal bond, and Rule 9 allowed him to be detained on unaffordable money bail until his trial if the DA demonstrated that he was a danger to the community.

To be clear, to the extent Amici use these anecdotes to complain about a "revolving door," 634-1 at 11, that concern is not implicated by the Consent Decree.  Rule 9 explicitly permits those who commit an offense or fail to appear while on release to be detained until an individualized hearing, and it explicitly permits those people to be detained after that hearing for the entire pretrial period.  The misleading posturing by Amici is therefore regrettable.  This Court should not allow itself to be the platform for that sort of demagogic political spin, which is unrelated to any valid issue before the Court.

### III.    The Consent Decree's Court Appearance Provisions Are Reasonable

The Harris County District Attorney's concerns about the Consent Decree are focused on the District Attorney's flawed interpretation of several provisions regarding court appearance. Several other Amici share these concerns and these misconceptions.

At the outset, Plaintiffs note that the District Attorney's claim that she raised these concerns "at numerous settlement conferences and meetings" with the parties during negotiations is puzzling.  Doc. 641-1 at 4.  The District Attorney never raised concerns with Plaintiffs concerning the court appearance policies she now criticizes.  Plaintiffs were not aware of the District Attorney's concerns about these issues until she filed an amicus brief in this Court.  Indeed, Plaintiffs are not aware of the District Attorney or her representatives attending *any* negotiation session or phone call in which Plaintiffs participated concerning these issues she now raises until

15

Plaintiffs asked to meet with the District Attorney after her brief was filed.  Plaintiffs are not aware of the District Attorney's involvement in any negotiations with them since the District Attorney worked with other stakeholders to help develop Rule 9 prior to its adoption in February.  Had the District Attorney raised these concerns to Plaintiffs, Plaintiffs could have corrected some of the misconceptions on which they are based.

The District Attorney's first concern is supposedly "unfettered discretion to waive court appearances."  Doc. 641-1 at 10.  But these provisions of the Consent Decree were simply meant by the Judges to be consistent with existing Texas law and practice, allowing the judicial officer to determine that a person's presence is not necessary at a particular setting.  *See* Tex. Code. Crim. Proc. 33.08 ("The district courts and county courts shall have control of their respective dockets as to the settings of criminal cases."); *State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 199 (Tex. Crim. App. 2003) (holding that "a trial court's inherent power includes broad discretion over the conduct of its proceedings," especially "in the absence of a statute that specifically prohibits" the judges' action).[7]  Under existing Texas law, then, judges have wide discretion to manage their dockets, and the Consent Decree contemplates many appearances at which a person's appearance is typically unnecessary and inefficient, such as the many settings where the parties are merely picking future court dates or exchanging discovery, which the Consent Decree refers to as "general settings."  Missing work and other obligations to attend a proceeding at which the presiding judge does not deem a person's presence to be required is a significant burden and increases the likelihood of nonappearance, and even nonappearance for good cause imposes significant costs on the system.  In contrast, the policies proposed by the judges in the Consent Decree require a

---

[7] Texas code specifies proceedings at which a defendant's presence is required.  *See, e.g.*, Tex. Code. Crim. Proc. 33.03 (requiring defendants' presence at felony trials and at misdemeanor trials where jail time is the result, but not requiring defendants' presence at hearings on motions for new trial in a misdemeanor case).

person's presence at the first appearance, Doc. 617-1 at X.68, and the Consent Decree identifies pleas, bond forfeiture and revocation hearings, suppression hearings, and trials as "required" appearances, as well as any other appearance the court orders to be "required."  Doc. 617-1 at IV.17.r.  The District Attorney cites no relevant authority for the proposition that Texas judges do not have the power to excuse a person's appearance, and that is contrary to both their broad discretion under the law cited above and to current practice in Harris County.  The DA (in a footnote) cites only to Rule 28.01, but Rule 28.01 hearings are a special type of discretionary pretrial hearing under Texas law, rarely used in Harris County, at which advance notice of *ten days* is required (i.e., it is entirely consistent with the Consent Decree requiring at least seven days' notice prior to changing a "regular setting" into a "required" appearance).  *See, e.g.*, *Bush v. State*, 628 S.W.2d 270, 272 (Tex. Ct. App. 1982) (holding that the 28.01 hearing is discretionary with the trial court).  When a special Rule 28.01 hearing is set by the judge, statute requires advance notice, special procedures, and the attendance of the prosecutor, defense counsel, and the defendant.  Nothing about that Rule, however, interferes with the otherwise wide discretion of trial judges to excuse the appearance of defendants for court settings during the life of a misdemeanor case at which the presiding judge determines the presence of counsel to suffice.[8]  In any event, although entirely unnecessary, Plaintiffs would have no objection to clarifying for the District Attorney that this provision is in no way meant to contradict any provision of Texas law by adding the phrase "consistent with Texas law" to this provision.

