United States District Court
Southern District of Texas
**ENTERED**
September 05, 2019
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, *et al.*, | § | |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-1414 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION PRELIMINARILY APPROVING THE PROPOSED
CONSENT DECREE AND SETTLEMENT AGREEMENT AND APPROVING AND
DIRECTING ISSUANCE OF CLASS NOTICE**

For the last three years, the parties have litigated constitutional challenges to Harris County's policies and practices of requiring indigent misdemeanor defendants to post secured money bail. In July 2019, the parties notified the court that they had reached a comprehensive resolution. On July 30, the Harris County Commissioners Court approved the proposed consent decree and settlement agreement the parties now present to the court. The parties jointly ask the court to preliminarily approve the proposed consent decree and settlement agreement and to approve the form and manner of class notice.

Based on a careful review of the motion, the objections, amicus briefs, and responses; the terms of the proposed consent decree, the settlement agreement, and the class notice; the voluminous record; and the applicable law, the court: (1) grants the parties' joint motion; (2) preliminarily approves the proposed consent decree and settlement agreement; (3) approves the proposed notice (with minor changes) and the proposed methods to distribute it; and (4) directs the parties to issue the notice using those methods, by **September 9**, **2019**. The court finds and

concludes that the proposed consent decree securely meets the requirements for preliminary approval.  It is designed to address the constitutional violations that were alleged and proven, and to implement the relief sought by requiring policies and practices designed to protect the safety of the community, reduce failures to appear at hearings and trials, and protect the rights of indigent misdemeanor defendants.  The public safety and public resource concerns raised by the recent filings are important; the proposed consent decree and settlement agreement are preliminarily approved because these concerns are fully recognized and addressed.  A final fairness hearing on the proposed consent decree and settlement agreement is set for **October 21**, **2019**, at **9:00 a.m.**, in Courtroom 11-B.

The reasons for these rulings are explained in detail below.

## I.      The Litigation and Proposed Class Settlement

### A.      Background

In May 2016, Maranda Lynn ODonnell filed a class-action complaint against Harris County, the Harris County Sheriff, and five Harris County Hearing Officers.  (Docket Entry No. 3). Seeking injunctive and declaratory relief under 42 U.S.C. § 1983, ODonnell alleged that Harris County's postarrest incarceration policies and practices imposed a "wealth-based detention system" of keeping misdemeanor defendants in jail only because they could not pay secured money bail, while those who could pay were promptly released, in violation of the Fourteenth Amendment's Equal Protection and Due Process Clauses.  (*Id*. at ¶¶ 75, 121).

In September 2016, ODonnell amended her complaint, consolidating the case with the lawsuits of Robert Ryan Ford and Loetha McGruder and adding 16 Harris County Criminal Court at Law Judges as defendants.  (Docket Entry No. 54).  The defendants moved to dismiss for failure to state a claim and under the *Younger* abstention doctrine.  (Docket Entry Nos. 61, 80, 83, 84, 85).

In December 2016, the court granted and denied in part the defendants' motions to dismiss. *ODonnell v. Harris Cty.*, 227 F. Supp. 3d 706, 715 (S.D. Tex. 2016). The court dismissed the personal-capacity claims against the Sheriff and County Judges and the official-capacity claim against the Hearing Officers. *Id.* The court denied the motions to dismiss the claim against Harris County and the official-capacity claims against the Sheriff and Judges. *Id.* The Hearing Officers did not move to dismiss the personal-capacity claims against them, and those claims proceeded. *Id.*

In January 2017, the plaintiffs filed amended motions for class certification and preliminary injunctive relief. (Docket Entry Nos. 143, 146). In March 2017, the court held an eight-day evidentiary hearing, at which many witnesses testified and the parties submitted extensive exhibits. (Docket Entry Nos. 222, 223, 228–230, 246, 247, 251). In April 2017, the court granted the plaintiffs' motions for class certification and injunctive relief. (Docket Entry Nos. 302, 303). The court certified a class under Federal Rule of Civil Procedure 23(b)(2) of:

> [a]ll Class A and Class B misdemeanor arrestees who are detained by Harris County from the date of this order through the final resolution of this case, for whom a secured financial condition of release has been set and who cannot pay the amount necessary for release on the secured money bail because of indigence.

*ODonnell v. Harris Cty.*, No. H-16-1414, 2017 WL 1542457, at *1 (S.D. Tex. Apr. 28, 2017); (Docket Entry No. 303 at 1).

The court's April 28, 2017 Memorandum and Opinion made extensive findings of fact and conclusions of law, including the following:

- Harris County has a consistent and systematic policy and practice of imposing secured money bail as de facto orders of pretrial detention in misdemeanor cases.

- These de facto detention orders effectively operate only against the indigent, who would be released if they could pay at least a bondsman's premium, but

3

who cannot.  Those who can pay are released, even if they present similar risks of nonappearance or of new arrests.

- Harris County has an inadequate basis to conclude that releasing misdemeanor defendants on secured financial conditions is more effective to assure a defendant's appearance or law-abiding behavior before trial than release on unsecured or nonfinancial conditions, or that secured financial conditions of release are reasonably necessary to assure a defendant's appearance or to deter new criminal activity before trial.

- Harris County's policy and practice violates the Equal Protection and Due Process Clauses of the United States Constitution.

*ODonnell v. Harris Cty.*, 251 F. Supp. 3d 1052, 1059–60 (S.D. Tex. 2017); (Docket Entry No. 302 at 7).  The court found that "40 percent of all Harris County misdemeanor arrestees every year are detained until case disposition" because, among other reasons, hearing officers mechanically applied a bail schedule that failed to consider an arrestee's ability to pay.  *ODonnell*, 251 F. Supp. 3d at 1095, 1130–31 (from January 2015 to January 2017, Harris County hearing officers "adhered to the prescheduled bail amount stated on the charging documents in 88.9 percent of all misdemeanor cases").  The court entered a preliminary injunction order against the defendants and denied their motion to stay.  *ODonnell v. Harris Cty.*, No. H-16-1414, 2017 WL 1735453, at *1–3 (S.D. Tex. Apr. 28, 2017); (Docket Entry Nos. 304, 305).  The defendants appealed.

The Fifth Circuit affirmed in part and vacated in part.  *ODonnell v. Harris Cty.*, 882 F.3d 528, 549 (5th Cir. 2018), *opinion withdrawn and superseded on reh'g sub nom. ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018).  The Fifth Circuit upheld this court's factual findings and affirmed the legal "conclusion that ODonnell established a likelihood of success on the merits of [her] claims that [Harris] County's policies violate procedural due process and equal protection." *ODonnell*, 892 F.3d at 152.  The Fifth Circuit found the April 2017 preliminary injunction order overbroad as to one aspect and instructed this court to more narrowly tailor the relief.  *Id.* at 163–64.

4

On remand, after hearing oral argument and receiving proposals from the parties, this court issued a memorandum and opinion and an amended preliminary injunction order in June 2018. *ODonnell v. Harris Cty.*, 321 F. Supp. 3d 763 (S.D. Tex. 2018).  In July 2018, 14 of the 16 County Judges appealed the amended preliminary injunction order.

The 14 County Judges moved to stay four sections of the amended preliminary injunction order.  A divided Fifth Circuit motions panel granted the motion and stayed the challenged provisions pending the appeal.  *ODonnell v. Goodhart*, 900 F.3d 220, 223 (5th Cir. 2018).

In June and July 2018, the parties conducted extensive discovery, filed cross-motions for summary judgment, and prepared for trial on a permanent injunction, while briefing the merits of the appeal from the court's amended preliminary injunction order.  (Docket Entry Nos. 400, 429, 432).

On November 6, 2018, 15 of the 16 County Judges named as defendants lost their reelection bids.  Voters also elected two new members of the Harris County Commissioners Court. On November 13, 2018, this court granted the defendants' motion to stay the case until February 1, 2019.  (Docket Entry Nos. 529, 532).

Because the plaintiffs had sued the County Judges in their official capacities, the newly elected judges were substituted as parties on January 1, 2019.  (Docket Entry No. 548).  On January 7, all the County Judges voluntarily dismissed the appeal of the amended preliminary injunction. That same day, the Fifth Circuit Clerk "entered an order, issued as the mandate, stating that . . . the appeal is dismissed . . . pursuant to appellants' motion."  *ODonnell v. Salgado*, 913 F.3d 479, 481 (5th Cir. 2019) (per curiam).

On January 25, 2019, the parties jointly submitted Amended Local Rule 9.1 of the Harris County Criminal Courts at Law.  (Docket Entry No. 557).  Amended Rule 9.1 rescinded Harris

County's "secured money bail schedule and instead require[s] that the initial, post-arrest release-or-detention decision be made on the basis of the charged offense." (Docket Entry No. 557-2 at 1). The amended rule also requires "the prompt release of all misdemeanor arrestees on a personal bond except for five categories of arrestees." (*Id.* (quotation omitted)). If a misdemeanor arrestee is not released promptly on a personal bond, then that person "must receive a bail hearing . . . [within] 48 hours after arrest." (Docket Entry No. 617-1 at 18).

On February 1, 2019, the court reviewed and approved the implementation of the amended rule, which went into effect on February 16. (Docket Entry No. 557 at 2; Docket Entry No. 563). At the February 1 hearing, the parties informed the court that they were actively pursuing settlement negotiations. (Docket Entry No. 563). On April 8, the court granted the parties' joint motion to dismiss the Hearing Officers as defendants in the case. (Docket Entry No. 587).

On July 25, the parties reported that they had reached a resolution and had submitted a proposed consent decree and settlement agreement to the Harris County Commissioners Court for approval. (Docket Entry No. 615). On July 30, a majority of the Commissioners approved the proposed consent decree and settlement agreement. The parties jointly moved this court for preliminary approval the next day. (Docket Entry No. 617). The parties also moved for approval of a proposed class notice, permission to issue the notice, and attorneys' fees. (*Id.*; Docket Entry No. 618).

In August, several individuals and organizations filed amicus briefs or letters opposing all or parts of the proposed consent decree. The objectors include the Harris County Deputies' Organization (Fraternal Order of Police Lodge #39); the Professional Bondsmen of Harris County; Harris County Commissioner Steve Radack; Equal Justice Now; Crime Stoppers of Houston, Inc.; Pasadena, Texas Police Chief Josh Bruegger; Harris County Commissioner R. Jack Cagle; the

Harris County Domestic Violence Coordinating Council; Harris County District Attorney Kim Ogg; the Houston Area Police Chiefs Association; and the Texas School District Police Chiefs' Association.  (Docket Entry Nos. 629, 631-2, 634-1, 635-1, 636–39, 641-1, 646-1).  To allow the parties to respond, and to enable the court to fully consider the objectors' arguments, the court extended the deadlines for class notice and objections and reset the final fairness hearing.

On August 30, the parties filed their responses to the amici and objectors.  (Docket Entry Nos. 647–49).  The responses were filed shortly after 11 current and former Harris County District Judges were reprimanded for requiring indigent misdemeanor defendants to post money bail in disregard of the rules and law governing personal pretrial bonds in misdemeanor cases. Associated Press, *Commission: 11 Texas Judges Broke Law by Denying Free Bail*, N.Y. TIMES (Aug. 30, 2019), https://www.nytimes.com/aponline/2019/08/30/us/ap-us-texas-judges-admonished.html.

