## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-cv-01414 |
| ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |
| _____ ) | |

## CONSENT DECREE

## I.   INTRODUCTION

1. This Consent Decree is entered into between the Plaintiff class, represented by named Plaintiffs Maranda Lynn ODonnell, Robert Ryan Ford, and Loetha McGruder (collectively, the "Plaintiffs"), and Harris County, Texas ("County"), the Harris County Sheriff ("Sheriff"), and the Harris County Criminal Court at Law Judges ("CCCL Judges"), (collectively, the "Defendants") (with Plaintiffs and Defendants collectively referred to as the "Parties").

2. The Parties jointly enter into this Consent Decree to resolve Plaintiffs' claims and remedy the constitutional violations challenged in this litigation.[1] This Consent Decree is intended to create and enforce constitutional and transparent pretrial practices and systems that protect the due process rights and equal protection rights of misdemeanor arrestees.

3. This litigation affirmed that, without the necessary safeguards, the use of secured money bail can deprive individuals of their constitutional rights to due process and equal protection, impose high public costs, and "exacerbate the racial disparities in pretrial detention and posttrial outcomes."[2] This litigation also affirmed that an up-front payment of money bail does not meaningfully promote public safety or appearance in court.[3]

---

[1] *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052, 1166–68 (S.D. Tex. 2017), *aff'd as modified,* 892 F.3d 147 (5th Cir. 2018).

[2] *Id.* at 1122 (pretrial detention of defendants who cannot pay secured money bail has been shown in research to correlate "at statistically significant levels with recidivism," result in "cumulative disadvantage," exacerbate poverty, and exacerbate racial disparities in detention and post-trial outcomes).

[3] The Court found that "[s]ecured money bail in Harris County does not meaningfully add to assuring misdemeanor defendants' appearance at hearings or absence of new criminal activity during pretrial release." *Id.* at 1119–20.

4.   On September 1, 2016, Plaintiffs filed an amended complaint under 42 U.S.C. § 1983, seeking declaratory and injunctive relief to remedy Defendants' unconstitutional misdemeanor bail policies and practices, including equal protection, substantive due process, and procedural due process violations. Specifically, Plaintiffs' amended complaint challenged the County's policy and practice of detaining individuals arrested for misdemeanor offenses due solely to their inability to make a monetary payment. When Plaintiffs sued, they challenged Defendants' policies and practices of routinely detaining indigent, presumptively innocent misdemeanor arrestees for days or weeks before trial solely because they were unable to pay financial conditions of release and without an individualized finding that detention served any purpose, let alone a finding that detention was necessary because less-restrictive alternative conditions of release were unavailable, and without providing the procedural due process protections required to ensure the accuracy of any such finding.[4] *See infra* Section II.

5.   On April 28, 2017, the Court granted class certification,[5] and issued a 193-page preliminary injunction decision with extensive factual findings based on an eight-day evidentiary hearing, as well as voluminous records from years of misdemeanor cases, expert testimony, video evidence of bail proceedings, and numerous briefs. On the basis of its factual findings, the Court held that "Harris County's [bail] policy and practice violates the Equal Protection and Due Process Clauses of the United States Constitution."[6]

6.   The Court's initial preliminary injunction order went into effect on June 6, 2017.[7] Defendants appealed the Court's preliminary injunction order in the Fifth Circuit, which upheld the Court's factual findings on June 1, 2018.[8]

## II.   FACTUAL FINDINGS

7.   This Court made the following findings of fact,[9] which the Fifth Circuit affirmed:

---

[4] First Amended Complaint, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 54

[5] Memorandum and Order Certifying Class, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 303

[6] *Id.* at 1060; *id.* at 162 n.99 ("The evidence here shows tens of thousands of constitutional violations.").

[7] Notice of Fifth Circuit Court of Appeals' Denial of Defendants' Motion to Stay the Preliminary Injunction Pending Appeal, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 339.

[8] *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018).

[9] Except where noted below in footnote 56, these findings were recounted in the Court's "findings of fact." *ODonnell*, 251 F. Supp. 3d at 1060–1133 (Part I of the Court's opinion). Throughout the Consent Decree, in the citations to the Court's opinion, the Parties omit internal citations to evidence cited in the Court's opinion. In footnote 56, the parties quote from a transcript, a brief, and an expert report that set forth arguments offered by Defendants that the Court rejected in its "findings of fact."

a.  At the start of this litigation, Harris County had "a consistent and systematic policy and practice of imposing secured money bail as de facto orders of pretrial detention in misdemeanor cases."[10]

b.  Harris County's "de facto detention orders effectively operate only against the indigent, who would be released if they could pay at least a bondsman's premium, but who cannot. Those who can pay are released, even if they present similar risks of nonappearance or of new arrests."[11]

c.  Harris County's "de facto detention orders are not accompanied by the protections federal due process requires for pretrial detention orders."[12]

d.  "Harris County has an inadequate basis to conclude that releasing misdemeanor defendants on secured financial conditions is more effective to assure a defendant's appearance or law-abiding behavior before trial than release on unsecured or nonfinancial conditions, or that secured financial conditions of release are reasonably necessary to assure a defendant's appearance or to deter new criminal activity before trial."[13]

e.  Harris County's bail system "detains 40 percent of all those arrested only on misdemeanor charges, many of whom are indigent and cannot pay the amount needed for release on secured money bail."[14] For decades, Harris County used a secured bail schedule to determine conditions of release.[15]

f.  The bail schedule was promulgated by the County Criminal Court at Law Judges, sitting *en banc* and voting by two-thirds majority.[16] Within hours of an arrest for a misdemeanor, an Assistant District Attorney makes a charging decision and assigns a bail amount based on the CCCL Judges' bail schedule, which considers only the arrestee's then-current charge and criminal history.[17] Once the case is paper-ready, a misdemeanor defendant with access to enough money can pay the amount required for

---

[10] *Id.* at 1059.

[11] *Id.* at 1060.

[12] *Id.*

[13] *Id.*

[14] *Id.* at 1058.

[15] *See id.* at 1072 (CCCL Judges implemented and maintained a bond schedule for all misdemeanor offenses following entry of the Roberson consent decree in 1987); *see also id.* at 1100-01 ("The court finds and concludes that in the typical case, Hearing Officers set secured money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than as a mechanism for pretrial release.").

[16] *Id.* at 1086.

[17] *Id.* at 1088.

release and be promptly released from custody.[18] Arrestees who are unable to make the payment remain in custody and are transferred to and booked into the Harris County Jail, if they were not taken there directly.[19]

g.  At the Harris County Jail, arrestees were taken to a room in the jail to appear by video at a legal proceeding during which a Harris County Criminal Law Hearing Officer determined probable cause for warrantless arrests and addressed bail.[20] "Hearings typically lasted one to two minutes per arrestee. During this brief period, the Assistant District Attorney reads the charge, and the Hearing Officer determines probable cause and sets bail."[21] "Defendants almost never have counsel at the probable cause and bail-setting hearing. Those who are indigent have not yet had counsel appointed. Those who can afford counsel have either paid their bonds and been released or have not been able to arrange their counsel's presence."[22] "Defendants who try to speak are commanded not to, shouted down, or ignored."[23] The Hearing Officers "do not make written findings or issue reasoned opinions explaining why they set bail on a secured or unsecured basis, or why they select the bail amount imposed."[24]

h.  Hearing Officers adhered to the bail schedule in 88.9 percent of misdemeanor cases.[25] When Hearing Officers did change the bail amount, "they raise it about 67 percent of the time."[26]

i.  The Court found "little to no credibility in the Hearing Officers' claims of careful case-by-case consideration" of conditions of release other than the prescheduled money bail amounts.[27] The Court further found that the Hearing Officers set secured money bail intending to detain arrestees, stating: "The Hearing Officers' testimony that they do not 'know' whether imposing secured money bail will have the effect of detention in

---

[18] *See id.* at 1088 (regarding prompt release); *id.* at 1091 ("Arrestees who do not pay for release or obtain release on personal bond by early presentment at the City Jail are taken to and booked in the Harris County Jail." ); *id.* at 1124 ("Those who can pay secured bonds are released within hours of arrest.").

[19] *See id.* at 1091 ("Arrestees who do not pay for release or obtain release on personal bond by early presentment at the City Jail are taken to and booked in the Harris County Jail" ), and *id.* at 1124 ("Those who can pay secured bonds are released within hours of arrest").

[20] *Id.* at 1092.

[21] *Id.*

[22] *Id.* at 1093.

[23] *Id.* at 1099 & n.48.

[24] *Id* at 1093.

[25] *Id.* at 1095 & n. 42.

[26] Id. at 1096.

[27] *Id.* at 1097.

any given case, [] and their testimony that they do not intend that secured money bail have that effect, is not credible."[28]

j.  "Hearing Officers treat the bail schedule, if not as binding, then as a nearly irrebuttable presumption in favor of applying secured money bail at the prescheduled amount. Amounts that deviate from the schedule are treated as 'incorrect,' and requests for a personal bond, if not denied outright, are deferred until the County Judge holds a later hearing. Hearing Officers routinely adjust initial bail settings to conform to, not to deviate from, the bail schedule. Defendants who try to speak are commanded not to, shouted down, or ignored."[29]

k.  "[I]n the typical case, Hearing Officers set secured money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than a mechanism for pretrial release. In the vast majority of cases, the Hearing Officers use their discretion to consider the five Article 17.15 factors to almost automatically impose the prescheduled secured bail amounts, notwithstanding Pretrial Services recommendations to release defendants on unsecured personal bonds and notwithstanding clear evidence of indigence. Hearing Officers make these decisions in brief, uncounseled hearings at which the defendants are actively discouraged from speaking, and no reviewable findings are made on the record."[30]

l.  "Before the most recent change to the County Rules of Court in February 2017, any 'incarcerated person' who remained in detention after the probable cause hearing would be scheduled to appear" the next business day before a County Court at Law Judge.[31] However, "more than 26,000 misdemeanor arrestees—over 51 percent of those still detained—waited more than 48 hours after their arrests before their first appearances before a County Criminal Court at Law Judge.[32] Over 6,800 people—just over 13 percent of the detained population—were confined longer than 96 hours after arrest before their first appearance."[33] At this court appearance, arrestees were kept in a holding cell outside the courtroom unless they agreed to plead guilty.[34] "Defendants who did not plead guilty but wanted to contest their bail settings depended on court-appointed counsel filing a formal motion for bail review. That motion would not be

---

[28] *Id.*

[29] *Id.* at 1099 & nn. 45–48.

[30] *Id.* at 1100–01.

[31] *Id.* at 1113; *id.* ("The February 9, 2017 amendment took effect on March 9, 2017. The amended County Rules of Court require 'any arrestee that is booked into the Harris County Jail' to be presented at a 'Next Business Day Setting,' even if that arrestee is released from custody between booking and the next business day.").

[32] *Id.*

[33] *Id.*

[34] *Id.* at 1101 & 1105.

considered until a later hearing, usually held one or two weeks later. The only way to gain release earlier was to pay the bail or to plead guilty."[35]

m.  The Court credited testimony by prosecutor JoAnne Musick, who testified based on her lengthy experience as both a prosecutor and a criminal defense attorney, that many misdemeanor defendants "don't really want to plead guilty, but sometimes they want to get out of jail, return to family, return to work, what have you. So they will inquire about a plea so that they can get out."[36] The Court cited testimony by Judge Darrell Jordan (Presiding Judge of the misdemeanor courts at the time this Consent Decree is entered) "that it was common to have misdemeanor clients who professed their innocence and had valid defenses to nevertheless plead guilty in order to be released much earlier than if they sought an unsecured bond based on indigence or challenged the prosecution's case."[37] The Court concluded: "Those who can pay secured bonds are released within hours of arrest. Those who cannot are detained for days or weeks and face intense pressures to accept a guilty plea to end their pretrial detentions."[38]

n.  A further "indication that misdemeanor defendants abandon valid defenses and plead guilty to obtain faster release than if they contested their charges is a report from the National Registry of Exonerations showing that Harris County … led the United States in the total number of criminal exonerations" in 2015 and 2016.[39] Most of Harris County's exonerations occurred in "misdemeanor drug offenses that evidence samples conclusively prove the defendant did not commit. But rather than wait for lab tests that may exonerate them, misdemeanor arrestees who cannot pay for release before their first appearances plead guilty in order to end their pretrial detention and be released."[40]

o.  Additionally, "uncontroverted and reliable testimony" showed that "from 2015 to early 2017, for misdemeanor arrestees who did not bond out—40 percent of all misdemeanor arrestees—the median time between arrest and case disposition was 3.2 days. Of those, 72 percent resolved their cases within 7 days; 90 percent resolved their cases within 30 days. Over the same period, for misdemeanor arrestees released on bond (either secured or unsecured)—60 percent of misdemeanor arrestees—the median time to disposition was 120 days. Of those, 5 percent resolved their cases within 7 days; 13 percent resolved their cases within 30 days."[41] "Of the 84 percent of detained arrestees who plead guilty at their first appearance, 67 percent are released within a day. About 83 percent are released within five days of their first

---

[35] *Id.* at 1101.

[36] *Id.* at 1104.

[37] *Id.* at 1107.

[38] Id. at 1124.

[39] *Id.* at 1105.

[40] *Id.*

[41] *Id.*

appearance."[42] The Court found these figures to be "consistent with, and support, the plaintiffs' theory that for misdemeanor defendants unable to pay secured money bail, Harris County maintains a 'sentence first, conviction after' system that pressures misdemeanor defendants to plead guilty at or near their first appearances because that was the only way to secure timely release from detention."[43]

p.   Harris County's "custom and practice" of imposing money bonds on misdemeanor arrestees regardless of their ability to pay meant that "40 percent of all Harris County misdemeanor arrestees every year are detained until case disposition. Most of those detained—around 85 percent—plead guilty at their first appearance before a County Judge. Reliable and ample record evidence shows that many abandon valid defenses and plead guilty in order to be released from detention by accepting a sentence of time served before trial. Those detained seven days following a bail-setting hearing are 25 percent more likely to be convicted, 43 percent more likely to be sentenced to jail, and, on average, have sentences twice as long as those released before trial."[44]

q.   A peer-reviewed study led by Paul Heaton ("the Heaton study") and found by the Court to be "one of the most sophisticated and rigorous" regarding "bail and pretrial detention in misdemeanor cases to date" studied the misdemeanor bail system in Harris County and determined that still-detained defendants were 25% more likely to be convicted and 43% more likely to be sentenced to jail than defendants who were able to pay money bail and gain release.[45] Individuals detained at disposition "received sentences that were nine days longer on average, more than double the average sentence of similar, released defendants."[46] The study concluded that "the fact of detention itself, rather than the defendant's charge, criminal history or other variables, causally affects these outcomes."[47]

r.   "Recent studies of bail systems in the United States have concluded that even brief pretrial detention because of inability to pay a financial condition of release increases the likelihood that misdemeanor defendants will commit future crimes or fail to appear at future court hearings."[48] One "landmark study" of Colorado practices found that "unsecured appearance bonds are equally effective as secured money bail, at both assuring appearance at trial as well as law-abiding behavior before trial."[49] The Heaton study found that, had Harris County given early release on unsecured personal bonds

---

[42] *Id.* at 1114.

