**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |

## SUMMARY EXPERT REPORT OF DR. STEPHEN DEMUTH

### I.     Introduction

1.  I have reviewed the expert reports I submitted to the Court throughout this lawsuit and incorporate their analysis in this Summary Report. For the Court's convenience, I have attached to this Report as Exhibits my Rebuttal Report dated March 3, 2017 (which summarized my initial Expert Report and two Supplemental Reports), Dkt. 207-1 (Exhibit 1); my Second Rebuttal Report, dated March 17, 2017, Dkt. 242 (Exhibit 2); the report I filed in the Fifth Circuit Court of Appeals and subsequently with this Court, analyzing the County and Judges' claims that bond-forfeiture rates dramatically increased while the Court's first preliminary injunction was in effect, dated May 14, 2018, Dkt. 402-4 (Exhibit 3); and the report I filed in this Court supplementing the May 2018 report and also analyzing the effects of the preliminary injunction order on the misdemeanor bail system in Harris County, dated June 11, 2018, Dkt. 402-1 (Exhibit 4).

2.  These reports accurately reflect my analysis of the Harris County bail system as it existed before Plaintiffs filed this lawsuit and while this Court's first preliminary injunction order was in effect.

3.  I have been asked in this Summary Report (a) to highlight a few of the most important findings from the May 2018 and June 2018 reports; and (b) to assess the reasonableness of certain provisions of the Consent Decree in light of my analysis of the Harris County misdemeanor bail system throughout this entire case, the policies and practices in place while the Court's first injunction was in effect, and my expertise in pretrial systems and best practices.

4.  It is my opinion that the Consent Decree is well-crafted to remedy past harms and to prevent a reversion to the types of policies and practices that caused and perpetuated those harms for decades prior to this lawsuit. Moreover, the Consent Decree comports with the findings of rigorous research in the pretrial field about the types of policies and practices that are most likely to promote the legitimate goals of any bail system: to maximize pretrial liberty, maximize court appearance, and maximize community safety.

5.   It is also my opinion that ongoing evaluation of the new practices by the Court Monitor, especially during the implementation phase will be crucial to ensuring that the Consent Decree succeeds according to those metrics. The importance of the data, transparency, training, and oversight provisions of the Consent Decree cannot be overstated.

## II.      Background and Qualifications

6.   My name is Stephen Demuth. I have been engaged as an expert consultant and witness by the plaintiffs in this case.

7.   I hold a Ph.D. in Sociology with a Major in Criminology and a Minor in Methods/Statistics from The Pennsylvania State University.

8.   I am a tenured Associate Professor of Sociology at Bowling Green State University in Bowling Green, Ohio.

9.   I am performing this analysis *pro bono*. A true and correct copy of my Curriculum Vitae ("CV") further detailing my educational and professional background is included as Appendix 1. Lists of publications and cases in which I have served as an expert are included in my CV on pages 1 and 8, respectively.

10. In reaching the opinions expressed in this document, I have relied on the training, experience, knowledge, and expertise I have gained throughout my career as a sociologist and criminologist.  The documents and materials I have considered are cited herein and/or included in Appendix 2.

## III.     Review of Certain Findings from May 2018 and June 2018 Reports

11. These two reports provided information to the Court about the system that existed while the Court's first preliminary injunction was in effect. The analysis is reiterated here because previous efforts to undermine the Court's preliminary injunction help explain why some of the provisions of the Consent Decree are necessary to remedy past harms and, importantly, to protect against a reversion to the prior practices.

12. In May 2018, I was asked by the Plaintiffs to evaluate certain Defendants' claims that bond-forfeiture rates had dramatically increased since the Court's first preliminary injunction went into effect. I concluded that "the judges' bond-forfeiture statistics suggests that they are deliberately manipulating the system in an effort to produce a desired result: to suggest that people released on unsecured bonds supposedly evade justice." Ex. 3, Dkt. 402-4 ¶ 2. More specifically, I observed that "systemic patterns" in the data revealed "differential treatment by the Judges" of people released on surety bonds versus unsecured bonds, and that these deliberate policies were the primary cause of the elevated bond forfeiture rate for people released on unsecured bonds. *Id.* ¶ 9. Ultimately, I concluded that "[t]he judges' bond-forfeiture rates for people released on unsecured bonds are seriously inflated by their and the County's policy decisions and practices." *Id.* ¶ 23.

13. After reviewing the data, I observed the following:

    a. <u>People with higher "risk scores" (as determined by the County's assessment tool) were funneled into the group released pursuant to the injunction</u>: "[T]he FTA risk score for people released on unsecured bonds [pursuant to the injunction] was 53% higher than the score for people released on surety bonds and 36% higher than for people released on personal bonds." *Id.* ¶ 10.

    b. <u>People released pursuant to the injunction were not provided services or supports to help assure appearance</u>: "[O]nly 5.6% of people released on unsecured bonds were supervised by pretrial services and only 4.4% had additional non-financial conditions. In contrast, 67% of people released on personal bonds were supervised, and roughly 13% had additional non-financial conditions." *Id.* ¶ 11.

    c. "[P]eople are often released from jail in the middle of the night." *Id.* ¶ 12.

    d. <u>People released on unsecured or personal bonds were more likely to be required to appear more quickly after release</u>, sometimes within just 12 or 24 hours of the bond being approved, for a first appearance: "For people released on *unsecured or personal bonds* between June 7, 2017 and December 31, 2018, the median time between bond-approval and first-setting was *one day*. About 25% of people released on unsecured bond had less than 12 hours between the bond-approved time and first-setting time; 57% had less than 24 hours between the bond-approved time and first-setting time." *Id.* ¶ 13. In contrast, "[f]or people released on *cash or surety bonds* during this time period, the median time between bond-approval and first-setting was *five days*. Only 4% of cash releasees and 5% of surety releasees had less than 12 hours between bond-approved time and first-setting time; about 26% of cash and surety bond releases had less than 24 hours between bond-approved time and first-setting time." *Id.* ¶ 14.

    e. <u>People released pursuant to the injunction were required to appear in court more frequently</u>: Moreover, "people released on unsecured bonds are scheduled, on average, for more court settings than are people released on surety bonds, and [] those court settings are scheduled closer in time for people released on unsecured bonds as compared to surety bonds." *Id.* ¶ 15.

    f. <u>The Judges' bond-forfeiture policies varied widely</u>: I reviewed the bond-forfeiture rates for each judge and found that the "rates vary dramatically among the various judges. For example, I observed bond-forfeiture rates in certain courts that are two or three times greater than the bond-forfeiture rates in other courts." *Id.* ¶ 17. A "possible explanation for differences in forfeiture rates is that judges have different practices for setting court dates or use different standards in deciding when to forfeit bonds." *Id.* ¶ 18.

    g. <u>Misdemeanor arrestees released on unsecured and personal bonds were not "evading justice"</u>: I conducted preliminary analysis to determine whether people

3

released pursuant to the injunction were "evading justice" and concluded that they were not. I examined "cases in which people were released on unsecured bonds and surety bonds between June 7 and August 15, 2017 and did not appear for their first two court dates. My preliminary analysis shows that about 2/3 of people released on unsecured bonds had returned to court and resolved their cases by January 31, 2018. (The data show that a similar percentage of people released on surety bonds appeared by January 31, 2018.)." *Id.* ¶ 20. I concluded that this "data analysis is consistent with the research literature, which shows that only a very small portion of FTAs are 'willful,' meaning that the person is actively evading justice. More likely explanations are that people lacked transportation or childcare, could not take off work, were confused about the right court date, were told to go to the wrong courtroom or courthouse, or were afraid to appear because of possible outstanding warrants caused by an earlier nonappearance for one of the above reasons." *Id.* ¶ 21.

h. In summary: "What these findings mean is that the County and Judges are releasing the people most in need of services without any services or support and often in the middle of the night within hours of their first hearing before a County Criminal Court at Law Judge. People released on unsecured and personal bonds have considerably less time after release until their first court date than people released on surety or cash bonds. Moreover, the County and the Judges have chosen not to require additional non-financial conditions designed to reduce nonappearance for precisely the category of arrestees that their own risk assessment tool suggests should receive those conditions. On top of all that, the Judges[] apparently have a policy or practice of treating people released on surety bonds much more leniently than they treat people released on unsecured bonds with respect to bond forfeiture and appearance. Each of these factors on its own makes it much more likely that a person will miss a court date. Together, they make appearance extremely difficult. As such, comparisons made by the Judges and the County between the forfeiture rates of unsecured and surety bonds are dubious, especially given that the data is replete with errors suggesting flaws in its integrity." *Id.* ¶ 16.

14. In June 2018, I prepared a report that supplemented the report I produced in May 2018. *See* Ex. 4, Dkt. 402-1. In that report:

a. I compared the bail system Plaintiffs challenged to the bail system that existed while the preliminary injunction was in effect along certain metrics, including: the number of misdemeanor arrestees released prior to disposition, *id.* ¶¶ 1–3; case outcomes for people released on different bond types, *id.* ¶¶ 4–10; and length of time to disposition, *id.* ¶¶ 11–15.

b. I conducted further analysis on Defendants' claims that people released on unsecured and personal bonds were evading justice by evaluating the percentage of cases released on various bond types since June 7, 2017, that were resolved as of April 30, 2018, *id.* ¶¶ 16–22; the effects of certain Defendants' policies on appearance rates, *id.* ¶¶ 23–30; and the Judges' widely varying bond-forfeiture policies, *id.* ¶¶ 31–37.

c. I observed that "bond forfeiture" is not a useful proxy for tracking "failures to appear," *id.* ¶¶ 38–46, and recommended that the County and Judges develop an "objective and standardized metric for nonappearance" to "allow a comparison of non-appearance rates by bond type" and to "make the system more transparent," *id.* ¶ 43.

d. I offered additional recommendations for improving rates of court appearance, including eliminating the next-day-setting policy, implementing a text-message reminder system, developing a process for accurately tracking and reporting failures to appear, and tracking and comparing pretrial decisions and case outcomes in the judges' courts, *id.* ¶¶ 51–55.

15. The key findings from my June 2018 report are summarized below:

a. <u>Pretrial liberty increased under the injunction:</u> Many more misdemeanor arrestees were released while the first preliminary injunction was in effect than prior to Plaintiffs' lawsuit, and people who were released spent much less time in jail. Specifically, "Between June 7, 2017 and April 30, 2018 . . . 92 percent of misdemeanor cases were released before disposition," and the releases occurred typically within 24 hours of arrest. *Id.* ¶ 3 & n.1–2. Before Plaintiffs sued, only about 66 percent of cases were released after arrest, and those releases often occurred days or weeks after arrest. *Id.* ¶ 2.

b. <u>Case outcomes for the poorest arrestees improved under the injunction:</u> I compared people detained at disposition pre-injunction to people released pursuant to the preliminary injunction order and found that the rate of guilty pleas decreased from 81% to 57% of cases, and that the dismissal rate increased from 16% to 38%. *Id.* ¶ 8; *see id.* n.5 ("Although not perfectly comparable, it is not unreasonable to assume that most unsecured bond cases would have been detained at disposition pre-injunction because people released on unsecured bond post-injunction are people who cannot afford to pay the secured money bail amount required for release, as were the vast majority of people detained at disposition pre-injunction.").

c. <u>Overall, dismissals increased and convictions decreased:</u> Because "a much greater proportion of cases" were released pre-disposition under the Court's injunction order, "a much greater proportion of all cases post-injunction [] avoided conviction: 52 percent, as compared to 41 percent pre-injunction. And, a much greater proportion of all cases are dismissed post-injunction: 46 percent, as compared to 33 percent pre-injunction." *Id.* ¶ 9. "These findings support what other research shows, which is that people who are released after arrest have better case outcomes: they are less likely to be convicted primarily because they are less likely to plead guilty." *Id.* ¶ 10.

5

d. <u>Defendants' "evading justice" claim has no merit:</u> To determine whether people released pursuant to the injunction were "evading justice," I analyzed the percent of cases filed in June 2017 that were resolved as of April 30, 2018, and concluded that "a slightly greater proportion of people released on unsecured or personal bonds in June 2017 had resolved their cases as of April 30, 2018, as compared to people released on surety or cash bonds that same month." *Id.* ¶¶ 18–20.

e. <u>The next-day-setting policy made it more difficult for people to appear in court:</u> The Judges' next-day-setting policy "disproportionately affect[ed] people released on unsecured bonds," *id.* ¶ 26, people who are "by definition, resource-constrained," *id.* ¶ 27. "My analysis also shows that this group of people, on average and as compared to people released on other bond types, pose a greater risk of not appearing in court absent interventions like text-message reminders and transportation assistance. [] The next-day-setting policy adds yet another *obstacle* to court appearance for a group of people who should be receiving *more support* than the average arrestee to be successful in making court appearances." *Id.* ¶ 27.

f. <u>Bond-forfeiture rates among the 16 judges varied widely,</u> which suggested that the judges all had their own policies and criteria for deciding whether to forfeit a bond or excuse an instance of nonappearance. *Id.* ¶ 32.

g. <u>Unreliable appearance data:</u> The County and Judges did not reliably track instances of nonappearance. *Id.* ¶ 38.

h. <u>The County and Judges set arrestees up to fail.</u> "Based on my experience and my evaluation of the data and the representations of the Defendants, Harris County and the Judges do not seem to understand that the goal of a pretrial system is to mitigate risks of nonappearance so that the maximum number of presumptively innocent people can be released prior to trial. The County should be developing systems and procedures that help 'riskier' arrestees be successful on release.  Instead, their practices punish people who are more likely to have difficulty getting to court. There is no dispute that people released on unsecured bonds in Harris County are more likely, on average, to not appear absent any services or supervision, based on data from the County's pretrial assessment tool.  That means that the County should be providing the kind of supervision and court reminders necessary to assist these individuals. Instead the County is releasing them without supervision or reminders and erecting barriers to their success (e.g., requiring them to appear in court the day after being released from the jail, often in the middle of the night)." ¶ 46.

i. <u>I recommended several policy changes to mitigate nonappearance, including:</u> two-way text messaging, eliminating the next-day-setting policy, reliably tracking court settings and appearance rates and minimizing arrest warrants for nonappearance, ongoing data and feedback to judges about pretrial decisions in their courtrooms, and inter-agency development of a set of policies to maximize liberty, maximize court appearance, and mitigate risk. I stated, and firmly believe, that "[h]igh forfeiture rates represent a challenge to be overcome through creative systemic

solutions that mitigate risk and increase appearance, not a failure for which there is no remedy other than detention." ¶ 55.

## IV.    Analysis of the Consent Decree

16. I was asked by the Plaintiffs to evaluate the Consent Decree in light of my prior analysis of the Harris County misdemeanor bail system, Defendants' policies and practices while the first injunction was in effect, and my expertise in pretrial systems and pretrial best practices.

17. Considering my knowledge of the Harris County system and research in the field, it is my expert opinion that the Consent Decree in this case is closely tailored to remedy the systemic problems in the Harris County bail system that the Plaintiffs challenged and to prevent a reversion to the old system, and that it reflects best practices. I believe the Consent Decree will promote pretrial liberty, court appearance, and community safety, and that it will do so far better than the system that existed when Plaintiffs filed this lawsuit.

18. **Section 17(f) and 17(m):** These provisions provide clear definitions of "failure to appear" and "nonappearance." It is crucial to clearly define "failure to appear" and "nonappearance." For years, the Harris County system has not clearly defined, directly measured, or reliably tracked "failure to appear" in court (FTA). Instead, the county identified FTAs indirectly using "bond forfeiture" as a proxy indicator. As a result, it was difficult to determine when FTAs occurred, under what circumstances, and to evaluate the government's effectiveness in achieving one of its major goals: maximizing court appearance. For example, I found that despite having comparable caseloads, judges had vastly different rates of bond forfeiture suggesting that judges had different definitions of what circumstances necessitated a bond forfeiture. *See* Dkt. 402-4 ¶¶ 17–18; Dkt. 402-1, ¶¶ 31–37. Without a clear definition of what constitutes an FTA, it is not possible to reliably measure FTA or track FTA within or between cases, across judges, or over time.

The Consent Decree clearly defines "failure to appear" and a related concept, "nonappearance." We know from past empirical research that most instances of nonappearance in court are not "willful," *i.e.*, they are not an attempt to evade justice (Phillips 2012). Some common reasons people arrive late to court, or fail to appear in court, include: forgetting the court date, time, or location, misunderstanding directions from government officials about where and when to appear, inability to get time off work, lack of transportation, and inability to find or afford child care (Cooke et al. 2018). The Consent Decree provides concise definitions differentiating nonappearance and failure to appear, namely that a late appearance to court within a defined period of time does not indicate nonappearance, and that nonappearance does not necessarily mean a willful failure to appear. The definitions are clear enough that nonappearance and failure to appear can be measured and tracked consistently. Importantly, the definitions are not unnecessarily punitive or unpredictable: they take into account the life challenges and logistical hurdles facing people in the Harris County misdemeanor system who genuinely want to appear in court to handle their cases.

19. **Section 30 (Rule 9):** These provisions eliminate the secured bail schedule and provide new post-arrest policies and procedures for misdemeanor arrestees. Section 30 (Rule 9) requires the

immediate release of the vast majority of misdemeanor arrestees promptly after arrest, without requiring an up-front payment:

a. Making release and detention decisions on the basis of factors *other* than access to money, and releasing the vast majority of misdemeanor arrestees very quickly after arrest, will promote pretrial liberty, court appearance, and community safety better than making arbitrary release and detention decisions based on how much money a person can access after arrest and detaining a majority of arrestees until after they appear before a judge. Research shows that releasing as many people as possible as quickly as possible improves overall court appearance and community safety, primarily because it avoids unnecessarily disrupting people's lives through lengthy and traumatic jail stays.

Arrest and detention are highly disruptive and can quickly snowball into negative consequences that "punish" detainees and their families, hurt their future life chances and the stability of their communities, and create the conditions for future nonappearance and criminal activity. The longer a person is detained pretrial before being released (if they are not detained throughout the entire pretrial period), the more likely they are to later miss court and commit new crimes. Demonstrable harm from detention can occur as quickly as within the first 24 to 48 hours. Greater harm occurs more quickly for the least serious offenders (Lowenkamp et al. 2013). Not only does detention prevent people from effectively fighting their cases, but lives can unravel very quickly after arrest. Minimizing detention and getting out quickly allows people to avoid the worst consequences to health, well-being, and family (Irwin 2013).

There is a large body of empirical research that demonstrates convincingly that pretrial detention has severe consequences for the detained person and for the community, including (1) increasing the likelihood of a defendant receiving a greater punishment, including increased court fees, increased likelihood of receiving a sentence of incarceration, and increased sentence length; (2) increasing the likelihood of guilty pleas and wrongful convictions; (3) increasing the likelihood of offending while released pretrial and after conviction; (4) decreasing prospects for future employment in the formal labor market; and (5) increasing the cost of jailing individuals both pretrial and after conviction (Dobbie et al. 2018; Gupta et al. 2016; Heaton et al. 2017; Leslie and Pope 2017; Lowenkamp et al. 2013; Lum et al. 2017; Phillips 2012; Stevenson 2018).

For many years, Harris County has detained many people arrested for relatively low-level crimes for substantial periods of time only because they could not afford to pay money bail. It is important to remember that around 40% of adults in the U.S. have insufficient funds to cover an unexpected $400 expense without selling something or borrowing money (Board of Governors of the Federal Reserve System 2018). Stevenson (2018) found that 40% of Philadelphia defendants with bail set at $5000, needing only to secure a $500 deposit, remained detained pretrial. The pretrial procedures outlined in the Consent Decree provide a process in which

money is less of an obstacle to release and there is a clear goal to minimize unnecessary time spent in detention.

b. Section 30 does not contemplate the imposition of conditions of release prior to release for most misdemeanor arrestees, although it allows a judge to impose conditions at subsequent hearings. This policy is consistent with research showing that pretrial outcomes are better if conditions are imposed sparingly. The best available empirical research concludes that people should be released pretrial with as few conditions as possible. "Over-conditioning" is expensive, burdensome for arrestees who are released, and actually increases the chances arrestees will be unable to satisfy them (Stevenson and Mayson 2017). But most importantly, there is little evidence that the common conditions required improve rates of appearance in court or reduce rates of rearrest.

For example, there is little evidence that meeting with supervising officers has any effect on court appearance or rearrest. Although there is more research examining the efficacy of supervision in the probation and parole context, including many randomized controlled trials ("RCT") (*e.g.*, Barnes et al. 2010; Turner et al. 1992), there are also numerous studies in the pretrial context (Austin et al. 1985; Goldkamp and White 2006; Lowenkamp and VanNostrand 2013). The overall conclusion is that supervision meetings provide only costs and no benefits. That is, the evidence suggests that supervision does not reduce FTA or rearrest, but does increase costs and the likelihood of "technical" violations of conditions.

Similarly, multiple RCT studies find that drug testing is ineffective for reducing nonappearance and rearrest (e.g., Goldkamp and Jones 1992; Toborg et al. 1989; VanNostrand et al. 2011). The best available evidence suggests that it should not be used as a common condition of pretrial release.

Lastly, we know little about the efficacy of electronic monitoring ("EM") in the pretrial context. While there is some evidence that EM can be an effective alternative to incarceration in the probation and parole context, the social, psychological, and economic burdens it imposes on the releasee and society make it largely unsuitable for pretrial release (Bales et al. 2010; Payne 2014).

The Consent Decree requires an evidence-based approach for guiding decision makers to choose the least restrictive conditions of release reasonably necessary to achieve the government's interests in maximizing court appearance, public safety, and liberty. Arrestees have the ability with the assistance of counsel to challenge their conditions of release; judges must state on the record their reasons for any conditions; and arrestees have the opportunity to have their conditions reviewed by another judge if still unsatisfied. In my expert opinion, these procedures are likely to promote court appearance, public safety, and pretrial liberty.

c. Section 30 identifies narrow categories of arrestees who may be required to see a judge before being released. The categories of arrestees who may be detained until

9

seeing a judge for individualized determinations of conditions of release appear based on officials' reasonable exercise of discretion. Under the Consent Decree, while most people arrested on a misdemeanor charge will be released quickly on a personal bond with a small unsecured bail amount, there are several specific "carve-out" categories of arrestees who may be detained longer in order to receive an individualized hearing with a judge. The carve-out categories are based on objective criteria, either a charge or past behavior, that might reasonably raise a concern that further review is necessary or that a person might benefit from individualized conditions. This procedure represents an improvement from the prior system in Harris County in which the only criteria for determining whether a person saw a judge was whether they could pay a predetermined amount of money printed in the bail schedule. Under the Consent Decree, there is a systematic process available to review the kinds of cases that tend to worry judges the most in terms of public safety and court appearance. Furthermore, consistent with evidence-based practices, the new system that will be implemented pursuant to the Consent Decree will be routinely evaluated to see whether the carve-out categories are appropriate or need to be modified.

20. **Sections 46-48**: These provisions require the County and Judges to update the forms used to provide notice to arrestees of when and where they must appear for court settings. An updated, clear notice form that reflects evidence and research regarding the most effective layout and content for promoting court appearance can be expected to improve court appearance at a relatively low cost. We often assume that people behave in certain ways because they make an active choice based on weighing costs and benefits. The usual policy response is guided by this assumption of rational choice behavior and in the criminal justice environment is often based on a deterrence approach that calls for greater enforcement or punishment. But, a growing body of behavioral and cognitive science research suggests that we often act in ways that are not based on active choice, but rather in predictable, "automatic" ways without fully understanding or considering all the options. Luckily, it turns out that behavior can be modified to some extent quite inexpensively and without resorting to more extreme measures.

