United States District Court
Southern District of Texas
**ENTERED**
November 21, 2019
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, *et al.*, | § | |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-16-1414 |
| | § | |
| HARRIS COUNTY, TEXAS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION APPROVING THE PROPOSED CONSENT DECREE
AND SETTLEMENT AGREEMENT AND GRANTING THE MOTION TO
AUTHORIZE COMPENSATION OF CLASS COUNSEL**

> I, Maranda Lynn ODonnell, am a 22-year-old woman.  I was arrested yesterday . . .
> for a misdemeanor offense. . . . I was never asked if I could afford my bail. . . .
> I have one 4-year-old daughter. . . . I live paycheck to paycheck[.]  I'm worried
> about whether my job will still be there when I get out.  I cannot afford to buy my
> release from jail.

Maranda Lynn ODonnell, *Declaration Attached to Complaint*, May 19, 2016.  (Docket Entry No.

3-2).

> Twenty years ago, not quite one-third of [Texas's] jail population was awaiting
> trial.  Now the number is three-fourths.  Liberty is precious to Americans, and any
> deprivation must be scrutinized.  To protect public safety and ensure that those
> accused of a crime will appear at trial, persons charged with breaking the law may
> be detained before their guilt or innocence can be adjudicated, but that detention
> must not extend beyond its justifications.  Many who are arrested cannot afford a
> bail bond and remain in jail awaiting a hearing.  Though presumed innocent, they
> lose their jobs and families, and are more likely to re-offend.  And if all this weren't
> bad enough, taxpayers must shoulder the cost—a staggering $1 billion per year.

The Honorable Nathan L. Hecht, Chief Justice of the Texas Supreme Court, *Remarks Delivered to*

*the 85th Texas Legislature*, Feb. 1, 2017.

For more than three years, the parties have litigated constitutional challenges to Harris County's policies and practices of requiring indigent defendants accused of misdemeanors to post secured money bail pending trial.  Maranda Lynn ODonnell's account is from a handwritten statement filed at the beginning of this case.  Chief Justice Hecht of the Texas Supreme Court described the state of money bail in Texas during the first year of the lawsuit.  Their words have helped inspire reform, not just in Texas, but all over the country.

Chief Justice Hecht's description does not apply to the Harris County bail system as well today as it did in 2017, thanks to Amended Local Rule 9.  Going forward, his message remains vital.  No bail system can avoid all the risks.  No system can guarantee that all those accused of misdemeanors who are released on personal bonds—rich or poor—will appear for hearings or trial, or that they will commit no crimes on release.  No system can guarantee that all those accused of misdemeanors who are detained pending trial—rich or poor—should have been detained.  But Harris County—which operates the third-largest jail system in the country—can stop systematically depriving indigent misdemeanor defendants of their constitutionally-protected rights by detaining them simply because they cannot afford to post money bail.  The class settlement and consent decree the parties ask this court to approve and enter continue the work toward a constitutional, effective pretrial bail system for all defendants charged with petty offenses.  The court grants the parties' motion to enter the consent decree and approve the class settlement.  The court also grants the plaintiffs' unopposed motion to authorize compensation of class counsel.

The court reached its decision based on careful consideration of the motions, the objections, amicus briefs, and responses; the terms of the proposed consent decree and settlement agreement; the voluminous record; the testimony and nonparty statements at the final fairness hearing; and the

applicable law.  The public safety and public resource concerns raised by amicus briefs, objectors, and nonparty speakers at the final fairness hearing are important and have been fully aired and addressed.

Because the court thoroughly examined the record before issuing its Opinion giving preliminary approval, and because those objecting raised few new arguments at the final fairness hearing, this Opinion includes much of the earlier Opinion.  The court has, however, considered all the arguments with fresh eyes, in light of all the filings and the record.

The reasons for the rulings are explained in detail below.

## I.    The Litigation and Proposed Class Settlement

### A.    Background

In May 2016, Maranda Lynn ODonnell filed a class-action complaint against Harris County, the Harris County Sheriff, and five Harris County Hearing Officers.  (Docket Entry No. 3). Seeking injunctive and declaratory relief under 42 U.S.C. § 1983, ODonnell alleged that Harris County's postarrest incarceration policies and practices imposed a "wealth-based detention system" of keeping misdemeanor defendants in jail only because they could not pay secured money bail, while those who could pay were promptly released, in violation of the Fourteenth Amendment's Equal Protection and Due Process Clauses.  (*Id.* at ¶¶ 75, 121).

In September 2016, ODonnell amended her complaint, consolidating the case with the lawsuits of Robert Ryan Ford and Loetha McGruder and adding 16 Harris County Criminal Court at Law Judges as defendants.  (Docket Entry No. 54).  The defendants moved to dismiss for failure to state a claim and under the *Younger* abstention doctrine.  (Docket Entry Nos. 61, 80, 83, 84, 85). In December 2016, the court granted and denied in part the defendants' motions to dismiss. *ODonnell v. Harris Cty.*, 227 F. Supp. 3d 706, 715 (S.D. Tex. 2016).  The court dismissed the

3

personal-capacity claims against the Sheriff and County Judges and the official-capacity claim against the Hearing Officers. *Id.* The court denied the motions to dismiss the claim against Harris County and the official-capacity claims against the Sheriff and Judges. *Id.* The Hearing Officers did not move to dismiss the personal-capacity claims against them, and those claims proceeded. *Id.*

In January 2017, the plaintiffs filed amended motions for class certification and preliminary injunctive relief. (Docket Entry Nos. 143, 146). In March 2017, the court held an eight-day evidentiary hearing, at which many witnesses testified and the parties submitted extensive exhibits. (Docket Entry Nos. 222, 223, 228–230, 246, 247, 251). In April 2017, the court granted the plaintiffs' motions for class certification and injunctive relief. (Docket Entry Nos. 302, 303). The court certified a class under Federal Rule of Civil Procedure 23(b)(2) of:

> [a]ll Class A and Class B misdemeanor arrestees who are detained by Harris County from the date of this order through the final resolution of this case, for whom a secured financial condition of release has been set and who cannot pay the amount necessary for release on the secured money bail because of indigence.

*ODonnell v. Harris Cty.*, No. H-16-1414, 2017 WL 1542457, at *1 (S.D. Tex. Apr. 28, 2017); (Docket Entry No. 303 at 1).

The court's April 28, 2017, Memorandum and Opinion made extensive findings of fact and conclusions of law, including the following:

- Harris County has a consistent and systematic policy and practice of imposing secured money bail as de facto orders of pretrial detention in misdemeanor cases.

- These de facto detention orders effectively operate only against the indigent, who would be released if they could pay at least a bondsman's premium, but who cannot. Those who can pay are released, even if they present similar risks of nonappearance or of new arrests.

- Harris County has an inadequate basis to conclude that releasing misdemeanor defendants on secured financial conditions is more effective to assure a

defendant's appearance or law-abiding behavior before trial than release on unsecured or nonfinancial conditions, or that secured financial conditions of release are reasonably necessary to assure a defendant's appearance or to deter new criminal activity before trial.

- Harris County's policy and practice violates the Equal Protection and Due Process Clauses of the United States Constitution.

*ODonnell v. Harris Cty.*, 251 F. Supp. 3d 1052, 1059–60 (S.D. Tex. 2017); (Docket Entry No. 302 at 7). The court found that "40 percent of all Harris County misdemeanor arrestees every year [were] detained until case disposition" because, among other reasons, Hearing Officers mechanically applied a bail schedule that failed to consider an arrestee's ability to pay. *ODonnell*, 251 F. Supp. 3d at 1095, 1130–31 (from January 2015 to January 2017, Harris County Hearing Officers "adhered to the prescheduled bail amount stated on the charging documents in 88.9 percent of all misdemeanor cases"). The court entered a preliminary injunction order against the defendants and denied their motion to stay. *ODonnell v. Harris Cty.*, No. H-16-1414, 2017 WL 1735453, at *1–3 (S.D. Tex. Apr. 28, 2017); (Docket Entry Nos. 304, 305). The defendants appealed.

The Fifth Circuit affirmed in part and vacated in part. *ODonnell v. Harris Cty.*, 882 F.3d 528, 549 (5th Cir. 2018), *opinion withdrawn and superseded on reh'g sub nom. ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018). The Fifth Circuit upheld this court's factual findings and affirmed the legal "conclusion that ODonnell established a likelihood of success on the merits of [her] claims that [Harris] County's policies violate procedural due process and equal protection." *ODonnell*, 892 F.3d at 152. The Fifth Circuit ruled that the April 2017 preliminary injunction order was overbroad as to one aspect and instructed this court to more narrowly tailor the relief. *Id.* at 163–64.

On remand, after hearing oral argument and receiving proposals from the parties, this court issued a Memorandum and Opinion and an amended preliminary injunction order in June 2018. *ODonnell v. Harris Cty.*, 321 F. Supp. 3d 763 (S.D. Tex. 2018).  In July 2018, 14 of the 16 County Judges appealed the amended preliminary injunction order.

The 14 County Judges moved to stay four sections of the amended preliminary injunction order.  A divided Fifth Circuit motions panel granted the motion and stayed the challenged provisions pending the appeal.  *ODonnell v. Goodhart*, 900 F.3d 220, 223 (5th Cir. 2018).

In June and July 2018, the parties conducted extensive discovery, filed cross-motions for summary judgment, and prepared for trial on a permanent injunction, while briefing the merits of the appeal from the court's amended preliminary injunction order.  (Docket Entry Nos. 400, 429, 432).

On November 6, 2018, 15 of the 16 County Judges named as defendants lost their reelection bids.  Voters also elected two new members of the Harris County Commissioners Court. Because the plaintiffs had sued the County Judges in their official capacities, the newly elected judges were substituted as parties on January 1, 2019.  (Docket Entry No. 548).  On January 7, all the County Judges voluntarily dismissed the appeal of the amended preliminary injunction.  That same day, the Fifth Circuit Clerk "entered an order, issued as the mandate, stating that . . . the appeal is dismissed . . . pursuant to appellants' motion."  *ODonnell v. Salgado*, 913 F.3d 479, 481 (5th Cir. 2019) (per curiam).

On January 25, the parties jointly submitted Amended Local Rule 9 of the Harris County Criminal Courts at Law.  (Docket Entry No. 557).  Amended Rule 9 rescinded Harris County's "secured money bail schedule and instead require[s] that the initial, post-arrest release-or-detention decision be made on the basis of the charged offense."  (Docket Entry No. 557-2 at 1).  The

amended rule also requires "the prompt release of all misdemeanor arrestees on a personal bond except for five categories of arrestees." (*Id.* (quotation omitted)).  If a misdemeanor arrestee is not released promptly on a personal bond, then that person "must receive a bail hearing . . . [within] 48 hours after arrest."  (Docket Entry No. 701-2 at 18).

On February 1, the court reviewed and approved the implementation of the amended rule, which went into effect on February 16.  (Docket Entry No. 567 at 6–7; Docket Entry No. 617 at 9).  At the February 1 hearing, the parties informed the court that they were actively pursuing settlement negotiations.  (Docket Entry No. 563).  On April 8, the court granted the parties' joint motion to dismiss the Hearing Officers as defendants in the case.  (Docket Entry No. 587).

On July 25, the parties reported that they had reached a resolution and had submitted a proposed consent decree and settlement agreement to the Harris County Commissioners Court for approval.  (Docket Entry No. 615).  On July 30, a majority of the Commissioners approved the proposed consent decree and settlement agreement.  The parties jointly moved for preliminary approval on August 1.  (Docket Entry No. 617).  The parties also moved for approval of a proposed class notice, permission to issue the notice, and attorneys' fees.  (*Id.*; Docket Entry No. 618).

In August, several individuals and organizations filed amicus briefs or letters opposing all or parts of the proposed consent decree.  The objectors included the Harris County Deputies' Organization (Fraternal Order of Police Lodge #39); the Professional Bondsmen of Harris County; Harris County Commissioner Steve Radack; Equal Justice Now; Crime Stoppers of Houston, Inc.; Pasadena, Texas Police Chief Josh Bruegger; Harris County Commissioner R. Jack Cagle; the Harris County Domestic Violence Coordinating Council; Harris County District Attorney Kim Ogg; the Houston Area Police Chiefs Association; and the Texas School District Police Chiefs' Association.  (Docket Entry Nos. 629, 631-2, 634-1, 635-1, 636–39, 641-1, 646-1).  To allow the

parties to respond, and to enable the court to fully consider the objections, the court extended the deadlines for class notice and objections and reset the final fairness hearing. (Docket Entry No. 644).

