# Monitoring Pretrial Reform in Harris County

# First Sixth Month Report of the Court-Appointed Monitor

**September 3, 2020**



**Brandon L. Garrett, JD, Monitor**
*L. Neil Williams Professor of Law*
*Director, Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Chair*
*and Criminal Justice Institute Director*
*University of Houston Law Center*
*4604 Calhoun Road, BLB 122*
*Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Team Members:**

**Dottie Carmichael, PhD, Research Scientist**
*dottie@ppri.tamu.edu*
**George Naufal, PhD, Asst. Research Scientist**
*gnaufal@ppri.tamu.edu*
*Texas A&M University*
*Public Policy Research Institute*
*Research Scientist*
*4476 TAMU*
*College Station, Texas 78743-7746*
*(979) 854-8800*

**Songman Kang, PhD, Consultant**
Hanyang University
Seoul, Korea

**Phil Cook, PhD**
**Catherine Grodensky, M.P.H., PhD student**
*Duke University Sanford School of Public Policy*
*201 Science Drive*
*Durham, NC  27708*

**Thomas Maher, Executive Director**
*Center for Science and Justice*

*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*

**Marvin Swartz, MD**
*Duke University School of Medicine*
*Department of Psychiatry and Behavioral Sciences*
*Durham, NC  27708*

Provided to:

**Representative of Plaintiff Class:**

> **Elizabeth Rossi, Plaintiffs' counsel, elizabeth@civilrightscorps.org**

**Representatives of Harris County:**

> **Rachel Fraser, Assistant County Attorney, Rachel.Fraser@cao.hctx.net;**

> **Jim Bethke, Director, Justice Administration Department, jim.bethke@jad.hctx.net**

**Representative of County Criminal Court at Law Judges:**

> **Allan VanFleet, Counsel for the 16 County Criminal Court at Law Judges, allanvanfleet@gmail.com**

**Representative of Harris County Sheriff's Office:**

> **Major Patrick Dougherty, patrick.dougherty@sheriff.hctx.net**

## *Executive Summary*

**Our First Six Months of Work**

- Completed and submitted first year Work Plan.
- Convened Community Working Group (with three meetings to date).
- Held regular meetings with parties and meetings with wide range of Harris County stakeholders.
- Conferred with the defendants and agreed on the key policies to be summarized and made available at the Harris County Joint Processing Center and Harris County Criminal Justice Center.
- Created monitor website.
- Secured access to data, including jail data, court data, hearing videos, and judicial opinions.
- Assisted in testing and development of misdemeanor data portal and initial analysis of five years of Harris County pre-trial data.
- Conducted analysis of hand-collected data regarding misdemeanor jail population and outcomes in magistration hearings.
- Provided feedback and policy improvements regarding the use of Rule 9 in hearings.
- Reviewed and approved proposals for vendors to improve pre-trial work in Harris County
- Created a project management structure for monitorship.

**Our Findings**

- Initial Data Analysis Shows:
    - Post-Rule 9 Increase in Use of Personal or General Order Bond.
    - Post-Rule 9 Reduction in race disparities in pre-trial release.
    - Post-Rule 9 Preliminary finding of unchanged recidivism.
    - Post-Rule 9 decline in pretrial jail days for most defendants, with detention costs driven by a minority of individuals with lengthy detentions.
- Analysis of hearings showed need for further improvements in process, several of which were implemented.
- Approved vendor proposals.

**Next Monitoring Steps**

- Assist in further implementation of court appearance requirements.
- Review county indigent defense study and implementation of recommendations.
- Review county completion of training plan and implementation of recommendations.
- Review county development of text and electronic court notification system.
- Conduct further data analysis, including with an added focus on CCCL court outcomes, court appearance, and recidivism.
- Review progress in logistics and outcomes regarding jail bookings and the use of Rule 9 in magistration hearings.
- Conduct further cost analysis.

## *Table of Contents*

*Introduction*                                                                          **1**

**I. The ODonnell Litigation and the Monitor's Role**                                   **1**

    **A. The Historical Problem of Misdemeanor Bail in Harris County**   **3**
    **B. The ODonnell Decree**                                             **4**
    **C. The Goals of the Monitor**                                         **5**
    **C.  Consent Decree Authority**                                        **6**

**II. Policy Assessment and Reporting**                                                 **6**

    **A.  The COVID-19 Response**                                           **7**

    **B.  Policy Review and Improvements**                                  **9**
      **1.   Magistration: Observations and Improvements**          **10**
      **in 15.17 Hearings**
      **2.   Sheriff's Office: Logistical Improvements**            **15**
      **3.   CCCL: Court Appearance Requirements**                  **17**
      **4.   District Attorney's Office**                           **17**
      **5.   Public Defender's Office**                             **18**

    **C. Data Analysis**                                                    **18**

**III. Cost Study and Project Management**                                              **31**
    **A.  Cost Analysis**                                                   **31**
    **B.  Project Management**                                              **37**

**IV.  Community Outreach, Participation, and Working Group**                            **39**

**V.  Our Work in the Next Six Months**                                                 **41**

*Appendix*

**A. Monitor Team Bios**                                                                **42**
**B. Organizational Chart**                                                             **46**
**C. Community Work Group Bios**                                                        **46**
**D. Year 1 Statement of Work**                                                         **49**
**E. Current Status of Consent Decree Milestones**                                      **60**
**F. Consent Decree Milestones in the Next Six-Month Reporting Period**                 **69**

## *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the ODonnell Consent Decree, and Professor Sandra Guerra Thompson, University of Houston Law Center, serves as Deputy Monitor.  The Monitor team also includes research experts from the Public Policy Research Institute (PPRI) at Texas A&M University, as well as the Center for Science and Justice (CSJ) at Duke University.

This is the Monitor's first six-month report.  We have been impressed with the progress made towards implementing this Decree, especially during an extremely challenging time. Important preliminary steps have been made, the data collected suggests great progress, and community participation in our work has been very valuable. However, important implementation work remains, and the next six months will be a critical time as the structure of the remedies called for under his Decree takes shape.

## I. The O'Donnell Litigation and the Monitor's Role

### A. The Historical Problem of Misdemeanor Bail in Harris County

The *ODonnell* lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, preventing the needless suffering of vulnerable people, and in promoting public safety.  Named plaintiff Maranda ODonnell, following an arrest for driving with a suspended license, while driving to her mother's house to pick up her four-year-old daughter, had bail set according to a schedule in place in Harris County at the time, at $2,500.[1] Like tens of thousands of others, she could not afford to make bail and was detained in jail.[2]

In 2016, ODonnell and other plaintiffs brought a class action in federal court, and moved for a preliminary injunction, to end the practices that led to these detentions. The complaint noted that on a typical night, 500 people arrested for misdemeanors were detained in the Harris County

---

[1] Class Action Complaint at 1, ODonnell v. Harris County, 4:16-cv-01414 (S.D.Tex. May 16, 2016); Meagan Flynn, *Group Sues Harris County Over Bail System that Keeps People in Jail Just Because They're Poor*, Houston Press, May 20, 2016.

[2] Thus, the opinion approving this Consent Decree begins:

> I, Maranda Lynn ODonnell, am a 22-year-old woman. I was arrested yesterday for a misdemeanor offense. . . . I was never asked if I could afford my bail. I have one 4-year-old daughter. . . . I live paycheck to paycheck[.] I'm worried about whether my job will still be there when I get out. I cannot afford to buy my release from jail."

Memorandum and Opinion Approving the Proposed Consent Decree and Settlement Agreement and Granting the Motion to Authorize Compensation of Class Counsel, ODonnell et al v. Harris County, Texas, No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019).

Jail.[3] The complaint highlighted that between 2009 and 2015, fifty-five people who could not afford bail, died in Harris County Jail while awaiting trial.[4]

At the time when ODonnell filed the lawsuit, arrestees in Harris County appeared before magistrates without the assistance of attorneys to speak on their behalf.  Nor were they allowed to speak in their own defense. They were not informed of their rights.  In hearings that typically lasted for a minute or two, magistrates almost invariably set monetary bail amounts according to a fixed bail schedule, without regard to each person's ability to pay.[5]  People like ODonnell, being too poor to pay for their release, languished in the Harris County Jail, but not because of their danger to society or their likelihood of not appearing in court.  The only obstacle to their release was their inability to post a financial bond.  And studies show that holding low-risk people in jail, even for just a day or two, significantly increases their likelihood of committing another crime after release.[6]  The court noted that the defendants did not "identify a jurisdiction that, like Harris County, detains over 40 percent of those charged only with misdemeanor offenses until their cases are resolved."[7] The system ODonnell faced made the public less safe by needlessly locking up poor people.

The unfairness of the Harris County misdemeanor bail practices also exacerbated racial disparities in the Harris County jail population.  As the Federal District Court found, a 2011 study showed that in Harris County, 70 percent of white misdemeanor defendants obtain early pretrial release from detention, but only 52 percent of Latino misdemeanor defendants and 45 percent of African-American misdemeanor defendants did so.[8]

The district court relied on a comprehensive set of factual findings, in concluding that "Harris County's [bail] policy and practice violates the Equal Protection and Due process Clauses of the United States Constitution."[9] Following an appeal to the Fifth Circuit,[10] the parties jointly submitted Amended Local Rule 9 of the Harris County Criminal Courts at Law, which rescinded the secured money bail schedule, and provided for a new set of procedures, requiring prompt release of misdemeanor arrestees except for five carve-out categories of arrestees; the court approved the amended rule, which took effect on February 16, 2019.[11]

---

[3] Class Action Complaint, supra, at 2.

[4] Id. at 2.

[5] ODonnell v. Harris Cty., 251 F. Supp. 3d 1052, 1100-01 (S.D. Tex 2017) (No. 16-cv-01414), ECF No. 339 ("The court finds and concludes that in the typical case, Hearing Officers set seemed money bail as a condition of detention operating only against those who are indigent and cannot pay the bail, rather than as a mechanism for pretrial release.").

[6] Prior research in Harris County has found that for similarly situated individuals, those detained for misdemeanors pretrial were "25% more likely to be convicted and 43% more likely to be sentenced to jail." Paul Heaton, Sandra G. Mayson and Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stanford L. Rev. 711, 717 (2017).

[7] ODonnell v. Harris Cty., 251 F. Supp. 3d at 1123.

[8] Id. at 1122.

[9] Memorandum and Order Certifying Class, ODonnell v. Harris Cty., 251 F.Supp.3d 1052, 1059 (S.D. Tex. Apr. 28, 2017).

[10] ODonnell v. Harris Cty., 882 F.3d 528, 549 (5th Cir. 2018), opinion withdrawn and superseded on reh'g sub nom. ODonnell v. Harris Cty., 892 F.3d 147 (5th Cir. 2018).

[11] Memorandum and Opinion at 6-7, ODonnell et al v. Harris County, Texas, No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019).

## B.      The ODonnell Consent Decree

After three years of litigation, the parties reached a settlement consisting in this landmark Consent Decree, approved on November 21, 2019.[12] The ODonnell Consent Decree represents the first federal court-supervised remedy governing bail.  The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of misdemeanor arrestees. The terms of the Decree envision lasting change.[13]

First, the Decree incorporates the new Rule 9.  Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds.  Persons arrested for misdemeanors that do fall within that list, must receive a magistration hearing, complying with Rule 9, under which there must be clear and convincing evidence supporting the pretrial conditions set.  All misdemeanor defendants are represented by a public defender at that hearing, with access to the client and information needed to prepare for the hearing.

Second, following this pretrial stage, misdemeanor defendants now benefit from a defined set of court appearance requirements, as the Consent Decree sets forth a new process for waiving or rescheduling appearances.  Further, a new court notification system is to be built by the County. New work is to be done to study causes of nonappearance and to address those causes.  New trainings on the Consent Decree policies are to be conducted. New work to study and plan for indigent defense in misdemeanor cases is to improve the standards for misdemeanor representation.

Third, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[14] The Consent Decree provides for public meetings and input, County reports to be published every sixty days, and online information regarding the implementation of the Decree.[15]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented.  After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020.

As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree.  The number of misdemeanor arrestees who are released has dramatically increased, and the reliance on cash bail and detention of those who lack the resources to make bail has dramatically decreased. However, substantial work remains to be done to implement the structural changes envisioned by the Consent Decree.  The Parties have invested resources already towards accomplishing the goals of the

---

[12] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019) [hereinafter, Consent Decree].
[13] Id. at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").
[14] Consent Decree, *supra*, at ¶83-85.
[15] *Id*. at ¶87-88.

Decree and important steps were made in the first six months of this Decree.  Important work also remains, and all involved look forward to the work to come, as we build a model system in Harris County.

## B. The Goals of the Monitor

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system that restores the public's trust, safeguards constitutional rights, and in fact accomplishes the twin aims of bail: to keep the community safe and promote the integrity of the judicial proceedings by preventing defendants from fleeing justice.  Thus, as Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[16]  From the Consent Decree, we distilled nine guiding principles by which we will guide this Monitorship:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – Accountability should be viewed as part of an ongoing process of systemic evaluation and improvement, with community participation.

(3) **Permanency** – Regarding permanency, the Monitor, must not only evaluate progress, but also ensure that the administrative measures, policies, and processes, can work well long-term.

(4) **Protecting constitutional rights** – Protecting civil and human rights, including the constitutional rights of arrestees.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We seek to maximize pretrial liberty and to minimize criminal justice involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

---

[16] Consent Decree, supra, at ¶1.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, the goal is to produce data and systems so that the system is self-monitoring and can make ongoing improvements.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

**C. Monitor Team**

Our interdisciplinary team includes experts in law, criminal law and procedure, social science, behavioral health, economic analysis, indigent defense, and project management. Team biographies are included in the Appendix. The team, which includes researchers at Duke University School of Law, University of Houston Law Center, and Texas A&M University, includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael and George Naufal (Public Policy Research Institute at Texas A&M University)

- Thomas Maher, Marvin Swartz, Will Crozier, Catherine Grodensky, Phil Cook (Center for Science and Justice (CSJ) at Duke University)

- Songman Kang (Hanyang University)

Our full organization chart is also included in the Appendix.



**D.  Consent Decree Authority**

This Report contains the Monitor's review of compliance for the first six months that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> "The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree."

Further, the Consent decree details in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:
>
> a. A description of the work conducted by the Monitor during the reporting period;
>
> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;
>
> c. The methodology and specific findings for each compliance review conducted;
>
> d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;
>
> e. A projection of the work to be completed during the upcoming reporting period;
>
> f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;
>
> g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;
>
> h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:
>
>> i. Maximizing pretrial liberty;
>> ii. Maximizing court appearance; and
>> iii. Maximizing public safety.

6

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds: "The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court."

Our Monitor Work Plan for Year 1 is divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117 divided into three main topics: (1) Policy Assessment and Reporting; (2) Cost study and Project Management; (3) Community Outreach, Participation, and Working Group. We have similarly divided this Report into three parts, reflecting those components of our work, but also addressing each of the subjects set out in the Consent Decree.

## II. Policy Assessment and Reporting

We started our work upon our appointment on March 3, 2020. In the motion to appoint us as Monitor, our submission to Court included a Proposal and Budget for Year 1 of work, which describes our team members, timelines, an organization chart, and a budget for all participants. We do not repeat that information here, but it is available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/). On May 1, 2020, we also provided the Parties with a Work Plan setting out our first year of work, set out in quarterly deliverables, as was most convenient for the County and its budgeting process. That Plan has been made available on our Monitor website, as well. Here, we describe our progress towards carrying out each of the tasks outlined in our proposal and Work Plan.

