# Monitoring Pretrial Reform in Harris County

# Second Report of the Court-Appointed Monitor

*March 3, 2021*



**Brandon L. Garrett, JD, Monitor**
*L. Neil Williams Professor of Law*
*Director, Wilson Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Chair*
*and Criminal Justice Institute Director*
*University of Houston Law Center*
*4604 Calhoun Road, BLB 122*
*Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Dottie Carmichael, PhD, Research Scientist**
**George Naufal, PhD, Asst. Research Scientist**
**Jongwoo Jeong, MA, Graduate Research Assistant**
**Andrea Seasock, Project Coordinator**
**Heather Caspers, Sr. Research Associate**
*Texas A&M University*
*Public Policy Research Institute*
*Research Scientist*
*4476 TAMU*
*College Station, Texas 78743-7746*
*(979) 854-8800*
*dottie@ppri.tamu.edu*

**Songman Kang, PhD, Consultant**
Hanyang University
Seoul, Korea

Provided to:

**The Honorable Lee H. Rosenthal
Chief Judge, United States District Court
for the Southern District of Texas**

Also provided to:

**Representative of Plaintiff Class:**

      **Elizabeth Rossi, Plaintiffs' Counsel, elizabeth@civilrightscorps.org**

**Representatives of Harris County:**

      **Rachel Fraser, Assistant County Attorney,
Rachel.Fraser@cao.hctx.net**

      **Jim Bethke, Director, Justice Administration Department,
jim.bethke@jad.hctx.net**

**Representative of County Criminal Court at Law Judges:**

      **Allan Van Fleet, Counsel for the 16 County Criminal Court at Law
Judges, allanvanfleet@gmail.com**

**Representative of Harris County Sheriff's Office:**

      **Major Patrick Dougherty, patrick.dougherty@sheriff.hctx.net**

## *Executive Summary*

- **The ODonnell Consent Decree:**
  - *Misdemeanor Bail Reform:* In Harris County, secured money bonds are no longer required for most misdemeanor cases under the court rule adopted as part of the settlement of the *ODonnell v. Harris County* case.  Most people are released promptly without a hearing.
  - *Bail Options Unchanged for Cases with Public Safety Concerns:* For misdemeanors presenting public safety risks (e.g., repeat DWIs, family violence, prior bond violations or outstanding warrants), arrestees are not automatically released.  They get a hearing at which magistrates have the usual options to require financial bonds, protective orders, pretrial supervision requirements, and GPS monitoring.
  - *Better Bail Hearings:* Defense attorneys now represent people at bail hearings. Previously they had no defense at these hearings. Judges also must give greater attention in deciding on bail requirements.

- **Major Consent Decree Accomplishments:**
  - *First Public Meeting*: Harris County's Justice Administration Department held its first official public meeting regarding the ODonnell Consent Decree at which the Monitors presented the First Report.  (The Monitors also presented the Report to the Commissioner's Court, and at a series of additional presentations to community groups and stakeholders.)
  - *Training*: VERA Institute of Justice conducted the first trainings on the Consent Decree to public defenders, prosecutors, hearing officers, judges, and other county officials.
  - *Revised Pretrial Hearing Form*: Criminal Court Judges developed and approved a set of redesigned misdemeanor pretrial hearing forms that better reflect the Consent Decree provisions and progress, which we believe will improve both the quality and efficiency of rulings at misdemeanor pretrial hearings, and promote fuller compliance with Rule 9.
  - *Discovery*: In an important accomplishment, pretrial services records and criminal history records are now electronically provided to defense counsel before misdemeanor pretrial hearings, as required by the Consent Decree.
  - *Court Appearance Policy*: The new court appearance and rescheduling procedures set out in the Consent Decree began full operation in the misdemeanor courts, providing a clearer set of options for people with court dates, and electronically recording court appearance types. A vendor was selected to research the primary causes of court non-appearance.
  - *Indigent Defense*: A vendor was selected to evaluate Harris County's systems of indigent defense.  A director for the new Office of the Managed Assigned Counsel was also hired to oversee attorneys appointed to represent indigent clients.

- **Ongoing Work by the Monitor Team:**
  - *Community Work Group*: We convened our monthly Community Work Group, to share our work and solicit input from our diverse community stakeholders.

- *Regular Meetings:* We held regular meetings with the parties and Harris County stakeholders, including weekly calls, monthly meetings with both judges and hearing officers, and periodic calls with public defenders and prosecutors.
- *Feedback:* We provided feedback to the parties on several improvements to the hearing process, the designed and implemented training, and vendor proposals regarding holistic defense services and nonappearance.
- *Data Development:* We analyzed data prepared by Harris County and provided continual feedback on data development in regular meetings concerning the assembly and validation of data regarding misdemeanor cases.
- *Cost Study:* We continued to conduct conversations with Harris County offices to gather data to permit a more detailed cost analysis of the misdemeanor system.

- **Our Findings:**
  - *Bail Hearings:* We identified several necessary improvements to the bail hearing process, including electronic discovery, which was implemented, and improved electronic forms for hearing officers to document their rulings, for which implementation is underway.
  - *Data Analysis:* Our analysis now includes richer and more comprehensive data regarding misdemeanor cases in Harris County. Our findings largely confirm what we reported in our initial six-month report, but with more robust data and more detailed analyses. We were able to estimate the share of Latinx misdemeanor defendants and cases involving members of specific particularly vulnerable populations. These data analyses show:

    - A gradual decline in repeat offending rates across the entire 2015-2019 time period, based on numbers of repeat-offense cases.
    - Slightly declining rates of individual people arrested for misdemeanors who repeat-offend in each year from 2015 to 2019 (from 23.4% in 2015 to 20.5% in 2019).
    - A slight increase in the share of cases associated with a new felony case (from 10.7% in 2015 to 11.4% in 2019.)
    - Only about 1% of those arrested for a misdemeanor offense in 2019, were re-arrested on four or more separate occasions within 365 days, a rate that has not substantially changed from 2015 to 2019.
    - A steady reduction in numbers of misdemeanor filings, with about 45,000 filings in 2020 as compared with over 60,000 filings in 2015. This may in part reflect the efforts of the Harris County DA's Office misdemeanor marijuana diversion program.
    - A geographic concentration of misdemeanor cases in a small set of low-income neighborhoods, based on our analysis of geocoded data.
    - An overall decrease in the duration of pretrial detention: in more than 80% of the cases since 2017, defendants spent two days or fewer in jail before their release (80% in 2017, 82% in 2018, 85% in 2019, and 86% in 2020).
    - Little change from 2015 to 2019 in the sex and racial distribution of misdemeanor defendants.

- ▪ A gradually increasing share of Latinx misdemeanor defendants, based on our current estimates using defendant name and address information.
- ▪ Increasing numbers of carve-out cases, with the number of domestic violence misdemeanor cases increasing by more than 50% between 2017 and 2020.
- ▪ People arrested who had mental-health flags and who were recorded as homeless were about twice as likely to be re-arrested than other people arrested.
- ▪ In 2015, virtually every misdemeanor case (92%) had a secured money bond set; the share is just 14% in 2020 since the implementation of Rule 9. The cost of surety bonds paid is 60% lower (from $2,500 to $1,000 in 2020) and the median cash bond has declined by 80% (from $500 to $100 in 2020) (Table 4).
- ▪ There has been a stunning drop in the financial value of bonds set by the courts since the implementation of Rule 9 from $135 million in 2015 to $13 million in 2020 – one tenth of the previous amount (Table 3).
- ▪ Defendants paid bond companies over $4.4 million in 2016.  However, since 2018, bail-bond companies have earned less than $1 million annually on low-level misdemeanor cases Table 5).
- ▪ Although 99% of misdemeanor defendants are released from pretrial detention within a few days of arrest, a small subset of cases await release for three months or longer.  These longest-held cases include more people with mental illness or homelessness, with holds, warrants, or assaultive misdemeanor charges.  Yet after months-long jail stays the majority end in dismissal or acquittal.  More investigation is needed to understand if barriers to release might be addressed to resolve these cases more efficiently.

- **Next Monitoring Steps:**
  - o Assist in further implementation of improvements to pretrial hearings to facilitate compliance with the Consent Decree.
  - o Review county indigent defense study and implementation of recommendations.
  - o Review county completion of a training plan and implementation of recommendations.
  - o Review county development of text and electronic court notification system.
  - o Conduct further data analysis, including with an added focus on CCCL court outcomes, court appearance, recidivism, and estimations of ethnicity.
  - o Conduct further cost analysis.

## *Table of Contents*

*Introduction*                                                                    1

I. The ODonnell Litigation and the Monitor's Role                                  2

    A. The Goals of the Monitor                                  4
    B.  The Monitor Team                                          5
    C.  Community Working Group                                    5
    D. Consent Decree Authority                                  10

II. Policy Assessment and Reporting                                               12

    A.  Policy Assessment                                        12
    1.  Bail Hearing Discovery                                    13
    2.  Hearing Officers' Bail Decisions                          14
    3.  Studying Hearing Outcomes                                 16
        4.  Harris County Sheriff's Office: Logistical Improvements   18
        5.  CCCL: Court Appearance and Courtwatching         18
        6.  District Attorney's Office                       20
        7.  Public Defender's Office and Managed Appointed Counsel   20

    B. Data Analysis                                             21

III. Cost Study and Project Management                                            47
    A.  Cost Analysis                                            47
    B.  Project Management                                        58

IV.  Community Outreach, Participation, and Working Group                         58

V.  Our Work in the Next Six Months                                               60

*Appendix*                                                                        61

A. Monitor Team Bios                                                              61
B. Organizational Chart                                                           64
C. Year 1 Statement of Work                                                       65
D. New 15.17 Hearing Forms                                                        75
E. Cost Analysis Data Components                                                  80
F. Consent Decree Tasks and Milestones                                           85

## *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the *ODonnell* Consent Decree, along with Professor Sandra Guerra Thompson, University of Houston Law Center, who serves as the Deputy Monitor. The Monitor team includes research experts from the Public Policy Research Institute ("PPRI") at Texas A&M University, and the Wilson Center for Science and Justice ("WCSJ") at Duke University. Our first report was filed on September 3, 2020. In that report, we described how impressed we have been with the progress made towards implementing this Decree, during trying circumstances. We noted that important implementation work remained and how the next six months would be a critical time as the structure of the remedies under this Decree take shape.

This is the Monitor's second report. The entire first year of our work has been marked by the COVID-19 pandemic, which has upended all of our lives. The pandemic has added a new deadly risk for people detained in a custodial facility. The first COVID-19 case was reported in the Harris County Joint Processing Center on March 29, 2020, shortly after our appointment as monitor. The Harris County Sheriff's Office ("HCSO") has adopted a range of precautions in response, including implementing mask-wearing, hygiene and quarantine requirements. [1] Nevertheless, the Sheriff reported to this Court on January 12 that the "jail is bursting at the seams," and "new inmates who test positive have no place to quarantine because the surveillance tank is full and the general population is grid-locked." Additionally, "[s]ix inmates and two HCSO staff members have died from the virus." [2] The HCSO has administered to date over 25,000 COVID-19 tests. Since March 29, 2020 through January 2021, there have been a total of 1,558 COVID positive inmates released, of which 49 were charged with misdemeanors only, and 1,115 were charged with a misdemeanor and a felony offense. As of January 27, 2021, of the 1,082 COVID positive persons in the jail, there were twelve persons who were COVID positive and were charged solely with a misdemeanor. An additional 286 were charged with a misdemeanor and another offense. [3]

We note that in response to the pandemic, the Harris County courts have adopted new procedures, including virtual appearances in most proceedings, and jury trials have substantially slowed. [4] Law enforcement has adopted new practices towards arrests, including a new cite and release program. [5] New programs are apparently in development regarding pre-arrest diversion and emergency COVID-19-related release, in collaboration between Pretrial Services ("PTS"), HCSO, and the Harris County District Attorney's Office. [6] We emphasize that, while we reported data

---

[1]     Harris     County     Sheriff's     Office,     Frequently     Asked     Questions,     COVID-19,     at https://www.harriscountyso.org/documents/COVID-19%20Frequently%20Asked%20Questions.pdf.

[2] Report of Sheriff Ed Gonzalez January 12, 2021 And Request for Emergency Hearing, *Russell v. Harris County*, Case No. 4:19-cv-00226, ECF 364.

[3] Sheriff Ed Gonzalez and Ericka Brown, Effectively Managing the Health of the Harris County Jail Population During a Pandemic, In Session JAD Newsletter, February 2021.

[4] Update on CCCL Appearance Policy, Harris County Criminal Courts at Law, March 13, 2020, at https://www.hcdistrictclerk.com/common/Civil/pdf/HC_County_Criminal_Courts_at_Law_Procedures_2020.pdf.

[5]     EO     1-68,     Cite     and     Release     Program,     City     of     Houston     Texas,     Sept.     28,     2020,     at http://www.houstontx.gov/execorders/1-68.pdf.

[6] In Session, *supra* note 2.

concerning positive test results, we cannot confirm whether or how many undiagnosed instances of transmission of COVID-19 have occurred during misdemeanor arrests, bookings, and detention in Harris County.

We also note that on February 8, 2021, the HCSO resumed accepting people charged with low-level misdemeanors, such as Class C tickets for nonpayment of fines and fees, reversing a policy implemented at the beginning of the pandemic to cease admitting such people to the jail as a means of preventing further spread of the disease. The HCSO stated that a surge in admissions to the jail was expected as a result of the policy change, and that the surge could cause delays in presenting people for bail hearings.[7]

Despite these grave challenges, the past six months have been an extremely productive time and key elements of the Consent Decree have been implemented. These include the new court appearance rules (with court appearances and setting types captured beginning December 5, 2020), and the beginning of trainings (on December 11, 2020). We also highlight the implementation of a Managed Appointed Counsel (MAC) program, and the hiring of former public defender Kenneth Hardin, to support defense attorneys representing people arrested for misdemeanors in Harris County (the MAC Director was appointed by Commissioners Court on October 13, 2020 and began work on November 21, 2020). New issues that came to our attention regarding discovery and hearing rulings have been addressed with a great deal of hard work and cooperation by the parties. For example, a new misdemeanor pretrial disposition form was adopted by the criminal court judges on January 12, 2021. Important implementation remains for the next six months, including follow-up trainings, evaluations of training plans, evaluation of the court appearance program, development of an electronic court notification system, and ongoing work to assemble more complete data concerning misdemeanor case outcomes.

## I. The ODonnell Litigation and the Monitor's Role

As described in our first six-month report, the *ODonnell* lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, preventing the needless suffering of vulnerable people, and the promotion of public safety. After three years of litigation, the parties reached a settlement consisting in this landmark Consent Decree, approved on November 21, 2019.[8] The *ODonnell* Consent Decree represents the first federal court-supervised remedy governing bail. The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of people arrested for misdemeanor offenses.[9]

First, under the Consent Decree, <u>people arrested for low-level misdemeanors are promptly released</u>. The Consent Decree incorporates the new Harris County Criminal Courts at Law

---

[7] *See* Email, Major Patrick L. Dougherty, Harris County Sheriff's Office, To All JPC Criminal Justice Partners, February 1, 2021.

[8] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019), ECF 708 [hereinafter, Consent Decree].

[9] Id. at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").

(CCCL) Rule 9, which sets out bail policies.[10]  Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds. Allowing this group to be quickly released without paying allows them to return to their jobs, take care of their children, and avoid the trauma and danger of incarceration.

Second, the Consent Decree has brought about more rigorous bail hearings with greater attention paid to the issues that matter—whether a person should be released and on what least-restrictive conditions—though much work remains to ensure the hearings and the recorded findings comply with Rule 9 and the Consent Decree. Persons arrested for misdemeanors that fall within the list of carve-out offenses must receive a magistration hearing, complying with Rule 9, at which there must be clear and convincing evidence supporting the pretrial conditions set and any decision to detain a person.  All misdemeanor defendants have access to a public defender to represent them at that hearing. Counsel has access to the client and information needed to prepare for the hearing. New trainings on the Consent Decree policies are being conducted. Upcoming work to study and plan for indigent defense in misdemeanor cases will improve the standards for misdemeanor representation, and will ensure that defense lawyers have access to social workers, investigators, and other support staff necessary to provide effective representation to people arrested for misdemeanor offenses.

Third, following this pretrial stage, misdemeanor defendants now benefit from a defined set of court appearance rules that is uniform among the 16 misdemeanor courts. The Consent Decree sets out a new process for waiving or rescheduling appearances.  People can change some court dates so they can make it to court without undue hardship due to illness, lack of childcare and other issues. Further, a new court notification system is to be built by Harris County. New work will study the causes of non-appearance and improve the ability to address those causes.

Fourth, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[11] The Consent Decree provides for public meetings and input, Harris County reports to be published every sixty days, and for Harris County to make information available online regarding the implementation of the Decree.[12]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented.  After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020.  As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree.  Key elements of the Consent Decree have now been implemented. Important work also remains, and all involved look forward to the work to come, as we build a model system in Harris County.

---

[10] Rules of Court, Harris County Criminal Courts at Law, Rule 9 (as amended through April 22, 2020), at http://www.ccl.hctx.net/attorneys/rules/Rules.pdf.; Consent Decree ¶ 30.

[11] Consent Decree, *supra*, at ¶83-85.

[12] *Id.* at ¶87-88.

**A. The Goals of the Monitor**

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system. This system is intended to restore the public's trust, safeguard constitutional rights, and accomplish the aims of bail: to maximize pretrial release while keeping the community safe and promoting the integrity of the judicial proceedings by preventing defendants from fleeing justice. Thus, as the Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[13]  From the Consent Decree, we distilled nine guiding principles:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – We view accountability as part of an ongoing process of systemic evaluation and improvement with community participation.

(3) **Permanency** – We must not only evaluate progress, but also ensure that the administrative measures, policies, and processes, can work well long-term.

(4) **Protecting constitutional rights** – We must protect civil and human rights, including the constitutional rights of arrestees.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We must seek to maximize pretrial liberty and to minimize criminal legal involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, we should establish a system that is self-monitoring and can make ongoing improvements.

---

[13] Consent Decree, supra, at ¶1.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

## B. Monitor Team

Our interdisciplinary team includes experts in law, social science, behavioral health, economic analysis, indigent defense, and project management.  Team biographies are included in Appendix A.  The team includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael and George Naufal (Public Policy Research Institute at Texas A&M University)

- Marvin Swartz and Philip J. Cook (WCSJ at Duke University)

- Songman Kang (Hanyang University)

Our full organization chart is also included in Appendix B.



## C. Community Working Group

The Monitor Team relies on the guidance of a Community Working Group (CWG), a dedicated group of community leaders who represent a diverse set of perspectives and specializations.  The CWG meets on a monthly basis with the Monitor Team, as well as with

various county officials responsible for implementation of the Consent Decree. The CWG has provided guidance on topics such as the need to collect data on the ethnicities of people in the jail, designing a training curriculum for county officials, and strategies for community outreach, especially with regard to the advocates for the survivors of domestic violence and the providers of services to the homeless and people with mental health illness. The CWG also participated in a conference with media representatives in anticipation of this Report to foster improved reporting about the changes resulting from the Consent Decree.



**Hiram A. Contreras** served for 36 years with the Houston Police Department. He retired as Assistant Chief of Police in March 1998. While ascending the police ranks, Mr. Contreras' assignments included the Auto Theft, Juvenile, Recruiting, Planning and Research, Northeast Patrol and Major Offenders. He was promoted to the rank of Assistant Chief July 1991. In the same year as a result of a court ruling, he became the only Latinx person to attain the rank of Deputy Chief. This was retroactive as of March 1986. As Assistant Chief he directed the Professional Development Command. At retirement he was directing the Special Investigation Command. In his career with HPD, Mr. Contreras established the first HPD storefront in the city and initiated the Culture Awareness Program. In collaboration with the U.S. Marshal's Service, he initiated the Gulf Coast Violent Offenders Task Force. As commander of the Special Investigations Command, he coordinated HPD's participation with the Department of Justice High-Intensity Drug Trafficking Area Program. Also, he coordinated the International Symposium on the Police Administration and Problems in Metropolitan Cities with the Istanbul Police Department in Istanbul, Turkey. As Assistant Chief, Mr. Contreras, at the request of the Police Executive Research Forum, participated in police promotional assessment centers in Chicago, Denver, and San Francisco. Nominated by President William J. Clinton, Mr. Contreras became U.S. Marshal for the Southern District of Texas in 1998 and served until 2002. His consulting business, Art Contreras & Associates – LLC, specializes in human resource and marketing principles.



**Thao Costis** is President and CEO of SEARCH Homeless Services, a leading Houston agency helping people move from the streets, into jobs, and safe, stable housing. During her 24-year tenure, she's focused on how SEARCH can best help people who are homeless transform their lives, improve their health, and change how the community addresses this problem. Prior to SEARCH, she worked at the Coalition for the Homeless of Houston/Harris County where she brought together 150 not-for-profit agencies to coordinate their efforts. Thao has a bachelor's degree in accounting from the University of Texas and an MBA from University of Houston.



**J. Allen Douglas** is the executive director of the Downtown Redevelopment Authority (DRA). In addition, he performs the duties of general counsel for the organization and its related entities Central Houston and the Downtown District. Prior to joining the DRA, Allen practiced law for more than 20 years, beginning his career as a law clerk at Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. in Houston. He worked for the United States Court of Appeals, Sixth Circuit and the United States District Court, Northern District of Ohio in Cleveland, Ohio. Most recently he was an associate attorney at

Littler Mendelson, P.C. and assistant county attorney with the Harris County Attorney's office where he focused on appellate labor, employment, and civil rights cases. Allen has also served as vice-chair of the Midtown Management District's board of directors since June 2015, as well as chair of the organization's Urban Planning Committee.



**Guadalupe Fernández** joined the Houston Office of Tahirih Justice Center in 2015 and serves the Policy and Advocacy Manager.  She leads the development and advancement of Tahirih's local and state-wide advocacy projects to transform the policies and practices that impact immigrant survivors of gender-based violence. Guadalupe joined Tahirih as the Children's Legal Advocate. Prior to Tahirih, she worked at Catholic Charities Houston as the Lead Legal Caseworker for the Child Advocacy and Legal Services Program. In Washington DC, Guadalupe was on the steering committee of the DC Detention Visitation Network and completed internships at the Lawyers' Committee for Civil Rights Under Law and the Central American Resource Center. Currently, she serves on the Public Policy Committee for the Texas Council of Family Violence, the Immigration and Racial Equity taskforces of the Texas Family Leadership Council, and the Harris Co. Housing Stability Taskforce. She is a graduate of the Advocacy Learning Center hosted by Praxis International and Camp Wellstone.  Guadalupe is the proud daughter of immigrants and a first-generation college graduate from Georgetown University. She is a Fully Accredited Representative through the Department of Justice and is allowed to practice before both DHS and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals.



