IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | |
|---|---|
| MARANDA LYNN ODONNELL, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 16-cv-01414 |
| ) | (Consolidated Class Action) |
| HARRIS COUNTY, TEXAS, et al. ) | The Honorable Lee H. Rosenthal |
| ) | U.S. District Judge |
| Defendants. ) | |
| ) | |

**EXPERT REPORT IN RESPONSE TO DISTRICT ATTORNEY
KIM OGG'S REPORT ON "BAIL, CRIME & PUBLIC SAFETY"**

1. On September 2, 2021, Harris County District Attorney Kim Ogg issued a report entitled "Bail, Crime & Public Safety," which was sent to the Harris County Commissioners' Court and circulated widely to the media. Ex. 1 ("the Ogg Report"). The District Attorney's Office ("DAO") purported to analyze the data relied upon by the *ODonnell* Federal Court Monitors in their First and Second Reports to this Court (Dkt. 722-1, dated September 3, 2020; Dkt. 725-2, dated March 3, 2021), as well as data relied upon by Harris County's Justice Administration Department in producing at least one memorandum to the County Commissioners. *See* Ex. 1 at 13. The Ogg Report's main findings are that (1) among people released after arrest, the number of people who reoffend, the number of bond failures, and the number of violent offenses have increased over time; (2) bail reform has not been limited to misdemeanors (based on Ogg's observation of a decrease in average bond amounts, and an increase in personal bonds, for felony offenses); and (3) "bail reform" is and will continue to be "a driving factor in the crime crisis gripping our community." *Id.* at 3.

2. Based on my review of the Ogg Report and the Monitors' Reports, including the Third Monitor Report, which was issued on September 3, 2021, I conclude that these findings are misleading, false, or irrelevant to this Court's and the public's assessment of misdemeanor bail reform. I also conclude that the findings are not based on sound methodology.

   **I.   Summary of Findings**

3. The Ogg report focuses narrowly on the behavior of people released on bond and concludes that "recidivism" has increased. But Ogg defines "recidivism" in two misleading ways: first, to include any new case filed—ignoring the fact that approximately 67% of misdemeanor cases were dismissed in 2019 (and approximately 68% were dismissed in 2020) and 34% of felony cases were dismissed in 2019 (the only year for which I have access to this statistic) and implying that all new *cases filed* represent new *crimes*; and second, to exclude anyone who was *not* on bond when a new case was filed.

1

By focusing on the increase in new cases filed against people on bond, Ogg ignores the fact that release rates have dramatically increased and people are on bond for much longer since Rule 9 went into effect in 2019, and for those reasons, it is expected that a greater share of new-case-filings would be attributable to people on bond. She also ignores the crucial fact that *overall rates of new-case-filings for people who were arrested for a misdemeanor have not changed over time.* The only thing that has changed is the individuals' system status: on-bond or not-on-bond. And, again, new-case-filings tell us very little about new *crime* rates, given that approximately 67% of misdemeanor cases and 34% of felony cases are dismissed.

4. Ogg mischaracterizes the size of bond-failure rates, the change in rates of bond failure, and the overall trend in rates of bond failure, apparently to make the situation seem more dire. Additionally, despite the evidence previously submitted to this Court about the prior Judges' intentional manipulation of bond-failure rates in 2017 and 2018, Ogg insists, without evidence, that bond-failure rates are a reliable proxy for rates of pretrial misconduct (failure to appear, nonappearance, and violations of bond conditions). They are not reliable proxies.

5. Ogg asserts that Rule 9 *caused* an increase in violent crime in Harris County. Here, again, she relies on new-case-filings as a proxy for new "crime" and ignores the system's high case-dismissal rates. Additionally, she ignores the fact that, although Rule 9 may have been implemented before the DAO's new-case-filings for violent crime increased, there is no evidence that Rule 9 *caused* any increase in new-case-filings for violent crime.

**II. The Ogg Report's Findings On "Reoffending" Are Misleading**

6. The Ogg Report's definition of "recidivism" makes little sense if the Court and the public are concerned about public safety for at least two reasons.

7. First, Ogg limits her definition of "recidivism" to include only those who "reoffend" *while on bond*. She ignores the question of whether the total amount of "reoffending" *overall* has increased, decreased, or stayed the same: and that is the question that is relevant to public safety, not whether the person happened to be on-bond or not-on-bond at the time of "reoffending." Ogg never explains why she focuses on "reoffending" *while on bond* or why she ignores overall rates of reoffending. And, the reason the share of people "reoffending" while on-bond has increased as compared to those not-on-bond should be obvious: many more people are being released on bond under the new system, and they are on bond for much, much longer periods of time.

