# Monitoring Pretrial Reform in Harris County

# Fifth Report of the Court-Appointed Monitor

*September 3, 2022*



**Brandon L. Garrett, JD, Monitor**
*L. Neil Williams Professor of Law*
*Director, Wilson Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Professor of Law*
*University of Houston Law Center*
*4170 Martin Luther King Blvd.Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Dottie Carmichael, PhD, Director and Research Scientist**
**Iftekhairul Islam, Asst. Research Scientist**
**Andrea Seasock, Project Coordinator**
*Texas A&M University*
*Public Policy Research Institute*
*4476 TAMU*
*College Station, TX 78743-7746*
*(979) 854-8800*
*dottie@ppri.tamu.edu*

**Songman Kang, PhD, Consultant**
Professor, Division of Economics & Finance
Hanyang University
Seoul, Korea

Provided to:

**The Honorable Lee H. Rosenthal**
**Chief Judge, United States District Court**
**for the Southern District of Texas**

Also provided to:

**Representatives of Plaintiff Class:**

> **Elizabeth Rossi, Plaintiffs' Counsel, elizabeth@civilrightscorps.org**

> **Cody Cutting, Plaintiffs' Counsel, cody@civilrightscorps.org**

**Representatives of Harris County:**

> **Rachel Fraser, Assistant County Attorney,**
> **Rachel.Fraser@cao.hctx.net**

> **Dr. Ana Correa, Interim Director, Office of Justice and Safety,**
> **Ana.YanezCorrea@jad.hctx.net**

**Representative of County Criminal Court at Law Judges:**

> **Allan Van Fleet, Counsel for the 16 County Criminal Court at Law**
> **Judges, allanvanfleet@gmail.com**

**Representative of Harris County Sheriff's Office:**

> **Major Patrick Dougherty, patrick.dougherty@sheriff.hctx.net**

## *Executive Summary*

- **The ODonnell Consent Decree:**
  - *Misdemeanor Bail Reform:* In Harris County, secured money bonds are no longer required for most misdemeanor cases under the court rule adopted as part of the *ODonnell v. Harris County* settlement.  Most people arrested for misdemeanors are released promptly without a hearing.
  - *Bail Options Unchanged for Cases with Public Safety Concerns:* People charged with misdemeanors that potentially present public safety risks (e.g., repeat DWIs, family violence, prior bond violations or outstanding warrants) are not automatically released.  A hearing officer makes a bail decision, usually following a hearing at which magistrates have the traditional options to require financial bonds, protective orders, pretrial supervision requirements, or other release conditions.
  - *Better Bail Hearings:* Defense attorneys continue to represent people at bail hearings, as required by Rule 9 and the Consent Decree. Before 2017, people arrested in Harris County had no defense attorney at these hearings. Judges also must give greater attention to more rigorous bail requirements.

- **Major Consent Decree Accomplishments:**
  - *Court Appearance*: An $850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's  Court as part of the FY22 budget.  Ideas42 conducted studies of primary causes of court non-appearance. The County is developing an implementation plan to make use of that allocation to improve court appearance.
  - *Data Portal*: Much of the relevant information is now available in an automated report.  We have continued work to provide feedback on Harris County's development of the public data portal.
  - *Training*: A new vendor to provide refresher trainings has been selected, the Deason Criminal Justice Reform Center at the SMU Dedman School of Law, and will begin work in Fall 2022.
  - *Indigent Defense*: The County is planning its response to the National Association for Public Defense (NAPD) evaluation of Harris County's misdemeanor indigent defense systems.[1]  A written plan for the system of private appointed counsel is also being developed by the Office of the Managed Assigned Counsel, and is scheduled to be completed on July 7, 2022.

- **Ongoing Work by the Monitor Team:**
  - *Data Development:* We analyzed data prepared by Harris County and provided continual feedback on data development in regular meetings concerning the assembly and validation of data regarding misdemeanor cases.
  - *Community Work Group*: We convened quarterly meetings of our Community Work Group, to share our work and solicit input from our diverse community

---

[1] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/HarrThis%20County%20Report%20July%206%202021%20FINAL.pdf.

stakeholders.  Members share their perspectives for the "Community Viewpoints" column found in our reports.

- o *Regular Meetings:* We held regular meetings with the parties and Harris County stakeholders, including weekly calls, monthly meetings with both judges and hearing officers, and periodic calls with public defenders and prosecutors.  Our next public meetings will be help in-person on October 7 and virtual on October 13.

- o *Feedback:* We provided feedback to the parties on several improvements to the hearing process, the designed and implemented training, and the assessment work regarding holistic defense services and nonappearance.

- **Our Findings:**
  - o *Data Analysis:* Our updated findings largely confirm what we reported in our first four reports.  The bail reforms under the ODonnell Consent Decree have saved Harris County and residents many millions of dollars, improved the lives of tens of thousands of persons arrested for misdemeanors, and these large-scale changes have produced no increase in new offenses by persons arrested for misdemeanors.

    - ▪ *Overall, the work suggests that repeat offending by persons arrested for misdemeanors has remained stable in recent years.*

    - ▪ The numbers of persons arrested for misdemeanors have declined.

    - ▪ The numbers of those arrested for misdemeanors who had new charges filed within one year have also declined.

  - o We note that an independent report by the Quattrone Center at the University of Pennsylvania School of Law was recently completed, examining the County administrative data that we have examined. Focusing on the time period before and after the ODonnell preliminary injunction, the researchers found, consistent with our findings, sharp decreases in guilty pleas and jailtime following the change, but also positive impacts on public safety, where arrestees had, following the change, reduced repeat contacts with the criminal system.[2]
  - o We now have data regarding persons flagged as homeless or with mental health needs and plan to undertake these analyses and report the results as more data is available and validated.
  - o The analyses conducted show:

    ### Misdemeanor Case and Defendant Characteristics

  - o The number of persons arrested for misdemeanors has continued to steadily decline.
  - o These arrest numbers fell between 2015 (50,528) and 2021 (41,540). The number of people arrested during the first half of 2022 (20,891) is slightly less than the count from the first half of 2021 (22,375).

---

[2] Paul Heaton, The Effects of Misdemeanor Bail Reform (August 30, 2022), at https://www.law.upenn.edu/institutes/quattronecenter/reports/bailreform/#/.

o In the first half of 2022, as in each year between 2015 and 2021, males made up about 75 percent of the misdemeanor arrestees.

o We observe little change in the racial makeup of misdemeanor arrestees, and consistent with data from 2015 to 2021, in the first half of 2022, 41% of arrestees were Black, and 57% were white.

o The share of Latinx arrestees has gradually increased over time, reaching 41 percent in 2019, and remained nearly constant since then; the share was 41% in the first half of 2022.

o We have now geocoded misdemeanor arrestee address information and display these geographic distributions.  We observe a modest decline in misdemeanor arrests among persons who reside in the eastern part of Harris County.

o We have also now examined Houston Police Department data concerning calls-for-service during the time period in which these misdemeanor bail reforms took effect, and find that the number of the crime-related calls were quite stable during the 2015-2021 time period.

### Bond Amounts and Holds

o We continue to observe increased use of unsecured personal bonds and general order bonds over time. While 87 percent of the bond releases in 2015 involved secured bonds, this share fell to 21 percent in 2019 and 13 percent in 2021.

o The number of misdemeanor cases with an existing hold nearly doubled between 2015 (2,164) and 2019 (3,755), and then sharply dropped in 2020 (2,963) and 2021 (2,145).  There were 989 such holds in the first half of 2022.

o The prior gaps in pretrial release rates between female/male, black/white, and Latinx/non-Latinx persons, have rapidly narrowed, as the percentage point differences fell by approximately two-thirds between 2015 and 2019.

### Case Outcomes

o We present a preliminary analysis based on all magistration hearings that took place between March 10, 2021, and June 30, 2022 (N=36,519). In those hearings, 74% resulted in a personal bond and 24% a secured bond.  We find that indigence is found in 51% of cases, and defendants are found not indigent in 4%. Information about indigence is missing in 39% of cases.

o The share of misdemeanor cases resulting in a criminal conviction has substantially declined between 2015 (59%) and 2021 (19%), while the share of cases dismissed or acquitted has risen (31% in 2015 vs. 48% in 2021).

o Disposition outcomes are observed for most cases filed prior to 2020, but 18 percent of the cases filed in 2020 and 31 percent of the cases filed in the first half of 2021 are yet to be disposed.

### Repeat Offending

o The share of misdemeanor arrestees who had a new criminal case filed within a year has changed minimally between 2015 (23%) and 2021 (23%).

- o We also note that the rate of new cases filed has remained nearly constant across all three time periods considered, namely, 90, 180, and 365 days, although all three rates slightly increased between 2019 and 2020.
- o The number of misdemeanor cases has steadily declined since 2016, while the number of felony cases has substantially increased between 2019 (N=36,960) and 2021 (N=44,154). Despite these opposing trends, the shares of misdemeanor and felony cases filed against former misdemeanor arrestees have remained mostly stable, if not slightly lower.

### *Cost Evaluation*

- o The Fourth Monitor Report concluded that if 2021 post-ODonnell criminal justice practices had been in use since 2015, the county would have saved millions of dollars per year in misdemeanor case processing costs and even more costs would have been avoided by defendants in personal, family, and earnings impacts. However, analyses did not examine whether these apparent cost savings might be offset if the new policies introduced by Rule 9, including the use of unsecured General Order Bonds, increased the rate of new offending.
- o To examine these questions, we conceptually distinguished re-arrests that can potentially be attributed to ODonnell bond policies from overall arrests for people without recent exposure to Harris County's pretrial system. To allow a standardized 365-day re-arrest interval, we took cases filed on or before June 31, 2021, then looked forward one year from the case filing date to assess the amount, severity, and cost of future arrests.
- o Since Rule 9 was implemented, fewer re-arrests have occurred; 77% of misdemeanor arrests have been "one-time" events with "0" re-arrests within a year. Previously just 74% of arrests met this standard.
- o Not only has the share of misdemeanors with a new arrest fallen from 26% pre-Rule 9 to 24% after, the average *number* of re-arrests has also dropped by 11% from 0.47 new arrests per misdemeanor prior to 2018 to 0.41 in 2019 and later. (The average number of re-arrests is a decimal value less than "1" because a "0" is entered into the mean for the three-fourths of misdemeanor arrests with no new charges.)
- o Altogether, we estimate that Harris County processed about 6,000 fewer re-arrests each year since 2019 compared to the years before.
- o At the same time that the number of re-arrests following misdemeanor charges have fallen we find the severity of charges filed has increased for both misdemeanor arrests and re-arrests.  Because a similar change is observed for new offenses as well as for initial misdemeanor arrests unaffected by ODonnell protocols, there is likely a common explanation for both trends that is unrelated to to bond practices.  A leading explanation may be the changing composition of cases being filed:  As up to 20% fewer misdemeanors have been prosecuted in recent years, lower-level charges are increasingly dropped, leaving the more serious violations to rise as a share of all filings.  There may be other contributing factors as well, COVID-related crime trends among them, but pretrial processes do not seem a primary cause.

o Since the Consent Decree, a larger share of re-arrests have been for offenses that disproportionately impact vulnerable populations with repeat criminal justice contact.  Though the increase is small – just 3 percentage points – it may affected by the increased speed of pretrial release under ODonnell, which leaves little time to connect people to community services.  Ideally, a means can be found to strengthen handoffs to community organizations without impeding prompt pretrial release.

o We note that the decline in the number of drug-related misdemeanor offenses may be driven in part by initiatives operated in Harris County criminal justice departments.  A pre-charge diversion program operated by the District Attorney's Office since 2017 offers education and rehabilitation alternatives instead of a conviction to people charged with simple possession of marijuana.

o The program is estimated to have reduced the cost of arrest and prosecution by more than $35 million in its first two years.  Similarly, the Community Supervision and Corrections Division  offers court-supervised probationers a full range of substance abuse treatment from group counseling to intensive residential treatment.

o Cost analyses assessed changes in costs of processing misdemeanor arrest and re-arrests over time, as well as and the underlying explanatory factors.  Separate estimations were done for county departments, defendants, and victims.

o In Harris County, criminal case processing costs per arrest have fallen overall, but even greater declines were observed for re-arrests.  A substantial increase in jail days following bond failure, makes detention the largest county expense.  However, since the Consent Decree, jail days for re-arrestees have significantly declined, cutting total cost per re-arrest by one-third.

o Involvement in the criminal justice system exacts a high financial toll on the defendants involved.  Since the Consent Decree, thought, costs to defendants have fallen 28% per arrest and by 37% per re-arrest on average with the greatest declines since Rule 9.  Reductions are primarily driven by significant declines in detention which remains the single most potent driver of cost burden for the accused.

o Crime victim costs per *arrest* have risen nearly 50% since 2015, almost entirely due to the increasing share of misdemeanor filings in two of most expensive victim categories:  assault and impaired driving.  Importantly, though, costs of *arrest* are distinct from the costs of *re-arrest* which are more clearly linked to practices under the Consent Decree.  As more arrestees have been released on unsecured General Order Bonds, victim costs for new charges seem largely unaffected, remaining stable at about $4,500 per misdemeanor re-arrest on average.

- **Next Monitoring Steps:**

  o Assist in further implementation of improvements to pretrial hearings and accompanying procedures to facilitate compliance with the Consent Decree.
  o Review County plans that follow recommendations made in NAPD indigent defense study and Ideas42 court appearance study.
  o Conduct further data analysis regarding vulnerable populations and cost analysis.

## *Table of Contents*

*Introduction*                                                          **1**

**I. Community Viewpoints**                                             **1**

**II. Policy Assessment and Reporting**                                 **6**

**III. Data Analysis**                                                  **11**

**IV. Cost Study and Project Management**                               **47**

**V.  Our Work in the Next Six Months**                                 **61**

*Appendix*                                                             **62**

**A. The Monitorship Structure**                                        **63**
**B. Community Working Group**                                          **71**
**C. Monitor Team Bios**                                                **76**
**D. Organizational Chart**                                             **77**
**E. Year 3 Statement of Work**                                         **78**
**F. Re-Arrest Analysis and Cost Evaluation Detail**                    **88**
**G. Gun Crime Cost Methodology**                                       **97**
**H. Consent Decree Tasks and Milestones**                              **105**

## *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the ODonnell Consent Decree, along with Professor Sandra Guerra Thompson, University of Houston Law Center, who serves as the Deputy Monitor. The Monitor team includes research experts from the Public Policy Research Institute ("PPRI") at Texas A&M University, and the Wilson Center for Science and Justice ("WCSJ") at Duke University School of Law.

Our role is wholly independent of any of the parties in the ODonnell case; our role is to report to the federal court regarding the progress of this Consent Decree. We were appointed because the prior system of misdemeanor bail was found unconstitutional and after years of litigation, which we took no part in, and which the parties settled prior to our appointment. As such, our work pertains only to misdemeanor cases in Harris County.

Second, the parties envisioned a seven-year term for the monitorship because the ODonnell Consent Decree sets out a comprehensive plan for misdemeanor bail reform. People mean different things by both the term "bail" and the phrase "bail reform." Harris County is implementing a quite comprehensive model for misdemeanor cases, which governs more than just decisions whether to release a person or detain them pretrial. First, at the point of arrest, there are required releases for low-level misdemeanors. Second, for those defendants not entitled to release without a hearing, magistrates conduct bail hearings. The Consent Decree requires public defense representation, discovery and due process protections, making the hearings far more robust. Third, the Consent Decree aims to increase court appearance rates over time with sound rules and supports to help people comply with legal obligations, including new court appearance rules and electronic court notifications. Fourth, the Consent Decree calls for evaluations of the system, including third-party recommendations regarding indigent defense and court appearance, and a publicly accessible data portal, with responses in progress.

For those reasons, we emphasize that the Consent Decree is a long-term undertaking, with key pillars implemented, but others still in progress. These improvements will require assessment and implementation over time. Thus, while we have described in our six-month reports highly positive results, we will continue to update our findings over time. In this fifth report, we describe how key pillars of the Consent Decree are now in place, including the court appearance provisions and the electronic court notification system. Additional implementation remains in progress, including responses to recommendations regarding indigent defense in misdemeanor cases in Harris County and development of a public data portal.

## I. Community Viewpoints

### *Perspectives on the ODonnell Misdemeanor Bail Rules: Public Safety, Policing and Preventing the Harms of Arrest and Jail*

In this second edition of *Community Viewpoints*, the ODonnell Monitor team explores the impact of the changes in how bail works in Harris County under ODonnell. Deputy Monitor Sandra Guerra Thompson interviewed Terrance "TK" Koontz and Tim Oettmeier, two members of the Community Work Group, a group of community leaders who meet quarterly to advise the Monitor team. Koontz's career as a community organizer grew out of his experience being arrested in Harris

1

County over ten years ago.  Having languished in jail unable to post bail, he well understands the importance of the ODonnell rules that allow most people charged with misdemeanors to gain their release without paying money.  The ODonnell reform means that the only people whose bail is decided by a magistrate are those who face a charge involving family violence or a second DWI, or those who were already out on a bond.  Oettmeier, the long-time Executive Assistant Chief of Police for the Houston Police Department, brings a law enforcement perspective to the conversation about bail and public safety.  Despite their vastly different experiences with the justice system, the two men express surprisingly similar views in calling for an approach that does not rely on arrest and prosecution for people who deserve a more productive and humane response, an approach which would also free up the justice system for more serious cases.



*Terrance "TK" Koontz currently serves as Statewide Training Coordinator for the Texas Organizing Project.  In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement.  He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County to elect Brian Middleton, the first African American D.A. in Fort Bend County history.  He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator.  He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service.  Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.*



*Timothy N. Oettmeier most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer.  As Executive Assistant Chief of Police, he supervised numerous divisions in the department.  He was a principal architect for implementing community policing throughout the agency.  He received his Ph.D. in Police Administration from Sam Houston State University in 1982.  He oversaw national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training.  He authored department reports, and articles for textbooks and journals on police management issues.  Early in his career, the 100 Club of Houston recognized him as an Officer of the Year.  Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services.  He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from The 100 Club of Houston.*

**Opposing Perspectives, Similar Justice Goals**

Tim Oettmeier and TK Koontz came by their interest in criminal law from opposite directions.  Oettmeier became a police officer on a hunch that he'd like it, "out of curiosity more than anything else, but once you give it a try, it gets in your blood and you're kind of stuck with it."  After completing his college degree at the University of Houston, he joined the Houston Police Department.  Over the course of the next six or seven years, he regularly made the three-hour

roundtrip commute from Houston to graduate school in Huntsville and earned his PhD in Police Administration, all while serving as a full-time HPD officer. His professors taught him "how to think critically about different issues involved in criminal justice," which he believes "improved [his] performance as a police officer." Oettmeier played many roles at HPD, under many Police Chiefs, ultimately serving as Executive Assistant Chief of Police, a behind-the-scenes leadership role that he loved.

On the other hand, Koontz learned about criminal law when he was arrested on a felony "evading the police" charge in 2010. "'Felony' is a blanket term that we use," he explains. He admits that he was driving while intoxicated (normally a misdemeanor), but he says the officer did not even turn on his lights until he had followed him for three to five minutes, probably deciding whether he seemed intoxicated. He knows he should not have been driving drunk, but the felony evading arrest charge, he feels, was excessive. Felony convictions should be reserved for people who pose a danger to society, he says, and cases like his should be treated as misdemeanors. "I was no threat to anyone past that moment. If you check my history, I am not a threat to anyone," he says. But the felony arrest experience forever changed his life. Unable to post bail, he lost everything— his job, his housing. Forced to sit in jail, his lawyer convinced him to plead guilty and, in the process, he also surrendered his status in society. The experience of having one very bad night that ultimately ended with his becoming labeled as a felon fueled in Koontz a passion to work for justice. He started his career with a group called Texas Together doing work to help connect people with housing, and then he moved to the Texas Organizing Project (TOP) where he now serves as statewide coordinator for training. Koontz says of the journey, "It was my destiny to be an organizer."

**The Truth About the ODonnell Consent Decree**

Much is said in the media about people out on bond who then commit murders, and critics point to "bail reform" as the problem. Oettmeier believes, "the public doesn't understand the parameters of ODonnell." He states, "All you have to do is have one bad example and everyone comes down and says, 'I told you so!'" Good policy making, he explains, cannot be decided by a few tragic cases. "You can't design a program around one example or a few examples--you have to look at the majority," Oettmeier says. Koontz agrees, saying, "Advocates and organizers don't necessarily control the media as much as elected officials and police, so even those people who are affected by negative policies like [the money bail problem addressed by] ODonnell, these people operate from a place of fear." Koontz laments that "a lot of people are misinformed." He publicly shares the story of his arrest to help the black community understand the truth about the bail system. "If they really understood what was going on," he says, "there would be more voices lifted to say we want these types of changes like bail reform, especially in the black community."

With an effective and fair pretrial system, Koontz believes the courts would be better positioned to deal with the serious cases that pose a real threat to the public. "If the system was working the way it is supposed to, if we cleared up all the jails and got out all the people who don't need to be sitting in there," he says, "it would help expedite the process for some of the folks who are more dangerous in the community, and we wouldn't have the [overcrowding] issues that we have."

**The Compounding Costs of Arrest and Jail**

3

The ODonnell consent decree involves only misdemeanor cases.  In the past, when police officers arrested people for low-level nonviolent misdemeanors, the individuals often sat in jail unable to post bail.  Both Oettmeier and Koontz question whether arrest and prosecution even make sense for these cases.  Oettmeier asks, "With this population, do they really need to go to jail?"  The traditional approach put these people through the criminal justice system usually leads to a sentence of probation designed to impose some form of rehabilitation. "It seems to me that one ought to go look at the whole functionality of probation and rethink that," Oettmeier says.  "Maybe the [misdemeanor] population you're working with in the consent decree don't need to go the jail route; maybe they need to go a different route."

Oettmeier would prefer programs that supervise people without using the arrest and prosecution model.  Oettmeier knows that "some people will say there's no accountability, no justice," but he says "you have to ask yourself, 'Do the offenses really require that kind of response?' I'm thinking in some of these areas, the answer is 'no'.  We have to think differently about people who make some of these mistakes.  They don't all have to go into the same arrest funnel."  In his view, ODonnell helps many poor people to escape pretrial incarceration and the coercion to plead guilty, but it is still only an improvement on a system that perhaps we should be avoiding altogether. "Even the bail system is still working within the confines of this same funnel system, Oettmeier says, adding that "in the future, people are going to have to think differently about these things and remove bail as an issue by taking a different route."

Koontz agrees that arrest and prosecution should be avoided for people who just need society's support.  "The criminal legal system (or criminal injustice system) is not designed to support rehabilitation in my opinion," he says.  The cost of pursuing the arrest and prosecution route has far-reaching negative effects on the individuals who are prosecuted,their families, society in general, and especially communities of color.  For him personally, he says there's a "compounding effect, so my arrest cost me more than it would have cost me, had I been given an opportunity to get out of jail."  Koontz explains that jobs, housing and criminal justice are "all connected."  He says, "There's intersectionality in how they impact the black community . . . how one connects to the opportunity for the other."  In his case, his arrest led to the loss of his job and his housing, but the effects continue indefinitely.  "Job security creates opportunity to get decent housing, but even having a good job, since I have a criminal background," he explains, "it becomes a challenge for me to get housing.  You've got to have your ducks in a row."

Thinking about the pretrial bail process, Koontz reflects, "I definitely would have appreciated that opportunity [to make bail] if it had been offered to me."  He believes he would have found a better lawyer and would have been better positioned to fight his case.  "I probably would have got the case dismissed. Had I been in the community with my friends and family, I could have been better advised about getting a better lawyer."  Even with the success he has had in recovering from his arrest and conviction, Koontz, now a husband and father, worries that "the effects go beyond a lifetime sometimes."  He explains, "My situation could have potentially, and still does, affect my kids and my kids' kids and so on," Koontz explains. "With that understanding, I'm never going to be in a rush to put somebody in jail or prison."

## A Better Approach

This Monitor Report finds a high rate of misdemeanor cases are dismissed.   Oettmeier believes, "The conditions probably have to do with COVID and jail overcrowding.  This puts a lot

of pressure on caseloads, but [dismissal] doesn't necessarily mean that the DA couldn't prove the case." Many other dismissals are attributable to pretrial diversion programs instituted by the District Attorney's Office. In addition, Oettmeier also says recent changes in the leadership at Harris County Pretrial Services agency was a "huge thing" that will "help ensure people come to court, facilitate remote appearances, and even with the problems at the courthouse due to Harvey and COVID." Nonetheless, he returns to the topic of avoiding arrest and prosecution and opting instead for a new approach. "It all starts with whether or not you're going to send an officer to a particular scene, like a domestic violence, mental health, or homeless issue. Are police the ones who really need to deal with that? The answer to that is 'no,'" Oettmeier says. He believes we need to create other avenues that utilize social services specialists so that jail becomes a "last alternative." Oettmeier says, "Public leaders need to think differently about how to spend money so as to mobilize other specialists to address issues like mental health, homelessness, and reducing domestic violence. We might handle things differently rather than always pursuing prosecution as a first resort."

Koontz agrees that arrest should be a last resort. He says, "A lot of folks who are in jail for low-level offenses just maybe had a rough day; they made a poor decision on a given day." To reduce this type of low-level offending, he says, "we don't need patchwork programs. We need jobs, programs for children and seniors, second chance opportunities for those coming home from prison." Like Oettmeier, he thinks the police departments can take a different approach that will result in "making more empathetic human decisions and not just use their current means to do a job." Most importantly, Koontz believes, "we need community reinvestment" so that neighborhoods like the one where his family lives can look a little more like privileged communities. By investing in neighborhoods like his, public officials would acknowledge communities of color as "just as human and deserving," he notes, and in so doing, "lift up everybody."

## II. Policy Assessment and Reporting

We started our work upon our appointment on March 3, 2020.[3]  In this fifth report, we describe our progress towards carrying out the tasks outlined in our Year Three Work Plan, focusing on the time period following the completion of our fourth report on March 3, 2022 (amended on April 18, 2022).  Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County in meeting their goal of making the Harris County misdemeanor system a national model.  Our work continues to be informed by regular conversations with County stakeholders and an intensive analysis of court records, ranging from docket entries to videos.  We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to future conversations.  As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under the Consent Decree, as well as conducted regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Conducted an in-person site visit.

(3) Approved proposal for the County to retain outside vendor to conduct refresher training, and reviewed a report by outside vendor concerning court appearance.

(4) Continued to convene the Community Working Group.

(5) Continued data collection and analysis and incorporated this work into the fifth six-month Monitor Report, as well as advising on development of a public data dashboard.

## A. Policy Assessment

This Report describes our work reviewing the implementation of a range of policies under the Consent Decree.  We held our first site visit on March 25, 2022.  We had valuable meetings with the parties and a wide range of professionals who work in the misdemeanor bail system in Harris County.  We were particularly grateful to the District Attorney's Office for inviting us to observe the intake process and to the Sheriff's Office for providing us with a tour of the Joint Processing Center.

We had expected to visit on a typical day and not on a day in the misdemeanor system would be facing especially difficult challenges.  When we began our day, we learned that the JWEB computer system had experienced an outage, which meant that district attorneys and sheriffs lacked charging information for arrestees.  As the day progressed, it became clear that this was not a temporary outage, and it took some time for the system to be restored.

Of the most direct concern regarding the specific provisions of the consent decree, was that persons charged with misdemeanors have statutory and consent decree rights to a timely release.  We

---

[3] In the motion to appoint us as Monitor, our submission to the Court included a Proposal and Budget for Year 1 of work, which describes our team members, timelines, an organization chart, and a budget for all participants. We do not repeat that information here, but it is available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/).  On May 1, 2020, we also provided the Parties with a Work Plan setting out our first year of work, set out in quarterly deliverables, as was most convenient for the County and its budgeting process.  That Plan has been made available on our Monitor website, as are our second year and third year Work Plans. *Id.*

learned in the days that followed that several hundred individuals experienced delays in release, including many dozens of persons arrested in misdemeanor cases.  For many individuals entitled to prompt release, those delays resulted in substantial hardship.  The delays ultimately led to statutory and Consent Decree release requirements being triggered.  If there were individuals who would otherwise have been detained, those mandated releases raise public safety concerns.  We appreciated the hard work that the judges and hearing officers put into trying to ascertain appropriate resolutions in these cases.  Similarly, Sheriff's Office staff had to gather information about these persons without access to the electronic records they typically rely on.  District attorneys and public defenders also lacked that charging information.

