# Monitoring Pretrial Reform in Harris County

# Seventh Report of the Court-Appointed Monitor

**March 3, 2024**



THE OFFICIAL WEBSITE OF THE
**INDEPENDENT MONITOR FOR THE**
*ODONNELL V. HARRIS COUNTY* **DECREE**
REGARDING MISDEMEANOR
BAIL PRACTICES

sites.law.duke.edu/odonnellmonitor

WILSON
CENTER FOR SCIENCE AND JUSTICE
AT DUKE LAW

UNIVERSITY of HOUSTON
LAW CENTER

ĀĪM | LIBERAL ARTS
TEXAS A&M UNIVERSITY
PUBLIC POLICY RESEARCH INSTITUTE

**Brandon L. Garrett, JD, Monitor**
*L. Neil Williams Professor of Law*
*Faculty director, Wilson Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC 27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Professor of Law*
*University of Houston Law Center*
*4170 Martin Luther King Blvd.*
*Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Dottie Carmichael, PhD, Director and Research Scientist**
**David (Dongwei) Shi, ABD, MS, Senior Research Associate**
**Andrea Sesock, Project Coordinator**
*Texas A&M University*
*Public Policy Research Institute*
*4476 TAMU*
*College Station, TX 78743-7746*
*(979) 854-8800*
*dottie@ppri.tamu.edu*

**Songman Kang, PhD, Consultant**
*Associate Professor, Department of Economics*
*Sungkyunkwan University*
*Seoul, Korea*

Provided to:

**The Honorable Lee H. Rosenthal**
**Chief Judge, United States District Court**
**for the Southern District of Texas**

Also provided to:

**Representatives of Plaintiff Class:**

    **Elizabeth Rossi, Plaintiffs' Counsel, [elizabeth@civilrightscorps.org](mailto:elizabeth@civilrightscorps.org)**

    **Cody Cutting, Plaintiffs' Counsel, [cody@civilrightscorps.org](mailto:cody@civilrightscorps.org)**

**Representatives of Harris County:**

    **Rachel Fraser, Assistant County Attorney,**
    **[Rachel.Fraser@cao.hctx.net](mailto:Rachel.Fraser@cao.hctx.net)**

    **Michael Giordanelli, Research Administration Division,**
    **[Mike.Giordanelli@jad.hctx.net](mailto:Mike.Giordanelli@jad.hctx.net)**

**Representative of County Criminal Court at Law Judges:**

    **Allan Van Fleet, Counsel for 14 County Criminal Court at Law**
    **Judges, [allanvanfleet@gmail.com](mailto:allanvanfleet@gmail.com)**

**Representative of Harris County Sheriff's Office:**

    **Major Patrick Dougherty, [patrick.dougherty@sheriff.hctx.net](mailto:patrick.dougherty@sheriff.hctx.net)**

## *Executive Summary*

- **The ODonnell Consent Decree:**
  - *Misdemeanor Bail Reform:* In Harris County, secured money bonds are no longer required for most misdemeanor cases under the court rule adopted as part of the *ODonnell v. Harris County* settlement. Most people arrested for misdemeanors are released promptly without a hearing.
  - *Bail Options Unchanged for Cases with Public Safety Concerns:* People charged with misdemeanors that potentially present public safety risks (e.g., repeat DWIs, family violence, prior bond violations or outstanding warrants) are not automatically released. A hearing officer makes a bail decision, usually following a hearing at which magistrates have the traditional options to require financial bonds, protective orders, pretrial supervision requirements, or other release conditions.
  - *Better Bail Hearings:* Defense attorneys continue to represent people at bail hearings, as required by Rule 9 and the Consent Decree. Before 2017, people arrested in Harris County usually had no defense attorney at these hearings. Judges also must give greater attention to more rigorous bail requirements.

- **Major Consent Decree Accomplishments:**
  - *Court Appearance*: The County is currently implementing an approved plan to make use of the budget allocation to improve court appearance. The County is now piloting a new website, https://myharriscountycase.com, where people can readily look up information about upcoming appearances in their cases.
  - *Data*: Much of the relevant information about the misdemeanor bail process is now available in an automated report. We have continued work to provide feedback on Harris County's public data portal. We now have improved data regarding persons flagged as homeless or with mental health assessment requests, as well as data concerning pretrial supervision conditions, and report these new analyses in this report.
  - *Training*: The Deason Criminal Justice Reform Center at the SMU Dedman School of Law conducted trainings in 2023, which resume in early 2024.
  - *Indigent Defense*: The County is continuing to develop plans in response to the National Association for Public Defense (NAPD) evaluation of Harris County's misdemeanor indigent defense systems. We hope the County will implement a plan for the earlier appointment of counsel.

- **Ongoing Work by the Monitor Team:**
  - *Data Development:* We analyzed data prepared by Harris County and provided continual feedback on data development in regular meetings concerning the assembly and validation of data regarding misdemeanor cases.
  - *Community Work Group*: We convened quarterly meetings of our Community Work Group, to share our work and solicit input from our diverse community stakeholders. Members share their perspectives for the "Community Viewpoints" column found in our reports.
  - *Regular Meetings:* We held regular meetings with the parties and Harris County stakeholders, including weekly calls, monthly meetings with both judges and hearing officers, and periodic calls with public defenders and prosecutors. Our next public meetings will be held in-person on April 18, 2024.
  - *Feedback:* We provided feedback to the parties on several improvements to the hearing process, the designed and implemented training, and the assessment work regarding holistic defense services and nonappearance.
  - *Review of Violations*: We are extremely grateful for the work that has begun to build an improved system to permit all County actors to review potential Rule 9 violations and prevent delays and errors in case processing.

- **Our Findings:**
  - *Data Analysis:* Our updated findings largely confirm what we reported in our first six reports. The bail reforms under the ODonnell Consent Decree have saved Harris County and residents many millions of dollars, improved the lives of tens of thousands of persons arrested for misdemeanors, and these large-scale changes have produced no increase in new offenses by persons arrested for misdemeanors.

    - *Overall, the work suggests that repeat offending by persons arrested for misdemeanors has remained stable in recent years.*

    - The numbers of persons arrested for misdemeanors have declined since 2015.

    - The numbers of those arrested for misdemeanors who had new charges filed within one year have also declined.

  - The analyses conducted show:

  - ***Misdemeanor Case and Defendant Characteristics***

  - The number of misdemeanor arrestees has declined by more than 15 percent between 2015 (N=49,359) and 2023 (N=41,177).

  - The count has been slightly increasing since 2020, which marked the beginning of the Covid-19 pandemic period.

o The number of misdemeanor cases has declined by nearly 20 percent between 2015 (N=60,623) and 2023 (N=50,330).

o The number of misdemeanor cases with co-occurring felonies nearly tripled (1,321 in 2015 vs. 3,818 in 2023), which is in line with a growing number of felony cases filed in Harris County.

o Both the counts of total misdemeanor arrestees and the arrestees with co-occurring felonies remained stable between 2021 and 2022.

o Males account for a disproportionately larger share (roughly 75%) of the misdemeanor arrestee population. This ratio has been very stable between 2015 and 2023, as the male share ranged only between 75% and 77% over this 9-year period.

o Black persons accounted for nearly 40 percent of the misdemeanor arrestee population in each year between 2015 and 2023, with the share remaining stable.

o The share of Latinx misdemeanor arrestees in Harris County has gradually but consistently increased over time, from 37% in 2015 to 43% in 2023.

o We find that the share of misdemeanor cases involving homeless persons has noticeably declined between 2015 (11%) and 2021 (6%), then slightly increased in 2022 (8%) and stabilized in 2023 (8%).

o The share of misdemeanor cases involving persons flagged as mentally ill fell between 2019 (27%) and 2020 (21%) but has remained very stable since then.

o Nearly two-thirds of misdemeanor arrestees for whom we have a valid address were from the Census tracts with poverty rates higher than 15%, about one-half from the tracts with poverty rates higher than 20%, and roughly one-tenth from the tracts with poverty rates higher than 40%. All three shares fell slightly since 2015.

### *Bond Amounts and Holds*

o Short pretrial detention, lasting two days or less, has become more common since 2015 (75% in 2015 vs. 86% in 2023).

o In 2023, misdemeanor arrestees were released on a bond before the first court setting in more than 80% of cases. That share has slightly declined since 2019. In 2015, a misdemeanor arrestee was released on a bond pretrial only 49% of the time.

o Secured bonds, which require arrestees to pay money up front in order to be released, accounted for 12% of all initial bond approvals, marking a large decline from 54% in 2017, and 20% in 2019.

o The disparities in pretrial release rates between male and female, black and white, and Latinx and Non-Latinx misdemeanor arrestees in 2023 (3, 4, and 4 percentage points, respectively) are considerably smaller than in 2015.

o In 2023, approximately 30% of misdemeanor cases belonged to one of the carve-out categories, not eligible for the "prompt release with an unsecured bail amount" policy established in Local Rule 9. Less than 15% of the misdemeanor cases filed in 2015 and 2016 belonged to one of the six carve-out categories.

o In 2022, there were 39,222 misdemeanor cases in which an arrestee was released on a bond, and 26% of them resulted in a bond failure. The overall bond failure rate was relatively low for cases filed in 2015 and 2016 (16%). The rate then rose to 30% in 2018 and has gradually declined since then.

o We underscore, however, that bond-failure data may be a poor proxy for assessing nonappearance rates. Bond forfeiture and bond revocation all reflect discretionary judicial decisions. Beginning in December 2020, a new set of definitions were adopted as the Consent Decree's court appearance policy was operationalized, which should help us obtain a more reliable measure of non-appearance in the future.

### Case Outcomes

o For the last three consecutive years, the share of cases disposed within one year has increased from 45% in 2020, to 54% in 2021, and to 68% in 2022.

o While in 2015 and 2016, approximately 60% of misdemeanor cases resulted in a conviction, this share substantially decreased between 2017 (the year when the preliminary injunction became effective) and 2019 (the year when Local Rule 9 became effective).

o We observe a decline in the conviction rate from 60% in 2015 to 22% in 2022, while the rate of cases that are dismissed or acquitted has increased from 31% in 2015 to 76% in 2022.

o The share of misdemeanor cases that ended in a jail sentence has substantially fallen since 2015. Out of 60,373 misdemeanor cases that were filed in 2015 and were eventually disposed, the arrestee was sentenced to a jail term 62% of the time. By contrast, only 25% of cases that were filed in 2022 and were eventually disposed resulted in a jail sentence.

o The distribution of jail sentencing length has remained relatively stable. Across all years considered, approximately 70% of jail sentences involved jail time of 30 days or less, 80% involved 90 days or less, and 90% involved 180 days or less.

### Repeat Offending

o The share of *misdemeanor arrestees* who had a new criminal case filed within a year has remained very stable between 2015 (23%) and 2022 (22%), except for a small and temporary decline in repeat arrest rates in 2019 (21%).

o In 2022, 27% of *misdemeanor cases* led to a new criminal case filed against the same person within a year. Similar to the person-level analysis, this one-year repeat arrest rate at the case-level has remained stable between 2015 (27%) and 2022 (27%).

### Programs to Increase Court Appearance

o Harris County has made positive progress on each of the three requirements of the Consent Decree to reduce court nonappearance, but more remains to be done.

o After reviewing the operation of the electronic court notification system launched on February 26, 2022, in the Sixth Report, the Monitor team identified several system failures that were highlighted for remediation. The most concerning of these prevented defendants from enrolling to receive court date reminders or, for people who believed they had enrolled, prevented reminders from being delivered.

o An updated review of the system for the current report finds that significant remediation has occurred for unsecured bonds filed by Pretrial Services on behalf of people entering custody at the JPC. In the past year, enrollments on GOB and personal bonds have increased from 25% to 60%. However, barriers still remain for secured bonds: Just 16% of people filing cash and surety bonds through the Sheriff's Records Division are enrolled for reminders – the same share as last year. Sheriff's Records Division staff are currently being trained to key in reminder enrollments before they are filed by the District Clerk which is expected to fix the problem.

o Early analyses on the effect of reminders are positive. Multivariate logistic regression analyses show that, other things equal, court date reminders decrease the odds of nonappearance at arraignment by 35% compared to people not enrolled in the system.

o Prior bond failure is the strongest single predictor of nonappearance. A bond forfeiture or revocation in the past three years increases the odds of missing court by nearly 400%. Other factors that contribute to nonappearance include a co-occurring felony charge, homelessness, mental illness and a history of repeated criminal justice involvement. This finding affirms the logic of Harris County's Community Assistance Referral Program (CARP), which aims to mitigate nonappearance by assessing defendant risk attributes and making referrals to appropriate community services at the time of pretrial release.

- These promising findings highlight the importance of continued progress toward system changes needed to make court reminder enrollment available to all defendants.

- **Next Monitoring Steps:**

    - Assist in further implementation of improvements to pretrial hearings and accompanying procedures to facilitate compliance with the Consent Decree.

    - Review County plans that follow recommendations made in NAPD indigent defense study and monitor the implementation of court appearance plan.

    - Conduct further data analysis regarding vulnerable populations and cost analysis.

# *Table of Contents*

*Introduction*                                                          **1**

**I. Community Viewpoints**                                             **1**

**II. Policy Assessment and Reporting**                                 **5**

**III. Data Analysis**                                                  **8**

**IV. Cost Study and Project Management**                              **43**

*Appendix*                                                             **57**

**A. The Monitorship Structure**                                       **57**
**B. Community Working Group**                                         **61**
**C. Monitor Team Bios**                                               **66**
**D. Organizational Chart**                                            **69**
**E. Year 5 Statement of Work**                                        **69**
**F.  Enrollment and Nonappearance Rates by Subgroup**                 **82**
**G. Correlation Matrix (2/26/22 to 1/7/24)**                          **86**
**H.  Logistic Regression Model Coefficients and Odds Ratios**         **89**
**I. Consent Decree Tasks and Milestones**                             **93**

# *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the ODonnell Consent Decree, along with Professor Sandra Guerra Thompson, University of Houston Law Center, who serves as the Deputy Monitor. The Monitor team includes research experts from the Public Policy Research Institute ("PPRI") at Texas A&M University, and the Wilson Center for Science and Justice ("WCSJ") at Duke University School of Law.

Our role is wholly independent of any of the parties in the ODonnell case. Our role is to report to the federal court regarding the progress of this Consent Decree. We were appointed because the prior system of misdemeanor bail was found unconstitutional after years of litigation, which we took no part in, and which the parties settled prior to our appointment. As such, our work pertains only to misdemeanor cases in Harris County.

The parties envisioned a seven-year term for the monitorship because the ODonnell Consent Decree sets out a comprehensive plan for misdemeanor bail reform. People mean different things by both the term "bail" and the phrase "bail reform." Harris County is implementing a quite comprehensive model for misdemeanor cases, which governs more than just decisions whether to release a person or detain them pretrial. First, there are required releases after booking for low-level misdemeanors. Second, for those defendants not entitled to release without a hearing, magistrates conduct bail hearings. The Consent Decree requires public defense representation, discovery and due process protections, making the hearings far more robust. Third, the Consent Decree aims to increase court appearance rates over time with sound rules and supports to help people comply with legal obligations, including new court appearance rules and electronic court notifications. Fourth, the Consent Decree calls for evaluations of the system, including third-party recommendations regarding indigent defense and court appearance, and a publicly accessible data portal, with responses in progress.

For those reasons, we emphasize that the Consent Decree is a long-term undertaking, with key pillars implemented, but others still in progress. These improvements will require assessment and implementation over time. Thus, while we have described in our reports highly positive results, we will continue to update our findings over time. In this seventh report, we describe how key pillars of the Consent Decree are now in place. Additional implementation remains in progress, including responses to recommendations regarding improving court appearance, court notifications, and indigent defense in misdemeanor cases in Harris County.

## I. Community Viewpoints

### *Misdemeanor Bail and the Unhoused Population, Including Unhoused Veterans*

A Conversation with Oudrey Hervey and Rebecca Landes

In this fourth edition of *Community Viewpoints*, the ODonnell Monitor team explores the topic of Harris County's misdemeanor bail system and how it responds to the unhoused population and veterans. Deputy Monitor Sandra Guerra Thompson interviewed Rebecca Landes and Oudrey Hervey, members of the Community Working Group, a group of community leaders who meet quarterly to advise the Monitor team.



Oudrey Hervey is a retired Navy Commander with 29 years of progressive experience in leadership, Strategic HR, and Executive-level management. He has managed or provided expert advice in Global HR, Executive Coaching, Learning & Development, Diversity, Equity & Inclusion, Policy Design, Emergency Preparedness, Interagency Coordination, Project Management, Federal Grants Mgt., and stakeholder engagement. He has trained over 5,000 people in a multinational environment regarding various topics of individual and institutional excellence. He holds an M.A. degree in National Security and a M.S. degree in Public Service, which together provide him with the ability to work effectively and professionally across the public, private, and federal landscape. Oudrey is a certified Global Professional in Human Resources, a Society of Human Resource Management Senior Certified Professional, and a trained Evidence-Based Coach. As the former executive director of U.S. Veterans Initiative-Houston and Career Advisor for Texas Veterans Commission, Oudrey oversaw the intake, housing, meals, clinical counseling, and career development over 500 Veterans, many of them unhoused or justice-involved. He is a thought leader and change agent, with a passion for veteran inclusion, affordable housing, and strategic problem solving through a systems-thinking lens. He is a member of the Houston Housing Collaborative and former Vice Chair of the Harris County Housing Policy Advisory Committee.

Oudrey is a Human Development PhD student, beach cruiser enthusiast, recreational boater, and USCG licensed Master of 100-ton vessels.



**Becky Landes** has been an active participant in the Houston nonprofit community since moving to the area in 1988. Since 2016, she has served in the role of Chief Executive Officer at The Beacon. The Beacon's mission is to provide essential and next-step services to restore hope and help end homelessness in Houston.

Since beginning her career, Becky has maintained a lively interest in building community capacity to deliver successful programs that address the needs of those most vulnerable community members and to support them to move forward in meeting their goals. Following college graduation, her time as a Peace Corps volunteer overseas sparked a passion to continue working in the helping professions. She has experience managing federal, state, and local collaborative projects, serving a myriad of individuals from infants to seniors.

Becky holds a Master of Science in Counseling from the University of Houston, Clear Lake and a Bachelor of Arts degree from the College of William and Mary in Virginia. Becky has served on the Continuum of Care (CoC) Steering Committee for the Greater Houston homeless response system known as The Way Home and has enjoyed serving on two local nonprofit boards.

**Avoiding The Unintended Harms of Jails and Lifting People Up**

The ODonnell Consent Decree requires the release of most people charged with misdemeanors without requiring that they pay money, except for people charged with some offenses that have public safety implications like domestic violence, a subsequent drunk driving charge, or

someone already out on a bond or who has a pending warrant. The latter cases are decided initially by judicial magistrates. Asked what he thinks of the ODonnell policy of releasing low-risk people from jail without requiring financial payment, Hervey calls it a "great policy," seeing several benefits. Having grown up in an impoverished small town in Mississippi in the wake of Jim Crow, Hervey sees the criminal justice system in general as "still operating in a residual fog of the Jim Crow South." He sees the policy reform in ODonnell as a welcome change. "It prevents overcrowding [in the jail]," he notes, "and it prevents overcriminalization."

Landes agrees that ODonnell's policy of releasing low-risk individuals helps to reduce overcriminalization, especially of the unhoused population that she helps. "The data that the ODonnell monitors have shown confirms that many of the people arrested are unhoused, and they're charged with low-level offenses like trespassing," Landes notes. "There is a legal issue here as to whether a person should be charged with a crime for sleeping on public land when they have nowhere else to go, no shelter will take them. What are they supposed to do?" From her time volunteering as a young adult, she came to believe that most people do the best they can to succeed given their environment and the circumstances that life presents them. Through her experience working with this population, she understands that what people often need most is the chance to address the problems that may get them into trouble with the law, such as mental health crises. She explains, "Houston has about a dozen Crisis Intervention Response Teams (CIRT) that pair a mental health professional with law enforcement to respond to a behavioral health crisis, helping to keep people from going to jail. Through these types of interventions, people in crisis can be connected to affordable medical care. Although, our community needs more indigent medical care to be available."

After decades in the Navy, Hervey has worked for many years serving veterans and the unhoused, and he sees ODonnell serving the interests of people who get arrested for making a "bad decision" on a particular day. "Jail isn't just a place to sit and process and wait," he says, "jail is also a very scary place" with dangers that can come from other inmates and, sometimes even from jail officials, he says. When thinking about the benefits of not jailing a low-risk person who "just shouldn't be in jail," Hervey says:

> [Getting out of jail] is great for the psyche of an individual not to be in a space with a criminal who is there on a higher offense. Just being in that environment actually creates a certain . . . self-stigma. Being there when you don't have to be reinforces a negative sentiment about yourself that actually lands you, in many cases, in [future bad] situations because now [the jail experience] has helped define who you are.

For Hervey, helping a justice-involved person, like many of the veterans he has helped over the years, means giving all people, whether rich or poor, the "positive regard" that a second chance entails. He describes a pretrial program for veterans in Galveston that he audited years ago. When veterans were arrested, the program offered them pretrial release and helped them find employment. For veterans who completed the program successfully, they had their cases dismissed and their arrest records expunged. For those who were unhoused, it offered them resources for temporary housing as well.

Finding jobs for justice-involved people was always the challenge due to the stigma of a criminal record, but some employers were willing to hire them. To help people overcome their own self-stigma about finding employment, he says, "took a lot of coaching, just to support and uplift

them and let them understand what their options are and connecting them with free legal resources." Veterans and other justice-involved people can find it hard to overcome their own self-doubts. Hervey explains, "This is why I talk about stigma so much. The self-stigma comes from having been in [jail], society makes you feel like you can never recuperate, that you can never rebuild yourself."

Reflecting on the pretrial program he observed in Galveston, Hervey concludes, "I thought it was phenomenal for a segmented few, and I thought it would have been exceptional for all." ODonnell, he notes, operates similarly in some ways in helping people to be released, but it is not a diversion program with programming and the opportunity to have a clean record for successful completion, which he believes would be far better to help more people turn their lives around.

Landes worries that the criminal justice system places expectations on the unhoused that they are not equipped to meet. "The people I work with need help when they get arrested for misdemeanor offenses," she says. "Their situation makes it difficult for them to keep track of the paperwork to know when and where to go to court. They don't know who to call for information. They don't have transportation." Fortunately, organizations like The Beacon, the group that Landes leads, help unhoused people with civil legal aid. The Beacon's legal program, known as Beacon Law, typically has a waitlist due to the high demand for services. Landes noted that "Our criminal justice system has favored those who can pay for money bonds, and despite the progress made by the ODonnell consent decree, low-level offenders living unhoused are still more likely to be ticketed or arrested than the general public."

**Public Awareness and Bail Reform**

Hervey thinks the public would feel differently about misdemeanor bail reform if "social media and traditional media would tone down the sensationalism." He says, "if they could slow down the spin, stop sensationalizing reform to be a negative." Instead, he points out that "there's always a positive" to be found.

Hervey believes the public would better understand if they had relatable examples. "It's unfortunate," he says, "that most people don't care about these things until it directly impacts them." The benefits of pretrial release become understandable when the person arrested is "their son, their daughter, their uncle. Now they say, "Oh my God! Why is he sitting up in jail just because he doesn't have the money to be released!?" He points out that everyone knows people who have gotten arrested, and "often they don't fit the stereotype of offenders being set free—it's your son, your neighbor in a very affluent neighborhood . . . it's the high school quarterback—and somebody might have the money to get them out, but maybe they don't have the money." At the end of the day, he says, "If they don't have the money, that shouldn't be what prevents them from getting the same treatment" in the criminal justice system.

Landes says that it is important that those who work with vulnerable populations continue to acknowledge that disparities exist. We need to take advantage of opportunities to share stories within our professional and personal circles of influence. Jailing a low-level offender can be problematic for any family. But, if that offender happens to be poor, the loss of a job and wages is particularly devastating.

## II. Policy Assessment and Reporting

In this seventh report, we describe our work, focusing on the time period following the completion of our sixth report on March 3, 2023.[1] Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County in meeting their goal of making the Harris County misdemeanor system a national model. Our work continues to be informed by regular conversations with County stakeholders and an intensive analysis of court records, ranging from docket entries to videos. We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to future conversations. As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under the Consent Decree, as well as conducted regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Conducted in-person site visits and public meetings.

(3) Continued to convene the Community Working Group.

(4) Examined and advised on the implementation of the court appearance reminder system.

(5) Continued data collection and analysis and incorporated this work into the seventh six-month Monitor Report, as well as advising on development of a public data dashboard.

### A. Policy Assessment

This Report describes our work reviewing the implementation of a range of policies under the Consent Decree. We held our most recent site visit on October 13, 2023. We had valuable meetings with the parties and a wide range of professionals who work in the misdemeanor bail system in Harris County.

The monitors and parties have long agreed on the need for better ways to detect and prevent these errors, since our own spot-checking is no substitute for a robust and automated system. In Fall 2023, the Office of Justice Safety (OJS) created a useful portal to report potential Rule 9 concerns and for the parties to share information and steps taken in response. Presently, OJS is working on additional data that could be imported to improve the ability to flag cases that might raise concerns, including cases in which a person did not receive a timely bail hearing or bail review. More resources need to be dedicated to reviewing cases of persons who receive prolonged and unwarranted detention, including in violation of the Consent Decree. We are extremely grateful for the work to build an improved system to permit all of the County actors to prevent delays and errors in case processing.

Below we describe: (1) studying pretrial hearing outcomes and changes to the magistration hearing process; (2) work with agencies including the Harris County Sheriff's Office; (3) work with

---

[1] We started our work upon our appointment on March 3, 2020. In the motion to appoint us as Monitor, our submission to the Court included a Proposal and Budget for Year 1 of work, which described our team members, timelines, an organization chart, and a budget for all participants. That information, and subsequent Work Plans, are available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/). Our Year 5 Work Plan is included here as Appendix E.

the CCCL and the Office of Court Management; and (4) Pretrial Services. We also describe engagement with nonparties, (5) the Harris County Public Defender's Office (HCPD) and the relatively new Office of Managed Assigned Counsel (MAC).

## 1. Studying Magistration Hearing Outcomes

We have continued to examine data regarding misdemeanor bail hearings as well as view videos from magistration hearings. We have continued to examine the text of Hearing Officers' pretrial rulings in misdemeanor cases. Among Hearing Officers, we have observed more detailed rulings that better track the process and requirements of Rule 9 and the Consent Decree from most of the magistrates. One ongoing area for improvement continues to be the need for factual findings regarding why or whether, when pretrial conditions are set, there is clear and convincing evidence that no less restrictive conditions can reasonably assure community safety and protect against flight from prosecution. We underscore that we continue to be impressed by the way in which the vast majority of rulings display real attention and care.

We also continue to observe videos of misdemeanor pretrial hearings conducted, both selecting hearings at random and when individual cases are brought to our attention. We watched several dozen hearings from Fall 2023. By watching these videos, we have learned a great deal about the important and challenging work of hearing officers during these hearings. We have seen quite careful discussions of appropriate conditions and types of bond. More broadly, we hope that the continued conversations and the recent trainings on Rule 9 and the Consent Decree will continue to improve outcomes and consistency in bail hearings at magistration and at bail review hearings in the Judges' courtrooms. We continue to explore the feasibility of additional changes that can improve the quality, fairness, and efficiency of the bail hearing process. We are extremely grateful for ongoing feedback and collaboration with the Hearing Officers.

