# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| MARANDA LYNN ODONNELL, *et al.*, | § | |
| on behalf of themselves and all others | § | |
| similarly situated, | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. 4:16-cv-1414 |
| | § | (Consolidated Class Action) |
| v. | § | |
| | § | |
| HARRIS COUNTY, TEXAS, *et. al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## PLAINTIFFS' RESPONSE TO THE TEXAS ATTORNEY GENERAL'S MOTION TO INTERVENE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

I.   INTRODUCTION ................................................................................................. 1

II.  BACKGROUND .................................................................................................. 2

   A.  Indigent People Arrested for Misdemeanors Sue to Stop Unconstitutional
       Pretrial Detention. .................................................................................... 2

   B.  The *ODonnell* Consent Decree Remedies the Constitutional Violations,
       Increases Pretrial Liberty, and Promotes Public Safety. ........................... 5

   C.  The Texas Legislature Enacts Two Bail Laws, and the Attorney General
       Raises Abstention and Mootness in Two Other Cases But Forgoes
       Opportunity to do the Same in *ODonnell*. ................................................ 7

       1.  The Texas legislature enacts Senate Bill 6. ...................................... 7

       2.  The *en banc* Fifth Circuit overrules the *ODonnell* panel's *Younger* holding. ........ 8

       3.  The Texas legislature enacts Senate Bill 9. ...................................... 9

III. NATURE AND STAGE OF PROCEEDINGS ...................................................... 9

IV.  STATEMENT OF ISSUES AND LEGAL STANDARDS ..................................... 9

V.   SUMMARY OF ARGUMENT ............................................................................ 11

VI.  ARGUMENT ..................................................................................................... 11

   A.  The Court Should Deny the Attorney General's Request to Intervene
       to Assert *Younger* Abstention and Mootness. .......................................... 11

       1.  The Attorney General's Proposed Intervention is Untimely. ............... 12

       2.  The Attorney General's Proposed Intervention Is Futile. ................... 21

       3.  The Court Should Deny Permissive Intervention Under Rule 24(b). ...... 22

   B.  Plaintiffs Take No Position on the Attorney General's Request to Intervene
       to Assert Potential Conflicts Between the Consent Decree and State Law. ........ 22

VII. CONCLUSION ................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Beauregard v. Sword Servs., LLC*,
    107 F.3d 351 (5th Cir. 1997) ........................................................................... 10

*Bouman v. Pitchess*,
    158 F. App'x 937 (9th Cir. 2006) ..................................................................... 11

*Bush v. Viterna*,
    740 F.2d 350 (5th Cir. 1984) ........................................................................... 16

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    595 U.S. 267 (2022) ................................................................................... 12, 15

*Daves v. Dallas Cty.*,
    22 F.4th 522 (5th Cir. 2022) ............................................................................ 3, 8

*Daves v. Dallas Cty.*,
    64 F.4th 616 (5th Cir. 2023) ............................................................................ 3, 8

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) ............................................................................. 10

*Engra, Inc. v. Gabel*,
    958 F.2d 643 (5th Cir. 1992) ........................................................................... 13

*In re Deepwater Horizon*,
    546 F. App'x 502 (5th Cir. 2023) ..................................................................... 22

*Jansen v. City of Cincinnati*,
    904 F.2d 336 (6th Cir. 1990) ........................................................................... 14

*Jones v. Caddo Par. Sch. Bd.*,
    204 F.R.D. 97 (W.D. La. 2001) ....................................................................... 18

*Kneeland v. N.C.A.A.*,
    806 F.2d 1285 (5th Cir. 1987) ......................................................................... 13

*Latham v. Wells Fargo Bank, N.A.*,
    987 F.2d 1199 (5th Cir. 1993) ......................................................................... 12

*League of United Latin Am. Citizens v. Wilson*,
    131 F.3d 1297 (9th Cir. 1997) ......................................................................... 13

*Lobrow v. Vill. of Port Barrington,*
    406 F. App'x 60 (7th Cir. 2010) ............................................................. 20

*Louisiana v. Burgum,*
    132 F.4th 918 (5th Cir. 2025) ................................................................ 10

*Meridian Homes Corp. v. Nicholas W. Prassas & Co.,*
    683 F.2d 201 (7th Cir. 1982) ................................................................. 16

*NAACP v. New York,* 413 U.S. 345 (1973) ..................................................... 10

*New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,*
    732 F.2d 452 (5th Cir. 1984) ................................................................. 10

*ODonnell v. Goodhart,*
    900 F.3d 220 (5th Cir. 2018) ................................................................... 3

*ODonnell v. Harris Cty.,*
    251 F. Supp. 3d 1052 (S.D. Tex. 2017) ....................................................... 2

*ODonnell v. Harris Cty.,*
    892 F.3d 147 (5th Cir. 2018) ................................................................... 3

*R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.,*
    584 F.3d 1 (1st Cir. 2009) ...................................................................... 20

*Rotstain v. Mendez,*
    986 F.3d 931 (5th Cir. 2021) ...................................................... 13, 19, 22

*Rufo v. Inmates of Suffolk County Jail,*
    502 U.S. 367 (1992) .............................................................................. 20

*Saavedra v. Murphy Oil U.S.A., Inc.,*
    930 F.2d 1104 (5th Cir. 1991) ................................................................ 21

*Sierra Club v. Espy,*
    18 F.3d 1201 (5th Cir. 1994) .................................................................. 10

*Sokaogon Chippewa Cmty. v. Babbitt,*
    214 F.3d 941 (7th Cir. 2000) ................................................................. 17

*Staley v. Harris Cty.,*
    160 F. App'x 410 (5th Cir. 2005) ........................................................... 13

*Stallworth v. Monsanto Co.,*
    558 F.2d 257 (5th Cir. 1977) ................................................................. 12

*Stringfellow v. Concerned Neighbors in Action*,
480 U.S. 370 (1987) .......................................................................................... 11

*Texas v. United States*,
805 F.3d 653 (5th Cir. 2015) .......................................................................... 19

*Turner v. Cincinnati Ins. Co.*,
9 F.4th 300 (5th Cir. 2021) ............................................................................ 10

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
513 U.S. 18 (1994).......................................................................................... 20

*United States v. Allegheny-Ludlum Industries, Inc.*,
553 F.2d 451 (5th Cir. 1977) .................................................................... 11, 19

*United States v. City of New Orleans*,
540 F. App'x 380 (5th Cir. 2014) .................................................................. 10

*United States v. Covington Cty. Sch. Dist.*,
499 F.3d 464 (5th Cir. 2007) .................................................................... 12, 15

*United States v. Texas*,
No. 7:25-cv-55, 2025 WL 2423900 (N.D. Tex. Aug. 15, 2025) ...................... 16

*United States v. U.S. Steel Corp.*,
548 F.2d 1232 (5th Cir. 1977) .................................................................. 13, 18