---

[8] This also echoes a concern that the DA raises in footnote 2.  *See* Doc. 641-1 at 4.  The DA appears to interpret the Consent Decree to remove the DA's role in compelling a personal appearance for a bond forfeiture hearing.  This is an odd interpretation, because the Consent Decree specifically identifies bond forfeiture proceedings as "required" appearances.  Thus, if there is a bond forfeiture hearing triggered by a DA motion, the Consent Decree treats the ensuing hearing as "required."

The next concern is supposedly "unfettered discretion" whether to issue arrest warrants for nonappearance. Doc. 641-1 at 11. This concern is difficult to understand. The Consent Decree merely requires the court to determine whether the person had notice of the court appearance and, if so, whether they had good cause for not being present. These are basic elements of due process, and the DA herself agrees in a footnote that both of these are already *required by Texas law*. *Id.* at 11 n.6. The concern appears to be that the Consent Decree does not provide an additional requirement that an arrest warrant issue if there was no good cause for the nonappearance. But the Consent Decree need not speak to every eventuality, and it should not be read to contradict Texas law in the many areas where the Consent Decree is silent about criminal procedure. To the extent the DA is correct that Texas law requires an arrest warrant to issue if there is no good cause, *nothing* in the Consent Decree prohibits that. Although the DA appears to want the Parties to significantly expand the Consent Decree by copying various Texas laws and rules into it, a far better approach is to take the text of the Consent Decree at face value and understand that, where it does not address an issue, it is not purporting silently to change other Texas law. (Indeed, the parties are not aware of any aspect of the Consent Decree that is contrary to Texas law, and certainly not through silence.)[9]

Next, the DA takes issue with what she characterizes as "indefinite" rescheduling of court appearances. Doc. 641-1 at 12. Many of the DA's assertions in this argument are not correct. Most relevant here, a person can only reschedule a "regular setting" twice. (Recall, also, that "regular settings" are presumptively excusable on request of counsel, so this rescheduling would apply mainly to those criminal defendants who *wanted* to attend all appearances with their lawyer,

---

[9] The Pasadena Police Chief is also confused about the Consent Decree. He wrongly asserts, Doc. 637 at 3, that a first appearance can be waived on request and overlooks that existing Texas law already allows a judge to recall a warrant if the judge learns that the person had good cause for nonappearance.

even where the only thing that happened was an exchange of discovery.)  More importantly, if a Defendant misses a "required appearance," the DA herself argues, Texas law requires that a warrant issue for the person's arrest if the person does not have good cause.  So, a person cannot indefinitely reschedule a court appearance unless there is a judicial finding of good cause, all of which is already the law in Texas.  The Plaintiffs simply cannot reconcile the concern about indefinite rescheduling with either the plain language of the Consent Decree or with Texas law, and Plaintiffs can attest that such a result as described by the DA was not their intent.

Next, the DA raises concerns with the provision requiring a 72-hour notice period prior to scheduling a court appearance after a person has been released from jail.  The DA purports to have "public safety issues," Doc. 641-1 at 15, with this provision.  But the DA's issues are with Texas law and not with the Consent Decree.[10]  In 2017, Texas legislation created a new rule that the defendant and prosecution must each be given at least "three business days" notice prior to the setting of *any* hearing.  Texas Code Crim Proc. 29.035(a).  The rule provides for a mandatory continuance of any hearing on request by either party if the requisite notice has not been provided.

The 72-hour provision in the Consent Decree was particularly important given the evidence in this case of manipulation of the preliminary injunction to inflate nonappearance statistics by requiring indigent arrestees released pursuant to this Court's injunction to return to court within hours of their release from jail.  *See generally* Doc. 402 at 22–23 (explaining manipulations and referencing attached declarations of Judge Jordan, Judge Fields, and Professor Demuth); Doc. 402-1, Doc. 402-2, Doc. 402-3; Doc. 617-1 at 21–23.  The provision of the Consent Decree is consistent with state law, which actually provides *greater* protection to a criminal defendant who wishes to

---

[10] The DA's examples also presume that the relevant magistrate would have ignored Texas law requirements such that they would have created the legal problem the DA is concerned about solving within 72 hours.

postpone a hearing if not notified "three business days" in advance, which can be more than 72 hours (considering weekends and holidays).  So, again, the DA's objection appears to be with Texas law, which in this area is explicitly more protective than the policy the DA objects to.