The parties' arguments are amply supported by the extensive record evidence and governing law.  As explained below, the amicus briefs and objections do not identify an adequate basis to deny preliminary approval of the proposed settlement and consent decree.

**B.      The Proposed Class Settlement**

**1.      The Proposed Consent Decree**

The proposed consent decree requires Harris County to carry out a broad range of bail reforms.  Harris County must implement, comply with, enforce, and train[1] certain officials on Amended Local Rule 9, which provides that "[a]ll misdemeanor arrestees must be released on a personal bond or on nonfinancial conditions as soon as practicable after arrest, except" individuals arrested:

- and charged with domestic violence, violating a protective order in a domestic violence case, or making a terroristic threat against a family or household member;

---

[1]  Harris County must train all Criminal Court at Law Judges and the defendants' agents responsible for implementing Amended Local Rule 9 on an ongoing basis.  (Docket Entry No. 617 at 27).

- and charged with assault;

- and charged with a second or subsequent driving-under-the-influence offense;

- and charged with a new offense while on pretrial release;

- on a warrant issued after a bond revocation or bond forfeiture; and

- while on any type of community supervision for a Class A or B misdemeanor or a felony.

(Docket Entry No. 617 at 25; Docket Entry No. 617-1 at 17–18).

A misdemeanor "arrestee who is not promptly released on a personal bond . . . must receive a bail hearing . . . [within] 48 hours after arrest." (Docket Entry No. 617-1 at 18). An arrestee subject to a bail hearing must be represented by counsel—either a private attorney or a Harris County Public Defender. (*Id.* at 19). The hearing officer must give the arrestee adequate notice and "an opportunity to be heard concerning any factors relevant to release, detention, and the availability of alternative conditions." (*Id.* at 20–21). The arrestee must also have "an opportunity at the hearing to present evidence and make argument[s] concerning those issues." (*Id.* at 21). If secured money bail is imposed as a release condition, the hearing officer must find on the record, by clear and convincing evidence, that: (1) "the arrestee has the ability at the time of the hearing to pay the amount required"; or (2) "no less-restrictive condition or combination of conditions could reasonably assure" community safety or prevent flight from prosecution. (*Id*. at 21–22). The arrestee may seek review of a hearing officer's decision in the Harris County Criminal Court at Law. (*Id*. at 22–23).

Hearing officers may not require indigent arrestees to pay "any fee associated with a personal bond or an unsecured bond, or the cost of a non-financial condition of release, including . . . a supervision fee." (*Id.* at 22). And the Harris County Sheriff "must not enforce any order requiring secured money bail that was imposed [before] an individualized hearing." (*Id*. at 23).

Consistent with Amended Local Rule 9, Harris County must "provide the funding and staffing necessary" for the Public Defender's Office to adequately represent all misdemeanor arrestees at bail hearings.  (*Id*. at 25).  Harris County must also "provide defense counsel access to early and effective support staff" to assist "in gathering and presenting information relevant to the bail decision."  (*Id*.).  The consent decree requires Harris County to provide access to, fund, and disclose the names of qualified support staff to assist court-appointed counsel.  (*Id*.).  In addition, the consent decree requires Harris County to retain an indigent-defense expert "to evaluate the County's current misdemeanor indigent defense systems and determine the County's need for essential support staff . . . to promote . . . effective indigent defense."  (*Id*. at 26).

To reduce failures to appear after pretrial release, the defendants must give eligible misdemeanor arrestees "written notice of the date, time, and location of their scheduled court appearance."  (*Id*. at 27).  The defendants must "update any form [used] to provide written notice of scheduled court dates to incorporate evidence-based design practices for effectively reducing nonappearance."  (*Id*.).  The defendants must also: (1) "develop and maintain a website where misdemeanor arrestees can access their court dates, times, location, [and] attorney information"; and (2) "adopt text-message-based and telephone-based" services to remind misdemeanor arrestees about scheduled court appearances.  (*Id*. at 29, 33).

Policies and procedures designed to reduce failures to appear are also addressed.  The consent decree includes the following provisions:

- A misdemeanor arrestee is not required to appear in court within 72 hours of release for proceedings in the case for which they were arrested.

- The Harris County Criminal Court at Law Judges must hold "Open Hours Court" at least one day each week, and a misdemeanor arrestee who missed a scheduled court appearance may attend "Open Hours Court" to reschedule the missed appearance.

- A misdemeanor arrestee may waive appearance at any regular setting before or during the setting, and an arrestee who has not waived appearance may reschedule any appearance at least twice before the hearing.

- If a misdemeanor arrestee fails to appear, a warrant will not issue if the arrestee appears in the assigned Harris County Criminal Court or in "Open Hours Court" to reschedule the appearance before "close of business on the day of Open Hours Court of the week following the missed setting."

- A warrant may issue only if a Harris County Criminal Court at Law Judge finds that the misdemeanor arrestee had actual notice of the hearing and that there was no good cause for failing to appear.

- A misdemeanor arrestee subject to a warrant for failing to appear may appear in "Open Hours Court" to reschedule the hearing. "In the absence of other bases for the misdemeanor arrestee's arrest," and if the hearing was a regular or first setting, the Harris County Criminal Court at Law Judge must recall the warrant.  If the hearing was a required appearance, the arrestee may not be taken into custody unless the Harris County Criminal Court at Law Judge finds that the arrestee had actual notice of the hearing and that there was no good cause for failing to appear.

- Any person subject to a warrant for failing to appear that was issued before January 1, 2019, may appear at "Open Hours Court" or in the assigned Harris County Criminal Court to have the warrant recalled and to schedule a new hearing date.

(*Id.* at 34–36).  In addition, Harris County must "study and seek to mitigate the primary wealth-based causes of nonappearance among misdemeanor arrestees" and "allocate $250,000 annually, beginning in Fiscal Year 2020–21, toward assisting . . . indigent misdemeanor arrestees in making court appearances."  (*Id.* at 30–31).

The consent decree requires Harris County to collect, study, and make publicly available on a website other data about:

- Harris County's compliance with the consent decree;

- pretrial release and detention decisions relating to misdemeanor arrestees;

- Amended Local Rule 9's effect on misdemeanor arrestees' appearance rates;

- demographic and socioeconomic information as to each misdemeanor arrestee; and

- Harris County's misdemeanor bail system from 2009 to the present.

10

(*Id.* at 38–40).   Harris County must generate, and publish online, a report every 60 days on the proposed consent decree's implementation.   (*Id.* at 41–42).   Harris County must also launch and maintain a website for information related to this lawsuit and to the implementation of the consent decree, including the policies and procedures adopted under the consent decree.   (*Id.* at 43–44).

An independent monitor the parties jointly select will oversee Harris County's compliance with the consent decree for seven years.   (*Id.* at 44, 46).   The monitor will conduct audits, reviews, and assessments "to determine whether the Consent Decree has been implemented as required." (*Id.* at 45).   Harris County must make the monitor's reports publicly available.   (*Id.* at 47–48).

Finally, Harris County must hold at least two public meetings each year to "report on [the] implementation of the Consent Decree," and to give community members an opportunity to comment and ask questions about Harris County's misdemeanor criminal justice system.   (*Id.* at 43–44).   The monitor and representatives of Harris County, the Sheriff, and the Criminal Court Judges must attend the meetings.   (*Id.* at 43).

The court raises some questions about the proposed consent decree below.[2]   To be clear, the court is not rewriting and will not rewrite any of the terms; it is up to the parties, not the court, to write, and explain, the proposed consent decree.

---

[2]   On page six, in paragraph o, and on page 22, in paragraph 9.12.8, there are typos (there is an "e" missing from "detained" and "defined").   Another question arises from the use of the word "shall" in the same paragraph as the word "must."   The word "shall" can be ambiguous.   Although certain Texas law provisions define it as synonymous with "must," "shall" can mean, depending on context, "must," "may," "will," or "should."   *See* TEX. GOV'T CODE § 311.016(2) (1997) (the word "'shall' imposes a duty" "unless the context in which the word . . . appears necessarily requires a different construction or unless a different construction is expressly provided by statute").   The ambiguity is heightened when the word is used interchangeably with one or more of these alternatives.   For these reasons, the Federal Rules of Civil Procedure and other Federal Rules have banished "shall," with only rare exceptions.   Bryan Garner agrees. BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 952 (3d ed. 2011) (discussing the meanings of "shall").   Examples appear on page 22, in paragraph 9.13; page 23, paragraphs 9.14 and 9.15; and page 25, paragraphs 39 and 40 of the proposed consent decree.

### 2.      The Proposed Settlement Agreement

The proposed settlement agreement states that the parties "agree to file a joint motion seeking approval of the Consent Decree to resolve all of [the] Plaintiffs' claims." (Docket Entry No. 617-2 at 1). The terms are summarized above. The agreement also addresses fees and costs.

Harris County agrees to pay the following attorneys' fees and costs:

- $3,725,231.00 in fees and $114,832.54 in costs to Civil Rights Corps;

- $2,161,262.00 in fees (to be forgone) and $30,214.86 in costs to Susman Godfrey L.L.P.;

- $632,453.00 in fees to Wilmer Cutler Pickering Hale and Dorr LLP; and

- $182,715.90 in fees and $5,378.00 in costs to the Texas Fair Defense Project.

(*Id.*). Harris County also agrees that it will preserve "all filings and evidence submitted in" this litigation. (*Id.* at 2).

Susman Godfrey agrees to forgo all of its fee "in consideration of [Harris] County's agreement to allocate [that amount of money] to its own efforts to meet the needs of class members, as described in the Consent Decree." (*Id.* at 1). The parties agree that Harris County will not pay any attorneys' fees or costs incurred in implementing or monitoring the consent decree, but class counsel do "reserve[] the right to seek fees . . . for work performed in connection with contempt proceedings if there is a finding of contempt." (*Id.*).

The terms are examined under the legal standard and the record.

## II.    The Legal Standard for Preliminarily Approving a Class Settlement

Federal Rule of Civil Procedure 23(e) governs court review of proposed class-action settlements. Because the court has certified the class, the class certification issues at this settlement stage are "whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted." FED. R. CIV. P. 23(e)(1)

Committee Notes to 2018 amendments.  No new certification is required at settlement for a previously certified class.

Rule 23(e)(1)(B) requires the court to "direct notice in a reasonable manner to all class members who would be bound by the proposal."  FED. R. CIV. P. 23(e)(1)(B).  The court must consider whether "giving notice is justified by the parties' showing that the court will likely be able to [finally] approve the proposal under Rule 23(e)(2)."  *Id.* 23(e)(1)(B)(i).  The 2018 Committee Notes to Rule 23(e)(1) clarify that the "decision to give notice of a proposed [class] settlement . . . should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object."  FED. R. CIV. P. 23(e)(1) Committee Notes to 2018 amendments.

A proposed settlement "will be preliminarily approved unless there are obvious defects in the notice or other technical flaws, or the settlement is outside the range of reasonableness or appears to be the product of collusion, rather than arms-length negotiation."  2 MCLAUGHLIN ON CLASS ACTIONS § 6:7 (15th ed. 2018).  A lower degree of scrutiny applies if, as here, "class certification took place long before any settlement was reached or negotiated."  *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 122 (S.D.N.Y. 1997) (citing MANUAL FOR COMPLEX LITIGATION § 30.44 (3d ed. 1995)).