[43] *Id.* at 1105.
[44] *Id.* at 1130-31.

[45] *Id.* at 1105-06 (citing Paul Heaton et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2016)).

[46] *Id.* at 1106.

[47] *Id.*

[48] *Id.* at 1121.

[49] *Id.* at 1120.

to the lowest-risk misdemeanor arrestees between 2008 and 2013, "40,000 more people would have been released pretrial; nearly 6,000 convictions and 400,000 days in jail at County expense would have been avoided; those released would have committed 1,600 fewer felonies and 2,400 fewer misdemeanors in the eighteen months following pretrial release; and the County would have saved $20 million in supervision costs alone"[50] "Sheriff Gonzalez credibly testified [at the preliminary injunction hearing] that the research showing the 'criminogenic' effects of even a short period of pretrial detention and the high public costs of extended detention is consistent with his own experience as a Harris County law-enforcement officer."[51]

s.   "Secured money bail in Harris County does not meaningfully add to assuring misdemeanor defendants' appearance at hearings or absence of new criminal activity during pretrial release."[52]

t.   "Harris County does not track the comparative failure-to-appear or new-criminal-activity rates of misdemeanor defendants released on different types of bonds. Harris County has not coded, collected, or analyzed data on the different types of pretrial misconduct. It cannot, as other jurisdictions have, determine whether new misconduct by those released on surety bond or on personal bond is violent or is the type of nonviolent offense for which release on unsecured personal bond is presumed. . . . [F]or now, the County is imposing secured money bail, usually at prescheduled amounts, for almost all misdemeanor defendants, with no ability to tell how effective this type of bond is to prevent failures to appear or new criminal activity compared to release on unsecured or nonfinancial conditions."[53]

u.   "Harris County does keep, and was able to produce, data coded as 'bond forfeiture,' 'bond revocation,' and 'bond surrender.' But this data is not consistently kept or recorded. Some County Judges 'forfeit' a bond after a single failure to appear. Others reset hearings and do not record a bond as forfeited until after multiple failures to appear. A single entry in the 'forfeiture' data may mean one failure to appear or many. A bond may be revoked because a defendant failed a drug test, even if the defendant appeared at every court setting and is never arrested or charged with another offense, or revoked because the defendant failed to appear. Similarly, one 'revocation' entry may indicate one failure to appear, many, or none at all, and may or may not indicate new criminal activity. Commercial sureties can ask for bond surrender for a variety of reasons. Judges may rely on a variety of factors to grant or deny the request."[54]

---

[50] *Id.* at 1122.

[51] *Id.* at 1122.

[52] *Id.* at 1119-20.

[53] *Id.* at 1117–18.

[54] *Id.* at 1118.

Case 4:16-cv-01414   Document 657-1   Filed on 09/27/19 in TXSD   Page 9 of 52

v.   Judge Paula Goodhart, who was Presiding Judge of the misdemeanor courts at the time of the preliminary injunction hearing in this lawsuit, "testifying on behalf of herself and County [Criminal Court at Law] Judge Margaret Harris," another misdemeanor judge who was in office when the lawsuit was filed until January 2019, "that no Harris County policymaker, so far as she is aware, has examined Harris County data to compare pretrial failure-to-appear rates or bond forfeiture rates between those released on secured or unsecured financial conditions. Her impression was confirmed by Director of Pretrial Services Kelvin Banks and the Hearing Officers."[55]

w.   "The court finds and concludes that the Harris County policymakers with final authority over the County's bail system have no adequate or reasonable basis for their belief that for misdemeanor defendants, release on secured money bail provides incentives for, or produces, better pretrial behavior than release on unsecured or nonfinancial conditions. The policymakers are apparently unaware of important facts about the bail-bond system in Harris County, yet they have devised and implemented bail practices and customs, having the force of policy, with no inquiry into whether the bail policy is a reasonable way to achieve the goals of assuring appearance at trial or law-abiding behavior before trial. In addition to the absence of any information about the relative performance of secured and unsecured conditions of release to achieve these goals [of assuring appearance at trial or law-abiding behavior before trial], the policymakers have testified under oath that their policy would not change despite evidence showing that release on unsecured personal bonds or with no financial conditions is no less effective than release on secured money bail at achieving the goals of appearance at trial or avoidance of new criminal activity during pretrial release."[56]

x.   Requiring payment for release from jail after arrest "exacerbates and perpetuates poverty because of course only people who cannot afford the bail assessed or to post a bond—people who are already poor—are detained in custody pretrial. As a consequence, they often lose their jobs, may lose their housing, be forced to abandon their education, and likely are unable to make their child support payments."[57]

y.   The County's practices had disparate racial and ethnic effects. "Money-based pretrial systems exacerbate the racial disparities in pretrial detention and posttrial outcomes. An amicus filing by Harris County Commissioner Rodney Ellis and the NAACP Legal Defense and Educational Fund notes that African–Americans make up 18 percent of Harris County's adult population but 48 percent of the Harris County Jail's adult population. A 2011 study found that in Harris County, 70 percent of white misdemeanor defendants obtain early pretrial release from detention, but only 52

---

[55] *Id.* at 1102-03.

[56] *Id.* at 1103.

[57] *Id.* at 1122.

percent of Latino misdemeanor defendants and 45 percent of African–American misdemeanor defendants do so."[58]

z. The Court rejected claims by the original Defendants[59] that "virtually no" arrestee is detained "'because of' an inability to pay secured money bail,"[60] and concluded that "[t]he record provides no support for defense counsel's argument that some defendants choose [to] remain detained. . . . The credible testimony . . . is that no one remains in the Harris County Jail out of a desire to be there."[61]

8. On the basis of these and its other findings, the Court held that the County's bail practices caused "irreparable" harm to "tens of thousands" of indigent misdemeanor arrestees every year.[62] "The record evidence shows that the plaintiffs' injury is irreparable. Misdemeanor

---

[58] *Id.*

[59] On February 8, 2017, Harris County argued through its privately retained lawyers that "[t]here are individuals . . . [t]hey do want to go to the jail and stay there, if it's a cold week," and "there are individuals who believe they have guilt." Transcript of 2/8/17 Hearing at 20–22, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) (oral argument by counsel for Harris County and the Hearing Officers at hearing on Defendants' Motion to Stay Preliminary Injunction Hearing); *id.* at 20 (THE COURT: "[I]t is uncomfortably reminiscent of a historical argument that used to be made that people enjoyed slavery, because they were afraid of the alternative. And there may have been individual cases in which that fear was tremendously powerful and real, but you didn't see a lot of people running toward enslavement. You don't see a lot of people volunteering for jail in order to get warm."). On November 9, 2016, the original Fifteen Defendant Judges asserted similarly that an arrestee might be in the jail because she or he "wishes to remain in custody (e.g., the Harris County jail provides a shelter, multiple meals per day, and medical services; the accused is guilty and is accruing credit towards an expected early, reasonable plea bargain)." Brief in Support of the Fifteen County Criminal Court at Law Judges' Motion to Dismiss at 28, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 80. At the preliminary injunction hearing, all Defendants offered testimony from an expert witness who asserted, "In the Harris County Jail, people are rarely held if indigent." Defendants Exhibit 28 at 45 (Expert Report of Dr. Robert Morris), *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414).

The Parties stipulate that the legal positions taken by the original Defendants differ significantly from those of the current Defendants who are entering into this Consent Decree. The Court, too, recognized that the elections in 2016 and 2018 changed the political landscape in such a way as to make an agreed resolution of the lawsuit a realistic possibility. For example, following the election of Defendant Sheriff Ed Gonzalez, County Criminal Court at Law Judge Number 16 Darrell Jordan, and District Attorney Kim Ogg in November 2016, the Court noted that "there is a new sheriff in town" and a "new D[istrict] A[ttorney]" who might have "a somewhat more open mind" about the legal issues in the case and how to resolve them. Transcript of 11/28/16 Hearing at 139-141, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414); *id.* at 7-8 ("The sheriff has already made clear, sheriff elect, that he intends to negotiate. . . . [W]e have a number of people whose political approach to these issues, not legal, political, may influence the shape of the issues that are before me for legal analysis and decision under the applicable law. . . . I need to understand the best way, from my case management view, to take advantage of a political willingness of the policymakers to fashion a solution rather than have one imposed upon them."). Following the elections in November 2018, Defendants sought, and the Court granted, a stay of litigation "to allow the parties to discuss resolving the case without continued litigation based on the change in the political context." Transcript of 11/13/18 Hearing at 5, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414).

[60] *ODonnell,* 251 F. Supp. 3d at 1067; *id.* at 1117 (finding Defendants' expert's analysis "critically flawed" and "not entitled to any weight" because he "excluded indigent defendants from his survey to conclude that, of the misdemeanor defendants surveyed, none was detained because of indigence.").

[61] *Id.* at 1109 n.57.

[62] *Id.* at 1150 n.99 ("The evidence here shows tens of thousands of constitutional violations."); *id.* at 1157.

defendants detained before trial face significant pressure to plead guilty, and in fact do so at much higher rates than those released before trial, in order to obtain release. Pretrial detention of misdemeanor defendants, for even a few days, increases the chance of conviction and of nonappearance or new criminal activity during release. Cumulative disadvantages mount for already impoverished misdemeanor defendants who cannot show up to work, maintain their housing arrangements, or help their families because they are detained. This factor weighs strongly in favor of granting the plaintiffs' request for the injunctive relief."[63]

9. Accordingly, the Court entered a preliminary injunction designed to remedy the constitutional violations that it found.[64] The Court's preliminary injunction went into effect on June 6, 2017.[65]

### III.    PARTIES' INTENT & RECITALS

10. This Consent Decree is tailored to remedy the systemic and longstanding constitutional violations found by the Court in this litigation; to safeguard arrestees' equal protection and due process rights, including the fundamental interest in pretrial liberty and the right against wealth-based detention; to promote court appearance and public safety; to require investments necessary for new systems to function efficiently in a large jurisdiction; and to promote transparency, rigorous analysis, and accountability throughout the pretrial process so that constitutional practices will endure. It is crafted to protect against a reversion to the pre-litigation system of mass, non-individualized pretrial detention of misdemeanor arrestees without lawful justification.[66]

11. To those ends, the Parties have consented to establishing mechanisms for implementation, investment, monitoring, and public understanding of the harms imposed by the County's unconstitutional bail practices—all of which are necessary to make sure that the system does not return to widespread unlawful pretrial detention based solely on access to money.

12. After careful negotiations over a period of months, the Parties have consented to specific measures Defendants will undertake to uphold the due process rights and equal protection rights of indigent misdemeanor arrestees. The Parties agree that the terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform to the County's system of pretrial detention and safeguard against future violations of the rights of indigent misdemeanor arrestees.

---

[63] *ODonnell*, 251 F. Supp. 3d at 1157–58; *see also ODonnell v. Harris County*, 260 F. Supp. 3d 810, 820 (S.D. Tex. May 11, 2017) (referring to these harms as "some of the injuries inflicted on over 100 misdemeanor defendants every day in Harris County").

[64] *Id.* at 1167–68.

[65] Notice of Fifth Circuit Court of Appeals' Denial of Defendants' Motion to Stay the Preliminary Injunction Pending Appeal, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 339

[66] *ODonnell*, 251 F. Supp. 3d at 1167, 1168.

13. The Parties acknowledge that the CCCL Judges have already taken the important step of amending Local Rule 9, which is intended to safeguard against the unlawful pretrial detention of misdemeanor arrestees and which has resulted in the pretrial release of those arrestees who previously would have been detained pretrial solely because they could not afford to pay secured financial conditions of release and without the substantive findings and procedural safeguards the Constitution requires. Local Rule 9 is memorialized in Section 30.

14. In addition to allocating the necessary resources for full and effective implementation of Local Rule 9, the County is committed to establishing pretrial systems and supports that will facilitate the release of misdemeanor arrestees through the least restrictive means necessary; to collecting and publicly releasing comprehensive pretrial data that will promote meaningful evaluation of the County's pretrial practices, facilitate transparent decision-making, and protect against the development of unwritten customs that do not comply with this Consent Decree; and to rigorously studying its pretrial systems and best practices to inform implementation of cost-effective, nonfinancial programs aimed at achieving misdemeanor arrestees' appearance at trial and law-abiding behavior before trial through the least restrictive means necessary.

15. The Parties recognize, and the Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and that implementation of this Consent Decree will remedy the constitutional violations identified by the Court and the practices and beliefs contributing to those violations; will avoid prolonged litigation between the parties; will create the support structures necessary to maintain the remedial systems established under this Consent Decree; and is fair, reasonable, and in the public interest.

16. It is therefore ORDERED that the following relief is binding on Defendants, including Harris County, the Harris County Sheriff, , and the CCCL Judges in their policymaking capacity. The injunction covers and is binding on those who are in active concert or participation with the Parties or the Parties' officers, agents, servants, employees, or attorneys.