Cooke et al. (2018) used an experimental design to test whether simply redesigning an existing court summons form using what we know from cognitive and behavioral science resulted in lower levels of FTA in New York City. With only three changes to the form, they reduced FTA rates by 13%. First, they made the title of the form clearer by describing its purpose and required action. Second, they moved the date, time, and location of the hearing to the top of the form. Third, they clearly explained the consequences of missing the hearing. At very little cost, the design change improved appearance, reduced unnecessary warrants, and saved considerable public funds. The Consent Decree outlines a process by which Harris County will revise its written forms used to notify defendants of scheduled court dates using these evidence-based best practices, which I believe will promote court appearance in Harris County

21. **Sections 49-50:** These provisions require the County to implement a text-message reminder system. Text message reminders are another important, cost-effective way to promote court appearance. In addition to simple design changes to court notification forms, we have long known that court reminders are effective for reducing nonappearance. Reminders help to overcome

many of the reasons that research shows people fail to appear in court, including forgetting, misunderstanding that they need to go to court even for more minor offenses, overweighing the short-term hassle of appearance, and underestimating the long-term consequences of nonappearance. The most effective messaging includes information about the consequences of not showing up, what to expect in court, and plan-making information (Cooke et al. 2018).

For example, Bornstein et al. (2013) found that written reminders to appear in court and about the consequences of nonappearance reduced FTA rates substantially. They also showed that, even though defendants who had more confidence in and felt more fairly treated by the criminal justice system were more likely to appear in court, the effectiveness of reminders was greatest for people with the lowest levels of trust in the courts. Nice (2006) showed that phone call reminders significantly reduced nonappearance in court. More recently, Cooke et al. (2018) used an experimental design to test the effectiveness of generic, one-way text message reminders to reduce FTA rates and found that the most effective reminder messaging reduced FTAs by 26%. This was in addition to the improvements described above resulting from a redesign of the summons form sent to defendants (which yielded an additional 13% reduction in FTAs). The use of text message reminders in Harris County, per the Consent Decree, represents a relatively easy and cost effective strategy to reduce FTA rates pretrial. Furthermore, two-way text message reminders in which people interact have been found to be even more successful than one-way reminders in obtaining adherence because two-way reminders can be used to confirm the receipt of messages and to enable communications to identify and resolve problems (see, for example, a meta-analysis showing the benefits of two-way text message reminders versus one-way reminders in the context of getting people to take their medication as prescribed, Wald et al. 2015).

22. **Sections 51-56**: These provisions require the County to study the causes of nonappearance in Harris County. A jurisdiction-based study of the causes of nonappearance is a worthy investment of time and money to ensure that the interventions the County develops are targeted to the specific needs of the misdemeanor population in Harris County. It is clear from past research (as described above) that the overwhelming majority of FTAs are not willful attempts to evade justice. The causes of nonappearance are various, often mundane, and vary from jurisdiction to jurisdiction (Rosenbaum et al. 2012; Tomkins et al. 2012). While some of the common causes are well-known and listed in the Consent Decree, what is often unknown is the relative importance of these common causes for explaining nonappearance in a particular jurisdiction. There are also often unique causes in particular jurisdictions. For example, is there something about the way a jurisdiction schedules hearings (e.g., time, place, notification) that presents challenges to court appearance? Is availability of transportation a particular problem in the county? Is language a barrier to effective communication with the court? Every jurisdiction is unique in its strengths, weaknesses, and needs.

A helpful way of thinking about the problem is to reframe nonappearance as an "access-to-justice" issue in which the goal is to find practical systemic solutions to reduce nonappearance based on the empirical evidence (Arizona Supreme Court 2016, p. 20-22; Bernal 2017). Furthermore, investments in systems and logistics to help people get to court are preferable to criminalizing nonappearance not only because investments improve appearance rates, but because they can increase defendants' trust and confidence in the system (Bornstein et al. 2011) and reduce

human and economic costs overall (e.g., Cooke 2018; Rosenbaum et al. 2012) as compared to unnecessary pretrial jailing.

23. **Sections 57-72**: These provisions set forth uniform policies for court appearance and the issuance of arrest warrants for nonappearance.

    a.  Uniform appearance policies and warrant-issuance policies are important to court appearance, the integrity of the court system, and public trust in the government. The implementation of transparent, uniform, and predictable appearance and warrant-issuance policies is important for at least two reasons, improving system fairness and improving system monitoring, both of which contribute to better court appearance outcomes. First, people are more likely to accept unfavorable outcomes and follow unwanted directives when they believe the process to be procedurally fair (see for review, MacCoun 2005). Prior research shows that increasing levels of institutional trust/confidence and perceptions of procedural justice improve court appearance rates (Bornstein et al. 2011). Furthermore, court interventions to improve perceptions of procedural justice have the greatest effects for people with the lowest levels of trust (Bornstein et al. 2011). Clear policies that are uniform across all judges are likely to increase perceptions of fairness in part because they reduce confusion and increase predictability for defendants. Second, uniform policies enable more accurate monitoring and evaluation of the system. When different judges use different rules to define "failure-to-appear" or apply different standards for the issuance of warrants, it becomes impossible to determine whether differences in court appearance rates are caused by the behavior of defendants or judges, or some other factor altogether. Those variations also make it difficult to assess the effectiveness of interventions to improve court appearance.

       Under the County's prior pretrial system, FTA rates were quite different across judges despite cases being assigned randomly to judges. The only possible explanation was that judicial "personality" played a role in outcomes. Not only will deciding on a common set of policies create more predictability for defendants, but it will also enable judges to assess their performance using a common "metric." Feedback is important so that judges know how their outcomes change over time, how they compare to other judges, and whether they differ based on interventions to improve appearance. If undesirable differences emerge despite the use of consistent practices, it is possible that interventions are not working as intended or that there are other contextual factors influencing outcomes. For example, different docket times might produce different appearance rates because of employment conflicts or lack of transportation.

    b.  In particular, Section 65 is notable. It requires the Judges to waive most court appearances upon request. The policy of waiving most court appearances upon request is likely to promote the integrity of the system and ease the burden on misdemeanor defendants, who often plead guilty to end the onerous requirement to repeatedly appear in court. It is well documented that in a lot of misdemeanor courts, "the process is the punishment" (Feeley 1979; Bernal 2017). Even for

people who have their charges dismissed, they often experience the burden of many hearings for which appearance is required, but ultimately unnecessary for the progress of their case. In fact, people can get so worn down by the sheer number of required court appearances that rather than seek justice, defend their innocence, and/or raise valid defenses, they end up pleading guilty to save time and money.

The reality is that many court hearings do not really require physical appearance by the defendant; nothing much happens. Asking people who are living in poverty to show up for unnecessary court appearances makes precarious lives more precarious: people have to find childcare, miss work, pay for gas or transportation, and make numerous other adjustments in their lives to get to court. Procedures, such as those provided for in the Consent Decree, that allow counsel to request that certain court appearances be waived will help to mitigate the coercive effect of numerous, unnecessary appearances by defendants, reduce the social and economic burden on defendants, and improve the fairness and efficiency of the court. This provision is consistent with policy changes in other jurisdictions that have recognized that there is little need for arrestees to physically appear at most court settings. For example, the Arizona Supreme Court (2016, p. 20-22) also suggests that jurisdictions consider using remote video and phone appearances as well as allowing people to demonstrate compliance through email instead of physical appearance.

24. **Sections 80-90:** These provisions set forth robust data collection and reporting requirements, as well as a framework for ensuring transparency relating to the implementation and monitoring of the Consent Decree:

    a.  Robust data collection relating to the new pretrial system and an easy process for accessing the data are crucial to implementing and monitoring the new policies and practices. All institutions (*e.g.*, universities, businesses, courts) have difficulty knowing how they're doing, whether they're functioning the way they imagine, whether they're making efficient and effective use of resources, or achieving their desired goals. In the case of Harris County, without robust data collection, there is no way to truly understand how the case process works, in particular, whether the desired reforms have had an effect on detention rates, case outcomes, appearance, or new criminal activity. Robust data collection supports and enables evidence-based practices that can help the county and its citizens to know how it's doing.

    b.  Another key to understanding and accountability is transparency. All stakeholders—both government officials and the general public—must have relatively easy access to the same data. While everyone might not always interpret the data in the same way, without equal access to the data, stakeholders cannot even have productive conversations about the system or the progress of proposed reforms. Unequal access to data can often leads to unproductive fights about the data itself, before anyone begins to discuss what the data means.

Another reason that public access to data is critical is that institutions that lack transparency, intentionally or not, often obscure what is happening, withhold important data, or make claims without evidence to support them because they can. In this case, the County argued that people were in jail because they wanted to be there, argued that no one in the jail was there because they were indigent, and argued that people released pursuant to the injunction were evading justice. All of these arguments were factually wrong, but it is my understanding that the County was able to make these claims because the County controlled the data and made it difficult for others, including the Plaintiffs, to access the data to test and challenge the County's assertions.

c.   It is crucial that members of the public, researchers, and journalists have access to common, robust data so that they can continually monitor the bail system and know how it's working. Not just because the County and its courts are government institutions, or because of any conditions of a Consent Decree, but because the institution will function better when all stakeholders can have open and honest discussions about how the system works and how it might work better. Even when different stakeholders disagree about the end goals, having the means to be able to debate those goals in an informed way helps to strengthen the institution and find opportunities for cooperation and understanding instead of creating distrust, anger, and cynicism.

d.   The data variables listed in Section 85 are the most important to conducting basic analyses of the system and its effects on poor people and people of color. One of the most important and illuminating findings in this case was that there was a two-track system of justice in Harris County, one for people who had the money to get out of jail after arrest and another for people who did not have money and could not get out of jail after arrest. Collecting and maintaining the listed data variables enables stakeholders to see whether the proposed reforms have changed outcomes for poor people and people of color and made the system more fair and just. Some stakeholders have concerns that reforms might hinder the efficient functioning of the courts or endanger public safety. Collecting the data variables helps to address these concerns as well. If there are disagreements about whether the system has been successfully reformed, many of these data variables can be used to help answer questions about why outcomes might be different for different groups and offer possible acceptable solutions. These variables will also provide opportunities for researchers and journalists to rigorously investigate a variety of questions relating to the system and how best to balance the three goals of maximizing liberty, appearance, and public safety.

e.   It is vital to goals of full implementation and effective monitoring to produce regular data analysis providing basic facts about the system, as required by sections 87 and 89. Not everyone has the skills or time to conduct their own data analyses. Data analysis reports will provide the public with basic statistics and information on a regular basis. In the same way that people who work in the system need data to make decisions, the public and other stakeholders need data in order to educate

14

themselves about how the system works. This information should not be proprietary: the bail system has an enormous effect on people's lives, not just for people who are arrested, but also for people in the community who experience its consequences secondhand and/or pay taxes to support it.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

_Stephen Demuth, Ph.D._

10-17-19
Date

15

# App. 1

Demuth 1

**CURRICULUM VITAE**

**STEPHEN DEMUTH**

**Spring 2019**

<u>**Office**</u>
234 Williams Hall
Department of Sociology
Bowling Green State University
Bowling Green, OH 43403
(419)372-7260/fax (419)372-8306
demuth@bgsu.edu

<u>**Education**</u>
| | | |
|---|---|---|
| 2000 | Ph.D. | The Pennsylvania State University, University Park, PA (Sociology, Major: Criminology, Minor: Methods/Statistics) |
| 1997 | M.A. | The Pennsylvania State University, University Park, PA (Sociology) |
| 1995 | B.S. | Virginia Tech, Blacksburg, VA (Sociology and Psychology)  Phi Beta Kappa, 1994 |

<u>**Employment**</u>
| | |
|---|---|
| 2010-2018 | Director of Graduate Studies, Sociology, Bowling Green State University |
| 2006-present | Associate Professor of Sociology, Bowling Green State University |
| 2000-2006 | Assistant Professor of Sociology, Bowling Green State University |

<u>**Publications**</u>
Gresham, Mitchell and Stephen Demuth. Forthcoming. "Who Owns a Handgun?: An Analysis of the Correlates of Handgun Ownership in Young Adulthood." *Crime and Delinquency*. https://doi.org/10.1177%2F0011128719847457

Finkeldey, Jessica G. and Stephen Demuth. Forthcoming. "Race/Ethnicity, Perceived Skin Color, and the Likelihood of Adult Arrest." *Race and Justice*. https://doi.org/10.1177%2F2153368719826269

Dennison, Christopher R. and Stephen Demuth. 2018. "The More You Have, The More You Lose: Criminal Justice Involvement, Ascribed Socioeconomic Status, and Achieved SES." *Social Problems* 65:191-210.

Doerner, Jill K. and Stephen Demuth. 2014. "Gender and Sentencing in the Federal Courts: Are Women Treated More Leniently?" *Criminal Justice Policy Review* 25:242-269.

Doerner, Jill K. and Stephen Demuth. 2010. "The Independent and Joint Effects of Race/Ethnicity, Gender, and Age on Sentencing Outcomes in U.S. Federal Courts." *Justice Quarterly* 27:1-27.

Demuth 2

McGovern, Virginia and Stephen Demuth. 2010. "Race/Ethnicity and Recidivism Risk: The Importance of Considering Nativity When Examining White-Black-Hispanic Differences." *International Journal of Sociological Research* 3:19-34.

McGovern, Virginia, Stephen Demuth, and Joseph E. Jacoby. 2009. "Racial and Ethnic Recidivism Risks: A Comparison of Postincarceration Rearrest, Reconviction, and Reincarceration Among White, Black, and Hispanic Releasees." *Prison Journal* 89:309-327.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2007. "Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization, and Jury Decision Making." *Criminology* 45:865-892.

Steffensmeier, Darrell and Stephen Demuth. 2006. "Does Gender Modify the Effects of Race-Ethnicity on Criminal Sanctioning? Sentences for Male and Female White, Black, and Hispanic Defendants." *Journal of Quantitative Criminology* 22:241-261.

Demuth, Stephen and Darrell Steffensmeier. 2004. "Ethnicity Effects on Sentence Outcomes in Felony Cases: Comparisons Among White, Black, and Hispanic Defendants." *Social Science Quarterly* 85:994-1011.

Holcomb, Jefferson E., Marian R. Williams, and Stephen Demuth. 2004. "White Female Victims and Death Penalty Disparity Research." *Justice Quarterly* 21:877-902.

Demuth, Stephen and Darrell Steffensmeier. 2004. "The Impact of Gender and Race-Ethnicity in the Pretrial Release Process." *Social Problems* 51: 222-242.

Demuth, Stephen. 2004. "Understanding the Delinquency and Social Relationships of Loners." *Youth and Society* 35:366-392.

Demuth, Stephen and Susan L. Brown. 2004. "Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence versus Parental Gender." *Journal of Research in Crime and Delinquency* 41:58-81.

Demuth, Stephen. 2003. "Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees." *Criminology* 41:873-908.

Demuth, Stephen. 2002. "The Effect of Citizenship Status on Sentencing Outcomes in Drug Cases." *Federal Sentencing Reporter* 14: 271-275.

Steffensmeier, Darrell and Stephen Demuth. 2001. "Ethnicity and Judges= Sentencing Decisions: Hispanic-Black-White Comparisons." *Criminology* 39:145-178.

Steffensmeier, Darrell and Stephen Demuth. 2000. "Ethnicity and Sentencing Outcomes in U.S. Federal Courts: Who is Punished More Harshly?" *American Sociological Review* 65:705-729.

Demuth 3

**Proposals Funded**

| | |
|---|---|
| Summer 2003 | "Understanding the Causes of Hispanic Delinquency: An Examination of Adolescent Social Life." FRC Faculty Mentoring and Enrichment Grant, Bowling Green State University, Stephen Demuth, principal investigator. $3,000. |
| Summer 2002 | "Citizenship, Race/Ethnicity, and Sentencing Outcomes in U.S. Federal Courts." FRC Research Incentive Grant, Bowling Green State University, Stephen Demuth, principal investigator. $5,500. |

**Proposals Submitted but not Funded**

| | |
|---|---|
| October 2018-September 2020 | "Assessing the Impact of Pretrial Detention on Pretrial Outcomes and Defendants' Stability." Laura and John Arnold Foundation, Jennifer E. Copp (PI) and Stephen Demuth (Co-PI). $232,354. |
| January 2003-December 2004 | "The Main and Interactive Effects of Citizenship Status and Race/Ethnicity on Sentencing Outcomes in U.S. Federal Courts." National Science Foundation, Stephen Demuth, principal investigator. $60,313. |
| July 2001-December 2002 | "Citizenship, Race/Ethnicity, and Sentencing Outcomes in U.S. Federal Courts." Bureau of Justice Statistics (Small Grants for Analysis of Data from Bureau of Justice Statistics, administered by American Statistical Association), Stephen Demuth, principal investigator. $37,320. |

**Presentations**

Demuth, Stephen. 2019. "Authors Meet Critics: *Punishing Poverty: How Bail and Pretrial Detention Fuel Inequalities in the Criminal Justice System.*" Comments at the annual meeting of the American Society of Criminology, San Francisco, CA.

Demuth, Stephen. 2019. "Punishing Poverty: The Problem with Money Bail." Invited speaker at Issue Day, Maumee Valley Country Day School, March 15, 2019.

Demuth, Stephen. 2019. "Opinions about the Efficacy of Money Bail." Presentation to the Task Force to Examine the Ohio Bail System, Supreme Court of Ohio, February 27, 2019.

Kimbrell, Catherine, Stephen Demuth, Jennifer Copp, and Christine S. Scott-Hayward. 2018. "Developing a Pretrial Research Network within the Criminology Community." Roundtable at the annual meeting of the American Society of Criminology, Atlanta, GA.

Demuth, Stephen. 2016. "Race/Ethnicity, Class, and Pretrial (Justice?)." Invited speaker at the annual summer conference of the Ohio Association of Community Action Agencies, Huron, OH.

Demuth, Stephen. 2015. "Racial and Ethnic Disparities in Bail and Pretrial Detention." Invited speaker at the Pretrial Racial Justice Initiative Roundtable on Racial and Ethnic Disparities in Bail and Pretrial Detention, American University School of Law, Washington, DC.

Demuth, Stephen. 2015. "Understanding Racial and Ethnic Disparities at the Pretrial Stage." Invited speaker for Pretrial Justice Institute webinar to NJ (and other states') practitioners on December 16, 2015.

Demuth 4

Demuth, Stephen and Jessica Finkeldey. 2013. "The Joint Effects of Race/Ethnicity, Class, and Gender on the Likelihood of Pretrial Detention in the Federal Courts." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Demuth, Stephen and Angela Kaufman. 2013. "Ethnicity, Social Class, and Pretrial Detention in Federal Drug Cases: Are Latino Citizens Being Treated Like an Alien Other?" Invited presentation at Center for Family and Demographic Research, Bowling Green State University.

Demuth, Stephen and Angela Kaufman. 2011. "Do Social Class Differences Explain Racial and Ethnic Disparities in Federal Pretrial Detention?" Paper presented at the annual meeting of the American Society of Criminology, Washington, DC.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2007. "Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-related Victimization, and Jury Decision-making." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Williams, Marian R., Stephen Demuth, and Jefferson E. Holcomb. 2006. "The Independent and Joint Effects of Victim Gender and Race on Death Penalty Outcomes: Revisiting the Baldus Study." Paper presented at the annual meeting of the Midwestern Criminal Justice Association, Chicago, IL.

Demuth, Stephen and Darrell Steffensmeier. 2004. "Racial and Ethnic Differences in Age-Crime Curves." Paper presented at the annual meeting of the American Society of Criminology, Nashville, TN.

Steffensmeier, Darrell, Stephen Demuth, and Jennifer Van Hook. 2004. "Hispanic-Black-White Differences in the Age Distribution of Homicide Offending: Methodological and Substantive Issues." Paper presented at the annual meeting of the Population Association of America, Boston, MA.

Demuth, Stephen. 2004. "An Examination of Hispanic-Black-White Differences in the Federal Pretrial Release Process." Paper presented at the annual meeting of the Academy of Criminal Justice Sciences, Las Vegas, NV.

Demuth, Stephen and Peggy C. Giordano. 2003. "Understanding the Causes of Hispanic Delinquency: An Examination of Adolescent Social Life." Paper presented at the annual meeting of the American Society of Criminology, Denver, CO.

Demuth, Stephen. 2002. "Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black, and White Felony Arrestees." Paper presented at the annual meeting of the American Society of Criminology, Chicago, IL.

Demuth, Stephen and Darrell Steffensmeier. 2002. "Modeling the Main and Interactive Effects of Gender and Race/Ethnicity on the Case Processing of Criminal Defendants in Large Urban Courts." Paper presented at the annual meeting of the American Society of Criminology, Chicago, IL.

Demuth 5

Demuth, Stephen. 2001. "The Effects of Citizenship and Race/Ethnicity on Sentencing Outcomes in Federal Courts." Paper presented at the annual meeting of the American Society of Criminology, Atlanta, GA.

Brown, Susan L. and Stephen Demuth. 2001. "Family Structure, Family Processes, and Adolescent Delinquency: The Significance of Parental Absence Versus Parental Gender." Paper presented at the Add Health Users Workshop, National Institutes of Health, Bethesda, MD.

Demuth, Stephen and Susan L. Brown. 2000. "Family Structure Effects on Adolescent Delinquency." Paper presented at the annual meeting of the American Society of Criminology, San Francisco, CA.

Demuth, Stephen. 1999. "Felony Defendant Processing in Large Urban Counties: Are Black, White, and Hispanic Defendants Processed Differently?" Paper presented at the annual meeting of the American Society of Criminology, Toronto, Canada.

Demuth, Stephen and Darrell Steffensmeier. 1998. "Ethnicity and Sentencing Outcomes in U.S. Federal Courts." Paper presented at the annual meeting of the American Society of Criminology, Washington, DC.

Demuth, Stephen. 1997. "Understanding the Peer-Delinquency Relationship: An Investigation of the Loner." Paper presented at the annual meeting of the American Society of Criminology, San Diego, CA.