On August 30, the parties filed their responses to the amici and objectors. (Docket Entry Nos. 647–49). The responses were filed shortly after 11 current and former Harris County Judges were reprimanded for requiring indigent misdemeanor defendants to post money bail in disregard of the rules and law governing personal pretrial bonds in misdemeanor cases. Associated Press, *Commission: 11 Texas Judges Broke Law by Denying Free Bail*, Aug. 30, 2019, https://apnews.com/736b81ac8406449f8be51f71cdd5cbbb [https://perma.cc/Z7SP-XMN6].

On September 5, the court preliminarily approved the proposed settlement agreement, consent decree, and class notice. (Docket Entry No. 651). The parties moved for final approval on September 27, submitting a revised consent decree that clarified provisions identified in amicus briefs as potentially conflicting with provisions of state law. (Docket Entry No. 657). The revisions made clear that the consent decree must be applied consistent with Texas law. (*Id.* at 2).[1]

On October 28, the court held a final fairness hearing, inviting both parties and nonparties to attend and present their views on the proposed consent decree and settlement. (Docket Entry Nos. 662, 700). The parties called Harris County Sheriff Ed Gonzalez and Harris County Criminal Court at Law Judges Darrell William Jordan and Franklin Bynum to testify in favor of their joint motion for final approval. Nonparty speakers included: Mr. Andy Kahan, for Crime Stoppers of Houston; Ms. Dianna Williams, for the Texas Advocates for Justice; Kevin Pennell, Esq., for the Professional Bondsmen of Harris County; Mr. Kaleb J. Taylor, a private citizen; Mary Nan

---

[1] On November 4, the parties submitted another revised draft of the proposed consent decree, which remedied two errors in Sections 105 and 110. (Docket Entry No. 701).

Huffman, Esq., for the Houston Police Officers' Union; Ms. Koretta Brown, for The Young and the Politics; Mr. Doug Smith, a private citizen; Mr. Carl Davis, for the Houston Society for Change and the Social Action Commission General Board of the African Methodist Episcopal Church; Harris County Commissioner Steve Radack; and Special Litigation Counsel Adam Biggs, for the Office of the Attorney General of Texas. District Attorney Kim Ogg, who had received approval to speak, elected to file written remarks instead, though she attended the hearing in case the court had questions for her. (Docket Entry No. 696; *see also* Docket Entry No. 665 (statement of intent to appear and supplemental amicus brief)). Judges Bynum and Jordan filed written responses to District Attorney Ogg's concerns before the hearing. (Docket Entry Nos. 674–75).

The parties' responses to the objections are amply supported by the extensive record evidence and governing law. As explained below, the amici and nonparty objectors do not identify an adequate basis to deny final approval of the proposed settlement and consent decree.

**B.    The Proposed Class Settlement**

**1.    The Proposed Consent Decree**

The proposed consent decree requires Harris County to carry out a broad range of bail reforms. Harris County must implement, comply with, enforce, and train[2] certain officials on Amended Local Rule 9, which provides that "[a]ll misdemeanor arrestees must be released on a personal bond or on non-financial conditions as soon as practicable after arrest, except" individuals arrested:

- and charged with domestic violence, violating a protective order in a domestic violence case, or making a terroristic threat against a family or household member;

- and charged with assault;

---

[2]    Harris County must train on an ongoing basis all Criminal Court at Law Judges and the defendants' agents responsible for implementing Amended Local Rule 9. (Docket Entry No. 701-2 at 37).

- and charged with a second or subsequent driving-under-the-influence offense;

- and charged with a new offense while on pretrial release;

- on a warrant issued after a bond revocation or bond forfeiture;

- or individuals arrested while on any type of community supervision for a Class A or B misdemeanor or a felony.

(Docket Entry No. 701-2 at 17–18) (citing sections of the Texas Penal Code).

A misdemeanor "arrestee who is not promptly released on a personal bond . . . must receive a bail hearing . . . [within] 48 hours after arrest." (*Id.* at 18). An arrestee subject to a bail hearing must be represented by counsel—either a private attorney or a Harris County Public Defender. (*Id.* at 19). The Hearing Officer must give the arrestee adequate notice and "an opportunity to be heard concerning any factors relevant to release, detention, and the availability of alternative conditions." (*Id.* at 20–21). The arrestee must also have "an opportunity at the hearing to present evidence and make argument[s] concerning those issues." (*Id.* at 21). If secured money bail is imposed as a release condition, the Hearing Officer must find on the record, by clear and convincing evidence, that: (1) "the arrestee has the ability at the time of the hearing to pay the amount required"; or (2) "no less-restrictive condition or combination of conditions could reasonably assure" community safety or prevent flight from prosecution. (*Id.* at 21–22). The arrestee may seek review of a Hearing Officer's decision in the Harris County Criminal Court at Law. (*Id.* at 22–23).

Hearing Officers may not require indigent misdemeanor arrestees to pay "any fee associated with a personal bond or an unsecured bond, or the cost of a non-financial condition of release, including . . . a supervision fee." (*Id.* at 22). And the Harris County Sheriff "must not enforce any order requiring secured money bail that was imposed [before] an individualized hearing." (*Id.* at 23).

10

Consistent with Amended Local Rule 9, Harris County must "provide the funding and staffing necessary" for the Public Defender's Office to adequately represent all misdemeanor arrestees at bail hearings. (*Id.* at 25). Harris County must also "provide defense counsel access to early and effective support staff" to assist "in gathering and presenting information relevant to the bail decision." (*Id.*). The consent decree requires Harris County to provide access to, fund, and disclose the names of qualified support staff to assist court-appointed counsel. (*Id.*). In addition, the consent decree requires Harris County to retain an indigent-defense expert "to evaluate the County's current misdemeanor indigent defense systems and determine the County's need for essential support staff . . . to promote . . . effective indigent defense." (*Id.* at 26).

To reduce failures to appear after pretrial release, the defendants must give eligible misdemeanor arrestees "written notice of the date, time, and location of their scheduled court appearance." (*Id.* at 27). The defendants must "update any form [used] to provide written notice of scheduled court dates to incorporate evidence-based design practices for effectively reducing nonappearance." (*Id.*). The defendants must also: (1) "develop and maintain a website where misdemeanor arrestees can access their court dates, times, location, [and] attorney information"; and (2) "adopt text-message-based and telephone-based" services to remind misdemeanor arrestees about scheduled court appearances. (*Id.* at 29, 33).

The proposed consent decree includes other policies and procedures designed to reduce failures to appear. The decree includes the following provisions:

- A misdemeanor arrestee is not required to appear in court within 72 hours of release for proceedings in the case for which they were arrested.

- The Harris County Criminal Court at Law Judges must hold "Open Hours Court" at least one day each week, and a misdemeanor arrestee who missed a scheduled court appearance may attend Open Hours Court to reschedule the missed appearance, "subject to the other provisions in [the] Consent Decree."

- A misdemeanor arrestee may waive appearance at any regular setting before or during the setting, and an arrestee who has not waived appearance may reschedule any appearance at least twice before the hearing.

- If a misdemeanor arrestee fails to appear, a warrant will not issue if the arrestee appears in the assigned Harris County Criminal Court or in Open Hours Court to reschedule the appearance before "close of business on the day of Open Hours Court of the week following the missed setting."

- A warrant may issue only if a Harris County Criminal Court at Law Judge finds that there was no good cause for failing to appear, "consistent with Texas state law."

- A misdemeanor arrestee subject to a warrant for failing to appear may appear in Open Hours Court to reschedule the hearing.  "In the absence of other bases for the misdemeanor arrestee's arrest," and if the hearing was a regular or first setting, the Harris County Criminal Court at Law Judge must recall the warrant.  If the hearing was a required appearance, the arrestee may not be taken into custody unless the Harris County Criminal Court at Law Judge finds that the arrestee had actual notice of the hearing and that there was no good cause for failing to appear.

- Any misdemeanor arrestee subject to a warrant for failing to appear that was issued before January 1, 2019, may appear at Open Hours Court or in the assigned Harris County Criminal Court to have the warrant recalled and to schedule a new hearing date.

(*Id.* at 34–36).  In addition, Harris County must "study and seek to mitigate the primary wealth-based causes of nonappearance among misdemeanor arrestees" and "allocate $250,000 annually, beginning in Fiscal Year 2020–21, toward assisting . . . indigent misdemeanor arrestees in making court appearances."  (*Id.* at 30–31).

The consent decree requires Harris County to collect, study, and make publicly available data about:

- Harris County's compliance with the consent decree;

- pretrial release and detention decisions relating to misdemeanor arrestees;

- Amended Local Rule 9's effect on misdemeanor arrestees' appearance rates;

- demographic and socioeconomic information as to each misdemeanor arrestee; and

- Harris County's misdemeanor bail system from 2009 to the present.

(*Id.* at 38–43).  Harris County must generate, and publish online, a report every 60 days on the proposed consent decree's implementation.  (*Id.* at 41–43).  Harris County must also make available online information related to this lawsuit and to the implementation of the consent decree, including the policies and procedures adopted under the consent decree.  (*Id.* at 43–44).

An independent monitor the parties jointly select will oversee Harris County's compliance with the consent decree for seven years.  (*Id.* at 44, 46).  The monitor will conduct audits, reviews, and assessments "to determine whether the Consent Decree has been implemented as required." (*Id.* at 45).  Harris County must make the monitor's reports publicly available.  (*Id.* at 47–48).

Finally, Harris County must hold at least two public meetings each year to "report on [the] implementation of the Consent Decree," and to give community members an opportunity to comment and ask questions about Harris County's criminal justice system.  (*Id.* at 43–44).  The monitor and representatives of Harris County, the Sheriff, and the Criminal Court Judges must attend the meetings.  (*Id.* at 44).

### 2.      The Proposed Settlement Agreement

The proposed settlement agreement states that the parties "agree to file a joint motion seeking approval of the Consent Decree to resolve all of [the] Plaintiffs' claims."  (Docket Entry No. 617-2 at 1).  The terms are summarized above.  The agreement also addresses fees and costs.[3]

Harris County agrees to pay the following attorneys' fees and costs:

- $3,725,231.00 in fees and $114,832.54 in costs to Civil Rights Corps (though Civil Rights Corps, after exercising billing discretion after the settlement agreement was

---

[3]     The Memorandum and Opinion on preliminary approval noted "some relatively minor discrepancies in these fee amounts," which the parties clarified in their motion for final approval.  (Docket Entry No. 651 at 42; *id.* at 42 n.30; Docket Entry No. 657 at 3–4).

signed, requests only $3,716,531.00 (Docket Entry No. 618 at 1; Docket Entry No. 657 at 3));

- $2,161,262.00 in fees (to be forgone) and $30,214.86 in costs to Susman Godfrey L.L.P.;

- $632,453.00 in fees to Wilmer Cutler Pickering Hale and Dorr LLP; and

- $182,715.90 in fees and $5,378.00 in costs to the Texas Fair Defense Project.

(Docket Entry No. 617-2 at 1; *see also* Docket Entry No. 618 at 1–2 (unopposed Rule 54(d)(2) motion to authorize compensation of class counsel)).  Harris County also agrees that it will preserve "all filings and evidence submitted in" this litigation.  (Docket Entry No. 617-2 at 2).

Susman Godfrey agrees to forgo all of its fee "in consideration of [Harris] County's agreement to allocate [that amount of money] to its own efforts to meet the needs of class members, as described in the Consent Decree." (*Id.* at 1).  The parties agree that Harris County will not pay any attorneys' fees or costs incurred in implementing or monitoring the consent decree, but class counsel do "reserve[] the right to seek fees . . . for work performed in connection with contempt proceedings if there is a finding of contempt." (*Id.*).

The terms are examined under the legal standard and the record.