## A. The COVID-19 Response

The Monitor Team began work upon appointment on March 3, 2020, which coincided with the onset of the COVID-19 emergency that has created enormous health and safety challenges for law enforcement, courts, the County, and the public in Harris County, as in the entire nation.[17]

We emphasize that we have been incredibly impressed with the hard work by the County, the Judges, the Hearing Officers, and all of the Parties and Counsel, as they have continued to work to safeguard the constitutional rights protected by this landmark Consent Decree, and during a time that posed great strains on all involved. We have been working hard, albeit remotely. We regret that we could not attend the planned meetings in Houston in person at which we had hoped to introduce our role to the entire criminal justice community. Nevertheless, we have adapted to these challenges, with the help of the parties.

---

[17] The stay-at-home order for the Houston area was announced on March 24, 2020 (effective date: March 24, 2020, at 11:59 pm).

First, as Monitors, we sought to begin observing the misdemeanor process in Harris County. We sought to ensure that Rule 9 was continuing to be carefully followed by hearing officers and judges, particularly given the public health threat that COVID-19 created in the courts and in the Harris County jail. While getting full access to the data concerning misdemeanor bookings, hearings, jail population, and court outcomes is still (and understandably) a work in progress, we were gratified that the County made basic preliminary data, such as jail rosters, available to us so that we could examine cases and hearing decisions each week as the COVID-19 crisis began to create new challenges for the criminal system in Harris County.

We have been kept fully apprised by the Parties of changes to court procedures, as the crisis necessitated closings. We have been impressed with the judges and the County's hard work to ensure that robust hearings were held for those detained during very challenging times. We also joined in a video-conference call with all of the CCCL Judges to introduce ourselves and describe the role of the Monitor, and the importance of adhering to the constitutional obligations of the Consent Decree during this challenging time. We have followed up with monthly video calls with both the CCCL Judges and hearing officers, designed to maintain an ongoing conversation regarding how to best improve the misdemeanor system in Harris County.

In a letter to the parties and the CCCL judges on March 30, 2020, we emphasized the constitutional obligations that ground the Consent Decree and Rule 9, in order to address any confusion about the matter. We highlighted how our work is defined by the U.S. Constitution. Changes in state law, like the Executive Order the Governor issued in response to COVID, cannot and do not supplant the Consent Decree. We were gratified by the response to the letter and by the continued hard work by all Parties to make this Consent Decree a success.

Due to the COVID-19 crisis, we have not been able to meet in person, early on in our work as we had hoped, with the parties, with hearing officers and judges, or with the Community Working Group. Our plans for public participation for the year evolved to take account of this crisis. We have been in constant contact with the parties, with weekly formal calls and additional regular calls, as well as conversations with a wide range of County officials and stakeholders. We have held regular monthly meetings with the magistrates and with the CCCL judges. We had periodic meetings with the District Attorney's Office and the Public Defender's Office. We have also held monthly meetings with the Community Working Group, which like the others, is currently a remote video call, due to COVID-19.

We have also not been able to observe the Joint Processing Center (JPC) in person. We have been meeting with a range of county officials and Harris County stakeholders, however to discuss improvements in practices, including in the JPC. We have been reviewing videos from magistration hearings and reviewing the court clerk video records regarding every hearing in which there was a misdemeanor ruling (not hearings involving felony charges or holds). All of these conversations, data collection, and analysis has resulted in a range of input and policy improvements, discussed in the next section.

While we cannot predict how this crisis will affect our work in the months ahead, we have been impressed with what has been accomplished under trying circumstances and are confident that all Parties will continue to work hard to implement the Consent Decree to the extent feasible.

**B. Policy Review and Improvements**

Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County to meet their goal of making the Harris County misdemeanor system a national model.  During our first six months, we have conducted a detailed initial examination of the misdemeanor process and implementation of Rule 9 in Harris County. This work has been informed by a series of regular conversations with County stakeholders, as well as by an intensive analysis of court records, ranging from docket entries to videos.  The result has been a set of initial recommendations, several of which have been implemented, and others which are presently being implemented. We have discussed each of these improvements with the parties and with stakeholders, and those conversations have, in turn, generated additional insights and suggestions for further improvements.  We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to the conversations to come.

As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under Consent Decree, as well as conducting regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Secured access to data, including jail data, court data, hearing videos, and judicial opinions, to begin organizing material for analysis. As described below, some data is still being assembled by the county, which will be creating a public data portal as required by the Decree, but preliminary analysis is included in this report, and it provides valuable insights. Additional data was collected by the monitor team.

(3) Conferred with the defendants and agreed on the key policies to be summarized and made available at the Harris County Joint Processing Center and Harris County Criminal Justice Center.

(4) Approved proposals for County to retain outside researchers to study topics such as causes of nonappearance, indigent defense, court forms.

(5) Convened a Community Working Group, with which we held four meetings, as well as launching monitor website and social media presence.

(6) Developed the Monitoring Plan for conducting compliance reviews and audits for the first year of implementation and shared it with the parties for review and comment; it is also available on our Monitor website. We have not reviewed plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation), but have discussed the development of such plans with the County, which is presently procuring consultants that will advise on the development of such improvements.

This Report describes in further detail our work on these topics.  Early on in our work, we did not yet have access to comprehensive electronic data from the county Justice Administration Department (JAD). As a result, we collected by hand, information regarding every misdemeanor magistration hearing, in which there was not a concurrent pending felony or a hold in place at the time we reviewed the record. Under Rule 9, such hearings are held only for six "carve-out" types of cases, set forth in Local Rule 9.4.1- 9.4.6.  For such cases, a prompt hearing is required by Rule 9; in addition, cases are governed by Tex. CCP Art. 17.033 (commonly referred to as SB-7, after the 2001 legislation adopting the provision, requiring that a person be released on bond no later than 24 hours after arrest if jailed and no probable cause hearing is held for a misdemeanor case).

Several improvements emerged from our analysis of these data, including because we observed patterns that raised questions, which we then posted to stakeholders, including the District Attorney's Office, Public Defender, Courts Administration, and the Hearing Officers. Additional improvements and new questions emerged for our conversations with the parties and other stakeholders. We discuss each in turn.

### 1.   Magistration: Observations and Improvements in 15.17 Hearings

A hearing officer now explains to a defendant, following Rule 9 and this Consent Decree:

I cannot order that you be detained or require you to pay an unaffordable amount of money bail as a condition of release unless I make a finding by clear and convincing evidence that no other condition or combination of conditions is adequate to reasonably assure public safety or to reasonably protect against flight from prosecution.

Further, a hearing officer explains:

I must identify and explain the reasons for my decision and the evidence and information I relied on in making that decision on the record, so that you can challenge the decision at a later date. Requiring unaffordable money bail or ordering you detained must be the last resort, and I will order detention after this hearing only if I make a finding that there are no alternatives for reasonably assuring the safety of the community and reasonably protecting against your flight from prosecution.

That requirement reflects the constitutional standard, drawing on the U.S. Supreme Court's ruling in *United States v. Salerno*, 481 U.S. 739 (1987), holding that pretrial detention was permissible only where the government provided a robust, adversarial, on-the-record hearing and a judge made a finding by clear and convincing evidence that detention was necessary, and prior cases holding that under the Due Process Clause, when the government seeks to detain a person, presumed innocent and not yet convicted of any crime, and seeks to deprive that person of liberty, it must do so only based on a strong evidentiary showing.  See also *Addington v. Texas*, 441 U.S. 418, 432 (1979).  We sought to examine whether hearing outcomes and reasoning reflect that important and appropriately demanding standard.

### a. Studying Hearing Outcomes

We have reviewed outcomes in pre-trial hearings held, beginning in late March after our appointment, through mid-July 2020; 579 cases in total. Our goal in hand-collecting these data was to better understand magistration hearing outcomes during the time period. We have limited our work to cases in which a person appeared in the jail roster, as someone who was in custody, with an active misdemeanor case, in which there was no pending concurrent felony or other holds at the time of the review. We have reviewed what pre-trial conditions were set, what reasons were offered by the hearing officer in written decisions, and whether the Harris County Criminal Court at Law (CCCL) judge later modified those conditions. Figure 1 and Table 1 below describe what we found in examining these cases.

**Figure 1. Types of Pretrial Conditions Following Rule 9 Hearings**



**Table 1. Pre-trial Conditions in Rule 9 Hearings, March to Mid-July, 2020**

|  | Cases with Personal Bond or General Order Bond | Cases with Secured Bond |
|---|---|---|
| Total number granted | **270 cases** | **290** |
| Average cash amount | $2,212 | $3,515 |
| Median cash amount | $1,500 | $1,500 |

| Average District Attorney cash request | $4,312 | $6,995 |
|---|---|---|
| Average Public Defender cash request | $1,123 | $1,343 |
| Number of District Attorney requests for personal bond | 0 (DA opposed in 89 cases) | 1 (DA opposed in 201 cases) |
| Number Public Defender requests for personal bond | 86 (PD opposed in 1 case) | 152 (PD opposed in 8 cases) |

Thus, in 47% of the carve-out cases examined (or 270 of the 579 total cases), the person spent some time in the jail, but at the hearing, a personal bond was granted.  In 171 of those 270 cases (63%), the person was released on a personal bond under SB7.[18]  The largest personal bond amount was for $30,000 and the smallest was for $20.  The average personal bond amount was $2,2125 and the median amount was $1,500. The table also notes district attorney and public defender requests and opposition to personal and cash bond; however, in many cases that information was not available.

In 50% (290 of 579 cases), a secured bond condition was imposed, with an average amount of $3,515.  (In the remaining cases, charges were dismissed or no bond was imposed).  The largest secured bond amount was for $100,000, and the smallest was for $50.  In over one-third of secured bond cases (102 cases), the amounts were for $500 or less.

We emphasize that the Consent Decree provides that a person is "indigent" and lacks the ability to pay any amount of secured bail if they struggle to meet basic necessities. Consent Decree at ¶17(h). Similarly, "indigency" includes individuals who are deemed indigent under indigent defense guidelines; who are homeless; who themselves or their dependents receive public assistance; whose household income does not exceed 200% of the federal poverty guidelines; and who are currently incarcerated. Id. For indigent individuals, as Rule 9 states, "An arrestee who is indigent (as defined in Section 17(h)) or who meets any of the following, may not be assessed any fee associated with a personal bond or an unsecured bond, or the cost of a non- financial condition of release…" Id. at 9.12.8.

We also learned that in general, many hearings result in outcomes in which the misdemeanor defendant is released.  Delays, including those resulting in SB7 releases, continue to result fairly often.  Even in these carve-out categories of cases, real judgment is being exercised whether there is a pressing public safety need to detain the individual.  We note that in some cases (59 of the 579 cases examined), the CCCL judges later modified pretrial conditions set by the hearing officers, denying or granting a personal bond; finding that bond conditions were violated; and/or raising or lowering the bond amount. In some cases, court records indicated that the secured bond amount was made. In still additional cases, charges were dismissed or the defendant pleaded guilty. As described in Part III, future analysis will examine merits outcomes in these cases.

---

[18] Tex. CCP Art. 17.033 (requiring that, in a provision commonly referred to as SB-7 after the 2001 legislation adopting it, that a person be released on bond no later than 24 hours after arrest if jailed and no probable cause hearing is held for a misdemeanor case).

We also examined the text of magistration rulings in these cases.  As we conducted that work, we first noticed at the outset that those orders increasingly refer to the clear and convincing standard.  However, it was sometimes difficult to fully understand the basis for hearing officer decisions from the written decisions issued.  The standard form in which such decisions were recorded only had space for approximately two lines of text.  We did not feel that the space available permitted judges to adequately explain the bases for their rulings in a manner that can comply with the Consent Decree, which calls for a showing of clear and convincing evidence to support a decision to impose pre-trial conditions. We discussed this issue with the Hearing Officers at our regular meetings, and they expressed frustration with the limited space available. In conversation with Court Administration, we were pleased to see this recommendation for change adopted quickly: electronic forms for Hearing Officers have expanded, creating a 1,000-word space to explain reasons for decisions and write case notes.

As a result of this change, we have seen the length and detail of rulings increase to take advantage of the available space.  We observe that the practice has improved, but it is still not always apparent what the clear and convincing evidence is to support a particular pre-trial condition.  In conversations with representatives of the Public Defender's Office and the District Attorney's Office, we learned that both prosecutors and defense attorneys would benefit from opinions that provide clear recitations of the facts supporting the clear and convincing standard for decisions on the choice of bond conditions, a person's ability to pay a secured bond, and whether the decision reflects a need to protect the public safety.

In our meetings with the Hearing Officers, they have been extremely receptive to further improving the electronic form so as to facilitate the completeness of decisions and ensure that opinions fully comply with the Consent Decree.  Discussions about how to make further improvements to that electronic form are ongoing with the Hearing Officers and the Justice Administration Department.  We will continue to track the bases for such rulings, in order to observe compliance with the Consent Decree requirement that pre-trial decisionmaking be carefully substantiated.

This work resulted in a range of additional useful insights and lessons.  The Hearing Officers also brought to our attention a different reason why decisions had often been terse in the past: the overlapping schedule for their hearings often resulted in backlogs and led to rushed schedules with insufficient time for decisionmaking.  Court Administration developed, in response, a revised hearing schedule which better spaces out hearings during the day.  The Hearing Officers have welcomed this change. It was implemented on August 31, 2020.

The Hearing Officers and others also brought to our attention that it can take additional translation time during the hearings, where most of the relevant bond forms are not translated into Spanish, and that translators are not assigned to work all of the hours during which hearings occur. We have discussed these changes with Court Administration. Regarding bond forms, the forms have been translated and will be made available.

These latter changes in the overlapping schedule and in the translation of forms should help to keep hearings moving at an efficient speed, but they do not address other concerns.  Our continuing concern lies with the absence of a statement of the evidence that meets the clear and

convincing standard for a particular pretrial condition; the lack of explanation for the choice of a particular amount of financial bond; the need for explicit findings of ability to pay, consistent with the Consent Decree definition of indigency; and the need for an explicit finding, based on clear and convincing evidence, that detention is necessary if the person cannot afford the amount required.

### b. Studying Hearing Videos

Each magistration hearing in Harris County is video recorded, and the County has been sharing those video files with the monitor team. We have so far observed videos from hearings conducted in April and May 2020, in order to assess whether more information is gleaned during the live hearing, and to better understand not only the hearing officer's decision, but also how the public defender and the prosecutor presented their views. We have coded information from a large body of such videos, selected at random in order to obtain information from a variety of defendants, lawyers, and hearing officers.

To date, we have reviewed 100 such videos, each from April and May, 2020. We coded a range of information regarding the hearing outcomes, as well as the reasoning of the district attorney, the public defender, regarding their pre-trial requests, and then the reasoning of the magistrate. We found:

The average hearing length was: 7 minutes
The median hearing length was: 6 minutes
Average and median secured bond amounts: approx. $3,500.

In 29 of the 100 cases, a personal bond was granted. In the video hearings, we can observe whether a protective order is entered; in 37 of the 100 cases an MOEP was entered.