**Tara Grigg Green** (formerly Garlinghouse) is the Co-Founder and Executive Director of Foster Care Advocacy Center. Prior to founding Foster Care Advocacy Center, Tara was a Staff Attorney and Skadden Fellow in the Houston office of Disability Rights Texas.  There, she helped develop the Foster Care Team to provide direct representation to foster children with disabilities in state child welfare cases, special education litigation and Medicaid appeals. She authored an Amicus Brief in *M.D. v. Abbott*—class action litigation seeking to reform the Texas foster care system—cited by the Fifth Circuit in affirming the State's liability. She has consulted on child welfare policy issues for organizations such as Casey Family Programs, the ABA Center on Children and the Law, the Texas Children's Commission, and the United States Children's Bureau. Tara has published law review articles and research papers on the constitutional rights of children and families and quality legal representation in child welfare proceedings.  Her passion for this field comes from her family's experience as a foster family caring for over one hundred foster children. She has received many awards and was recently named the National Association of Counsel for Children's Outstanding Young Lawyer. Tara clerked for the Hon. Micaela Alvarez of the U.S. Southern District of Texas in McAllen. She holds a J.D. from the University of Pennsylvania Law School where she was a Toll Public Interest Scholar, a M.P.P. from the Harvard Kennedy School of Government where she was a Taubman Fellow, and a B.A. from Rice University.



**Jay Jenkins** is the Harris County Project Attorney at the Texas Criminal Justice Coalition. Since joining TCJC in 2014, he has promoted broad youth and adult justice reforms in Houston and the surrounding areas. Jay received his J.D. from Northwestern University School of Law, graduating *magna cum laude* in 2009. While at Northwestern, he worked at the Bluhm Legal Clinic's Children and Family Justice Center, focusing on a number of youth justice issues. In his third year, Jay was the lone law student at the newly formed Juvenile Post-Dispositional Clinic, where he promoted policy reform throughout Chicago while also advocating on behalf of juvenile clients. Jay was admitted to practice law in the State of Illinois and worked as a civil litigator in the private sector for three years. At TCJC, Jay has researched and pursued reforms related to over-policing and prosecution, while also reimagining the local bail system and supporting indigent defense, and he was instrumental in the development of a first-of-its-kind data dashboard that visualizes more than one million criminal case outcomes in Harris, Dallas, Bexar, and Travis Counties. Jay additionally serves as co-founder and President of the Convict Leasing and Labor Project, which launched in 2018 to expose the history of the convict leasing system and its connection to modern prison slavery.



**Terrence "TK" Koontz** currently serves as Statewide Training Coordinator for the Texas Organizing Project. His path to service began after he was arrested in 2010. While sitting in the Harris County Jail, he witnessed the mistreatment of black and brown people and realized that the criminal justice system was essentially about class and racial oppression. Koontz walked away as a convicted felon. Since that time, he has worked without cease to reestablish his life by fighting as an activist and organizing for criminal justice reform. His passion for criminal justice reform is rooted in his experience growing up in communities that were plagued with crime, poverty, and over-policing. In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement. He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County that helped to elect Brian Middleton, the first African American D.A. in Fort Bend County history. He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator. He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service. Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.



**Johnny N. Mata** currently serves as the Presiding Officer of the Greater Houston Coalition for Justice, a coalition of 24 diverse civil rights organizations. Through the coalition, Mr. Mata has supported changes in policing use-of-force policies and called for the creation of a citizen review board. He led the effort to reform the Texas grand jury selection process and has strived to improve relations between the police and communities of color. He has also advocated for bail bond reform, victim's rights, protecting the voices of residents affected by community

development, and promoting the hiring of Latinx educators and administrators. He served two terms as Texas State Director of the League of Latin American Citizens (LULAC) and six terms as a District Director of LULAC. He worked for 32 years as a community director and human resources professional with the Gulf Coast Community Services Association. He organized the community to create the Latino Learning Center and served as a founding board member. Mr. Mata has received the NAACP President's Award, the OHTLI Award from the Republic of Mexico, Hispanic Bar Association Lifetime Achievement Award, the Willie Velasquez-KTMD Telemundo Channel 48 Hispanic Excellence Award, Antioch Baptist Church Martin L. King Justice Award, and numerous others. The Houston Community College System awarded him an honorary Associate in Arts Degree in recognition of his achievements in promoting education in the Latinx community.



**Maureen O'Connell**, M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Sister Maureen created a successful program that has empowered hundreds of women using a standard of care other programs could emulate. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; and more than 40 years as a Dominican Sister, a religious order known for its commitment to social justice. She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director of Angela House for 17 years, retiring in 2018 and joining the Board of Directors in 2019.



**Timothy N. Oettmeier** most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer. As Executive Assistant Chief of Police, he was assigned to the Investigative Operations Command supervising the Special Investigations Command consisting of Auto Theft, Gang, Major Offenders, Narcotics, Vehicular Crimes, and Vice Divisions; the Criminal Investigations Command consisting of the Burglary and Theft, Homicide, Investigative First Responder, Juvenile, Robbery, and Special Victims Divisions; and the Technology Services Command. He was a principle architect for implementing community policing throughout the agency. He received his Ph.D. in Police Administration from Sam Houston State University in 1982. He helped oversee national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training. He authored department reports, and articles for textbooks and journals on police management issues. Early in his career, the 100 Club of Houston recognized him as an Officer of the Year. Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services. He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from The 100 Club of Houston.

**Sybil Sybille**, a Texas Advocates for Justice Fellow, is a military veteran, who is a survivor of childhood sexual violence and stabbing, as well as sexual assault in the military. During her life, she nearly died of drug overdoses on seven occasions. Convicted of organized crime, she served time in a Texas prison. Since her release, she completed a college certificate program and was certified in 2015 by the Texas Department of Health Services to provide Peer Recovery Coach Training. In 2017, she received a training certificate in Veterans Court Advocacy and Mentoring for Peers. In 2018, she was a graduate of the Texas Southern University Anthony Graves Smart Justice Speakers Bureau. In 2019, Ms. Sybille was named a Fellow for Texas Advocates for Justice and Grassroots.org. Through that work she has testified before the Texas legislature regarding a bill to support trauma-informed training for staff within the criminal justice and juvenile justice systems. She is currently working on a portfolio to advocate for "banning the box" to eliminate the check box on job applications which requires disclosure of criminal convictions. She believes this practice poses the greatest barrier for those reentering society.

## D. Consent Decree Authority

This Report contains the Monitor's review of compliance for the second six months that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.

Further, the Consent Decree states in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:
>
> a. A description of the work conducted by the Monitor during the reporting period;
>
> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;
>
> c. The methodology and specific findings for each compliance review conducted;

d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

e. A projection of the work to be completed during the upcoming reporting period;

f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;

g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;

h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:

      i. Maximizing pretrial liberty;
      ii. Maximizing court appearance; and
      iii. Maximizing public safety; and

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds:

The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Our Monitor Work Plan for Year 1 is divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117.  As in our first report, we have divided this report into three parts, reflecting the main components of our work and addressing each subject set out in the Consent Decree: Policy Assessment and Reporting; Cost Study and Project Management; and Community Outreach, Participation, and Working Group.

## II. Policy Assessment and Reporting

We started our work upon our appointment on March 3, 2020.[14]  In this second report, we describe our progress towards carrying out the tasks outlined in our Proposal and Work Plan, focusing on the time period following the completion of our first report on September 3, 2020. Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County in meeting their goal of making the Harris County misdemeanor system a national model. During our first year, we have conducted a detailed initial examination of the misdemeanor process and implementation of Rule 9 in Harris County.  Our work continues to be informed by regular conversations with County stakeholders and an intensive analysis of court records, ranging from docket entries to videos.  We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to the conversations to come.

As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under the Consent Decree, as well as conducting regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Approved proposals for the County to retain outside researchers to study topics such as causes of nonappearance, indigent defense, and court forms. We have not reviewed results of that research, as it has not been completed yet; however, vendors were retained during this time period. Similarly, we have not reviewed plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation), but have discussed the development of such plans with the County, which is presently procuring consultants that will advise on the development of such improvements.

(3) Continued to convene monthly the Community Working Group.

(4) Continued data collection and analysis and incorporated this work into the second six-month Monitor Report.

## A.  Policy Assessment

This Report describes in further detail our work on these topics.  Early on in our work, we did not yet have access to comprehensive electronic data from the County Justice Administration Department (JAD). We initially collected, by hand information regarding misdemeanor magistration hearings. Under Rule 9, such hearings are held prior to a person's release only for six "carve-out" types of cases, set forth in Local Rule 9.4.1- 9.4.6.  For such cases, a prompt hearing

---

[14] In the motion to appoint us as Monitor, our submission to Court included a Proposal and Budget for Year 1 of work, which describes our team members, timelines, an organization chart, and a budget for all participants. We do not repeat that information here, but it is available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/). On May 1, 2020, we also provided the Parties with a Work Plan setting out our first year of work, set out in quarterly deliverables, as was most convenient for the County and its budgeting process.  That Plan has been made available on our Monitor website. [possibly include that link here]

is required by Rule 9; in addition, cases are governed by Texas Code of Criminal Procedure 17.033 (commonly referred to as SB-7, after the 2001 legislation adopting the provision requiring that a person be released on a personal bond no later than 24 hours after arrested pursuant to a warrantless arrest where no probable cause determination has been made by a judge in a misdemeanor case). In December 2020, the Office of Court Management completed a system to automatically collect information regarding all electronically filed misdemeanor bail hearings. We then began to examine this more comprehensive collection of misdemeanor pretrial rulings. We have also viewed videos from bail hearings. We report on this work below.

Several improvements emerged from our analysis of these data, which we shared with the parties and with other stakeholders. Two main issues that occupied our team and the parties during the past six months were: (1) discovery to be provided to the defense before hearings, and (2) pretrial decisions and findings by magistrates at pretrial hearings. We discuss each in turn below.

### 1. Bail Hearing Discovery

In conversations with stakeholders immediately following the release of our first six-month report in September 2020, we learned that: (i) discovery was not being provided to public defenders, in advance of pretrial hearings, as required by Rule 9 and the Consent Decree; and, (ii) that the Sheriff was detaining people who had been required to pay secured bail following hearings at which discovery was not provided, in violation of Rule 9. Both Rule 9 and the Consent Decree are clear that any information relied upon by a hearing officer, including criminal history information, must be shared in advance with the public defender, to permit adequate preparation for the hearing. If that information is not shared with the defense prior to the hearing, then the judicial officer may not consider it at the hearing. Further, the Sheriff may not enforce any order to pay secured bail issued following a hearing at which the Hearing Officer or judge considered information that was not provided to defense counsel. Rule 9.12.6 provides:

> The arrestee must have access to all of the evidence and information considered at the bail hearing, including any criminal history from the National Crime Information Center ("NCIC") and Texas Crime Information Center ("TCIC").

Two pieces of information were not yet being shared with defendants and public defenders at pretrial hearings: (1) the financial affidavit prepared by pretrial services; and (2) the criminal history information. (Pretrial services interviews are not currently being conducted, due to COVID-19, but when they resume, reports from those interviews must be shared as well, before pretrial hearings.)

First, Harris County responded by setting up a system to share financial affidavits from pretrial services with the public defender or retained counsel, in advance of hearings. That implementation work, completed in October 2020, solved the issue of discovery regarding pretrial services records (as the affidavit is the only record currently prepared; during COVID-19, pretrial services interviews with persons booked are not occurring). It was a noteworthy achievement and an important improvement to the process. We are grateful to the District Attorney's Office for their crucial cooperation and assistance in setting up the new discovery system.

Second, however, the criminal history information was not yet being shared with public defenders, and yet that information was nevertheless often being presented and relied upon by hearing officers in setting secured bail amounts that resulted in detention. Setting up a system to share that criminal history information required quite a bit of organizational and technical work. Due to regulatory requirements, the criminal records must also be redacted before they are shared with the public defender in advance of hearings. The process for exchanging these documents was made significantly more difficult due to the pandemic, which complicated the exchange of information. Fortunately, after a series of meetings and efforts to develop a plan to address this problem, a new electronic solution was developed, and it was implemented as of January 30, 2021.

The new approach will be a real improvement in efficiency.  A new data system, called "eCharge," set up by the District Attorney's Office, will be customized going forward to more readily permit electronic sharing in an automatic fashion, with the defense, District Attorney's Office, and with the hearing officers.  In the past, the process of obtaining criminal history for a defendant was conducted in a redundant fashion.  The District Attorney would, when making charging decisions, run the complete criminal history of each defendant. Additionally, Pretrial Services would separately run the criminal history for defendants who would appear at a PC Court docket, and then share that copy with the magistrate for review in setting bail or bail conditions. The defense attorney was permitted to review the criminal history forms that had been printed for the magistrates just before the hearing. It is expected that in March 2021, a single portal will be available that will include eCharging, filing, and criminal history all in one portal communicating to the DEEDS and J-WEB information systems.

### 2. Hearing Officers' Bail Decisions

Second, we continued to observe real inadequacies in bail decisions.  In our first six-month report we began our discussion of magistration by highlighting that the Consent Decree and Rule 9 require that findings be made "by clear and convincing evidence" that the arrestee has the ability to pay the amount required, or does not have that ability to pay but that "no less-restrictive condition or combination of conditions" could "reasonably assure" against flight from prosecution or safety of the community. Rule 9.12.7. Thus, a hearing officer must find more than a preponderance of the evidence: there must be a substantial amount of evidence:

> "Clear and convincing evidence is defined as that measure or degree of proof which will produce in the mind of the trier of fact **a firm belief or conviction as to the truth of the allegations sought to be established**. This is an intermediate standard, falling between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings." *Young v. State*, 648 S.W.2d 2 (Tex. Crim. App. 1983) (en banc) (quoting *State v. Addington*, 588 S.W.2d 569 (Tex.1979).

In our first report, we emphasized that this is also a constitutional standard. We remained concerned that hearing outcomes and reasoning did not refer to that standard or contain factual findings that meet that standard.  Rule 9.12.7 requires the judicial officer to "explain the reasons for the decision and the evidence relied on," on the record, either in writing or orally.

However, up until shortly before we submitted our first report, the hearing form that gave magistrates a little more than a line of text in which to write their written opinions explaining their decisions. We noted that with a revised form in place, we expected sufficient findings to now be made. We also noted that in our meetings with the Hearing Officers, they were extremely receptive to further improving the electronic form so as to facilitate the completeness of decisions and ensure that opinions fully complied with the Consent Decree.  Discussions about how to make further improvements to that electronic form were ongoing during the first six-month time period.

On October 20, 2020, we sent letters to both the Hearing Officers and CCCL Judges regarding the need for further improvements in the process. We noted that in our work reading bail hearing records, we continued to regularly review cases that did not:

- Include any statement about indigency (as defined in the Consent Decree at Paragraph 17(h)), where a person who meets the indigence definition cannot be assessed any fee or the cost of a non-financial condition of release.
- Refer to the clear and convincing evidence standard.
- Contain factual findings that are clearly set out, or explanation of why facts mentioned meet a clear and convincing evidence standard.
- Provide sufficient or understandable reasons for the result.
- Explain why non-monetary-related conditions are the least restrictive.

In subsequent meetings, we further discussed how to address these issues with both the Hearing Officers and CCCL Judges.  They were receptive to these concerns.  We also observed over time that the Hearing Officers began to incorporate some of these elements in their written opinions.  We started to see opinions that referred to the Rule 9 clear and convincing evidence standard and to the indigency standard, which we had not seen in the past.  However, we also continued to observe a lack of factual findings meeting a clear and convincing evidence standard. Many rulings did not include findings that provided more support than repetition of the probable cause finding.  In our regular conversations with them, Hearing Officers had voiced the need to improve and structure the forms used to enter bail decisions.  The change had been made to create more space to write their decisions (increasing the word limit to 1,000 words).  However, the form itself contained quite a few fields irrelevant to misdemeanor bail and the Rule 9 process, and it was missing key items, such as the indigency determination, and a place to make factual findings. We also suggested that a bench card or guide could be of use to accompany a form that better fit the provisions of Rule 9 and the Consent Decree.

What followed was an extremely productive set of discussions with the CCCL Judges, Hearing Officers, Plaintiffs, and the Sheriff in an effort to draft and revise a new hearing form, as well as an accompanying bench guide , to improve the structure of decision-making to better reflect the requirements of Rule 9 and the Consent Decree, and to ensure that the Sheriff would no longer detain people who had not been afforded a constitutional bail hearing, consistent with Rule 9 and the Consent Decree.  We discussed this issue in a series of meetings. The CCCL Judges and Hearing Officers then undertook substantial work to produce a new template for issuing magistration rulings pretrial.

We are pleased to report that the revised misdemeanor bail hearing forms were finalized and approved by the CCCL Judges on January 12, 2021. They are attached as Appendix D. The forms that the judges designed are concise, intuitive, and clear. They will provide clear direction to the Sheriff's Office about when a secured bail order may not be enforced under Rule 9 and the Consent Decree. Programming work will now proceed to make them available in the court information management system.

### 3. Studying Hearing Outcomes

We continued to examine the text of pretrial rulings in misdemeanor cases. As we conducted that work, we noted real improvements, but also that it was sometimes difficult to fully understand the basis for Hearing Officers' decisions from the written decisions issued. As discussed above, we conveyed our concerns to the Hearing Officers and Judges, resulting in a series of efforts to address the concerns, including through a substantial redesign of the misdemeanor bail decision form.

While that redesign was pending, we observed far more detailed rulings from Hearing Officers, and rulings that better reflect the requirements of Rule 9 and the Consent Decree. It is now routine to see pretrial rulings that include a finding on the indigency of the defendant. It is now routine to see references to the clear and convincing evidence standard, in cases in which a person is ultimately detained. The findings are set out in more detail than in the past.

The main ongoing concern is that we still often cannot observe from a written ruling (or alternatively, from viewing the oral statements that the hearing officer makes on the record), why or whether there is *substantial*, or clear and convincing evidence, that no less restrictive conditions can assure safety or appearance. Often basic information from the police report, or prior offenses, are recited, with a statement that those facts are found to be clear and convincing evidence. Asserting that there is clear and convincing evidence is not enough. Why, for example, do prior offenses render the defendant an unmitigable risk? Why were alternative conditions deemed insufficient? The written hearing rulings still often do not make clear what *additional* evidence, relevant to flight and safety, provides the basis for the ruling beyond the charge and the allegations, which are not enough under Texas or federal law to constitute clear and convincing evidence. We are hopeful that the new hearing form, by focusing the written opinion on the factual findings, will focus Hearing Officers and judges on these key questions.

We note that translation into Spanish of each of the forms given to defendants at the Harris County Joint Processing Center, regarding their bond conditions, is presently underway. We understand that the financial affidavit form was translated into Spanish, and has been shared with the judges for approval at their next meeting. The Bond Conditions form will also be translated, but the project has been on hold until the revised form is approved by the County and District Court Judges, which we hope will be addressed promptly.

### a. Cash Bond Requests

We observed in our last report that there was a wide gap between the bail requests of district attorneys and public defenders at pretrial hearings. We have more comprehensive data concerning

those requests, beginning in December 2020.  For the almost 1,200 hearings for carve-out cases that we examined from December 2020 through early February 2021, we observed that in over 800 cases, the Hearing Officer imposed cash bail as a condition of release, and in over 300 cases, a personal bond was granted.  The median cash bond amount was $2,000, and the average amount was over $11,000.  The average district attorney cash bond request was over $7,000 while the average public defender cash bond request was just over $1,000.  Public defenders almost always requested a personal bond, while prosecutors did so in a handful of cases during this time period. Rule 9 and the Consent Decree did away with the misdemeanor cash bail schedules that had been in place in Harris County. We observe that assistant district attorneys today regularly request cash bail in misdemeanor cases that exceed the amounts imposed pursuant to the bail schedules of past years.[15] We commonly observe $10,000, $15,000, $20,000, and $25,000 requests, which are likely to be far in excess of the individuals' ability to pay. However, we rarely see Hearing Officers impose cash bail conditions at those dollar levels in carve-out misdemeanor cases.

### b.  Studying Hearing Videos

Each magistration hearing in Harris County is video recorded. We have coded information from the videos of seventy misdemeanor pretrial hearings conducted in September, October, and in December 2020, and including a range of magistrates and types of carve-out cases. As in our last report, we coded a range of information regarding the hearing outcomes and the reasoning of the district attorneys and the public defenders, regarding their pretrial requests, and then the oral and written rulings by the Hearing Officer.  The average hearing length was nine minutes, which is quite a bit more than the typical hearing before Rule 9 was adopted.[16]  In cases in which a cash bond was imposed, the average amount was about $4,000. Prosecutors asked for bond aounts averaging $8,700 at these hearings, with requests ranging up to $50,000 in one case.  Public defender cash bond requests averaged about $2,000, and public defenders also often requested release on personal bond. At all but three of the observed hearings, the defendant was present (and in those three, the person was reportedly under mental health observation). Over these months, as noted, we saw a trend towards more detailed explanations regarding pretrial rulings.

More broadly, we believe that further and more-detailed training on Rule 9 and the Consent Decree will improve outcomes and consistency in bail hearings at magistration.  We continue to explore the feasibility of additional changes:

1.  Enabling the defense to bring witnesses to bail hearings at magistration by using a courtroom that has public access.
2.  Ensuring that translators made available and on the job at all times.
3.  Charging people with all charges at initial booking (including JP cases) so as not to delay their time in custody by requiring a second booking on less serious charge later.
4.  Preventing delays in processing release and standardizing interdepartmental.

---

[15] For the 2017 Initial Bail Schedule in Harris County, see http://www.ccl.hctx.net/attorneys/bailschedule.pdf.  For the 2012 Misdemeanor Bail Schedule for the Harris County Criminal Courts at Law, see http://www.ccl.hctx.net/criminal/Misdemeanor%20Bail%20Schedule.pdf.