8. Second, Ogg defines "recidivism" and "reoffending" in a way that deceptively inflates the level of new crime. According to Ogg, "recidivism" or "reoffending" refers to any "new case filed," which ignores the fact that a large proportion of those new cases are dismissed: about 67% of misdemeanor cases and 34% of felony cases, in 2019.[1] Thus, it is highly misleading to rely on

---

[1] *See* Dkt. 726-1, Third Report of the Court-Appointed Monitor ("Third Monitor Report") at 46 (Figure 11: illustrating that 67% of misdemeanor cases in 2019 and 68% of misdemeanor cases in 2020 were dismissed). Another 3% of misdemeanor cases result in deferred adjudication, which is a type of pre-plea probation that typically results in immediate release from custody and, if the person complies with certain conditions of community supervision,

2

*new-case-filed rates* to assert that people on bond are causing a crime wave, given that most cases filed are not substantiated, and many other people avoid conviction through deferred-adjudication dispositions and are deemed safe enough to be released immediately into the community.[2]

9. In sum, the Monitors' focus on the *overall number* of new cases filed—and their acknowledgment that many of these new cases result in dismissal—is more accurate and makes more sense. As they report, the number (and share) of people against whom new cases are filed within 90 days, 180 days, and 365 days of an initial misdemeanor case filing has stayed the same or declined slightly since Rule 9 went into effect, which suggests that Rule 9 has not caused—and is not even correlated with—any increase in "reoffending," even if "reoffending" is defined to include all new cases filed. Dkt. 726-1 at 49 (Table 4); *see also id.* at 50 (Table 5) (analyzing new cases filed at the case level).

**III. The Ogg Report's Findings On "Bond Failure" Rates Are Misleading**

10. Ogg asserts that bond-failure rates among people released pretrial in misdemeanor cases have increased by 50% (from "about" 2/10 to "about" 3/10 defendants) since 2017. Ex. 1 at 28. She equates "bond failure" with "fail[ure] to show up for court or otherwise fail[ing] to meet bond terms" as reflected in bond forfeiture, bond revocation, and bond surrender rates, *id.*, and concludes that "moving defendants from [] secured bonds to [unsecured] bonds has drastically increased the bond failure rate," *id.* at 30.

While bond-failure rates do appear to have increased between 2015 and 2019, Figure 10 in the Third Monitor Report provides additional data and details suggesting that Ogg mischaracterizes the rates themselves, the changes in rates, and the overall trend in rates in a way that makes the situation appear dire. *See* Dkt. 726-1 at 45. Regarding the rates themselves and the changes in rates: bond-failure rates rose from 1.7 out of 10 (in 2015 and 2016) to 2.3 out of 10 (in the first half of 2020), a rise of 35% (or 0.6 percentage points) between 2015 and 2020—not 50%. With a smaller starting base rate, as we have here (17% in 2015), it is easy to make small changes (such as the increase from 17% to 23% between 2015 and the first half of 2020) look like large percentage increases, which is what Ogg does. But her lack of precision results in a misleading figure. Figure 10 also shows that overall bond-failure rates have trended downward since a peak in 2018. In 2015 and 2016, the rates were 17%. They rose to 28% in 2017 and to 30% in 2018. Since then, bond-failure rates declined to 26% in 2019 and to 23% in the first half of 2020. *Id.* Ogg's decision to look at the difference in rates between 2015 as compared to the first half of 2020 obscures the downward trend in the past three years.

11. Moreover, bond-failure rates are not a useful proxy for nonappearance, failure to appear, and violations of bond conditions. I have previously opined on the numerous problems with relying

---

ultimately leads to dismissal of the charge. *See also* Ex. 2 (June 1, 2020 Letter from the Justice Management Institute to Commissioners Court) (stating that 34% of felony cases in 2019 were dismissed; 3% were acquitted; 23% resulted in deferred in adjudication; and only 42% resulted in a conviction).

[2] I do not have access to data showing the specific dismissal rates for cases filed against people who are on bond at the time of the new case filing, which may differ from the overall dismissal rates for all cases filed.