We hope that this was a one-time event and understand that the County has made efforts to understand how the computer outage occurred, in order to prevent future occurences.  These events, however, highlight the need for systems to ensure that pretrial determinations are made efficiently and timely, as well as the need for backup plans when systems fail.  Further, other events may place similar types of strain on the intake process.  We have continued to see delays in processing individuals for release, as well as in conducting hearings and bail review.  We continue to discuss with the parties ways to improve pretrial processes,but we have yet to see any systemic improvement. Making system improvements would both ensure fairness and promote public safety.

We also appreciated the opportunity to visit with many professionals in person.  Watching bail hearings, the JPC intake process, in person, was extremely valuable.  Below we describe: (1) studying pretrial hearing outcomes and changes to the magistration hearing process; (2) work with agencies including the Harris County Sheriff's Office; (3) work with the CCCL and the Office of Court Management; and (4) Pretrial Services.  We also describe engagement with nonparties, (5) the Harris County Public Defender's Office (HCPD) and the relatively new Office of Managed Assigned Counsel (MAC).

## 1.  Studying Magistration Hearing Outcomes

We have continued to examine data regarding misdemeanor bail hearings as well as view videos from magistration hearings. We report on this work below.  We continued to examine the text of Hearing Officers' pretrial rulings in misdemeanor cases.  Among Hearing Officers, we have observed more detailed rulings that better track the process and requirements of Rule 9 and the Consent Decree from most of the magistrates.  One ongoing area for improvement continues to be the need for factual findings regarding why or whether, when pretrial conditions are set, there is clear and convincing evidence that no less restrictive conditions can reasonably assure community safety and protect against flight from prosecution. We underscore that we continue to be impressed by the way in which the vast majority of rulings display real attention and care.  However, we do continue to review some rulings, both written and oral, that do not explain, for example, why prior offenses or non-appearance render the arrestee an unmitigable risk.  Such conclusory rulings do not explain why alternative conditions to secured money bail were deemed insufficient. The oral and written hearing rulings sometimes do not make clear what *additional* evidence, relevant to flight and safety, provides the basis for the ruling beyond the charge and the allegations.

Unfortunately, we continue to observe instances in which errors were made that resulted in people being unlawfully detained.  While these do not appear to be common occurrences, in comparison to the total number of persons coming through the system, we saw in the wake of our site visit how a system failure could lead to large numbers of prolonged, unlawful detentions.  While

that data outage may have been an unusual event, overcrowding in the jail places pressure on these processes as well.

The results for the affected individuals can be quite drastic. They can also raise public safety concerns, if a person who would otherwise be detained, is released because the required timely hearing was not provided. Both types of errors raise concerns. We also note that for individuals experiencing medical and behavioral health needs, careful treatment is warranted. We continue to discuss with the parties the development of systems to detect and correct such errors before they result in unlawful detention or unwarranted release, rather than after the fact.

We continue to observe videos of misdemeanor pretrial hearings conducted, both selecting hearings at random and when individual cases are brought to our attention. We watched several dozen hearings from Spring 2022. By watching these videos, we have learned a great deal about the important and challenging work of hearing officers during these hearings. More broadly, we hope that the continued conversations and future refresher trainings on Rule 9 and the Consent Decree will improve outcomes and consistency in bail hearings at magistration (and also at bail hearings in the Judges' courtrooms). We continue to explore the feasibility of additional changes that can improve the quality, fairness, and efficiency of the bail hearing process. We are extremely grateful for ongoing feedback and collaboration with the Hearing Officers.

### 2. Harris County Sheriff's Office

The Harris County Sheriff's Office ("HCSO") plays a central role in the Consent Decree's success, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing numerous improvements to the systems used in the past. We continue to discuss additional improvements, including implementing processes to quickly identify individuals who have not received a timely hearing or bail review, or who otherwise have not received the process due under this Consent Decree. As noted, we have continued to learn of cases in which persons did not receive the process that they are entitled to receive under this Consent Decree. As a result, we have been more frequently combing data to examine cases and bring issues to the attention of the Sheriff's Office and the other parties. We have seen cases which should have been GOB releases, where the person was instead held for a bail hearing. We understand that the converse can also occur, where a carve-out case is erroneously designated as a GOB. We have seen cases in which a person did not receive a bail hearing within 48 hours. We saw this happen in an especially large number of cases after our site visit. We have seen cases in which the person did not receive the bail review, which the Consent Decree requires be held the next business day after a bail hearing. All potential Consent Decree violations should be reported to us promptly. Most important, an improved and well-established process is needed to proactively identify errors before they result in violations of the Consent Decree. We continue to discuss improving the procedures and interdepartmental communication to detect errors and reduce the time it takes to release people after making bond.

We hope Harris County further improves the availability of community reentry services so that people released will be safe and have a means of getting home or to a shelter, no matter the day or time they are released. We are impressed with the Pretrial Services pilot program in partnership with the Harris Center. We are incredibly grateful and fortunate to work with such responsive county officials.

### 3. CCCL: Court Appearance and Notifications

An important pillar of the Consent Decree reforms has been the changed system for court appearance.  The ODonnell court appearance policies have now been implemented.  That system introduces a new clarity and consistency to the rules regarding court appearance.  These reforms also introduced much-needed flexibility regarding court appearance.  Persons charged with misdemeanors do not need to be present at every appearance.  Many appearances can be handled by counsel.  Further, many appearances can and should be rescheduled, when work is still progressing on a case and an appearance is not useful.  Further, the Consent Decree required Harris County to implement an electronic court notification system, to better inform people of their court appearance obligations.  These reforms are extremely important.  They provide greater supports for appearance, but also provide that people need not appear when it is not necessary for a case to move forward.

During the past year, an outside vendor, Ideas42, conducted several evaluations of court nonappearance in the Harris County misdemeanor system, using a mix of methods.[4]  A range of insights flow from that work, and the County will be proposing the use of funds, already allocated, as the Consent Decree provides, to improve court appearance outcomes.

The Ideas42 report discussed why court non-appearance occurs.  The report emphasized throughout that when people do not appear in court, it is typically not because of their "characteristics or intentions," but rather because of poverty and "chronic scarcity."[5]  They interviewed 43 individuals who had one or more misdemeanors in Harris County, as part of their work.[6]  They also analyzed anonymized text concerning 3,893 interviews conducted by public defenders with clients who had missed court and were awaiting bail revocation hearings.[7]  They also surveyed 60 individuals with active misdemeanor cases in Harris County, and interviewed 83 individuals from 23 agencies in Harris County.[8]

We have reviewed administrative data concerning appearances under the new court appearance policies, which was also shared with Ideas42.  Ideas 42 concluded that these administrative data regarding court appearances from January 1, 2021, to December 31, 2021, were not usable for analysis.[9]  We have had productive discussions with the Office of Court Management (OCM) regarding these data.  The conclusion that we reached, after much analysis and discussion with the parties, was that those administrative data from OCM are simply not usable to reach any clear understanding of the extent to which persons appear or do not, and whether they had been required to appear or not.  One aspect of the challenge is that judges may differ in their practices regarding which appearances are required or regular, as well as when they make those designations.  Further, Ideas 42 found that court coordinators may have different practices, that court setting types may not be consistently recorded, and that appearance data has not been "closely supervised or

---

[4] Shannon McAuliffe, Samantha Hammer, Alissa Fishbane, and Andrea Wilk, *Navigating the Real-Life Challenges of Appering in Court: Recommendations for Reducing Wealth-Based Barries for Court Appearance in Harris County,* Ideas42 (2022).
[5] Id. at 6.
[6] Id. at 9.  Regarding limitations of these data, see id. at 10-11.
[7] Id. at 11.
[8] Id. at 12.
[9] Id. at 14.

checked for quality."[10] The Ideas42 report sets out why these administrative data do not help one understand when non-appearance occurs and why.

We underscore the importance of having sound information regarding court appearance. It is important for all concerned to better understand what is working and what is not working. As Ideas42 put it:

> We urge Harris County to prioritize improving appearance data quality so that the CCCL can measure the appearance rate reliably across courts, identify changes in the appearance rate resulting from interventions to reduce barriers, and the data can be used by external researchers to verify and conduct further analysis.

The goal of the Consent Decree was to produce clear rules concerning court appearance, and consistent definitions that would be implemented in order to make the process fair and efficient, as well as capable of being studied.

We have reviewed the Ideas42 findings with the parties. Ideas42 concluded that data on court appearance from January 1, 2021, and before December 31, 2021, was not of sufficient quality to be usable for analysis. The Office of Court Management for the CCCL ("OCM") informs us that while data collection was not sufficiently uniform when the court appearance system was still new, after January 2022, the data is far more uniform. We plan to review these data collected after January 1, 2022, asses it, and provide analysis in our next report.

We are grateful to Ideas42 for their study and their recommendations concerning how to improve data collection to allow one to evaluate court appearance in the misdemeanor system in the County. Those recommendations include adopting clearer definitions of relevant terms, such as not present, and waived, clear protocols for when and how data is entered, auditing data for quality, and conducting regular trainings for court coordinators regarding data entry.

The County is continuing its work to prepare a non-appearance mitigation plan. County funds have already been secured to implement that plan, once it is finalized. We will review that plan when it is completed and work with the County to ensure its success.

We will also continue to work with the County and the Judges to improve the data collection system concerning court appearance, as well as improve court appearance outcomes. Further, OCM has conducted regular trainings on the new court appearance system and terminology with court coordinators and clerks, and will continue to do so, to improve the quality and consistency of data collection. We are extremely grateful for the feedback and collaboration with the CCCL Judges and the Office of Court Management.

### 4. Pretrial Services

Pretrial Services has begun to develop a range of improvements to their work, including changes that importantly impact misdemeanor cases. We have discussed the importance of ensuring that only the least-restrictive conditions necessary are imposed and have provided information about how imposing excessive conditions of release can be counterproductive, making it more likely a

---

[10] Id. at 15.

person will miss court and/or reoffend. We have also begun examining the range of conditions set pretrial in misdemeanor cases. Pretrial Services has been examining such questions to improve the recommendations made to Hearing Officers and Judges. Pretrial Services has also had valuable conversations with us concerning what data concerning pretrial services may be available in the future, as new case management systems are implemented.

### 5. Public Defender's Office and the Office of the Managed Assigned Counsel (MAC)

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention."[11] Rule 9 and the Consent Decree require that a public defender is available to represent all individuals at bail hearings.  Further, the Consent Decree envisions a process of continuous improvement in the public defense services provided at these hearings, including the retention of an expert in holistic defense services and the development of a plan for improving indigent defense.[12]  The County retained the National Association for Public Defense (NAPD) to: (1) evaluate its current misdemeanor indigent defense systems in Harris County; and (2) determine the need for essential support staff and holistic services to promote zealous and effective indigent defense. The NAPD's report was completed on July 6, 2021, and it is available online.[13]  The report made a series of detailed recommendations, largely focusing on merits representation.

We are pleased that Harris County is developing plans to respond to these recommendations. Some of those recommendations have been responded to already, but other work is in the planning stages.  Regarding magistration hearings, which are a central focus of our work under this Consent Decree, the report noted the need for prompt appointment of counsel at magistration.  Currently, Judges have not authorized magistrates or other judicial designees to appoint counsel prior to the first appearance. Prompt appointment of counsel would enable , the information obtained by the public defender at magistration to be promptly conveyed to whoever represents the person throughout the rest of the case.  Prompt appointment of counsel will also have the highly beneficial effect of promoting appearance at the first appearance. We have participated in discussions regarding the logistics involved in developing a prompt appointment system and expect to see progress in the coming weeks on this critical improvement.

## III.  Data Analysis

The *ODonnell* Monitor team continues to do substantial work, jointly with the Office of Justice and Safety ("OJS"), previously named the Justice Administration Department, to prepare and improve a data management system to permit analysis of misdemeanor cases in Harris County. Some of the key data extensions include the addition of geocoded misdemeanor defendant addresses and arrest locations, and bond requests and decisions made in magistration hearings since March 2021. Below, we briefly describe how these new data elements allow us to examine the change in the geographic distribution of crimes in Harris County before and after the implementation of the bail reform and refine some of the key measures in our analysis. OJS has also worked on obtaining new data on court settings and directives, which we plan to validate and use to explore key outcomes such

---

[11] Consent Decree at ¶37.
[12] Consent Decree at ¶41, 43.
[13] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/Harris%20County%20Report%20July%206%202021%20FINAL.pdf.

as court appearance, notification, and diversion. We are extremely grateful to OJS for their hard work throughout these months.

Following the requirements set out in Section 88 of the Consent Decree, OJS has also worked on a public-facing online data platform where a series of key measures and outcomes related to the misdemeanor system in Harris County, such as the number of cases filed, bond approvals, and pretrial detention, will be published and updated real-time. The Monitor team helped OJS's work by performing data validation and providing feedback and suggestions. This platform should be publicly available very soon. We very much appreciate the opportunity to be part of this important ongoing work.

### 1. Improved Ethnicity Imputation

Information on arrestee ethnicity is missing in a large number of misdemeanor cases in Harris County, as ethnicity is not commonly recorded at booking, and nor is it required to be recorded. To fill this gap, in our previous reports, we have used a well-established statistical technique to predict a person's ethnicity based on their last names. While this last-name-based imputation seems to provide reasonably accurate predictions, it is plausible that we can improve the accuracy of our predictions by utilizing information on both the person's last name and neighborhood of residence. Since April 2022, OJS has worked with Texas A&M Geoservices to geocode misdemeanor defendant addresses, converting the raw addresses listed into a GPS coordinate (a pair of latitude and longitude). Taking advantage of this coordinate information, we refined our ethnicity imputation process, this time using both the person's last name and neighborhood of residence to predict their ethnicity. The geocoded address information also allows us to observe the geographic distribution of misdemeanor arrestees at a finer neighborhood level and explore key demographic and economic attributes commonly observed in neighborhoods with high misdemeanor arrestee populations.

### 2. Calls-for-Service, Arrest, and Criminal Incident Data from Houston Police

The Houston Police Department (HPD) generously shared their calls-for-service, arrest, and criminal incident data with the monitor team. The police data contain information on the date, time, type, and location of each call-for-service, arrest, and crime reported to HPD between 2015 and 2021, which can be linked to the Harris County's misdemeanor case records via incident ID numbers. Once data validation is completed, we plan to use this police data to explore how the recent misdemeanor bail reform has affected the geographic distribution of crimes and arrests in Harris County and whether there exist certain offense and arrest characteristics that can significantly predict whether a reported crime actually results in a criminal charge and conviction.

In this report, we present a preliminary analysis of the HPD's calls-for-service and arrest records, which shows that the total number of crime-related calls-for-service and felony arrests have remained remarkably stable between 2015 and 2021. On the other hand, the count of misdemeanor arrests has been on a declining trend, which is largely driven by a reduced number of arrests involving theft, criminal trespass, and drug-related offenses.

### 3. Magistration Hearing Outcomes

We continued to watch a number of bail hearing recordings and analyze the text of hearing officers' pretrial ruling to identify key patterns that emerged during the hearings. Meanwhile, we

12

have also collected more detailed data from misdemeanor bail hearings, which contain information on the arrestee's indigent status, the bond types and amounts requested by the defense counsel and Assistant District Attorney , and the actual bond types and amounts set by the hearing officer. Under Rule 9, many misdemeanor arrestees who do not belong to one of the carve-out categories are eligible for general order bonds and released without a magistration hearing. Still, a sizable number of misdemeanor arrestees attend the magistration hearing, where the hearing officer determines probable cause for further detention and sets the bond type and amount. Based on data from approximately 36,000 magistration hearings that took place between March 2021 and June 2022, below we illustrate the large disparity between the bond requests made by the defense attorney and ADA, and how they compare to the actual bond decision made by hearing officers.

In this report, our data analyses examine the following topics:

1. Number of misdemeanor cases and arrestees.
2. Demographic characteristics of misdemeanor arrestees.
3. Geographic distribution of misdemeanor arrestee addresses.
4. Calls-for-service and arrest records from Houston Police.
5. Number of misdemeanor cases that belong to "carve-out" categories.
6. Duration of pretrial detention and holds placed.
7. Initial bond decisions.
8. Magistration hearing outcomes.
9. Case dispositions.
10. Repeat offense rate.

We note that analyses which have not been completed at this time include: Court appearance and types of pretrial supervision, including ignition interlock, alcohol monitoring, and electronic monitoring. We plan to undertake these analyses and report the results promptly in the future, as more data restoration, expansion, and validation take place.

## 1. Number of Misdemeanor Cases and Arrestees

Our main data source is the case-level records on all Class A and B misdemeanor cases filed in the Harris County Criminal Courts at Law (CCCL) between January 1, 2015 and June 30, 2022. which was downloaded from OJS's database on August 11, 2022.[14] We begin our analysis by presenting in Figure 1 the number of people arrested for misdemeanors in Harris County by the year of case filing date. Here, we consider all misdemeanor cases filed against the same individual during a calendar year as a single observation.

Figure 1 presents the number of people arrested for misdemeanors between January 2015 and June 2022. We observe that the number has steadily declined between 2015 (N = 50,528) and 2021 (N=41,540), with a sizable but brief fall in 2020 (N=38,044). The number of people arrested during the first half of 2022 (N=20,891) is slightly less than the count from the first half of 2021 (N=22,375). We also report in Figure 1 the number of people arrested for misdemeanors with co-occurring felonies, who were arrested for a misdemeanor *and* a felony on the same date and likely subject to different pretrial jail and bond policies from other misdemeanor arrestees. Unlike the total number

---

[14] It is important to note the vintage date of our data, as a small number of cases may be sealed, expunged, or corrected over time, which will update and revise existing misdemeanor case records in the database.

of people arrested for misdemeanors, the number of people arrested for misdemeanors with co-occurring felonies has consistently increased during our study period and more than doubled between 2015 (N=1,276) and 2021 (N=3,154). However, this rising trend may have stabilized in 2022, as the number from the first half of 2022 (N=1,518) is similar to the counts from the first half of 2021 (N=1,637) and 2020 (N=1,570).

Figure 1: Number of Persons Arrested for Misdemeanors by Year



The number of people arrested for misdemeanors, presented in Figure 1, understates the number of misdemeanor cases, as some individuals may be arrested multiple times during a calendar year, and some are charged with multiple offenses from a single arrest. In Figure 2, we present the number of misdemeanor cases filed each year between 2015 and 2022, which has followed a similar trend as the number of misdemeanor arrestees. The count of misdemeanor cases has declined between 2015 (N=62,345) and 2021 (N=49,710), but the trend has been largely stable since 2019, except for a brief drop in 2020. Overall, we find that both the number of persons arrested for misdemeanors and the number of misdemeanor cases in Harris County have steadily declined, and this downward trend seems to have stabilized since 2019.

14

Figure 2: Number of Misdemeanor Cases Filed by Year



Following offense categories used by the FBI's National Incident-Based Reporting System (NIBRS), we present in Table 1 the breakdown of the misdemeanor cases by year and offense type.[15] The five offense types most commonly observed in the data are assault, burglary & trespass, drug-related offense, theft, and weapon law violations, which account for roughly one-half of all misdemeanor cases in Harris County. Although the total number of misdemeanor cases has been clearly trending down, the offense-specific trends have not been uniform. The counts of misdemeanor criminal trespass and drug-related offense have substantially declined since 2015, while assault and weapon law violation cases have increased. We note that the decline in the number of drug-related misdemeanor offenses is likely driven by the recent pre-charge diversion program by the Harris County District Attorney's Office, which diverts people who would have been arrested and charged for simple possession of marijuana to education and rehabilitation programs instead. The diversion program has been implemented since 2017 and have reduced the associated arrest and prosecution costs by more than $35 million during the first two years of the program.[16]

Table 1. Number of Misdemeanor Cases by Year and Offense Type

| Year | Assault | | Trespass | | Drug | | Theft | | Weapon Violation | | Others | |
|------|---------|------|----------|-------|------|-------|-------|-------|------------------|------|--------|-------|
| 2015 | 7603 | (12%) | 5490 | (9%) | 9878 | (16%) | 9811 | (16%) | 1565 | (3%) | 27998 | (45%) |
| 2016 | 7793 | (13%) | 5863 | (10%) | 9509 | (16%) | 6861 | (11%) | 2158 | (4%) | 29060 | (47%) |
| 2017 | 7437 | (14%) | 5398 | (10%) | 4539 | (9%) | 5972 | (11%) | 2328 | (4%) | 27416 | (52%) |

---

[15] We linked the Texas offense codes to NIBRS offense codes using the crosswalk published by the Texas Department of Public Safety, which is available at https://www.dps.texas.gov/section/crime-records/nibrs-technical-documentation.
[16] *See* https://app.dao.hctx.net/ogg-law-enforcement-community-partners-mark-two-year-milestone-misdemeanor-marijuana-diversion.

15

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 9784 | (18%) | 4607 | (8%) | 4757 | (9%) | 5487 | (10%) | 2331 | (4%) | 28296 | (51%) |
| 2019 | 9596 | (18%) | 2192 | (4%) | 2380 | (5%) | 6177 | (12%) | 2361 | (5%) | 29197 | (56%) |
| 2020 | 10724 | (24%) | 1578 | (3%) | 1009 | (2%) | 4061 | (9%) | 3491 | (8%) | 24618 | (54%) |
| 2021 | 11423 | (23%) | 2167 | (4%) | 988 | (2%) | 3717 | (7%) | 4727 | (10%) | 26688 | (54%) |
| 2022 1H | 5369 | (22%) | 1321 | (5%) | 375 | (2%) | 2129 | (9%) | 2162 | (9%) | 12863 | (53%) |

## 2. Demographic Characteristics of Misdemeanor Defendants

We now examine the sex, race, and ethnic distributions of persons arrested for misdemeanors in Harris County and how they have changed over the last few years. Harris County follows the U.S. Census Bureau, in adhering to 1997 Office of Management and Budget definitions, in which a person may self-identify as having both races (with categories of White, Black or African American, American Indian or Native Alaskan,  Asian, and Native Hawaiian or Other Pacific Islander) and ethnicity (Hispanic, Latino or Spanish).[17] A person is allowed to choose one race category, and the existing data may not reflect how a person would self-identify if they were given the option to select more than one category or self-identify as a mixed race. Regarding ethnicity, we use the term Latinx throughout this report. As discussed in more detail below, information regarding ethnicity is not required to be filled out and is often not filled out by the Sheriff's Office. As in Figure 1, we present in the figures below the sex, race, and ethnic distribution at the *person-level*.

Sex information is available for virtually all misdemeanor arrestees in Harris County. For example, out of the 20,891 people arrested for a misdemeanor offense in the first half of 2022, sex information was missing for 62 people only (0.3%). As documented in our previous reports, the sex composition of the misdemeanor arrestee population in Harris County has been very stable over the past years. In each year between 2015 and 2022, males consistently made up about 75 percent of the misdemeanor arrestees. We also note that the observed sex composition in Harris County is very close to the nationwide average. According to the FBI's arrest data, males accounted for 74 percent of misdemeanor arrestees nationwide in 2020.[18] Neither Harris County nor FBI arrest data contain information about persons who identify themselves as non-binary or transgender.

---

[17] More information about the race and ethnicity definitions used by the U.S. Census can be found at: https://www.census.gov/topics/population/race/about.html.
[18] *See* Federal Bureau of Investigation, Crime Data Explorer, at https://crime-data-explorer.fr.cloud.gov/pages/explorer/crime/arrest.

16

Figure 3: Sex Distribution of Misdemeanor Defendants



Similarly, we present the racial distribution of persons arrested for misdemeanors in Harris County between 2015 and 2022 in Figure 4. Among persons arrested for misdemeanors whose race information is observed in the data (98% of the total defendants), blacks and whites made up approximately 40 percent and 60 percent of the defendant population, with little change in the distribution over the years. We note that the share of black persons arrested for misdemeanors in Harris County (39% in 2020) is substantially higher than the share of nationwide (26%, according to the FBI's national arrest statistics from 2020) and the share of black population in Harris County (20%, according to the 2019 U.S. Census estimate).[19] The sum of black and white defendant shares presented in Figure 4 does not add up to 100% because of a small number of Asian and Native Americans persons arrested for misdemeanors in the data (about 2 percent). Overall, we find that both sex and racial distributions of misdemeanor defendants in Harris County have been remarkably stable over the past years.

---

[19] *See* United States Census Bureau, Quick Facts, Harris County, at https://www.census.gov/quickfacts/harriscountytexas.

Figure 4: Racial Distribution of Misdemeanor Defendants



Unlike sex and race, information on defendant ethnicity is often not recorded and unobserved for many misdemeanor defendants. For example, ethnicity information is missing for more than 70 percent of misdemeanor arrestees from 2022. This is an important data limitation, especially given that Latinx persons account for 44 percent of the population in Harris County, according to the U.S. Census.[20] To overcome this data limitation, we implement an imputation technique which predicts individuals' ethnicity based on their last names and neighborhood of residence.[21] Imputation results presented in our previous reports were based on people's last names only, but thanks to OJS's effort, the defendant addresses are now geocoded, which allows us to match each address with the corresponding Census tract and use the tract-level ethnic composition as an additional predictor of ethnicity. Geocoded address data are available for 92 percent of misdemeanor arrestees in our analysis (N=307,153). In a small number of cases where the persons' addresses were invalid or missing (N=26,856), we only use their last names as a predictor of their ethnicity.

---

[20] *See* United States Census Bureau, Quick Facts, Harris County, at https://www.census.gov/quickfacts/harriscountytexas.
[21] We used the R package wru for this prediction. The package predicts individuals' race and ethnicity by applying a well-established statistical technique, the Bayes' Rule, to the U.S. Census Bureau's Surname List from 2010, which contains information on the nationwide racial and ethnic composition associated with each last name, and the Decennial U.S. Census data, which include the racial and ethnic composition in each Census tract in 2010.

Figure 5: Ethnic Distribution of Misdemeanor Defendants



The prediction results seem to be quite accurate. For 131,230 people whose actual ethnicity (Latinx or non-Latinx) is observed in our data, our imputation method correctly predicts their recorded ethnicity 94 percent of the time. Based on the prediction results, we present the ethnic composition of misdemeanor defendants in Figure 5. Latinx arrestees accounted for slightly more than one-third (37%) of misdemeanor defendants in 2015, but this share has gradually increased over time, reaching 41 percent in 2019, and remained nearly constant since then. We note that the current share of Latinx arrestees is similar to the share of Latinx population in Harris County, which was 44%, according to the 2021 U.S. Census estimate.

### 3. Geographic Distribution of Misdemeanor Defendants

In our last report, we presented the geographic distribution of misdemeanor defendant addresses in Harris County before and after the implementation of Rule 9, using the 5-digit ZIP Code listed in the address recorded at the time of case filing. Thanks to OJS, the addresses are now geocoded, which allows us to obtain their exact coordinates and examine the distribution of misdemeanor defendant addresses at a finer geographic level.

Before presenting the geographic distribution, we present in Table 2 the number of misdemeanor arrestees whose address at the time of case filing is located in Harris County. To present the results at the person-level, if a person is arrested multiple times during a calendar year, we only consider their address recorded at the time of first arrest.

Most misdemeanor arrestees in our data seem to be from Harris County, as approximately 80 percent of the arrestees between 2015 and 2022 had a "valid" address (which could be matched to a specific X-Y coordinate) in Harris County. When people living in one of the neighboring counties

are included, the share of misdemeanor arrestees from the Greater Houston area further increases to nearly 90 percent.[22] Moreover, the shares of misdemeanor arrestees from Harris County and Greater Houston have not changed much since 2015.