## 2. Harris County Sheriff's Office

The Harris County Sheriff's Office ("HCSO") plays a central role in the Consent Decree's success, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing numerous improvements to the systems used in the past. We have been impressed with the efforts by HCSO to proactively identify cases of individuals with behavioral health needs and other cases that might risk errors or delays. We continue to discuss with the parties plans for improving the procedures and interdepartmental communication to detect and correct errors and reduce the time it takes to release people after making bond.

Regarding persons who are homeless and have behavioral health needs, we also hope Harris County further improves the availability of community reentry services so that people released will be safe and have a means of getting home or to a shelter, no matter the day or time they are released. We are impressed with the Pretrial Services pilot program in partnership with the Harris Center and related efforts during our last site visit. We are incredibly grateful and fortunate to work with such responsive county officials.

## 3. CCCL: Court Appearance and Notifications

An important pillar of the Consent Decree reforms has been the changed system for court appearance. The County completed a non-appearance mitigation plan, which was approved. One

important part of that work has already been piloted: a new website, https://myharriscountycase.com, at which a person can quickly look up their case and locate detailed information about future appearances in that case. We view these new resources aimed at improving court appearance as an extremely important part of the Consent Decree and are so impressed with the hard work and collaboration among multiple County agencies to develop and now implement these plans.

As detailed in Part IV, the Office of Court Management ("OCM") and the County have now addressed issues identified in our last report, regarding system failures in sending electronic court notifications to people who have signed up for them. We describe in Part IV our evaluation of the initial data since those issues were fixed.

We also underscore the importance of having sound information regarding court appearance. We will continue to work with the County and the Judges to improve the data collection system concerning court appearance, as well as improve court appearance outcomes.

Where a central focus of our work under this Consent Decree are the magistration hearings which are overseen by the Judges, we continue to see prompt appointment of counsel as a crucial need. The County retained the National Association of Public Defense to conduct a study of Harris County's indigent defense system. The report noted the need for prompt appointment of counsel at magistration. Currently, the Judges have not authorized magistrates or other judicial designees to appoint counsel prior to the first appearance. Thus, it often takes seven days for counsel to be appointed to handle misdemeanor cases, and we have seen that sometimes it has taken more time than that. Prompt appointment of counsel would enable the client information obtained by the public defender at magistration to be promptly conveyed to whoever represents the person throughout the rest of the case. Prompt appointment of counsel will also have the highly beneficial effect of promoting appearance and vigorous representation at the first appearance, as well as establishing a relationship with counsel that would promote appearance and sound representation during the entire process. Further, prompt appointment would prevent violations in which a person is wholly unrepresented at a bail review hearing or as a case proceeds. We have participated in ongoing discussions regarding the logistics involved in ensuring that counsel is appointed promptly and view this as a critical improvement that would provide enormous benefits to Harris County. We hope that the County and CCCL Judges will develop a plan for prompt appointment as soon as possible.

We also highlight the need for improved processes and data concerning the bail review hearings that judges conduct. We continue to review, by hand, documentation from those bail review hearings. We continue to observe instances in which bail reviews are purportedly waived, but now see far more instances in which the bail review was reset because the person was not present. We recently learned that in summer 2023, the CCCL Judges modified the bail review form to include an option to reset a bail review hearing on the basis that a person was not present. Where that option is selected, it is still not clear whether a reset was necessary under the circumstances. A limited review of a sample of bail review hearing forms suggests that resetting bail reviews in this manner is a common—most likely daily—occurrence. Under Rule 9, a person is entitled to a bail review within the next business day of a 15.17 hearing. We continue to discuss under what situations these resets occur and how to assure that Rule 9 is followed and to prevent undue delay, so that judges can efficiently conduct their review. We also continue to discuss the need for a system to automatically detect and flag cases in which a valid bail review or waiver has not taken place. We are extremely grateful for the feedback and collaboration with the CCCL Judges and OCM.

### 4. Pretrial Services

Pretrial Services has begun to develop a range of improvements to their work, including changes that importantly impact misdemeanor cases. We have discussed the importance of ensuring that only the least-restrictive conditions necessary are imposed and have provided information about how imposing excessive conditions of release can be counterproductive, making it more likely a person will miss court and/or reoffend.

We continue to highlight the importance of the noteworthy study released by the Government Performance Lab at Harvard's Kennedy School, finding that CCCL judges and Harris County Pretrial Services reduced the use of punitive conditions for over 2,200 clients on pretrial supervision while observing steady compliance and rates of rearrest.[2] This pilot project, conducted from October 2020 to June 2022, involved both pretrial staff and judges in reviewing condition placement within 30-120 days to adjust condition intensity and frequency. They would "step down" these conditions of supervision, resulting in substantial cost savings to the County, maximizing the freedom of clients, and, they found, achieving positive public safety results. We hope that there is strong interest in continuing this work among judges and Pretrial Services. Further, the work has implications for Hearing Officers, as well, as they consider what initial conditions of supervision are appropriate.

As noted, we have also discussed procedures and possible improvements when persons with behavioral health needs are booked in misdemeanor cases. We are extremely grateful for the collaboration and efforts of Pretrial Services.

### 5. Public Defender's Office and the Office of the Managed Assigned Counsel (MAC)

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention."[3] Rule 9 and the Consent Decree require that a public defender is available to represent all individuals at bail hearings. Further, the Consent Decree envisions a process of continuous improvement in the public defense services provided at these hearings, including the retention of an expert in holistic defense services and the development of a plan for improving indigent defense.[4] The County retained the National Association for Public Defense (NAPD) to: (1) evaluate its current misdemeanor indigent defense systems in Harris County; and (2) determine the need for essential support staff and holistic services to promote zealous and effective indigent defense. The NAPD's report made a series of detailed recommendations.[5] Harris County is completing plans to respond to these recommendations. Some recommendations have been responded to already, but other work is in the planning stages.

## III. Data Analysis

The ODonnell Monitor team continues to do substantial work, jointly with Harris County Research and Analysis Division (RAD), to prepare and improve a data management system to permit

---

[2] Hena Rafiq, *Building a Responsive Pretrial Supervision System in Harris County, TX* (2023), at https://govlab.hks.harvard.edu/building-responsive-pretrial-supervision-system-harris-county-texas?admin_panel=1.

[3] Consent Decree at ¶37.

[4] Consent Decree at ¶41, 43.

[5] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/Harris%20County%20Report%20July%206%202021%20FINAL.pdf.

analysis of misdemeanor cases in Harris County. Some of the key data updates since our last report include incorporating more detailed information on arrestees' mental health status and refining our internal logic to determine whether a given case should belong to each type of carve-out cases.

The expansion of the mental health measure is particularly noteworthy. In our previous reports, we only relied on whether and when a magistrate had requested a mental health assessment from a local Mental Health and Mental Retardation (MHMR) agency to determine a persons' mental health status. An arrestee was considered to have a mental health disorder if the request was made within one year before their case filing date. Since then, the monitor team has worked closely with the Harris County Office of Budget and Management and RAD to acquire more comprehensive and detailed information on arrestees' mental health status. This effort has enabled us to obtain additional mental health measures, allowing us to implement a more in-depth analysis of misdemeanor arrestees with a history of mental health disorders. We are extremely grateful to the Office of Budget and Management and RAD for their generosity and hard work.

In recent months, RAD has also worked with several county government agencies, including the Harris County Attorney's Office (CAO), Office of Court Management for the CCCL (OCM), Harris County Office of Management and Budget, and Harris County Pretrial Services, to obtain new and improved data elements. We very much appreciate their support and guidance, which helped us significantly expand the scope of our analysis and enhancing the quality of both existing and new data for misdemeanor cases and arrestees.

In this report, our data analyses examine the following topics:
1. Number of misdemeanor cases and arrestees.
2. Demographic characteristics of misdemeanor arrestees.
3. Number of misdemeanor cases that belong to "carve-out" categories.
4. Duration of pretrial detention and holds placed.
5. Initial bond decisions.
6. Magistration hearing outcomes.
7. Case dispositions.
8. Repeat arrest rate.
9. Homelessness and mental health assessment.

## 1. Number of Misdemeanor Cases and Arrestees

Our main data source consists of case-level records on all Class A and B misdemeanor cases filed in the Harris County Criminal Courts at Law (CCCL) between January 1, 2015 and December 31, 2023. which was downloaded from the RAD's database on February 12, 2024.[6] A noteworthy sample restriction is that 12,104 out-of-county fugitive cases during this period of time are removed from our analysis. Most of these fugitive cases simply result in the arrestee being sent back to the requesting agency and thus are not directly related to the misdemeanor bail reforms in Harris County. As before, all Class C misdemeanor cases, which only involve a fine of up to $500 without any jail time, are also omitted from the analysis.

---

[6] It is important to note the vintage date of our data, as a small number of cases may be sealed, expunged, or corrected over time, which will update and revise existing misdemeanor case records in the database.

We begin our analysis by presenting the number of persons arrested for misdemeanors in Harris County between 2015 and 2023, by the year of case filing date. For this person-level count, if a person is arrested multiple times during a calendar year, we count this as a single observation. As shown in Figure 1, the number of misdemeanor arrestees has declined by more than 15 percent between 2015 (N=49,359) and 2023 (N=41,177). However, there has been a slight increase in misdemeanor arrests since 2020, the year the misdemeanor system in Harris County was most significantly affected by the Covid-19 pandemic.

Figure 1 also shows the number of people arrested for misdemeanors with co-occurring felonies, who were arrested for a misdemeanor *and* a felony on the same date and likely subject to different pretrial jail and bond policies from other misdemeanor arrestees. If a person was arrested for a misdemeanor multiple times during a calendar year, and any of these arrests involved a co-occurring felony, we consider this person as the one with a co-occurring felony. While the total number of misdemeanor arrestees has substantially declined since 2015, we observe that the number of misdemeanor arrestees with co-occurring felonies has increased over time (1,221 in 2015 vs. 3,467 in 2023). It is unclear why the number of such persons has consistently and substantially increased over time, but one possible explanation is that the increase is largely driven by a rising number of felony cases filed in Harris County in recent years. In Table 14 below, we elaborate further on this point by presenting the annual counts of felony cases in Harris County.

**Figure 1: Number of Persons Arrested for Misdemeanors by Year**



The number of people arrested for misdemeanors, presented in Figure 1, understates the number of misdemeanor cases, as some individuals may be arrested multiple times during a calendar year, and some are charged with multiple offenses from a single arrest. Figure 2 presents the annual counts of misdemeanor cases, which should be more closely aligned with the prevalence of misdemeanor offenses in Harris County. As expected, the number of misdemeanor cases is roughly 20 percent higher than that of misdemeanor arrestees, but following a similar downward trend from

2015 (N=60,623) and 2023 (N=50,330), with a slight increase after 2020. Also, as in Figure 1, the number of misdemeanor cases with co-occurring felonies has nearly tripled between 2015 and 2023. Overall, we conclude that misdemeanors in Harris County have declined between 2015 and 2023 by 17 percent, but the recent uptick since 2020 suggests a need for further observation to determine whether this trend will persist.

**Figure 2: Number of Misdemeanor Cases Filed by Year**



Motivated by the offense categories used by the FBI's National Incident-Based Reporting System (NIBRS), we present in Table 1 the breakdown of the misdemeanor cases by the offense type. Specifically, we linked the Texas offense codes to NIBRS offense codes using the crosswalk published by the Texas Department of Public Safety.[7] When looking at the count of misdemeanor cases by offense type, we find diverse trends in misdemeanor offenses between 2015 and 2023. For instance, the share of thefts among all misdemeanor cases has fallen from 16 percent in 2015 to 10 percent in 2023, while the share of weapon violation cases has increased from 3 percent in 2015 to 7 percent in 2023. Despite the substantial decline in the total number of misdemeanor cases (see Figure 2), the number of misdemeanor assault cases has nearly doubled between 2015 (N = 7,574) and 2023 (N = 12,326). We also note that these four types of offenses alone account from nearly one-half of the total misdemeanor cases filed in Harris County in 2023.

**Table 1. Number of Misdemeanor Cases by Year and Offense Type**

| Year | Assault | | Theft | | Trespass | | Weapon Violation | | Others | |
|------|---------|------|-------|-------|----------|------|----------|------|--------|------|
| 2015 | 7574 | (12%) | 9775 | (16%) | 5485 | (9%) | 1563 | (3%) | 36226 | (60%) |

[7] The offense code crosswalk is available at: https://www.dps.texas.gov/section/crime-records/nibrs-technical-documentation (last accessed on February 29, 2024).

| 2016 | 7756 | (13%) | 6817 | (11%) | 5854 | (10%) | 2149 | (4%) | 36730 | (62%) |
| 2017 | 7394 | (14%) | 5939 | (11%) | 5387 | (10%) | 2318 | (4%) | 30623 | (59%) |
| 2018 | 9679 | (18%) | 5441 | (10%) | 4589 | (9%) | 2303 | (4%) | 31568 | (59%) |
| 2019 | 9491 | (19%) | 6108 | (12%) | 2177 | (4%) | 2338 | (5%) | 30111 | (60%) |
| 2020 | 10569 | (24%) | 4013 | (9%) | 1568 | (4%) | 3460 | (8%) | 24415 | (55%) |
| 2021 | 11292 | (24%) | 3670 | (8%) | 2155 | (4%) | 4689 | (10%) | 26118 | (54%) |
| 2022 | 11141 | (23%) | 4363 | (9%) | 3051 | (6%) | 4245 | (9%) | 24743 | (52%) |
| 2023 | 12326 | (24%) | 5160 | (10%) | 3466 | (7%) | 3667 | (7%) | 25711 | (51%) |

## 2. Demographic Characteristics of Misdemeanor Arrestees

Below we describe demographic characteristics of misdemeanor arrestees in Harris County, covering sex, race, ethnic, and income distributions. Harris County follows the U.S. Census Bureau, in adhering to 1997 Office of Management and Budget definitions, in which a person may self-identify as having both races (with categories of White, Black or African American, American Indian or Native Alaskan, Asian, and Native Hawaiian or Other Pacific Islander) and ethnicity (Hispanic, Latino or Spanish).[8] A person is allowed to choose one race category, and the existing data may not reflect how a person would self-identify if they were given the option to select more than one category or self-identify as a mixed race. Regarding ethnicity, we use the term Latinx throughout this report. We note that an arrestee's ethnicity information is not required to be filled out and is often not filled out by the Sheriff's Office. As in Figure 1, we present in the figures below the sex, race, and ethnic distribution at the *person-level*.

**Figure 3: Sex Distribution of Misdemeanor Defendants**



---

[8] More information about the race and ethnicity definitions used by the U.S. Census can be found at: https://www.census.gov/topics/population/race/about.html.

Figure 3 indicates that the sex distribution of misdemeanor arrestees in Harris County has been very stable during the last nine years, with males making up approximately 75 percent of arrestees annually. This sex ratio closely aligns with recent arrest statistics published by the FBI, showing that males accounted for 73% of all arrests made in 2022.[9] We also note that an arrestee's sex information is available in virtually all misdemeanor cases. For example, out of 41,177 misdemeanor arrestees in Harris County in 2023, information on sex is missing for only 71 persons.

**Figure 4: Race Distribution of Misdemeanor Defendants**



Figure 4 illustrates the race makeup of misdemeanor arrestees. A person may be identified as one of the five racial groups, namely, (1) White, (2) Black or African American, (3) American Indian or Native Alaskan, (4) Asian, and (5) Native Hawaiian or Other Pacific Islander. However, in reality, black and white individuals represent 98 percent of the misdemeanor arrestees. (For brevity, we do not separately report the shares of the other three racial groups.) As in the sex distribution, the race makeup of misdemeanor arrestees has also been remarkably stable over time. Despite the significant changes in the total number of misdemeanor cases (Figure 2) and offense composition over time (Table 1), black and white arrestees accounted for approximately 40 and 60 percent of the misdemeanor arrestees in Harris County in each year between 2015 and 2023.

When compared to the national statistics, the share of black misdemeanor arrestees in Harris County in 2022 (40 percent) is somewhat higher than the FBI's reported national average from the same year (27 percent).[10] However, some of this disparity likely come from the difference in the racial composition of Harris County relative to the national average. According to the U.S. Census Bureau's 2023 Population Estimates Program (PEP), the share of black population in Harris County was 20.6 percent, while the national average was only 13.6 percent. We also note that Figure 4

---

[9] *See* Federal Bureau of Investigation, Crime Data Explorer, at https://cde.ucr.cjis.gov/
[10] *See* Federal Bureau of Investigation, Crime Data Explorer, at https://cde.ucr.cjis.gov/

presents the racial distribution among *misdemeanor* arrestees in Harris County, while the FBI's national arrest statistics encompasses both misdemeanor and felony cases.

Unlike sex and race, information on defendant ethnicity is often not recorded and unobserved for many misdemeanor defendants. For example, ethnicity information is missing for more than 60 percent of misdemeanor arrestees between 2015 and 2023. To overcome this data limitation, we implement an imputation technique which predicts individuals' ethnicity based on their neighborhoods of residence and last names.[11] More specifically, for each misdemeanor arrestee, we utilize the last address observed at the time of each case filing to identify the associated Census tract and use the tract-level ethnic composition, as well as their last names, to predict their ethnicity. In a small number of cases where the persons' addresses were invalid or missing, we only use their last names as a predictor of their ethnicity. Our imputation method yields reasonably accurate results, with predicted ethnicity matching actual ethnicity in over 94 percent of the 140,812 misdemeanor arrestees whose ethnicity information is available.

**Figure 5: Ethnic Distribution of Misdemeanor Defendants**



Figure 5 presents the ethnic distribution of misdemeanor arrestees. We find that, overall, Latinx account for approximately 40 percent of the misdemeanor arrestees. However, unlike trends in sex and race distributions, the ethnic distribution has gradually shifted over time, as the share of Latinx arrestees rose from 37 percent in 2015 to 42 percent in 2020 to 43 percent in 2023. This increase mirrors the growing share of Latinx population in Harris County, which increased from 42 percent in 2015 to 45 percent in 2022.[12] In fact, the share of Latinx misdemeanor arrestees in 2022

---

[11] We used the R package wru for this prediction. The package predicts individuals' race and ethnicity by applying a well-established statistical technique, the Bayes' Rule, to the U.S. Census Bureau's Surname List from 2010, which contains information on the nationwide racial and ethnic composition associated with each last name, and the Decennial U.S. Census data, which include the racial and ethnic composition in each Census tract in 2010.

[12] *See* U.S. Census Bureau, at https://data.census.gov/

(42 percent) is very close to the share of Latinx population share in Harris County in the same year (45 percent). We cannot directly compare the ethnic distribution of misdemeanor arrestees in Harris County with national statistics, however, because ethnicity information is often missing in FBI's arrest statistics as well.

An arrestee's economic status, such as income and employment history, is believed to be correlated with the probability of arrest and incarceration. However, such information is rarely collected in a systematic and reliable way.[13] We thus use the neighborhood where the person lived at the time of case filing and consider the neighborhood-level poverty rate as a proxy of the person's economic status. Specifically, we use a person's last known address at the time of each case filing, geocode the person's address to find out a corresponding Census Tract, and consider the tract-level poverty rate, observed from the U.S. Census' 5-year American Community Survey (ACS) data from years 2015-2019. An important limitation is that persons without a valid address, due to either homelessness or inaccurate address data entry, are necessarily omitted from this analysis.

The first column of Table 2 shows the number of misdemeanor arrestees with a valid address in Harris County that could be geocoded and linked to a specific Census tract. In each of the nine years considered, about 80 percent of the misdemeanor arrestees (for example, 33,170 out of 41,177 in 2023) had a valid Harris County address.

The subsequent columns of Table 2 present the number and share of misdemeanor arrestees, broken down by the tract-level poverty rate. We choose 15, 20, and 40 percent as the key thresholds of the neighborhood poverty level for the following reasons. According to the latest Census data, the official poverty rate in Harris County is 16.4 percent.[14] Moreover, U.S. Government Agencies often consider Census tracts with poverty rates over 20 percent as "poverty areas", and those with poverty rates over 40 percent as "extreme poverty areas."[15]

Out of persons with a valid address, roughly two-thirds are from Census Tracts with poverty rates higher than 15 percent, one-half from Census Tracts with poverty rates higher than 20 percent, and one-tenth from Census Tracts with poverty rates higher than 40 percent. These numbers are substantially higher than the corresponding shares from the general population, indicating that people from high-poverty neighborhoods are more likely to be in contact with the misdemeanor system in Harris County. In the same 5-year ACS data from the years 2015-2019, 52 percent of the Harris County population lived in Census Tracts with poverty rates higher than 15 percent, 37 percent lived in Census Tracts with poverty rates higher than 20 percent, and 6 percent lived in Census Tracts with poverty rates higher than 40 percent. We also note that, across all three measures, the share of misdemeanor arrestees from high-poverty neighborhoods seems to have fallen modestly but steadily. Specifically, the share of misdemeanor arrestees from high poverty rates (over 20 percent) has declined from 52 percent in 2015 to 49 percent in 2023.

---

[13] One notable exception is a recent report by the Bureau of Justice Statistics, Employment of State and Federal Prisoners Prior to Incarceration, 2016, at https://bjs.ojp.gov/employment-state-and-federal-prisoners-prior-incarceration-2016cde.ucr.cjis.gov/.

[14] *See* U.S. Census, Quick Facts, at https://www.census.gov/quickfacts/fact/table/harriscountytexas/PST045223.

[15] *See* Poverty Glossary from the U.S. Census Bureau (https://www.census.gov/topics/income-poverty/poverty/about/glossary.html) and Poverty Area Measures Documentation from the U.S. Department of Agriculture, at https://www.ers.usda.gov/data-products/poverty-area-measures/documentation/.

**Table 2. Number of Misdemeanor Arrestees from High-poverty Neighborhoods**

| Year | Number of Misd. Arrestees With Valid Address in Harris County | | Census Tract Poverty Rate in 2015-2019 | | | | | |
| | | | Over 15% | | Over 20% | | Over 40% | |
|------|-------|--------|-------|--------|-------|--------|-------|--------|
| 2015 | 39109 | (79%) | 26416 | (68%) | 20447 | (52%) | 3938 | (10%) |
| 2016 | 38078 | (80%) | 25843 | (68%) | 19976 | (52%) | 3904 | (10%) |
| 2017 | 34333 | (80%) | 22799 | (66%) | 17616 | (51%) | 3415 | (10%) |
| 2018 | 36270 | (81%) | 24734 | (68%) | 19248 | (53%) | 3788 | (10%) |
| 2019 | 35536 | (83%) | 23845 | (67%) | 18473 | (52%) | 3752 | (11%) |
| 2020 | 30512 | (83%) | 20350 | (67%) | 15700 | (51%) | 3044 | (10%) |
| 2021 | 32653 | (81%) | 21350 | (65%) | 16420 | (50%) | 3060 | (9%) |
| 2022 | 31870 | (81%) | 20657 | (65%) | 15762 | (49%) | 2913 | (9%) |
| 2023 | 33170 | (81%) | 21398 | (65%) | 16300 | (49%) | 3089 | (9%) |

### 3. Number of misdemeanor cases that belong to "carve-out" categories

Under Local Rule 9, which became effective on February 16, 2019, all persons arrested for misdemeanors must "have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non-financial conditions as soon as practicable after arrest," except for those who belong to the following "carve-out" categories:

9.4.1 Individuals arrested and charged for protective order and bond condition violations.[16]
9.4.2 Individuals arrested and charged for domestic violence (namely, assault or terroristic threat against family and intimate partners).
9.4.3 Individuals arrested and charged for repeat DWI within the past five years.
9.4.4 Individuals arrested and charged with any new offense while on any form of pretrial release.
9.4.5 Individuals arrested on a capias issued after a bond forfeiture or bond revocation.
9.4.6 Individuals arrested while on any form of community supervision for a Class A or B misdemeanor or a felony offense.

The first three carve-out categories concern the type of offense committed (such as domestic violence and repeat DWI), while the last three concern the person's status at the time of an arrest (such as pretrial release and community supervision). These categories are not mutually exclusive, and a single case may belong to more than one carve-out category. For example, a person arrested for a repeat DWI while under community supervision would belong to the third and sixth carve-out categories at the same time. The monitor has worked with RAD to further refine and validate the logic that predicts the carve-out status of a given case, based on the offense penal code and existing pretrial conditions. We are extremely grateful to RAD for their hard work and cooperation.

One important data expansion made since our last report is the addition of the "early presentment" (EP) flag, which reflects whether the arrestee had to appear for the bail magistration

---

[16] We note that noncompliance with conditions of pretrial release is likely more common than is reflected by the number of charges filed for alleged violations of bond conditions because not every alleged violation may result in a report of noncompliance.

hearing. Since the Consent Decree explicitly allowed those who do not belong to any of the carve-out categories to be eligible for a general order bond and be released from pretrial detention without having to appear for the magistration, the EP flag should be a more reliable measure of whether a misdemeanor arrestee belonged to one of the carve-out categories or not, compared to our internal logic that infers the person's carve-out status based on observable data elements. However, the EP flag has an important limitation in that it does not contain any information on why the person belongs to one of the carve-out categories. To explore the distribution of cases that belong to each carve-out category, we still have to rely on our internal logic. Perhaps more importantly, the EP flag can only tell us whether a given misdemeanor case filed *since 2019* belonged to a carve-out category because the general order bond was introduced in 2019. To explore whether and how the misdemeanor bail reforms have affected the prevalence of a certain carve-out offense (for example, repeat DWI), we still need to use the internal logic to compute the number of cases from earlier years (2015-2018) that would have belonged to a carve-out category if the Consent Decree were in place. In any case, the EP flag provides a valuable benchmark for our logic that determines whether a given misdemeanor case should belong to a carve-out category or not, and we plan to use the EP flag to further refine our internal logic.

**Figure 6: Share of Carve-out Misdemeanor Cases by Year**



For some of the carve-out categories, it is difficult to determine exactly which cases belong to the given carve-out category. This limitation is particularly relevant for the carve-out category 9.4.2 (domestic violence). More specifically, the currently available data do not allow us to distinguish between 1) terroristic threats against family (Penal Code 22.07(c)(1)) which make up the bulk of domestic violence carve-out cases and 2) other types of terroristic threats that should not be considered as domestic violence. In the absence of this full penal code information, we consider the count of *Class A misdemeanor* terroristic threat cases (Penal Code 22.07) as the proxy for the true count of domestic terroristic threats. This is likely an imperfect measure of the domestic violence carve-out case counts, but it should be a reasonably accurate estimate of the true count because

17

terroristic threats against a family member is a Class A misdemeanor offense while all other types of terroristic threats (e.g., against the public transportation and services) are considered as a third-degree felony, state jail felony, or Class B misdemeanor.

Figure 6 presents the share of carve-out misdemeanor cases by the year of case filing. Before the implementation of misdemeanor bail reforms during 2015 to 2016, less than 20 percent of the misdemeanor cases belonged to one of the carve-out categories. However, this share has gradually increased over time, with over 30 percent of the misdemeanor cases filed in 2023 falling into one of the carve-out categories. As noted above, one of the key components of the misdemeanor bail reforms in Harris County was the adoption of the general order bond, which allowed many misdemeanor arrestees to be released on bond without having to appear before a bail magistrate and without having to post a financial bond. The growing share of carve-out cases over time suggests that an increasing number of misdemeanor arrestees are no longer eligible for this crucial aspect of the bail reform.