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010).......................................................................................... 20

*Valley Ranch Dev. Co. v. F.D.I.C.*,
960 F.2d 550 (5th Cir. 1992) .......................................................................... 11

*Woodward Harbor LLC v. City of Mandeville*,
No. 23-cv-5824, 2025 WL 1194161 (E.D. La. Apr. 24, 2025)........................ 13

**Statutes**

S.B. 6, 87th Leg. (Tex. 2021) ............................................................... 8, 9, 26

S.B. 9, 89th Leg. (Tex. 2025) ........................................................... 10, 25, 26

**Rules**

Federal Rule of Civil Procedure 24 ............................................................. 9, 10, 16, 19

Federal Rule of Civil Procedure 60(b) ............................................................... 21

**Treatises**

Wright & Miller, et al., *Federal Practice and Procedure* (3d ed. 2025) ...................................... 12

**Other Authorities**

Brandon Garrett et al.,
    *Liberty, Safety, and Misdemeanor Bail*, 76 Fla. L. Rev. 321 (Mar. 1, 2024) .................... 7

Paul Heaton,
    *The Effects of Misdemeanor Bail Reform*, Quattrone Center for the
    Fair Administration of Justice (Aug. 16, 2022) ................................................. 7

# I.    INTRODUCTION

In 2019, this Court entered a landmark Consent Decree ending Harris County's widespread practice of unconstitutionally detaining people arrested for misdemeanors before trial, and requiring relief tailored to prevent those practices from re-emerging. That Consent Decree is an unqualified success and a national model for common-sense practices. As confirmed by an independent, third-party monitor, the Consent Decree is remedying rampant violations of people's constitutional rights, enhancing liberty by permitting thousands of people to remain at home as their cases proceed, keeping families together, reducing coerced guilty pleas, saving taxpayers millions every year, and doing it all without any increase in recidivism.

Parties seek settlements and consent decrees based on the principle that those agreements will resolve litigation entirely and in perpetuity. Because of the importance of finality to achieving these resource-saving resolutions, it is rare that adequate reasons arise to allow a party to modify a judgment, to say nothing of allowing a nonparty to intervene in a closed case to challenge the validity of a longstanding consent decree. In seeking to do just that, the Attorney General does not so much as acknowledge the significant passage of time since this case was closed, or that, for years, he repeatedly passed on opportunities to raise *Younger* abstention and mootness, the same legal bases he now claims require vacatur of the decree. Despite knowing for nearly seven years that the Parties did not represent his interests, the Attorney General chose not to intervene to urge the Court to reconsider *Younger* at summary judgment, to participate in settlement negotiations, to oppose or appeal entry of the Consent Decree, to petition for *en banc* review of the Fifth Circuit panel's *Younger* ruling, or to otherwise raise his claims at any point.

The Court should deny the Attorney General's irregular request to intervene so he may re-litigate previously resolved issues concerning *Younger* abstention and mootness, as that request is both untimely and futile under settled law. Plaintiffs take no position on whether the Court should

permit the Attorney General to intervene for the limited purpose of asserting that the Consent Decree should be modified because it conflicts with recently enacted state law.

## II.    BACKGROUND

### A. Indigent People Arrested for Misdemeanors Sue to Stop Unconstitutional Pretrial Detention.

Over nine years ago, in May 2016, Maranda Lynn ODonnell filed a class action lawsuit challenging Harris County's policy and practice of detaining approximately 40% of all people arrested for misdemeanors—tens of thousands of people every year—for the duration of their cases solely because they could not pay money bail, and without any finding that their detention served any governmental interest. *ODonnell v. Harris Cty.*, 251 F. Supp. 3d 1052, 1058 (S.D. Tex. 2017), *aff'd as modified*, 892 F.3d 147 (5th Cir. 2018).

The case was strenuously contested in the trial court and on appeal. Defendants Harris County, the County Criminal Court at Law Judges ("CCCL Judges"), the Criminal Law Hearing Officers, and the Sheriff moved to dismiss, in part on the basis of *Younger* abstention. Dkts. 80, 83–85. The Court largely denied the Defendants' motions, holding *inter alia* that jurisdiction existed and abstention was inappropriate. Dkt. 125. Interested parties, but not the Attorney General, sought to intervene. Dkt. 202. In 2017, the Court heard evidence and argument at an eight-day preliminary injunction hearing. Dkts. 222, 223, 228–30, 246, 247, 251. Thereafter, the Court issued a 193-page opinion that included over 120 pages of detailed factual findings about the County's bail practices and held that Plaintiffs were likely to succeed on their claims that those practices violated the Equal Protection and Due Process Clauses of the U.S. Constitution, Dkt. 302. The Court granted Plaintiffs' motions for a preliminary injunction and class certification. Dkts. 303, 304.

The County and Hearing Officers appealed, continuing to press *Younger* abstention as a

defense. The Attorney General filed an amicus brief urging the Fifth Circuit to vacate the preliminary injunction, but did not raise abstention. Br. for State of Texas et al., *ODonnell v. Harris Cty.*, No. 17-20333, 2017 WL 2861848 (5th Cir. June 26, 2017). The Fifth Circuit affirmed much of the substance of the injunction and affirmed this Court's determination that abstention was improper. *ODonnell v. Harris Cty.*, 892 F.3d 147 (5th Cir. 2018) (opinion on rehearing), *overruled in part by Daves v. Dallas Cty.*, 22 F.4th 522 (5th Cir. 2022), *overruled in part by Daves v. Dallas Cty.*, 64 F.4th 616 (5th Cir. 2023). The case returned to this Court on remand for issuance of a revised preliminary injunction. Dkts. 426, 427. The CCCL Judges appealed that order, Dkt. 434, where the Attorney General filed another amicus brief urging the Fifth Circuit to vacate the preliminary injunction, but again did not raise abstention. Br. for State of Texas et al., *ODonnell v. Goodhart*, No. 18-20466, 2018 WL 4603243 (5th Cir. Sept. 17, 2018). The Fifth Circuit stayed certain provisions of the revised preliminary injunction pending appeal. *ODonnell v. Goodhart*, 900 F.3d 220, 222 (5th Cir. 2018), *overruled in part by Daves*, 22 F.4th 522.

Litigation before the trial court continued as the appeal of the amended preliminary injunction was pending before the Fifth Circuit. Defendants cross-moved for summary judgment. The CCCL Judges continued to argue that *Younger* abstention was appropriate, presumably preserving the issue for *en banc* review at a later stage. Dkt. 432 at 12–18 (CCCL Judges' Motion for Summary Judgment, raising *Younger*).