Finally, the DA suggests that the Consent Decree limits the Court's discretion to compel appearance.  Doc. 641-1 at 16–17.  The crux of this argument appears to be that the Consent Decree provides for seven days notice if a setting that was supposed to be a "regular" setting is thereafter converted into a "required" appearance.  Misunderstanding these provisions, the DA launches into a series of hypotheticals, including human traffickers using this extra seven days to wreak havoc on Harris County.  None of this makes any sense.  First, the seven-days-notice provision applies only to settings that are *changed* from one type of setting to another, not to the creation of a new setting, such as a bond revocation hearing.  More importantly, though, if a person is released on bond subject to a condition—such as a stay-away order from a victim—and the person violates that condition as the DA posits, then the person could be arrested *immediately*.  Rule 9 would then require the person to be detained until an individualized hearing, and the person's original bond could be revoked and/or the person could be detained after that hearing.  In sum, the DA's concerns are based on a flat misreading of the Consent Decree and the mechanisms already available under Texas law for holding people accountable if they violate a pretrial condition.

In sum, the Consent Decree does not do anything other than codify uniform court appearance policies that the judges could each implement on their own in their discretion and entirely consistent with Texas law.  The Consent Decree represents a policy decision by the judges to be uniform and transparent about what is required of people appearing in their courts, and the uniform policies reflect their judgment that transparency and predictability will incentivize court appearance and promote confidence that the system will treat people fairly, consistently, and

reasonably.  As this Court will recall, a major controversy that arose earlier in this litigation was that different policies among the various judges led to different behavior concerning bond forfeitures which, in turn, made it impossible to collect meaningful standard data on failures to appear.  *See* Doc. 402 at 21–24; Doc. 617-1 at 21–23.  These uniform policies, carefully tailored to the everyday workings of the Harris County system and the intricacies of Texas law, will promote exactly what the DA wants: respect for the system and increased appearance in court while avoiding costly transportation, needless bench warrants, and unnecessary jailing.  It is particularly important that these policies are codified and transparently available, because when they were inconsistent and secretive across sixteen County Courts, people who wanted to see the system fail were able to create confusion and make it look for media articles and filings in this Court as if indigent arrestees released on personal bonds or through this Court's injunction were failing to appear in droves relative to other arrestees, for whom the judges could, consciously or subconsciously, apply different policies and unstated norms.  The Harris County judges have explained to Plaintiffs that they believe that rectifying these errors by being straightforward about their uniform policies will increase public trust and reduce nonappearance, which is one of the main goals of any bail system.

### IV.    The Consent Decree Reasonably Requires Additional Financial Investment, Transparency, and Monitoring

The bail system challenged in this case was entrenched and devastating to tens of thousands of people every year.  The assembly line bureaucracy served certain interests well: it was profitable to surety corporations and enabled local officials to process large number of arrests through coerced guilty pleas in cases that lasted only a few days and that involved no investigation or meaningful litigation.  Doc. 302 at 84–87.  The initial post-arrest system was so overburdened that, even though it was not providing counsel, defense investigation, or any rigorous bail process, it

was still unable to comply, in tens of thousands of cases every year, with basic federal law requiring minimal safeguards or state law requiring magistration hearings within 24 hours.  *See supra* (citing Doc. 302 at 97, 167).  These proceedings are replete with examples of an entrenched culture that resisted significant changes at every turn and that, unfortunately, tried to undermine and manipulate even the changes ordered by this Court during this litigation.  Doc. 617 at 5 (discussing this Court's comments about repeated concerns with "transparency" of Defendants).

It is in the face of this overwhelming record of illegality, ongoing bureaucratic pressures, and a systemic culture of disregard for the rights of the Plaintiffs, that the Consent Decree was negotiated.  The Parties understood as a practical matter that, because of the many interrelated systems and norms, the same procedural changes necessary to imminently cease certain constitutional violations at the preliminary injunction stage were not sufficient to make sure that those changes would persist (and function properly) in the long term.  In addition, as a matter of binding Supreme Court precedent, the relief appropriate to cease imminent harm in a vigorously contested temporary injunction motion is different from what the parties to litigation can negotiate in a consent judgment designed to be enduring.  These two sets of considerations—one based on the detailed factual record of this case and one based on the legal standard applicable to consent judgments—establish that each provision meticulously negotiated by the Parties over many months is fair, reasonable, and adequate.