The proposed settlement must be "fair, reasonable, and adequate."  FED. R. CIV. P. 23(e)(2); *United States v. City of New Orleans*, 731 F.3d 434, 438–39 (5th Cir. 2013) (a court must find that a consent decree is fair, reasonable, and adequate before entering it as a judgment).  Under the 2018 amendments to Rule 23(e)(2), courts look to whether:

> (A) the class representatives and class counsel have adequately represented the class;
>
> (B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

FED. R. CIV. P. 23(e)(2); *see also* 4 NEWBERG ON CLASS ACTIONS § 13:14 (5th ed. 2019) (in adopting the 2018 amendments to Rule 23(e), "Congress essentially codified [the] prior practice").

Common-law criteria preceded the Rule 23 factors. In *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983), the Fifth Circuit laid out six factors for courts to consider in determining the fairness, reasonableness, and adequacy of a proposed class settlement:

(1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*All Plaintiffs v. All Defendants*, 645 F.3d 329, 334 (5th Cir. 2011) (quoting *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194–95 (5th Cir. 2010)).

Because the Rule 23 and case-law factors overlap, courts in this circuit often combine them in analyzing class settlements. *See Hays v. Eaton Grp. Attorneys, LLC*, No. 17-88-JWD-RLB, 2019 WL 427331, at *9 (M.D. La. Feb. 4, 2019); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. H-17-3852, 2019 WL 387409, at *3 (S.D. Tex. Jan. 30, 2019); *see also* FED. R. CIV. P. 23(e)(2) Committee Notes to 2018 amendments ("The goal of this amendment [to Rule 23(e)(2)] is not to displace any [circuit case-law] factor, but rather to focus the court and the lawyers on the

core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 02-CV-1152-M, 2018 WL 1942227, at *4 (N.D. Tex. Apr. 25, 2018) (quoting *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012)). This presumption reflects the strong public interest in settling class actions. *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. Jan. 1981) ("Particularly in class action suits, there is an overriding public interest in favor of settlement." (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977))); *Hays*, 2019 WL 427331, at *8 ("Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable[,] and adequate." (quoting *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 930–31 (E.D. La. 2012))).

## III. Analysis

### A. The Rule 23(e)(2) and *Reed* Factors

#### 1. Whether the Class Representatives and Counsel Have Adequately Represented the Class[3]

Ample record evidence shows that the class has been ably and diligently represented, in a case filled with legal and factual complexities. Class counsel enabled the plaintiffs to survive challenges to the pleadings in motions to dismiss, objections to class certification, multiple discovery objections and hearings, an eight-day bench trial, and several appeals. Class counsel obtained consequential injunctive and declaratory relief for the class. *ODonnell v. Harris Cty.*,

---

[3] *See* FED. R. CIV. P. 23(e)(2)(A).

892 F.3d at 166–67; *ODonnell v. Harris Cty.*, 321 F. Supp. 3d at 778–85; *ODonnell v. Harris Cty.*, 251 F. Supp. 3d at 1059–60; *ODonnell v. Harris Cty.*, 227 F. Supp. 3d at 715.   In January 2019, on the defendants' motion, the Fifth Circuit dismissed the appeal of this court's amended preliminary injunction order.   (Docket Entry No. 551).   The defendants concede that the plaintiffs prevailed and achieved meaningful changes and protections for class members.   (Docket Entry No. 617 at 32 n.68).

This factor weighs heavily in favor of preliminarily approving the consent decree and settlement agreement.

## 2. Whether the Proposed Class Settlement Was Negotiated at Arm's Length or Was a Product of Fraud or Collusion[4]

"The Court may . . . presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary."   *Welsh v. Navy Fed. Credit Union*, No. 16-CV-1062-DAE, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018).   There has been, and could not be, any suggestion of fraud or collusion in this case.   The proposed class settlement was the product of rigorous, hard-fought negotiations conducted at arm's-length.   (Docket Entry No. 617 at 30).   The record of many, many hearings; the bench trial; the several appeals; and the lengthy, difficult negotiations, amply demonstrate the zealous advocacy that all sides deployed.   (Docket Entry Nos. 563, 573, 575, 579, 580, 590, 594, 605, 606, 615).

Some amici contend that "collusion occurred after the November 2018 county-wide election when the new political establishment in Harris County sought to use this litigation to further policy goals outside traditional political avenues."   (Docket Entry No. 629 at 33; *see also* Docket Entry No. 634-1 at 4 (making the same argument)).   Evidence of the alleged collusion includes the newly elected defendants' attempt to vacate the Fifth Circuit's decision staying the

---

[4]   *See* FED. R. CIV. P. 23(e)(2)(B); *Reed*, 703 F.2d at 172.

amended injunction;[5] provisions of the proposed consent decree that are "beyond the scope of the original litigation," such as the measures to reduce failures to appear;[6] Susman Godfrey's decision to waive its fee in consideration of Harris County's promise to put that amount of money toward implementing the consent decree;[7] and various statements by Harris County Commissioners supporting the proposed consent decree.[8]  These arguments do not show any "collusion" that would require rejecting the proposed decree.

The parties' responses to the amicus briefs reaffirm that the settlement talks involved "many months of give-and-take, not merely between the two sides of this case, but also among the various constituencies that make up the defendants."  (Docket Entry No. 647 at 3; *see also* Docket Entry No. 648 at 29 n.16 ("The Parties met dozens of time[s] over many months, with a great deal of give and take.")).  The amici overlook those months of vigorous negotiations.  Newly elected officials do not collude simply because they take different positions or favor different approaches than their predecessors.  As discussed below, voluntary consent decrees may provide broader remedies than a party could have obtained after trial.  These remedies may require the expenditure of public funds; the fact that Harris County agreed to allocate resources in the amount of Susman Godfrey's waived fee does not make the allocation, or the fee waiver, illegitimate.

Nor do statements by Harris County Commissioners in support of the consent decree suggest "collusion."  Amicus Steve Radack, who is also a County Commissioner, argues that Commissioner Rodney Ellis "admitt[ed] . . . collusion with the plaintiffs" by publicly saying that he (Ellis) "encourage[d Civil Rights Corps] to sue" before he became a Commissioner.  (Docket Entry No. 634-1 at 5–6).  Commissioner Ellis's statement before he assumed his current office

---

[5] (Docket Entry No. 629 at 35); *see Salgado*, 913 F.3d at 482 (denying the motion to vacate).
[6] (Docket Entry No. 629 at 33, 37).
[7] (*Id*. at 38–39).
[8] (Docket Entry No. 634-1 at 5–6).

does not suggest "collusion" with class counsel.  The six months of hard-fought negotiations are strong evidence to the contrary.

Commissioner Radack argues that other Commissioners' praise of the proposed settlement agreement indicates that those Commissioners did not negotiate at arm's-length.  (*Id*. at 4–5) (citing news coverage of Commissioners' statements).  Commissioner Radack emphasizes that Commissioner Ellis described the proposed settlement as having the significance of *Brown v. Board of Education*, 347 U.S. 483 (1954).  (Docket Entry No. 634-1 at 5 (citing Docket Entry No. 634-2 at 1)).  One might well disagree with that comparison, but Commissioner Radack does not explain why the comment indicates any collusion.  Praising the outcome does not suggest impropriety in the process.

The high-quality representation on all sides, the lack of any evidence of fraud or collusion, the parties' adverse posture, and the six months of negotiations required to produce this settlement amply satisfy the *Reed* factor requiring the absence of collusion.  This weighs heavily in favor of preliminarily approving the proposed consent decree and settlement agreement.

### 3. Whether the Relief was Adequate in Light of the Duration, Costs, Risks, and Delay of Trial and Appeal[9]

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Heartland*, 851 F. Supp. 2d at 1064 (quoting *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010)); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("[S]ettling . . . avoids the risks and burdens of potentially protracted litigation.").  The parties have extensively litigated this case—already in its fourth year—in this court and in the Fifth Circuit, resulting in millions of dollars in fees and costs.  The motions to dismiss and for summary judgment, the trial, and the

---

[9]  *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

appeals raised constitutional and jurisdictional questions that required extensive efforts by the parties and the courts.  (*See* Docket Entry Nos. 400, 429, 430, 432).  If the case proceeded, additional discovery, likely as contentious as the past discovery, would be required.  The permanent injunction trial "would be lengthy, burdensome, and would consume tremendous time and resources of the [p]arties and the [c]ourt."  *Hays*, 2019 WL 427331, at *10.

By reaching a favorable settlement before additional summary judgment motions and the permanent injunction trial, the plaintiffs "avoid[ed] expense and delay and ensur[ed] recovery for the [c]lass."  *Id*.  This factor favors preliminarily approving the proposed consent decree and settlement agreement.

### 4. The Stage of the Proceedings and the Amount of Discovery Completed[10]

This factor requires the court to look to whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions." *Ayers*, 358 F.3d at 369.  The parties conducted significant discovery.  The eight-day preliminary injunction trial "featured [13] live witnesses and thousands of documents and videos."  (Docket Entry No. 617 at 31).  The court entered the preliminary injunction based on extensive and detailed findings of fact and conclusions of law that were affirmed on appeal.  *ODonnell*, 892 F.3d at 166; *ODonnell*, 251 F. Supp. 3d at 1059–60.  The Fifth Circuit has issued three published decisions clarifying the law. *Salgado*, 913 F.3d at 481; *Goodhart*, 900 F.3d at 221; *ODonnell*, 892 F.3d at 152.  The parties, and the court, "have ample factual and legal information with which to evaluate the merits of their competing positions and to 'make a reasoned judgment about the desirability of settling the case on the terms proposed.'"  (Docket Entry No. 617 at 32 (quoting *In re Educ. Testing Serv. Praxis*

---

[10]  *See Reed*, 703 F.2d at 172.

*Principles of Learning & Teaching, Grades 7–12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006))).

This factor heavily favors preliminarily approving the proposed consent decree and settlement agreement.

### 5. The Probability of Success on the Merits[11]

The probability of the plaintiffs' success on the merits is the most important *Reed* factor, "absent fraud and collusion." *Santinac v. Worldwide Labor Support of Ill., Inc.*, No. 15-CV-25, 2017 WL 1098828, at *3 (S.D. Miss. Mar. 23, 2017) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. Unit A 1982)). This factor relates to the "risks . . . of trial and appeal," a Rule 23(e)(2) consideration. FED. R. CIV. P. 23(e)(2)(C)(i). "In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial." *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) (citing *Reed*, 703 F.2d at 172). This factor favors approving a settlement even when the likelihood of success on the merits is not certain. *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1326–27 (5th Cir. Unit A Oct. 1981) ("A district court need not establish the plaintiffs' likelihood of prevailing to a certainty.").