## IV.   DEFINITIONS & ABBREVIATIONS

17. For purposes of this Consent Decree, the following terms will have the stipulated meanings as follows:

   a. "Bail hearing" refers to any legal proceeding at which conditions of release are determined, or that might result in pretrial detention or a requirement to pay secured bail as a condition of release, in any Class A or Class B misdemeanor case to be prosecuted in the Harris County Criminal Courts at Law.

   b. "County" refers to Harris County, Texas, its officers, agents, personnel, and anyone otherwise employed by Harris County.

   c. "County Criminal Courts at Law," "Criminal Courts at Law," or "CCCL" refers to the Harris County Criminal Courts at Law.

d. "County Criminal Court at Law Judges" or "CCCL Judges" refers to the judges sitting in the Harris County Criminal Courts at Law.

e. "Defendants" refers collectively to Harris County, the Harris County Sheriff, and the Harris County Criminal Court at Law Judges.

f. "Failure to appear" refers to any instance when a misdemeanor arrestee was scheduled to appear in court, the arrestee's appearance was not waived, the arrestee did not physically appear in court, an arrest warrant issued because of the misdemeanor arrestee's nonappearance, and the warrant either (1) was executed by placing the misdemeanor arrestee in custody, or (2) remained outstanding 30 days after issuance and no indication appears in the court record that the misdemeanor arrestee was prevented from appearing in court due to circumstances not in the misdemeanor arrestee's control, as determined by a CCCL Judge.

g. "First appearance" or "first setting" refers to the first scheduled court appearance for a misdemeanor arrestee in a particular case. (The term "misdemeanor arrestee" is defined in Section 17(k).)

h. "Indigent" refers to any misdemeanor arrestee who cannot afford to pay the cost of secured bail or a fee or cost associated with a condition of pretrial release in a case to be prosecuted in the Harris County Criminal Courts at Law without suffering hardship meeting the basic necessities of life, such as food, shelter, clothing, communication, transportation, and medical care, including, but not limited to, anyone who meets one or more of the following criteria:

    i. Is found to be indigent under the indigent defense plan of the Harris County Criminal Courts of Law;

    ii. Is, or has dependents who are, eligible to receive food stamps, Medicaid, Temporary Assistance for Needy Families, Supplemental Security Income, Social Security Disability Income, public housing, or any other federal or state public assistance program based on financial hardship;

    iii. Has a net household income that does not exceed 200% of the Poverty Guidelines as revised annually by the United States Department of Health and Human Services and published in the Federal Register;

    iv. Is homeless as that term is defined by federal public health and welfare law found at 42 U.S.C. § 11302; or

    v. Is currently serving a sentence in a correctional institution, is currently residing in a public mental health facility or court-ordered treatment facility, or is subject to a proceeding in which admission or commitment to such a mental health facility is sought.

i.   "Judicial officer" refers to a Harris County Criminal Court at Law Judge or a Harris County Criminal Court at Law Hearing Officer.

j.   "Local Rule 9" or "Rule 9" refers to Rule 9 of the Harris County Criminal Courts at Law Local Rules of Court. The text of "Local Rule 9" is provided in Section 30 of this Consent Decree.

k.   "Misdemeanor arrestee" or "arrestee" refers to any person who has been arrested, or against whom a charging instrument has been filed with the Harris County District Clerk, in connection with a Class A or Class B misdemeanor case to be prosecuted in the County Criminal Courts at Law.

l.   "Monitor" refers to the Consent Decree Monitor described in Sections 95–96 of this Consent Decree.

m.   "Nonappearance" refers to when a misdemeanor arrestee does not appear for a scheduled court appearance and the misdemeanor arrestee's appearance is not waived. An instance of late arrival may not be deemed a "nonappearance" unless the misdemeanor arrestee did not appear in court within one hour of the time set for the misdemeanor arrestee's appearance or by the time the docket (if applicable) has concluded, whichever is later, and the misdemeanor arrestee's appearance was not waived. For purposes of data collection, "nonappearance" is distinct from "failure to appear," which is intended to capture a willful failure to attend court when required.

n.   "Private appointed counsel" refers to counsel assigned to represent an indigent misdemeanor arrestee in the Harris County Criminal Courts at Law who is not employed by the Harris County Public Defender's Office.

o.   "Public defender" refers to an attorney employed by the Harris County Public Defender's Office.

p.   "Public Defender's Office" or "PDO" refers to the Harris County Public Defender's Office.

q.   "Regular setting" or "regular appearance" refers to any setting that is not a required appearance for a misdemeanor arrestee. ("Required appearance" is defined in Section 17(r).)

r.   "Required setting" or "required appearance" refers to trial settings, bond violation hearings, suppression hearings, or plea settings for any misdemeanor arrestee; or any pretrial hearing before a Harris County Criminal Court at Law Judge in a case where a misdemeanor arrestee has had prior sufficient notice, as required by Section 65(b) of the Consent Decree, that the appearance is required.

s.   "Sheriff" refers to the Harris County Sheriff, his or her officers, agents, and personnel, and anyone otherwise employed by the Harris County Sheriff.

14

    t.   "Support staff" refers to social workers, disposition specialists, caseworkers, mitigation specialists, and/or investigators.

## V.   GENERAL PROVISIONS

18. This Consent Decree is intended to create and enforce a constitutional and transparent pretrial release and detention system that safeguards misdemeanor arrestees' equal protection and substantive due process rights, and provides the protections that procedural due process requires; to promote the government's compelling interests in maximizing pretrial liberty, court appearance, and public safety; to ensure public access to information and the transparency necessary for monitoring, evaluation, and public accountability; and to set forth the changes and investments required to ensure that the new policies and practices implemented under this Consent Decree are effective and enduring.

19. In the interest of avoiding a costly and protracted trial, Defendants agree to entry of this Consent Decree by which they are enjoined from engaging in conduct that deprives persons of rights, privileges, or immunities secured or protected by the laws of the United States.

20. This Consent Decree resolves all claims in Plaintiffs' amended complaint filed in this case.

21. This document will constitute the entire integrated Consent Decree agreed to by the Parties. No prior drafts of this Consent Decree or prior or contemporaneous communications, oral or written, about this Consent Decree will be relevant or admissible for purposes of determining the meaning of any provisions of this Consent Decree in any litigation or any other proceeding.

22. This Consent Decree is binding upon all Parties hereto, by and through their officials, officers, agents, assigns, employees, and successors. Defendants must require their officials, officers, employees, agents, assigns, and successors to comply with this Consent Decree. If any Defendants contract with a government agency or entity whose function includes overseeing, regulating, accrediting, investigating, or otherwise reviewing or assuming the operations of Defendants or their officials, officers, agents, assigns, employees, or successors, Defendants agree to ensure these functions are consistent with the terms of this Consent Decree and must incorporate the terms of this Consent Decree into the functions of the government agency or contracting entity as necessary to ensure consistency.

23. This Consent Decree is enforceable only by the Parties. No other person or entity is intended to be a third-party beneficiary of the provisions of this Consent Decree for purposes of any civil, criminal, or administrative action, and accordingly, no other person or entity may assert any claim or right as a beneficiary or protected class under this Consent Decree.

24. This Consent Decree is not intended to limit or expand the right of any person or organization to seek relief against Defendants, or any of Defendants' officials, officers, agents, assigns, employees, or successors, for their conduct; accordingly, it does not alter legal standards governing any such claims by third parties, including those arising from city, state, or federal law. This Consent Decree does not expand, nor will it be construed to expand, the right to

Defendants' information or documents such as to be in violation of any federal or state laws regarding the privacy or confidentiality of information.

25. The County is responsible for providing the support and resources necessary to fulfill Defendants' obligations under this Consent Decree, and as otherwise necessary to ensure that the requirements of this Consent Decree are fully implemented and sustained. To meet this requirement, the County may pursue and use grant funding or other non-County sources of financial support.

26. Any requests for resources and staffing needs by County departments related to the implementation of this Consent Decree will be evaluated by the Monitor, who will provide a recommendation to assist Commissioners Court in its determination of the extent and type of staffing and resources needed, if any, in response to the request.

27. All time periods specified in this final Consent Decree must be computed according to Rule 6 of the Federal Rules of Civil Procedure.

28. If any term, condition, or provision of this Consent Decree, or the application thereof to any person or circumstance, is to any extent held by this Court to be invalid, void, or unenforceable, that term, condition or provision must be severed and will be inoperative, and the remainder of this Consent Decree will remain operative and binding on the Parties.

29. Except as otherwise specified below, Defendants must implement the provisions of this Consent Decree as soon as practicable, taking into account that any Sections of this Consent Decree implemented with the help of consultants, experts, or technical assistance providers may require the County to participate in a procurement process in accordance with County purchasing procedures. Where timelines are specified, Defendants will be afforded reasonable additional time as approved by Class Counsel and the Monitor, subject to Section 140. Any disputes about whether additional time should be afforded will be presented to the Court for resolution.

## VI.   COMPLIANCE WITH CONSTITUTIONAL STANDARDS

30. As of the entry of this Consent Decree, the County, the Sheriff, and the CCCL Judges must comply with, implement, and enforce the post-arrest procedures set forth in Local Rule 9 and reproduced herein as follows:

### RULE 9.  BAIL POLICIES

9.1         Pursuant to *ODonnell v. Harris County*, 251 F. Supp. 3d 1052 (S.D. Tex. 2017), and the Fifth Circuit in *ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018), the Harris County Criminal Court at Law Judges ("CCCL Judges") order these policies be applied to all persons arrested for a misdemeanor offense. This rule is designed to vindicate the federal constitutional rights at issue in *ODonnell v. Harris County* arising from the federal Due Process and Equal Protection Clauses. To the extent other

provisions of federal or Texas law provide greater protections, nothing in this Rule should be construed to limit those greater protections.[67]

9.2.    To the extent Local Rule 9 conflicts with any other local rule, Local Rule 9 controls. Except for situations described in Local Rule 9.4.1–9.4.6, all misdemeanor arrestees will have unsecured bail amounts set initially at no more than $100 and be promptly released[68] on a personal bond with or without other non-financial conditions as soon as practicable after arrest. Consistent with Texas law, a judicial officer is not required to sign a personal bond prior to the person's release.

9.3.    Secured money bail must not be required as a condition of pretrial release prior to a bail hearing[69] that meets the requirements of Local Rule 9.12, including an individualized determination of ability to pay and, if the person cannot pay, consideration of alternatives and a finding that detention is necessary to meet a compelling government interest in reasonably assuring public safety or reasonably protecting against flight from prosecution.

9.4.    All misdemeanor arrestees must be released on a personal bond or on non-financial conditions as soon as practicable after arrest,[70] except those who fall within the following categories, who may be detained for up to 48 hours[71] for an individualized hearing:

---

[67] For example, Texas law provides greater protections through the Texas Constitution's right to bail clause, Tex. Const. art. 1 § 11, and through statutory protections relating to the timing of post-arrest proceedings, *see, e.g.*, Tex. Crim. Proc. Code § 15.17 (requiring arrestees be taken before a magistrate "without unnecessary delay"); Tex. Gov't Code § 54.858(d) ("The criminal law hearing officer shall be available, within 24 hours of a defendant's arrest, to determine… all matters pertaining to bail."); Tex. Crim. Proc. Code § 17.033(a) ("[A] person who is arrested without a warrant and who is detained in jail must be released on bond, in an amount not to exceed $5,000, not later than the 24th hour after the person's arrest if the person was arrested for a misdemeanor and a magistrate has not determined whether probable cause exists to believe that the person committed the offense. If the person is unable to obtain a surety forthe bond or unable to deposit money in the amount of the bond, the person must be released on personal bond.").

[68] The term "release" as used herein refers to release from custody in the pending case for which the new arrest occurred. Thus, if a person has other pending lawful holds (e.g. from another case, parole, or from another jurisdiction), "release" would mean release to that other hold rather than release from custody.

[69] "Bail hearing" refers to any legal proceeding that occurs before any judicial officer, including CCCL Judges and Harris County Criminal Law Hearing Officers, at which conditions of release are determined or that might result in pretrial detention or a requirement to pay secured money bail as a condition of release.

[70] If necessary to assure community safety or the safety of the arrestee, a person arrested for violating Penal Code § 49.04(a) (driving while intoxicated) or Tex. Alco. Bev. Code § 106.041(c) (driving under the influence as a minor, third offense) may be detained for up to eight (8) hours after arrest, including past the time they would have otherwise been released, to allow time for the person to become sober and be safely released.

[71] As noted in provision 9.1, although individuals who fall within Local Rule 9.4.1–9.4.6. *may* be detained for up to 48 hours for a bail hearing consistent with federal law, detention is not mandatory, and Local Rule 9 does not authorize or require detention in violation of state law.

9.4.1     Individuals arrested and charged under Penal Code § 25.07;

9.4.2     Individuals arrested and charged under Penal Code § 22.01, against a person described in Penal Code § 22.01(b)(2), or individuals arrested and charged under Penal Code § 22.07(c)(1);

9.4.3     Individuals arrested and charged under Penal Code § 49.04 and who the State gives notice may be subject to Penal Code § 49.09(a) for a conviction that became final within the past five years;

9.4.4     Individuals arrested and charged with any new offense while on any form of pretrial release;

9.4.5     Individuals arrested on a capias issued after a bond forfeiture or bond revocation; and

9.4.6     Individuals arrested while on any form of community supervision for a Class A or B misdemeanor or a felony offense.

9.5     Any person arrested for the reasons described in Local Rule 9.4.1–9.4.6 may be kept in custody pending an individualized hearing before a judicial officer.[72] Any judicial officer who makes decisions about conditions of release, including the Harris County Criminal Law Hearing Officers, must have complete discretion to release on a personal bond any misdemeanor arrestee prior to an individualized hearing.

9.6     Secured money bail must not be imposed as a condition of release prior to a bail hearing that meets the requirements of Local Rule 9.12.

9.7     Secured money bail must not be used as a condition of pretrial release at any time in the pretrial period for any misdemeanor arrestee other than those persons arrested for the reasons described in Local Rule 9.4.1–9.4.6.

9.8     Any arrestee who is not promptly released on a personal bond after arrest must receive a bail hearing that meets the requirements of Local Rule 9.12 as soon as practicable but no later than 48 hours after arrest. Nothing in this provision is intended to conflict with any provision of Texas law or local rules.

9.9     If a person falls within a carve-out category set forth in Local Rule 9.4.1–9.4.6 and cannot be physically brought to an in-person hearing, a bail hearing must be conducted within 48 hours of arrest in absentia, and an in-person bail hearing must be conducted as soon as practicable thereafter. A judicial officer may travel to the physical location of the arrestee to conduct

---

[72] Employees of the District Attorney's Office, Pretrial Services, the Sheriff's Office, or other government agencies may recommend that a judicial officer release any arrestee on a personal bond prior to a bail hearing. The decision to release a person who falls within these categories must be made by a judicial officer. Such recommendations do not infringe judicial officers' authority to make decisions about conditions of release. They simply preserve the possibility of expeditious release on unsecured bond prior to a bail hearing for arrestees who fall within Local Rule 9.4.1–9.4.6. if a judicial officer decides that release prior to a bail hearing is appropriate.

the bail hearing in-person; a bail hearing conducted using audio-visual equipment will satisfy the requirement for an in-person bail hearing.