**Teaching Experience**
Undergraduate: Corrections, Crime and Punishment, Criminology, Research Methods
Graduate: Research Methods, Sentencing, Social Responses to Crime, Crime Theory

**Research Interests and Specialization**
Race/Ethnicity, Crime, and the Criminal Justice System, Pretrial and Sentencing Processes, Research Methods, Statistics

**Student Theses and Dissertations (Sociology, unless otherwise indicated)**
Chair, Ph.D. committee:
        Jill Doerner (2009)
        Jennifer Brown
        Danielle Soto (2010)
        April Holbrook (2019)
        Mitchell Gresham

Chair, M.A. committee:
        Jill Doerner (2004)
        Patrick Seffrin (2006)
        Angela Kaufman (2011)
        Andrea Garber (2012)
        Tanya Leyman (2012)
        April Holbrook (2013)
        Jessica Finkeldey (2014)

Demuth 6

Jessica Ziegler (2014)
Mitchell Gresham (2016)
Brittany Ganser (2019)
Ashley Chapski (2019)

Member, Ph.D. committee:
Annette Hoffman (Psychology-2001)
Virginia McGovern (2004)
Ryan Schroeder (2005)
Nathan Crook (American Cultural Studies-2009)
Peter Meagher (Higher Education Administration-2009)
Robert Lonardo
Julia Mack (2012)
Nicole Shoenberger (2012)
Gregory Rocheleau (2012)
William Lally (2014)
Unique Shaw (2013)
Janelle Nannini (2016)
Andrea Krieg (2015)
Layal Abadi (Psychology-2016)
Christopher Dennison (2017)
Jesse Hotmire (Leadership Studies-2018)
Catherine Kimbrell (Criminology, Law and Society, George Mason University-2019)
LaNaya Anderson (Psychology)
Mallory Minter

Member, M.A. committee:
Shawn Trusten (2002)
Cheryl Lero (2005)
Wendi Goodlin (2005)
Danielle Soto (2007)
Unique Shaw (2011)
Janelle Nannini (2011)
Katie Mead (2012)
Emily Herbst (2013)
William Clemens (2016)
Marissa Landeis (2017)
Melissa Freitag (2017)
Kyla Campbell (2017)
Kyle Bares (2018)
Cori Pryor

Mentor, Undergraduate Summer Research Scholar Project:
Kyle Thompson (Sociology, McNair, 2019)
Ashley Schroeder (Psychology, 2011)

Member, Senior Honors committee:
Paige Chretien (Criminal Justice, 2014)

Demuth 7

David Kuebeck (Sociology, 2006)
Jacob Castillo (Philosophy, 2005)
Brian Small (Psychology, 2003)

Chair, Senior research paper:
Chloe Hollingsworth (2009)
Brandon Smith (2006)
David Kuebeck (2005)
Vincent Staropoli (2004)
Brian Small (2003)
Andrew Wachter (2002)
Thomas Roether (2001)

**Service**
University:
Discussion leader, Great Ideas and Desserts, Honors College, Fall 2019 (x2)
NSF ALLIES training, Ally, 2018-2019; Advocate, 2019-present
President's Advisory Committee on Health, Wellness, and Insurance, 2019-present
Joint Presidential Committee on Firelands, 2019-present
Dean of the Graduate College search committee, 2017
Health Service Advisory Committee, 2016-present, Chair, 2017-2019
Labor-Management Committee, 2016-present
Provost's Market Pool Committee, 2016-2019
Chief Negotiator, BGSU-FA, 2015-16, 2018-19
How to Best Serve the Adult Population/Adult Student Program and Services Task Force, 2015
Vice President, BGSU-Faculty Association, AAUP, 2014-present
Project Search/Graduate Student Diversity Ad Hoc Committee, 2015
Faculty Senate Distinguished Service Award, 2014
Graduate Faculty Status Ad Hoc Committee, 2014
Health, Wellness, and Insurance Committee, 2014-2015
Residential Faculty Mentor Program (RAs: Danya Crow, Amanda Mutchler) 2014-2015
Allocated Market Pool Committee, 2013-2015
Efficiency Task Force, 2012-2014
Graduate Council, 2010-2018
Director of Graduate Enrollment Search Committee, 2013
Graduate Contracting Kaizen, 2013
Graduate Student Orientation Research Ethics Discussion Panel, 2012, 2013, 2014
Graduate Education Strategic Implementation Committees, 2012-13
Graduate Education Strategic Planning Committee, 2011-12
Social Science Curriculum Committee, 2007-2010
BGSU/OSPR Research & Creative Activity Conference Organizing Committee, 2009
Faculty Personnel and Conciliation Committee (Faculty Senate), 2006-07
Undergraduate Council, 2002-05
Union Advisory Committee, 2003-04
Honors and Awards Committee, 2002-03
Parking Committee, 2000-01

Department:
> Member, Demography Faculty Search Committee, 2018
> Chair, Criminology Faculty Search Committee, 2016
> Director of Graduate Studies, 2010-2018
> Chair, Criminology Area Committee, 2008-2015
> Member, Graduate Committee, 2018-19, 2006-07, 2004-05, 2002-03
> Member, Executive Committee, 2005-06, 2003-04
> Member, Undergraduate Committee, 2007-10, 2000-02

Profession:
> Expert Witness, pro bono, O'Donnell v. Harris County, TX; Hester v. Gentry (Cullman County, AL); Daves v. Dallas County, TX; Booth v. Galveston County, TX; Edwards v. Cofield (Randolph County, AL); Fant v. City of Ferguson (St. Louis County, MO)
> Board of Directors, Pretrial Justice Institute, 2015-present
> Editorial Board, *Contemporary Sociology*, 2015-2017
> Mentor and Affiliate, Racial Democracy, Crime and Justice Network, Ohio State University
>> Summer 2012-Mia Ortiz, Bridgewater State University
>> Summer 2013-Brian Starks, Delaware State University
> Research Affiliate, Center for Family and Demographic Research, BGSU, 2001-present
> Research Affiliate, Population Research Institute, The Pennsylvania State University, 2001-present
> Member, ASA Crime and Deviance Graduate Student Paper Competition Jury, 2011
> ASC Session Chair
>> Race, Crime, and Corrections Across the Life-Course, 2004
>> Testing Control Theories, 2003
>> Understanding Juvenile Violence: Family, Firearms, and Societal Failure, 2000
> Affiliate, Center for Research on Crime and Justice, Pennsylvania State University, 1998-2000

Reviewer, National Institute of Justice, National Science Foundation, Office of Juvenile Justice and Delinquency Prevention, American Civil Liberties Union

Occasional reviewer, *American Journal of Criminal Justice, American Journal of Sociology, American Sociological Review, Crime and Delinquency, Crime, Law, and Social Change, Criminal Justice Review, Criminology, Criminology and Public Policy, Homicide Studies, International Criminal Justice Review, International Migration Review, Journal of Adolescence, Journal of Family Issues, Journal of Law and Courts, Journal of Quantitative Criminology, Journal of Research in Crime and Delinquency, Justice Quarterly, Latino Studies, Law and Society Review, Social Forces, Social Problems, Social Science Quarterly, Social Science Research, Sociological Forum, Sociological Quarterly, Youth and Society, Youth Violence and Juvenile Justice*

Member, American Sociological Association, American Society of Criminology, American Association of University Professors

# App. 2

## References

Arizona Supreme Court. (2016). Justice for all: Report and recommendations of the task force on fair justice for all: court-ordered fines, penalties, fees, and pretrial release policies.

Austin, J., Krisberg, B., & Litsky, P. (1985). The effectiveness of supervised pretrial release. Crime & Delinquency, 31(4), 519-537.

Bales, W., Mann, K., Blomberg, T., Gaes, G., Barrick, K., Dhungana, K., & McManus, B. (2012). Quantitative and qualitative assessment of electronic monitoring. BiblioGov.

Barnes, G. C., Ahlman, L., Gill, C., Sherman, L. W., Kurtz, E., & Malvestuto, R. (2010). Low-intensity community supervision for low-risk offenders: a randomized, controlled trial. Journal of Experimental Criminology, 6(2), 159-189.

Bernal, D. (2017). Taking the court to the people: real-world solutions for nonappearance. Ariz. L. Rev., 59, 547.

Board of Governors of the Federal Reserve System. (2018). Report on the Economic Well-Being of U.S. Households in 2017. Washington, D.C.: Federal Reserve Board.

Bornstein, B. H., Tomkins, A. J., & Neeley, E. M. (2011). Reducing courts' failure to appear rate: A procedural justice approach. Washington, DC: United States Department of Justice.

Bornstein, B. H., Tomkins, A. J., Neeley, E. M., Herian, M. N., & Hamm, J. A. (2013). Reducing Courts' Failure-to-Appear Rate by Written Reminders. Psychology, Public Policy, and Law, 19(1), 70.

Cooke, B., Diop, B. Z., Fishbane, A., Hayes, J., Ouss, A., & Shah, A. (2018). Using Behavioral Science to Improve Criminal Justice Outcomes.

Dobbie, W., Goldin, J., & Yang, C. S. (2018). The effects of pretrial detention on conviction, future crime, and employment: Evidence from randomly assigned judges. American Economic Review, 108(2), 201-40.

Feeley, M. M. (1979). The Process is the Punishment. New York: Russell Sage Foundation.

Goldkamp, J. S., & Jones, P. R. (1992). Pretrial drug-testing experiments in Milwaukee and Prince George's County: The context of implementation. Journal of Research in Crime and Delinquency, 29(4), 430-465.

Goldkamp, J. S., & White, M. D. (2006). Restoring accountability in pretrial release: The Philadelphia pretrial release supervision experiments. Journal of Experimental Criminology, 2(2), 143-181.

Gupta, A., Hansman, C., & Frenchman, E. (2016). The heavy costs of high bail: Evidence from judge randomization. The Journal of Legal Studies, 45(2), 471-505.

Heaton, P., Mayson, S., & Stevenson, M. (2017). The downstream consequences of misdemeanor pretrial detention. Stan. L. Rev., 69, 711.

Irwin, J. (2013). The Jail: Managing the Underclass in American Society. Berkeley, CA: University of California Press.

Leslie, E., & Pope, N. G. (2017). The unintended impact of pretrial detention on case outcomes: Evidence from New York City arraignments. The Journal of Law and Economics, 60(3), 529-557.

Lowenkamp, C. T., & VanNostrand, M. (2013). Exploring the impact of supervision on pretrial outcomes. Houston, Laura and John Arnold Foundation.

Lowenkamp, C. T., VanNostrand, M., & Holsinger, A. (2013). The Hidden Costs of Pretrial Detention. Houston, TX: Laura And John Arnold Foundation.

Lum, K., Ma, E., & Baiocchi, M. (2017). The causal impact of bail on case outcomes for indigent defendants in New York City. Observational Studies, 3, 39-64.

MacCoun, R. J. (2005). Voice, control, and belonging: The double-edged sword of procedural fairness. Annu. Rev. Law Soc. Sci., 1, 171-201.

Nice, M. (2006). Court appearance notification system: Process and outcome evaluation. A Report for the Local Public Safety Coordinating Council and the CANS Oversight Committee.

Payne, B. K., May, D. C., & Wood, P. B. (2014). The 'pains' of electronic monitoring: a slap on the wrist or just as bad as prison?. Criminal Justice Studies, 27(2), 133-148.

Phillips, M. (2012). A Decade of Bail Research in New York City. New York, NY: New York Criminal Justice Agency.

Rosenbaum, D. I., Hutsell, N., Tomkins, A. J., & Bornstein, B. H. (2011). Court Date Reminder Postcards: A Benefit-Cost Analysis of Using Reminder Cards to Reduce Failure to Appear Rates. Judicature, 95, 177.

Stevenson, M. T. (2018). Distortion of justice: How the inability to pay bail affects case outcomes. The Journal of Law, Economics, and Organization, 34(4), 511-542.

Stevenson, M.  & Mayson, S. G. (2017). Pretrial Detention and Bail. Pp. 21-48 in E. Luna (Ed.), Reforming Criminal Justice: Pretrial and Trial Processes (Vol. 3). Phoenix, AZ: Arizona State University.

Toborg, M. A., Bellassai, J. P., Yezer, A. M., & Trost, R. P. (1989). Assessment of pretrial urine testing in the District of Columbia. US Department of Justice, Office of Justice Programs, National Institute of Justice.

Tomkins, A. J., Barnstein, B., Herian, M. N., & Rosenbaum, D. I. (2012). An experiment in the law: Studying a technique to reduce failure to appear in court. Ct. Rev., 48, 96.

Turner, S., Petersilia, J., & Deschenes, E. P. (1992). Evaluating intensive supervision probation/parole (ISP) for drug offenders. Crime & Delinquency, 38(4), 539-556.

VanNostrand, M., Rose, K., & Weibrecht, K. (2011). State of the science of pretrial release recommendations and supervision. Pretrial Justice Institute.

Wald, D. S., Butt, S., & Bestwick, J. P. (2015). One-way versus two-way text messaging on improving medication adherence: meta-analysis of randomized trials. The American journal of medicine, 128(10), 1139-e1.

# Ex. 1

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |

## REBUTTAL REPORT OF STEPHEN DEMUTH

I reviewed the materials listed in Exhibit A in preparing this report.

### Key Findings from Prior Reports

#### A. Expert Report of Dr. Stephen Demuth

1. I determined that, for the dataset I analyzed (January 1, 2015 – November 25, 2016), 66.7% (65,208) of misdemeanor arrestees were detained continuously between arrest and the probable cause and bail setting hearing. Of those, 20.2% (13,194) were held for 24 hours or longer after arrest.

2. I also determined that, for the dataset I analyzed, 50.7% (49,524) of misdemeanor arrestees were detained continuously between arrest and first setting. Of those, 51.7% (25,602) were held for 48 hours or longer; 25.8% (12,750) were held for 72 hours or longer; and 13.0% (6,442) were held for 96 hours or longer.

#### B. Supplemental Expert Report of Dr. Stephen Demuth

3. I conducted the identical analysis I conducted in my initial report to determine the delays between arrest and first setting for people with cases filed May 12-22, 2016; August 12-22, 2016; and November 12-22, 2016.

4. For people arrested between May 12–22, 2016 and detained continuously *until their first setting* (i.e., 51.5% of all arrestees), (a) 47.46% (364) were held 48 hours or longer; and (b) 24.12% (185) were held 72 hours or longer. For people in this time period who were detained continuously *between arrest and probable cause and bail setting hearing* (a) 10.97% (102) were held 24 hours or longer; and (b) 1.72% (16) were held 48 hours or longer.

5. For people arrested between August 12–22, 2016 and detained continuously *until their first setting* (i.e., 51.5% of all arrestees), (a) 52.83% (355) were held 48 hours or longer; and (b) 20.83% (140) were held 72 hours or longer. For people in this time period who were detained continuously

1

*between arrest and probable cause and bail setting hearing* (a) 20.85% (176) were held for 24 hours or longer; and (b) 1.54% (13) were held 48 hours or longer.

6.  For people arrested between November 12–22, 2016 and detained continuously *until their first setting* (i.e., 50.1 % of all arrestees), (a) 28.19% (192) were held 48 hours or longer; and (b) 10.57% (72) were held 72 hours or longer.  For people in this time period who were detained continuously *between arrest and probable cause and bail setting hearing* (a) 13.81% (120) people were held 24 hours or longer after arrest, and (b) 0.69% (6) were held for 48 hours or longer.

### C.  Second Supplement to Expert Report of Dr. Stephen Demuth

7.  I analyzed the delays for the full dataset (January 1, 2015 – January 31, 2017) because the additional two months of data were not provided by Defendants until early February 2017.  I also identified the people who were released on the day of first setting prior to 9 a.m. and coded them as released prior to first setting.  My findings did not change in any meaningful way.

8.  I analyzed the cases that fell into the category of people who were detained continuously from arrest to first setting and who were held for 48 hours or longer prior to first setting.  There were 26,817 in that group.  Of those:

    a.  100% (26,817) were held for 48 hours or longer.
    b.  70.5% (18,914) were held for 60 hours or longer.
    c.  50.0% (13,412) were held for 72 hours or longer.
    d.  37.4% (10,041) were held for 84 hours or longer.
    e.  25.5% (6,846) were held for 96 hours or longer.

9.  I then analyzed the data for people whose cases were filed from December 1, 2016 – January 31, 2017 to see if there were recent changes.  In that two-month period, of people detained until probable cause (i.e., 67.2% of all arrestees), 16.1% (838) were held 24 hours or longer.  Of people detained until first setting (i.e., 44.9% of all arrestees), 38.4% (1,137) were held 48 hours or longer, 20.2% (704) were held 72 hours or longer, and 12.2% (423) were held 96 hours or longer.

10.  Deviation from the bail schedule: I examined the full dataset to determine how often new bond amounts were made different from the original bond amount set on the Complaint.  In 89% of cases, there are no changes to the bail amount set on the Complaint.

11.  Jail population: On average, between February 15, 2017 and February 26, 2017, every day in the Harris County Jail, there were:
    a.  353 people charged only with misdemeanors.
    b.  251 people charged only with misdemeanors who have no holds (at the time the information is extracted from the County's website).
    c.  193 people charged only with misdemeanors, who have no holds, and have been in the jail for two or more days.
    d.  170 people charged only with misdemeanors, who have no holds, and have been in the jail for three or more days.

## Rebuttal of Dr. Robert Morris's Report

**I.     Delays to probable cause and first setting are the same after accounting for the variables identified by Dr. Morris as possibly causing the delays (Rebuttal to Morris Report pages 5-8)**

12. After receiving Dr. Morris's Report, I re-ran my analysis of the delays to determine whether any of the variables he identified could have significantly affected the delays from arrest to probable cause and bail setting, or from arrest to first setting. None did. The delays were substantially the same.

13. I excluded from my analysis each of the following groups he raised as having a possible effect on delays from arrest to PC, or from arrest to first setting:

     a.   People with holds
     b.   People on probation or parole
     c.   People with any prior FTA
     d.   People with more than 1 prior misdemeanor conviction
     e.   People with concurrent, pending charges
     f.   People with current felony charges
     g.   People with mental health or medical admissions
     h.   People designated "high risk"
     i.   People who I coded as duplicates
     j.   People with arrest-to-pc times of greater than 365 days (likely data entry errors)

14. None substantially mattered to the delays.

15. I then investigated whether a person's risk score on the Harris County risk assessment tool had any relationship to the delays. They do not. Delays are the same regardless of whether a person is designated low, low moderate, moderate, or high risk.

16. In all of my updated analyses, I used the full data set (January 1, 2015 – January 31, 2017), and coded as "released prior to first setting" anyone who was released prior to 9 a.m. on the day of their first setting, to address Dr. Morris's criticisms on page 5 at ¶ 1, and page 8 at ¶ 6.

17. In response to Dr. Morris's critique of my use of averages (in fact I had not relied primarily on averages and instead based my analysis on the number of people and percentages of people who experience delays of particular lengths and had also provided a median number, so Morris's critique is simply incorrect), I added the medians I previously identified to *all* of my summary spreadsheets. In any event, the number and percentage of people with delays longer than particular periods (24, 48, 72, 96 hours) is a far more meaningful number than medians or averages.

18. I revisited my exclusion of people with negative values in response to a criticism from Morris (*see* Morris Report page 9 at ¶ 9) and confirmed that those were warrant cases by determining that the Complaint date for each person preceded the arrest date.

19. Page 9 at ¶ 10: Dr. Morris misread my report; I did not claim to hand-check 97,715 observations, nor could one reasonably be expected to do so.

**II.    Morris misunderstands the purpose of the Snapshot Spreadsheet, which does not attempt to address the reasons the people in the spreadsheet are in jail (Rebuttal to Morris Report, pages 2-5, 8-9 at ¶ 8)**

20. Dr. Morris states that he investigated the case records of every person in the Snapshot Spreadsheet to determine "the likelihood that the defendant was in jail for no reason other than an inability to secure financially backed bond." (Morris Report at 3). This suggests that he may have misunderstood the purpose of the Snapshot Spreadsheet.

21. The Snapshot Spreadsheet I analyzed is presented for the simple proposition that, in Courts 1 and 2, on the selected days, after filtering for certain characteristics, and considering only people arrested within the prior five days, there were people in the Harris County Jail who *would be released* if they paid their monetary bail amounts.

22. Dr. Morris noted that *some* people's records show *now* that holds were placed *subsequent* to the day the snapshot was taken.

23. That fact does not change the basis for including that person in the spreadsheet: at the time the snapshot was taken, as supported by HTML reports of then-existing online court records (the County's online records are regularly updated; the screenshots I reviewed reflect the records at the time the information in the spreadsheet was gathered), each individual in the spreadsheet would have been released if she had paid the financial condition of release imposed.

24. None of Morris's analysis on pages 2–5 of his report changes the simple fact that each person in the Snapshot Spreadsheet I analyzed would have been released (at the time the snapshot was taken) if he or she paid the secured financial condition of release.

25. Since receiving Dr. Morris's report, I have been provided with additional data that takes a daily census of the jail population, thereby eliminating the concerns he raises about selection bias.

26. As explained in my Second Supplemental Expert Report, these daily jail population reports from the County Defendants show that there are hundreds of people in jail every day, charged only with misdemeanors, who are not subject to holds, and who would be released if they paid the secured financial condition of release assigned to them.

### III.   Being Poor Increases the Likelihood of Being Detained at the Probable Cause Hearing and at First Setting

27. Morris argues in this section that no one who is in jail when their case resolves is in jail "solely due to indigence." *See* Report at 11. His chart on page 11 ("Indigence Factors among Unreleased Bond Eligible Misd. Low Risk Defendants – (n=92941)") purports to show:

   a. Zero (0) people who are in the jail at disposition are unemployed; have no car; no phone; no high school degree or GED; and do not live with family (far-left column)
   b. Zero (0) people who are in jail at disposition are unemployed; have no car; no phone; and no high school degree or GED (second from left column)
   c. 8 are unemployed, have no car, and no phone (middle column)
   d. 9 are unemployed and have no car (fourth column from left)
   e. 65 are unemployed (far-right column)

28. I was immediately struck by Dr. Morris's apparent finding that there are zero people who have 4 or 5 of the "indigence risk factors" who are in jail when their case resolves.[1]

29. This finding set off alarm bells for two reasons: First, it is very uncommon when working with such a large dataset to find "0" instances of any event; second, all of the research I am aware

---

[1] Although he does not state explicitly that he is examining only the population of people who are in jail at disposition (as opposed to people in jail at probable cause, first setting, or some other point in the case), I inferred that he is looking only at those people because I realized that he excludes all defendants "who have bonded out," and believe he means to exclude all defendants "who have bonded out *at any point during the case.*"

of, including the study by Paul Heaton and his colleagues at the University of Pennsylvania (referenced by Dr. Morris in his report), shows that jails disproportionately detain poor people, and I know that 18% of people in Harris County live below the poverty line.

30. I began investigating a series of questions that ultimately led to the following key conclusions:

Conclusion Number 1: Morris defines "indigence" in a way that excludes anyone who is poor. That is how he reaches the conclusion that there are "0" people in jail who are "eligible" to be considered in jail due to indigence.

Conclusion Number 1: Poverty increases the likelihood of detention at the probable cause hearing, and at the first setting.

**Conclusion Number 1: Morris defines "indigence" to exclude anyone who is poor.**

31. The key to his finding that no one is in jail who is indigent is that his filters exclude anyone who is not "low risk." The "low risk" category captures anyone who scores more than 3 points on the Harris County risk assessment tool. However, it is almost impossible to have 3 or fewer points if you are poor because the risk assessment tool allocates points based on indicators of poverty, which co-occur.

### A. Morris first filters out certain categories of people for whom he believes something other than "indigence" provides the reason for detention

32. To determine whether a person is "eligible to be considered jailed solely for indigence," Morris Report at 11, Dr. Morris first filtered out groups of people who are not "eligible" to be considered to be in jail due solely to indigence. Those groups of people are anyone who (a) bonded out during their case, (b) had a hold, (c) was not "low-risk" based on pretrial services' risk assessment; (d) had a mental health or medical admission; or (e) had ever been arrested previously in Harris County.

33. If a person fell into any of those categories, Dr. Morris considered them "ineligible" to be in jail due to indigence.

34. By applying these five filters, the n=92,941 is reduced to n=583 in the following way:

   a. Start with n=92,941 cases (these include duplicates)
   b. Exclude people who bond out → 43,829 cases remain
   c. Exclude people with holds → 34,955 cases remain
   d. Exclude people with any prior arrest in Harris County → 4,517 cases remain.
   e. Exclude people with an MHMR → the number doesn't change, it remains 4,517 cases.
   f. Exclude anyone who is not "low risk" → 583 cases.[2]

### B. Morris next determined how many of those 583 people had indicators of poverty

---

[2] Therefore, one reason his findings are misleading is that his numbers and percentages along the bottom should be based on a denominator of 583, not 92,941.