## II.    The Legal Standard for Approving a Class Settlement

Federal Rule of Civil Procedure 23(e) governs court review of proposed class-action settlements.  To secure final approval, the proposed settlement must be "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2); *United States v. City of New Orleans*, 731 F.3d 434, 438–39 (5th Cir. 2013) (a court must find that a consent decree is fair, reasonable, and adequate before entering it as a judgment).  Under the 2018 amendments to Rule 23(e)(2), courts look to whether:

(A) the class representatives and class counsel have adequately represented the class;

14

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

FED. R. CIV. P. 23(e)(2); *see also* 4 NEWBERG ON CLASS ACTIONS § 13:14 (5th ed. 2019) (in adopting the 2018 amendments to Rule 23(e), "Congress essentially codified [the] prior practice").

Common-law criteria preceded the Rule 23 factors.  In *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983), the Fifth Circuit laid out six factors for courts to consider in determining the fairness, reasonableness, and adequacy of a proposed class settlement:

(1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the litigation and available discovery; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and certainty of damages; and (6) the opinions of class counsel, class representatives, and absent class members.

*All Plaintiffs v. All Defendants*, 645 F.3d 329, 334 (5th Cir. 2011) (quoting *In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 194–95 (5th Cir. 2010)).

Because the Rule 23 and case-law factors overlap, courts in this circuit often combine them in analyzing class settlements.  *See Hays v. Eaton Grp. Attorneys, LLC*, No. 17-88-JWD-RLB, 2019 WL 427331, at *9 (M.D. La. Feb. 4, 2019); *Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, No. H-17-3852, 2019 WL 387409, at *3 (S.D. Tex. Jan. 30, 2019); *see also* FED. R. CIV. P. 23(e)(2) Committee Notes to 2018 amendments ("The goal of this amendment [to Rule 23(e)(2)]

is not to displace any [circuit case-law] factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.").

"A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Erica P. John Fund, Inc. v. Halliburton Co.*, No. 02-CV-1152-M, 2018 WL 1942227, at *4 (N.D. Tex. Apr. 25, 2018) (quoting *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1063 (S.D. Tex. 2012)). This presumption reflects the strong public interest in settling class actions. *Kincade v. Gen. Tire & Rubber Co.*, 635 F.2d 501, 507 (5th Cir. Jan. 1981) ("Particularly in class action suits, there is an overriding public interest in favor of settlement." (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977))); *Hays*, 2019 WL 427331, at *8 ("Because the public interest strongly favors the voluntary settlement of class actions, there is a strong presumption in favor of finding the settlement fair, reasonable[,] and adequate." (quoting *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mex.*, 910 F. Supp. 2d 891, 930–31 (E.D. La. 2012))).

III.   **Analysis**

   A.   **The Rule 23(e)(2) and *Reed* Factors**

      1.   **Whether the Class Representatives and Counsel Have Adequately Represented the Class**[4]

Ample record evidence shows that the class has been ably and diligently represented, in a case filled with legal and factual complexities. Class counsel enabled the plaintiffs to survive challenges to the pleadings in motions to dismiss, objections to class certification, multiple discovery objections and hearings, an eight-day bench trial, and several appeals. Class counsel

---

[4]   *See* FED. R. CIV. P. 23(e)(2)(A).

obtained consequential injunctive and declaratory relief for the class.  *ODonnell v. Harris Cty.*, 892 F.3d at 166–67; *ODonnell v. Harris Cty.*, 321 F. Supp. 3d at 778–85; *ODonnell v. Harris Cty.*, 251 F. Supp. 3d 1059–60; *ODonnell v. Harris Cty.*, 227 F. Supp. 3d at 715.  In January 2019, on the defendants' motion, the Fifth Circuit dismissed the appeal of this court's amended preliminary injunction order.  (Docket Entry No. 551).  The defendants concede that the plaintiffs prevailed and achieved meaningful changes and protections for class members.  (Docket Entry No. 617 at 32 n.68).

This factor weighs heavily in favor of approving the consent decree and settlement agreement.

### 2.    Whether the Proposed Class Settlement Was Negotiated at Arm's Length or Was a Product of Fraud or Collusion[5]

"The Court may . . . presume that no fraud or collusion occurred between opposing counsel in the absence of any evidence to the contrary."  *Welsh v. Navy Fed. Credit Union*, No. 16-CV-1062-DAE, 2018 WL 7283639, at *12 (W.D. Tex. Aug. 20, 2018).  The proposed class settlement was the product of rigorous, hard-fought negotiations conducted at arm's-length.  (Docket Entry No. 617 at 30).  The record of many, many hearings; the bench trial; the several appeals; and the lengthy, difficult negotiations, amply demonstrate the zealous advocacy that all sides deployed. (Docket Entry Nos. 563, 573, 575, 579, 580, 590, 594, 605, 606, 615).

Some amici contended that "collusion occurred after the November 2018 county-wide election when the new political establishment in Harris County sought to use this litigation to further policy goals outside traditional political avenues."  (Docket Entry No. 629 at 33; *see also* Docket Entry No. 634-1 at 4 (making the same argument)).  Evidence of the alleged collusion included the newly elected defendants' attempt to vacate the Fifth Circuit's decision staying the

---

[5]  *See* Fed. R. Civ. P. 23(e)(2)(B); *Reed*, 703 F.2d at 172.

amended injunction;[6] provisions of the proposed consent decree that are "beyond the scope of the original litigation," such as the measures to reduce failures to appear;[7] Susman Godfrey's decision to waive its fee in consideration of Harris County's promise to put that amount of money toward implementing the consent decree;[8] and various statements by Harris County Commissioners supporting the proposed consent decree.[9] These arguments do not show any "collusion" that would require rejecting the proposed decree.

The parties' responses to the amicus briefs reaffirmed that the settlement talks involved "many months of give-and-take, not merely between the two sides of this case, but also among the various constituencies that make up the defendants." (Docket Entry No. 647 at 3; *see also* Docket Entry No. 648 at 29 n.16 ("The Parties met dozens of time[s] over many months, with a great deal of give and take.")). The amici overlooked those months of vigorous negotiations. Newly elected officials do not collude simply because they take different positions or favor different approaches than their predecessors. As discussed below, voluntary consent decrees may provide broader remedies than a party could have obtained after trial. These remedies may require the expenditure of public funds; the fact that Harris County agreed to allocate resources in the amount of Susman Godfrey's waived fee does not make the allocation, or the fee waiver, illegitimate.

Nor do statements by Harris County Commissioners in support of the consent decree suggest "collusion." Amicus Steve Radack, who is also a County Commissioner, argued that Commissioner Rodney Ellis "admitt[ed] . . . collusion with the plaintiffs" by publicly saying that he (Ellis) "encourage[d Civil Rights Corps] to sue" before he became a Commissioner. (Docket Entry No. 634-1 at 5–6). Commissioner Ellis's statement before he assumed his current office

---

[6]  (Docket Entry No. 629 at 35); *see Salgado*, 913 F.3d at 482 (denying the motion to vacate).
[7]  (Docket Entry No. 629 at 33, 37).
[8]  (*Id.* at 38–39).
[9]  (Docket Entry No. 634-1 at 5–6).

does not suggest "collusion" with class counsel.  The months of hard-fought negotiations are strong evidence to the contrary.

Commissioner Radack argued that other Commissioners' praise of the proposed settlement agreement indicates that those Commissioners did not negotiate at arm's-length.  (*Id.* at 4–5 (citing news coverage of Commissioners' statements)).   Commissioner Radack emphasized that Commissioner Ellis described the proposed settlement as having the significance of *Brown v. Board of Education*, 347 U.S. 483 (1954).  (Docket Entry No. 634-1 at 5 (citing Docket Entry No. 634-2 at 1)).  One might well disagree with that comparison, but Commissioner Radack did not explain why the comment indicates any collusion.   Praising the outcome does not suggest impropriety in the process.

The high-quality representation on all sides, the lack of any evidence of fraud or collusion, the parties' adverse posture, and the months of negotiation required to produce this settlement amply satisfy the *Reed* factor requiring the absence of collusion.  This weighs heavily in favor of approving the proposed consent decree and settlement agreement.

### 3.     Whether the Relief was Adequate in Light of the Duration, Costs, Risks, and Delay of Trial and Appeal[10]

"When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Heartland*, 851 F. Supp. 2d at 1064 (quoting *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010)); *see also Ayers v. Thompson*, 358 F.3d 356, 369 (5th Cir. 2004) ("[S]ettling . . . avoids the risks and burdens of potentially protracted litigation.").   The parties have extensively litigated this case—already in its fourth year—in this court and in the Fifth Circuit, resulting in millions of dollars in fees and costs.  The motions to dismiss and for summary judgment, the trial, and the

---

[10]  *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

appeals raised constitutional and jurisdictional questions that required extensive efforts by the parties and the courts.   (*See* Docket Entry Nos. 400, 429, 430, 432).   If the case proceeded, additional discovery, likely as contentious as the past discovery, would be required.   The permanent injunction trial "would be lengthy, burdensome, and would consume tremendous time and resources of the [p]arties and the [c]ourt."   *See Hays*, 2019 WL 427331, at *10.

By reaching a favorable settlement before additional summary judgment motions and the permanent injunction trial, the plaintiffs "avoid[ed] expense and delay and ensur[ed] recovery for the [c]lass."   *See id.*   This factor favors approving the proposed consent decree and settlement agreement.

### 4.   The Stage of the Proceedings and the Amount of Discovery Completed[11]

This factor requires the court to look to whether "the parties and the district court possess ample information with which to evaluate the merits of the competing positions."   *Ayers*, 358 F.3d at 369.   The parties conducted significant discovery.   The eight-day preliminary injunction trial "featured [13] live witnesses and thousands of documents and videos."   (Docket Entry No. 617 at 31).   The court entered the preliminary injunction based on extensive and detailed findings of fact and conclusions of law that were affirmed on appeal.   *ODonnell*, 892 F.3d at 166; *ODonnell*, 251 F. Supp. 3d at 1059–60.   The Fifth Circuit has issued three published decisions clarifying the law. *Salgado*, 913 F.3d at 481; *Goodhart*, 900 F.3d at 221; *ODonnell*, 892 F.3d at 152.   The parties, and the court, "have ample factual and legal information with which to evaluate the merits of their competing positions and to 'make a reasoned judgment about the desirability of settling the case on the terms proposed.'"   (Docket Entry No. 617 at 32 (quoting *In re Educ. Testing Serv. Praxis*

---

[11]   *See Reed*, 703 F.2d at 172.

*Principles of Learning & Teaching, Grades 7–12 Litig.*, 447 F. Supp. 2d 612, 620 (E.D. La. 2006))).

This factor heavily favors approving the proposed consent decree and settlement agreement.

### 5.    The Probability of Success on the Merits[12]

The probability of the plaintiffs' success on the merits is the most important *Reed* factor, "absent fraud and collusion."  *Santinac v. Worldwide Labor Support of Ill., Inc.*, No. 15-CV-25, 2017 WL 1098828, at *3 (S.D. Miss. Mar. 23, 2017) (citing *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. Unit A 1982)).  This factor relates to the "risks . . . of trial and appeal," a Rule 23(e)(2) consideration.  FED. R. CIV. P. 23(e)(2)(C)(i).  "In evaluating the likelihood of success, the Court must compare the terms of the settlement with the rewards the class would have been likely to receive following a successful trial."  *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 287 (W.D. Tex. 2007) (citing *Reed*, 703 F.2d at 172).  This factor favors approving a settlement even when the likelihood of success on the merits is not certain.  *See In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1326–27 (5th Cir. Unit A Oct. 1981) ("A district court need not establish the plaintiffs' likelihood of prevailing to a certainty.").

The plaintiffs asked for an injunction requiring Harris County to release all misdemeanor arrestees on a personal bond "as soon as practicable after arrest, except arrestees who fall within [certain] categories."  (Docket Entry No. 401-1 at 1; *see* Docket Entry No. 257-1 at 1 (proposing an order stating that "[n]o arrestee may be kept in custody for any period of time solely because the arrestee cannot make a monetary payment imposed as a secured financial condition of release")).  On remand, this court issued an amended preliminary injunction order that included a

---

[12]  *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

provision adopting some of the plaintiffs' requested relief, with carefully crafted exceptions, exclusions, and limitations.  *See ODonnell*, 321 F. Supp. 3d at 769–70, 781–82.  The defendants appealed the amended preliminary injunction order and asked the Fifth Circuit to stay that provision and three other sections of the order pending the appeal.  The Fifth Circuit granted the stay, holding that the defendants would likely succeed on the merits in arguing that the specific challenged provisions were overbroad.  *Goodhart*, 900 F.3d at 224–25.