Of these 100 cases, in 16 the defendant was not represented by counsel at the hearing. Almost all were cases in which, the defendant was not present in the courtroom and where the public defender was not permitted to make a presentation without the defendant present. The defendant may have been unavailable due to delays due to medical observation or other delays causing the person to have not yet met with counsel. However, Rule 9 is clear that: "Arrestees must be represented by counsel at bail hearings." Consent Decree ¶30, at 9.12.1. The public defender must be permitted to represent the arrestee at hearings. A hearing should not proceed without the adversary process that Rule 9 requires.

We also examined to what degree the ability of a defendant to pay some level of secured bond was discussed at the hearing. We did not have financial affidavits from the court clerk website and could not verify what was discussed. However, we observe that in 45 of the 100 cases, a person's ability to pay was not discussed. In 18 cases, it was discussed briefly, but without any details, such as if the public defender mentioned the employment status of the defendant, but not specifying what that meant in terms of financial resources. In 37 cases, there was a more detailed discussion of ability to pay, often where the public defender emphasized that the defendant is homeless, indigent, unemployed, or does not have financial resources.

In some cases, more information concerning the bases for pre-trial decisions was available during the hearing than is often reflected down in the written decisions.  In some cases, for example, there was a detailed discussion of the financial means of the defendant.  In others, there was not.  We have also seen cases in which personal bond amounts were not properly geared towards ability to pay. We have also discussed that issue with the hearing officers.

We also reviewed thirty videos from April and May, 2018, to provide a comparison between the hearings conducted before and after the adoption of Rule 9.  The differences were striking. In the 2018 hearings, public defenders were representing clients as part of a pilot program, but not in hearings in which there was a bond forfeiture. As a result, in the thirty videos randomly selected, there were public defenders in 19 of 30 cases.  In those hearings, 14 of the 20 involved secured bond set.  The average length of hearings was 3 minutes; the hearings were noticeably shorter than after Rule 9 was adopted.  No reasoning was given by the hearing officers in 11 of the 30 cases from 2018.  This rough comparison serves to highlight the remarkable progress made under Rule 9 and this Consent Decree, in providing fairer and more robust pre-trial hearings.

More broadly, we believe that a common training on Rule 9 will improve outcomes and consistency in 15.17 hearings.  There is great enthusiasm for such training, as well as for continued feedback from our team.

We continue to explore the feasibility of additional changes:

1. Enabling the defense to bring witnesses to 15.17 hearings by use of a courtroom that has public access.
2. Ensuring that translators are on the job at all times.
3. Charging people with all charges at initial booking (including JP cases) so as not to delay their time in custody by requiring a second booking on less serious charge later.
4. To prevent delays in processing release, it would be best for the HCSO if judges used standardized interdepartmental communications, terminology, and electronic documents. HCSO has noted that staff may spend a great deal of time reading judicial orders and other documents to ensure consistency and to figure out what conditions for release entail.

We are extremely grateful for the feedback and collaboration with the hearing officers during our first six months.

## 2.  Sheriff's Office: Logistical Improvements

The Harris County Sheriff's Office (HCSO) plays an instrumental role in the success of misdemeanor bail reform, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing a range of improvements to the systems used in the past.

We observed early in our data collection that people were regularly not present at the hearing and/or had not been able to meet with counsel before the hearing.  In discussing this issue with the monitor team, hearing officers noted their discomfort with proceeding if the public defender had not met with the client, and noted that the issue often occurred due to logistical

15

challenges, where a person was in a different part of the facility.  Sometimes there was a good reason why the person was being observed, such as to assess whether behavioral health treatment would be needed, but then once the decision was made that no further observation was necessary, there were delays that resulted in the person missing their hearing.  As a result, a person might spend hours or even a day in the jail, unnecessarily.  Further, a hearing should not proceed without the public defender permitted to advocate for that individual.  As noted, Rule 9 is clear that "Arrestees must be represented by counsel at bail hearings." Consent Decree ¶30, at 9.12.1.

Our conversations with the parties resulted in problem-solving regarding the sources of these logistical issues, and the Sheriff's Office making thoughtful changes designed to address them.  New arrangements are in progress to permit people, who had not signed paperwork before their hearing, to do so upon release. Clearer lists have been created to set out work flow and prioritizing which cases should be addressed next. In addition, reduced caseflow due to COVID has been cited as a reason why scheduling has been more manageable.  We and the Hearing Officers have observed an improvement and great reduction in these delays. We hope that these improvements are made permanent, at the HCSO and also at the district clerk's office.  The HCSO has also explained that new development towards adoption of electronic records has improved workflow and will in the months ahead result in further improvements, such as the creation of dashboards to show personal workflow.  We also note that this problem should also be reduced in the future because the county's Homeless Task Force has plans to build more "jail diversion" resources so that the police can take people to a residential facility for mental health care rather than arresting them.

We plan to continue conversations designed to improve logistics for the misdemeanor population at the JPC, including to better facilitate speedier release.

Further, we have discussed Spanish translation of the webpage with instructions about obtaining release on bond. First, currently the translations appear on a webpage that can only be accessed via Google Chrome, not Internet Explorer.  We have asked whether this service can be included on Internet Explorer as well.  Second, the Sheriff's Office is looking into changing the prompt for the translation service from "Select Language" to "Select Language/Seleccionar Idioma" to make the service more accessible to Spanish speakers.

We plan to engage in further discussion regarding the possibility of adopting additional improvements:

1. Expanding the avenues for people to "self-bond" without the need for assistance from family or bondsman.

2. Implementing quality assurance measure to assure that every person admitted to the jail has had an opportunity to transcribe phone numbers from their phones so that no one is left incommunicado while in jail.

3. Making community reentry services available on a 24/7 basis so that released at night will be safe and have a means of getting home or to a shelter.

16

4. Improving the procedures and interdepartmental communication to reduce the time it takes to release people after making bond.

We are incredibly grateful and fortunate to have such responsive county officials to work with.

### 3.  CCCL: Court Appearance Requirements

The Consent Decree revamps the court appearance process in Harris County.  The detailed rules set out in paragraphs 57-72 represent a sea change in the manner in which court appearance had been handled in the past.  It is now far clearer how one can waive and reschedule court appearances, which court appearances are required and which are waivable, and how many times one can reschedule before a warrant may issue. Those court appearance provisions are posted and available on the Harris County Criminal Courts at Law website.[19]

Those Consent Decree requirements are presently being implemented. The Open Hours Court is to begin by the end of August, 2020. In the months ahead, the court appearance requirements will be further implemented with the assistance of new technology. More immediately, a method to email to reschedule a hearing will be developed.  The county will be soliciting vendors for a new court date notification system for Email, Text, and Voice.  That system will include Spanish translations of Court Notifications in new system for Email, Text and Voice. Translations into Chinese and Vietnamese will occur in a second phase of the project.  We will explore with the Judges, court personnel, and the defense bar, technological and administrative options to make rescheduling more convenient for the stakeholders, consistent with the Consent Decree and the Judges' discretion.  For example, it may be more efficient and convenient to have routine rescheduling requests handled initially by a central coordinator, similar to Open Hours Court, with determinations requiring judicial discretion made by the Judge for the case. We also note that the Consent Decree language is not always clear to a layperson, and the court appearance procedures set out in the Decree can be complex.  We have recommended that a user-friendly guide should be made available. We have also discussed with the parties conducting trainings for court administrators and for lawyers regarding the new court appearance process.  The County has selected a vendor to redesign court date notification forms to incorporate evidence-based design practices.

We are extremely grateful for the feedback and collaboration with the CCCL Judges during our first six months.

### 4.  District Attorney's Office

The Harris County District Attorney's Office's policies have a significant effect on the new misdemeanor system in Harris County, including through exercise of discretion in initial charging decisions, in decisions to request pre-trial conditions, and in merits litigation of misdemeanor cases. We have begun regular conversations to exchange insights.

---

[19] The provisions are available in a link on the front page of the CCCL, at: http://www.ccl.hctx.net/criminal/default.htm and the provisions are available in full at: http://www.ccl.hctx.net/admin/documents/Court%20Setting%20Guidelines%20and%20Procedures.pdf.

Our data collection led us to observe that we occasionally saw cases erroneously coded as "no bond" cases when in fact the case was a carve-out, or even a person entitled to a General Order Bond in a non-carve-out case. This could result in delays in providing the person with such a bond. We discussed this with the District Attorney's Office, which was extremely responsive in identifying the source of the confusion that had occurred, and discussing the issue with prosecutors to ensure that this problem does not recur. We have also discussed the need for training for lawyers in Harris County regarding Rule 9 and its accompanying processes. Again, we are incredibly fortunate to have such responsive county officials to work with.

### 5. Public Defender's Office

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention." Consent Decree at ¶37. One of the most important changes brought about by Rule 9 and the Consent Decree has been the assurance that a public defender represents all individuals at bail hearings. Further, the Consent Decree envisons a process of continuous improvement in the public defense services provided at these hearings, including through the retention of an expert in holistic defense services, and the development of an indigent defense plan. Consent Decree at ¶41, 43. That written plan has not been provided, in the first 180 days of the Decree, because the expert has not yet been procured.

However, work has been done, pending that planning process, to address indigent defense needs in the Harris County misdemeanor system. We have regularly met with the public defender's office regarding implementation of Rule 9 and the consent decree. We have solicited their feedback on the indigent defense planning and improvements contemplated by the Consent Decree. One issue raised has been the provision of records to appointed counsel, after pre-trial hearings. We have discussed better facilitating such access, in order to enable better representation in subsequent representation. We have also discussed, as noted, the need for training for lawyers in Harris County, including public defender's, regarding Rule 9 and its accompanying processes.

## C. Data Analysis

In order to assess the improvements in Harris County's misdemeanor bail system over time and its compliance with the Consent Decree, it is essential to develop and maintain a well-functioning data management system. Such a system, required by and described in Section XI of the Consent Decree, will enable the County, Monitor, and members of the public to track key statistics relevant to the misdemeanor bail system, such as the size of jail population, length of the pre-trial detention, racial disparities in the system, and prevalence of secured money bail in a convenient and transparent way.

Substantial work was done, jointly with the Justice Administration Department ("JAD"), in our first six months to prepare a data management system to permit analysis of misdemeanor cases in Harris County. We are extremely grateful to JAD for their hard work, throughout these months, to set up such a system, using Power BI, a Microsoft analytics platform that is compatible with the county's technology. For some time, we spot-checked, tested, and provided feedback on the data, as new fields were added, and new capabilities provided. Each step of the way, JAD was

extremely solicitous, in giving our team information about the system, providing test-drive demonstrations of its functions, and in responding to our comments regarding additional data and capabilities to be added. We look forward to further collaborating with JAD on this front and providing technical assistance as needed.

We expect the available data content and quality on the data platform to greatly expand and improve over the next six months. Meanwhile, the data currently available allowed us to run initial analyses and uncover some of the key trends in the misdemeanor bail system in Harris County over the last few years. Specifically, our initial analysis examines the following questions:

1. Total number of misdemeanor cases filed.
2. Number of "carve-out" offenses, namely, protective order or bond condition violations, misdemeanor assault and terroristic threat, and driving while intoxicated.
3. Duration of pre-trial detention.
4. The share of misdemeanor cases in which a personal or general order bond was approved.
5. The share of misdemeanor cases in which an arrestee was released from pre-trial detention either by receiving a personal or general order bond or paying secured money bail.
6. Initial bond amount set for misdemeanor defendants.
7. Recidivism within 90, 180, and 365 days of the date of initial complaint.
8. The share of misdemeanor cases in which a personal or general order bond was approved, broken out by the arrestee's race.
9. The share of misdemeanor cases in which an arrestee was released either by receiving a personal bond or paying secured money bail, broken out by the arrestee's race.

We note that analyses which *have not been completed* at this time include: court appearance and bond failure-related information; and disposition outcomes (whether a dismissal, guilty plea, trial, or some other outcome).  These important analyses will occur in the months ahead, as will further analysis of the data presented here.

### 1.  Total Number of Misdemeanor Cases Filed

Our main data source is the case-level records on all misdemeanor cases filed by complaint in Harris County between January 1, 2015 and June 30, 2020.[20] Based on this data, we observe the number of misdemeanor cases slightly fell over the last few years. The decline is somewhat larger for the first part of 2020 (between January 1 and June 30), which can be attributed to COVID-19. By case, we mean a misdemeanor charge filed; one person could have more than one charge result from a single arrest. Figure 2 below illustrates these trends.

---

[20] One notable limitation of our data is that it is based on misdemeanor complaint records only, and leaves out a small number of direct file cases. We intend to incorporate data on direct file cases in our future reports.

**Figure 2: Number of Misdemeanor Cases by Year**



The number of misdemeanor cases presented in Figure 2 is somewhat larger than the number of misdemeanor defendants, as some individuals may be charged with multiple offenses from a single arrest. We present the number of misdemeanor defendants by year in Figure 3, where multiple charges filed against the same individual on the same day are considered as a single observation. It appears that the number of misdemeanor offenses in Harris County, in terms of both case and defendant counts, has gradually declined in recent years.

Information on defendant race is available for nearly all defendants (98.5%) observed in the data, that is, individuals against whom a criminal complaint was filed between January 1, 2015 and June 30, 2020. Among the defendants whose race information is available, blacks (40%) and whites (58%) make up the vast majority, while Asians (2%) and Native Americans (0.1%) account for the rest. Moreover, as Figure 4 indicates, the racial distribution of misdemeanor defendants in Harris County has been remarkably constant over the past years. On the other hand, reliable information on defendant ethnicity is not available yet, and we plan to work on data collection and analysis regarding defendant ethnicity in the future.

**Figure 3: Number of Misdemeanor Defendants by Year**



**Figure 4: Share of Black and White Misdemeanor Defendants by Year**



## 2. Number of Carve-out Offenses

Rule 9 requires that all misdemeanor arrestees will be promptly released with unsecured bail amounts initially set at no more than $100, except for individuals arrested and charged for protective order or bond condition violations, misdemeanor assault and terroristic threat, and driving while intoxicated-second (DWI) (Rule 9.4.1—9.4.3), as well as those arrested and charged with a new offense while on pre-trial release (Rule 9.4.4), those arrested on a capias issued after a bond forfeiture or bond revocation (Rule 9.4.5), and arrested while on community supervision (Rule 9.4.6).

We do not yet have information on whether a case belongs to the "carve-out" category because it involves a new offense while on pre-trial release, bond forfeiture or revocation, or arrest while on community supervision. However, based on the type of offense listed in the complaint, we can determine whether a case belongs to one of three (of the six) carve-out offense categories, namely, filed charges for violations of protective orders and/or bond conditions,[21] misdemeanor assault and terroristic threat, and DWI-2nd. As shown in Figure 5, the number of some carve-out offenses in Harris County increased since 2015.

**Figure 5: Number of Carve-out Offenses by Year**



---

[21] We note that filed charges for violation of bond conditions do not commonly occur and do not reflect many of the instances in which pre-trial services may identify noncompliance with conditions.

We note a modest increase in DWI-2nd cases, and suggest it may be partly driven by changes in charging decisions and policing efforts against drunk driving, while it is also plausible that the number of drunk drivers has gone up over the last few years. According to the Annual Motor Vehicle Crash Statistics, published by the Texas Department of Transportation, the number of alcohol-involved crashes in Harris County rose by more than 20 percent between 2015 and 2019. We do not see an increase of that size in DWI-2nd cases, however.