[16] *See* ODonnell v. Harris Cty., Texas, 251 F. Supp. 3d 1052, 1092 (S.D. Tex. 2017), aff'd as modified, 882 F.3d 528 (5th Cir. 2018), and aff'd as modified sub nom. ODonnell v. Harris Cty., 892 F.3d 147 (5th Cir. 2018) (describing how of the 121 videos examined by the plaintiffs, 26 are under one minute, 98 are at or under two-and-a-half minutes, and 115 are at or under 4 minutes.)

communications, terminology, and electronic documents.  Harris County Sheriff's Office (HCSO) has noted that staff may spend a great deal of time reading judicial orders and other documents to ensure consistency and figure out what conditions for release entail.

We are extremely grateful for the feedback and collaboration with the Hearing Officers during our second six months.

### 4.  Harris County Sheriff's Office: Logistical Improvements

The HCSO plays an instrumental role in misdemeanor bail reform's success, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing a range of improvements to the systems used in the past.

We plan to engage in further discussion regarding the possibility of adopting additional improvements:

1.  Expanding the avenues for people to "self-bond" without the need for assistance from family or bondsman, which is currently only available for people who happen to have in their possession at the time of arrest the full amount needed in cash to post bond.

2.  Implementing quality assurance measures to ensure that every person admitted to the jail has had an opportunity to transcribe phone numbers from their phones so that no one is left incommunicado while in jail.

3.  Improving the procedures and interdepartmental communication to reduce the time it takes to release people after making bond.

We hope that Harris County further improves the availability of community reentry services so that people released will be safe and have a means of getting home or to a shelter.  We are incredibly grateful and fortunate to have such responsive county officials to work with.

### 5.  CCCL: Court Appearance and Court Watching

The Consent Decree revamps the court appearance process in Harris County, and the detailed rules set out in paragraphs 57-72, which represent a sea change in the manner in which court appearance had been handled in the past, have now been fully implemented.  During these six months time period, substantial work was done by the Harris County Courts, Office of Court Management, which is the administrative office that serves all Harris County courts, and Harris County Universal Services, which provides information technology support to Harris County, to program the new appearance categories so that judges can make use of them.

The court appearances and setting types were captured by the Office of Court Management, under a new data system, beginning on December 5, 2020. The court appearance policy itself was put into place and made publicly available in August 2020. It is now far clearer how one can reschedule court appearances, where the defendant's presence is required (subject to the court's

waiver), and how many times one can fail to appear and reschedule before a warrant may issue. The Open Hours Court, permitting rescheduling, was also in operation during this entire time period.

These are significant developments, which required hard work by the Office of Court Management, and more work is yet to come. Next, the County and the Office of Court Management, together with a contractor, Ideas42, are developing a new Electronic Court Notification System. That system will include email, text and voice notifications regarding court appearances. The system will include Spanish translations of court notifications, and translations into Chinese and Vietnamese will occur in a second phase of the project. The Electronic Court Notification system's intended completion date is late March 2021; the code has been written, but the technical writing and message design remain to be completed. The County has also selected a vendor to redesign court date notification forms to incorporate evidence-based design practices. The vendor will conduct the necessary research in the next six-month time period.

We also note that the Consent Decree language is not always clear to a layperson, and the court appearance procedures set out in the Decree can be complex. We have recommended that a user-friendly guide should be made available, and we have shared a guide, drafted with input from the parties to this Consent Decree, with the MAC. Trainings to be held by the Vera Institute of Justice will also describe the new court appearance process.

We also began a project of watching the live-streams of the misdemeanor judges' court proceedings, available online, to review misdemeanor court proceedings. We had heard reports that cases have experienced delays, and at the CCCL Judges' suggestion, we began to watch proceedings to get an idea of what occurs and how cases proceed. Unlike in the time-period before Rule 9 was adopted, there are far fewer people who cannot afford cash bail who might plead guilty to gain release, often after a quite short jail stay. More cases may proceed on the merits. Further, COVID has affected case dispositions and the mechanics of court appearances, hearings, and trials. What we observed provided valuable insights into how dockets proceed in misdemeanor matters, during the COVID pandemic.

We watched live-streams beginning in October 2020, selecting a range of courtrooms and times of day in order to get a sense of the variety of judicial approaches towards case-management. To date, we have observed and recorded information regarding proceedings in almost 800 misdemeanor cases. We have observed several common themes in this work:

- Resets, or rescheduled hearings, are quite common (occurring in 436 of 780 cases observed).
- The reasons for resets often had to do with referral to a deferred prosecution, lack of discovery materials (the most common reason, occurring in 94 cases), the defendant needing an attorney, and further negotiation between the parties.
- Court non-appearance was not common (occurring in 54 of 780 cases observed). The reasons for non-appearance often had to do with medical issues, quarantine, miscommunication between defense attorneys and clients, and other such explanations.

The most common reasons for resets had to do with ongoing work as cases proceeded to ultimate disposition.  Many resets had to do with discovery matters, either because the prosecution had yet to produce discovery materials, including body camera evidence from the police, or the defense was in the process of securing evidence to share with the prosecution, such as mitigation material and medical records.  Other resets had to do with ongoing negotiations between the parties regarding plea offers or offers to enter deferred prosecution agreements.  Still other hearings and resets had to do with pretrial conditions, and modifying or adjusting them.  Quite a few cases involved multiple issues.

We are extremely grateful for the feedback and collaboration with the CCCL Judges during our second six months. We are particularly grateful for the hard work that the CCCL Judges and Hearing Officers have put into revising the new pretrial misdemeanor hearing form.

### 6. District Attorney's Office

The Harris County District Attorney's Office's ("HCDAO") policies have had a significant effect on the misdemeanor system in Harris County, including through the exercise of discretion in initial charging decisions, in decisions to request pretrial conditions, and in merits litigation of misdemeanor cases. The HCDAO provided valuable feedback before we submitted our prior report and continues to do so. We have continued to have regular conversations to exchange insights. During this time period, the HCDAO implemented the new eCharge application to streamline its charge processing. That system has made it possible to provide discovery of criminal history information in misdemeanor matters more efficiently.

### 7. Public Defender's Office and Managed Appointed Counsel

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention."  Consent Decree at ¶37. One of the most important changes brought about by Rule 9 and the Consent Decree has been the assurance that a public defender is available to represent all individuals at bail hearings.  Further, the Consent Decree envisions a process of continuous improvement in the public defense services provided at these hearings, including the retention of an expert in holistic defense services and developing an indigent defense plan.  Consent Decree at ¶41, 43.  The County received two proposals in response to the RFP, and ultimately determined to retain the National Association for Public Defense to assess the current systems and develop a plan for additional needs in order to provide holistic defense services.

We have had a series of conversations with the Public Defender's Office concerning best practices and representation at misdemeanor hearings.  We worked with the parties to address the lack of discovery provided before hearings, which harmed the public defenders' ability to adequately prepare and represent clients.  Along with the parties, we also solicited the office's feedback on the training to be provided to public defenders.  During this past six-month time period, Vera Institute of Justice was retained to provide trainings on Rule 9 and the Consent Decree.  On December 11, 2020, the first training was provided and it was attended by about 370 people. The initial training covered these topics:

- Origin of Consent Decree (and authority based in Federal Constitution)
- Impact of bail reform in Harris County
- How the basic process has changed and each step in the process from arrest to first setting
- Serve as a problem-solving liaison: Vera Institute of Justice will be available to gather feedback and concerns

The Vera Institute of Justice will provide additional targeted workshop trainings with specific groups: (1) workshops for all practitioners (district attorneys, defense counsel, magistrates, and judges) about how to make the hearings robust how to think through cases, and (2) a session specific to pretrial services and their role and expectations.

On October 13, 2020, Kenneth Hardin was appointed as Executive Director of the MAC. The MAC Office will coordinate work by private defense counsel appointed to represent those indigent persons who the Public Defender's Office does not represent.  Unless and until the felony judges approve a MAC program for the felony courts, the MAC Office will coordinate the appointed attorneys in misdemeanor cases only.   The MAC Office is crucial to this Consent Decree's success, given the proportion of misdemeanor cases in which appointed counsel to provide representation following the pretrial hearing (approximately 90%).  Mr. Hardin started work on November 21. Since his appointment, Mr. Hardin has secured office space close to the courthouse, launched a website, and is presently hiring leadership and staff.  The MAC Office will be making random assignments and evaluating appointed counsel's work to ensure high-quality work. They will provide holistic services, client support, case support, mentorship, and training. The Monitor Team met with Mr. Hardin on January 6, 2021, and introduced him to the Community Working Group ("CWG") on January 9, 2021.  We look forward to working with Mr. Hardin in his office's efforts to provide holistic services and support for private attorneys in misdemeanor cases.

## B. Data Analysis

Substantial work continues to be done, jointly with the Justice Administration Department ("JAD"), to prepare a data management system to permit analysis of misdemeanor cases in Harris County. We are extremely grateful to JAD for their hard work throughout these months to continue to create such a system.

We note that the average misdemeanor jail population has further declined, to about 330 people each day, in January 2021.  Quite a few more individuals, or about 1800 individuals, in the jail have misdemeanors with co-occurring felonies, however. We have been receiving daily jail roster updates from JAD.

### 1.  Race and Ethnicity Data

One important gap in these data concerns race and particularly ethnicity. In our first six-month report, we examined data regarding misdemeanor arrestees' race, and we had fairly complete data regarding race.  However, that data did not include information about ethnicity, as information regarding ethnicity is not commonly recorded at booking, and nor is it required to be

recorded.  We have continued to explore additional means to obtain more detailed race and ethnicity information.

The County conducted substantial work to obtain data from the Texas Department of Public Safety, to match driver's license information concerning self-reported race and ethnicity, with the names and addresses of persons booked on misdemeanors in Harris County.  However, we found that this additional data did not supplement a great deal of the missing information.  To provide one example of how much ethnicity data is missing from the existing records maintained by the County, on January 6, 2021, of the 330 individuals in the jail roster with only a misdemeanor charge, 95 were marked as Latinx, but 235 were marked as "N" for blank and "U" for unknown. Without reliable and comprehensive race and ethnicity data, it is not possible to fully determine whether a greater proportion of Black and Latinx people are being detained pretrial or whether more onerous conditions are more likely to be imposed on people who are not White. There are numerous other important questions that the Consent Decree requires us to investigate that we cannot fully explore without more reliable and comprehensive data.

In this report, we used a well-established statistical technique to predict defendants' ethnicity based on their last names, and present the estimated ethnic distribution of the defendant population. We plan to continue working closely with Harris County to collect accurate and reliable data on defendant ethnicity, and explore other data sources and statistical techniques to improve the accuracy of our prediction results.

## 2.  Crime Trends

As murders have gone up in Harris County, with this year's totals the highest in years, members of the public and public officials have understandably sought explanations.   We have noted some public statements linking homicides to "bail reform."  However, we find no evidence that bail reform has led to an increase in homicides, and those who have asserted otherwise have not identified any data to support the assertion.[17]  The only significant changes to bail proceedings in Harris County have occurred under this Consent Decree, and therefore have been limited to misdemeanors.  We note that homicides and shootings have gone up in a wide range of jurisdictions across the country.  Interestingly, in Harris County as in many other jurisdictions nationwide, a wide range of crimes, including other violent crimes like simple assaults, have also declined during the pandemic.[18]

Our first report briefly described the share of misdemeanor cases in which the defendant committed a new offense within a year. In this report, we extend the analysis by including several new analyses on the offense-specific re-arrest patterns. We also conduct additional analyses on the patterns of re-arrest among misdemeanor defendants who are homeless or have mental health problems identified in jail or case records.

---

[17] For a detailed analysis, *see* Memorandum, *Data On Crime, Overall Crime Trends in the City of Houston and Harris County, Odonnell Consent Decree Implementation, and Solutions to Address Violence and Support Crime Survivors*, Justice Administration Department, February 16, 2021.
[18] *Id.*

### 3.  Expanded Data

In our last report, we noted that we could only run initial analyses, but that we expected that the available data content and quality on the County-created data platform would greatly expand and improve over the next six months. It has greatly expanded and improved, but that said, there are still important data that remain to be vetted and incorporated.

One source of data that was missing from our initial six-month report was data concerning misdemeanor cases that are not initiated through a complaint, but rather are direct-filed. Still additional cases are now initiated through the new cite and release program begun by the Houston Police Department.  Our data now includes such cases.  In this report, our data analyses examine the following topics:

1.  Number of misdemeanor cases filed, including cases filed directly.
2.  Number of cases that belong to "carve-out" categories.
3.  Geographic distribution of misdemeanor defendants.
4.  Duration of pretrial detention.
5.  Types of initial bond approval and bond amounts set.
6.  Gender and racial disparity in initial bond approval and bond amounts set.
7.  Recidivism within 90, 180, and 365 days.
8.  Homelessness and mental health problems.

We note that analyses which *have not been completed* at this time include: court appearance and disposition outcomes (whether a dismissal, guilty plea, trial, or some other outcome).  We have not completed this analysis because we have only recently received the necessary data, and have just begun to examine and vet it for future analyses.

### 1.  Number of Misdemeanor Cases Filed

Our main data source is the case-level records on all misdemeanor cases filed in Harris County between January 1, 2015 and December 31, 2020. As noted above, our data has become more comprehensive since the first monitor report, and now contain information on cases initiated through a complaint, direct file cases, and cases initiated through the cite and release program.

We begin our analysis by presenting the number of misdemeanor cases in Harris County in Figure 1. Here, we consider each misdemeanor charge filed as a single case, and count multiple charges filed against the same person from a single arrest as separate cases. We observe a notable reduction in the number of misdemeanor cases over the 6-year period, which fell from roughly 63,000 per year in 2015 to 46,000 in 2020. We similarly observe a decline in the numbers of people held on misdemeanors in the Harris County jail, with approximately 500 people held on misdemeanors only in 2016, and approximately 320 people held only on misdemeanors at the time of this writing.

Figure 1: Number of Misdemeanor Cases



Some individuals are charged with multiple offenses from a single arrest, and Figure 1 almost certainly overstates the number of *people* arrested for misdemeanors in Harris County. To account for this duplication, we consider multiple charges filed against the same person on the same day as a single observation and report the number of misdemeanor defendants in Figure 2. From the two figures, it is clear that misdemeanor offenses in Harris County have gradually declined in recent years. Both the misdemeanor case and defendant counts fell by approximately 25 percent between 2015 and 2020. At this time, we cannot say what accounts for the decline, which could be due to fewer offenses committed, exercise of discretion to decline charges by law enforcement or by prosecutors, and the decline is likely due to some combination of factors.

Separately shown in Figure 2 is the number of misdemeanor defendants with a co-occurring felony case. Prior to 2019, there were fewer than 2,000 misdemeanor defendants also charged with a felony on the same day. But since then, this number has increased somewhat, and more than 3,000 people in 2020 were arrested for both a felony and a misdemeanor on the same day. We note that the bulk of persons detained in the jail are persons arrested for both a felony and misdemeanor charge. It remains to be seen whether this increase in co-occurring charges reflects a temporary deviation from the general trend or a more lasting, systematic change in the composition of misdemeanor defendant population.

24

Figure 2: Number of Misdemeanor Defendants



Next, we briefly discuss some of the key demographic characteristics of misdemeanor defendants such as sex, race, and ethnicity. Harris County follows the U.S Census Bureau, which adheres to 1997 Office of Management and Budget definitions, in which a person may self-identify as having both race (with categories of White, Black or African American, American Indian or Native Alaskan,  Asian, and Native Hawaiian or Other Pacific Islander), and ethnicity (Hispanic, Latino or Spanish).[19] Unlike the Census, however, the jail staff identifies individuals, and their data may not reflect how a person would self-identify, including if they were given the option to self-identify by selecting more than one category.  Regarding ethnicity, we use the term Latinx throughout this report. As discussed below, information regarding the ethnicity category is not required to be filled out and is often not filled out by the Sheriff's Office.

It is well-documented that males make up a much larger share of arrestees than females for most types of crime.[20] In the misdemeanor defendant population in Harris County, male arrestees accounted for more than 75 percent of all misdemeanor cases in Harris County in each of the last six years. We also note that, despite of the substantial changes in the misdemeanor bail system in recent years (described in more detail below), there has been little change in the gender composition of the misdemeanor defendant population between 2015 and 2020.

---

[19] U.S. Census Bureau, About, at https://www.census.gov/topics/population/race/about.html.
[20] Regarding gender, the HCSO Office does track those who identify as trans or non-binary. At the time of this report, the HCSO informed us that twenty such individuals housed in the jail identify as transgender.

Figure 3: Sex Distribution of Misdemeanor Defendants



Information on defendant race is available for virtually all misdemeanor defendants (98.5%) whose case was filed between January 1, 2015 and December 31, 2020. Among the defendants whose race information is available, blacks (41%) and whites (57%) make up the vast majority of the dataset, while Asians (1.9%) and Native Americans (0.1%) account for the rest. In Harris County, about 20% of the population is black and 70% is white, according to the most recent U.S. Census population estimates.[21] Figure 4 shows the shares of black and white misdemeanor defendants for each year between 2015 and 2020. We note that the racial distribution of misdemeanor defendants has been remarkably stable over the six-year period examined.

---

[21] U.S. Census Bureau, Quick Facts: Harris County, Texas, at
https://www.census.gov/quickfacts/fact/table/harriscountytexas,US/PST045219.

Figure 4: Racial Distribution of Misdemeanor Defendants



On the other hand, information on defendant ethnicity is missing for more than 50 percent of misdemeanor cases in the data, which is an important data limitation. In Harris County, approximately 44% of the population is Latinx.[22]  We plan to continue working closely with Harris County to accurately and systematically obtain data on defendant ethnicity. Meanwhile, we utilized a statistical technique to address this gap in the historical data. We used U.S. Census Bureau data to predict defendant ethnicity based on last names.[23] The prediction results seem to be quite accurate. For more than 130,000 people whose actual ethnicity (Latinx or non-Latinx) is observed in our data, the method correctly predicted their ethnicity more than 90 percent of the time.

Based on the prediction results, we present the ethnic composition of misdemeanor defendants in Figure 5.  Latinx defendants accounted for approximately one-third (34%) of misdemeanor cases in 2015, but this share gradually increased, reaching 40 percent in 2020.

We note that these predicted values may slightly overstate (or understate) the actual share of Latinx defendants from the previous years. Our method predicts that 37 percent of all misdemeanor defendants in the data are Latinx. However, among the defendants whose ethnicity

---

[22] U.S. Census Bureau, Quick Facts: Harris County, Texas, at
https://www.census.gov/quickfacts/fact/table/harriscountytexas,US/PST045219.
[23] We used the R package wru. The package predicts individuals' race and ethnicity by applying a well-established statistical technique, the Bayes' Rule, to the U.S. Census Bureau's Surname List from 2010, which contains information on the racial and ethnic composition associated with each last name.

is observed in the data, only 33 percent are listed as Latinx. In the future, we plan to improve the accuracy of our prediction results by utilizing both defendant name and address information and exploring other cutting-edge statistical methods.

Figure 5: Ethnic Distribution of Misdemeanor Defendants



## 2. Number of Carve-out Offenses

Under Local Rule 9, all misdemeanor arrestees must "have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non-financial conditions as soon as practicable after arrest", except for those who belong to the following "carve-out" categories:

9.4.1 Individuals arrested and charged for protective order and bond condition violations.[24]
9.4.2 Individuals arrested and charged for domestic violence (assault against family and intimate partners or terroristic threat against family and intimate partners).
9.4.3 Individuals arrested and charged for repeat DWI within the past five years.
9.4.4 Individuals arrested and charged with any new offense while on any form of pretrial release.
9.4.5 Individuals arrested on a capias issued after a bond forfeiture or bond revocation.
9.4.6 Individuals arrested while on any form of community supervision for a Class A or B

---

[24] We note that noncompliance with conditions of pretrial release is likely more common than is reflected by the number of charges filed for alleged violations of bond conditions because not every observed violation may result in a report of noncompliance.

misdemeanor or a felony offense.

Note that the first three carve-out categories concern the type of offense committed (such as domestic violence and DWI), while the last three concern the individual's status at the time of an arrest (such as pretrial release and community supervision). These cases are not mutually exclusive, and a single case may belong to more than one carve-out category. For example, an individual arrested for a repeat DWI while under community supervision would belong to the third and sixth carve-out categories at the same time.

Figure 6: Number of Carve-out Cases



At the time of our first report, our misdemeanor case data only contained a brief description of the offense that a defendant was arrested for. Since then, JAD has collaborated with the Office of Court Management for the CCCL ("OCM") to re-organize and refine the case data, and the information on the number of carve-out cases from each year and the exact carve-out categories they belong to is now available. We are extremely grateful to JAD and OCM data teams for their hard work and cooperation. At the same time, we also note that our carve-out analysis is not complete yet, and more work will be done in the future to improve and refine the quality of the data.[25]

---

[25] For example, terroristic threat against family and intimate partners belongs to the carve-out category 9.4.2, but the penal code associated with it (§ 22.07(c)(1)) is not observed in the data currently available. To address this data limitation, we instead count the number of cases that 1) are either associated with Penal Code § 22.07 (terroristic threat) or § 22.07(c) (terroristic threat against family, intimate partners, or public servant), and 2) are also flagged as domestic violence cases in the Harris County District Attorney Intake Management System (DIMS)

Figure 6 presents the number of misdemeanor cases that belong to one of the six carve-out categories. We find that the number of these carve-out cases have gradually increased over time (approximately 10,500 cases in 2015 and 14,000 cases in 2020). Moreover, given the steady decline in the number of total misdemeanor cases (also shown in Figure 6), it is noteworthy that these carve-out cases now account for a much larger share of the total misdemeanor cases.

Figure 7 provides a more detailed analysis, this time reporting the number of misdemeanor cases that belong to each of the six carve-out categories. (Recall that one misdemeanor case may belong to multiple carve-out categories.) While we find an increased number of cases across most carve-out categories, the biggest increases seem to come from domestic violence (9.4.2) and repeat DWI cases (9.4.3). It is also noteworthy that the number of domestic violence cases continued to increase in 2020, when there were far fewer misdemeanor cases recorded compared to the previous years. (See Figure 1.)