3

on bond-failure rates, and refer the Court to those reports. *See, e.g.*, Dkt. 402-1 (Expert Report of Dr. Stephen Demuth) (especially pages 7–10); Dkt. 402-4 (Expert Analysis of Dr. Stephen Demuth); Dkt. 690-4 (Summary Expert Report of Dr. Stephen Demuth) at 2–4.

12. Ogg (and the Monitors) acknowledge the limitations of bond-failure rates, but Ogg urges us to "think through this." *Id.* at 31. She asserts—without any evidence—that the current bond-failure rates *underrepresent* behavior by defendants that would justify bond failure. She claims that defendants' pretrial misconduct (nonappearance, failures to appear, and conditions-violations) must have stayed the same or increased since 2019 because a new slate of judges was elected who, she says, are more lenient and more likely to ignore the type of conduct that *should* or *could* (in her view) result in a bond failure. Ex. 1 at 31. Ogg ignores the evidence previously submitted to this Court about the prior slate of Judges' intentional manipulation of bond-failure rates in 2017 and 2018. *See* Dkt. 690-4, 402-1, 402-4.

13. The Monitors reach the more methodologically sound conclusion: findings about rates of nonappearance, failure to appear, and pretrial misconduct cannot be drawn accurately from available data on bond forfeiture, bond revocation, and bond surrender. Dkt. 726-1 at 7, 44–45.

14. But even assuming pretrial misconduct has increased—and, again, there is no data capable of showing that it did—the data do not answer *why*. Research is helpful in explaining any such hypothetical increase. First, it is likely that a greater proportion of people who are released on bond since Rule 9 was implemented are poor and experience the challenges of getting to court that research shows are associated with poverty, for example, difficulty finding transportation, difficulty finding childcare, housing instability, substance use disorders, mental illness, and unpredictable and uncontrollable work schedules. Moreover, in recent years, people who are on bond remain in that status for much longer, increasing the likelihood that the person will trip up and violate a condition of release. Ogg ignores these facts in leaping to the unsubstantiated conclusion that "the big picture is that the observed data suggests increased criminality." Ex. 1 at 32.

15. She also presents no evidence that people accused of misdemeanors are fleeing prosecution—which is a more difficult problem to solve than "nonappearance." Moreover, Ogg fails to mention the crucial fact that the County and Judges have the power to mitigate nonappearance and pretrial misconduct—and the Consent Decree requires the County and Judges to take steps to do just that, for example, by making Judges' appearance policies predictable and uniform, studying the causes of nonappearance (a study that is underway), and investing in strategies designed to mitigate the main causes of nonappearance.

16. As the Monitors note, the County and misdemeanor Judges began tracking "failures to appear" and "nonappearance," as defined in Sections 17(f) and 17(m) of the Consent Decree, in December 2020, which should allow for more a more accurate picture of whether people charged with misdemeanors are missing court or fleeing prosecution. Dkt. 726-1 at 44–45.

4

### IV. The Ogg Report's Findings About "Violent" Crime Are Misleading

17. Ogg relies on a classic logical fallacy (*post hoc ergo propter hoc*) to assert that Rule 9 caused an increase in violent crime in Harris County. As a preliminary matter, Ogg relies on "new case filings" as a proxy for new crime, but new case filings do not equate to more crime, given that approximately 67% of misdemeanors and 34% of felony cases are dismissed. Moreover, new-case-filings depend in significant part on policing practices and DAO charging decisions—not solely on conduct happening in the community. Even leaving those limitations of the data aside, Ogg's assertion is illogical: although Rule 9 may have been implemented before new-case-filings for violent crime increased, there is no evidence that Rule 9 *caused* any increase in new-case-filings for violent crime.

18. It is unlikely that any such causal connection exists. In fact, research investigating the relationship between pretrial detention and crime finds that detaining fewer people does not appear to increase offending and may actually decrease future crime.[3] And a recent meta-analysis looking at the effect of custodial sentences on recidivism concluded that it is a "criminological fact" that "incarceration cannot be justified on the grounds it affords public safety by reducing recidivism."[4]

### V. Any Changes to the Felony Bail System Are Irrelevant to an Analysis of the Effects of Misdemeanor Bail Reform

19. Ogg's argument that bail reform has not been limited to misdemeanor cases, Ex. 1 at 45–48, is irrelevant to the question of whether the Consent Decree is being implemented and what effect it has had on the misdemeanor bail system.

20. First, Ogg is correct that the data appear to show that, since 2016, more people charged with felony offenses have been released on unsecured bonds[5] or bonds that, on average, are lower than bonds issued prior to 2016.