We also find that misdemeanor arrestees who are homeless (that is, those who explicitly reported homeless or listed one of the homeless shelter locations in Houston as their address) or had an invalid address has gradually declined over time.[23] Some of this decline may reflect an improved data collection effort during the intake process. At the same time, we note that the number of homeless individuals in Harris County has substantially declined in recent years. According to the 2022 annual report published by the Coalition for the Homeless of Houston/Harris County, the number of people experiencing homelessness in Harris, Fort Bend, and Montgomery counties has fallen by 28 percent between 2018 (N=4,143) and 2022 (N=3,223).[24]

Table 2. Number of Misdemeanor Defendants with Harris County Address

| Year | # of Misd. Defendants | Valid Address in Harris County | | Valid Address in Greater Houston | | Homeless or Invalid Address | |
|---|---|---|---|---|---|---|---|
| 2015 | 50528 | 39680 | (79%) | 43400 | (86%) | 5457 | (11%) |
| 2016 | 48824 | 38790 | (79%) | 42393 | (87%) | 4675 | (10%) |
| 2017 | 43863 | 34937 | (80%) | 38092 | (87%) | 4112 | (9%) |
| 2018 | 46206 | 37024 | (80%) | 40496 | (88%) | 4041 | (9%) |
| 2019 | 44134 | 36372 | (82%) | 39824 | (90%) | 2472 | (6%) |
| 2020 | 38023 | 31229 | (82%) | 34192 | (90%) | 2190 | (6%) |
| 2021 | 41540 | 33444 | (81%) | 36916 | (89%) | 2422 | (6%) |
| 2022 1H | 20891 | 16719 | (80%) | 18366 | (88%) | 1487 | (7%) |

Taking advantage of the improved address data, we present in Figure 6 the share of misdemeanor arrestees per 1,000 populations across Harris County neighborhoods in 2017 and 2021, two years before and after the implementation of Rule 9. Our unit of analysis is a Census tract, which tends to be smaller than a ZIP code area and usually have a population size between 1,200 and 8,000.[25] Census tracts with more than 50 misdemeanor arrestees per 1,000 populations are colored in dark red, and those with less than 5 arrestees per 100,000 in light yellow. We note that most Census tracts in Harris County experienced little change in the share of arrestee population between 2017 and 2021, which is in line with the fact that the total number of misdemeanor arrestees with a Harris County address has minimally changed between 2017 (N=34,937) and 2021 (N=33,444).

---

[22] Greater Houston is formally designated as Houston—The Woodlands—Sugar Land Metropolitan Area by the United States Office of Management and Budget (FIPS Code: 26420) and covers the following counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

[23] The list of homeless shelters in Houston is taken from the "Help Cards" published by the Coalition for the Homeless of Houston/Harris County in 2014 and 2021.

[24] *See* The Coalition for the Homeless of Houston/Harris County's 2022 Point-in-Time Homeless Count & Survey, at https://www.homelesshouston.org/coalition-for-the-homeless-2022-homeless-count-results-suggest-housing-focused-pandemic-response-kept-numbers-down.

[25] The average populations in a Census tract and ZIP Code area are approximately 4,000 and 10,000, respectively.

Figure 6: Residential Locations of Misdemeanor Defendants in 2017 and 2021



Next, we examine the relationship between the share of arrestee population and key neighborhood characteristics. Specifically, we link our geocoded address data with the 2015 American Community Survey (ACS) 5-year Estimates data published by the U.S. Census, which contain information on key demographic and socioeconomic characteristics of Census tracts

measured between years 2011 and 2015. Our analysis focuses on misdemeanor arrestees with a valid address in the Greater Houston area only.

The top panel of Figure 7 plots the number of misdemeanor arrestees per 1,000 populations in each Census tract (vertical axis) against the tract's non-white population share from 2015 (horizontal axis). We find that Census tracts heavily populated by non-whites tend to have disproportionately many misdemeanor arrestees in both 2017 and 2021, but the correlation between neighborhood misdemeanor arrestee and non-white population shares, represented by the slope of the best fitting line in the figure, has somewhat decreased from 0.127 in 2017 to 0.111 in 2021. To further explore the neighborhood-specific changes in the share of misdemeanor arrestees, we plot in the bottom panel of Figure 7 the change in the number of misdemeanor arrestees in each Census tract between 2017 and 2021 (vertical axis) against the tract's non-white population share from 2015 (horizontal axis). While the number of misdemeanor arrestees has fallen in many Census tracts with varying levels of non-white population shares, we note that some of the largest declines took place in high-minority neighborhoods.

Figure 7: Number of Misdemeanor Arrestees per 1,000 Populations, by Non-white Population Share



We also compare the number of persons arrested for misdemeanors and poverty rate at the tract-level in Figure 8. Perhaps not surprisingly, misdemeanor arrestees were more heavily concentrated in high-poverty Census tracts in both 2017 and 2021 (top panel). When considering the tract-specific changes in the share of misdemeanor arrestees between 2017 and 2021 (bottom panel), we find that the two are negatively and statistically significantly correlated (slope = -0.03) which indicates that high-poverty neighborhoods tended to experience a larger reduction in the number of misdemeanor arrestees. Overall, it seems that the racial and economic disparity between neighborhoods with low and high concentration of misdemeanor arrestees have been somewhat alleviated between 2017 and 2021.

22

Figure 8: Number of Misdemeanor Arrestees per 1,000 Populations, by Poverty Rate



### 4.  Calls-for-service and arrest records from Houston Police Department

The bail reform required by the Consent Decree intends to maximize pretrial liberty, court appearance, and public safety, and it is of great importance to evaluate how the reform has influenced public safety in Harris County. One key metric of public safety presented in our previous and current reports is the re-arrest rate of former misdemeanor arrestees, but it is important to note that the re-arrest rate is an imperfect measure of criminal activity. The number of re-arrests and new charges filed may overstate the prevalence of true criminal activities, given that most criminal cases filed, especially misdemeanor cases, are either dismissed or diverted. On the other hand, it is well-documented that many criminal incidents, especially less-serious ones, are not reported to the authority and therefore do not lead to an arrest or a criminal charge.[26] Moreover, the re-arrest rate of former arrestees may not follow a similar trend as the total number of criminal offenses in the county, which may be more closely related to the citizens' perception of public safety.

Thus, to better understand the impact of the bail reform on crime and public safety in Harris County, it may be beneficial to use and analyze data that come from multiple stages of the criminal justice process. To this end, we met with Houston Police Department Chief Troy Finner and are extremely grateful for his guidance and for providing the Monitor team with access to HPD's data. Following that meeting, we contacted HPD's Office of Planning & Data Governance in 2021, requested the data on criminal incidents in Houston during our study period, and obtained their calls-

---

[26] According to the Bureau of Justice Statistics, only 40 percent of violent victimization and 33 percent of property victimization in 2020 were reported to police. (https://bjs.ojp.gov/library/publications/criminal-victimization-2020)

for-service and arrest data between 2015 and 2021. We are extremely grateful for their generosity and guidance.  While HPD is only one of numerous police agencies serving Harris County, it is the primary agency serving the City of Houston.

Calls-for-service likely correspond to the earliest stage of the criminal justice process, but many of the calls are not crime-related and instead come from non-crime emergencies and complaints. For our purpose, we restrict our analysis to the calls-for-service related to crimes (assault, burglary, criminal mischief, forgery, fraud, motor vehicle theft, robbery, shoplifting, and theft) and public disorder (disturbance, noise, and suspicious activities), and present their counts in the first two columns of Table 3.

An arrest is the next key stage of the criminal justice process, in which suspects are apprehended and taken into custody. In Harris County, the arresting police officer contacts and explains the details of the case to the intake bureau of the District Attorney's Office, which then promptly determines whether probable cause exists and decides which charges to file. As a result, HPD's arrest data also contain incident-level information on the type of charge filed. The last two columns of Table 3 show the annual counts of misdemeanor and felony arrests.

Overall, we find that the number of calls-for-service regarding crime and public disorder and the number of arrests leading to a felony charge in Harris County has remained largely stable between 2015 and 2021. On the other hand, the change in the number of arrests leading to a misdemeanor charge has been more drastic, as the count has gradually declined between 2015 (N=40,593) and 2019 (N=33,521) and then fell by more than 40% in 2020 (N=19,794).

Table 3. Number of Calls-for-Service and Arrests

| Year | Call-for-Service | | Arrest | |
|------|------|------|------|------|
| | Crime | Public Disorder | Misdemeanor | Felony |
| 2015 | 224205 | 325522 | 40593 | 19097 |
| 2016 | 222676 | 320647 | 39226 | 20248 |
| 2017 | 218126 | 307203 | 31373 | 19008 |
| 2018 | 211072 | 293875 | 36106 | 19975 |
| 2019 | 217619 | 284316 | 33521 | 20806 |
| 2020 | 224825 | 300240 | 19794 | 19936 |
| 2021 | 225048 | 289255 | 22315 | 19843 |

To further explore the details of misdemeanor arrests, we present the breakdown of HPD's misdemeanor arrests by year and offense types in Table 4. For simplicity, we only report the six most commonly observed misdemeanor offenses in the arrest data, namely, assault, weapon law violation, theft, resisting arrest, criminal trespass, and drug-related offenses. The table makes it clear that the decline in the number of misdemeanor arrests has been largely driven by a fewer number of arrests associated with theft, trespass, and drugs. By contrast, the number of misdemeanor arrests involving assault and weapon law violation has substantially increased between 2015 and 2021 (2,184 vs. 2,990 for assault; 591 vs. 1,552 for weapon law violation).

24

Table 4. Number of Misdemeanor Arrests by Offense Types

| Year | Assault | | Weapon | | Theft | | Resisting Arrest | | Trespass | | Drug | |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 2015 | 2184 | (5%) | 594 | (1%) | 3491 | (9%) | 934 | (2%) | 3484 | (9%) | 3100 | (8%) |
| 2016 | 2269 | (6%) | 843 | (2%) | 2421 | (6%) | 989 | (3%) | 3359 | (9%) | 3473 | (9%) |
| 2017 | 2385 | (8%) | 819 | (3%) | 1883 | (6%) | 872 | (3%) | 3043 | (10%) | 1721 | (5%) |
| 2018 | 3737 | (10%) | 892 | (2%) | 1933 | (5%) | 902 | (2%) | 2845 | (8%) | 1808 | (5%) |
| 2019 | 3693 | (11%) | 920 | (3%) | 2275 | (7%) | 906 | (3%) | 1310 | (4%) | 1039 | (3%) |
| 2020 | 3466 | (18%) | 1182 | (6%) | 844 | (4%) | 812 | (4%) | 665 | (3%) | 364 | (2%) |
| 2021 | 2990 | (13%) | 1552 | (7%) | 884 | (4%) | 629 | (3%) | 1059 | (5%) | 399 | (2%) |

## 5.  Number of cases that belong to "carve-out" categories

Under Local Rule 9, which became effective on February 16, 2019, all persons arrested for misdemeanors must "have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non-financial conditions as soon as practicable after arrest", except for those who belong to the following "carve-out" categories:

9.4.1 Individuals arrested and charged for protective order and bond condition violations.[27]
9.4.2 Individuals arrested and charged for domestic violence (namely, assault or terroristic threat against family and intimate partners).
9.4.3 Individuals arrested and charged for repeat DWI within the past five years.
9.4.4 Individuals arrested and charged with any new offense while on any form of pretrial release.
9.4.5 Individuals arrested on a capias issued after a bond forfeiture or bond revocation.
9.4.6 Individuals arrested while on any form of community supervision for a Class A or B misdemeanor or a felony offense.

The first three carve-out categories concern the type of offense committed (such as domestic violence and repeat DWI), while the last three concern the person's status at the time of an arrest (such as pretrial release and community supervision). These categories are not mutually exclusive, and a single case may belong to more than one carve-out category. For example, a person arrested for a repeat DWI while under community supervision would belong to the third and sixth carve-out categories at the same time.

With the cooperation of the Office of Court Management for the CCCL ("OCM"), OJS worked very hard to build a logic which determines the carve-out status of a given case based on the offense penal code and existing pre-trial conditions, such as pre-trial release, bond forfeiture, and community supervision. We are extremely grateful to OJS and OCM data teams for their hard work, but at the same time, we note that more work needs to be done to improve the data so that the carve-out status of a given misdemeanor case can be accurately recorded.

---

[27] We note that noncompliance with conditions of pretrial release is likely more common than is reflected by the number of charges filed for alleged violations of bond conditions because not every observed violation may result in a report of noncompliance.

One important data limitation is our inability to determine exactly which cases belong to the carve-out domestic violence cases. More specifically, the currently available data do not allow us to distinguish between 1) terroristic threats against family (Penal Code 22.07(c)(1)) which make up the bulk of domestic violence carve-out cases and 2) other types of terroristic threats that should not be considered as domestic violence cases. In the absence of this full penal code information, we considered all types of terroristic threat cases (Penal Code 22.07) as domestic violence cases in our previous reports, which likely over-estimates the true count of carve-out domestic violence cases. The monitor team has had an extensive discussion with OJS over this data limitation and its potential remedies, and decided to consider the count of *Class A misdemeanor* terroristic threat cases as the proxy for the true count of domestic terroristic threats. Although this alternative measure may still overstate the number of domestic violence carve-out cases, it should be a more accurate measure than the one used previously. Under the state laws, a terroristic threat offense is considered Class A misdemeanor only if 1) committed against a family member or a public servant, or 2) interrupted the use of public place (for example, a building). All other types of terroristic threat cases are considered third-degree felony (if committed against a large group of the public, public transportation, or other public services), state jail felony (if committed against a judge or peace officer), or Class B misdemeanor offenses.

With this caveat in mind, we present in Figure 9 the share of misdemeanor cases which belong to one of the carve-out categories. The share has approximately doubled between 2015 (17%) and 2021 (34%), but modestly fell during the first half of 2022 (30%). It remains to be seen whether this decline in 2022 indicates a temporary shock or an actual trend reversal.

Figure 9: Share of Carve-out Misdemeanor Cases by Year



Table 5 breaks down the distribution of carve-out cases by the category (rows) and the year of case filing (columns). For example, 2% of the carve-out misdemeanor cases in 2015 involve violation of protective orders and 38% involve domestic violence. Some of the cases belong to

multiple carve-out categories, which is why the sum of the percentages within each column add up to more than 100%. Overall, we find some notable changes in the composition of carve-out cases over time. The shares of cases involving protective order violations, domestic violence, repeat DWIs, and arrests while out on bond have all gradually increased between 2015 and 2021. On the other hand, the changes were more drastic for arrests while out on bond (34% in 2015 vs. 50% in 2021) and arrests made while on community supervision (26% in 2015 vs. 10% in 2021). During the first half of 2022, the three most common types of carve-out cases were domestic violence (47%), arrests while out on bond (37%), and arrests after bond failure (22%). The prevalence of bond-related carve-out cases is consistent with the fact that the number of bond approvals and average time-to-case-disposition have both increased since 2019. We note that, however, the share of arrests while out on bond has substantially decreased in 2022.

Table 5: Distribution of Carve-out Cases, by Category and Year

| Carve-out Categories | Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 1H |
| Protective Order Violation | 2% | 3% | 3% | 3% | 4% | 5% | 7% | 8% |
| Domestic Violence | 38% | 38% | 38% | 46% | 43% | 44% | 42% | 47% |
| Repeat DWI | 8% | 8% | 9% | 8% | 9% | 10% | 10% | 9% |
| Arrest while out on Bond | 34% | 35% | 36% | 37% | 43% | 48% | 50% | 37% |
| Arrest after Bond Failure | 13% | 13% | 15% | 16% | 18% | 22% | 26% | 22% |
| Arrest while on Supervision | 26% | 25% | 24% | 18% | 14% | 12% | 10% | 12% |
| Number of Carve-out Cases | 10894 | 11158 | 11006 | 13685 | 14263 | 15496 | 17125 | 7261 |

## 6. Pretrial Detention and Holds Placed

Next, we examine the length of pretrial detention experienced by persons charged with misdemeanors by taking the time in days between initial booking and release dates. For the current analysis, we focus on the length of initial pretrial detention, which is known to have a substantial impact on the case disposition outcomes, as well as subsequent labor market and criminal outcomes.[28] To be specific, we examine whether a misdemeanor arrestee was detained within 7 days of the case filing date and if so, the length of that initial detention.

As noted in our previous reports, the currently available booking and release data appear to be somewhat incomplete, especially for the cases filed in the earlier years. For example, we observe that the number of misdemeanor cases and arrestees in 2015 are more than 10 percent greater than in 2017 (Figures 1 and 2), but the number of misdemeanor cases involving initial pretrial detention in 2015 is nearly 10 percent *lower* than in 2017 (Table 6). However, these numbers are most likely not accurate. This discrepancy is likely to be driven by the fact that, prior to the opening of the Joint Processing Center (JPC) in 2019, some arrestees were able to bond out before reaching the Harris

---

[28] Will Dobbie, Jacob Goldin & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 AM. ECON. REV. 201 (2018).

County Jail without leaving a booking record, and does not necessarily mean that misdemeanor defendants have become more likely to be detained in recent years.[29]

Based on the available data, Table 6 presents the number of misdemeanor cases involving pretrial detention and its breakdown by the length of detention, namely, 0-2 days, 3-7 days, and more than 7 days. People charged with misdemeanor offenses in 2017 and later tend to experience a relative short period of pretrial detention, compared to the previous years. For example, about 60 percent of misdemeanor cases filed in 2015 involved initial pretrial detention lasting two days or less in 2015, but this share jumped to 87 percent in the first half of 2022. Similarly, the share of initial pretrial detention lasting more than seven days has declined from 19 percent in 2015 to 5 percent during the first half of 2022. These trends are in line with recent changes in the misdemeanor bail system in Harris County, most notably the first preliminary injunction adopted in 2017 and Local Rule 9 implemented in 2019.

Table 6: Distribution of Initial Pretrial Detention Duration

| Year | Initial Pretrial Detention Length | | | Obs. |
|------|-----------|-----------|-----------|------|
|      | 0-2 Days  | 3-7 Days  | > 7 Days  |      |
| 2015 | 62%       | 19%       | 19%       | 36894 |
| 2016 | 69%       | 15%       | 16%       | 44786 |
| 2017 | 81%       | 8%        | 11%       | 39870 |
| 2018 | 83%       | 6%        | 11%       | 39330 |
| 2019 | 87%       | 5%        | 9%        | 34384 |
| 2020 | 86%       | 4%        | 10%       | 27845 |
| 2021 | 87%       | 5%        | 9%        | 31639 |
| 2022 1H | 87%     | 5%        | 8%        | 13925 |

Another important factor that may affect the duration of pretrial detention is whether a misdemeanor defendant is subject to an existing hold, which may be placed by other agencies such as the U.S. Immigration and Customs Enforcement (ICE), Texas Board of Pardons and Paroles (BOPP), or law enforcement agencies from other jurisdictions. Indeed, our data indicate that the prevalence and composition of holds have substantially changed since 2015. The number of misdemeanor cases with an existing hold nearly doubled between 2015 (N=2,164) and 2019 (N=3,755), and then sharply dropped in 2020 (N=2,963) and 2021 (N=2,145). We also find a notable change in the types of holds placed over time. The share of ICE holds increased sevenfold between 2015 (7%) and 2020 (49%), but has rapidly fallen since then. During the first half of 2022, only 7 percent of the existing holds were placed by ICE.

---

[29] Before 2019, law enforcement agencies would initially transport the arrestees to their local jail or substation and then transport them to the Harris County Jail, but if an individual had a bond amount set in the system, the person could post a surety bond from that location and get released before reaching the Harris County Jail. Since JPC opened in February 2019, all arrestees are transported by the arresting officer directly to the JPC. Even after the opening of JPC, some of the defendants who are not in custody but have an active warrant are allowed to post unsecured personal bonds (if approved) without being admitted to the JPC's intake section.

Figure 10: Share of Misdemeanor Cases with an Active Hold



### 7. Initial Bond Decisions

As noted above, one of the most important consequences of Rule 9 is that most misdemeanor arrestees who do not belong to one of the carve-out categories are now eligible to be released on an unsecured personal bond or general order bond with an initial unsecured bond amount of $100 or less. We examine whether this change is in line with the actual bond decisions observed in the data. To focus our analysis on the initial stage of the criminal justice process, our analysis only considers the first bond decision associated with a given case. For the same reason, we also omit from the analysis a small number of the cases in which the first bond decision took place after the first setting date.

Figure 11 presents the share of misdemeanor cases in which defendants were released on a bond before the first setting, by the year of case filing. We find that the release rate has substantially increased since 2017 (the year that the first preliminary injunction was in effect, in June 2017 to August 2018) and reached 84 percent in 2019 (the year when Local Rule 9 became effective). Since then, the release rate has slightly declined and reached 78 percent during the first half of 2022.

The level of financial burden associated with bail decisions likely depends on whether arrestees are released on a secured bond (cash or surety) or an unsecured bond (personal or general order bonds). In Figure 12, we observe a clear increase in the use of unsecured personal bonds and general order bonds over time. Specifically, 87 percent of the bond releases in 2015 involved secured bonds, but this share fell to 21 percent in 2019 and 13 percent in 2022. Nearly 90 percent of the cases involved either personal bonds or general order bonds, which should impose little financial costs on the arrestees. Overall, the observed patterns in the initial bond decisions show that the level of financial burden associated with pretrial release has declined in recent years.

Figure 11: Share of Misdemeanor Cases in which Defendants Were Released on a Bond before First Setting



Figure 12: Types of Initial Bond Approvals



Next, we examine the distribution of initial bond amounts set and posted. If a person is ordered to be released on a secured bond (but not a personal bond or general order bond), the bond amount set can have a significant impact on whether the person can actually be released or not. Prior

30

to Rule 9, many misdemeanor arrestees routinely remained in jail even though their bonds were approved, because they could not afford the set bond amount. Rule 9, however, required most misdemeanor defendants (barring a small number of exceptional cases) to be released with an unsecured bond amount of $100, and the Consent Decree requires the arrestees' financial information to be reviewed before a secured bond is given and the bond amount is set. It is of great importance to examine whether these changes are in line with the distribution of bond amounts set actually observed in the data.

We present in Table 7 the distribution of initial bond amounts set and posted by misdemeanor arrestees, by the year of case filing. Panel (A) shows that Rule 9 has clearly reduced the bond amount set initially for most misdemeanor cases. In virtually all misdemeanor cases prior to 2019, the initial bond amount was $500 or more—which is consistent with the bail schedules that were in place during those years. But since then, bond amounts of $100 or less have become more common, and are now observed in about two-thirds of the cases filed in 2022.

Panel (B) presents the distribution of initial bond amounts posted. We note that the number of observations in Panel (B) is often lower than that in Panel (A), which suggests that some of the surety and cash bond approvals that required people to pay in order to be released did not actually result in a release. Prior to 2019, the number of initial bonds that were approved but not posted (that is, the difference in the number of observations between the two panels) was very high, which may be explained by the widespread use of surety and cash bonds during that period of time. Perhaps not surprisingly, we also observe that a large share of bonds that were approved but not posted involves very high bond amounts ($3,000 or more). However, since 2019, this discrepancy has largely diminished, and the numbers presented in the two panels more closely resemble each other.

Table 7: Distribution of Initial Bond Amount Set and Posted

| (A) Outcome: | Initial Bond Amount Set | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | | Obs. |
| 2015 | 6 | (0.01%) | 1 | (0.00%) | 33482 | (60%) | 22520 | (40%) | 56009 |
| 2016 | 17 | (0.03%) | 7 | (0.01%) | 34486 | (60%) | 22496 | (39%) | 57006 |
| 2017 | 226 | (0.47%) | 18 | (0.04%) | 34455 | (72%) | 13303 | (28%) | 48002 |
| 2018 | 544 | (1.15%) | 102 | (0.21%) | 40781 | (86%) | 6025 | (13%) | 47452 |
| 2019 | 29351 | (62%) | 330 | (0.70%) | 12953 | (28%) | 4434 | (9%) | 47068 |
| 2020 | 26481 | (66%) | 406 | (1.0%) | 8555 | (21%) | 4700 | (12%) | 40142 |
| 2021 | 29461 | (67%) | 456 | (1.0%) | 9942 | (23%) | 3798 | (9%) | 43657 |
| 2022 1H | 13855 | (67%) | 221 | (1.1%) | 4915 | (24%) | 1595 | (8%) | 20586 |
| (B) Outcome: | Initial Bond Amount Posted | | | | | | | | |
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | | Obs. |
| 2015 | 6 | (0.02%) | 1 | (0.00%) | 25759 | (77%) | 7520 | (23%) | 33286 |
| 2016 | 17 | (0.05%) | 6 | (0.02%) | 26827 | (78%) | 7375 | (22%) | 34225 |
| 2017 | 191 | (0.52%) | 16 | (0.04%) | 29844 | (81%) | 6636 | (18%) | 36687 |
| 2018 | 457 | (1.13%) | 64 | (0.16%) | 36011 | (89%) | 3814 | (9%) | 40346 |
| 2019 | 28670 | (66%) | 239 | (0.55%) | 10829 | (25%) | 3634 | (8%) | 43372 |
| 2020 | 25467 | (70%) | 308 | (0.9%) | 7076 | (19%) | 3531 | (10%) | 36382 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2021 | 28649 | (72%) | 362 | (0.9%) | 8430 | (21%) | 2341 | (6%) | 39782 |
| 2022 1H | 13538 | (72%) | 163 | (0.9%) | 4177 | (22%) | 910 | (5%) | 18788 |

From the evidence presented so far, it seems that recent bail reforms have significantly changed the patterns of pretrial release and bond approvals, helping more misdemeanor arrestees to be released from jail on a personal or general order bond and reducing the associated financial burden. A closely related question is whether the increased use of unsecured personal and general order bonds has led to an increase in non-appearance. Unfortunately, Harris County only began tracking appearance information in December 2020. Prior to that date, the only data that is available is bond forfeiture, bond surrender, and bond revocation data.

Using these available data, we computed the share of initial bonds that "failed," defined here as the bond approvals that resulted in bond forfeiture, bond surrender, or bond revocation within a year of the bond approval date.[30] We underscore, however, that bond-failure data may be a poor proxy for assessing nonappearance rates. Bond forfeiture, bond surrender, and bond revocation all reflect discretionary judicial decisions about whether a person missed court or violated a bond condition and, separately, whether the person's reasons for doing so warranted a forfeiture, surrender, or revocation. Different judges will make different decisions given the same real-world facts. However, beginning in December 2020, a new set of definitions were adopted as the Consent Decree's court appearance policy was operationalized by OCM, which should help us obtain a more reliable measure of non-appearance in the future.

Figure 13 presents the one-year misdemeanor bond failure rate, defined as the share of bond that failed within 365 days of the bond approval date. The overall bond failure rate was relatively low for cases filed in 2015 and 2016 (17%). The rate then rose to 27 percent in 2017 and 29 percent in 2018, and has gradually declined since then, reaching 26 percent in 2019, and 22 percent in 2020. Note that the bond failure rates could not be computed for cases filed in the second half of 2021 and after, because they cannot be followed up for a year yet.

Figure 13 also shows the bond failure rates by the type of bond approved, namely, surety and cash bonds, personal bonds, and general order bonds. Across all years considered, surety and cash bonds had the lowest one-year failure rate, which has remained mostly stable at around 15 percent. By contrast, there was a greater fluctuation in the personal bond failure rate, which increased from 21 percent in 2015 to 40 percent in 2018, and then fell to 26 percent in 2020. Since the general order bond was adopted in 2019, its one-year failure rate can only be computed for 2019, 2020, and the first half of 2021; it fell from 29 percent in 2019 to 24 percent in 2020 to 21 percent in 2021. Both personal bond and general order bond failure rates somewhat changed between 2020 and 2021, but the overall bond failure rate remained nearly constant.

---

[30] Most bond failures seem to take place within the first few months after they are issued. Among all initial bonds in our data that were approved between January 1, 2015 and June 30, 2021 and failed within 365 days, 50 percent of the bond failures were observed within 46 days of the approval date, and 90 percent of bond failures within 208 days.

Figure 13: Rate of Bond Failures within 365 Days, by Bond Types



Lastly, we explore the extent to which initial bond decisions vary across different demographic groups. Specifically, we illustrate the pattern of pretrial release for each sex, race, and ethnic group, and examine whether and how the disparity in pretrial release rates across demographic groups, if any, has changed since the implementation of the bail reforms.