In Table 3, we present a more detailed distribution of carve-out cases by category and year, focusing on distributions from odd years between 2015 and 2023 to save space. The rise in carve-out case counts appears to be largely driven by an increased number of arrests after a bond failure, escalating from 2,312 (32 percent) in 2015 to 6,739 (44 percent) in 2023. Likewise, the number of domestic violence cases almost doubled, moving from 3,052 (42 percent) in 2015 to 6,083 (39 percent) in 2023, although this growth is just in line with the overall rise in carve-out cases. On the other hand, we find that the number of arrests while under supervision fell from 1,893 (26 percent) in 2015 to 1,423 (11 percent) in 2021, before partially rebounding to 1,871 (12 percent) in 2023. Protective order violations and arrests while out on bond have been relatively rare throughout our study period, but arrests while out on bond has significantly increased between 2021 (N=234) and 2023 (N=1,427). It remains to be seen whether this represents a temporary fluctuation or the start of a sustained trend.

**Table 3: Distribution of Carve-out Cases, by Category and Year**

|  | | | Year | | |
| --- | --- | --- | --- | --- | --- |
|  | 2015 | 2017 | 2019 | 2021 | 2023 |
| Carve-out Categories | | | | | |
| Protective Order Violation | 2.50% | 2.70% | 2.90% | 6.30% | 5.00% |
| Domestic Violence | 42% | 36% | 40% | 39% | 39% |
| Repeat DWI | 6% | 8% | 10% | 11% | 7% |
| Arrest while out on Bond | <0.03% | 0.10% | 0.60% | 1.70% | 9.30% |
| Arrest after Bond Failure | 32% | 41% | 45% | 46% | 44% |
| Arrest while Supervised | 26% | 23% | 13% | 11% | 12% |
| Number of Carve-out Cases | 7268 | 8925 | 12124 | 13537 | 15401 |

## 4. Pretrial Detention and Holds Placed

Next, we examine the length of pretrial detention experienced by persons charged with misdemeanors by taking the time in days between booking and release dates. As in our previous reports, our focus is the length of *initial* pretrial detention has changed after recent misdemeanor bail

reforms. To be clear, for the initial pretrial detention, we consider whether a misdemeanor arrestee was detained within seven days of the case filing date and if so, the length of that initial detention. As noted in our previous reports, the currently available booking and release data appear to be somewhat incomplete, especially for the cases filed in earlier years. To some extent, this data limitation is likely to be explained by the fact that, prior to the opening of the Joint Processing Center (JPC) in 2019, some arrestees could be released on bond before reaching the Harris County Jail without leaving a booking record.[17] Even after 2019, it remains possible for some persons to post a pre-arranged bond without being booked at JPC.

Following the implementation of Local Rule 9 in 2019, a sizable number of misdemeanor arrestees became eligible for a general order bond, which allows them to be promptly released without having to appear before a bail magistrate and without leaving a formal booking record. We identify such persons based on their bond records, attributing to them with zero day of booking, instead of considering them as "missing" observations. This approach aims to illuminate the full impact of the misdemeanor bail reform on the length of initial pretrial detention among misdemeanor arrestees. Cases lacking both booking *and* bond records are still considered as missing observations and excluded from our analysis. Based on this methodology, we present in Table 4 the distribution of initial pretrial detention length at the case-level.

Table 4 reveals that cases filed after the misdemeanor bail reforms tend to involve a shorter duration of initial pretrial detention. For example, only in 75 percent of misdemeanor cases filed in 2015 and 2016 misdemeanor arrestees were released from jail within two days, while 12 percent involved initial pretrial detention of three to seven days, and another 12 percent resulted in pretrial detention extending beyond seven days. This distribution has significantly shifted over time, as more than 85 percent of the cases filed in 2023 involved initial pretrial detention lasting less than three days. Still, even after 2020, approximately 10 percent of the misdemeanor cases filed resulted in the arrestees being detained in jail for more than seven days before release.

**Table 4: Distribution of Initial Pretrial Detention Duration, All Misdemeanor Cases**

| | Initial Pretrial Detention Length | | | | | | |
|------|-------|-------|------|------|------|-------|-------|
| Year | 0-2 Days | | 3-7 Days | | > 7 Days | | Obs. |
| 2015 | 42809 | (75%) | 7009 | (12%) | 6959 | (12%) | 56777 |
| 2016 | 42145 | (75%) | 7010 | (12%) | 7369 | (13%) | 56524 |
| 2017 | 41372 | (84%) | 3388 | (7%) | 4536 | (9%) | 49296 |
| 2018 | 43978 | (86%) | 2421 | (5%) | 4590 | (9%) | 50989 |
| 2019 | 41518 | (87%) | 2357 | (5%) | 3917 | (8%) | 47792 |
| 2020 | 34409 | (85%) | 1939 | (5%) | 4252 | (10%) | 40600 |
| 2021 | 38349 | (85%) | 2198 | (5%) | 4401 | (10%) | 44948 |
| 2022 | 36910 | (83%) | 2444 | (6%) | 5037 | (11%) | 44391 |
| 2023 | 39970 | (86%) | 2191 | (5%) | 4582 | (10%) | 46743 |

---

[17] Before 2019, law enforcement agencies would initially transport the arrestees to their local jail or substation and then transport them to the Harris County Jail, but if an individual had a bond amount set in the system, the person could post a surety bond from that location and get released before reaching the Harris County Jail. Since JPC opened in February 2019, all arrestees are transported by the arresting officer directly to the JPC. Even after the opening of JPC, some of the defendants who are not in custody but have an active warrant are allowed to post unsecured personal bonds (if approved) without being admitted to the JPC's intake section.

## 5. Initial Bond Decisions

The recent misdemeanor bail reforms in Harris County were initiated by a federal class action lawsuit brought by a group of misdemeanor arrestees who remained in jail pretrial due solely to their inability to post a financial bond. Accordingly, the resulting bail reforms were designed to eliminate the existing bail system that imposed a fixed, prescribed bond amount for the offense in question, and instead promote a new, individualized misdemeanor bail system based on lawful justification. For instance, Local Rule 9 explicitly requires most misdemeanor arrestees who do not belong to one of the carve-out categories to be released on a general order bond, with an initial unsecured bond amount of $100 or less. We thus expect a higher rate of pretrial release on bond and a less frequent use of secured bond after the implementation of these bail reforms, and it is crucial to test these hypotheses based on the actual bond decision data.

**Figure 7: Share of Misdemeanor Cases in which Defendants Were Released on a Bond before First Setting**



As seen in Figure 7, the rate of initial pretrial release has substantially increased in recent years. Misdemeanor arrestees were released on a bond before the first setting in only 49 percent of the time in 2015, but this share has constantly increased, reaching 68 percent in 2017 (the year when the preliminary injunction became effective) and 84 percent in 2019 (the year when Local Rule 9 became effective). The rate slightly declined in 2020 but has remained very stable at around 80 percent since then. The significant increase in the pretrial release rate between 2015 and 2020 provides suggestive evidence that the reforms were effective in promoting pretrial liberty of many misdemeanor arrestees who, in the absence of the bail reforms, would have had to remain in jail due to their inability to post a financial bond.

Figure 8 presents the distribution of initial bond approvals by bond type. Prior to the bail reforms, most initial bond approvals involved surety or cash bonds, which require an upfront payment and thus prevented persons who lacked the financial resources from being released pretrial (86 percent in 2015 and 82 percent in 2016). However, after the implementation of the preliminary injunction, the share of surety and cash bonds sharply fell down to 54 percent in 2017 and 42 percent in 2018. Moreover, after Local Rule 9 in 2019, the share of surety and cash bonds has declined even further and reached 12 percent in 2023.

By contrast, the use of personal bonds and general order bonds, which do not require arrestees to pay to be released, has become far more common and now accounts for a vast majority of the bond approvals. For example, 28 and 60 percent of initial bond approvals in 2023 involved personal bonds and general order bonds, respectively. These changes likely lessened the financial burden of persons arrested for a misdemeanor offense, and helped to alleviate the gap in pretrial liberty between those who could and those who could not afford to pay the cost of secured bail.

**Figure 8: Types of Initial Bond Approvals**



Next, we look at the distribution of bond amounts and how it has changed over time to explore the impact of misdemeanor bail reforms. Although a majority of bond approvals now come from personal bonds and general order bonds, which do not involve a financial payment at the time of release, thousands of bond approvals in 2022 and 2023 still involve surety or cash bonds. Moreover, it is important to document the distribution of bond amounts from early years (2015 and 2016, for example) to better understand the financial burden that made it difficult for many low-income individuals to post a bond and be released from jail pretrial.

The top panel of Table 5 presents the distribution of initial bond amounts set. Before 2017, virtually all bond approvals (more than 99 percent of the time) involved a bond amount of $500 or more, and approximately 40 percent of the bond approvals required the person to pay $3,000 or more,

either directly or indirectly through the bond company. Bond amounts less than $500 were nearly non-existent. The share of bond approvals set at $3,000 or more decreased in 2017 (28%) and 2018 (13%), but more than 99 percent of the bonds still involved a bond amount equal to or higher than $500.

However, the bond amount distribution drastically changed in 2019, when Local Rule 9 was first implemented, requiring misdemeanor arrestees who do not belong to one of the carve-out categories to be released on "unsecured bail amounts set initially at no more than $100." This requirement seems to have had a major impact on the patterns of actual bond decisions, as nearly two-thirds of the bond approvals since 2019 involved bond amounts set at $100 or less. Meanwhile, initial bond amounts set at $500 or more have become less common and only account for roughly 30 percent of the bond approvals in 2023.

**Table 5: Distribution of Initial Bond Amount Set and Posted**

| | Initial Bond Amount Set | | | | | | | |
|------|------|------|------|------|------|------|------|------|
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | Obs. |
| 2015 | 7 | (0.01%) | 1 | (<0.01%) | 30686 | (59%) | 21655 | (41%) | 52349 |
| 2016 | 14 | (0.03%) | 7 | (0.01%) | 32712 | (60%) | 21996 | (40%) | 54729 |
| 2017 | 195 | (0.42%) | 16 | (0.03%) | 33098 | (71%) | 13082 | (28%) | 46391 |
| 2018 | 518 | (1.13%) | 94 | (0.21%) | 39087 | (86%) | 5954 | (13%) | 45653 |
| 2019 | 28721 | (62%) | 322 | (0.70%) | 12683 | (28%) | 4382 | (10%) | 46108 |
| 2020 | 25957 | (66%) | 409 | (1.04%) | 8470 | (21%) | 4649 | (12%) | 39485 |
| 2021 | 29185 | (67%) | 464 | (1.07%) | 10015 | (23%) | 3830 | (9%) | 43494 |
| 2022 | 28865 | (67%) | 548 | (1.28%) | 10169 | (24%) | 3383 | (8%) | 42965 |
| 2023 | 30021 | (67%) | 517 | (1.15%) | 10507 | (23%) | 3756 | (8%) | 44801 |
| | Initial Bond Amount Posted | | | | | | | |
| Year | $100 or Less | | $101-$499 | | $500-$2999 | | $3000 or More | Obs. |
| 2015 | 7 | (0.02%) | 1 | (<0.01%) | 23026 | (77%) | 6732 | (23%) | 29766 |
| 2016 | 14 | (0.04%) | 6 | (0.02%) | 25102 | (78%) | 6926 | (22%) | 32048 |
| 2017 | 164 | (0.47%) | 14 | (0.04%) | 28516 | (81%) | 6439 | (18%) | 35133 |
| 2018 | 435 | (1.13%) | 57 | (0.15%) | 34323 | (89%) | 3755 | (10%) | 38570 |
| 2019 | 28024 | (66%) | 230 | (0.54%) | 10551 | (25%) | 3586 | (8%) | 42391 |
| 2020 | 24974 | (70%) | 307 | (0.86%) | 6996 | (20%) | 3482 | (10%) | 35759 |
| 2021 | 28341 | (72%) | 362 | (0.92%) | 8481 | (21%) | 2370 | (6%) | 39554 |
| 2022 | 28153 | (72%) | 423 | (1.08%) | 8635 | (22%) | 2012 | (5%) | 39223 |
| 2023 | 29425 | (72%) | 389 | (0.95%) | 8803 | (22%) | 2322 | (6%) | 40939 |

Another key measure of the financial burden associated with pretrial release is how much money the person actually had to post, either by actually paying it via cash/secured bonds or promising to pay it in case of non-appearance. The difference between the bond amounts set and posted, and the difference between the number of bond approvals and actual bond postings, can shed light on how many persons received a bond "approval" but had to remain in jail because they could not afford the bond amount.

Three key patterns emerge from the bottom panel of Table 5, which presents the distribution of bond amounts posted. First, even before the general order bonds were introduced in 2019, most of the initial bonds set at $100 or less were successfully posted. For example, out of 195 misdemeanor cases in 2017 and 518 cases in 2018 that required a bond amount of $100 or less, the arrestee successfully posted a bond 84 percent of the time (164 and 435 cases in 2017 and 2018, respectively). On the other hand, when the initial bond amount was set at $3,000 or more, only 31 percent of the bond approvals actually resulted in a bond posting and pretrial release (6,732 out of 21,655 cases in 2015 and 6,926 out of 21,996 cases in 2016).

Secondly, the number of initial bonds of $100 or less rose steeply since 2019, which is most likely due to Local Rule 9 and general order bonds introduced in 2019. Since the general order bond is a judicial release order pre-approved by the CCCL judges and is a non-secured bond that does not require a cash payment at the time of release, it should not be surprising that a vast majority of the bond approvals with $100 or less bond amounts since 2019 (most of which should be the general order bond) are successfully posted and result in pretrial release of the arrestee. For example, in 2023, out of 30,021 misdemeanor cases in which the initial bond amount was set at $100 or less, the initial bond was successfully posted in 98 percent of the time (N = 29,425). Even for cases with higher bond amounts, the bond posting rate has also increased. When the bond amount set is between $500 and $2,999, the posting rate has increased from 75 percent in 2015 to 84 percent in 2023. Likewise, even among the cases with very high bond amounts set (that is, $3,000 or higher), the bond posting rate doubled from 31 percent in 2015 to 62 percent in 2023. Of course, it is noteworthy that the number of such cases has also declined between 2015 (N=21,655) and 2023 (N=2,322).

As shown above, the misdemeanor bail reforms helped many persons who would have remained in jail because of their inability to post the financial bond to be released pretrial. Given that the reforms have changed the composition of people released on bond, it is of interest to examine how and whether the increased number of bonds are successfully completed. To explore this important issue, we consider the data on bond forfeiture and revocation. The data currently available to us do not contain information on why a bond was forfeited or revoked, but both bond forfeiture and revocation can be viewed as an indicator that the bond "failed" due to non-appearance, new offense committed while on a bond, or other important violations. When constructing this measure of bond failure, we only include bond failures observed within one year of the bond approval date, rather than using different follow-up periods for bonds approved in different years. (Bonds approved in 2015 can be followed up for nine years while those approved in 2023 can only be followed up for one year.) Moreover, based on the actual bond data, we confirmed that most bond failures take place within the first few months of the approval date. For example, among all misdemeanor cases filed in 2019, 75 and 90 percent of the bond failures that occurred took place within 142 and 353 days of the approval date, respectively. Since most bonds approved in 2023 cannot be followed up to one year yet, our analysis only focuses on years between 2015 and 2022.

We underscore, however, that bond-failure data may be a poor proxy for assessing non-appearance rates. Bond forfeiture and bond revocation all reflect discretionary judicial decisions about whether a person missed court or violated a bond condition and, separately, whether the person's reasons for doing so warranted a forfeiture, surrender, or revocation. Different judges will make different decisions given the same real-world facts. However, beginning in December 2020, a new set of definitions were adopted as the Consent Decree's court appearance policy was operationalized by OCM, which should help us obtain a more reliable measure of non-appearance in the future.

Figure 9 presents the one-year failure rate of initial bonds by the year of case filing and type of bond approval. The failure rate among all bonds increased between 2015 (17%) and 2018 (30%), but have gradually declined since then and remained stable at around 25 percent as of 2022. When considering each bond type separately, surety and cash bonds tend to have the lowest one-year failure rate (14 percent in 2022) and personal bonds the highest failure rate (32 percent in 2022). The one-year failure rate of the general order bond, which now account for the majority of pretrial release of misdemeanor arrestees, is somewhere in the middle, currently at 25 percent as of 2022.

**Figure 9: Rate of Bond Failures within 365 Days, by Bond Types**



Another important limitation of the previous misdemeanor bail system in Harris County was that it had disparate racial and ethnic effects, as the jail population consisted of disproportionately many blacks and Latinx persons relative to the general county population. While the composition of jail population is a useful measure, it may be helpful to consider additional measures to fully understand the racial and ethnic inequality in the misdemeanor bail system. To this end, we present the rate of initial pretrial release by sex, race, and ethnicity in Table 6. The top panel shows the overall rate of pretrial release for each demographic group, and the bottom panel shows the rate of pretrial release on non-secured bonds such as personal bond and the general order bond.

The top panel shows that, prior to the misdemeanor bail reforms, there existed substantial differences in the pretrial release rates between females and males, blacks and whites, and Latinx and Non-Latinx. For example, in 2015, females (57%) were 10 percentage points more likely to be released than males (47%), whites (55%) 16 percentage points more likely than blacks (39%), and Latinx (59%) 15 percentage points more likely than Non-Latinx (44%). Since then, however, these gaps have noticeably diminished, there seem to be little differences in pretrial release rates across sex, racial, and ethnic groups after 2019. For example, among all misdemeanor cases filed in 2023,

the female-male and black-white differences in pretrial release rates narrowed down to 3 and 4 percentage points, respectively.

A slightly different pattern emerges when considering the rate of pretrial release on non-secured bonds. In 2015 and 2016, non-secured bonds were rarely approved, and there was little difference between blacks and whites, and Latinx and non-Latinx, in terms of the pretrial release on non-secured bonds. As the number of persons released on non-secured bonds increased in 2017, the rate of pretrial release on non-secured bonds differed by roughly 5 percentage differences between females and males (35% vs. 31%), blacks and whites (35% vs. 29%), and Latinx and non-Latinx (29% vs. 33%). However, after the implementation of Local Rule 9 and the Consent Decree in 2019, these differences became more modest. As of 2023, all three differences (by sex, race, and ethnicity) are equal to 1 percentage point or less.

**Table 6: Initial Pretrial Release Rate by Sex, Race, and Ethnicity**

| | By Sex | | By Race | | By Ethnicity | |
| Year | Female | Male | Black | White | Latinx | Non-Latinx |
|---|---|---|---|---|---|---|
| (A) Pretrial Release on Any Bond | | | | | | |
| 2015 | 57% | 47% | 39% | 55% | 59% | 44% |
| 2016 | 64% | 51% | 45% | 60% | 63% | 49% |
| 2017 | 74% | 66% | 62% | 71% | 73% | 65% |
| 2018 | 77% | 71% | 67% | 75% | 77% | 69% |
| 2019 | 87% | 84% | 82% | 86% | 87% | 83% |
| 2020 | 82% | 81% | 78% | 83% | 84% | 79% |
| 2021 | 85% | 82% | 80% | 85% | 85% | 81% |
| 2022 | 83% | 82% | 80% | 84% | 85% | 81% |
| 2023 | 84% | 81% | 79% | 83% | 83% | 80% |
| (B) Pretrial Release on PR/GOB | | | | | | |
| 2015 | 11% | 5% | 7% | 6% | 6% | 7% |
| 2016 | 15% | 8% | 11% | 9% | 9% | 10% |
| 2017 | 35% | 31% | 35% | 29% | 29% | 33% |
| 2018 | 46% | 40% | 45% | 40% | 39% | 43% |
| 2019 | 68% | 67% | 69% | 66% | 67% | 67% |
| 2020 | 69% | 69% | 68% | 69% | 71% | 67% |
| 2021 | 72% | 70% | 70% | 71% | 72% | 69% |
| 2022 | 72% | 72% | 71% | 73% | 74% | 71% |
| 2023 | 73% | 71% | 72% | 71% | 72% | 71% |

## 6. Magistration Hearing Outcomes

As shown above, in a large number of misdemeanor cases filed after 2019, the arrestee could be released on a general order bond set at $100 or less, bypassing the need for a magistration hearing or payment at the time of release. However, even in 2023, general order bonds only accounted for 60 percent of all misdemeanor bond approvals, and the other 40 percent was determined at the magistration hearing. These hearings involve the bail magistrate, defense counsel (either from the Harris County Public Defender's Office or a private attorney), and Assistant District Attorney (ADA),

and determine the probable cause for further detention and the specifics of the bond, such as the type and amount.

Below, we explore some of the key decisions made at the hearing, such as the type of bond approvals and requests, the set bond amounts, and the arrestee's indigency status. An important aspect of our magistration data is that it contains comprehensive information on both bond approvals (made by the magistrate) and requests (made by the defense counsel and ADAs). We also note that, the county adopted an electronic magistration form in March 2021, which has been used by all hearing officers since then. Thanks to it, a consistent record of all bond requests and decisions made during this timeframe has been maintained. Accordingly, our analysis focuses on roughly 80,000 misdemeanor magistration hearings that took place between March 10, 2021 and December 31, 2023.

Table 7 summarizes the bond requests made by the defense counsel and ADA, as well as the final bond decision made by the hearing officer. Across all three years considered, a personal bond was approved approximately 70 percent of the time, whereas a secured bond was granted roughly 25 percent of the time. The hearing officer can also explicitly deny a bail, but such instances are very rare (less than 1 percent of the time).[18] The shares of personal bond approvals, secured bond approvals, and bail denials do not add up to 100 percent because the bail magistrate may order the defendant to be further detained "until further order of the Court."

Furthermore, Table 7 highlights that defense counsel and ADAs frequently do not specify a bond request. However, when requests are made, they often differ significantly. For example, in 2023, defense counsel explicitly made a bond request in 38 percent of all magistration hearings (N=31,079), advocating for a personal bond 30 percent of the time and a secured bond 8 percent of the time. Conversely, ADAs made bond requests in 39 percent of the misdemeanor magistration hearings from 2023, mostly requesting a secured bond (38 percent) and seldom requesting a personal bond (0.1 percent) or bond denial (1 percent).

**Table 7: Bond Type Request and Outcome in Magistration Hearing**

|  | Personal Bond | Secured Bond | Bail Denied | No Request Made | Obs. |
|---|---|---|---|---|---|
| **(A) Year = 2021** |  |  |  |  |  |
| Actual Outcome | 72.1% | 25.7% | 0.9% |  | 22017 |
| Defense Request | 37.7% | 6.9% |  | 53.3% | 22017 |
| ADA request | 0.3% | 42.6% | 2.2% | 49.7% | 22017 |
| **(B) Year = 2022** |  |  |  |  |  |
| Actual Outcome | 77.4% | 20.8% | 0.3% |  | 28695 |
| Defense Request | 28.5% | 6.2% |  | 48.5% | 28695 |
| ADA request | 0.1% | 34.0% | 1.5% | 44.3% | 28695 |
| **(C) Year = 2023** |  |  |  |  |  |
| Actual Outcome | 69.9% | 28.0% | 0.2% |  | 31079 |
| Defense Request | 29.8% | 8.2% |  | 41.1% | 31079 |
| ADA request | 0.1% | 37.8% | 1.0% | 35.1% | 31079 |

---

[18] The Texas Constitution limits when bail can be denied in a misdemeanor case. Tex. Con. Article I. Sec. 11b-c.

Table 8 illustrates the distribution of bond amounts requested by the defense counsel and ADAs, along with the actual bond amount set by the magistrate. Similar to Table 7, we find that defense counsels tend to make a request for lower bond amounts while ADAs asking for higher amounts, with the actual bond amount set by the magistrate falling in between these two extremes. For example, across all three years considered, defense counsel requested a bond amount of $1,000 or less in over 75 percent of the cases, while ADAs did so in roughly 25 percent of the time. The requested bond amounts from both parties significantly diverge from the distribution of actual bond amounts set, where $1,000 approximately corresponds to the 60th percentile. We also note that all three bond amount distributions seem to have changed relatively stable between 2021 and 2023.

**Table 8: Distribution of Bond Amount Requests in Magistration Hearing**

|  | Bond Amount Set | Defense Request | ADA Request |
| --- | --- | --- | --- |
| (A) Year = 2021 (N = 22,017) |  |  |  |
| $100 or Less | 13.6% | 16.5% | 6.0% |
| $500 or Less | 42.3% | 50.2% | 20.0% |
| $1000 or Less | 59.3% | 75.7% | 26.0% |
| $3000 or Less | 82.7% | 92.5% | 42.7% |
| $5000 or Less | 94.1% | 97.8% | 80.5% |
| $10000 or Less | 98.4% | 99.6% | 94.8% |
| (B) Year = 2022 (N = 28,695) |  |  |  |
| $100 or Less | 14.9% | 24.5% | 5.3% |
| $500 or Less | 42.4% | 56.7% | 17.3% |
| $1000 or Less | 59.6% | 79.4% | 22.7% |
| $3000 or Less | 83.0% | 93.3% | 36.8% |
| $5000 or Less | 93.5% | 97.6% | 71.1% |
| $10000 or Less | 98.1% | 99.5% | 90.1% |
| (C) Year = 2023 (N = 31,079) |  |  |  |
| $100 or Less | 10.0% | 26.0% | 4.5% |
| $500 or Less | 37.7% | 54.4% | 15.8% |
| $1000 or Less | 53.7% | 77.9% | 23.2% |
| $3000 or Less | 80.5% | 92.2% | 39.9% |
| $5000 or Less | 92.8% | 96.8% | 70.0% |
| $10000 or Less | 98.0% | 99.4% | 89.6% |

Under Local Rule 9, bail magistrates are required to review the arrestee's financial information collected through an affidavit and ask the person to sign it. They are also expected to determine the maximum amount of bail the arrestee can afford before making a final bond decision. Furthermore, an arrestee identified as indigent—defined as having an income at or below 200% of the federal poverty level, being a full-time student, homeless, institutionalized, or eligible for public

assistance due to financial hardship—is presumed eligible for pretrial release without the imposition of payment or fees for their release from pretrial detention. Therefore, the determination of an arrestee's indigency status can have a substantial impact on the person's ultimate bond decisions.

Despite the importance of the person's indigency status at the magistration hearing, Table 9 shows that indigency status is frequently left unrecorded by the hearing officer. Indeed, the information is missing for about 40 percent of the magistration hearings in 2021 and 2022, although the figure improved to 31 percent in 2023. Nevertheless, the share of misdemeanor arrestees identified as indigent has seen a steady increase from 51 percent in 2021 to 59 percent. Combined with the high rate of personal bond approvals at the magistration hearing (Table 7), these findings imply that a significant number of misdemeanor arrestees in Harris County are likely low-income individuals who are unable to afford the amounts needed for release on secured bonds.

**Table 9: Indigency Status**

| Year | Indigent | Not Indigent | Unable to Determine | Missing Data | Obs. |
|------|----------|--------------|---------------------|--------------|-------|
| 2021 | 50.9% | 4.3% | 5.7% | 39.2% | 22017 |
| 2022 | 51.2% | 4.2% | 4.8% | 39.8% | 28695 |
| 2023 | 59.0% | 6.0% | 4.0% | 31.0% | 31079 |

### 7. Case Disposition Outcomes

Recent academic studies find evidence that pretrial detention may significantly aggravate arrestees' eventual case disposition outcomes, because the detention may hamper their ability to gather supporting evidence and/or increase the pressure to accept an unfavorable plea deal to avoid continued detention and uncertainty associated with a future trial.[19] Given that Harris County's bail reforms substantially increased the likelihood of prompt pretrial release of misdemeanor arrestees, it is plausible that these reforms have also influenced the trends in misdemeanor case dispositions. We thus proceed to explore the patterns of misdemeanor case disposition outcomes before and after the implementation of these bail reforms.