The November 2018 elections changed some of the decision-makers in Harris County. While the then-defendants' summary judgment motions were still pending, two new county commissioners were elected, and fifteen new judges were elected on a platform of resolving *ODonnell* and creating fairer and safer pretrial practices. The successor judges took office on January 1, 2019, and withdrew their predecessors' appeal, reflecting their agreement with the

3

revised preliminary injunction. Unopposed Motion for Voluntary Dismissal, *ODonnell v. Salgado*, No. 18-20466, Dkt. 130 (5th Cir. Jan. 7, 2019); Order Dismissing Appeal, Dkt. 551.

The Parties began contentious settlement talks immediately after the elections. Minute Entry, Dkt. 532 (noting on Nov. 13, 2018, that "[t]he parties will negotiate to attempt a resolution"). For months, the Parties worked toward a settlement, providing regular updates to the Court in writing and at status conferences. The Attorney General never sought to intervene in the trial court to re-assert *Younger* abstention despite numerous opportunities, including (1) when the Court denied the CCCL Judges' motion for summary judgment, Dkt. 540; (2) when the Parties notified the Court in January 2019 of a new local rule that they anticipated would provide "a foundation for a broader, global settlement and consent decree," Dkt. 557 at 2; (3) when the Parties asked this Court in February 2019 to issue a formal order directing Defendants to comply with the new rule, Dkt. 573; (4) when the Court issued that order, Dkt. 575; or (5) at multiple status conferences when the Parties reported their progress toward a resolution, *e.g.*, Dkt. 563, Dkt. 590.

In August 2019, after years of litigation, including two appeals to the Fifth Circuit, the Parties, intending to avoid the risks associated with further prolonged litigation, millions of dollars in additional attorneys' fees and other defense costs, and the prospect of trial, negotiated a proposed class settlement and consent decree. Dkt. 617. The proposed decree required that most people arrested for misdemeanors be promptly released without having to pay for their freedom, and that bail hearings include rigorous procedural protections and substantive findings necessary to protect the fundamental right to pretrial liberty, including an inquiry into ability to pay, consideration of alternatives to detention, and a finding of necessity prior to any order requiring an unaffordable amount of cash as a condition of release. Dkt. 701-2. In agreeing to the decree, the Parties "intended to implement and enforce fair and transparent policies and practices that will

result in meaningful, lasting reform to the County's system of pretrial detention and safeguard against future violations of the rights of indigent misdemeanor arrestees." Dkt. 701-2 ¶ 12.

The Court allowed numerous nonparties to file amicus briefs voicing support of or opposition to the proposed consent decree. Dkt. 643. The Court held a final fairness hearing where nonparties, including a representative of the Office of the Attorney General of Texas, received time to speak on the record. Dkts. 692, 700. Numerous other interested individuals submitted written testimony. *See, e.g.*, Dkts. 636, 637. The Attorney General submitted written testimony arguing that the proposed consent decree "endanger[ed] public safety," Dkt. 689 at 1, was "contrary to Texas law," *id.* at 3, and that the Court lacked subject matter jurisdiction to enter the decree because the case was moot, *id.* at 6–7. At the hearing his representative also testified in opposition to the proposed decree. Dkt. 704 at 58:13–64:5. The Attorney General did not raise abstention. On November 21, 2019, after reviewing the submissions, and considering the arguments made at the final hearing, the Court approved the *ODonnell* Consent Decree. Dkt. 708.

Throughout all of these proceedings, the Attorney General did not seek to intervene at any point, whether for purposes of re-urging the Court to reconsider *Younger* on summary judgment, participating in settlement negotiations, opposing or appealing entry of the Consent Decree, seeking *en banc* review of the Fifth Circuit panel's *Younger* holding, or otherwise.

**B. The *ODonnell* Consent Decree Remedies the Constitutional Violations, Increases Pretrial Liberty, and Promotes Public Safety.**

Following approval of the Consent Decree, the Court appointed Independent Monitor Professor Brandon Garrett, along with Professor Sandra Guerra Thompson as Deputy Monitor, to oversee the implementation of the Consent Decree in March 2020. Dkt. 714.

Over the five years since then, the Monitors have published periodic reports in which they analyzed the data and exhaustively documented the effects of the Consent Decree. Dkts. 722-1,

725-2, 726-1, 733-2, 734-1, 736-1, 737-1, 739-1. The findings from those reports have been consistent with each other and with other rigorous studies analyzing the positive effects of ceasing widespread and unconstitutional money-based pretrial detention on liberty, safety, municipal budgets, and the local economy.

As a result of the Consent Decree, many fewer people charged with misdemeanors are required to pay cash for release. In 2015, 86% of people arrested for misdemeanors were required to pay secured bonds to get out of jail, and 63% were detained at disposition. Most of those individuals pled guilty and then were promptly released. Sixty-eight percent of misdemeanor cases ended in guilty pleas, while 31% ended in a dismissal or acquittal. Dkt. 739-1 at 45.

According to the Monitors' most recent report, only 13% of people arrested for misdemeanors are now required to pay cash or surety bonds for release, and only 9% of people arrested for misdemeanors are still detained at disposition. Eighty-six percent of people arrested for misdemeanors are released within two days of arrest, Dkt. 739-1 at 29, generally on an unsecured bond (either a personal bond issued at a magistration hearing or a General Order Bond issued immediately after arrest), *id.* at 33. Approximately 74% of misdemeanor cases are dismissed or acquitted. *Id.* at 45. Only 24% of misdemeanor cases end in a guilty plea. *Id.*

The Monitors calculate that, because thousands fewer people are now detained pretrial every year, the County saves $15.6 million per year from the changes in the Consent Decree and values the savings to individuals arrested for misdemeanors at $79.7 million per year. Dkt. 733-2 at 51. Moreover, the Monitors estimate that bail bond companies' profits from misdemeanor bonds have decreased significantly, from approximately $4,431,916 in 2016 to $506,485 in 2019—about $3.9 million less than before the *ODonnell* lawsuit was filed. Dkt. 725-2 at 60.

The Consent Decree has increased pretrial liberty, protected the constitutional rights of

vulnerable residents, decreased the prevalence of coerced guilty pleas, and saved millions of dollars annually—all without any increase in recidivism. Dkt. 736-1 at 50 ("[W]e find little evidence that the risk of repeat arrest by persons with prior misdemeanor charges has significantly changed over the past few years."). Indeed, the evidence suggests that "public safety has . . . powerfully benefited" as the data "describe a steady decline in the numbers of both misdemeanor arrests and rearrests."[1] The number of people arrested for misdemeanors fell by 14% from 49,228 in 2015 to 42,448 in 2024, while the share of those people who are charged with a new criminal case within a year declined from 23% to 22%. Dkt. 739-1 at 20, 48.