First, the law.  As explained in the Parties' Joint Motion, consent decrees routinely provide detailed requirements to provide specific relief that the Court would not have ordered in a contested adversarial context.  Several of the Amici misstate this core principle and therefore apply the wrong legal standard to this Court's review of the Consent Decree.  *See, e.g.*, Doc, 629 at 31 (arguing that

"the government cannot agree to substantive remedies that go beyond what is constitutionally required"). Most of Amici's arguments fail on their face when the proper standard is applied.

The Parties in this case were well within their authority to agree to provisions that set forth more detailed requirements, procedures, and reporting mechanisms than the general provisions of the federal Constitution. It is well established that consent decrees may embody conditions beyond those imposed directly by the Constitution itself. *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 389 (1992); *Cooper v. Noble*, 33 F.3d 540, 544–45 (5th Cir. 1994) (noting that parties to a consent judgment can "settle the dispute over the proper remedy for the constitutional violations that had been found by undertaking to do more than the Constitution itself requires" and "more than what a court would have ordered absent the settlement"). As the Supreme Court has explained, there is "no doubt that, to save themselves the time, expense, and inevitable risk of litigation," *Rufo*, 502 U.S. at 389, "state and local officers in charge of institutional litigation may agree to do more than that which is minimally required by the Constitution to settle a case and avoid further litigation," *id.* at 392; *see also Suter v. Artist M.*, 503 U.S. 347, 354 n.6 (1992) ("[P]arties may agree to provisions in a consent decree which exceed the requirements of federal law."); *Kindred v. Duckworth*, 9 F.3d 638, 641–42 (7th Cir. 1993) (the view that "consent decrees . . . stemming from constitutional grievances[] cannot impose upon the parties rights and obligations greater than those required by the Constitution. . . . quite simply is incorrect").[11]

---

[11] *See also McClendon v. City of Albuquerque*, 79 F.3d 1014, 1021 (10th Cir. 1996); *Duran v. Carruthers*, 885 F.2d 1485, 1491 (10th Cir. 1989); *Lopez-Aguilar v. Marion Cty. Sheriff's Dep't*, 296 F. Supp. 3d 959, 968, 979 (S.D. Ind. 2017); *Greene v. Cook Cty. Sheriff's Office*, 79 F. Supp. 3d 790, 816 (N.D. Ill. 2015); *LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 99–100 (D.D.C. 2010), *aff'd sub nom. LaShawn A. ex rel. Moore v. Gray*, 412 F. App'x 315 (D.C. Cir. 2011); *Evans v. Fenty*, 701 F. Supp. 2d 126, 166–67 (D.D.C. 2010); *Fisher v. United States*, No. CV 74-204TUCDCB, 2007 WL 2410351, at *6 n.4 (D. Ariz. Aug. 21, 2007); *R.C. by Alabama Disabilities Advocacy Program v. Nachman*, 969 F. Supp. 682, 702 (M.D. Ala. 1997), *aff'd sub nom. R.C. v. Nachman*, 145 F.3d 363 (11th Cir. 1998); *Wyatt By & Through Rawlins v. Rogers*, 985 F. Supp. 1356, 1425 (M.D. Ala. 1997); *Wyatt By & Through Rawlins v. King*, 811 F. Supp. 1533, 1541 (M.D. Ala. 1993); *Wyatt, By & Through Rawlins v. King*, 803 F. Supp. 377, 387–88 (M.D. Ala. 1992).

Given these background principles, federal courts have set forth a different standard for evaluating proposed consent decrees.  Federal courts have broad discretion to enter consent decrees that are within "the general scope" of the cases before them.  *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525–26 (1986).  "Parties to a suit have the right to agree to any thing they please in reference to the subject-matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings."  *Pacific Railroad v. Ketchum*, 101 U.S. 289, 297 (1879). "[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree."  *Local No. 93*, 478 U.S. at 525.  Accordingly, consent decrees need not be limited to the relief that a court could provide on the merits, *id.*, and "district courts are afforded wide discretion to give effect to joint compromises that timely advance the interests of the parties without wasteful litigation."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 317 (3d Cir. 2011).  So long as the terms of a consent decree come "within the general scope of the case made by the pleadings, it will be within the district court's power to enter the decree, if the pleadings state a claim over which a federal court has jurisdiction."  *Sansom Comm. by Cook v. Lynn*, 735 F.2d 1535, 1538 (3d Cir. 1984) (citation omitted); *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 431 (2004); *Rufo*, 502 U.S. at 389; *Local No. 93*, 478 U.S. at 525; *Kindred*, 9 F.3d at 641.[12]