The plaintiffs asked for an injunction requiring Harris County to release all misdemeanor arrestees on a personal bond "as soon as practicable after arrest, except arrestees who fall within [certain] categories." (Docket Entry No. 401-1 at 1; *see* Docket Entry No. 257-1 at 1 (proposing an order stating that "[n]o arrestee may be kept in custody for any period of time solely because the arrestee cannot make a monetary payment imposed as a secured financial condition of release")). On remand, this court issued an amended preliminary injunction order that included a

---

[11] *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

provision adopting some of the plaintiffs' requested relief, with carefully crafted exceptions, exclusions, and limitations. *See ODonnell*, 321 F. Supp. 3d at 769–70, 781–82. The defendants appealed the amended preliminary injunction order and asked the Fifth Circuit to stay that provision and three other sections of the order pending the appeal. The Fifth Circuit granted the stay, finding that the defendants would likely succeed on the merits in arguing that the specific challenged provisions were overbroad. *Goodhart*, 900 F.3d at 224–25.

Although "a merits panel is not bound by a motions panel," the *Goodhart* court's decision demonstrates that it was uncertain that the plaintiffs would have prevailed on appeal or trial, or to what extent. *Salgado*, 913 F.3d at 482 (quoting *Trevino v. Davis*, 861 F.3d 545, 548 n.1 (5th Cir. 2017)). On the other hand, in *ODonnell* the Fifth Circuit affirmed this court's findings of fact, its principal conclusions of law (including the existence of grave and widespread constitutional violations), and preliminary remedies.[12] *ODonnell*, 892 F.3d at 163–66. The proposed consent decree provides the critical relief the plaintiffs have long sought, requiring Harris County to release many indigent misdemeanor arrestees on a personal bond as soon as practicable, again subject to carefully framed exceptions, exclusions, and limits. (*See* Docket Entry No. 617-1 at 17). The proposed consent decree also provides other relief, including training, data collection and analysis, and monitoring, that the amended preliminary injunction did not impose. In short, the proposed consent decree meets, supports, and implements the relief the class would likely recover were this case to proceed to trial and appeal. The settlement is likely to benefit the class members and Harris County as a whole.

---

[12] The pending cases challenging the bail systems in Dallas County, Texas and Cullman County, Alabama add to the uncertainty and support the *ODonnell* defendants' decision to settle the Harris County case. *See Daves v. Dallas Cty.*, 341 F. Supp. 3d 688 (N.D. Tex. 2018), *appeal docketed*, No. 18-11368 (5th Cir. Oct. 23, 2018); *Schultz v. Alabama*, No. 5:17-CV-00270-MHH, 2018 WL 4253645 (N.D. Ala. Sept. 5, 2018), *appeal docketed sub nom. Hester v. Gentry*, No. 18-13894 (11th Cir. Sept. 13, 2018).

This factor strongly favors preliminarily approving the proposed consent decree and settlement agreement.

### 6.        The Range and Certainty of Recovery[13]

This factor requires the district court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 213 (5th Cir. Apr. 1981)).  The court's consideration of this factor "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether, or from only obtaining a small amount." *Klein*, 705 F. Supp. 2d at 656. The question is not whether the parties have reached "exactly the remedy they would have asked the Court to enter absent the settlement," but instead "whether the settlement's terms fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits." *Id.* (quoting *Frew v. Hawkins*, No. 93-CA-065, 2007 WL 2667985, at *6 (E.D. Tex. Sept. 5, 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 849–50 (E.D. La. 2007)).

Estimating the range of possible recovery is not difficult.  The lowest band is no recovery, after all legal challenges.  A middle band is the relief granted in the amended preliminary injunction order, without the four provisions stayed by the motions panel.  *See Goodhart*, 900 F.3d at 228; *ODonnell*, 321 F. Supp. 3d at 778–85.  The upper band is the relief contained in the proposed consent decree, which robustly implements the amended preliminary injunction order. (*See* Docket Entry No. 617-1).  Based on the motions panel's decision, the upper band of recovery after trial and appeals likely would be less, and almost certainly no more, than the relief in the

---

[13]  *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

proposed consent decree. *Cf. Heartland*, 851 F. Supp. 2d at 1067–68 ("Based on the very small number of claims filed after an extensive settlement notice campaign, the upper band of recovery after trial likely would be much smaller, and almost certainly no higher, than the upper amount offered in the settlement.").

This factor favors approving the proposed consent decree and settlement agreement.

### 7. The Respective Opinions of the Participants, Including Class Counsel, Class Representatives, and the Absent Class Members[14]

"The endorsement of class counsel is entitled to deference, especially in light of class counsels' significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims." *DeHoyos*, 240 F.R.D. at 292; *see also Stott*, 277 F.R.D. at 346 ("As class counsel tend[] to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'" (quoting *Cotton*, 559 F.2d at 1330)). A court may not simply defer to class counsels' opinion. "Rather, the Court must give class counsel[s'] recommendations appropriate weight in light of all the factors surrounding the settlement." *Turner*, 472 F. Supp. 2d at 852.

Counsel for all the parties, including class counsel, have endorsed the proposed consent decree and settlement agreement. The parties jointly state that the proposed class settlement "is a landmark vindication of Fourteenth Amendment rights"; "honors the mandate issued by Harris County voters in electing new judges, a new Sheriff, and new County Commissioners responsible for the County's bail system"; and "will improve the lives of tens of thousands of class members each year." (Docket Entry No. 617 at 35–36). Class counsels' opinions as to the benefits of the proposed consent decree are consistent with the court's own analysis of the proposed consent decree and settlement agreement under the *Reed* and Rule 23(e)(2) factors.

---

[14] *See Reed*, 703 F.2d at 172.

This factor strongly favors preliminarily approving the proposed consent decree and settlement agreement.

### 8. Whether the Proposal Treats Class Members Equitably Relative to Each Other[15]

The proposed consent decree requires Harris County to take "action that applies to all class members equally." (Docket Entry No. 617 at 30); *see Hays*, 2019 WL 427331, at *13 (the court decided that the equitable-treatment factor was "easily met as each class member, save the Class representative, will receive the same amount"). All class members are entitled to the same relief. This factor supports preliminarily approving the proposed consent decree and settlement agreement.

All of the Rule 23(e)(2) and *Reed* factors weigh in favor of preliminarily approving the proposed consent decree and settlement agreement. The court preliminarily finds that the proposed consent decree and settlement agreement terms are fair, reasonable, and adequate under Rule 23(e) and the governing case law.

### B. The Authority to Enter the Proposed Consent Decree

Because the parties ask the court to enter a consent decree—a "hybrid creature[]" that is "part contract and part judicial decree"—an added step is necessary for preliminary approval. The court must make a preliminary determination that it has the authority to enter the decree. *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (en banc) ("The entry of a consent decree is more than a matter of agreement among litigants. It is a 'judicial act.'").

---

[15] *See* FED. R. CIV. P. 23(e)(2)(D).

The "voluntary nature of a consent decree is its most fundamental characteristic." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 521 (1986); *see id.* at 525 ("[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree."). "Consequently, a consent decree can sweep more broadly than can other forms of court-ordered relief." *Smith*, 906 F.3d at 335; *see also Local No. 93*, 478 U.S. at 525 ("[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial."); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) ("[A] district court may provide broader relief in an action that is resolved before trial than the court could have awarded after trial." (alterations and quotation omitted)). The relief must, however, "spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Smith*, 906 F.3d at 335 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *see Clements*, 999 F.2d at 846 ("A consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based.").

The Fifth Circuit twice rejected the defendants' abstention arguments, affirming this court's power to hear the Fourteenth Amendment claims. *See Goodhart*, 900 F.3d at 232; *ODonnell*, 892 F.3d at 156–57. The Fifth Circuit also affirmed this court's conclusion that Harris County's misdemeanor bail system violated procedural due process and equal protection rights. *ODonnell*, 892 F.3d at 161–63. The proposed consent decree fully resolves the plaintiffs' claims and addresses the "[t]he fundamental source of constitutional deficiency" the Fifth Circuit identified—Harris "County's mechanical application of the secured bail schedule without regard for the individual arrestee's personal circumstances." *Id*. at 163.

The relief the proposed consent decree requires "spring[s] from" the plaintiffs' claims, "come[s] within the general scope of the case made by the pleadings," and "further[s] the objectives of the law upon which the complaint was based." *Smith*, 906 F.3d at 335.  Amended Local Rule 9 entitles class members to protections designed to end Harris County's past practices of mechanically applying a secured bail schedule, regardless of inability to pay or the adequacy of other conditions of pretrial release, by requiring: pretrial release on a personal bond for certain categories of arrestees; an individualized hearing; notice; and the opportunity to be heard, present evidence, and dispute the prosecutor's evidence supporting detention.  (*See* Docket Entry No. 617-1 at 16–25).  The proposed consent decree's representation requirement and policies are designed to increase court appearances and to protect misdemeanor arrestees from arbitrary wealth-based detention.  (*See id.* at 25–37).  The data-collection, analysis, and reporting requirements are designed to increase the understanding of how Harris County's bail system is working in practice, how it can be improved, and whether it is constitutional in application.  The training and monitoring provisions are important to ensure that the "constitutional practices will endure."  (*Id.* at 11, 37–50).

Some of the proposed consent decree provisions are clearly broader than the amended preliminary injunction order, but each provision "spring[s] from," and works to resolve, the plaintiffs' constitutional claims.  *Smith*, 906 F.3d at 335.  This court preliminarily finds that it has the authority to enter the proposed consent decree.

In addition to the arguments about collusion discussed above, the objectors also contend that:

- the court lacks the power to enter the proposed consent decree because the decree is overbroad;[16]

---

[16]  (Docket Entry No. 629 at 36–38; Docket Entry No. 631-2 at 15–17; Docket Entry No. 634-1 at 7; Docket Entry No. 638 at 10; Docket Entry No. 641-1 at 5).

- the decree "remov[es] the individualized [bail] hearing process";[17]

- the decree jeopardizes public safety;[18]

- the decree threatens the interests of crime victims generally and domestic violence victims in particular;[19]

- the decree creates significant burdens on law enforcement and taxpayers;[20]

- the decree usurps legislative authority and bypasses and Harris County voters.[21]

- the decree "raises serious federalism concerns" by imposing obligations on local officials;[22]

- the decree violates Texas law;[23]

- the decree violates bail bondsmen's property rights;[24]

- the decree imposes unlawful obligations on the Harris County Sheriff, who "is not a proper party;"[25] and

- the decree should not be approved until third parties have "sufficient notice" and "a better opportunity to be heard."[26]

These contentions do not support denying preliminary approval.

This court would act within its authority in entering the proposed consent decree. The Fifth Circuit affirmed the court's factual findings and central legal conclusions that the decree

---

[17] (Docket Entry No. 629 at 17; *see also* Docket Entry No. 631-2 at 11 (making the same argument); Docket Entry No. 646-1 at 4 (same)).

[18] (Docket Entry No. 629 at 24–25; Docket Entry No. 634-1 at 8–11; Docket Entry No. 635-1 at 5; Docket Entry No. 636 at 1; Docket Entry No. 637 at 2–3; Docket Entry No. 641-1 at 14–15; Docket Entry No. 646-1 at 2–3).

[19] (Docket Entry No. 637 at 2–3; Docket Entry No. 638 at 18–19; Docket Entry No. 639 at 8–12; Docket Entry No. 641-1 at 6, 15–17; Docket Entry No. 646-1 at 2–3).