9.10    At the bail hearing, the judicial officer may consider the full range of available conditions of release, including secured money bail (to the extent consistent with Local Rule 9.7), unsecured money bail, and nonfinancial conditions. Any judicial officer has complete discretion to release any misdemeanor arrestee on a personal bond.

9.11    Arrestees subject to a bail hearing must be represented by the Harris County Public Defender or other court-appointed counsel. Arrestees may retain a private attorney to represent them at the bail hearing.

9.12    Before a judicial officer may require secured money bail as a condition of release at a bail hearing, the following procedures must be provided, and the following findings must be made:

9.12.1    Arrestees must be represented by counsel at bail hearings. Indigent arrestees are entitled to representation by the Public Defender's Office or other court-appointed counsel. At bail hearings under Local Rule 4.2, arrestees must be represented by the Harris County Public Defender as described in Local Rule 4.2.2.2.

9.12.2    In every case, notice must be provided to the arrestee that financial information will be collected through an affidavit, and the County must explain to the arrestee the nature and significance of the financial information to be collected. The language required is as follows:

9.12.3    **I am [First Name] from Harris County Pretrial Services. I am here to interview you and report your answers to the Court. What you tell me may be used to make decisions about your release from jail and whether a lawyer will be appointed in your defense. Also, you will need to state the amount of money that you can afford to pay at the time of the hearing that will be held after we talk. This is the amount of money you could pay without suffering any hardship in your ability to meet your basic needs, like food, clothing, shelter, phone, medical care, and transportation for you and any dependents. If you cannot afford to pay any money without hardship, please let me know. I will then also ask you to sign a paper with the financial information that you provided. Your answers must be truthful under penalty of law. False answers may be used against you. The information will be shared with the Court, the District Attorney, and possibly other agencies. You may refuse to complete the interview, or you may refuse to provide me with the financial information. You will be allowed to talk to an attorney before your bail hearing. You may speak to the attorney before you decide whether to participate in this interview. Do you agree to**

**go forward with the interview and to provide financial information?**

9.12.4 The judicial officer must provide adequate notice to every arrestee appearing for a hearing concerning pretrial release and detention of the rights at stake in the hearing and the procedural protections and substantive findings required when determining conditions of pretrial release or detention. The judicial officer may satisfy this requirement by providing a general oral notice to a group of arrested individuals. The judicial officer must provide notice that includes the following in all material respects:

- The purpose of this hearing is to determine the least-restrictive pretrial conditions necessary to serve the government's interest in reasonably assuring public safety and reasonably protecting against flight from prosecution.

- Your federal constitutional rights to pretrial liberty and against wealth-based detention are at issue in this hearing because I will be considering conditions of release and whether pretrial detention is necessary.

- I am required to consider whether alternatives to pretrial detention could serve the government's interests in reasonably assuring public safety and reasonably protecting against flight from prosecution. I cannot order you detained before trial—and I cannot require you to pay an amount of money bail that you cannot afford—if there are any conditions of release that would be adequate to reasonably assure public safety and reasonably protect against flight from prosecution.

- Your lawyer will be able to present or proffer evidence and to argue on your behalf at this hearing about any factors relevant to release, detention, and the availability of alternative conditions.

- Before requiring secured money bail as a condition of release, I will review the financial information that was collected through an affidavit so that I can determine whether you can afford to pay money bail and if so, how much. Before I am permitted to require money bail, I must make a finding on the record as to whether you can afford to pay that amount today.

- You will have an opportunity to challenge the government's arguments and evidence relating to the bail decision. You will also have an opportunity during this hearing to make legal arguments and to present or proffer evidence about any factors relevant to release, detention, and the availability of alternative conditions. This is not an opportunity to try your case—the issue before the court is determining appropriate conditions of pretrial release or whether you must be detained as a last resort pending your trial.

- If I require conditions of release or pretrial detention, I will explain my decision on the record.

- I cannot order that you be detained or require you to pay an unaffordable amount of money bail as a condition of release unless I make a finding by clear and convincing evidence that no other condition or combination of conditions is adequate to reasonably assure public safety or to reasonably protect against flight from prosecution. I must identify and explain the reasons for my decision and the evidence and information I relied on in making that decision on the record, so that you can challenge the decision at a later date. Requiring unaffordable money bail or ordering you detained must be the last resort, and I will order detention after this hearing only if I make a finding that there are no alternatives for reasonably assuring the safety of the community and reasonably protecting against your flight from prosecution.

- After the hearing today, you will have an opportunity to have the bail decision, including any conditions of release, reviewed by another judge within one business day if you remain detained after today's hearing. If you are released, you will also be entitled to a hearing before another judge if you want to challenge conditions of release.

9.12.5   In every case in which a judicial officer is contemplating secured money bail as a condition of release, the arrestee must be asked, under penalty of perjury, the amount of money she can afford to pay from any lawful source at the time of the hearing.

9.12.6   The arrestee must be given an opportunity to be heard concerning any factors relevant to release, detention, and the availability of alternative conditions. Additionally, the arrestee must have an opportunity at the hearing to present evidence and make argument concerning those issues, and to contest any evidence or argument offered by the government concerning those issues. The arrestee must have access to all of the evidence and information considered at the bail hearing, including any criminal history from the National Crime Information Center ("NCIC") and Texas Crime Information Center ("TCIC").

9.12.7   If the judicial officer requires money bail as a condition of release, the money bail order must be accompanied by substantive findings on the record that are reviewable by a higher court. The findings will be deemed "on the record" if they explain the reasons for the decision and the evidence relied on either (1) in writing on a form available to the arrestee and her lawyer upon request without a fee, or (2) orally and available to the arrestee through transcript or audio recording at no cost to the indigent. The findings must be that, by clear and convincing evidence: (1) the arrestee has the ability at the

21

time of the hearing to pay the amount required, or (2) that the arrestee does not have the ability to pay the amount required, but alternative conditions of release were considered, no less-restrictive condition or combination of conditions could reasonably assure the safety of the community or reasonably protect against flight from prosecution, and imposition of unaffordable money bail is necessary to reasonably assure the safety of the community or to reasonably protect against flight from prosecution. These findings and procedures must be provided if the court imposes an order of pretrial detention, either through an unattainable financial condition or directly through an order of pretrial detention.

9.12.8   An arrestee who is indigent (as defined in Section 17(h)) or who meets any of the following, may not be assessed any fee associated with a personal bond or an unsecured bond, or the cost of a non-financial condition of release, including but not limited to, a supervision fee, a fee for electronic monitoring, or the cost of an interlock device:

- Is eligible for appointment of counsel;
- Has been homeless in the past six months;
- Has income at or below 200% of the federal poverty guidelines;
- Is a full-time student;
- Is, or within the past six months has been, homeless;
- Is incarcerated, or residing in a mental health or other treatment program; or
- Is or has dependents who are eligible to receive food stamps, Medicaid, Temporary Assistance for Needy Families, Supplemental Security Income, Social Security Disability Income, public housing, or any other federal or state public assistance program based on financial hardship.

9.12.9   No arrestee may be incarcerated due to inability to pay a fee or cost associated with a condition of release.

9.13     At any bail hearing in the assigned County Criminal Court at Law, the arrestee must be provided with the same substantive and procedural protections as described in Local Rule 9.12. Specifically, the court is required to afford the arrestee counsel under Local Rule 9.12.1 and to make findings under Local Rule 9.12.7 if the court imposes or continues an order of detention or money bail set at an unaffordable amount. Any arrestee who remains in jail after a Local Rule 4.2 hearing that meets the requirements of Local Rule 9.12 must be provided with a bail hearing the next business day

22

before a CCCL Judge under Local Rule 4.3. The bail hearing before a CCCL Judge must occur before a plea can be accepted by the court. If a person is subject to a hold or has a concurrently pending felony case, the person may waive the bail hearing before a CCCL Judge without being brought into the courtroom. For every other arrestee, waiver of the bail hearing before a CCCL Judge may not be accepted unless the person is present in court, appears before the CCCL Judge, is informed by the judge of her rights as set forth in Local Rule 9.12.4, and makes a knowing, intelligent, and voluntary waiver of the bail hearing before the CCCL Judge on the record.

9.14    Upon an arrestee's request at any subsequent time prior to trial, the CCCL Judge must provide a prompt bail hearing on the record to review conditions of bail. Prior to a hearing before a CCCL Judge, if requested by defense counsel, the court must approve and assure timely access to supportive defense services such as investigators, experts, or social workers and to discovery of any information that may be considered by the court at the hearing. If the CCCL Judge imposes or continues conditions of release after the hearing, the CCCL Judge must provide written factual and legal findings that the conditions imposed are the least restrictive necessary to reasonably assure public safety or to reasonably protect against flight from prosecution.

9.15    The Sheriff must not enforce any order requiring secured money bail that was imposed prior to an individualized hearing. All arrestees must be treated in accordance with Local Rule 9.2 and released on a personal bond, or Local Rule 9.12, and afforded an individualized hearing.

9.16    The Sheriff must not enforce any order requiring secured money bail that is not accompanied by a record showing that the procedures and findings described in Local Rule 9 were provided. By General Order of the CCCL Judges, if an order to pay secured money bail is unaccompanied by the required record, the Sheriff must deliver to the arrestee a General Order Bond ("GOB") issued by one or more of the CCCL Judges and release the arrestee.[73]

9.17    Any directive or requirement to pay money bail must not be enforced if issued prior to the bail hearing.

9.18    If an arrestee is in the Sheriff's custody 40 hours after arrest and no conditions of release have been determined, the Sheriff must present the arrestee to a judicial officer for a bail hearing. If the person does not appear before a judicial officer within 48 hours of arrest, by general order of the judges, the Sheriff must deliver to the arrestee a "General Order Bond" issued by one or more of the CCCL Judges and release the arrestee.

9.19    The District Clerk's Office will electronically provide to the Sheriff's Office, on an hourly basis, a list of all misdemeanor arrestees who have been

---

[73] The General Order Bond is a judicial release order, requiring the Sheriff, pursuant to judicial order, to release the arrestee from Harris County custody. The bond is pre-approved by the CCCL Judges or the Presiding Judge.

in custody 40 hours or more from the recorded arrest date and time, and have not received a bail hearing or a General Order Bond.

31. It is expected that the CCCL Judges will continue to audit the implementation of Local Rule 9 and other post-arrest policies, and may seek to update the rule from time to time to reflect best practices and to maximize pretrial liberty, court appearance, and public safety. Any change to Local Rule 9 must ensure that no misdemeanor arrestee is detained solely due to inability to make a monetary payment; that hearings to determine conditions of release or detention comply with constitutional principles of equal protection and substantive and procedural due process; that any condition of release is the least restrictive condition necessary to meet the government's interests in preventing bodily harm to another person and preventing flight from prosecution; and must be consistent with the best available evidence.

32. Any change to Local Rule 9 or any other post-arrest policies employed by the CCCL Judges that affect the pretrial detention or release of misdemeanor arrestees must be approved by the Monitor. As promptly as possible, but in any event no longer than 14 days, subject to Section 29, of receiving a request from the CCCL Judges to amend Local Rule 9 or other post-arrest policies of the CCCL Judges that affect the pretrial detention or release of misdemeanor arrestees, the Monitor must respond by approving the change, objecting to the change and stating reasons for the objection, requesting further information relating to the proposed change, and/or proposing an alternative change. The CCCL Judges and Monitor must work in good faith to reach agreement on the proposed change. If the CCCL Judges and Monitor agree on the change, they must notify Class Counsel and file a motion with the Court asking the Court to issue an amended Consent Decree reflecting the change.

33. In the event the CCCL Judges, the Monitor, and Class Counsel do not all agree to the change, the CCCL Judges must seek approval from the Court by filing a Motion to Amend the Consent Decree. Class Counsel and the Monitor will have 14 days from the filing of the CCCL Judges' Motion to respond.

34. Following a change to Local Rule 9 or other post-arrest policies, Defendants may begin implementing the changes upon the Court's approval of the amendment.

35. To the extent that any of Defendants' existing policies or procedures are identified to be in conflict with Local Rule 9 as set forth in this Consent Decree at Section 30, Defendants who are responsible for promulgating and/or enforcing the policies or procedures that are identified to be in conflict with Local Rule 9 must work with the Monitor to amend those policies or procedures to achieve consistency with Local Rule 9 and this Consent Decree.

36. The County's databases and computer systems must clearly indicate that a General Order Bond is a personal bond for which the underlying amount is unsecured. The County agrees to evaluate its databases and computer systems to determine how to update those systems so that they clearly indicate that a General Order Bond is a personal bond for which the underlying amount is unsecured. The County also agrees to develop and implement a plan, based on the evaluation of its databases and computer systems, to address any lack of clarity in communicating or relaying information (internally and to other jurisdictions) about

misdemeanor arrestees' conditions of release. The County's study and proposed plan are to be presented to the Monitor for approval within 120 days of the appointment of the Monitor.

## VII. REPRESENTATION AT BAIL HEARINGS

37. The Parties agree that zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention. The Parties further agree that the availability of adequate time and workspace for defense counsel to confidentially interview misdemeanor arrestees in preparation for bail hearings, as well as access to early and effective support staff to assist defense counsel in gathering and presenting information relevant to the bail decision and appropriate conditions of release, are important to supporting defense counsel's ability to make the best available arguments for release.

38. All misdemeanor arrestees are entitled to representation of counsel at bail hearings in accordance with Local Rule 9. The County will provide the funding and staffing necessary to ensure the PDO is both able to provide zealous and effective representation to misdemeanor arrestees at bail hearings as required by Local Rule 9 and this Consent Decree and also meet its obligations to provide zealous and effective representation to indigent defendants at all other stages of the representation process. To this end, any such funding provided must be at or above the PDO's Fiscal Year 2019-20 approved budget.

39. Any indigent misdemeanor arrestee will be presumed eligible for appointment of counsel and may not be charged any fees for any condition of pretrial release. This provision in no way precludes a determination to appoint counsel or waive fees for a misdemeanor arrestee who does not meet the definition of "indigent" set forth in Section 17(h).

40. Any judicial officer presiding over the Local Rule 4.2 hearing of a misdemeanor arrestee must authorize the PDO to represent the misdemeanor arrestee for purposes of determining probable cause and the terms of pretrial release.