35. Dr. Morris identified five factors in the Harris County risk assessment tool that are reasonably correlated with indigence, specifically, whether a defendant:

a. Is employed
b. Has a vehicle
c. Has a land-line telephone
d. Has a high school degree or GED
e. Lives with someone other than a family member

36. Morris states that the degree of indigence increases for each of the five poverty indicators that a person has. *See* Morris Report at 11 (stating that a person's "risk for indigence" "is increased for each of the indicators A through E. . . ."). After applying the five filters (no bond, no holds, "low risk," no MHMR, 1 arrest), he found that, of the 583 people "eligible" to be indigent, there were:

f. Zero (0) people who are in the jail at disposition with 4 or 5 poverty indicators (unemployment, no car, no phone, no high school[, and no family])
g. 8 who have 3 poverty indicators (unemployment, no car, no landline)
h. 9 who have 2 poverty indicators (unemployment, no car)
i. 65 who have 1 poverty indicator (unemployment)

37. I wanted to understand who had been filtered out when Dr. Morris excluded everyone who is not "low risk," so I analyzed Harris County's risk assessment tool.

## C. An arrestee's "risk level" is largely determined by their degree of poverty

38. Harris County's risk assessment tool lists 17 risk factors: Nine (9) are categorized by the tool as "Criminal Risk Items." Eight (8) are categorized as "Background Risk Items."

39. Each of the five poverty indicators Morris identifies – no high school, no land-line, lives not with family, no car, and unemployed – is included in the background risk column of the risk assessment, along with sex/gender: a person also gets a point for being male or under 30. (The eighth background risk factor is "under 21 and has a prior juvenile adjudication." I do not have information about anyone's juvenile record, so I do not consider that variable.)

40. A person's "risk" is assessed by assignment of a point for each "risk factor" a person is considered to have.

41. A person is assigned to a risk category as follows:

a. Low: 3 points or less
b. Low Moderate: 4-5 points
c. Moderate: 6-7 points
d. High: 8+ points

42. I revisited my original data, and excluded people with no risk assessment score, which left me with 76,529 cases.[3]

43. I discovered that very few people are "low risk," only 13.56% (if you exclude duplicates), and only 11.90% (if you do not).

44. I then determined that 75% of a person's risk score comes from the eight background factors. In other words, the main factors Harris County uses to determine risk are demographic indicators. In essence, poverty increases an arrestees' risk score.

---

[3] These are cases for which I had complete information on both risk and whether they were detained at first setting and probable cause.

45. The following chart illustrates this finding. "Fsdet"=1 for people who are detained at first setting and =0 for people who are not detained at first setting. "Riskscore," in the table below is the sum of the 17 item risk assessment check sheet. I broke it down into its two components: the left column from the pretrial assessment report (crimriskscore) are criminal risk factors and the right column, background risk factors, (backriskscore) are background risk factors like age, sex, and poverty. Crimriskscore and Backriskscore sum to Riskscore.

| Variable | N | Mean | Std Dev | Minimum | Maximum |
|---|---|---|---|---|---|
| riskscore | 76529 | 5.6669890 | 2.0090293 | 0 | 13.0000000 |
| crimriskscore | 76529 | 1.4055195 | 1.1560112 | 0 | 7.0000000 |
| backriskscore | 76529 | 4.2614695 | 1.4839461 | 0 | 7.0000000 |
| fsdet | 76529 | 0.5734950 | 0.4945722 | 0 | 1.0000000 |

### D. Morris' indigence analysis is tautological.

46. The most significant reason why a person's risk score increases is their background characteristics, namely indigence (the 5 indicators of poverty). Remember, 75% of the average person's "final risk level" is a product of those background risk factors.

47. Poverty indicators are the biggest reason why someone reaches the level of "high" risk.

48. To see how the final risk level is so influenced by poverty, consider how a person's profile must be in order to get a "low" risk level, remembering that you can only get 3 points on the checklist before you are pushed out of the "low risk" category.

49. If you are poor, your criminal record must be clean. If you are not poor, then you could have a couple felony convictions on your record and still be "low" risk. If you are not poor, you could also afford to be bonded out.

50. By filtering on the "final risk score" and selecting only people with "low risk," Dr. Morris basically eliminated indigent people because poverty is the biggest contributor to impoverished people's risk scores.[4] (Recall that he also excludes anyone with any prior arrests in Harris County).

51. If you look at the 4,517 arrestees who have no holds, no medical or mental health issues, and have never been arrested before (refer back to section 34e), of them, 1,964 cases *cannot be "low risk" because they have 4 or 5 points based solely on indicators of poverty.*

52. In other words, 43.5% of this group of people – no holds, no MHMR, no prior arrests – are too poor to be low risk.

53. If you back out to the 34,955 cases, excluding only people who bond out and people with holds, 17,003 of them (or 48.6%) cannot be low risk because of a 4 or 5 on the poverty scale.

54. If you back out the people who did not bond out, 43,829 cases, of them, 21,267 cannot be low risk because of a 4 or 5 on the poverty scale. That's 48.5% of that group.

55. Compare these groups to the people who bonded out using a surety. Of the 25,120 people who used a surety to bond out, only 6,570 were precluded from being low risk based on a 4 or 5 on the poverty scale. That's 26.2%.

---

[4] This fact might also explain why Dr. Morris did not show the "high" risk people in his analysis. There would have been a lot of indigent people. If the hearing officers are relying on those words "high risk" to justify why they set high bonds or don't adjust bonds away from the schedule, then their policy is basically to detain poor people.

56. Because 4-5 is low-moderate risk level, if a person has all 5 poverty indicators, then he is automatically moderate level with a 6. If a man is under 30, then he is a 7. He only needs 1 more point to have 8, which puts him in the high risk category.

57. Because the 14-variable dataset that was produced by Morris excludes a lot of data, I went to the risk assessment dataset that includes all 17 risk criteria and the final risk level. I wanted to determine the distribution of the sum of the 5 poor measures, being male, and being under 30 (I excluded the other age-related measure because it requires a juvenile record).

58. Of the 91,854 cases in the risk assessment dataset, only 30.5% could even qualify as low risk based solely on background factors, not even looking at criminal background. That means that almost 70% of misdemeanor arrestees cannot qualify as low-risk due solely to their background factors.

59. Another 47.7% would be considered low-moderate based on these background factors alone. 21.8% would be at moderate risk from demographic background.

60. Below are the points from criminal background risk from this same dataset for each level of the combined score on young (1 point), poor (5 points), male (1 point). A person could be assigned up to a total of 7 points based on these background factors. I have named this score "pooryoungmale" in the following analyses.

| pooryoungmale | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 199 | 0.22 | 199 | 0.22 |
| 1 | 2107 | 2.29 | 2306 | 2.51 |
| 2 | 8943 | 9.74 | 11249 | 12.25 |
| 3 | 16767 | 18.25 | 28016 | 30.50 |
| 4 | 22018 | 23.97 | 50034 | 54.47 |
| 5 | 21760 | 23.69 | 71794 | 78.16 |
| 6 | 15265 | 16.62 | 87059 | 94.78 |
| 7 | 4795 | 5.22 | 91854 | 100.00 |

61. I wanted to see how many people with these demographic characteristics had little to no criminal background.

62. I identified 1,065 people with a 7, and no criminal indicators.

63. There are 7,274 people with a 6 from background factors, plus 0 or 1 criminal indicators.

64. Remember that 75% of risk points are coming from background factors not crime.

| The SAS System |
|---|

The FREQ Procedure

8

pooryoungmale=0

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 105 | 52.76 | 105 | 52.76 |
| 1 | 45 | 22.61 | 150 | 75.38 |
| 2 | 31 | 15.58 | 181 | 90.95 |
| 3 | 15 | 7.54 | 196 | 98.49 |
| 4 | 3 | 1.51 | 199 | 100.00 |

The SAS System

The FREQ Procedure

pooryoungmale=1

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 895 | 42.48 | 895 | 42.48 |
| 1 | 591 | 28.05 | 1486 | 70.53 |
| 2 | 429 | 20.36 | 1915 | 90.89 |
| 3 | 164 | 7.78 | 2079 | 98.67 |
| 4 | 27 | 1.28 | 2106 | 99.95 |
| 7 | 1 | 0.05 | 2107 | 100.00 |

The SAS System

The FREQ Procedure

9

pooryoungmale=2

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 3008 | 33.64 | 3008 | 33.64 |
| 1 | 2732 | 30.55 | 5740 | 64.18 |
| 2 | 2212 | 24.73 | 7952 | 88.92 |
| 3 | 810 | 9.06 | 8762 | 97.98 |
| 4 | 174 | 1.95 | 8936 | 99.92 |
| 5 | 5 | 0.06 | 8941 | 99.98 |
| 6 | 2 | 0.02 | 8943 | 100.00 |

## The SAS System

The FREQ Procedure

pooryoungmale=3

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 4957 | 29.56 | 4957 | 29.56 |
| 1 | 4761 | 28.40 | 9718 | 57.96 |
| 2 | 4526 | 26.99 | 14244 | 84.95 |
| 3 | 2060 | 12.29 | 16304 | 97.24 |
| 4 | 421 | 2.51 | 16725 | 99.75 |
| 5 | 41 | 0.24 | 16766 | 99.99 |
| 7 | 1 | 0.01 | 16767 | 100.00 |

## The SAS System

The FREQ Procedure

pooryoungmale=4

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 6121 | 27.80 | 6121 | 27.80 |
| 1 | 5821 | 26.44 | 11942 | 54.24 |
| 2 | 6145 | 27.91 | 18087 | 82.15 |
| 3 | 3200 | 14.53 | 21287 | 96.68 |
| 4 | 656 | 2.98 | 21943 | 99.66 |
| 5 | 72 | 0.33 | 22015 | 99.99 |
| 6 | 3 | 0.01 | 22018 | 100.00 |

The SAS System

The FREQ Procedure
pooryoungmale=5

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 5363 | 24.65 | 5363 | 24.65 |
| 1 | 5329 | 24.49 | 10692 | 49.14 |
| 2 | 6534 | 30.03 | 17226 | 79.16 |
| 3 | 3672 | 16.88 | 20898 | 96.04 |
| 4 | 781 | 3.59 | 21679 | 99.63 |
| 5 | 79 | 0.36 | 21758 | 99.99 |
| 6 | 2 | 0.01 | 21760 | 100.00 |

The SAS System

The FREQ Procedure
pooryoungmale=6

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 3517 | 23.04 | 3517 | 23.04 |
| 1 | 3757 | 24.61 | 7274 | 47.65 |
| 2 | 4445 | 29.12 | 11719 | 76.77 |
| 3 | 2768 | 18.13 | 14487 | 94.90 |
| 4 | 701 | 4.59 | 15188 | 99.50 |
| 5 | 72 | 0.47 | 15260 | 99.97 |
| 6 | 5 | 0.03 | 15265 | 100.00 |

The SAS System

The FREQ Procedure
pooryoungmale=7

| crimriskscore | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| 0 | 1065 | 22.21 | 1065 | 22.21 |
| 1 | 1335 | 27.84 | 2400 | 50.05 |
| 2 | 1313 | 27.38 | 3713 | 77.43 |
| 3 | 848 | 17.69 | 4561 | 95.12 |
| 4 | 206 | 4.30 | 4767 | 99.42 |
| 5 | 27 | 0.56 | 4794 | 99.98 |
| 6 | 1 | 0.02 | 4795 | 100.00 |

65. Thus, the current system potentially keeps less risky poor people locked up, but allows wealthier but more criminally risky people to be released.

**Conclusion Number 2: Poverty increases the likelihood of detention at probable cause hearing, and at first setting.**

66. I used the five binary indicators of poverty (each of the poverty indicators Dr. Morris lists on page 10 of his report) to create a poverty index.

67. The index adds up 5 binary indicators of indigence: no phone, no high school degree, living with others, no car, and no employment/school. For each indicator, a 1 indicates that this is true. So a 1 on "no phone" means it is true that you have no phone. Poverty scores range from 0 to 5 with 5 being the most poverty.

68. I first did a simple analysis and determined that, among people who get a 0 on the poverty index, only 29% are still detained at first setting, but 71% of people with a 5 on the poverty index are detained at first setting.

69. I then created a logistic regression model to predict the likelihood of someone being detained at the probable cause hearing and at first setting.

70. <u>I found that for every unit increase in the poverty index, a person's likelihood of being detained at the probable cause hearing increased statistically significantly.</u>

## A. Poverty increases the likelihood of detention at PC hearing

71. I looked at only the cases (n=59,799) in which the most serious charge was a misdemeanor. I investigated four variables: (1) criminal background risk score (which is the sum of the left-hand column on the pretrial services risk assessment form); (2) the poverty factors; (3) demographics (sex/age); and (4) bond amount prior to booking.

72. I found that all four variables are statistically significant in predicting detention at PC or first setting, in part because the sample size is so large, but mostly because the variables predict detention.

73. <u>The single strongest predictor of detention at the probable cause hearing is the poverty measure.</u>

74. You can see this by looking at the righthand column (standardized estimate) of the chart below. The largest absolute value is for poor. However, overall the two crime-related measures (crimriskscore and bond_set) have a larger combined effect.

75. But the important thing is that being poor matters quite a bit. More specifically, for a 1 standard deviation increase in poverty, you would see a .101 standard deviation increase in the likelihood of still being detained at the probable cause hearing.

76. Of more interest are the odds ratios below. For poor, the odds ratio is 1.161. <u>This means that for each unit level of increase in the poor measure, the odds of being detained are 1.16 times higher or about 16% higher. That's for each level of poor (remember there are 5 levels).</u> And importantly, this effect exists on average across all levels of the other variables.

77. <u>So, on average, poorer people are more likely to be detained whatever their bond amount or criminal risk score or sex/age.</u>

Logistic regression of detention at PC on risk factors and initial bond amount

| Parameter | DF | Estimate | Standard Error | Wald Chi-Square | Pr > ChiSq | Standardized Estimate |
|---|---|---|---|---|---|---|
| Intercept | 1 | 0.7498 | 0.0321 | 544.5418 | <.0001 | |
| poor | 1 | 0.1493 | 0.00862 | 299.8901 | <.0001 | 0.1014 |
| youngmale | 1 | -0.0839 | 0.0161 | 27.0429 | <.0001 | -0.0299 |
| crimriskscore | 1 | 0.1391 | 0.0117 | 141.3084 | <.0001 | 0.0866 |
| Bond_Set_at_Complain | 1 | 0.000063 | 6.987E-6 | 82.4427 | <.0001 | 0.0767 |

### Odds Ratio Estimates

| Effect | Point Estimate | 95% Wald Confidence Limits | |
|---|---|---|---|
| poor | 1.161 | 1.142 | 1.181 |
| youngmale | 0.920 | 0.891 | 0.949 |
| crimriskscore | 1.149 | 1.123 | 1.176 |
| Bond_Set_at_Complain | 1.000 | 1.000 | 1.000 |

### B. Poverty increases the likelihood of detention at first setting

78. I then conducted the same analysis by creating a logistic regression model to predict the likelihood of being detained at first setting.

79. "Poor" is still highly statistically significant. Notice that all the standardized estimates are bigger than in the first model. The variables have bigger effects on first setting detention.

80. Remember the story is that the poverty gaps in detention outcomes grow over time. At probable cause, more people are detained, because the time from arrest is relatively short. But once you add the time between probable cause and first setting, things start to snowball, and a person can either come up with the money or she can't.

81. Looking at the standardized estimates, for every 1 standard deviation increase in poor, there is a .25 standard deviation increase in the likelihood of being detained. Looking below at the odds ratios, for each 1 unit increase in "poor" the odds of remaining detained increase 1.44 times.

82. This is on average across all levels of the other variables. So, whether a person's bond was high or low, on average being poor means that you are less likely to be released prior to first setting than a person with more resources.

14

**Logistic regression of detention at First Setting on risk factors and initial bond amount**

| Parameter | DF | Estimate | Standard Error | Wald Chi-Square | Pr > ChiSq | Standardized Estimate |
|---|---|---|---|---|---|---|
| Intercept | 1 | -1.9001 | 0.0307 | 3842.5398 | <.0001 | |
| poor | 1 | 0.3647 | 0.00775 | 2215.3817 | <.0001 | 0.2476 |
| youngmale | 1 | -0.0612 | 0.0143 | 18.3125 | <.0001 | -0.0218 |
| crimriskscore | 1 | 0.4845 | 0.0104 | 2155.2417 | <.0001 | 0.3018 |
| Bond_Set_at_Complain | 1 | 0.000216 | 6.203E-6 | 1214.5800 | <.0001 | 0.2614 |

**Odds Ratio Estimates**

| Effect | Point Estimate | 95% Wald Confidence Limits | |
|---|---|---|---|
| poor | 1.440 | 1.418 | 1.462 |
| youngmale | 0.941 | 0.915 | 0.967 |
| crimriskscore | 1.623 | 1.590 | 1.657 |
| Bond_Set_at_Complain | 1.000 | 1.000 | 1.000 |

83. I have reached some general findings about the Harris County system after conducting the above analysis on Morris's findings:

    a. Most people are not able to bond out before booking, presumably because they can't get the money together in such a short period of time if at all.

    b. People who are indigent are more likely to be detained at the PC hearing.

    c. It takes a long time for people to go before a judge; by the time people get to see a judge, half have been waiting for more than 48 hours.

    d. Indigence really begins to take its toll between probable cause and first setting; only about 1/3 of arrestees with 0 poverty indicators are still detained at first setting, but ¾ of people with 5 poverty indicators are still detained at first setting.

    e. 75% of the overall risk factor score is due to demographic characteristics versus 25% being due to criminal background; "high risk" people are better described as poor than dangerous.

    f. About 10% of arrestees end up getting personal bonds. It's unclear from the dataset who is making that change, the hearing officer or the judge. Otherwise, only about another 10% of bonds get modified at the probable cause hearing from the schedule. So overall, there doesn't appear to be much tailoring of bonds to arrestees' circumstances.

    g. The amount of time it takes people to travel from arrest to probable cause and probable cause to first setting is largely driven by the overall caseload speed. If you

15

can't bond out, then the amount of time it takes is invariant across different risk groups. So, clearly the important thing is to bond out and bond out early, otherwise you are going to be waiting awhile.

h.   Quite a few arrestees have their cases dismissed after waiting until probable cause and first setting.

i.   People who bonded out are much more likely to get their cases dismissed than people who remain incarcerated. Meanwhile, people who can't bond out are more likely to plead guilty than people who bonded out.

## IV. A Person's Risk Score Has No Effect on the Delay Between Arrest and Probable Cause, or Between Arrest and First Setting

84.   I then ran my original delays analysis to determine whether the delay between arrest and probable cause, or between arrest and first setting changed based on a person's risk score. It does not.   *See* App. 3.   The delay is the same regardless of a person's risk score.

## V. Case disposition

85.   The variable "judgefs" indicates whether a judgment date is equivalent to the first setting date. "Judgefs"=1 if the judgment and first setting dates are the same and =0 if they are not on the same day. About 20% of cases have judgments on the day of first setting. This is after removing cases with multiple arrest charges, people with more than 365 days between arrest and probable cause (the likely entry error cases, approx. 66 cases–it's easier to just delete them), and people with holds.

| judgefs | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---------|-----------|---------|----------------------|--------------------|
| 0 | 71283 | 80.16 | 71283 | 80.16 |
| 1 | 17648 | 19.84 | 88931 | 100.00 |

86. If you break it down by whether the arrestee was detained or not:

| judgefs | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---------|-----------|---------|----------------------|--------------------|
| 0 | 25167 | 61.86 | 25167 | 61.86 |
| 1 | 15520 | 38.14 | 40687 | 100.00 |

87. If the arrestee was not detained at first setting:

| judgefs | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---------|-----------|---------|----------------------|--------------------|
| 0 | 46116 | 95.59 | 46116 | 95.59 |

16

| judgefs | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---------|-----------|---------|----------------------|---------------------|
| 1 | 2128 | 4.41 | 48244 | 100.00 |

88. Here are the judgments for the people who were detained and received a judgment on their first setting date:

| Judgment | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|----------|-----------|---------|----------------------|---------------------|
| Conditional Discharge Revoked | 1 | 0.01 | 1 | 0.01 |
| Conviction-Nolo Contendre | 75 | 0.48 | 76 | 0.49 |
| Conviction-Plea of Guilty | 13795 | 88.89 | 13871 | 89.37 |
| Deferred Ajudication | 332 | 2.14 | 14203 | 91.51 |
| Dismissal | 1293 | 8.33 | 15496 | 99.85 |
| Pre Trial Intervention | 24 | 0.15 | 15520 | 100.00 |

89. Here is an interesting comparison between the judgments of people who were detained at first setting versus those that were not.

90. First, detained at first setting:

| Judgment | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|----------|-----------|---------|----------------------|---------------------|
| Acquittal by Jury | 28 | 0.08 | 28 | 0.08 |
| Acquittal by Trial to Court | 4 | 0.01 | 32 | 0.09 |
| Conditional Discharge Revoked | 7 | 0.02 | 39 | 0.11 |
| Conviction by Jury | 30 | 0.08 | 69 | 0.19 |
| Conviction-Nolo Contendre | 195 | 0.54 | 264 | 0.73 |
| Conviction-Plea of Guilty | 28712 | 78.92 | 28976 | 79.65 |
| Deferred Adjudication | 1442 | 3.96 | 30418 | 83.61 |
| Deferred Disposition | 2 | 0.01 | 30420 | 83.62 |
| Dismissal | 5689 | 15.64 | 36109 | 99.25 |
| Pre Trial Intervention | 272 | 0.75 | 36381 | 100.00 |

17

91. Next, not detained at first setting:

| Judgment | Frequency | Percent | Cumulative Frequency | Cumulative Percent |
|---|---|---|---|---|
| **Acquittal by Jury** | 66 | 0.18 | 66 | 0.18 |
| **Case Disposed** | 1 | 0.00 | 67 | 0.19 |
| **Conditional Discharge Revoked** | 2 | 0.01 | 69 | 0.19 |
| **Conviction by Jury** | 145 | 0.41 | 214 | 0.60 |
| **Conviction by Trial to Court** | 7 | 0.02 | 221 | 0.62 |
| **Conviction-Nolo Contendre** | 154 | 0.43 | 375 | 1.05 |
| **Conviction-Plea of Guilty** | 17313 | 48.49 | 17688 | 49.54 |
| **Deferred Adjudication** | 4333 | 12.13 | 22021 | 61.67 |
| **Deferred Diposition** | 17 | 0.05 | 22038 | 61.72 |
| **Dismissal** | 11187 | 31.33 | 33225 | 93.05 |
| **Pre Trial Intervention** | 2482 | 6.95 | 35707 | 100.00 |

Compare percent guilty pleas, deferred adjudications, and dismissals. It is very clear that being detained increases the likelihood of a guilty plea and not being detained increases dismissals. These trends suggest that being able to buy time, defend yourself, and not be coerced by your detention, really has an impact on willingness to plead guilty. At least, it appears this way based on a relatively simple analysis. I am confident it's robust to more sophisticated analysis.