Although "a merits panel is not bound by a motions panel," the *Goodhart* court's decision demonstrates that it was uncertain that the plaintiffs would have prevailed on appeal or trial, or to what extent.  *Salgado*, 913 F.3d at 482 (quoting *Trevino v. Davis*, 861 F.3d 545, 548 n.1 (5th Cir. 2017)).  On the other hand, in *ODonnell* the Fifth Circuit affirmed this court's findings of fact, its principal conclusions of law (including the existence of grave and widespread constitutional violations), and preliminary remedies.[13]  *ODonnell*, 892 F.3d at 163–66.  The proposed consent decree provides the critical relief the plaintiffs have long sought, requiring Harris County to release many indigent misdemeanor arrestees on a personal bond as soon as practicable, again subject to carefully framed exceptions, exclusions, and limits.  (*See* Docket Entry No. 701-2 at 17).  The proposed consent decree also provides other relief, including training, data collection and analysis, and monitoring, that the amended preliminary injunction did not impose.  In short, the proposed consent decree supports and implements the critical aspects of the relief the class would likely recover were this case to proceed to trial and appeal.  The settlement is likely to benefit the class members and Harris County as a whole.

---

[13]  The pending cases challenging the bail systems in Dallas County, Texas and Cullman County, Alabama add to the uncertainty and support the *ODonnell* defendants' decision to settle the Harris County case.  *See Daves v. Dallas Cty.*, 341 F. Supp. 3d 688 (N.D. Tex. 2018), *appeal docketed*, No. 18-11368 (5th Cir. Oct. 23, 2018); *Schultz v. Alabama*, No. 5:17-CV-00270-MHH, 2018 WL 4253645 (N.D. Ala. Sept. 5, 2018), *appeal docketed sub nom. Hester v. Gentry*, No. 18-13894 (11th Cir. Sept. 13, 2018).

This factor strongly favors approving the proposed consent decree and settlement agreement.

### 6. The Range and Certainty of Recovery[14]

This factor requires the district court to "establish the range of possible damages that could be recovered at trial, and, then, by evaluating the likelihood of prevailing at trial and other relevant factors, determine whether the settlement is pegged at a point in the range that is fair to the plaintiff settlors." *Maher v. Zapata Corp.*, 714 F.2d 436, 460 (5th Cir. 1983) (quoting *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 213 (5th Cir. Apr. 1981)). The court's consideration of this factor "can take into account the challenges to recovery at trial that could preclude the class from collecting altogether . . . ." *Klein*, 705 F. Supp. 2d at 656. The question is not whether the parties have reached "exactly the remedy they would have asked the Court to enter absent the settlement," but instead "whether the settlement's terms fall within *a reasonable range of recovery*, given the likelihood of the plaintiffs' success on the merits." *Id.* (quoting *Frew v. Hawkins*, No. 93-CA-065, 2007 WL 2667985, at *6 (E.D. Tex. Sept. 5, 2007); *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830, 849–50 (E.D. La. 2007)).

Estimating the range of possible recovery is not difficult. The lowest band is no recovery, after all legal challenges. A middle band is the relief granted in the amended preliminary injunction order, without the four provisions stayed by the motions panel. *See Goodhart*, 900 F.3d at 228; *ODonnell*, 321 F. Supp. 3d at 778–85. The upper band is the relief contained in the proposed consent decree, which robustly implements the amended preliminary injunction order. (*See* Docket Entry No. 701-2). Based on the motions panel's decision, the upper band of recovery after trial and appeals likely would be less, and almost certainly no more, than the relief in the

---

[14] *See* FED. R. CIV. P. 23(e)(2)(C)(i); *Reed*, 703 F.2d at 172.

proposed consent decree.  *See Heartland*, 851 F. Supp. 2d at 1067–68 ("Based on the very small number of claims filed after an extensive settlement notice campaign, the upper band of recovery after trial likely would be much smaller, and almost certainly no higher, than the upper amount offered in the settlement.").

This factor favors approving the proposed consent decree and settlement agreement.

### 7. The Opinions of the Participants, Including Class Counsel, Class Representatives, and the Absent Class Members[15]

"The endorsement of class counsel is entitled to deference, especially in light of class counsel's significant experience in complex civil litigation and their lengthy opportunity to evaluate the merits of the claims."  *DeHoyos*, 240 F.R.D. at 292; *see also Stott*, 277 F.R.D. at 346 ("As class counsel tend[] to be the most familiar with the intricacies of a class action lawsuit and settlement, 'the trial court is entitled to rely upon the judgment of experienced counsel for the parties.'" (quoting *Cotton*, 559 F.2d at 1330)).  A court may not simply defer to class counsel's opinion.  "Rather, the Court must give class counsel's recommendations appropriate weight in light of all the factors surrounding the settlement."  *Turner*, 472 F. Supp. 2d at 852.

Counsel for all the parties, including class counsel, and the class representatives themselves have endorsed the proposed consent decree and settlement agreement.  (Docket Entry Nos. 690-1, 690-2, 690-3 (named class representatives' declarations in support of final approval)).  The parties jointly state that the proposed class settlement "is a landmark vindication of Fourteenth Amendment rights"; "honors the mandate issued by Harris County voters in electing new judges, a new Sheriff, and new County Commissioners responsible for the County's bail system"; and "will improve the lives of tens of thousands of class members each year."  (Docket Entry No. 617 at 35–36).  Class counsel's opinions as to the benefits of the proposed consent decree are consistent

---

[15] *See Reed*, 703 F.2d at 172.

with the court's own analysis of the proposed consent decree and settlement agreement under the *Reed* and Rule 23(e)(2) factors.

This factor strongly favors approving the proposed consent decree and settlement agreement.

### 8. Whether the Proposal Treats Class Members Equitably in Relation to Each Other[16]

The proposed consent decree requires Harris County to take "action that applies to all class members equally." (*Id.* at 30); *see Hays*, 2019 WL 427331, at *13 (the court decided that the equitable-treatment factor was "easily met as each class member, save the Class representative, will receive the same amount"). All class members are entitled to the same relief. This factor supports approving the proposed consent decree and settlement agreement.

All of the Rule 23(e)(2) and *Reed* factors weigh in favor of approving the proposed consent decree and settlement agreement. The court holds that the proposed consent decree and settlement agreement terms are fair, reasonable, and adequate under Rule 23(e) and the governing case law.

### B. The Authority to Enter the Proposed Consent Decree

Because the parties ask the court to enter a consent decree—a "hybrid creature[]" that is "part contract and part judicial decree"—the court must determine that it has the authority to enter the decree. *Smith v. Sch. Bd. of Concordia Par.*, 906 F.3d 327, 334 (5th Cir. 2018); *see also League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 845 (5th Cir. 1993) (en banc) ("The entry of a consent decree is more than a matter of agreement among litigants. It is a 'judicial act.'").

The "voluntary nature of a consent decree is its most fundamental characteristic." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 521 (1986); *see*

---

[16] *See* FED. R. CIV. P. 23(e)(2)(D).

*id.* at 525 ("[I]n addition to the law which forms the basis of the claim, the parties' consent animates the legal force of a consent decree."). "Consequently, a consent decree can sweep more broadly than can other forms of court-ordered relief." *Smith*, 906 F.3d at 335; *see also Local No. 93*, 478 U.S. at 525 ("[A] federal court is not necessarily barred from entering a consent decree merely because the decree provides broader relief than the court could have awarded after trial."); *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 179, 185 (2d Cir. 1987) ("[A] district court may provide broader relief in an action that is resolved before trial than the court could have awarded after trial." (alterations and quotation omitted)). The relief must, however, "spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Smith*, 906 F.3d at 335 (quoting *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004)); *see Clements*, 999 F.2d at 846 ("A consent decree must arise from the pleaded case and further the objectives of the law upon which the complaint is based.").

The Fifth Circuit twice rejected the defendants' abstention arguments, affirming this court's power to hear the Fourteenth Amendment claims. *See Goodhart*, 900 F.3d at 232; *ODonnell*, 892 F.3d at 156–57. The Fifth Circuit also affirmed this court's conclusion that Harris County's misdemeanor bail system violated procedural due process and equal protection rights. *ODonnell*, 892 F.3d at 161–63. The proposed consent decree fully resolves the plaintiffs' claims and addresses the "[t]he fundamental source of constitutional deficiency" the Fifth Circuit identified—Harris "County's mechanical application of the secured bail schedule without regard for the individual arrestee's personal circumstances." *Id.* at 163.

The relief the proposed consent decree requires "spring[s] from" the plaintiffs' claims, "come[s] within the general scope of the case made by the pleadings," and "further[s] the

26

objectives of the law upon which the complaint was based." *See Smith*, 906 F.3d at 335.  Amended Local Rule 9 entitles class members to protections designed to end Harris County's past practices of mechanically applying a secured bail schedule, regardless of inability to pay or the adequacy of other conditions of pretrial release, by requiring: release on a personal bond or on nonfinancial conditions for certain categories of arrestees as soon as possible after arrest; an individualized hearing; notice; and the opportunity to be heard, present evidence, and dispute the prosecutor's evidence supporting detention.  (Docket Entry No. 701-2 at 16–25).  The proposed consent decree's appearance policies and representation requirement are designed to increase court appearances and to protect misdemeanor arrestees from arbitrary wealth-based detention.  (*See id.* at 25–37).  The data-collection, analysis, and reporting requirements are designed to increase the understanding of how Harris County's bail system works in practice, how it can be improved, and whether it is constitutional in application.  (*Id.* at 38–43).  The training and monitoring provisions are important to ensure that the "constitutional practices will endure."  (*Id.* at 11, 37–38, 43–50).

Some of the proposed consent decree provisions are clearly broader than the amended preliminary injunction order, but each provision "spring[s] from," and works to resolve, the plaintiffs' constitutional claims.  *Smith*, 906 F.3d at 335.  This court holds that it has the authority to enter the proposed consent decree.

The nonparties who opposed the proposed consent decree at the final fairness hearing raised concerns that largely overlap with those the amici and objectors raised in the preliminary approval stage.  Several nonparty speakers had filed amicus briefs or objections previously.

The court addresses these amicus briefs and objections, aside from the arguments about collusion discussed above.  Nonparty objectors contended that:

- the court lacks the power to enter the proposed consent decree because the decree is overbroad;[17]
- the court lacks jurisdiction because there is no longer a case or controversy;[18]
- the decree "remov[es] the individualized [bail] hearing process";[19]
- the decree jeopardizes public safety;[20]
- the decree threatens the interests of crime victims generally and domestic violence victims in particular;[21]
- the decree creates significant burdens on law enforcement and taxpayers;[22]
- the decree usurps legislative authority and bypasses Harris County voters;[23]
- the decree "raises serious federalism concerns" by imposing obligations on local officials;[24]
- the decree violates Texas law;[25]
- the decree violates bail bondsmen's property rights;[26]
- the decree imposes unlawful obligations on the Harris County Sheriff, who "is not a proper party";[27] and that

---

[17]   (Docket Entry No. 629 at 36–38; Docket Entry No. 631-2 at 15–17; Docket Entry No. 634-1 at 7; Docket Entry No. 638 at 10; Docket Entry No. 641-1 at 5).

[18]   (Docket Entry No. 689 at 6–7).

[19]   (Docket Entry No. 629 at 17; *see also* Docket Entry No. 631-2 at 11 (making the same argument); Docket Entry No. 646-1 at 4 (same); Docket Entry No. 689 at 2 (same)).

[20]   (Docket Entry No. 629 at 24–25; Docket Entry No. 634-1 at 8–11; Docket Entry No. 635-1 at 5; Docket Entry No. 636 at 1; Docket Entry No. 637 at 2–3; Docket Entry No. 641-1 at 14–15; Docket Entry No. 646-1 at 2–3; Docket Entry No. 689 at 2–6; Docket Entry No. 696 at 2–4).