**Figure 6: Number of Alcohol-involved Crashes in Harris County by Year**



### 3. Duration of Pre-trial Detention

Third, we examine the change in the duration of pre-trial detention in Harris County, measured as the difference between initial arrest and release dates. If a case was completed before the release date, we set the duration of pre-trial detention equal to the number of days between the arrest and case completion dates instead.[22] Based on this computation, we find that most misdemeanor defendants are released from jail within two days of the initial arrest. The share jumped from just below 60 percent in 2016 to more than 80 percent in 2019. On the other hand, more than 10 percent of misdemeanor defendants were detained for more than 14 days in 2016, but only 6 percent in 2019.

---

[22] If a misdemeanor defendant was detained multiple times prior to disposition, we only consider the duration of the initial detention. Also discarded from the analysis are the cases where the initial arrest took place after the bond posting or first setting date. In cases where the arrest date is not observed, we take the difference between the initial pre-trial booking and release dates to compute the length of pre-trial detention.

**Figure 7: Share of Misdemeanor Cases by the Duration of Pre-trial Detention**



### 4. The Share of Cases in which a Personal or General Order Bond was Approved

Fourth, we examine the share of misdemeanor cases in which a personal or general order bond was approved. Figure 8 below displays these data both before and after Rule 9 was adopted. One can readily observe that where, prior to the implementation of Rule 9 in 2019, most misdemeanor cases did not involve a personal or general order bond. Following the adoption of Rule 9, the vast bulk of misdemeanor cases (more than 70 percent of the cases in 2019 and 2020) now involve pre-trial release, under a personal or general order bond.

**Figure 8: Share of Personal/General Order Bonds Approved**



### 5. The Share of Cases in which an Arrestee was Released Either by Receiving a Personal Bond or Paying Secured Money Bail

Consistent with the increased number of personal/general order bond approval, we observe more defendants were released from pre-trial detention either by receiving a personal/general order bond or paying secured money bail in recent years. For example, pre-trial release, through a personal/general order bond or secured money bail, was observed in less than two-thirds of misdemeanor cases in 2016, but more than 90 percent of the cases in 2019.

**Figure 9. Share of Cases in which an Arrestee was Released either by Receiving a Personal Bond or Paying Secured Money Bail**



### 6. Initial Bond Amount Set for Misdemeanor Defendants

We also observe a substantial reduction in the initial bond amount set at the 15.17 hearing over time. Rule 9 requires that all misdemeanor arrestees who do not fall into the six "carve-out" categories will have unsecured bail amounts initially set at no more than $100. The observed bond amounts set at the 15.17 hearing are largely consistent with this requirement. Figure 10 indicates that the initial bond amount was nearly always $500 or more before 2019, but the initial bond amount of $100 or less became much more common after the adoption of Rule 9 in 2019.[23]

---

[23] Under the misdemeanor bail system in Harris County prior to Rule 9, a pre-determined bond amount would be set for some defendants at the time of complaint, who could post this bond amount and be released from custody before the 15.17 hearing. For those arrestees who bonded out this way and were released before the 15.17 hearing, we take their posted bond amount as the "initial bond amount set."

**Figure 10: Distribution of the Bond Amount Set for Misdemeanor Cases**



### 7. Recidivism within 90, 180, and 365 days of the Date of Initial Complaint

Next, in order to explore repeat offenses of misdemeanor defendants, we analyzed the share of misdemeanor cases in which a defendant received a new criminal complaint (either felony or misdemeanor) within 90, 180, and 365 days of the initial complaint. We note that misdemeanor cases from 2020 are omitted from this analysis, as the 90- and 180-day recidivism outcomes cannot be fully observed for these cases. Furthermore, when measuring recidivism within 365 days, misdemeanor cases filed after June 30, 2019 are also omitted, for the same reason. It is noteworthy that, in spite of the notable reduction in the length of pre-trial detention (Figure 7) and increased use of personal/general order bond (Figure 8), the rate of recidivism remained largely stable over the last few years.

We emphasize that when examining recidivism, one should carefully consider what types of repeat criminal conduct are to be examined, during what time periods, for what types of offenders, and based on what data sources. As we develop below, we plan to engage in more detailed analyses of recidivism in future reports. Based on these data, examined in three different ways, we so far observe a quite stable rate of recidivism.

Our focus is on the complete set of misdemeanor cases, where for a given defendant, a new complaint (either felony or misdemeanor) was filed.  This focus captures a wide range of cases and outcomes.  We also examined several different time periods: 90, 180, and 365 days of the initial complaint. As with all recidivism measures, the longer the time frame selected, the more repeat-conduct one tends to observe.  However, as Figure 11 shows, recidivism is stable or declining across the entire time period from 2015-2019 for each of the 90, 180, and 365-day time periods.  These findings give us greater confidence in the trends that we report here.

**Figure 11. The share of misdemeanor cases where a new complaint for the same defendant was observed within 90, 180, and 365 days of the initial complaint**



Second, the seriousness of the repeat-offense matters when one examines recidivism.  We plan in the future to conduct more detailed analysis breaking out types of offense. In this first report, we conducted a separate analysis of cases in which a misdemeanor defendant committed a new felony.  We note that some felony charges are misdemeanors that are charged as felonies because the law allows an increased charge on account of a prior misdemeanor conviction; such charges are also included here.  As Figure 12 displays, we do not see any change during the 2015 to 2019 time period regarding repeat offenses that are felonies.[24]

---

[24] We were grateful for the suggestion from the District Attorney's office that we examine a time period longer than 90 or 180 days, and as a result, we made the valuable addition of analyses using a 365-day time period. We note that we also recently received data from the District Attorney's Office, regarding misdemeanor cases in which individuals were on bond (of any type) at the time they committed a new offense (whereas our data considers new offenses for *all people* charged with misdemeanors, not simply those released on bond). While that subset of cases appears to show an upward trend, however, this fails to account for two factors: (1) the much-increased number of bond approvals to defendants who would not have been eligible for bond previously; and (2) lengthening of bond duration over time. To be sure, it is important to examine outcomes for persons who are on bond.  We do not yet have adequate data, for

**Figure 12. The share of misdemeanor cases where a new felony complaint for the same defendant was observed within 90, 180, and 365 days of the initial complaint**



Third, a similar pattern is found when looking at the average count of new complaints filed within X days for each existing complaint (Table 2).

**Table 2. Average Count of New Complaints Filed Against the Same Defendant**

| Year | # New Complaint Within | | | # New Felony Complaint Within | | |
|------|---------|----------|----------|---------|----------|----------|
|      | 90 Days | 180 Days | 365 Days | 90 Days | 180 Days | 365 Days |
| 2015 | 0.138   | 0.242    | 0.425    | 0.048   | 0.084    | 0.152    |
| 2016 | 0.151   | 0.257    | 0.436    | 0.052   | 0.091    | 0.159    |
| 2017 | 0.153   | 0.255    | 0.440    | 0.055   | 0.093    | 0.164    |
| 2018 | 0.154   | 0.248    | 0.400    | 0.057   | 0.095    | 0.162    |
| 2019 | 0.130   | 0.218    | 0.356    | 0.057   | 0.098    | 0.161    |

## 8.   Personal/General Order Bond Approval and Pre-trial Release by Race

Lastly, we explored the black-white gap in pre-trial detention and release by analyzing the share of misdemeanor cases in which a personal/general order bond was approved (Figure 13) and the share of pre-trial release through a personal/general order bond or secured bond (Figure 14) separately for black and white defendants. While the share of personal bond approval was similar

---

example, to examine the effectiveness of supervision of individuals released on bond.  We intend to return to this question in our next report.

between the two groups (Figure 13), the share of black arrestees who bonded out (either cash or personal) was considerably lower than white arrestees, especially for 2015 and 2016 (Figure 14), with the disparity almost entirely eliminated following adoption of Rule 9 in early 2019.

**Figure 13:  Share of Personal Bond Approval, by Arrestee's Race**



**Figure 14: Share of Any Bond (Personal or Cash) Filed, by Arrestee's Race**



## III.  Cost Study and Project Management

This section of the Monitor Report reviews the status of two responsibilities assigned to PPRI at Texas A&M University.  First, we respond to the Consent Decree requirement set out in Paragraph 117(i) that the Monitor report assess:

> *The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.*

Then, we describe progress toward PPRI's project management function, so far by creating documents and spreadsheets displaying deliverables and deadlines, and organizing files in common digital space.  We note that, in coordination with the Justice Administration Department as well as other departments at the County, we have been able to make real progress towards accomplishing the required tasks on schedule.  A table summarizing the status of Consent Decree milestones is reviewed in the Appendix.

### A.  Cost Study

Understanding cost is an important aspect of the pretrial reform required by the ODonnell Consent Decree.  Not only is affordability essential to implementation, but effective overall system

design depends on understanding where limited resources can best be expended to achieve the most good. While key cost-related concerns are likely to evolve over the course of the seven-year reform period, for the first year of the Monitorship, a foundational question is being asked: How did pretrial processing costs change before and after the implementation of Local Rule 9 in January 2019, and what factors account for the results observed?

In this section, we consider what will be required to fully implement the entire planned cost evaluation and assess the feasibility of doing so. We begin with preliminary findings based on the limited data available so far. The most readily accessible (though still incomplete) sources to assess pretrial costs are currently datasets tracking defendants through jail and court systems. Days spent in jail are one of the most consequential expenses emanating from pretrial case processes.

We emphasize, however, that at this point we have not yet examined comprehensive costs to the County or to members of the community. To date, we have only begun to examine detention costs.

Findings described elsewhere in this report show there have been observable changes in pretrial detention patterns over the past five years including:

- Declines in the overall number of misdemeanor cases each year since 2015 (Figure 2) and
- Declines in the number of days misdemeanor defendants are detained, with a growing share of people released within two days of arrest since 2015 (Figure 7).

The diminishing number of misdemeanor cases charged combined with shorter pretrial detention intervals would be expected to suppress the total number of defendant/jail days, reducing subsequent jail costs. To examine actual patterns in the data, arrest, booking, and pretrial release data were extracted for misdemeanor defendants between 2015 and 2020. People charged with co-occurring felonies were omitted from analysis. People with holds were included, with a maximum detention length of 10 days according to Sheriff's Office policy. Key variables were calculated as follows:

- Detention costs are the cost to detain misdemeanor defendants released each quarter for the full term of their pretrial detention at a cost of $800 per booking and an additional $65/day.[25]
- Mean and percentile pretrial jail days are based on the time in detention[26] for the sample of defendants released each quarter.

---

[25] Harris County Budget Management, "Estimated Harris County Jail Detention Costs," 2/28/2015 cited in Harris County District Attorney's Office (2017). "The Economics of Misdemeanor Marijuana Prosecution." This readily available figure is a temporary estimator until it is possible to complete a more refined analysis accounting for defendant-specific costs extracted directly from Sheriff's Office Budget records.

[26] Number of jail days was calculated as the difference between arrest and release dates. In instances where arrest date was missing, booking date was used instead. Jail days was equal to the difference between arrest and release if release preceded disposition date, or between arrest and case completion date if no pretrial release date was observed. For defendants booked multiple times for a single case, only the first detention was considered. Detentions for reasons other than the initial offense (e.g., bond violation or failure to appear), and instances where the first detention occurred

- Volume of misdemeanor defendants is reported as people arrested each quarter.  Note this measure counts individuals, not cases filed.

Figure 15 examines the relationship between misdemeanor detention costs and duration of jail stays.  Time in detention began a strong downward trend in late 2015, reaching the nadir in the fourth quarter of 2017 shortly after the federal court issued a preliminary injunction on the use of schedules in setting bond.  Since then, jail days have remained low relative to pre-ODonnell standards.  The gray "third quartile" line shows the maximum time in detention for 75% of detainees has been two days or less since mid-2017; more recently, this three-fourths of defendants has been detained a maximum of one day compared to stays up to five days in 2015.

However, *average* time in jail (shown in the blue line) has remained higher and recently trended upward, approaching 2016 levels as recently as the first quarter of 2020.  This can only occur if jail stays for at least some defendants in the top quartile (i.e., the 25% above the gray line) are high enough to pull up the average.  So, while a large majority (at least 75%) of misdemeanor arrestees in the past two years have experienced fewer jail days than before the ODonnell lawsuit, others continue to experience relatively lengthy jail stays, driving up average detention length and costs.

**Figure 15: Length of Misdemeanor Pretrial Detention and Jail Cost**



Figure 16 offers more detailed insight into trends for the upper 25% of jail stays.  Extending the right y-axis, changes perspective, revealing that, while 75% of defendants (gray line) were detained less than a week, 90% (orange line) were released in less than a month, and just 1% have been held as long as two to three months.  There are interesting variations over time that merit

---

more than 14 days after the complaint date were excluded.  People released during the first quarter of 2015 were excluded due to data limitations, and those released in the second quarter of 2020 were excluded because of the system-changing impact of COVID-19.

further investigation.  These include the above-noted "bottom" in 2017 and the subsequent upward trend for the top 1% of defendants beginning just before Rule 9.

**Figure 16:  Misdemeanor Detention Percentiles and Jail Cost**



Figure 17 explores the separate effect of the volume of misdemeanor defendants on detention costs.  In general, the $800 cost per misdemeanor booking drives costs to rise and fall in accordance with the number of people arrested.  However, considering the Figures 16 and 17 together suggests the interdependence of arrests and time detained on jail expense.  Since 2018, it appears rising jail costs may also have been buoyed by a small proportion of individuals with lengthy jail stays.

**Figure 17: Number of Misdemeanor Defendants and Jail Cost**



In practical terms, these findings imply jail costs associated with the number of bookings can potentially be contained by reducing the number of arrests through alternatives such as citations, diversion, or community treatment alternatives.  At the same time, because jail stays are also a significant driver of cost, more investigation is needed to understand the reasons for lengthy pretrial stays for some individuals arrested.  This finding raises questions about the types of individuals who remain jailed for nearly a week or longer.  Future analyses can assess the extent to which they are no-bond cases, carveout cases with an unattainable bond, holds, or are explained by other attributes.  These data can inform further calibration of judicial policies relating to pretrial release practices.

It is also worth noting that these observations omit pretrial jail data beginning in the second quarter of 2020—when COVID-19 began to impact pretrial detention policies.  This chance happening will likely increase the complexity of cost data analysis, but can also potentially provide a unique opportunity for empirical exploration of how policies favoring minimal arrest of misdemeanor defendants affect overall cost to the courts, jail, and other county departments as well as defendants and the community.

While these early findings are orienting, the data is not yet in a form for jail costs to be fully examined.  Moreover, detention is just one component of the many public and private systems that are impacted by pretrial programs and protocols.  We are aiming to determine comprehensive costs to the County, the community, and the individual.

Pretrial costs of importance to the County not only include outlays associated with the initial arrest and trial:  arrest, court appearances, defense, prosecution, conditions of supervision, detention, and sentencing outcomes.  They also include additional expenses for these same activities in the event of bond failure or new charges.  Early evidence presented in Figure 11 suggests that recidivism—measured as the share of misdemeanor cases with new offense for the

same arrestee within 90-100 days of the initial complaint—has not risen with the increasing use of unsecured pretrial release, and in fact seems to be on a downward trend.  If this finding endures, then it would be important to demonstrate that more liberal release policies can be attained with potential reduction in the downstream cost of new criminal activity.