Figure 7: Number of Carve-out Cases, by Category



Even if a given misdemeanor case does not fall into one of the six carve-out categories, misdemeanor defendants under an active hold, including an immigration hold from the U.S. Immigration and Customs Enforcement ("ICE"), may still go through a different bail process from others. Figure 8 shows that the number of misdemeanor cases with an active hold, at any time during a case, has notably increased between 2015 and 2019 but somewhat fell in 2020. The number of cases with an immigration hold also follows a similar time trend, but the number of cases with a non-immigration hold seems to be more stable over time.

Figure 8: Number of Misdemeanor Cases with an Active Hold



### 3.   Geographic Distribution of Misdemeanor Defendants

For most misdemeanor cases filed recently, the defendants' last known street addresses are available in the data. We geocoded these addresses and aggregated them up to the neighborhood level to create a series of "heat maps," which illustrate the geographic distribution of misdemeanor defendants in Harris County across different years.[26]  We acknowledge that this is likely to be a rough approximation of the actual distribution, because the currently available data only contains information on defendants' last known addresses. (Put differently, for those who were arrested multiple times between 2017 and 2020, we do not observe their residential locations at the time of the initial arrest.) In spite of this limitation, the quality of the address data appears to be very good. Except for a very small number of invalid entries such as "homeless" in the address field, more than 90 percent of the valid street addresses were successfully geocoded. (A separate data analysis on the group of misdemeanor defendants flagged as homeless is presented below.)

The heat maps are presented in Figure 9. Note that the color coding corresponds to the share of misdemeanor defendants at the neighborhood-level, ranging from dark blue (25 defendants per 100,000 population) to bright yellow (1,250 defendants per 100,000 population). Most importantly, the geographic distribution of misdemeanor defendants seems very uneven across neighborhoods, and we find them to be heavily and persistently concentrated in a small number of neighborhoods. On the other hand, the share of misdemeanor defendant population

---

[26] We are extremely thankful to Marty Davidson (University of Michigan) who created the maps shown in Figures 9 and 10.

seems to have fallen in most neighborhoods across Harris County, suggesting that the recent decline in the number of misdemeanor cases and arrestees (shown in Figures 1 and 2) was not limited to specific neighborhoods.

Figure 9: Residential Locations of Misdemeanor Defendants, 2017—2020



To explore whether and how the observed distribution of misdemeanor defendants aligns with the distribution of economic disadvantage, we similarly present the heat maps of poverty and income in Harris County in Figure 10. The left panel of Figure 10 illustrates the distribution of neighborhood-level poverty rates (dark blue for poverty rates below 5%, bright yellow for 35% or higher), and the right panel median household income (dark blue for less than $20,000, bright yellow for $110,000 or more). Both poverty and median household income data are taken from the American Community Survey 5-year Estimates, for the years 2013-2017, which is a nationally representative survey program operated by the U.S. Census Bureau. Comparison between Figures 9 and 10 suggests that many misdemeanor arrestees live in economically disadvantaged neighborhoods, characterized by high poverty and low income level.

Figure 10: Economic Disadvantage in Harris County



## 4. Duration of Pretrial Detention

Next, we explore the duration of pretrial detention by counting the number of days between initial booking and release dates (provided that the release date is prior to the case completion date) or the number of days between initial booking and case completion dates (provided that the release date is after the case completion date. For the purpose of our analysis, if a misdemeanor defendant was detained multiple times prior to disposition, we only consider the duration of the initial detention.

Figure 11 indicates that most people arrested for a misdemeanor are now released relatively quickly. Specifically, in more than 80 percent of cases since 2017 (80% in 2017, 82% in 2018, 85% in 2019, and 86% in 2020), defendants spent two days or less in jail before their release. We also note that recent reforms in the misdemeanor bail system seem to have reduced the length of pretrial detention substantially. The largest reductions in the length of pretrial detention are observed in 2017 and 2019, the years when the preliminary injunction and Local Rule 9 became effective, respectively.

Figure 11: Duration of Pretrial Detention



## 5. Initial Bond Types, Amounts, and Failures

One of the most important consequences of Rule 9 is that most misdemeanor arrestees now need to be released on an unsecured personal bond or general order bond with the initial bond amount no more than $100. We now examine whether the actual bond decisions observed in the data are in line with the requirement, by documenting the patterns of bond approvals, unsecured bond approvals, and initial bond amounts set for misdemeanor arrestees. Since the time of our first report, JAD has collaborated with CCL to improve their bond data collection effort and refine the quality of the data. We are extremely thankful for their hard work and cooperation.

The share of misdemeanor cases in which defendants filed a bond and were released from jail before the first setting is shown in Figure 12. Consistent with the timing of recent bail reforms, the share of defendants who bonded out at the earliest stage of processing when benefits of release are most impactful has substantially increased since 2017 (the year when the preliminary injunction became effective) and continued to rise until 2019 (the year when Rule 9 became effective). In particular, we observe that defendants were released on a bond in more than 80 percent of misdemeanor cases since 2018.

Figure 12:  Share of Misdemeanor Cases in which Defendants Were Released on a Bond before First Appearance



While the overall trend of pretrial release (Figure 12) is informative, it is also important to examine how the bail reforms have changed the types of initial bond approval. Potential financial burdens faced by defendants may vary greatly, depending on whether they are released on a cash/surety bond or a personal/general order bond.

Figure 13 suggests that the reforms likely had an important impact on the types of bond approved for misdemeanor arrestees and substantially reduced their financial burdens. For example, in 2015, unsecured personal bonds were rarely given out (less than 10% of the total misdemeanor cases), and a vast majority of people released pretrial were released on either a cash or surety bond. However, the share of misdemeanor cases with surety/cash bonds has noticeably declined since 2017. By the year 2020, misdemeanor arrestees released before first appearance had a personal or general order bond in more than 65 percent of the time.

Figure 13: Types of Initial Bond Approvals



Next, we consider the distribution of initial bond amounts set and examine how it has evolved over the past years. Under Rule 9, most misdemeanor defendants are released on an unsecured bond without actually having to pay money. But for those who are not eligible for an unsecured bond, whether they can be released from jail or not remains strongly dependent on the amount of bond set. For this illustration, therefore, we consider the initial bond amount set from all bond records, regardless of whether a bond was actually filed or not.[27]

Figure 14 displays a marked shift in the distribution of initial secured bond amounts over recent years. Initial bond amounts of $100 or less were extremely rare before 2019, but such cases became much more common, now accounting for more than 65 percent of all misdemeanor cases in the sample from 2020. On the other hand, we note that the share of cases with initial bond amounts equal to or greater than $3,000 has significantly declined since 2015. Interestingly, these very large initial bond amounts are still observed in a small number of misdemeanor cases (approximately 5% in 2020). In the future report, we plan to conduct a more detailed analysis on these unusual cases, with a special focus on reasons for the very high bond amounts.

---

[27] Under the misdemeanor bail system in Harris County prior to Rule 9, a pre-determined bond amount would be set for some defendants at the time of complaint, who could post this bond amount and be released from custody before the 15.17 hearing. For those arrestees who bonded out this way and were released before the 15.17 hearing, we take their posted bond amount as the "initial bond amount set."

Figure 14: Distribution of Pretrial Bond Amount



From the evidence presented so far, it seems that recent bail reforms have significantly changed the patterns of pretrial release and bond approvals for misdemeanor arrestees, who are now much more likely to be released from jail on a personal or general order bond with a smaller bond amount. A closely related question is whether the prevalence of pretrial release on an unsecured bond led to a significant change in the bond failure rate. Taking advantage of the improved bond data, we computed the share of initial bonds that "failed," defined here as the bond approvals that resulted in bond forfeiture, bond surrender, or bond revocation within a year of the bond approval date.[28] We note that these data reflects the decisionmaking of individual judges whether to consider a person to have "failed" bond, and this is not any objective measure of appearance or non-appearance, flight, bond violations, or new criminal activity. Beginning in December 2020, as noted, a new set of definitions were adopted as the Consent Decree's court appearance policy was operationalized by the Office of Court Management.

With those limitations in mind, however, we did seek to describe what data does exist regarding bond failures.  In addition to reporting the overall bond failure rate, we also separately report the rate of one-year bond failure specific to each bond type (namely, personal bond, general order bond, and surety/cash bond). Note that the bonds approved in 2020 are dropped from this computation because most of them were approved less than a year ago and their one-year failure rate cannot be determined yet.

---

[28] We note that most bond failures take place within the first few months after they are issued. Among all initial bonds in our data that were approved between 2015 and 2019, 50 percent of the bond failures were observed within 43 days of the approval date, and 95 percent of bond failures within 290 days.

We find that the overall bond failure rate has notably increased since 2017 but somewhat fell in 2019. Perhaps more importantly, the year-to-year variation in the bond failure rate appears to be largely driven by the changes in the bond composition. The increased bond failure rates for 2017 and 2018 seem to reflect the prevalence of personal and general order bonds approved in these years, which tend to have a higher failure rate than cash/surety bonds. At the same time, we note that the trend in bond failure rates cannot be explained by the change in the bond composition alone. Although more personal and general bonds (and fewer cash/surety bonds) were approved in 2019, the overall bond failure rate slightly declined that year.  Finally, we note that bond failure rates may reflect both conduct by persons charged with misdemeanors, as well as decisions by judges whether to revoke or forfeit a bond, and we cannot at present assess the relative role of each in the observed patterns in the data.

Figure 15: Share of Bond Failures within 365 Days



## 6. Sex and Racial Disparity in Initial Bond Approvals

Next, we explore the extent of sex disparity in bond approvals. Figure 16 shows the share of misdemeanor cases in which defendants were released either on any bond (left panel) or an unsecured personal/general order bond (right panel). From the figure, it is evident that female defendants were more likely to bond out than their male counterparts prior to the bail reforms. However, this gender gap has gradually declined over time. In 2020, female defendants were slightly less likely than male defendants to bond out.

Similarly, prior to the misdemeanor bail reforms, there existed a sizable disparity in pretrial detention and release between black and white arrestees, especially in 2015 and 2016. Since then,

however, both black and white arrestees became much more likely to be released before the first setting, especially on a personal or general order bond, and this black-white gap in initial bond approvals has significantly narrowed over time. As of 2020, there is little difference in the pattern of pretrial detention and release between black and white defendants.

Figure 16:  Share of Misdemeanor Cases with Pretrial Release, by Defendant Sex



39

Figure 17: Share of Misdemeanor Cases with Pretrial Release, by Defendant Race



Figure 18: Share of Misdemeanor Cases with Pretrial Release, by Defendant Ethnicity



### 7.   Repeat Offending

Below, we present a preliminary analysis of repeat offending patterns by misdemeanor arrestees in Harris County. We emphasize that when examining repeat offending, one should carefully consider what types of repeat criminal conduct are to be examined, during what time periods, for what types of offenders, and based on what data sources. We will continue to engage in more detailed, thorough analyses of recidivism in future reports. However, based on the currently available data, examined in several different ways, we so far observe a quite stable rate of repeat offending before and after Rule 9 took effect in Harris County.

As our main outcome, we computed the share of misdemeanor cases in which a defendant was arrested for a new crime (either felony or misdemeanor) within 90, and 180, and 365 days of the initial case filing date. Each misdemeanor booking is counted as a "case." This is a quite broad definition of repeat-offending, because if a single person repeat-offenders more than once during those time periods, then each time it is counted as a new "case." If a person is arrested for two misdemeanor offenses on the same date, those are each counted as separate cases as well. Therefore, the figure below includes any instance in which a booking is followed by a new offense. For example, if a defendant was booked on a misdemeanor, but then arrested for a new crime within 90 days, and again within 180 days, and then a third time in the 180 days that followed, that person's re-offending is included as three separate cases in that year. We do not report the repeat offense rates for misdemeanor cases from 2020, as the 365-day repeat-offense outcome cannot be fully observed for these cases. (Felony and misdemeanor case data from 2020 are still used to determine whether misdemeanor cases from 2019 were followed by a new crime in 2020.)

We also examined several different time periods: 90, 180, and 365 days of the initial case. As with all such measures, the longer the time frame selected, the more repeat-conduct one tends to observe. We note that this difference may be partly driven by the fact that some arrestees spend weeks and months in jail pre- and post-trial, physically separated from the opportunities to repeat-offend. The extent of this "incapacitation effect" may be modest, given that a vast majority of pretrial detention last less than two weeks (Figure 11).

Figure 19: Share of Misdemeanor Cases with a New Case Filed within 90, 180, and 365 Days



Figure 19 visually summarizes the rate of repeat offenses by misdemeanor defendants within 90, 180, and 365 days. We find that roughly a quarter of misdemeanor offenses are followed by a new crime within a year, during the entire time period before and after the misdemeanor bail reforms took effect. We also note that the rate of repeat offenses remained stable, or somewhat declined, across the entire time period from 2015-2019. It is reassuring that we find a similar pattern across the three time periods considered. These findings give us greater confidence in the trends that we report here.

Next, to explore whether and how the repeat-offense trend differs across different crime types, Figure 20 separately presents the share of cases in which a misdemeanor defendant committed a new felony within 90, 180, and 365 days. As Figure 20 displays, the rate of felony repeat offending among misdemeanor arrestees has also been largely constant, although there seems to be a slight increase in felony repeat offending among misdemeanor defendants arrested in 2019. Their rate of one-year felony repeat offending increased from 12.8 percent in 2018 to 13.3 percent in 2019.

Figure 20: Share of Misdemeanor Cases with a New Felony Case Filed within 90, 180, and 365 Days



To complement the case-level repeat-offense analysis presented in Figures 19 and 20, we also present the offender-level repeat-offense analysis in Figure 21. In this analysis, a person arrested on four separate occasions within a calendar year, for example, is considered as one repeat-offender, not three. Perhaps not surprisingly, computing the rate of repeat offense this way yields a slightly lower rate of repeat offending than the case-level computation: 23.7 percent of all misdemeanor cases filed in 2019 were followed by a new arrest within 365 days, but 20.5 percent of people arrested for a misdemeanor offense in 2019 were re-arrested within 365 days. We also note that, out of all who were arrested for a misdemeanor offense in 2019, only 1.1 percent were re-arrested on four or more separate occasions within 365 days.

Figure 21: Share of Misdemeanor Arrestees with a New Case Filed within 365 Days



## 8. Vulnerable Populations

The Consent Decree was intended to improve court appearance and public safety while maximizing pretrial liberty, and calls for more research on socioeconomic and structural factors that may aggravate defendants' non-appearance and criminal risks. A natural starting point would be to analyze the existing recidivism data from Harris County, with a special focus on vulnerable demographic groups, such as those who lack permanent housing and/or have known mental health problems.

Thanks to JAD's hard work, additional information on misdemeanor defendants' housing situations and mental health conditions are now linked to their case records. Specifically, we now can identify misdemeanor defendants who lack permanent housing, based on the list of homeless individuals provided by the Coalition for the Homeless of Houston/Harris County. (This list includes people whose reported addresses match the addresses of local homeless shelters.) One important data limitation is that the list is periodically updated to reflect the group of currently homeless people. However, these data may not reflect the housing status of misdemeanor defendants at the time of their arrest, and nor will it reflect individuals who are homeless but do not have a homeless shelter address. Instead, the data should be viewed as an incomplete snapshot of the homelessness situation for all current and former misdemeanor defendants in Harris County as of January 2021.

Next, to identify misdemeanor defendants with a known mental health problem, we utilize the mental health data collected from the intake process. During the intake process, an arrestee

may be suspected of having mental illness based on the person's records from four different data sources: 1) jail pharmacy, 2) jail EMR (electronic medical records), 3) the Harris Center for Mental Health and IDD (intellectual and developmental disabilities), and 4) jail suicide watch. In the analysis below, we consider a misdemeanor arrestee to have a mental health problem if the person came back "positive" in any of these four data systems.

Similar to the homelessness data, however, information on each arrestee's mental health status is constantly updated and only reflects the person's mental health status at the time of last booking observed. We acknowledge this data limitation, which should be kept in mind when interpreting the figures below.

Under the Texas Code of Criminal Procedure Article 16.22, if a defendant is suspected of having mental illness or intellectual disability, the magistrate is required to review a written assessment of the defendant's mental health. We note that JAD is actively working on collecting more data elements related to this 16.22 requirement, which should help us better understand the misdemeanor defendant population with mental health problems in Harris County and how their issues and needs are evaluated and addressed by the magistration process.

Figure 22: Shares of Misdemeanor Cases with Defendants who are Homeless or Have Known Mental Health Problems



We find that the share of misdemeanor cases with defendants who are homeless or have a mental health problem has either somewhat declined (homeless) or mostly remained constant (mental health). The share of cases filed against homeless defendants ranged between 14 and 16 percent until 2019 but eventually fell below 12 percent in 2020. On the other hand, throughout our

study period, the share of cases involving defendants who have a mental health problem constantly remained at around 30 percent, except a brief and modest increase in 2019 (35 percent).

The next two figures show one-year repeat offense rates of misdemeanor arrestees who are homeless (Figure 23) and those with known mental health problems (Figure 24). Note that these figures correspond to the rate of repeat-offense at the person-level (See Figure 21). Perhaps not surprisingly, we find that both groups are considerably more likely to commit a new offense relative to the general population. Approximately 40 percent are re-arrested for a new offense within a year and more than 20 percent are re-arrested for a new felony offense within a year, which is nearly twice as high as the rate of repeat-offense by the general population, presented in Figure 21.

Moreover, it seems that repeat-offending is more prevalent among those who are homeless or have a mental health problem, though still very low. For example, 3.5 percent of the homeless population who were arrested for a misdemeanor in 2019 were later re-arrested on four or more separate occasions within 365 days. Similarly, 2.9 percent of those with a mental health problem who were arrested for a misdemeanor in 2019 were later re-arrested on four or more separate occasions within 365 days. These shares are substantially higher than that from the general population (1.1%).

Figure 23: Share of Misdemeanor Arrestees Experiencing Homelessness  with a New Case Filed within 365 Days,



46

Figure 24: Share of Misdemeanor Arrestees with a New Case Filed within 365 Days, Arrestees with a Mental Health Problem Only



## III.  Cost Study and Project Management

This section of the Monitor Report reviews the status of two responsibilities assigned to PPRI at Texas A&M University.  Section A reviews the methods being used to assess cost impacts of bond reform in Harris County, and describes the current status of that undertaking.  In addition, two specific research questions are investigated.  In Section B we review progress on PPRI's project management function tracking progress of the Parties in addressing requirements of the Consent Decree.

### A.  Cost Study

Understanding cost is an important aspect of the pretrial reform required by the ODonnell Consent Decree.  Not only is affordability essential to implementation, but effective overall system design depends on understanding where limited resources can best be expended to achieve the most good.   In the first year of the monitorship, a great deal of data has become available to support cost analysis, but there is more work ahead.  The next section, "Cost Data Collection Status," provides an update and vision for the overall cost evaluation.

Next, there are two specific cost-related questions that can be explored with the data currently available.  The first, "Analysis of the Cost of Secured Bond" details how bond amounts and costs to defendants have changed with the implementation of bond reform.  The second, "Analysis of Misdemeanor Defendants with Longest Pretrial Jail Stays," offers additional insight

into the characteristics of relatively high-cost people accounting for the 99th percentile of longest pretrial detention.

### 1. Cost Data Collection Status

Over the past year, much of the work on the cost evaluation has centered on collecting three distinct but complementary types of data. The first is information about the costs to departments responsible for criminal case processes. PPRI has had extensive communication with representatives of the departments depicted in Table 1 with the objective of finding the budget totals allocated toward case-level costs depicted in the third column. Some of these discussions are ongoing.

Although the initial intent was to gather separate estimates by year, this has proven logistically difficult for most departments. Instead, the current approach is to standardize per-unit costs for FY19-20 and apply those as inflation-adjusted estimates in all other years under study. Using this approach, it will not be possible to account for all actual costs in every year. Still, the standardized metric will provide a means to broadly assess areas where costs are escalating or declining as a function of new pretrial release policies. It is also worth noting that analysis will focus on the direct line staff and direct supervisory costs that are most immediately impacted by case processing changes. Indirect costs supporting administrative functions such as clerical support, human resources, IT, or staff counsel as examples, are excluded because they are generally fixed costs not sensitive to changing caseloads.

Table 1.  Budget Data Sources

| Department | Primary Contact | FY20 Case-Level Costs |
|---|---|---|
| Community Supervision and Corrections Dept. | Dr. Theresa May | • Cost of Probation<br>• Specialty Court Treatment |
| District Attorney | JoAnne Musick | • Case Screening and Intake<br>• Bond hearing<br>• Prosecution<br>• Special prosecution |
| Pretrial Services | Dennis Potts | • Pretrial Screening<br>• Pretrial Supervision |
| Public Defender | Alex Bunin | • PDO Defense |
| Private Appointed Counsel | Auditor's office | • Private Appointed Defense |
| Office of Court Management | Ed Wells | • Court Appearance<br>• Specialty Court Participation |
| Sheriff's Office | Maj. Patrick Dougherty and Michael Landry | • JAD Intake and Booking<br>• Pretrial Detention |
| Houston Police Department | Public Information Office | • Arrest |
| Harris Center for MH and IDD | Wayne Young, Keena Pace, Monalisa Jiles | • Article 16.22 Evaluation<br>• Emmett Center Diversion<br>• Competency Restoration<br>• Jail Mental Health Treatment |

Individual defendant records form the second component of the cost evaluation. Database elements track the specific experiences of arrestees through all the departments represented in Table 1. Counts of their experiences will be divided into department budget data to get per-unit costs. Most individual defendant data is stored in the central JWeb data hub, but is controlled and understood by the various departments that design, maintain and manage the records. The JAD data team has served as an effective go-between to map and acquire data sources on behalf of the Monitor team -- a complicated ongoing task.

Last, some cost components cannot be determined using actual Harris County expenditure or defendant data, but are nonetheless essential for understanding the comprehensive impact of bond reform. Cost to defendants or families emanating from contact with the criminal justice system, pretrial detention, conviction, or sentences, or costs to victims when the bond system fails, can be retrieved from the research literature. While this work is also ongoing, the current status of department, individual, and research-based cost data is summarized in Appendix E.