21. Ogg implies that an increase in pretrial release for people charged with felonies is a harmful change to the system, ignoring the 34% dismissal rate for felony cases, the 23% deferred-

---

[3] Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017); Jennifer Doleac, *Don't Blame Progressive Prosecutors for Rising Crime* (Sept. 13, 2021), available at https://www.bloomberg.com/opinion/articles/2021-09-13/don-t-blame-progressive-prosecutors-for-rising-crime-rates; *see also* Will Dobbie, et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges* (Feb. 2018), available at https://www.aeaweb.org/articles?id=10.1257/aer.20161503; Emily Leslie & Nolan G. Pope, *The Unintended Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignments* (Aug. 2017), available at https://www.journals.uchicago.edu/doi/full/10.1086/695285.

[4] Damon M. Petrick, et al., *Custodial Sanction and Reoffending: A Meta-Analytic Review*, available at https://www.journals.uchicago.edu/doi/abs/10.1086/715100?ai=7st&mi=3elpax&af=R.

[5] According to Harris County Pretrial Services Annual Reports, about 65% of felony defendants in 2020 were released pretrial, as compared to about 55% in 2019 and about 42% in 2016. Moreover, about 30% of felony defendants in 2020 were released on unsecured bonds as compared to about 24% in 2019 and only 4.2% in 2016. These reports are available here: https://pretrial.harriscountytx.gov/Pages/Annual-Reports.aspx.

5

adjudication rate (resulting typically in immediate release from custody) for felony cases, the cost savings associated with lower rates of pretrial detention, the likely reduction in coerced guilty pleas, and the decrease in personal traumas precipitated by pretrial jailing such as the separation of parents and children, the loss of housing and jobs, the interruption of medical care, and the physical and sexual violence.

22. Ultimately, however, bail decisions in felony cases are not relevant to an assessment of the effects of the Consent Decree on the misdemeanor system or whether the Consent Decree in *ODonnell* is being fully implemented.

### VI. Potential Bias in the Ogg Report

23. The Ogg Report likely suffers from undisclosed bias: first, it was generated by employees of the DAO's office (as opposed to independent researchers) and a "consultant," whose credentials are not specified,[6] Ex. 1 at 64; and, second, the DAO has an institutional and financial interest in justifying misdemeanor arrests and prosecutions as necessary to promote public safety. This potential bias and conflict of interest, particularly given the lack of disclosure, depart from accepted standards in academic research.

24. The Monitors' reports, on the other hand, rely on data analysis provided by highly trained, independent social scientists, who have no personal stake in the content of the findings. Based on my analysis, the Monitors' Reports are far more rigorous and credible.

### VII. Conclusions

25. Viewing the Monitors' Reports and the Ogg Report together, and considering the bias and self-interest of the DAO in producing its report, I conclude that the Monitors' reports are more objective and more reliable. The Monitor Reports suggest that misdemeanor bail reform, so far, has been successful in terms of the three purposes of bail: maximizing pretrial release, maximizing court appearance, and maximizing public safety.

26. Under Rule 9 and the Consent Decree, many more people charged with misdemeanor offenses are being released pretrial and there is no evidence of an increase in crime. In fact, the Monitors' reports show that increasing pretrial release may lead to fewer arrests. Moreover, people who would have been detained in the past and coerced into guilty pleas are now having their cases dismissed, and families who were previously forced to pay money to private bondsmen—although there is no evidence that secured bail is more effective than unsecured bail at promoting court appearance and public safety—are no longer having to do that.

27. In light of all of the research I am aware of from jurisdictions throughout the country, including Harris County, the Monitors' findings make sense. When cash bail is set in fewer cases, more people are released pretrial; racial disparities in pretrial detention decrease; fewer people divert money from basic necessities in order to make payments to private bonding companies; people

---

[6] Ogg also does not disclose whether the Consultant was paid by the District Attorney's Office, which payment could further undermine the consultant's neutrality.

can return to their families, homes, and jobs; convictions are less likely because people are not coerced into guilty pleas; and cases take longer to resolve because people are free to fight their cases. Judges can still set individualized conditions of release in every case, and they can set secured bond—including unaffordable bond—in the most serious misdemeanor cases, if they deem pretrial detention necessary to protect public safety or prevent flight from prosecution. This is a rational system and the reliable evidence so far shows that it strikes an appropriate balance between safety and fairness.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

_____  September 24, 2021
Stephen Demuth, Ph.D.           Date