In panel (A) of Table 8, we present the rate of pretrial release, defined here as the share of misdemeanor cases in which a person was released on a bond before the first setting, for each sex, race, and ethnic group. It appears that there existed a substantial gap in pretrial release rates between females and males, blacks and whites, and Latinxs and non-Latinxs. For example, in 2015, females arrested for a misdemeanor offense were more likely to be released than their male counterparts by 10 percentage points, whites were more likely to be released than blacks by 17 percentage points, and Latinxs were more likely to be released than non-Latinxs by 17 percentage points. These female/male, black/white, Latinx/non-Latinx gaps have rapidly narrowed since then, as the percentage point differences fell by approximately two-thirds between 2015 and 2019. The black/white and Latinx/non-Latinx differences slightly increased in 2020 and 2021, but overall, the sex, race, and ethnic gaps in pretrial release rates in 2021 (3, 8, and 7 percentage points, respectively) remain considerably smaller than in 2015.

Panel (B) of Table 8 shows the rate of pretrial release on an *unsecured* bond for each sex, race, and ethnic group. Consistent with the drastic increase in the use of personal and general order bonds over time, we find that the rate of pretrial release on an unsecured bond has also increased dramatically for all demographic groups considered, especially when one compares the years before and after bail reform. Before the adoption of Rule 9 in 2019, unsecured releases were substantially lower, whereas they have remained at approximately 66% for all demographic groups. Moreover, the differences between sex, race, and ethnic groups have been rather modest and remained mostly

33

stable, especially since 2017. In 2021, female/male, black/white, Latinx/non-Latinx differences in the rate of pretrial release on an unsecured bond were 2, 3, and 5 percentage points, respectively.

Table 8: Initial Pretrial Release Rate by Sex, Race, and Ethnicity

| Year | By Sex | | By Race | | By Ethnicity | |
|---|---|---|---|---|---|---|
| | Female | Male | Black | White | Latinx | Non-Latinx |
| (A) Pretrial Release on Any Bond | | | | | | |
| 2015 | 61% | 51% | 43% | 60% | 62% | 48% |
| 2016 | 66% | 53% | 46% | 62% | 64% | 51% |
| 2017 | 75% | 67% | 63% | 73% | 74% | 66% |
| 2018 | 78% | 71% | 67% | 77% | 78% | 70% |
| 2019 | 86% | 83% | 81% | 86% | 86% | 82% |
| 2020 | 81% | 80% | 77% | 83% | 83% | 78% |
| 2021 | 83% | 79% | 76% | 83% | 83% | 78% |
| 2022 1H | 77% | 78% | 73% | 81% | 81% | 75% |
| (B) Pretrial Release on PR/GOB | | | | | | |
| 2015 | 12% | 5% | 7% | 6% | 7% | 7% |
| 2016 | 15% | 8% | 10% | 9% | 9% | 10% |
| 2017 | 34% | 30% | 34% | 29% | 29% | 32% |
| 2018 | 46% | 40% | 45% | 39% | 39% | 42% |
| 2019 | 67% | 65% | 67% | 65% | 66% | 65% |
| 2020 | 67% | 67% | 66% | 68% | 69% | 65% |
| 2021 | 70% | 68% | 67% | 69% | 71% | 66% |
| 2022 1H | 66% | 68% | 65% | 69% | 70% | 65% |

## 8. Magistration Hearing Outcomes

Since Rule 9 became effective in February 2019, a large number of misdemeanor arrestees are released on general order bonds without a formal bail hearing. Still, in more than 40 percent of cases, a misdemeanor arrestee was not eligible for a general order bond and had to attend a magistration hearing, where the hearing officer determines the probable cause for further detention and sets the bond type and amount. During the hearing, ADA and defense counsel (either a Harris County public defender or a private attorney) may also request a specific bond type (for example, by requesting or opposing a personal bond) and the bond amount. Analysis of bond hearing data can then shed light on the disparity between bond requests made by ADA and defense counsel and how they compare to the actual bond decision made by the hearing officer. Below, we present a preliminary analysis based on 36,519 misdemeanor magistration hearings that took place between March 10, 2021 and June 30, 2022. This sample choice is mainly driven by data availability, but we note that all the bond requests and decisions made during this time period are recorded in a consistent fashion, as an electronic magistration hearing form was revised on March 10, 2021 and is currently used by all hearing officers.

Figure 14 compares the types of bond set by the hearing officer, as well as the requests made by the defense counsel and ADA. The hearing officer released the arrestee on a personal bond in

most misdemeanor bail hearings (74%), and denied the bond in only 1 percent of the time.[31] Turning to the bond requests made by the defense counsel and ADA, we find that both sides often make no explicit bond request (in nearly 50 percent of the time). However, when a bond request is made, the two sides' requests tend to be very different from each other. The defense counsel is much more likely to request a personal bond (35 percent) than a secured bond (6 percent). On the contrary, ADA usually requests a secured bond (39 percent) and very rarely makes a request for a personal bond (0.3 percent) or bond denial (2 percent).

Figure 14: Bond Type Request and Outcome in Magistration Hearing



To further examine the disparity between the defense counsel and ADA's request, we show in Figure 15 how the bond amounts requested by the two sides compare to the actual bond amount set by the hearing officer. Again, both the defense attorney and ADA often make no specific request about the bond amount. When they make a request, however, the defense counsel usually asks for a lower bond amount than the actual bond amount set, while ADAs tend to ask for a higher bond amount.

---

[31] The shares of a secure bond (24%), a personal bond (74%), and bail denial (1%) do not add up to 100 percent because the Hearing Officer may order the defendant to be further detained "until further order of the Court."

Figure 15: Bond Amount Request in Magistration Hearing



Figure 16 provides another look at the distribution of bond amounts requested by the defense and ADA, as well as the actual bond amount set by the hearing officer. To keep the figure simple and easy to understand, we omit the cases in which the defense attorney or ADA did not request a specific bond amount. We also omit bond requests and outcomes higher than $10,000, which are extremely rare.[32]

The figure shows that there exists a remarkable disparity between the bond amounts requested by the defense counsel and ADA. The defense counsel usually requests bond amounts of $1,000 or less, while ADA often requests a much higher bond amount, such as $5,000 and $10,000. We note that the most commonly observed bond amounts set during a bail hearing are $500 (16%), $1,000 (15%), and $100 (14%), but larger amounts such as $2,000 (3%), $2,500 (4%), $3,000 (4%), and $5,000 (9%) are not uncommon.

A hearing officer also determines the arrestee's indigence status during the hearing. Under Rule 9, indigent arrestees are entitled to representation by a public defender or other court-appointed counsel, and are exempted from paying for a bond-related fee and the cost of a release condition, such as electronic monitoring and an interlock device. Therefore, whether an arrestee is determined indigent or not may influence the bail hearing outcomes, including the approved bond type, amount, and pretrial release conditions, if any. In spite of its significance, we find that the indigence status information is available in only 60 percent of the hearings. In the vast majority of cases where the indigence status is recorded, the arrestee is considered indigent (51%).

---

[32] Bond amounts higher than $10,000 are observed in 2 percent of the actual bond amount set, 7 percent of the ADA's bond request, and 0.4 percent of the defense counsel's request.

Figure 16: Distribution of Bond Amount Requests in Magistration Hearing



Figure 17: Indigence Status



### 9.  Case Disposition Outcomes

Given the substantial change in the patterns of pretrial detention and bond decisions documented above, it is plausible that case disposition outcomes may have also changed over time. To explore this question, we present the distribution of case disposition outcomes for misdemeanor cases filed between 2015 and 2021 in Figure 18.  Misdemeanor cases filed in 2022 and the second half of 2021 are again dropped from the analysis because most of them (76% for cases filed in 2022 and 50% for cases filed in the second half of 2021) are not disposed yet.

Indeed, we find that the share of misdemeanor cases resulting in a criminal conviction has substantially declined between 2015 (59%) and 2021 (19%), while the share of cases dismissed or acquitted has risen (31% in 2015 vs. 48% in 2021). Disposition outcomes are observed for most cases filed prior to 2020, but 18 percent of the cases filed in 2020 and 31 percent of the cases filed in the first half of 2021 are yet to be disposed. We also note that the use of deferred adjudication, a court-imposed diversion agreement which places the defendant under community supervision, have become less common over time, with the share gradually falling from 8 percent in 2015 to 2 percent in 2021. Unlike probation, deferred adjudication is not considered as a criminal conviction if the community supervision is successfully completed.

Figure 18: Case Disposition Outcomes



Figure 19 repeats the analysis, this time removing cases that are not disposed yet and instead focusing on cases in which the disposition outcomes are observed. Not surprisingly, this sample restriction reduces the number of observations, especially for cases filed during the last two years (2020 and the first half of 2021), but the overall pattern remains mostly unchanged. Again, we observe more cases that are dismissed or acquitted and the share of cases resulting in a conviction falling by more than one-half since 2015. It is also noteworthy the shares of conviction and dismissal/acquittal have remained nearly identical between 2019 and 2021.

Figure 19: Case Disposition Outcomes, Cases with Observed Disposition Only



Next, we examine the change in the share of misdemeanor convictions through a guilty plea in Figure 20. Prior to the preliminary injunction in 2017 and implementation of Rule 9 in 2019, nearly all misdemeanor convictions came from guilty pleas (97 percent in 2015 and 2016). Since then, the share of guilty pleas slightly fell, accounting for 94 percent of all misdemeanor convictions in 2019. The decline is even more drastic when taking into account the reduced number of convictions over the years. For example, 36,026 misdemeanor cases filed in 2015 resulted in a conviction through guilty plea; but only 12,804 cases filed in 2019 did so. The number further declined to 9,660 in 2020 and 4,526 in the first half of 2021, but the decline in the last two years are partially driven by the fact that many of these cases are not disposed yet. Overall, our findings provide suggestive evidence that the recent misdemeanor bail reforms in Harris County had a significant impact on the initial pretrial detention and bond decisions, as well as the eventual case disposition outcomes.

Figure 20: Share of Guilty Pleas among Misdemeanor Convictions



Another important disposition-related question we consider is the extent to which the duration of misdemeanor cases has changed since Rule 9 went into effect. To explore this question, we compute the time in days between case filing and initial case disposition and present in Figure 21 the share of cases disposed within 90, 180, and 365 days. The figure shows that cases filed in recent years tend to remain open for a longer period of time. For example, most cases (52%) in 2015 were disposed within three months of the case filing, but this share fell down to 13% in the first half of 2021. Likewise, about 90 percent of the cases filed in 2015 and 2016 were disposed within a year, but the number fell to 50 percent in 2021. Hurricane Harvey (in 2017) and the policy responses to the COVID-19 pandemic (in 2020 and 2021) are likely to be responsible for some of these delays, as they caused a major disruption in the criminal justice system, increasing the backlog of criminal cases, reducing the setting of trial dates, and lengthening the time between court appearances. We also note that, in some cases, time-to-disposition may also include the period of case inactivity due to non-appearance and the resulting bond failures, although we do not have information on the prevalence and duration of case inactivity in our data. We are currently working with OJS to explore additional data elements that can help us identify inactive cases in the data and measure the duration of inactivity.

40

Figure 21: Time in Days between Case Filing and Disposition



## 10. Repeat Offense

Lastly, we explore the pattern of repeat offenses by persons charged with misdemeanors using several different measures, namely, 1) the share of *persons* charged with misdemeanors and then with a new offense within a year of the initial case filing date (person-level repeat-offense), 2) the share of misdemeanor *cases* in which the same person was charged with a new crime (case-level repeat-offense) within a year of the initial case filing date, and 3) the share of misdemeanor cases filed each year that were charged against former misdemeanor arrestees from the previous year. As suggested by the Harris County District Attorney's Office, we consider both prospective and retrospective measures of re-arrest and omit out-of-county fugitive cases in our repeat offense analysis. We thank them for their helpful comments and suggestions.

Consider the first two measures first. To obtain the case-level repeat-offense rate, we follow all misdemeanor cases filed during a calendar year and compute the share of cases followed by a new criminal case filing within 90, 180, and 365 days. To compute the person-level repeat-offense rate, we follow all misdemeanor cases filed against the same person during a calendar year and consider whether any of these cases was followed by a new criminal case filing with 90, 180, and 365 days. The case-level rate should be higher than the person-level rate, as multiple cases filed against the same person on the same day will be double-counted under the case-level measure. For example, if a person was charged for two separate offenses on the same day and again charged for a new offense a month later, this is counted as two cases with a new case filed under the case-level measure but a single person with a new case filed under the person-level measure.

It is important to note that just because a case is *filed* does not mean that the person is found guilty or convicted. Our analysis shows only *new cases filed*. It does not reveal whether the person

was actually guilty or convicted of the offense in question. At the same time, we note that our person-level measure of repeat offending closely resembles the one used in the influential study by Heaton, Mayson, and Stevenson, which examined the share of persons charged with misdemeanors and then charged with a new offense within eighteen months of the initial bail hearing.[33] Although the two measures use slightly different reference dates (initial case filing date vs. initial bail hearing date), they are similar in the sense that both prospectively follow each misdemeanor case for a given period of time and look for a new criminal case filed against the same person during this follow-up period.

We also emphasize that both person-level and case-level measures consider all misdemeanor cases as the denominator, regardless of intermediate case outcomes such as pretrial release on a bond. This is noteworthy because separately computing the number of new cases filed against those who did and did not bond out on a prior charge, for example, confounds the overall trend in new case filings by misdemeanor defendants with the trend in hearing officers' propensity to approve pre-trial release on a bond. As pretrial release on a bond has become far more common since Rule 9, all else equal, the number of new cases filed while on bond should mechanically increase even if there were no actual change in the total number of new cases filed against persons facing misdemeanor charges.

In the repeat offense analysis presented below, we exclude out-of-county fugitive arrestees and cases because most of them simply result in the person being sent back to the requesting state or county, making it unlikely for them to be re-arrested in Harris County in the near future. Table 9 presents the total number of misdemeanor arrestees and cases in our data, as well as the number of non-fugitive arrestees and cases. Restricting the sample to non-fugitive arrestees and cases slightly reduces the number of observations, but in reality, the removal of fugitive arrestees and cases from the analysis leads to little change in the rate of re-arrest.

Table 9: Number of Misdemeanor Defendants and Cases, with and without Fugitives

| Year | Misdemeanor Defendants | | Misdemeanor Cases | |
|---|---|---|---|---|
| | Total | Excluding Fugitives | Total | Excluding Fugitives |
| 2015 | 50528 | 49483 | 62345 | 60777 |
| 2016 | 48824 | 47667 | 61244 | 59518 |
| 2017 | 43863 | 42996 | 53090 | 51923 |
| 2018 | 46206 | 45351 | 55262 | 54093 |
| 2019 | 44134 | 43312 | 51903 | 50732 |
| 2020 | 38023 | 37316 | 45481 | 44459 |
| 2021 1H | 22375 | 21932 | 25806 | 25185 |

We begin our repeat offense analysis in Table 10 by presenting the person-level rate of repeat offense within 90, 180, and 365 days. The share of misdemeanor arrestees who had a new criminal case filed within a year has changed little between 2015 (23%) and 2021 (23%). We also note that the rate of new cases filed has remained nearly constant across all three time periods considered, namely, 90, 180, and 365 days, although all three rates slightly increased between 2019 and 2020. This change in the re-arrest rate is likely explained by the brief reduction in the number of misdemeanor arrestees and cases in 2020. Except for 2019, the re-arrest rates have been largely

---

[33] Paul Heaton, Sandra Mayson & Megan Stevenson, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017).

constant. As before, persons arrested for a misdemeanor offense during the second half of 2021 are dropped from this analysis as they cannot be followed up for a year yet.

Table 10: Number of Misdemeanor Arrestees with a New Case Filed within 90, 180, and 365 Days

| | New Case Filed within | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | 90 Days | | 180 Days | | 365 Days | | # of Arrestees |
| 2015 | 5226 | (11%) | 7756 | (16%) | 11384 | (23%) | 49483 |
| 2016 | 5223 | (11%) | 7649 | (16%) | 10924 | (23%) | 47667 |
| 2017 | 4656 | (11%) | 6716 | (16%) | 9609 | (22%) | 42996 |
| 2018 | 4922 | (11%) | 7009 | (15%) | 9874 | (22%) | 45351 |
| 2019 | 4443 | (10%) | 6382 | (15%) | 8908 | (21%) | 43312 |
| 2020 | 3966 | (11%) | 5824 | (16%) | 8402 | (23%) | 37316 |
| 2021 1H | 2451 | (11%) | 3558 | (16%) | 5127 | (23%) | 21932 |

Table 11 presents the breakdown of one-year re-arrests by offense type. For brevity, we divided new cases filed into the following offense categories, some of which include both felony and misdemeanor offenses: homicide, robbery, assault (including both aggravate and simple assault), burglary, theft (including motor vehicle theft), drug-related offense, weapon law violation, and others. Although the overall rate of one-year re-arrest has remained nearly constant, we find that some of the offense-specific re-arrest rates have changed rather significantly. For instance, the shares of misdemeanor defendants re-arrested within a year for assault and weapon law violation have increased since 2015, while re-arrests involving burglary and drug-related offenses have become less common. The share of misdemeanor arrestees charged with a homicide within a year has increased from 0.14% in 2015 to 0.22% in 2021, but the count remains extremely low (48 out of 21,932 misdemeanor arrestees).

Table 11: Number of Misdemeanor Arrestees with a New Case Filed within 1 Year, by Offense Type

| Year | Murder | | Robbery | | Assault | | Burglary | | # of Arrestees |
|---|---|---|---|---|---|---|---|---|---|
| 2015 | 68 | (0.14%) | 435 | (0.9%) | 2368 | (4.8%) | 2063 | (4.2%) | 49483 |
| 2016 | 61 | (0.13%) | 397 | (0.8%) | 2398 | (5.0%) | 1998 | (4.2%) | 47667 |
| 2017 | 52 | (0.12%) | 376 | (0.9%) | 2439 | (5.7%) | 1819 | (4.2%) | 42996 |
| 2018 | 71 | (0.16%) | 437 | (1.0%) | 2767 | (6.1%) | 1457 | (3.2%) | 45351 |
| 2019 | 65 | (0.15%) | 463 | (1.1%) | 2778 | (6.4%) | 1043 | (2.4%) | 43312 |
| 2020 | 96 | (0.26%) | 436 | (1.2%) | 3068 | (8.2%) | 839 | (2.2%) | 37316 |
| 2021 1H | 48 | (0.22%) | 243 | (1.1%) | 1730 | (7.9%) | 561 | (2.6%) | 21932 |
| Year | Theft | | Drug | | Weapon | | Others | | # of Arrestees |
| 2015 | 2240 | (4.5%) | 3568 | (7.2%) | 521 | (1.1%) | 4818 | (10%) | 49483 |
| 2016 | 1959 | (4.1%) | 3312 | (6.9%) | 611 | (1.3%) | 4725 | (10%) | 47667 |
| 2017 | 1783 | (4.1%) | 2321 | (5.4%) | 543 | (1.3%) | 4370 | (10%) | 42996 |
| 2018 | 1749 | (3.9%) | 2266 | (5.0%) | 555 | (1.2%) | 4588 | (10%) | 45351 |
| 2019 | 1748 | (4.0%) | 1600 | (3.7%) | 618 | (1.4%) | 4546 | (10%) | 43312 |
| 2020 | 1291 | (3.5%) | 1442 | (3.9%) | 906 | (2.4%) | 4353 | (12%) | 37316 |
| 2021 1H | 838 | (3.8%) | 836 | (3.8%) | 545 | (2.5%) | 2747 | (13%) | 21932 |

Table 12 presents the shares of new cases filed within 90, 180, and 365 days of the initial case filing date, measured at the case level. As expected, this case-level measure provides a slightly higher rates of repeat-offense than the person-level measure, but the difference is rather modest. For example, 26 percent of misdemeanor *cases* filed in 2021 were followed by a new criminal case filing within a year, while 23 percent of misdemeanor *defendants* in 2021 had a new criminal case filed within a year. Similar to the person-level analysis, the rates of new cases filed within 90, 180, and 365 days all have changed little between 2015 and 2021.

Table 12: Number of Misdemeanor Cases with a New Case Filed within 90, 180, and 365 Days

| Year | 90 Days | | 180 Days | | 365 Days | | # of Cases |
|---|---|---|---|---|---|---|---|
| | | | New Case Filed within | | | | |
| 2015 | 7426 | (12%) | 11260 | (19%) | 16439 | (27%) | 60777 |
| 2016 | 7682 | (13%) | 11414 | (19%) | 16148 | (27%) | 59518 |
| 2017 | 6748 | (13%) | 9777 | (19%) | 13807 | (27%) | 51923 |
| 2018 | 6966 | (13%) | 10013 | (19%) | 13922 | (26%) | 54093 |
| 2019 | 5898 | (12%) | 8696 | (17%) | 12093 | (24%) | 50732 |
| 2020 | 5280 | (12%) | 7906 | (18%) | 11399 | (26%) | 44459 |
| 2021 1H | 3200 | (13%) | 4605 | (18%) | 6518 | (26%) | 25185 |

Tables 13 and 14 expand on the above analyses regarding new cases filed, by breaking down the number and share of re-arrests, this time by whether a bond was filed for the initial misdemeanor case and the type of bond filed. (As in Figures 11 and 12, these bond outcomes reflect whether a bond was filed and the type of bond filed before the first setting.) These tables highlight how, prior to the Rule 9 changes in early 2019, most persons facing misdemeanor charges who had a new case filed, did not receive bond. Many pleaded guilty after being denied bond and being detained in the jail. However, subsequent to the Rule 9 changes, far more persons received bond, and therefore, most who reoffended, received some type of bond. The composition of the bond types among those who had new cases filed changed a great deal as a result of the misdemeanor bail reforms, but as described, the rate of new case filings within each bond type did not.

Table 13. Number of Misdemeanor Cases with New Cases Filed by Bond or No Bond Filed

| Year | Bond Filed | # of Cases | 90 Days | | 180 Days | | 365 Days | |
|---|---|---|---|---|---|---|---|---|
| | | | Number of Misd. Cases with a New Case Filed within | | | | | |
| 2015 | No | 27491 | 5297 | (19%) | 7710 | (28%) | 10690 | (39%) |
| 2016 | No | 25293 | 5442 | (22%) | 7795 | (31%) | 10454 | (41%) |
| 2017 | No | 15236 | 3413 | (22%) | 4631 | (30%) | 6127 | (40%) |
| 2018 | No | 13747 | 2913 | (21%) | 3970 | (29%) | 5312 | (39%) |
| 2019 | No | 7361 | 1328 | (18%) | 1913 | (26%) | 2562 | (35%) |
| 2020 | No | 8077 | 1456 | (18%) | 2049 | (25%) | 2816 | (35%) |
| 2021 H | No | 4245 | 874 | (21%) | 1188 | (28%) | 1570 | (37%) |
| 2015 | Yes | 33286 | 2129 | (6.4%) | 3550 | (11%) | 5749 | (17%) |
| 2016 | Yes | 34225 | 2240 | (6.5%) | 3619 | (11%) | 5694 | (17%) |
| 2017 | Yes | 36687 | 3335 | (9.1%) | 5146 | (14%) | 7680 | (21%) |
| 2018 | Yes | 40346 | 4053 | (10%) | 6043 | (15%) | 8610 | (21%) |

44

| 2019 | Yes | 43371 | 4570 | (11%) | 6783 | (16%) | 9531 | (22%) |
| 2020 | Yes | 36382 | 3824 | (11%) | 5857 | (16%) | 8583 | (24%) |
| 2021 H | Yes | 20940 | 2326 | (11%) | 3417 | (16%) | 4948 | (24%) |

Table 14. Number of Misdemeanor Cases with New Cases Filed by Bond Type or No Bond Filed

| | | | Number of Misd. Cases with a New Case Filed within | | | | | |
| Year | Bond Filed | # of Cases | 90 Days | | 180 Days | | 365 Days | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2015 | Cash | 29010 | 1886 | (6.5%) | 3128 | (11%) | 5071 | (17%) |
| 2016 | Cash | 28430 | 1885 | (6.6%) | 3031 | (11%) | 4704 | (17%) |
| 2017 | Cash | 20234 | 1134 | (5.6%) | 1843 | (9.1%) | 2937 | (15%) |
| 2018 | Cash | 17554 | 964 | (5.5%) | 1552 | (8.8%) | 2395 | (14%) |
| 2019 | Cash | 9268 | 544 | (5.9%) | 874 | (9.4%) | 1345 | (15%) |
| 2020 | Cash | 5923 | 406 | (6.9%) | 658 | (11%) | 1033 | (17%) |
| 2021 1H | Cash | 3282 | 268 | (8.2%) | 406 | (12%) | 620 | (19%) |
| 2015 | PR | 4276 | 243 | (5.7%) | 422 | (9.9%) | 678 | (16%) |
| 2016 | PR | 5795 | 355 | (6.1%) | 588 | (10%) | 990 | (17%) |
| 2017 | PR | 16453 | 2201 | (13%) | 3303 | (20%) | 4743 | (29%) |
| 2018 | PR | 22792 | 3089 | (14%) | 4491 | (20%) | 6215 | (27%) |
| 2019 | PR | 11584 | 1525 | (13%) | 2269 | (20%) | 3178 | (27%) |
| 2020 | PR | 10891 | 1634 | (15%) | 2420 | (22%) | 3444 | (32%) |
| 2021 1H | PR | 6179 | 1024 | (17%) | 1423 | (23%) | 1989 | (32%) |
| 2015 | GOB | N/A | N/A | | N/A | | N/A | |
| 2016 | GOB | N/A | N/A | | N/A | | N/A | |
| 2017 | GOB | N/A | N/A | | N/A | | N/A | |
| 2018 | GOB | N/A | N/A | | N/A | | N/A | |
| 2019 | GOB | 22519 | 2501 | (11%) | 3640 | (16%) | 5008 | (22%) |
| 2020 | GOB | 19568 | 1784 | (9.1%) | 2779 | (14%) | 4106 | (21%) |
| 2021 1H | GOB | 11479 | 1034 | (9.0%) | 1588 | (14%) | 2339 | (20%) |
| 2015 | No Bond | 27491 | 5297 | (19%) | 7710 | (28%) | 10690 | (39%) |
| 2016 | No Bond | 25293 | 5442 | (22%) | 7795 | (31%) | 10454 | (41%) |
| 2017 | No Bond | 15236 | 3413 | (22%) | 4631 | (30%) | 6127 | (40%) |
| 2018 | No Bond | 13747 | 2913 | (21%) | 3970 | (29%) | 5312 | (39%) |
| 2019 | No Bond | 7361 | 1328 | (18%) | 1913 | (26%) | 2562 | (35%) |
| 2020 | No Bond | 8077 | 1456 | (18%) | 2049 | (25%) | 2816 | (35%) |
| 2021 1H | No Bond | 4245 | 874 | (21%) | 1188 | (28%) | 1570 | (37%) |

An important limitation of these prospective measures of repeat offending is that they can be strongly influenced by trends in the total number of criminal cases filed. For example, the one-year re-arrest rate is lower for people arrested for a misdemeanor in 2019, but this likely reflects the temporary drop in misdemeanor cases filed in 2020. To address this concern, we explore a complementary measure of repeat offending by computing the share of criminal cases each year that

45

were charged against former misdemeanor arrestees from the previous year. Specifically, we count the number of criminal cases filed each year that were charged against former misdemeanor arrestees (namely, those arrested for a misdemeanor offense less than a year from the new case filing date) and divide it by the total number of criminal cases filed each year. Note that this measure is retrospective, as we start from each case's filing date and go backward, looking for a previous case filed against the same person within a one-year period. Cases filed in 2015 are dropped from this analysis, because we cannot observe whether another (misdemeanor) case was filed against the same person in 2014. Out-of-county fugitive cases are again omitted from this analysis.

Table 15 presents the results. As shown in Figure 2, the number of misdemeanor cases has steadily declined since 2016, while the number of felony cases has gradually increased between 2016 (N=36,243) and 2021 (N=44,154). In spite of these opposing trends, we find that the shares of misdemeanor and felony cases filed against former misdemeanor arrestees have remained mostly stable, if not slightly lower. Less than 20 percent of the criminal cases filed in the first half of 2022 (18% for misdemeanors and 19% for felonies) were filed against persons charged with a misdemeanor in the previous year. Overall, we find little evidence that the risk of new case filings by persons with prior misdemeanor charges has significantly changed in recent years.