Figure 10 presents the distribution of case dispositions by the year of case filing. For this analysis, we focus on cases filed between 2015 and 2022 because many cases filed in 2023 remain undisposed yet. In fact, a non-trivial share of cases filed in 2020 (8%), 2021 (9%), and 2022 (16%) still remain undisposed, which introduces some complexity to our interpretation of the data. Nevertheless, our data reveal a noticeable decline over time in the share of cases resulting in a criminal conviction. Specifically, the conviction rate fell from 60 percent in 2015 to 48 percent in 2017, and further to 26 percent in 2019, while the combined rate of dismissal or acquittal surged from 31 percent in 2015 to 65 percent in 2019.

---

[19] Gupta, Arpit, Christopher Hansman, and Ethan Frenchman. "The heavy costs of high bail: Evidence from judge randomization." *Journal of Legal Studies* 45.2 (2016): 471-505.

**Figure 10: Case Disposition Outcomes**



Figure 11 once again shows the distribution of case dispositions, but this time without cases that are not disposed yet. The figure further highlights a large and steady reduction in the conviction rate over time, moving from 60 percent in 2015 to 22 percent in 2022. At the same time, there has been a marked increase in the share of misdemeanor cases acquitted or dismissed, which increased from 31 percent in 2015 to 76 percent in 2022. Figure 11 also shows that the use of deferred

adjudication, in which a person pleads guilty but the finding of guilt is not entered pending compliance with the conditions of the deferral agreement, has declined over time. While 8 percent of the cases filed in 2015 resulted in deferred adjudication, only 2 percent of the cases filed in 2022 did so.

In addition to the case disposition, we also consider the length of jail sentence, if given, as another key disposition outcome. The reduction in conviction rates over time, presented in Figures 10 and 11, may suggest a shift in the nature of misdemeanor conviction (that is, jail sentences are increasingly imposed upon the most severe types of misdemeanor offenses), which likely increases the average length of sentencing among those convicted. Alternatively, it is possible that the declining conviction rate over time is not significantly correlated with the types of misdemeanor offenses being convicted, resulting in minimal changes in the distribution of jail sentence lengths.

The actual distribution of misdemeanor jail sentences, presented in Table 10, has remained very consistent between 2015 and 2022. Throughout these years, about 80 percent of the misdemeanor cases resulted in jail sentences of 90 days or less, and approximately 90 percent were sentenced to 180 days or less. What makes this consistency even more remarkable is that both the number and share of misdemeanor cases resulting in jail sentence have declined substantially during this time period. For example, the number of misdemeanor cases resulting in a jail sentence fell from 37,488 in 2015 to 8,784 in 2022.

**Table 10: Distribution of Jail Sentences**

| Year | Case Count | Jail Sentence | | 30 Days or Less | | 90 Days or Less | | 180 Days or Less | |
|------|-----------|-------|-------|-------|-------|-------|-------|-------|-------|
| 2015 | 60373 | 37488 | (62%) | 26192 | (70%) | 31561 | (84%) | 34717 | (93%) |
| 2016 | 58945 | 34706 | (59%) | 24605 | (71%) | 29328 | (85%) | 32173 | (93%) |
| 2017 | 50910 | 24911 | (49%) | 16672 | (67%) | 20392 | (82%) | 22793 | (91%) |
| 2018 | 52237 | 20324 | (39%) | 13535 | (67%) | 16722 | (82%) | 18843 | (93%) |
| 2019 | 47546 | 13386 | (28%) | 8758 | (65%) | 10828 | (81%) | 12475 | (93%) |
| 2020 | 40692 | 10732 | (26%) | 6930 | (65%) | 8318 | (78%) | 9862 | (92%) |
| 2021 | 43525 | 10682 | (25%) | 7376 | (69%) | 8455 | (79%) | 9835 | (92%) |
| 2022 | 39870 | 8784 | (22%) | 6376 | (73%) | 7229 | (82%) | 8158 | (93%) |

Lastly, we examine the time it takes for misdemeanor cases to reach disposition and how this timeline has evolved in recent years. One potential concern with the bail reforms that allowed many misdemeanor arrestees to be released on unsecured bonds is that some of them may fail to appear for subsequent court dates, potentially causing a delay in the time-to-disposition. It is difficult to test this hypothesis directly, because there have been several other co-occurring factors that contributed to an increased case backlogs during our study period, such as Hurricane Harvey that closed down the courthouse in 2017 and Covid-19 pandemic which significantly slowed down all aspects of the criminal justice system between 2020 and 2022.

Notwithstanding these challenges, we find a steady increase in the time-to-disposition for many misdemeanor cases. For example, in 2015, more than 90 percent of the misdemeanor cases were disposed within 365 days, but this share plummeted to 45 percent in 2020.

However, this trend appears to reverse starting in 2020, with misdemeanor cases filed in subsequent years resolved more swiftly. The share of cases disposed within 365 days of the case filing date has increased between 2020 (45 percent) and 2022 (68 percent). Additional data from the coming years will be needed to confirm this trend reversal, but a growing number of cases disposed in a relatively shorter period of time is a positive sign for the misdemeanor system in Harris County.

**Figure 12: Time in Days between Case Filing and Disposition**



## 8. Repeat Arrest

In this section, we explore the pattern of repeat offenses by persons charged with misdemeanors using several different measures, namely, 1) the share of *persons* charged with misdemeanors and then with a new offense within a year of the initial case filing date (person-level repeat-offense), 2) the share of misdemeanor *cases* in which the same person was charged with a new crime (case-level repeat-offense) within a year of the initial case filing date, 3) the share of misdemeanor cases in which a new crime was filed against the same person before the current case was disposed (pretrial misconduct), and 4) the share of misdemeanor cases filed each year that were charged against former misdemeanor arrestees from the previous year.

Consider the first two measures first. To obtain the case-level repeat-arrest rate, we follow all misdemeanor cases filed during a calendar year and compute the share of cases followed by a new criminal case filing within 365 days. To compute the person-level repeat-arrest rate, we follow all misdemeanor cases filed against the same person during a calendar year and consider whether any of these cases was followed by a new criminal case filing with 365 days. The case-level rate should be higher than the person-level rate, as multiple cases filed against the same person on the same day will be double-counted under the case-level measure. For example, if a person was charged for two separate offenses on the same day and again charged for a new offense a month later, this is counted

as two cases with a new case filed under the case-level measure but a single person with a new case filed under the person-level measure. It is important to note that just because a case is *filed* does not mean that the person is found guilty or convicted. Our analysis shows only *new cases filed*. It does not reveal whether the person was actually guilty or convicted of the offense in question. We also note that cases filed in 2023 are omitted when considering these one-year re-arrest measures, because many of them cannot be followed up to a year yet.

We begin our analysis in Figure 13 by presenting the person-level repeat-arrest rate. From the figure, it is evident that the one-year repeat arrest rate has stayed remarkably constant during our study period, consistently hovering around 23 percent, except a small, temporary dip among persons initially arrested in 2019. Similarly, the rate of one-year felony repeat arrest has remained largely stable, fluctuating between 11 and 12 percent, again except for a brief increase in 2020. It is particularly noteworthy that the one-year repeat arrest rate among misdemeanor arrestees has remained stable, despite the substantial changes in the misdemeanor bail system that influenced the patterns of pretrial detention and case disposition in Harris County.

**Figure 13: Share of Misdemeanor Arrestees with a New Case Filed within 365 Days**



Table 11 presents the number of one-year repeat arrests by the type of new offense and the year of the initial case filing, with a focus on six major offense types for the sake of brevity. The data reveal that re-arrests for the most severe crimes (such as murder and robbery) among misdemeanor arrestees are relatively rare, whereas re-arrests for offenses like assault and theft are far more common. For example, out of 39,526 persons arrested for a misdemeanor in 2022, 79 (0.20 percent) and 453 (1.1 percent) were re-arrested for murder and robbery within a year, whereas 3,074 persons (7.8 percent) and 1,715 (4.3 percent) were re-arrested for assault and theft, respectively. We also note that, unlike the overall repeat arrest rate, the rates for specific offenses have experienced significant changes over time. For example, the repeat arrest rate due to assault has increased from 4.8 percent

in 2015 to 7.8 percent in 2022, while drug-related offenses decreased from 7.2 percent in 2015 to 3.3 percent in 2022.

**Table 11: Number of Misdemeanor Arrestees with a New Case Filed within 365 Days, by Offense Type**

| Year | Murder | | Robbery | | Assault | | Arrestee Count |
|------|------|---------|------|--------|------|--------|----------------|
| 2015 | 68 | (0.14%) | 434 | (0.9%) | 2363 | (4.8%) | 49359 |
| 2016 | 57 | (0.12%) | 398 | (0.8%) | 2393 | (5.0%) | 47503 |
| 2017 | 51 | (0.12%) | 375 | (0.9%) | 2423 | (5.7%) | 42785 |
| 2018 | 68 | (0.25%) | 436 | (1.0%) | 2754 | (6.1%) | 44901 |
| 2019 | 61 | (0.14%) | 459 | (1.1%) | 2774 | (6.5%) | 42859 |
| 2020 | 95 | (0.26%) | 435 | (1.2%) | 3059 | (8.3%) | 36929 |
| 2021 | 89 | (0.22%) | 421 | (1.0%) | 3178 | (7.9%) | 40231 |
| 2022 | 79 | (0.20%) | 453 | (1.1%) | 3074 | (7.8%) | 39526 |
| Year | Theft | | Drug | | Weapon | | Arrestee Count |
| 2015 | 2238 | (4.5%) | 3563 | (7.2%) | 520 | (1.1%) | 49359 |
| 2016 | 1955 | (4.1%) | 3301 | (6.9%) | 609 | (1.3%) | 47503 |
| 2017 | 1775 | (4.1%) | 2310 | (5.4%) | 542 | (1.3%) | 42785 |
| 2018 | 1746 | (3.9%) | 2247 | (5.0%) | 551 | (1.2%) | 44901 |
| 2019 | 1744 | (4.1%) | 1589 | (3.7%) | 617 | (1.4%) | 42859 |
| 2020 | 1292 | (3.5%) | 1437 | (3.9%) | 901 | (2.4%) | 36929 |
| 2021 | 1515 | (3.8%) | 1506 | (3.7%) | 950 | (2.4%) | 40231 |
| 2022 | 1715 | (4.3%) | 1320 | (3.3%) | 772 | (2.0%) | 39526 |

Figure 14 presents the case-level repeat arrest rate. As expected, the one-year case-level repeat arrest rates (in which multiple cases filed against a same person may be double-counted) tend to be higher than the corresponding person-level rates (in which double-counting is ruled out). However, the person-level repeat arrest rates have also displayed remarkable consistency, minimally fluctuating between 26 and 27 percent in each year between 2015 and 2022, with the only exception of 2019.

Figure 14 also presents our third measure of repeat offense, namely, the (case-level) rate of repeat arrest prior to the disposition of the initial case, which serves as an indicator of pretrial reoffending and thus carries significant implications for public safety. However, the interpretation of this metric is not as straightforward, because it can be affected by both the actual changes in criminal risks of misdemeanor arrestees and variations in the time-to-disposition among misdemeanor cases over time. This concern can be particularly relevant in a setting like Harris County, where the timeframe for case disposition has seen considerable variability in recent years (as depicted in Figure 12). Indeed, we find that the rate of repeat arrest before disposition closely mirrors the trends in case disposition times. Whereas only 8 percent of misdemeanor cases filed in 2015 were followed by another case before the initial case was disposed, this share escalated to 27 percent in 2020, later falling to 22 percent in 2022. Overall, lengthening of time-to-disposition in Harris County seems to be a primary factor driving the increase in the rate of pretrial repeat arrest.

**Figure 14: Share of Misdemeanor Cases with a New Case Filed Against Same Person**



We now extend the above analysis by examining the number and share of repeat arrests, this time considering whether a bond was filed for the initial misdemeanor case and the type of bond filed. Since the misdemeanor bail reforms allowed many more misdemeanor arrestees to be released on bond, it is highly likely that the *number* of repeat arrests among persons who were released on bond has also increased over time. However, it is less clear whether the *rates* of repeat arrests among those who did and did not bond out have undergone significant changes over the same time period. On the one hand, some speculate that persons who are released on unsecured bonds may perceive the new bail system as more lenient, and thus become more likely to commit new offenses, expecting another easy, prompt release even if re-arrested. On the other hand, the higher probability of prompt pretrial release under the new system may help lower the risk of repeat offense and re-arrests, in light of the research findings that pretrial detention exacerbates criminal behavior by disrupting the arrestees' normal life and separating them from their employment, family, and support networks.[20]

Table 12 presents the number and share of misdemeanor cases followed by another case within a year, by bond filing status. We note that the number of one-year repeat arrests among those who were pretrial released has nearly doubled between 2015 (N=5,576) and 2022 (N=9,816). Following the preliminary injunction in 2017 and Local Rule 9 in 2019, there was also a noticeable increase in the number of misdemeanor cases in which the person was released on bond during this time period (from 29,759 in 2015 to 39,222 in 2022). As a result, the one-year repeat arrest rate among those who were released on bond did not change much over time, especially since 2017. Likewise, the one-year repeat arrest rate among those who were not released pretrial has also remained stable, shifting slightly from 35 percent in 2015 to 34 percent in 2022.

---

[20] *See, e.g.*, Dobbie, Will, Jacob Goldin, and Crystal S. Yang. "The effects of pre-trial detention on conviction, future crime, and employment: Evidence from randomly assigned judges." *American Economic Review* 108.2 (2018): 201-240.

Table 13 presents a more granular analysis, this time breaking down the repeat arrest counts and rates by the type of initial pretrial bond. We find that persons released on either a secured bond and general order bond have similar rates of one-year repeat arrests of around 20 percent, whereas those who were not released, or released on a personal bond, tend to have higher repeat arrest rates. However, as in Table 12, there have not been significant fluctuations in repeat arrest rates within each category over time, especially since 2017.

**Table 12. Number of Misdemeanor Cases with New Cases Filed by Bond or No Bond Filed**

| Year | Bond Filed | Case Count | New Case Filed Within 365 Days | |
|------|-----------|-----------|------------------|------|
| 2015 | No | 30864 | 10841 | (35%) |
| 2016 | No | 27262 | 10503 | (39%) |
| 2017 | No | 16532 | 6138 | (37%) |
| 2018 | No | 15011 | 5310 | (35%) |
| 2019 | No | 7841 | 2561 | (33%) |
| 2020 | No | 8266 | 2808 | (34%) |
| 2021 | No | 8372 | 3108 | (37%) |
| 2022 | No | 8321 | 2790 | (34%) |
| 2015 | Yes | 29759 | 5571 | (19%) |
| 2016 | Yes | 32044 | 5596 | (17%) |
| 2017 | Yes | 35129 | 7598 | (22%) |
| 2018 | Yes | 38569 | 8531 | (22%) |
| 2019 | Yes | 42384 | 9468 | (22%) |
| 2020 | Yes | 35759 | 8544 | (24%) |
| 2021 | Yes | 39552 | 9462 | (24%) |
| 2022 | Yes | 39222 | 9816 | (25%) |

**Table 13. Number of Misdemeanor Cases with New Cases Filed by Bond Type or No Bond Filed**

| Year | Bond Type | Case Count | New Case Filed Within 365 Days | |
|------|-----------|-----------|------------------|------|
| 2015 | Cash | 25739 | 4906 | (19%) |
| 2016 | Cash | 26341 | 4615 | (18%) |
| 2017 | Cash | 18833 | 2880 | (15%) |
| 2018 | Cash | 16209 | 2355 | (15%) |
| 2019 | Cash | 8608 | 1324 | (15%) |
| 2020 | Cash | 5502 | 1019 | (19%) |
| 2021 | Cash | 5766 | 1165 | (20%) |
| 2022 | Cash | 4953 | 862 | (17%) |
| 2015 | PR | 4020 | 665 | (17%) |
| 2016 | PR | 5703 | 981 | (17%) |
| 2017 | PR | 16296 | 4718 | (29%) |
| 2018 | PR | 22360 | 6176 | (28%) |

| 2019 | PR | 11462 | 3164 | (28%) |
|------|-----|-------|------|-------|
| 2020 | PR | 10819 | 3429 | (32%) |
| 2021 | PR | 11630 | 3703 | (32%) |
| 2022 | PR | 12130 | 4155 | (34%) |
| 2015 | GOB | N/A | N/A | |
| 2016 | GOB | N/A | N/A | |
| 2017 | GOB | N/A | N/A | |
| 2018 | GOB | N/A | N/A | |
| 2019 | GOB | 22314 | 4980 | (22%) |
| 2020 | GOB | 19438 | 4096 | (21%) |
| 2021 | GOB | 22156 | 4594 | (21%) |
| 2022 | GOB | 22139 | 4799 | (22%) |
| 2015 | No Bond | 30864 | 10841 | (35%) |
| 2016 | No Bond | 27262 | 10503 | (39%) |
| 2017 | No Bond | 16532 | 6138 | (37%) |
| 2018 | No Bond | 15011 | 5310 | (35%) |
| 2019 | No Bond | 7841 | 2561 | (33%) |
| 2020 | No Bond | 8266 | 2808 | (34%) |
| 2021 | No Bond | 8372 | 3108 | (37%) |
| 2022 | No Bond | 8321 | 2790 | (34%) |

One important caveat of the repeat arrest analyses shown above is that the repeat arrest rate is likely influenced by both the characteristics of initial cases filed and the prevailing conditions within the criminal justice system. For example, the notably low one-year repeat arrest among misdemeanor cases filed in 2019, as shown in Figure 13, may suggest that persons arrested in 2019 had lower criminal risks than those arrested in other years, but perhaps a more likely explanation is the significant reduction in misdemeanor case filings in 2020 due to the widespread impact of the Covid-19 pandemic. Similarly, the observed gradual increase in repeat arrests leading to new felony charges over time could indicate a higher propensity among recent misdemeanor arrestees to commit serious felonies. Yet, this trend might also reflect an overall increase in felony case filings in Harris County, independent of the misdemeanor arrestee's previous history.

Given these complexities, a backward-looking measure of repeat arrest, which represents the share of *current criminal cases* that can be attributed to *former arrestees*, might offer additional insights. Specifically, our measure would track the number and proportion of criminal cases filed in a given year against individuals previously arrested for misdemeanors in the preceding year. Criminal cases filed in 2015 are omitted from the analysis, because we cannot determine whether they involve individuals charged in 2014 due to the data availability issue.

Table 14 presents the breakdown. Although the numbers of misdemeanor and felony cases filed against former misdemeanor arrestees have fluctuated somewhat over the years, the share of repeat arrests by these individuals has remained remarkably consistent. Throughout the analysis period, approximately 20 percent of misdemeanor cases each year were filed against individuals previously arrested for misdemeanors in the year before. Even more striking is the stability in the proportion of felony cases filed against former misdemeanor arrestees, which has consistently hovered between 19 and 20 percent.

**Table 14. Number of Criminal Cases Filed Against Persons Charged with Misdemeanor Cases in the Previous Year**

| Year | Current Offense Type | Case Count | Former Misd. Arrestees | |
|------|---------------------|-----------|------------------------|------|
| 2016 | Misdemeanor | 59306 | 11981 | (20%) |
| 2017 | Misdemeanor | 51661 | 9993 | (19%) |
| 2018 | Misdemeanor | 53580 | 9918 | (19%) |
| 2019 | Misdemeanor | 50225 | 8344 | (17%) |
| 2020 | Misdemeanor | 44025 | 7281 | (17%) |
| 2021 | Misdemeanor | 47924 | 8123 | (17%) |
| 2022 | Misdemeanor | 47543 | 8572 | (18%) |
| 2023 | Misdemeanor | 50330 | 9189 | (18%) |
| 2016 | Felony | 36788 | 7574 | (21%) |
| 2017 | Felony | 33992 | 6955 | (20%) |
| 2018 | Felony | 35397 | 6939 | (20%) |
| 2019 | Felony | 36530 | 7277 | (20%) |
| 2020 | Felony | 40044 | 7972 | (20%) |
| 2021 | Felony | 42453 | 8193 | (19%) |
| 2022 | Felony | 41683 | 8107 | (19%) |
| 2023 | Felony | 45240 | 8924 | (20%) |

## 9. Homelessness and Mental Health

Our analysis shifts focus towards a specific group of misdemeanor arrestees in Harris County: those who are either homeless or have a history of mental health disorders. This group, referred to as "vulnerable populations" henceforth, constitutes a disproportionately large fraction of the misdemeanor arrestee demographic in the county. Notably, the demographic characteristics and subsequent case outcomes of this group tend to diverge significantly from those of the broader misdemeanor arrestee population. Thanks to the hard works by RAD, we have been able to construct time-varying, person-level indicators of homelessness and mental health disorders. Specifically, our measure of homelessness is derived from the last known address of the misdemeanor arrestee *at the time of each case filing*, and our mental health disorder indicator is based on *when* the magistrate ordered a mental health assessment of an arrestee.

As described in our last monitor report, we consider a person as "homeless" if the person's last known address at the time of case filing was either "homeless" or invalid. The former corresponds to the cases in which the person's listed address explicitly indicates homelessness, such as "homeless," "sleeps in car," "streets," and "vagrant," or matches one of the homeless shelter addresses in Harris County.[21] The latter corresponds to the cases in which the person's listed address is an invalid street address that cannot be matched to a specific geographic location with a pair of latitude-longitude coordinates. Examples of such invalid address entries include "00000," "Houston, TX," "does not know," "does not remember," and "unknown." While some of these invalid addresses may stem from data quality issues, it is likely that some of them originate from homeless individuals who were not able to provide a valid street address to the authority.

---

[21] For the list of homeless shelters in Harris County, we used the list of homeless shelters published by the Coalition for Homeless in 2014 and 2021.

Our measure of mental health status is based on whether and when the magistrate requested a mental health assessment from a local mental health and mental retardation (MHMR) agency. Under Article 16.22 of the Texas Code of Criminal Procedure, once the Sheriff's Office notifies the magistrate there exists reasonable cause to believe that a misdemeanor arrestee has a mental illness or an intellectual disability, the bail magistrate can send a request a local mental health authority or intellectual and developmental disability services for a mental health assessment report about the person's mental health condition. Alternatively, the magistrate can refer to a previous report about the person's mental health condition from the previous year if available. We emphasize that our measure is only based on whether and when the magistrate requested a mental health assessment and does not consider the content of the assessment report. We also note that this mental health assessment request has been consistently recorded since October 2018, which necessarily restricts our analysis period to years between 2019 and 2023.

**Table 15. Homelessness and Mental Health Status among Misdemeanor Arrestees in Harris County, Case-level**

| Year | Case Count | Homeless | | Mental Health Assessment | |
|------|------------|----------|------|--------------------------|------|
| 2015 | 60623 | 6468 | (11%) | | |
| 2016 | 59306 | 5677 | (10%) | | |
| 2017 | 51661 | 4890 | (9%) | | |
| 2018 | 53580 | 4694 | (9%) | | |
| 2019 | 50225 | 2991 | (6%) | 13471 | (27%) |
| 2020 | 44025 | 2707 | (6%) | 9383 | (21%) |
| 2021 | 47924 | 2894 | (6%) | 10560 | (22%) |
| 2022 | 47543 | 3765 | (8%) | 10712 | (23%) |
| 2023 | 50330 | 4028 | (8%) | 11243 | (22%) |

Table 15 presents the number of misdemeanor cases that involved persons flagged as either homeless or mentally ill, based on the methodologies described above. The share of cases involving a homeless person has gradually fallen from 11 percent in 2015 to 6 percent in 2021, but modestly increased to 8 percent in 2023. On the other hand, the share of cases involving a person deemed mentally ill declined from 27 percent in 2019 to 21 percent in 2020, stabilizing at approximately 22 percent in the subsequent years. These trends suggest that the overall presence of economic and health vulnerability among misdemeanor arrestees has remained relatively constant in recent years.

Next, we present the prevalence of homelessness and mental health assessment among misdemeanor arrestees, this time reported at the person-level. This person-level measure may be more intuitively appealing than the case-level measure, because it is a person, not a criminal case, that can be either homeless or mentally ill. However, since the raw data on homelessness and mental health assessment come from a case record, we aggregate the case-level measures of vulnerability up to the person-level. For example, if one person has multiple arrests within a year, with at least one indicating homelessness or a mental health assessment, this person is classified accordingly at the person-level. Although this aggregation causes the same size to fall by approximately 20 percent, the person-level rates of homelessness and mental health assessment presented in Table 16 closely align with the case-level rates shown in Table 15. Specifically, in 2023, 8 percent of the misdemeanor

arrestees were identified as homeless, and 21 percent mentally ill, underlining the significant representation of vulnerable populations within the misdemeanor arrestee demographic in Harris County.

According to the estimates reported by the U.S. Department of Housing and Urban Development (HUD), the count of homeless persons in greater Houston (including Houston, Pasadena, Harris County, Fort Bend County, and Montgomery County) has steadily declined and nearly halved between 2013 and 2023.[22] Likewise, Similarly, the measure of homelessness among misdemeanor arrestees in our analysis also shows a decrease from 2015 to 2021. However, these two trends begin to diverge somewhat after 2021. This disparity is likely due to the differences in how the two measures are constructed. HUD's estimate is derived from a point-in-time physical survey, conducted once annually, to count the homeless population directly, while ours is based on individuals' last known addresses available in the criminal justice system. We also emphasize that our measure of homelessness likely over-estimates the share of homeless persons, by including persons with "invalid" addresses, which may sometimes result from data entry errors rather than actual homelessness.

The share of Harris County misdemeanor arrestees flagged as mentally ill is also broadly consistent with national estimates. according to the Bureau of Justice Statistics' (BJS) 2011-12 National Inmate Survey (NIS-3), 26 percent of jail inmates across the country reported serious psychological distress in the 30 days prior to the survey.[23]

**Table 16. Homelessness among Misdemeanor Arrestees in Harris County, Person-level**

| Year | Arrestee Count | Homeless | | Mental Health Assessment | |
|------|------|------|------|------|------|
| 2015 | 49359 | 5233 | (11%) | | |
| 2016 | 47503 | 4514 | (10%) | | |
| 2017 | 42785 | 4037 | (9%) | | |
| 2018 | 44901 | 3882 | (9%) | | |
| 2019 | 42859 | 2529 | (6%) | 10897 | (25%) |
| 2020 | 36929 | 2241 | (6%) | 7577 | (21%) |
| 2021 | 40231 | 2405 | (6%) | 8525 | (21%) |
| 2022 | 39526 | 3013 | (8%) | 8387 | (21%) |
| 2023 | 41177 | 3217 | (8%) | 8472 | (21%) |

Table 17 presents the race distribution among misdemeanor arrestees who are homeless or mentally ill, concentrating on data from 2019 to 2023, when the data on homelessness and mental

---

[22] Continuums of Care (CoCs) across the U.S. conduct a point-in-time homeless count in January each year to determine the number of people experiencing homelessness in their communities, and the U.S. Department of Housing and Urban Development (HUD) compiles these regional homeless counts and reports them in the Annual Homelessness Assessment Report (AHAR) to Congress. In "The Way Home" CoC, which covers Houston, Pasadena, Harris County, Fort Bend County, and Montgomery County, the point-in-time homeless counts has noticeably declined over the years: 6,359 in 2013, 4,609 in 2015, 3,974 in 2020, and 3,270 in 2023.

[23] *See Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-12* (published by the Bureau of Justice Statistics), at https://bjs.ojp.gov/library/publications/indicators-mental-health-problems-reported-prisoners-and-jail-inmates-2011

health assessments are both available. In each of the years considered, blacks and whites account for approximately 45 and 55 percent of the homeless misdemeanor arrestees. A similar pattern is observed among mentally ill misdemeanor arrestees, where the black-white distribution has also hovered around 45 and 55 percent, though it balanced out to nearly 50-50 in 2023.