Other empirical studies confirm the Monitor's findings. In 2017, Professor Paul Heaton published a regression analysis exploiting the natural experiment created when this Court entered a preliminary injunction in 2017 that suddenly increased the rate of pretrial release. Using data from over 500,000 cases, Professor Heaton found that the increase in pretrial release resulting from the preliminary injunction *decreased* future contacts with the criminal system.[2]

### C. The Texas Legislature Enacts Two Bail Laws, and the Attorney General Raises Abstention and Mootness in Two Other Cases But Forgoes Opportunity to do the Same in *ODonnell*.

#### 1. *The Texas legislature enacts Senate Bill 6.*

In August 2021, the Texas legislature enacted Senate Bill 6, which made certain changes to the state's bail laws.[3] The bill's lead sponsor, Senator Joan Huffman, emphasized that S.B. 6 was crafted to avoid conflict with the Harris County reforms.[4] S.B. 6 went into effect on January

---

[1] Brandon Garrett et al., *Liberty, Safety, and Misdemeanor Bail*, 76 Fla. L. Rev. 321 (Mar. 1, 2024), http://bit.ly/4n91CG8.

[2] Paul Heaton, *The Effects of Misdemeanor Bail Reform*, Quattrone Center for the Fair Administration of Justice (Aug. 16, 2022), http://bit.ly/3VRZGFT.

[3] S.B. 6, 87th Leg. (Tex. 2021), bit.ly/3Y83m6d (last visited Sept. 16, 2025).

[4] Hearing, *Senate Committee on Jurisprudence*, July 10, 2021, http://bit.ly/4nsZybE at 26:00 (last visited Sept. 16, 2025) (Sen. Huffman: "We know that misdemeanor bond reform in Harris

1, 2022, more than two years after the Consent Decree, and almost three years after the Court ordered compliance with the first iteration of Rule 9. Among other things, it requires that secured-money bail be imposed for anyone charged with certain enumerated offenses purportedly "involving violence," or with any felony while released on bail or community supervision for such an offense. Judges and hearing officers must require payment of secured-money bail in all such cases, even when, based on their individualized assessment, they do not believe a secured bond is necessary to address a risk of flight or danger, and even when requiring a secured bond will result in the detention of a person who cannot afford the condition. S.B. 6 further requires judges and hearing officers to consider a "Public Safety Report" consisting of the person's criminal history when determining an individual's bail conditions in a hearing.[5] Following the enactment of S.B. 6, the Attorney General did not seek intervention in *ODonnell* to raise a potential conflict between the new bail law and the Consent Decree.

> 2. *The* en banc *Fifth Circuit overrules the* ODonnell *panel's* Younger *holding.*

On January 7, 2022, the *en banc* Fifth Circuit issued a partial ruling in a challenge to the Dallas County bail system, a case in which the Texas Attorney General represented the defendant felony judges. *Daves*, 22 F.4th 522 ("Daves I"). The court remanded the case for further proceedings relating to *Younger* abstention and mootness (in light of S.B. 6). *Id.* at 548. Following the remand proceedings, the parties appealed and, on March 31, 2023, the *en banc* Fifth Circuit dismissed the plaintiffs' claims on the basis of *Younger* abstention and mootness. *Daves*, 64 F.4th 616 ("Daves II"). Two weeks later, in a separate case then pending before this Court challenging Harris County's *felony* bail system, the Texas Attorney General, on behalf of the State, argued that

---

County... has helped to prevent lower-level indigent offenders from languishing in prison, and we are not attempting to change the practice.").

[5] S.B. 6 § 5.

*Russell* should be dismissed in light of the abstention and mootness holdings in *Daves II*. State Intervenor's Supp. Br., *Russell v. Harris Cty.*, No. 4:19-cv-226, Dkt. 669 (S.D. Tex., Apr. 14 2023). Even as the Attorney General litigated *Younger* and mootness in *Daves* and *Russell*, he chose not to move to intervene in *ODonnell*.

### 3. The Texas legislature enacts Senate Bill 9.

In June 2025, the Texas Legislature passed Senate Bill 9, which, among other things, expands on parts of S.B. 6 by forcing judges and magistrates to impose secured bail as a condition of release for certain additional offenses, including some misdemeanors, with no regard for a person's risk of flight or danger. S.B. 9 went into effect on September 1, 2025.[6]

## III.    NATURE AND STAGE OF PROCEEDINGS

This case concerns a six-year-old Consent Decree entered to end a widespread practice of constitutional violations in the Harris County misdemeanor bail system. The Texas Attorney General, a nonparty to this case and the Consent Decree, has filed a motion to intervene, Dkt. 740, and a proposed motion to vacate the Consent Decree, Dkt. 742.

## IV.    STATEMENT OF ISSUES AND LEGAL STANDARDS

The Attorney General moves to intervene as of right, under Federal Rule of Civil Procedure 24(a)(2), and moves in the alternative for permissive intervention under Rule 24(b)(1).

To establish a *right* to intervene in an action pursuant to Rule 24(a)(2), a proposed intervenor must satisfy four conditions: (1) a timely application; (2) an interest relating to the property or transaction which is the subject of the underlying action; (3) significant impairment of the applicant's ability to protect his interests absent intervention; and (4) inadequate representation of the applicant's interests by the existing parties. *New Orleans Pub. Serv., Inc. v. United Gas Pipe*

---

[6] S.B. 9, 89th Leg. (Tex. 2025), https://bit.ly/4ny73y1 (last visited Sept. 16, 2025).

*Line Co.*, 732 F.2d 452, 463 (5th Cir. 1984) (en banc) ("NOPSI"). "Failure to satisfy any one requirement precludes intervention of right." *Louisiana v. Burgum*, 132 F.4th 918, 922 (5th Cir. 2025) (quotation omitted). The timeliness determination is reviewed only for abuse of discretion. *NAACP v. New York*, 413 U.S. 345, 366 (1973). The other requirements are reviewed *de novo*. *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994).

Rule 24(b)(1) authorizes a court to *permit* intervention if the applicant files a "timely motion" and asserts "a claim or defense that shares with the main action a common question of law or fact," provided intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1)(B), (3). Permissive intervention under Rule 24(b) is "wholly discretionary" and "may be denied even when the requirements of Rule 24(b) are satisfied." *Turner v. Cincinnati Ins. Co.*, 9 F.4th 300, 317 (5th Cir. 2021) (quoting *NOPSI*, 732 F.2d at 471–72 (5th Cir. 1984)). A denial of permissive intervention will be upheld on appeal absent a clear abuse of discretion. *United States v. City of New Orleans*, 540 F. App'x 380, 381 (5th Cir. 2013) (per curiam); *see also Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996) (en banc) (holding reversal appropriate only under "extraordinary circumstances.").