It makes sense that courts have equitable power to enter consent decrees implementing a government's agreement to remedy constitutional violations through measures more detailed than

---

[12] "While it is true . . . that a remedy ordered by a federal court must be tailored to curing the specific constitutional violation, the remedy adopted by the parties in a consent decree need not adhere to the constitutional "floor"; rather, the requirement is satisfied as long as the relief ordered is 'related to' the unconstitutional conditions."  *Wyatt*, 803 F. Supp. at 387–88 (citation omitted); *see also LaShawn*, 701 F. Supp. 2d at 99–100; *Wyatt*, 811 F. Supp. at 1541; *Wyatt*, 985 F. Supp. at 1425.

the Constitution itself. Specific remedial measures are more readily monitored and enforced than constitutional generalities. *See, e.g.*, *Rufo*, 502 U.S. at 389 (noting that "almost any affirmative decree beyond a directive to obey the Constitution necessarily" requires action beyond constitutional minima); *Komyatti v. Bayh*, 96 F.3d 955, 959 (7th Cir. 1996) ("Parties also stipulate to particular conditions that make it easier to monitor the decree and secure enforcement. Indeed, it is a rare case when a consent decree requires only the bare minimum required by the Constitution . . . ."); *Wyatt*, 803 F. Supp. at 388.[13]   The Parties in this case went beyond constitutional minima because it was vital to them to craft remedies that are designed to protect against reversion to longstanding illegal norms, customs, and attitudes by addressing the structural causes of the constitutional violations. It was similarly essential to the Parties that they craft uniform policies that will be easy to understand, follow, track, and monitor given the complexities of the system and the longstanding failure of the system to track—and repeated attempts to manipulate—basic data on its operations and effectiveness.[14]

---

[13] Even in contested litigation, where there is no settlement and no mutual consent of the parties to further "animate the legal force" of a decree, *Local No. 93*, 478 U.S. at 525, federal courts have broad equitable discretion to remedy pervasive constitutional violations. *See Chicago Teachers Union, Local No. 1, AFT, AFL-CIO v. Hudson*, 475 U.S. 292, 309 n.22 (1986) ("The judicial remedy for a proven violation of law will often include commands that the law does not impose on the community at large."); *Seymour v. Freer*, 8 Wall. 202, 218 (1869) ("[A] court of equity ha[s] unquestionable authority to apply its flexible and comprehensive jurisdiction in such manner as might be necessary to the right administration of justice between the parties."); *Ciudadanos Unidos v. Hidalgo Cty. Grand Jury Comm'rs*, 622 F.2d 807, 828 (5th Cir. 1980) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." (quoting *Milliken*, 433 U.S. at 281)); *Gates v. Collier*, 501 F.2d 1291, 1320 (5th Cir. 1974) (same); *Morrow v. Crisler*, 479 F.2d 960, 963 (5th Cir. 1973), *on reh'g*, 491 F.2d 1053 (5th Cir. 1974) ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15 (1971) ("Having found these numerous constitutional violations . . . the court had the duty and obligation to fashion effective relief. In such circumstances, the trial court is allowed wide discretion."))); *Local 53 of Int'l Ass'n of Heat & Frost Insulators & Asbestos Workers v. Vogler*, 407 F.2d 1047, 1052 (5th Cir. 1969) ("The District Court was invested with a large measure of discretion in modeling its decree to ensure compliance with the Act." (citing *Mitchell v. Robert DeMario Jewelry Co.*, 361 U.S. 288, 291 (1965); *International Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947))).

[14] It is thus unsurprising that federal courts commonly enter detailed consent decrees going well beyond minimal constitutional requirements—and indeed, even in the absence of an established constitutional violation like those underlying the present agreement. To take just one recent example from a recent case in this Circuit, the district court in *United States v. City of New Orleans*, 35 F. Supp. 3d 788, 790 (E.D. La.), *aff'd*, 731 F.3d 434 (5th Cir. 2013),

With these principles in mind, Plaintiffs address the main concerns of Amici that the proposed Consent Decree provides for more detail and expense than the Constitution requires.