[20] (Docket Entry No. 637 at 3; Docket Entry No. 638 at 7–9, 19; Docket Entry No. 641-1 at 4–5; Docket Entry No. 646-1 at 3–4).

[21] (Docket Entry No. 629 at 30–32, 40; Docket Entry No. 635-1 at 4; Docket Entry No. 641-1 at 7).

[22] (Docket Entry No. 638 at 1, 15–18; *see also* Docket Entry No. 641-1 at 7 (making the same argument)).

[23] (Docket Entry No. 629 at 11; Docket Entry No. 631-2 at 10–14; Docket Entry No. 641-1 at 6).

[24] (Docket Entry No. 631-2 at 14).

[25] (Docket Entry No. 631-2 at 16).

[26] (Docket Entry No. 637 at 1; *see also* Docket Entry No. 646-1 at 2 (making the same argument)).

implements. *ODonnell*, 892 F.3d at 166.  The Deputies' Organization argues that "the government cannot agree to substantive remedies that go beyond what is constitutionally required," (Docket Entry No. 629 at 36), but clear precedent establishes that consent decrees "can sweep more broadly than can other forms of court-ordered relief."  *Smith*, 906 F.3d at 334–35.  The proposed decree "spring[s] from" the plaintiffs' claims and falls within the scope of the pleadings and the relief sought.  *Id*. at 335 (quoting *Frew*, 540 U.S. at 437).

Other broad consent decree provisions have withstood Fifth Circuit scrutiny.  In 2013, the Fifth Circuit affirmed a district court's decision to approve a consent decree with detailed requirements about New Orleans police "policies and practices related to: (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4) photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight."  *United States v. City of New Orleans*, 35 F. Supp. 3d 788, 790 (E.D. La. 2013), *aff'd*, 731 F.3d 434 (5th Cir. 2013).  The court held that these provisions were "fair, adequate[,] and reasonable" solutions to alleged patterns of police conduct that allegedly violated the Fourth and Fourteenth Amendments.  *Id*. at 790, 793.  Because "almost any affirmative decree beyond a directive to obey the Constitution necessarily" requires parties to "do more than the Constitution itself requires," the *ODonnell* objectors' cannot defeat the parties' joint motion by pointing out that the decree goes above the constitutionally required minimum.  *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 389 (1992).

Several objectors and amici argue that the decree sacrifices security for increased procedural protections, but the record demonstrates that this is a false dichotomy. The court found no "reasonable basis for [the] belief that for misdemeanor defendants, release on secured money bail provides incentives for, or produces, better pretrial behavior than release on unsecured or nonfinancial conditions." *ODonnell*, 251 F. Supp. 3d at 1103.[27] The procedures set out in the proposed consent decree require individualized bail hearings that take both public safety and constitutional rights into account.

Amended Local Rule 9 provides that secured money bail may be imposed as a release condition for indigent arrestees if the hearing officer finds on the record, by clear and convincing evidence, that "no less-restrictive condition . . . could reasonably assure" community safety or prevent flight from prosecution. (Docket Entry No. 617-1 at 21–22). The rule "permits the use of secured money bail *after* the individualized hearing." (Docket Entry No. 557-2 at 2). The decree replaces wealth-based detention with individualized proceedings. In no way does the settlement agreement or consent decree create an "automatic [personal] bond system." (Docket Entry No. 629 at 17).

The proposed decree includes additional precautions to protect vulnerable groups, such as domestic violence victims. (Docket Entry No. 647 at 8–9; Docket Entry No. 648 at 20). Amended

---

[27] The proposed consent decree accounts for, and works toward, both public and victim safety, as well as protecting misdemeanor defendants' constitutional rights, and it does not "remov[e] the individualized hearing process" for bail decisions. (Docket Entry No. 629 at 17). The court cited volumes of recent scholarship, including a University of Pennsylvania study of the Harris County bail system concluding that "if, during the six years between 2008 to 2013, Harris County had given early release on unsecured personal bonds to the lowest-risk misdemeanor defendants . . . those released would have committed 1,600 fewer felonies and 2,400 fewer misdemeanors in the eighteen months following pretrial release." *ODonnell*, 251 F. Supp. 3d at 1122. The study found that wealth-based pretrial detention increases crime by exacerbating poverty conditions that cause crime, and that indigent individuals who are detained "often lose their jobs, may lose their housing, be forced to abandon their education, and likely are unable to make their child support payments." *Id.* (quoting Lisa Foster, Office for Access to Justice, *Remarks at the American Bar Association's 11th Annual Summit on Public Defense* (Feb. 6, 2016)).

Local Rule 9 provides that people arrested for domestic violence, for violating a protective order in a domestic violence case, for making a terroristic threat against a family or household member, or for committing a crime while on pretrial release, may be detained immediately after arrest and before their individualized hearings, which must occur within 48 hours of their arrest.  (Docket Entry No. 617-1 at 17–18).  If a misdemeanor defendant released on a conditional bond violates the condition—such as a command to stay away from a victim—then his or her bond may be revoked after a hearing.  (*Id*.; Docket Entry No. 648 at 20).  And, as the plaintiffs argue, that "requiring fewer hearings [promotes safety by allowing] more attention to the cases that are most serious, more attention to the conditions of release in serious cases . . . more attention to cases in which a condition of release is violated, [and] less strain on the Sheriff's Department resources." (Docket Entry No. 648 at 6).

Several amici cite cases of misdemeanor defendants committing crimes while on bond as evidence that the decree endangers public safety and should be rejected.  (*See, e.g.*, Docket Entry No 641-1 at 17–20).  These anecdotes do not undermine the record or the court's findings of fact and conclusions of law.  No pretrial bail system can prevent every defendant who is released on money bail or personal bond from committing an offense or failing to appear.  The amici's argument is essentially an argument for incarcerating *every* arrestee and defendant until trial or other disposition.  That is not and has not been our law.  Every American bail system must comply with the Constitution, which presumes innocence and eligibility for pretrial release.  The amici's hindsight disagreements with individual case outcomes have no bearing on whether the decree is a fair, reasonable, and adequate remedy for the constitutional violations that the record shows prevailed in Harris County.

Objections about the cost of the decree and its potential impact on law enforcement are also inadequate grounds to deny the parties' joint motion.  Injunctions and consent decrees often require expenditures of public funds, and the Fifth Circuit has affirmed decrees imposing far greater burdens on law enforcement than the proposed decree and settlement agreement in this case.  *See, e.g.*, *City of New Orleans*, 731 F.3d at 443 (New Orleans police consent decree); *Missouri v. Jenkins*, 495 U.S. 33, 38 (1990) (school-desegregation consent decree requiring state and local authorities to spend tens of millions of dollars).  The cost arguments are especially unpersuasive given the evidence in the record suggesting that the consent decree may save Harris County money, as compared to the former bail system.  *ODonnell*, 251 F. Supp. 3d. at 1122 (a study of the Harris County bail system found that the County would have saved tens of millions of dollars if it "had given early release on unsecured personal bonds to the lowest-risk misdemeanor defendants" between 2008 and 2013).

District Attorney Ogg asserts that the decree "unfair[ly] . . . expose[s] the District Attorney and her employees to federal sanctions for noncompliance with the proposed settlement absent appropriate clarity on her rights and responsibilities under the Proposed Settlement."  (Docket Entry No. 641-1 at 4).  But the District Attorney does not identify which, if any, of the proposed decree provisions a prosecutor could be accused of violating in a way that would incur contempt sanctions.  As discussed below, the District Attorney argues (unpersuasively) that the provisions addressing nonappearances wrongly increase judicial discretion at the expense of prosecutorial power, but it is not clear how those provisions put prosecutors at risk of being held in contempt. (*Id*. at 4 n.2, 6).

The amici's invocations of separation of powers and popular sovereignty ring hollow.  The settlement became feasible because of the voters' decisions in the November 2018 election.  In

that sense, the proposed consent decree "honors the mandate [of] Harris County voters."  (Docket Entry No. 617 at 35).  The proposed decree and settlement agreement will help transform a bail system that caused "tens of thousands of constitutional violations," vindicating Fourteenth Amendment rights.  *ODonnell*, 251 F. Supp. 3d at 1150 n.99.  The fact that democratically elected officials approved the decree, while the officials defeated in the election had opposed similar relief, does not offend, but celebrates, popular sovereignty.

Nor is the federalism objection persuasive.  A consent decree is a voluntary agreement; the Harris County Commissioners Court voted to approve the proposed decree after six months of arms-length negotiation.   It would not be a "judicial usurpation of local government responsibilities" for this court to approve the proposed decree after the plaintiffs and County defendants asked the court to do so.  (Docket Entry No. 638 at 15).

Some amici argue that enforcing the decree "for an extended period of time . . . would . . . bind future local governmental officials who were not parties to the [d]ecree."  (*Id.*; *see also* Docket Entry No. 641-1 at 7 (making the same argument)).  This objection belongs before the Harris County Commissioners Court, not this court.  Local officials may adopt consent decrees that bind their successors.  The proposed consent decree specifically provides for modification during its implementation.  (Docket Entry No. 647 at 7).  Paragraph 137 states that "any" provision of the decree may be modified for good cause and paragraph 31 "expect[s]" that the Harris County Criminal Court at Law Judges "may seek to update the rule from time to time to reflect best practices and to maximize pretrial liberty, court appearance, and public safety."  (Docket Entry No. 617-1 at 24, 50–51).  Current or future officeholders may move to modify or terminate the decree under Rule 60(b) if they think changes in circumstances warrant this relief.  FED R. CIV. P. 60(b); *see Rufo*, 502 U.S. at 393 ("[A] party seeking modification of a consent decree must

establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance."). Federalism provides no ground to reject the decree.

The amici raise objections under Texas law, but none supports denying preliminary approval. District Attorney Ogg contends that the decree "[a]ccords unfettered and unreviewable discretion to misdemeanor judges and magistrates to delay (or outright excuse) misdemeanor defendants from appearing in court, contrary to Texas law." (Docket Entry No. 641-1 at 6). She argues that this discretion would theoretically empower judges to thwart the prosecution by allowing defendants to *never* appear. (*Id*. at 11). The District Attorney concludes that the decree violates the Texas Code of Criminal Procedure's requirement that judges "shall" compel defendants' appearances when a court order or Code provision mandates an appearance. (*Id*. at 9–11 (citing TEX. CODE. CRIM. PROC. arts. 22.01, 22.02, 23.05 (2007)). The parties respond persuasively that the decree reflects Texas district and county courts' broad power to manage their dockets and decide whether a defendant must attend a particular hearing. (Docket Entry No. 647 at 10; Docket Entry No. 648 at 16–17 (citing TEX. CODE. CRIM. PROC. art. 33.08 (1966) ("The district courts and county courts shall have control of their respective dockets as to the settings of criminal cases."))).