41. To promote defense counsel's ability to make well-informed arguments for release, the County agrees to provide defense counsel access to early and effective support staff, as defined in Section 17(t), to assist defense counsel in gathering and presenting information relevant to the bail decision and appropriate conditions of release.

   a. Within 180 days of the entry of this Consent Decree, the CCCL Judges will establish a process by which private appointed counsel can receive assistance from support staff in gathering and presenting information relevant to the bail decision and appropriate conditions of release; in locating and linking misdemeanor arrestees to supports and services that may provide alternatives to detention; and in otherwise facilitating the provision of high-quality representation to misdemeanor arrestees who face the possibility of being detained pretrial. The CCCL Judges will provide a list of qualified support staff that the CCCL Judges have approved to assist private appointed counsel upon proper application. The County will provide access to and funding for support staff that court-appointed counsel can request to assist them at or before bail hearings, in accordance with Section 37 and Section 43(b). The County may provide such access

through independent contractors or through a nonprofit organization in partnership with the County. Nothing in this section (Section 41(a)) is intended to limit Defendants from hiring full-time support staff if the volume of cases requires additional such services in order for defense counsel to provide zealous and effective representation in accordance with best practices.

b. Additionally, the County will develop the systems and structures that best meet the goals of providing effective indigent defense services during the pretrial period, including providing resources for indigent defense support services, such as investigation and mitigation. Whether the County, in its discretion, ensures effective indigent defense services through expansion of the PDO, or through funding support staff for use by private appointed counsel (or some combination), within 180 days of entry of the Consent Decree, the County will retain an expert with experience in holistic indigent defense to evaluate the County's current misdemeanor indigent defense systems and determine the County's need for essential support staff and holistic services to promote zealous and effective indigent defense. The evaluation must be completed within 180 days of commencement and result in a written report with recommendations that reflect national best practices and professional norms governing the provision of indigent defense services. Based on the results of the evaluation, and in consultation with the Monitor, the County must fund the minimum number of support staff the retained expert recommends should be available for use by defense counsel representing indigent misdemeanor arrestees. This requirement in no way prevents or discourages the County from funding additional support staff in its discretion.

42. The CCCL Judges must adopt scheduling policies to ensure Local Rule 4.2 dockets allow defense counsel to provide zealous and effective representation at bail hearings consistent with prevailing professional standards.

43. Within 180 days of the entry of this Consent Decree, drawing on national standards and best practices for providing representation to indigent arrestees at bail hearings, Defendants must develop a written plan with policies and procedures to ensure defense counsel:

a. Are provided sufficient time, work space, and equipment to confer meaningfully and confidentially with misdemeanor defendants before a bail hearing is held;

b. Are provided access to social workers, investigators, and essential support staff, where access can be via phone or video conference;

c. Are able to call witnesses and present and confront evidence at bail hearings; and

    d.   Are promptly[74] able to discover any information or reports concerning the represented misdemeanor arrestee that will be presented to the judicial officer presiding over the misdemeanor arrestee's bail hearing.

44.  The plan developed pursuant to Section 43 will be submitted to the Monitor, who will review, provide feedback on, and approve the plan, which will be implemented within a reasonable timeline to be determined by the Monitor and Defendants. The Monitor will solicit Class Counsel's input during the review process.

45.  The CCCL Judges, in consultation with the Monitor, will amend their indigent defense policies to reflect Local Rule 9 and this Consent Decree.

## VIII.  PROMOTING PRETRIAL RELEASE THROUGH PROGRAMS TO INCREASE COURT APPEARANCE

### A.  Uniform Notice of Scheduled Appearances

46.  Defendants are required to implement Section 47 and Section 48 only as to misdemeanor arrestees in the County's custody or who have otherwise appeared in person such that they are able to receive written notice from Defendants at the time of scheduling. Defendants will nevertheless make the forms required by this Section readily accessible to third-party law enforcement agencies who arrest or detain misdemeanor arrestees in connection with a Class A or Class B misdemeanor to be prosecuted in the CCCL.

47.  Subject to Section 46, Defendants will provide eligible misdemeanor arrestees,[75] or the arrestee's lawyer if the arrestee is not present, written notice of the date, time, and location of their scheduled court appearance each time they receive a new court date in their case before the Criminal Courts at Law. Any form of written notice provided to misdemeanor arrestees, or their attorneys, in accordance with this section (Section 47) will be considered a court form and, therefore, the County will keep a copy of any such written notices issued to misdemeanor arrestees in their related case file.

48.  To facilitate court appearance and minimize confusion and misinformation about where and when misdemeanor arrestees must show up to court for a scheduled appearance, Defendants must update any form that Defendants use to provide written notice of scheduled court dates to incorporate evidence-based design practices for effectively reducing nonappearance.

    a.   The forms for providing written notice developed and adopted under Sections 47 and 48 must be easy to comprehend; must clearly and prominently display the date, time, and location of the misdemeanor arrestee's court appearance; must clearly and succinctly summarize the most essential components of the CCCL Judges'

---

[74] "Promptly" means as soon as possible but in any event before a bail hearing occurs.

[75] "Eligible misdemeanor arrestees" are misdemeanor arrestees who are in the County's custody or who have otherwise appeared in person such that they are able to receive written notice from Defendants at the time of scheduling.

rescheduling policies and the consequences of nonappearance; must notify the arrestee that a lawyer will be appointed if the misdemeanor arrestee is indigent; and must identify a telephone number and a website where misdemeanor arrestees can obtain additional information about their court appearance and the CCCL Judges' policies related to attending, missing, and rescheduling court appearances. Defendants may revise existing forms to meet the requirements of this section (Section 48(a)). Any language describing CCCL Judges' policies must be approved by the CCCL Judges.

b.  Within 180 days of the effective date of this Consent Decree, Defendants must update their forms in accordance with Section 48(a). The County may engage one or more technical assistance providers to assist Defendants in updating their forms in accordance with Section 48(a) and best practices. To promote uniformity of notice and avoid confusion, the updated forms must be the exclusive forms used by Defendants to provide notification of court dates.

c.  The County will provide the applicable updated form to any misdemeanor arrestee who is released by the County upon the misdemeanor arrestee's release. The forms may be updated at any time, as needed, with the advice of technical assistance providers and the Monitor. The updated forms must be the exclusive forms used by Defendants to provide notification of court dates. Nothing in Sections 47 or 48 prevents the CCCL Judges from otherwise providing general information to misdemeanor arrestees about the CCCL Judges' court schedules or policies.

d.  Within 180 days of appointment of the Monitor, the County will submit the updated forms to the Monitor for review and approval in accordance with Sections 111–114 below. The County will work with the Monitor to ensure that the required contents fit on any forms updated in accordance with Section 48(a). If, upon evaluation, it is infeasible to fit all of the information required by Section 48(a) on Defendants' existing forms, Defendants will work with the Monitor to determine the best way to provide misdemeanor arrestees with the most essential components of the CCCL Judges' rescheduling policies and the consequences of nonappearance along with the updated forms, such as on a separate sheet of paper appended to the updated forms. Whether the information is presented on a single form or two forms, Defendants must provide all of the information required by Section 48(a) to achieve the intended goal of minimizing confusion and misinformation about where and when misdemeanor arrestees must show up to court for a scheduled appearance.

e.  If Defendants decide to make any additional amendments to the forms for providing written notice of scheduled court dates following the Monitor's review and approval under Section 48(d), Defendants will adopt the additional amendments within 60 days of approval by the Monitor, at which point the newly amended forms must be the exclusive forms used to provide notification of court dates. Any additional amendments must conform with Section 48(a) above. Upon review and approval by the Monitor, Defendants will use the newly amended forms to provide misdemeanor arrestees written notice in accordance with Section 47 above. The updated or amended

forms may be subsequently updated with the advice of technical assistance providers and approval by the Monitor.

**B.  Court Date Reminder System**

49. Defendants are required to implement Section 50 only as to misdemeanor arrestees for whom the County has a telephone number and who do not opt out in accordance with Section 50(a).

50. The County will adopt text-message-based and telephone-based reminder services to provide eligible misdemeanor arrestees[76] with information about scheduled court appearances and related logistics. The reminders must be designed to reduce nonappearance by notifying misdemeanor arrestees of scheduled court appearances and encouraging misdemeanor arrestees to appear in court on the date scheduled. The County will consult with the Monitor to determine whether any other reminder systems are necessary, taking into account cost and best practices. In developing the text-message-based and telephone-based reminder services, the County must consult existing research and best practices regarding the form and frequency of effective appointment reminders, as well as successful court date reminder systems employed by other jurisdictions, to ensure the services the County adopts have a track record of effectively facilitating court appearances.

   a.  The County will provide every misdemeanor arrestee released by the County the option to receive reminders and logistical information about upcoming and missed court dates by telephone and/or text message. Misdemeanor arrestees may affirmatively opt out of receiving the reminders by providing a written waiver.

   b.  The reminders must, at a minimum, inform misdemeanor arrestees of the date, time, and location of their scheduled court appearance; and, if a misdemeanor arrestee did not appear at a scheduled court date, the reminders must notify the misdemeanor arrestee of the nonappearance and provide information about next steps for rescheduling or resolving the nonappearance.[77]

   c.  The County may satisfy the requirement to develop a text-message reminder system by implementing a one-way text-message reminder system. If the County implements a one-way text-message reminder system, it must also study the potential efficacy of a two-way text-message reminder system in promoting court appearance. "Two-way messaging" means that the recipient of the reminder would be able to respond to the message.

   d.  The substance, format, timing, and frequency of the reminders must be informed by evidence-based practices for effectively reducing nonappearance and be approved by

---

[76] Eligible misdemeanor arrestees are misdemeanor arrestees who provide a phone number upon arrest and do not opt out in accordance with Section 50(a).

[77] This Consent Decree does not prevent the County from providing text message and telephone call reminders to arrestees in felony cases and victims of crime.

the Monitor. Misdemeanor arrestees must be given the choice to opt out of receiving the reminders.

e.  Within 180 days of the appointment of the Monitor, the County must submit the proposed substance, format, timing, and frequency of the text message or telephone call reminders, as well as a proposed process for permitting misdemeanor arrestees to opt out of the reminders, to the Monitor for review and approval in accordance with Section 111-114.

f.  The County will implement the text-message and telephone reminder systems within 180 days of approval by the Monitor, or as soon as practicable taking into account the County's procurement processes.

### C.  Determination and Mitigation of Actual Causes of Nonappearance in Harris County

51.  The County will study and seek to mitigate the primary wealth-based causes of nonappearance among misdemeanor arrestees in order to safeguard against unnecessary pretrial detention, while furthering the County's interests in reasonably assuring misdemeanor arrestees' court appearances and law-abiding conduct before trial. The County must provide programs and services to maximize the ability of the pretrial bail practices set forth in Section 30 of this Consent Decree to serve the government's compelling interests by mitigating possible causes of non-appearance.

52.  Within 180 days of the effective date of this Consent Decree, or as soon as practicable taking into account the County's procurement processes, the County will engage one or more researchers to: (1) study the primary causes of nonappearance in the CCCL; and (2) based on the results of the study, recommend cost-effective policy solutions and programmatic interventions to mitigate the causes of nonappearances.

a.  The study must be based on qualitative and quantitative research methods. The researcher(s) engaged by the County to design and conduct the study must have social science training and demonstrated experience evaluating pretrial systems and processes.

b.  As soon as practicable after the study concludes, the researchers must provide written findings regarding the primary causes of nonappearance in the CCCL, as well as written recommendations to the County for mitigating nonappearance. The researchers' written findings and recommendations must be published in a report that the County will make available to the public online and upon request, as soon as practicable after publication.

c.  The study must evaluate the extent to which and explain how economic, geographic, and structural factors contribute to nonappearance for scheduled hearings before the County Criminal Courts at Law. At a minimum, the study must evaluate the following possible causes of nonappearance and may evaluate any other possible causes:

      i.  lack of transportation;

      ii.  lack of childcare;

      iii.  lack of permanent housing;

      iv.  lack of access to a telephone and/or a computer;

      v.  confusion and misinformation about court dates;

      vi.  inflexible work schedules;

      vii. detention by other jurisdictions;

      viii. substance use disorders;

      ix.  mental health problems;

      x.  lack of sufficient notice or understanding of procedures; and

      xi.  medical emergencies.

d. The study must also investigate and identify best practices and provide reasonable, cost-effective recommendations that the County can implement to mitigate the causes of nonappearance by misdemeanor arrestees. The recommendations must also include best practices for advising misdemeanor arrestees of their upcoming scheduled court dates.

e. The study must provide initial actionable recommendations within 180 days of commencing (absent any exceptions afforded pursuant to Section 29), but the researcher(s) may continue the study beyond that date and may provide additional recommendations.

53. While the study required by Section 52 is ongoing, and until implementation of the plan required by Section 55 begins, the County must allocate $250,000 annually, beginning in Fiscal Year 2020–21, toward assisting and supporting indigent misdemeanor arrestees in making court appearances.[78] The County may use the $250,000 in its discretion,[79] except that,

---

[78] If the length of time required to begin implementation is less than one year, this amount will be prorated to a portion of $250,000 that reflects the time required to begin implementation.

[79] This investment is intended to provide assistance and support to indigent misdemeanor arrestees. As a result, while investments in transportation to court, medical and mental health care, safe and affordable shelter, communication, translation and interpretation, drug treatment, and other services are contemplated, the County will not be permitted to satisfy this provision through expenditures on law enforcement, including jailing; liberty-restricting conditions of pretrial release, such as electronic monitoring or substance abuse testing; or funding for prosecution.

in order to satisfy this section (Section 53), the County must seek approval from the Monitor that its proposed allocation meets the requirements of Footnote 80. The Monitor must obtain Class Counsel's input in evaluating the County's proposed allocation. The County may provide its own funding or secure and utilize one or more external sources of funding to meet its obligations under this section (Section 53), including but not limited to allocating savings from Class Counsel's attorneys' fees donation or securing government grants and/or private philanthropic funding, to meet this obligation.