## VI.    Additional Rebuttal of Morris's Report

92. Response to Page 2, Materials Reviewed:  I needed Dr. Morris's complete dataset in order to replicate exactly what he did. He provided 20+ spreadsheets and a long, complex Stata code. He also analyzed a lot of data that I did not have available to me until at least a week later. Without his full combined dataset, it's very difficult to merge all the spreadsheets for analysis. My original expert report only analyzed data between 1/1/15 and 11/25/16.  In response to his criticisms, I analyzed the full range of dates so that we were analyzing the same core dataset.

93. Page 3 "I could determine why virtually all defendants were in jail.":  It strikes me as an overstatement to claim that one could "know" why a person is in jail, especially given that he claims that it is impossible to know whether a person is detained because they are "truly indigent."

94. Page 3, paragraph beginning "The below summary statistics…":  Dr. Morris appears to misunderstand the purpose of the Snapshot Spreadsheet.  It was *not* presented to prove that people were in jail *because* they were poor.  It simply demonstrates that in those Courts, on the selected days, people were in jail who would be released if they paid secured financial conditions of release.  Other analysis I have done of the full dataset speaks to the reasons people are in jail at the probable cause and first setting hearings.  The Snapshot Spreadsheet has a simple purpose: it shows that people are in jail solely because they have not paid money bail.

95. Page 3, paragraph beginning "The below summary statistics…": Morris' argument against indigence as a reasonable explanation for why people remain detained is tautological. He argues 1) you are not indigent if you can bond out. He also argues 2) you are not indigent if you don't bond out. He also argues 3) that there are no indigent people, and that paying bail is a choice. But, indigence is not dependent on the bail process. Indigence is poverty such that you lack resources to help yourself in the process. Dr. Morris appears to be trying to avoid an independent definition of poverty.

96. Page 3, summary chart: Dr. Morris excludes the median. He also includes the *current* arrest in his count of "prior" arrests. Therefore, the average number of "prior arrests" is 6.2 (not 7.2, as he states), and the median number of arrests is 5 (not 6). Another 7 (not 9) had ten or more arrests in Harris County.

97. Page 4, "Nearly half (49.2%) of defendants had used a surety bond at some point in the past.": It makes no sense to claim that a person is not indigent *now* because they paid money bail in the past. The Texas Indigent Defense Commission Report, on p.11, states that "When making a determination of indigence, courts may consider the factors in Article 26.04(m): [t]he defendant's income, source of income, assets property owned, outstanding obligations, necessary expenses, the number and ages of dependents, and spousal income that is available to the defendant. . . . A court may consider bail only 'to the extent that it reflects the defendant's financial circumstances,' as measured by the above considerations." It also recommends on page 12: "In accordance with Article 26.04(m), when making indigence determinations, the appointing authority may not consider whether a defendant has posted bail, except to the extent that it reflects the defendant's financial circumstances." It would seem that you should not be able to hold someone's past ability to pay against them. Also, the ~50% who've used surety are the same people who also have more prior arrests.

98. Page 4, paragraph beginning "16 of 59": Dr. Morris is suggesting that only 15% of people in the snapshot spreadsheet might be indigent. To me, this is a completely unreasonable assumption. If anything, it's the lower bound and most assuredly, it's a gross underestimate. What he also glosses over is that 9 of 16 (56.2%) of the lowest of the low risk arrestees were detained. The majority of people with no prior record in our snapshot continued to sit in jail using his data (I assume his bond out data are accurate, but would need to hand check to be sure).

99. Page 5, top of page, "it appears the majority of these defendants could reasonably be considered high risk, suggesting that they were in jail for more than indigence alone.": I disagree with this characterization. Look at the median values. Except for the ~10 people with high numbers of arrests, the group is low risk. And, good risk assessment tools don't use arrests to assess risk since many arrest charges are dismissed. Good tools use convictions, not arrests. See http://www.arnoldfoundation.org/wp-content/uploads/PSA-Risk-Factors-and-Formula.pdf

100. Page 5, "Review of Demuth Opinion and Analysis": He rightly criticizes my failure to consider various conditionals. One should always do that. However, I did not have that data until I received his report. In the paragraph numbered 2, Dr. Morris notes that I did not use the holds data that I had access to. Although he raises this issue, he does not run the numbers. If he did, he would find what I have now found, having run the delay numbers, excluding people with holds: excluding this group does not change my findings of the number or percent of people who are held from arrest to PC, or arrest to first setting.

101. "Demuth's Initial Analysis: ¶ 1": The full dataset has 116,310 cases. I re-ran all of my analysis using the full dataset. The findings do not change.

102. Page 6, paragraph beginning "A sitting judge…": Dr. Morris makes a fair point in noting that I "should account for the fact that multiple charges have been filed against a defendant." But, this is a small set of cases and has no appreciable effect on the overall average values of the population. Plus, since receiving Dr. Morris's data, I have included variables for final risk level, prior arrest, highest charge, bond amount. These are details that do not make a difference. Compare his time from arrest-to-pc numbers to mine sliced many different ways and it doesn't make a difference.

103. Page 6, paragraph beginning "A sitting judge…": Dr. Morris states that "[i]t is reasonable to think that a judge, when making a decision regarding bond setting, will factor in the seriousness of the charges against a defendant." However, the data show that very few bonds are changed from the schedule. About 10-20%. In about equal amounts up and down. They balance out. Again, no substantive change in the overall findings.

104. Page 6, ¶ 2(a): I did not "account for a number of factors" because I did not have access to any of that information when I conducted my original analysis. Now that I have that information, I re-ran it considering each factor Dr. Morris identifies as possibly having an effect on time to PC or time to first setting. They have no effect. *See supra* at ¶ 13.

105. Page 6, ¶ 2(c), 2(d): Dr. Morris makes a fair point that the averages could provide a misleading picture. That is why I framed my findings as the *number* of people held for certain periods of time prior to PC or first setting. I added medians to my summary Excel sheets. I also investigated the distributions and was able to replicate Dr. Morris's findings in his charts on pages 14-16. The median is very stable, excluding certain groups of people, according to the law of large numbers.

106. Page 6, ¶ 3: It doesn't matter what "high risk" arrestees you exclude from the analysis, the median and distribution doesn't change much. This is because unless you can get out early, you follow the same case flow speed as everyone else.

107. Page 8, ¶ 6: I re-ran the analysis setting first setting to midnight instead of 9am. It drops 9 hours off everyone's time and now only 40% of people have to wait 48 hours or more. But this issue arises rarely. I looked for how many cases had the same bond_approved and first setting dates. 5,169 people bonded out on the same day as first setting.

108. Page 8, ¶ 6: I subsequently was able to look at the actual release date-time. 1,245 of these cases were released before 9am. 3924 were released after 9am. I coded the 1,245 as released. The results don't change significantly.

109. Page 8, ¶ 7: Dr. Morris criticizes me for not knowing the "true time of the probable cause hearing." His calculations for the time from arrest to probable cause are the same as mine. He used the same data point for identifying the time of the probable cause hearing.

110. Page 8–9 ¶ 8: To address Dr. Morris's concerns about selection bias, I analyzed data scraped from the Harris County website that provided a daily census of the misdemeanor jail population. Those results are provided in my Second Supplemental Report. Hundreds of people are in the jail every day who would be released if they paid financial conditions of release. Most of them have been in jail for two days or more.

111. Page 9, ¶ 9: I subsequently confirmed that the negative values were indeed warrant cases by determining that the cases with negative values had a complaint date that preceded the arrest date.

112. Page 9, ¶ 10, sentence beginning "One part that is concerning…": He's referring to the instructions included in Appendix 1, which does not say that I hand checked the data. It even says

that while that would be ideal, it is not possible with such a large dataset. I did not handcheck the data, and I did not represent that I did.

113. Page 11, ¶ 11: I believe the code I provided was clear and easy to follow. To further clarify: I sorted on Name and arrest date and probable cause hearing so as to put the earliest probable cause date first for any duplicate charges. I then removed any duplicates that existed on name and arrest date. This is easy to do in Excel.

114. Page 10, ¶ 13: I have accounted for holds now. Holds are a very small number of cases. My analysis of the delays does not change.

115. Page 10, ¶ 14: His point about people being held for medical reasons is a red herring. People have probable cause hearings in absentia. I have excluded these cases from my analysis. There is no change in the delays.

116. Page 10, ¶ 15: I ran the delays excluding people with an active criminal justice status due to probation or parole. My findings do not change.

117. Page 10–11, "Replicating Demuth": When I received all the data, I considered each condition Dr. Morris identifies as possibly affecting the time to PC or time to first setting. None matters at all.

118. Page 11: "How many misdemeanor defendants are in HCJ solely due to indigence?": Note that one of the factors in the risk assessment form that Dr. Morris states is "reasonably correlated with indigence" is "C. has a land-line telephone." Almost 90% of people in the sample with risk assessment scores lacked a land-line phone. That means almost everyone starts out with one point.

119. Page 11: "How many misdemeanor defendants are in HCJ solely due to indigence?": Note that he is excluding from the group of people who are "truly indigent" anyone who was previously arrested in Harris County (see "I: No previous arrests in Harris County").

120. Page 11: "How many misdemeanor defendants are in HCJ solely due to indigence?": Note that Dr. Morris also excludes anyone who bonds out at any point during their case. This is tautological: If you bond out you are not indigent, but if you don't bond out, he concludes (on the next page) that you must also not be indigent (p.12: "Taken together, it appears that among the low-risk misdemeanor defendants who reported information to pretrial services (recall that 85% of defendants had results), were rarely, if ever truly indigent, according to these data points.").

121. Page 12: Dr. Morris has defined "indigent" in a way that the group excludes almost everyone who is poor: he excludes anyone who is NOT low risk from the group of people who are "at the highest risk for indigence" (page 11, bottom paragraph). But, it's very hard to be poor and low risk at the same time. Pursuant to the Harris County risk assessment tool, a person with 4 or more points will not be deemed low risk.

122. About 35% of the population has more than 3 points solely based on the poverty measures.

123. About 70% of the population taking the risk assessment has more than 3 points from just 3 sets of background factors: sex, age, and poverty.

124. The reason Dr. Morris finds that there "were rarely, if ever truly indigent" people in the jail is because he's eliminated all the poor people by selecting mainly non-poor people. Using his final analysis data, among people who did not bond out, 49% of them *could not be low risk* be low risk because they had a 4/5 on poverty. Among people who did bond out, only 26% couldn't be low risk because of poverty. This system punishes poverty.

125. Page 14, "During this period of 51 days, there were 1,169 admissions that certainly extend the time in jail.": My analysis did not investigate "time in jail"; I looked at the time between arrest and probable cause hearing, and arrest and first setting. Dr. Morris's analysis here raises several questions: Is the 1,169 number among all inmates or just new admissions to the jail? Based on

what information is he presuming that these happen between arrest and PC? By "admissions," is he talking about MHMR? I received those data as a spreadsheet he relied on in producing his data. I analyzed the impact of MHMR on the delays. There was no effect.

126. Page 15–16, "Bonded out": It makes no sense to exclude from an analysis of the time from arrest to PC those people who bonded out *after* the probable cause hearing. That is what Dr. Morris does in this chart. Even so, the delays do not change.

127. Page 19, "This analysis accounted for several factors that decrease the probability of a person being jailed for indigence alone.": My analysis shows that if you remain detained, it does not matter what you've done, or whether you have the characteristics Dr. Morris identifies as possibly affecting the time between arrest and PC or arrest and first setting. The detention time is the same for everyone. Because you are part of a queue, you travel with the flow of cases. The important thing to do is get out, and get out as quickly as possible. And poor people can't get out.

128. Page 19, "For example, in speaking with defense attorneys, defendants may be advised to remain in jail in order to receive credit for time served. . . .": It seems problematic that one aspect of the system involves defendants making a choice to accept punishment prior to being adjudicated guilty of any alleged crime.

129. Page 21, "I do not find the videos that I reviewed shocking considering that the determination of probable cause is a preliminary step to adjudication.": What shocked me was *not* the fact that probable cause was being assessed. What I found shocking was that the arrestees were never asked if they could afford the bail amount set. I have watched hearings involving arrestees who are clearly confused, and the officer treats them with callous disregard. It's literally a cattle call. That shocked me.

130. Page 21, "The decision to pay a bond does not mean one is wealthy. One can indeed be indigent or impoverished and choose to pay the bond over something else in their lives. One can decline paying a bond based on a personal preference.": This is tautological. Dr. Morris says: Paying a bond doesn't mean you are wealthy. In fact, you can be indigent and pay the bond. Basically, he's saying there is no way to be "truly" indigent in jail because even the indigent can afford bail. All the poor people who stay in jail have good reasons for doing so. In fact, they prefer it.

131. Page 21, "This is a value-based judgment that does not factor in individual differences among reasons for remaining inside a jail facility.": Dr. Morris suggests that Plaintiffs are inappropriately critiquing misdemeanor arrestees' "choice" to stay in jail. I find this to be a very distasteful contention. In my experience as an expert in the field of pretrial decision-making, people do not choose to be in jail.

132. From watching dozens of videos of probable cause hearings, it is my opinion that financial conditions of release are imposed on people who clearly cannot afford to pay them. I have seen many people ask for release on non-financial conditions, or for a lower bond, and be denied. Any reasonable person would conclude that those people will remain in jail as a result of their requests being denied.

133. Page 22, discussion of the Gupta study: Gupta, *et al*'s findings that "there is no relationship between requiring money bail as a condition of release and defendants' rates of appearance in court" demonstrates that money bail is not an effective tool for making people show up for court. This is the case because people pay sureties to get out, and they don't get the money back regardless of whether they show up or not. Paying a surety is basically a tax that only poor people pay. The Gupta study reflects this.

134. Page 22–23, criticisms of the Heaton study: The Heaton *et al.* study is about the most sophisticated, heavily controlled study about pre-trial ever conducted. It also is consistent with other studies that show the collateral consequences of time spent in jail: reduced well-being, increased unemployment, neighborhood decline, family disruption, downward economic mobility, etc. Needless involvement with the criminal justice system creates criminogenic effects, even after taking into account selection factors using a variety of statistical techniques, and increases the likelihood of future offending.

135. Page 23, "The Heaton report displays the results of a model that uses a linear probability measure. Given modern advances in econometrics and statistics, it is well known that this model is inappropriate to determine an outcome coded as 0/1.": This is not a factual statement. The model used by the Heaton authors is very common and used routinely in the top economics journals. There are distinct advantages to using linear probability models. For example, the results do not differ from a logistic or probit model except in cases in which the event being predicted is rare. The coefficients are more readily interpretable. I have reviewed several papers published in the top economics journals that apply these models.

136. Page 23, "The statistical analysis presented in the Heaton paper is highly suspect given its violation of well-known practices in modern empirical statistical work.": This is not a factual statement. The Heaton study is a strong piece of empirical work using two different methods, an incredibly rigorous statistical control method, and an innovative natural experiment using an instrumental variable approach, to try to confirm the downstream consequences of pretrial detention among misdemeanants. The statistical control approach is probably the most rigorous I have ever seen and the natural experiment is a nice attempt to approximate a true experiment to confirm the other results. It doesn't get more robust than this because it is not ethical to randomly detain people to determine causation.

## Additional Analysis Ongoing

137. I am continuing to supplement my findings with analysis of the data provided by Defendants, and in response to Dr. Morris's report, as well as his updated report and supplemental report, which I received four hours before submitting this report.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Stephen Demuth, Ph.D.

3-3-17
Date

# Ex. 2

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

|  |  |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-cv-01414 |
| ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |

## SECOND REBUTTAL EXPERT REPORT OF STEPHEN DEMUTH

This Second Rebuttal Expert Report is submitted pursuant to the Court's instructions.[1] The topics addressed below are intended (1) to respond to specific questions raised by the Court during the preliminary injunction hearing (some of which were also addressed in prior Expert Reports) and (2) to present my analysis of the data produced by Defendants subsequent to the hearing.[2]

**Materials Reviewed**: I reviewed the materials listed in Exhibit A in preparing this report.

I. **Detention Prior to the Probable Cause and Bail Hearing: 14,000 waited longer than 24 hours**

   a. About 14,000 people (almost 20%) waited 24 hours or longer for this hearing, but the hearing does not provide an opportunity to raise ability to pay or to make arguments concerning alternative conditions and is therefore, according to Plaintiffs' theory of the case, largely irrelevant to the constitutional issues in this case.

   b. My numbers are substantively the same as Dr. Morris's; we do not meaningfully disagree on this point.

   c. The median did not change even when I excluded any or all of the sub-populations Dr. Morris identified as possibly resulting in a longer time to the probable cause and bail hearing.[3] Dr. Morris never reported any analysis testing the hypothesis that including certain sub-populations may affect the delays.

---

[1] *See* Tr. 3/9/17, Afternoon Session, at 126:8-13.

[2] Unless otherwise noted, the numbers provided were derived from the dataset covering January 1, 2015 – January 31, 2017, excluding duplicates.

[3] Specifically, I ran the analysis of delays excluding duplicates, people on probation or parole, anyone with any prior failure to appear, more than one prior misdemeanor conviction, multiple concurrent charges, a current felony charge, or mental health or medical admissions, anyone designated "high risk" by the Harris County risk assessment tool, and anyone with an arrest-to-PC time of greater than 365 days. The median remained substantively the same regardless of how I filtered the data. Although Dr. Morris identified these sub-populations as potentially causing the delays, he

## II.    Detention Prior to First Setting: Almost 27,000 waited longer than 48 hours

   a.  52,194 people were detained until first setting, and 26,817 of them waited 48 hours or longer for that hearing, and about half of that number, (13,412) had been in jail for more than 72 hours.[4] This "hearing" is the first conceivable opportunity to raise ability to pay, but arrestees rarely actually appear in the courtroom unless they are pleading guilty.[5]

   b.  If a person cannot bond out by first setting, it is unlikely that they ever will: Of people detained at first setting, 81% remain detained until judgment (this includes the 55% of people detained at first setting who resolve their cases at first setting).

   c.  Dr. Morris claimed that he *did not even analyze* the delay between arrest and first setting because there was "missing" data. This stated reason for not analyzing the time to first setting makes little sense to me because: less than 1% of data are missing, and, by using the release dates and times in the dataset, it is possible to determine who is released prior to first setting.[6]

      i.  The analysis we both did was intended to describe a population: therefore, the time to first setting for every single person in the dataset is relevant because, even if information for some people is missing, you can still determine that tens of thousands of arrestees for whom data is available were delayed longer than 48 and 72 hours after arrest. And Dr. Morris had

---

never reported any analysis actually testing that question. To the extent he did examine the sub-populations, his analysis does not support his hypothesis. His report shows that the median is stable regardless of how he filters the data.

[4] I ran the same analysis excluding each and all of the sub-populations identified by Dr. Morris. None of them substantially affected the median time to first setting.

[5] Court-appointed attorneys have financial incentives to resolve cases quickly through guilty pleas: Doing so keeps the Judges' dockets moving quickly, which makes it more likely that the Judge will appoint the attorney future clients.

   Judges are evaluated each year by the Office of Court Administration on how efficiently they dispose of cases. *See* PX 13(l) (explaining that Judges in Harris County treat a fast-moving docket as a sign of success and appoint many cases to a certain group of lawyers who, in return for the appointments, move the cases quickly; in 2014, Judge Harmon assigned all of 2,451 court-appointed defendants to just 10 attorneys, and two of those attorneys accepted more than 750 misdemeanor defendants). Additionally, court-appointed attorneys are usually paid a flat rate per case, so "every extra minute spend improving the quality of his defense hurts [the court-appointed attorney's] bottom line." *Id.*

   The County's Office of Court Administration lists four "key performance indicators," each of which relates to the pace at which cases are moved: age of caseload, clearance rate, time to disposition, settings to disposition. *See* http://www.ccl.hctx.net/criminal/examine/Performance%20Based%20Criminal%20Case%20Processing.pdf at p.43.

[6] Dr. Morris testified at his deposition that this analysis was impossible to run because of "missing" data. I identified only 472 cases out of 116,310 that have missing entries for first setting. This number amounts to less than 1% of the full dataset. Moreover, it makes little sense to me to refuse to analyze the time between arrest and first setting because of missing data, even if 10% (or more) were missing (which they are not). Dr. Morris testified at the hearing that the Court's practice of imposing an automatic seven-day setting for people who bond out makes it look like many people are held for seven days prior to first setting. But he ignores the fact that the dataset includes release times and dates, making it possible to exclude from the analysis everyone who is released prior to first setting. To address the possibility that arrestees with apparent long delays may actually have been released on bond but were not coded as such due to a system data entry error, I completed a supplemental analysis excluding all cases with delays of 7 days or more. Excluding these 2712 cases with the longest delay times does not substantively change the results. Still, about 50% of detained arrestees waited 48 hours or more for First Setting. Over 10,000 arrestees waited 72 hours or more.

no difficulty analyzing the time between arrest and probable cause, despite the fact that 20% of data entries for the time of the probable cause determination were missing or occurred before the time of arrest.

d. The focus thus far has been on the delay until First Setting for those who remained detained. I also examined how long after the time of arrest it took arrestees who successfully bonded out before First Setting to be released. I found that of the 53,462 people who were released before First Setting, an additional 2,940 arrestees were detained 48 hours or longer before release without ever being taken to a County Criminal Court at Law for a first setting.

## III. For people who cannot afford to purchase their release by paying secured financial bail, the fastest way out of jail is to plead guilty.

a. The fastest way out of jail for those who cannot afford to pay their monetary bail amounts is almost always to plead guilty at first setting.

b. About half of the people detained at first setting – 54.7% – resolve their cases *at first setting*.

c. 92% of people who resolve their case at first setting do so by pleading guilty.

d. Of the people who resolve their cases at first setting by pleading guilty: 60% are released *that same day*, and 67% are released that day or the next day.

e. 83% of people who plead guilty at first setting are released *within 5 days of judgment*.

f. The next setting after first setting is typically at least two weeks in the future.[7] Therefore, the price of speedier release for a person who cannot afford to pay is a guilty plea at first setting.

## IV. Holds are largely irrelevant to Harris County's post-arrest system

a. There are a variety of "holds" in Harris County. The types that were identified in the data produced by Defendants are: immigration holds, parole holds, federal prisoner holds, Board of Pardons and Parole (BOPP) holds, "other" holds.

b. Only about 7.7% of misdemeanor arrestees have holds.

c. Of people who are detained at disposition, about 15.4% are subject to holds. My findings are nearly identical to the information reported by Defendants in Defendants' Exhibit 80.

d. Holds are placed and lifted at various points throughout the case, and the inability to post money bail will delay when the person can be transferred to resolve their hold.

e. Holds should be irrelevant to a person's case progress. My analysis confirms that holds do not affect the overall median time to the probable cause and bail hearing or the median time to first setting. Moreover, of those detained at judgment, the median time to judgment for people with holds and without are similar (3.8 days and 3.1 days, respectively).

f. **Response to Defendants' Exhibit 147:** I reviewed the data produced by the Sheriff during the preliminary injunction hearing. My understanding of the data is that it

---

[7] JoAnne Musick testified that if a misdemeanor case does not resolve at the first setting, it will be reset for "two to four weeks, maybe as much as six weeks out, depending on the type of case." Tr. 3/7/17, Morning Session, at 68.

shows the following: of people who have holds when they are booked into the Harris County jail, 77% of them are still detained 48 hours later. That means that 23% of people who have holds at booking are *released* within 48 hours notwithstanding the hold. The information says nothing about what percentage of arrestees have holds as Defendants first asserted.