[21]   (Docket Entry No. 637 at 2–3; Docket Entry No. 638 at 18–19; Docket Entry No. 639 at 8–12; Docket Entry No. 641-1 at 6, 15–17; Docket Entry No. 646-1 at 2–3).

[22]   (Docket Entry No. 637 at 3; Docket Entry No. 638 at 7–9, 19; Docket Entry No. 641-1 at 4–5; Docket Entry No. 646-1 at 3–4).

[23]   (Docket Entry No. 629 at 30–32, 40; Docket Entry No. 635-1 at 4; Docket Entry No. 641-1 at 7).

[24]   (Docket Entry No. 638 at 1, 15–18; *see also* Docket Entry No. 641-1 at 7 (making the same argument)).

[25]   (Docket Entry No. 629 at 11; Docket Entry No. 631-2 at 10–14; Docket Entry No. 641-1 at 6; Docket Entry No. 689 at 2–3, 4 n.5).

[26]   (Docket Entry No. 631-2 at 14).

[27]   (*Id.* at 16).

- the decree should not be approved until third parties have "sufficient notice" and "a better opportunity to be heard."[28]

These arguments do not support denying final approval.

This court acts within its authority in entering the proposed consent decree. The Fifth Circuit affirmed the court's factual findings and central legal conclusions that the decree implements. *ODonnell*, 892 F.3d at 166. The Deputies' Organization argued that "the government cannot agree to substantive remedies that go beyond what is constitutionally required," (Docket Entry No. 629 at 36), but clear precedent establishes that consent decrees "can sweep more broadly than can other forms of court-ordered relief." *Smith*, 906 F.3d at 334–35. The proposed decree "spring[s] from" the plaintiffs' claims and falls within the scope of the pleadings and the relief sought. *Id.* at 335 (quoting *Frew*, 540 U.S. at 437).

Other broad consent decree provisions have withstood Fifth Circuit scrutiny. In 2013, the Fifth Circuit affirmed a district court's decision to approve a consent decree with detailed requirements about New Orleans police "policies and practices related to":

> (1) the use of force; (2) investigatory stops and detentions, searches, and arrests; (3) custodial interrogations; (4) photographic lineups; (5) bias-free policing; (6) community engagement; (7) recruitment; (8) training; (9) officer assistance and support; (10) performance evaluations and promotions; (11) supervision; (12) the secondary employment system, also known as the paid detail system; (13) misconduct complaint intake, investigation, and adjudication; and (14) transparency and oversight.

*United States v. City of New Orleans*, 35 F. Supp. 3d 788, 790 (E.D. La. 2013), *aff'd*, 731 F.3d 434 (5th Cir. 2013). The district court held that these provisions were "fair, adequate[,] and reasonable" solutions to alleged patterns of police conduct that allegedly violated the Fourth and Fourteenth Amendments. *Id.* at 790, 793. Because "almost any affirmative decree beyond a

---

[28] (Docket Entry No. 637 at 1; *see also* Docket Entry No. 646-1 at 2 (making the same argument); Docket Entry No. 665 at 3–4 (same)).

directive to obey the Constitution necessarily" requires parties to "do more than the Constitution itself requires," the *ODonnell* objectors cannot defeat the parties' joint motion by pointing out that the decree goes above the constitutionally required minimum. *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 389 (1992).

The Attorney General of Texas argues that the court lacks jurisdiction because there is no "live case or controversy" between the parties. (Docket Entry No. 689 at 7). He contends that the lawsuit challenged "*past* bail practices" that "no longer exist," arguing that "the current process [under Amended Local Rule 9] far surpasses what the Constitution requires." (*Id.*). This argument fails because, as explained above, the proposed consent decree is the result of months of arms-length negotiations, and it is designed to implement Amended Local Rule 9 by establishing policies to ensure that constitutional practices endure in Harris County.

Several objectors and amici argue that the decree sacrifices security for increased procedural protections, but the record demonstrates that this is a false dichotomy. The court found no "reasonable basis for [the] belief that for misdemeanor defendants, release on secured money bail provides incentives for, or produces, better pretrial behavior than release on unsecured or nonfinancial conditions." *ODonnell*, 251 F. Supp. 3d at 1103.[29] The procedures set out in the

---

[29] The proposed consent decree accounts for, and works toward, both public and victim safety, as well as protecting misdemeanor defendants' constitutional rights, and it does not "remov[e] the individualized hearing process" for bail decisions. (*Contra* Docket Entry No. 629 at 17). The court cited volumes of recent scholarship, including a University of Pennsylvania study of the Harris County bail system concluding that "if, during the six years between 2008 to 2013, Harris County had given early release on unsecured personal bonds to the lowest-risk misdemeanor defendants . . . those released would have committed 1,600 fewer felonies and 2,400 fewer misdemeanors in the eighteen months following pretrial release." *ODonnell*, 251 F. Supp. 3d at 1122. The study found that wealth-based pretrial detention increases crime by exacerbating poverty conditions that cause crime, and that indigent individuals who are detained "often lose their jobs, may lose their housing, be forced to abandon their education, and likely are unable to make their child support payments." *Id.* (quoting Lisa Foster, Office for Access to Justice, *Remarks at the American Bar Association's 11th Annual Summit on Public Defense* (Feb. 6, 2016)).

proposed consent decree require individualized bail hearings that take both public safety and constitutional rights into account.

Amended Local Rule 9 provides that secured money bail may be imposed as a release condition for indigent arrestees if the Hearing Officer finds on the record, by clear and convincing evidence, that "no less-restrictive condition . . . could reasonably assure" community safety or prevent flight from prosecution.  (Docket Entry No. 701-2 at 21–22).  The rule "permits the use of secured money bail *after* the individualized hearing." (Docket Entry No. 557-2 at 2).  The decree replaces wealth-based detention with individualized proceedings.  In no way does the proposed settlement agreement or consent decree create an "automatic [personal] bond system."  (*Contra* Docket Entry No. 629 at 17).

The proposed decree includes additional precautions to protect vulnerable groups, such as domestic violence victims.  (Docket Entry No. 647 at 8–9; Docket Entry No. 648 at 20).  Amended Local Rule 9 provides that people arrested for domestic violence, for violating a protective order in a domestic violence case, for making a terroristic threat against a family or household member, or for committing a crime while on pretrial release, may be detained immediately after arrest and before their individualized hearings, which must occur within 48 hours of their arrest.  (Docket Entry No. 701-2 at 17–18).  If a misdemeanor defendant released on a conditional bond violates the condition—such as a command to stay away from a victim—then his or her bond may be revoked after a hearing.  (*See id.* at 17–18, 21–22, 40; Docket Entry No. 648 at 20).  And, as the plaintiffs argue, "requiring fewer hearings [promotes safety by allowing] more attention to the cases that are most serious, more attention to the conditions of release in serious cases . . . more attention to cases in which a condition of release is violated, [and] less strain on the Sheriff's Department['s] resources."  (Docket Entry No. 648 at 6).

Before the final fairness hearing, District Attorney Kim Ogg filed a statement informing the court that, because of "[t]he judicial trend toward [personal] bonds," Harris County misdemeanor cases increased 59 percent from January 1, 2018 to late October 2019, and that those accused of misdemeanors "are not showing up to court." (Docket Entry No. 696 at 2). The District Attorney argued that the proposed consent decree would "cement" or "exacerbate" this trend and make it harder to prosecute cases. (*Id.* at 2–3). At the final fairness hearing, the parties challenged the District Attorney's data set and contended that the prosecution is often responsible for rescheduling hearings. Most persuasively, the parties argued that if cases do proceed more slowly, that fact would suggest that fewer indigent defendants are being coerced into pleading guilty and forfeiting legitimate defenses simply to get out of jail.

Several amici cited cases of misdemeanor defendants committing crimes while on bond as evidence that the decree endangers public safety and should be rejected. (*See, e.g.*, Docket Entry No 641-1 at 17–20). These anecdotes do not undermine the record or the court's findings of fact and conclusions of law. No pretrial bail system can prevent every defendant who is released on money bail or personal bond from committing an offense or failing to appear. The amici's argument is essentially an argument for incarcerating *every* arrestee and defendant until trial or other disposition. That is not and has not been our law. Every American bail system must comply with the Constitution, which presumes innocence and eligibility for pretrial release. The amici's hindsight disagreements with individual case outcomes have no bearing on whether the decree is a fair, reasonable, and adequate remedy for the constitutional violations that the record shows prevailed in Harris County.

Objections about the cost of the decree and its potential impact on law enforcement are also inadequate grounds to deny the parties' joint motion. Injunctions and consent decrees often

require expenditures of public funds, and the Fifth Circuit has affirmed at least one decree imposing far greater burdens on law enforcement than the proposed decree and settlement agreement in this case. *See, e.g.*, *City of New Orleans*, 731 F.3d at 443 (New Orleans police consent decree); *see also Missouri v. Jenkins*, 495 U.S. 33, 38 (1990) (school-desegregation consent decree requiring state and local authorities to spend tens of millions of dollars). The cost arguments are especially unpersuasive given the evidence in the record suggesting that the consent decree may save Harris County money, as compared to the former bail system. *ODonnell*, 251 F. Supp. 3d. at 1122 (a study of the Harris County bail system found that the County would have saved tens of millions of dollars if it "had given early release on unsecured personal bonds to the lowest-risk misdemeanor defendants" between 2008 and 2013).

District Attorney Ogg asserts that the decree "unfair[ly] . . . expose[s] the District Attorney and her employees to federal sanctions for noncompliance with the proposed settlement absent appropriate clarity on her rights and responsibilities under the Proposed Settlement." (Docket Entry No. 641-1 at 4). But the District Attorney does not identify which, if any, of the proposed decree provisions a prosecutor could be accused of violating in a way that would incur contempt sanctions. As discussed below, the District Attorney argues (unpersuasively) that the provisions addressing nonappearances wrongly increase judicial discretion at the expense of prosecutorial power, but it is not clear how those provisions put prosecutors at risk of being held in contempt. (*Id.* at 4 n.2, 6).

The amici's invocations of separation of powers and popular sovereignty ring hollow. The settlement became politically feasible because of the voters' decisions in the November 2018 election. In that sense, the proposed consent decree "honors the mandate [of] Harris County voters." (Docket Entry No. 617 at 35). The proposed decree and settlement agreement will help

transform a bail system that caused "tens of thousands of constitutional violations," vindicating Fourteenth Amendment rights. *ODonnell*, 251 F. Supp. 3d at 1150 n.99. The fact that democratically elected officials approved the decree, while the officials defeated in the election had opposed similar relief, does not offend, but celebrates, popular sovereignty.

Nor is the federalism objection persuasive. A consent decree is a voluntary agreement; the Harris County Commissioners Court voted to approve the proposed decree after months of arms-length negotiation. It is not a "judicial usurpation of local government responsibilities" for this court to approve the proposed decree after the plaintiffs and County defendants asked the court to do so. (*Contra* Docket Entry No. 638 at 15).

Some amici argued that enforcing the decree "for an extended period of time . . . would . . . bind future local governmental officials who were not parties to the [d]ecree." (*Id.*; *see also* Docket Entry No. 641-1 at 7 (making the same argument)). Local officials may adopt consent decrees that bind their successors. The proposed consent decree specifically provides for modification during its implementation. (Docket Entry No. 647 at 7). Paragraph 137 states that "any" provision of the decree may be modified for good cause and paragraph 31 "expect[s]" that the Harris County Criminal Court at Law Judges "may seek to update [Local Rule 9] from time to time to reflect best practices and to maximize pretrial liberty, court appearance, and public safety." (Docket Entry No. 701-2 at 24, 51). Current or future officeholders may move to modify or terminate the decree under Rule 60(b) if they think changes in circumstances warrant this relief. FED R. CIV. P. 60(b); *see Rufo*, 502 U.S. at 393 ("[A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance."). Federalism provides no ground to reject the decree.