Successful estimation of pretrial costs depends on assistance determining costs of defendant interactions with key departments including the Sheriff's Office (enforcement and jail), Pretrial Services, Prosecutor, Public Defender, County and District Courts, Community Supervision, and County-funded holistic interventions such as those available at the Harris Center. We have acquired and examined budgets from the Budget Management Department for each of these units except the Community Supervision and Corrections Department.  In addition, we have found a number of useful public reports to help us learn more about the work and costs of these departments.

However, we are learning that much of the information required to fully assess cost is kept closer to the programs and activities being funded.  Individual conversations will be required with department- or program-level staff familiar with operations that impact pretrial defendants.

We are currently in the process of reaching out to identify a single contact person in each area who can be our guide to learn more about:

- Separate programs or areas of expenditure related to pretrial defendants,
- Any existing cost summaries or estimations in these areas (and methodology),
- Selection criteria or strategies to identify individual defendants participating in these processes, and
- Funding sources including costs to defendants.

Although department staff are busy, based on positive early interactions we are optimistic that in the coming weeks we can establish dialogues that will help us assemble the information needed for an accurate assessment of pretrial cost to the County.

<u>Costs to the community</u> include two primary categories of expenditure.  The first is costs to victims of criminal activity due to bond failure.  Since comprehensive studies have been done on the costs of crime to victims, we will extract those estimates from the academic literature.  If recidivism findings reported in Figure 9 are affirmed, victim costs may well remain stable even with the more liberal pretrial release policies prescribed by the Consent Decree.

The second category of community costs focuses on non-profit service organizations that are not reimbursed by the County, yet address defendant needs to improve personal and family success in the community.[27]  We are currently reaching out to key providers to learn more about their services and to consider possible ways to assess the benefits of their investment in the criminal justice population.  The Public Defender Office advocates have provided a roadmap to the most common referral agencies used, and we have either completed or scheduled calls with key providers including the Houston-Galveston Area Council Workforce Solutions, the Beacon, and

---

[27] In future years, the cost evaluation may examine whether defendants' criminal justice outcomes are improved when individuals and families are connected with community services that may not be paid by the County.  If confirmed, the finding might suggest investment by the County in community organizations to enhance their work with defendants could be a net benefit to the county from a cost perspective.

the Coalition for the Homeless. It is possible that these agencies can offer data that identifies the services received by justice-involved individuals. If data is accessible and we can address HIPA privacy considerations, it may be possible to quantify whether the cost of services are outweighed by improved criminal and personal outcomes. Such a finding could point to a recommendation for greater public investment in programs that can assist people in the community.

The final category to be considered is <u>cost to defendants</u>. The experience of being arrested and accused commonly has life-altering consequences even for individuals found not guilty of the charges filed, or whose cases are dismissed. PPRI has completed a review of the academic literature identifying studies of the economic effect of criminal justice involvement. In addition, if opportunity presents itself, we will aim to validate many of these costs in Harris County through interviews, focus groups, or other forms of data collection from defendants. In addition, Public Defender Office advocates have offered to add questions for the Monitor team on a data collection tool used for defendants receiving holistic defense services. This could offer a useful means to confirm the extent to which some cost drivers are experienced at least in this special population.

In conclusion, to address the charge of the Consent Decree, PPRI believes it is challenging but feasible to compare the estimated cost impacts of changes in misdemeanor processing compared to earlier years back to 2015. Success is contingent upon factors enumerated above, primarily (1) the ability to gather information about programs, operations, and funding impacting pretrial defendants in the County and the community and (2) data at a sufficient level of detail to track individual defendants' pretrial experiences. Other considerations such as qualified staff, time, and funding for the study have been accounted for in the Monitor's plan of work and budget.

## B. Project Management

PPRI at Texas A&M University, is charged with maintaining information necessary to manage the Monitorship and assure careful tracking of Consent Decree implementation. The project management function is at the operational center of the Monitorship, receiving real-time progress updates from the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved. We owe a debt to the Justice Administration Division team for assisting with this work and for keeping us apprised of progress being made in departments across the County. The JAD team has also enabled access to Harris County's Office 365 system which has proven to be a highly functional information center offering a number of tools to enable ongoing exchange. Project management activities have centered around the following functions:

- Task Management and Milestone Tracking—Considerable effort has gone into creating the framework for tracking Consent Decree milestones. PPRI staff initially abstracted all of the key requirements into a summary document and determined associated due dates and responsible parties. Duke University law students conducted an independent review of the Consent Decree framework; areas of disagreement were discussed and resolved. As tasks are completed or changes approved, the record has been updated to remain current. This precise accounting of the work and its status is centrally important to ensure the Parties fully comply with the intent of the court.

37

Work products required by the Consent Decree have been memorialized in Office 365 using the Planner app.  "Buckets" exist for each part of the Consent Decree with tasks organized by the primary party; secondary parties with a support role are also flagged and can be filtered so everyone can easily identify their areas of responsibility.  In addition to the abstracted summary of each section of the Consent Decree, with a clickable link to the original language in case a more precise understanding of the paragraph is needed.  Tasks can be checked off as they are completed and those overdue are highlighted so they are easily identifiable.  A status summary of Consent Decree requirements due in this reporting period is presented in Appendix E.

- Meeting Scheduling and Communication Interface—A Team calendar is available for organizing face-to-face meetings online.  Since the Monitor was appointed on March 3, weekly meetings have been held to discuss important concerns, share ideas or feedback, offer updates, and keep Consent Decree activities on track. Weekly meeting summaries are posted and accessible to all the ODonnell participants.  PPRI creates a comprehensive record of topics from every call to maintain a common understanding of progress, and support mutual accountability.

- File-Sharing—Building on the technical capacity of Office 365, Sharepoint serves as a cloud-based repository of documents of project management system to facilitate information-sharing and coordination of activities among members of the team implementing the Consent Decree.  Files are assigned a "folder" tag indicating purpose. Categories include meeting notes, policies, administration, contractors, cost study, or other. Additional tags indicate the source or subject of each file.[28]  Where helpful, files may also contain a brief commented description of contents.

PPRI remains primarily responsible for monitoring Consent Decree milestones and dates and the functionality has been shared with the Parties.  They have been trained on how to use the available features and invited to request additional supports if planning and information needs are not being met.

---

[28] Sources include Commissioner's Court, County Judge, CCCL Courts, District Courts, Federal Court, Justice Administration Department, Pretrial Services, Prosecutor's Office, Public Defender, Sheriff/Jail, Duke University, PPRI, Vendors, or other.

## IV.  Community Outreach, Participation, and Working Group



We completed the above website to make Monitor-related documents and announcements available to the public online: https://sites.law.duke.edu/odonnellmonitor/. We have conducted a series of individual calls with stakeholders, as described, ranging from the District Attorney's Office, to public defenders, pretrial services, community nonprofits, and others.

The parties' planning on conducting public meetings, as set out in paragraph 91-92 of the Consent Decree, has been placed on hold, due to COVID-19. Assuming in-person public meetings are not feasible in the near future, we will conduct such meetings remotely in the next reporting period.

The key policies regarding the Consent Decree have been made available at the JPC and courthouse, as well as online, as set out in paragraphs 93-94. They are available at: https://jad.harriscountytx.gov/.

Second, we have convened a Community Work Group (CWG), consisting of a group selected to include a diverse set of Harris County stakeholders, to share our findings and solicit feedback on the implementation of the Consent Decree.  We have conducted three such meetings to date.  The Community Work Group members include: Hiram Art Contreras, Thao Costis, Allen Douglas, Guadalupe Fernandez, Tara Grigg Garlinghouse, Jay Jenkins, TK Koontz, Johnny Mata, Maureen O'Connell, Tim Oettmeier, and Sybil Sybille.  (Their biographical information is found on the Monitor website and in Appendix D.)

### First Community Work Group Meeting: May 8, 2020

Brandon Garrett and Sandra Guerra Thompson introduced themselves.  Prof. Garrett gave a presentation explaining the Consent Decree and the role of Monitor.  Members of the Community Work Group introduced themselves to each other and explored how their backgrounds would enhance the work of the Monitorship.

**Second Community Work Group Meeting: June 5, 2020**

At the second meeting, Prof. Thompson presented data prepared by Dr. Songman Kang (Monitor Team Member from Duke University) regarding the number of arrests of George Floyd protesters (totals, felonies, and misdemeanors) as well as the time before release for each group for each day from May 18-May 31.  The charts were used to illustrate the operation of Rule 9 and show the vast majority of people arrested were released either the same day or the following day.

Next, Brandi Ebanks Copes, the Harris County Justice Administration Department Racial Disparity and Fairness Administrator, presented demographic data by racial groups and showed the racial and ethnic disparities in Harris County as of 2018.  She also discussed various initiatives and community outreach efforts her office has started to address racial disparities in the criminal justice system.  CWG Members raised questions with Ms. Copes regarding the classification of Hispanics by law enforcement, and Ms. Copes explained that the gathering of data regarding ethnicity is an issue that her office is pursuing.

Monitor Team Member Dr. Dottie Carmichael (Texas A&M University Public Policy Research Institute) introduced her team and then described the pretrial cost study that her team is doing under the ODonnell Consent Decree.  CWG Member Douglas asked whether Dr. Carmichael's study was taking into account the private costs being incurred by groups like the organizations he represents that are investing heavily to reduce homelessness.  Dr. Carmichael offered to follow up with him after the meeting.

**Third Community Work Group Meeting: July 10, 2020**

Prof. Garrett presented data prepared by Dr. Songman Kang (Monitor Team Member) regarding the number of misdemeanor cases over time, how many people are getting personal bonds, and the amounts of cash bond.  He also discussed the work being done to watch bail hearing videos and work with county officials to improve various aspects of the hearing process.  CWG Member Fernandez inquired about the number of people facing ICE holds, and Mr. Bethke (Harris County Justice Administration Department) was able to provide the current number, which was 925.  Prof. Thompson commented on the other progress in Spanish translations of forms, websites, and court notifications via emails, text and voice mail.  Court notifications will also be done in Chinese and Vietnamese in the second phase of implementation.  Thompson noted that it had proved more challenging to change the collection of data to capture ethnicity, but it is something the Monitor team is still working on.

Jim Bethke, Director of the Harris County Justice Administration Department, introduced himself to the CWG and discussed his role in the management of projects under the ODonnell Consent Decree.  Jim Nutter, Chair of the Harris County Homeless Task Force, described the work of the Homeless Task Force which is a joint project of Harris County and the City of Houston. The Task Force will deploy approximately $65 million of funding for a comprehensive plan to address homelessness that includes rapid rehousing resources for 1,000 people, mental health case management, rental assistance for 1,700 people, and a homelessness diversion program.

Following Mr. Nutter's presentation, CWG Members discussed the problem that people with prior felony convictions are prohibited from most apartment rentals and from job opportunities.  CWG Member Sybille discussed the challenges people face in trying to locate housing and how it leads to other social problems, including re-arrest.  CWG Members Costis and Sybille discussed prior efforts to "ban the box," which are efforts to prohibit employers from asking about prior felony convictions on job applications.  Several CWG Members agreed to participate in a further subgroup on community reentry, especially focused on creating housing and work opportunities for people with prior criminal records.

## V.  Our Work in the Next Six Months

The next six months will be an important time for the implementation of a range of important requirements in this Consent Decree.  First, we noted that implementation of a range of policies will occur in the next time period, including court appearance notification and scheduling options, indigent defense planning, and training.  Second, we note that a series of data analysis, including regarding court appearance, merits outcomes, and further analysis of outcomes including recidivism, will occur in the months ahead, together with feedback on the county's work creating a fully functional data portal for misdemeanor cases.  Third, we have described upcoming community working group meetings and public meetings.  Fourth, we have described cost study and project management work to come, including detailing the additional Consent Decree requirements to be met in the next six months (Appendix F lists each such requirement).

We are grateful for the opportunity to serve as monitor in this important Consent Decree. We look forward to feedback on this report and the opportunity to provide additional analyses and updates at the end of our first year of work.

APPENDIX

**A. Monitor Team Bios**

**University of Houston Law Center**

**Sandra Guerra Thompson** is the Newell H. Blakely Chair and Criminal Justice Institute Director at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019. In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions. Her scholarly articles address issues such as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations. Professor Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project. Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

**Duke University**

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018. He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005. Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes. Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers. Garrett's research and teaching interests include criminal procedure, wrongful convictions, habeas corpus, scientific evidence, and constitutional law. Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers, law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures supported by the Laura and John Arnold Foundation. As part of an interdisciplinary grant from the Charles Koch Foundation, Garrett has founded and directs the Center for Science and Justice at Duke.

**Marvin S. Swartz, M.D.** is the Professor and Head of the Division of Social and Community Psychiatry, Director of Behavioral Health for the Duke University Health System and Director of the Duke AHEC Program. Dr. Swartz has been extensively involved in research and policy issues related to the organization and care of mentally ill individuals at the state and national level. He

was a Network Member in the MacArthur Foundation Research Network on Mandated Community Treatment examining use of legal tools to promote adherence to mental health treatment and led the Duke team in conducting the first randomized trial of involuntary outpatient commitment in North Carolina and the legislatively mandated evaluation of Assisted Outpatient Treatment in New York. He co-led a North Carolina study examining the effectiveness of Psychiatric Advance Directives and the NIMH funded Clinical Antipsychotics Trials of Intervention Effectiveness study.  He is currently a co-investigator of a study of implementation of Psychiatric Advance Directives in usual care settings, an evaluation of implementation of assisted outpatient treatment programs and a randomized trial of injectable, long-acting naltrexone in drug courts. Dr. Swartz has done a range of work regarding diversion from jail, including among populations of co-occurring substance abuse and mental health disorders. Dr. Swartz was the recipient of the 2011 American Public Health Association's Carl Taube Award, the 2012 American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research and the 2015 Isaac Ray Award from the American Psychiatric Association for career contributions to forensic psychiatry.

**Thomas K. Maher** will be joining the Center for Science and Justice on March 1,2020, as Executive Director.  Mr. Maher is currently the Executive Director for the North Carolina Office of Indigent Defense Services [IDS], a position he has held for 11 years. IDS is the state-wide agency responsible for administration and support of public defense in North Carolina.  Prior to become Director of IDS, Mr. Maher served as the Executive Director of the Center for Death Penalty Litigation, a non-profit that focused on representation in capital cases, and worked as a criminal defense attorney representing clients, both retained and appointed, in state and federal court.  As Director of IDS, Mr. Maher worked with local actors and a researcher in a pretrial release pilot in one judicial district, and developed a system for contracting with local lawyers to provide meaningful representation at first appearances and measuring the impact of representation on outcomes.  The system ensured that representation was meaningful by requiring that counsel met clients in a timely fashion, were given access to relevant information from the prosecutor, and had time to prepare for a hearing to address conditions of release.  IDS is currently working with parties to a federal law suit challenging pretrial release in another county to craft a system of meaningful pretrial representation for that county, which would be part of a proposed settlement of that litigation.  As Director of IDS, Mr. Maher also works with the IDS research staff on evaluating the effectiveness and cost of representation, works with IDS staff in developing new systems of representation, works with the UNC School of Government in providing effective training for public defenders, and works with judges, clerks, district attorneys, as well as public defenders and private counsel, in designing and implementing reforms designed to increase the quality of justice for clients who rely on public defense.

**Will Crozier, PhD.**  is a post-doctoral fellow at Duke Law School, having completed a Ph.D. in Psychology at City University of New York, John Jay College of Criminal Justice, with a focus on criminal justice outcomes and cognitive processes, including work on police interrogation. Research at Duke has included studies of drivers' license suspensions in North Carolina, plea bargaining outcomes, jury evaluation of forensic evidence, and eyewitness memory.