## 2. Analysis of the Cost of Secured Money Bond

When the court sets *secured* conditions for pretrial release, money must be posted in order for arrestees to get out of jail. With *unsecured* release, a bond amount is also set, but money is only required if defendants fail to meet the court's conditions. Secured bonds paid by the arrestee are considered "cash" bonds. People who cannot afford cash pay a non-refundable 10% premium to a bond company to post the amount on their behalf.

For accused individuals detained on a secured bond, ability to pay is of great consequence. The longer a person remains jailed after arrest – away from family, employment, and freedom – the greater the pressure to plead irrespective of actual guilt or innocence. In Section C of this report, Rule 9 has been shown to have increased the share of misdemeanor cases released before the first court appearance (Figure 12), reduced the number of cases with secured terms of release (Figure 13), and where secured terms are required, lowered bond amounts required by the courts (Figure 14). Here we look more closely at the impact of these developments on the costs of bond to defendants.

While earlier analyses examined bond patterns before the first court setting, we take a longer view tracking the initial bond for up to nine months after booking. The analysis interval is standardized so that cases booked in recent months have the same time and opportunity for bond-related outcomes as older cases.[29] The sample therefore includes cases released promptly after arrest as well as those still detained up to the end of the nine-month window. These longer-held cases are those most likely to have unaffordable secured money bond conditions. Outcomes for cases pending after nine months are omitted from study.[30]

---

[29] With a data draw date in late January 2021, April 30, 2020 was the latest booking date that allowed a full 9 months for bond outcome analysis for all cases.
[30] By truncating analysis at 9 months post-booking, all cases have the same amount of time to potentially make bond, thereby eliminating time as a source of bias in results. Had a standardized analysis interval not been used,

Table 2.  Description of Analysis Sample

| Year | n | Cases with 9 Months of Data | |
|------|---|--------------------------------------------------------------|-----------------------------------------------------------------------------------------------|
| | | % of Cases Disposed within the 9-Month Analysis Interval | Days to Case Disposition within the 9-Month Analysis Interval<br><br>Median<br>(mean, sd) |
| 2015 | 35,557 | 93% | 9 days<br>(48.0, 67.2) |
| 2016 | 44,318 | 90% | 22 days<br>(59.7, 71.3) |
| 2017 | 37,765 | 83% | 54 days<br>(78.2, 77.3) |
| 2018 | 34,706 | 78% | 81 days<br>(94.8, 79.0) |
| 2019 | 37,216 | 59% | 95 days<br>(104.0, 80.7) |
| 2020 | 12,173 | 32% | 95 days<br>(110.4, 92.3) |

Table 2 helps us understand more about the analysis sample.  Notably, the proportion of cases that are disposed within the nine-month analysis interval, and therefore with full information about all bond outcomes, has declined by a remarkable two-thirds from 93% in 2015 to 32% in 2020.  At the same time, the median days required to dispose these cases has increased ten-fold from 9 to 95 days.  It is not yet clear how these changes in the length of the pretrial period might impact bond status.  However, bond is ordinarily determined in the early stages of a case and significant changes in bond types or rates of release are not common after nine months.  This assumption will be empirically validated in future analysis.

**Weighted Average Cost of Bond.**  To assess the overall direction in costs of pretrial release, a weighted average was computed as follows.  The sum of cash and surety bonds required by the courts was divided by the number of cases represented; cases with unsecured terms were weighted at a $0 cost of release.  This analysis is useful because it concisely captures the full impact of multiple convergent trends in Harris County bond practices.

Results presented in Table 3 depict a stunning drop in the aggregate amount of bonds set by the courts since the implementation of Rule 9.  In 2015 a money-based bond system prevented pretrial release for most arrestees.  Defendants were asked to post more than $135 million as a condition of release on misdemeanor offenses.  Unsecured bonds were rare:  people facing low-level charges were expected to pay an average $3,799 per case.  Of over 35,000 cases booked (see "Initial Bond Set by the Court"), only about 13,000 cases (37%) got out of jail before their case

---

recently booked cases would be less likely to make a secured bond because they would have less time to do so compared to cases booked further in the past.

was disposed at an average cost of $2,492 per case, or $33 million in bonds paid altogether (see "Bond Met by Defendants").

Table 3.  Weighted Average Bond Required by the Court for Release

*Note:  2020 data for "Amount of Bond Met by Defendants" is projected based on actual results for cases booked in the first four-months of the year and followed for bond outcomes up to n after booking).*

| | Initial Bond Set by the Court | | | Bond Met by Defendants | | |
|---|---|---|---|---|---|---|
| Year | Cases with Bond Set | Weighted Average Cost of Release per Case Set by Courts *(Unsecured bonds are weighted @ $0 cost of release)* | Extrapolated Total Cost of Release | Cases with Any Bond Made (within 9 Mos. of Booking) | Weighted Avg. Cost of Bond per Case Met by Defendants (within 9 Mos. of Booking) *(Unsecured bonds are weighted @ $0 cost of release)* | Extrapolated Actual Amounts for Release Paid by Defendants (within 9 Mos. of Booking) |
| 2015 | 35,557 | $3,799 | $135,081,043 | 13,288 | $2,492 | $33,113,696 |
| 2016 | 44,318 | $3,319 | $147,091,442 | 21,757 | $1,924 | $41,860,468 |
| 2017 | 37,765 | $1,808 | $68,279,120 | 26,041 | $846 | $22,030,686 |
| 2018 | 34,706 | $684 | $23,738,904 | 26,772 | $363 | $9,718,236 |
| 2019 | 37,216 | $259 | $9,638,944 | 31,959 | $144 | $4,602,096 |
| 2020 | 36,495 | $363 | $13,247,685 | 32,700 | *Projected: $255* | *Projected: $8,338,500* |

By 2020, a different story could be told.  Under Rule 9, secured money bond was reserved for  cases in carveout categories that hearing officers deemed at higher risk of bond failure based on an individualized review.  Subsequently, in 2020 the courts have set bonds valued at one tenth of the amount required five years ago:  $13.2 million total for a similar number of cases.  The cost for a single misdemeanor case dropped precipitously from $3,799 in 2015 to just $363, and the share of cases able to make bond approaches 90%.  These findings are driven by increased use of unsecured personal bonds and general order bonds, combined with constraints on eligibility for secured money bond and reductions in secured bond amounts.  Further analyses were conducted to understand these patterns more deeply.

**Rates and Cost of Secured Bond.**  Table 4 provides greater detail illustrating two complementary trends in how bond is being set and paid.  First, the share of cases for which money is required for pretrial release has fallen sharply (see "Secured Bond Set by the Court"). In 2015, nine of every ten cases had secured monetary terms, vs one in ten cases (14%) in 2020.  One -third of 2015 cases (34%) required largely impoverished defendants to paid a 10% non-refundable

premium to a bail company (see "Surety Bond Made).  Most (57%), unable to pay even the 10% premium, were either still detained when the case was disposed or were held for the duration of the nine-month analysis interval (see "No Bond Made).  Interestingly, a majority (53%) of these secured bond cases where no bond was made were disposed within three days suggesting the possibility that unaffordable bond may have led to coerced pleas in some instances.  By 2020, however, only 8% of cases required the purchase of a surety bond for release, and only 4% had not made bond by the end of the nine-month analysis period.

Table 4. Secured Bonds within 9 Months of Booking

| Year | n | Secured Bond Set by Court | Defendant Outcomes for Secured Bonds Set by the Court | | | | | |
|------|---|---------------------------|-----------------|--------------------------|-----------------|--------------------------|-----------------|--------------------------|
| | | | Surety Bond Made | | Cash Bond Made | | No Bond Made | |
| | | | % | Median (mean, sd) | % | Median (mean, sd) | % | Median (mean, sd) |
| 2015 | 35,557 | 92% | 34% | $2,500 ($3,022, $3,495) | 2% | $500 ($1,074, $1,148) | 57% | $5,000 ($4,581, $6,677) |
| 2016 | 44,318 | 85% | 37% | $2,000 ($2,676, $3,251) | 3% | $500 ($1,039, $2,065) | 45% | $5,000 ($4,700, $7,697) |
| 2017 | 37,765 | 52% | 27% | $1,500 ($2,280, $2,833) | 3% | $500 ($861, $904) | 23% | $5,000 ($4,495, $7,866) |
| 2018 | 34,706 | 33% | 19% | $1,000 ($1,448, $2,170) | 2% | $500 ($756, $659) | 12% | $1,000 ($2,605, $5,665) |
| 2019 | 37,216 | 17% | 9% | $1,000 ($1,452, $2,424) | 3% | $100 ($293, $580) | 5% | $1,000 ($2,017, $5,373) |
| 2020 | 12,173 | 14% | 8% | $1,000 ($2,338, $4,750) | 3% | $100 ($258, $558) | 4% | $1,000 ($2,720, $6,932) |

Second, just as fewer secured bonds are being set, amounts required have also declined. The median surety bond made in 2020 ($1,000) was 60% less than in 2015, and the median cash bond ($100) – paid in whole by the defendant – was 80% lower.  Only a small share of cases, 2% to 3%, can shoulder the full cost of release, and people facing higher secured amounts are still more likely to pay for a surety.  Still, the trend away from courts setting high-cost secured bonds has benefitted people with few financial means as the data shows a dramatic decline in the number "poverty holds" driven by inability to pay.

**Personal Cost of Bond to Arrestees.**  Table 5 translates the general bond values depicted in Table 4 into the practical expense to individuals for pretrial release.  Here we use the average so results are sensitive to the full range of bonds above or below the median.  Surety bonds and unpaid secured release are both estimated at a cost to arrestees of 10% of the full bond amount.  In the column headed "Surety Bond Paid/Case," findings show that if non-refundable surety bonds in 2015 cost an average $302 for each misdemeanor case, when multiplied by the number of cases affected, bond companies received over $3.6 million in bond fees that year (see "Actual Cost of Surety Bond to Defendants").  In 2016, due to higher case volume, bond company profits were as high as $4.4 million.

52

Table 5.  Average Bond Costs per Case to Defendants
within 9 Months of Booking

*Note: Results for the first four months of 2020 are projected over twelve months to produce an annual estimate.*

| Year | @ 10% of Full Bond Amount | | Full Refundable Bond Amount | | @ 10% of Full Bond Amount | | @ $0 |
|------|---------------------------|---------------------------|-----------------------------|-----------------------------|---------------------------|---------------------------|------|
| | Surety Bond Paid/Case | Actual Cost of Surety Bond to Defendants | Cash Bond Paid/Case | Actual Cost of Cash Bond to Defendants | Unpaid Secured Bond/Case | Total Unpaid Secured Bond Cost | Unsecured Bond |
| 2015 | $302 x 11,986 cases | $3,619,772 | $1,074 x 699 cases | $750,726 | $458 x 20,849 cases | $9,548,842 | $0 x 2.023 cases |
| 2016 | $268 x 16,537  cases | $4,431,916 | $1,039 x 1,486 cases | $1,543,954 | $470 x 21,126 cases | $9,929,220 | $0 x 5,169 cases |
| 2017 | $228 x 10,143 cases | $2,312,604 | $861 x 961 cases | $827,421 | $449 x 10,471 cases | $4,701,479 | $0 x 16,191 cases |
| 2018 | $145 x 6,678 cases | $968,310 | $756 x 842 cases | $636,552 | $260 x 6,735 cases | $1,751,100 | $0 x 20,451 cases |
| 2019 | $145 x 3,493 cases | $506,485 | $293 x 1,124 cases | $329,332 | $202 x 3,354 cases | $677,508 | $0 x 29,245 cases |
| *4 Mos. Actual 2020* | *$234 x x 933 cases* | *$218,322* | *$258 x 314 cases* | *$81,012* | *$272 x 858 cases* | *$233,376* | *$0 x 10,068 cases* |
| *Projected 12 Mos. 2020* | *$234 x 2,799 cases* | *$654,966* | *$258 x 942 cases* | *$243,036* | *$272 x 2,574 cases* | *$700, 128* | *$0 x 30,068 cases* |

Since the ODonnell Consent Decree, however, per-defendant costs have been as low as $145 in recent years, and profits to bail-bond companies for misdemeanor cases have remained below $1 million annually since 2018.  Interestingly, as the volume of secured money bonds declines, though, in 2020 defendants' cost per case appears to again be rising.  This could signal that hearing officers and judges are deploying financial bond more purposively now than in earlier years as a tool to detain a small group of higher-risk defendants while relieving individuals judged lower risk of this financial burden.

**Conclusion.**  In conclusion, there is strong evidence that Rule 9 and the Consent Decree have effectively lowered the cost of pretrial release  and significantly increased affordability of pretrial release for misdemeanor defendants.   Secured bonds, once used routinely and unquestioningly, are now set in fewer than 20% of misdemeanor cases.  When the courts do require secured bond, the amount is increasingly commensurate with individuals' ability to pay, and profits to bond companies from low-level cases have fallen by millions of dollars.

## 3.   Analysis of Misdemeanor Defendants with Longest Pretrial Jail Stays

The Six Month Monitor Report revealed that, for 99% of misdemeanor defendants, the median number of days spent in pretrial detention has declined from two weeks to only five days (Figure 25).  Yet, there remains a small subset of people who await release for much longer periods of time.  In addition to concern about lengthy detention of people presumed innocent, because this

special class of defendants is also among the most costly it is important to understand more about their characteristics.

Figure 25:  Misdemeanor Detention Percentiles and Jail Cost



To explore this question further, completed misdemeanor-only cases with the longest initial pretrial jail stays – in the 99th percentile – were selected for further descriptive analysis.  Only initial jail stays were considered, and cases with co-occurring felonies were excluded from analysis.

Table 6.  Length of Detention for Cases by Pretrial Detention Percentile

| Year | 99th Percentile | | Less than 99th Percentile | |
|---|---|---|---|---|
| | n | Median (mean, sd) | n | Median (mean, sd) |
| 2015 | 318 | 102.5 (117.1, 44.6) | 31,369 | 1 (5.2, 10.3) |
| 2016 | 419 | 94 (110.6, 49.8) | 40,766 | 1 (4.1, 8.8) |
| 2017 | 360 | 89 (114.7, 85.5) | 35,576 | 1 (2.6, 6.8) |
| 2018 | 335 | 130 (160.7, 90.9) | 32,594 | 1 (3.1, 9.7) |
| 2019 | 288 | 129.5 (150.6, 62.5) | 27,772 | 1 (3.2, 10.1) |
| 2020 | 209 | 81 (105.8, 63.6) | 3,912 | 1 (2.7, 6.6) |

Table 6 shows the differences in the time spent awaiting trial for these extreme cases.  While at least half of misdemeanor cases are detained for median one day or less, these cases experience median jail stays of three months or longer.  Further analysis was conducted to better understand the attributes of this unique group of defendants.

**Demographic Characteristics.**  Compared to the general population of misdemeanor cases, those detained the longest are more likely to be male (88% vs. 78%) and more likely to be Black (51% vs. 44%), with approximately equal proportions of people of Hispanic ethnicity (Table 7).  Importantly, they are also strikingly more vulnerable, with markedly greater prevalence of mental health concerns (64% vs. about 38%) and housing instability (28% vs 20%) than other misdemeanor arrestees.

Table 7.  Demographic Indicators by Pretrial Detention Percentile

|  | 99th Percentile (n=1,929) | Less than 99th Percentile (n=171,989) |
| --- | --- | --- |
| Male | 88% | 78% |
| Black Race | 51% | 44% |
| Hispanic Ethnicity | 31% | 34% |
| Mental Health Indicator | 64% | 38% |
| Homeless Indicator | 28% | 20% |

**Holds and Warrants.**  Cases in the 99th percentile are more likely to be complicated by holds and warrants (Table 8).  About three times more long-detained cases have had either an immigration hold (13% vs. 4%) or a hold for other reasons like other offense charges, court-order violations, unpaid fees or fines, or to allow for administrative records consolidation (34% vs. 12%).

Table 8.  Holds and Warrants by Pretrial Detention Percentile

|  | 99th Percentile (n=1,929) | Less than 99th Percentile (n=171,989) |
| --- | --- | --- |
| Immigration Hold | 13% | 4% |
| Hold for a Violation | 34% | 12% |
| Any Warrant | 87% | 76% |
| Multiple Warrants | 7% | 16% |
| Alias Capias on Forfeiture of Bond | 0% | 5% |

Although lengthy pretrial detainees are more likely to have had a warrant relating to the current case (87% vs. 76%), they are about half as likely to have multiple warrants issued (7% vs. 16%).  Warrant types indicating a bond forfeiture are rare among the longest-held cases (0% vs. 5%).

**Offense Types.**  Overall, long-detained cases are about twice as likely to involve serious misdemeanors (33% vs. 15%) compared to cases with earlier release (Table 9).  While only 1% of cases in either group are recognized as "violent assaults" by the Uniform Crime Reporting (UCR) Program, other serious misdemeanors classified as assaults against family members (5% vs. 1%), other assaults (23% vs. 13%), and sex offenses[31] (3% vs. 1%) are all more frequent in 99th detention percentile cases.

Table 9.  Assaultive or Sex Offenses by Pretrial Detention Percentile

|  | 99th Percentile (n=1,929) | Less than 99th Percentile (n=171,989) |
|---|---|---|
| UCR Violent Assault | 1% | 1% |
| Assault Against Family | 5% | 1% |
| Other Assault | 23% | 13% |
| Sex Offenses | 3% | 1% |
| All Assaultive or Sex Offenses Combined | 33% | 15% |

In the remaining UCR offense categories (Table 10), longer-detained cases were somewhat more likely to have charges of disorderly conduct or vandalism (7% vs. 4%).  However, people with shorter pretrial jail stays have more charges in virtually all remaining offense categories.  These include property offenses (12% vs. 14%), as well as drug- or alcohol-related violations like driving under the influence, drug abuse, and "vice" offenses like gambling, drunkenness, and prostitution, and  (48% vs. 66%).

Table 10.  Other Offenses by Pretrial Detention Percentile

|  | 99th Percentile (n=1,929) | Less than 99th Percentile (n=171,989) |
|---|---|---|
| Disorderly Conduct, Vandalism | 7% | 4% |
| Property Offenses: Burglary, Arson, Larceny, Theft | 12% | 14% |
| All Other Offenses:  Weapons, Fraud, Drug Abuse, DUI, Prostitution, Forgery, Drunkenness, Gambling, Liquor Laws, Other | 48% | 66% |

**Pretrial Release.**  Considering the great expense of jail, pretrial release for appropriate cases is key to cost containment. Table 11 shows cases in the 99th percentile experience much lower access to bond overall.  Since 2015, three times as many people with lengthy pretrial detentions eventually gain release on unsecured bonds.  Still, just unsecured release is significantly lower overall than for other misdemeanor cases (12% vs. 55%).

---

[31] Sex offenses charged as misdemeanors can include sexual touching or offenses such as indecent exposure that do not involve contact.

Table 11.  Bond Made by Pretrial Detention Percentile

| Year | 99th Percentile | | | | Less than 99th Percentile | | | |
|---|---|---|---|---|---|---|---|---|
| | n | Released on Unsecured Bond | Released on Surety/ Cash Bond | No Pretrial Release | n | Released on Unsecured Bond | Released on Surety/ Cash Bond | No Pretrial Release |
| 2015 | 318 | 4% | 5% | 91% | 31,369 | 2% | 34% | 68% |
| 2016 | 419 | 6% | 5% | 89% | 40,766 | 2% | 41% | 61% |
| 2017 | 360 | 9% | 4% | 88% | 35,576 | 16% | 31% | 53% |
| 2018 | 335 | 12% | 4% | 84% | 32,594 | 33% | 23% | 44% |
| 2019 | 288 | 13% | 5% | 82% | 27,772 | 57% | 11% | 32% |
| 2020 | 209 | 12% | 7% | 81% | 3,912 | 55% | 7% | 38% |

The majority of cases in the 99th percentile without unsecured release must post a secured money bond to get out of jail.  However, with a median bond amount two to four times higher than for other misdemeanor cases (Table 12), over 80% remain detained until case disposition.  It is possible that financial bond is being used in these instances as a tool of the court to strategically detain cases considered an immitigable risk of flight or to safety; as discussed below, however, most end in acquittal or dismissal.

Table 12.  Financial Bond Amounts Met
by Length of Pretrial Detention

| Year | 99th Percentile | | | Less than 99th Percentile | | |
|---|---|---|---|---|---|---|
| | n | % | Median (mean, sd) | n | % | Median (mean, sd) |
| 2015 | 318 | 5% | $5,000 ($8,875, $7,924) | 31,369 | 34% | $2,000 ($2,918, $3,647) |
| 2016 | 419 | 5% | $5,000 ($4,783, $2,472) | 40,766 | 41% | $1,500 ($2,457, $3,301) |
| 2017 | 360 | 4% | $3,000 ($3,038, $2,056) | 35,576 | 31% | $1,000 ($1,985, $2,568) |
| 2018 | 335 | 4% | $1,000 ($1,967, $1,747) | 32,594 | 23% | $500 ($1,302, $1,935) |
| 2019 | 288 | 5% | $2,000 ($2,123, $1,532) | 27,772 | 11% | $500 ($1,159, $2,296) |
| 2020 | 209 | 7% | $1,000 ($1,164, $1,242) | 3,912 | 7% | $500 ($1,801, $2,966) |

**Case Disposition.**  Even brief pretrial jail stays frequently cause arrestees to plead guilty, but most cases in the 99th percentile demonstrate a markedly different pattern. After failing in

most instances to make bond (Table 11) and spending months more time in detention than any other misdemeanor cases (Table 6), over half of the 99th percentile (52% vs. 42%) ultimately end in an acquittal or dismissal.

**Conclusion.**  More perspective on the qualitative attributes of 99th percentile cases would improve understanding of why they remain in jail so long.  Overall, we find these long-detained cases represent a more vulnerable population with higher rates of mental illness and housing instability.  They are also more likely to have risk attributes related to holds, warrants, and assaultive misdemeanor charges. They have benefited only marginally from higher rates of non-financial release and more affordable financial bonds.  But they are also more likely than not to avoid a conviction even after months in detention. Further qualitative and quantitative investigation is needed to understand the reasons for this costly pattern of case processing and to consider if barriers to release might be addressed in order to resolve these cases more efficiently.