Table 15. Number of Criminal Cases Filed Against Persons Charged with Misdemeanor Cases in the Previous Year

| Year | Current Offense Type | # of Cases | Charged Against Former Misd. Defendants | |
|------|----------------------|-----------|------------|-----|
| 2016 | Misdemeanor | 59518 | 12016 | (20%) |
| 2017 | Misdemeanor | 51923 | 10045 | (19%) |
| 2018 | Misdemeanor | 54093 | 9987 | (18%) |
| 2019 | Misdemeanor | 50732 | 8372 | (17%) |
| 2020 | Misdemeanor | 44459 | 7291 | (16%) |
| 2021 | Misdemeanor | 48348 | 8058 | (17%) |
| 2022 1H | Misdemeanor | 23503 | 4202 | (18%) |
| 2016 | Felony | 36243 | 7448 | (21%) |
| 2017 | Felony | 34126 | 6971 | (20%) |
| 2018 | Felony | 35566 | 6957 | (20%) |
| 2019 | Felony | 36960 | 7327 | (20%) |
| 2020 | Felony | 40744 | 8038 | (20%) |
| 2021 | Felony | 44154 | 8325 | (19%) |
| 2022 1H | Felony | 27683 | 5207 | (19%) |

46

## IV.  Cost Study and Project Management

This section of the Monitor Report reviews the status of two responsibilities assigned to the Public Policy Research Institute at Texas A&M University: (1) evaluating costs in the misdemeanor system in Harris County, and (2) project management.

## A. Cost Study

In the Fourth Monitor Report, the cost evaluation examined the effect of changes in pretrial release practices under the ODonnell Consent Decree for Harris County departments and defendants. Results described that if 2021 post-ODonnell criminal justice practices had been in use since 2015, the county would have saved millions of dollars per year in misdemeanor case processing costs. Even more costs would have been avoided by defendants in personal, family, and earnings impacts. However, earlier analyses did not examine whether these apparent cost savings might be offset if the new policies introduced by Rule 9, including use of unsecured General Order Bonds, increased the rate of new criminal offenses.  The current report therefore seeks to answer whether new pretrial practices have affected community safety outcomes and associated costs.

We test this premise by examining the trajectory of future offending for people experiencing pretrial release under ODonnell protocols versus earlier pretrial regimes.  If unsecured pretrial release is creating a public safety risk, we would expect the frequency and severity of new offending to be higher for recent misdemeanor releasees than in the past.  Additionally, we would expect to see costs to victims, defendants, and the county criminal justice system rise in parallel.

To examine these questions, we separate results for *re-arrests* that can potentially be attributed to ODonnell bond policies from overall arrest trends.  Paul Heaton has led work at the Quattrone Center involving more sophisticated multivariate analysis of future criminal justice contact among misdemeanor defendants before and after the June 2017 preliminary injunction against bond set by a standardized schedule.  This study found significant declines in new charges within 3 years of an initial misdemeanor arrest following implementation of individualized bond determinations.[34]

Here we report descriptive statistics on re-arrests before and after the June 2019 implementation of Local Rule 9.  We find Consent Decree provisions allowing immediate unsecured pretrial release do not increase the threat to public safety due to new offending.  To the contrary, the path created by Rule 9 for people to resolve low-level criminal charges while remaining in the community has made offenders *less* likely to have future criminal justice encounters within a year.  These positive outcomes have reduced the average cost of re-arrest for both the county and defendants while  victim costs attributed to re-arrests remain unchanged.

## 1. Methods

Key points needed to interpret findings include the following:

---

[34] The work of Paul Heaton and colleagues on Harris County bond reform is summarized online at https://www.law.upenn.edu/institutes/quattronecenter/reports/bailreform/#/

- The unit of analysis is: *All cases for a single person filed together on the same date*. Because this unit of analysis is different from the *person-level* and *case-level* analyses presented elsewhere in this report, the exact values returned in may differ slightly, but overall trends remain consistent.

- In instances where more than one charge was filed for the same person on the same date, key information such as the highest charge filed, the number of charges filed, and the costs of charges filed were aggregated to create a single observation.

- Observations were selected for analysis based on two considerations:

  1) <u>Standardized 365-Day Re-Arrest Interval</u> -  Bond failure due to re-arrest was measured as a new arrest *within 365 days of a misdemeanor case filing*, rather than as a new arrest *while on bond*.  This standardized measurement approach accounts for the wide discrepancy in time spent on bond before and after the Consent Decree: Before Rule 9 up to 90% of cases were disposed within 365 days of filing, whereas in more recent years only about 50% of cases are disposed in that timeframe (see Figure 21).

  To measure the 365-day re-arrest time interval, we took cases filed on or before June 31, 2021, then looked forward one year from the case filing date to consider the frequency, severity, and cost of future arrests.  Any given misdemeanor observation might therefore be counted as both an initial arrest and a re-arrest.

  2) <u>Initial Disposition Date</u> - To ensure information is available to calculate full case processing and defendant costs, analyses of the costs of arrests and re-arrests to Harris County, defendants, and victims use data with an initial disposition date on or before June 30, 2022.  In order to be considered disposed, all charges filed on the same date must have an initial disposition assigned.  In the remaining analyses describing the frequency and severity of re-arrests, all filed cases were used without consideration of disposition status. The number of arrests in each analysis sample is illustrated in Table 16, below.

Table 16.  Arrests in the Re-Arrest and Cost Analysis Datasets

|  | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021 1H** |
|---|---|---|---|---|---|---|---|
| Total Number of Arrests Used in Rearrest Analysis | 54,728 | 52,730 | 46,968 | 49,298 | 45,864 | 38,143 | 21,764 |
| Disposed Arrests Used in Cost Analysis | 53,540 | 51,428 | 45,134 | 46,446 | 40,789 | 30,057 | 13,769 |
| Percent of Arrests Disposed | 97.8% | 97.5% | 96.1% | 94.2% | 88.9% | 78.8% | 63.3% |

- Detailed data for figures in this section relating to re-arrest analysis and cost evaluation is presented in Appendix F.

48

- The sources and methods used to calculate victim costs is presented in Appendix G.

## 2. Misdemeanor Arrest and Re-Arrest Trends

Elsewhere in this report, it is established that the number of individuals arrested for misdemeanor-only charges (Figure 1) and the number of misdemeanor cases filed (Figure 2) have both dropped by roughly 20% under ODonnell pretrial release practices.  Even as new arrests have declined, however, some stakeholders have speculated that provisions of the Consent Decree might be contributing to a different trend toward more re-arrests and more violent crime.

Since Rule 9, bond hearings have been limited to arrests in special "carveout" categories; only about one-third of misdemeanors have met the requirements for an individualized bond determination. Of those, about one-in-four (23%) received an unsecured personal bond.  Including releases under General Order Bonds, three times more arrests have unsecured pretrial release since Rule 9 than before (Figure 22).  This is a substantial change in practice from before 2019 when most defendants had secured bond set by a judge.[35]  Without a bond hearing, and without secured bond or court supervision upon release, some stakeholders fear arrestees may go on to commit more numerous and more serious offenses while awaiting trial.

Figure 22



The following sections  allay these concerns.  Since the Consent Decree, 77% of misdemeanor arrests have had no subsequent criminal justice involvement for at least a year compared to 74% before Rule 9 (Figure 23).  A major initial conclusion, then, is that ODonnell pretrial protocols are associated with reductions — not increases — in repeat arrests.  In the sections that follow, this overarching finding is explored in greater detail considering the frequency, type, and severity of charges under the ODonnell pretrial regime.

---

[35] Data documenting the occurrence of bond hearings did not become available until August, 2018.  However, pretrial processes before the ODonnell lawsuit called for a bond hearing within 24-48 hours of arrest for any defendants who had not yet posted a scheduled bond amount.

Figure 23



## a. Frequency of Re-Arrest

The share of misdemeanor arrests followed by a repeat charge within 365 days has declined under ODonnell (Figure 24). In 2015, 27% of misdemeanors had another filing within a year, but since 2019 the number has been 5% lower. Moreover, when two leading trends are combined – the reduced likelihood of re-arrest plus fewer misdemeanor arrests overall – we find a substantial decline in the absolute number of future offenses charged. In 2015, more than 14,500 misdemeanor arrests had at least one subsequent arrest within a year. In 2020 and 2021 (first half) the number was closer to 10,000 arrests with a re-arrest.

Figure 24



The share of misdemeanors with new *felony* charges has remained largely stable over time. Each year from 2015 through 2019, 14% of misdemeanor arrests had a new felony charge. Since 2020, however, coinciding with COVID-related increases in more serious crime, the share moved 2

percentage points higher.  In combination with the drop in misdemeanor filings, about 1,000 fewer misdemeanors had a felony re-arrest in 2020 and 2021 (first half) than in 2015.

The preceding measure considers the number of misdemeanor arrests with a subsequent criminal justice contact, but it does not account for *how many* future encounters occur.  Figure 25 counts the average number of future filings within a year of a misdemeanor arrest.  The result is a decimal value less than "1" because a "0" entered into the mean for the roughly three-fourths of misdemeanor arrests with no new charges (Figure 23).

Figure 25



Overall, each misdemeanor arrest has had fewer subsequent re-arrests since the Consent Decree.  Between 2015 and 2018, misdemeanors had an average 0.47 subsequent arrests within 365 days.  Since Rule 9 however, the number is 11% lower at just 0.41 re-arrests per misdemeanor filing. When the falling number of re-arrests is combined with fewer initial misdemeanor filings, we find Harris County processed about 6,000 fewer re-arrests each year since 2019 compared to 2018 and the years before.

The subset of re-arrests that are felonies, however, has trended upward from an average 0.18 per misdemeanor before the Consent Decree to 0.19 afterwards.  Then a  specific rise to 0.22 felony re-arrests in 2021 suggests  it may be related to the general surge in more serious crimes that occurred during COVID.  As noted in other examples below, the declining share of case filings generally also appears to be increasing representation of more serious felony charges as a share of both arrests and re-arrests.  Even so, due to the falling number of initial misdemeanor arrests each year, Harris County has processed about 500 fewer felonies each annually since 2019 compared to earlier years.

**b. Type of Re-Arrest Charges**

While ODonnell pretrial processing protocols do not seem to cause *more* re-arrests, we have not considered if bond reform may have altered the *nature* of re-offenses.  To answer this question, Figure 26 looks at the types of re-arrest charges filed to see if they differ before and after Rule 9.  All

new charges are included up to the maximum of 10 arrests following an initial misdemeanor.  Offense categories are based on the FBI's National Incident-Based Reporting System (NIBRS).[36]

Figure 26



Re-Offenses Charged Before and After Rule 9

Since the Consent Decree, NIBRS "Group B" offenses[37] have made up the largest share of re-offenses (25%).  The Group B category includes charges such as vagrancy, disorderly conduct, and criminal trespass that disproportionately impact homeless or mentally ill people with repeat criminal justice contact.  Though Group B charges have increased by just 3 percentage points since Rule 9, it might nonetheless be related to the increased speed and volume of pretrial release since the introduction of General Order Bonds.  With people moving out of jail more quickly than before, there is often little time to connect vulnerable populations to community services.  If referrals and hand-offs to helping organizations could be improved without impeding prompt pretrial release, repeat arrests for this category of offenses might potentially decline.

On the other hand, while drug and burglary re-arrests have fallen by 20% and 55% respectively since the implementation of Rule 9, there is little reason to think this decline is linked to practices under the Consent Decree.  More likely, it is tied to larger crime trends:  Arrests in these

---

[36] For more information about the Uniform Crime Report and National Incident-Based Reporting Systems, see https://www.fbi.gov/services/cjis/ucr/nibrs
[37] NIBRS "Group B" offenses have a lower reporting standard. For these measures, jurisdictions only report arrest information rather than the more detailed incident-level information required for "Group A" crimes.  NIBRS "Group B" offenses include loitering/vagrancy, disorderly conduct, drunkenness, nonviolent family offenses, liquor laws, peeping tom, criminal trespass, bad checks, and "other."

offense categories have gone down in many urban jurisdictions since 2018.[38]  Additionally, drug treatment accessed through Harris County diversion and probation programs may also help reduce propensity to commit new drug crimes or burglaries to support drug use.  Since 2017, the District Attorney Office's marijuana pretrial diversion program has offered education and rehabilitation programs in instead of criminal processing.  Similarly, the Community Supervision and Corrections Division  offers court-supervised probationers a full range of substance abuse treatment from group counseling to intensive residential treatment.  Causal factors for the sharp reductions in drug and burglary re-arrests is not fully understood, but a direct link to pretrial release practices would seem tenuous at best.

Together, re-arrests for impaired driving and assaults have nearly doubled since the Consent Decree, increasing from 9% before Rule 9 to 16% after.  Before attributing the rise in these serious charges to a failure of unsecured bonds, though, it is instructive to consider the larger perspective. Figure 27 shows impaired driving and assault charges have risen from less than one-third of all misdemeanor arrests in 2015 to more than half in 2020; initial arrests in these two charge categories grew 85% over six years.  With such strong linear growth as a share of *arrests*, it is unsurprising to observe a parallel, though considerably more muted, trend among *re-arrests*.

Ultimately, growth in impaired driving and assaults appears to have an external cause unrelated to the Consent Decree.  Again, the leading explanation may be statistical artifact:  As the number of misdemeanor cases has declined overall, less serious charges are more often unfiled or dismissed.  As a result relative representation of these more serious offenses has increased.  In addition, since 2020, effects of the pandemic on excessive drinking and domestic violence likely amplified the occurrence of these charges not only in Harris County, but in Texas and nationally.[39]

Figure 27



<hr />

[38] Data from 29 US cities shows both burglaries and drug offenses have trended downward since 2018. See https://crime-data-explorer.app.cloud.gov/pages/explorer/crime/property-crime; and Rosenfeld, Richard, and Ernesto Lopez. "Pandemic, social unrest, and crime in US Cities." *Council on Criminal Justice* (2020).
[39] Boman, John H., and Owen Gallupe. "Has COVID-19 changed crime? Crime rates in the United States during the pandemic." *American journal of criminal justice* 45, no. 4 (2020): 537-545.

Overall, then, changes in re-arrest charges seem largely unrelated to ODonnell pretrial release practices. Most of these alterations can be explained by statistical artifact, by state and national trends, or possibly by practices implemented in other Harris County departments. Re-offenses among vulnerable populations may be an exception, since service linkages to stabilize individuals in the community can be difficult to achieve with speedy pretrial release. This may be an area where further improvement in pretrial processing is possible, ideally without undermining the key principles and requirements of Rule 9.

**c. Severity of Re-Arrest Charges**

Another way to assess outcomes attributable to the Consent Decree is in terms of re-offense severity. Even though the amount of repeat arrests has fallen after Rule 9, this does not answer whether filings have grown more dangerous. We explore this question using the level and degree of charges prosecuted.

Table 17 reviews the distribution of arrests and re-arrests by level and degree before and after Rule 9. It is initially apparent that misdemeanor arrests have increased in severity, with Class A Misdemeanor charges rising by 11 percentage points after 2019. The most relevant and important observation, however, is a 3 percentage point decline in 365-day re-arrests after the Consent Decree (from 74% of arrests before Rule 9 to 77% after). Beyond these main conclusions other clear trends are more difficult to discern.

Table 17. Highest Re-Arrest Offense Charged Before and After Rule 9

| | Misdemeanor Arrests | | Re-Arrests | |
| --- | --- | --- | --- | --- |
| | Before Rule 9 2015-2018 (n=199,590) | After Rule 9 2019-2021 1H (n=86,303) | Before Rule 9 2015-2018 (n=199,590) | After Rule 9 2019-2021 1H (n=86,303) |
| No Re-Arrest | --- | --- | 74% | 77% |
| Class B Misdemeanor | 60% | 49% | 7% | 4% |
| Class A Misdemeanor | 40% | 51% | 7% | 6% |
| State Jail Felony | --- | --- | 6% | 4% |
| 3rd Degree Felony | --- | --- | 3% | 4% |
| 2nd Degree Felony | --- | --- | 2% | 3% |
| 1st Degree Felony | --- | --- | 1% | 1% |
| Capital Felony | --- | --- | 0% | 0% |

To more concisely measure any shift in offense level and degree, a complementary analysis strategy was used. For each misdemeanor arrest, two numeric values were assigned for (a) the highest arrest charge filed and (b) the highest re-arrest charge filed within 365 days. The values and assignment strategy are presented in Table 18. After converting offense levels to numeric form, changes in the average were used to track whether, in the aggregate, charge level and degree went up or down over time. This approach yields more concise results than percentages, and more easily accommodates the aggregate effect of "0" values for the growing share of arrests with no new charges filed.

Table 18.  Charge "Level-Degree" Values and Assignment Strategy

|  | ARREST | RE-ARREST |
|---|---|---|
|  | Each misdemeanor arrest was assigned a code for the highest charge filed | Each re-arrest within 365 days was assigned a code for the highest charge filed |
| No New Charges Filed | -- | 0 |
| Class B Misdemeanor | 1 | 1 |
| Class A Misdemeanor | 2 | 2 |
| State Jail Felony | -- | 3 |
| Third Degree Felony | -- | 4 |
| Second Degree Felony | -- | 5 |
| First Degree Felony | -- | 6 |
| Capital Felony | -- | 7 |

Results presented Figure 28 confirm that, for *arrests*, "level-degree" scores rose from 1.37 in 2015 to 1.55 in the first half of 2021.  This means more initial Class B misdemeanors with a score of "1" were filed in the earlier years, but over time, a growing share of Class A or higher charges pulled average values closer to a "2."  The same data for *re-arrests*, shows a similar trend.  Mean "level-degree" scores trended slightly upward, from an average 0.52 per misdemeanor re-arrest in 2015 to 0.67 on average after 2019.  The average is below the Class B value of "1" because so few misdemeanor defendants – only about one-in-four – are re-arrested within a year.  As more cases have "0's" entered as the re-arrest value, the resulting scale score is pulled closer to lower below "1."

Figure 28



Even though there are fewer re-arrests following misdemeanor charges since the Consent Decree, then, on average those that have been filed have increased in severity.  Importantly, because arrest charges and re-arrest charges have moved upward together, both appear to be driven by a common set of external causes independent of Rule 9.  A leading explanation noted here and elsewhere in this report is the changing composition of cases being filed:  As up to 20% fewer misdemeanors have been prosecuted in recent years, lower-level charges are increasingly dropped, leaving the more serious violations to rise as a share of all filings.  There may be other contributing

factors as well, COVID-related crime trends among them, but pretrial processes do not seem a primary cause.

### 3. Costs of Misdemeanor Arrests and Re-Arrests

The data thus far have revealed several striking trends since the Consent Decree became policy in Harris County: (1) declines in the number of misdemeanor arrests, (2) a smaller share of arrests followed by new charges in 365 days, and (3) declines in the number re-arrests. These trends all work together not only to improve public safety but also to help contain costs. Various expense categories, each with their own levers for change, are affected differently. The following paragraphs describe cost impacts for Harris County criminal justice departments, the accused, and victims.

While the preceding data has considered re-arrests for all cases filed through June 31, 2021 irrespective of disposition, the cost analysis is based on the subset of cases disposed up to June 31, 2022. This is done so full information is available to estimate expense, but results are potentially affected by the cases omitted. The number of arrests in the disposed and undisposed analysis samples is described in Table 1, above.

### a. Harris County Case Processing Costs

For the Fourth Monitor Report, we extracted detailed budget and case count information from official documents and county criminal justice departments and combined our findings with case data to produce a cost per event for key milestones. The resulting estimates are presented in Table 19.

Table 19.  Estimated System Cost Per Case Processing Milestone

| Event | Cost per Occurrence |
|---|---|
| Initial Arrest | $293 |
| Booking | $472 |
| Pretrial Screening | $14/GOB or SB7 bond<br>$83/secured bond or other type |
| Trial Court Setting | $54 |
| Pretrial Detention | $74/person/day |

These "per event" cost estimates have been used to ascertain changes in costs of criminal cases in Harris County before and after Rule 9. In the current report, we use this same framework to explore a different question: Has greater use of unsecured pretrial release under the Consent Decree increased costs as a result of repeat arrests due to bond failure?

As in the preceding sections, costs were aggregated at the "arrest" level, combining costs for all charges filed against the same person on the same date. Average costs were then calculated separately for initial misdemeanor arrests and for all re-arrests up to one year later. The expectation is that declines in re-arrests under Rule 9 measured in preceding analyses mean associated costs will also be favorably impacted.

56

Figure 29 summarizes Harris County spending for both misdemeanor arrests and for re-arrests within 365 days.  While costs for initial misdemeanor case filings have trended downward in recent years, even greater savings accrue from the sharp reductions in re-arrests.  Costs per re-arrest for felony or misdemeanor charges peaked at $1,715 in 2017 but were nearly 40% lower ($1,079) by 2020.

Figure 29



Figure 30 provides a detailed breakdown of underlying expenses.  New charges within a year of misdemeanor arrest require much lower expenditures for arrest, booking, pretrial screening and court settings.  However, the most notable difference between arrest and re-arrest expenses is detention costs.  Because there are more jail days following bond failure, detention is the largest expense for a new arrest.  It is worth noting, though, that since the Consent Decree, jail days for re-arrestees have significantly declined, cutting total cost per re-arrest by one-third.

Figure 30



**b. Costs to Defendants**

Involvement in the criminal justice system exacts a high financial toll on the defendants involved. Table 20 shows most costs are traceable to the effects of secured bond and detention. Each day a person spends in jail, they and their family members accrue both tangible and intangible losses because of lost employment, inability to perform family-related duties, and even the risk of violent assault while behind bars. Moreover, studies have linked these costs to increased susceptibility to future arrests. To the extent that Rule 9 has decreased time spent behind bars, it has ameliorated these devastating impacts on the criminally accused.

Table 20. Estimated Cost to Defendants

| Event | Cost per Occurrence |
|---|---|
| Pretrial Release | Surety Bond:  10% of face amount |
| | Cash Bond:  2% of face amount |
| | Unsecured Bond:  $0 |
| Loss of Earnings | $29,000 lifetime loss if 3+ days in pretrial detention |
| Loss of Partner Benefits | $271/day detained |
| Loss of Child Support | $23/day detained |
| Violent Assault in Detention | $17/day detained |

58

Figure 31



Figure 31 shows that costs to the accused for both arrest and re-arrest have been on an increasingly downward trajectory since implementation of Rule 9. Average cost for an initial misdemeanor arrest is 28% lower since 2019 ($6,772) than in the years before ($9,452). Re-arrest costs to defendants have declined even more sharply – by nearly 40% compared to before Rule 9.

Figure 32



Figure 32 offers additional detail to help explain the contributing facors. Loss of partner assistance and lifetime earnings losses are by far the most important sources of defendant costs for both arrests and re-arrests. With re-arrestees facing more pretrial jail days, these personal costs are significantly amplified with new charges.  Dramatic declines in incarceration under Rule 9 have greatly decreased these expenses, but detention remains the single most potent driver of cost burden for defendants.

**c. Costs to Crime Victims**

Crime victim costs are an important new addition to the information being developed by the Monitor team.  Cost data was compiled based on information from Harris County case records, the Texas Department of Public Safety, the FBI's NIBRS offense categorization system, and the academic research literature.[40]  Upon conclusion of this work, each criminal case in the Harris County dataset was assigned a cost estimation for victim impact incorporating key expense domains: including medical, mental health, productivity, property loss, public services, and quality of life. Detailed discussion of methods and costs is available in Appendix F. Once determined, a value for victim costs was assigned to each misdemeanor-only arrest. Additional victim costs were summed separately for subsequent re-arrests within 365 days.  Findings in Figure 33 report both of these values.

---

[40] Miller, Ted R., Mark A. Cohen, David I. Swedler, Bina Ali, and Delia V. Hendrie. "Incidence and Costs of Personal and Property Crimes in the USA, 2017." *Journal of Benefit-Cost Analysis* 12, no. 1 (2021): 24-54.

Figure 33



The most striking initial observation is the consistent rise in costs of misdemeanor arrests over time. Victim costs have grown by nearly 50% since 2015, peaking in 2020 at an average $13,726 per arrest before declining in the first half of 2021. This rise in cost is almost entirely attributable to the increasing share of misdemeanor filings in two of most expensive victim categories: assault and impaired driving (see Figure 27). While other misdemeanor charges vary between $67 and $17,000, these violations cost victims an average $25,619 and $22,648 respectively. And as the percentage of assault and arrest charges has risen from 29% in 2015 to 54% in 2020, victim costs have gone up in tandem.

Importantly, the high and rising victim costs attributed to misdemeanor assault and impaired driving *arrests* are distinct from the costs of *re-arrest* which are more clearly linked to practices under the Consent Decree. As more arrestees have been released on unsecured General Order Bonds, victim costs for new charges seem largely unaffected, remaining stable at about $4,500 per misdemeanor re-arrest on average.

## 4. Conclusion

This section of the Monitor Report has explored the secondary consequences of Consent Decree protocols authorizing prompt unsecured pretrial release on re-arrests and costs. Findings show that the number of new arrests within 365 days of a misdemeanor has declined since the implementation of Rule 9. At the same time, both arrests and re-arrests are generally increasing in severity. We posit that this trend is related to overall declines in the number of cases filed; as lesser charges are dismissed, more severe charges increase as a share.

Costs of initial misdemeanor arrests and re-arrests have trended downward for Harris County criminal justice departments and defendants. While costs to crime victims have increased, the source is initial arrests for high-cost impaired driving or assault charges. Victim costs for re-arrests, which are more directly impacted by Rule 9, are effectively unchanged.

**B.  Project Management**

PPRI is also charged with maintaining information necessary to manage the monitorship and assure careful tracking of Consent Decree implementation.  The project management function is at the operational center of the monitorship, receiving real-time progress updates from the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved.  We owe a debt to the Office of Justice and Safety team for assisting with this work and for keeping us apprised of progress being made in departments across the County.  A status summary of Consent Decree requirements due in this reporting period is presented in Appendix H.

**APPENDIX**

**A. The Monitorship Structure**

**1. Monitorship Goals**

As described in our first report, the ODonnell lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, prevention of the needless suffering of vulnerable people, and the promotion of public safety. After three years of litigation, the parties reached a settlement consisting in this landmark Consent Decree, approved on November 21, 2019.[41] The ODonnell Consent Decree represents the first federal court-supervised remedy governing bail. The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of people arrested for misdemeanor offenses.[42]

First, under the Consent Decree, <u>people arrested for low-level misdemeanors are promptly released</u>. The Consent Decree incorporates the new Harris County Criminal Courts at Law (CCCL) Rule 9, which sets out bail policies.[43] Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds. Allowing this group to be quickly released without paying allows them to return to their jobs, take care of their children, and avoid the trauma and danger of incarceration.

Second, the Consent Decree has brought about more rigorous bail hearings with greater attention paid to the issues that matter—whether a person should be released and on what least-restrictive conditions—though much work remains to ensure the hearings and the recorded findings comply with Rule 9 and the Consent Decree. Persons arrested for misdemeanors that fall within the list of carve-out offenses must receive a magistration hearing, complying with Rule 9, at which there must be clear and convincing evidence supporting the pretrial conditions set and any decision to detain a person. All misdemeanor arrestees have access to a public defender to represent them at that hearing. Counsel has access to the client and information needed to prepare for the hearing. New trainings on the Consent Decree policies are being conducted. Completed work to study indigent defense in misdemeanor cases will inform plans and standards for misdemeanor representation, including to ensure that defense lawyers have access to social workers, investigators, and other support staff necessary to provide effective representation to people arrested for misdemeanor offenses.

Third, following this pretrial stage, misdemeanor arrestees now benefit from a defined set of court appearance rules that, with limited exceptions, is uniform among the 16 misdemeanor courts. The Consent Decree sets out a new process for waiving or rescheduling appearances. People can change some court dates so they can make it to court without undue hardship due to illness, lack of

---

[41] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019), ECF 708 [hereinafter, Consent Decree].

[42] *Id.* at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").

[43] Rules of Court, Harris County Criminal Courts at Law, Rule 9 (as amended through April 22, 2020), at http://www.ccl.hctx.net/attorneys/rules/Rules.pdf; Consent Decree ¶ 30.

childcare and other issues. Further, a new court notification system is to be built by Harris County. New work will study the causes of non-appearance and improve the ability to address those causes.