In contrast, the racial distribution shifts when examining individuals who do not fall into either the homeless or mentally ill categories ("Others"). In this group, there is a more notable disparity between black and white arrestees, with approximately 40 percent black and 60 percent white. This discrepancy indicates that black arrestees are disproportionately affected by homelessness and mental health issues relative to their white counterparts.

**Table 17. Race Distribution of Misdemeanor Arrestees, by Homeless and Mental Health Status**

| Year | Type | Arrestee Count | Race Info. Available | Black | | White | |
|------|------|------|------|------|------|------|------|
| 2019 | Homeless | 2529 | 2496 | 1108 | (44%) | 1335 | (53%) |
| | Mental Health | 10897 | 10748 | 4912 | (46%) | 5728 | (53%) |
| | Others | 31169 | 30422 | 11037 | (36%) | 18674 | (61%) |
| 2020 | Homeless | 2241 | 2219 | 1000 | (45%) | 1195 | (54%) |
| | Mental Health | 7577 | 7483 | 3548 | (47%) | 3869 | (52%) |
| | Others | 28625 | 28079 | 10322 | (37%) | 17145 | (61%) |
| 2021 | Homeless | 2405 | 2370 | 1048 | (44%) | 1269 | (54%) |
| | Mental Health | 8525 | 8412 | 3827 | (45%) | 4478 | (53%) |
| | Others | 31112 | 30559 | 11670 | (38%) | 18145 | (59%) |
| 2022 | Homeless | 3013 | 2980 | 1415 | (47%) | 1509 | (51%) |
| | Mental Health | 8387 | 8271 | 3887 | (47%) | 4267 | (52%) |
| | Others | 30234 | 29743 | 11247 | (38%) | 17638 | (59%) |
| 2023 | Homeless | 3217 | 3165 | 1410 | (45%) | 1699 | (54%) |
| | Mental Health | 8472 | 8361 | 4045 | (48%) | 4178 | (50%) |
| | Others | 31721 | 31215 | 11854 | (38%) | 18503 | (59%) |

Similarly, Table 18 presents the sex distribution among misdemeanor arrestees identified as homeless or mentally ill, offering a comparison against those not categorized as either (referred to as the baseline group). Consistently across all years evaluated, the baseline group comprises about 75 percent male and 25 percent female arrestees. This distribution serves as a reference point for examining disparities in homelessness and mental illness based on sex. Relative to this baseline, males appear to be marginally more prone to homelessness, with their representation in this category reaching approximately 80 percent, compared to 20 percent for females. This suggests that male misdemeanor arrestees face a higher risk of homelessness than their female counterparts. Conversely, when it comes to mental illness, the trend reverses; males are somewhat less represented, accounting for about 70 percent, while females constitute approximately 30 percent of mentally ill misdemeanor arrestees.

**Table 18. Sex Distribution of Misdemeanor Arrestees, by Homeless and Mental Health Status**

| Year | Type | Arrestee | Sex Info. | Male | Female |
|------|------|------|------|------|------|

| Year | Type | Count | Available | | | | |
|------|------|-------|-----------|---|---|---|---|
| 2019 | Homeless | 2529 | 2517 | 1961 | (78%) | 556 | (22%) |
| | Mental Health | 10897 | 10875 | 7856 | (72%) | 3019 | (28%) |
| | Others | 31169 | 31101 | 23549 | (76%) | 7552 | (24%) |
| 2020 | Homeless | 2241 | 2235 | 1824 | (82%) | 411 | (18%) |
| | Mental Health | 7577 | 7573 | 5676 | (75%) | 1897 | (25%) |
| | Others | 28625 | 28584 | 21947 | (77%) | 6637 | (23%) |
| 2021 | Homeless | 2405 | 2401 | 1933 | (81%) | 468 | (19%) |
| | Mental Health | 8525 | 8513 | 6342 | (74%) | 2171 | (26%) |
| | Others | 31112 | 31049 | 24097 | (78%) | 6952 | (22%) |
| 2022 | Homeless | 3013 | 3008 | 2336 | (78%) | 672 | (22%) |
| | Mental Health | 8387 | 8374 | 6045 | (72%) | 2329 | (28%) |
| | Others | 30234 | 30192 | 23200 | (77%) | 6992 | (23%) |
| 2023 | Homeless | 3217 | 3203 | 2487 | (78%) | 716 | (22%) |
| | Mental Health | 8472 | 8457 | 6009 | (71%) | 2448 | (29%) |
| | Others | 31721 | 31668 | 23946 | (76%) | 7722 | (24%) |

As shown above, the race and sex distributions of the vulnerable population do not differ significantly from the general population. However, Table 19 suggests that there exist greater, and more systematic, differences in the types of offenses for which these groups are arrested. For example, trespassing emerges as one of the most common offenses among homeless persons, constituting roughly 20 percent of all misdemeanor cases filed against them in 2023, whereas the corresponding share among those who are neither homeless nor mentally ill is only 4 percent. On the other hand, in 2023, persons flagged as mentally ill were more likely to be charged for an assault (28 percent) than homeless persons (18 percent) and the non-vulnerable populations (24 percent). We also note that persons who belong to one of the vulnerable groups may be less likely to be involved in certain types of offenses. For example, only 4 percent of both homeless and mentally ill misdemeanor arrestees were arrested for weapon-related violations in 2023, a figure significantly lower than the 9 percent observed among other misdemeanor arrestees. This disparity may reflect important differences in behavior, lifestyle, or policing patterns affecting these populations.

**Table 19. Types of Misdemeanor Cases Filed, by Homeless and Mental Health Status**

| Year | Type | Case Count | Assault | | Theft | | Trespass | | Weapon | |
|------|------|-----------|---------|---|-------|---|----------|---|--------|---|
| 2019 | Homeless | 2991 | 513 | (17%) | 483 | (16%) | 407 | (14%) | 92 | (3%) |
| | Mental Health | 13471 | 3125 | (23%) | 1849 | (14%) | 957 | (7%) | 485 | (4%) |
| | Others | 34942 | 6087 | (17%) | 3982 | (11%) | 1024 | (3%) | 1782 | (5%) |
| 2020 | Homeless | 2707 | 576 | (21%) | 365 | (13%) | 358 | (13%) | 119 | (4%) |
| | Mental Health | 9383 | 2626 | (28%) | 990 | (11%) | 615 | (7%) | 506 | (5%) |
| | Others | 32815 | 7571 | (23%) | 2803 | (9%) | 764 | (2%) | 2849 | (9%) |
| 2021 | Homeless | 2894 | 593 | (20%) | 348 | (12%) | 473 | (16%) | 164 | (6%) |
| | Mental Health | 10560 | 2885 | (27%) | 1019 | (10%) | 960 | (9%) | 625 | (6%) |
| | Others | 35539 | 8043 | (23%) | 2452 | (7%) | 985 | (3%) | 3929 | (11%) |
| 2022 | Homeless | 3765 | 771 | (20%) | 505 | (13%) | 785 | (21%) | 205 | (5%) |
| | Mental Health | 10712 | 2779 | (26%) | 1146 | (11%) | 1523 | (14%) | 538 | (5%) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Others | 34470 | 7861 | (23%) | 2922 | (8%) | 1182 | (3%) | 3533 | (10%) |
| 2023 | Homeless | 4028 | 734 | (18%) | 519 | (13%) | 885 | (22%) | 165 | (4%) |
| | Mental Health | 11243 | 3176 | (28%) | 1226 | (11%) | 1709 | (15%) | 401 | (4%) |
| | Others | 36503 | 8675 | (24%) | 3591 | (10%) | 1372 | (4%) | 3123 | (9%) |

Another key difference between the vulnerable population and the broader group of misdemeanor arrestees is that their repeat arrest rates tend to differ substantially. The group-specific repeat offense rate, presented in Table 20, indicates that individuals identified as homeless or with mental illness exhibit markedly higher rates of repeat offenses compared to their counterparts. Specifically, Panel (A) reveals that over 40 percent of misdemeanor cases filed against individuals who are homeless (44 percent) or mentally ill (45 percent) lead to another arrest within a year, a sharp contrast to the 20 percent rate observed among other misdemeanor arrestees.

This pattern persists across different analyses, including person-level repeat arrest rates (Panel (B)) and when focusing specifically on new felony arrests (presented in the last column of Table 20). The significant discrepancy in repeat arrest rates provides suggestive evidence that targeted interventions that address the underlying issues faced by these vulnerable groups may prove to be an effective tool to reduce the overall likelihood of repeat offenses and arrests in the county.

**Table 20. One-year Repeat Arrest Rates, by Homeless and Mental Health Status**

| Year | Type | Count | New Case Filed Within One Year | | New Felony Filed Within One Year | |
|---|---|---|---|---|---|---|
| (A) Case-level | | | | | | |
| 2019 | Homeless | 2991 | 1178 | (39%) | 684 | (23%) |
| | Mental Health | 13471 | 5154 | (38%) | 2918 | (22%) |
| | Others | 34942 | 6339 | (18%) | 3205 | (9%) |
| 2020 | Homeless | 2707 | 1177 | (43%) | 725 | (27%) |
| | Mental Health | 9383 | 3915 | (42%) | 2312 | (25%) |
| | Others | 32815 | 6764 | (21%) | 3639 | (11%) |
| 2021 | Homeless | 2894 | 1193 | (41%) | 684 | (24%) |
| | Mental Health | 10560 | 4404 | (42%) | 2530 | (24%) |
| | Others | 35539 | 7593 | (21%) | 4028 | (11%) |
| 2022 | Homeless | 3765 | 1653 | (44%) | 924 | (25%) |
| | Mental Health | 10712 | 4787 | (45%) | 2687 | (25%) |
| | Others | 34470 | 7056 | (20%) | 3701 | (11%) |
| (B) Person-level | | | | | | |
| 2019 | Homeless | 2529 | 903 | (36%) | 526 | (21%) |
| | Mental Health | 10897 | 3740 | (34%) | 2117 | (19%) |
| | Others | 31169 | 5134 | (16%) | 2579 | (8%) |
| 2020 | Homeless | 2241 | 881 | (39%) | 544 | (24%) |
| | Mental Health | 7577 | 2900 | (38%) | 1728 | (23%) |
| | Others | 28625 | 5442 | (19%) | 2918 | (10%) |
| 2021 | Homeless | 2405 | 880 | (37%) | 504 | (21%) |
| | Mental Health | 8525 | 3195 | (37%) | 1844 | (22%) |
| | Others | 31112 | 6032 | (19%) | 3192 | (10%) |

| | | | | | | |
|---|---|---|---|---|---|---|
| 2022 | Homeless | 3013 | 1146 | (38%) | 635 | (21%) |
| | Mental Health | 8387 | 3333 | (40%) | 1897 | (23%) |
| | Others | 30234 | 5629 | (19%) | 2975 | (10%) |

An important data expansion made since the last monitor report is the addition of detailed mental health status information. As noted above, our measure of mental health status used so far is solely based on whether the magistrate requested a mental health assessment of the arrestee within one year prior to a given case's filing date, which is a standard procedure motivated by Article 16.22 of the Texas Code of Criminal Procedure. However, thanks to the cooperation and guidance from the Harris County' Office of Management and Budget, we now have more detailed and comprehensive measures of misdemeanor arrestees' mental health status, including (1) whether the magistrate requested a mental health assessment of the person, (2) whether the person received mental health diagnosis either at the jail or at the mental health authority, (3) whether the person received a psychiatric medication prescription while in jail, (4) whether the person was flagged as having a mental health need based on the Continuity of Care Query (CCQ) match and suicide screening at the time of intake, and (5) whether the person was referred to a state mental health hospital.[24] We are extremely grateful to the Office of Management and Budget and RAD for their cooperation and support.

The availability of these additional measures of mental health status enables a deeper exploration into the experiences and needs of misdemeanor arrestees with mental health issues. It allows for a more granular analysis of how mental health status impacts interactions with the criminal justice system, from arrest through incarceration and potential re-entry into the community. This detailed information can help identify the specific challenges and disadvantages faced by individuals with mental health issues within this system. Moreover, understanding the relationship between various mental health indicators, such as the receipt of psychiatric medications while in jail or being flagged through suicide screenings at intake, and repeat arrest rates can guide policy improvements and practice adjustments. While these expanded mental health measures offer promising avenues for research and policy development, a period of further examination and data validation is necessary before drawing preliminary conclusions. The forthcoming analyses, to be detailed in the next report, plan to shed light on this important issue.


## IV. Cost Study and Project Management

This section of the Monitor report considers two responsibilities performed by the Public Policy Research Institute (PPRI) at Texas A&M University: Evaluating costs associated with implementation of the Consent Decree and tracking Consent Decree completion milestones.

### A. Harris County Programs to Increase Court Appearance

Section VIII of the Consent Decree, "Promoting Pretrial Release Through Programs to Increase Court Appearance," asks Harris County to adopt new practices that help misdemeanor defendants be present in court. Two of these requirements – a study of nonappearance and bond

---

[24] The first category ("16.22 notification") largely coincides with the measure of mental health status used so far, which represents whether the magistrate requested a mental health assessment of the arrestee within one year prior to a given case's filing date.

form re-design – have been fully implemented. While progress has been made on the third requirement – a court-date reminder system – for unsecured bonds, implementation has not been completed for secured bonds. This section of the Monitor Report reviews changes over the past year, describes the work ahead, and offers preliminary evidence of the potential impact of a reminder system.

### 1. ODonnell Nonappearance Mitigation Requirements

At the time of the March 2023 Monitor Report, two of the three mandatory strategies were fully attained:

- A study of nonappearance[25] released in July 2022 identified primary causes of missed appearances along with evidence-based recommendations to assist arrestees to be present in court.
- Bond forms and court reset forms have also been updated to include uniform notice of scheduled court appearances and a space to enroll in the court date reminder system.

A third Consent Decree nonappearance mitigation requirement calls for a court date reminder system that will issue text or telephone messages that notify recipients of the date, time, and location of upcoming court dates and provide steps for rescheduling or resolving a missed appearance. The initial system to achieve court reminder objectives was initially launched on February 26, 2022. However, after nearly a full year of operation, in March 2023 the Sixth Monitor Report revealed several system failures that were highlighted for remediation. In this Seventh Monitor Report, we describe progress toward fixing the previously identified problems as well as further work remaining.

### 2. Impediments to Court Date Reminder Implementation and Current Status

The most concerning obstacle to a functioning court date reminder system involved technical and data-flow issues that prevented individual defendants' enrollment requests from being entered into the reminder database. At present considerable work has been done to fix the problem for unsecured bonds filed by Pretrial Services. However, there remains no reliable path for enrollment on unsecured bonds filed by the Sheriff's Office.

**Unsecured Bonds.** Pretrial Services staff at the JPC file the large majority of GOB and personal bonds with the District Clerk's Office (DCO) in a fully electronic format. In March of 2023 it was discovered that, defendants had the opportunity to enroll for reminders on the bond forms but there was no "web service" to move data fields with defendant's sign-up information into the JWeb Party record from which court reminders are disseminated. After this problem was discovered, in May 2023, a new programming solution was implemented to transfer defendant enrollment data from electronic bond forms directly to the notification table in JWeb. Less frequently, bonds are submitted to the District Clerk in hard copy form filed as a scanned image. Prior to system improvements, there was no means to extract enrollment data for JWeb entry. Now, clerks manually entering bonds have a function key to facilitate entry of new enrollments or to update information already on file.

---

[25] McAuliffe, Shannon, Samantha Hammer, Alissa Fishbane, and Andrea Wilk (July 2022). *Navigating the Real-Life Challenges of Appearing in Court: Recommendations for addressing wealth-based barriers to court appearance in Harris County.* New York, NY: Ideas42. Based on report recommendations, today, Harris County contracts with the Harris Center to implement the Community Assistance Referral Program (CARP) helping pretrial releasees overcome obstacles to court appearance. The MyHarrisCountyCase.com web portal and smartphone application as well as videos, literature, signage, and interactive kiosks at the courthouse are also being developed to help people get to court.

These changes have been effective. Since September 2024, 70% of GOB-eligible defendants enroll for reminders at initial custody, up from 24% before changes were made. Enrollment on personal bonds has also risen from 26% before system improvements to 58% today (Appendix F).

**Secured Bonds.** In March of last year, the Monitor team identified two problems with court reminders on cash and surety bonds filed by the Sheriff's Records Division. First, most bond companies were using outdated surety bond forms that did not include the reminder signup option. In February, 2023 the change was formally announced at a Bail Bond Board meeting; [26] a spot check of surety bonds recently filed on the DCO website suggests many bond companies are now using the current version. Second, even when the new bond form is used, there was no consistent path for enrollments to be entered into JWeb. After the secured bond form is created, the paperwork is "walked back" to the detention area for signature. There defendants may write in their intent to enroll for reminders or correct wrong telephone numbers taken from booking records. The forms are then walked to the District Clerk's Office and filed as a scanned image, omitting the data entry step required to enroll reminder signups in JWeb.

The data show this enrollment problem persists: In recent months, the court reminder enrollment rate for people filing secured bonds at initial custody has remained at 16% -- effectively unchanged from the 17% rate when the initial reminder system was launched in February 2022 (Appendix F).[27] Sheriff's Office administrators explained that officers aware of the concerns last year retired without a full resolution of this issue and other officers were unaware. A plan is currently being expedited to train Sheriff's Records Division staff to key in reminder enrollments directly before they are transported to the District Clerk. In the coming months, the Monitor Team will re-examine enrollment rates for people filing secured bonds at initial custody and report progress to the Parties.

**Other General Concerns**. Other concerns identified in the Sixth Monitor Report also remain but are not directly related to the core operation of the reminder system. For example:

- Defense attorneys are still unable to see if clients are enrolled for court date reminders, to correct inaccurate contact information, or to view and confirm accuracy of case-related messages their clients are receiving.

- There is no means for defendants to review their contact information for accuracy unless they or their attorneys expressly ask the District Clerk's Office for the information on file; entry errors or outdated contact information that would prevent messages from being received are likely to be undetected.

- Without an affirmative "opt out" indicator, it is virtually impossible to ever fully validate the court reminder system because we cannot distinguish whether people who are not enrolled refused or were never offered the chance.

---

[26] The February 8, 2023 agenda for the Harris County Bail Bond Board meeting includes the following item: "Notice made by Sergeant Sisto DeLeon, The Harris County Sheriff's will provide their plan to implement the Misdemeanor Surety Bonds as well as give the path to get them circulated into the bonding community."

[27] Of 10 surety bonds posted on the DCO website within the past 4 months with a reminder enrollment requests, only 4 were found to be present in the JWeb reminder data table. Cash bonds were more difficult to check since the large majority of those retrieved (14 of 20 forms) were labeled "sensitive" and could not be viewed. Of 6 that could be viewed, 3 indicated a desire to enroll, and 2 were found in the notification data table.

These are important limitations that might ideally be addressed in the long term. However, the present focus is on continuing progress to remedy foundational barriers related to sign-up and notification protocols.

## B. Court Date Reminder System Effectiveness

Despite data and enrollment limitations, as court reminder signups have increased, we can begin to explore effects on court appearance. After the reminder system is fully implemented these tentative conclusions can be re-examined to reach a more conclusive assessment, including consideration of cost impacts. Here we present initial evidence that court date reminders do increase court appearance among similarly situated individuals; and identify categories of defendants who are most and least likely to participate in the court date reminder system.

### 1. Methods

September 1, 2023 was taken as a somewhat arbitrary date by which major corrections in the court date reminder system were expected to be complete. The analysis sample was defined as people entering initial custody by either bond or booking in two distinct timeframes.

- "Before System Corrections" includes people entering initial custody between the first system implementation date of February 26, 2022 and January 26, 2023 when problems were first identified.

- "After System Corrections" includes people entering initial custody between September 1, 2023 and January 7, 2024, after partial improvements to the enrollment process were made.

The two major outcomes of interest – reminder system enrollment and nonappearance – are:

- "Enrollment" in the court date reminder system defined as having a reminder message documented in the JWeb notification data table prior to arraignment.[28]

- "Nonappearance" defined as an arraignment where the Setting Type was "Required-Not Waived" and the Court Appearance code indicated the person was "Not Present."

Two analysis approaches were used:

- Percent change in enrollment for defendants "before" versus "after" system improvements is described in Appendix F. Results are reported separately for major defendant and case categories including demographics; detention status; offense attributes; criminal history; and attorney type. Nonappearance rates "after" system improvements are reported separately for enrolled versus un-enrolled individuals, and for people released versus detained at arraignment.

- Logistic regression methods were used to isolate the independent effects of overlapping defendant and case attributes on the two major outcomes of interest. The first model identifies factors that affect defendants' chance of being enrolled in the reminder system. A

---

[28] In Harris County, arraignment is generally held one day after booking for people who do not post bond, or one week after booking for people who are released pretrial.

second model includes defendant enrollment status as a dependent variable to assess the effect of receiving reminders on nonappearance. Both models are based only on cases entering custody "after" system corrections. A correlation matrix provided in Appendix G shows relationships between variables that informed construction of the multivariate model. The complete models with coefficients and odds ratios are included in Appendix H.

Logistic regression results are reported as odds ratios.

- An odds ratio *greater than* 1 means an increase in the independent/predictor variable increases the likelihood of the dependent/outcome variable. For example, expressed as a percent change, an odds ratio of 1.3 means a one-unit increase in the independent variable will *increase* the chance of the dependent variable by 30%.[29]

- An odds ratio *less than* 1 means an increase in the independent/predictor variable decreases the likelihood of the dependent/outcome variable. For example, an odds ratio of 0.7 means a one-unit increase in the independent variable will *decrease* the chance of the dependent variable by 30%.[30]

It is important to note when interpreting findings that selection bias remains a crucial concern in all results that follow. Overall, only 55% of cases entering custody during the four-month study period are enrolled for court date reminders, and we have identified major deficiencies exist in the current notification signup protocols for cash and surety bonds in particular. Because people that have signed up are systematically different from unenrolled individuals, a more complete and representative sample of enrollees is needed to draw firm conclusions. Results should therefore be interpreted with caution.

## 2. Summary of Major Findings

The results presented here offer important early evidence for three leading conclusions:

- **<u>Court date reminders decrease the odds of nonappearance at arraignment by 35%</u>** relative to statistically similar people who are not receiving reminders.

- The greatest determinant of reminder enrollment at intake is, by far, bond type. **<u>People filing an unsecured bond are 10 times more likely to get arraignment reminders than people filing a secured bond.</u>** This discrepancy is traceable to differences in signup processing by Pretrial Services staff responsible for personal or GOB bonds versus Sheriff's Records officers filing cash or surety bonds.

- The greatest determinant of nonappearance is a history of bond failure. **<u>People with a forfeiture or revocation in the past three years are almost 4 times more likely to miss arraignment</u>**, other things equal. This finding affirms the logic of interventions that remove general obstacles to appearance. But it also suggests there may be an even greater return from investment in more intense targeted interventions focusing narrowly on individuals with a known history of missed court dates. Pretrial Services, Harris Center for Mental Health and IDD, the Public Defender and MAC Offices are potential homes for such initiatives.

---

[29] Percent Change = $(1.3 - 1) \times 100 = 30\%$
[30] Percent Change = $(0.7 - 1) \times 100 = -30\%$

Tables 21 and 22 summarize the effect of factors predicting enrollment and nonappearance among statistically similar cases. In each table results are presented in order from most to least desirable with higher odds being better for reminder system enrollment and lower odds better for nonappearance at arraignment.

**Table 21.  Logistic Regression Model Predicting Court Reminder Enrollment**
**(Cases Entering Custody September 1, 2023 – January 7, 2024)**

|  |  | Odds of Enrollment | |
|---|---|---|---|
|  |  | Odds are: | P-value |
| Increase Odds of Enrollment | Unsecured Bond Filed | 963% higher | 0.00 |
|  | Impaired Driving Charge | 40% higher | 0.00 |
|  | Hispanic Ethnicity | 24% higher | 0.00 |
|  | African American | 23% higher | 0.00 |
|  | Weapons Charge | 18% higher | 0.04 |
|  | Female | 14% higher | 0.00 |
|  | Any Charges, Past 3 Yrs. | 13% higher | 0.01 |
| No Effect | Other Non-White Race | N/A | 0.17 |
|  | Homeless Only | N/A | 0.46 |
|  | Other Group A NIBRS Chg. | N/A | 0.36 |
|  | Mentally Ill Only | N/A | 0.16 |
|  | Both Homeless & MI | N/A | 0.08 |
|  | Burglary Charge | N/A | 0.11 |
| Decrease Odds of Enrollment | Over Age 30 | 8% lower | 0.02 |
|  | MAC Attorney | 8% lower | 0.03 |
|  | Assault Charge | 16% lower | 0.00 |
|  | Larceny/Theft Charge | 22% lower | 0.00 |
|  | Co-Occurring Felony Charge | 27% lower | 0.00 |
|  | Bond Failures, Past 3 Yrs. | 27% lower | 0.00 |
|  | Public Defender Attorney | 50% lower | 0.00 |
|  | No Bond Filed | 76% lower | 0.00 |

**Table 22. Logistic Regression Model Predicting Arraignment Nonappearance**
**(Cases Entering Custody September 1, 2023 – January 7, 2024)**

| | | Odds of Nonappearance | |
|---|---|---|---|
| | | Odds are: | P-value |
| Decrease Odds of Nonappearance | MAC Attorney | 55% lower | 0.00 |
| | Impaired Driving Charge | 51% lower | 0.00 |
| | Weapon Charge | 35% lower | 0.00 |
| | Reminder Enrollment | 35% lower | 0.00 |
| | Public Defender Attorney | 30% lower | 0.00 |
| | Other Non-White | 23% lower | 0.03 |
| No Effect | No Bond Filed | N/A | 0.16 |
| | African American | N/A | 0.72 |
| | Hispanic | N/A | 0.94 |
| | Assault Charge | N/A | 0.83 |
| | Female | N/A | 0.70 |
| Increase Odds of Nonappearance | Over Age 30 | 12% higher | 0.01 |
| | Other Group A NIBRS Chg. | 17% higher | 0.04 |
| | Larceny/Theft Charge | 18% higher | 0.03 |
| | Any Charges, Past 3 Yrs. | 29% higher | 0.00 |
| | Unsecured Bond Filed | 31% higher | 0.00 |
| | Mentally Ill Only | 39% higher | 0.00 |
| | Both Homeless & MI | 45% higher | 0.00 |
| | Burglary Charge | 47% higher | 0.00 |
| | Homeless Only | 50% higher | 0.00 |
| | Co-Occurring Felony Chg. | 54% higher | 0.00 |
| | Bond Failures, Past 3 Yrs. | 351% higher | 0.00 |

### 3. Factors Predicting Reminder Enrollment and Nonappearance at Arraignment

The sections that follow offer a more granular view of the data underlying these broad conclusions. While multivariate results are presented by categories, results cannot be fully interpreted apart from the complete model with all variables and coefficients provided in Appendix H.

### a. Court Date Reminders

Before reminders can improve court appearance, enrollment is an essential prerequisite. Table 23 shows the share of cases that register when entering custody has more than doubled since the Sixth Monitor Report from 23% of defendants before system improvements (n=41,945) to 55% in recent months (n=15,707). This growth in sign-ups suggests some modifications have been effective, but more remains to be done to ensure enrollment opportunity for the 45% of defendants not participating in the reminder system. As noted, a plan has been launched to increase enrollment

for defendants with secured bonds (16% rate) relative to peers with unsecured bonds (59% rate, Appendix F).