Neither as-of-right nor permissive intervention is an all-or-nothing concept; a court may grant intervention in limited scope. *See Beauregard, Inc. v. Sword Servs. LLC*, 107 F.3d 351, 352–53 (5th Cir. 1997) ("[I]t is now a firmly established principle that reasonable conditions may be imposed even upon one who intervenes as of right."); Fed. R. Civ. P. 24, advisory committee's note to 1966 amendment ("An intervention of right . . . may be subject to appropriate conditions or restrictions responsive among other things to the requirements of efficient conduct of the proceedings.").[7]

---

[7] "[A] denial of intervention is immediately appealable as a collateral order," *Valley Ranch Dev.*

## V.    SUMMARY OF ARGUMENT

The Texas Attorney General has effectively filed two separate motions to intervene, each one with its own claims, asserted interests, and timeliness considerations. First, he asks to intervene in order to assert defenses of *Younger* abstention and mootness. That request should be denied. It is untimely because it comes nearly seven years after the Attorney General knew that his interest in the case was no longer represented by the Parties. And it is futile because his proposed motion to vacate fails to identify any legal basis for raising these grounds post-judgment. Second, the Attorney General asks to intervene to assert that recent changes to state law warrant a modification to the Consent Decree. While Plaintiffs vociferously oppose the substance of that claim, they take no position on the Attorney General's intervention to raise and, after appropriate discovery, to litigate the issue.

## VI.    ARGUMENT

### A. The Court Should Deny the Attorney General's Request to Intervene to Assert *Younger* Abstention and Mootness.

"Post-judgment intervention is rare." *United States v. Allegheny-Ludlum Indus., Inc.*, 553 F.2d 451, 453 (5th Cir. 1977) (per curiam); *Bouman v. Pitchess*, 158 F. App'x 937, 939 (9th Cir. 2006) ("[I]ntervention after entry of a consent decree is reserved for exceptional cases.") (quotation omitted). The Attorney General's request that he be permitted to intervene in a six-year-old judgment and consent decree to raise issues that he watched be litigated, decided, appealed, negotiated, and permanently resolved through settlement, without ever intervening to assert his supposed urgent interest, even as he raised the same arguments in two other cases, is unaccompanied by the "strong showing" required to justify post-judgment intervention. 7C Wright

---

*Co. v. F.D.I.C.*, 960 F.2d 550, 555 (5th Cir. 1992), but only if it is a "*complete* denial" that "prevents a putative intervenor from becoming a party in *any* respect," *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 377 (1987) (emphasis in original).

& Miller, et al., *Federal Practice and Procedure* § 1916 (3d ed. 2025) ("There is considerable reluctance on the part of the courts to allow intervention after the action has gone to judgment and a strong showing will be required of the applicant.").

> 1. *The Attorney General's Proposed Intervention is Untimely.*

Timeliness is governed by four factors: (1) the length of time between the applicant's learning of his interest in the proceeding and his petition to intervene, (2) the extent of prejudice to existing parties from allowing late intervention, (3) the extent of prejudice to the applicant if the petition is denied, and (4) any unusual circumstances. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 263–66 (5th Cir. 1977). Each factor favors denying intervention to assert *Younger* abstention and mootness as untimely.

> i.  <u>Intervention is untimely because almost seven years have elapsed since the Attorney General knew the Parties did not represent his interests.</u>

Timeliness is measured by "the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties." *Sierra Club*, 18 F.3d at 1206 (citing *Stallworth*, 558 F.2d at 264); *accord Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 279–80 (2022) ("[T]he most important circumstance relating to timeliness is that the attorney general sought to intervene 'as soon as it became clear' that the [State's] interests 'would no longer be protected' by the parties in the case.") (quotation omitted); *see also Latham v. Wells Fargo Bank, N.A.*, 987 F.2d 1199, 1203 (5th Cir. 1993) (per curiam) ("Rule 60(b) simply may not be used as an end run to effect an appeal outside the specified time limits, otherwise those limits become essentially meaningless.") (internal quotation omitted).

As soon as an interested non-party knows (or should know) its interests are no longer represented by the parties to the case, it must act promptly to intervene. *See, e.g., United States v. Covington Cty. Sch. Dist.*, 499 F.3d 464, 466 (5th Cir. 2007) (per curiam) (holding that intervention

fifteen weeks after entry of consent decree was untimely, where intervenor should have known of its interest in the case for months); *Kneeland v. N.C.A.A.*, 806 F.2d 1285, 1289 (5th Cir. 1987) (holding that intervention after four months was untimely where proposed intervenor did "not suggest that it lacked ample notice of its interest in the lawsuit"); *Rotstain v. Mendez*, 986 F.3d 931, 937–38 (5th Cir. 2021) (holding intervention 18 months after proposed intervenors "became aware that their interests were no longer protected by the existing parties" was untimely); *Engra, Inc. v. Gabel*, 958 F.2d 643, 645 (5th Cir. 1992) (per curiam) (delay of eight months was untimely); *United States v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir. 1977) (delay of "almost a year" was untimely). The Fifth Circuit has found a request to intervene only nine days after final judgment was untimely where the applicant "knew or should have known of its interest in the action before the entry of final judgment." *Staley v. Harris Cty.*, 160 F. App'x 410, 413 (5th Cir. 2005) (per curiam).

Against this backdrop, the Attorney General's proposed intervention to assert *Younger* and mootness obviously comes too late. While in any case the court should "bear in mind that any substantial lapse of time weighs heavily against intervention," the delay here is enormous by any measure. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997) (quotation omitted). Under the most favorable possible timing for the Attorney General, the clock started ticking when the Fifth Circuit decided *Daves II* in March 2023. But even on those facts, the Attorney General has not so much as tried to "explain why [he] waited [over thirty] months to intervene" since *Daves II*, which "would be tough." *Woodward Harbor LLC v. City of Mandeville*, No. 23-cv-5824, 2025 WL 1194161, at *3 (E.D. La. Apr. 24, 2025). That is because "[i]n many [Fifth Circuit] cases where [the court] found intervention motions to be timely, the delay was much shorter [than eighteen months]." *Rotstain*, 986 F.3d at 938 (collecting cases). Following *Daves II*,

13

the Attorney General even acted in another case, *Russell v. Harris County*, No. 4:19-cv-226 (S.D. Tex.), to raise the same issues he now seeks to raise here. Such gamesmanship should be rejected.

The Attorney General attempts to rely on *Jansen v. City of Cincinnati*, 904 F.2d 336 (6th Cir. 1990), but that case only illustrates why his delay, even if measured from *Daves II*, is inexcusable. In *Jansen*, the proposed intervenors, who were the intended beneficiaries of a consent decree, understood a party to be representing their interest in litigation until summary judgment revealed a divergence of interests. *Id.* at 341. From that point on, the proposed intervenors "proceeded with haste." *Id.* "Approximately two weeks elapsed between the time in which the proposed intervenors learned of their need to intervene and when they filed their motion to intervene[,]" making the motion timely. *Id.* Here, even accepting that the Attorney General did not know of his need to protect his interests until *Daves II*—a specious proposition, given not only his public opposition to the Consent Decree beginning in 2018, but also his choice to raise these abstention and mootness arguments on behalf of himself or his clients in both *Daves* and *Russell* well before 2023—he continued to sit on his hands for 30 months. Delay on the order of years, rather than weeks, is untimely.