## A.    Amici Disagree with the Reasonable Policy Choices of Elected Officials

Several amici argue that the Consent Decree circumvents the will of the voters by requiring expenditures in the future. *See, e.g.*, Doc. 631-2 at 40. As a threshold matter, the voters ousted local officials who spent over $9 million of taxpayer money defending an unconstitutional bail system. It was the officials elected by the voters who, pursuant to the power that voters gave them in a representative democracy, worked diligently and for long, contentious hours over many months to negotiate a Consent Decree that is based on the testimony, empirical research, and their professional judgment.[15] Although some of the amici are politicians who supported continued

---

entered a consent decree to remedy an *alleged* pattern or practice of police conduct *alleged* to have resulted in violations of the Fourth and Fourteenth Amendments, inter alia. *Id.* at 790. The consent decree contained detailed provisions concerning changes in police "policies and practices related to: (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4) photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight." *Id.* The decree also included detailed provisions regarding its implementation and enforcement. *Id.* Although the district court noted its duty to "consider the nature of the litigation and the purposes to be served by the decree," as well as whether the decree was "consistent with the public objectives" behind any federal statute it was meant to enforce, *id.* at 793, there was no suggestion that these provisions had to be read directly off the Constitution (or a statute) itself in order for the court to order them by agreement of the parties. When the City of New Orleans eventually moved to vacate the consent decree on multiple grounds, it made no hint that the decree was improperly entered simply because its terms were not all mandated by federal law. *See United States v. City of New Orleans*, 947 F. Supp. 2d 601 (E.D. La. 2013). The City argued at length that the decree required it to violate federal statutory law (the Fair Labor Standards Act), and the district court and Fifth Circuit rejected that argument; but everyone understood that the issue was the decree's *consistency with* federal law, not its *entailment by* federal law. *See id.* at 624–27; 731 F.3d 434, 441–42 (5th Cir. 2013) (affirming entry of consent decree and denial of motion to vacate it).

    *City of New Orleans* illustrates the flexibility afforded federal litigants who agree to remedy wide-ranging institutional defects in order to avoid costly litigation. If federal courts could only enforce such agreements to the extent federal law mandated their terms, the parties would never be able to forestall such costs; they would be forced to expend judicial resources seeking final resolution of their legal claims, and they would be handcuffed, in crafting remedies, to broad language that does not lend itself to effective administration and monitoring. Fortunately, federal courts have the equitable power to enforce fair and reasonable settlements that further the objectives of federal law.

[15] There is nothing wrong with consent decrees that require financial investment. Even contested injunctions that are not animated by the agreement between the government and plaintiffs can require the government to make significant investments. Indeed, the expenditures can be required even where, unlike here, state law prohibits them. For example, in *Missouri v. Jenkins* the district court entered a desegregation order including requirements to implement a capital improvement program, "improve the quality of the curriculum and library, reduce teaching load, and implement tutoring, summer school, and child development programs." 495 U.S. 33, 38 n.4 (1990). The district court concluded

litigation of the case, those politicians do not speak for Harris County, which acts through its duly elected representatives.

**B.     Consent Decrees Are Meant to Bind the Parties**

Although Amici are concerned that the Consent Decree constrains the whims of officials elected by a majority of voters, that is, to some extent, the very purpose of the liberty protections in our Constitution. In the same way, the goal of consent decrees in civil rights cases is to bind future government actors to certain specified provisions that can remedy constitutional violations, be effectively monitored, and that can build a foundation from which those same violations will not recur over the long term. Of course, the Consent Decree and federal equity jurisprudence set forth mechanisms for modification of the Consent Decree—for example if the facts on the ground change or if experience reveals to the Parties that different provisions are required to better serve constitutional and equitable principles.