Nothing in the proposed decree prevents judges from requiring a defendant's appearance at a pretrial hearing under Article 28.01 of the Code. (Docket Entry No. 647 at 11–12). Article 28.01 provides that courts "may set any criminal case for a pre-trial hearing . . . and direct the defendant and his attorney . . . to appear before the court." TEX. CODE. CRIM. PROC. art. 28.01 (1979). "[B]y its terms, Article 28.01 comes into play only when the trial court exercises its discretion to 'set' a criminal case for a pre-trial hearing." *State v. Velasquez*, 539 S.W.3d 289,

294–95 (Tex. Crim. App. 2018). Article 33.03 mandates that misdemeanor defendants appear at trials when they face imprisonment, but so does the proposed decree, which requires defendants to attend "trial settings, bond violation hearings, suppression hearings, or plea settings," as well as "any pretrial hearing before a Harris County Criminal Court at Law Judge in a case where a misdemeanor arrestee has had prior sufficient notice . . . that the appearance is required." TEX. CODE. CRIM. PROC. art. 33.03 (1979); (Docket Entry No. 617-1 at 14).

District Attorney Ogg contends that paragraph 65(c) of the proposed decree conflicts with Article 28.01, because the provision gives a Harris County Criminal Court at Law Judge discretion to "waive a misdemeanor arrestee's appearance at any court appearance at which that . . . Judge is presiding." (Docket Entry No. 641-1 at 11 n.5 (citing Docket Entry No. 617-1 at 34)). The District Attorney observes that Article 28.01's second sentence states that "[t]he defendant must be present at the arraignment, and his presence is required during any pre-trial proceeding." *Id.* (citing CRIM. PROC. art. 28.01). But paragraph 65(c) of the decree is consistent with Article 28.01, because a judge can waive the defendant's appearance at a pretrial hearing by not designating the setting as required under Article 28.01. Article 28.01's first sentence provides that courts "*may*" set a criminal case for a pretrial hearing. CRIM. PROC. art. 28.01 (emphasis added); *Velasquez*, 539 S.W.3d at 294–95.

That said, the court asks whether the parties are willing to consider clarifying paragraph 65(c) to be more clearly consistent with the Code requirement that misdemeanor defendants facing prison time must appear at their trials. CRIM. PROC. art. 33.03. Paragraph 65(c) authorizes waiving "any court appearance," which theoretically encompasses trials. (Docket Entry No. 617-1 at 34). Although paragraph 17(r) of the decree includes trials as "required setting[s]," paragraph 65(c) applies "[n]otwithstanding any other provision in this Consent Decree." (*Id.* at 14, 34). The

34

plaintiffs state that they "would have no objection to clarifying for the District Attorney that this provision is in no way meant to contradict any provision of Texas law by adding the phrase 'consistent with Texas law' to this provision." (Docket Entry No. 648 at 17).

The court also asks the parties to consider whether to clarify paragraph 68(a)(ii), which states that if a Harris County Criminal Court at Law Judge "finds . . . that the arrestee [who missed a required appearance] did not have actual notice of the setting, then a[n arrest] warrant may not issue." (Docket Entry No. 617-1 at 36). The Professional Bondsmen contend that this provision conflicts with the Texas Code of Criminal Procedure, which provides that a warrant must issue if a defendant forfeits his bond by failing to attend a required appearance without good cause. (Docket Entry No. 631-2 at 13–14); *see* CRIM. PROC. art. 22.02 (bond forfeiture for nonappearance will occur "unless good cause be shown why the defendant did not appear"); CRIM. PROC. art. 23.05(a) ("If a forfeiture of bail is declared by a court . . . a capias shall be immediately issued for the arrest of the defendant."). The Professional Bondsmen argue that the proposed decree violates Texas law because it requires judges to not issue a warrant after a defendant misses a required hearing, even without finding good cause, if the defendant lacked actual notice of the setting. (Docket Entry No. 631-2 at 13–14).

The parties respond that nothing in the proposed consent decree overrides the state-law mandate. (Docket Entry No. 647 at 13 ("[I]f a person fails to appear when required, courts and prosecutors retain the power to engage in forfeiture procedure as before."); Docket Entry No. 648 at 18 ("To the extent . . . that Texas law requires an arrest warrant to issue if there is no good cause, *nothing* in the Consent Decree prohibits that.")). The parties should consider clarifying paragraph 68(a)(ii).

The other state-law challenges are not persuasive.  The District Attorney objects that "there is no requirement that a county criminal court at law judge issue a warrant authorizing the defendant's arrest" when necessary under Texas law.  (Docket Entry No. 641-1 at 11).  But the absence of an explicit requirement to follow state law does not equate to an implicit command to violate it.  (Docket Entry No. 648 at 18).  The potential issue of compliance with Texas law on issuing arrest warrants relates to paragraph 68(a)(ii), discussed above.  The decree must comply with Texas law, but it does not have to repeat every state-law requirement.[28]

The Professional Bondsmen assert that personal bonds may be granted to misdemeanor arrestees before a bail hearing "only if a magistrate . . . concludes that a personal bond is appropriate."  (Docket Entry No. 631-2 at 11).  The Professional Bondsmen appear to suggest— in one terse sentence—that all misdemeanor defendants, whether or not they can afford secured money bail, must be detained before their individualized bail hearings.  But the Texas Government Code allows County Judges to "adopt rules consistent with the Code of Criminal Procedure . . . for practice and procedure in the courts."  *ODonnell*, 251 F. Supp. 3d at 1086 (quoting TEX. GOV'T CODE § 75.403(f) (1987)).  The Professional Bondsmen do not explain why the proposed consent decree conflicts with the Code provisions they cite.  (Docket Entry No. 631-2 at 11).  Article 17.03 of the Texas Code of Criminal Procedure grants magistrate judges the power to release arrestees on personal bond, subject to several exceptions, but does not bar release on personal bond before a bail hearing.  TEX. CODE. CRIM. PROC. art. 17.03 (2017); (Docket Entry No. 648 at 4).  And

---

[28]   The decree also need not duplicate the Texas Code of Criminal Procedure's provision giving child and domestic-abuse victims the right to have courts consider the impact of a defendant's requested continuance on those victims.  *See* TEX. CRIM. PROC. CODE. art. 56.02(a)(13) (2015); (Docket Entry No. 639 at 9–10).  The Harris County Domestic Violence Coordinating Council argues that, under the Code, in child and domestic-abuse cases, "[t]he reason for granting or denying a continuance must be stated on the record."  (Docket Entry No. 639 at 10).  But Article 56.02(a)(13) requires a statement on the record only "if [it is] requested by the attorney representing the state or by counsel for the defendant."  CRIM. PROC. art. 56.02(a)(13).

Article 17.04 lists the "[r]equisites of a personal bond" document, such as the defendant's name and address, but says nothing to support the Professional Bondsmen's claim.  TEX. CODE. CRIM. PROC. art. 17.04 (1987); (Docket Entry No. 648 at 4).

The Professional Bondsmen argue that the proposed decree violates Texas law by preferring personal bonds over other bonds and by using preapproved, $100 General Order Bonds. (Docket Entry No. 631-2 at 11, 13).  Again, they cite a litany of Texas Code provisions (and, this time, one case), but no specific analysis to support their argument.

The Professional Bondsmen argue that the proposed consent decree provides that the Harris County Sheriff must "reject an otherwise valid bond."  (Docket Entry No. 631-2 at 12).  But Texas law requires sheriffs to "execute all *lawful* process."  TEX. CODE CRIM. PROC. art. 2.13(b)(2) (2019) (emphasis added); *see also* TEX. CODE CRIM. PROC. art. 2.16 (1966) ("If any sheriff or other officer shall wilfully [*sic*] refuse or fail from neglect to execute any summons, subpoena[,] or attachment for a witness, or any other legal process which it is made his duty by law to execute, he shall be liable to a fine for contempt.").  The proposed decree establishes criteria for assessing whether a bond is lawful in Harris County and whether the Sheriff must enforce it under state law.  (Docket Entry No. 617-1 at 23 ("The Sheriff must not enforce any order requiring secured money bail that is not accompanied by a record showing that the procedures and findings described in Local Rule 9 were provided.")).  The decree reflects the Fifth Circuit's suggested language for the amended injunction.  *ODonnell*, 892 F.3d at 165 (the Sheriff may "decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided."); (*cf.* Docket Entry No. 617-1 at 23).  The proposed decree does not empower the Harris County Sheriff "to avoid executing judicial orders

imposing secured bail by unilaterally declaring them unconstitutional." *ODonnell*, 892 F.3d at 156.

The Professional Bondsmen object that Texas law does not require the proposed decree's clear-and-convincing evidence standard in bail determinations and its least-restrictive-means analysis of conditions of release.  (Docket Entry No. 631-2 at 12–13).  The Professional Bondsmen cite no authority for the claim that a Texas local government cannot agree to procedural safeguards that go above a constitutional or state-law floor.  The clear-and-convincing evidence and least-restrictive means tests channel magistrates' discretion, but do not eliminate it.  As explained above, "[t]he Texas Government Code permits the County Judges to 'adopt rules consistent with the Code of Criminal Procedure.'"  *ODonnell*, 251 F. Supp. 3d at 1086.  The Professional Bondsmen do not show that these proposed consent decree provisions violate the Texas Code of Criminal Procedure.

The Professional Bondsmen assert that the proposed decree "fails to consider funds available from the detainee's family."  (Docket Entry No. 631-2 at 12).  The proposed decree does consider funds from family and other sources in the provision stating that "the arrestee must be asked, under penalty of perjury, the amount of money she can afford to pay from *any lawful source* at the time of the hearing."  (Docket Entry No. 617-1 at 21 (emphasis added)).

The Professional Bondsmen contend that the "[d]ecree seeks to exclude the private surety bail bondsmen from posting any bonds for 85% of the misdemeanor arrestees," invoking "a protected property interest under the Texas Constitution in their bail bond license[s]."  (Docket Entry No. 631-2 at 14).  The Professional Bondsmen also complain that the decree's provisions about failures to appear and rescheduling hearings "increas[e] the risk" and "financial burden on bondsmen."  (*Id*. at 15).  As explained above, the proposed consent decree does not remove the individualized hearing process, and nothing in the decree forbids bondsmen from practicing their

38

trade.  The key Texas case the Professional Bondsmen cite recognizes that the general "property right in making a living" is not unlimited but is instead "subject . . . to valid and subsisting regulatory statutes." *Smith v. Decker*, 312 S.W.2d 632, 634 (Tex. 1958).  Bondsmen have no legal right to bail policies that reduce their risk and increase their wealth by violating the constitutional rights of tens of thousands of indigent arrestees.

The Professional Bondsmen assert that the Fifth Circuit held that "[the Harris County Sheriff] is not a proper party to this litigation."  (Docket Entry No. 631-2 at 16).  But the appellate court withdrew an opinion holding that the Harris County Sheriff "cannot be sued under § 1983." *ODonnell*, 882 F.3d at 538, *opinion withdrawn and superseded on reh'g sub nom. ODonnell*, 892 F.3d 147.  On rehearing, the Fifth Circuit ruled that "[the] Sheriff is not an appropriate party *for attaching municipal liability*."  *ODonnell*, 892 F.3d at 156 (emphasis added).  The Fifth Circuit suggested language for the amended preliminary injunction authorizing the Sheriff "to decline to enforce orders requiring payment of prescheduled bail amounts" that are not "accompanied by [an adequate] record."  *Id*. at 165.  The Professional Bondsmen do not undermine the proposed consent decree by questioning the Sheriff's party status.