54. After the study concludes, the County must allocate at least $850,000 per year, absent demonstrating good cause to the Monitor for allocating a lesser amount, for each of the first seven (7) years following the conclusion of the study, toward mitigating the causes of nonappearance in the County in accordance with the plan required by Section 55. To establish good cause, the County must submit such purported cause to the Monitor. The Monitor must notify Class Counsel that Defendants have sought permission from the Monitor to spend less than $850,000 per year. The Monitor must make a determination of whether good cause exists for allocating a lesser amount. Either Party may file a motion to the Court if that Party disagrees with the Monitor's determination. The County may provide its own funding or secure and utilize one or more external sources of funding, including, but not limited to, allocating savings from Class Counsel's attorneys' fees donation or securing government grants and/or private philanthropic funding, to meet these obligations.

55. Within 180 days of receiving the published results of the study, absent any exceptions afforded pursuant to Section 29, the County must work in consultation with the researchers that conduct the study to develop a written plan for mitigating the causes of nonappearance in the County, as determined by the results of the study, including a reasonable timeline for implementing the plan and a proposed budget for how the $850,000 (or more, in the County's discretion) will be spent annually in each of the initial three years following the study.[80] After two years, the plan must be updated to identify expenditures for subsequent years. The County will present the plan to the Monitor, who will convey the plan to Class Counsel for review.

   a. The County will submit the plan to the Monitor for review and approval in accordance with Sections 111–114. The Monitor will solicit Class Counsel's written comments and objections on the plan during its 30-day review period provided by Sections 111–114. Upon returning its comments or objections to the County in accordance with Sections 111–114, the Monitor will also convey Class Counsel's comments or objections to the County for the County's consideration and response. The County must respond to all comments and objections within 30 days of receipt from the Monitor. The County's response must explain its position on the comments or objections, if any, and include any proposed amendments necessary to address them.

---

[80] This investment is intended to provide assistance and support to indigent misdemeanor arrestees. As a result, while investments in transportation to court, medical and mental health care, safe and affordable shelter, communication, translation and interpretation, drug treatment, and other services are contemplated, the County will not be permitted to satisfy this provision through expenditures on law enforcement, including jailing; liberty-restricting conditions of pretrial release, such as electronic monitoring or substance abuse testing; or funding for prosecution.

     b.   The Monitor may function as a liaison to secure Class Counsel's input on the plan. If Class Counsel objects to any aspect of the plan, and the Monitor is unable to resolve the dispute, the Parties may submit the dispute to the Court to resolve in accordance with Sections 111–114.

56. Notwithstanding the Parties' agreement in this Consent Decree to study and implement best practices to mitigate nonappearance, nothing will prevent Defendants from seeking to implement, before the study is complete, additional good-faith efforts to reduce nonappearance for people on pretrial release.

## IX.  COURT POLICIES AND PROCEDURES CONCERNING NONAPPEARANCE FOR SCHEDULED COURT HEARINGS[81]

57. No later than 180 days after the entry of this Consent Decree, the County must develop and maintain a website where misdemeanor arrestees can access their court dates, times, location, attorney information, whether the next court appearance is "required" or "regular," and any additional case information that the CCCL Judges or County deem appropriate. The website must be updated to reflect accurate court dates and times within 24 hours of a court date being scheduled.

58. **Options for rescheduling a court date:** The County will provide technology that defense counsel and misdemeanor arrestees can use to facilitate requesting a new court date or to be informed of a court date that the court has set. With the goal of identifying mechanisms for rescheduling court dates that do not require the misdemeanor arrestee or the arrestee's counsel to appear in person to obtain a new court date, the County and the CCCL Judges will work with the Monitor to identify and implement the most effective technology to facilitate rescheduling court dates. If a misdemeanor arrestee receives a new court date, notice of the new court date must be provided via the telephone and text-message reminders required by Section 49–50. If defense counsel has been appointed or retained, notice must also be provided to counsel. A record of the notice provided must be preserved in the misdemeanor arrestee's case file. The County will also ensure that there is an in-person option for rescheduling a court date during regular business hours.

59. To comply with the requirement that there be an in-person option for rescheduling court dates during regular business hours, the CCCL Judges will designate one CCCL Judge each week, for at least one day each week, to preside over an "Open Hours Court" to be located in that CCCL Judge's own courtroom. The Open Hours Court will occur on a predictable weekly schedule, and the schedule will be posted in the courthouse, at the jail, on the written notification(s) described in Sections 47–48, and on the website described in Section 57. This Consent Decree does not require the Open Hours Court to operate beyond normal business hours.

---

[81] "Defense counsel" or "attorney" for purposes of this Section refers to counsel appointed or retained to represent a misdemeanor arrestee before the Harris County Criminal Courts at Law.

60. Beginning no later than 180 days from the appointment of the Monitor, the County and the CCCL Judges must implement the policies and practices in Sections 57–79. The objective of these provisions is to promote effective implementation of Local Rule 9 and accurate and transparent tracking and publication of rates of nonappearance.

61. Notice of the CCCL Judges' appearance, rescheduling, and warrant policies will be provided on the written notification(s) described in Sections 47–48 and on the website described in Section 57.

62. To ensure that people released from custody after arrest have an adequate opportunity to address the disruption to their lives caused by the arrest, absent a request made by an arrestee or the arrestee's counsel, no misdemeanor arrestee may be required to appear in court less than 72 hours of being released from jail for proceedings in the same misdemeanor case in which they were arrested and released.

63. The terms "regular setting" and "required appearance" are defined in Section 17(q) and Section 17(r) above.

64. **Open Hours Court:** County and CCCL Judges must provide at least one weekly "Open Hours Court" to be held at the same time and on the same day each week, which may be rescheduled from time to time, to account for holidays or other court business. Any change to the Open Hours Court schedule must be advertised on the website as described in Section 57 at least 30 days in advance of the change becoming operative. The location of the Open Hours Court must be advertised as described in Sections 48(a) and 57. Any misdemeanor arrestee who has missed a court appearance can appear at Open Hours Court to reschedule the missed court appearance, subject to the other provisions in this Consent Decree. The County will ensure that assistant public defenders and/or private appointed counsel will be available at this docket to assist unrepresented individuals who appear. The purpose of Open Hours Court is to provide an opportunity for people to move forward with the business in their cases more efficiently and, to the extent permitted by other provisions of the Consent Decree, to do so without fear of going into custody for a prior nonappearance. This program must be advertised as described in Sections 48(a) and 57.

65. **Waiver of appearance:**

   a. Upon request by counsel, before or during a regular setting, a misdemeanor arrestee's appearance at any regular setting must be waived.

   b. Notwithstanding Section 65(a), a CCCL Judge will be authorized to convert any regular setting into a required appearance with 7 days' written notice to the misdemeanor arrestee and/or her lawyer that the arrestee's personal appearance in court is required and will not be waived.

   c. Notwithstanding any other provision in this Consent Decree, a CCCL Judge may, on his or her own motion, waive a misdemeanor arrestee's appearance at any court appearance at which that CCCL Judge is presiding, consistent with Texas law.

34

66. **Rescheduling in advance of the court date:**

   a.  A misdemeanor arrestee who is not in custody may reschedule any regular appearance in advance of the court date by using the rescheduling procedures described in this Consent Decree.

   b.  A misdemeanor arrestee who has not sought a waiver of appearance and is not in custody may reschedule through counsel any regular appearance in advance of the court date two times per case for any reason with no adverse consequences. If multiple open cases are consolidated onto a single schedule of court appearances, any rescheduling of any one of the open, consolidated cases will count toward the two permitted reschedulings for all of the open, consolidated cases.

   c.  After a misdemeanor arrestee reschedules twice, any subsequent nonappearance at a regular setting may result in a warrant being issued if the CCCL Judge finds that notice of that setting was provided in accordance with this Consent Decree, and does not make a finding of good cause.

67. **Process for issuing a warrant after nonappearance at a regular setting**:

   a.  If a misdemeanor arrestee does not appear at a regular setting, and the appearance was not waived in advance, the case will be rescheduled for the following week's Open Hours Court. The County and the CCCL Judges will inform the misdemeanor arrestee of the new date and time for the court setting at which the misdemeanor arrestee's presence is required using the notification procedures set forth in this Consent Decree. The misdemeanor arrestee may appear at the following week's Open Hours Court or in the assigned court at any time between the date of the missed regular setting and close of business on the day of Open Hours Court of the week following the missed setting to reschedule the missed regular setting without arrest or other adverse consequences for a missed regular setting.

   b.  If a misdemeanor arrestee does not appear at a regular setting, and does not appear in Open Hours Court or the assigned court before close of business on the day of Open Hours Court of the week following the missed appearance, a warrant for nonappearance may issue to the extent consistent with state law.

68. **Process for issuing a warrant after nonappearance at a first setting or required appearance:**

   a.  If a misdemeanor arrestee does not appear at a first setting or a required setting, meaning that the arrestee has not appeared in court within one hour of the time set for the misdemeanor arrestee's appearance or by the time the docket (if applicable) has concluded, whichever is later:

      i. The CCCL Judge must determine whether the misdemeanor arrestee had actual notice of the court setting and whether there exists good cause for nonappearance.

If the CCCL Judge finds that good cause exists for the misdemeanor arrestee's nonappearance then a warrant may not issue and the setting must be rescheduled for a minimum of seven days in the future. Because notice is a basic requirement of due process, lack of actual notice of the court setting constitutes good cause for nonappearance such that an arrest warrant for nonappearance may not issue. If the CCCL Judge finds that no good cause exists for the misdemeanor arrestee's nonappearance, then the CCCL Judge may take any action consistent with Texas state law.

69. **Process for rescheduling a court date after a warrant has been issued:**

    a. If a warrant is issued following nonappearance at a regular setting or first setting, the arrestee may appear in the assigned court or the Open Hours Court and request a new court date. In the absence of other bases for the misdemeanor arrestee's arrest, the warrant for nonappearance will be recalled when the misdemeanor arrestee seeks to reschedule the missed regular setting or first setting. A misdemeanor arrestee may reschedule a first setting or a regular setting after a warrant for nonappearance has issued twice without risking arrest. In such circumstances, the warrant for nonappearance must be recalled.

    b. If a warrant is issued following nonappearance at a required appearance, the arrestee must appear in person in the assigned court or at Open Hours Court to request a new court date. If practicable, and to avoid the need to arrest, book, and jail the misdemeanor arrestee, the missed setting should be rescheduled for that day. If the setting cannot occur that day and must be rescheduled for another date, the judge will have discretion to recall the warrant, modify conditions of pretrial release, or order that the misdemeanor arrestee be taken into custody on the warrant if such custody is otherwise consistent with state law and if the court finds after a hearing with counsel, that (i) there was actual notice of the required setting that was missed and (ii) no good cause exists for the nonappearance.

70. All misdemeanor arrestees with outstanding arrest warrants for nonappearance issued for any type of misdemeanor court appearance prior to January 1, 2019, will be permitted to appear at Open Hours Court or in the assigned court, or to use any of the rescheduling procedures described in this Consent Decree, to have the warrant for nonappearance recalled and to receive a new court date in the assigned court. No such misdemeanor arrestee may be arrested for nonappearance pursuant to a warrant for nonappearance issued on or before December 31, 2018, upon voluntary appearance in Open Hours Court or in the assigned court. This option must be advertised on the website described in Section 57, in the joint processessing center, and by any other method determined by the County. The County may also choose, in its discretion, to advertise this option on local radio and television.

71. The CCCL Judges are committed to recording data regarding nonappearance and failures to appear in an electronic, machine readable format that will provide a basis for tracking and

comparing nonappearance rates and failure-to-appear rates of misdemeanor arrestees released on different pretrial conditions.

72. The CCCL Judges will continue to evaluate their policies relating to court appearance and determine whether they can authorize misdemeanor arrestees who are represented by counsel to waive personal appearance at additional hearings in order to minimize the burden of court appearance on the system and on indigent arrestees. The CCCL Judges will provide a report to the Court Monitor and Class Counsel regarding the process used to evaluate local policies and the conclusions reached within 180 days of entry of this Consent Decree.

## X.   CONTINUING TRAINING

73. To enhance and promote compliance with the purpose and requirements of this Consent Decree, Defendants will provide ongoing training to the CCCL Judges and Defendants' agents and employees whose work is necessary to implementing Local Rule 9, including public defenders and private appointed counsel. The Monitor will recommend any additional training that is needed to promote full implementation of the Consent Decree more broadly.

74. To that end, and within 180 days of the appointment of the Monitor, or as soon as is practicable in light of the County's procurement processes, the Defendants may, in consultation with the Monitor, engage a consultant and/or technical assistance provider to assist in developing an ongoing training plan ("Training Plan") that Defendants will implement to promote full and effective implementation of the Consent Decree. If Defendants decide to engage such a consultant and/or technical assistance provider, that person or entity must have expertise in pretrial systems and experience developing or conducting training on pretrial practices.

75. The Training Plan must include both an initial training course and an annual refresher training course that the CCCL Judges and Defendants' agents and employees whose work is necessary to implement Local Rule 9 will be required to complete. The County may provide the training in person or online.

76. The Training Plan must incorporate qualitative and quantitative training on the following:

   a. The purpose, proper implementation, and enforcement of Local Rule 9 and this Consent Decree, and the requirements to uphold the constitutional rules and standards governing pretrial release and detention and the use of secured money bail;

   b. Costs and consequences of pretrial detention on misdemeanor arrestees and the public, including empirical research concerning:

      i. The effects of pretrial detention on case outcomes (including the effect of secured bail and pretrial detention on guilty pleas, time served pretrial, conviction and sentencing, and sentence length) and re-arrest and recidivism during the pretrial period and following case disposition; and

ii.  The social and economic impacts on accused persons, their families and communities, and the broader community resulting from pre- and post-trial incarceration;

c.  The available alternatives to pretrial detention locally, best practices and alternatives employed in other jurisdictions, and the costs and consequences of and alternatives to issuing bench warrants in response to nonappearance and failures to appear;

d.  Discussion of current data, research, and best practices relating to bail setting and pretrial release practices nationally;

e.  Accounts and stories of people who have been affected by the bail system in Harris County or their family members.

77.  Throughout the development of the Training Plan, the Monitor must consult with Class Counsel regarding the content of the training and the individuals and entities who will conduct the training.Defendants must submit the proposed Training Plan to the Monitor for review and approval in accordance with Sections 111–114 below.

78.  Class Counsel may review the Training Plan on an annual basis and recommend  updates and improvements as necessary to maintain compliance with the provisions and purpose of this Consent Decree, policies and practices developed pursuant to this Consent Decree, and any developments in applicable law.