V.  **Case outcomes, and the speed to disposition, vary dramatically for people detained at disposition as compared to people released at disposition**

    a.  Harris County operates a two-track system: For people who do not post bond, cases move relatively quickly and typically are resolved through guilty pleas, but for people who manage to secure release prior to disposition, cases take much longer to resolve, and chances are good that the charge will be dismissed, or at least will not result in a finding of guilt.

Case Outcomes

    a.  Specifically, for people who are not detained at the time of disposition, dismissals are almost 1/3 of judgments, and, combined with deferred adjudication and pretrial intervention, *the majority of people who manage to bond out of jail avoid a guilty finding*.

    b.  38,206 people – 44.2% of the dataset – were detained at disposition.

    c.  **Guilty pleas:** 84% of people detained at disposition plead guilty, while only 49% of people released at disposition plead guilty.

    d.  **Dismissal:** 13% of people detained at disposition have their cases dismissed (another 2% receive deferred adjudication), while 32% of people released at disposition have their cases dismissed (and another 12% receive deferred adjudication).

Time to Disposition

    a.  Cases move relatively quickly for people who cannot bond out of jail: The median length of time to disposition is 3.2 days. 72% of defendants detained at disposition resolved their cases within 7 days. 78% resolved their cases within 10 days. 90% resolved their cases within 30 days.

    b.  Of the people who were released at disposition, the median length of time between arrest and disposition was 112 days. 5% of people resolved their cases within 7 days. 7% resolved their cases within 10 days. 13% resolved their cases within 30 days. 54% resolved their cases within 120 days.

    c.  The data contradict Bob Wessels' testimony that people released on bond resolve their cases in "around 67 to 90 days," and that people who are detained resolve their cases "in the 30-day range."[8]

Paul Heaton, *Downstream Consequences,* and Arpit Gupta, *Heavy Costs of High Bail*

    a.  Paul Heaton and his colleagues analyzed these questions using Harris County data and were able to provide a robust regression analysis controlling for a host of variables as well as an impressive "natural experiment" that confirms their

---

[8] Tr. 3/10/17 at 36.

4

regression findings and provides compelling evidence of a causal connection between detention and case outcomes. Heaton and his co-authors analyzed the differences in case outcomes between people who did not post bond within the 7 days following the bail hearing, and people who did post bond within that time period. They found that detained defendants are 25% (14 percentage points) more likely to be convicted, and 43% (17 percentage points) more likely to be sentenced to jail. On average, when sentenced to jail, their sentences are 9 days longer, which is more than double the average sentence of similar, released defendants.

b. In his reports and testimony, Dr. Morris makes a number of criticisms of the Heaton study, and other similar studies such as Gupta et al., that I believe are either unreasonable or belied by the facts.

    i. First, both studies were peer-reviewed. The Gupta study was peer-reviewed and published in the Journal of Legal Studies, which is associated with the University of Chicago. The Heaton study was peer-reviewed and will be published in the Stanford Law Review.

    ii. I queried Dr. Heaton who informed me that they actually submitted the article using Stanford's exclusive submissions option so they'd have longer to look at it, to facilitate peer review of the piece. Information about this process can be found here: https://www.stanfordlawreview.org/submissions/issue-article/ .

c. Regarding the Heaton study, Morris states, first, "The Heaton report displays the results of a model that uses a linear probability measure. Given modern advances in econometrics and statistics, it is well known that this model is inappropriate to determine an outcome coded as 0/1."

    i. It is well known that the linear probability model performs well on a 0/1 outcome when the outcome is relatively common. Many articles published in the top economic journals use this model for binary outcomes. There are also good reasons to prefer the linear probability model, such as ease of interpretation. There is some additional discussion of this issue here: http://www.mostlyharmlesseconometrics.com/2012/07/probit-better-than-lpm/ and it is covered in depth in the book *Mostly Harmless Econometrics* by Dr. Joshua Angrist.

d. Second, Dr. Morris states "In Table 6, they account for differences across day of the week to assess if there is a differential impact in conviction across all available days. While they find statistically significant differences, across each day of the week, the differences do not represent substantive changes across each category. The statistical analysis presented in the Heaton paper is highly suspect given its violation of well-known practices in modern empirical statistical work."

    i. It is unclear exactly why he is concerned about this day-of-week design so it is hard to respond to the criticism, but although all studies have weaknesses, this study is incredibly rigorous with numerous controls, includes a novel instrumental approach, and is hardly suspect. Along with the Gupta et al. study, Heaton et al. is one of the most, if not the most, rigorous study of the effects of pretrial detention to date.

5

e. Third, Dr. Morris claims that causality cannot be inferred.

  i. I agree with Dr. Heaton and Dr. Stevenson's response to this criticism: "The whole point of the natural experiment is to allow this [inference of causality]. [It] [i]s similar to running a randomized trial...in this case, think of people on Thursdays as being assigned in the experiment to having a slightly better chance of making bail. Another way to think about it is the following...do we think Thursday defendants are more guilty than Wednesday defendants for some reason? Probably not. Yet they do end up being detained less often, and they did also end [up] convicted less often also, which suggests conviction is affected by detention." (Dr. Heaton, by e-mail)

  ii. "We acknowledge in the paper that our estimated effects might not be 100% due to pretrial detention -- that there might be unobserved differences across the two groups that account for part of the effect. But the paper controls in a very detailed manner for a huge variety of different characteristics, including the exact charge, the criminal history and the bail amount. And the natural experiment yields very similar results as the regression analysis." (Dr. Stevenson, by e-mail)

f. Fourth, Morris testified that the use of zip codes as a proxy for wealth is inappropriate for Harris County.

  i. I agree with Dr. Heaton, who stated via e-mail that although zip code is an imperfect proxy for wealth, given the high degree of housing segregation by socio-economic level in Harris County (as in most large U.S. cities), it is useful. It is also common for researchers to use zip code or neighborhood as a proxy for socio-economic status when individual data are not available.

g. Fifth, Morris criticized Heaton, et al for not accounting for post-arrest variables like employment.

  i. I agree with Heaton and Stevenson who stated, "That's true, but controlling for variables that might themselves be outcomes would be faulty analysis. We make the point in the paper that to do casual analysis properly you can't control for variables that are themselves results of what you are studying. That is non-controversial." (Heaton, by e-mail) "To put it in plainer English, detention may affect case outcomes for a variety of reasons. One reason is that released defendants have more opportunity to take actions that a judge would look favorably upon -- maintaining a stable job, for example. So employment may be one of the channels by which pretrial detention status affects case outcomes. In that case you don't want to control for it because it is part of the detention effect." (Stevenson, by e-mail)

h. Sixth, Dr. Morris's most significant criticism is that the natural experiment is flawed due to selection bias, and that Heaton, et al are wrong about the types of charges being similar on Tuesdays, Wednesdays, and Thursday.

       i.  I agree with Heaton and Stevenson who responded to this criticism by explaining, "If he read the paper, he would know that in the natural experiment we controlled for charges. So even if his statement about charges were true, we've accounted for that…it's akin to comparing two people who were charged with the exact same crime (and who have the same demographics, criminal history, etc.) who had differential access to bail due to having hearings on different days." (Heaton, by e-mail) "[T]here have been several other studies that have been put out in the last year that provide pretty irrefutable evidence that pretrial detention has an adverse effect on case outcomes.  The studies are based on the intuition that defendants who have bail set by a strict judge will [be] statistically identical to defendants who have bail set by a lenient judge, except in their likelihood of being detained pretrial.  The studies have found that defendants who had bail set by a strict judge are more likely to be convicted and receive harsher sentences than those who had bail set by a lenient judge. . . ." (Stevenson, by e-mail).

i.  Heaton also argued, and I agree, that "there is an important contradiction" in Dr. Morris's argument:

       i.  "On the one hand, their basic argument is that the bail system is working properly to appropriately segregate people according to risk. They also argue that the natural experiment is invalid due to differences in charges or other characteristics across people across days that lead to selection bias. However, Figure A.2 in our paper shows that the bail amounts set for folks across the different days are virtually identical (not just on average, but the entire distribution of amounts is identical). If the bail system works as it should and there is something about the Tuesday or Wednesday folks that makes them riskier, why didn't the judges see this and assign them different bail amounts? You can't have it both ways--if you really believe that the bail system works properly, then Figure A.2 should pretty much be all the evidence you need that the natural experiment is valid." (Heaton, by e-mail)

     ii.  "You don't need the bail system to work properly in order for the results in the paper to be informative. So long as judges are equally discriminatory across the different days of the week (so they don't treat poor people on Tuesdays differently than say Wednesdays), the natural experiment would still appropriately measure the harmful impacts of detention." (Heaton, by e-mail)

   iii.  The same point can be made about the Gupta study: The cases are assigned randomly to the judges, and the authors do "randomization checks" to make sure that the case characteristics are statistically equivalent across judges.

k.  I fully endorse Dr. Heaton's general critiques of Dr. Morris's criticisms of the *Downstream Consequences* study:

       i.  "Basically, the county is trying to argue that it isn't about poverty, there are other reasons besides poverty that can explain what we see in terms of who is detained in Harris County and what happens to them.  To demonstrate

this, they first contend that judges can see a lot of information about the circumstances of defendants that go into the bail amount, and if one properly account[s] for those, it isn't obvious that anyone is detained due to poverty. You can think of the expert's arguments on pg. 3 and beginning on pg. 10 as reflecting that view.

"The expert does not critique at all our analysis in Figure 4, which argues strongly against that view. In the figure, we compare each defendant only to those who have been assigned the exact same dollar amount of bail by the court. Whatever the court was able to see that would cause them to want to treat someone differently (whether they own a car, priors, etc.--whatever else the court might have at its disposal) should already be reflected in the bail amount. And what we see is that poorer people (using an imperfect proxy for wealth) are more likely to be detained. You can think of this (again, undisputed) figure as saying--let's let the court apply whatever information it has at the initial stage of bail setting first, and then see what happens to people based on wealth. So it really can't be about the court having some sort of superior information that isn't being properly accounted for, because we already account for the court's information by controlling for the exact bail amount.

"The second claim they are making is that the worse outcomes we see for the detained aren't because bail coerces people, but, again, because there are unobserved differences (like whether people know that they are guilty) that cause guilty people to be more likely to be detained. First, it's worth noting that all of our analyses do the same thing that we do in the figure, which is control for exact bail amount, so it again is highly unlikely that somehow the court has superior information that isn't being properly accounted for. Second, the day-of-the-week design, which the expert does not provide a coherent critique of, is specifically designed to address that concern, by finding pools of people who look statistically identical to one another but who get released at different rates for reasons plausibly unrelated to guilt or innocence. It is designed to provide as convincing as possible an answer to the causal question of what would happen specifically in Harris County if one were to detain fewer people holding other factors constant, which is a core question in this case (and the very issue the expert spends a lot of time on in his discussion of DC). The answer is that there would be fewer convictions of possibly innocent individuals, the county would spend less on jail, and crime would go down." (Heaton, by e-mail)

1. Generally, I believe Dr. Morris' criticisms of the Heaton and Gupta studies as well as his characterizations in testimony of what is required to draw adequate, fair-minded conclusions from statistical analyses are unreasonable and do not accurately reflect how science works in practice. While Dr. Morris is correct that scientific research does not "prove" anything, that we must always seek out potential alternative explanations for our findings, and that there are always

limitations to any study, I believe that Dr. Morris seems unwilling to endorse any finding that is not the product of the "perfect" study. No study is good enough for him. He uses this imperfection to create doubt, unreasonable doubt in my opinion, that we cannot draw meaningful conclusions from what are a collection of quite rigorous studies about the effects of pretrial detention.

m. The Heaton and Gupta studies are of similar or higher quality than the articles published in the flagship peer-reviewed journals in criminology and criminal justice. To dismiss their findings and argue that the doubt is too great to draw meaningful conclusions about the likely impact of pretrial detention and money bail strains credulity. To quote the famous statistician George Box, "Remember that all models are wrong; the practical question is how wrong do they have to be to not be useful?"

## VI. Pretrial misdemeanor detainees remain in jail for days and weeks.

a. Defendants claim that nearly all pretrial misdemeanor detainees in the Harris County Jail are in "processing" in the inmate processing center. This is incorrect.

b. 45% of people detained at first setting do not resolve their cases at first setting and spend additional time in the Harris County Jail prior to disposition.

c. On average, between February 15 – March 14, 2017 (excluding February 18), every day in the Harris County Jail there were: 328 people charged only with misdemeanors, 240 of whom were not subject to any kind of hold.

d. Of the average 240 pretrial arrestees charged only with misdemeanors and not subject to holds, an average of 154 every day had been in jail for 3+ days; 126 had been in jail 5+ days; and 84 had been in jail for 10+ days.

e. Every single one of these individuals would be released if she paid the monetary bail amount assigned to her pursuant to the County's bail schedule, notwithstanding her criminal history, current charge, prior failures to appear, or any other factors.

f. This means that Mr. Wessels' testimony that there are only between 15 and 30 misdemeanor arrestees who are in the jail every day *without* holds[9] is simply incorrect.

## VII. Hearing Officers and Judges do not follow the recommendations of the current risk tool

a. Very few people are approved for release on unsecured bond or non-financial conditions. About 10,273 (or 9.7%) of all arrestees were released on personal bonds.

b. Hearing Officers and Judges are usually unwilling to grant release on unsecured bond or non-financial conditions even when the County's validated risk assessment tool and trained pretrial services agents make such a recommendation.

c. In 2015, Hearing Officers rejected 50% of Pretrial Services' recommendations for personal bond release with standard conditions, and 80% of recommendations for personal bond release with additional conditions.[10]

---

[9] Tr. 3/10/17 at 33:16-19; *see generally* Tr. 3/10/17 at 31-33.

[10] In 2015, Pretrial Services recommended release on personal bonds for 14,204 *cases* (not people). Because *people* (not cases) are "released," the number of people recommended for release on personal bonds may be less.

d. Harris County's Pretrial Services Annual Report suggests that Judges rarely "review" the recommendations for release on unsecured bail. The Report states that County Criminal Court at Law Judges "reviewed" only 1,243 pretrial services interview reports in 2015 (remember that roughly 26,000 people are still detained at first setting (though not all of them had interview reports)). Judges granted personal bonds in 480 of the reviewed cases.

**VIII. Hearing Officers and Judges apply the bail schedule in almost 90% of cases.**
   a. Bond amounts were changed in only 11,003 (11.1%) cases.
   b. 99.4% of bond changes were made by Hearing Officers.
   c. About 2/3 of those changes were increases in bond amounts.
   d. Changes in bond amount by a County Court at Law judge occur in less than 1% of cases.

**IX. Hearing Officers routinely state that they are setting bail — or denying a personal bond — "pursuant to the schedule," but they rarely state their reasons for granting personal bonds.**
   a. Hearing Officers state orally and in writing that they are bound by the bail schedule and the Judges' rules when setting bail and denying personal bonds.
   b. Hearing Officers regularly make statements to the effect of, "I'm setting your bail at $5,000 (or $2,500; or $1,000; etc.) pursuant to the Judges' bail schedule" or "pursuant to the Judges' [or Judge's] instructions," "based on your priors," because of concerns for "safety of the community," because the person is "out on bond" in another case, due to the nature of the current charge, or because of the arrestee's "criminal history."
   c. Hearing Officers provide the same reasons — priors, bail schedule, on probation, nature of the current charge — when they deny personal bonds.
   d. Hearing Officers also state on the record that they deny personal bonds because a person lacks a stable residence or has just moved to Houston.
   e. Sometimes the reasons a personal bond is denied are written on the "Probable Cause / Statutory Warnings" forms that the Hearing Officer completes for each arrestee.
   f. I have reviewed Plaintiffs' Exhibit 9, which consists of several examples of these forms, each of which includes a hand-written statement under the box indicating that a personal bond was "disapproved" that states, for example, "Safety of Community" and "Homeless" (Andrew Goodson); "Parole" (Edward Randle); "Safety" (Howard Pratt); "Criminal History" (Meghan Whilley).
   g. Hearing Officers routinely state simply, and without further explanation, that a person does not "qualify" for a personal bond, or is not "eligible" for a personal bond.
   h. The reasons for *granting* a personal bond are rarely stated.

---

Additionally, Pretrial Services reports information about personal bond recommendations, and whether those recommendations resulted in release on personal bonds, only for people who had an interview report that was reviewed by a Hearing Officer. More people appear at probable cause and bail hearings and are denied personal bonds than have interview reports reviewed by Hearing Officers.

**X.    Release and detention is determined primarily based on a person's access to money, resulting in the detention of less criminally risky, but poorer, people.**

    a.  The overall likelihood of receiving a personal bond is low regardless of an arrestee's situation, but people with high background risk scores are less likely to receive a personal bond at the same level of criminal risk.

    b.  Because of the low usage of unsecured personal bonds, most arrestees must rely on surety bonds as their only avenue for release.

    c.  For arrestees with 1 criminal risk point on the pretrial risk assessment, differences in the likelihood of being held on bond based on background characteristics such as social class, sex, and age are stark: Among arrestees with 1 criminal risk point and 0 points for background risk factors, about 14% remain detained unable to make bail, but for arrestees with 1 criminal risk point and 7 points from background factors, over 53% remain detained.

**XI.    Harris County's data on pretrial misconduct does not permit robust findings about the comparative rates of court appearance and new criminal activity between surety bond and personal bond releasees. The data that are available shows a slightly lower rate of bond failure (defined as *either* a failure to appear or a new arrest because Defendants state that they cannot differentiate between them) for people released on personal bonds as compared to people released on surety bonds.**

Raw data produced by the County

    a.  Harris County does not code or track failures to appear, which makes any analysis of this issue extremely difficult.

    b.  Harris County also does not track arrests of people on pretrial release.

    c.  Harris County does track "bond revocations," "bond forfeitures," and "bond surrenders." These notations can be used as proxies for pretrial misconduct generally. However, there is no way to determine whether a revocation or surrender denotes a failure to appear or, instead, a new arrest. My review of an email from Defendants' counsel states that a bond forfeiture notation is a proxy for a failure to appear. But there is no evidence that every failure to appear results in a bond forfeiture.

    d.  Moreover, there is no way to determine what underlying conduct, given various policies of the District Attorney or individual judges, results in each of these findings. For example, some judges may not forfeit a bond based on a single failure to appear, while other judges may not revoke a bond based on a single failed drug test or new arrest for a petty offense.

    e.  Therefore, it is impossible to determine from Harris County's data whether surety bond or personal bond releasees are more likely to commit new crimes or fail to appear.

    f.  Another reason the data is not useful in comparing rates of pretrial misconduct is that we have no idea whether a forfeiture is entered for every single failure to appear. For example, a forfeiture for failure to appear may be less likely to be entered for a person released on a surety bond than for a person released on a personal bond. Texas law provides a six month "grace period" to commercial

bonding agents, which means that sureties do not forfeit a bond if the person is arrested by law enforcement or otherwise shows back up after a failure to appear within six months. *See* Texas Code of Crim. Pro. Art. 22.13(a)(5). People released on personal bonds do not benefit from the same statutory grace period prior to forfeiture. It is also unclear whether the code "forfeiture" is a good proxy for failures to appear because the District Attorney or other official may not pursue bond forfeiture for every failure to appear.

g.  Moreover, the data suffer from the same fundamental flaw as Dr. Morris' Dallas study: the data do not allow an "apples to apples" comparison in this case because Harris County's pretrial services do not make full use of non-financial conditions and supervision best practices. For example, Harris County does not employ proven strategies like text message and phone reminders of court dates, nor does the County provide transportation to court for people who do not have their own transportation. These strategies have been shown to increase court appearance rates for people released on non-financial conditions, even in a pretrial system that is understaffed and under-resourced, as Mr. Kelvin Banks testified is the case currently in Harris County.

h.  Another problem is that it is impossible to know if there are unmeasured differences between the groups of people released on personal and surety bonds. For example, the cohort of people who are able to pay money bail pursuant to the schedule prior to a probable cause hearing (when personal bond is typically available) may be a more stable and less risky cohort.

i.  Even with these caveats, the data show that people released on personal bonds have lower failure rates than people released on surety bonds.

  i.  When you compare bond failure rates of people released after the probable cause hearing, people released on personal bonds have a lower bond failure rate: specifically, those who are released on personal bonds have a failure rate of 13.60%, and people released on surety bonds have a failure rate of 14.35%. People released on cash bonds have a failure rate of 7.96%.

  ii.  If you examine all approved bonds (including people who bond out prior to the probable cause hearing), personal bond releasees have a failure rate of 13.7%; surety bond releasees have a failure rate of 11.1%; and cash bond releasees have a failure rate of 5.9%. Although these numbers are relatively close and not remotely robust for the reasons described above, they tend to suggest that the category of people who are able to pay for release quickly are a less risky cohort.

j.  Although the data make it impossible to say anything reliable about failures to appear or new criminal activity in Harris County because those results are not coded and collected, if attempting to do even a rough comparison using the flawed data, it makes better sense to compare to each other the surety and personal bond releasees who were released after the probable cause hearing. This makes more sense because they are likely more similar populations: people who could not immediately or very quickly obtain the money necessary to bond out of jail. The people who are able to bond out very quickly prior to booking are probably, on average, wealthier and may have certain characteristics as a cohort that make them less in need of supervision or non-financial interventions that are

useful to reasonably ensuring court appearance. Thus, to obtain a more "apples to apples" comparison, it is helpful to compare surety releasees and personal bond releasees who are released at the same point in the process to each other.

k. Research and statistics from other jurisdictions suggest that unsecured bail or non-financial conditions are at least as effective at ensuring safety and court appearance as secured financial conditions, even without the application of all of the best practices in supervision. *See, e.g.*, Michael Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option* (Oct. 2013); Docket Entry No. 233 (Plaintiffs' summary of other jurisdictions).

l. I have reviewed Dr. Morris' study examining differences in failure to appear rates and pretrial misconduct across several different pretrial release alternatives in Dallas County. It is an unpublished study and doesn't provide much explanation beyond a reporting of the results. I have a few concerns about the rigor of the study and its applicability to other jurisdictions.

    i. On the front page of the study, there is a disclaimer: "No attempt by the research investigator, Professor Robert Morris, or the University of Texas at Dallas, will be made to explain the reasons behind the findings presented within this report." I found this disclaimer strange since the report itself provides little context for understanding how pretrial practices operate in Dallas County. The report only includes the results and a description of propensity score matching, the statistical technique used in the analysis. There is no discussion of pretrial services except in the technical appendix in which we learn that there are only minimal staffing and services provided for arrestees released on unsecured bonds: for example, the report states that the entire Dallas Pretrial Services consisted of only "four pretrial services officers." Def.'s Exhibit 30 at 28. I wouldn't characterize Dr. Morris' study as "scientific" given that it includes only data (analysis) and no theory or logical/contextual foundation to understand findings, which in my view is a requirement of good science.

    ii. The author's attempt to use propensity score matching to compare different pretrial release options is notable and worthwhile. Propensity score matching attempts to approximate an experimental design in which groups assigned to each treatment option are equivalent on characteristics such that any differences in outcomes can be attributed to the effect of the treatment. Unfortunately, while experiment-like, propensity score matching is only as good as the variables observable to the researcher and included in the models to "equate" the groups. Any unobserved differences between groups undermine the researcher's ability to equate groups through statistical matching. Two concerns are notable to me from the report:

        1. Typically, researchers provide descriptive statistics for all the case characteristics used to compare the different treatment groups (i.e, different bond types in Morris' study) before and after matching. This is not only to inform the reader about how the groups differed on characteristics before the statistical procedure, but also to provide a "randomization check" showing that the matching procedure actually produced statistically equivalent groups before comparing

outcomes. A good example of this for the natural experiment by Heaton and colleagues can be found on page 28 of their study. Morris does not provide a table of this kind describing his sample or confirming statistically equivalent groups.