The amici raise objections under Texas law, but none supports denying final approval. District Attorney Ogg contended that the decree "[a]ccords unfettered and unreviewable discretion to misdemeanor judges and magistrates to delay (or outright excuse) misdemeanor defendants from appearing in court, contrary to Texas law." (Docket Entry No. 641-1 at 6). She argued that this discretion would theoretically empower judges to thwart the prosecution by allowing defendants to *never* appear. (*Id.* at 11). The District Attorney contended that the decree violates the Texas Code of Criminal Procedure's requirement that judges "shall" compel defendants' appearances when a court order or Code provision mandates an appearance. (*Id.* at 9–11 (citing TEX. CODE CRIM. PROC. arts. 22.01, 22.02, 23.05 (2007)).

The parties responded persuasively that the decree reflects Texas district and county courts' broad power to manage their dockets and decide whether a defendant must attend a particular hearing. (Docket Entry No. 647 at 10; Docket Entry No. 648 at 16–17 (citing TEX. CODE CRIM. PROC. art. 33.08 (1966) ("The district courts and county courts shall have control of their respective dockets as to the settings of criminal cases."))).

Nothing in the proposed decree prevents judges from requiring a defendant's appearance at a pretrial hearing under Article 28.01 of the Code. (Docket Entry No. 647 at 11–12). Article 28.01 provides that courts "may set any criminal case for a pre-trial hearing . . . and direct the defendant and his attorney . . . to appear before the court." TEX. CODE CRIM. PROC. art. 28.01 (1979). "[B]y its terms, Article 28.01 comes into play only when the trial court exercises its discretion to 'set' a criminal case for a pre-trial hearing." *State v. Velasquez*, 539 S.W.3d 289, 294–95 (Tex. Crim. App. 2018). Article 33.03 requires misdemeanor defendants to appear at trials when they face imprisonment, but so does the proposed decree, which requires defendants to attend "trial settings, bond violation hearings, suppression hearings, or plea settings," as well as "any

35

pretrial hearing before a Harris County Criminal Court at Law Judge in a case where a misdemeanor arrestee has had prior sufficient notice . . . that the appearance is required." TEX. CODE CRIM. PROC. art. 33.03 (1979); (Docket Entry No. 701-2 at 14).

District Attorney Ogg contended at the preliminary approval stage that paragraph 65(c) of the proposed decree conflicts with Article 28.01, because the decree provision gives a Harris County Criminal Court at Law Judge discretion to "waive a misdemeanor arrestee's appearance at any court appearance at which that . . . Judge is presiding." (Docket Entry No. 641-1 at 11 n.5 (citing Docket Entry No. 617-1 at 34)). The District Attorney observed that Article 28.01's second sentence states that "[t]he defendant must be present at the arraignment, and his presence is required during any pre-trial proceeding." *Id.* (citing CRIM. PROC. art. 28.01). But paragraph 65(c) of the decree is consistent with Article 28.01, because a judge can waive the defendant's appearance at a pretrial hearing by not designating the setting as required under Article 28.01. Article 28.01's first sentence provides that courts "*may*" set a criminal case for a pretrial hearing. CRIM. PROC. art. 28.01 (emphasis added); *Velasquez*, 539 S.W.3d at 294–95. To remove any doubt, the parties amended paragraph 65(c) to clarify that "a [Harris County Criminal Court at Law] Judge may . . . waive a misdemeanor arrestee's appearance . . ., *consistent with Texas law*." (Docket Entry No. 701-2 at 34 (emphasis added)).

The parties also clarified paragraph 68(a), which stated in the preliminary-approval-stage draft that if a Harris County Criminal Court at Law Judge "finds . . . that the arrestee [who missed a required appearance] did not have actual notice of the setting, then a[n arrest] warrant may not issue." (Docket Entry No. 617-1 at 36). The Professional Bondsmen had contended that paragraph 68(a) conflicts with the Texas Code of Criminal Procedure, which provides that a warrant must issue if a defendant forfeits his or her bond by failing to attend a required appearance without good

cause.  (Docket Entry No. 631-2 at 13–14); *see* CRIM. PROC. art. 22.02 (bond forfeiture for nonappearance will occur "unless good cause be shown why the defendant did not appear"); CRIM. PROC. art. 23.05(a) ("If a forfeiture of bail is declared by a court . . . a capias shall be immediately issued for the arrest of the defendant.").  The Professional Bondsmen argued that the proposed decree violates Texas law because it requires judges to not issue a warrant after a defendant misses a required hearing, even without finding good cause, if the defendant lacked actual notice of the setting.  (Docket Entry No. 631-2 at 13–14).  The parties resolved this concern by deleting paragraph 68(a)(ii) and revising paragraph 68(a)(i) to provide that "[i]f the [County Criminal Court at Law] Judge finds that no good cause exists for the misdemeanor arrestee's nonappearance, then the [County Criminal Court at Law] Judge may take any action *consistent with Texas state law*." (Docket Entry No. 701-2 at 36 (emphasis added)).[30]

The other state-law challenges are not persuasive.  The District Attorney objected that "there is no requirement [in the proposed decree] that a county criminal court at law judge issue a warrant authorizing the defendant's arrest" when necessary under Texas law.  (Docket Entry No. 641-1 at 11).  But the absence of an explicit requirement to follow state law does not equate to an implicit command to violate it.  (Docket Entry No. 648 at 18).  The issue of compliance with Texas law on issuing arrest warrants relates to paragraph 68(a), discussed above.  The decree must comply with Texas law, but it does not have to repeat every state-law requirement.[31]

_____

[30] The analysis above rebutting District Attorney Ogg and the Professional Bondsmen's arguments also addresses the Texas Attorney General's contention that allowing defendants to reschedule missed appearances at weekly Open Hours Court will "tie[] judges' hands" and enable defendants to "avoid their court settings for up to two weeks."  (*Contra* Docket Entry No. 689 at 4; *see* Docket Entry No. 701-2 at 34 (emphasis added) ("Any misdemeanor arrestee who has missed a court appearance can appear at Open Hours Court to reschedule the missed court appearance, *subject to the other provisions in this Consent Decree*.")).

[31] The decree also need not restate crime victims' rights under Texas law, such as child and domestic-abuse victims' right to have courts consider how they would be impacted by a defendant's requested continuance.  *See* TEX. CODE CRIM. PROC. art. 56.02(a)(13) (2015); (*contra* Docket Entry No.

37

The Texas Attorney General and the Professional Bondsmen of Harris County questioned the legality of creating Open Hours Court to allow misdemeanor defendants to reschedule court appearances.  (*See* Docket Entry No. 701-2 at 33).  Under the proposed decree, "the [County Criminal Court at Law] Judges will designate one [County Criminal Court at Law] Judge each week, for at least one day each week, to preside over an 'Open Hours Court' to be located in that [County Criminal Court at Law] Judge's own courtroom."  (*Id.*).  "Any misdemeanor arrestee who has missed a court appearance can appear at Open Hours Court to reschedule the missed court appearance, subject to the other provisions in [the] Consent Decree."  (*Id.* at 34).  The Attorney General stated that "[i]t is unclear whether the proposed Consent Decree requires the county to establish a new court," arguing that such a mandate "would violate state law because . . . only the Texas Legislature can create a new court."  (Docket Entry No. 689 at 4 n.5; *see also* Docket Entry No. 631-2 at 15 (raising the same issue)).  The proposed decree does not create a new court.  It requires the existing County Criminal Court at Law Judges to designate one current Judge to hold Open Hours Court each week.  (Docket Entry No. 701-2 at 33).  "The purpose of Open Hours Court is to provide an opportunity for people to move forward with the business in their cases more efficiently and, to the extent permitted by other provisions of the Consent Decree, to do so without fear of going into custody for a prior nonappearance."  (*Id.* at 34).

---

639 at 9–10).  The Harris County Domestic Violence Coordinating Council argued that, under the Texas Code of Criminal Procedure, in child and domestic-abuse cases, "[t]he reason for granting or denying a continuance must be stated on the record."  (Docket Entry No. 639 at 10).  But Article 56.02(a)(13) requires a statement on the record only "if [it is] requested by the attorney representing the state or by counsel for the defendant."  CRIM. PROC. art. 56.02(a)(13).  At the final fairness hearing, Andy Kahan of Crime Stoppers of Houston expressed concern that, under the proposed consent decree, "victims are not entitled to receive notice when a defendant reschedules court appearances."  The proposed consent decree states that it "does not prevent the County from providing text message and telephone call reminders [about court appearances] to . . . victims of crime."  (Docket Entry 701-2 at 29 n.77).

The Texas Attorney General argued that the proposed consent decree violates state law on local cooperation with federal immigration enforcement.  *See* TEX. CODE CRIM. PROC. art. 2.251 (2017); TEX. GOV'T CODE § 752.053(a)–(b) (2017).  The Attorney General's representative at the final fairness hearing argued that the proposed decree would obligate a local jail to immediately release a detainee even though Texas law requires the jail to honor a request from federal immigration officials to interview or hold that detainee.  The representative claimed, without providing details, that "at least one Harris County official" used the court's injunction to justify refusing to cooperate with federal immigration personnel, in violation of Texas law.  But, as explained above, the proposed consent decree does not require officials to violate state statutes.  Harris County Criminal Court at Law Judge Darrell Jordan, who testified in support of the proposed decree, explained that release on a General Order Bond under Amended Local Rule 9 (and the proposed consent decree) takes approximately 20 to 48 hours.  This window leaves time for local officials to comply with federal immigration enforcement requests.  Harris County Sheriff Ed Gonzalez, another party witness, stated that federal immigration officials operate in Harris County jails, monitor detainee populations, and place holds as they see fit, with full cooperation from local authorities.

The Professional Bondsmen and the Texas Attorney General asserted that personal bonds may be granted to misdemeanor arrestees before a bail hearing "only if a magistrate . . . concludes [based on an individualized assessment] that a personal bond is appropriate."  (Docket Entry No. 631-2 at 11; Docket Entry No. 689 at 2).  The Professional Bondsmen and the Attorney General appear to suggest that all misdemeanor defendants, whether or not they can afford secured money bail, must be detained before their individualized bail hearings.  But the Texas Government Code allows County Judges to "adopt rules consistent with the Code of Criminal Procedure . . . for

practice and procedure in the courts." *ODonnell*, 251 F. Supp. 3d at 1086 (quoting TEX. GOV'T CODE § 75.403(f) (1987)).   The proposed consent decree's preapproved General Order Bonds, which the County Judges endorse based on their experience as judges and former prosecutors and defense attorneys, do not conflict with the Code provisions the Texas Attorney General and the Professional Bondsmen cite.   (*Contra* Docket Entry No. 631-2 at 11; Docket Entry No. 689 at 2 n.1).   Article 17.03 of the Texas Code of Criminal Procedure grants magistrate judges the power to release arrestees on a personal bond, subject to several exceptions, but does not bar release on a personal bond before a bail hearing.   TEX. CODE CRIM. PROC. art. 17.03 (2017); (Docket Entry No. 648 at 4).   Article 17.04 lists the "[r]equisites of a personal bond" document, such as the defendant's name, address, and the bond amount, but says nothing to support the objectors' claim. TEX. CODE CRIM. PROC. art. 17.04 (1987); (Docket Entry No. 648 at 4).   The fact that Article 17.04 lists the bond amount in parentheses, as the Professional Bondsmen's counsel emphasized at the final fairness hearing, does not preclude County Judges from filling in that amount using bonds preapproved under rules consistent with the Code of Criminal Procedure.   *See* GOV'T CODE § 75.403(f).   Article 17.15 establishes five criteria for fixing bail amounts but does not require misdemeanor defendants to be detained before their individualized bail hearings.   TEX. CODE CRIM. PROC. art. 17.15 (1993); (Docket Entry No. 648 at 2–3).   The objectors did not cite a court decision reaching a contrary conclusion.   The Professional Bondsmen's position is striking given that their business model long depended on posting specific bail amounts for misdemeanor arrestees before those arrestees ever saw a Hearing Officer.   (Docket Entry No. 648 at 2–3); *see ODonnell*, 251 F. Supp. 3d at 1088 (describing prehearing bail procedures in Harris County before this lawsuit).