**Travis Seale-Carlisle, PhD.,**  is a post-doctoral fellow at Duke Law School, having completed a Ph.D. in Royal Hollaway University of London, with a focus on human memory and

43

decisionmaking. Research at Duke has included studies of jury evaluation of eyewitness evidence, felony data, plea bargaining outcomes, pretrial outcomes, and evaluation of pretrial services outcomes.

**Phil Cook, ITT/Sanford Professor of Public Policy and Professor of Economics and Sociology at Duke University.** Cook served as director and chair of Duke's Sanford Institute of Public Policy from 1985-89, and again from 1997-99. Cook is a member of Phi Beta Kappa, and an honorary Fellow in the American Society of Criminology. In 2001 he was elected to membership in the Institute of Medicine of the National Academy of Sciences. Cook joined the Duke faculty in 1973 after earning his PhD from the University of California, Berkeley. He has served as consultant to the U.S. Department of Justice (Criminal Division) and to the U.S. Department of Treasury (Enforcement Division). He has served in a variety of capacities with the National Academy of Sciences, including membership on expert panels dealing with alcohol-abuse prevention, violence, school shootings, underage drinking, the deterrent effect of the death penalty, and proactive policing. He served as vice chair of the National Research Council's Committee on Law and Justice. Cook's primary focus at the moment is the economics of crime. He is co-director of the NBER Work Group on the Economics of Crime, and co-editor of a NBER volume on crime prevention. Much of his recent research has dealt with the private role in crime prevention. He also has several projects under way in the area of truancy prevention. His book (with Jens Ludwig), *Gun Violence: The Real Costs* (Oxford University Press, 2000), develops and applies a framework for assessing costs that is grounded in economic theory and is quite at odds with the traditional "Cost of Injury" framework. His new book with Kristin A. Goss, *The Gun Debate* (Oxford University Press 2014) is intended for a general audience seeking an objective assessment of the myriad relevant issues. He is currently heading up a multi-city investigation of the underground gun market, one product of which is a symposium to be published by the *RSF Journal* in 2017. Cook has also co-authored two other books: with Charles Clotfelter on state lotteries (*Selling Hope: State Lotteries in America*, Harvard University Press, 1989), and with Robert H. Frank on the causes and consequences of the growing inequality of earnings (*The Winner-Take-All Society*, The Free Press, 1995). *The Winner-Take-All Society* was named a "Notable Book of the Year, 1995" by the *New York Times Book Review*. It has been translated into Japanese, Chinese, Portuguese, Polish, and Korean.

**Catherine Grodensky, M.P.H., PhD student,** was previously a project coordinator and research associate in the UNC Institute for Global Health and Infectious Diseases, where she coordinated NIH-funded primary research projects focused on health among those involved in the criminal justice system in the US. She coordinated multiple AHRQ-funded systematic reviews on prevention and treatment health topics with the RTI-UNC Evidence-Based Practice Center at the Cecil G. Sheps Center for Health Services Research. Since 2008, Ms. Grodensky held multiple roles on research projects focused on the health of North Carolina prison inmates, particularly in the areas of HIV testing, antiretroviral medication adherence, linkage to HIV care post-release, and access to Medicaid coverage. Currently she is a doctoral student in public policy at Duke, where she is researching policies driving high incarceration rates in the US criminal justice system, and conducting or directing empirical studies, including work examining plea bargaining practices and causes of court non-appearance.

44

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems.  Moreover, she is knowledgeable and experienced in the operation of local governments.  Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures.  Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019.  In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**George Naufal, PhD, Assistant Research Scientist.** Dr. Naufal is an assistant research scientist at the Public Policy Research Institute (PPRI) at Texas A&M University and a research fellow at the IZA Institute of Labor Economics. Previously he was the Technical Director at Timberlake Consultants. He was also an Assistant/Associate Professor of Economics at The American University of Sharjah (2007 to 2014) in the United Arab Emirates. George earned his PhD in Economics in 2007 from Texas A&M University. His area of expertise is applied econometrics with applications to labor economics including criminal justice, education, migration, demographics and unemployment. He is the co-author of "Expats and the Labor Force: The Story of the Gulf Cooperation Council Countries" (Palgrave Macmillan, 2012). He also has published several journal articles and book chapters. Dr. Naufal has secured more than $1.2 million in grant funding. His work has been cited by regional and international media outlets such as the New York Times, the Washington Post, and NPR.

**Heather Caspers, M.A., Research Associate.** Caspers is a Research Associate at the Public Policy Research Institute at Texas A&M University. Caspers earned her Bachelor's degree from Buena Vista University in criminology and psychology and her Master's degree from the University of Northern Iowa in social psychology.  Her primary focus over nearly a decade at PPRI has been on criminal justice related projects with nine studies focusing on the cost and quality of indigent defense and pretrial practices in Texas.

As a task leader in PPRI's study on behalf of the Office of Court Administration titled *Liberty and Justice: Pretrial Practices in Texas*, Caspers was responsible for compiling much of the data needed to calculate costs of bond practices Travis and Tarrant Counties, and for developing and documenting strategies for extracting cost estimates.  Her work is documented in the report's technical appendix including specific formulas to calculate each cost applied in the investigation. Similarly, Caspers was a lead team member in a second investigation of pretrial risk assessment in Nueces County. She conducted qualitative interviews with key stakeholders to understand the processes underlying the data.  She then managed the collection of risk assessment data, and wrote portions of the final report.  Caspers is an asset to the current proposed monitoring effort, possessing possesses extensive knowledge of survey programming, data cleaning, quantitative data analysis, literature reviews, and program evaluation.

## B. Organizational Chart



## C. Community Work Group Bios

**Hiram "Art" Contreras,** served for 36 years in the Houston Police Department, starting as a patrol officer and ultimately becoming the first Hispanic to attain the rank of Assistant Chief. Chief Contreras founded HPD's Organization of Spanish-Speaking Officers and started the Department's Cultural Awareness Program.  While working for HPD, he also mentored other

Latino officers who are now well-known in the city.  In 2015, Houston's City Council approved a measure to rename the Northeast HPD station after him.  Earlier in his career, Chief Contreras had led that station as a captain and made important changes, becoming a well-respected figure in the neighborhood.  After retiring from HPD, President Bill Clinton appointed him as U.S. Marshal for the Southern District of Texas.  He has served on several community boards including for the Houston Forensic Science Center, Inc. and the Career and Recovery Resources, Inc., and received numerous awards for his volunteer work.

**Thao Costis** is President and CEO of SEARCH Homeless Services, a leading Houston agency helping people move from the streets, into jobs, and safe, stable housing.  During her 24-year tenure, she has focused on how SEARCH can best help people who are homeless transform their lives, improve their health, and change how the community addresses this problem.  Prior to SEARCH, she worked at the Coalition for the Homeless of Houston/Harris County where she brought together 150 not-for-profit agencies to coordinate their efforts.  Thao has a bachelor's degree in accounting from the University of Texas and an MBA from University of Houston

**J. Allen Douglas** currently serves as the Executive Director of the Downtown Redevelopment Authority and general counsel for the organization its related entities, Central Houston, Inc., and the Houston Downtown Management District. His community service activities include serving as the Vice-Chair of the Midtown Management District Board of Directors.  From February to August of 2019, he served as Harris County Associate County Attorney.  He spent six years in private practice with the law firm of Littler Mendelson, P.C. and had previously also worked for ten years as Career Law Clerk to a federal district court judge in the Northern District of Ohio from 2002 to 2012.

**Guadalupe Fernández** serves as the Policy and Advocacy Manager for the Tahirih Justice Center's Houston Office.  She is responsible for leading the development and advancement of Tahirih's local and state-wide advocacy projects that directly impact immigrant survivors of violence. She has worked with immigrant victims of violence who have engaged in the criminal legal process on both sides – as victims/witness and as defendants on cases. As a result, she is aware of how the criminal legal process, as it exists often impacts immigrants, victims, and communities of color in dipropionate ways and how the stakes and consequences for these communities are often high given their experiences.  Guadalupe is a Fully Accredited Representative through the Department of Justice and is allowed to practice before both DHS and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals.

**Jay Jenkins**, J.D., a Magna Cum Laude graduate of Northwestern Law School, works as a Project Attorney for the Texas Criminal Justice Coalition in Houston, where he heads TCJC's Harris County Criminal Justice Project. Since his start in 2014, he has worked to amplify the community's voice in criminal justice policy, including supporting the Harris County Public Defender's Office, where he has focused on interactions between citizens and law enforcement, while also mobilizing a diverse group of faith leaders in support of juvenile justice reform in Harris County. Jenkins has also authored and edited numerous policy papers and comprehensive reports supporting broader criminal justice reforms throughout the county. Jenkins continues to advise policy makers at every level of government, serving on Harris County's MacArthur Grant Planning Committee, Mayor

47

Turner's Criminal Justice Transition Committee, and the State of Texas Judicial Council's Advisory Board on Pretrial Justice.

**Terrance "TK" Koontz** serves as Community Engagement Coordinator in the office of Harris County Precinct One Commissioner Rodney Ellis.   On March 1, 2020, he joins the Texas Organizing Project's Right 2 Justice. He has worked to mobilize communities of color throughout the city for years, most recently for organizations like Texans Together, SEIU, and Working America, and the Texas Organizing Project. His path to organizing began after his arrest in 2010 when he observed the suffering of black and brown inmates. Recently, TK led a field team that significantly impacted the 2018 Fort Bend County D.A.'s race, which resulted in the election of the first African American D.A. in Fort Bend's history.

**Johnny Mata** is the founder and presiding officer of the Greater Houston Coalition for Justice, a group comprised of 24 local organizations dedicated to improving the local criminal justice system.   In recent years, he has organized meetings and press conferences to address the Harris County pretrial justice system.  He is currently organizing a Town Hall scheduled for February 6, 2020, to inform the community about the changes under the *ODonnell* Consent Decree.  Mata became widely known as an activist while helping organize key protests following the killing of Joe Campos Torres by a group of Houston police officers in 1977. He is a U.S. Army veteran who retired after three decades as a staff member of the federally-funded Gulf Coast Community Services Association.  He is most widely known as a leader and community activist for over 40 years with the League of United Latin American Citizens (LULAC). Mata served two terms as Texas State Director for LULAC, among other leadership positions within the organization. One of his most significant achievements was the creation of the Latino Learning Center, Inc., a nonprofit he co-founded in 1979 that provides vocational training and other services to low-income communities in Houston.

**Sister Maureen O'Connell,** M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; more than 40   years as a Dominican Sister, a Catholic religious community known for its commitment to social justice. She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director for 17 years. She retired in 2018 and joined the Board of Directors in 2019.

**Timothy N. Oettmeier**, Ph.D. in Police Administration, until his retirement in 2016, served the public as a member of the Houston Police Department (HPD) for over 42 years, most recently as Executive Assistant Chief of Police assigned to the Investigative Operations Command.  During his career, he worked in a variety of significant assignments including: chief of staff for the Field Operations Command, Director of Training, City of Houston's Inspector General, Assistant Chief over the Internal Affairs Division, Executive Assistant Chief over the Field Operations Command, Executive Assistant Chief of Support Operations, and Acting Chief of Police.  Within HPD, Chief Oettmeier oversaw several important administrative research projects including: work demands

analysis, resource allocation strategies, patrol management strategies, calls for service management, investigative management strategies, beat reconfiguration, field training/mentoring initiatives, accreditation, problem solving, and performance evaluation methodologies. He was one of the department's principal architects for developing and implementing community policing throughout the agency.

A national leader in policing research, Chief Oettmeier served as a Project Director or principal member of several national police research initiatives funded by the National Institute of Justice involving topics such as: fear reduction, organizational change, criminal investigations, cultural diversity, measuring what matters, and training. He has published articles for textbooks, magazines, and journals on various police management issues. Early in his career, the 100 Club of Houston recognized him as an Officer of the Year. Tim has been the recipient of the prestigious Police Executive Research Forum's annual, national Gary P. Hayes Award in recognition of his outstanding initiative and commitment in furthering the improvement of the quality of police services. He has also received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from The 100 Club of Houston.

**Sybil Sybille**, a military veteran, is a survivor of childhood sexual violence and stabbing, as well as sexual assault in the military. During her life, she nearly died of drug overdoses on seven occasions. Convicted of organized crime, she served time in a Texas prison. Since her release, she completed a college certificate program and was certified in 2015 by the Texas Department of Health Services to provide Peer Recovery Coach Training. In 2017, she received a training certificate in Veterans Court Advocacy and Mentoring for Peers. In 2018, she was a graduate of the Texas Southern University Anthony Graves Smart Justice Speakers Bureau. In 2019, Sybille was named a Fellow for Texas Advocates for Justice and Grassroots.org. Through that work she has testified before the Texas legislature regarding a bill to support trauma-informed training for staff within the criminal justice and juvenile justice systems. She is currently working on a portfolio to advocate for "banning the box" to eliminate the check box on job applications which requires disclosure of criminal convictions. She believes this practice poses the greatest barrier for those reentering society.

## D. Year 1 Statement of Work

### Task I: Policy Assessment and Reporting

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree. A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 1, the Monitor will be producing reports, including: a Monitor Plan in the first sixty days, a Monitor Report at six months, and a second report at the year's end. The Monitor will be analyzing data from the county and reporting on these data in reports and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

**Task I:1. Provide Feedback on County Plans and Assessments**

Begin meetings/calls with the parties to discuss progress under Consent Decree. **[We note that weekly calls have begun as well as additional calls to discuss specific tasks].**

Secure access to data, including jail data, court data, hearing videos, and judicial opinions, and begin organizing material for analysis. **[We note that we have received hearing videos from 2018 and 2019, as well as daily jail rosters; the County is working on facilitating access to more complete data for analysis].**

Defendants confer and agree on the key policies to be summarized and made available at the Harris County Joint Processing Center and Harris County Criminal Justice Center. The Monitor will resolve any disputes about the length and content of the summary.

Monitor approves plans for County to retain outside researchers to study topics such as causes of nonappearance, indigent defense, court forms. **[We have already reviewed and approved a series of such plans].**

Monitor develops the Monitoring Plan for conducting compliance reviews and audits for the first year of implementation and shares it with the parties for review and comment.

Monitor reviews plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

**Task I:2. Complete First Six-month Report**

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Initial analysis of data.

The Monitor provides feedback on the Training Plan developed for judges and defendants' agents; Monitor receives and evaluates report by Judges on CCCL plan.

The Monitor will receive by this time updated forms for review and approval.

The Monitor consults concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

Incorporate work into first six-month Monitor Report.

**Task I:3. Provide Feedback on County Plans and Assessments**

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Provide feedback to Parties on each of these plans and assessments.

Continue data collection and analysis.

**Task I:4. Complete Second Six-month Report**

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Continue data collection and analysis.

Conduct follow-up analysis and secure access to follow-up data.

Develop surveys or other qualitative evaluation tools may be used to assess compliance and efforts, such as training programs, under this Consent Decree.

Incorporate work into second six-month Monitor Report.

**Project Timeline and Staffing.**

This work will be conducted between March 3, 2020 and March 2, 2021.

**Monitor Team Personnel:**

- **Brandon Garrett** (Duke Law School)

- **Thomas Maher** Executive Director, Center for Science and Justice (Duke Law School)

- **Post-doctoral Fellow / Data Programmer** Center for Science and Justice (Duke Law School) (**Prof. Songman Kang** will conduct data analysis work for the Center).