### 4.  Project Management

PPRI at Texas A&M University, is charged with maintaining information necessary to manage the monitorship and assure careful tracking of Consent Decree implementation.  The project management function is at the operational center of the monitorship, receiving real-time progress updates from the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved.  We owe a debt to the Justice Administration Division team for assisting with this work and for keeping us apprised of progress being made in departments across the County.  The JAD team has also enabled access to Harris County's Office 365 system which has proven to be a highly functional information center offering a number of tools to enable ongoing exchange.  A status summary of Consent Decree requirements due in this reporting period is presented in Appendix F.

## V.  Community Outreach, Participation, and Working Group



We completed the above website to make Monitor-related documents and announcements available to the public online: https://sites.law.duke.edu/odonnellmonitor/. We have conducted a series of individual calls with stakeholders, as described, ranging from the District Attorney's Office, to public defenders, pretrial services, community nonprofits, and others.

The parties have conducted a public meeting (via remote access due to COVID), as set out in paragraph 91-92 of the Consent Decree. We expect the parties to conduct such meetings, whether remotely or in person, in the next reporting period.

The key policies regarding the Consent Decree have been made available at the JPC and courthouse, as well as online, as set out in Paragraphs 93-94. They are available at: https://jad.harriscountytx.gov/.

Second, we have convened a Community Work Group (CWG), consisting of a group selected to include a diverse set of Harris County stakeholders, to share our findings and solicit feedback on the implementation of the Consent Decree. We have conducted nine such meetings to date. The CWG members include: Hiram Art Contreras, Thao Costis, Allen Douglas, Guadalupe Fernandez, Tara Grigg Green, Jay Jenkins, TK Koontz, Johnny Mata, Maureen O'Connell, Tim Oettmeier, and Sybil Sybille. (Their biographical information is found on the Monitor website and in Part I.)

The CWG has heard presentations from numerous county officials such as Kenneth Hardin, the Executive Director of the Office of Managed Assigned Counsel; Brandi Ebanks Copes, Racial Disparity and Fairness Administrator; Karen Evans, Community Engagement Manager; Jim Bethke, Executive Director of the Justice Administration Department; and Jim Nutter, Chair of the Homeless Task Force. These presentations, as well as regular updates from members of the Monitor Team, have kept the CWG informed about the work under the Consent Decree and allow for the CWG to provide input on numerous ongoing projects.

Additionally, the CWG assisted the Monitor Team in planning two important community meetings. The Monitor Team held one meeting with approximately 20 advocates and community providers for domestic violence survivors and immigrant groups, and a separate meeting with nearly 50 advocates and community providers for the homeless and individuals with mental health conditions. In these meetings, the Monitor Team gave a presentation with the findings of the first sixth-month report and solicited input on how the pretrial process could be improved to better serve the constituencies these community leaders serve. These meetings have resulted in ongoing communications between various representatives of these groups and the Monitor Team that have helped refine the Monitor Team's data collection.

Finally, the CWG heard from Alison Shih of the Vera Institute of Justice who was preparing the training curriculum for county officials. The CWG gave Ms. Shih invaluable guidance about designing a trauma-informed curriculum and one that includes personal stories of affected individuals. Members of the CWG followed up with Ms. Shih to provide additional assistance after the meeting.

At present, the CWG is planning to take an active role in connecting the Monitor Team with community media representatives so as to ensure that the publicity surrounding the release of Monitor reports conveys an accurate picture of the changes brought about under the Consent Decree.

## V.  Our Work in the Next Six Months

The next six months will continue to be an important time for the implementation of this Consent Decree.  Much of the central architecture of misdemeanor bail reform is now in place. However, implementation of a range of policies will occur in the next time period, including court appearance notification and scheduling options, indigent defense planning, and ongoing training. We note that a series of additional data analysis, including regarding court appearance, merits outcomes, ethnicity estimation, and further analysis of outcomes including recidivism, will occur in the months ahead, together with feedback on Harris County's work creating a fully functional data portal for misdemeanor cases.  We have described cost study and project management work to come, including detailing the additional Consent Decree requirements to be met in the next six months (Appendix F lists each such requirement). Finally, we look forward to upcoming community working group meetings and public meetings.

We look forward to feedback on this report and the opportunity to continue to serve in this role. We are very grateful for the opportunity to serve as Monitor in this important Consent Decree.

**APPENDIX**

**A. Monitor Team Bios**

**University of Houston Law Center**

**Sandra Guerra Thompson** is the Newell H. Blakely Chair and Criminal Justice Institute Director at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019.  In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions.  Her scholarly articles address issues such as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations.  Professor Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project.  Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

**Duke University**

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018.  He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005.  Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes.  Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers.  Garrett's research and teaching interests include criminal procedure, wrongful convictions, habeas corpus, scientific evidence, and constitutional law. Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers, law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures supported by the Laura and John Arnold Foundation.  As part of a grant from the Charles Koch Foundation and the Wilson Foundation, Garrett founded and directs the Wilson Center for Science and Justice at Duke.

**Marvin S. Swartz, M.D.** is the Professor and Head of the Division of Social and Community Psychiatry, Director of Behavioral Health for the Duke University Health System and Director of the Duke AHEC Program. Dr. Swartz has been extensively involved in research and policy issues related to the organization and care of mentally ill individuals at the state and national level. He

was a Network Member in the MacArthur Foundation Research Network on Mandated Community Treatment examining use of legal tools to promote adherence to mental health treatment and led the Duke team in conducting the first randomized trial of involuntary outpatient commitment in North Carolina and the legislatively mandated evaluation of Assisted Outpatient Treatment in New York. He co-led a North Carolina study examining the effectiveness of Psychiatric Advance Directives and the NIMH funded Clinical Antipsychotics Trials of Intervention Effectiveness study.  He is currently a co-investigator of a study of implementation of Psychiatric Advance Directives in usual care settings, an evaluation of implementation of assisted outpatient treatment programs and a randomized trial of injectable, long-acting naltrexone in drug courts. Dr. Swartz has done a range of work regarding diversion from jail, including among populations of co-occurring substance abuse and mental health disorders. Dr. Swartz was the recipient of the 2011 American Public Health Association's Carl Taube Award, the 2012 American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research and the 2015 Isaac Ray Award from the American Psychiatric Association for career contributions to forensic psychiatry.

**Philip J. Cook, ITT/Sanford Professor of Public Policy and Professor of Economics and Sociology at Duke University.** Cook served as director and chair of Duke's Sanford Institute of Public Policy from 1985-89, and again from 1997-99. Cook is a member of Phi Beta Kappa, and an honorary Fellow in the American Society of Criminology. In 2001 he was elected to membership in the Institute of Medicine of the National Academy of Sciences.  Cook joined the Duke faculty in 1973 after earning his PhD from the University of California, Berkeley. He has served as consultant to the U.S. Department of Justice (Criminal Division) and to the U.S. Department of Treasury (Enforcement Division). He has served in a variety of capacities with the National Academy of Sciences, including membership on expert panels dealing with alcohol-abuse prevention, violence, school shootings, underage drinking, the deterrent effect of the death penalty, and proactive policing. He served as vice chair of the National Research Council's Committee on Law and Justice. Cook's primary focus at the moment is the economics of crime. He is co-director of the NBER Work Group on the Economics of Crime, and co-editor of a NBER volume on crime prevention. Much of his recent research has dealt with the private role in crime prevention. He also has several projects under way in the area of truancy prevention. His book (with Jens Ludwig), *Gun Violence: The Real Costs* (Oxford University Press, 2000), develops and applies a framework for assessing costs that is grounded in economic theory and is quite at odds with the traditional "Cost of Injury" framework. His new book with Kristin A. Goss, *The Gun Debate* (Oxford University Press 2014) is intended for a general audience seeking an objective assessment of the myriad relevant issues.  He is currently heading up a multi-city investigation of the underground gun market, one product of which is a symposium to be published by the *RSF Journal* in 2017. Cook has also co-authored two other books: with Charles Clotfelter on state lotteries (*Selling Hope: State Lotteries in America*, Harvard University Press, 1989), and with Robert H. Frank on the causes and consequences of the growing inequality of earnings (*The Winner-Take-All Society*, The Free Press, 1995). *The Winner-Take-All Society* was named a "Notable Book of the Year, 1995" by the *New York Times Book Review*.  It has been translated into Japanese, Chinese, Portuguese, Polish, and Korean.

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems. Moreover, she is knowledgeable and experienced in the operation of local governments. Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures. Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019. In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**George Naufal, PhD, Assistant Research Scientist.** Dr. Naufal is an assistant research scientist at the Public Policy Research Institute (PPRI) at Texas A&M University and a research fellow at the IZA Institute of Labor Economics. Previously he was the Technical Director at Timberlake Consultants. He was also an Assistant/Associate Professor of Economics at The American University of Sharjah (2007 to 2014) in the United Arab Emirates. George earned his PhD in Economics in 2007 from Texas A&M University. His area of expertise is applied econometrics with applications to labor economics including criminal justice, education, migration, demographics and unemployment. He is the co-author of "Expats and the Labor Force: The Story of the Gulf Cooperation Council Countries" (Palgrave Macmillan, 2012). He also has published several journal articles and book chapters. Dr. Naufal has secured more than $1.2 million in grant funding. His work has been cited by regional and international media outlets such as the New York Times, the Washington Post, and NPR.

**Heather Caspers, M.A., Research Associate.** Caspers is a Research Associate at the Public Policy Research Institute at Texas A&M University. Caspers earned her Bachelor's degree from Buena Vista University in criminology and psychology and her Master's degree from the University of Northern Iowa in social psychology. Her primary focus over nearly a decade at PPRI has been on criminal justice related projects with nine studies focusing on the cost and quality of indigent defense and pretrial practices in Texas.

63

As a task leader in PPRI's study on behalf of the Office of Court Administration titled *Liberty and Justice: Pretrial Practices in Texas*, Caspers was responsible for compiling much of the data needed to calculate costs of bond practices Travis and Tarrant Counties, and for developing and documenting strategies for extracting cost estimates.  Her work is documented in the report's technical appendix including specific formulas to calculate each cost applied in the investigation. Similarly, Caspers was a lead team member in a second investigation of pretrial risk assessment in Nueces County. She conducted qualitative interviews with key stakeholders to understand the processes underlying the data.  She then managed the collection of risk assessment data, and wrote portions of the final report.  Caspers is an asset to the current proposed monitoring effort, possessing possesses extensive knowledge of survey programming, data cleaning, quantitative data analysis, literature reviews, and program evaluation.

## B. Organizational Chart



## C. Year 1 Statement of Work

### Task I: Policy Assessment and Reporting

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree.  A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 1, the Monitor will be producing reports, including: a Monitor Plan in the first sixty days, a Monitor Report at six months, and a second report at the year's end.  The Monitor will be analyzing data from the county and reporting on these data in reports and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

### Task I:1. Provide Feedback on County Plans and Assessments

Begin meetings/calls with the parties to discuss progress under Consent Decree. **[We note that weekly calls have begun as well as additional calls  to discuss specific tasks].**

Secure access to data, including jail data, court data, hearing videos, and judicial opinions, and begin organizing material for analysis.  **[We note that we have received hearing videos from 2018 and 2019, as well as daily jail rosters; the County is working on facilitating access to more complete data for analysis].**

Defendants confer and agree on the key policies to be summarized and made available at the Harris County Joint Processing Center and Harris County Criminal Justice Center. The Monitor will resolve any disputes about the length and content of the summary.

Monitor approves plans for County to retain outside researchers to study topics such as causes of nonappearance, indigent defense, court forms. **[We have already reviewed and approved a series of such plans].**

Monitor develops the Monitoring Plan for conducting compliance reviews and audits for the first year of implementation and shares it with the parties for review and comment.

Monitor reviews plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

### Task I:2. Complete First Six-month Report

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Initial analysis of data.

The Monitor provides feedback on the Training Plan developed for judges and defendants' agents; Monitor receives and evaluates report by Judges on CCCL plan.

The Monitor will receive by this time updated forms for review and approval.

The Monitor consults concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

Incorporate work into first six-month Monitor Report.

### Task I:3. Provide Feedback on County Plans and Assessments

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.

Provide feedback to Parties on each of these plans and assessments.

Continue data collection and analysis.

### Task I:4. Complete Second Six-month Report

Continue meetings/calls with the parties to discuss progress under Consent Decree.

Continue data collection and analysis.

Conduct follow-up analysis and secure access to follow-up data.

Develop surveys or other qualitative evaluation tools may be used to assess compliance and efforts, such as training programs, under this Consent Decree.

Incorporate work into second six-month Monitor Report.

### Project Timeline and Staffing.

This work will be conducted between March 3, 2020 and March 2, 2021.

### Monitor Team Personnel:

- **Brandon Garrett** (Duke Law School)

- **Post-doctoral Fellow / Data Programmer** Center for Science and Justice (Duke Law School) (**Prof. Songman Kang** will conduct data analysis work for the Center).

- **Research assistants** (Duke Law School and University of Houston Law Center)

- **Philip J. Cook** (Sanford School of Public Policy, Duke University)

**Travel:**

- <u>Travel</u>: travel to Houston for Duke University Team Members.

## Task II: Cost Study and Project Management

The Public Policy Research Institute (PPRI) at Texas A&M University will evaluate the cost impacts of bail reform in Harris County.  There are a range of costs in the pretrial context, and not only the costs of detention, recidivism, court costs, costs of non-appearance, but also the costs of physical injury in jail, harm to physical and behavioral health, to families and communities, and the criminogenic harm of pretrial detention.  The Monitor team will assess each of those costs to determine what are the most cost-effective methods of realizing priorities under the Decree.  This work will be led by the <u>Public Policy Research Institute</u> (PPRI) at Texas A&M University, a leading interdisciplinary government and social policy research organization.  PPRI will also lead the project management efforts of the team.

## Task II:1.  Implement and Maintain Project Management Protocol

Identify and implement a cloud-based project management system to facilitate information-sharing and coordination of activities among members of the team implementing the Consent Decree.

Share information on how to use features with ODonnell team and solicit feedback and requests to meet needs of users.  Functionality will at least include file-sharing, meeting scheduling, centralized calendaring, milestone tracking, and online meetings.

## Task II:2.  Produce Year One Cost Analysis Plan

Identify a menu of informative and useful potential targets for early cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources as appropriate.

Solicit input from parties engaged in implementing the Consent Decree to finalize the year-one cost-analysis agenda.

Continue Project Management work.

Incorporate work into first six-month Monitor Report.

## Task II:3. Year-One Cost Data Acquisition

Identify data sources appropriate to answer research questions prioritized in the Year-One Cost Analysis Plan. To the extent possible, data will be extracted from existing Harris County information systems.

Identify alternative strategies to estimate costs or develop estimates where individual-level cost records are unavailable. These may include extracting average expenditures from aggregate budget records (e.g., to estimate court or prosecution costs), collecting new data (e.g., from planned defendant surveys), or applying cost estimates validated by government agencies or in the academic research literature.

Continue Project Management work.

### Task II:4. Produce Prelimary Year One Cost Analysis Report

Generate a written report summarizing results from initial analysis of cost data summarized in written Year One Cost Analysis Report.

Continue Project Management work.

Incorporate work into second six-month Monitor Report.

### Project Timeline and Staffing

This work will be conducted between March 3, 2020 and March 2, 2021.

- **Texas A&M, Public Policy Research Institute (PPRI)** will conduct a multi-year evaluation

- **Dottie Carmichael** (Research Scientist, Texas A&M University, PPRI)

- **George Naufal** (Economist, Texas A&M University, PPRI)

Staffing changes include the following:

- **Zachariah Bratain** will replace **Heather Caspers** (Project Manager, Texas A&M University, PPRI)

- **A new hire** will replace **Bethany Patterson** (Data Analyst, Texas A&M University, PPRI)

- Travel: to Houston for Texas A&M University Team Members

### Task III: Community Outreach, Participation, and Working Group

68

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders.  The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

### Task III:1. Initial Public Outreach and Participation

The Monitor Team develops Monitoring Plan and sets out plans for outreach and participation for the first year.

Convene first meeting of Community Working Group (CWG).

Begin set up of Houston office.

The Monitor Team builds a Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

### Task III:2. First Public Meeting, First Six-month Report

The Monitor Team reaches out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

The Monitor Team will review County's plan for public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Incorporate work into first six-month Monitor Report.

Updates to Monitor website.

### Task III:3. Convene CWG and Solicit Additional Public Input

The Monitor Team further reaches out, with the guidance of the CWG, to local organizations and community groups, including to share results of first Monitor Report.

Convene experts at conference at Houston Law.

Updates to Monitor website.

### Task III:4. Second Public Meeting, Second Six-month Report

Second public meeting convened.

Monitor Team outreach, with the guidance of the CWG, to local organizations and community groups.

Incorporate work into second six-month Monitor Report.

Updates to Monitor website.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2020 and March 2, 2021.

- **Sandra Guerra Thompson** (University of Houston Law Center)
  Office Space, Equipment and Support:

- Office supplies: paper, pens, notepads in the Houston office space. We would plan to use the office space provided pursuant to the decree because of its central and accessible location, as well as an office phone, laptop computer and printing equipment and IT support for computer use, meetings via Zoom, and phone conferences.  We would need a meeting room with sufficient space for periodic Community Working Group meetings and meetings with stakeholders or researchers.

- Parking: A parking budget for downtown parking for the Monitor Team and twelve Community Working Group members (12 meetings per year).

- **Houston Office Assistant**
- **Houston Investigator**

**Houston Conference Costs:**

- Administrative support, food, publicity, space rental
- Travel: to Houston for Prof. Thompson (from vacation home).

**Deliverables**

| Deliverable I | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task 1:1. Begin meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Secure access to data.<br><br>Monitor approves plans re. e.g. nonappearance, indigent defense, court forms.<br><br>Monitor develops Monitoring Plan.<br><br>Monitor reviews indigent defense services plans.<br><br>Task II:1.  The Monitor Team (PPRI) develops Project Management protocol and makes it accessible to facilitate information-sharing among the parties.<br><br>Task III:1.  Monitoring Plan re. outreach and participation for the first year.<br><br>Convene first meeting of Community Working Group (CWG).<br><br>Begin set up of Houston office.<br><br>The Monitor Team build Monitor website. | June 1, 2020 | $154,424.75 |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task I:2</u>.  Continue meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Initial analysis of data.<br><br>Feedback on Training Plan .<br><br>Evaluates report by Judges on CCCL plan.<br><br>Monitor reviews and approves updated court forms.<br><br>Monitor reviews concerning data variables.<br><br>Incorporate work into first six-month Monitor Report.<br><br><u>Task II:2</u>.  The Monitor Team (PPRI) produces Year One Cost Analysis Plan for submission with first six-month Monitor Report<br><br><u>Task III:2</u>.  Community Outreach.<br><br>Review County's plan for public meetings.<br><br>Incorporate work into first six-month Monitor Report.<br><br>Updates to Monitor website. | August 20, 2020 | $166,951.75 |

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:3.   Continue meetings/calls with the parties to discuss progress under Consent Decree.  Review results of research by outside vendors.  Provide feedback to Parties on each of these plans and assessments.  Continue data collection and analysis.  Task II:3.   The Monitor Team (PPRI) acquires and assembles datasets required to initiate Year One Cost Analysis  Task III:3.   Outreach to share results of first Monitor Report.  Convene experts at conference at Houston Law.  Updates to Monitor website | November 28, 2020 | $140,348.75 |

| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:4.   Continue meetings/calls with the parties to discuss progress under Consent Decree.  Data collection and analysis.  Develop surveys or other qualitative evaluation tools.  Incorporate work into second six-month Monitor Report.  Task II:4.  The Monitor Team (PPRI) produces Year One Cost Analysis Report  Task III:4.  Second public meeting convened.  Monitor Team outreach, with the guidance of the CWG, to local organizations and community groups.  Incorporate work into second six-month Monitor Report. | March 2, 2021 | $197,459.75 |

| | | |
|---|---|---|
| Updates to Monitor website. | | |

Total Year 1 Budget: $  659,185.00

## D. New 15.17 Hearing Forms

Cause No. _____

CAUSE NO. _____     SPN: _____     DATE/TIME OF ARREST:_____

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE COUNTY CRIMINAL |
| v. | § | COURT AT LAW NO. _____ |
| _____ | § | HARRIS COUNTY, TEXAS |
| Defendant | | |
| DOB:_____ | | |

### STATUTORY WARNINGS BY MAGISTRATE - PROBABLE CAUSE DETERMINATION – PR BOND/BAIL ORDER

Defendant is accused of a misdemeanor, namely, _____

**1. DEFENDANT PRESENT**

Defendant was present and appeared  ☐ **in person or** ☐ **by video teleconference**

**2. NOTIFICATION OF RIGHTS**

☐ I admonished Defendant as required by Article 15.17 regarding the nature of the offense and Defendant's rights.

**3. APPOINTMENT OF COUNSEL FOR ARTICLE 15.17 HEARING**

☐ Defendant **was represented by** Assistant Public Defender _____ (name) at the Article 15.17 hearing, **OR**

☐ I find that Defendant **made a knowing, voluntary, and intelligent waiver of representation** for determination of bail and any other matters addressed at the Article 15.17 hearing only; the waiver does not extend beyond this Article 15.17 hearing.

**4. REQUEST FOR APPOINTMENT OF COUNSEL IN THE COUNTY CRIMINAL COURT AT LAW**

Defendant ☐ **requested** ☐ **did not request** counsel. ☐ The Court **ORDERS** Pretrial Services to help Defendant, if still in custody, prepare the request for counsel, including any paperwork, and forward it to the judge of the court in which the case is pending within 24 hours.

**5. CONSULAR NOTIFICATION**

☐ I informed Defendant "If you are a non-U.S. citizen, you are entitled to have us notify your country's consular representatives here in the United States. If you want us to notify your country's consular officials, you can request this notification now, or at any time in the future. For some non-U.S. citizens, we are required to notify your country's consular representatives here in the United States that you have been arrested or detained. You are not required to accept their assistance. If mandatory notification applies to you, we will notify your country's consular officials as soon as possible.

"Do you want your country's consular officials to be notified?" ☐ **Yes** ☐ **No** The consulate to be notified is:_____.
**OR**

☐ The Court has determined that the following consulate must be notified of your arrest _____.

### PROBABLE CAUSE FINDING AND ORDER

☐ The Court **FINDS** that probable cause for further detention **DOES NOT EXIST**. The Court **ORDERS** the law enforcement agency and officer having custody of Defendant to immediately release Defendant from custody.