Fourth, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[44] The Consent Decree provides for public meetings and input, Harris County reports to be published every sixty days, and for Harris County to make information available online regarding the implementation of the Decree.[45]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented.  After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020.  As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree.  Key elements of the Consent Decree have now been implemented. Important work also remains, and all involved look forward to the work to come, as we build a model misdemeanor pretrial system in Harris County.

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system. This system is intended to restore the public's trust, safeguard constitutional rights, and accomplish the aims of bail: to maximize pretrial release while keeping the community safe and promoting the integrity of the judicial proceedings by preventing persons from fleeing justice.  Thus, as the Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[46]  From the Consent Decree, we distilled nine guiding principles:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – We view accountability as part of an ongoing process of systemic evaluation and improvement with community participation.

(3) **Permanency** – We must not only evaluate progress, but also ensure that the administrative measures, policies, and processes, can work well long-term.

(4) **Protecting constitutional rights** – We must protect civil and human rights, including the constitutional rights of arrestees.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

---

[44] Consent Decree, *supra*, at ¶83-85.
[45] *Id.* at ¶87-88.
[46] Consent Decree, supra, at ¶1.

64

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We must seek to maximize pretrial liberty and to minimize criminal legal involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, we should establish a system that is self-monitoring and can make ongoing improvements.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

## 2. The Monitor Team

Our interdisciplinary team includes experts in law, social science, behavioral health, economic analysis, indigent defense, and project management.  Team biographies are included in Appendix B.  The team includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael, Iftekhairul Islam, and Andrea Sesock  (Public Policy Research Institute at Texas A&M University)

- Marvin Swartz and Philip J. Cook (WCSJ at Duke University)

- Songman Kang (Hanyang University)

Our full organization chart is also included in Appendix C.



### 3. Consent Decree Authority

This Report contains the Monitor's review of compliance for the fourth six month time period that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.

Further, the Consent Decree states in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:

> a. A description of the work conducted by the Monitor during the reporting period;

> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;

> c. The methodology and specific findings for each compliance review conducted;

> d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

e. A projection of the work to be completed during the upcoming reporting period;

f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;

g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;

h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:

> i. Maximizing pretrial liberty;
> ii. Maximizing court appearance; and
> iii. Maximizing public safety; and

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds:

The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Our Monitor Work Plans are divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117. As in our first two reports, we have divided this report into three parts, reflecting the main components of our work and addressing each subject set out in the Consent Decree: Policy Assessment and Reporting; Cost Study and Project Management; and Community Outreach, Participation, and Working Group.

## B. Community Work Group

The Monitor Team relies on the guidance of a Community Work Group (CWG), a dedicated group of community leaders who represent a diverse set of perspectives and specializations. The CWG meets on a monthly basis with the Monitor Team, as well as with various county officials responsible for the implementation of the Consent Decree.



**Hiram A. Contreras** served for 36 years with the Houston Police Department. He retired as Assistant Chief of Police in March 1998. While ascending the police ranks, Mr. Contreras' assignments included the Auto Theft, Juvenile, Recruiting, Planning and Research, Northeast Patrol and Major Offenders. He was promoted to the rank of Assistant Chief July 1991. In the same year as a result of a court ruling, he became the only Latinx person to attain the rank of Deputy Chief. This was retroactive as of March 1986. As Assistant Chief he directed the Professional Development Command. At retirement he was directing the Special Investigation Command. In his career with HPD, Mr. Contreras established the first HPD storefront in the city and initiated the Culture Awareness Program. In collaboration with the U.S. Marshal's Service, he initiated the Gulf Coast Violent Offenders Task Force. As commander of the Special Investigations Command, he coordinated HPD's participation with the Department of Justice High-Intensity Drug Trafficking Area Program. Also, he coordinated the International Symposium on the Police Administration and Problems in Metropolitan Cities with the Istanbul Police Department in Istanbul, Turkey. As Assistant Chief, Mr. Contreras, at the request of the Police Executive Research Forum, participated in police promotional assessment centers in Chicago, Denver, and San Francisco. Nominated by President William J. Clinton, Mr. Contreras became U.S. Marshal for the Southern District of Texas in 1998 and served until 2002. His consulting business, Art Contreras & Associates – LLC, specializes in human resource and marketing principles.



**J. Allen Douglas** is the executive director of the Downtown Redevelopment Authority (DRA). In addition, he performs the duties of general counsel for the organization and its related entities Central Houston and the Downtown District. Prior to joining the DRA, Allen practiced law for more than 20 years, beginning his career as a law clerk at Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. in Houston. He worked for the United States Court of Appeals, Sixth Circuit and the United States District Court, Northern District of Ohio in Cleveland, Ohio. Most recently he was an associate attorney at Littler Mendelson, P.C. and assistant county attorney with the Harris County Attorney's office where he focused on appellate labor, employment, and civil rights cases. Allen has also served as vice-chair of the Midtown Management District's board of directors since June 2015, as well as chair of the organization's Urban Planning Committee.



**Guadalupe Fernández** joined the Houston Office of Tahirih Justice Center in 2015 and serves the Policy and Advocacy Manager. She leads the development and advancement of Tahirih's local and state-wide advocacy projects to transform the policies and practices that impact immigrant survivors of gender-based violence. Guadalupe joined Tahirih as the Children's Legal Advocate. Prior to Tahirih, she worked at Catholic Charities Houston as the Lead Legal Caseworker for the Child Advocacy and Legal Services Program. In Washington DC, Guadalupe was on the steering committee of the DC Detention Visitation Network and completed internships at the Lawyers' Committee for Civil Rights Under Law and the Central American Resource Center. Currently, she serves on the Public Policy Committee for the Texas Council of Family Violence, the Immigration and Racial Equity taskforces of the Texas Family Leadership Council, and the Harris Co. Housing Stability Taskforce. She is a graduate of the Advocacy Learning Center hosted by Praxis International and Camp Wellstone. Guadalupe is the proud daughter of immigrants and a first-generation college graduate from Georgetown University.

She is a Fully Accredited Representative through the Department of Justice and is allowed to practice before both DHS and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals.



**Tara Grigg Green** (formerly Garlinghouse) is the Co-Founder and Executive Director of Foster Care Advocacy Center. Prior to founding Foster Care Advocacy Center, Tara was a Staff Attorney and Skadden Fellow in the Houston office of Disability Rights Texas.  There, she helped develop the Foster Care Team to provide direct representation to foster children with disabilities in state child welfare cases, special education litigation and Medicaid appeals. She authored an Amicus Brief in *M.D. v. Abbott*—class action litigation seeking to reform the Texas foster care system—cited by the Fifth Circuit in affirming the State's liability. She has consulted on child welfare policy issues for organizations such as Casey Family Programs, the ABA Center on Children and the Law, the Texas Children's Commission, and the United States Children's Bureau. Tara has published law review articles and research papers on the constitutional rights of children and families and quality legal representation in child welfare proceedings.  Her passion for this field comes from her family's experience as a foster family caring for over one hundred foster children. She has received many awards and was recently named the National Association of Counsel for Children's Outstanding Young Lawyer. Tara clerked for the Hon. Micaela Alvarez of the U.S. Southern District of Texas in McAllen. She holds a J.D. from the University of Pennsylvania Law School where she was a Toll Public Interest Scholar, a M.P.P. from the Harvard Kennedy School of Government where she was a Taubman Fellow, and a B.A. from Rice University.



**Frances E. Isbell** is the Chief Executive Officer of Healthcare for the Homeless – Houston (HHH), a Federally Qualified Health Center providing care for 8,500 people annually.  As the inaugural CEO of Healthcare for the Homeless – Houston, Ms. Isbell has been instrumental in bringing together a large number of community-based agencies, healthcare clinicians, educational institutions, and public organizations to forge a common strategic plan to effectively address the health needs of people experiencing homelessness. The primary aim of this consortium is to increase access to quality healthcare while concurrently reducing costly and ineffective service duplication.  Since joining this endeavor in 1998, Ms. Isbell has received numerous local and national awards and recognitions for her work, and two of HHH's programs have been cited as a national best practice.  Previous to this position, Ms. Isbell had a private practice in therapeutic counseling and taught Sociology at Houston Community College, North Harris College, and Sam Houston State University.  She also has worked as a consultant in organizational development and has worked in clinical administration within large hospital systems.  Ms. Isbell holds undergraduate and graduate degrees in Social Rehabilitation/Pre-Law and Behavioral Sciences, respectively.



**Jay Jenkins** is the Harris County Project Attorney at the Texas Criminal Justice Coalition. Since joining TCJC in 2014, he has promoted broad youth and adult justice reforms in Houston and the surrounding areas. Jay received his J.D. from Northwestern University School of Law, graduating *magna cum laude* in 2009. While at Northwestern, he worked at the Bluhm Legal Clinic's Children and Family Justice Center, focusing on a number of youth justice issues. In his third year, Jay was the lone law student at the newly formed Juvenile Post-Dispositional Clinic, where he promoted policy reform throughout Chicago while also advocating on behalf of juvenile clients. Jay was admitted to practice law in the State of Illinois and worked as a civil litigator in the private sector for three years. At TCJC, Jay has researched and pursued reforms related to over-policing and prosecution, while also reimagining the local bail system and supporting indigent defense, and he was instrumental in the development of a first-of-its-kind data dashboard that visualizes more than one million criminal case outcomes in Harris, Dallas, Bexar, and Travis Counties. Jay additionally serves as co-founder and President of the Convict Leasing and Labor Project, which launched in 2018 to expose the history of the convict leasing system and its connection to modern prison slavery.



**Terrance "TK" Koontz** currently serves as Statewide Training Coordinator for the Texas Organizing Project. His path to service began after he was arrested in 2010. While sitting in the Harris County Jail, he witnessed the mistreatment of black and brown people and realized that the criminal justice system was essentially about class and racial oppression. Koontz walked away as a convicted felon. Since that time, he has worked without cease to reestablish his life by fighting as an activist and organizing for criminal justice reform. His passion for criminal justice reform is rooted in his experience growing up in communities that were plagued with crime, poverty, and over-policing. In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement. He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County that helped to elect Brian Middleton, the first African American D.A. in Fort Bend County history. He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator. He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service. Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.



**Johnny N. Mata** currently serves as the Presiding Officer of the Greater Houston Coalition for Justice, a coalition of 24 diverse civil rights organizations. Through the coalition, Mr. Mata has supported changes in policing use-of-force policies and called for the creation of a citizen review board. He led the effort to reform the Texas grand jury selection process and has strived to improve relations between the police and communities of color. He has also advocated for bail bond reform, victim's rights, protecting the voices of residents affected by community development, and promoting the hiring of Latinx educators and administrators. He served two terms as Texas State Director of the League of Latin American Citizens (LULAC) and six terms as a District Director of LULAC. He worked for 32 years as a community director and human resources professional with the Gulf Coast Community Services Association. He organized the community to create the Latino

70

Learning Center and served as a founding board member.  Mr. Mata has received the NAACP President's Award, the OHTLI Award from the Republic of Mexico, the Hispanic Bar Association Lifetime Achievement Award, the Willie Velasquez-KTMD Telemundo Channel 48 Hispanic Excellence Award, Antioch Baptist Church Martin L. King Justice Award, and numerous others. The Houston Community College System awarded him an honorary Associate in Arts Degree in recognition of his achievements in promoting education in the Latinx community.



**Maureen O'Connell**, M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Sister Maureen created a successful program that has empowered hundreds of women using a standard of care other programs could emulate. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; and more than 40 years as a Dominican Sister, a religious order known for its commitment to social justice.  She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director of Angela House for 17 years, retiring in 2018 and joining the Board of Directors in 2019.



**Timothy N. Oettmeier** most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer. As Executive Assistant Chief of Police, he was assigned to the Investigative Operations Command supervising the Special Investigations Command consisting of Auto Theft, Gang, Major Offenders, Narcotics, Vehicular Crimes, and Vice Divisions; the Criminal Investigations Command consisting of the Burglary and Theft, Homicide, Investigative First Responder, Juvenile, Robbery, and Special Victims Divisions; and the Technology Services Command.   He was a principal architect for implementing community policing throughout the agency.  He received his Ph.D. in Police Administration from Sam Houston State University in 1982.  He helped oversee national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training.  He authored department reports, and articles for textbooks and journals on police management issues.  Early in his career, the 100 Club of Houston recognized him as an Officer of the Year.  Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services.  He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from The 100 Club of Houston.



**Sybil Sybille**, a Texas Advocates for Justice Fellow, is a military veteran, who is a survivor of childhood sexual violence and stabbing, as well as sexual assault in the military.  During her life, she nearly died of drug overdoses on seven occasions.  Convicted of organized crime, she served time in a Texas prison.  Since her release, she completed a college certificate program and was certified in 2015 by the Texas Department of Health Services to provide Peer Recovery Coach Training.  In 2017, she received a training certificate in Veterans Court Advocacy and Mentoring for Peers.  In 2018, she was a graduate of the Texas Southern University Anthony Graves Smart Justice Speakers Bureau.  In 2019, Ms. Sybille was named a Fellow for Texas Advocates for Justice and Grassroots.org.  Through that work she has testified before the Texas legislature regarding a bill to support trauma-informed training for staff within the criminal justice and juvenile justice systems. She is currently working on a portfolio to advocate for "banning the box" to eliminate the check box on job applications which requires disclosure of criminal convictions.  She believes this practice poses the greatest barrier for those reentering society.

## C. Monitor Team Bios

**University of Houston Law Center**

**Sandra Guerra Thompson** is the Newell H. Blakely Chair at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019.  In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions.  Her scholarly articles address issues such as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations.  Professor Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project.  Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

**Duke University**

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018.  He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005.  Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes.  Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers.  Garrett's research and teaching interests include criminal procedure, wrongful convictions, habeas corpus, scientific evidence, and constitutional law.  Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers,

law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures.  Garrett founded and directs the Wilson Center for Science and Justice at Duke.

**Marvin S. Swartz, M.D.** is the Professor and Head of the Division of Social and Community Psychiatry, Director of Behavioral Health for the Duke University Health System and Director of the Duke AHEC Program. Dr. Swartz has been extensively involved in research and policy issues related to the organization and care of mentally ill individuals at the state and national level. He was a Network Member in the MacArthur Foundation Research Network on Mandated Community Treatment examining use of legal tools to promote adherence to mental health treatment and led the Duke team in conducting the first randomized trial of involuntary outpatient commitment in North Carolina and the legislatively mandated evaluation of Assisted Outpatient Treatment in New York. He co-led a North Carolina study examining the effectiveness of Psychiatric Advance Directives and the NIMH funded Clinical Antipsychotics Trials of Intervention Effectiveness study.  He is currently a co-investigator of a study of implementation of Psychiatric Advance Directives in usual care settings, an evaluation of implementation of assisted outpatient treatment programs and a randomized trial of injectable, long-acting naltrexone in drug courts. Dr. Swartz has done a range of work regarding diversion from jail, including among populations of co-occurring substance abuse and mental health disorders. Dr. Swartz was the recipient of the 2011 American Public Health Association's Carl Taube Award, the 2012 American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research and the 2015 Isaac Ray Award from the American Psychiatric Association for career contributions to forensic psychiatry.

**Philip J. Cook, ITT/Sanford Professor of Public Policy and Professor of Economics and Sociology at Duke University.** Cook served as director and chair of Duke's Sanford Institute of Public Policy from 1985-89, and again from 1997-99. Cook is a member of Phi Beta Kappa, and an honorary Fellow in the American Society of Criminology. In 2001 he was elected to membership in the Institute of Medicine of the National Academy of Sciences.  Cook joined the Duke faculty in 1973 after earning his PhD from the University of California, Berkeley. He has served as consultant to the U.S. Department of Justice (Criminal Division) and to the U.S. Department of Treasury (Enforcement Division). He has served in a variety of capacities with the National Academy of Sciences, including membership on expert panels dealing with alcohol-abuse prevention, violence, school shootings, underage drinking, the deterrent effect of the death penalty, and proactive policing. He served as vice chair of the National Research Council's Committee on Law and Justice. Cook's primary focus at the moment is the economics of crime. He is co-director of the NBER Work Group on the Economics of Crime, and co-editor of a NBER volume on crime prevention. Much of his recent research has dealt with the private role in crime prevention. He also has several projects under way in the area of truancy prevention. His book (with Jens Ludwig), *Gun Violence: The Real Costs* (Oxford University Press, 2000), develops and applies a framework for assessing costs that is grounded in economic theory and is quite at odds with the traditional "Cost of Injury" framework. His new book with Kristin A. Goss, *The Gun Debate* (Oxford University Press 2014) is intended for a general audience seeking an objective assessment of the myriad relevant issues.  He is currently heading up a multi-city investigation of the underground gun market, one product of which is a symposium to be published by the *RSF Journal* in 2017. Cook has also co-authored two other books: with Charles Clotfelter on state lotteries (*Selling Hope: State Lotteries in America*, Harvard

University Press, 1989), and with Robert H. Frank on the causes and consequences of the growing inequality of earnings (*The Winner-Take-All Society*, The Free Press, 1995). *The Winner-Take-All Society* was named a "Notable Book of the Year, 1995" by the *New York Times Book Review*.  It has been translated into Japanese, Chinese, Portuguese, Polish, and Korean.

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems.  Moreover, she is knowledgeable and experienced in the operation of local governments.  Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures.  Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019.  In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**Iftekhairul Islam, PhD,** is an **Assistant Research Scientist** at the Public Policy Research Institute at Texas A&M University. Mr. Islam earned his Bachelor's degree in Engineering from Bangladesh University of Engineering and Technology and Master's degree in Finance from the University of Texas at Dallas. He completed PhD in Public Policy and Political Economy from the same university in 2021. He is trained in the latest experimental and quasi-experimental research methodologies, and has extensive experience with data management and analysis of large and complex data sets across different areas including criminal justice, education, and health. Mr. Islam is proficient in GIS and spatial analytics as well. His recent research covers profiling/detecting prospective voters and donors from Collin and Dallas Counties using spatial tools.

**D. Organizational Chart**



Brandon L. Garrett
Monitor
Sandra Guerra Thompson
Deputy Monitor
Cost Study:
Dottie Carmichael
Texas A&M, PPRI
Duke Center for Science and Justice
Community Working Group
Iftekhairul Islam
Andrea Sesock
Texas A&M PPRI Staff
Thomas Maher, Executive Director
Duke Graduate Students
Phil Cook, Duke
Sanford School
Marvin Swartz, Duke Psychiatry
University of Houston Law Center support staff
Houston Monitor Team Office
Office Assistant
Investigator
Post-Doctoral Fellow(s)
Data Analyst(s)
Research Assistants
Admin Staff
Duke Grant Suppor Staff

## E. Year 3 Statement of Work

### *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, as Monitor, and Professor and Sandra Guerra Thompson, University of Houston Law Center, as Deputy Monitor, with the support team members at the Public Policy Research Institute at Texas A&M University, as well as the Center for Science and Justice (CSJ) at Duke University, were appointed to serve as the Monitor Team for the *ODonnell* Consent Decree.

In January 2019, after an initial preliminary injunction order, which took effect June 6, 2017, and following an appeal, Harris County, the misdemeanor judges, and the sheriff promulgated new bail rules, requiring the prompt post-arrest release on unsecured bonds of the vast majority of people arrested for misdemeanor offenses. Pursuant to the rules, everyone else is afforded a bail hearing with counsel, and most are then also ordered released. These rules provided the foundation for the global Consent Decree, which the parties agreed to in July 2019 and which Chief Judge Rosenthal approved on November 21, 2019. The resulting Consent Decree builds upon the county's new pretrial justice system, so as to bring about lasting change in Harris County. The Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of misdemeanor arrestees. Under the terms of the Consent Decree, the Monitor will serve a key role in bringing each of the component parts together to ensure a holistic and collaborative approach towards pretrial reform. This new system has the potential to become a model for jurisdictions around the country.

The submission to Court included a Proposal and Budget for Year 1 of work, which describes team members, timelines, an organization chart, and a budget for all participants. We provided on May 1, 2020, a work plan for our first year of work. We provided in March, 2021, a work plan for our second year of work.

This Work Plan describes the third year of our work, set out in quarterly deliverables, with a budget of approximately $580,378. As with our prior work plans, this Year 3 Statement of Work is divided into three Deliverables: (1) Policy Assessment and Reporting; (2) Cost Study and Project Management; (3) Community Outreach, Participation, and Working Group.

## Task I: Policy Assessment and Reporting

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree. A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 3, the Monitor will be producing reports, including: a Monitor Report at 30 months and a second report 30 days after year's end. The Monitor will be analyzing data from the county and reporting on these data in reports and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

**Task I:1. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.

**Task I:2. Complete Monitor Report**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

Incorporate work into Monitor Report.

**Task I:3. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

### Task I:4. Complete Year-end Report

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County; including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

Incorporate work into year-end Monitor Report.

### Project Timeline and Staffing.

This work will be conducted between March 3, 2022 and March 2, 2023.

### Monitor Team Personnel:

- **Prof. Brandon Garrett** (Duke Law School)

- **Prof. Songman Kang**.

- **Research assistants** (Duke Law School and University of Houston Law Center)

- **Prof. Philip J. Cook** (Sanford School of Public Policy, Duke University)

### Travel:

78

- Travel: travel to Houston Team Members.

## Task II: Cost Study and Project Management

The cost impacts of bail reform in Harris County are being evaluated by the Public Policy Research Institute (PPRI), a leading interdisciplinary government and social policy research organization at Texas A&M University.  There are a range of costs in the pretrial context – not only costs to the system relating to detention, court appearances, prosecution, indigent defense, pretrial services, monitoring, and re-arrest/recidivism, but also costs to the defendant, families, and the community due to loss of freedom, loss of housing, loss of earnings, loss of benefits of spousal/partner assistance, and harm to physical and behavioral health due to pretrial detention.  The PPRI team will assist the Monitor to understand relevant costs, assess change over time, and help identify cost-effective methods of realizing priorities under the Decree.    PPRI will also document information about community service data and lead the project management efforts of the team. Tasks and deliverables are described below.

## Task II:1. Complete Cost Data Acquisition

PPRI will continue to work with JAD and Monitor team colleagues to acquire, merge, and prepare datasets needed for analysis and statistical modeling.  A number of issues emerging during the 2021-22 contract year a have delayed progress in this work.  Most notably, from May through July of 2021, internal Harris County data governance concerns interrupted JAD progress compiling the necessary data elements for Monitor analysis.  Additionally, negotiations relating to Monitor use of protected health information have prevented planned analyses relating to vulnerable populations.  As a result of these unexpected events, data assembly and cleaning has been set back with corresponding impacts on the cost evaluation.

During the 2022-23 contract year PPRI will collaborate to remediate these setbacks and to incorporate the heretofore unavailable or unvalidated data that is in still being developed.  This includes indigent defense appointments (including court-appointed and contract attorney fees, investigation, experts, and other litigation expenses); pretrial monitoring data; court orders (e.g., for mental health evaluation and treatment or supervision conditions); and defendant address at the time of booking along with geolocation data to assess transportation costs for court and pretrial reporting.  These data will be used to produce more robust estimates of per-defendant costs and to demonstrate how these costs have changed in amount and composition since the implementation of the Consent Decree.

## Task II:2.  Produce Fifth Six-Month Cost Analysis Report

Cost-related findings based on both existing and newly available data elements will be summarized in a report submitted in September 2022 as the Fifth Six-Month Monitor Report. Analyses will assess general misdemeanor case processing costs as well as specific cost impacts of changes under the Consent Decree.  Results will quantify the relative contributions of independent cost centers and the impact of programs or practices within and between

departments.  The report will summarize major findings, offer recommendations, and propose future directions for continued investigation in support of Consent Decree objectives.  Project partners and stakeholders will be kept informed of cost study findings as needed through brief interim updates shared at stakeholder meetings. This practice will increase accuracy, transparency, and relevance of the work, and will promote timely integration of results to strengthen and calibrate the bail reform process.

## Task II:3.  Continue to Support Community Service Data Acquisition

While core PPRI analyses will assess cost of misdemeanor processing within the Harris County criminal justice systems, a number of social service organizations also offer supports to justice-involved individuals that can mitigate criminality.  The PPRI team will continue to support the Monitor team efforts to understand and acquire this data and to plan future analyses.

In the 2021-22 contract year, the Patient Care Intervention Center (PCIC-TX) was identified as a source of integrated community treatment records for the criminal justice population.  Moreover, the Harris County Public Defender Office (PDO) has efforts underway to access this powerful resource to make holistic service referrals that might improve pretrial outcomes for defendants. The Monitor team hopes to leverage this data integration initiative to assess whether defendant access to community services might ultimately help offset costs of case processing for county criminal justice agencies by improving current case outcomes and reducing future criminal involvement.  PPRI will continue to develop opportunity for these analyses by facilitating ongoing communication and planning between the Monitor team and key parties including PCIC-TX, the Harris County PDO, and others as appropriate.

## Task II:4.  Produce Sixth Six-Month Cost Analysis Report

For the Sixth Six-Month Monitor Report to be submitted March 3, 2022, PPRI will further expand analysis centering on cost aspects of the Consent Decree.  Working with the Monitors, we will identify a menu of informative and useful potential targets for cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources as appropriate.

## Task II:5.  Maintain Project Management Protocol

In their project management role PPRI will facilitate information-sharing and coordination of activities among members of the monitor team and other stakeholder implementing the Consent Decree.  We will assist the Monitor with managing a rolling an agenda of topics for meetings of the Parties, maintain progress notes recording accomplishments and obstacles toward implementing Consent Decree requirements, collaborate with JAD staff to document attainment of tasks and timelines in the cloud-based Monday.com project tracking system, memorialize key work products, and regularly report progress to JAD, the Parties, the Federal Court, and the public through semi-annual status reports on Consent Decree milestones. Costs for this continuous support function will be apportioned evenly across billing for other deliverables over the course of the year.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2022 and March 2, 2023.

- **Texas A&M, Public Policy Research Institute** (**PPRI**) will conduct a multi-year evaluation
- **Dottie Carmichael** (Research Scientist, Texas A&M University, PPRI)
- **Ifte Islam** (Assistant Research Scientist) will replace **Trey Marchbanks** (Research Scientist), Texas A&M University, PPRI
- **Andrea Sesock** (Project Coordinator) will remain on the research team.
- Travel: to Houston for Texas A&M University Team Members

**Task III: Community Outreach, Participation, and Working Group**

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders. The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

**Task III:1. Continued Public Outreach and Participation**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to maintain Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

**Task III:2. Third Public Meeting, Fourth Monitor Report**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

The Monitor Team will review County's plan for upcoming public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

**Task III:3. Convene CWG and Solicit Additional Public Input**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to update Monitor website.

**Task III:4. Fourth Public Meeting, Fifth Six-month Report**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Third public meeting convened.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2022 and March 2, 2023.