**Table 23. Enrollment and Nonappearance Rates**
**For All Cases Entering Custody**

| | | NONAPPEARANCE RATE | | |
| ENROLLMENT RATE | | Defendants Out of Detention at Arraignment: | | |
| Before System Corrections | After System Corrections | With Reminders | Without Reminders | Defendants Detained at Arraignment: |
| 23% (n=41,945) | 55% (n=15,707) | 18% (n=8,441) | 23% (n=5,051) | 34% (n=2,219) |

Multivariate results (Table 24) demonstrate that, after controlling for other case and defendant characteristics, the odds of nonappearance are 35% lower for people getting reminders compared to similarly situated peers who are not in the system (p<0.00). This, the featured finding of this analysis, offers preliminary evidence that investment in creating the court reminder system could pay off not by reducing resets in Harris County misdemeanor courts, but also by helping defendants avoid the high-stakes costs and consequences of bond failure.

**Table 24. Multivariate Effect of Court Date Reminders on Nonappearance**

| | Odds of Nonappearance | | | |
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| Reminder System Enrollment (vs. Not Enrolled) | 0.65 | 35% lower | 0.00 | (0.60, 0.73) |

It is also worth noting that, descriptively, nonappearance rates are the highest for people who are in detention at arraignment: 34% compared to a 20% nonappearance rate for defendants out on bond (Table 23). Reasons for this finding are not entirely clear. A small share of misdemeanor defendants held in jail may have co-occurring felony cases in District Court that compete for their presence. There may also be barriers that prevent jail staff from delivering individuals to necessary hearings. Sometimes arrestees are in isolation or a treatment setting because of behavioral or health problems. Still, the high nonappearance rate affecting one-third of detainees suggests the need to better understand the reasons jailed defendants miss arraignments and remove obstacles where possible. Moreover, because the bail review ordinarily occurs at arraignment, there is a particular concern that detainees who miss arraignment may be eligible for immediate release on a Sheriff's GOB bond.

### b. Defendant Characteristics

Defendant sex, race, and ethnicity have a small but statistically significant effect on reminder system enrollment (Table 25). Female (p<0.00), African American (p<0.00), and Hispanic individuals (p<0.00) are 14% to 23% more likely to get court date reminders. Sex and race are

generally unrelated to court appearance. People in "other non-white races" (i.e., Asian, Native American, and unknown) are an exception, with 23% better appearance outcomes than those in the White comparison group (p<0.03). Older defendants over age 30 are both *less* likely to participate in reminders (p<0.02) and *more* likely to miss their arraignment compared to those age 30 and younger (p<0.01).

**Table 25.  Multivariate Effect of Defendant Characteristics**

| | Odds of Enrollment | | | | Odds of Nonappearance | | | |
|---|---|---|---|---|---|---|---|---|
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| **SEX** | | | | | | | | |
| Female (vs. Male) | 1.14 | 14% higher | 0.00 | (1.05, 1.24) | 1.02 | --- | NS | (0.92, 1.13) |
| **RACE** | | | | | | | | |
| African American (vs. White) | 1.23 | 23% higher | 0.00 | (1.13, 1.33) | 0.98 | --- | NS | (0.89, 1.08) |
| Other Non-White (vs. White) | 1.14 | --- | NS | (0.95, 1.37) | 0.77 | 23% lower | 0.03 | (0.61, 0.98) |
| Hispanic (vs. Not Hispanic) | 1.24 | 24% higher | 0.00 | (1.08, 1.43) | 1.01 | --- | NS | (0.86, 1.18) |
| **AGE** | | | | | | | | |
| Over Age 30 (vs. ≤ 30) | 0.92 | 8% lower | 0.02 | (0.85, 0.99) | 1.12 | 12% higher | 0.01 | (1.03, 1.23) |
| **VULNERABILITY** | | | | | | | | |
| Homeless Only (vs. No Impairment) | 1.10 | --- | NS | (0.86, 1.40) | 1.50 | 50% higher | 0.00 | (1.17, 1.93) |
| Mentally Ill Only (vs. No Impairment) | 0.92 | --- | NS | (0.82, 1.03) | 1.39 | 39% higher | 0.00 | (1.24, 1.57) |
| Both Homeless & MI (vs. No Impairment) | 0.87 | --- | NS | (0.74 1.02) | 1.45 | 45% higher | 0.00 | (1.23, 1.71) |

Mental health and homelessness are statistically unrelated to court reminder enrollment but are strong predictors of nonappearance. Compared to people without impairments, odds of missing arraignment are nearly 50% higher where homelessness is a factor, either with (p<0.00) or without mental illness (p<0.00). Odds of missed arraignment are about 39% higher for people with mental illness alone (p<0.00).

**c.  Bond and Detention**

As noted above, bond type is the single strongest predictor of court date reminder enrollment (Table 26):  People with unsecured GOB or personal bonds are 10 times more likely to receive reminders than peers with secured bonds (p<0.00).  Importantly, enrollment rates between the two

bond processing systems are expected to re-align in the coming months as changes to secured bonds filing protocols are implemented in the Sheriff's Record Division.[31]

**Table 26. Multivariate Effect of Bond and Detention**

| | Odds of Enrollment | | | | Odds of Nonappearance | | | |
|---|---|---|---|---|---|---|---|---|
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| **BOND FILED** | | | | | | | | |
| Unsecured Bond (vs. Secured Bond) | 10.63 | 963% higher | 0.00 | (9.40, 12.02) | 1.31 | 31% higher | 0.00 | (1.14, 1.49) |
| No Bond (vs. Secured Bond) | 0.24 | 76% lower | 0.00 | (0.17, 0.34) | 0.87 | --- | NS | (0.72, 1.06) |

Though people with unsecured bonds are more likely to get reminders, they are also 31% more likely to miss arraignment (p<0.00). Surety bond companies may issue their own court date reminders.[32] Moreover, people released on surety bonds who tend to have greater financial means, may also have an easier time overcoming barriers to appearance such as securing transportation or childcare. This result can be revisited and answered more fully after secured bond enrollments have increased. As expected, people with no bond filed at arraignment have the lowest odds of signup for reminders (0.24, p<0.00), presumably because signup is done on the bond form itself.

### d. Offense Characteristics

Offense characteristics are related to reminder system enrollment and nonappearance in court (Table 27). Most notably, cases with co-occurring felonies have worse outcomes in terms of both enrollment (27% lower odds, p<0.00) and nonappearance (54% higher odds, p<0.00) compared to misdemeanor-only cases.

---

[31] See "Surety Bonds" in Section IV(A)(2), above.

[32] There is some indication that reminders may substantially improve appearance for secured bond cases. When secured bond and reminder system enrollment are interacted in the logistic regression model predicting nonappearance (Appendix H), a strong statistically significant relationship is observed indicating that reminders are disproportionately impactful for helping people on secured bond appear at arraignment. However, because of significant selection bias resulting in underrepresentation of secured bond cases in the current sample, this finding is considered highly tenuous.

**Table 27. Multivariate Effect of Current Offense**

| | Odds of Enrollment | | | | Odds of Nonappearance | | | |
|---|---|---|---|---|---|---|---|---|
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| **CHARGE** | | | | | | | | |
| Co-Occurring Felony (vs. Misd. Only) | 0.73 | 27% lower | 0.00 | (0.64, 0.83) | 1.54 | 54% higher | 0.00 | (1.35, 1.76) |
| **OFFENSE** | | | | | | | | |
| Assault Charge (vs. NIBRS Group B) | 0.84 | 16% lower | 0.00 | (0.75, 0.94) | 1.01 | --- | NS | (0.89, 1.15) |
| Burglary Charge (vs. NIBRS Group B) | 0.87 | --- | NS | (0.74, 1.03) | 1.47 | 47% higher | 0.00 | (1.23, 1.75) |
| Impaired Driving Chg. (vs. NIBRS Group B) | 1.40 | 40% higher | 0.00 | (1.25, 1.57) | 0.49 | 51% lower | 0.00 | (0.42, 0.57) |
| Larceny/Theft Charge (vs. NIBRS Group B) | 0.78 | 22% lower | 0.00 | (0.68, 0.90) | 1.18 | 18% higher | 0.03 | (1.02, 1.38) |
| Weapons Charge (vs. NIBRS Group B) | 1.18 | 18% higher | 0.04 | (1.01, 1.39) | 0.65 | 35% lower | 0.00 | (0.53, 0.80) |
| Other Grp. A NIBRS (vs. NIBRS Group B) | 0.94 | --- | NS | (0.82, 1.08) | 1.17 | 17% higher | 0.04 | (1.01, 1.36) |

Charges, included in the model primarily as a control measure,[33] have less practical use by stakeholders since the offense is not ordinarily a primary consideration in developing nonappearance policies in misdemeanor court. Still, the offense can make a difference in enrollment and nonappearance. Compared to low-level NIBRS Group B offenses,[34] impaired driving and weapon law violations predict uniformly positive outcomes for enrollment (40% higher odds, p<0.00; and 18% higher odds, p<0.04 respectively) and nonappearance (51% lower odds, p<0.00; and 35% lower odds, p<0.00 respectively). In contrast, larceny/theft charges are linked to uniformly negative outcomes for both enrollment (22% lower odds, p<0.00) and nonappearance (18% higher odds, p<0.03).

People with burglary (47% higher odds, p<0.00) and other NIBRS Group A violations[35] (17% higher odds, p<0.04) are significantly more likely to miss arraignment, while assault charges have no impact on appearance but reduce the chance of reminder enrollment by 16% (p<0.00).

[33] Several strategies were considered to determine the best current offense control measure. Violent vs. non-violent crimes, carveout vs. non-carveout offenses, and NIBRS offense categorization were all considered for inclusion in the model. However, because these groups are highly inter-correlated with each other, only one could be selected. Since violent and carveout indicators were also correlated with other important measures such as bond type and past charges, the NIBRS categorization was chosen as the best available current offense indicator.

[34] Group B Offenses specified in the National Incident Based Reporting System (NIBRS) include a wide range of crimes primarily focused on less serious or property-related offenses. Examples include bad checks, vagrancy, disorderly conduct, drunkenness, nonviolent family offenses, liquor law violations, peeping tom, and trespassing. Driving under the influence is a Group B Offense but was extracted and reported separately.

[35] Group A Offenses specified in the National Incident Based Reporting System (NIBRS) are serious crimes that include the offenses shown here (i.e., assault, burglary, larceny-theft, and weapon law violations) and "other" violations such as

### e. Past 3-Year Criminal History

Table 28 shows a history of bond failure in the past 3 years is the single most potent predictor of nonappearance:  The odds of missing arraignment are nearly 4 times higher for people who previously had a warrant issued for absence in court (4.51, p<0.00).  In fact, people with a prior bond failure miss arraignment about 55% of the time compared to a 13% nonappearance rate for other defendants (Appendix F).  Moreover, a quarter of cases in the analysis sample experienced a bond failure in the 3-years examined.

Given the powerful strength of this effect, stakeholders might consider whether intense interventions specifically directed toward this high-risk population might be needed to meaningfully mitigate overall nonappearance.  Increasing participation in the reminder system may have some effect as people with a demonstrated propensity to miss court are 27% less likely to enroll than peers (p<0.00).  Other strategies beyond supervision such as holistic defense to address underlying problems, help mitigating personal obstacles like childcare or transportation, or even positive reinforcements to reward court attendance might also offer potential solutions.

### Table 28.  Multivariate Effect of Criminal History

| | Odds of Enrollment | | | | Odds of Nonappearance | | | |
|---|---|---|---|---|---|---|---|---|
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| **PAST CHARGES** | | | | | | | | |
| Any Charges (3 Yrs.) (vs. No Past Charges) | 1.13 | 13% higher | 0.01 | (1.04, 1.23) | 1.29 | 29% higher | 0.00 | (1.17, 1.43) |
| **BOND FAILURE** | | | | | | | | |
| Bond Failures (3 Yrs.) (vs. No Bond Failures) | 0.73 | 27% lower | 0.00 | (0.66, 0.80) | 4.51 | 351% higher | 0.00 | (4.09, 4.97) |

A history of charges filed in the past 3 years also raises the odds of nonappearance by a more moderate 30% margin (p<0.00).  Notably, prior defendants are 13% more likely receive court date reminders (p<0.01), possibly because enrollments in prior bookings are automatically carried forward to future arrests.  More than half of cases in the analysis sample (51%) might potentially have signed up during an earlier arrest.

### f. Attorney Type

People with court-appointed attorneys are less likely to sign up for court date reminders compared to people with other types of counsel – either retained or pro-se (Table 29).  In fact, odds of signup are 8% lower with Managed Assigned Counsel (MAC) (p<0.03) and 50% lower for Public Defender Office (PDO) clients (p<0.00).  Appointed attorneys have said they want to do more to support reminder enrollment, but note that they have no means to easily determine which clients are

---

forgery, drug offenses, fraud, gambling, prostitution, and theft.  Additional Group A Offenses ordinarily charged as felonies include homicide, rape, robbery, aggravated assault, and arson.

signed up or see the notifications they have received. These information barriers make it difficult to systematically monitor and promote signup for an entire caseload.

**Table 29. Multivariate Effect of Attorney Type**

| | Odds of Enrollment | | | | Odds of Nonappearance | | | |
|---|---|---|---|---|---|---|---|---|
| | Odds Ratio | Odds are: | p-value | 95% Confidence Interval | Odds Ratio | Odds are: | p-value | 95% Confidence Interval |
| **ATTORNEY** | | | | | | | | |
| Public Defender Atty. (vs. Other Attorney) | 0.50 | 50% lower | 0.00 | (0.43, 0.59) | 0.70 | 30% lower | 0.00 | (0.59, 0.82) |
| MAC Attorney (vs. Other Attorney) | 0.92 | 8% lower | 0.03 | (0.85, 0.99) | 0.45 | 55% lower | 0.00 | (0.41, 0.50) |

Defendants with court-appointed counsel also have lower odds of nonappearance than similarly situated people with retained attorneys or who are pro-se. This is an unexpected finding since attorney appointment occurs *at arraignment*, begging the question how Public Defender and MAC counsel might help clients be present in court. Since arraignment in District Court is always the day after booking, some people with co-occurring felonies may already have an attorney assigned that can encourage appearance at the subsequent CCCL hearing. However, it is also possible that for many cases, the lower chance of nonappearance is an artifact of the appointment process: It is because attorneys are appointed *at arraignment*, that people with appointed counsel are more likely to be present at arraignment. Those who missed arraignment may well have absconded with no counsel assigned.

Public defender clients in particular have the highest baseline odds of missing court due to a disproportionate share of cases with challenges like mental illness, homelessness, a history of past charges, co-occurring felonies, and previous bond failures. This explains why, descriptively (Appendix F), the rate of nonappearance at arraignment is markedly higher for public defender clients (43%) than for people with either MAC (14% nonappearance rate) or private/pro-se counsel (24% nonappearance rate). However, after introducing statistical controls to account for these nonappearance risk attributes, both public defender (p<0.00) and MAC clients (p<0.00) are 30% and 55% less likely to miss arraignment respectively than people with other forms of representation.

## 4. Conclusions

After the Sixth Monitor Report found deficiencies in implementation of Harris County's court date reminder system required under Section VIII of the Consent Decree, this Seventh Monitor Report finds corrections have been made in enrollment protocols for unsecured bonds. However, steps are still being taken to resolve problems with reminder system enrollment on secured bonds. Bond companies have been instructed to use the updated form including the enrollment signup option since February of 2023, but the Sheriff's Records Division staff only recently began manual entry of defendant signups before bond forms are scanned by District Clerk staff for filing.

It is nonetheless possible to conduct some preliminary analyses estimating the impact of reminders on court appearance at arraignment. We tentatively conclude that that court date

notifications reduce the chance of nonappearance by 35% for people that receive them. Having a history of prior bond failure is a powerful predictor of future nonappearance, suggesting that mitigation strategies directed toward this population, if effective, could yield a high return on investment.

These analyses will be repeated and updated in the coming months after people with surety bonds have greater opportunity to enroll in the court date reminder system. A more complete and representative sample of defendants will allow for a fuller and more accurate perspective on the utility of notifications for all defendants.

## C. Project Management

PPRI is also charged with maintaining information necessary to manage the monitorship and assure careful tracking of Consent Decree implementation. The project management function is at the operational center of the monitorship, receiving real-time progress updates from the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved. We owe a debt to the Office of Justice and Safety team for assisting with this work and for keeping us apprised of progress being made in departments across the County. A status summary of Consent Decree requirements due in this reporting period is presented in Appendix I.

# APPENDIX

## A. The Monitorship Structure

### 1. Monitorship Goals

As described in our first report, the ODonnell lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, prevention of the needless suffering of vulnerable people, and the promotion of public safety. After three years of litigation, the parties reached a settlement consisting in this landmark Consent Decree, approved on November 21, 2019.[36] The ODonnell Consent Decree represents the first federal court-supervised remedy governing bail. The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of people arrested for misdemeanor offenses.[37]

First, under the Consent Decree, <u>people arrested for low-level misdemeanors are promptly released</u>. The Consent Decree incorporates the new Harris County Criminal Courts at Law (CCCL) Rule 9, which sets out bail policies.[38] Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds. Allowing this group to be quickly released without paying allows them to return to their jobs, take care of their children, and avoid the trauma and danger of incarceration.

Second, the Consent Decree has brought about more rigorous bail hearings with greater attention paid to the issues that matter—whether a person should be released and on what least-restrictive conditions—though much work remains to ensure the hearings and the recorded findings comply with Rule 9 and the Consent Decree. Persons arrested for misdemeanors that fall within the list of carve-out offenses must receive a magistration hearing, complying with Rule 9, at which there must be clear and convincing evidence supporting the pretrial conditions set and any decision to detain a person. All misdemeanor arrestees have access to a public defender to represent them at that hearing. Counsel has access to the client and information needed to prepare for the hearing. New trainings on the Consent Decree policies are being conducted. Completed work to study indigent defense in misdemeanor cases will inform plans and standards for misdemeanor representation, including to ensure that defense lawyers have access to social workers, investigators, and other support staff necessary to provide effective representation to people arrested for misdemeanor offenses.

Third, following this pretrial stage, misdemeanor arrestees now benefit from a defined set of court appearance rules that, with limited exceptions, is uniform among the 16 misdemeanor courts. The Consent Decree sets out a new process for waiving or rescheduling appearances. People can change some court dates so they can make it to court without undue hardship due to illness, lack of

---

[36] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019), ECF 708 [hereinafter, Consent Decree].

[37] *Id.* at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").

[38] Rules of Court, Harris County Criminal Courts at Law, Rule 9 (as amended through April 22, 2020), at http://www.ccl.hctx.net/attorneys/rules/Rules.pdf; Consent Decree ¶ 30.

childcare and other issues. Further, a new court notification system is to be built by Harris County. New work will study the causes of non-appearance and improve the ability to address those causes.

Fourth, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[39] The Consent Decree provides for public meetings and input, Harris County reports to be published every sixty days, and for Harris County to make information available online regarding the implementation of the Decree.[40]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented. After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020. As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree. Key elements of the Consent Decree have now been implemented. Important work also remains, and all involved look forward to the work to come, as we build a model misdemeanor pretrial system in Harris County.

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system. This system is intended to restore the public's trust, safeguard constitutional rights, and accomplish the aims of bail: to maximize pretrial release while keeping the community safe and promoting the integrity of the judicial proceedings by preventing persons from fleeing justice. Thus, as the Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[41] From the Consent Decree, we distilled nine guiding principles:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – We view accountability as part of an ongoing process of systemic evaluation and improvement with community participation.

(3) **Permanency** – We must not only evaluate progress, but also ensure that the administrative measures, policies, and processes, can work well long-term.

(4) **Protecting constitutional rights** – We must protect civil and human rights, including the constitutional rights of arrestees.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

---

[39] Consent Decree, *supra*, at ¶83-85.
[40] *Id.* at ¶87-88.
[41] Consent Decree, supra, at ¶1.

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We must seek to maximize pretrial liberty and to minimize criminal legal involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, we should establish a system that is self-monitoring and can make ongoing improvements.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

## 2. The Monitor Team

Our interdisciplinary team includes experts in law, social science, behavioral health, economic analysis, indigent defense, and project management. Team biographies are included in Appendix B. The team includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael, David Shi, and Andrea Sesock (Public Policy Research Institute at Texas A&M University)

- Songman Kang (Sungkyunkwan University)

Our full organization chart is also included in Appendix C.



### 3. Consent Decree Authority

This Report contains the Monitor's review of compliance for the fourth six month time period that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.

Further, the Consent Decree states in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:

> a. A description of the work conducted by the Monitor during the reporting period;

> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;

> c. The methodology and specific findings for each compliance review conducted;

> d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;

e. A projection of the work to be completed during the upcoming reporting period;

f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;

g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;

h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:

      i. Maximizing pretrial liberty;
      ii. Maximizing court appearance; and
      iii. Maximizing public safety; and

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds:

The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Our Monitor Work Plans are divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117. As in our first two reports, we have divided this report into three parts, reflecting the main components of our work and addressing each subject set out in the Consent Decree: Policy Assessment and Reporting; Cost Study and Project Management; and Community Outreach, Participation, and Working Group.

## B. Community Work Group

The Monitor Team relies on the guidance of a Community Work Group (CWG), a dedicated group of community leaders who represent a diverse set of perspectives and specializations. The CWG meets on a quarterly basis with the Monitor Team, as well as with various county officials responsible for the implementation of the Consent Decree.



**Hiram A. Contreras** served for 36 years with the Houston Police Department. He retired as Assistant Chief of Police in March 1998. While ascending the police ranks, Mr. Contreras' assignments included the Auto Theft, Juvenile, Recruiting, Planning and Research, Northeast Patrol and Major Offenders. He was promoted to the rank of Assistant Chief July 1991. In the same year as a result of a court ruling, he became the only Latinx person to attain the rank of Deputy Chief. This was retroactive as of March 1986. As Assistant Chief he directed the Professional Development Command. At retirement he was directing the Special Investigation Command. In his career with HPD, Mr. Contreras established the first HPD storefront in the city and initiated the Culture Awareness Program. In collaboration with the U.S. Marshal's Service, he initiated the Gulf Coast Violent Offenders Task Force. As commander of the Special Investigations Command, he coordinated HPD's participation with the Department of Justice High-Intensity Drug Trafficking Area Program. Also, he coordinated the International Symposium on the Police Administration and Problems in Metropolitan Cities with the Istanbul Police Department in Istanbul, Turkey. As Assistant Chief, Mr. Contreras, at the request of the Police Executive Research Forum, participated in police promotional assessment centers in Chicago, Denver, and San Francisco. Nominated by President William J. Clinton, Mr. Contreras became U.S. Marshal for the Southern District of Texas in 1998 and served until 2002. His consulting business, Art Contreras & Associates – LLC, specializes in human resource and marketing principles.



**Katharina Dechert** serves as the Houston Policy & Advocacy Manager for the Tahirih Justice Center, leading the development and advancement of Tahirih's local and state-wide advocacy projects and campaigns to transform the policies and practices that impact immigrant survivors of gender-based violence. Katharina joined Tahirih in 2016 as a legal advocate, supporting survivors in their immigration journey and later working as a Department of Justice Fully Accredited Representative, qualified to represent immigrant survivors before both U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals. She has experience working with human rights defenders in Guatemala, as well as previous internships working to advance asylum policy in Ecuador and increase access to justice for survivors of human rights violations at the International Criminal Court - Secretariat of the Trust Fund for Victims. She is a graduate of Wellesley College and prior to joining Tahirih, obtained her Master of International Studies in Peace and Conflict Resolution as a Rotary Peace Fellow at the University of Queensland in Brisbane, Australia.



**J. Allen Douglas** is the executive director of the Downtown Redevelopment Authority (DRA). In addition, he performs the duties of general counsel for the organization and its related entities Central Houston and the Downtown District. Prior to joining the DRA, Allen practiced law for more than 20 years, beginning his career as a law clerk at Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. in Houston. He worked for the United States Court of Appeals, Sixth Circuit and the United States District Court, Northern District of Ohio in Cleveland, Ohio. Most recently he was an associate attorney at Littler Mendelson, P.C. and assistant county attorney with the Harris County Attorney's office where he focused on appellate labor, employment, and civil rights cases. Allen has also served as vice-chair

of the Midtown Management District's board of directors since June 2015, as well as chair of the organization's Urban Planning Committee.



**Tara Grigg Green** (formerly Garlinghouse) is the Co-Founder and Executive Director of Foster Care Advocacy Center. Prior to founding Foster Care Advocacy Center, Tara was a Staff Attorney and Skadden Fellow in the Houston office of Disability Rights Texas. There, she helped develop the Foster Care Team to provide direct representation to foster children with disabilities in state child welfare cases, special education litigation and Medicaid appeals. She authored an Amicus Brief in *M.D. v. Abbott*—class action litigation seeking to reform the Texas foster care system—cited by the Fifth Circuit in affirming the State's liability. She has consulted on child welfare policy issues for organizations such as Casey Family Programs, the ABA Center on Children and the Law, the Texas Children's Commission, and the United States Children's Bureau. Tara has published law review articles and research papers on the constitutional rights of children and families and quality legal representation in child welfare proceedings. Her passion for this field comes from her family's experience as a foster family caring for over one hundred foster children. She has received many awards and was recently named the National Association of Counsel for Children's Outstanding Young Lawyer. Tara clerked for the Hon. Micaela Alvarez of the U.S. Southern District of Texas in McAllen. She holds a J.D. from the University of Pennsylvania Law School where she was a Toll Public Interest Scholar, a M.P.P. from the Harvard Kennedy School of Government where she was a Taubman Fellow, and a B.A. from Rice University.



Oudrey Hervey is a retired Navy Commander with 29 years of progressive experience in leadership, Strategic HR, and Executive-level management. He has managed or provided expert advice in Global HR, Executive Coaching, Learning & Development, Diversity, Equity & Inclusion, Policy Design, Emergency Preparedness, Interagency Coordination, Project Management, Federal Grants Mgt., and stakeholder engagement. He has trained over 5,000 people in a multinational environment regarding various topics of individual and institutional excellence. He holds an M.A. degree in National Security and a M.S. degree in Public Service, which together provide him with the ability to work effectively and professionally across the public, private, and federal landscape. Additionally, he held leadership positions in public, nonprofit, and private organizations where he produced outcomes that increased revenue, alleviated poverty, and built institutional capacity. Oudrey is a certified Global Professional in Human Resources, a Society of Human Resource Management Senior Certified Professional, and a trained Evidence-Based Coach. He is a thought leader and change agent, with a passion for veteran inclusion, affordable housing, and strategic problem solving through a systems-thinking lens. He is a member of the Houston Housing Collaborative and former Vice Chair of the Harris County Housing Policy Advisory Committee.

Oudrey is a Human Development PhD student, beach cruiser enthusiast, recreational boater, and USCG licensed Master of 100-ton vessels.



**Frances E. Isbell** is the former Chief Executive Officer of Healthcare for the Homeless – Houston (HHH), a Federally Qualified Health Center providing care for 8,500 people annually. As the inaugural CEO of Healthcare for the Homeless – Houston, Ms. Isbell was instrumental in bringing together a large number of community-based agencies, healthcare clinicians, educational institutions, and public organizations to forge a common strategic plan to effectively address the health needs of people experiencing homelessness. The primary aim of this consortium is to increase access to quality healthcare while concurrently reducing costly and ineffective service duplication. Ms. Isbell has received numerous local and national awards and recognitions for her work, and two of HHH's programs have been cited as a national best practice. Previous to this position, Ms. Isbell had a private practice in therapeutic counseling and taught Sociology at Houston Community College, North Harris College, and Sam Houston State University. She also has worked as a consultant in organizational development and has worked in clinical administration within large hospital systems. Ms. Isbell holds undergraduate and graduate degrees in Social Rehabilitation/Pre-Law and Behavioral Sciences, respectively.