In reality, though, the Attorney General's delay is even more intentional and inexcusable. The Attorney General knew the Parties to the case did not share his interests long before *Daves II*. In fact, the intervention clock started ticking nearly seven years ago, when the new CCCL judges replaced the old judge defendants, abandoned their appeal of the revised preliminary injunction, and began settlement discussions. The Attorney General was aware of his interest in the *ODonnell* litigation from early on, filing amicus briefs in multiple appeals of the Court's preliminary injunction orders and opposing the Consent Decree in this Court. *See* Br. for State of Texas et al., *ODonnell v. Harris Cty.*, No. 17-20333, 2017 WL 2861848 (5th Cir. June 26, 2017); Br. for State

of Texas et al., *ODonnell v. Goodhart*, No. 18-20466, 2018 WL 4603243 (5th Cir. Sept. 17, 2018); Written Statement of Intent to Appear, Dkt. 689; Final Fairness Hearing Transcript, Dkt. 704 at 58:13–64:5. The Attorney General knew the original judge defendants had been continuing to press *Younger* in the trial court, even after losing in the first round of preliminary injunction proceedings. But he did not move to intervene in late 2018 or early 2019 when those judges lost their seats, when the trial court denied their summary judgment motion preserving *Younger* for *en banc* review, when the incoming judges withdrew their appeal of the revised preliminary injunction, or when the Parties began settlement discussions. Nor did he intervene when the Parties reached agreement on an interim rule in January 2019, or in February 2019 when this Court ordered compliance with it.

The Attorney General also did not intervene at any point during the settlement process or after the Parties moved for preliminary approval of the Consent Decree. *See Covington Cty. Sch. Dist.*, 499 F.3d at 466 (holding intervention after judgment untimely when "[t]he possibility that the United States and the District might settle was well-publicized for more than six months before the consent decree was entered"). Even when this Court rejected the Attorney General's objections after the final fairness hearing and entered a final judgment, the Attorney General did not intervene to appeal and seek *en banc* reconsideration of the panel's *Younger* abstention ruling. *Cf. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. at 277–82 (permitting state attorney general to intervene on appeal to defend state abortion restriction). Over the following years, the Attorney General litigated *Younger* and mootness in *Daves*, *e.g.*, Br. of Judicial Defs, *Daves v. Dallas Cty.*, No. 3:18-cv-154, Dkt. 274 (N.D. Tex. Mar. 1, 2022) (arguing abstention and mootness); Resp. of Judicial Defs., *Daves v. Dallas Cty.*, No. 3:18-cv-154, Dkt. 280 (N.D. Tex. Mar. 29, 2022) (same), and in *Russell*, *e.g.*, State of Texas's Resp. to Pls.' Mot. for Prelim. Inj., *Russell v. Harris Cty.*, No. 4:19-

15

cv-226, Dkt. 67 at 21–22 (S.D. Tex. Apr. 6, 2020) (arguing abstention), but he never moved to intervene in *ODonnell* to raise those same issues.

Nevertheless, the Attorney General asserts that he "sought to intervene at the earliest possible moment" because "[h]e may not have been able to intervene . . . before the defendants abandoned their duty to defend against this action." Mem. at 11.[8] The Attorney General does not identify a date on which he contends Defendants "abandoned their duty," but this vague argument makes no sense because he waited at least several years to attempt intervention under any conceivable understanding of when his abstention and mootness arguments became known. Whether or not parties to a consent decree assume a "duty" to sabotage their own negotiated settlement whenever subsequent case law arises that might have—in hindsight—provided a defense they could have litigated, the argument is wrong as a matter of fact.[9] The Attorney General does not explain why it was not "possible" to move to intervene in November 2018, when the new judge defendants were elected, or in January 2019, when he learned that they were withdrawing their appeal to pursue settlement. Nor does he explain why it was not "possible" to move to intervene later in 2019, when, as he admits, he formally "expressed an interest in this case and

---

[8] The Attorney General makes this statement months after he opposed intervention by advocates for undocumented students in a highly unusual case where final judgment was entered via consent judgment *on the same day the complaint was filed. See United States v. Texas*, No. 7:25-cv-55, 2025 WL 2423900, at *1 (N.D. Tex. Aug. 15, 2025). On behalf of the State, he argued that intervening even seven days after the final judgment was untimely. *See* State of Texas's Opposition to LUPE's Motion to Intervene, *United States v. Texas*, No. 7:25-cv-55, Dkt. 50 at 16 (N.D. Tex. July 14, 2025) ("Attempts to wind back the clock to re-litigate already decided matters in a closed case are wholly improper.").

[9] Indeed, if a nonparty opponent of a judgment could establish inadequate representation whenever the parties had not moved to vacate their own settlement following a change in law, Rule 24(a)'s requirement of inadequate representation would be meaningless. *Cf. Bush v. Viterna*, 740 F.2d 350 (5th Cir. 1984) (per curiam) ("However 'minimal' this burden may be, it cannot be treated as so minimal as to write the requirement completely out of the rule.") (quoting *Meridian Homes Corp. v. Nicholas W. Prassas & Co.*, 683 F.2d 201, 205 (7th Cir. 1982)).

opposed the relief sought" prior to the entry of the Consent Decree. Mem. at 11; *see also Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 948 (7th Cir. 2000) ("[I]f [the movant] was concerned about settlement negotiations not taking its interests into account, it should have moved to intervene at such a time when it would have been able to participate in them."). And he does not explain why, following the legal decision he claims placed a "duty" on the Defendants to raise abstention and mootness, it was still not "possible" for him to move to intervene to raise those same issues for another two-and-a-half years.

The Attorney General's final attempt to excuse his delay turns on discussions among the Parties following a May 30, 2025, letter in which four of the CCCL judges asserted their opinion that the Consent Decree is in conflict with S.B. 6. Mem. at 11 (citing Dkt. 740-2 (Goodhart Ltr.)). But a recent two-page letter signed by a minority of the CCCL judges has no relevance to the untimely nature of the Attorney General's motion, and he does not even attempt to cite any precedent arguing otherwise. Moreover, the judges' letter has nothing to do with the abstention and mootness issues that the Attorney General now seeks to raise. *See* Dkt. 740-2 at 3 (referring to S.B. 6, effective Jan. 1, 2022); *see also* Dkt. 740-3 (Pls.' Resp. to Goodhart Ltr.); Dkt. 740-4 (Monitor's Resp. to Goodhart Ltr.). The letter addressed only the Consent Decree's potential conflict with state law, and as discussed below, Plaintiffs' opposition to the Attorney General's intervention extends only to its attempt to raise *Younger* and mootness. The letter—and thus, the May 2025 date—is irrelevant as to the Attorney General's efforts to intervene to raise *Younger* and mootness.