**C.     The Consent Decree Is Not Limited to the Claims or Relief Litigated at the Preliminary Injunction Stage**

Amici also argue that some of the relief goes beyond what the Fifth Circuit suggested as appropriate relief in the contested preliminary injunction proceedings. This argument is triply flawed. First, as noted, an appellate court's review of the temporary relief needed in a contested preliminary injunction posture is different from this Court's analysis of a proposed final consent decree. In the former, the court is examining what specific relief is necessary, even though there is no final judgment on the merits, to balance the equities in a way that prevents specific irreparable

---

that "several provisions of Missouri law" capping property taxes would prevent the district from being able to pay its ordered share of the costs to fulfill those obligations. *Id.* at 38. It ordered the district to submit to the voters a proposal for an increase in taxes and enjoined application of state laws that would frustrate that power. The Supreme Court upheld this remedy and found that "a local government with taxing authority may be ordered to levy taxes in excess of the limit set by state statute where there is reason based in the Constitution for not observing the statutory limitation." *Id.* at 57. Because the school district had an obligation imposed by the Fourteenth Amendment, it was required to disregard conflicting state statutory limitations on its taxing power. *Id.*

harm in the interim.  A preliminary injunction is a disfavored remedy, hard to win and narrowly drawn.  In the latter, the court has broad discretion to effectuate the settlement of the parties so long as the settlement is within the "general scope" of the issues raised by the complaint, *see supra*. Because it is a final judgment, the uncertainties of temporary litigation are no longer applicable and the facts no longer subject to dispute at a later trial; the focus is how the details of the Parties' agreed judgment can ensure longevity of constitutional behavior.   Thus, most of Amici's arguments fail because the standard for approving the Consent Decree is not whether any specific provision would have been valid relief at the preliminary injunction stage of this case.

Second, Amici attempt to limit the relief they deem appropriate by consistently misstating the scope of Plaintiffs' claims.  While the Fifth Circuit chose to resolve the preliminary injunction by reaching only the equal protection and procedural due process claims raised by Plaintiffs in that motion, the Parties' complex, dueling summary judgment briefs—put on hold to work on settlement—and the rest of Plaintiffs' complaint raise additional constitutional issues not yet resolved, including Plaintiffs' claims concerning the "fundamental" substantive due process right to bodily liberty and Plaintiffs' procedural due process claims to rigorous adversarial pretrial detention proceedings, including a heightened evidentiary standard and counsel (both of which Plaintiffs expressly chose not to include in the preliminary injunction proceedings).  *See generally, e.g.*, Doc. 400; Doc. 465.  Thus, Amici are wrong that the scope of Plaintiffs' complaint (the relevant barometer when evaluating the "general scope" of a consent decree) is limited to only "procedural" relief or the claims raised and decided in the preliminary injunction litigation.

Third, many of the provisions in the Consent Decree are designed to protect against manipulation, sabotage, arbitrariness, and secrecy that occurred *after* the preliminary injunction proceedings in this case.  *See* Doc. 402 at 21–24; Doc. 617-1 at 21–23.  The Parties and this Court

are well within their discretion to ensure that the Consent Decree contains the detailed provisions necessary to prevent local officials from sabotaging reform efforts from doing so again, either intentionally or through bureaucratic inefficiency and inertia.  This includes requiring the tracking, reporting, and monitoring that will allow the Parties to uncover manipulation and ameliorating a few of the inconsistent, confusing, arbitrary, and widely varying pretrial release policies among sixteen different County Judges.  And as explained, everything the Judges have done to address the systemic practices that long caused federal constitutional violations and that were exploited to undermine this Court's initial attempts to remedy them is not only well founded in the record but also consistent with their authority under Texas law.

### D.       The Additional Expenditures and Monitoring Are Reasonable

The parties worked with great difficulty to ensure practices that resolve Plaintiffs' constitutional claims, that are based on the evidentiary record, that prevent against a reversion to prior practices and norms, and that establish mechanisms for tracking and monitoring.  All of these are well within their authority in a consent judgment.[16]

Without any citations to case law, some Amici complain (using wild and unsupported cost exaggerations) that Harris County agreed to a consent decree that will cause it to spend money in the future.  As a preliminary matter, the evidence in the record suggests that Harris County would *save* tens of millions of dollars simply by not detaining even a small category of the lowest level arrestees for whom it used to require $500 secured bonds.  Doc. 302 at 113 (discussing Heaton study of Harris County misdemeanor case processing).  The Parties also predict, based on the

---

[16] Some Amici allege "collusion" between the Parties.  *See* 634-1 at 4 (Brief of Commissioner Radack).  This claim is offensive.  The Parties met dozens of time over many months, with a great deal of give and take.  The negotiations were, at times, contentious and uncertain. Many important pieces of relief that Plaintiffs sought were negotiated away, as evidenced by the significantly diminished relief included in the proposed Consent Decree compared to that set forth in the document that was leaked to the Houston Chronicle by one of the Defendants in April 2019.