The objectors' and amici's briefs and letters demonstrate that third parties have had notice and an ample opportunity to be heard about the proposed settlement and consent decree.  Many of the objectors and amici reprise arguments made and thoroughly argued during the litigation in this court and in the Fifth Circuit.  This court reset the deadlines for class notice and objections and postponed the final fairness hearing to give the parties time to respond to the concerns raised.  Objections to final approval must be filed by October 11, 2019.  The final fairness hearing, set for October 21, 2019, at 9:00 a.m., will be open to the public.  If this court grants the motion for final

approval, it will do so after providing ample opportunities for, and receiving, robust public comment.

The court does not question the amici's and objectors' good faith.  The public safety and public resource concerns they raise are important.  The proposed consent decree and settlement agreement are preliminarily approved because these concerns are fully recognized and addressed.

### C.    Attorneys' Fees and Costs

The plaintiffs have filed an unopposed motion under Rule 54(d)(2) for attorneys' fees and costs.  (Docket Entry No. 618).  The "parties agree that Class Counsel, based on prevailing hourly rates, [are] entitled to" the requested amounts, which Harris County had agreed to pay to settle the plaintiffs' claims for attorneys' fees and costs.  (Docket Entry No. 617-2 at 1).  Class counsel have explained that they arrived at these amounts using a lodestar analysis, and the factors in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–20 (5th Cir. 1974).  (Docket Entry No. 617 at 32–36).

Rule 23(h) authorizes a district court to "award reasonable attorney[s'] fees and nontaxable costs that are authorized by law or by the parties' agreement."[29]  FED. R. CIV. P. 23(h).  The "claim for an award must be made by motion under Rule 54(d)(2)," and a "class member, or a party from whom payment is sought, may object."  *Id*. 23(h)(1)–(2).  The court "must find the facts and state its legal conclusions under Rule 52(a)."  *Id*. 23(h)(3).

Courts in this circuit "have encouraged litigants to resolve fee issues by agreement, if possible."  *DeHoyos*, 240 F.R.D. at 322 (citing cases, including *Johnson*, 488 F.2d at 720).  A court is not bound by the parties' agreement.  *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844,

---

[29]  The court may also award the prevailing party "reasonable attorney[s'] fee[s]" in a § 1983 action.
*See* 42 U.S.C. § 1988 (2000).

849 (5th Cir. 1998).  Instead, the court must carefully review a proposed fee award to ensure reasonableness.  *Id.*  This scrutiny is necessary to "guard[] against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class."  *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (quoting *Strong*, 137 F.3d at 849).

The Fifth Circuit "requires district courts to use the 'lodestar method' to 'assess attorneys' fees in class action suits.'"  *Sulfur*, 517 F.3d at 228 (quoting *Strong*, 137 F.3d at 850).  The court "must first determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney."  *Id.*  "The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate."  *Id.*  After calculating the lodestar, the court must evaluate the proposed fee award under the *Johnson* factors "and not merely 'ratify a pre-arranged compact.'"  *Id.* (quoting *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980)).  The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642 n.25 (5th Cir. 2012) (citing *Johnson*, 488 F.2d at 717–19).

The court "must explain how each of the *Johnson* factors affects its award."  *Sulfur*, 517 F.3d at 228.  The explanation, however, "need not be meticulously detailed to survive appellate review."  *Id.* (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996)).  After reviewing the twelve factors, "the court may then apply a multiplier to the lodestar, adjusting the

lodestar either upward or downward." *Strong*, 137 F.3d at 850.  There is a "strong presumption" that the lodestar number is reasonable.  *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 388 n.17 (5th Cir. 2013).  The court's fee award is reviewed for abuse of discretion.  *Strong*, 137 F.3d at 850.

### 1.    The Lodestar Calculation

Under the proposed settlement agreement, Harris County agrees to pay:

- $3,725,231.00 in fees and $114,832.54 in costs to Civil Rights Corps;

- $2,161,262.00 in fees (to be forgone) and $30,214.86 in costs to Susman Godfrey L.L.P.;

- $632,453.00 in fees to Wilmer Cutler Pickering Hale and Dorr LLP; and

- $182,715.90 in fees and $5,378.00 in costs to the Texas Fair Defense Project.

(Docket Entry No. 617-2 at 1).  The court will approve the final figures after all counsel meet, confer, and clarify some relatively minor discrepancies in these fee amounts.[30]

According to the fees and costs reports, class counsel billed over 9,700 hours in this case. (Docket Entry No. 617 at 33).  Civil Rights Corps worked 7,860.60 hours; Susman Godfrey contributed 4,326.80 hours; WilmerHale put in 1,240.80 hours; and the Texas Fair Defense Project worked 637.35 hours.  (Docket Entry No. 618-5 at 1; Docket Entry No. 618-6 at 7).  Multiplied by

---

[30]  The plaintiffs' Rule 54(d)(2) motion states that Civil Rights Corps seeks attorneys' fees in the amount of $3,716,531.00.  (Docket Entry No. 618 at 1).  But the proposed settlement agreement provides that Harris County will pay Civil Rights Corps $3,725,231.00 in attorneys' fees.  (Docket Entry No. 618-1 at 1).  The billing data supports the lower figure.  (Docket Entry No. 618-6 at 7).  The difference between the two numbers is less than $10,000 and the total award is more than $3.7 million.  The declaration of Neal Manne on Susman Godfrey's attorneys' fees states that "[a]t the normal and customary hourly rates that Susman Godfrey charges clients, the value of Susman Godfrey's time spent working on this matter was $2,165,012.50."  (Docket Entry. No. 618-5 at 1–2).  But the proposed settlement agreement and the proposed notice provide that Susman Godfrey agrees to waive a $2,161,262.00 fee.  (Docket Entry No. 617-2 at 1; Docket Entry No. 617-3 at 1).  The difference between the two numbers is $3,750.50.  The documents the court will review at the final fairness hearing should resolve these inconsistencies.

the various hourly rates charged by class counsel, the lodestar totals $4,540,399.90, excluding Susman Godfrey's fees.  Costs totaled $150,425.40.  (Docket Entry Nos. 618-1, 618-2, 618-3, 618-4, 618-5).

*Cole v. Collier*, No. H-14-1698, 2018 WL 2766028, at *13 (S.D. Tex. June 8, 2018), is instructive.  Inmates at a Texas prison sued under § 1983 "to end [the] policy and practice of exposing them to extreme, unsafe heat."  *Id.* at *1.  The parties reached a settlement "[a]fter nearly four years of contentious litigation."  *Id.*  Class counsel billed over 9,900 hours of work for $4,428,466.25 in fees and $300,721.99 in costs.  *Id.* at *13.  The court approved these amounts "in light of the significant time required to effectively litigate this action."  *Id.*  Prosecuting the case required "40 depositions and review of over 500,000 pages of documents."  *Id.*  "Motion practice included class certification, summary judgment, motions to dismiss, discovery disputes, and preliminary injunctions," and class counsel "expended additional time defending three interlocutory appeals."  *Id.*  The court "recognize[d] that prison litigation can be particularly time-consuming" and credited class counsel's billing judgment because they "omitt[ed] numerous hours spent reviewing emails, writing correspondence, holding telephone calls, and traveling."  *Id.*

This case, which also involves important constitutional challenges to criminal justice policies and practices, has relevant similarities.  Class counsel billed over 9,700 hours in litigating the plaintiffs' claims.  (Docket Entry No. 617 at 33).  The case—already in its fourth year—challenged the nation's third-largest jail system and required "intensive investigation and expert analysis of important factual matters."  *ODonnell*, 251 F. Supp. 3d at 1058; (Docket Entry No. 617 at 31).  Discovery was extensive.  The record was voluminous.  The preliminary injunction trial "featured [13] live witnesses and thousands of documents and videos."  (Docket Entry No. 617 at 31).  Motions included motions for class certification, motions to dismiss, many discovery

43

disputes, motions for reconsideration, a preliminary injunction, and motions for summary judgment.  Class counsel defended two interlocutory appeals.  The record shows that class counsel exercised a high degree of billing judgment in not charging for all of the time they expended.  For example, "[the] Plaintiffs' expert witnesses donated hundreds of hours of expert analysis and testimony."  (Docket Entry No. 618-2 at 4).

The court preliminarily finds that the number of hours class counsel worked in prosecuting this case, while high, is reasonable.  *See Cole*, 2018 WL 2766028, at *13 ("While the number of hours expended is high, the amount is reasonable in light of the significant time required to effectively litigate this action.").

The hourly rates used are also reasonable.  "An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates[,] and the rate is not contested."  *Altier v. Worley Catastrophe Response, LLC*, Nos. 11-241, 11-242, 2012 WL 161824, at *22 (E.D. La. Jan. 18, 2012) (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995)).  The rates ranged from $600.00 per hour for one of the lead class counsel to as low as $180.00 for a paralegal.  (Docket Entry No. 618-6 at 7).

Craig Smyser, Esq., a Houston-based attorney with significant complex-litigation experience, opined that the "hourly rates charged by [the p]laintiffs for the different levels of lawyers and paralegals are within the normal range of hourly fees charged by civil trial lawyers in Harris County prosecuting similar cases to this."  (*Id.* at 4).  The lawyers are all experienced in civil-rights and complex litigation.  They work in geographic areas that command high hourly rates for lawyers with comparable experience and expertise.  And it appears that Civil Rights Corps, WilmerHale, and the Texas Fair Defense Project have significantly understated their usual hourly

44

rates by instead using the rates Harris County paid to its counsel.  (Docket Entry No. 617 at 33; Docket Entry No. 618-6 at 5).

The court preliminarily finds that the hourly rates are within the "prevailing market rates for lawyers with comparable experience and expertise" in complex class-action litigation and are reasonable.  *Heartland*, 851 F. Supp. 2d at 1088 (quoting *Altier*, 2012 WL 161824, at *22); *see also McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) ("'[R]easonable' hourly rates 'are to be calculated according to the prevailing market rates in the relevant community.'" (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984))).

### 2.    The *Johnson* Factors

The *Johnson* factors also favor preliminarily finding that the attorneys' fees are reasonable. The first factor, the time and labor required, centers on billing judgment.  Class counsel "calculated their respective lodestars based on agreed hourly rates" that are "lower than those charged by counsel retained by [Harris] County in this matter."  (Docket Entry No. 618 at 2).  Hundreds of hours of work were not included in the lodestar number of hours charged.  (Docket Entry No. 618-2 at 4; Docket Entry No. 618-5 at 1–2).  Susman Godfrey has forgone over $2.1 million in fees, enabling Harris County to allocate that amount "to its own efforts to meet the needs of class members."  (Docket Entry No. 617 at 28).  Class counsel have not moved for fees and costs related to monitoring or implementing the proposed consent decree.  (*Id.* at 34).  Neither of the plaintiffs' testifying experts at the March 2017 preliminary injunction trial was compensated.  (*Id.*).  Nor did the plaintiffs bill other consulting experts for their "guidance, technical assistance, or supporting affidavits."  (*Id.*).  This demonstrates that class counsel worked hard—and often for free—to resolve this case in a manner that benefits the class and Harris County.  This factor is amply met.

The second factor examines the novelty and difficulty of the issues.  The parties argue correctly that this case presented complex "legal issues concerning not only the nature of the constitutional rights at stake, but also federal jurisdiction, municipal liability, immunity, abstention, equitable remedies, and related state law."  (Docket Entry No. 617 at 33).  This case also involved complex factual issues that required extensive investigation, discovery, trial, and appellate review.  This factor strongly supports preliminary finding that the claimed fees are reasonable.