79.  Defendants will begin implementing the Training Plan upon approval by the Monitor, who must review the trainings provided under the Training Plan annually and recommend updates and improvements as necessary to maintain compliance with the provisions and purpose of this Consent Decree, policies and practices developed pursuant to this Consent Decree, and any developments in applicable law. Class Counsel must review any proposed updates to the Training Plan before they are implemented.

## XI.   DATA COLLECTION, ANALYSIS, AND TRANSPARENCY

80.  The purpose of this Section is to ensure that Harris County's pretrial system can be effectively monitored and evaluated to determine whether it is remedying the constitutional violations raised in this litigation, and whether Defendants are complying with the purpose and provisions of this Consent Decree. It is also intended to facilitate constitutional and effective misdemeanor pretrial decision-making and outcomes that maximize pretrial liberty and court appearance rates; and to enhance accountability and transparency related to Defendants' pretrial policies, practices, and decision-making concerning misdemeanor arrestees.[82]

---

[82] At a hearing on January 23, 2018, when Plaintiffs raised the concern that Defendants had not produced documents in discovery, the district court expressed concerns about Defendants' lack of "transparency" in this case. Transcript of 1/23/18 Hearing at 5, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414) (THE COURT: "[T]ransparency is another feature that is in insufficient supply in many aspects of this case[.] . . . And the lack of transparency is not the Plaintiffs'."). Additionally, when the litigation was stayed in November 2018, Plaintiffs

81. Defendants will systematically and continuously collect and preserve the data and records necessary to analyze and report on Defendants' compliance with the intent and requirements of this Consent Decree and the constitutional standards governing pretrial release and detention; Defendants' decision-making and performance related to the pretrial release and detention of misdemeanor arrestees; and the effects of Defendants' pretrial policies, practices, and decision-making on the comparative case outcomes and nonappearance rates of misdemeanor arrestees. Within 180 days of appointment of the Monitor, Defendants will consult with the Monitor to determine the extent to which Defendants already collect the data variables sufficient to permit tracking, analysis, and reporting required by this Consent Decree. In consultation with the Monitor, within 180 days of appointment of the Monitor, Defendants will also:

   a. Identify and define the data variables Defendants will be required to collect and preserve to effectively analyze and report on the measures identified in Section 85, with the exception of "nonappearance" and "failure to appear," which are defined in this Consent Decree.

   b. Determine how Defendants can collect and maintain the data variables required in a manner that allows the Monitor, Class Counsel, Defendants, and members of the public to access, review, analyze, and report on them efficiently and effectively. The Monitor should take into account that several County agencies are currently responsible for collecting and preserving the County's misdemeanor pretrial data and include in its recommendations ways the County can integrate the required data variables across those agencies' data systems upon collection.

82. If, upon evaluation, any of the Defendants concludes that it would be cost prohibitive or otherwise infeasible to collect or maintain any of the data variables they are required to collect under this Consent Decree, Defendants may submit a request to the Monitor seeking exemption from the requirement to collect and maintain the particular data variable(s). The Monitor will evaluate any such request by Defendants to determine whether they can be relieved of their obligation to collect and maintain the particular variables for which exemption is sought.

83. Within 180 days of appointment of the Monitor, the County will develop and implement a process by which the public can download, or otherwise readily access, the raw data that Defendants are required to collect and maintain under this Consent Decree in a usable format, such as an Excel spreadsheet. Any such process is expected to preserve and maintain compliance with applicable state and federal laws concerning confidentiality of information. The intent of this Section is to promote transparency and accountability by promoting public access to and analysis of the data and information collected pursuant to this Consent Decree.

---

had sought leave from the Court "to conduct futher depositions . . . crucial to discovering why and how Defendants destroyed relvant evidence for almost a year into this case, and then failed to disclose that fact when they learned it more than a year ago," so that Plaintiffs could "determine whether it would be appropriate to move for sanctions." Plaintiffs' Pre-motion Letter Seeking Leave to Conduct Additional Depositions, *ODonnell v. Harris Cty.,* 251 F. Supp. 3d 1052 (S.D. Tex. 2017) (No. 16-cv-01414), ECF No. 523-1.

84. The County will preserve all existing data relating to misdemeanor cases from 2009 through the present, including all data used to generate the reports required by Sections 87 and 89, to facilitate comparative analysis of the County's prior misdemeanor pretrial system with the misdemeanor pretrial system that will be implemented pursuant to this Consent Decree.

85. Defendants will also continue to collect and maintain all of the misdemeanor case data variables they collect and maintain currently, including all of the data variables that Defendants have produced to Plaintiffs in this litigation. If feasible and not cost prohibitive,[83] Defendants will also collect and maintain data variables sufficient to permit tracking, analysis, and reporting of the following information, to the extent applicable for each misdemeanor arrestee:

   a. Race and ethnicity of the misdemeanor arrestee;
   b. Zip code of home residence of the misdemeanor arrestee and/or place of arrest;
   c. Primary language(s) spoken by the misdemeanor arrestee;
   d. Financial status of the misdemeanor arrestee (e.g. income bracket, employment status, receipt of means-tested government benefits, automobile ownership, education level, and/or residence status or homelessness);
   e. Any concurrent holds and, if so, which type(s) and/or any concurrent felony charges;
   f. Whether the misdemeanor arrestee was identified as a "non-carve-out" or a "carve-out" (including the relevant "carve-out" category) under Local Rule 9;
   g. To the extent applicable, all underlying constituent data points used in calculating an actuarial risk score or recommendation;
   h. Any amount of money the misdemeanor arrestee reported being able to afford to pay at the time of the bail hearing, as set forth in Local Rule 9;
   i. Whether the misdemeanor arrestee was afforded the procedural requirements of a bail hearing, as set forth in Local Rule 9;
   j. Whether a motion for secured bail, high bail, or pretrial detention was filed, and, if so, which;
   k. Substantive findings made by the judicial officer at the bail hearing;
   l. Any date and times of release from custody;
   m. Any scheduled appearances that the misdemeanor arrestee appeared at;
   n. All instances of "nonappearance" as defined in this Consent Decree;
   o. All instances of "failure to appear" as defined in this Consent Decree;
   p. Any scheduled appearances that were waived and/or rescheduled;
   q. Any pretrial release decisions by a judicial officer and the date of each;
   r. Any pretrial release recommendations (e.g. release, release to supervision, etc.) made by a judicial officer and the date of each;
   s. Any conditions of release or supervision imposed by a judicial officer, the date each was imposed, and the amount of any fees assessed; and
   t. Any findings that a bond condition was violated and the results of any such findings (e.g. revocation; forfeiture; additional conditions imposed; etc.).

---

[83] As determined pursuant to Section 82.

86. "Failure to appear" and "nonappearance" are defined in Section 17(f) and Section 17(m), respectively, of this Consent Decree. Within 180 days of the appointment of the Monitor, absent any exceptions afforded pursuant to Section 29, and subject to Section 29, Defendants, in consultation with the Monitor and any subject matter experts or technical assistance providers Defendants deem necessary, will begin collecting and maintaining data concerning nonappearances and failures to appear by misdemeanor arrestees in a standardized electronic format. The process by which Defendants collect and maintain data concerning nonappearances and failures to appear must be approved by the Monitor and must permit transparent, consistent, and reliable collecting and reporting of comparative failure-to-appear rates and comparative nonappearance rates of misdemeanor arrestees released on different bond types and under various conditions of release.

87. Within 180 days of the appointment of the Monitor, Defendants must begin generating reports once every 60 days that provide the information in Section 89—except that, where Defendants do not yet collect the data needed to report on certain information in Section 89, they will work with the Monitor to determine an appropriate timeline in which to collect, analyze, and begin reporting on any new data that is feasible and not cost-prohibitive to collect. The reports must clearly indicate a break-down of numbers and percentages by race and zip code of residence. The purpose of these reports is to ensure that basic information necessary to evaluate how the Consent Decree is affecting the County's misdemeanor pretrial system is readily available to and can be easily understood by Defendants and their agents and employees working within the system, community members, the Monitor, and Class Counsel. The reports must be made publicly available on the website described in Section 90. Defendants may authorize the Monitor, or a subject-matter expert or technical assistance provider with experience and expertise in analyzing large datasets, to generate the reports. Defendants will work with the Monitor, along with any technical assistance provider Defendants authorize to generate the reports, and to determine additional parameters for the analysis such as the appropriate time period that each report will cover and whether the information will be reported in terms of cases or persons.

88. To promote transparency and accountability, the County will also develop a web-based data platform ("Data Platform") that organizes, integrates, analyzes, and presents the information required by Section 89 into a public-facing interface.[84] The County may engage a technical assistance provider with expertise in data analytics to create the Data Platform. Subject to Section 82, Defendants must also analyze and present, at a minimum, the following information listed in Pararagraph 89 on the Data Platform, which must allow for a break-down of all numbers and percentages by race and zip code of residence.

89. If feasible and not cost-prohibitive,[85] all of the following information will be published publicly through the Data Platform as required by Section 88. All such information will

---

[84] The County is not precluded from organizing, integrating, analyzing, and presenting additional information or data on the Data Platform.

[85] As determined pursuant to Section 82.

preserve and maintain compliance with applicable state and federal laws concerning confidentiality of information. Defendants will work with the Monitor, as necessary, to identify and define any additional measures and outcomes on which Defendants will report to the public to facilitate transparency and accountability in meeting the goals and requirements of this Consent Decree and the frequency with which Defendants will report on those measures and outcomes.

a. The misdemeanor pre-trial and post-conviction jail population, excluding detainees who are subject to holds and/or concurrent felony charges;

b. The percent of misdemeanor arrestees detained at disposition;

c. Total number of people arrested for misdemeanor offenses;

d. Total number of people cited and released for misdemeanor offenses;

e. Total number of misdemeanor cases filed;

f. Total number and percent of misdemeanor arrestees who fell into the carve-out categories and, separately, the non-carve-out categories;

g. Total number of arrestees in each carve-out category;

h. Total number and percent of misdemeanor arrestees released on a General Order Bond;

i. Total number of bail hearings that occurred in the Joint Processing Center;

j. Total number of bail hearings that occurred in the CCCL;

k. Total number of arrestees who had a bail hearing and remained detained longer than 24 hours after arrest, and the length of time each arrestee was detained;

l. Total number of arrestees required to pay secured money bail as a condition of release, and, of that number, the total number who did not pay the secured bail amount required;

m. Total number of people detained 24 hours or longer who were not detained for any reason other than a pending misdemeanor charge;

n. Total number of arrestees:
   i. Assigned to pretrial supervision;
   ii. Assigned to electronic monitoring;
   iii. Required to report in person at Pretrial Services;
   iv. Required to undergo any drug testing;
   v. Required to undergo any form of mental health treatment; and
   vi. Whose release was conditioned on home detention;

o. Total number of bond forfeitures;

p. Total number of bond revocations;

q. The length of time to disposition for people released on different bond types;

r. Median time to disposition for people detained at disposition;

s. Median time to disposition for people released at disposition;

t. Number and percent of cases resulting in a guilty finding, broken out by whether the misdemeanor arrestee was detained or released at disposition;

u. Number and percent of cases resulting in dismissal, broken out by whether the misdemeanor arrestee was detained or released at disposition;

    v.    Number and percent of cases resulting in community supervision, broken out by whether the misdemeanor arrestee was detained or released at disposition;

    w.    Number and percent of cases in which the misdemeanor arrestee was sentenced to jail time, broken out by whether the misdemeanor arrestee was detained or released at disposition;

    x.    Number and percent of cases in which a motion for a high bond was filed, and, if generated, the final risk assessment score for each misdemeanor arrestee who was the subject of such a motion;

    y.    Number and percent of cases in which a motion to detain a misdemeanor arrestee was filed, the offense with which the misdemeanor arrestee was charged, and, if generated, the final risk assessment score for each misdemeanor arrestee who was the subject of such a motion; and

    z.    Any other data analysis the Monitor determines is required to adequately understand how the County's pretrial system works.

90. Within 90 days of the entry of this Consent Decree, the County must launch and maintain a website ("Consent Decree Website") for information related to the *ODonnell* lawsuit and this Consent Decree. The website will be updated on an ongoing basis, as needed, and, once the website is accessible online, must provide public access to the following materials:

    a.    Links to the Consent Decree and all of the information and data the County is required by this Consent Decree to collect and report on in accordance with Sections 88 and 89;

    b.    Materials used for training concerning implementation, monitoring, or reporting related to this Consent Decree must be publicly available on the website.

## XII.  OVERSIGHT AND ACCOUNTABILITY

91. All Parties recognize that the input and involvement of the residents of Harris County will be essential to meaningful and lasting reform and to effective and ongoing monitoring and evaluation of the system. Therefore, Defendants are committed to involving community members in the implementation and monitoring process. To that end, within 180 days, Defendants will submit a plan to the Monitor for conducting regular public meetings that are intended to promote transparency, accountability, and local participation in the implementation process. At each meeting, a representative of each Defendant group and the Court Monitor must report on implementation of the Consent Decree, including explicitly identifying areas of success and areas for improvement.

92. The following are minimum requirements for the meetings, but Defendants will have broad discretion within these parameters to determine the most effective way to communicate and work with their constituents:

    a.    The meetings must occur at least every six months in at least two geographic locations that render them accessible to the maximum number of residents possible. To the

extent practicable and cost-feasible, the County will simulcast the meetings via the website described in Section 90;

b. At least one representative of each Defendant group (*i.e.*, the County, the Sheriff, and the CCCL Judges) with knowledge of the process for and progress toward implementing the Consent Decree, will attend the meeting, together with the Monitor;

c. Defendants will work with local community groups to determine the parameters of the meetings, including time of day, length of meeting, location of meeting, agenda, and allocation of time to specific agenda items, with the goal of reasonably maximizing transparency and information sharing. The Monitor must approve the parameters of the meetings;

d. Defendants will provide community members a reasonable opportunity to provide input relating to the County's criminal legal system, to ask questions of Defendants' representatives and the Monitor relating to implementation of the Consent Decree, and to have those questions answered during the meeting.

## XIII.  PUBLICATION OF POLICIES ENACTED TO IMPLEMENT THE CONSENT DECREE

93. As soon as practicable, key policies enacted to implement this Consent Decree must be made available online. In addition, a summary of the key policies must be made available in writing at each of the following locations and in each language in which Harris County is required to provide a ballot under Section 203 of the Voting Rights Act of 1965:

a. Harris County Joint Processing Center, 700 N San Jacinto St, Houston, TX 77002; and
b. Harris County Criminal Justice Courthouse, 1201 Franklin St, Houston, TX 77002.