2. The study does not use measures of employment status, residential status, or pretrial risk assessment. While no study is without limitations, the ability to create equivalent groups using propensity score matching is hampered by not knowing this information. These are important sources of unobserved heterogeneity that make it difficult to compare the outcomes of arrestees released on pretrial services versus commercial bonds. The two groups may be different in other unobserved characteristics and not just the type of bond.

iii. My last concern is not a criticism of Dr. Morris' study, but rather the ability of anyone to make a fair comparison between two release options that are not equivalent by design. Maximum success with unsecured pretrial services bonds usually requires some basic support infrastructure. It is clear that Dallas County does not have this infrastructure and support. Thus, a comparison of commercial bonds to personal bonds in Dallas says very little about how commercial bonds would compare to the success of a system using non-financial alternatives of personal bonds with even minimal best practices in supervision and court reminders.

iv. Furthermore, commercial bail bondsmen get "first dibs" on arrestees, with pretrial service bonds considered only for those remaining arrestees not bonded out by the bail bondsmen (usually because they cannot afford money bond). The unsupportive system for pretrial service bond releases combined with the clear "cherry picking" by bondsmen of the least risky, most resourceful arrestees creates a situation designed for unsecured bonds to perform more poorly than commercial bonds.

v. I believe it is likely dubious to attempt to statistically equate groups of people through propensity score matching who are a product of the purposely nonrandom selection process of bondsmen and a pretrial services system that provides only minimal contact and monitoring.

DX-145 (spreadsheet 471)

m. DX-145 appears to be a chart showing the comparative failure to appear and new criminal activity rates for people who were released on personal bonds and whose cases were disposed of between January 1 and March 8, 2017, for each of the 16 courts.

n. Because Judge Jordan came on the bench on January 3, the results for Court 16 cannot be solely attributed to his practices.

o. Notably, when removing older cases and looking at only cases approved under Judge Jordan, he grants the highest percentage of personal bonds of all the County Criminal Court at Law Judges and has a lower-than-average failure rate compared to the other County Criminal Courts at Law. This is described more fully below.

p. According to the results presented in DX-145, the failure to appear rate for all courts is 21%. The rate of new criminal activity for all courts is 4.85%. This shows that

the real challenge is to provide the services necessary to help people get to court: the problem is failures to appear, not new criminal activity.

q. DX-145 purports to show that the rate of new criminal activity among people released on personal bonds in Judge Jordan's courtroom is among the highest. But, again, these numbers cannot be attributed to Judge Jordan because he came on the bench on January 3, and the chart reflects cases *disposed* since January 1.

DX-150 (spreadsheet 818)

r. This document shows forfeiture rates for people released on surety bonds whose cases were *disposed* between January 1 and March 8, 2017.

s. This data is not useful for comparing Judge Jordan's practices in Court 16 with the practices of the other 15 Judges because, like DX-145, it reflects outcomes for cases *disposed* since January 1. It therefore captures people who were placed on surety bonds by Judge Jordan's predecessor in Court 16.

t. As noted below, when considering only Judge Jordan's activity, which the data allow, Judge Jordan actually has higher than average success rates.

**XII. County Court at Law Judge No. 16, Darrell Jordan, has grants a higher percentage of personal bonds than the other 15 judges. The failure rate of defendants in his court room is lower than the average.**

a. The County produced data that allowed me to determine the number of personal bonds approved by each County Criminal Court at Law Judge since January 2017.

b. Judge Darrell Jordan, Court No. 16, has granted the highest percentage of personal bonds (as a percent of all his bonds) and the lowest percentage of surety bonds (as a percent of all his bonds) of any County Criminal Court at Law Judge.

c. The failure rate of defendants in Judge Jordan's courtroom for both surety and personal bonds is lower than the average failure rate across all County Criminal Courts at Law.

**XIII. Defendant not present entries – DX-143 (spreadsheet 983)**

a. This spreadsheet simply reflects the fact that people Hearing Officers determine probable cause and set bail in arrestees' absence.

b. Plaintiffs' Exhibit 3, Part IV.E. shows this same fact.

c. In each of those cases, the arrestee's "hearing" was recorded by video, and a notation appears under the "Activities" tab on the district clerk's website: "DEF NOT PRESENT." Additionally, "DNP" was routinely written on the arrestee's probable cause / statutory warnings form.

**XIV. Very few people are released on personal bonds prior to being transferred to the Harris County Jail.**

a. In 2015, 90 people (out of 50,947 arrestees) were released on personal bonds after arrest but prior to booking into the Harris County Jail.

b. In 2016, 240 people were released after arrest but prior to booking into the Harris County Jail. I do not have data on the total number of misdemeanor arrestees in 2016.

    c.  Harris County provided no information about the circumstances giving rise to release on a personal bond prior to being transferred.

**XV.  Hearing Officers have access to very little, if any, financial information on which to base bail decisions.**

    a.  I reviewed Plaintiffs' exhibit 8(b), a Summary Chart of a random sample of 140 pretrial services interview reports, plus the Named Plaintiffs' interview reports. The Summary reflects the fact that the interview forms routinely lack any financial information whatsoever.

    b.  When financial information is available, it is rarely useful to determining a person's ability to pay a particular bail amount.

    c.  More frequently, the financial information reflects the arrestee's abject poverty by, for example, reflecting that the person is homeless, receives government benefits, has expenses exceeding income, or has no income at all.

    d.  I have reviewed the interview reports, probable cause hearings, and case histories of four individuals from among the hundreds of people whose interview reports were produced to Plaintiffs. These individuals' experiences reflect some of the general trends evident in the data.

### i.  <u>Casey Lynn Gaedchens</u>

Ms. Gaedchens was arrested on August 12, 2016 at 2 p.m. for trespass. A $5,000 bail amount was set pursuant to the bail schedule. She was interviewed in the Inmate Processing Center at the Harris County Jail on August 13 at 12:13 a.m.

Her pretrial services interview form shows the following:
- She is homeless.
- She has three children under age 17. They live with another family member.
- She has no history of failures to appear in Harris County, despite prior convictions, suggesting that she has made every court appearance in the past.
- She has lived in Harris County for 29 years.
- She has no holds.

Pretrial Services designated her "high risk." She got a point for being "male," even though she is not. She also got a point because of the trespassing charge. If her background risk points were ignored, she would be categorized as "low/moderate."

There is no financial information whatsoever in the interview form, except for the notation: "does not pay any bills homeless."

For some reason, Pretrial Services included a note: "Defendant is white."

On August 14 at 2:15 a.m. – almost 36 hours after her arrest – she appeared by videolink at a probable cause hearing. Hearing Officer Ron Nicholas, in 1 minute and 10 seconds, confirmed her bail amount at $5,000, found that she did not "qualify" for a personal bond, and informed her that she was assigned to County Court at Law No. 1, Judge Paula Goodhart.

On August 15 – more than 67 hours after her arrest – she had a "jail hearing," meaning that she appeared in the lock-up off of the courtroom. She was not appointed counsel, and her case was reset to August 16.

On August 16, she was brought back to the lock-up off of the courtroom. She was finally appointed counsel – almost four days after her arrest. She accepted a guilty plea and was released four days later, on August 20, at 2:35 pm.

### ii. **Dylan Cole Burgess**

Mr. Burgess is a 22-year-old African-American man who was arrested on August 7, 2016 at 5:13 pm. He was charged with trespassing, and a bail amount of $2,500 was imposed pursuant to the schedule.

He was interviewed by Pretrial Services shortly after midnight on August 9, while in the Inmate Processing Center at the Harris County Jail. He told pretrial services the following:

- He had lived in Harris County for 22 years, his entire life.
- His monthly income was $1,100, and his monthly expenses were $1,300.
- He supports two children.
- He had no prior failures to appear.

He was assigned a risk score of 7 and categorized as "moderate" risk. Four of those points were from background factors, and another was a result of the current charge (trespass). Therefore, he would have been "low risk" (a risk score of 2) but for the background factors and the point he received for the current charge being trespass. Pretrial services recommended him for release on a personal bond with standard conditions.

He appeared by videolink before Defendant Hearing Officer Jill Wallace around 1 a.m., more than 24 hours after his arrest. During the hearing, Wallace told Mr. Burgess not to talk. She denied Pretrial Services' recommendation for a personal bond.

The next morning, August 10, he was brought to County Court at Law No. 3, Judge Natalie Fleming's court. He was not appointed an attorney. He returned on August 11. Again, he was not appointed an attorney.

On August 12, almost 5 days after his arrest and imposition of a $2,500 secured money bail, he finally was appointed counsel. That same day, he pled guilty and was sentenced to 20 days in jail with credit for the six days he had been in jail prior to meeting his lawyer.

He was released that same night at 11:41 p.m.

### iii. **Taurus Malik Williams**

Mr. Williams was arrested on May 8, 2016, for possession of marijuana under two ounces, a first offense. A $500 bail was imposed. He was interviewed by pretrial services around 2:45 a.m. on May 9. He told pretrial services that he did not have a job and had lived in Harris County his entire life. He reported no income or expenses. He was given a risk score of "moderate" based on 7 points he was assigned due to background risk factors alone. He was recommended for release on a personal bond with standard conditions.

At 7:31 a.m. on May 9, he appeared by videolink before Defendant Hearing Officer Blanca Villagomez. Villagomez confirmed his bail amount at $500 and denied a personal bond.

Two days later, on May 11, Mr. Williams was taken to County Court at Law No. 12, Judge Robin Brown's court. He was found indigent and appointed counsel.

He pled guilty that same day and was sentenced to 10 days in the Harris County Jail with credit for the four dates he had already been in jail on a $500 bond.

He was released that night at 11:44 p.m.

### iv. **Norma Bremmer**

Ms. Bremmer was arrested on August 8, 2016 at 1:42 p.m. for trespassing and resisting arrest. Bail was set pursuant to the bail schedule at $1,000 for the resisting arrest charge and $500 for trespassing.

She was interviewed by pretrial services at 9:50 a.m. on August 9. The interview form states that she refused to provide financial information, except to state that she had been employed full-time for a year.

At 4:43 pm on August 9, more than 24 hours after her arrest, Ms. Bremmer appeared before Defendant Hearing Officer Joe Licata. Licata denied her personal bond, stating,

> She refused to give information, and they put that on there? Refused information? You don't have a choice. Okay. I refuse to give her a personal bond. That doesn't make any sense. Gonna find probable cause. Leave your bonds. . . . you refused to give information to pretrial and I'm going to refuse to give you a personal bond. I'm going to deny your personal bonds.

On August 10, Ms. Bremmer was taken to County Court at Law No. 10, Judge Ross's court. The public defender was appointed because of a concern about a possible mental health issue. Her cases were reset for August 18.

They were subsequently reset another 8 times, including for a mental competency hearing in October. She waived her right to appointed counsel on November 18, 2016. On December 15, 2016, she represented herself at trial.

She was convicted by a jury of both charges. She was ordered to pay a $50 fine for the trespassing conviction, and was sentenced to 21 days in jail for the resisting arrest charge. But she had already spent 129 days in jail.

Therefore, Ms. Bremmer was released that same day, having spent more than four months in jail solely because she could not afford a $1,500 bail. She served 108 days longer than her sentence.

e. These individuals' case histories illustrate the following information that is reflected in the data:

   i. Half of people detained at first setting resolve their cases, overwhelmingly typically by pleading guilty. The vast majority of those who plead guilty at first setting are released within 5 days of judgment. (Williams, Burgess, Gaedchens)

   ii. If a person wants to fight their case but cannot afford bail, they could remain in jail pretrial for much longer than the sentence they would be likely to receive for the offense. It therefore is totally rational to plead guilty to secure early release. (Bremmer)

   iii. Many people do not have a probable cause and bail hearing within 24 hours. (Gaedchens, Burgess, Bremmer)

   iv. The interview reports do not answer the most useful question for determining whether imposition of a monetary bail amount will result in a person's detention, namely: can this arrestee afford a monetary bail amount, and if so, how much can they pay?

   v. Misdemeanor defendants are not always appointed counsel the first time they are taken to a County Court at Law. (Gaedchens, Burgess)

**XVI.  Data on mental health, intellectual disability, and psychiatric medication (DX-152 (spreadsheet 827))**

  a.  This spreadsheet includes information about 56,299 cases that have unique SPN/arrest dates. I believe these are all people who had a mental health assessment done while in Harris County custody between January 1, 2016 and February 14, 2017.

  b.  1,823 were admitted to the mental health unit *at some point* between booking and release. The spreadsheet does not state whether the admission occurred during the person's pretrial detention.

  c.  8,257 people had been prescribed psychiatric medication at some point in their life. 4,129 were prescribed psychiatric medication at some point while in Harris County custody.

  d.  13,835 had a mental health diagnosis at some point in their life. 327 had an intellectual disability diagnosis at some point int heir life.

  e.  5,598 had been diagnosed with Bipolar, Major Depressive Disorder, or Schizophrenia.


I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.


Stephen Demuth, Ph.D.

3-17-17

Date

# Ex. 3

# Exhibit 3

# EXPERT ANALYSIS OF DR. STEPHEN DEMUTH[1]

## I.      Introduction

1.   I have conducted a preliminary analysis of the data Defendants have produced in discovery in the above-captioned case. My analysis has focused on the data showing bond forfeitures and the judges' assertion that bond-forfeiture rates have dramatically increased since the injunction went into effect.[2]   The County and judges have not produced all the data necessary to analyze bond forfeitures and failures to appear throughout the entire 11 months since the injunction went into effect.   I am awaiting updated data and will continue my analysis when I receive it.  My analysis therefore is ongoing.

2.   This report sets forth my preliminary findings, which I am continuing to update.  My preliminary analysis of the judges' bond-forfeiture statistics suggests that they are deliberately manipulating the system in an effort to produce a desired result:  to suggest that people released on unsecured bonds supposedly evade justice.

## II.      A "bond forfeiture" is not a one-to-one proxy for "failure to appear"

3.   I have reviewed Exhibit A, filed by the Fourteen Judges in the Fifth Circuit Court of Appeals on May 3, 2018, which includes a declaration by Ed Wells and a chart purporting to show bond failure rates, including the bond-forfeiture rates for four different bond types. The Judges report that between June 6, 2017 and April 30, 2018, the "raw" bond forfeiture rates by bond type were as follows:
   a.   Cash: 15.82%
   b.   "Secured" (surety bonds): 10.02%
   c.   Personal: 26.67%
   d.   "Sheriff's" bonds (unsecured bonds issued pursuant to the federal court injunction): 49.30%

4.   These raw bond-forfeiture statistics do not provide meaningful information about comparative *appearance* rates for people released on different bond types.

5.   Court Manager Ed Wells states in his declaration that each of the above-listed bond-forfeiture rates "represents a failure-to-appear rate." That is incorrect for several reasons discussed

---

[1] Submitted in *ODonnell v. Harris County,* Case No. 16-cv-01414 (S.D. Tex. 2016), No. 17-20333 (5th Cir. 2017).

[2] I am aware of the judges' claim that bond-forfeiture rates have "skyrocketed while the preliminary injunction has been in place," but the judges do not identify a baseline against which they are comparing current rates.  To the extent the judges are comparing bond-forfeiture rates for each bond type from the months immediately following June 7, 2017 (when the injunction went into effect) to the bond-forfeiture rates they now report for the full 11 months since the injunction went into effect, *the increase is to be expected*:  as time passes, more court dates are scheduled and there are more opportunities for each person to not appear and for a bond to be forfeited.  To the extent the judges are comparing bond-forfeiture rates post-injunction to bond-forfeiture rates pre-injunction, the comparison is meaningless because there is an entirely new category of bonds post-injunction (the unsecured bonds issued pursuant to the injunction), and because this type of comparison can only be made if an identical time period were identified, which the judges do not do.

in this declaration. Among them: the bond-forfeiture statistics count *bonds* not *people*. The data show that many people have multiple bonds and that a single missed court date can result in numerous bond forfeitures.

6. Jurisdictions that rigorously monitor and evaluate their pretrial systems track failures to appear clearly by person and court date, not by the number of total cases. They follow them prospectively, as opposed to just lumping them all together.

7.

8. I used the data to analyze the relationship between bond forfeitures and failures to appear. My preliminary analysis (which involved cases with arrest dates between June and September 2017 because I have not received data for the full 11 months since the injunction has been in effect) shows that:

  a. There are numerous cases involving people released on unsecured bond who, according to the County's data, appeared in court for their first court date, *but their bonds were forfeited anyway*;

  b. There are numerous cases involving people released on surety bonds who, according to the County's data, missed multiple court appearances, but whose bonds were *never forfeited*;

  c. Among people released on *unsecured bonds* who, according to the County's data, missed their first two scheduled court dates, 36% had their bonds forfeited.

  d. Among people released on *surety bonds* who, according to the County's data, missed their first two scheduled court dates, only 6% had their bonds forfeited.

9. Although there are inconsistencies in the data that I will continue to explore during my ongoing analysis, these systemic patterns suggest that people released on unsecured bonds are treated differently—and more harshly—than people released on surety bonds. Based on the available data, it is likely that differential treatment by the Judges explains the different forfeiture rates between unsecured and surety bonds in these cases.

**III.    The Elevated Bond-Forfeiture Rate for People Released on Unsecured Bond Can Be Explained by Additional Factors**

**A.    People Released on Unsecured Bond Belong to a Group of People Who, According to the County's Pretrial Assessment Tool, Are More Likely to Miss Court Than People Released on Other Bond Types And Are Not Receiving Pretrial Services or Supervision**

10. I analyzed the data from the County's pretrial assessment tool to determine the average assessed risk of failure-to-appear (FTA) on a 6-point scale among people released on different types of bonds. Between July 28, 2017, and January 31, 2018, people released on unsecured bonds pursuant to the federal court's order presented, on average, a substantially higher risk score (2.51)

than people released on surety bonds (1.64) or personal bonds (1.85). That is, the FTA risk score for people released on unsecured bonds was 53% higher than the score for people released on surety bonds and 36% higher than for people released on personal bonds.

11. Despite their higher "risk" of nonappearance—and greater need for pretrial assistance to get to court—people released pursuant to the federal court's order during this time period were *much less likely* to be supervised or to have non-financial conditions imposed. Using data showing bond supervision and conditions for cases released between June 7 and November 20, 2017, I found that only 5.6% of people released on unsecured bonds were supervised by pretrial services and only 4.4% had additional non-financial conditions. In contrast, 67% of people released on personal bonds were supervised, and roughly 13% had additional non-financial conditions.

**B.  People Are Routinely Released From the Jail in the Middle of the Night**

12. Data showing release times reveal that people are often released from the jail in the middle of the night.

**C.  People Released on Unsecured Bond Are Typically Required to Return to Court the Next Day And Have More Court Settings Scheduled Close in Time**

13. For people released on *unsecured or personal bonds* between June 7, 2017 and December 31, 2017, the median time between bond-approval and first-setting was *one day*. About 25% of people released on unsecured bond had less than 12 hours between the bond-approved time and first-setting time; 57% had less than 24 hours between the bond-approved time and first-setting time.

14. For people released on *cash or surety bonds* during this time period, the median time between bond-approval and first-setting was *five days*. Only 4% of cash releasees and 5% of surety releasees had less than 12 hours between bond-approved time and first-setting time; about 26% of cash and surety bond releases had less than 24 hours between bond-approved time and first-setting time.

15. The data also show that people released on unsecured bonds are scheduled, on average, for more court settings than are people released on surety bonds, and that those court settings are scheduled closer in time for people released on unsecured bonds as compared to surety bonds. These practices dramatically increase the chances for a person to not appear.

**D.  Summary**

16. What these findings mean is that the County and Judges are releasing the people most in need of services without any services or support and often in the middle of the night within hours of their first hearing before a County Criminal Court at Law Judge. People released on unsecured and personal bonds have considerably less time after release until their first court date than people released on surety or cash bonds. Moreover, the County and the Judges have chosen not to require additional non-financial conditions designed to reduce nonappearance for precisely the category of arrestees that their own risk assessment tool suggests should receive those conditions.  On top

3

of all that, the Judges' apparently have a policy or practice of treating people released on surety bonds much more leniently than they treat people released on unsecured bonds with respect to bond forfeiture and appearance. Each of these factors on its own makes it much more likely that a person will miss a court date. Together, they make appearance extremely difficult. As such, comparisons made by the Judges and the County between the forfeiture rates of unsecured and surety bonds are dubious, especially given that the data is replete with errors suggesting flaws in its integrity.

## IV.     Bond-Forfeiture Rates Vary Dramatically Among the Judges

17. I was able to analyze bond approval and forfeiture data for June 7, 2017 through April 30, 2018. Bond forfeiture rates vary dramatically among the various judges. For example, I observed bond-forfeiture rates in certain courts that are two or three times greater than the bond-forfeiture rate in other courts. Further analysis is necessary to determine the cause of the variations, but the initial findings are surprising given my understanding that cases are assigned "randomly" across the 16 courts which would make the average characteristics of caseloads the same across the 16 courts.

18. Unless there is some other difference in the nature or timing of cases across the courts, another possible explanation for differences in forfeiture rates is that judges have different practices for setting court dates or use different standards in deciding when to forfeit bonds.

## V.     People Who Miss Court Are Not Evading Prosecution

19. Based on my analysis of the data involving thousands of cases, I do not believe that people released on unsecured bonds who do not appear for their initial court dates are evading justice.

20. To get a sense of what happens to these cases, I examined cases in which people were released on unsecured bonds and surety bonds between June 7 and August 15, 2017 and did not appear for their first two court dates. My preliminary analysis shows that about 2/3 of people released on unsecured bonds had returned to court and resolved their cases by January 31, 2018. (The data show that a similar percentage of people released on surety bonds appeared by January 31, 2018.)

21. My data analysis is consistent with the research literature, which shows that only a very small portion of FTAs are "willful," meaning that the person is actively evading justice. More likely explanations are that people lacked transportation or childcare, could not take off work, were confused about the right court date, were told to go to the wrong courtroom or courthouse, or were afraid to appear because of possible outstanding warrants caused by an earlier nonappearance for one of the above reasons.

22. My analysis of case outcomes is ongoing and will become more robust as I receive data for the rest of the post-injunction time period.

4

## VI.    Conclusions

23. The judges' bond-forfeiture rates for people released on unsecured bonds are seriously inflated by their and the County's policy decisions and practices. This inflation fatally undermines any conceivable utility from them.

24. The elevated bond-forfeiture rate in Harris County, to the extent that it exists, does not reflect that unsecured bond is ineffective or any less effective than secured bond. The data does not provide a basis for drawing the conclusion that the Judges suggest in their Motion about the federal court order having any negative effect on nonappearance. The statistics suggest a deliberate manipulation of the numbers and the post-arrest system to attempt to produce a desired outcome.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

Stephen Demuth, Ph.D.

5-14-18

Date

# Ex. 4

# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-01414 |
| | ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. | ) | The Honorable Lee H. Rosenthal |
| | ) | U.S. District Judge |
| Defendants. | ) | |
| | ) | |

## EXPERT REPORT OF DR. STEPHEN DEMUTH

**Materials Reviewed:** Data produced by Defendants in this case; Expert Analysis of Dr. Stephen Demuth filed in the Fifth Circuit, May 23, 2018 (Dkt. 402-4); Declarations of Ed Wells, filed in the Fifth Circuit on May 3, 2018 (Dkt. 402-8) and May 21, 2018 (Dkt. 402-5); Declaration of Judge Natalie Fleming, filed in the Fifth Circuit on May 21, 2018 (Dkt. 402-6).