The Professional Bondsmen argued that the proposed decree violates Texas law by preferring personal bonds over other bonds and by using preapproved General Order Bonds. (Docket Entry No. 631-2 at 11, 13).  They cited numerous Texas Code provisions (and, this time, one case), but no specific analysis to support their argument.

The Professional Bondsmen contended that the proposed consent decree violates state law by providing that the Harris County Sheriff must reject a bond that is "otherwise valid" under Texas law.  (*Id.* at 12).  But Texas law requires sheriffs to "execute all *lawful* process."  TEX. CODE CRIM. PROC. art. 2.13(b)(2) (2019) (emphasis added); *see also* TEX. CODE CRIM. PROC. art. 2.16 (1966) ("If any sheriff or other officer shall wilfully [*sic*] refuse or fail from neglect to execute any summons, subpoena[,] or attachment for a witness, or any other legal process which it is made his duty by law to execute, he shall be liable to a fine for contempt.").  The proposed decree establishes criteria for assessing whether a bond is lawful in Harris County and whether the Sheriff must enforce it under state law.  (Docket Entry No. 701-2 at 23 ("The Sheriff must not enforce any order requiring secured money bail that is not accompanied by a record showing that the procedures and findings described in Local Rule 9 were provided.")).  The decree reflects the Fifth Circuit's suggested language for the amended injunction.  *ODonnell*, 892 F.3d at 165 (the Sheriff may "decline to enforce orders requiring payment of prescheduled bail amounts as a condition of release for said defendants if the orders are not accompanied by a record showing that the required individual assessment was made and an opportunity for formal review was provided."); (*cf.* Docket Entry No. 701-2 at 23).  The proposed decree does not empower the Harris County Sheriff "to avoid executing judicial orders imposing secured bail by unilaterally declaring them unconstitutional."  *ODonnell*, 892 F.3d at 156.

41

The Professional Bondsmen also objected that the proposed consent decree violates Texas law by requiring the Harris County Sheriff to reject a bond that is valid under another county's laws but not the proposed decree.  (Docket Entry No. 631-2 at 13).  As the plaintiffs' counsel observed at the final fairness hearing, the proposed consent decree has a limited scope; it applies only to "Class A and Class B misdemeanor arrestees who are detained by Harris County," not to defendants apprehended outside of Harris County under another county's laws.  (Docket Entry No. 303 at 1).  The conflict the Professional Bondsmen described would not arise.

The Professional Bondsmen argued that Texas law does not require the proposed decree's clear-and-convincing-evidence standard in bail determinations and its least-restrictive-means analysis of conditions of release.  (Docket Entry No. 631-2 at 12–13).  The Professional Bondsmen cite no authority for the claim that a Texas local government cannot agree to procedural safeguards that go above a constitutional or state-law floor.  The clear-and-convincing-evidence and least-restrictive-means tests channel magistrates' discretion, but do not eliminate it.  As explained above, "[t]he Texas Government Code permits the County Judges to 'adopt rules consistent with the Code of Criminal Procedure.'"  *ODonnell*, 251 F. Supp. 3d at 1086.  The Professional Bondsmen did not show that these proposed consent decree provisions violate the Texas Code of Criminal Procedure.

The Professional Bondsmen objected that the proposed decree "fails to consider funds available from the detainee's family."  (Docket Entry No. 631-2 at 12).  But the proposed decree does consider funds from family and other sources in the provision stating that "the arrestee must be asked, under penalty of perjury, the amount of money she can afford to pay from *any lawful source* at the time of the hearing."  (Docket Entry No. 701-2 at 21 (emphasis added)).

42

The Professional Bondsmen objected that the "[d]ecree seeks to exclude the private surety bail bondsmen from posting any bonds for 85% of the misdemeanor arrestees," invoking "a protected property interest under the Texas Constitution in their bail bond license[s]." (Docket Entry No. 631-2 at 14). The Professional Bondsmen also complained that the decree's provisions about failures to appear and rescheduling hearings "increas[e] the risk" and "financial burden on bondsmen." (*Id.* at 15). As explained above, the proposed consent decree does not remove the individualized hearing process, and nothing in the decree forbids bondsmen from practicing their trade. The key Texas case the Professional Bondsmen cited recognizes that the general "property right in making a living" is not unlimited but is instead "subject . . . to valid and subsisting regulatory statutes." *Smith v. Decker*, 312 S.W.2d 632, 634 (Tex. 1958). Bondsmen have no legal right to bail policies that increase their wealth by violating the constitutional rights of tens of thousands of indigent arrestees.

The Professional Bondsmen claimed that the Fifth Circuit held that "[the Harris County Sheriff] is not a proper party to this litigation." (Docket Entry No. 631-2 at 16). But the appellate court withdrew an opinion holding that the Harris County Sheriff "cannot be sued under § 1983." *ODonnell*, 882 F.3d at 538, *opinion withdrawn and superseded on reh'g sub nom. ODonnell*, 892 F.3d at 147. On rehearing, the Fifth Circuit ruled that "[the] Sheriff is not an appropriate party *for attaching municipal liability*." *ODonnell*, 892 F.3d at 156 (emphasis added). The Fifth Circuit suggested language for the amended preliminary injunction authorizing the Sheriff "to decline to enforce orders requiring payment of prescheduled bail amounts" that are not "accompanied by [an adequate] record." *Id.* at 165. The Professional Bondsmen do not undermine the proposed consent decree by questioning the Sheriff's party status.

The objectors' and amici's briefs and letters, and the nonparties' statements at the final fairness hearing, demonstrate that third parties have had notice and ample opportunities to be heard about the proposed settlement and consent decree.  Many of the objectors and amici reprised arguments made and thoroughly argued during the litigation in this court and in the Fifth Circuit. This court reset the deadlines for class notice and objections and postponed the final fairness hearing to give the nonparties and parties time to object and to respond to the concerns raised.  The final fairness hearing was open to the public, and both nonparties and parties spoke.  The court grants the motion for final approval after providing ample opportunities for, and receiving, robust comment.

District Attorney Ogg argued that these efforts were inadequate because "no Harris County law enforcement officials other than defendant Harris County Sheriff Ed Gonzalez were present at any of the settlement meetings to which the District Attorney was invited."  (Docket Entry No. 665 at 2–3).  "[A]lthough the District Attorney acknowledge[d] and appreciate[d]" the opportunities for comment the court provided "*after* the Proposed Settlement was finalized," she contended that "these opportunities . . . are poor substitutes for the hands-on discussion with and input from law enforcement officials regarding the Proposed Settlement that should have occurred *before* finalization." (*Id.* at 3–4).  But as the plaintiffs' counsel explained during the final fairness hearing, there were many opportunities for public comment, including feedback from law enforcement, during the months it took Harris County to negotiate the settlement and deliberate over whether to approve it.

The court does not question the amici and objectors' good faith.  The public safety and public resource concerns they raise are important.  The proposed consent decree and settlement agreement are approved because these concerns are fully recognized and addressed.

44

### C.    Attorneys' Fees and Costs

The plaintiffs have filed an unopposed motion under Rule 54(d)(2) for attorneys' fees and costs. (Docket Entry No. 618). The "parties agree[d] that Class Counsel, based on prevailing hourly rates, [are] entitled to" the requested amounts, which Harris County agreed to pay to settle the plaintiffs' claims for attorneys' fees and costs. (Docket Entry No. 617-2 at 1). Class counsel have explained that they arrived at these amounts using a lodestar analysis, and the factors in *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–20 (5th Cir. 1974). (Docket Entry No. 617 at 32–36).

Rule 23(h) authorizes a district court to "award reasonable attorney[s'] fees and nontaxable costs that are authorized by law or by the parties' agreement."[32] FED. R. CIV. P. 23(h). The "claim for an award must be made by motion under Rule 54(d)(2)," and a "class member, or a party from whom payment is sought, may object." *Id.* 23(h)(1)–(2). The court "must find the facts and state its legal conclusions under Rule 52(a)." *Id.* 23(h)(3).

Courts in this circuit "have encouraged litigants to resolve fee issues by agreement, if possible." *DeHoyos*, 240 F.R.D. at 322 (citing cases, including *Johnson*, 488 F.2d at 720). A court is not bound by the parties' agreement. *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). Instead, the court must carefully review a proposed fee award to ensure reasonableness. *Id.* This scrutiny is necessary to "guard[] against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class." *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008) (quoting *Strong*, 137 F.3d at 849).

---

[32] The court may also award the prevailing party "reasonable attorney[s'] fee[s]" in a § 1983 action. *See* 42 U.S.C. § 1988 (2000).

The Fifth Circuit "requires district courts to use the 'lodestar method' to 'assess attorneys' fees in class action suits.'" *Sulfur*, 517 F.3d at 228 (quoting *Strong*, 137 F.3d at 850).  The court "must first determine the reasonable number of hours expended on the litigation and the reasonable hourly rate for the participating attorney."  *Id.*  "The lodestar is then computed by multiplying the number of hours reasonably expended by the reasonable hourly rate."  *Id.*  After calculating the lodestar, the court must evaluate the proposed fee award under the *Johnson* factors "and not merely 'ratify a pre-arranged compact.'"  *Id.* (quoting *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980)).  The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642 n.25 (5th Cir. 2012) (citing *Johnson*, 488 F.2d at 717–19).

The court "must explain how each of the *Johnson* factors affects its award."  *Sulfur*, 517 F.3d at 228.  The explanation, however, "need not be meticulously detailed to survive appellate review."  *Id.* (quoting *Forbush v. J.C. Penney Co.*, 98 F.3d 817, 823 (5th Cir. 1996)).  After reviewing the twelve factors, "the court may then apply a multiplier to the lodestar, adjusting the lodestar either upward or downward."  *Strong*, 137 F.3d at 850.  There is a "strong presumption" that the lodestar number is reasonable.  *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 388 n.17 (5th Cir. 2013).  The court's fee award is reviewed for abuse of discretion.  *Strong*, 137 F.3d at 850.

### 1.       The Lodestar Calculation

Under the proposed settlement agreement, Harris County agrees to pay:

- $3,725,231.00 in fees and $114,832.54 in costs to Civil Rights Corps (though Civil Rights Corps, after exercising billing discretion after the settlement agreement was signed, requests only $3,716,531.00 (Docket Entry No. 618 at 1; Docket Entry No. 657 at 3));

- $2,161,262.00 in fees (to be forgone) and $30,214.86 in costs to Susman Godfrey L.L.P.;

- $632,453.00 in fees to Wilmer Cutler Pickering Hale and Dorr LLP; and

- $182,715.90 in fees and $5,378.00 in costs to the Texas Fair Defense Project.

(Docket Entry No. 617-2 at 1; *see also* Docket Entry No. 618 at 1–2 (unopposed Rule 54(d)(2) motion to authorize compensation of class counsel)).  The court approves these figures, including the lower fee number that Civil Rights Corps requests.

According to the fees and costs reports, class counsel billed over 9,700 hours in this case. (Docket Entry No. 617 at 33).  By the time the parties moved for preliminary approval, Civil Rights Corps had worked 7,860.60 hours; Susman Godfrey had contributed 4,326.80 hours; WilmerHale had put in 1,240.80 hours; and the Texas Fair Defense Project had worked 637.35 hours.  (Docket Entry No. 618-6 at 7; Docket Entry No. 657-2 at 1).  Multiplied by the various hourly rates charged by class counsel, the lodestar totals $4,531,699.90, excluding Susman Godfrey's fees.  (Docket Entry No. 618-6 at 7).  Costs totaled $150,425.40.  (Docket Entry Nos. 618, 618-1, 618-2, 618-3, 618-4, 618-6, 657-2).