- **Research assistants** (Duke Law School and University of Houston Law Center)

- **Philip J. Cook** (Sanford School of Public Policy, Duke University)

  **Travel:**

- Travel: travel to Houston for Duke University Team Members.


**Task II: Cost Study and Project Management**

The Public Policy Research Institute (PPRI) at Texas A&M University will evaluate the cost impacts of bail reform in Harris County. There are a range of costs in the pretrial context, and not only the costs of detention, recidivism, court costs, costs of non-appearance, but also the costs of physical injury in jail, harm to physical and behavioral health, to families and communities, and the criminogenic harm of pretrial detention. The Monitor team will assess each of those costs to determine what are the most cost-effective methods of realizing priorities under the Decree. This work will be led by the Public Policy Research Institute (PPRI) at Texas A&M University, a leading interdisciplinary government and social policy research organization. PPRI will also lead the project management efforts of the team.

**Task II:1.  Implement and Maintain Project Management Protocol**

Identify and implement a cloud-based project management system to facilitate information-sharing and coordination of activities among members of the team implementing the Consent Decree.

Share information on how to use features with ODonnell team and solicit feedback and requests to meet needs of users. Functionality will at least include file-sharing, meeting scheduling, centralized calendaring, milestone tracking, and online meetings.

**Task II:2.  Produce Year One Cost Analysis Plan**

Identify a menu of informative and useful potential targets for early cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources as appropriate.

Solicit input from parties engaged in implementing the Consent Decree to finalize the year-one cost-analysis agenda.

Continue Project Management work.

Incorporate work into first six-month Monitor Report.

**Task II:3. Year-One Cost Data Acquisition**

Identify data sources appropriate to answer research questions prioritized in the Year-One Cost Analysis Plan. To the extent possible, data will be extracted from existing Harris County information systems.

Identify alternative strategies to estimate costs or develop estimates where individual-level cost records are unavailable. These may include extracting average expenditures from aggregate budget records (e.g., to estimate court or prosecution costs), collecting new data (e.g., from planned defendant surveys), or applying cost estimates validated by government agencies or in the academic research literature.

Continue Project Management work.

**Task II:4. Produce Prelimary Year One Cost Analysis Report**

Generate a written report summarizing results from initial analysis of cost data summarized in written Year One Cost Analysis Report.

Continue Project Management work.

Incorporate work into second six-month Monitor Report.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2020 and March 2, 2021.

- **Texas A&M, Public Policy Research Institute (PPRI)** will conduct a multi-year evaluation

- **Dottie Carmichael** (Research Scientist, Texas A&M University, PPRI)

- **George Naufal** (Economist, Texas A&M University, PPRI)

Staffing changes include the following:

- **Zachariah Bratain** will replace **Heather Caspers** (Project Manager, Texas A&M University, PPRI)

- **A new hire** will replace **Bethany Patterson** (Data Analyst, Texas A&M University, PPRI)

- Travel: to Houston for Texas A&M University Team Members

**Task III: Community Outreach, Participation, and Working Group**

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders.  The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

**Task III:1. Initial Public Outreach and Participation**

The Monitor Team develops Monitoring Plan and sets out plans for outreach and participation for the first year.

Convene first meeting of Community Working Group (CWG).

Begin set up of Houston office.

The Monitor Team builds a Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

### Task III:2. First Public Meeting, First Six-month Report

The Monitor Team reaches out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

The Monitor Team will review County's plan for public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Incorporate work into first six-month Monitor Report.

Updates to Monitor website.

### Task III:3. Convene CWG and Solicit Additional Public Input

The Monitor Team further reaches out, with the guidance of the CWG, to local organizations and community groups, including to share results of first Monitor Report.

Convene experts at conference at Houston Law.

Updates to Monitor website.

### Task III:4. Second Public Meeting, Second Six-month Report

Second public meeting convened.

Monitor Team outreach, with the guidance of the CWG, to local organizations and community groups.

Incorporate work into second six-month Monitor Report.

Updates to Monitor website.

### Project Timeline and Staffing

This work will be conducted between March 3, 2020 and March 2, 2021.

- **Sandra Guerra Thompson** (University of Houston Law Center)
Office Space, Equipment and Support:

- Office supplies: paper, pens, notepads in the Houston office space. We would plan to use the office space provided pursuant to the decree because of its central and accessible location, as well as an office phone, laptop computer and printing equipment and IT support for computer use, meetings via Zoom, and phone conferences.  We would need a meeting room with sufficient space for periodic Community Working Group meetings and meetings with stakeholders or researchers.

- Parking: A parking budget for downtown parking for the Monitor Team and twelve Community Working Group members (12 meetings per year).

- **Houston Office Assistant**
- **Houston Investigator**

**Houston Conference Costs:**

- Administrative support, food, publicity, space rental
- Travel: to Houston for Prof. Thompson (from vacation home).

**Deliverables**

| Deliverable I | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task 1:1.</u> Begin meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Secure access to data.<br><br>Monitor approves plans re. e.g. nonappearance, indigent defense, court forms.<br><br>Monitor develops Monitoring Plan.<br><br>Monitor reviews indigent defense services plans.<br><br><u>Task II:1.</u>   The Monitor Team (PPRI) develops Project Management protocol and makes it accessible to facilitate information-sharing among the parties.<br><br><u>Task III:1.</u>  Monitoring Plan re. outreach and participation for the first year.<br><br>Convene first meeting of Community Working Group (CWG).<br><br>Begin set up of Houston office.<br><br>The Monitor Team build Monitor website. | June 1, 2020 | $154,424.75 |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task I:2</u>.  Continue meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Initial analysis of data.<br><br>Feedback on Training Plan .<br><br>Evaluates report by Judges on CCCL plan.<br><br>Monitor reviews and approves updated court forms.<br><br>Monitor reviews concerning data variables.<br><br>Incorporate work into first six-month Monitor Report.<br><br><u>Task II:2.</u>  The Monitor Team (PPRI) produces Year One Cost Analysis Plan for submission with first six-month Monitor Report<br><br><u>Task III:2</u>.  Community Outreach.<br><br>Review County's plan for public meetings.<br><br>Incorporate work into first six-month Monitor Report.<br><br>Updates to Monitor website. | August 20, 2020 | $166,951.75 |

57

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task I:3.</u>   Continue meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Review results of research by outside vendors.<br><br>Provide feedback to Parties on each of these plans and assessments.<br><br>Continue data collection and analysis.<br><br><u>Task II:3</u>.   The Monitor Team (PPRI) acquires and assembles datasets required to initiate Year One Cost Analysis<br><br><u>Task III:3.</u>   Outreach to share results of first Monitor Report.<br><br>Convene experts at conference at Houston Law.<br><br>Updates to Monitor website | November 28, 2020 | $140,348.75 |

58

| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task I:4.</u>   Continue meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Data collection and analysis.<br><br>Develop surveys or other qualitative evaluation tools.<br><br>Incorporate work into second six-month Monitor Report.<br><br><u>Task II:4.</u>  The Monitor Team (PPRI) produces Year One Cost Analysis Report<br><br><br><u>Task III:4.</u>  Second public meeting convened.<br><br>Monitor Team outreach, with the guidance of the CWG, to local organizations and community groups.<br><br>Incorporate work into second six-month Monitor Report.<br><br>Updates to Monitor website. | March 2, 2021 | $197,459.75 |

Total Year 1 Budget: $  659,185.00

## Current Status of Consent Decree Milestones

| ¶ | Due Date | Milestones | Status |
|---|----------|------------|--------|
| 99, 100, and 101a | 1/20/2020 | **Take Applications for Consent Decree Monitor** - The Parties will jointly select a Monitor with the appropriate expertise using an agreed-upon process. The Monitor may provide recommendations to the County for efficient and effective implementation of the Consent Decree.  Within 60 days from approval of the Consent Decree, the Parties will request proposals from qualified candidates interested in serving as the Monitor.  The period for receiving applications may be at least 30 days and no more than 60 days. | **STATUS:  Complete**<br>• January 30, 2020:  Monitor proposal submitted |
| 90 | 2/19/2020 | **Launch HCTX Consent Decree website** - The County will launch and maintain a publicly available Consent Decree Website, to be updated on an ongoing basis.  The website must provide information related to the *ODonnell* lawsuit including links to the Consent Decree, data the County is required to report and collect (¶ 88 and ¶ 89), and materials used for training. | **STATUS:  Complete**<br>• HCTX Consent Decree Website: https://jad.harriscountytx.gov/ODonnell-Consent-Decree<br>• Currently includes:<br>   ○ Consent decree<br>   ○ Year-One Monitoring Plan (¶ 116, due 5/2/20)<br>• Planned additional content includes at least the following required items:<br>   ○ All Monitor reports (¶ 122)<br>   ○ Web-based data platform (¶ 88, due 8/30/20) including information required in ¶ 89 to be posted on a timeline negotiated with the Monitor<br>   ○ Training plan and materials approved by Monitor (¶ 75-77, due 11/28/20) |
| 38 | 3/1/2020 | **Provide FY 20-21 PDO allocation > FY 19-20 approved budget** - The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. | **STATUS:  Complete**<br>• FY 2020-21 Public Defender Office Approved Budget |
| 53 | 3/1/2020 | **Allocate $250,000 Year 1 to support court appearance** - The County must allocate $250,000 annually beginning in FY 20-21 to assist and support misdemeanor arrestees in making court appearances.  Use of funds is at the County's discretion with approval from the Monitor and input from Class Counsel.  The | **STATUS:  Complete**<br>• FY 2020-21 Public Defender Office Approved Budget<br>   ○ Use of funds has not been determined, pending Monitor approval with input from Class Counsel |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| | | allocation cannot fund law enforcement, jailing, or liberty-restricting conditions of pretrial release. | |
| 103 | 3/3/2020 | **Monitor's Budget:  Year 1** - The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. | **STATUS:  Complete**<br>• February 21, 2020:  Monitor's deliverable-based budget submitted<br>• April 28, 2020:  Monitor's budget approved by Harris County Commissioner's Court |
| 104 and 105 | 3/3/2020 | **Provide Monitor supports** - The County will provide the Monitor with office space and reasonable office support.  The Monitor may hire, employ, or contract reasonably necessary additional persons or entities. | **STATUS:  Complete** |
| 101b and 102 | 3/31/2020 | **Recommend Consent Decree Monitor** - Within 30 days from the close of applications, the Parties will review applications, interview candidates, and recommend a candidate to the Court for appointment.  If the Parties are unable to agree on a Monitor, the Court will consider the Parties' submissions and choose a candidate. | **STATUS:  Complete**<br>• March 3, 2020:  Monitor appointed by the Federal Court |
| 93 and 94 | 5/2/2020 | **Year 1: Summarize and post key policies** - Defendants will confer and agree on the key policies to be summarized and made available online, at the Harris County Joint Processing Center, and at the Harris County Criminal Justice Center and must be translated into each language required to provide a ballot under Section 203 of the Voting Rights Act of 1965. The Monitor will resolve any disputes about the length and content of the summary. | **STATUS:  In Process**<br>• Key policies agreed by the Defendants are currently posted on the HCTX ODonnell Consent Decree website (https://jad.harriscountytx.gov/ODonnell-Consent-Decree).  They include:<br>  o Summary of the ODonnell Consent Decree<br>  o CCCL Judges' Local Rule 9 (as incorporated into the Consent Decree)<br>  o Summary of planned improvements to written and electronic court appearance notifications<br>  o Excerpts from court appearance sections 58-70<br>  o Monitor contact information (to be included in English and translated policy summary documents)<br>• Remaining work includes:<br>  o Translation of court appearance policy excerpt<br>  o Posting of policy summaries online, at the JPC, and at the CJC |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| 116 | 5/2/2020 | **Submit Monitoring Plan: Year 1** - Monitor will develop a Monitoring Plan for conducting compliance reviews and audits for the first year of Consent Decree implementation and will share it with the parties for review and comment. The Parties will have 30 days to provide comments or objections.  The plan must contain a schedule with target dates for conducting reviews or audits of applicable requirements, and be posted on the County's Consent Decree Website. | **STATUS:  Complete**<br>• May 1, 2020:  Year 1 Monitoring Plan Complete |
| 39 and 40 | 5/19/2020 | **Set policies presuming waiver of fees and indigent appointment** - Any indigent misdemeanor arrestee may not be charged any fees as a condition of pretrial release and is presumed eligible for court-appointed counsel.  Any judicial officer presiding at the 15.17 hearing must appoint the Public Defender to represent an arrestee requesting counsel during a misdemeanor bail hearing. | **STATUS:  Complete**<br>• Rule 9.11:  Arrestees subject to a bail hearing must be represented by the Public Defender, other court-appointed counsel, or a retained attorney.<br>• Rule 9.12.8:  Indigent arrestee may not be charged any fee associated with conditions of release. |
| 42 | 5/19/2020 | **Set scheduling policies allowing for effective bail defense** - CCCL judges must adopt scheduling policies to ensure zealous and effective defense counsel representation at bail hearings. | **STATUS:  Complete**<br>• June 4, 2004:  CCCL Judges posted proposed docket times to be implemented June 15, 2020<br>• Future modifications may occur for system improvement or in response to recommendations emerging from the holistic defense study (¶ 41b, due 11/15/20) |
| 45 | 5/19/2020 | **Amend indigent defense policies per Local Rule 9** - CCCL Judges, in consultation with the Monitor, will amend indigent defense policies to reflect Local Rule 9 and the Consent Decree. | **STATUS:  Complete**<br>• In consultation with the Monitor, indigent defense policies are consistent with Rule 9.<br>• Future modifications may occur for system improvement or in response to recommendations emerging from the holistic defense study (¶ 41b, due 11/15/20) |
| 36 | 7/1/2020 | **Update databases and inform stakeholders re: unsecured GOB** - County databases must be updated to clearly indicate that a General Order Bond is a personal bond for which the underlying amount is unsecured.  The same information must be communicated internally and to other jurisdictions.  The County presents the plan to the Monitor for approval. | **STATUS:  In Process**<br>• Universal Services estimates database updates and notification to jurisdictions that a GOB bond is unsecured can be complete by April 2021<br>• As an interim solution, the Sheriff can add language in the teletype sent to external counties who may arrest a person on a warrant, though this has not yet occurred. |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| 115 and 118 | 7/21/2020 | **Submit Draft Monitor's Report:  Year 0.5** - Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in ¶ 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.  Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. | **STATUS:  Complete** <br> July 21, 2020:  Draft Year 0.5 Monitor Report submitted for review by the Parties. |
| 48d-e | 8/30/2020 Extension requested to 11/15/20 | **Submit court date notification forms to Monitor for review** - The County will submit redesigned court date notification forms to the Monitor for review. Defendants will work with the Monitor to ensure at least information required by ¶ 48(a) is available to arrestees.  Any future amendments must be implemented within 60 days of approval by the Monitor and the updated forms must be the only ones used. | **STATUS:  In Process** <br> • Proposed philanthropic funding to design court date notification forms was withdrawn. <br> • JAD is currently finalizing a contract for the selected vendor, Ideas42. With the cost of the services proposed at less than $50,000, JAD has requested expedited procurement. <br> • OCM is currently planning preliminary revisions to the form with final evidence based language to be determined in consultation with the vendor. |
| 49 and 50a-e | 8/30/2020 Extension requested to 11/15/20 | **Submit court appearance reminder system design for Monitor review** - The County will consult existing research and best practices to design text- and telephone-based court appearance reminder services and opt-out process for misdemeanor arrestees with a telephone number on file.  Reminders must contain information specified in ¶ 50b.  If reminders are delivered by one-way text reminder system, it must study the potential efficacy of a two-way system in promoting court appearance.  Proposed substance, format, timing, and frequency of text- or telephone-reminders and the opt-out process must be submitted for review by the Monitor within 180 days of Monitor appointment. | **STATUS:  In Process** <br> • Proposed philanthropic funding to design an automated court appearance reminder service was withdrawn. <br> • JAD is currently developing a procurement to select a vendor to design the text- and telephone-based court date reminder system. |
| 58 | 8/30/2020 | **Implement court date request/notification technology** - The County and CCCL Judges will work with the Monitor to identify effective technology for misdemeanor arrestees or counsel to request a new court date or be informed of newly set dates without having to appear in person. Notice of new court dates | **STATUS:  In Process** <br> • Text- and phone-based court date reminder and request system is still in the planning phase and is contingent upon vendor design recommendations (¶ 49-50) |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| | | must be provided via text and telephone reminders (¶ 49-50) to arrestees and appointed or retained defense counsel. A record of notice must be preserved in the case file. The County must also provide an in-person option for rescheduling a court date during regular business hours. | • Functionality will be implemented in 2 parts, delivering texts directing people to the DCO website until the rescheduling website is fully developed (see 7/9/20 call notes)<br>• When full functionality required by the CD is available, online court-date scheduling can be synced with phone- and text-based court notification systems (¶ 49-50) through JWeb.<br>• A request for a deadline extension to develop and maintain a court date notification/change website (¶ 57, due 9/21/20; extension requested to 12/15/20) has been submitted to the Monitor and Plaintiffs and filed with the court. |
| 59 | 8/30/2020 | **Hold weekly Open Hours Court** - CCCL Judges will hold an Open Hours Court in a designated judge's courtroom at least one day each week on a predictable schedule posted in the courthouse, at the jail, on the updated form for written court notifications (¶ 47-48) and on the website (¶ 57) | **STATUS:  In Process**<br>• Open Hours Court implementation plan is complete and awaiting approval by a vote of the CCCL Judges.<br>• Earliest possible start date will be 9/3. Until then, defendants can appear in their assigned court to request a docket reset at any time.<br>• Remaining work includes:<br>  ○ Initiating operation of Open Hours Court<br>  ○ Posting Open Hours Court hours on written court date notification forms (¶ 47-48, due 9/21/20; extension requested to 11/15/20). |
| 61, 62, 65, 66, 67, 68, 69 | 8/30/2020 | **Publicly post appearance, rescheduling, and warrant policies** - Notice of the CCCL Judges' appearance, rescheduling, and warrant policies must be provided on the updated form for written court date notification (¶ 47-48) and on the website (¶ 57).<br><br>Judges' policies posted must make specific provisions for a 72-hour post-arrest appearance buffer (¶ 62), waiver of appearance (¶ 65), rescheduling in advance of the court date (¶ 66), and issuance of a warrant for nonappearance at a regular setting (¶ 67) or a first setting or required appearance (¶ 68), and rescheduling after a warrant has been issued (¶ 69). | **STATUS:  In Process**<br>• CCCL judges have approved appearance, rescheduling, and warrant policies based on the Consent Decree<br>• Policies have been posted on the District Clerk's court date scheduling website (¶ 57, due 9/21/20).<br>• Remaining work includes:<br>  ○ Posting policies on written court date notification forms (¶ 47-48, due 9/21/20; extension requested to 11/15/20) |

| ¶ | Due Date | Milestones | Status |
|---|----------|------------|--------|
| 64 | 8/30/2020 | **Publicly post information about Open Hours Court** - If Open Hours Court is rescheduled from time to time, the change must be advertised on the County court date scheduling website at least 30 days in advance.  Location of Open Hours Court must be advertised on the updated form for written court notifications (¶ 48a) and on the website (¶ 57).<br><br>Any misdemeanor arrestee who has missed a court appearance can reschedule at Open Hours Court with assistance from public defenders or private appointed counsel.  This program must also be advertised on the updated form for written court notifications (¶ 48(a)) and on the website (¶ 57). | **STATUS:  In Process**<br>• CCCL judges have approved Open Hours Court policies based on the Consent Decree<br>• Remaining work includes:<br>  ○ Posting OHC opening date, times, and location (¶ 59, due 8/30/20) on written court date notification forms (¶ 47-48, due 9/21/20; extension requested to 11/15/20)<br>  ○ Posting OHC location on court date scheduling website (¶ 57, due 9/21/20).<br>• A request for a deadline extension to develop and maintain a court date notification/change website (¶ 57, due 9/21/20; extension requested to 12/15/20)  has been submitted to the Monitor and Plaintiffs and filed with the court. |
| 70 | 8/30/2020 | **Publicly post how to reset nonappearance warrants issued prior to January 1, 2019** - Misdemeanor arrestees with outstanding warrants for nonappearance issued before January 1, 2019 may appear or use rescheduling procedures to have the warrant recalled and receive a new court date without arrest. This must be advertised on the website (¶ 57), in the joint processing center, and as determined by the County (e.g., radio/television). | **STATUS:  In Process**<br>• CCCL judges have approved policies to reset nonappearance warrants based on the Consent Decree<br>• Remaining work includes:<br>  ○ Final policies will be posted on written court date notification forms (¶ 47-48, due 9/21/20; extension requested to 11/15/20)<br>  ○ Posting nonappearance warrant reset policy on court date scheduling website (¶ 57, due 9/21/20).<br>• A request for a deadline extension to develop and maintain a court date notification/change website (¶ 57, due 9/21/20; extension requested to 12/15/20)  has been submitted to the Monitor and Plaintiffs and filed with the court. |
| 71 | 8/30/2020 | **Record non-appearance/FTA electronically.**  CCCL Judges must record FTAs in an electronic, machine readable format. | **STATUS:  In Process**<br>• OCM's court appearance data entry and tracking system is still in the design phase.  The system will capture warrants, bond forfeitures, and FTAs per Consent Decree.<br>• Completion is contingent upon comprehensive justiceagency database changes required for the court |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| | | | date notification/change website (¶ 57, due 9/21/20; extension requested to 12/15/20). |
| 73 and 74 | 8/30/2020 | **Procure optional training plan consultant** - Defendants may, in consultation with the Monitor, engage a consultant or technical assistance provider with expertise and experience in pretrial systems and practices to help develop an ongoing Training Plan for CCCL Judges, Defendants' agents and employees implementing Local Rule 9, and for public defender and private appointed defense counsel. | **STATUS:  Complete** <ul><li>6/22/20:  Vendor proposals to develop Consent Decree training plan submitted</li><li>7/17/20:  Anticipated vendor selection date</li></ul> |
| 81, 82, 84, and 85 | 8/30/2020 | **Provide data for Monitor to evaluate Consent Decree implementation** - Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶89.<br><br>If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | **STATUS:  In Process** <ul><li>In coordination with the Monitor, JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree.</li><li>Data is being posted for access by the Monitor team through the Office 365 PowerBI app.</li><li>Remaining work includes:</li><li>Exemption request for infeasible variables</li></ul> |
| 83 | 8/30/2020 Extension requested to 11/15/20 | **Make Consent Decree data publicly available** - The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  In Process** <ul><li>In coordination with the Monitor, JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree (¶ 81-85, due 8/30/20)</li><li>Upon completion of data assembly and cleaning, raw data will be available for public download on the HCTX Consent Decree Website:  https://jad.harriscountytx.gov/ODonnell-Consent-Decree</li><li>A request for deadline extension to implement a process for public data access has been submitted to the Monitor and Plaintiffs and filed with the court.</li></ul> |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| 86 | 8/30/2020 | **Begin collecting nonappearance data electronically** - Defendants, in consultation with the Monitor and any TA providers deemed necessary, will begin collecting and maintaining data concerning nonappearances and failures to appear by misdemeanor arrestees in a standardized electronic format and using a process approved by the Monitor. | STATUS:  In Process<br>• OCM's court appearance data entry and tracking system (¶ 71, due 8/30/20) is still in the design phase.<br>• The system will capture warrants, bond forfeitures, and FTAs per Consent Decree.<br>• Completion is contingent upon comprehensive justice agency database changes required for the court date notification/change website (¶ 57, due 9/21/20; extension requested to 12/15/20). |
| 87 | 8/30/2020 | **Begin generating 60-day data reports** - Defendants will begin generating reports every 60 days that post information specified in ¶ 89 on the public website (described in ¶ 90) unless they don't yet collect the data—in which case they work with the Monitor to determine a timeline for appropriate collection.  Reports may be generated by the Monitor, a subject-matter expert, or a TA provider experienced in large datasets. | STATUS:  In Process<br>• In coordination with the Monitor, JAD staff are currently integrating data variables from multiple Harris County departments required to permit tracking, analysis, and reporting required by the Consent Decree (¶ 81-85, due 8/30/20)<br>• Upon completion of data assembly and cleaning, raw data will be available for public download<br>• A request for deadline extension to implement a process for public data access ((¶ 83, due 8/30/20) has been submitted to the Monitor and Plaintiffs and filed with the court. |
| 88 | 8/30/2020 | **Develop web-based Data Platform** - The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | STATUS:  In Process<br>• In coordination with the Monitor, JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree (¶ 81-85, due 8/30/20)<br>• A draft data platform spreadsheet is currently posted on the Parties' shared data drive.<br>• Upon completion of data assembly and online report development, a public-facing interface will be posted on the HCTX Consent Decree Website: https://jad.harriscountytx.gov/ODonnell-Consent-Decree<br>• A request for deadline extension to implement a process for public data access ((¶ 83, due 8/30/20) has been submitted to the Monitor and Plaintiffs and filed with the court. |

| ¶ | Due Date | Milestones | Status |
|---|---|---|---|
| 117 | 9/3/2020 | **Publish Monitor's Report:  Year 0.5** - Monitor will file with the Court, and the County will publish, written public reports on compliance. | **STATUS:  Complete** |

**Consent Decree Milestones in the Next Six-Month Reporting Period**

| ¶ | Due Date | Milestones |
|---|---|---|
| 117 | 9/3/2020 | **Publish Monitor's Report:  Year 0.5** - Monitor will file with the Court, and the County will publish, written public reports on compliance. |
| 41a | 9/21/2020 Extension requested to 12/15/20 | **Provide support staff for private apptd. counsel at bail hearing**  - CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. |
| 41b | 9/21/2020 Extension requested to 11/15/20 | **Retain expert to assess need for holistic defense services** - The County will retain a holistic indigent defense expert to evaluate current systems and assess need for essential services. |
| 43 and 44 | 9/21/2020 Extension requested to 12/15/20 | **Develop written plan for essential defense counsel supports** - Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer.  The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. |
| 48a-c | 9/21/2020 Extension requested to 11/15/20 | **Redesign court date notification forms to reduce nonappearance** - Defendants will update court date notification forms to incorporate evidence-based design practices to reduce nonappearance as specified in ¶ 48a.  The County may engage technical assistance providers to assist.  Forms may be updated at any time as needed with advice of technical assistance providers and the Monitor.  Updated forms must be the exclusive forms used to provide notification of court dates. |
| 51 and 52a-d | 9/21/2020 Extension requested to 12/15/20 | **Engage researchers to study nonappearance** - The County will engage researchers to study primary causes of nonappearance in the CCCL and recommend cost-mitigating policy and program solutions.  The study must meet criteria specified in ¶ 52 a-e.  The County will make researchers' written findings and recommendations available to the public and upon request as soon as practicable after publication. |
| 57 | 9/21/2020 Extension requested to 12/15/20 | **Create a court date scheduling website** - County must develop and maintain a website where misdemeanor arrestees can access court dates, times, location, attorney info, whether the appearance is required or regular.  The website must include options for rescheduling court dates with updates accurate within 24 hours of being scheduled. |
| 72 | 9/21/2020 Extension requested to 12/15/20 | **Report to Monitor on court appearance policy** - CCCL Judges will evaluate local policies relating to court appearance to determine whether they can authorize more misdemeanor arrestees with counsel to waive personal appearance at more hearings.  A report will be provided to the Monitor and Class Counsel regarding their process used and the conclusions reached. |

| ¶ | Due Date | Milestones |
|---|---|---|
| 91 | 9/21/2020 | **Submit Plan for Conducting Public Meetings** - Defendants will submit a plan to the Monitor for conducting regular public meetings that conform with requirements in ¶ 92. |
| 46 | 10/29/2020 | **Provide court date notification forms to third party LEAs** - Defendants will make the court date notification forms required by ¶ 47 and ¶ 48 readily accessible to third-party law enforcement agencies that arrest or detain misdemeanor arrestees to be prosecuted in the Harris County CCCL. |
| 47 | 10/29/2020 Extension requested to 11/15/20 | **Provide written court date notifications to arrestees and case file** - Defendants will provide written notice of the date/time and location of each new scheduled court appearance to misdemeanor arrestees or the lawyer if the arrestee is not present.  Any such written notice will be considered a court form with a copy retained in the case file. |
| 93 and 94 | 11/2/2020 | **Year 1.5 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CjC and update as necessary. |
| 41b | 11/15/2020 | **Receive written recommendations for holistic defense services** - The County will receive a written report with recommendations for essential holistic indigent defense services must be completed within 180 days of commencement. |
| 52e | 11/15/2020 Extension requested to 12/15/20 | **Receive recommendations to mitigate nonappearance** - Within 180 days of commencing the nonappearance study, researchers must provide the County initial actionable recommendations.  Researcher(s) may continue study and provide additional recommendations beyond that date. |
| 92 | 11/21/2020 | **Conduct Year 0.5 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simul-cast (¶ 90).  Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. |
| 75, 76, and 77 | 11/28/2020 | **Submit CD training plan for for Monitor review** - The Training Plan for effective implementation of the Consent Decree must include an initial training course with an annual refresher that embodies the ideals of the Rule and Consent Decree.  Required qualitative and quantitative training topics are named in ¶ 76.  Monitor must consult Class Counsel throughout development of the Training Plan.  Defendants must submit the proposed Training Plan to the Monitor for approval (per ¶ 111-114). |
| 115 and 118 | 1/18/2021 | **Submit Draft Monitor's Report: Year 1** - Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in ¶ 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.  Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. |

| ¶ | Due Date | Milestones |
|---|---|---|
| 78 and 79 | 1/27/2021 | **Deliver Year 1 Consent Decree Training Course** - Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. |
| 38 | 3/1/2021 | **Provide FY 21-22  PDO allocation > FY 19-20 approved budget** - The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. |
| 41b | 3/1/2021 | **Fund at least min. holistic defense staff recommended by expert** - Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. |
| 54 | 3/1/2021 | **Allocate $850,000 Year 2 to support court appearance per mitigation plan timeline and budget** - After study concludes, absent good cause for a lesser amount, County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan.  To establish good cause, County submits purported cause to the Monitor; Monitor notifies Class Counsel; Monitor makes a determination; Either Party may file a motion to the Court if they disagree with the Monitor's determination. |
| 103 | 3/3/2021 | **Monitor's Budget:  Year 2** -  The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. |
| 117 | 3/3/2021 | **Publish Monitor's Report:  Year 1** - Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in ¶ 117. |