☐ The Court **FINDS** that probable cause for further detention **EXISTS**. The Court reviewed and/or set Defendant's bond as indicated in the BAIL ORDER below and, in clear and unambiguous language: (1) informed Defendant of the Defendant's rights pursuant to TEX. CODE CRIM. P. Art. 15.17; and (2) provided Defendant with information required by law. The Court **ORDERS** Defendant committed to the custody of the Sheriff of Harris County, Texas, until Defendant posts the required bond or until further order of the Court.

☐ Probable cause was previously determined. The Court **ORDERS** Defendant committed to the custody of the Sheriff of Harris County, Texas, until Defendant posts the required bond or until further order of the Court.

Magistrate _____ (printed name)     (Revised 12-17-2020)     Page **1** of **2**

Cause No. _____

CAUSE NO. _____     SPN: _____     DATE/TIME OF ARREST:_____

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE COUNTY CRIMINAL** |
| **v.** | § | **COURT AT LAW NO. _____** |
| _____ | § | **HARRIS COUNTY, TEXAS** |
| **DOB:_____** | | |

---

### STATUTORY WARNINGS BY MAGISTRATE - PROBABLE CAUSE DETERMINATION – PR BOND/BAIL ORDER

---

The Defendant is accused of a misdemeanor, namely, _____

**1. DEFENDANT NOT PRESENT**

On this date and time the defendant was <u>not</u> present due to ☐ **medical condition** ☐ **mental illness/IDD** ☐ **other** _____,

**2. APPOINTMENT OF COUNSEL FOR ARTICLE 15.17 HEARING**

☐ Defendant **was represented by** Assistant Public Defender _____ (name) at the Article 15.17 hearing, **OR**

☐ I find that Defendant **made a knowing, voluntary, and intelligent waiver of representation** for determination of bail and any other matters addressed at the Article 15.17 hearing only; the waiver does not extend beyond this Article 15.17 hearing.

## PROBABLE CAUSE FINDING AND ORDER

☐ The Court **FINDS** that probable cause for further detention **DOES NOT EXIST**. The Court **ORDERS** the law enforcement agency and officer having custody of the defendant to immediately release the defendant from custody.

☐ The Court **FINDS** that probable cause for further detention **EXISTS**. The Court reviewed and/or set the defendant's bond as indicated in the BAIL ORDER below and, in clear and unambiguous language: (1) informed the defendant of his rights pursuant to Tex. Code Crim. P. Art. 15.17; and (2) provided the defendant with information required by law. The Court **ORDERS** the defendant committed to the custody of the Sheriff of Harris County, Texas, until he posts the required bond or until further order of the Court.

☐ Probable cause previously determined. The Court **ORDERS** the defendant committed to the custody of the Sheriff of Harris County, Texas, until he posts the required bond or until further order of the Court.

## SUMMARY OF BAIL HEARING

**Having found probable cause exists for the further detention of the Defendant, the Court next determined the conditions of release for the accused to ensure he/she will appear and answer before the proper Court and to reasonably protect the safety of the community.**

**A. Evidence**
☐ All information I considered in determining bail conditions, including criminal history, was provided to the defense prior to the hearing.

**B. Indigence Determination and Ability to Pay:**
☐ Defendant swore to and signed a Financial Affidavit stating that Defendant could afford $_____; **OR**
☐ Defendant did not swear to and sign a Financial Affidavit.

☐ I find by clear and convincing evidence that <u>Defendant is indigent</u> as defined by Section 17(h) of the O'Donnell Consent Decree and/or cannot afford any amount of secured bail; **OR**
☐ I find by clear and convincing evidence that <u>Defendant is not indigent</u> and can afford $_____ at the time of this hearing without experiencing hardship in meeting the basic necessities of life.

Magistrate _____ (printed name)     (Revised 12-17-2020)     Page **1** of **2**

76

Cause No. _____

**C. Personal Bond / Bail Requests**
**District Attorney Request**

☐ Personal Bond requested in the amount of $_____     ☐ Opposed     ☐ No Position
☐ Secured Bail requested in the amount of $_____
☐ DA requested denial of bail
☐ DA made no bail request

**Defendant's Request**

☐ Personal Bond requested in the amount of $_____     ☐ Opposed     ☐ No Position
☐ Secured Bail requested in the amount of $_____
☐ Defense made no bail request

# BAIL ORDER

☐ Defendant is ordered RELEASED on a personal bond in the amount of $_____; **OR**

☐ The Court ORDERS the defendant committed to the custody of the Sheriff of Harris County, Texas, until he/she posts the required bond or until further order of the Court**, AND:**

☐ The Defendant must pay $_____ secured bail to be released and I find that the Defendant <u>can afford</u> the secured bail amount; **OR**

☐ The Defendant must pay $_____ secured bail to be released. The Defendant <u>does not have the ability to pay the amount</u> required, but I considered alternative conditions of release, and by clear and convincing evidence, there was no less-restrictive condition or combination of conditions that could reasonably prevent flight from prosecution and/or reasonably protect the safety of the community. The reasons I have concluded that unaffordable bail is necessary and the evidence I considered in reaching that conclusion are set forth below:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

☐ I certify that the procedures and findings required by Local Rule 9 were provided and that I have explained the reasons and evidence relied on for my decision to Defendant and/or counsel, ☐**orally,** ☐**in writing,** ☐**or both.**

_____     _____     _____
**Date and Time**               **Magistrate (Judge or Hearing Officer)**                     **Interpreter (if applicable)**

Magistrate _____ (printed name)     (Revised 12-17-2020)     Page **2** of **2**

Cause No. _____

CAUSE NO. _____     SPN: _____     DATE/TIME OF ARREST:_____

| | | |
|---|---|---|
| **THE STATE OF TEXAS** | § | **IN THE COUNTY CRIMINAL** |
| **v.** | § | **COURT AT LAW NO. _____** |
| _____ | § | **HARRIS COUNTY, TEXAS** |
| **DOB:**_____ | | |

### STATUTORY WARNINGS BY MAGISTRATE - PROBABLE CAUSE DETERMINATION – PR BOND/BAIL ORDER

The Defendant is accused of a misdemeanor, namely, _____

**1. DEFENDANT NOT PRESENT**

On this date and time the defendant was <u>not</u> present due to ☐ **medical condition** ☐ **mental illness/IDD** ☐ **other** _____,

**2. APPOINTMENT OF COUNSEL FOR ARTICLE 15.17 HEARING**

☐ Defendant **was represented by** Assistant Public Defender _____ (name) at the Article 15.17 hearing, **OR**

☐ I find that Defendant **made a knowing, voluntary, and intelligent waiver of representation** for determination of bail and any other matters addressed at the Article 15.17 hearing only; the waiver does not extend beyond this Article 15.17 hearing.

## PROBABLE CAUSE FINDING AND ORDER

☐ The Court **FINDS** that probable cause for further detention **DOES NOT EXIST**. The Court **ORDERS** the law enforcement agency and officer having custody of the defendant to immediately release the defendant from custody.

☐ The Court **FINDS** that probable cause for further detention **EXISTS**. The Court reviewed and/or set the defendant's bond as indicated in the BAIL ORDER below and, in clear and unambiguous language: (1) informed the defendant of his rights pursuant to Tex. Code Crim. P. Art. 15.17; and (2) provided the defendant with information required by law. The Court **ORDERS** the defendant committed to the custody of the Sheriff of Harris County, Texas, until he posts the required bond or until further order of the Court.

☐ Probable cause previously determined. The Court **ORDERS** the defendant committed to the custody of the Sheriff of Harris County, Texas, until he posts the required bond or until further order of the Court.

## SUMMARY OF BAIL HEARING

**Having found probable cause exists for the further detention of the Defendant, the Court next determined the conditions of release for the accused to ensure he/she will appear and answer before the proper Court and to reasonably protect the safety of the community.**

**A. Evidence**
☐ All information I considered in determining bail conditions, including criminal history, was provided to the defense prior to the hearing.

**B. Indigence Determination and Ability to Pay:**
☐ Defendant swore to and signed a Financial Affidavit stating that Defendant could afford $_____; **OR**
☐ Defendant did not swear to and sign a Financial Affidavit.

☐ I find by clear and convincing evidence that <u>Defendant is indigent</u> as defined by Section 17(h) of the O'Donnell Consent Decree and/or cannot afford any amount of secured bail; **OR**
☐ I find by clear and convincing evidence that <u>Defendant is not indigent</u> and can afford $_____ at the time of this hearing without experiencing hardship in meeting the basic necessities of life.

Magistrate _____ (printed name)      (Revised 12-17-2020)     Page **1** of **2**

Cause No. _____

# SUMMARY OF BAIL HEARING

**Having found that probable cause exists for the further detention of the Defendant, the Court next determined the conditions of release for Defendant to ensure that Defendant will appear and answer before the proper Court and to reasonably protect the safety of the community.**

**A. Evidence**
☐ All information I considered in determining bail conditions, including criminal history, was provided to the defense prior to the hearing.

**B. Indigence Determination and Ability to Pay:**
☐ Defendant swore to and signed a Financial Affidavit stating that Defendant could afford $_____; **OR**
☐ Defendant did not swear to and sign a Financial Affidavit.

☐ I find by clear and convincing evidence that <u>Defendant is indigent</u> as defined by Section 17(h) of the O'Donnell Consent Decree and/or cannot afford any amount of secured bail; **OR**
☐ I find by clear and convincing evidence that <u>Defendant is not indigent</u> and can afford $_____ at the time of this hearing without experiencing hardship in meeting the basic necessities of life.

**C. Personal Bond / Bail Requests**
**District Attorney Request**

☐ Personal Bond requested in the amount of $_____     ☐ Opposed     ☐ No Position
☐ Secured Bail requested in the amount of $_____
☐ DA requested denial of **bail**
☐ DA made no bail request

**Defendant's Request**

☐ Personal Bond requested in the amount of $_____     ☐ Opposed     ☐ No Position
☐ Secured Bail requested in the amount of $_____
☐ Defense made no bail request

# BAIL ORDER
☐ Defendant is ordered RELEASED on a personal bond in the amount of $_____; **OR**

☐ The Court ORDERS Defendant committed to the custody of the Sheriff of Harris County, Texas, until Defendant posts the required bond or until further order of the Court**, AND:**

  ☐ Defendant must pay $_____ secured bail to be released and I find that Defendant <u>can afford</u> the secured bail amount; **OR**
  ☐ Defendant must pay $_____ secured bail to be released. Defendant <u>does not have the ability to pay the amount</u> required, but I considered alternative conditions of release, and by clear and convincing evidence, there was no less-restrictive condition or combination of conditions that could reasonably prevent flight from prosecution and/or reasonably protect the safety of the community. The reasons I have concluded that unaffordable bail is necessary and the evidence I considered in reaching that conclusion are set forth below:

_____
_____
_____
_____
_____
_____

I certify that the procedures and findings required by Local Rule 9 were provided and that I have explained the reasons and evidence relied on for my decision to Defendant and/or counsel, ☐**orally,** ☐**in writing,** ☐**or both.**

_____     _____     _____
**Date and Time**                          **Magistrate (Judge or Hearing Officer)**                     **Interpreter (if applicable)**

Magistrate _____ (printed name)     (Revised 12-17-2020)   Page **2** of **2**

79

## E. Cost Analysis Data Components

| JAD | DATA SOURCE | ELEMENT | STATUS |
|---|---|---|---|
| **ARREST** | | | |
| | **Cost of Arrest** | | TBA |
| **INTAKE/BOOKING** | | | |
| **Cost of Booking**  *(Cost of JPC Operation/# Defendant Intakes Processed)* | | | |
| | Sheriff's Office Budget | JPC Operating Cost | HCTX FY20:  $34,764,198   (excludes City JPC Contract) |
| | Sheriff's Office Budget | City JPC Contract | HCTX FY20:  $15,024,682 |
| * | Defendant Data | JPC Intake/Booking Date | Count of Defendants with Intake/Booking Date |
| **BOND HEARING** | | | |
| **Cost of Bond Hearing**  *(Art. 15.17 Court Staffing Cost/# Defendants with a Bond Hearing)* | | | |
| | Office of Court Management | Bond Hearing Officer Cost | HCTX FY21:  $2,170,232 |
| | District Attorney's Office | Bond Hearing Prosecutor Cost | **TBA** |
| | IDER | Bond Hearing Defender Cost | IDER 10/18-9/19:  $1,335,617 |
| * | Defendant Data | 15.17 Hearing Dates | Count of Defendants with a Bond Hearing |
| **Cost of Art. 16.22 MH Evaluation and Report** *(Art. 16.22 Evaluation Contract Amount/# Defendants with 16.22 Evaluation)* | | | |
| | Harris Center | Art. 16.22 Contract Amount | CY20:  $1.5 Million (Harris Center Contract) |
| * | Defendant Data | MH Evaluation Data | Count of Defendants with an Art. 16.22 MH Evaluation Order |
| **CRIMINAL COURTS** | | | |
| **Cost of a CCCL or District Court Appearance** *(Criminal County or District Court Costs/# Court Settings)* | | | |
| | Office of Court Management | CCCL Court Staff Cost (Judges, Coordinators, Court Reporters) | FY21:  $9,843,158 |
| | District Court FY20 Budget Detail Document | District Court Staff Cost (Judges, Coordinators, Court Reporters) | **TBA** |
| | Sheriff's Office | Cost of Sheriff's Staff Assigned to CCCL and District Courts | FY20:  $25,281,250 |
| * | Defendant Data | Court Setting Dates | Count of Defendants' Misdemeanor and Felony Court Settings |
| **Cost of Specialty Court Treatment** *(Specialty Court Treatment Costs/# Defendants in Specialty Court)* | | | |
| | Specialty Court Division | Sober Court Treatment Contract with CSCD | FY20:  $93,651.39 |
| | Specialty Court Division | "Other Dept. Resources" funding | **TBD** |
| * | Defendant Data | Specialty Court Begin-End Dates | # Defendant Specialty Court Participation Days |

| | **Cost of Competency Evaluation** *(Competency Evaluation Contract Amount /# Evaluations)* | | |
|---|---|---|---|
| | Harris Center | Competency Evaluation Contract Amount | FY20: $835,433 |
| * | Defendant Data | Competency Evaluation Date | Count of Competency Evaluations Conducted |
| | **Cost of Competency Restoration** *(Competency Restoration Contract Amount/# Treatment Days)* | | |
| | Harris Center | Outpatient Competency Restoration Treatment | State Funding for FY20:  $1,210,079 |
| | Harris Center | Residential Competency Restoration Treatment | State Funding for FY20:  $4,474,535 |
| | Harris Center | In-Jail Competency Restoration Treatment | State Funding for FY20:  $871,500 |
| * | Defendant Data | Competency Treatment Dates and Type | Count of Defendant Competency Restoration Treatment Days by Type in FY20 |
| **DETENTION** | | | |
| | **Cost of Detention** *(Detention Costs/# Detainee Jail Days)* | | |
| | Sheriff's Office | Jail Housing Costs | FY20: $167,911,760 |
| | Sheriff's Office | Jail Medical Cost (includes MH medications) | FY20: $68,946,584 |
| * | Defendant Data | Detention and Release Dates | Count of All Pre- and Post-Disposition Defendant Jail Days |
| | **Cost of In-Jail Mental Health Treatment** *(Jail MH Treatment Costs/# Detainee Treatment Events)* | | |
| | Harris Center | In-Jail "Outpatient-Style" MH Treatment (General Population + Chronic Care + Admin. Separation) | FY20: $5,77,595 |
| | Harris Center | In-Jail "Residential-style" MH Treatment (MH Acute, Stepdown, and CBT Housing Units) | FY20: $1,830,157 |
| | Harris Center | In-Jail MH Treatment Admin (Support Services, Medical Director, MH Administrator, Program Manager, Performance Improvement Specialist) | FY20: $876,575 |
| * | Defendant Data | Jail Mental Health Treatment Data | In-Jail Pre- and Post-Disposition Defendant MH Treatment Days by Type |

| PROSECUTION | | | |
|---|---|---|---|
| **Cost of Charge Determination** *(Cost of DIMS Screening Staff/# People Screened)* | | | |
| | District Attorney's Budget | Screening Staff Costs | **TBA** |
| * | Defendant Data | DIMS Cases Screened by SPN | **TBA** |
| **Cost of JPC Charge Processing** *(DA's Intake Staff Costs/# Defendant Intakes Processed thru JPC)* | | | |
| | District Attorney's Budget | Intake Staff Costs | **TBA** |
| * | Defendant Data | Defendant Cases Filed at JPC | Count of Charges Filed at Intake |
| **Cost of Prosecution** *(Prosecution Staff Costs/(# Cases x # Court Settings)* | | | |
| | District Attorney's Budget | Felony Trial Bureau Budget | **TBA** |
| | District Attorney's Budget | Misdemeanor Trial Bureau Budget | **TBA** |
| | District Attorney's Budget | Special Prosecution Unit Budgets | **TBA** |
| * | Defendant Data | Court Setting Data | Type of Prosecutor (Regular or Special); Count of CCCL and District Court Settings |
| **Cost of Mental Health Diversion** *(Diversion Program Costs/# Diversion Participants)* | | | |
| | Harris Diversion Center | Emmett Center Budget for Pre-Filing Diversion | Jail Diversion Desk:  $582,135/year; Ed Emmett Diversion Center $3,502,353.00/year |
| * | Defendant Data | DA's Diversion Participant Data | **TBA** |
| **Cost of Misdemeanor Marijuana Diversion** *(Diversion Program Participant Fee)* | | | |
| | District Attorney's Budget | Per-Defendant Fee | **TBA** |
| * | Defendant Data | MMPD Participation Dates; Completion/ Success Status; and Final Case Disposition | **TBA** |
| DEFENSE | | | |
| **Cost of Public Defender Counsel** *(PDO costs/# Defendants Represented)* | | | |
| | TIDC Expenditure Report | Cost/Felony PDO Defense | 10/2018-09/2019:  $2,808 |
| | TIDC Expenditure Report | Cost/Misd. PDO Defense (10/2018-09/2019) | 10/2018-09/2019:  $1,288 |
| **Cost of Private Appointed Counsel** *(Attorney Payments per Case)* | | | |
| * | HCTX Auditor | Cost of Private Assigned Counsel | Attorney Fee Vouchers for Misd. Cases |
| * | HCTX Auditor | Cost of Private Assigned Counsel | Attorney Fee Vouchers for Felony Cases |

| **Cost of Term Contract Counsel of the Day** *(Attorney Payments per Cases/Day)* | | | |
|---|---|---|---|
| * | HCTX Auditor | Contract attorney payments | **TBD** |
| * | Defendant Data | Term Attorney Appointment Data | Type of Counsel; Appointment Date |
| **PRETRIAL SERVICES** | | | |
| **Cost of Pretrial Screening** *(Pretrial Screening Costs/# Cases Screened (including at intake and in court))* | | | |
| | Pretrial Services | Screener Staff Cost (in court vs intake) | **TBD** |
| * | Defendant Data | Intake Screening Data | Count of JPC Intake/Screening Dates, Count of Bond Hearing Dates,  Secured or Unsecured Release |
| **Cost of Pretrial Supervision/Monitoring** *(Pretrial Monitor Cost/# Cases Monitored)* | | | |
| | Pretrial Services | Monitoring Staff Cost | **TBD** |
| * | Defendant Data | Supervision Requirements | Supervision Level (#/type of check-ins); Supervision Conditions; Supervision Fee Payment Dates, Amount, and Purpose |
| **Cost of Pretrial Conditions** *(# Days Condition Assigned x Daily Cost)* | | | |
| | Harris County Pretrial Services Transition Plan, March 17, 2020 | Ignition Interlock | $2.65/day |
| | | In-Home Alcohol Monitoring | $2.65/day |
| | | Portable Alcohol Monitoring | $5.95/day |
| | | Continuous Alcohol Monitoring | $10.60/day |
| | | Electronic Monitoring (RF) | $2.55/day |
| | | Electronic Monitoring (GPS) | $3.71/day |
| | | Drug Testing | $9.50/test |
| * | Defendant Data | Conditions of Supervision and Cost | Condition types; Begin-end dates; Technology fee amounts and dates paid to vendors or HCTX |
| **SENTENCES** | | | |
| **Cost Sentences Served** *(# days sentenced x Daily supervision cost)* | | | |
| | State of Texas "FY 2017 and 2018 Uniform Cost Report." Legislative Budget Board: January 2019. | Day of probation | Community Supervision -- $3.75/day<br>Intensive Supervision Probation -- $10.52/day<br>Specialized Caseloads -- $7.32/day<br>Specialized Caseload – Mentally Impaired Caseloads -- $7.24/day |
| | | Day of state-operated correctional institution | FY17: $62.25/day; FY18: $62.34/day |

83

| DEFENDANT COSTS (from Research Literature) | | |
|---|---|---|
| **Cost to Defendants for Pretrial Detention** | | |
| Loss of Freedom | ~$11 per day | Shima Baradaran Baughman, "Costs of Pretrial Detention," Boston University Law Review 97, no. 1 (January 2017): 1-30. Costs are in 2014 dollars. "Typical defendant willing to pay $1036 for 90 days of freedom." David S. Abrams & Chris Rohlfs, Optimal Bail and the Value of Freedom: Evidence from the Philadelphia Bail Experiment, 49 Econ. Inquiry (2011). |
| Loss of Income | ~$90 per day | Harris County per capita income is $32,765, https://www.census.gov/quickfacts/fact/table/harriscountytexas/PST120219 |
| **VICTIM COSTS (from Research Literature)** | | |
| **Cost of crime to Victims** | | |
| **Offense** | **Cost** | |
| Homicide | $4,822,352.80 | |
| Attempted Homicide | $15,418.41 | |
| Sexual Assault | $142,702.28 | |
| Robbery | $13,122.05 | |
| Assaultive Offense | $15,418.41 | |
| Other Violent Offense | $15,418.41 | From Miller, Ted, Mark Cohen, and Brian Wiersema (1996). *Victim Costs and Consequences: A New Look*. A Final Summary Report presented to the National Institute of Justice. Costs were inflated to 2015 dollars using https://data.bls.gov/cgi-bin/cpicalc.pl. |
| Burglary | $2,296.36 | |
| Theft | $606.89 | |
| Other Property Crime | $606.89 | |
| Drug Offense | $606.89 | |
| Weapons Offenses | $606.89 | |
| Other Felony Offense | $606.89 | |
| Class A & B Misdemeanors | $606.89 | |

## F. Consent Decree Tasks and Milestones

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 6 | 36 | 7/1/2020<br><br>*Expected 4/21/21* | **Update databases and inform stakeholders re: unsecured GOB** - County databases must be updated to clearly indicate that a General Order Bond is a personal bond for which the underlying amount is unsecured.  The same information must be communicated internally and to other jurisdictions.  The County presents the plan to the Monitor for approval. | **STATUS:  Working on it**<br>200828:  Universal Services will incorporate an indicator in the bond process to clarify that "a General Order Bond (GOB) is a personal bond for which the underlying amount is unsecured."<br><br>The estimate for completing this project is 2,420 hours of development with a completion date at the end of April 2021. |
| 7 | 38 | 3/1/2021<br><br>*Done* | **Provide FY 21-22  PDO allocation > FY 19-20 approved budget** - The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. | **STATUS:  Done**<br>PDO expansion was approved by Commissioner's Court as part of the FY22 budget on 1/26/21. |
| 7 | 41b | 11/15/20<br>(Extended)<br><br>*Done* | **Retain expert to assess need for holistic defense services** - The County will retain a holistic indigent defense expert to evaluate current systems and assess need for essential services. | **STATUS:  Done**<br>NAPD was approved by Commissioner's Court on 1/26/21 to assess need make recommendations regarding holistic defense services. |
| 7 | 41b | 11/15/2020<br><br>*Expected 7/25/21* | **Receive written recommendations for holistic defense services** - The County will receive a written report with recommendations for essential holistic indigent defense services must be completed within 180 days of commencement. | **STATUS:  Working on it**<br>NAPD begins their role as holistic defense evaluation vendor on 1/26/21. Recommendations will be due 180 days later or July 25, 2021. |
| 7 | 41b | 3/1/2021<br><br>*Nearly Done* | **Fund at least minimum holistic defense staff recommended by expert** - Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. | **STATUS:  Nearly Done**<br>Funding for holistic defense staff is being provided as part of the Managed Assigned Counsel office grant from the Texas Indigent Defense Commission (212-20-D06) in the amount of $2.17 million approved in FY20.<br><br>Status will be changed to "Done" after NAPD-recommended staffing is implemented based on their report due July 25, 2021. |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 7 | 41a | 12/15/20 *(Extended)* *Nearly Done* | **Provide support staff for private apptd. counsel at bail hearing** - CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. | **STATUS:  Nearly Done** CCCL judges anticipate assigning support services for private appointed counsel through the Managed Assigned Counsel office.  The MAC director was hired on 11/20/20, and funding for holistic defense services is included in the TIDC grant supporting startup of the office. Status will be changed to "Done when it can be confirmed support staff are available at bail hearings. |
| 7 | 43 and 44 | 12/15/20 Extended *Expected 7/25/21* | **Develop written plan for essential defense counsel supports** - Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer.  The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. | **STATUS:  Working on it** OCM staff report that a written plan to support defense counsel will be developed by the MAC director who began in November 2020.  The plan will incorporate recommendations from the NAPD holistic defense assessment expected July 25, 2021. |
| 8A | 46 | 10/29/2020 *Expected by 4/14/21* | **Provide court date notification forms to third party LEAs** - Defendants will make the court date notification forms required by ¶ 47 and 48 readily accessible to third-party law enforcement agencies that arrest or detain misdemeanor arrestees to be prosecuted in the Harris County | **STATUS:  Working on it** Court date notification forms will be made available to third party LEAs upon completion of the revisions being developed by ideas42 under ¶ 48.  The original due date of 10/29/20 was extended by the federal court to 11/15/20.  Completion is now expected by 4/14/21 (with two 16-week renewal options) per contract with Ideas42. |
| 8A | 48a-c | 11/15/20 Extended *Expected by 4/14/21* | **Redesign court date notification forms to reduce nonappearance** - Defendants will update court date notification forms to incorporate evidence-based design practices to reduce nonappearance as specified in ¶ 48a.  The County may engage technical assistance providers to assist.  Forms may be updated at any time as needed with advice of technical assistance providers and the Monitor.  Updated forms must be the exclusive forms used to provide notification of court dates. | **STATUS:  Working on it** On 12/15/20, Harris County contracted with Ideas42 for redesign of court date notification forms.  The original due date of 8/30/20 was extended by the federal court to 11/15/20.  Completion is now expected by 4/14/21 (with two 16-week renewal options) per contract with Ideas42. |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 8A | 48d-e | 11/15/20 (Extended)<br><br>*Expected by 4/14/21* | **Submit court date notification forms to Monitor for review** - The County will submit redesigned court date notification forms to the Monitor for review. Defendants will work with the Monitor to ensure at least information required by ¶ 48(a) is available to arrestees.  Any future amendments must be implemented within 60 days of approval by the Monitor and the updated forms must be the only ones used. | **STATUS:  Working on it**<br>Redesigned court date notification forms will be submitted to the Monitor for review upon completion of the revisions being developed by ideas42 under ¶ 48.  The original due date of 8/30/20 was extended by the federal court to 11/15/20.  Completion is now expected by 4/14/21 (with two 16-week renewal options) per contract with Ideas42. |
| 8A | 47 | 11/15/20 Extended<br><br>*Expected by 4/14/21* | **Provide written court date notifications to arrestees and case file** - Defendants will provide written notice of the date/time and location of each new scheduled court appearance to misdemeanor arrestees or the lawyer if the arrestee is not present.  Any such written notice will be considered a court form with a copy retained in the case file. | **STATUS:  Working on it**<br>Written court date notifications will be available to arrestees and the case file upon completion of the revisions being developed by ideas42 under ¶ 48.  The original due date of 10/29/20 was extended by the federal court to 11/15/20.  Completion is now expected by 4/14/21 (with two 16-week renewal options) per contract with Ideas42. |
| 8B | 49 and 50a-e | 11/15/20 (Extended)<br><br>*Expected by 4/14/21* | **Submit court appearance reminder system design for Monitor review** - The County will consult existing research and best practices to design text- and telephone-based court appearance reminder services and opt-out process for misdemeanor arrestees with a telephone number on file.  Proposed substance, format, timing, and frequency of text- or telephone-reminders and the opt-out process must be submitted for review by the Monitor within 180 days of Monitor appointment. | **STATUS:  Working on it**<br>The court appearance reminder system design will be submitted to the Monitor for review upon completion of recommendations being developed by ideas42 under ¶ 49.  The original due date of 8/30/20 was extended by the federal court to 11/15/20.  Completion is now expected by 4/14/21 (with two 16-week renewal options) per contract with Ideas42. |
| 8C | 53 | 3/1/2020<br><br>*Done* | **Allocate $250,000 Year 1 to support court appearance** - The County must allocate $250,000 annually beginning in FY 20-21 to assist and support misdemeanor arrestees in making court appearances.  Use of funds is at the County's discretion with approval from the Monitor and input from Class Counsel.  The allocation cannot fund law enforcement, jailing, or liberty-restricting conditions of pretrial release. | **STATUS:  Done**<br>$250,000 was allocated to JAD from the FY21 budget to address nonappearance.  In October of 2020 found the funds were not being spent, so JAD is in the process of developing an RFP for services supporting court appearance (e.g., access to computers and internet, childcare, housing near downtown courts). |

| Section | ¶ | Due Date | Task Details | Status |
|---------|---|----------|--------------|--------|
| 8C | 54 | 3/1/2021<br><br>*Nearly Done* | **Allocate $850,000 in Year 2 to support court appearance per mitigation plan timeline and budget** - County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan. | **STATUS:  Nearly Done**<br>$850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's Court as part of the FY22 budget on 1/26/21.<br><br>Status will be changed to "Done" when the timeline and budget for implementation of mitigation services have been determined for the first three years. |
| 8C | 51 and 52a-d | 12/15/20 Extended<br><br>*TBD* | **Engage researchers to study nonappearance** - The County will engage researchers to study primary causes of nonappearance in the CCCL and recommend cost-mitigating policy and program solutions.  The study must meet criteria specified in ¶ 52 a-e. | **STATUS:  Working on it**<br>Vendor interviews for the nonappearance study were completed in December of 2020, and a contract with Ideas42 for the project was being developed by the County Attorney's Office the week of 2/8/21.  On 2/9/21, Ideas42 asked to delay the start of the study until 5/1/21, after completion of their work on the court date notification work under ¶ 49 on 5/1/21.  Approval for the modified due date is pending. |
| 8C | 52e | 12/15/20 Extended<br><br>*TBD* | **Receive recommendations to mitigate nonappearance** - Within 180 days of commencing the nonappearance study, researchers must provide the County initial actionable recommendations. Researcher(s) may continue study and provide additional recommendations beyond that date. | **STAUS:  Not Started**<br>Recommendations to mitigate nonappearance are due within 180 days of commencing the nonappearance study.  A modified start date for the study has been requested with a determination still pending (see ¶ 52 and 52a-d). |
| 9 | 64 | 8/30/2020<br><br>*Nearly Done* | **Publicly post information about Open Hours Court** - If Open Hours Court is rescheduled from time to time, the change must be advertised on the County court date scheduling website at least 30 days in advance.  Location of Open Hours Court must be advertised on the updated form for written court notifications (¶ 48a) and on the website (¶ 57).<br><br>Any misdemeanor arrestee who has missed a court appearance can reschedule at Open Hours Court with assistance from public defenders or private appointed counsel.  This program must also be advertised on the updated form for written court notifications (¶ 48(a)) and on the website (¶ 57). | **STATUS:  Nearly Done**<br>Open Hours Court is currently operational every Thursday in each individual court.  The OHC schedule is posted in the lobby of the Criminal Justice Center and Justice Processing Center, and on the CCCL court date scheduling website (with links from the District Court website).<br><br>Status will be changed to "Done" when the requirement to post the information on the court date notification form has been met (expected from Ideas42 by 4/14/21 per Para. 48). |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 9 | 58 | 8/30/2020<br><br>*Expected by 5/12/21* | **Implement court date request/notification technology** - The County and CCCL Judges will work with the Monitor to identify effective technology for misdemeanor arrestees or counsel to request a new court date or be informed of newly set dates without having to appear in person. Notice of new court dates must be provided via text and telephone reminders (¶ 49-50) to arrestees and appointed or retained defense counsel. A record of notice must be preserved in the case file. The County must also provide an in-person option for rescheduling a court date during regular business hours. | **STATUS:  Working on it**<br>On 8/28/20, Universal Services submitted a proposal to implement electronic court date notifications and reminders.  The proposal will be updated to include the message substance, format, timing, and frequency once Ideas42 has completed development of the reminder system design specified in ¶ 49 and 50.  In the interim Universal Services has begun work on the platform.  Completion of the entire system is projected for May 2021. |
| 9 | 61, 62, 65, 66, 67, 68, 69 | 8/30/2020<br><br>*Nearly Done* | **Publicly post appearance, rescheduling, and warrant policies** - Notice of the CCCL Judges' appearance, rescheduling, and warrant policies must be provided on the updated form for written court date notification (¶ 47-48) and on the website (¶ 57).<br><br>Judges' policies posted must make specific provisions for a 72-hour post-arrest appearance buffer (¶ 62), waiver of appearance (¶ 65), rescheduling in advance of the court date (¶ 66), and issuance of a warrant for nonappearance at a regular setting (¶ 67) or a first setting or required appearance (¶ 68), and rescheduling after a warrant has been issued (¶ 69). | **STATUS:  Nearly Done**<br>CCCL judges approved appearance, rescheduling, and warrant policies specified in the Consent Decree by 8/30/20.  Policies are posted on the District Clerk's court date scheduling website (¶ 57).<br><br>Status will be changed to "Done" when the requirement to post policies on written court date notification forms has been met (expected from Ideas42 by 4/14/21 per Para. 48). |
| 9 | 59 | 8/30/2020<br><br>*Nearly Done* | **Hold weekly Open Hours Court** - CCCL Judges will hold an Open Hours Court in a designated judge's courtroom at least one day each week on a predictable schedule posted in the courthouse, at the jail, on the updated form for written court notifications (¶ 47-48) and on the website (¶ 57) | **STATUS:  Nearly Done**<br>Open Hours Courts launched 9/3/2020.  The schedule is currently posted in the lobby of the Criminal Justice Center and Justice Processing Center, and on the CCCL court date scheduling website (with links from the District Court website).<br><br>Status will be changed to "Done" when the requirement to post the information on the court date notification form has been met (expected from Ideas42 by 4/14/21 per Para. 48). |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 9 | 70 | 8/30/2020<br><br>*Nearly Done* | **Publicly post how to reset nonappearance warrants issued prior to January 1, 2019** - Misdemeanor arrestees with outstanding warrants for nonappearance issued before January 1, 2019 may appear or use rescheduling procedures to have the warrant recalled and receive a new court date without arrest. This must be advertised on the website (¶ 57), in the joint processing center, and as determined by the County (e.g., radio/television). | STATUS:  Nearly Done<br>CCCL judges approved appearance, rescheduling, and warrant policies specified in the Consent Decree on 7/20/20.  Policies are posted on the District Clerk's court date scheduling website (¶ 57).<br><br>Status will be changed to "Done" when the requirement to post the information on the court date notification form has been met (expected from Ideas42 by 4/14/21 per Para. 48). |
| 9 | 71 | 8/30/2020<br><br>*Done* | **Record non-appearance/FTA electronically.**  CCCL Judges must record FTAs in an electronic, machine readable format. | STATUS: Done<br>In January, 2021, CCCL Judges implemented electronic fields capturing if defendants appear, don't appear, or were waived and (if nonappearance) whether the next setting is required or regular. Classification as an FTA is an automated calculation based on whether a capias was issued and executed within 30 days. |
| 9 | 86 | 8/30/2020<br><br>*Done* | **Begin collecting nonappearance data electronically** - Defendants, in consultation with the Monitor and any TA providers deemed necessary, will begin collecting and maintaining data concerning nonappearances and failures to appear by misdemeanor arrestees in a standardized electronic format and using a process approved by the Monitor. | STATUS: Done<br>In January, 2021, CCCL Judges implemented electronic fields capturing if defendants appear, don't appear, or were waived and (if nonappearance) whether the next setting is required or regular. Classification as an FTA is an automated calculation based on whether a capias was issued and executed within 30 days. |
| 9 | 81, 82, 84, and 85 | 8/30/2020<br><br>*TBD* | **Provide data for Monitor to evaluate Consent Decree implementation** - Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶ 89.<br><br>If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | STATUS:  Working on it<br>JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree.  Existing data for cases from 2009 through the present are currently available to the Monitor team.<br><br>Status will be changed to "Done" after all variables specified in ¶ 85 are available.  Examples of variables still in development include financial status of the arrestee; money the arrestee reported being able to afford; scheduled appearances that the misdemeanor arrestee appeared at; scheduled appearances that were waived or rescheduled; and conditions of pretrial release or supervision, date, and fees assessed.  Great progress is being made and infeasible variables have not yet been identified. |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 9 | 87 | 8/30/2020<br><br>*Nearly Done* | **Begin generating 60-day data reports** - Defendants will begin generating reports every 60 days that post information specified in ¶ 89 on the public website (described in ¶ 90) unless they don't yet collect the data—in which case they work with the Monitor to determine a timeline for appropriate collection.  Reports may be generated by the Monitor, a subject-matter expert, or a TA provider experienced in large datasets. | **STATUS:  Nearly Done**<br>Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public-facing.<br><br>Status will be changed to "Done" after reports are posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 88 | 8/30/2020<br><br>*Nearly Done* | **Develop web-based Data Platform** - The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | **STATUS: Nearly Done**<br>Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public-facing.<br><br>Status will be changed to "Done" after reports are posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 57 | 12/15/20 Extended<br><br>*Done* | **Create a court date scheduling website** - County must develop and maintain a website where misdemeanor arrestees can access court dates, times, location, attorney info, whether the appearance is required or regular.  The website must include options for rescheduling court dates with updates accurate within 24 hours of being scheduled. | **STATUS:  Done**<br>An online form to request a court reset date is under development.  The request goes to the court coordinator's inbox for approval.  Expected release date of 3/1/2021 has been pushed forward to 3/8/211 due to weather emergency in Harris County.  Other pre-existing functionality gives misdemeanor defendants access to information about court date times, location, attorney, and appearance type (required or regular). |
| 9 | 72 | 12/15/20 Extended<br><br>*TBD* | **Report to Monitor on court appearance policy** - CCCL Judges will evaluate local policies relating to court appearance to determine whether they can authorize more misdemeanor arrestees with counsel to waive personal appearance at more hearings.  A report will be provided to the Monitor and Class Counsel regarding their process used and the conclusions reached. | **STATUS:  Not Started** |
| 10 | 75, 76, and 77 | 11/28/2020<br><br>*Done* | **Submit CD training plan for for Monitor review** - The Training Plan for effective implementation of the Consent Decree must include an initial training course with an annual refresher that embodies the ideals of the Rule and Consent Decree.  Required qualitative and quantitative training topics are namsed in ¶ 76.  Monitor must consult Class Counsel throughout development of the Training Plan.  Defendants must submit the proposed Training Plan to the Monitor for approval (per ¶ 111-114). | **STATUS:  Done**<br>Vera Institute presented the proposed Consent Decree training plan for review by the Parties on 10/14/20. |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 10 | 78 and 79 | 1/27/2021<br><br>*Done* | **Deliver Year 1 Consent Decree Training Course** - Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. | **STATUS:  Done**<br>Vera Institute completed implementation of the Consent Decree Training Course between 12/11/20 and 1/6/21. |
| 11 | 83 | 11/15/20 (Extended)<br><br>*Nearly Done* | **Make Consent Decree data publicly available** - The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  Nearly Done**<br>Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public-facing.<br><br>Status will be changed to "Done" after raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 12 | 91 | 9/21/2020<br><br>*Done* | **Submit Plan for Conducting Public Meetings** - Defendants will submit a plan to the Monitor for conducting regular public meetings that conform with requirements in ¶ 92. | **STATUS:  Done**<br>A proposal for conducting public meetings that is adapted to accommodate COVID-19 safety protocols was submitted by JAD for review by the Monitor on 9/21/20.  Modifications to the plan will be considered in the future as the pandemic is contained and large group events become more feasible. |
| 12 | 92 | 11/21/2020<br><br>*Done* | **Conduct Year 0.5 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simul-cast (¶ 90). Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS:  Done**<br>The first six-month public meeting on the ODonnell Consent Decree was held via WebEx on 10/28/20.  Due to COVID, the requirement to meet in two locations was waived.  The meeting combined updates from representatives of each defendant group, and also included data from the 6-month Monitor report. |
| 13 | 93 and 94 | 5/2/2020<br><br>*Done* | **Year 1: Summarize and post key policies** - Defendants will confer and agree on the key policies to be summarized and made available online, at the Harris County Joint Processing Center, and at the Harris County Criminal Justice Center and must be translated into each language required to provide a ballot under Section 203 of the Voting Rights Act of 1965. The Monitor will resolve any disputes about the length and content of the summary. | **STATUS:  Done**<br>The following five summarized policies are currently posted online and at the Joint Processing Center (JPC) and Criminal Justice Center (CJC) including translations into Chinese, Vietnamese, and Spanish.<br>1. Notice of the Consent Decree to Misd. Arrestees<br>2. Local Rule 9<br>3. Notification Summary<br>4. Excerpted Court Policies and Procedures<br>5. Monitor Contact Information |

| Section | ¶ | Due Date | Task Details | Status |
|---|---|---|---|---|
| 13 | 93 and 94 | 11/2/2020 <br> *Done* | **Year 1.5 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS:  Done** <br> Policies are reviewed every six months. |
| 14 | 116 | 3/3/2021 <br> *Done* | **Monitoring Plan:  Year 2** - In coordination with the Parties, the Monitor will prepare an annual Monitoring Plan to be made public and published on the County's Consent Decree Website (see Sec. 90).  The Plan must delineate requirements of the Consent Decree to be assessed for compliance, identify the proposed methodology, and create a schedule with target dates for conducting reviews or audits. | **STATUS:  Done** <br> Monitor's Year 1 Report will be submitted by 3/3/21. |
| 14 | 103 | 3/3/2021 <br> *Done* | **Monitor's Budget:  Year 2** -  The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. | **STATUS:  Done** <br> Monitor's Year 1 Report will be submitted by 3/3/21. |
| 14 | 115 and 118 | 1/18/2021 <br> *Done* | **Submit Draft Monitor's Report:  Year 1** - Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in ¶ 117) for review by the Parties. | **STATUS: Done** <br> The "Draft Second Sixth Month Report of the Court Appointed Monitor" was submitted on 1/18/21. |
| 14 | 117 | 3/3/2021 <br> *Done* | **Publish Monitor's Report:  Year 1** - Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in ¶ 117. | **STATUS:  Done** <br> The "Second Sixth Month Report of the Court Appointed Monitor" is submitted herewith. |

### Consent Decree Tasks and Milestones in the Next Six-Month Reporting Period

| Section | ¶ | Due Date | Task Details |
|---|---|---|---|
| 8B | 50f | 4/27/2021 | **Implement court appearance reminder systems** - The County will implement the text- and telephone-based reminder systems within 180 days of approval by the Monitor. |
| 13 | 93 and 94 | 5/2/2021 | **Year 2 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. |

| Section | ¶ | Due Date | Task Details |
|---------|---|----------|--------------|
| 8C | 55 | 5/14/2021 | **Develop written nonappearance mitigation plan** - Within 180 days after receiving published results of study (Sec. 52), the County will work with researchers to develop a written plan for mitigating causes of nonappearance including implementation timeline and proposed budget of at least $850,000 for each of the initial three years following the study.<br><br>The County will submit the plan to the Monitor for review.  Monitor solicits Class Counsel's written comments/objections during a 30-day review period (per Sec. 111-114). Monitor will convey Class Counsel's comments to County for response (objections or amendments) within 30 days of receipt.  The Parties may submit unresolvable disputes to the Court. |
| 12 | 92 | 5/19/2021 | **Conduct Year 1 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simul-cast (Sec. 90).  Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. |
| 14 | 115 and 118 | 7/21/2021 | **Submit Draft Monitor's Report:  Year 1.5** - Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec. 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.  Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. |
| 14 | 117 | 9/3/2021 | **Publish Monitor's Report:  Year 1.5** - Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in Sec. 117. |