- **Sandra Guerra Thompson** (University of Houston Law Center)

**Houston Meeting Costs:**

- <u>Administrative support, food, publicity, space</u>
- <u>Travel</u>: to Houston for Prof. Thompson

**Deliverables**

| Deliverable I | Estimated Dates | Billable Amount |
|---|---|---|
| <u>Task 1:1.</u><br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br><u>Task II:1.</u><br><br>The Monitor Team (PPRI) continues work to acquire, clean, link, and prepare datasets and county department budget records for cost analysis.<br><br>Initial statistical analysis will be conducted in preparation for the cost analysis report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br><u>Task III:1.</u> | June 1, 2022 | $160,199 |

| | | |
|---|---|---|
| Monitoring Plan re: outreach and participation for the second year.<br><br>Convene monthly meetings of Community Working Group (CWG). | | |

| | | |
|---|---|---|
| Begin set up of Houston office.<br><br>Continue to maintain Monitor website. | | |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:2.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into Monitor Report.<br><br><br>Task II:2.<br><br>The Monitor Team (PPRI) produces the Cost Analysis Plan for submission with the third six-month Monitor Report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:2.<br><br>Continue Community Outreach. | August 20, 2022 | $145,546 |

| | | |
|---|---|---|
| Convene monthly meetings of the Community Working Group (CWG). Review County's plan for upcoming public meetings. Incorporate work into third six-month Monitor Report. Updates to Monitor website. | | |

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:3. Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree. Analyze data, including jail data, court data, hearing videos, and judicial opinions. Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation). Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms. Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County. Task II:3. The Monitor Team (PPRI) facilitates community service data acquisition by facilitating ongoing communication and planning between the Monitor team and key parties including PCIC-TX, the Harris County PDO, and others as appropriate. | November 28, 2022 | $117,279 |

| | | |
|---|---|---|
| Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:3.<br><br>Outreach to share results of third six-month Monitor Report.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Updates to Monitor website | | |

| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:4.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into year-end Monitor Report.<br><br>Task II:4. | March 2, 2023 | $157,354 |

| | | |
|---|---|---|
| The Monitor Team (PPRI) produces Year Two Cost Analysis Report reflecting informative and useful targets for research developed in collaboration with the Monitor and Deputy Monitor, and with input from key stakeholders such as the Parties and the Community Working Group.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:4.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Third public meeting convened.<br><br>Continued outreach, with the guidance of the CWG, to local organizations and community groups.<br><br>Incorporate work into fourth six-month Monitor Report.<br><br>Updates to Monitor website. | | |

Total Year 3 Budget: $580,378

## F. Re-Arrest Analysis and Cost Evaluation Data Detail

**Figure 22:  Pretrial Hearing and Release Processes Before and After Rule 9**

| Year | Misdemeanor Arrests | Carveout Arrests | | Carveout Arrests with Unsecured Pretrial Release | | Arrests with Unsecured Pretrial Release | |
|---|---|---|---|---|---|---|---|
| | Number | Number | Percent | Number | Percent | Number | Percent |
| 2015 | 54,408 | 9,680 | 18% | 220 | 0.40% | 4,232 | 8% |
| 2016 | 52,181 | 9,829 | 19% | 376 | 0.70% | 5,287 | 10% |
| 2017 | 45,861 | 9,670 | 21% | 3,319 | 7.20% | 15,744 | 34% |
| 2018 | 47,140 | 11,953 | 25% | 5,910 | 12.50% | 22,282 | 47% |
| 2019 | 41,499 | 11,876 | 29% | 7,773 | 18.70% | 27,997 | 67% |
| 2020 | 30,703 | 11,396 | 37% | 7,852 | 25.60% | 22,081 | 72% |
| 2021 1H | 14,101 | 5,543 | 39% | 3,884 | 27.50% | 10,624 | 75% |

**Figure 23:  Highest Re-Arrest Charge Before and After Rule 9**

| Year | No Re-Arrest | | Misdemeanor B | | Misdemeanor A | | State Jail Felony | | Felony 3rd | | Felony 2nd | | Felony 1st | | Felony Capital | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| 2015 | 40,188 | 73.4% | 4,407 | 8.1% | 3,544 | 6.5% | 3,318 | 6.1% | 1,456 | 2.7% | 1,176 | 2.1% | 632 | 1.2% | 7 | 0.0% |
| 2016 | 38,633 | 73.3% | 4,013 | 7.6% | 3,513 | 6.7% | 3,191 | 6.1% | 1,617 | 3.1% | 1,203 | 2.3% | 544 | 1.0% | 16 | 0.0% |
| 2017 | 34,648 | 73.8% | 3,082 | 6.6% | 3,408 | 7.3% | 2,737 | 5.8% | 1,439 | 3.1% | 1,153 | 2.5% | 497 | 1.1% | 4 | 0.0% |
| 2018 | 36,776 | 74.6% | 2,947 | 6.0% | 3,362 | 6.8% | 2,715 | 5.5% | 1,612 | 3.3% | 1,308 | 2.7% | 558 | 1.1% | 20 | 0.0% |
| 2019 | 35,141 | 76.6% | 2,013 | 4.4% | 2,802 | 6.1% | 2,140 | 4.7% | 1,686 | 3.7% | 1,438 | 3.1% | 615 | 1.3% | 29 | 0.1% |
| 2020 | 28,709 | 75.6% | 1,416 | 3.7% | 2,578 | 6.8% | 1,527 | 4.0% | 1,833 | 4.8% | 1510 | 4.0% | 545 | 1.4% | 25 | 0.1% |
| 2021 1H | 16,286 | 74.8% | 845 | 3.9% | 1458 | 6.7% | 886 | 4.1% | 1112 | 5.1% | 822 | 3.8% | 339 | 1.6% | 16 | 0.1% |

**Figure 24:  Misdemeanor Arrests Followed by Re-Arrest within 365 Days**

| Year | Misdemeanor Arrests | Any Re-Arrest | | Felony Re-Arrest | |
|---|---|---|---|---|---|
| | Number | Number | Percent | Number | Percent |
| 2015 | 54,728 | 14,540 | 26.6% | 7,340 | 13.4% |
| 2016 | 52,730 | 14,097 | 26.7% | 7,458 | 14.1% |
| 2017 | 46,968 | 12,320 | 26.2% | 6,654 | 14.2% |
| 2018 | 49,298 | 12,522 | 25.4% | 7,025 | 14.3% |
| 2019 | 45,864 | 10,723 | 23.4% | 6,558 | 14.3% |
| 2020 | 38,143 | 9,434 | 24.7% | 6,024 | 15.8% |
| 2021 1H | 21,764 | 5,478 | 25.2% | 3,400 | 15.6% |

**Figure 25:  Average Number of Re-Arrests within 365 Days of Each Misdemeanor Arrest**

| Year | Misdemeanor Arrests | Any Re-Arrest Number | Felony Re-Arrest Number |
|---|---|---|---|
| 2015 | 54,728 | 0.46 | 0.17 |
| 2016 | 52,730 | 0.47 | 0.18 |
| 2017 | 46,968 | 0.49 | 0.18 |
| 2018 | 49,298 | 0.44 | 0.18 |
| 2019 | 45,864 | 0.39 | 0.19 |
| 2020 | 38,143 | 0.41 | 0.22 |
| 2021 1H | 21,764 | 0.43 | 0.22 |

**Figure 26:  Re-Offenses Charged Before and After Rule 9; Figure 27:  Share of Misdemeanor-Only Arrests for Impaired Driving and Assault**

| NIBRS Category | Highest Charge for Misdemeanor Arrests | | | | | | | Highest Charges for All Re-Arrests | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Animal Cruelty | 143 | 116 | 113 | 212 | 224 | 248 | 43 | 21 | 35 | 40 | 38 | 35 | 45 | 16 |
| Arson | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 10 | 12 | 20 | 19 | 33 | 21 |
| Assault Offenses | 7078 | 7162 | 6917 | 9152 | 8960 | 9691 | 5250 | 562 | 870 | 991 | 1600 | 1655 | 2276 | 1285 |
| Group B_Disorderly Conduct | 374 | 411 | 380 | 400 | 296 | 666 | 127 | 227 | 350 | 399 | 440 | 420 | 343 | 200 |
| Group B_Liquor Law | 139 | 104 | 90 | 249 | 125 | 51 | 47 | 4 | 27 | 31 | 44 | 25 | 22 | 14 |
| Group B_Nonviolent Family Offense | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 51 | 58 | 64 | 88 | 72 | 40 |
| Other Group B | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 2 | 3 | 8 | 16 | 6 | 5 |
| Bribery/Extortion/Embezzlement | 5464 | 5584 | 5059 | 4390 | 2099 | 1350 | 911 | 3544 | 5354 | 6103 | 6065 | 2710 | 2378 | 1432 |
| Burglary | 87 | 90 | 60 | 84 | 113 | 59 | 42 | 147 | 156 | 178 | 199 | 222 | 151 | 91 |
| Counterfeiting/Forgery | 8404 | 7860 | 3986 | 4469 | 2257 | 904 | 563 | 4233 | 6006 | 6847 | 6545 | 5736 | 4886 | 2660 |
| Drug Violations | 1934 | 2070 | 1921 | 1714 | 1893 | 1038 | 612 | 721 | 1086 | 1238 | 1793 | 1638 | 1451 | 916 |
| Fraud Offenses | 174 | 193 | 105 | 141 | 208 | 120 | 69 | 13 | 17 | 19 | 14 | 39 | 25 | 16 |
| Gambling Offenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 1 |
| Homicide Offenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 19 | 22 | 18 | 21 | 29 | 15 |
| Human Trafficking | 8748 | 8999 | 9868 | 11413 | 12628 | 10988 | 6378 | 718 | 1178 | 1343 | 2068 | 2305 | 2619 | 1468 |
| Impaired Driving | 43 | 51 | 48 | 32 | 43 | 61 | 37 | 1 | 3 | 4 | 6 | 5 | 4 | 2 |
| Kidnapping/Abduction | 9344 | 6483 | 5601 | 5064 | 5735 | 3634 | 1719 | 1859 | 2330 | 2656 | 3215 | 3458 | 2703 | 1814 |
| Larceny/Theft | 0 | 0 | 1 | 4 | 1 | 2 | 0 | 230 | 284 | 323 | 529 | 507 | 497 | 383 |
| MV Theft | 8572 | 8648 | 7982 | 7382 | 6814 | 4826 | 2770 | 3711 | 5274 | 6012 | 6919 | 6527 | 6377 | 3849 |
| Pornography | 5 | 3 | 12 | 8 | 2 | 3 | 1 | 2 | 11 | 13 | 8 | 5 | 5 | 2 |
| Prostitution | 1508 | 1751 | 1511 | 1235 | 1064 | 518 | 399 | 430 | 558 | 636 | 727 | 553 | 350 | 257 |
| Robbery | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 14 | 15 | 17 | 31 | 25 | 45 | 34 |
| Sex Offenses | 0 | 0 | 0 | 0 | 11 | 58 | 46 | 3 | 7 | 8 | 2 | 15 | 12 | 16 |
| Stolen Property | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Vandalism | 1395 | 1480 | 1405 | 1363 | 1413 | 1202 | 734 | 647 | 933 | 1063 | 1218 | 1114 | 1160 | 702 |
| Weapon Laws | 1314 | 1725 | 1907 | 1986 | 1978 | 2724 | 2016 | 552 | 980 | 1117 | 1349 | 1274 | 1409 | 885 |

**Figure 28:  Average "Level-Degree" Scores** *(range 0-7)* **for Misdemeanor Arrests and 365-Day Re-Arrests**

| | Offense Level Rank for Misdemeanor Focus Arrest | | | | | | | Offense Level Rank for Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | 1.37 | 1.38 | 1.42 | 1.44 | 1.47 | 1.54 | 1.55 | 0.52 | 0.53 | 0.53 | 0.51 | 0.62 | 0.69 | 0.70 |
| Median | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trimmed Min. | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trimmed Max | 2 | 2 | 2 | 2 | 4 | 4 | 2 | 4 | 4 | 4 | 4 | 5 | 5 | 5 |
| Trimmed N | 54,728 | 52,730 | 46,968 | 49,298 | 45,864 | 38,143 | 21,764 | 52,913 | 50,967 | 45,314 | 47,412 | 45,220 | 37,573 | 21,409 |
| Untrimmed N | 54,728 | 52,730 | 46,968 | 49,298 | 45,864 | 38,143 | 21,764 | 54,728 | 52,730 | 46,968 | 49,298 | 45,864 | 38,143 | 21,764 |

**Figure 29 and 30:  Cost of Misd. Arrest and 365-Day Re-Arrest to:  Harris County Criminal Justice Departments**

**Total Costs**

| | Cost per Misdemeanor Focus Case | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $1,258 | $1,397 | $1,495 | $1,620 | $1,661 | $1,555 | $1,461 | $1,404 | $1,434 | $1,715 | $1,595 | $1,268 | $1,079 | $747 |
| Median | $1,050 | $1,137 | $1,191 | $1,220 | $1,245 | $1,191 | $1,155 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $83 | $83 | $83 | $83 | $68 | $68 | $81 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $7,304 | $8,345 | $9,314 | $12,782 | $13,874 | $13,723 | $11,865 | $29,069 | $29,322 | $34,604 | $35,198 | $35,931 | $29,693 | $19,277 |
| Trimmed N | 53,540 | 51,428 | 45,134 | 46,446 | 40,789 | 30,057 | 13,769 | 53,587 | 51,339 | 45,141 | 46,368 | 40,760 | 30,063 | 13,809 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Arrest Cost**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $293 | $293 | $293 | $293 | $293 | $291 | $290 | $102 | $102 | $100 | $97 | $86 | $87 | $79 |
| Median | $293 | $293 | $293 | $293 | $293 | $293 | $293 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Trimmed Min. | $147 | $147 | $147 | $98 | $98 | $49 | $73 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Trimmed Max | $293 | $293 | $293 | $293 | $293 | $293 | $293 | $879.27 | $1,025.82 | $1,025.82 | $879.27 | $879.27 | $879.27 | $879.27 |
| Trimmed N | 51,162 | 49,367 | 43,363 | 44,753 | 39,076 | 27,801 | 12,960 | 53,291 | 51,012 | 44,646 | 46,157 | 40,839 | 30,200 | 13,855 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Pretrial Screening Cost**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $88 | $86 | $89 | $89 | $61 | $58 | $57 | $28 | $29 | $32 | $27 | $20 | $20 | $18 |
| Median | $83 | $83 | $83 | $83 | $83 | $83 | $83 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $12 | $2 | $1 | $1 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $194 | $166 | $208 | $203 | $208 | $189 | $180 | $2,075 | $1,079 | $1,494 | $1,107 | $802 | $747 | $945 |
| Trimmed N | 53,571 | 51,576 | 44,868 | 46,131 | 41,011 | 30,478 | 14,030 | 53,389 | 51,056 | 44,961 | 46,140 | 40,280 | 29,880 | 13,741 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Booking Costs**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $314 | $384 | $416 | $397 | $375 | $319 | $325 | $149 | $154 | $167 | $138 | $88 | $80 | $68 |
| Median | $472 | $472 | $472 | $472 | $472 | $472 | $472 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $1,133 | $1,180 | $1,353 | $1,369 | $1,337 | $1,180 | $1,133 | $1,605 | $1,770 | $2,045 | $1,676 | $1,214 | $1,062 | $1,023 |
| Trimmed N | 53,996 | 51,752 | 45,008 | 46,440 | 40,873 | 30,460 | 13,933 | 53,198 | 50,903 | 44,868 | 46,042 | 40,406 | 29,960 | 13,798 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Detention Costs**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $309 | $354 | $353 | $462 | $479 | $448 | $411 | $1,022 | $1,033 | $1,258 | $1,193 | $974 | $792 | $512 |
| Median | $74 | $74 | $74 | $74 | $74 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $5,920 | $6,882 | $7,696 | $11,174 | $12,210 | $12,210 | $10,434 | $27,454 | $27,602 | $32,486 | $33,374 | $34,188 | $28,120 | $17,760 |
| Trimmed N | 53,529 | 51,422 | 45,121 | 46,436 | 40,791 | 30,057 | 13,764 | 53,618 | 51,376 | 45,159 | 46,378 | 40,800 | 30,080 | 13,828 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Court Setting Costs**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $251 | $272 | $320 | $359 | $442 | $445 | $378 | $37 | $39 | $54 | $54 | $59 | $58 | $42 |
| Median | $215 | $215 | $269 | $323 | $376 | $430 | $376 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $968 | $1,021 | $1,129 | $1,290 | $1,452 | $1,344 | $1,075 | $4,570 | $5,484 | $4,785 | $5,376 | $7,634 | $4,570 | $3,656 |
| Trimmed N | 53,620 | 51,243 | 45,067 | 46,406 | 40,890 | 30,238 | 13,904 | 53,292 | 50,989 | 44,742 | 46,001 | 40,537 | 29,977 | 13,788 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Figure 31 and 32:  Cost of Misd. Arrest and 365-Day Re-Arrest to:  Defendants**

**Total Defendant Costs**

| | Cost per Misdemeanor Focus Case | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $9,881 | $10,314 | $8,763 | $8,852 | $7,386 | $6,431 | $6,500 | $11,398 | $11,544 | $12,430 | $11,532 | $8,813 | $7,667 | $5,588 |
| Median | $600 | $661 | $400 | $311 | $311 | $50 | $100 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $70,530 | $74,247 | $71,690 | $82,514 | $83,242 | $83,759 | $78,159 | $174,552 | $177,003 | $203,674 | $200,505 | $201,129 | $178,107 | $130,543 |
| Trimmed N | 53,671 | 51,488 | 45,150 | 46,433 | 40,717 | 30,018 | 13,774 | 53,324 | 51,123 | 44,900 | 46,189 | 40,661 | 29,974 | 13,744 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Loss of Earnings**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $7,248 | $7,385 | $6,589 | $6,463 | $5,329 | $4,507 | $4,677 | $20,605 | $16,916 | $15,083 | $11,021 | $6,805 | $5,898 | $3,531 |
| Median | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $29,000 | $174,000 | $145,000 | $145,000 | $116,000 | $87,000 | $87,000 | $58,000 |
| Trimmed N | 52,919 | 50,616 | 450,08 | 46,411 | 41,021 | 30,285 | 13,914 | 53,132 | 50,542 | 44,592 | 45,663 | 40,172 | 30,096 | 13,782 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Loss of Partner Support**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $1,134 | $1,298 | $1,295 | $1,692 | $1,756 | $1,643 | $1,508 | $14,884 | $13,431 | $12,047 | $9,433 | $6,112 | $3,838 | $1,920 |
| Median | $271 | $271 | $271 | $271 | $271 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $21,700 | $25,226 | $28,210 | $40,959 | $44,756 | $44,756 | $38,246 | $238,429 | $221,883 | $216,186 | $199,640 | $164,106 | $113,925 | $65,371 |
| Trimmed N | 53,529 | 51,422 | 451,21 | 46,436 | 40,791 | 30,057 | 137,64 | 533,34 | 51,085 | 44,902 | 461,78 | 406,82 | 30,060 | 13,829 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Loss of Child**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $96 | $110 | $110 | $144 | $149 | $140 | $128 | $1,265 | $1,141 | $1,024 | $802 | $519 | $326 | $163 |
| Median | $23 | $23 | $23 | $23 | $23 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $1,844 | $2,144 | $2,397 | $3,481 | $3,803 | $3,803 | $3,250 | $20,261 | $18,855 | $18,371 | $16,965 | $13,945 | $9,681 | $5,555 |
| Trimmed N | 53,529 | 51,422 | 45,121 | 46,436 | 40,791 | 30,057 | 13,764 | 53,334 | 51,085 | 44,902 | 46,178 | 40,682 | 30,060 | 13,829 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Defendant Bond Costs**

| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $305 | $301 | $172 | $83 | $48 | $47 | $45 | $944 | $807 | $588 | $480 | $349 | $282 | $127 |
| Median | $200 | $200 | $50 | $50 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $1,900 | $1,768 | $1,255 | $852 | $751 | $950 | $901 | $11,250 | $10,750 | $8,850 | $8,325 | $7,200 | $6,200 | $3,800 |
| Trimmed N | 53,649 | 51,566 | 45,370 | 46,418 | 40,847 | 30,139 | 13,784 | 53,447 | 51,305 | 44,948 | 46,241 | 40,751 | 30,252 | 13,765 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

| Costs of Violence in Detention | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Focus Re-Arrest | | | | | | |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $70 | $81 | $80 | $105 | $109 | $102 | $94 | $924 | $833 | $747 | $585 | $379 | $238 | $119 |
| Median | $17 | $17 | $17 | $17 | $17 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $1,346 | $1,565 | $1,750 | $2,541 | $2,777 | $2,777 | $2,373 | $14,794 | $13,767 | $13,414 | $12,387 | $10,182 | $7,069 | $4,056 |
| Trimmed N | 53,529 | 51,422 | 45,121 | 46,436 | 40,791 | 30,057 | 13,764 | 53,334 | 51,085 | 44,902 | 46,178 | 40,682 | 30,060 | 13,829 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

**Figure 33 and 34:  Cost of Misd. Arrest and 365-Day Re-Arrest to:  Defendants**

| Victim Costs | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cost per Misdemeanor Focus Arrest | | | | | | | Cost per Misdemeanor Re-Arrest | | | | | | |
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 1H |
| Mean | $8,510 | $8,930 | $9,727 | $11,042 | $12,117 | $13,726 | $12,560 | $4,238 | $4,279 | $4,547 | $4,542 | $4,793 | $5,094 | $3,821 |
| Median | $2,959 | $2,959 | $2,959 | $4,263 | $4,263 | $22,648 | $4,330 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Min. | $67 | $67 | $67 | $67 | $67 | $67 | $67 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Trimmed Max | $38,462 | $38,462 | $42,610 | $42,543 | $45,296 | $50,598 | $48,334 | $821,574 | $716,972 | $796,104 | $713,273 | $786,970 | $765,266 | $713,273 |
| Trimmed N | 54,153 | 51,940 | 45,686 | 46,959 | 41,309 | 30,465 | 13,989 | 54,293 | 52,049 | 45,692 | 46,949 | 41,355 | 305,86 | 14,068 |
| Untrimmed N | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 | 54,408 | 52,181 | 45,861 | 47,140 | 41,499 | 30,703 | 14,101 |

94

## G. Crime Victim Cost Methodology

### Offense Classification Data Sources

**NIBRS Offense Classification System -** The National Incident Based Reporting System (NIBRS) is part of the FBI's Uniform Crime Reporting System used to standardize crime statistics at the national level.[47]  NIBRS includes detailed incident-level reporting for 52 specific "Group A" crimes in 23 offense categories.  In addition, information about arrests alone is reported for 7 additional "Group B" offenses.

**Texas Department of Public Safety Crosswalk to Texas Penal Code -** The Texas Department of Public Safety (DPS) collects NIBRS crime statistics from participating in-state law enforcement jurisdictions for reporting to federal authorities.  The DPS Crime Records Division created technical documentation in support of this responsibility that includes a cross-walk of Texas Penal Code offenses to the corresponding NIBRS classification.[48]

**Harris County Criminal Case Records –** The Harris County criminal case data system contains three key variables describing the offense charged in each criminal case:
- "Offense Literal" is an abbreviated text description of the offense
- "Penal Code" is an alpha-numeric reference to the statutory citation
- "Level Degree" indicates the level and degree of each offense being charged: Misdemeanor B or A, State Jail Felony, 3rd through 1st Degree Felonies, and Capital Felony.

### Determination of Offense Costs

In 2021, Miller and colleagues[49] published cost estimates for crime in the US using categories derived from the UCR-NIBRS framework.  Estimates were based on crime incidence and cost data taken from various reporting systems and the peer reviewed literature and reported as the present value of lifetime costs to victims for offenses incurred in 2017.  The monitor team adjusted the 2017 values to 2020 dollars to standardize with costs used elsewhere in this study.

Miller et al. constructed separate estimates for eight categories of expense including lifetime victim medical costs, mental health treatment costs, lifetime victim productivity loss, property loss, public services (i.e., police, fire, EMS, and victim services), adjudication and sanctioning, perpetrator work loss, and quality of life costs based on jury willingness to award compensation.[50]  All of these cost categories were included in our estimation except adjudication/sanctioning and perpetrator work loss which are estimated separately.

---

[47] For more information about the Uniform Crime Report and National Incident-Based Reporting Systems, see https://www.fbi.gov/services/cjis/ucr/nibrs
[48] DPS technical documentation including a download file with Texas offenses mapped to NIBRS classification categories can be found here:  https://www.dps.texas.gov/section/crime-records/nibrs-technical-documentation
[49] Miller, Ted R., Mark A. Cohen, David I. Swedler, Bina Ali, and Delia V. Hendrie. "Incidence and Costs of Personal and Property Crimes in the USA, 2017." *Journal of Benefit-Cost Analysis* 12, no. 1 (2021): 24-54.
[50] Ibid.  The authors describe their sources of data for crime costs in Table 3 (p. 31).  2017 costs per crime by cost category are presented in Table 5 (p. 36-37).

**Assignment of NIBRS Codes to Harris County Offenses**

No key was available in the Harris County criminal case dataset to directly link offenses charged with the Department of Public Safety classification system. The "Offense Literal" and "Penal Code" data fields used to name charges in Harris County are loosely standardized text entries; offenses and/or Penal code citations for the same offense may be entered in different formats from case to case. Therefore, manual matching methods were used to import NIBRS codes assigned to Texas Penal Code offenses into Harris County case records. More than 1,600 distinct felony and misdemeanor offense labels were manually mapped to the official NIBRS category assigned by the state. Three primary decision rules were developed to guide and systemize this process.

**1. Cost Assignment Strategy for Multiple NIBRS Code Sets**

For most Texas offenses, DPS applied a single NIBRS code making assignment of the corresponding cost estimate from Miller et. al straightforward. These offenses and costs are presented in Table G-1 (shown at the end of this appendix). However, in some instances DPS assigned multiple NIBRS codes to account for potentially complex or enhanced offenses. In these instances, a strategy was needed to determine which cost to assign. In general, the following decision rules were used.

- **If multiple assigned codes were from a single cost category**, then category costs were applied. E.g., the category combining "Aggravated Assault (13A), Intimidation (13C)" (charged as Threaten/Exhibit/Use Firearm at School or on a Bus) was assigned the "Assault" cost.

- **If one offense type was clearly dominant,** the leading offense cost was applied. E.g., for the category "Aggravated Assault (13A), Simple Assault (13B), Group B-Other (90Z)" (charged as Taking Weapon from an Officer), the cost of "Assault" was applied without consideration of the "Group B-Other" offense cost.

- **If offenses were grouped and it could not be determined whether they all actually occurred together**, offense costs were averaged. E.g., costs for the offense set "Negligent Manslaughter (09B), Impaired Driving (90D)" (charged as Intoxicated Assault/Manslaughter) were averaged.

- **If grouped offenses would be charged differently in misdemeanor and felony cases**, the cost of the highest charge was taken in misdemeanor cases, and costs were averaged for felony cases. E.g., for the offense set "Arson (200), Assault(13A), Homicide (09A)," (charged as Arson of a Building with Injury or Arson In Manufacture of a Controlled Substance), the highest-cost charge -- Assault -- was used for misdemeanors, while costs for Assault, Arson, and Homicide were averaged for felonies.

Multi-code offenses and cost allocation strategies are detailed in Table G-2 at the end of this appendix.

96

## 2. Cost Assignment Strategy for "Child Maltreatment" Costs

Miller et al. provided separate cost estimates for cases involving child maltreatment.  Adapting an approach originated by Fang and associates,[51] the authors estimated enhanced medical costs (up to four years post treatment), mental health treatment costs, child welfare costs, and up to three years of special education service costs for children needing assistance because of physical, cognitive, or emotional issues, and severe permanent disabilities.

The resulting victim cost estimate – $71,768 after adjustment for inflation – reflects annual costs per child maltreated.  This cost is applied conservatively here as a single (not yearly) amount to increase the expense of eligible offenses that would be under-valued without accounting for the additional harm that accrues to child victims.  Where child maltreatment occurs alongside a higher-cost offense, the larger offense cost is applied; for example, in cases involving child rape, the higher $356,637 estimate for Rape is used.

Table G-3 (at the end of this appendix) illustrates the seven child maltreatment offenses identified in Harris County based on the statutory elements of the offense charged.  Notably, because all child maltreatment offenses are felonies, only factor into estimates of repeat arrests of misdemeanor defendants on future felony charges.

## 3.  Cost Adjustment for Misdemeanor Cases

The victim cost estimates generated by Miller and colleagues average expenses for all victims of a given crime, irrespective of whether they incurred a specific cost or not.  As a result, each NIBRS category encompass a broad range of potential actual costs accrued in individual cases, ranging from $0 to amounts well in excess of the stated estimate.  Consequently, there is no consideration of variations in the amount of harm within each offense category.

At the same time it is generally accepted that misdemeanor offenses, by definition, cause less harm than a felony charge under the same NIBRS classification.  Indeed, the amount of harm caused is considered in determining the filing level and degree.  To increase sensitivity to this appropriate and meaningful difference in valuation, in the research presented here, costs applied to misdemeanor violations were reduced by 20% relative to the same NIBRS offense charged as a felony.  This modest adjustment will adjust the cost of misdemeanor-only charges downward, but will also account for the higher costs incurred by victims when misdemeanor defendants are re-arrested for subsequent felony offenses.

---

[51] Fang, X., D. S. Brown, C. S. Florence, and J. A. Mercy. 2012. "The Economic Burden of Child Maltreatment in the United States and Implications for Prevention." Child Abuse and Neglect: The International Journal, 36(2): 156–165.

**Table G-1.  Cost Estimation for NIBRS Group A and Group B Offense Categories**

| IBR Code | NIBRS Offense Category | NIBRS Offense Description | Crime Against | Cost Category | Cost Estimate in 2020 Dollars | Misdemeanor Cost @ 20% Discount |
|---|---|---|---|---|---|---|
| **Group A Offenses** | | | | **Cost Estimates Applied** (Miller et al., 2021) | | |
| 720 | Animal Cruelty Offenses | Animal Cruelty | Society | All non-violent crime | $1,929 | $1,543 |
| 200 | Arson | Arson | Property | Arson | $38,372 | $30,697 |
| 13A | Assault Offenses | Aggravated Assault | Person | Assault* | $32,024 | $25,619 |
| 13B | Assault Offenses | Simple Assault | Person | Assault* | $32,024 | $25,619 |
| 13C | Assault Offenses | Intimidation | Person | Assault* | $32,024 | $25,619 |
| 510 | Bribery | Bribery | Property | All non-violent crime | $1,929 | N/A |
| 220 | Burglary/Breaking & Entering | Burglary/Breaking & Entering | Property | Burglary* | $3,699 | $2,959 |
| 250 | Counterfeiting/Forgery | Counterfeiting/Forgery | Property | All non-violent crime | $1,929 | $1,543 |
| 290 | Destruction/Damage/Vandalism | Destruction/Damage/Vandalism of Property | Property | Vandalism | $436 | $349 |
| 35A | Drug/Narcotic Offenses | Drug/Narcotic Violations | Society | Drug possession/sales | $5,329 | $4,263 |
| 35B | Drug/Narcotic Offenses | Drug Equipment Violations | Society | Drug possession/sales | $5,329 | $4,263 |
| 270 | Embezzlement | Embezzlement | Property | All non-violent crime | $1,929 | $1,543 |
| 210 | Extortion/Blackmail | Extortion/Blackmail | Property | All non-violent crime | $1,929 | $1,543 |
| 26A | Fraud Offenses | False Pretenses/ Swindle/ Confidence Game | Property | Fraud (FTC) | $2,912 | $2,330 |
| 26B | Fraud Offenses | Credit Card/Automated Teller Machine Fraud | Property | Fraud (FTC) | $2,912 | $2,330 |
| 26C | Fraud Offenses | Impersonation | Property | Fraud (FTC) | $2,912 | $2,330 |
| 26D | Fraud Offenses | Welfare Fraud | Property | Fraud (FTC) | $2,912 | $2,330 |
| 26E | Fraud Offenses | Wire Fraud | Property | Fraud (FTC) | $2,912 | $2,330 |
| 26F | Fraud Offenses | Identity Theft | Property | Fraud (Identity theft) | $910 | $722 |
| 26G | Fraud Offenses | Hacking/Computer Invasion | Property | Fraud (FTC) | $2,912 | $2,330 |
| 39A | Gambling Offenses | Betting/Wagering | Society | Gambling | $83 | $67 |
| 39B | Gambling Offenses | Operating/Promoting/Assisting Gambling | Society | Gambling | $83 | $67 |
| 39C | Gambling Offenses | Gambling Equipment Violations | Society | Gambling | $83 | $67 |
| 39D | Gambling Offenses | Sports Tampering | Society | Gambling | $83 | $67 |
| 09A | Homicide Offenses | Murder & Non-negligent Manslaughter | Person | Murder | $7,553,794 | N/A |
| 09B | Homicide Offenses | Negligent Manslaughter | Person | Murder | $7,553,794 | N/A |
| 09C | Homicide Offenses | Justifiable Homicide | Not A Crime | Murder | $7,553,794 | N/A |

98

| 64A | Human Trafficking | Human Trafficking, Commercial Sex Acts | Person | All personal crime | $21,155 | N/A |
| 64B | Human Trafficking | Human Trafficking, Involuntary Servitude | Person | All personal crime | $21,155 | N/A |

| Group A Offenses | | | | Cost Estimates Applied (Miller et al., 2021) | | |
|---|---|---|---|---|---|---|
| IBR Code | NIBRS Offense Category | NIBRS Offense Description | Crime Against | Cost Category | Cost Estimate in 2020 Dollars | Misdemeanor Cost @ 20% Discount |
| 100 | Kidnapping/Abduction | Kidnapping/Abduction | Person | All personal crime | $21,155 | $16,924 |
| 23A | Larceny/Theft Offenses | Pocket-picking | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23B | Larceny/Theft Offenses | Purse-snatching | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23C | Larceny/Theft Offenses | Shoplifting | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23D | Larceny/Theft Offenses | Theft From Building | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23E | Larceny/Theft Offenses | Theft From Coin-Operated Machine or Device | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23F | Larceny/Theft Offenses | Theft From Motor Vehicle | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23G | Larceny/Theft Offenses | Theft of Motor Vehicle Parts or Accessories | Property | Larceny/Theft* | $2,095 | $1,676 |
| 23H | Larceny/Theft Offenses | All Other Larceny | Property | Larceny/Theft* | $2,095 | $1,676 |
| 240 | Motor Vehicle Theft | Motor Vehicle Theft | Property | Motor Vehicle Theft* | $8,503 | $6,802 |
| 370 | Pornography/Obscene Material | Pornography/Obscene Material | Society | All non-violent crime | $1,929 | $1,543 |
| 40A | Prostitution Offenses | Prostitution | Society | Prostitution/pandering | $83 | $67 |
| 40B | Prostitution Offenses | Assisting or Promoting Prostitution | Society | Prostitution/pandering | $83 | $67 |
| 40C | Prostitution Offenses | Purchasing Prostitution | Society | Prostitution/pandering | $83 | $67 |
| 120 | Robbery | Robbery | Property | Robbery (police-reported) | $25,403 | N/A |
| 11A | Sex Offenses | Rape | Person | Rape (police-reported) | $356,637 | N/A |
| 11B | Sex Offenses | Sodomy | Person | Other sexual assault | $91,525 | $73,220 |
| 11C | Sex Offenses | Sexual Assault with An Object | Person | Other sexual assault | $91,525 | $73,220 |
| 11D | Sex Offenses | Fondling | Person | Other sexual assault | $91,525 | $73,220 |
| 36A | Sex Offenses | Incest | Person | Other sexual assault | $91,525 | $73,220 |
| 36B | Sex Offenses | Statutory Rape | Person | Other sexual assault | $91,525 | $73,220 |
| 280 | Stolen Property Offenses | Stolen Property Offenses | Property | Buying stolen property | $2,605 | $2,084 |
| 520 | Weapon Law Violations | Weapon Law Violations | Society | Weapons carrying | $83 | $67 |
| | | | | | | |
| Group B Offenses | | | | Cost Estimates Applied (Miller et al., 2021) | | |
| IBR Code | NIBRS Offense Category | NIBRS Offense Description | Crime Against | Cost Category | Cost Estimate in 2020 Dollars | Misdemeanor Cost @ 20% Discount |
| 90A | Bad Checks | Bad Checks | Property | Other non-traffic offenses | $83 | $67 |
| 90B | Curfew/Loitering/Vagrancy Violations | Curfew/Loitering/Vagrancy Violations | Society | Vagrancy/Curfew/Loitering | $83 | $67 |
| 90C | Disorderly Conduct | Disorderly Conduct | Society | Disorderly conduct | $83 | $67 |
| 90D | Driving Under the Influence | Driving Under the Influence | Society | Impaired driving | $28,310 | $22,648 |

100

| **Group B Offenses** | | | | **Cost Estimates Applied** (Miller et al., 2021) | | |
|---|---|---|---|---|---|---|
| **IBR Code** | **NIBRS Offense Category** | **NIBRS Offense Description** | **Crime Against** | **Cost Category** | **Cost Estimate in 2020 Dollars** | **Misdemeanor Cost @ 20% Discount** |
| 90E | Drunkenness | Drunkenness | Society | Drunkenness | $83 | $67 |
| 90F | Family Offenses, Nonviolent | Family Offenses, Nonviolent | Society | Other non-traffic offenses | $83 | $67 |
| 90G | Liquor Law Violations | Liquor Law Violations | Society | Liquor laws | $83 | $67 |
| 90H | Peeping Tom | Peeping Tom | Society | Other non-traffic offenses | $83 | $67 |
| 90J | Trespass of Real Property | Trespass of Real Property | Society | Other non-traffic offenses | $83 | $67 |
| 90Z | All Other Offenses | All Other Offenses | Person, Property, Society | Other non-traffic offenses | $83 | $67 |

* These costs are for crimes reported to police.  Costs for reported crimes are generally higher than for unreported crimes because reporting rises with crime severity and only reported crimes involve police investigation, adjudication, and sanctioning.

**Table G-2.  Cost Estimation for Offenses Assigned Multiple NIBRS Categories**

| Offenses Assigned Multiple NIBRS Codes by DPS | | | Cost Estimates Applied (Miller et al., 2021) | | |
|---|---|---|---|---|---|
| Multi-Code NIBRS Category Assigned by DPS | Harris County Offense Charged | Cost Assignment Strategy | Cost Category | Cost Estimate in 2020 Dollars | Misdemeanor Cost @ 20% Discount |
| Arson (200), Assault(13A), Homicide (09A) | Arson (e.g., of a building with injury, or in manufacture of controlled substance) | Felony cases:  Costs for Assault and Arson were averaged with higher accompanying Homicide costs to reflect enhanced offense severity.<br><br>Misd. cases:  Applied cost for Aggravated Assault because Homicide cannot be charged as a misdemeanor. | Arson | $2,541,397 | $30,697 |
| Arson (200), Vandalism (290) | Arson with Intent to Damage Place of Worship | Higher Arson costs were applied without consideration of lesser Vandalism costs. | Arson | $38,372 | $30,697 |
| Murder (09A), Aggravated Assault (13A) | Terroristic Threat | Felony cases:  Costs for Aggravated Assault were averaged with higher accompanying Homicide costs to reflect enhanced offense severity.<br><br>Misd. cases:  Applied cost for Aggravated Assault because Murder cannot be charged as a misdemeanor. | Assault Offenses | $3,792,909 | **$25,619** |
| Neg. Mansl. (09B), Aggravated Assault (13A), Simple Assault (13B) | Reckless  Injury to Elderly/ Child/ Disabled/ Mentally Ill Person | Costs for Assault were averaged with higher accompanying Negligent Manslaughter costs to reflect enhanced offense severity. | Assault Offenses | $3,792,909 | **$25,619** |
| Aggravated Assault (13A), Simple Assault (13B) | Assault or Injury against vulnerable populations (family member, EMS, pregnant, security officer, public servant, MI, child/elderly/disabled) | Applied Assault cost. | Assault Offenses | $32,024 | $25,619 |
| Aggravated Assault (13A), Simple Assault (13B), Intimidation (13C) | Assault Against a Peace Officer/Judge, Elderly/Disabled, or with throat contact resulting in abortion. | Applied Assault cost. | Assault Offenses | $32,024 | $25,619 |
| Aggravated Assault (13A), Simple Assault (13B), Group B-Other (90Z) | Take Weapon from an Officer | Higher Assault costs were applied without consideration of  lesser Group B-Other costs. | Assault Offenses | $32,024 | $25,619 |

| Offenses Assigned Multiple NIBRS Codes by DPS | | | Cost Estimates Applied (Miller et al., 2021) | | |
|---|---|---|---|---|---|
| **Multi-Code NIBRS Category Assigned by DPS** | **Harris County Offense Charged** | **Cost Assignment Strategy** | **Cost Category** | **Cost Estimate in 2020 Dollars** | **Misdemeanor Cost @ 20% Discount** |
| Aggravated Assault (13A), Intimidation (13C) | Threaten/Exhibit/Use Firearm School or Bus | Applied Assault cost. | Assault Offenses | $32,024 | $25,619 |
| Fraud-FTC (26A), Extortion (210), Embezzlement (270) | Abuse of Official Capacity or Official Oppression | Higher Fraud offense costs were applied without consideration of lesser Extortion and Embezzlement costs. | Bribery/ Extortion/ Embezzlement | $2,912 | $2,330 |
| Bribery (510), Extortion (210) | Witness Tampering | Applied Bribery and Extortion cost (equal). | Bribery/ Extortion/ Embezzlement | $1,929 | $1,543 |
| Drug (35A-B), Forgery (250) | Forged Prescription | Higher Drug/Narcotic Violation costs were applied without consideration of lesser Forgery costs. | Drug/Narcotic Violations | $5,329 | $4,263 |
| Intimidation (13C), Fraud-FTC (26C) | Online Harassment-Name/Persona Creation | Costs for Fraud were averaged with higher accompanying Assault by Intimidation costs to reflect enhanced offense severity. | Fraud Offenses | $17,468 | $13,975 |
| Fraud-FTC (26A), Fraud-Identity Theft (26F) | Fraudulent Use/Possession of Someone Else's ID | Costs for Identity Theft were averaged with higher accompanying Fraud costs to reflect enhanced offense severity. | Fraud Offenses | $1,911 | $1,529 |
| Forgery (250), Fraud-FTC (26A), Group B-Other (90Z) | Tampering with Physical Evidence | Higher Fraud offense costs were applied without consideration of lesser Forgery and Group B-Other costs. | Fraud Offenses | $2,912 | $2,330 |
| Bribery (510), Gambling (39D) | Influencing Racing | Higher Gambling Offense costs were applied without consideration of lesser Bribery costs. | Gambling Offenses | $1,929 | $1,543 |
| Neg. Mansl. (09B), Impaired Driving (90D) | Intoxicated Assault/Manslaughter | Costs for Impaired Driving were averaged with higher accompanying Negligent Manslaughter costs to reflect enhanced offense severity. | Homicide Offenses | $3,791,052 | $25,619 |
| Pornography (370), Promoting Prostitution (40B), Trafficking/ Commercial Sex (64A) | Compelling Prostitution of a Minor | Applied the higher Child Maltreatment cost | Human Trafficking | $71,768 | $67 |
| Pornography (370), Trafficking/Servitude (64A-B), Prostitution (40A-C) | Sexual Performance by a Child | Applied the higher Child Maltreatment cost | Human Trafficking | $71,768 | $67 |
| Human Trafficking (64A-B), Prostitution (40A-C) | Online Solicitation of a Minor; Smuggling of Persons; Child Trafficking | Applied the higher Child Maltreatment cost | Human Trafficking | $71,768 | $67 |

| Offenses Assigned Multiple NIBRS Codes by DPS | | | Cost Estimates Applied (Miller et al., 2021) | | |
|---|---|---|---|---|---|
| Multi-Code NIBRS Category Assigned by DPS | Harris County Offense Charged | Cost Assignment Strategy | Cost Category | Cost Estimate in 2020 Dollars | Misdemeanor Cost @ 20% Discount |
| Aggravated Assault (13A), Simple Assault (13B), Intimidation (13C), Prostitution (40 A-C), Human Trafficking (64A) | Compelled Prostitution | Costs for Human Trafficking were averaged with higher accompanying Assault charges to reflect enhanced offense severity without consideration of lesser Prostitution costs. | Human Trafficking | $26,590 | $21,272 |
| Human Trafficking (64A-B), Prostitution (40A-C) | Online Solicitation of a Minor; Smuggling of Persons; Child Trafficking | Applied the higher Child Maltreatment cost. | Human Trafficking | $71,768 | $67 |
| Trafficking/Servitude (64A-B), Prostitution (40A-C), Group B-Other (90Z) | Soliciting Prostitution for Other Payor | Higher Human Trafficking cost without consideration of lesser Prostitution and Group B-Other costs. | Human Trafficking | $21,155 | $67 |
| Human Trafficking (64A-B), Prostitution (40A-C), Group B-Other (90Z) | Smuggling of Person, SBI or Death | Higher Human Trafficking cost without consideration of lesser Prostitution and Group B-Other costs. | Human Trafficking | $21,155 | $67 |
| Kidnapping (100), Aggravated Assault (13A), Simple Assault (13B) | Aggravated Kidnapping | Costs for Kidnapping were averaged with higher accompanying Assault costs to reflect enhanced offense severity. | Kidnapping/Abduction | $26,590 | $21,272 |
| Kidnapping (100), Group B-FamilyNV (90F) | Enticing a Child Away from Custodian (with or w/out intent for Felony) | Higher Kidnapping costs were applied without consideration of lesser Group B-Nonviolent Family Offenses costs. | Kidnapping/Abduction | $21,155 | $16,924 |
| Robbery-V (120), Larceny (23), Fraud-FTC (26A-C, E), Burglary (220), MV Theft (240), Extortion (210), Embezzlement (270), Bribery (510) | Theft of Cargo | Costs for Larceny/Theft were averaged with higher accompanying Robbery, Fraud, Burglary, MV Theft, Extortion, Embezzlement, and Bribery costs to reflect enhanced offense severity. | Larceny/Theft | $6,050 | $4,840 |
| Larceny (23A-H), Extortion (210) | Theft of Firearm | Higher Larceny/Theft costs were applied without consideration of lesser Extortion costs. | Larceny/Theft | $2,095 | $1,676 |
| Larceny (23A,B,H), Extortion (210) | Theft (e.g., from person, elderly, pub. servant) | Higher Larceny/Theft costs were applied without consideration of lesser Extortion costs. | Larceny/Theft | $2,095 | $1,676 |

104

| Offenses Assigned Multiple NIBRS Codes by DPS | | | Cost Estimates Applied (Miller et al., 2021) | | |
|---|---|---|---|---|---|
| **Multi-Code NIBRS Category Assigned by DPS** | **Harris County Offense Charged** | **Cost Assignment Strategy** | **Cost Category** | **Cost Estimate in 2020 Dollars** | **Misdemeanor Cost @ 20% Discount** |
| Stolen Property (280), Shoplifting (23C) | Organized Retail Theft | Costs for Larceny/Theft (Shoplifting) were averaged with higher accompanying Stolen Property costs to reflect enhanced offense severity. | Larceny/Theft | $2,350 | $1,880 |
| Pornography (370), Prostitution (40A-C) | Employment Harmful to Children | Applied the higher Child Maltreatment cost. | Prostitution | $71,768 | $57,414 |
| Prostitution (40A-C), Human Trafficking (64A-B) | Promotion of Prostitution | Felony cases:  Costs for Prostitution were averaged with higher accompanying Human Trafficking costs to reflect enhanced offense severity.<br><br>Misd. cases:  Applied cost for Prostitution because Human Trafficking is not ordinarily charged as a misdemeanor. | Prostitution | $10,619 | $67 |
| Sex Offenses (11D), Group B-Disorderly Conduct (90C) | Indecent Assault | Higher Sex Offenses costs were applied without consideration of  lesser Group B-Disorderly Conduct costs. | Sex Offenses | $91,525 | $73,220 |
| Rape (11A), Sex Offenses (11B-C) | (Aggravated) Sexual Assault; (Aggravated) Sexual Assault of a Child | Higher Rape costs were applied without consideration of  lesser Sex Offense or Child Maltreatment costs. | Sex Offenses | $356,637 | $285,309 |
| Rape (11A), Sex Offenses (11B-D) | Sexual Abuse of a Child; Sexual Contact in a Juvenile Facility; Improper Relationship btw. Educator/Student | Higher Rape costs were applied without consideration of  lesser Sex Offense or Child Maltreatment costs. | Sex Offenses | $356,637 | $285,309 |
| Fraud-FTC (26B), Vandalism (290) | Criminal Mischief to Impair/Interrupt and ATM | Higher Fraud cost were applied without consideration of lesser Vandalism costs. | Vandalism | $2,912 | $2,330 |
| Aggravated Assault (13A), Weapon Law (520) | Disorderly Conduct w Firearm | Costs for Weapon Law Violations were averaged with higher accompanying Aggravated Assault costs to reflect enhanced offense severity. | Weapon Law Violation | $16,054 | $12,843 |
| Aggravated Assault (13A), Weapon Law (520) | Disorderly Conduct w Firearm | Costs for Weapon Law Violations were averaged with higher accompanying Aggravated Assault costs to reflect enhanced offense severity. | Weapon Law Violation | $16,054 | $12,843 |

Table G-3.  Cost Allocation Strategy for Child Maltreatment Offenses

| Harris County Offense Charged | NIBRS Offense Category Assigned by DPS | Cost Allocation Strategy |
|---|---|---|
| Compelling Prostitution of a Minor | Pornography (370), Promoting Prostitution (40B), Trafficking/Commercial Sex (64A) | Applied Child Maltreatment cost ($71,768) |
| Sexual Performance by a Child | Pornography (370), Trafficking/Servitude (64A-B), Prostitution (40A-C) | Applied Child Maltreatment cost ($71,768) |
| Online Solicitation of a Minor; Smuggling of Persons; Child Trafficking | Human Trafficking (64A-B), Prostitution (40A-C) | Applied Child Maltreatment cost ($71,768) |
| Employment Harmful to Children | Pornography (370), Prostitution (40A-C) | Applied Child Maltreatment cost ($71,768) |
| (Aggravated) Sexual Assault of a Child | Rape (11A), Sex Offenses (11B-C) | Applied Rape cost ($356,637) |
| Sexual Abuse of a Child; Sexual Contact in A Juvenile Facility; Improper Relationship Between an Educator and Student | Rape (11A), Sex Offenses (11B-D) | Applied Rape cost ($356,637) |
| Indecency with A Child – Sexual Contact | Sex Offenses (11B-D) | Applied Sex Offense cost ($91,525) |

## H. Consent Decree Tasks and Milestones

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 7 | 41a | 12/15/2020 *Nearly Done* | **Provide support staff for private apptd. counsel at bail hearing** - CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. | **STATUS:  Nearly Done**<br><br>The Managed Assigned Counsel officially began serving all 16 misdemeanor courts as of December 27, 2021.<br><br>Status will be changed to "Done" once the requirements of ¶ 43b have been met. |
| 7 | 41b | 3/1/2021 (Extended) *Nearly Done* | **Fund at least min. holistic defense staff recommended by expert** - Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. | **STATUS:  Nearly Done**<br><br>Funding for holistic defense staff is being provided as part of the Managed Assigned Counsel office grant from the TIDC (212-20-D06) in the amount of $2.17 million approved in FY20.  The NAPD report recommendations were submitted to the Commissioner's Court 8/10/21.<br><br>Status will be changed to "Done" once Harris County Budget Management develops the full implementation with JAD, PDO, and MAC of the recommendations. |
| 7 | 43 and 44 | 12/15/2020 (Extended) *TBD* | **Develop written plan for essential defense counsel supports** - Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer.  The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. | **STATUS:  Working on it**<br><br>Harris County is working collectively with several agencies on a plan.  The plan will incorporate recommendations from the NAPD Holistic Defense assessment (¶ 41b) completed on 7/7/21.  The county is working with Budget Management for all budgetary requests for submission to Commissioners Court approval. Completion Goal Q4 2022.<br><br>Status will be changed to "Done" once a written plan is in place. |
| 8A | 46 | 10/29/2020 (Extended) *Nearly Done* | **Provide court date notification forms to third party LEAs** - Defendants will make the court date notification forms required by ¶ 47 and ¶ 48 readily accessible to third-party law enforcement agencies that arrest or detain misdemeanor arrestees to be prosecuted in the Harris County | **STATUS: Nearly Done**<br><br>All court date notification forms were implemented by 11/4/21.<br>Status will be changed to "Done" once it's confirmed they have been provided to third party LEAs. |
| 8C | 52e | 12/15/2020 (Extended) *Done* | **Receive recommendations to mitigate nonappearance** - Within 180 days of commencing the nonappearance study, researchers must provide the County initial actionable recommendations.  Researcher(s) may continue study and provide additional recommendations beyond that date. | **STATUS: Done**<br><br>Ideas42 submitted a final report of recommendations 7/29/22. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 8C | 55 | 5/14/2021 *(Expected by 1/25/23)* | **Develop written nonappearance mitigation plan**- Within 180 days after receiving published results of study (Sec.52),the County will work with researchers to develop a written plan for mitigating causes of nonappearance including implementation timeline and proposed budget of at least $850,000 for each of the initial three years following the study. The County will submit the plan to the Monitor for review. Monitor solicits Class Counsel's written comments/objections during a 30- day review period (per Sec.111-114). Monitor will convey Class Counsel's comments to County for response (objections or amendments) within 30 days of receipt. The Parties may submit unresolvable disputes to the Court. | **STATUS: Working on it** Ideas42 has been aligning on the scope of work for this next phase with the County, and are on track to begin work helping the County develop a written plan to implement recommendations from the study (¶ 52e) completed on 7/29/22. Status will be changed to "Done" once final a written plan and budget is in place to mitigate court nonappearance. |
| 8C | 54 | 3/1/2021 (Extended) *Nearly Done* | **Allocate $850,000 Year 2 to support court appearance per mitigation plan timeline and budget** - After study concludes, absent good cause for a lesser amount, County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan.  To establish good cause, County submits purported cause to the Monitor; Monitor notifies Class Counsel; Monitor makes a determination; Either Party may file a motion to the Court if they disagree with the Monitor's determination. | **STATUS: Nearly Done** $850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's Court as part of the FY22 budget on 1/26/21.  The County received recommendations from nonappearance study (¶ 52e) on 7/29/22. Status will be changed to "Done" when the timeline and budget for implementation of mitigation services have been determined for the first three years (¶ 55). |
| 10 | 78 and 79 | Extended *TBD* | **Deliver Year 3 Refresher Consent Decree Training** - Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. | **STATUS: Working on it** Deason Criminal Justice Reform Center, SMU, has been selected as a vendor and an agreement was signed 8/2/22.  Working on a timeline for the trainings. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 9 | 81, 82, 84, and 85 | 8/30/2020 *Nearly Done* | **Provide data for Monitor to evaluate Consent Decree implementation** - Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶89. If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | **STATUS: Nearly Done** JAD staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree. Existing data for cases from 2009 through the present are currently available to the Monitor team. Status will be changed to "Done" after all variables specified in ¶ 85 are available. Monitors are still waiting on #S: Any conditions of release or supervision imposed by a judicial officer, the date each was imposed, and the amount of any fees assessed. |
| 11 | 83 | 11/15/2020 (Extended) *Nearly Done* | **Make Consent Decree data publicly available** - The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  Nearly Done** Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public facing.  The data team has been working with OCM to ensure the raw data is perfect by checking the logic and spot-checking the data before posting. Status will be changed to Done after raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 88, 89 | 8/30/2020 *Nearly Done* | **Develop web-based Data Platform** - The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | **STATUS: Nearly Done**  Much of the currently available information specified in ¶ 89 is available in automated report form but is not yet public facing.  The data team has been working with OCM to ensure the raw data is perfect by checking the logic and spot-checking the data before posting. Status will be changed to Done after reports are posted on the existing public Consent Decree website described in ¶ 90. |
| 12 | 92 | 5/19/2022 Done | **Conduct Year 2 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90). Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: Done** The virtual public meeting was held 4/27/2022. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 13 | 93, 94 | 5/2/2022<br>*Done* | **Year 3 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS: Done**<br><br>Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website. |
| 14 | 116 | 3/3/2022<br>*Done* | **Monitoring Plan:  Year 3** - In coordination with the Parties, the Monitor will prepare an annual Monitoring Plan to be made public and published on the County's Consent Decree Website (see Sec. 90).  The Plan must delineate requirements of the Consent Decree to be assessed for compliance, identify the proposed methodology, and create a schedule with target dates for conducting reviews or audits. | **STATUS: Done**<br><br>The Monitor's year 3 plan was submitted on 2/15/22 and approved by the Commissioner's Court on 6/14/2022. |
| 14 | 115, 118 | 7/21/2022<br>*Done* | **Submit Draft Monitor's Report:  Year 2.5** - Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec. 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree. Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. | **STATUS: Done**<br><br>The year 2.5 draft monitor report was submitted on 7/21/2022 |
| 14 | 117 | 9/3/2022<br>*Done* | **Publish Monitor's Report:  Year 2.5** - Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in Sec. 117. | **STATUS: Done**<br><br>The final year 2.5 monitor report will be submitted on 9/3/2022. |