**Jay Jenkins** is the Harris County Project Attorney at the Texas Criminal Justice Coalition. Since joining TCJC in 2014, he has promoted broad youth and adult justice reforms in Houston and the surrounding areas. Jay received his J.D. from Northwestern University School of Law, graduating *magna cum laude* in 2009. While at Northwestern, he worked at the Bluhm Legal Clinic's Children and Family Justice Center, focusing on a number of youth justice issues. In his third year, Jay was the lone law student at the newly formed Juvenile Post-Dispositional Clinic, where he promoted policy reform throughout Chicago while also advocating on behalf of juvenile clients. Jay was admitted to practice law in the State of Illinois and worked as a civil litigator in the private sector for three years. At TCJC, Jay has researched and pursued reforms related to over-policing and prosecution, while also reimagining the local bail system and supporting indigent defense, and he was instrumental in the development of a first-of-its-kind data dashboard that visualizes more than one million criminal case outcomes in Harris, Dallas, Bexar, and Travis Counties. Jay additionally serves as co-founder and President of the Convict Leasing and Labor Project, which launched in 2018 to expose the history of the convict leasing system and its connection to modern prison slavery.



**Terrance "TK" Koontz** currently serves as Statewide Training Coordinator for the Texas Organizing Project. His path to service began after he was arrested in 2010. While sitting in the Harris County Jail, he witnessed the mistreatment of black and brown people and realized that the criminal justice system was essentially about class and racial oppression. Koontz walked away as a convicted felon. Since that time, he has worked without cease to reestablish his life by fighting as an activist and organizing for criminal justice reform. His passion for criminal justice reform is rooted in his experience growing up in communities that were plagued with crime, poverty, and over-policing. In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement. He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County that helped to elect Brian Middleton, the first African American D.A. in Fort Bend County

history. He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator. He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service. Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.



**Becky Landes** has been an active participant in the Houston nonprofit community since moving to the area in 1988. Since 2016, she has served in the role of Chief Executive Officer at The Beacon. The Beacon's mission is to provide essential and next-step services to restore hope and help end homelessness in Houston.

Since beginning her career, Becky has maintained a lively interest in building community capacity to deliver successful programs that address the needs of those most vulnerable community members and to support them to move forward in meeting their goals. Following college graduation, her time as a Peace Corps volunteer overseas sparked a passion to continue working in the helping professions. She has experience managing federal, state, and local collaborative projects, serving a myriad of individuals from infants to seniors.

Becky holds a Master of Science in Counseling from the University of Houston, Clear Lake and a Bachelor of Arts degree from the College of William and Mary in Virginia. Becky has served on the Continuum of Care (CoC) Steering Committee for the Greater Houston homeless response system known as The Way Home and has enjoyed serving on two local nonprofit boards.



**Johnny N. Mata** currently serves as the Presiding Officer of the Greater Houston Coalition for Justice, a coalition of 24 diverse civil rights organizations. Through the coalition, Mr. Mata has supported changes in policing use-of-force policies and called for the creation of a citizen review board. He led the effort to reform the Texas grand jury selection process and has strived to improve relations between the police and communities of color. He has also advocated for bail bond reform, victim's rights, protecting the voices of residents affected by community development, and promoting the hiring of Latinx educators and administrators. He served two terms as Texas State Director of the League of Latin American Citizens (LULAC) and six terms as a District Director of LULAC. He worked for 32 years as a community director and human resources professional with the Gulf Coast Community Services Association. He organized the community to create the Latino Learning Center and served as a founding board member. Mr. Mata has received the NAACP President's Award, the OHTLI Award from the Republic of Mexico, the Hispanic Bar Association Lifetime Achievement Award, the Willie Velasquez-KTMD Telemundo Channel 48 Hispanic Excellence Award, Antioch Baptist Church Martin L. King Justice Award, and numerous others. The Houston Community College System awarded him an honorary Associate in Arts Degree in recognition of his achievements in promoting education in the Latinx community.



**Maureen O'Connell**, M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Sister Maureen created a successful program that has empowered hundreds of women using a standard of care other programs could emulate. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; and more than 40 years as a Dominican Sister, a religious order known for its commitment to social justice. She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director of Angela House for 17 years, retiring in 2018 and joining the Board of Directors in 2019.



**Timothy N. Oettmeier** most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer. As Executive Assistant Chief of Police, he was assigned to the Investigative Operations Command supervising the Special Investigations Command consisting of Auto Theft, Gang, Major Offenders, Narcotics, Vehicular Crimes, and Vice Divisions; the Criminal Investigations Command consisting of the Burglary and Theft, Homicide, Investigative First Responder, Juvenile, Robbery, and Special Victims Divisions; and the Technology Services Command. He was a principal architect for implementing community policing throughout the agency. He received his Ph.D. in Police Administration from Sam Houston State University in 1982. He helped oversee national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training. He authored department reports, and articles for textbooks and journals on police management issues. Early in his career, the 100 Club of Houston recognized him as an Officer of the Year. Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services. He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from the 100 Club of Houston.

**C. Monitor Team Bios**

**University of Houston Law Center**

**Sandra Guerra Thompson** is the Newell H. Blakely Chair at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019. In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions. Her scholarly articles address issues such

as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations. Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project. Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

**Duke University**

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018. He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005. Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes. Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers. Garrett's research and teaching interests include criminal procedure, wrongful convictions, habeas corpus, scientific evidence, and constitutional law. Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers, law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures. Garrett founded and directs the Wilson Center for Science and Justice at Duke.

**Marvin S. Swartz, M.D.** is the Professor and Head of the Division of Social and Community Psychiatry, Director of Behavioral Health for the Duke University Health System and Director of the Duke AHEC Program. Dr. Swartz has been extensively involved in research and policy issues related to the organization and care of mentally ill individuals at the state and national level. He was a Network Member in the MacArthur Foundation Research Network on Mandated Community Treatment examining use of legal tools to promote adherence to mental health treatment and led the Duke team in conducting the first randomized trial of involuntary outpatient commitment in North Carolina and the legislatively mandated evaluation of Assisted Outpatient Treatment in New York. He co-led a North Carolina study examining the effectiveness of Psychiatric Advance Directives and the NIMH funded Clinical Antipsychotics Trials of Intervention Effectiveness study. He is currently a co-investigator of a study of implementation of Psychiatric Advance Directives in usual care settings, an evaluation of implementation of assisted outpatient treatment programs and a randomized trial of injectable, long-acting naltrexone in drug courts. Dr. Swartz has done a range of work regarding diversion from jail, including among populations of co-occurring substance abuse and mental health disorders. Dr. Swartz was the recipient of the 2011 American Public Health Association's Carl Taube Award, the 2012 American Psychiatric Association's Senior Scholar, Health Services Research Award for career contributions to mental health services research and the 2015 Isaac Ray Award from the American Psychiatric Association for career contributions to forensic psychiatry.

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems. Moreover, she is knowledgeable and experienced in the operation of local governments. Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures. Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019. In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**David (Dongwei) Shi**, ABD, MS, is a Senior Research Associate at the Public Policy Research Institute at Texas A&M University. Mr. Shi is currently completing a PhD in public policy and administration at the Martin School of Public Policy and Administration at the University of Kentucky, and has earned a M.S. in economics at the University of Wisconsin-Madison in 2018. He is trained in the latest experimental and quasi-experimental research methodologies, and has extensive experience with programming, statistical analysis, data management and analysis of large and complex data sets across different areas including criminal justice.

**Sungkyunkwan University**

**Songman Kang** is an associate professor of economics at Sungkyunkwan University in Seoul, South Korea. He earned his B.A. in Economics from the University of Pennsylvania in 2005, and his Ph.D. in Economics from Duke University in 2012. After completing his Ph.D., he worked as a postdoctoral research associate at the Sanford School of Public Policy at Duke University. Kang is an applied microeconomist with extensive research experience in economic inequality, education, and criminal justice policy. He has published several research papers in prestigious academic journals, including *American Economic Journal: Applied Economics*, *Journal of Econometrics*, *Journal of Population Economics*, and *Journal of Quantitative Criminology*. Kang's recent research, published in *Journal of Law, Economics, and Organization*, investigated the causal effect on local crime of the Secure Communities program, an interior immigration enforcement policy first adopted in Harris County in 2008 and eventually implemented nationwide in 2013. Kang has also received several honors and grants, including Wigong Award from the Korean Law and Economics Association in 2021, and was selected as the Junior Fellow of NBER Economics of Crime Working Group in 2012-2013.

## D. Organizational Chart



## E. Year 5 Statement of Work

## *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, as Monitor, and Professor and Sandra Guerra Thompson, University of Houston Law Center, as Deputy Monitor, with the support team members at the Public Policy Research Institute at Texas A&M University, as well as the Center for Science and Justice (CSJ) at Duke University, were appointed to serve as the Monitor Team for the *ODonnell* Consent Decree.

In January 2019, after an initial preliminary injunction order, which took effect June 6, 2017, and following an appeal, Harris County, the misdemeanor judges, and the sheriff promulgated new bail rules, requiring the prompt post-arrest release on unsecured bonds of the vast majority of people arrested for misdemeanor offenses. Pursuant to the rules, everyone else is afforded a bail hearing with counsel, and most are then also ordered released. These rules provided the foundation for the global Consent Decree, which the parties agreed to in July 2019 and which Chief Judge Rosenthal approved on November 21, 2019. The resulting Consent Decree builds upon the county's new pretrial justice system, so as to bring about lasting change in Harris County. The

Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of misdemeanor arrestees. Under the terms of the Consent Decree, the Monitor will serve a key role in bringing each of the component parts together to ensure a holistic and collaborative approach towards pretrial reform. This new system has the potential to become a model for jurisdictions around the country.

The submission to Court included a Proposal and Budget for Year 1 of work, which describes team members, timelines, an organization chart, and a budget for all participants. We provided on May 1, 2020, a work plan for our first year of work. We provided in March, 2021, a work plan for our second year of work and similarly provided in March 2022 a work plan for our third year of work.

This Work Plan describes the fifth year of our work, set out in quarterly deliverables, with a budget of approximately $580,378. As with our prior work plans, this Year 4 Statement of Work is divided into three Deliverables: (1) Policy Assessment and Reporting; (2) Cost Study and Project Management; (3) Community Outreach, Participation, and Working Group.

**Task I: Policy Assessment and Reporting**

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree. A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 4, the Monitor will be producing reports, including: a year-end Monitor Report. The Monitor will be analyzing data from the county and reporting on these data in that report and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

**Task I:1. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:2. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:3. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:4. Complete Year-end Report**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

Incorporate work into year-end Monitor Report.

**Project Timeline and Staffing.**

This work will be conducted between March 3, 2024 and March 2, 2025.

**Monitor Team Personnel:**

- **Prof. Brandon Garrett** (Duke Law School)

- **Prof. Songman Kang**.

- **Research assistants** (Duke Law School and University of Houston Law Center)

**Travel:**

- <u>Travel</u>: travel to Houston Team Members.

## Task II: Cost Study and Project Management

The cost impacts of bail reform in Harris County are being evaluated by the <u>Public Policy Research Institute</u> (PPRI), a leading interdisciplinary government and social policy research organization at Texas A&M University. There are a range of costs in the pretrial context – not only costs to the system relating to detention, court appearances, prosecution, indigent defense, pretrial services, monitoring, and re-arrest/recidivism, but also costs to the defendant, families, and the community due to loss of freedom, loss of housing, loss of earnings, loss of benefits of spousal/partner assistance, and harm to physical and behavioral health due to pretrial detention. The PPRI team will assist the Monitor to understand relevant costs, assess change over time, and help identify cost-effective methods of realizing priorities under the Decree. Tasks and deliverables are described below.

## Task II:1. Complete Cost Data Acquisition

PPRI will continue to work with the Research and Analysis Division and Monitor team colleagues to acquire, merge, and prepare datasets needed for analysis and statistical modeling. Data development and validation is a constant demand requiring ongoing close monitoring to ensure data quality. Recent examples of complex quantitative acquisition and validation efforts include clarifying and mitigating the effects of imputed booking dates, improving estimations of cases that meet criteria for "carveout" prior to 2019, and negotiating access to data needed to evaluate the effects of the CARP program on pretrial success. Considerable time and attention is invested in qualitative data collection to understand the meaning of variables and the underlying processes for accurate interpretation. During the 2024-25 contract year PPRI will continue to collaborate to identify new data needs, validate existing data, and remediate discrepancies. Resulting data products will be used to produce more robust estimates of per-defendant costs and to demonstrate how these costs have changed in amount and composition since the implementation of the Consent Decree.

## Task II:2. Produce Ongoing Research Output

Cost-related findings based on both existing and newly available data elements will be studied over the course of the year in order to strengthen and calibrate the bail reform process. Analyses determined by the Monitors with input from the Parties and other stakeholders will assess general misdemeanor case processing costs as well as specific cost impacts of changes under the Consent Decree. Results will quantify the relative contributions of independent cost centers and the impact of programs or practices within and between departments. Reports will summarize major findings, offer recommendations, and propose future directions for continued investigation in support of Consent Decree objectives. Findings will be shared at stakeholder meetings, in written reports, and in academic publications.

## Task II:3. Maintain Project Management Protocol

In their project management role PPRI will facilitate information-sharing and coordination of activities among members of the monitor team and other stakeholder implementing the Consent Decree. We will assist the Monitor with managing a rolling an agenda of topics for meetings of the Parties, maintain progress notes recording accomplishments and obstacles toward implementing Consent Decree requirements, collaborate with JAD staff to document attainment of tasks and timelines in the cloud-based Monday.com project tracking system, memorialize key work products,

and regularly report progress to JAD, the Parties, the Federal Court, and the public through semi-annual status reports on Consent Decree milestones. Costs for this continuous support function will be apportioned evenly across billing for other deliverables over the course of the year.

**Task II:4.  Produce Eighth Cost Analysis Report**
For the Eighth Monitor Report to be submitted March 3, 2025, PPRI will further expand and integrate analysis centering on cost or compliance aspects of the Consent Decree.  Working with the Monitors, we will identify a menu of informative and useful potential targets for cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources as appropriate.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2024 and March 2, 2025.
- **Texas A&M, Public Policy Research Institute (PPRI)** will conduct a multi-year evaluation
- **Dottie Carmichael** (Director and Research Scientist, Texas A&M University, PPRI)
- **David Shi** (Senior Research Associate)
- **Andrea Sesock** (Project Coordinator)
- <u>Travel</u>: to Houston for Texas A&M University Team Members

**Task III: Community Outreach, Participation, and Working Group**

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders.  The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

**Task III:1. Continued Public Outreach and Participation**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to maintain Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

**Task III:2. Continued Public Outreach and Participation**

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

The Monitor Team will review County's plan for upcoming public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Continue to update Monitor website.

### Task III:3. Convene CWG and Solicit Additional Public Input

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to update Monitor website.

### Task III:4. Public Meeting, Seventh Monitor Report

Convene monthly meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Third public meeting convened.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

### Project Timeline and Staffing

This work will be conducted between March 3, 2024 and March 2, 2025.

- **Sandra Guerra Thompson** (University of Houston Law Center)

**Houston Meeting Costs:**

- Administrative support, food, publicity, space
- Travel: to Houston for Prof. Thompson

**Deliverables**

| Deliverable I | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task 1:1.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Task II:1.<br><br>The Monitor Team (PPRI) continues work to acquire, clean, link, and prepare datasets and county department budget records for cost analysis.<br><br>Statistical analysis will be conducted in preparation for the cost analysis report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:1.<br><br>Monitoring Plan re: outreach and participation for the second year.<br><br>Convene monthly meetings of Community Working Group (CWG). | June 1, 2024 | $160,758 |

| | | |
|---|---|---|
| Begin set up of Houston office.<br><br>Continue to maintain Monitor website. | | |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:2.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into Monitor Report.<br><br>Task II:2.<br><br>The Monitor Team (PPRI) develops ongoing research output on topics determined in collaboration with the Monitors, the Parties, and other stakeholders. Resulting work products include presentations, reports, and publications.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:2.<br><br>Continue Community Outreach. | August 20, 2024 | $167,371 |

| | | |
|---|---|---|
| Convene monthly meetings of the Community Working Group (CWG).<br><br>Review County's plan for upcoming public meetings.<br><br>Incorporate work into third six-month Monitor Report.<br><br>Updates to Monitor website. | | |

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:3.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Task II:3.<br><br>The Monitor Team (PPRI) facilitates information-sharing and coordination of activities among ODonnell stakeholders relating to progress under the Consent Decree. Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status. | November 28, 2024 | $115,647 |

| | | |
|---|---|---|
| **Task III:3.**<br><br>Outreach to share results of third six-month Monitor Report.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Updates to Monitor website | | |
| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
| <u>Task I:4.</u><br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into year-end Monitor Report.<br><br><u>Task II:4.</u> | March 2, 2025 | $150,802 |

| | | |
|---|---|---|
| The Monitor Team (PPRI) produces the Eighth Cost Analysis Report reflecting informative and useful targets for research developed in collaboration with the Monitor and Deputy Monitor, and with input from key stakeholders such as the Parties and the Community Working Group.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:4.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Third public meeting convened.<br><br>Continued outreach, with the guidance of the CWG, to local organizations and community groups.<br><br>Incorporate work into fourth six-month Monitor Report.<br><br>Updates to Monitor website. | | |

Total Year 5 Budget: $594,578

## Appendix F:  Enrollment and Nonappearance Rates by Subgroup

| | ENROLLMENT RATE | | NONAPPEARANCE RATE (After System Corrections) | | |
| | | | Defendants Out of Detention at Arraignment: | | Defendants Detained at Arraignment: |
| | Before System Corrections | After System Corrections | With Reminders | Without Reminders | |
|---|---|---|---|---|---|
| **All Cases** | | | | | |
| | 23% (n=41,945) | 55% (n=15,707) | 18% (n=8,441) | 23% (n=5,051) | 34% (n=2,219) |
| **SEX** | | | | | |
| Female | 22% (n=9,747) | 57% (n=3,855) | 18% (n=2,174) | 22% (n=1,292) | 36% (n=390) |
| Male | 23% (n=32,115) | 54% (n=11,827) | 18% (n=6,255) | 24% (n=3,748) | 34% (n=1,826) |
| **RACE/ETHNICITY** | | | | | |
| White | 20% (n=23,366) | 54% (n=8,831) | 16% (n=4,710) | 21% (n=3,005) | 35% (n=1,119) |
| African American | 27% (n=16,919) | 55% (n=6,240) | 21% (n=3,364) | 28% (n=1,834) | 32% (n=1,042) |
| Other Non-White | 21% (n=1,661) | 58% (n=637) | 12% (n=367) | 17% (n=212) | 41% (n=58) |
| Hispanic or Latino | 31% (n=3,589) | 54% (n=1,201) | 22% (n=630) | 33% (n=330) | 35% (n=241) |
| Non-Hispanic | 22% (n=38,357) | 55% (n=14,507) | 18% (n=7,811) | 23% (n=4,721) | 34% (n=1,978) |
| **AGE** | | | | | |
| 17-25 | 18% (n=10,626) | 55% (n=4,524) | 15% (n=2,464) | 19% (n=1,488) | 31% (n=573) |
| 26-30 | 22% (n=7,732) | 57% (n=2,817) | 17% (n=1,573) | 22% (n=848) | 34% (n=397) |
| 31-40 | 24% (n=12,271) | 54% (n=4,411) | 20% (n=2,326) | 25% (n=1,371) | 35% (n=714) |
| 40+ | 25% (n=11,276) | 54% (n=3,945) | 21% (n=2,071) | 26% (n=1,341) | 37% (n=534) |

| | ENROLLMENT RATE | | NONAPPEARANCE RATE (After System Corrections) | | |
| | | | Defendants Out of Detention at Arraignment: | | Defendants Detained at Arraignment: |
| | Before System Corrections | After System Corrections | With Reminders | Without Reminders | |
| **VULNERABILITY** | | | | | |
| Homeless Only | 32% (n=1,129) | 54% (n=363) | 32% (n=188) | 38% (n=91) | 36% (n=80) |
| Mentally Ill | 26% (n=6,630) | 46% (n=2,138) | 34% (n=959) | 44% (n=584) | 33% (n=634) |
| Both Homeless and Mentally Ill | 34% (n=3,192) | 46% (n=1,015) | 50% (n=448) | 54% (n=327) | 29% (n=244) |
| Neither | 20% (n=30,996) | 57% (n=12,192) | 13% (n=6,846) | 17% (n=4,049) | 36% (n=1,261) |
| **BOND FILED** | | | | | |
| GOB | 24% (n=21,066) | 70% (n=8,434) | 17% (n=5,849) | 27% (n=2,284) | 40% (n=301) |
| Unsecured | 26% (n=12,404) | 58% (n=4,019) | 23% (n=2,230) | 25% (n=1,266) | 37% (n=526) |
| Secured | 17% (n=5,808) | 16% (n=2,145) | 12% (n=337) | 16% (n=1,395) | 35% (n=413) |
| No Bond Ever Filed | 4% (n=2,669) | 3% (n=1,110) | 20% (n=25) | 24% (n=106) | 30% (n=979) |
| **DETENTION** | | | | | |
| Detained at Arraignment | 15% (n=13,458) | 26% (n=5,186) | --- | --- | 34% (n=2,219) |
| Released at Arraignment | 26% (n=28,487) | 69% (n=10,521) | 18% (n=8,441) | 23% (n=5,051) | --- |
| 0-2 Days Initial Detention | 24% (n=36,532) | 60% (n=13,878) | 18% (n=8,267) | 23% (n=4,909) | 40% (n=702) |
| 3-5 Days Initial Detention | 13% (n=1,227) | 19% (n=361) | 34% (n=62) | 31% (n=35) | 39% (n=264) |
| >5 Days Initial Detention | 12% (n=4,188) | 12% (n=1,472) | 23% (n=112) | 41% (n=107) | 28% (n=1,253) |

| | ENROLLMENT RATE | | NONAPPEARANCE RATE (After System Corrections) | | |
| | | | Defendants Out of Detention at Arraignment: | | Defendants Detained at Arraignment: |
| | Before System Corrections | After System Corrections | With Reminders | Without Reminders | |
|---|---|---|---|---|---|
| **CHARGE** | | | | | |
| Misd. Only | 22% (n=37,805) | 56% (n=14,049) | 18% (n=7,770) | 23% (n=4,640) | 32% (n=1,642) |
| Co-Felony | 25% (n=4,142) | 44% (n=1,659) | 22% (n=671) | 31% (n=411) | 41% (n=577) |
| **CARVEOUT** | | | | | |
| Not Carveout | 23% (n=24,582) | 62% (n=9,820) | 17% (n=6,061) | 22% (n=3,311) | 41% (n=448) |
| Carveout | 22% (n=17,363) | 42% (n=5,887) | 22% (n=1,965) | 25% (n=1,157) | 32% (n=1,771) |
| **VIOLENT** | | | | | |
| Non-Violent Charge | 23% (n=32,183) | 56% (n=11,807) | 18% (n=6,526) | 24% (n=3,761) | 32% (n=1,520) |
| Violent Charge | 21% (n=9,696) | 50% (n=3,697) | 16% (n=1,818) | 21% (n=1,206) | 38% (n=676) |
| **OFFENSE** | | | | | |
| Assault Offenses | 21% (n=9,612) | 50% (n=3,666) | 16% (n=1,807) | 21% (n=1,194) | 38% (n=668) |
| Burglary | 33% (n=2,875) | 52% (n=934) | 44% (n=480) | 50% (n=304) | 27% (n=150) |
| Impaired Driving | 21% (n=9,682) | 65% (n=3,606) | 9% (n=2,341) | 10% (n=1,114) | 32% (n=151) |
| Larceny/ Theft | 20% (n=3,855) | 47% (n=1,621) | 28% (n=734) | 31% (n=602) | 34% (n=285) |
| Weapon Law Violation | 26% (n=3,775) | 60% (n=1,100) | 11% (n=658) | 16% (n=346) | 31% (n=96) |
| Other NIBRS Group A | 24% (n=4,511) | 52% (n=1,737) | 27% (n=856) | 35% (n=499) | 28% (n=382) |
| Least Serious NIBRS Group B | 21% (n=7,569) | 53% (n=2,840) | 18% (n=1,468) | 23% (n=908) | 36% (n=464) |

| | ENROLLMENT RATE | | NONAPPEARANCE RATE (After System Corrections) | | |
| | | | Defendants Out of Detention at Arraignment: | | Defendants Detained at Arraignment: |
| | Before System Corrections | After System Corrections | With Reminders | Without Reminders | |
|---|---|---|---|---|---|
| **BOND FAILURE** | | | | | |
| No Past Bond Failure | 20% (n=27,066) | 57% (n=11,898) | 9% (n=6,739) | 13% (n=3,812) | 36% (n=1,349) |
| Past Bond Failure | 27% (n=14,881) | 46% (n=3,810) | 54% (n=1,702) | 55% (n=1,239) | 32% (n=870) |
| **PAST CHARGES** | | | | | |
| 0 Past Charges | 16% (n=19,060) | 59% (n=7,712) | 11% (n=4,574) | 16% (n=2,741) | 37% (n=399) |
| 1-2 Past Charges | 29% (n=13,570) | 57% (n=5,128) | 21% (n=2,850) | 26% (n=1,440) | 36% (n=839) |
| 3-4 Past Charges | 27% (n=4,455) | 41% (n=1,502) | 33% (n=585) | 40% (n=419) | 33% (n=498) |
| 5+ Past Charges | 24% (n=4,749) | 34% (n=1,365) | 49% (n=432) | 44% (n=451) | 29% (n=483) |
| **PAST FELONY** | | | | | |
| 0 Past Felony Charges | 22% (n=34,566) | 58% (n=13,528) | 16% (n=7,699) | 21% (n=4,365) | 34% (n=1,467) |
| 1-2 Past Felony Charges | 27% (n=4,985) | 39% (n=1,540) | 38% (n=567) | 40% (n=452) | 34% (n=521) |
| 3-4 Past Felony Charges | 24% (n=1,395) | 30% (n=431) | 40% (n=114) | 47% (n=151) | 35% (n=167) |
| 5+ Past Felony Charges | 17% (n=999) | 31% (n=208) | 36% (n=61) | 24% (n=83) | 44% (n=64) |
| **ATTORNEY** | | | | | |
| Public Defender | 23% (n=3,992) | 32% (n=1,112) | 38% (n=304) | 48% (n=286) | 35% (n=523) |
| MAC Counsel | 25% (n=20,278) | 55% (n=7,557) | 12% (n=4,044) | 18% (n=2,163) | 32% (n=1,350) |
| Other Attorney | 20% (n=17,555) | 58% (n=7,033) | 22% (n=4,089) | 25% (n=2,601) | 41% (n=345) |

## Appendix G:  Correlation Matrix (2/26/22 to 1/7/24)

| | Enrolled | Female | White | African American | Other Race | Hispanic | Age | Homeless Only | MI Only | Homeless + MI | Neither Homeless Nor MI |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Enrolled for Reminders | 1 | | | | | | | | | | |
| Female | 0.01 | 1 | | | | | | | | | |
| White | -0.06 | -0.05 | 1 | | | | | | | | |
| African American | 0.06 | 0.05 | **-0.92** | 1 | | | | | | | |
| Other Non-White Race | 0.00 | 0.01 | **-0.22** | **-0.17** | 1 | | | | | | |
| Hispanic | 0.04 | -0.06 | **0.24** | **-0.23** | -0.03 | 1 | | | | | |
| Age | 0.03 | -0.01 | 0.03 | -0.04 | 0.03 | 0.11 | 1 | | | | |
| Homeless Only | 0.02 | -0.01 | -0.07 | 0.08 | -0.02 | 0.02 | 0.07 | 1 | | | |
| Mentally Ill Only | 0.01 | 0.02 | -0.07 | 0.08 | -0.03 | 0.08 | 0.05 | -0.07 | 1 | | |
| Homeless and Mentally Ill | 0.05 | 0.00 | -0.12 | 0.14 | -0.04 | 0.02 | 0.15 | -0.05 | -0.12 | 1 | |
| Neither Homeless Nor MI | -0.04 | -0.01 | 0.15 | -0.18 | 0.06 | -0.09 | -0.16 | **-0.28** | **-0.73** | **-0.48** | 1 |
| Unsecured Bond Filed | 0.19 | 0.02 | -0.02 | 0.02 | 0.00 | 0.00 | 0.02 | 0.01 | -0.04 | 0.01 | 0.03 |
| Secured Bond Filed | -0.12 | 0.01 | 0.04 | -0.05 | 0.01 | -0.02 | -0.04 | -0.02 | -0.04 | -0.08 | 0.08 |
| No Bond Filed | -0.15 | -0.05 | -0.03 | 0.03 | -0.02 | 0.03 | 0.02 | 0.02 | 0.12 | 0.09 | -0.16 |
| Initial Pretrial Jail Days | -0.07 | -0.05 | -0.03 | 0.04 | -0.02 | 0.03 | 0.01 | 0.02 | 0.12 | 0.08 | -0.15 |
| Released Before Arraignment | 0.17 | 0.00 | 0.06 | -0.06 | 0.02 | -0.02 | -0.02 | -0.03 | -0.14 | -0.08 | 0.17 |
| Co-Occuring Felony Charge | 0.00 | -0.07 | -0.04 | 0.05 | -0.01 | 0.02 | -0.04 | 0.01 | 0.08 | 0.00 | -0.07 |
| Processed as a Carveout | -0.07 | -0.02 | -0.07 | 0.08 | -0.02 | 0.04 | 0.01 | 0.03 | 0.16 | 0.07 | -0.18 |
| Violent Charge | -0.03 | 0.04 | -0.03 | 0.03 | 0.00 | 0.01 | 0.05 | 0.00 | 0.04 | -0.01 | -0.02 |
| Assault | -0.03 | 0.04 | -0.03 | 0.03 | -0.01 | 0.01 | 0.04 | 0.00 | 0.04 | -0.01 | -0.02 |
| Burglary | 0.04 | -0.03 | -0.09 | 0.10 | -0.02 | 0.01 | 0.06 | 0.05 | 0.11 | 0.18 | **-0.22** |
| Impaired Driving | 0.01 | -0.02 | **0.20** | **-0.21** | 0.02 | 0.01 | 0.08 | -0.05 | -0.15 | -0.13 | **0.21** |
| Larceny/Theft | -0.02 | 0.10 | -0.04 | 0.05 | -0.01 | -0.01 | 0.01 | 0.02 | 0.04 | 0.05 | -0.08 |
| Weapon Charge | 0.02 | -0.11 | -0.07 | 0.08 | -0.02 | -0.04 | -0.17 | -0.02 | -0.06 | -0.07 | 0.10 |
| Any Prior Charges (3 Years) | 0.07 | -0.10 | -0.14 | 0.15 | -0.04 | 0.06 | -0.04 | 0.05 | **0.24** | 0.18 | **-0.33** |
| Any Bond Failure (3 Years) | 0.01 | -0.04 | -0.08 | 0.10 | -0.05 | 0.07 | 0.02 | 0.07 | **0.20** | **0.24** | **-0.33** |
| Public Defender Attorney | -0.03 | -0.03 | -0.08 | 0.09 | -0.02 | 0.05 | 0.08 | 0.01 | **0.22** | **0.25** | **-0.34** |
| MAC Attorney | 0.03 | 0.06 | -0.15 | 0.17 | -0.05 | -0.01 | -0.10 | 0.06 | 0.07 | 0.01 | -0.08 |
| No Appointed Attorney | 0.01 | 0.10 | -0.07 | 0.06 | 0.03 | 0.01 | 0.00 | 0.02 | 0.08 | 0.07 | -0.12 |

| | Unsecured Bond | Secured Bond | No Bond Filed | Initial Jail Days | Released Before Arrnmt. | Co-Felony Charge | Carveout | Violent Charge | Assault | Burglary | Impaired Driving |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Enrolled for Reminders | | | | | | | | | | | |
| Female | | | | | | | | | | | |
| White | | | | | | | | | | | |
| African American | | | | | | | | | | | |
| Other Non-White Race | | | | | | | | | | | |
| Hispanic | | | | | | | | | | | |
| Age | | | | | | | | | | | |
| Homeless Only | | | | | | | | | | | |
| Mentally Ill Only | | | | | | | | | | | |
| Homeless and Mentally Ill | | | | | | | | | | | |
| Neither Homeless Nor MI | | | | | | | | | | | |
| Unsecured Bond Filed | 1 | | | | | | | | | | |
| Secured Bond Filed | **-0.79** | 1 | | | | | | | | | |
| No Bond Filed | **-0.52** | -0.11 | 1 | | | | | | | | |
| Initial Pretrial Jail Days | -0.15 | -0.06 | **0.33** | 1 | | | | | | | |
| Released Before Arraignment | **0.47** | **-0.35** | **-0.29** | **-0.27** | 1 | | | | | | |
| Co-Occuring Felony Charge | -0.06 | -0.02 | 0.13 | **0.25** | -0.18 | 1 | | | | | |
| Processed as a Carveout | **-0.23** | 0.06 | **0.28** | 0.16 | **-0.22** | 0.08 | 1 | | | | |
| Violent Charge | -0.05 | 0.02 | 0.06 | 0.02 | -0.05 | 0.00 | **0.38** | 1 | | | |
| Assault | -0.05 | 0.02 | 0.06 | 0.02 | -0.05 | 0.00 | **0.38** | **0.99** | 1 | | |
| Burglary | 0.06 | -0.08 | 0.02 | 0.00 | 0.00 | -0.06 | 0.00 | -0.15 | -0.15 | 1 | |
| Impaired Driving | 0.06 | 0.00 | -0.10 | -0.08 | 0.18 | -0.06 | **-0.25** | **-0.30** | **-0.30** | -0.15 | 1 |
| Larceny/Theft | -0.02 | 0.03 | -0.01 | 0.00 | -0.09 | 0.01 | -0.04 | -0.18 | -0.18 | -0.09 | -0.18 |
| Weapon Charge | 0.02 | 0.00 | -0.04 | -0.02 | 0.06 | 0.11 | -0.12 | -0.17 | -0.17 | -0.08 | -0.16 |
| Any Prior Charges (3 Years) | -0.08 | -0.02 | 0.17 | 0.15 | **-0.21** | **0.30** | **0.28** | -0.02 | -0.02 | 0.14 | **-0.26** |
| Any Bond Failure (3 Years) | 0.02 | -0.07 | 0.08 | 0.04 | -0.07 | 0.03 | 0.15 | -0.05 | -0.05 | **0.21** | -0.17 |
| Public Defender Attorney | -0.07 | -0.05 | 0.18 | **0.20** | **-0.20** | 0.14 | 0.15 | 0.01 | 0.01 | 0.14 | -0.14 |
| MAC Attorney | 0.03 | -0.04 | 0.01 | 0.03 | -0.05 | 0.02 | 0.10 | 0.06 | 0.06 | 0.03 | -0.19 |
| No Appointed Attorney | -0.01 | -0.02 | 0.05 | 0.04 | -0.1 | -0.02 | 0.02 | -0.18 | -0.19 | -0.09 | -0.19 |

| | Larceny/Theft | Weapon Charge | Prior Charges (3 Yrs) | Bond Failure (3 Yrs) | Public Defender Attorney | MAC Attorney | Other Attorney |
|---|---|---|---|---|---|---|---|
| Enrolled for Reminders | | | | | | | |
| Female | | | | | | | |
| White | | | | | | | |
| African American | | | | | | | |
| Other Non-White Race | | | | | | | |
| Hispanic | | | | | | | |
| Age | | | | | | | |
| Homeless Only | | | | | | | |
| Mentally Ill Only | | | | | | | |
| Homeless and Mentally Ill | | | | | | | |
| Neither Homeless Nor MI | | | | | | | |
| Unsecured Bond Filed | | | | | | | |
| Secured Bond Filed | | | | | | | |
| No Bond Filed | | | | | | | |
| Initial Pretrial Jail Days | | | | | | | |
| Released Before Arraignment | | | | | | | |
| Co-Occuring Felony Charge | | | | | | | |
| Processed as a Carveout | | | | | | | |
| Violent Charge | | | | | | | |
| Assault | | | | | | | |
| Burglary | | | | | | | |
| Impaired Driving | | | | | | | |
| Larceny/Theft | 1 | | | | | | |
| Weapon Charge | -0.10 | 1 | | | | | |
| Any Prior Charges (3 Years) | 0.05 | 0.07 | 1 | | | | |
| Any Bond Failure (3 Years) | 0.10 | -0.07 | **0.30** | 1 | | | |
| Public Defender Attorney | 0.03 | -0.06 | **0.23** | 0.19 | 1 | | |
| MAC Attorney | 0.08 | 0.00 | 0.12 | 0.06 | **-0.30** | 1 | |
| No Appointed Attorney | -0.11 | -0.10 | 0.10 | 0.10 | 0.07 | 0.04 | 1 |

# Appendix H:  Logistic Regression Model Coefficients and Odds Ratios

**Table H1.  Logistic Regression Coefficients Predicting Court Reminder Enrollment
(Cases Entering Custody September 1, 2023 – January 7, 2024)**

|  | Coefficient | Std. err. | z | P>z | [95% conf. |
|---|---|---|---|---|---|
| Unsecured Bond Filed | 2.36 | 0.06 | 37.61 | 0.00 | (2.24, 2.49) |
| Impaired Driving Charge | 0.33 | 0.06 | 5.71 | 0.00 | (0.22, 0.45) |
| Hispanic Ethnicity | 0.22 | 0.07 | 2.95 | 0.00 | (0.07, 0.36) |
| African American | 0.20 | 0.04 | 4.95 | 0.00 | (0.12, 0.28) |
| Weapons Charge | 0.17 | 0.08 | 2.04 | 0.04 | (0.01, 0.33) |
| Female | 0.13 | 0.04 | 3.03 | 0.00 | (0.05, 0.22) |
| Any Charges, Past 3 Yrs. | 0.12 | 0.04 | 2.82 | 0.01 | (0.04, 0.21) |
| Other Non-White | 0.13 | 0.09 | 1.37 | 0.17 | (-0.06, 0.31) |
| Homeless Only | 0.09 | 0.13 | 0.73 | 0.46 | (-0.15, 0.34) |
| Other Grp. A NIBRS | -0.06 | 0.07 | -0.92 | 0.36 | (-0.20, 0.07) |
| MI Only | -0.08 | 0.06 | -1.41 | 0.16 | (-0.20, 0.03) |
| Both Homeless & MI | -0.14 | 0.08 | -1.73 | 0.08 | (-0.30, 0.02) |
| Burglary | -0.14 | 0.09 | -1.60 | 0.11 | (-0.31, 0.03) |
| Over Age 30 | -0.09 | 0.04 | -2.26 | 0.02 | (-0.16, -0.01) |
| MAC Attorney | -0.08 | 0.04 | -2.12 | 0.03 | (-0.16, -0.01) |
| Assault Charge | -0.17 | 0.06 | -3.07 | 0.00 | (-0.28, -0.06) |
| Larceny/Theft Charge | -0.24 | 0.07 | -3.45 | 0.00 | (-0.38, -0.11) |
| Co-Occurring Felony Chg. | -0.32 | 0.07 | -4.83 | 0.00 | (-0.45, -0.19) |
| Bond Failures, Past 3 Yrs. | -0.32 | 0.05 | -6.45 | 0.00 | (-0.41, -0.22) |
| Public Defender Attorney | -0.69 | 0.08 | -8.26 | 0.00 | (-0.85, -0.52) |
| No Bond Filed | -1.43 | 0.18 | -7.87 | 0.00 | (-1.78, -1.07) |

**Table H2.  Logistic Regression Odds Ratios Predicting Court Reminder Enrollment
(Cases Entering Custody September 1, 2023 – January 7, 2024)**

|  | Odds ratio | Std. err. | z | P>z | 95% Confidence Interval |
|---|---|---|---|---|---|
| Unsecured Bond Filed | 10.63 | 0.67 | 37.61 | 0.00 | (9.40, 12.02) |
| Impaired Driving Charge | 1.40 | 0.08 | 5.71 | 0.00 | (1.25, 1.57) |
| Hispanic Ethnicity | 1.24 | 0.09 | 2.95 | 0.00 | (1.08, 1.43) |
| African American | 1.23 | 0.05 | 4.95 | 0.00 | (1.13, 1.33) |
| Weapons Charge | 1.18 | 0.10 | 2.04 | 0.04 | (1.01, 1.39) |
| Female | 1.14 | 0.05 | 3.03 | 0.00 | (1.05, 1.24) |
| Any Charges, Past 3 Yrs. | 1.13 | 0.05 | 2.82 | 0.01 | (1.04, 1.23) |
| Other Non-White | 1.14 | 0.11 | 1.37 | 0.17 | (0.95, 1.37) |
| Homeless Only | 1.10 | 0.14 | 0.73 | 0.46 | (0.86, 1.40) |
| Other Grp. A NIBRS | 0.94 | 0.07 | -0.92 | 0.36 | (0.82, 1.08) |
| MI Only | 0.92 | 0.05 | -1.41 | 0.16 | (0.82, 1.03) |
| Both Homeless & MI | 0.87 | 0.07 | -1.73 | 0.08 | (0.74, 1.02) |
| Burglary | 0.87 | 0.07 | -1.60 | 0.11 | (0.74, 1.03) |
| Over Age 30 | 0.92 | 0.03 | -2.26 | 0.02 | (0.85, 0.99) |
| MAC Attorney | 0.92 | 0.04 | -2.12 | 0.03 | (0.85, 0.99) |
| Assault Charge | 0.84 | 0.05 | -3.07 | 0.00 | (0.75, 0.94) |
| Larceny/Theft Charge | 0.78 | 0.06 | -3.45 | 0.00 | (0.68, 0.90) |
| Co-Occurring Felony Chg. | 0.73 | 0.04 | -6.45 | 0.00 | (0.66, 0.80) |
| Bond Failures, Past 3 Yrs. | 0.73 | 0.05 | -4.83 | 0.00 | (0.64, 0.83) |
| Public Defender Attorney | 0.50 | 0.04 | -8.26 | 0.00 | (0.43, 0.59) |
| No Bond Filed | 0.24 | 0.04 | -7.87 | 0.00 | (0.17, 0.34) |

**Table H3.  Logistic Regression Coefficient Predicting Arraignment Nonappearance
(Cases Entering Custody September 1, 2023 – January 7, 2024)**

| CA_Failure | Coefficient | Std. err. | z | P>z | 95% Confidence Interval |
|---|---|---|---|---|---|
| MAC Attorney | -0.79 | 0.05 | -16.27 | 0.00 | (-0.88, -0.69) |
| Impaired Driving | -0.71 | 0.08 | -9.35 | 0.00 | (-0.86, -0.56) |
| Weapon | -0.43 | 0.10 | -4.16 | 0.00 | (-0.63, -0.23) |
| Enrollment | -0.42 | 0.05 | -8.90 | 0.00 | (-0.52, -0.33) |
| Public Defender Attorney | -0.36 | 0.08 | -4.35 | 0.00 | (-0.52, -0.20) |
| Other Non-White | -0.26 | 0.12 | -2.15 | 0.03 | (-0.50, -0.02) |
| No Bond Filed | -0.14 | 0.10 | -1.40 | 0.16 | (-0.33, 0.05) |
| African American | -0.02 | 0.05 | -0.36 | 0.72 | (-0.11, 0.08) |
| Hispanic | 0.01 | 0.08 | 0.08 | 0.94 | (-0.15, 0.16) |
| Assault | 0.01 | 0.06 | 0.22 | 0.83 | (-0.11, 0.14) |
| Female | 0.02 | 0.05 | 0.38 | 0.70 | (-0.08, 0.12) |
| Over Age 30 | 0.12 | 0.05 | 2.59 | 0.01 | (0.03, 0.20) |
| Other Grp. A NIBRS | 0.16 | 0.08 | 2.08 | 0.04 | (0.01, 0.31) |
| Larceny/Theft | 0.17 | 0.08 | 2.17 | 0.03 | (0.02, 0.32) |
| Any Charges, Past 3 Yrs. | 0.26 | 0.05 | 4.91 | 0.00 | (0.16, 0.36) |
| Unsecured Bond Filed | 0.27 | 0.07 | 3.93 | 0.00 | (0.13, 0.40) |
| MI Only | 0.33 | 0.06 | 5.38 | 0.00 | (0.21, 0.45) |
| Both Homeless & MI | 0.37 | 0.08 | 4.50 | 0.00 | (0.21, 0.54) |
| Burglary | 0.38 | 0.09 | 4.27 | 0.00 | (0.21, 0.56) |
| Homeless Only | 0.40 | 0.13 | 3.15 | 0.00 | (0.15, 0.66) |
| Co-Felony | 0.43 | 0.07 | 6.34 | 0.00 | (0.30, 0.56) |
| Any Past Bond Failures. Past 3 Yrs | 1.51 | 0.05 | 30.20 | 0.00 | (1.41, 1.60) |

**Table H4. Logistic Regression Odds Ratios Predicting Arraignment Nonappearance
(Cases Entering Custody September 1, 2023 – January 7, 2024)**

|  | Odds ratio | Std. err. | z | P>z | 95% Confidence Interval |
|---|---|---|---|---|---|
| MAC Attorney | 0.45 | 0.02 | -16.27 | 0.00 | (0.41, 0.50) |
| Impaired Driving | 0.49 | 0.04 | -9.35 | 0.00 | (0.42, 0.57) |
| Weapon | 0.65 | 0.07 | -4.16 | 0.00 | (0.53, 0.80) |
| Enrollment | 0.65 | 0.03 | -8.90 | 0.00 | (0.60, 0.72) |
| Public Defender Attorney | 0.70 | 0.06 | -4.35 | 0.00 | (0.59, 0.82) |
| Other Non-White | 0.77 | 0.09 | -2.15 | 0.03 | (0.61, 0.98) |
| No Bond Filed | 0.87 | 0.08 | -1.40 | 0.16 | (0.72, 1.06) |
| African American | 0.98 | 0.05 | -0.36 | 0.72 | (0.89, 1.08) |
| Hispanic | 1.01 | 0.08 | 0.08 | 0.94 | (0.86, 1.18) |
| Assault | 1.01 | 0.07 | 0.22 | 0.83 | (0.89, 1.15) |
| Female | 1.02 | 0.05 | 0.38 | 0.70 | (0.92, 1.13) |
| Over Age 30 | 1.12 | 0.05 | 2.59 | 0.01 | (1.03, 1.23) |
| Other Grp. A NIBRS | 1.17 | 0.09 | 2.08 | 0.04 | (1.01, 1.36) |
| Larceny/Theft | 1.18 | 0.09 | 2.17 | 0.03 | (1.02, 1.38) |
| Any Charges, Past 3 Yrs. | 1.29 | 0.07 | 4.91 | 0.00 | (1.17, 1.43) |
| Unsecured Bond Filed | 1.31 | 0.09 | 3.93 | 0.00 | (1.14, 1.49) |
| MI Only | 1.39 | 0.09 | 5.38 | 0.00 | (1.24, 1.57) |
| Both Homeless & MI | 1.45 | 0.12 | 4.50 | 0.00 | (1.23, 1.71) |
| Burglary | 1.47 | 0.13 | 4.27 | 0.00 | (1.23, 1.75) |
| Homeless Only | 1.50 | 0.19 | 3.15 | 0.00 | (1.17, 1.93) |
| Co-Felony | 1.54 | 0.10 | 6.34 | 0.00 | (1.35, 1.76) |
| Bond Failures, Past 3 Yrs. | 4.51 | 0.22 | 30.20 | 0.00 | (4.09, 4.97) |

# Appendix I. Consent Decree Tasks and Milestones

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 7 | 38 | 10/1/2023 *Done* | **Provide FY 23-24 PDO allocation > FY 19-20 approved budget -** The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. | **STATUS: Done**<br><br>PDO Budget Approved by Commissioner's Court September 2023. |
| 7 | 41a | 12/15/2020 *Nearly Done* | **Provide support staff for private apptd. counsel at bail hearing -** CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. | **STATUS: In Progress**<br><br>The Managed Assigned Counsel officially began serving all 16 misdemeanor courts as of December 27, 2021, however, are not yet attending bail hearings. In August 2022, the MAC provide a recommendation to the judiciary should they eventually delegate appointment authority over to the MAC.<br><br>Status will be changed to "Done" once the requirements of ¶ 41b and 43b have been met. |
| 7 | 41b | 3/1/2021 (Extended) *Nearly Done* | **Fund at least min. holistic defense staff recommended by expert -** Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. | **STATUS: In Progress**<br><br>Funding for holistic defense staff was being provided as part of the Managed Assigned Counsel office grant from the TIDC (212-20-D06). The NAPD report recommendations were submitted to the Commissioner's Court 8/10/21. In August 2022, the MAC provide a recommendation to the judiciary should they eventually delegate appointment authority over to the MAC but they are not yet attending bail hearings. They currently have 20-30 cases per social worker and would like an additional social worker and social worker supervisor but would need additional funding to do so. A supervisor would allow for expanded services. Previous attempts for budget increases have been denied by the County.<br><br>Status will be changed to "Done" once Harris County Budget Management agrees with OJS, PDO, and MAC on the number of support staff positions to be hired. |
| 7 | 43 and 44 | 12/15/2020 (Extended) *TBD* | **Develop written plan for essential defense counsel supports -** Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer. The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. | **STATUS: In Progress**<br><br>Harris County is working collectively with several agencies on a plan. The plan will incorporate recommendations from the NAPD Holistic Defense assessment (¶ 41b) completed on 7/7/21. Many of the recommendations have already been implemented. Budget cuts in September 2022 hindered the implementation of other recommendations. The County continues to work on how they can move forward with developing a plan.<br><br>Status will be changed to "Done" once a written plan is in place. |

| Section | ¶ | Due Date | Milestones | Status |
|---------|---|----------|-----------|--------|
| 8A | 46 | 10/29/2020 (Extended) *Nearly Done* | **Provide court date notification forms to third party LEAs** - Defendants will make the court date notification forms required by ¶ 47 and ¶ 48 readily accessible to third-party law enforcement agencies that arrest or detain misdemeanor arrestees to be prosecuted in the Harris County | **STATUS: Done**<br><br>All court date notification forms were implemented by 11/4/21. The court date notifications are provided on the citation forms used by the third-party LEAs. |
| 8C | 55 | 5/14/2021 Done | **Develop written nonappearance mitigation plan**- Within 180 days after receiving published results of study (Sec.52),the County will work with researchers to develop a written plan for mitigating causes of nonappearance including implementation timeline and proposed budget of at least $850,000 for each of the initial three years following the study.<br>The County will submit the plan to the Monitor for review. Monitor solicits Class Counsel's written comments/objections during a 30- day review period (per Sec.111-114). Monitor will convey Class Counsel's comments to County for response (objections or amendments) within 30 days of receipt. The Parties may submit unresolvable disputes to the Court. | **STATUS: Done**<br><br>The County developed a written plan to implement recommendations from the study (¶ 52e) completed on 7/29/22 and provided to the Monitor on 1/18/23.<br><br>Plaintiffs and Harris County agreed on the nonappearance mitigation plan in June 2023. It was submitted to the Commissioner's Court and approved on 11/14/23. |
| 8C | 54 | 3/1/2021 (Extended) *Nearly Done* | **Allocate $850,000 Year 2 to support court appearance per mitigation plan timeline and budget** - After study concludes, absent good cause for a lesser amount, County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan. To establish good cause, County submits purported cause to the Monitor; Monitor notifies Class Counsel; Monitor makes a determination; Either Party may file a motion to the Court if they disagree with the Monitor's determination. | **STATUS: Done**<br><br>$850,000 allocation to mitigate causes of nonappearance was approved by Commissioner's Court as part of the FY23 budget. |
| 10 | 78 and 79 | Done | **Deliver Year 3 Refresher Consent Decree Training** - Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. | **STATUS: Done**<br><br>Deason Criminal Justice Reform Center, SMU, conducted trainings with attorneys 5/10/23 and 7/20/23 and with the CCCL Judges 7/19/23. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 9 | 81, 82, 84, and 85 | 8/30/2020 *Nearly Done* | **Provide data for Monitor to evaluate Consent Decree implementation -** Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶89. If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | **STATUS: Nearly Done** OJS staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree. Existing data for cases from 2009 through the present are currently available to the Monitor team. Status will be changed to "Done" after all variables specified in ¶ 85 are available. Monitors are still waiting on #S: Any conditions of release or supervision imposed by a judicial officer, the date each was imposed, and the amount of any fees assessed. |
| 11 | 83 | 11/15/2020 (Extended) *Nearly Done* | **Make Consent Decree data publicly available -** The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  Nearly Done** The ODonnell Public Dashboard went live 9/8/2022 with automated reports of some of the data measures specified in ¶ 89.  The OJS data team is in process of adding 6 more measures. Status will be changed to Done after adding additional data measures in ¶ 89 and raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 88, 89 | 8/30/2020 *Nearly Done* | **Develop web-based Data Platform -** The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | **STATUS: Nearly Done** The ODonnell Public Dashboard went live 9/8/2022 with automated reports of some of the data measures specified in ¶ 89.  The OJS data team is in process of adding 6 more measures. Status will be changed to Done after adding additional data measures in ¶ 89 and raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 12 | 92 | 5/19/2023 Done | **Conduct Year 3 Public Meeting -** Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90). Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: Done** In-person public meeting was held 3/24/2023.  A virtual public meeting was held 4/11/2023. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 12 | 92 | 11/23/2023<br>*Done* | **Conduct Year 3 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90). Defendants and community groups will determine meeting parameters with approval by the Monitor. Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: Done**<br><br>In-person public meeting was held 10/13/2023 and broadcasted live on the OJS website. |
| 13 | 93, 94 | 5/2/2023<br>*Done* | **Year 4 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS: Done**<br><br>Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website. |
| 13 | 93, 94 | 11/2/2023<br>*Done* | **Year 4.5 review of posted policies** - Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS: Done**<br><br>Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website. |
| 14 | 103 | 3/3/2024<br>*Done* | **Monitor's Budget: Year 5 -** The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. | **STATUS: Done**<br><br>Monitor's budget Year 5 has been submitted to the county. |
| 14 | 116 | 3/3/2024<br>*Done* | **Monitoring Plan: Year 5 -** In coordination with the Parties, the Monitor will prepare an annual Monitoring Plan to be made public and published on the County's Consent Decree Website (see Sec. 90). The Plan must delineate requirements of the Consent Decree to be assessed for compliance, identify the proposed methodology, and create a schedule with target dates for conducting reviews or audits. | **STATUS: Done**<br><br>Monitor's Year 5 plan has been submitted to the county. |
| 14 | 115, 118 | 1/18/2024<br>*Done* | **Submit Draft Monitor's Report: Year 4 -** Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec. 117) for review by the Parties. Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree. Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. | **STATUS: Done**<br><br>The year 4 draft monitor report was submitted on 1/18/2024. |

| Section | ¶ | Due Date | Milestones | Status |
|---------|-----|----------|------------|--------|
| 14 | 117 | 3/3/2024 *Working on It* | **Publish Monitor's Report:  Year 4** - Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in Sec. 117. | **STATUS: Done**<br><br>The final year 4 monitor report was submitted on 3/3/2024. |