Thus, even construing the timeliness factor in the light most favorable to the Attorney General, he waited 30 months since the Fifth Circuit decided *Daves II* to intervene to assert *Younger* abstention and mootness. In reality, though, he has known the Parties did not share his

interests since January 2019, and he waited nearly seven years to move to intervene. Under either benchmark, his delay is plainly untimely.

      ii.    <u>Permitting the Attorney General's late-stage intervention to assert *Younger* abstention and mootness would prejudice the Parties.</u>

The Parties would be significantly prejudiced by permitting the Attorney General's late-stage intervention to assert legal issues decided by *Daves II*, which he had the opportunity to assert earlier in this case via intervention. "[I]ntervention attempts after final judgments are ordinarily looked upon with a jaundiced eye" because such attempts "have a strong tendency to prejudice existing parties to the litigation or to interfere substantially with the orderly process of the court." *U.S. Steel Corp.*, 548 F.2d at 1235 (quotation omitted). Here, the prejudice of post-final-judgment intervention is magnified because the Attorney General seeks to litigate issues he could have raised prior to settlement. Instead, the Attorney General watched and did not intervene as the Parties withdrew their appeals, engaged in extensive multi-party settlement negotiations, and finally reached an agreement that was acceptable to each party.

And so now, nearly seven years since the Attorney General understood the Parties did not share his interests, six years after judgment and entry of the Consent Decree, and two-and-a-half years after the Fifth Circuit issued the rulings he is using as a justification, he seeks an opportunity to intervene and vacate the Consent Decree. Finding his intervention timely would risk undoing the significant time and resources that this Court and the Parties have invested in negotiating, finalizing, and, for the last six years, implementing and monitoring compliance with the Consent Decree. *See Jones v. Caddo Par. Sch. Bd.*, 204 F.R.D. 97, 100 (W.D. La. 2001) (weighing against a finding of timeliness the fact that "this case has advanced far into the remedial stage" and "[t]he only issue remaining before this court is continued compliance with the parameters of the 1990 order"). Plaintiffs' counsel in particular have spent thousands of hours on these tasks over the

course of the Attorney General's delay. Moreover, intervention would open the door to extensive new litigation on fact-dependent issues—such as whether the kinds of claims in this case are subject to abstention—that are typically resolved early in a case, forcing Plaintiffs into the difficult position of collecting evidence and discovery that is now nearly a decade old. The Fifth Circuit has affirmed denials of a request to intervene on the basis of far less prejudice. *See, e.g.*, *Allegheny-Ludlum Indus.*, 553 F.2d at 453 (holding that intervention six months after implementation of two consent decrees "will prejudice the appellees by jeopardizing months of negotiations, causing substantial litigation expenses, and even more substantial expenses of implementation"); *Rotstain*, 986 F.3d at 938 (holding that intervention eighteen months after the denial of class certification would prejudice the parties by requiring "a second round of fact discovery, significantly increasing litigation costs").

      iii.   <u>The Attorney General faces no prejudice beyond the natural consequences of his own litigation decisions.</u>

     The Attorney General does not identify any prejudice that would result from denying his untimely intervention to assert *Younger* abstention and mootness. That is because none exists.[10]

     Even if the Attorney General were to identify some prejudice if he is not permitted to intervene to retroactively argue abstention and mootness, it would merely be a natural consequence

---

[10] The Attorney General does not identify which interest he is purportedly protecting by raising *Younger* and mootness, as required by Rule 24. By deduction, it appears he relies on an "interest in keeping the public safe from crime." Mem. at 7. But he already raised that interest to the Court in 2019. *See* Dkt. 689 at 1 (arguing that the proposed Consent Decree "endangers public safety"). How strong could his public safety interest possibly be if the Attorney General waited six years before moving to defend it? Indeed, he makes no showing that denying intervention to attempt to vacate the Consent Decree would actually "impair" that interest. Fed. R. Civ. P. 24(a)(2). To the contrary, all available evidence shows "public safety has . . . powerfully benefited" from the Consent Decree's reforms. *Supra* at 7. The lack of prejudice to any conceivable public-safety interest the Attorney General might have in intervening to raise *Younger* and mootness further militates against intervention. *See Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) ("[A]n intervenor fails to show a sufficient interest when he seeks to intervene solely for ideological . . . reasons; that would-be intervenor merely *prefers* one outcome to the other.") (emphasis original).

of his own litigation strategy and could not support intervention. When a litigant disagrees with a judicial order, "Congress has prescribed a primary route, by appeal as of right and certiorari, through which parties may seek relief from the legal consequences of judicial judgments." *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 27 (1994). By repeatedly choosing not to intervene over the years despite knowing his interests were not represented, he chose, as a matter of litigation strategy, not to avail himself of any of these usual forms of judicial recourse, even as he pursued and received similar recourse in both *Daves* and *Russell*. Regretting those decisions does not constitute a prejudice that can possibly justify intervention. *See R & G Mortg. Corp. v. Fed. Home Loan Mortg. Corp.*, 584 F.3d 1, 9 (1st Cir. 2009) ("For obvious reasons, a preventable hardship weighs less heavily in the balance of harms.").

      iv.   <u>No unusual circumstances excuse the Attorney General's untimely attempt to intervene.</u>

Anything less than prompt intervention can be justified only by unusual circumstances. *See Stallworth*, 558 F.2d at 266-67 (finding unusual circumstances where the plaintiffs and district court deceived the nonparty, rendering them "unable" to intervene earlier). The Attorney General does not identify any unusual circumstances justifying intervention here, nor do any exist. The fact that the Fifth Circuit decided *Daves II* after the Court entered the Consent Decree is neither an unusual circumstance nor a justification for timeliness. It is hardly unusual that, after final judgment, legal doctrine continues to develop and change. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 369 (1992) ("To hold that a clarification in the law automatically opens the door for relitigation of the merits of every affected decree would undermine the finality of such agreements and could serve as a disincentive to settle institutional reform litigation."); *see also Lobrow v. Vill. of Port Barrington*, 406 F. App'x 60, 61 (7th Cir. 2010) ("Rule 60 does not provide a litigant license to sleep on his rights.") (citing *United Student Aid Funds, Inc. v. Espinosa*, 559

U.S. 260, 275 (2010)). And most importantly, as explained above, even if *Daves II* constituted an unusual circumstance, the Attorney General declined to intervene for years afterwards, making his attempt to intervene now untimely.

***

The Attorney General consistently expressed an interest in this case while it was open and active from 2016 to 2019. And by late 2018 he knew the Parties did not represent his interests. Yet at no point did he try to intervene. Instead, he let the Parties and this Court rely on his choice not to intervene to make decisions about how they would litigate, settle, and achieve finality of their interests. Now, years later, he wants to re-litigate issues that were raised and decided before the Parties entered the Consent Decree. At this late post-judgment stage, forgiving the Attorney General's untimeliness would jeopardize the Parties' painstaking work, be highly prejudicial to the Parties, and waste judicial resources. The Court should deny the Attorney General's requested intervention to assert *Younger* abstention and mootness.

### 2. The Attorney General's Proposed Intervention Is Futile.

Even if the Attorney General's request were timely, it should be denied as futile. *See Saavedra v. Murphy Oil U.S.A., Inc.*, 930 F.2d 1104, 1109 (5th Cir. 1991) ("[A] proper basis for denying leave to intervene may be a finding that the proposed intervention would fail to state a claim.") (quotation omitted).[11] The Attorney General's proposed motion to vacate names Rule 60(b)(5) as the legal basis for asserting that a purported conflict with state law requires vacating

---

[11] Indeed, the Attorney General transparently seeks to re-litigate the same flawed arguments in opposition to the Consent Decree this Court already heard and rejected nearly six years ago. *See* Memo. in support of Mot. to Vacate, Dkt. 742-1 at 5 ("incorporate[ing] by reference as if fully restated here the arguments made in its Written Statement of Intent to Appear at the Final Fairness Hearing"); Dkt. 689 at 1 (arguing the proposed Consent Decree "endangers public safety"), 2 (arguing the proposed Consent Decree violates state law by preventing "individualized assessment"), 6–7 (arguing this case was moot).

the Consent Decree. Memo. in support of Mot. to Vacate, Dkt. 742-1 at 2. However, his motion does not identify any subsection of Rule 60(b), nor any other legal basis, that would allow him to raise his *Younger* and mootness arguments in the same way. *Id.* This failure to even articulate a basis for vacatur based on *Younger* or mootness leaves the Parties and the Court guessing. As presented, the motion to vacate on those grounds does not state a claim, and thus the motion to intervene on those grounds should be denied as futile. *See, e.g.*, *Saavedra*, 930 F.2d at 1109; *In re Deepwater Horizon*, 546 F. App'x 502, 504 (5th Cir. 2023) (per curiam) (affirming denial of motion to intervene where "the intervention that [the non-party movant sought] would be futile").[12]

### 3. *The Court Should Deny Permissive Intervention Under Rule 24(b).*

The Court should deny the Attorney General's request for permissive intervention to raise *Younger* abstention and mootness for the same reasons it should deny intervention as-of-right. *See supra* § VI.A.1 (untimeliness); *supra* § VI.A.2 (futility); *see also Rotstain*, 986 F.3d at 942 (observing that timeliness is evaluated more strictly under permissive intervention than under mandatory intervention).

### B. Plaintiffs Take No Position on the Attorney General's Request to Intervene to Assert Potential Conflicts Between the Consent Decree and State Law.

While the Court should deny the Attorney General's request to intervene for the purpose of asserting *Younger* abstention and mootness, Plaintiffs take no position on the Attorney General's request to intervene for the purpose of asserting a purported conflict between the Consent Decree and Senate Bill 9, which went into effect on September 1, 2025. The Attorney General's arguments to vacate the Consent Decree based on that conflict fail on the merits because they do not meet Rule 60(b)(5)'s high burden to modify—let alone entirely vacate—a consent

---

[12] At a minimum, the Attorney General's failure to identify a legal basis for raising these argument in support of vacatur prevents Plaintiffs from responding. If the Attorney General belatedly identifies such a basis in reply, Plaintiffs will likely seek leave to file a surreply to address it.

decree adopted to protect federal constitutional rights. But the question this Court must address if the Attorney General is permitted to file a motion to vacate is distinct from the question at issue here, which is whether the Attorney General is permitted to even make those arguments. Plaintiffs acknowledge the Attorney General's general interest in enforcing state law, and, although his intervention is plainly untimely with respect to Senate Bill 6, which was enacted over four years ago, Plaintiffs recognize that it is timely with respect to Senate Bill 9, which took effect this month.

Thus, Plaintiffs take no position on the Attorney General's intervention for the limited purpose of litigating whether S.B. 9 conflicts with the Consent Decree. Of course, according to the Attorney General, S.B. 9 codifies in state law the precise constitutional violations Defendants committed as a matter of uniform practice, specifically, requiring secured bail in entire categories of cases without regard for ability to pay or the necessity of pretrial detention. Mem. at 10. If the Attorney General is permitted to intervene to press conflicts with state law codifying practices this Court has already struck down, Plaintiffs will vigorously contest any effort to show that modification is warranted.

## VII.    CONCLUSION

For the foregoing reasons, the Court should deny the Attorney General's motion to intervene for the purpose of raising *Younger* abstention and mootness.

Date: September 16, 2025                           Respectfully Submitted,


/s/ Jeremy D. Cutting
Alec George Karakatsanis                          Neal S. Manne
alec@civilrightscorps.org                         Texas Bar No. 12937980
Elizabeth Rossi                                   nmanne@susmangodfrey.com
elizabeth@civilrightscorps.org                    Joseph S. Grinstein
Jeremy D. Cutting                                 Texas Bar No. 24002188
cody@civilrightscorps.org                         SUSMAN GODFREY L.L.P.
CIVIL RIGHTS CORPS                                1000 Louisiana Street, Suite 5100
1601 Connecticut Ave NW, Suite 800                Houston, Texas 77002
Washington, DC 20009                              Telephone: (713) 651-9366
Telephone: (202) 681-2721


Dustin Rynders
Texas Bar No. 24048005
dustin@texascivilrightsproject.org
Travis Fife
Texas Bar No. 24126956
travis@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
2100 Travis Street
Houston, TX 77002
Telephone: (512) 474-5073

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 16, 2025, a true and correct copy of this document was properly served on counsel of record via electronic filing in accordance with the USDC, Southern District of Texas Procedures for Electronic Filing. I further certify that I served a copy of the foregoing on the following unrepresented parties by agreement as follows:

| | |
|---|---|
| The Honorable Paula Goodhart<br>Harris County Criminal Court at Law No. 2 | Paula_Goodhart@ccl.hctx.net |
| The Honorable Leslie Johnson<br>Harris County Criminal Court at Law No. 3 | Leslie_Johnson@ccl.hctx.net |
| The Honorable Jessica Padilla<br>Harris County Criminal Court at Law No. 14 | Jessica_Padilla@ccl.hctx.net |
| The Honorable Linda Garcia<br>Harris County Criminal Court at Law No. 16 | Linda_Garcia@ccl.hctx.net |

*/s/ Jeremy D. Cutting*
Jeremy D. Cutting