empirical evidence, that reductions in unconstitutional jailing required by the consent decree will have numerous other economic benefits in Harris County, including preventing lost housing, terminated employment, suspended licenses, and interrupted medication. *See, e.g.*, Doc. 302 at 114 (discussing some of the overwhelming evidence of these collateral harms). In any event, the mere fact that Harris County might need to spend money to develop infrastructure to provide adequate counsel and support services for bail hearings, data collection, services to mitigate nonappearance and manipulation of nonappearance, and monitoring compliance does not render the agreement unlawful. It is a routine feature of consent decrees that they include reasonable expenditures required to implement their terms. Amici's complaint is a purely political one: The Amici raising the cost concerns themselves voted to spend over $9 million on legal fees to continue litigation of this case. Now, different officials are making a political choice to spend money to settle the case in a way that they believe will resolve the constitutional claims, save money in the future, and serve the interests of the constituents who elected them. The ability to make different choices with their budget is one of the key features of the democratic process that elected them.

On the merits, Amici do not explain why any particular expenditure envisioned by the Consent Decree is unreasonable or unfair. The District Attorney complains in a footnote about the support provided to the public defender and indigent defense counsel generally without a concomitant commitment to "support" the District Attorney. Doc. 641-1 at 6–7 & n.4. But this case involved massive violations of the rights of indigent misdemeanor arrestees at appearances in which they were denied access to counsel, ordered not to speak, and otherwise experienced a total breakdown in the availability of services necessary to develop evidence and arguments concerning alternatives to their detention. Plaintiffs challenged that system, including the constitutionality of ordering them detained prior to trial without access to counsel. It is not surprising, then, that a

settlement to remedy these violations would guarantee that the County made the investments required to provide Plaintiffs with effective counsel.  The absence of a vague commitment to similarly expand funding to the District Attorney is a political choice about whether the District Attorney needs more resources to devote to prosecution and not a flaw that renders a Consent Decree addressing discrete constitutional violations inappropriate.  The District Attorney is free to, and has, petitioned Commissioner's Court for additional funding.

Other Amici highlight the investments the Consent Decree requires into systems for notifying and reminding misdemeanor arrestees about their court dates.  But a main goal of a bail system is to promote court appearance.  Throughout this litigation, one of the main justifications offered for the prior, unconstitutional practices is that they fostered court appearance.  The evidence established, however, that many more people could be released from jail with the use of far cheaper alternatives, such as text message reminders and better and more consistent notification policies.  *See* Doc. 302 at 110.  Although these investments will likely *save* money, they are entirely reasonable expenditures regardless because they are constitutional alternatives that allow more people to be released from jail while improving court appearance rates and reducing the pressure to resort to unconstitutional prior practices.  These investments, along with transparent and uniform policies across all sixteen courts, also help to guard against some of the most unfortunate practices observed during this litigation, including misinforming people about their court dates and locations, confusion about court policies and data collection protocols, and declining to offer any help or support or supervision to certain arrestees in an effort to manipulate appearance rates to undermine this Court's preliminary injunction.  *See generally* Doc. 402 at 21–24; Doc. 617-1 at 21–23.  These provisions therefore ensure against any renewed efforts by future officials to undermine Rule 9 with policies that make it difficult for people to get to court.  These

expenditures are directly responsive to Plaintiffs' claims, Defendants' compelling interests, and the factual history of this case.

For the reasons set forth in their Joint Motion and those explained above, Plaintiffs respectfully ask this Court to grant the Parties' joint motion for preliminary approval.

Date: August 30, 2019

Respectfully Submitted,

*/s/ Alec Karakatsanis*
*/s/ Elizabeth Rossi*
Alec George Karakatsanis
alec@civilrightscorps.org
Elizabeth Rossi
elizabeth@civilrightscorps.org
Civil Rights Corps
910 17th Street NW, Suite 200
Washington, DC 20006
Telephone: (202) 681-2721

*/s/ Neal S. Manne*
Neal S. Manne
Texas Bar No. 12937980
nmanne@susmangodfrey.com
Lexie G. White
Texas Bar No. 24048876
lwhite@susmangodfrey.com
Joseph S. Grinstein
Texas Bar No. 24002188
jgrinstein@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

*/s/ Michael Gervais*
Michael Gervais
mgervais@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, #1400
Los Angeles, CA 90067
Telephone: (310) 789-3100

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 30th day of August 2019, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Alec Karakatsanis*
Alec Karakatsanis