The third factor is the skill required to prosecute the plaintiffs' claims.  This factor is satisfied when "counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution."  *King v. United SA Fed. Credit Union*, 744 F. Supp. 2d 607, 614 (W.D. Tex. 2010) (quoting *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 WL 34633373, at *12 (S.D. Tex. Dec. 19, 2001)).  The legal and factual complexities required class counsel to exercise a high degree of skill to, among other things, conduct extensive discovery; survive motions to dismiss; prevail in an eight-day bench trial; and defend two interlocutory appeals.  As the court stated in *Cole*:

> Skilled attorneys were necessary to perform the legal services properly.  This was a complex action in a specialized area of law.  Defendants put forth a vigorous defense.  Class Counsel are experienced, reputable, and able, and brought their expertise in complex litigation and civil rights to bear in successfully litigating this action.

*Cole*, 2018 WL 2766028, at *14.  This factor strongly supports preliminary finding that the claimed fees are reasonable.

The fourth factor asks whether litigating this case precluded class counsel from other employment.  Class counsel worked over 9,700 hours in this case, and hundreds more if the court

includes the hours donated by Susman Godfrey.   The record shows that "class counsel[s'] representation of the class imposed a substantial opportunity cost on them, occupying large amounts of time that they could otherwise have spent on other matters."  (Docket Entry No. 617 at 33).

The fifth factor requires the court to analyze customary fees for similar work in the community.  Mr. Smyser presents uncontroverted evidence that class counsels' claimed rates are reasonable and that the proposed award reflects a conservative market-based fee.  (Docket Entry No. 618-6).  It appears that Civil Rights Corps, WilmerHale, and the Texas Fair Defense Project have "based their proposed rates on those paid by [Harris] County to its counsel, choosing slightly lower rates than the County paid for lawyers with comparable experience and expertise."  (Docket Entry No. 617 at 33).  As noted above, Susman Godfrey has forgone over $2.1 million in its fees; class counsel have not asked for certain expert compensation or attorneys' fees related to implementing or monitoring the proposed consent decree; and class counsel have exercised a high degree of billing judgment.  This factor strongly favors preliminarily finding that the claimed fees are reasonable.

Under the sixth factor, the court evaluates class counsels' fee arrangement.  As in *Cole* and many civil-rights cases, class counsel agreed to pursue fees only if the plaintiffs prevailed, and then only under Rule 23(h) or 42 U.S.C. § 1988.  (*Id.* at 34).  Class counsel spent four years litigating this case, "facing the distinct possibility that they would receive nothing" and giving up other work and fees.  *Cole*, 2018 WL 2766028, at *14.  Because the record shows that class counsel performed a public service by representing the class, this factor weighs heavily in favor of preliminarily finding that the claimed fees are reasonable.

The seventh factor looks to the time limitations the circumstances imposed.  As class counsel argued, "the urgency of addressing the irreparable harm that hundreds of class members suffered every day in [Harris] County's bail system . . . imposed significant time pressure on class counsel[s'] prosecution of this case."  (Docket Entry No. 617 at 34).  The 14 County Judges' motion for an emergency stay also imposed significant time pressure on class counsel, as did the other emergency motions filed in this case.  (*See* Docket Entry Nos. 165, 311).  This factor strongly favors preliminarily finding that the claimed fees are reasonable.

The eighth factor, the amount involved and the results obtained, is "the most critical factor in determining the reasonableness of a fee award."  *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998));  *Heartland*, 851 F. Supp. 2d at 1085 (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).  Class counsel have achieved extraordinary results for the plaintiffs.  The proposed consent decree addresses the constitutional harms the Fifth Circuit identified.  To address those harms, the decree provides for counsel for indigent misdemeanor arrestees at bail hearings; establishes an electronic notification system; imposes training and monitoring requirements; and requires oversight for seven years.  (*See* Docket Entry No. 617-1).  The court agrees that the proposed class settlement and consent decree are "landmark developments backed by intensive investigation and innovative lawyering."  (Docket Entry No. 617 at 34–35).  This factor strongly supports preliminarily finding that the claimed fees are reasonable.

The ninth factor, class counsels' experience, reputation, and ability, is amply met.  The court commends the talented lawyering shown by all counsel, for all the parties, throughout the years of vigorous litigation.

The court also evaluates the "undesirability" of the case.  This factor relates closely to the sixth factor—class counsels' fee arrangement.  This litigation was not "undesirable" to class

counsel, "given their mission and the opportunity [the case] presented to stop a large-scale constitutional harm." (Docket Entry No. 617 at 35). But "the significant and uncertain upfront investment for many years would have made [litigating this matter] undesirable to the private bar." (*Id*.). And this case did require class counsel to forgo other opportunities, cases, and clients. This factor supports preliminarily finding that the claimed fees are reasonable.

The eleventh factor looks to the length and nature of class counsels' relationship with their clients. Class counsel ably defended the named class representatives when needed and attempted to protect their interests. The proposed consent decree, a result of class counsels' skillful advocacy, will greatly benefit the class of indigent misdemeanor arrestees. This factor weighs in favor of preliminarily finding that the claimed fees are reasonable.

The final factor, a review of awards in similar cases, strongly favors preliminarily finding that the claimed fees are reasonable. *See Perdue v. Kenny A.*, 559 U.S. 542, 548 (2010) ($6 million lodestar); *DeHoyos*, 240 F.R.D. at 333–34, 342 (fee award of over $11 million approved); *Cole*, 2018 WL 2766028, at \*14 (fee award of $4.5 million approved).

The court preliminarily finds that the *Johnson* factors confirm the reasonableness of the fee award. Class counsel have not asked the court to increase the lodestar. Given the analysis above and the "strong presumption" that the lodestar amount is reasonable, the court identifies no grounds to decrease or increase that amount. *Ransom*, 734 F.3d at 388 n.17.

### 3.    Costs

Class counsel ask for $150,425.40 in costs. (Docket Entry No. 618 at 1–2). "The appropriate analysis to apply in determining which expenses are compensable in a class action case is whether such costs are of the variety typically billed by attorneys to clients." *DeHoyos*, 240 F.R.D. at 334 (collecting cases). Class counsels' claimed costs include the expenses related

to travel, depositions, transcripts, filings, photocopies, and meals.  (Docket Entry No. 618-2 at 4; Docket Entry No. 618-3 at 24; Docket Entry No. 618-5 at 3).  Class counsel have submitted documents supporting the costs, which the court has reviewed.  The defendants do not object.  The court preliminarily finds that the costs are reasonable and that these are appropriate categories of expenses.  *See DeHoyos*, 240 F.R.D. at 334, 342 ($582,485.40 in costs approved); *Cole*, 2018 WL 2766028, at *13–15 ($300,721.99 in costs approved).

### D.   Notice

Because the proposed consent decree and settlement agreement are preliminarily approved, the "court must direct notice in a reasonable manner to all class members who would be bound by the [class settlement]." FED. R. CIV. P. 23(e)(1)(B).  "There are no rigid rules to determine whether a settlement notice to the class satisfies constitutional or Rule 23(e) requirements." *Wal-Mart*, 396 F.3d at 114.  Instead, "a settlement notice need only satisfy the 'broad reasonableness standards imposed by due process.'" *In re Katrina*, 628 F.3d at 197 (quoting *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999)).  Due process is satisfied if the notice provides class members with the "information reasonably necessary for them to make a decision whether to object to the settlement." *Id.*; *see also* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.04(a) (2010) ("The purpose of a notice of a proposed class settlement is to set forth the major contours of the proposal and to inform class members of their right to attend the fairness hearing and to lodge written objections by a prescribed date should they so desire.").

The *Manual for Complex Litigation* states that courts should evaluate whether the proposed notice:

(1) describe[s] the essential terms of the proposed settlement;

(2) disclose[s] any special benefits provided to the class representatives;

(3) provide[s] information regarding attorneys' fees . . . ;

(4) indicate[s] the time and place of the hearing to consider approval of the settlement, and the method for objecting to (or, if permitted, for opting out of) the settlement;

(5) explain[s] the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set[s] out those variations; and

(6) prominently display[s] the address and phone number of class counsel and the procedure for making inquiries.

*Smith v. Tower Loan of Miss., Inc.*, 216 F.R.D. 338, 352 (S.D. Miss. 2003), *aff'd sub nom. Smith v. Crystian,* 91 F. App'x 952 (5th Cir. 2004) (quoting MANUAL FOR COMPLEX LITIGATION § 30.212 (3d ed. 1995)).

The proposed notice describes in language that strives to be as direct and clear as the subject permits:

- the nature of the action;

- the definition of the class;

- the class claims;

- the terms of the consent decree and the settlement agreement;

- the effect of a class judgment on class members;

- how class members can ask for more information about, object to, and contact class counsel about the proposed class settlement; and

- information about the date, time, and location of the fairness hearing.

(*See* Docket Entry No. 617-3 at 1).  The parties' proposed notice satisfies due process and Rule 23(e) by giving class members the "information reasonably necessary for them to make a decision whether to object to the settlement." *In re Katrina*, 628 F.3d at 197.  The court has revised the notice to include the correct date for the final fairness hearing and the correct address for the U.S.

Courthouse on Rusk Street.   A slightly revised version of the notice is attached to this Memorandum and Opinion.

Rule 23(e)(1)(B) requires that the parties distribute the "notice in a reasonable manner." FED. R. CIV. P. 23(e)(1)(B).   The parties propose posting the notice, in both English and Spanish, "in the Joint Processing Center of the Harris County Jail, the lobby of the [Harris County Criminal Justice Center], and 'hold-over cells' outside of [Harris County Criminal Court at Law J]udges' courtrooms."   (Docket Entry No. 617 at 37).   The parties also propose posting the notice on Harris County websites, in *The Houston Chronicle*, and in community newspapers.   (*See* Docket Entry No. 625 at 7–10).   The court finds that each of these proposed distribution methods will distribute the notice to class members, their families, and the community at large.   *See Heartland*, 851 F. Supp. 2d at 1061–62 (similar notice plan approved); *Jones v. Gusman*, 296 F.R.D. 416, 467 (E.D. La. 2013) (same).

The parties must issue the notice using these methods of distribution, no later than **September 9**, **2019**.

## V.    Conclusion and Order

The parties' joint motion for preliminary approval of the consent decree and settlement agreement and for approval of class notice, (Docket Entry No. 617), is granted.   The court: (1) preliminarily approves the proposed consent decree and settlement agreement (Docket Entry Nos. 617-1, 617-2); (2) approves the proposed notice (with minor changes) and the methods of distribution; and (3) directs the parties to issue the notice using those methods by **September 9**, **2019**.   The parties must move for final approval by **September 27**, **2019**.   Nonduplicative written objections must be filed by **October 11**, **2019**.

A final fairness hearing on the proposed consent decree and settlement agreement is set for **October 21**, **2019**, at **9:00 a.m.**, in Courtroom 11-B.

      SIGNED on September 5, 2019, at Houston, Texas.

_____

Lee H. Rosenthal

Chief United States District Judge