94. Within 60 days of the appointment of the Monitor, Defendants must confer and agree on the key policies to be summarized and made available at the above locations. The Monitor will resolve any disputes about the length and content of the summary. The policies and the summary of the policies must be reviewed every six (6) months and updated as necessary.

## XIV.  CONSENT DECREE MONITOR

### A.  The Monitor

95. The Parties will jointly select an independent monitor ("Monitor") who will assess and report on whether the requirements of this Consent Decree have been implemented. The Monitor's decisions and evaluations will be guided by the principles of ensuring accountability, transparency, and compliance with this Consent Decree consistent with the overall goals of maximizing pretrial liberty, court appearance, and public safety.

96. The Monitor may be an individual, team of individuals, non-profit institution, or non-profit organization. The Monitor must have the knowledge, skills, and expertise necessary to accomplish the Monitor's duties under this Consent Decree.

97. The Monitor will have only the duties, responsibilities, and authority conferred by this Consent Decree. The Monitor will not, and is not intended to, replace or assume the role or duties of the County, any County official, the Sheriff, or the CCCL Judges.

98. In order to assess and report on whether the requirements of this Consent Decree have been implemented and its objectives are being achieved, the Monitor will conduct the reviews, audits, and assessments specified below, and such additional audits, reviews, and assessments as the Monitor reasonably deems necessary to determine whether the Consent Decree has been implemented as required.

### B.   Selection and Compensation of the Monitor

99. The Parties will jointly select a Monitor that is acceptable to all. The Monitor will have expertise in some combination of the following: pretrial release and detention practices, monitoring and oversight, preparation of reports or other written materials for diverse audiences, law and civil rights, project management, data analysis and information technology, communication, and budgeting. The Monitor will also have a demonstrated ability to collaborate with government entities and knowledge of the diverse communities affected by the pretrial system. The Monitor will act in accordance with standards of integrity and will consistently demonstrate professionalism and respect in all interactions with the community, County officials and agents, members of the courts, and all others with whom they interact in the course of performing the Monitor's duties.

100. The Monitor may evaluate and provide recommendations to the County regarding the resources and staffing needed to promote efficient and effective implementation of this Consent Decree, which the County may consider in allocating resources to carry out this Consent Decree.

101. In selecting the Monitor, the Parties have established a mutually agreed-upon process:

   a.   As soon as practicable, but no later than 60 days from the date of approval of the Consent Decree, the Parties will request proposals from qualified candidates interested in serving as the Monitor that include an identification of qualifications, proposed team members, proposed Monitoring plan, and a proposed budget. The period for receiving applications may be no less than 30 days and no more than 60 days.

   b.   Within 30 days from the close of the period for submitting applications, the Parties will review applications, interview candidates, and recommend a candidate to the Court for appointment.

102. If the Parties are unable to agree on a Monitor, each Party will submit the name of the proposed individuals, groups of individuals, or entities, along with resumes and cost proposals, to the

Court. The Court will consider the Parties' submissions and will choose a candidate or candidate team proposed by one of the Parties.

103. The Parties recognize the importance of ensuring that the fees and costs associated with the Monitor are reasonable. Accordingly, the Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate.

104. The County will provide the Monitor with office space and reasonable office support, such as furniture, telephones, computers, internet access, IT support, secure document storage, and document scanning capabilities.

105. The Monitor may hire, employ, or contract with such additional misdemeanor arrestees or entities as are reasonably necessary to perform tasks assigned to the Monitor by this Consent Decree. Any misdemeanor arrestee hired or otherwise retained by the Monitor will be subject to the provisions of this Consent Decree.

106. The Parties may submit written feedback to the Monitor, the Parties, and the Court regarding the Monitor. The feedback may address such topics as the Monitor's effectiveness, the Monitor's ability to work cost-effectively on the budget, and whether the Monitor is adequately engaging the community and relevant stakeholders. Upon receiving the Parties' feedback, the Court may convene the Parties and Monitor to discuss the feedback.

107. At any time, on motion by any Party or the Court's own determination, the Court may remove the Monitor for good cause.

108. In the event the Monitor is removed, resigns, or is no longer able to fulfill its responsibilities under this Consent Decree, the Court will appoint a replacement recommended by the Parties. The Parties' selection will follow the same process as described in Sections 99–102.

109. Except for the period in which a new or replacement Monitor is selected, there will be a Monitor in place for seven (7) years from the appointment of the Monitor.

110. The Monitor must operate for a period of seven (7) years beginning on the date that the Monitor is appointed by the Court. The period may be extended for good cause. Good cause is shown if the County has not been substantially in compliance with this Consent Decree in the two years immediately prior to the end of the final scheduled year.

### C. Monitor's and Parties' Review of Implementation Plans, Policies and Procedures, Proposals, and Training Materials

111. The County, Sheriff, or CCCL Judges will submit their plans, policies, procedures, proposals, or materials required by this Consent Decree to the Monitor for consultation, review, and, in specified cases, approval. The Monitor will provide Defendants any written comments on or objections to any submissions by Defendants within 30 days of receipt from Defendants. Defendants will respond to any comments from the Monitor within 30 days of receipt from the Monitor. Defendants' response will explain Defendants' position and include any

46

proposed amendments as necessary to address the Monitor's concerns. Where specified, the Monitor must approve summission before it can be implemented.

112. All such submissions must be sent simultaneously to Class Counsel. Any response from Class Counsel must be sent simultaneously to Defendants. The Monitor may function as a liaison to secure Class Counsel's input and feedback on any submissions. The Monitor will permit all Parties to review and comment on any final plans, policies, procedures, or other materials required by this Consent Decree prior to implementation with sufficient time such that Defendants can modify their plans, policies, procedures, or other materials prior to the implementation deadline in light of input from Class Counsel.

113. The Parties and the Monitor may work collaboratively on developing and revising any materials related to this Consent Decree.

114. Any party is free to seek intervention by the Court in the event the parties and the Monitor are unable to resolve any disagreements about the implementation of any provision of this Consent Decree. If a party seeks intervention by the Court, the implementation timelines will be tolled while the Court undertakes review. Absent the objecting party's consent, implementation will not begin until the Court resolves the dispute.

### D. The Monitor's Compliance Reviews and Reports

115. The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree. Compliance with the requirements means that the County, CCCL Judges, and Sheriff: (a) have incorporated the requirements into policy and explicitly rescinded and eliminated any existing, contradictory policies; (b) have trained all relevant personnel as necessary to fulfill their responsibilities pursuant to the requirements; and (c) are carrying out the requirements of the Consent Decree in actual practice.

116. No later than 60 days after appointment of the Monitor, the Monitor will develop a plan ("Monitoring Plan") for conducting compliance reviews and audits for the first year of implementation, and share it with the parties for review and comment. The Parties will have 30 days to provide comments or objections. In subsequent years, the Monitor will, in coordination with the Parties, prepare an annual Monitoring Plan for each year the Monitor is in place. The Monitoring Plan will be made public, including by being posted on the Website described in Section 90, will clearly delineate the requirements of this Consent Decree to be assessed for compliance, will identify the proposed methodology for auditing compliance, and will create a schedule with target dates for conducting reviews or audits of applicable requirements.

117. Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:

a.   A description of the work conducted by the Monitor during the reporting period;

b.   A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;

c.   The methodology and specific findings for each compliance review conducted;

d.   For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

e.   A projection of the work to be completed during the upcoming reporting period;

f.   A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;

g.   Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;

h.   For each requirement of the Consent Decree that is assessed, whether the requirement is producing the desired outcomes of:

     i.   Maximizing pretrial liberty;
     ii.  Maximizing court appearance; and
     iii. Maximizing public safety.

i.   The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

118. The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

119. The Monitor will be available for the accountability meetings described in Sections 91–92 of the Consent Decree to speak with community members regarding its findings and to learn what community input is being shared during such meetings.

120. The Monitor will publish a comprehensive assessment after 2 years, 5 years, and 7 years have elapsed since the entry of this Consent Decree. The comprehensive assessment will report whether and to what extent the County, CCCL Judges, and Sheriff are in compliance with this Consent Decree, whether the outcomes intended by this Consent Decree are being achieved, and whether any modifications to this Consent Decree are necessary in light of changed circumstances or unanticipated impact (or lack of impact) of the requirements. The comprehensive assessment must be filed with the Court and is public.

    a. This comprehensive assessment will also address the areas of greatest progress and achievement, and the requirements that appear to have contributed to these achievements, as well as areas of greatest concern, including strategies for accelerating full and effective compliance.

    b. Based upon this comprehensive assessment, the Monitor will recommend any modifications to this Consent Decree necessary to achieve and sustain intended results. To the extent the Parties agree with the Monitor's recommendations, the Parties will move the Court to modify this Consent Decree accordingly. In the event of a disagreement that the Monitor is unable to resolve, the Parties will submit their positions to the Court for resolution. Nothing in this Consent Decree will empower the Monitor to unilaterally modify any term of this Consent Decree.

121. The Monitor may, at any time, prepare written reports on any issue or set of issues covered by the Consent Decree following the same process as applicable to the reports described in Sections 115–119.

122. All reports must be filed with the Court on the public docket and made available on the public website described in Section 90 of this Consent Decree.

123. The Monitor may raise any issue related to this Consent Decree with the Court at any time.

124. The Monitor must maintain regular contact with all parties, including conducting quarterly meetings with each of Class Counsel and representatives of the County, the Sheriff, and the CCCL Judges about implementation of this Consent Decree.

### E. Technical Assistance and Recommendations by the Monitor

128. The Monitor may, at the request of the County, CCCL Judges, Class Counsel, or on its own initiative, provide technical assistance, to the extent the Monitor has relevant skills and experience, and may make recommendations to the Parties regarding measures that the Monitor believes are likely to facilitate timely, full, and effective compliance with this Consent Decree and achievement of its underlying objectives. Such assistance may include recommending consultants and experts to assist the County, Sheriff, CCCL Judges, and any other entity or agency involved in the implementation of this Consent Decree; suggestions to change, modify, or amend a provision of this Consent Decree; to develop or amend policy; to provide additional training in any area related to this Consent Decree; or to modify the content or form of existing training.

### F.   Access and Confidentiality

129. The Court Monitor will have access to all staff, data, information, documents, and facilities reasonably necessary to conduct its work, all of which must be made accessible to the Monitor by the County, the CCCL Judges, and the Sheriff.

130. The Monitor will provide the County, CCCL Judges, and Sheriff with reasonable notice of a request for documents or data.

131. The Monitor will maintain all confidential or non-public information provided by the County, Sheriff, and CCCL Judges in a confidential manner in keeping with all applicable state and Federal laws. However, the Monitor may negotiate continued use of the information and data for non-profit and/or research purposes on its own behalf if consistent with federal and state law. Defendants will approve lawful continued use absent good cause as determined by the Court.

132. Information obtained from the County, CCCL Judges, Sheriff, or other county agency will be the property of the County and copies of all completed or partially completed information, programs, inventions, software, firmware, designs, documentation or data developed, created, or invented under this Consent Decree must be delivered to the County, CCCL Judges, Sheriff, or other county agency upon conclusion of the Monitor's work, including upon resignation or termination, if applicable. Class Counsel must have access to all of the above, subject to reasonable procedures relating to confidentiality and nondisclosure.

133. The Monitor may not copy, recreate, or use any proprietary information or documents obtained in connection with this Consent Decree other than for the performance of this Consent Decree, subject to negotiated continued use for non-profit or research purposes.

## XV.   CONTINUING JURISDICTION

### A.   Continuing Jurisdiction & Enforcement

134. The Parties will comply with the terms of this Consent Decree. The Court retains jurisdiction to enforce this Consent Decree.

135. This Court will retain jurisdiction over this matter and allow the Parties to this Consent Decree to apply to the Court for any further order that may be necessary to construe, carry out, enforce compliance, and/or resolve any dispute regarding the terms or conditions of this Consent Decree.

136. Nothing in this Consent Decree may be construed to limit the equitable powers of the Court to modify these terms upon a showing of good cause by any party.

### B.   Process for Seeking Modification

137. The Court retains jurisdiction to oversee and enforce compliance with this Consent Decree and to require modifications for good cause shown in its equitable discretion. Either party may request modification of any aspect of this Consent Decree, provided that the parties confer prior to the request and make a good-faith effort to come to an agreement. The parties must also notify the Monitor at least 21 days prior to any such request, and the Monitor will provide a recommendation to the Court not later than seven (7) days after the filing of such a request by a party. The parties may jointly agree to modify or amend this Consent Decree. Such joint modifications and amendments will be encouraged when the parties agree, or when the Monitor's review demonstrates that an alternative policy would better further the goals of the Consent Decree, which include promoting the government's compelling interests in pretrial liberty, court appearance, and public safety. At all times, Defendants will bear the burden of demonstrating by a preponderance of the evidence full and effective compliance with this Consent Decree.

### C.  Procedures in the Event of Noncompliance

138. In the event any of the Defendants is deemed by the Monitor to be not in compliance with any term of the Consent Decree, the Parties must attempt to identify the source of any problems inhibiting compliance and create a plan and timeline for the County to achieve compliance. If the parties are unable to resolve the issue, they may submit the dispute to the Court for resolution.

139. In the event Class Counsel has a reasonable belief that any of the Defendants is not in compliance with the terms of the Consent Decree, Class Counsel must notify the Monitor and Defendants and confer in a good-faith attempt to resolve the issue. Only if the Parties are unable to achieve a resolution may they submit the dispute to the Court.

### D.  Force Majeure

140. The Parties recognize that the possibility exists that circumstances outside the reasonable control of the County could delay compliance with the timetables contained in this Consent Decree. Such situations include, but are not limited to, unforeseen catastrophic environmental events, such as Hurricane Ike in 2008 and Hurricane Harvey in 2017, both of which required an immediate and time-consuming response by Harris County government and both of which caused severe interruptions in the operations of the County's court system. Should a delay occur due to such circumstances, any resulting failure to meet the timetables set forth herein will not constitute a failure to comply with the terms of this Consent Decree, and any deadlines occurring within one hundred twenty (120) days of the termination of the delay will be extended one day for each day of the delay, or more if the Parties so agree.

## XVI.  EFFECTIVE DATE

This Consent Decree will become effective upon entry by the Court.

Ordered this ___ day of _____, 2019.


_____
Hon. Lee H. Rosenthal District Judge