## I.   92 percent of misdemeanor cases[1] are released prior to disposition (as compared to 66 percent pre-injunction)

1.   More than 11,000 people have been released pursuant to this Court's preliminary injunction order since it went into effect on June 6, 2017, according to information provided by counsel for the Sheriff.

2.   From January 1, 2015 until January 31, 2017 (the "pre-injunction" period), 66 percent of misdemeanor cases were released on some type of bond after arrest. Those releases sometimes occurred several days or weeks after arrest.

---

[1] The findings in this report (unless otherwise noted) exclude cases subject to holds or concurrent felony charges. They also use "case" as the unit of analysis, rather than "person. The pre-injunction percentages presented in this report differ slightly from those presented in my second rebuttal expert report (Dkt. 242), because the prior analyses used "person" as the unit of analysis, and the findings presented here and in my recent report submitted to the Fifth Circuit use "case" as the unit of analysis. Both analyses are accurate. The main reason for using "case" instead of "person" is to preserve data. Using "person" results in the deletion of concurrent charges (cases) through a process that requires the selection of a primary case for the purposes of analysis. Also, the County has traditionally reported forfeiture rates using "case" as the unit of analysis. Regardless, the results are substantively the same.

3. Between June 7, 2017 and April 30, 2018 (the "post-injunction" period), 92 percent of misdemeanor cases were released before disposition. These releases typically occurred within 24 hours.[2]

## II.  A greater proportion of misdemeanor cases now avoid conviction[3]

4. **Among cases released prior to disposition, pre-injunction:**
   a. 46 percent resulted in a guilty plea.
   b. 41 percent were dismissed.
   c. 11 percent resulted in deferred adjudication.
   d. Released cases resolved in a median of 125 days.

5. **Among cases detained at disposition, pre-injunction:**
   a. 81 percent resulted in a guilty plea.
   b. 16 percent were dismissed.
   c. 2 percent resulted in deferred adjudication.
   d. Detained cases resolved in a median of 3.3 days.

6. **Overall, among all cases disposed pre-injunction:**
   a. 58 percent resulted in a guilty plea.
   b. 33 percent were dismissed.
   c. 8 percent resulted in deferred adjudication.
   d. The median time to disposition was 78 days.

7. **Overall, among all cases disposed post-injunction:**
   a. 47 percent resulted in a guilty plea.
   b. 46 percent were dismissed.
   c. 6 percent resulted in deferred adjudication.
   d. The median time to disposition was 69 days.[4]

8. **Detained cases pre-injunction vs. cases released on unsecured bond post-injunction:[5]**
   a. Pre-injunction detained cases (*supra* ¶ 5; reproduced here for convenience):
      i. 81 percent resulted in a guilty plea.

---

[2] From January 1, 2015 until January 31, 2017, 61 percent of all misdemeanor cases, *including* those with holds and pending felony charges, were released on some type of bond after arrest. Between June 7, 2017 and April 30, 2018, 87 percent of all misdemeanor cases, *including* those with holds and pending felonies, were released after arrest.

[3] This analysis pertains only to cases that have been resolved.

[4] One reason the median time to disposition for post-injunction cases is shorter is that a smaller percentage of post-injunction cases have resolved.

[5] Although not perfectly comparable, it is not unreasonable to assume that most unsecured bond cases would have been detained at disposition pre-injunction because people released on unsecured bond post-injunction are people who cannot afford to pay the secured money bail amount required for release, as were the vast majority of people detained at disposition pre-injunction.

      ii. 16 percent were dismissed.

      iii. 2 percent resulted in deferred adjudication.

  b. Post-injunction, cases released on unsecured bond:

      i. 57 percent result in guilty pleas.

      ii. 38 percent were dismissed.

      iii. 5 percent resulted in deferred adjudications.

9. These numbers show that, post-injunction, a much greater proportion of cases are being released prior to disposition: 92 percent of cases, as compared to 66 percent pre-injunction. As a result, a much greater proportion of all cases post-injunction have avoided conviction: 52 percent, as compared to 41 percent pre-injunction. And, a much greater proportion of all cases are dismissed post-injunction: 46 percent, as compared to 33 percent pre-injunction. Moreover, among the group of indigent arrestees whose cases were most likely to have been detained at disposition under the pre-injunction system, many more cases resulted in dismissals and many fewer resulted in guilty pleas.

10. These findings support what other research shows, which is that people who are released after arrest have better case outcomes: they are less likely to be convicted primarily because they are less likely to plead guilty.

### III. A greater percentage of misdemeanor cases take several months to resolve

11. Cases now take longer on average to resolve, likely because detained arrestees are not coerced into resolving their cases at or near first appearance in order to gain their freedom.[6]

12. **Among released cases, post-injunction (92 percent of cases)**: the median time from arrest to disposition was 90 days.

13. **Among released cases, pre-injunction (66 percent of cases)**: the median time to disposition was 131 days.

14. **Detained cases pre-injunction vs. cases released on unsecured bond post-injunction:**[7]

  a. Pre-injunction detained cases resolved in a median of 3.3 days.

  b. Post-injunction cases released on unsecured bond resolved in a median of 73 days.

---

[6] Some cases may be dismissed because individuals had multiple charges and pled guilty to some of the charges, in exchange for dismissal of the others.

[7] A notable comparison can be made between the median time from arrest to disposition for pre-injunction detained cases and the median time from arrest to disposition for post-injunction cases released on unsecured bonds. Although not perfectly comparable, it is not unreasonable to assume that most unsecured bond cases would have been detained at disposition during the pre-injunction period.

15. This analysis shows that the median time to disposition for released cases post-injunction (90 days) is roughly comparable to the median time to disposition for released cases pre-injunction (131 days). However, a direct comparison between the two time periods cannot be made because the amount of time that elapsed from the beginning of the pre-injunction period until April 30, 2018 (more than three years) is greater than the amount of time that elapsed in the post-injunction period that I analyzed from June 6, 2017 and April 30, 2018 (about eleven months). In other words, the median time-to-disposition post-injunction is necessarily shorter than the median time-to-disposition pre-injunction because the post-injunction period covers a shorter amount of time than does the pre-injunction period. Pre-injunction cases have had a much longer time to resolve.

## IV.     People released on unsecured bond are not evading justice

16. The data show that a greater percentage of cases released on unsecured bonds since June 7, 2017 had been resolved as of April 30, 2018, than had cases released on any other type of bond. Among cases filed post-injunction:

    a.  57 percent of unsecured bond cases were resolved by April 30, 2018.
    b.  50 percent of personal pretrial bond cases were resolved by April 30, 2018.
    c.  40 percent of surety bond cases were resolved by April 30, 2018.
    d.  34 percent of cash bond cases were resolved by April 30, 2018.
    e.  32 percent of early presentment cases were resolved by April 30, 2018.

17. These percentages will all increase over time: they include cases filed up through the end of April. Considering the 90-day median time to disposition for 92 percent of cases, these rates of resolution make sense.

18. It may therefore be useful to consider only those cases filed in June 2017.  Among those cases, as of April 30, 2018:

    a.  79 percent of unsecured-bond cases had been resolved.
    b.  77 percent of personal-pretrial bond cases had been resolved.
    c.  76 percent of surety-bond cases had been resolved.
    d.  71 percent of cash-bond cases had been resolved.

19. In other words, misdemeanor arrestees are not evading justice, and in fact a slightly greater proportion of people released on unsecured or personal bonds in June 2017 had resolved their cases as of April 30, 2018, as compared to people released on surety or cash bonds that same month.

20. These percentages are consistent with the results of my analysis of cases filed in other post-injunction months.  I chose to examine cases filed four and seven months after the injunction went into effect (those filed in October 2017 and January 2018).  I chose January 2018 as the latest month I analyzed because a greater proportion of cases filed more recently than January will not have been resolved by April 30, 2018.  And I chose two months that were relatively evenly spaced from when the injunction went into effect.

4

21. Among cases filed in October 2017, as of April 30, 2018:
   a. 63 percent of unsecured bond cases had been resolved.
   b. 60 percent of personal pretrial bond cases had been resolved.
   c. 59 percent of early presentment cases had been resolved.[8]
   d. 54 percent of surety bond cases had been resolved.
   e. 49 percent of cash bond cases had been resolved.

22. Among cases filed in January 2018, as of April 30, 2018:
   a. 40 percent of unsecured bond cases had been resolved.
   b. 39 percent of personal pretrial bond cases had been resolved.
   c. 32 percent of early presentment cases had been resolved.
   d. 23 percent of surety bond cases had been resolved.
   e. 18 percent of cash bond cases had been resolved.

**V.      The Judges' next-day-setting policy disproportionately affects people released on unsecured bond**

23. According to the Judges' local rules (as explained in Dkt. 402-6 ¶ 14 (a)–(d)), anyone who is booked into the Harris County Jail must be scheduled for a court date on the next business day, even if the person is booked and then immediately released.

24. Judge Fleming states that the next-day-setting policy is facially neutral. However, the data show that it disproportionately affects people released on unsecured bond.

25. I conducted two separate analyses that show the disproportionate effect of the next-day-setting policy on people released pursuant to the injunction.
   a. First, in the report I filed in the Fifth Circuit, Dkt. 402-4, I presented analysis showing that, for people released on unsecured bonds pursuant to the injunction between June 7 and December 31, 2017, the median time between bond-approval and first-setting was one day. For people released on cash or surety during the same period, the median time between bond-approval and first-setting was five days. *Id.* ¶¶ 13–14.
   b. Second, in response to Judge Fleming's assertion that the policy is neutral because it affects everyone who is "booked" into the jail, I analyzed whether the likelihood of being booked varies by bond type. It does. To conduct this analysis, I considered data for arrests between June 7, 2017 and September 13, 2017 (which are the only booking data I had been given as of June 8, 2018, when I completed my analysis for this report). I was able to examine what percentage of cases were booked into the jail by the type of bond on which they were released. **I found that the likelihood of being booked varies by bond type, and people released on**

---

[8] "Early presentment" did not appear in the data as a "bond type" until September 2017.

5

**unsecured bond are more likely than people released on any other bond type to have been booked into the jail prior to release.** My analysis shows that:

| Bond type | Percent of cases released that were booked |
|---|---|
| Unsecured | 93% |
| Personal pretrial | 81% |
| Early presentment | 57% |
| Surety | 51% |
| Cash | 43% |

26. This analysis shows that the next-day-setting policy—and the challenges it poses to people who must appear in court so soon after release—disproportionately affects people released on unsecured bonds.

27. People released on unsecured bonds are, by definition, resource-constrained. My analysis also shows that this group of people, on average and as compared to people released on other bond types, pose a greater risk of not appearing in court absent interventions like text-message reminders and transportation assistance. Dkt. 402-4 ¶¶ 10–11. The next-day-setting policy adds yet another *obstacle* to court appearance for a group of people who should be receiving *more support* than the average arrestee to be successful in making court appearances.

28. Appearing in court so quickly after release is challenging, at best. Being arrested is traumatic and disorienting. Losing one's liberty, being handcuffed, and being confined to a jail cell cause a severe disruption to a person's life, even if the deprivation of liberty is for a relatively short period of time. A person needs time after the deprivation ends to get her affairs back in order. The arrestee might not have slept, bathed, or eaten. Pretrial detention disrupts employment and family responsibilities and upsets financial and social arrangements. To make a next-day appearance a person must very quickly plan transportation and reschedule employment and child care duties, among other things that are especially difficult for people with limited resources and challenging life circumstances.

29. It is likely that the next-day-setting policy contributes to a higher rate of nonappearance for people released on unsecured bond pursuant to the injunction, both because it is difficult logistically to appear so soon after being released from jail, and because quicker and more frequent court settings increase the opportunity for nonappearance, all else equal. *See* Dkt. 402-4 ¶ 15 ("The data show that people released on unsecured bonds are scheduled, on average, for more court settings than are people released on surety bonds, and that those court settings are scheduled closer in time for people released on unsecured bonds as compared to surety bonds.").

6

30. Changing the next-day-setting policy for people who are booked would level the playing field across bond types and is necessary for an apples-to-apples comparison of nonappearance in court.

## VI.   Bond-forfeiture rates vary widely among the courts

31. Ed Wells states that "the forfeiture rates for secured bonds and unsecured Sheriff's Bonds are substantially similar across all 16 Courts." Dkt. 402-5 ¶ 9. Mr. Wells appears to be reviewing the same data I am, but characterizing it differently.

32. For example, Court 4 has a personal bond forfeiture rate of 19.2 percent compared to a forfeiture rate of 28.9 percent in Court 1. That means that the forfeiture rate for personal bonds in Court 1 is 51 percent higher than the forfeiture rate for personal bonds in Court 4.

33. Other examples of what I consider to be wide variations include:
   a. A 12 percent forfeiture rate for surety bonds in Court 5, as compared to a 4.2 percent forfeiture rate for surety bonds in Court 1. That means that the forfeiture rate for surety bonds is nearly three times higher in Court 5 than in Court 1.
   b. A 29.4 percent forfeiture rate for unsecured bonds in Court 2, as compared to a 48.1 percent forfeiture rate for unsecured bonds in Court 5. That means that the forfeiture rate for unsecured bonds is 64 percent higher in Court 5 than in Court 2.

34. Because cases are randomly assigned to courtrooms, I would expect the forfeiture rates to be more similar across courtrooms. The fact that they are *not* the same suggests that the judges have their own individual policies, including their own individualized criteria for "find[ing] grounds to excuse [a] failure to appear." Dkt. 402-5 ¶ 4; *see also* Dkt. 402-6 ¶ 7.

35. Perhaps the reason Ed Wells and Judge Fleming assert that the rates are consistent across courts is because we are dealing with relatively low rates that, at first glance, appear relatively close together. But, consider the following scenario, which is based on the forfeiture rates for Courts 2 and 5 during the January through April 2018 period: Court 2 released 194 arrestees on unsecured bond in a four-month period. If that rate continues, Court 2 will release 582 people on unsecured bond in a one-year period. Let's assume Court 5 will release the same number of people (582) on unsecured bond in a one-year period. Of the 582 people released in Court 2, *171 people* will have their bonds forfeited. Of the 582 people released in Court 5, *280 people* would be forfeited. I would rather be assigned to Court 2.

36. There is other evidence in the data that the judges have different practices for dealing with nonappearances: Court 2 and Court 10 apparently *revoke* bonds, instead of *forfeiting* bonds, when people do not appear and the nonappearance is not excused. The data show the following:
   a. Court 2 has a 4.3 percent bond-forfeiture rate for personal bonds.
   b. Court 10 has a 3.6 percent bond-forfeiture rate for personal bonds.

   c.   The other fourteen judges have bond-forfeiture rates for personal bonds that range from 19.2 percent to 28.9 percent.

   d.   Upon further examination of the data, I realized that Courts 2 and 10 have much higher bond *revocation* numbers for personal bonds than other courts.

   e.   Court 2 *revoked* 16.5 percent of bonds.

   f.   Court 10 *revoked* 19.3 percent of bonds.

   g.   When you add forfeitures to revocations in Court 2 and Court 10, the combined "failure" rate (20.8 percent for Court 2 and 23 percent for Court 10) is within the forfeiture rate for the other judges.

   h.   What this data suggests is that Courts 2 and 10 are choosing to *revoke* personal bonds when people do not appear (and the nonappearance is not "excused") instead of *forfeiting* personal bonds when people do not appear.

   i.   The discretion to enter either a bond forfeiture or a bond revocation in the computer system in response to non-appearance is another reason that the County's and Judges' bond-forfeiture data are not a reliable proxy for failure-to-appear.

37. My prior analysis showed that some judges treat people released on surety bonds more leniently than people released on unsecured or personal bonds when it comes to the bond-forfeiture decision. Dkt. 402-4 ¶ 8(a)-(d). I reported that there are numerous cases in which people released on unsecured bonds had their bonds forfeited even though they appeared in court, and numerous cases in which people released on surety bonds missed court but never had their bonds forfeited. *Id.* ¶ 8(a)-(b). My analysis also showed that people released on unsecured bond who missed their first two scheduled court dates were much more likely to have a bond forfeiture entered than were people released on surety bonds. *Id.* ¶ 8(c)-(d).

## VII.   "Bond forfeitures" are not a useful proxy for "failures to appear"

38. Ed Wells states that "[b]ond forfeiture rates are a reliable proxy for failure-to-appear rates," Dkt. 402-5 ¶ 4, and that bond-forfeiture rates "represent" failure-to-appear rates, *Id.* ¶¶ 11–14. But it is impossible to make that assertion without either (a) tracking failures to appear or (b) explaining whether and when judges "find grounds to excuse the failure to appear."

39. The Defendants have stated that they do not reliably track actual failures to appear. Dkt. 402-5 ¶ 4; Dkt. 402-6 ¶ 7. And, as I described above, the data show that judges have different practices relating to whether they enter a forfeiture or excuse failures to appear in different circumstances.

40. I do not find it particularly surprising that the judges apply different standards to decide whether there are "grounds to excuse," Dkt. 402-5 ¶ 4; Dkt. 402-6 ¶ 7, a particular nonappearance. They are exercising judicial discretion. A judge's *job* is to make decisions about blameworthiness, dangerousness, and practical issues and then exercise judgment and discretion to determine conditions of release, impose a sentence, revoke probation, or resolve whatever other matter is before them. We know that some judges are harsher and less forgiving than others in a variety of

contexts (e.g. sentencing and decisions about probation revocation). That is what data show in all jurisdictions across time when it comes to a wide range of discretionary decisions that judges have the power to make.

41. It therefore makes sense that the bond-forfeiture rates vary among the judges. Whether a bond is forfeited depends on that particular judge's *discretionary judgment* as to whether there exist "grounds" to "excuse" the person's nonappearance in light of whatever factors the judge is made aware of and sees fit to consider. The judges' discretion to make a decision to forfeit a bond or not given an instance of nonappearance is reflected in the variations among bond-forfeiture rates.

42. If some judges are less forgiving of people released on unsecured bonds than of people released on other types of bonds, then it will also be more likely that a bond forfeiture will be entered for a person released on unsecured bonds who does not appear as compared to someone released on another type of bond who does not appear.

43. Because the bond-forfeiture decision hinges on judicial discretion, it is important to use an objective and standardized metric for nonappearance. An objective and standardized system for tracking court settings and whether a person appeared or did not appear at each setting would not affect a judge's discretion to forfeit a bond because of nonappearance. But it would allow a comparison of non-appearance rates by bond type and would make the system more transparent.

44. Without an objective and standardized system for recording court settings and instances of non-appearance, it is impossible to know how closely bond-forfeiture rates align with actual failure-to-appear rates.

45. It is also important to note that other jurisdictions, including Washington, D.C., have very low non-appearance rates for people released on unsecured bail or non-financial conditions. These jurisdictions use strategies like text-message notifications and appropriate supervision to help people make it to court. And they give people more time after release before requiring them to appear in court for their first hearing.

46. Based on my experience and my evaluation of the data and the representations of the Defendants, Harris County and the Judges do not seem to understand that the goal of a pretrial system is to mitigate risks of nonappearance so that the maximum number of presumptively innocent people can be released prior to trial. The County should be developing systems and procedures that help "riskier" arrestees be successful on release. Instead, their practices punish people who are more likely to have difficulty getting to court. There is no dispute that people released on unsecured bonds in Harris County are more likely, on average, to not appear absent any services or supervision, based on data from the County's pretrial assessment tool. That means that the County should be providing the kind of supervision and court reminders necessary to assist these individuals. Instead the County is releasing them without supervision or reminders and

9

erecting barriers to their success (e.g., requiring them to appear in court the day after being released from the jail, often in the middle of the night).

**VIII.  Bond-forfeiture rates for unsecured bonds are higher than bond-forfeiture rates for secured bonds in Judge Jordan's and Judge Fields' courtrooms—as in all of the judges' courtrooms—because the people released on unsecured bond have a very different risk profile than people released on secured bonds**

47. The forfeiture rates are much higher for unsecured bonds than surety bonds in all courts, including in Judge Fields' and Judge Jordan's courts, as Judge Fleming notes. Dkt. 402-6 ¶ 11(b). But this disparity is to be expected *because the risk profiles of the two groups are completely different.*

48. Data from the County's pretrial assessment tool shows that the average "FTA score" (i.e. the score reflecting the likelihood that a person will "fail to appear" in court) for people released on unsecured bonds is 2.6, while the average "FTA score" for people released on surety bonds is 1.6.  In other words, the average risk score for people released on unsecured bonds is 63% higher than the average risk score for people released on secured bonds.

49. People released on unsecured bonds need assistance, such as court reminders, transportation help, or pretrial services to mitigate their greater likelihood of not appearing. But, as my prior analysis showed, individuals released on unsecured bond are *less likely* to receive supervision.  The available information suggests that they are being set up to fail. Dkt. 402-4 ¶ 10–11.

50. In fact, many arrestees who are recommended for release on *personal bonds*—which come with supervision and conditions—are being denied personal bonds and subsequently are released on *unsecured* bonds, without supervision.  For example, among people who completed pretrial assessment, the County's pretrial assessment tool recommended personal bonds for 58% of the people who were ultimately required to pay unaffordable bail and, as required by the injunction, subsequently released on unsecured bonds.  This shows that the Hearing Officers and Judges are not following the recommendations made by the pretrial assessment tool.[9]  Because of Defendants' policies, the decision to ignore the risk assessment tool means that Defendants funnel people who otherwise would have received pretrial supervision into a category of people who Defendants have chosen not to provide any supervision for.  Appearance rates would likely improve if people released on unsecured bonds received the same pretrial support that people released on personal bonds are receiving.

---

[9] It is also possible that some of the people recommended for personal bonds who are released on unsecured bonds are released because of the 24-hour requirement.

## IX.    Recommendations for addressing non-appearance

51. The County should provide two-way text-messaging reminders to all people who are released after arrest. People released on unsecured bond need support in order to be successful and most of them were considered eligible for a personal bond, which could include supervision. In particular, the County should ensure that the people who are most in need of court reminders or other assistance to be successful on pretrial release are receiving that support.

52. The County should eliminate the next-day court setting for people who are released from jail, regardless of whether they are "booked."

53. The County should reliably track court settings and whether a person appeared or did not appear so that it can begin to accurately assess its system. The County should work with Judges to develop a set of principles that provide guidance for how to consistently assess when a non-appearance constitutes an official failure-to-appear ("FTA") with the goal of minimizing the forfeiture of bonds for FTAs that are not willful.

54. The County should provide feedback to Judges and Hearing Officers on a regular basis showing how they compare to each of the other Judges and Hearing Officers on 1) the percentage of cases in which their personal bond decision differs from the risk assessment tool recommendation, 2) the percentage of cases receiving each of the different bond types, and 3) the percentage of each bond type that are forfeited or revoked.

55. The County should work with the Judges, Hearing Officers, and pretrial services staff to develop a set of policies to maximize liberty while also maximizing court appearance. High forfeiture rates represent a challenge to be overcome through creative systemic solutions that mitigate risk and increase appearance, not a failure for which there is no remedy other than detention.

## X.    My analysis is ongoing

56. I am continuing to receive new data, and my analysis is ongoing.


I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.


_Stephen Demuth, Ph.D._                     6-11-18

Stephen Demuth, Ph.D.                     Date