*Cole v. Collier*, No. H-14-1698, 2018 WL 2766028, at *13 (S.D. Tex. June 8, 2018), is instructive.  A class of Texas prisoners sued under § 1983 "to end [the] policy and practice of exposing them to extreme, unsafe heat."  *Id.* at *1.  The parties reached a settlement "[a]fter nearly

47

four years of contentious litigation." *Id.* Class counsel billed over 9,900 hours of work for $4,428,466.25 in fees and $300,721.99 in costs. *Id.* at *13. The court approved these amounts "in light of the significant time required to effectively litigate this action." *Id.* Prosecuting the case required "40 depositions and review of over 500,000 pages of documents." *Id.* "Motion practice included class certification, summary judgment, motions to dismiss, discovery disputes, and preliminary injunctions," and class counsel "expended additional time defending three interlocutory appeals." *Id.* The court "recognize[d] that prison litigation can be particularly time-consuming" and credited class counsel's billing judgment because they "omitt[ed] numerous hours spent reviewing emails, writing correspondence, holding telephone calls, and traveling." *Id.*

This case, which also involves important constitutional challenges to criminal justice policies and practices, has relevant similarities. Class counsel billed over 9,700 hours in litigating the plaintiffs' claims. (Docket Entry No. 617 at 33). The case—already in its fourth year—challenged the nation's third-largest jail system and required "intensive investigation and expert analysis of important factual matters." *ODonnell*, 251 F. Supp. 3d at 1058; (Docket Entry No. 617 at 31). Discovery was extensive. The record was voluminous. The preliminary injunction trial "featured [13] live witnesses and thousands of documents and videos." (Docket Entry No. 617 at 31). Motions included motions for class certification, motions to dismiss, many discovery disputes, motions for reconsideration, a preliminary injunction, and motions for summary judgment. Class counsel defended two interlocutory appeals. The record shows that class counsel exercised a high degree of billing judgment in not charging for all of the time they expended. For example, "[the] Plaintiffs' expert witnesses donated hundreds of hours of expert analysis and testimony." (Docket Entry No. 618-2 at 4).

The court holds that the number of hours class counsel worked in prosecuting this case, while high, is reasonable.  *See Cole*, 2018 WL 2766028, at \*13 ("While the number of hours expended is high, the amount is reasonable in light of the significant time required to effectively litigate this action.").

The plaintiffs presented strong evidence that the hourly rates used are also reasonable.  "An attorney's requested hourly rate is prima facie reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates[,] and the rate is not contested."  *Altier v. Worley Catastrophe Response, LLC*, Nos. 11-241, 11-242, 2012 WL 161824, at \*22 (E.D. La. Jan. 18, 2012) (citing *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 328 (5th Cir. 1995)).  The rates ranged from $600.00 per hour for one of the lead class counsel to as low as $180.00 for a paralegal.  (Docket Entry No. 618-6 at 7).  Craig Smyser, Esq., a Houston-based attorney with significant complex-litigation experience, opined that the "hourly rates charged by [the p]laintiffs for the different levels of lawyers and paralegals are within the normal range of hourly fees charged by civil trial lawyers in Harris County prosecuting similar cases to this."  (*Id.* at 4).  The lawyers are all experienced in civil rights and complex litigation.  They work in geographic areas that command high hourly rates for lawyers with comparable experience and expertise.  And it appears that Civil Rights Corps, WilmerHale, and the Texas Fair Defense Project have significantly understated their usual hourly rates by instead using the rates Harris County paid to its counsel.  (Docket Entry No. 617 at 33; Docket Entry No. 618-6 at 5).

The court finds and concludes that the hourly rates are within the "prevailing market rates for lawyers with comparable experience and expertise" in complex class-action litigation and are reasonable.  *See Heartland*, 851 F. Supp. 2d at 1088 (quoting *Altier*, 2012 WL 161824, at \*22);

49

*see also McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011) ("'[R]easonable' hourly rates 'are to be calculated according to the prevailing market rates in the relevant community.'" (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984))).

## 2. The *Johnson* Factors

The *Johnson* factors favor holding that the attorneys' fees are reasonable. The first factor, the time and labor required, centers on billing judgment. Class counsel "calculated their respective lodestars based on agreed hourly rates" that are "lower than those charged by counsel retained by [Harris] County in this matter." (Docket Entry No. 618 at 2). Hundreds of hours of work were not included in the lodestar number of hours charged. (Docket Entry No. 618-2 at 4; Docket Entry No. 657-2 at 1–2). Susman Godfrey has forgone over $2.1 million in fees, enabling Harris County to allocate that amount "to its own efforts to meet the needs of class members." (Docket Entry No. 617 at 28). Class counsel have not moved for fees and costs related to monitoring or implementing the proposed consent decree. (*Id.* at 34). Neither of the plaintiffs' testifying experts at the March 2017 preliminary injunction trial was compensated. (*Id.*). Nor did the plaintiffs bill other consulting experts for their "guidance, technical assistance, or supporting affidavits." (*Id.*). This demonstrates that class counsel worked hard—and often for free—to resolve this case in a manner that benefits the class and Harris County. This factor strongly supports approving the requested award.

The second factor examines the novelty and difficulty of the issues. The parties argue correctly that this case presented complex "legal issues concerning not only the nature of the constitutional rights at stake, but also federal jurisdiction, municipal liability, immunity, abstention, equitable remedies, and related state law." (*Id.* at 33). This case also involved complex

factual issues that required extensive investigation, discovery, trial, and appellate review.  This factor strongly supports holding that the claimed fees are reasonable.

The third factor is the skill required to prosecute the plaintiffs' claims.  This factor is satisfied when "counsel performed diligently and skillfully, achieving a speedy and fair settlement, distinguished by the use of informal discovery and cooperative investigation to provide the information necessary to analyze the case and reach a resolution."  *King v. United SA Fed. Credit Union*, 744 F. Supp. 2d 607, 614 (W.D. Tex. 2010) (quoting *Di Giacomo v. Plains All Am. Pipeline*, Nos. H-99-4137, H-99-4212, 2001 WL 34633373, at *12 (S.D. Tex. Dec. 19, 2001)). The legal and factual complexities required class counsel to exercise a high degree of skill to, among other things, conduct extensive discovery; survive motions to dismiss; prevail in an eight-day bench trial; and defend two interlocutory appeals.  As the court stated in *Cole*:

> Skilled attorneys were necessary to perform the legal services properly.  This was a complex action in a specialized area of law.  Defendants put forth a vigorous defense.  Class Counsel are experienced, reputable, and able, and brought their expertise in complex litigation and civil rights to bear in successfully litigating this action.

*Cole*, 2018 WL 2766028, at *14.  This factor strongly supports holding that the claimed fees are reasonable.

The fourth factor asks whether litigating this case precluded class counsel from other employment.  Class counsel worked over 9,700 hours in this case, and thousands more if the court includes the hours donated by Susman Godfrey.  The record shows that "class counsel's representation of the class imposed a substantial opportunity cost on them, occupying large amounts of time that they could otherwise have spent on other matters."  (Docket Entry No. 617 at 33).

The fifth factor requires the court to analyze customary fees for similar work in the community. Mr. Smyser presents uncontroverted evidence that class counsel's claimed rates are reasonable and that the proposed award reflects a conservative market-based fee. (Docket Entry No. 618-6). It appears that Civil Rights Corps, WilmerHale, and the Texas Fair Defense Project have "based their proposed rates on those paid by [Harris] County to its counsel, choosing slightly lower rates than the County paid for lawyers with comparable experience and expertise." (Docket Entry No. 617 at 33). As noted above, Susman Godfrey has forgone over $2.1 million in its fees; class counsel have not asked for certain expert compensation or attorneys' fees related to implementing or monitoring the proposed consent decree; and class counsel have exercised a high degree of billing judgment. This factor strongly favors holding that the claimed fees are reasonable.

Under the sixth factor, the court evaluates class counsel's fee arrangement. As in *Cole* and many civil-rights cases, class counsel agreed to pursue fees only if the plaintiffs prevailed, and then only under Rule 23(h) or 42 U.S.C. § 1988. *See Cole*, 2018 WL 2766028, at *14; (Docket Entry No. 617 at 34). Class counsel spent four years litigating this case, "facing the distinct possibility that they would receive nothing" and giving up other work and fees. *See Cole*, 2018 WL 2766028, at *14. Because the record shows that class counsel performed a public service by representing the class, this factor weighs heavily in favor of holding that the claimed fees are reasonable.

The seventh factor looks to the time limitations the circumstances imposed. As class counsel argued, "the urgency of addressing the irreparable harm that hundreds of class members suffered every day in [Harris] County's bail system . . . imposed significant time pressure on class counsel's prosecution of this case." (Docket Entry No. 617 at 34). The 14 County Judges' motion

for an emergency stay also imposed significant time pressure on class counsel, as did the other emergency motions filed in this case.  (*See* Docket Entry Nos. 165, 311).  This factor strongly favors holding that the claimed fees are reasonable.

The eighth factor, the amount involved and the results obtained, is "the most critical factor in determining the reasonableness of a fee award."  *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998)); *Heartland*, 851 F. Supp. 2d at 1085 (citing *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).  Class counsel have achieved extraordinary results for the plaintiffs.  The proposed consent decree addresses the constitutional harms the Fifth Circuit identified.  To address those harms, the decree provides for counsel for indigent misdemeanor arrestees at bail hearings; establishes an electronic notification system; imposes training and monitoring requirements; and requires oversight for seven years.  (*See* Docket Entry No. 701-2).  The court agrees that the proposed class settlement and consent decree are "landmark developments backed by intensive investigation and innovative lawyering."  (Docket Entry No. 617 at 34–35).  This factor strongly supports holding that the claimed fees are reasonable.

The ninth factor, class counsel's experience, reputation, and ability, strongly supports approving the requested award.  The court commends the talented lawyering shown by all counsel, for all the parties, throughout the years of vigorous litigation.

The court also evaluates the "undesirability" of the case.  This factor relates closely to the sixth factor—class counsel's fee arrangement.  This litigation was not "undesirable" to class counsel, "given . . . the opportunity [the case] presented to stop a large-scale constitutional harm." (Docket Entry No. 617 at 35).  But "the significant and uncertain upfront investment for many years would have made [litigating this matter] undesirable to the private bar." (*Id.*).  And this case

did require class counsel to forgo other opportunities, cases, and clients.  This factor supports holding that the claimed fees are reasonable.

The eleventh factor looks to the length and nature of class counsel's relationship with their clients.  Class counsel ably defended the named class representatives when needed and attempted to protect their interests.  (Docket Entry Nos. 690-1, 690-2, 690-3 (named class representatives' declarations to this effect)).  The proposed consent decree, a result of class counsel's skillful advocacy, will greatly benefit the class of indigent misdemeanor arrestees.  This factor weighs in favor of holding that the claimed fees are reasonable.

The final factor, a review of awards in similar cases, strongly favors holding that the claimed fees are reasonable.  *See Perdue v. Kenny A.*, 559 U.S. 542, 548 (2010) ($6 million lodestar); *DeHoyos*, 240 F.R.D. at 333–34, 342 (fee award of over $11 million approved); *Cole*, 2018 WL 2766028, at *14 (fee award of $4.5 million approved).

The court holds that the *Johnson* factors confirm the reasonableness of the fee award.  Class counsel have not asked the court to increase the lodestar.  Given the analysis above and the "strong presumption" that the lodestar amount is reasonable, the court identifies no grounds to decrease or increase that amount.  *See Ransom*, 734 F.3d at 388 n.17.

### 3.    Costs

Class counsel ask for $150,425.40 in costs.  (Docket Entry No. 618 at 1–2).  "The appropriate analysis to apply in determining which expenses are compensable in a class action case is whether such costs are of the variety typically billed by attorneys to clients."  *DeHoyos*, 240 F.R.D. at 334 (collecting cases).  Class counsel's claimed costs include expenses related to travel, depositions, transcripts, filings, photocopies, and meals.  (Docket Entry No. 618-2 at 4; Docket Entry No. 618-3 at 24; Docket Entry No. 618-5 at 3; Docket Entry No. 657-2 at 2).  Class

counsel have submitted documents supporting the costs, which the court has reviewed.   The defendants did not object.   The court holds that the costs are reasonable and that these are appropriate categories of expenses.   *See DeHoyos*, 240 F.R.D. at 334, 342 ($582,485.40 in costs approved); *Cole*, 2018 WL 2766028, at *13–15 ($300,721.99 in costs approved).

## IV.   Conclusion

The parties' joint motion for final approval of the consent decree and settlement agreement, (Docket Entry No. 657), is granted.   The court will enter the consent decree, (Docket Entry No. 701-2), and judgment.   The plaintiffs' unopposed motion to authorize compensation of class counsel, (Docket Entry No. 618), is also granted.

SIGNED on November 21, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge