# Monitoring Pretrial Reform in Harris County

# Ninth Report of the Court-Appointed Monitor

**March 4, 2026** (correction on page 22 of the case number in last paragraph)



**Brandon L. Garrett, Monitor**
*L. Neil Williams Professor of Law*
*Faculty director, Wilson Center for Science and Justice*
*Duke University School of Law*
*210 Science Drive*
*Durham, NC  27708*
*(919) 613-7090*
*bgarrett@law.duke.edu*

**Sandra Guerra Thompson, Deputy Monitor**
*Newell H. Blakely Professor of Law*
*University of Houston Law Center*
*4170 Martin Luther King Blvd.*
*Houston, TX 77204-6060*
*(713) 743-2134*
*sgthompson@Central.uh.edu*

**Dottie Carmichael, PhD, Director and Research Scientist**
**David (Dongwei) Shi, ABD, MS, Senior Research Associate**
**Andrea Sesock, Project Coordinator**
*Texas A&M University*
*Public Policy Research Institute*
*4476 TAMU*
*College Station, TX 78743-7746*
*(979) 854-8800*
*dottie@ppri.tamu.edu*

**Songman Kang, PhD, Consultant**
*Associate Professor, Department of Economics*
*Sungkyunkwan University*
*Seoul, Korea*

Provided to:

**The Honorable Lee H. Rosenthal**
**United States District Court**
**for the Southern District of Texas**

Also provided to:

**Representatives of Plaintiff Class:**

      **Elizabeth Rossi, Plaintiffs' Counsel,** elizabeth@civilrightscorps.org

      **Cody Cutting, Plaintiffs' Counsel,** cody@civilrightscorps.org

      **Travis Fife, Plaintiffs' Counsel,** travis@texascivilrightsproject.org

**Representatives of Harris County:**

      **Rachel Fraser, Assistant County Attorney,** Rachel.Fraser@cao.hctx.net

      **Natosha Willis, Office of County Administration,**
      natosha.willis@harriscountytx.gov

**Representative of County Criminal Court at Law Judges:**

      **Allan Van Fleet, Counsel for 12 County Criminal Court at Law Judges,**
      allanvanfleet@gmail.com

      **Joseph R. Russo, Jr. Counsel for 4 County Criminal Court at Law Judges,**
      JRusso@greerherz.com

**Representative of Harris County Sheriff's Office:**

      **Major Matt Ferguson,** matthew.ferguson@sheriff.hctx.net

      **Arlisa Certain,** Arlisa.Certain@Sheriff.hctx.net

## *Executive Summary*

- **The ODonnell Consent Decree:**
  - *Misdemeanor Bail Reform:* In Harris County, secured money bonds are no longer used for most misdemeanor cases under the court rule adopted as part of the 2019 settlement in *ODonnell v. Harris County*. Most people arrested for misdemeanors are now released promptly on unsecured bail without waiting for a bail hearing.
  - *Bail Options Unchanged for Cases with Public Safety Concerns:* People charged with misdemeanors that potentially present public safety risks (e.g., repeat DWIs, family violence, prior bond violations or outstanding warrants) are not automatically released, however. A hearing officer makes a bail decision, usually at a bail hearing at which they have the traditional options to decide whether to require financial bonds, protective orders, pretrial supervision requirements, or other release conditions.
  - *Better Bail Hearings:* Defense attorneys continue to represent people at bail hearings, as required by the Judges' Rule 9 and the Consent Decree. Before 2017, people arrested in Harris County usually had no defense attorney at these hearings. Judges also must give greater attention to more rigorous bail requirements.

- **Major Consent Decree Accomplishments:**
  - *Court Appearance*: The County is implementing an approved plan to improve court appearance. A website, https://myharriscountycase.com, allows people to readily look up information about upcoming appearances in their cases. New video guides are being finalized.
  - *Data*: Much of the relevant information about the misdemeanor bail process is now available in an online data portal. We have continued work to examine updated data and have completed regression analysis examining costs and benefits of the misdemeanor bail changes in the County. These analyses are being published in a law and economics journal and in a *Houston Law Review* symposium issue.
  - *Training*: The County has hired a staffer to conduct trainings on misdemeanor bail processes.

**\* Areas of Non-Compliance with the Consent Decree:**

  - *Status of the Consent Decree.* We emphasize, as we have conveyed to the parties, that while litigation, described below, is pending, at present, the Consent Decree remains in effect and unaltered, as does Local Rule 9, unless and until there is some modification in the future.
  - *Consent Decree Compliance in Year 6.* We have been troubled to see, as we discuss below in our Report, a range of recurring and new types of violations of the Consent Decree and Rule 9. These have included larger-scale patterns and issues in groups of cases as well as more individual violations. These errors and violations have rarely been brought to our attention by the County, and there is currently no system to detect, prevent, or remedy them. We note that the County is presently planning to hire staff attorneys to identify GOB eligible cases and also ensure compliance

with Rule 9 and the Consent Decree. Those attorneys could assist with such a system.

o *Indigent Defense*: The County has not developed a plan in response to the National Association for Public Defense (NAPD) evaluation of Harris County's misdemeanor indigent defense systems, nor does it appear that there is any effort to develop such a plan despite a years-long effort to encourage the County to do so. The plan would require the cooperation of the CCCL judges who have been unwilling to move forward with proposals. Thus, virtually all people arrested on misdemeanors continue to appear in court for arraignment before CCCL Judges without the benefit of counsel.

o *Liberty Deprivations of People Who Lack Counsel.* These have included examples of cases in which bond has been revoked, without the required findings, and also for people who have not yet had counsel appointed.

o *Implementing a Compliance System.* All the parties, of course, are bound to ensure that the Consent Decree is followed, including the Sheriff's Office, which is prohibited from enforcing cash bail unaccompanied by a record in compliance with Rule 9 and the Consent Decree. Yet, although we have discussed the need for a compliance system in our reports, now, with one year left in our seven-year term, there is not now any system in place to detect, prevent, or remedy these recurring violations.

o Overall, the results of the Consent Decree have been quite remarkable and positive, from public safety, liberty, and cost savings perspectives. Our findings continue to show these deep, positive effects. Yet, a system is needed to ensure that these procedures are consistently and carefully followed going forward, so that these remarkable gains are not eroded.

- **Ongoing Work by the Monitor Team:**
  - *Data Development:* We analyzed data prepared by Harris County and provided continual feedback on data development in regular meetings concerning the assembly and validation of data regarding misdemeanor cases.
  - *Community Work Group*: We convened biannual meetings of our Community Work Group, to share our work and solicit input from our diverse community stakeholders. Members share their perspectives for the "Community Viewpoints" column found in our reports.
  - *Regular Meetings:* We held regular meetings with the parties and Harris County stakeholders to provide feedback and receive updates on a range of topics. Our most recent public meetings were held in-person on February 5, 2026.

- **Our Findings:**

  - *Data Analysis:* Our updated findings largely confirm what we reported in our first eight reports. The bail reforms under the ODonnell Consent Decree have saved Harris County and residents many millions of dollars and improved the lives of tens of thousands of persons arrested for misdemeanors, and these large-scale changes have produced no increase in new offenses by persons arrested for misdemeanors.

    - *Overall, the work suggests that repeat offending by persons arrested for misdemeanors has remained stable in recent years.*

    - The numbers of persons arrested for misdemeanors have declined since 2015.

    - The numbers of those arrested for misdemeanors who had new charges filed within one year have also declined.

  - The analyses conducted show:

  *Misdemeanor Case and Defendant Characteristics*

    - The numbers of persons arrested for misdemeanors have declined since 2015, overall, by about 10 percent. There was a decline from almost 50,000 people per year in 2015, to 36,451 in 2020; after a gradual uptick, we saw a modest decline to about 41,932 people in 2025.
    - The numbers of misdemeanor cases similarly declined from over 60,000 cases filed in 2015 to 51,590 cases filed in 2025.
    - The share of misdemeanor cases that belong to one of the carve-out categories increased from 2015 (10.9%) to 2021 (30.9%), but has declined since then, reaching 23.2 percent in 2025.
    - The biggest driver was fluctuation in cases involving assault or terroristic threat against family and partners (7.6% in 2015 to 15.8% in 2021 to 12.5% in 2025). The number of cases may be a function of arrest and prosecution policies, rather than an actual increase in offending conduct.

vi

- DWI has been, and remains, one of the most commonly observed misdemeanor offenses; its case count gradually increased between 2015 and 2021, but has decreased and remained largely constant since then.
- The sex and racial distribution among misdemeanor defendants have remained stable since 2015. In each of the years considered, males and Whites accounted for approximately 75 percent and 60 percent of the defendants, respectively.
- The share of Latinx defendants has gradually risen, from 41 percent in 2015 to 47 percent in 2025, reflecting the growth in population in Harris County.

### Bond Amounts and Holds
- In 2015 and 2016, misdemeanor defendants were detained for two days or less approximately 75 percent of the time, whereas the shares of initial pretrial detention lasting three-to-seven days and more-than-seven-days were 13 percent and 14 percent, respectively.
- The share of cases with short pretrial detention (two days or less) increased to 84 percent in 2017 (the year when the preliminary injunction became effective) and has remained stable since then.
- The share of misdemeanor cases with initial pretrial detention lasting more than seven days has been largely stable at about 10 percent in recent years.
- Pretrial release was observed in approximately 50 percent of misdemeanor cases filed in 2015 and 2016.
- The share noticeably increased as the preliminary injunction and Local Rule 9 were adopted and implemented (68 percent in 2017 and 85 percent in 2019) and has remained at roughly 80 percent in each year since 2019.
- Misdemeanor arrestees were released on a general order bond about 50 percent of the time in the year it was first introduced (2019); the share has gradually risen, reaching above 60 percent in 2024 and 2025.
- There were notable differences in the pretrial release rates by sex, race, and ethnicity prior to the bail reforms. In 2015, females were more likely to be released than males (57 percent vs. 47 percent), Whites more than Blacks (55 percent vs. 39 percent), and Latinx more than non-Latinx (58 percent vs. 43 percent).
- These gaps have diminished over time, and since 2019, we observe very little difference in pretrial release rates across sex, racial, and ethnic groups.
- The overall one-year bond failure rate increased between 2015 (17%) and 2018 (30%) but has gradually declined since then and remained stable at 25 percent as of 2024.

### Case Outcomes
- The conviction rate fell rapidly from 60 percent in 2015 to 27 percent in 2019 and has remained nearly constant at 21 percent since 2022.
- The combined rate of dismissal or acquittal increased from 31 percent in 2015 to 70 percent in 2023.
- The use of deferred adjudication fell from 8 percent in 2015 to 3 percent in 2024.

- The time-to-disposition initially increased for many misdemeanor cases, as the share of cases disposed within 365 days fell from 92 percent in 2015 to 45 percent in 2020.
- However, this trend has sharply reversed since then. The share of cases disposed within 365 days has increased for the last four consecutive years and is currently above 80 percent.

### *Repeat Offending*

- In each year since 2015, about 23 percent of misdemeanor defendants had a new criminal case filed against them within 365 days, with one exception in 2019 (21 percent).
- The share of misdemeanor arrests followed by a felony arrest within one year has been stable at 11 or 12 percent throughout the entire time period.

### *Cost Study*

Ordinary least squares regression was used to estimate cost effects of four major policy intervals before and after the ODonnell Consent Decree.

- From the pre-reform baseline to Rule 9, reforms reduced total misdemeanor system costs by 33%, yielding $1,191 in net savings per comparable case. Bond reform realized $1,735 in savings for statistically similar cases.
  - As personal and GOB bonds became the norm, reliance on costly processes—bookings, screenings, bond hearings, and pretrial detention—declined, while more defendants could contest charges in the community, increasing dismissals and reducing detention-driven pleas and sentencing costs.
  - Bond reform also raised expenditures by $544 for statistically similar cases as due process investments increased, particularly for courts and legal counsel.
- Of the net savings, 60% ($714/case) accrued to Harris County systems, while 40% ($477/case) directly benefited defendants—with the key insight that reducing defendants' financial burden was also a primary driver of county savings.
- Public safety results improved, not worsened. For comparable cases, reforms were associated with a 5% decline in the share of arrests followed by any new charges within three years and a 12% decline in the average number of re-arrests per initial arrest. These reductions brought the costs of re-arrest among similar cases down by 4% or $310 per case.
- Overall, results show the ODonnell lawsuit and Consent Decree achieved constitutional and financial gains without compromising public safety—and with measurable improvements in re-arrest outcomes.

- **Next Monitoring Steps:**

- o   Assist in development of systems to accurately and consistently detect, remedy, and prevent errors and violations of the Consent Decree.

- o   Assist in further implementation of improvements to pretrial hearings and accompanying procedures to facilitate compliance with the Consent Decree.

- o   Review County plans that follow recommendations made in NAPD indigent defense study and monitor the implementation of court appearance plan.

- o   Conduct further updated data analysis.

# TABLE OF CONTENTS

**INTRODUCTION**      **11**

**I. COMMUNITY VIEWPOINTS**      **14**

**II. POLICY ASSESSMENT AND REPORTING**      **18**

**III.  DATA ANALYSIS**      **27**

**IV.  COST STUDY AND PROJECT MANAGEMENT**      **57**

**APPENDIX**      **69**

**A. The Monitorship Structure**      **69**

**B. Community Work Group**      **73**

**C. Monitor Team Bios**      **79**

**D. Organizational Chart**      **81**

**E. Year 7 Statement of Work**      **82**

**G. Consent Decree Tasks and Milestones**      **101**

**Introduction**

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, was appointed to serve as Monitor for the ODonnell Consent Decree, along with Professor Sandra Guerra Thompson, University of Houston Law Center, who serves as the Deputy Monitor. The Monitor team includes research experts from the Public Policy Research Institute ("PPRI") at Texas A&M University, and the Wilson Center for Science and Justice ("WCSJ") at Duke University School of Law.

Our role is wholly independent of any of the parties in the ODonnell case. We report to the federal court regarding the progress of this Consent Decree. We were appointed because the prior system of misdemeanor bail was found unconstitutional after years of litigation, which we took no part in, and which the parties settled prior to our appointment. As such, our work pertains only to misdemeanor cases in Harris County.

The parties envisioned a seven-year term for the monitorship because the ODonnell Consent Decree sets out a comprehensive plan for misdemeanor bail reform. (We note that while our term serving as monitor is a seven-year term, the Consent Decree is not time-limited). People mean different things by both the term "bail" and the phrase "bail reform." Harris County is implementing a quite comprehensive model for misdemeanor cases, which governs more than just decisions whether to release a person or detain them pretrial. First, there are required releases after booking for low-level misdemeanors. Second, for those defendants not entitled to release without a hearing, magistrates conduct bail hearings. The Consent Decree requires public defense representation, discovery and due process protections, making the hearings far more robust. Third, the Consent Decree aims to increase court appearance rates over time with sound rules and supports to help people comply with legal obligations, including new court appearance rules and electronic court notifications. Fourth, the Consent Decree calls for evaluations of the system, including third-party recommendations regarding indigent defense and court appearance, and a publicly accessible data portal, with responses in progress.

For those reasons, we have emphasized that the Consent Decree is a long-term undertaking, with key pillars implemented, but unfortunately, after six years, there is still substantial work to be done to assure self-monitoring and compliance. These improvements will require assessment and implementation over time. Thus, while we have described in our reports highly positive results, we continue to observe violations that are not consistently detected or remedied. An effective, practical, and well-resourced system to ensure long-term compliance, remains a pressing need. This is all the more the case after six years of our seven-year term serving as independent monitor. We do not know of any proposals to establish such a system to ensure that there is compliance when our seven-year term as monitor ends. However, we note that the County is presenting planning to hire staff attorneys, to identify GOB-eligible cases but also to assist with Rule 9 and Consent Decree Compliance; that group could take on the compliance role that we describe.

We also note that last summer, we responded to a request by four CCCL judges to modify the Consent Decree. We then heard from the four judges and from the other parties, regarding that specific proposal. We responded, on July 25, 2025, noting that our overall task when considering any proposal to modify Rule 9 or the Consent Decree, is to follow the considerations set out in Paragraph 31, which states:

> Any change to Local Rule 9 must ensure that no misdemeanor arrestee is detained solely due to inability to make a monetary payment; that hearings to determine conditions of release or detention comply with constitutional principles of equal protection and substantive and procedural due process; that any condition of release is the least restrictive condition necessary to meet the government's interests in preventing bodily harm to another person and preventing flight from prosecution; and must be consistent with the best available evidence.

Thus, any such request must be evaluated based on whether it satisfies those core principles, reflecting core commitments of the U.S. Constitution. We also noted that Paragraph 26 states:

> Any requests for resources and staffing needs by County departments related to the implementation of this Consent Decree will be evaluated by the Monitor, who will provide a recommendation to assist Commissioners Court in its determination of the extent and type of staffing and resources needed, if any, in response to the request.

Thus, for any requested modification that would have substantial budgetary and/or staffing implications, we must examine the types of information that the Commissioner's Court would have to consider.

We concluded that the request to amend Local Rule 9 was premature, where the twelve CCCL judges, apart from the four judges making the proposal, did not join in it. Our view was that four judges, acting alone, and without further consensus among their colleagues, cannot amend Local Rule 9 or the Decree.

We also noted at that time a range of concerns that we had with the substance of the proposal. The practical, rights-based, and budget-related burdens of the proposal, which would require magistrates to review each case, without any General Order Bond eligibility, would be substantial, on magistrates, judges, the Sheriff's Office, and the County. We also have public safety concerns with any changes that might result in releases, due to delays in considering cases, without the careful processes in place under the Consent Decree. We noted that the population of persons affected by the proposal was enormous, almost 28,000 cases a year, who currently are eligible for a General Order Bond. We further noted that while better harmonizing Local Rule 9 with recent changes in Texas law is a laudable goal, the specific proposal advanced was inconsistent with Texas law, in that it would have eliminated the important Texas law requirement that a person not be held without a probable cause hearing for more than 48 hours, as well as the complementary Local Rule 9 and Consent Decree requirement that a bail hearing be held within 48 hours.

Following our response, motions were filed in the District Court in this case, by the four judges, and the Attorney General, as an intervenor. We understand that this litigation remains ongoing, at the time of this Report.

More recently, we learned shortly before our public meetings on February 5, that the District Attorney's Office and the County are exploring hiring, at the Office of Court Administration ("OCA"), six additional staff attorneys to determine whether a person is eligible for a GOB. We underscored in a letter on February 11, that this proposal implicates a process that has long been integral to the Consent Decree. The GOB process affects a very large population of people in Harris County, well over 25,000 people per year. The GOB process was adopted through an Amendment to Rule 9, approved by the District Court, in January 2019. It ensures the prompt release, "as soon as practicable" after arrest, and without financial conditions, of persons whose cases are not carved out as more serious under the Decree.

We have since learned more about the details of this plan, including a written description of the envisioned roles of these staff attorneys, stating that their role will include assuring compliance with Local Rule 9 and the Consent Decree. We share the consensus among the parties that new staffing and resources could improve upon the current GOB-designation process. In fact, we had planned to discuss during our site visit that we continued to see inaccuracies in the designation of cases for GOBs. Our goal was to ensure that these new staff were tasked with, including in their role and supervision, following the existing rules set out in Rule 9 and the Consent Decree, for example. We also agree that additional staff to ensure compliance with Local Rule 9 and the Consent Decree are much needed and could play an important role in implementing a compliance system.

At the same time, we expressed our concerns that the insertion of another agency in the processing of arrest cases could lead to further delays. As it stands, with only the District Attorney's Office involved in the GOB-screening process at present, people eligible for release on GOBs may nonetheless wait 24 hours or more for release, which is an extremely long time for a purely administrative process that should take far less time. Thus, rather than improving the efficiency of the process for release, this change appears likely to make it less efficient. As this change is implemented, we urge the County to examine its current system and find solutions that can speed up releases.

Finally, we emphasize, as we have conveyed to the parties, that while this litigation is pending, at present, the Consent Decree remains in effect and unaltered, as does Local Rule 9, unless and until there is some modification in the future.

We have been troubled, therefore, to see, as we discuss below, recurring and new types of violations of the Consent Decree and Rule 9. We describe violations that have come to light in which magistrates and judges have stated that they would not follow the Consent Decree in specific cases, as well as a range of violations that have no apparent justification, as they are off the record. All of the parties, of course, are bound to ensure that the Consent Decree is followed,

including the Sheriff's Office, which is prohibited from enforcing cash bail unaccompanied by a record in compliance with Rule 9 and the Consent Decree.  As discussed, these highlight the need for a system in place to detect, prevent, or remedy these violations.

## I. Community Viewpoints

**Protecting the Survivors of Domestic Violence and Immigrants**
*A Conversation with Katharina Dechert*

 **Katharina Dechert**, a policy manager at Tahirih Justice Center, sat down recently with ODonnell Deputy Monitor Sandra Guerra Thompson to talk about her work with immigrant survivors of gender-based violence.  The Tahirih Justice Center, which operates nationally, provides a wide variety of legal, social, and advocacy services for immigrant survivors of gender-based violence of all kinds, such as domestic violence and sex trafficking, among others.

*ODonnell* affects Tahirih's clients, but only to a limited degree.  In almost every regard, *ODonnell* has not affected the bail process for family violence cases.  *ODonnell* reformed the misdemeanor bail system in Harris County, but it does not apply to the felony bail system. Regarding misdemeanor cases, *ODonnell* allows for cashless release for people charged with most minor offenses, except for family violence offenses (and several other situations involving public safety concerns). People charged with family violence must see a magistrate who has every tool available as a bail condition, such as surety bonds, emergency orders of protection, GPS monitoring, and periodic reporting requirements.  ODonnell did improve the quality of these magistrate hearings, but it has not restricted in any way how magistrates set bail in family violence cases.

*What do survivors of domestic violence want when they call the police?*

Dechert says that in Tahirih's experience, when survivors call the police and file a report, they often don't know what to expect next.  Primarily, they want safety from further violence. But calling the police involves great risks for victims of gender violence.  Tahirih has seen clients end up "on both sides of the criminal justice system," when their partners are arrested and they are arrested as well, perhaps due to a language barrier with law enforcement or if they are being subjected to sex trafficking.  Thus, they have fears about interacting with law enforcement.

For survivors who are immigrants, the fear has only become more pronounced.  In 2025, a national survey by the Alliance for Immigrant Survivors, of which Tahirih is a co-chair, found that one-half of individuals surveyed are no longer willing to call the police at all or to go to court.  "We're seeing that locally as well," Dechert says. She adds, "We see this fear causing survivors to think about whether it is safer to stay in an abusive relationship or risk a potential ICE arrest when calling the police. Unfortunately, a lot of survivors are choosing not to leave."

Sadly, immigrants are also more vulnerable to crime in the first place because people see them as easy targets.  Dechert observes that national studies have found that immigrant women experience domestic violence at twice the rate as American women.

*After an abusive partner is arrested, how well does the justice system serve survivors?*

Communication with survivors is a key factor in promoting survivor safety, Dechert says. "Ideally," she says, "we would have a survivor-centered system where survivors are being asked, 'What does safety look like to you?'"  She adds, "Unfortunately, the system of charging people who commit violent acts is not designed to take into account what the survivor wants or needs."  Some local police departments send advocates on the scene to respond with law enforcement, which Dechert considers optimal.  She says, "It is super valuable for getting survivors' information in the moment, for lethality assessment, and for connecting them with shelters and other services."  Otherwise, if the risks of releasing a partner from custody are not immediately assessed, then it "complicates the process of making survivor safety a priority."

"The most dangerous time during a domestic violence relationship is when a survivor is leaving [the relationship] because of the way the dynamics of power and control move in that relationship, which makes it even more important that she has additional support and has somewhere safe to go," Dechert says. Texas law requires that survivors be notified prior to the release of a person arrested for harming them, but the bail process does not always accommodate this communication.

*How should the bail system address the needs of survivors of misdemeanor family violence?*

Dechert understands the impetus to hold people in custody pretrial when they are arrested for family violence crimes, but she says there are competing interests to consider, especially in misdemeanor cases.  Understandably, many people focus on the rare case when a survivor is injured or even killed by an abuser who is released on bond.  Often, the reaction is to call for higher cash bonds.  Dechert thinks that misdemeanor domestic violence cases call for a different approach.  "It is terrible whenever there is a death that was preventable," she says, "but I don't think that cash bond is centered in the safety of a survivor in the way that bond conditions or other mechanisms are."

As Dechert sees it, low-level family assaults involve a different root problem than other misdemeanors.  "When we think of the different types of low-level crimes that are the ambit of *ODonnell*, we are often talking about things that are a product of poverty, social exclusion, and desperation."  On the other hand, she explains, "With gender-based violence, there's a different dynamic in the sense that the perpetrator is someone who is exerting power and control and manipulation and violence against someone else, which is a core element of a crime in a way that is not the case with a shoplifting case, for example."  She says, "If we want to prevent violence, we need to address this dynamic [of using violence to exert control]—we're not going to solve it by punishing it out."

Contrary to the get-tough approach often heard in the media, Dechert observes that "a lot of survivors want their partners to be released."  She explains, "Maybe they wanted to get help in the moment but never intended for their partners to have charges filed; maybe they're financially dependent on them." Even prolonged delays in releasing a partner can have enormous implications for survivors who rely financially on the partner.

Many people charged with misdemeanor family violence will be released, whether on cash bonds or without requiring cash, and usually with other pretrial conditions like emergency protective orders, no-contact orders, and others.  Dechert also believes that the justice system could do more to stop future violence.  She explains that the perpetrators of family violence have usually experienced violence themselves.  Thus, she says that the justice system ought to provide "intervention supports" for people who are using violence so that they can stop hurting others.

*From your work with survivors, what are key policy approaches to best help survivors?*

Reflecting on her ten years working at the intersection of international human rights and gender violence, Dechert says, "This work enables me to take a holistic approach on behalf of survivors."  Immigrant survivors often have zero experience with the American justice system, she says, as well as many fears, and systems should be designed with their needs in mind. Instead, Dechert says, "These systems can be unhelpful to survivors, retraumatizing—so the policy work I do enables me to try to fix some of the structural barriers that clients are facing." "When the legal system takes over and makes decisions for them, that replicates the problem of survivors not having control of their lives," Dechert says.  Keeping survivors informed, maintaining incentives for them to cooperate with police and prosecutors, and giving them a voice in the decision-making process can best keep them safe and help them to regain a sense of autonomy and self-esteem.

**\*\*\*\*\***

**University of Houston Law Center Symposium on ODonnell**

On February 6, 2026, the University of Houston Law Center's *Houston Law Review* convened a Symposium regarding bail reform and the ODonnell Consent Decree, which brought together leading scholars who lend their own perspectives to the work that has been done in Harris County.  We wanted to briefly share and describe those presentations and academic publications here. Each of these essays will be published in the Houston Law Review later this year.

First, Professor Kellen Funk, who in "Uncomfortably Reminiscent: *ODonnell* in History and Memory," relies on an historical account from Reconstruction to illuminate Congress's vision of federalism in enacting the Civil Rights Act of 1871 and Section 1983. His article provides a fascinating account, based on original historical work examining a trove of correspondence of the Assistant Commissioner of the Freedmen's Bureau, an agency with hundreds of agents dispatched by Congress to the former Confederate states during Reconstruction. The Freedmen's Bureau agents were given broad authority to oversee, regulate,

16

and even displace state courts in both civil and criminal actions, as necessary to provide equal justice for freedmen against continuing southern outrages.  This history then sets the backdrop against which Congress enacted the Civil Rights Act of 1871, and authorized Section 1983 lawsuits like the one in ODonnell.  This history lays bare the true purpose of the legislation to give federal courts the authority to hold local judges accountable for violations of the Bill of Rights, which the Fourteenth Amendment bestowed on freedmen.

Next, the symposium issue turned to Professor Sandra Mayson, who in "The Evolving Jurisprudence of Bail," describes the constitutional underpinnings of rights to pretrial liberty in the United States. Professor Mayson discusses the three waves of bail reform that have come and gone since the era of the Warren Court.  Part of the landscape for reform includes § 1983 civil rights lawsuits seeking equitable relief like the one filed in *ODonnell,* which she calls the "high water mark for bail reform litigation." She chronicles legal developments in federal justiciability doctrines that have been invoked lately to limit a federal court's authority to intervene in state bail challenges.  Professor Mayson concludes by exploring the use of the Excessive Bail Clause, as well as the possibility of state constitutional claims as new fronts in civil rights bail litigation.

We, together with our other monitor team colleagues, contribute the third article in this symposium issue.  In it, we describe our updated work, many years in the making, addressing the cost savings that have resulted from the implementations of the reforms in Harris County. We compare these cost saving benefits of ODonnell to the findings on public safety to provide a more comprehensive cost-benefit analysis. In the end, we show that granting providing greater due process protections for people's constitutional pretrial liberty interests has the counterintuitive effect of reducing costs for taxpayers and not affecting public safety.  Those findings are described in more detail in Part IV of this report.

Finally, Professor Zina Makar, in "Friction and Inertia," examines the consequences of pretrial detention, on liberty but also on communities.  She frames the broad equitable relief granted through ODonnell as a "corrective vision," and a form of procedural "friction" needed to slow down the process surrounding bail, and in so doing to better protect individuals from the institutional inertia of the carceral process.  She offers other possible applications of procedural friction, such as second look legislation, that are similarly advantageous in providing post-conviction relief from the excesses of punishment.

**II. Policy Assessment and Reporting**

In this ninth report, we describe our work, focusing on the time-period following the completion of our eighth report on March 3, 2025.[1]  Our goal is to assess the implementation of this Consent Decree and assist officials in Harris County in meeting their goal of making the Harris County misdemeanor system a national model.  Our work continues to be informed by regular conversations with County stakeholders and an intensive analysis of court records, ranging from docket entries to videos.  We have welcomed suggestions from Harris County officials, local stakeholders, and the public, and we look forward to future conversations.  As our Monitor Plan described, during this time period, we have:

(1) Conducted regular meetings with the parties to discuss progress under the Consent Decree, as well as conducted regular meetings with hearing officers, judges, and a wide range of stakeholders.

(2) Conducted in-person site visits and public meetings.

(3) Continued to convene the Community Working Group.

(4) Examined and advised on the implementation of the court appearance reminder system.

(5) Continued data collection and analysis and incorporated this work into the ninth Monitor Report, as well as advising on development of a public data dashboard.

This Report describes our work reviewing the implementation of a range of policies under the Consent Decree. We held our most recent site visit on February 5, 2026.  We had valuable meetings with community members, representatives of the parties, and a wide range of professionals who work in the misdemeanor bail system in Harris County.

The overall success of the Consent Decree is remarkable and it is a national model. However, a compliance system is needed to ensure that these benefits are maintained.  We have grave concerns about noncompliance issues and a continued failure to implement systemic changes that are leading to unnecessary detentions and delays in releases, and due process concerns.

Below we describe: (1) the failure to implement systemic compliance; (2) studying pretrial hearing outcomes and changes to the magistration hearing process; (3) work with agencies including the Harris County Sheriff's Office; (3) work with the CCCL and the Office of Court Management; and (4) Pretrial Services.  We also describe (5) engagement with

---

[1] We started our work upon our appointment on March 3, 2020.  In the motion to appoint us as Monitor, our submission to the Court included a Proposal and Budget for Year 1 of work, which described our team members, timelines, an organization chart, and a budget for all participants. That information, and subsequent Work Plans, are available on our Monitor website (https://sites.law.duke.edu/odonnellmonitor/).  Our Year 7 Work Plan is included here as Appendix E.

nonparties the Harris County Public Defender's Office (HCPD) and the relatively new Office of Managed Assigned Counsel (MAC).

### 1. Failure to Implement Systemic Compliance

After six years of experience under this Consent Decree, we highlight a fundamental need: there is still no system in place for detecting errors and failures to comply with the Consent Decree, and then, once detected, remedying those errors and failures to comply. Given the nature of such a system, it would be incumbent on the County to determine which agency or agencies would be accountable for developing and implementing such a system.

We have seen many different types of errors and patterns of errors over the years, and more recently. Some have involved larger scale issues, such as when computer systems have failed and larger numbers of cases were not timely processed. We are seeing now, recurring issues, some that are most prominent in particular courts, such as the failure to conduct timely bail reviews or make the required findings regarding changes to bail conditions, to justify why the conditions are the least restrictive and why there was clear and convincing evidence supporting imposition of a secured bond. We have seen issues across courts, such as failure to appoint counsel before modifying or adding bail conditions. We have also seen more individualized issues with designating people for the appropriate type of bond, or timely bail review. We describe below, new types of violations that have come to light. Many of these violations are also not documented, accompanied by proper written findings, and are therefore not easy to detect. That makes the cases of violations that do come to light all the more troubling.

In any given week, one can observe at least some errors that were detected, including those helpfully flagged by magistrates who have noted when cases were miscoded for bail hearings but were in fact eligible for GOBs. We continue to see that next-day bail reviews are routinely not conducted, but also not waived by the defendant. We routinely see that people who are not represented by counsel at first appearances have their bond type or conditions modified. These Consent Decree and Local Rule 9 violations continue to occur without any response.

In general, the system nevertheless works extremely well due to hard work over many years by the parties. However, errors can be very serious for the individuals that experience them, and they can harm public safety, since they can involve unreasoned or unsupported decisions that result in a release, as well as a decision to detain. Further, we continue to see that a range of these errors are not corrected promptly, or at all.

We also emphasize again that when errors have come to light, as they have in the past, and more recently during this past year, it has rarely been the parties who have identified those errors. Nor is there an established system for remedying those errors. There are no staff members, whether at the Sheriff's office or elsewhere, who are specifically tasked with detecting and responding to violations, to assure prompt release of a person detained in violation of the Consent Decree. Instead, there are still good faith but ad hoc efforts to communicate any issues, if identified in a timely fashion, with the appropriate judge.

The monitors and parties have long discussed the need for better ways to detect and prevent these errors, since our own spot-checking, or notifications from the relevant counsel, are no substitute for a robust and automated system, with persons assigned with authority to remedy errors should they arise. No such system exists.

The Harris County Research and Analysis Division (RAD) had done some preliminary work to develop the ability to flag cases that might raise concerns with Consent Decree compliance, including cases in which a person did not receive a timely bail hearing or bail review. No such system has been implemented. Furthermore, even if such a system was implemented to better flag errors and violations, no one is tasked with remedying any such flagged cases. Resources need to be dedicated to reviewing cases of persons who receive unwarranted detention, including in violation of the Consent Decree.

We underscore that a formal system, with dedicated process and personnel, needs to ensure that any such instances are promptly remedied. The Sheriff's Office would be one logical party, given their Consent Decree responsibility to promptly release any person detained by a bond entered without the required findings or process. Such a system would ensure that this Consent Decree was complied with, and that any departures are remedied. We especially want to see such a system functioning as our seven-year term comes to an end, to ensure future compliance with the Consent Decree.

## 2. Studying Bail Hearing Outcomes

We have continued to examine data regarding misdemeanor bail hearings as well as view many videos from bail hearings and examine the text of Hearing Officers' pretrial rulings in misdemeanor cases, as well. We remain impressed by how the vast majority of rulings display real attention and care.

Unfortunately, we have also seen examples of magistrates violating the Consent Decree by denying personal bonds while making reference to recent changes in state law. *See* Local Rule 9.10. However, as noted above, the Consent Decree and Rule 9 remain in effect, until such time as they are modified.

We have also seen examples of magistrates referring questions of appropriate bail to the judge. That is quite problematic, where magistrates are tasked with exercising their discretion and setting bail, and not simply deferring their discretion. This is also problematic because of the issues we have seen in the County courts, including delays in conducting the bail review on the next business day, and the delays in appointing counsel to represent a person until after that review occurs. *See* Local Rule 9.13; Local Rule 9.12.1.

We note that magistrates have helpfully indicated when cases were GOB eligible, but were miscoded, and therefore incorrectly placed on their hearing dockets. *See* Local Rule 9.4. These instances occur each week and further work should be done to prevent these violations, which create unnecessary delay in release and further burden on the magistrate's dockets. As noted above, there is a plan underway to transition that work of designating GOB cases to staff

20

attorneys. Given the importance of that process for the sound implementation of the Consent Decree and Local Rule 9, we will be paying close attention to the design and implementation of any substitute process, as no doubt will the parties. We hope the new system is both more accurate and that it does not cause further delay.

An ongoing area for improvement continues to be the need, as required by Rule 9, for factual findings "on the record" why or whether, when pretrial conditions are set, there is "clear and convincing evidence" that no less restrictive conditions can reasonably assure community safety and protect against flight from prosecution. *See* Local Rule 9.12.7. We continue to observe many of the videos of misdemeanor pretrial hearings. We select videos at random and also examine videos when individual cases are brought to our attention. While we have seen some careful discussions of appropriate types of bonds, the norm is for magistrates to impose non-financial bond conditions without any substantive discussion at hearings and without justifying the need for these conditions.

More broadly, we hope that continued conversations and the recent trainings on Rule 9 and the Consent Decree will improve outcomes and consistency in initial bail hearings before the Hearing Officers and at bail review hearings in the Judges' courtrooms.

### 2. Harris County Sheriff's Office

The Harris County Sheriff's Office ("HCSO") plays a central role in the Consent Decree's success, including by facilitating a wide range of logistics regarding booking, hearings, and release. We are grateful for their cooperation in implementing numerous improvements to the systems used including to expedite the processes in the Joint Processing Center to minimize delays. We continue to be impressed with the efforts by HCSO to examine data and systems to proactively identify cases of individuals with behavioral health needs and other cases that might risk errors or delays.

We also underscore the Sheriff's Office's obligation to release any individuals held on a secured bond that does not comply with Rule 9 and the Consent Decree. *See* Local Rule 9.16 ("The Sheriff must not enforce any order requiring secured money bail that is not accompanied by a record showing that the procedures and findings described in Local Rule 9 were provided."). A system should be developed to ensure that such release occurs, promptly, to ensure reliable compliance with legal requirements concerning misdemeanor bail.

### 3. CCCL: Court Appearance, Notifications and Attorney Appointments

An important pillar of the Consent Decree reforms has been the changed system for court appearance. The County completed a non-appearance mitigation plan, which was approved. A new website has been launched in this past year, https://myharriscountycase.com, at which a person can quickly look up their case and locate detailed information about future appearances in that case. We view these new resources aimed at improving court appearance as an extremely important part of the Consent Decree and are so impressed with the hard work and collaboration among multiple County agencies to develop and now implement these plans. We also underscore

21

the importance of having sound information regarding court appearance. New videos are being finalized to provide guidance at the Joint Processing Center regarding the process in misdemeanor cases.

We concluded, without any resolution, a series of conversations regarding the need for timely appointment of counsel in misdemeanor cases. The County retained the National Association of Public Defense to conduct a study of Harris County's indigent defense system. The report noted the need for prompt appointment of counsel at magistration; for persons released prior to magistration, appointment at the time of booking is needed. Currently, the CCCL Judges have not authorized magistrates or other designees to appoint counsel prior to the first appearance. Thus, it often takes many days for counsel to be appointed to handle misdemeanor cases, and we have seen that sometimes it has taken more time than that. Timely appointment would enable the client information obtained by the public defender at magistration, or by pretrial services at the time of booking, to be promptly conveyed to whoever represents the person throughout the rest of the case.

As a result of the delay in appointing counsel, a range of Consent Decree violations can and do occur. For example, at first appearances, individuals are appearing before CCCL judges unrepresented, if they had been released on a personal or GOB bond. At best, counsel will be appointed during that appearance, but we observe that counsel is often not appointed until afterwards, sometimes days later. Either at that appearance, or sometimes before then, judges may impose additional conditions on individual's pretrial freedom, despite their lack of representation. This violates Rule 9 and the Consent Decree. Local Rule 9.13 provides that for any misdemeanor bail hearing before a CCCL Judge, the same protections must be afforded as at a 15.17 hearing before a magistrate. The rule provides:

> Specifically, the court is required to afford the arrestee counsel under Local Rule 9.12.1 and to make findings under Local Rule 9.12.7 if the court imposes or continues an order of detention or money bail set at an unaffordable amount.

*See* Local Rule 9.13.

We include in this report several examples from specific cases, which we have not done before in our prior reports. We are doing that because we are making the point that there is not a compliance system in place to detect these issues as they arise. These are just the examples that have come to our attention, through the parties, but typically through non-parties, such as anonymous emailed complaints or through appointed counsel or the public defender's office. We have included these recent examples, since our last report, here. But we have no reason to think that these are not representative of other similar issues, including in other courts.

To give an example, in Cause Number 260652401010, before Judge Kelley Andrews, in Court 6, in a case receiving a GOB, an order with specific additional supervision and bond conditions was entered on February 24, 2026, but counsel was not appointed until three days later.

To give another example, in Cause Number 260700501010, before Judge Erika Ramirez, Court 8, counsel was appointed on February 27, 2026, and on that same date, specifical supervision and bond convictions were ordered.

There is nothing unusual about these examples; there are examples of this in many, if not all, of the courts.

Again, currently, counsel is not appointed before the first appearance for any individuals charged with misdemeanors. Every person in a carve-out case has a public defender at their bail hearing, but that lawyer only represents them at that bail hearing. When they have a first appearance, no one who does not have the resources to hire private counsel to accompany them, has a lawyer to represent them at that first appearance. At best, counsel is appointed at that first appearance. This lack of representation occurs in all of the CCCL courts. Again, only people with the wherewithal to hire their own attorneys will make their first appearances with counsel present to speak for them as the judges reconsider bail. It is not possible to have a fair bail review hearing conducted in compliance with the Consent Decree and Local Rule 9, if they do not have counsel representing them.

People with private attorneys also have the advantage of potentially reaching a final disposition in their cases, which is possible when the District Attorney can negotiate with a person's defense attorney. For indigent defendants, however, judges are adding additional conditions of pretrial release to individuals who stand before them without counsel to speak for them, and negotiations to reach final dispositions are not ethically permitted without the presence of counsel.

Timely appointment of counsel would address these systemic violations. Ensuring that all people have counsel appointed before the first appearance in misdemeanor cases will also have the highly beneficial effect of promoting court appearance. After a series of discussions, including presentations and meetings that we convened, no progress has been made towards consideration of a timely appointment system.

We have relatedly seen examples of judges taking a range of more serious actions, such as revoking personal bonds and raising secured bond amounts, without on-the-record hearings and findings made, as clearly required by the Consent Decree and Rule 9. *See* Local Rule 9.12-13. Many of those have involved people who are not represented by counsel, in violation of Local Rule 9.13. And more fundamentally, in GOB cases, bond cannot be revoked without on-the-record findings.

We describe four representative examples below, which we single out because these are more serious than the examples of conditions added to a GOB, described above. These were all examples that were brought to our attention since our last report. They would not be easy types of issues for us to identify on our own based on reviewing dockets by hand.

To give one example, in an October 2025 case, Cause Number 2587687, from Judge Leslie Johnson, Court Three, a person was arrested for a GOB-eligible trespass charge. At the

same initial appearance at which counsel was first appointed, the GOB was revoked and replaced with a $2,000 secured bond. This person was not yet represented by counsel. Still more fundamental, a GOB cannot be revoked, under Local Rule 9 and the Consent Decree, absent a on-the-record findings, such as of a willful violation, such that the bond is forfeited. The reasoning was brief and included the statement that the person had "4 cases dismissed this year," and "GOB insufficient." Nor did the defendant sign any acknowledgement or waiver of the right to a hearing on the issue.

Thus, the judge was expressly violating Rule 9 and the Consent Decree. The defendant was detained for about a month, until a community bail fund posted bond. The case was later dismissed for a lack of probable cause.

In another case from January 2026, Cause Number 2603288, also in Court Three, the GOB was revoked and replaced with a $15,000 secured bond. No counsel was appointed until the day after the judge revoked the bond. As in the prior example, did the defendant not sign any acknowledgement or waiver of the right to a hearing on the issue. And again, it is a basic requirement of Local Rule 9 and the Consent Decree that a GOB cannot be revoked absent a new on-the-record finding of violations.

In a third case from January 2026, Cause Number 2602872, also in Court Three, at the first appearance, the judge raised a GOB to a $2,000 secured bond. Again, that order was issued to a person who was uncounseled; counsel was not appointed for another several days. The person was detained until he was released on a surety bond. No reasons were included in the record for imposing a secured bond, in violation of Rule 9 and the Consent Decree.

In a fourth case from February 2026, Cause Number 195109501010, from Judge Linda Garcia, Court 16, a person arrested for two misdemeanors, as well as a felony, received GOBs for the two misdemeanors. At the first appearance, at which he was unrepresented, the GOBs were revoked, and $5,000 cash bail was set instead on each charge. Later, these were changed to $5,000 personal bonds, at which point counsel was appointed. Local Rule 9 forbids these changes unless supported by a statement of adequate factual findings, nor does the rule permit such changes for an unrepresented person.

There are many other examples, as well, of other violations of the Consent Decree, occurring after people have had counsel appointed. We have seen judges rule that state law changes prevent them from granting personal bonds at all in certain types of cases. As noted earlier, it could not be clearer that the Consent Decree and Rule 9 remain in effect, until and at such time as they are modified.

We have seen examples of judges revoking personal bonds without providing the required findings under Rule 9 and the Consent Decree. In another recent January 2026 case, a judge imposed a secured bond, leaving the "findings of fact" section blank, apart from stating the phrase "AFM Family Member" and simply checking the box noting "the nature of the offense and the circumstances under which it was allegedly committed."

We also highlight the need for improved processes and data concerning the bail review hearings that judges conduct. Under Local Rule 9, a person detailed on a secured bond is entitled to a bail review within the next business day of a 15.17 hearing. *See* Local Rule 9.13. We continue to observe instances in which bail reviews are not conducted, even though the person did not waive, or was not present.

We have observed entire sets of blank forms resetting bail reviews for later dates, hearings that, again, are required and are an important part of Rule 9's assurance that bail conditions be carefully reviewed.

For example, we saw a large group of these blank forms resetting bail reviews in November in Court 7, Judge Andrew Wright. When this came to our attention, we reached out to counsel, received a timely response, and we hope that the issue has been resolved. These are not new Consent Decree or Rule 9 requirements. Yet, this persistent issue has not been addressed to date.

We remind the Judges and the County that in each of these types of violations of Rule 9 and the Consent Decree, the person is entitled to a prompt release, because their bond was not supported by the required findings and process.

### 4. Pretrial Services

Pretrial Services has been developing a range of improvements to their work, including changes that importantly impact misdemeanor cases. We have discussed the importance of ensuring that only the least-restrictive conditions necessary are imposed and have provided information about how imposing excessive conditions of release can be counterproductive, making it more likely a person will miss court and/or reoffend. *See* Local Rule 9.12-13. We continue to highlight the importance of the noteworthy study released by the Government Performance Lab at Harvard's Kennedy School, finding that CCCL judges and Harris County Pretrial Services reduced the use of punitive conditions for over 2,200 clients on pretrial supervision while observing steady compliance and rates of rearrest.[2] This pilot project, conducted from October 2020 to June 2022, involved both pretrial staff and judges in reviewing condition placement within 30-120 days to adjust condition intensity and frequency. They would "step down" these conditions of supervision, resulting in substantial cost savings to the County, maximizing the freedom of clients, and, they found, achieving positive public safety results. Unfortunately, when the Kennedy School study ended, the systematic review and selection of cases eligible for possible reductions of supervision conditions also ended.

We believe that the same system can be revitalized, using recommendations by Pretrial Services to the judiciary to reestablish a system which has already proven itself to save costs, maximize pretrial freedom and achieve positive public safety benefits. We are extremely

---

[2] Hena Rafiq, *Building a Responsive Pretrial Supervision System in Harris County, TX* (2023), at https://govlab.hks.harvard.edu/building-responsive-pretrial-supervision-system-harris-county-texas?admin_panel=1.

grateful for the collaboration and efforts of Pretrial Services, and we expect to see in the coming months the adoption of a new process that will accomplish the goals of the prior "step down" program.

### 5. Public Defender's Office and the Office of the Managed Assigned Counsel (MAC)

The Consent Decree emphasizes that "zealous and effective representation at bail hearings is important to protecting arrestees' right to pretrial liberty and right against wealth-based detention."[3]  Rule 9 and the Consent Decree require that a public defender is available to represent all individuals at bail hearings and that counsel is also available at bail hearings conducted in the County courts.  *See* Local Rule 9.12-13.  Further, the Consent Decree envisions a process of continuous improvement in the public defense services provided at these hearings, including the retention of an expert in holistic defense services and the development of a plan for improving indigent defense.[4]  The County retained the National Association for Public Defense (NAPD) to: (1) evaluate its current misdemeanor indigent defense systems in Harris County; and (2) determine the need for essential support staff and holistic services to promote zealous and effective indigent defense. The report made a series of detailed recommendations.[5]  Harris County is completing plans to respond to these recommendations.  Some recommendations have been responded to, but other work is in the planning stages.  Our discussion of the need for prompt appointment was included above, as in our last report.

---

[3] Consent Decree at ¶37.
[4] Consent Decree at ¶41, 43.
[5] *See National Association for Public Defense Harris County Misdemeanor Assessment Report* (July 6, 2021), at https://www.publicdefenders.us/files/Harris%20County%20Report%20July%206%202021%20FINAL.pdf.

### III.  Data Analysis

The ODonnell Monitor team continues to collaborate closely with the Harris County Research and Analysis Division (RAD) to enhance data management systems for analyzing misdemeanor cases in Harris County.

In this report, our data analyses examine the following topics:
1.  Number of misdemeanor cases and defendants.
2.  Demographic characteristics of misdemeanor defendants.
3.  Number of misdemeanor cases that belong to "carve-out" categories.
4.  Duration of pretrial detention and holds placed.
5.  Initial bond decisions.
6.  Magistration hearing outcomes.
7.  Case dispositions.
8.  Repeat arrests.
9.  Assault or terroristic threat against family and intimate partners.

### 1.  Number of misdemeanor cases and arrestees

Our data analysis is based on case-level records of all Class A and B misdemeanor cases filed in the Harris County Criminal Courts at Law (CCCL) between January 1, 2015 and December 31, 2025, which was downloaded from the RAD's database on February 10, 2026.[6] We examine how the misdemeanor bail system in Harris County as a whole has changed in recent years and thus aim to have our data coverage as comprehensive as possible.  However, we made a few notable sample restrictions. First, out-of-county fugitive cases (N = 15,380), most of which simply result in the arrestee sent back to the requesting agency, are omitted from the analysis. Secondly, also removed from the analysis are Class C misdemeanor cases, which involve a fine of up to $500 but no jail time. Lastly, we acknowledge that there are a small number of sealed and expunged Harris County criminal cases that are not included in our data.

Our case records data contain detailed information collected at different stages of the criminal justice process, from the time of a criminal case filing (e.g., case filing dates, types of criminal offenses and charges filed) to pretrial detention and bond decisions (e.g., types and amounts of bond filed, booking and release dates) to subsequent case disposition and repeat offenses (e.g., case disposition types and dates), as well as some of the key demographic characteristics of defendants (e.g., race, sex, date of birth, and addresses). Most of this case- and person-level information are made publicly available by the county.[7]

For some of the more recently filed misdemeanor cases, we also have detailed information regarding (1) probable cause hearings, including the bond type and amount proposed by a defense attorney and the prosecutor (assistant district attorney) and the actual bond decision

---

[6] It is important to note the vintage date of our data, as a small number of cases may be sealed, expunged, or corrected over time, which will update and revise existing misdemeanor case records in the database.

[7] *See* Harris County District Clerk's Office, at https://www.hcdistrictclerk.com/.

made by a magistrate and the stated reasons for the decision, and (2) the types and duration of pretrial supervision, if any. Our analysis primarily focuses on the misdemeanor cases, but some parts of our analysis use information from felony case records, especially when constructing our measure of repeat offending, namely, whether any new criminal case (misdemeanor or felony) is filed against a former misdemeanor arrestee within a certain period of time after the original case filing date. These data elements were collected and provided by RAD, which has spent substantial time and effort on data collection and maintenance. We are extremely thankful to RAD for their hard work and generous cooperation.

Our analysis begins by presenting the number of misdemeanor cases in Harris County filed between January 1, 2015, and December 31, 2025, by the year of the case filing date. We find that the number of misdemeanor cases filed declined by nearly 30 percent between 2015 (N=60,449) and 2020 (N=43,462) and remained relatively low during the Covid-19 pandemic years (2020—2022), but the count has gradually increased since then, reaching approximately 51,590 in 2025. Compared to the first two years of our analysis period, the number of misdemeanor cases filed annually is still more than 10 percent lower.

**Figure 1: Number of Misdemeanor Cases Filed by Year**



A lower number of misdemeanor cases filed does not necessarily mean that the total number of criminal cases declined. In fact, as shown below, the number of felony cases filed in Harris County has increased from 34,918 in 2015 to 49,516 in 2024. This trend is also reflected in the number of misdemeanor cases with co-occurring felony charges (that is, the cases where

both misdemeanor and felony cases were filed against the same person on the same day), which has gradually but monotonically increased between 2015 (N=1,313) and 2024 (N=4,281).

Our raw misdemeanor data come from case-level records, but viewing these data at the person-level can also provide a useful, policy-relevant perspective. Specifically, we can aggregate the data up to the person-by-year level so that multiple cases filed against the same person in a given year will be considered as a single observation. This aggregation enables us to answer the following question: "How many people are arrested for a misdemeanor offense in Harris County each year?" Moreover, if the case-level and person-level counts exhibit different trends over time, this may be viewed as indirect evidence that offending and/or charging patterns in the county have changed over time, as reflected in changes in the average number of misdemeanor cases filed against a person. The person-level count is somewhat lower than the case-level count presented in Figure 1, but the trend is similar. The number of misdemeanor defendants fell from 49,150 in 2015 to 36,451 in 2020, before rising again and reaching 41,932 in 2025. Also as before, the number of misdemeanor defendants with a co-occurring felony has monotonically increased between 2015 and 2024, although it noticeably fell in 2025.

### Figure 2: Number of Misdemeanor Defendants by Year



In addition to the simple misdemeanor case count, we also present in Table 1 the number and share of misdemeanor cases for the five most commonly observed offense types. From the table, it is evident that in recent years there has been a notable change in the misdemeanor case composition. For example, the number of misdemeanor assault and weapon law violation cases

increased substantially between 2015 (7,539 and 1,556, respectively) and 2025 (11,396 and 3,008, respectively), whereas theft and trespass became less common over the years (9,734 cases in 2015 vs. 4,957 cases in 2025 for theft; 5,476 cases in 2015 vs. 3,967 cases in 2025 for trespass). DWI has been, and remains, one of the most commonly observed misdemeanor offenses in the data; its case count gradually increased between 2015 and 2021, but has decreased and remained largely constant at around 11,000 since then.

**Table 1. Number of Misdemeanor Cases by Year and Offense Type**

| Year | Assault | Theft | Trespass | Weapon Violation | DWI | Others |
|------|---------|-------|----------|------------------|-----|--------|
| 2015 | 7,539 | 9,734 | 5,476 | 1,556 | 9,429 | 26,715 |
|      | (12%) | (16%) | (9%) | (3%) | (16%) | (44%) |
| 2016 | 7,722 | 6,778 | 5,848 | 2,137 | 9,772 | 26,844 |
|      | (13%) | (11%) | (10%) | (4%) | (17%) | (45%) |
| 2017 | 7,343 | 5,898 | 5,374 | 2,305 | 10,625 | 19,873 |
|      | (14%) | (11%) | (10%) | (4%) | (21%) | (39%) |
| 2018 | 9,600 | 5,401 | 4,559 | 2,287 | 12,127 | 19,257 |
|      | (18%) | (10%) | (9%) | (4%) | (23%) | (36%) |
| 2019 | 9,371 | 6,037 | 2,159 | 2,313 | 13,674 | 16,175 |
|      | (19%) | (12%) | (4%) | (5%) | (27%) | (33%) |
| 2020 | 10,399 | 3,970 | 1,559 | 3,410 | 12,297 | 11,827 |
|      | (24%) | (9%) | (4%) | (8%) | (28%) | (27%) |
| 2021 | 11,104 | 3,614 | 2,136 | 4,630 | 13,378 | 12,333 |
|      | (24%) | (8%) | (5%) | (10%) | (28%) | (26%) |
| 2022 | 10,954 | 4,298 | 3,031 | 4,175 | 10,901 | 13,529 |
|      | (23%) | (9%) | (6%) | (9%) | (23%) | (29%) |
| 2023 | 12,191 | 5,081 | 3,445 | 3,649 | 10,726 | 14,782 |
|      | (24%) | (10%) | (7%) | (7%) | (22%) | (30%) |
| 2024 | 12,195 | 5,268 | 3,524 | 3,374 | 11,297 | 17,180 |
|      | (23%) | (10%) | (7%) | (6%) | (21%) | (33%) |
| 2025 | 11,396 | 4,957 | 3,967 | 3,008 | 11,169 | 17,093 |
|      | (22%) | (10%) | (8%) | (6%) | (22%) | (33%) |

## 2. Demographic characteristics of misdemeanor defendants

Despite the large changes in the total number of misdemeanor cases and their composition over time, our previous reports have repeatedly found little evidence of a systematic change in the demographic characteristics of misdemeanor defendants. We now revisit this question, by using the updated data to present the misdemeanor defendants' sex, race, and ethnicity distributions, computed at the *person-level*. Regarding ethnicity, we use the term "Latinx" throughout this report.

We first note that sex and race information are recorded and observed for virtually all Harris County misdemeanor defendants, as defendants' sex (male or female) and race (Black or African American, Asian, Native American, or White) information are missing in 0.18 percent and 1.6 percent of the time, respectively. A person is allowed to choose one race category, and the existing data may not reflect how a person would self-identify if they were given the option to select more than one category or self-identify as a mixed race.

Unlike sex and race, information on defendant ethnicity is often not recorded and unobserved for many misdemeanor defendants. For example, ethnicity information is missing for 64 percent of misdemeanor defendants between 2015 and 2025. To overcome this data limitation, we implement an imputation technique that predicts individuals' ethnicity based on their place of residence and last names.[8] More specifically, for each misdemeanor arrestee, we utilize the last address observed at the time of each case filing to identify the associated county of residence and use the county-level ethnic composition, as well as their last names, to predict their ethnicity. In a small number of cases where the persons' addresses were invalid or missing, we only use their last names as a predictor of their ethnicity. Our imputation method yields reasonably accurate results, with predicted ethnicity matching actual ethnicity in 92 percent of the 159,117 misdemeanor arrestees whose ethnicity information is available.

Table 2 presents misdemeanor defendants' sex (female and male), race (Black and White), and ethnicity (Latinx and non-Latinx) distributions observed between 2015 and 2025.[9] Each cell presents the number of individuals who belong to each sex/race/ethnicity category, and the numbers in parentheses represent the corresponding sample share. The total sample size slightly differs across the columns because observations with unknown sex, race, and ethnicity information are removed.

A couple of notable patterns emerge from the data. First, the sex and racial distribution among misdemeanor defendants have remained stable since 2015. In each of the years considered, males and Whites accounted for approximately 75 percent and 60 percent of the defendants, respectively. The sex distribution is in line with the currently available national-level statistics. According to national statistics from the FBI, males accounted for 73 percent of all arrests made in 2024. However, it is less straightforward to compare Harris County's Black defendant shares with national-level statistics, since the Black population share in Harris County is substantially higher than the national average.[10]

Secondly, the share of Latinx defendants has gradually risen, from 41 percent in 2015 to 47 percent in 2025. Again, it is difficult to compare the ethnic distribution of misdemeanor

---

[8] We used the R package wru for this prediction. The package predicts individuals' race and ethnicity by applying a well-established statistical technique, the Bayes' Rule, to the U.S. Census Bureau's Surname List from 2020, which contains information on the nationwide racial and ethnic composition associated with each last name, and the Decennial U.S. Census data, which include the racial and ethnic composition in each county in 2020.

[9] For brevity, we focus on Blacks and Whites when presenting the racial distribution, as Asians and Native Americans make up only two percent of the misdemeanor defendants.

[10] According to the U.S. Census Bureau's 2024 Population Estimates Program (PEP), the share of Black population in Harris County was 20.9 percent, while the national average was only 13.7 percent.

defendants in Harris County with the national level, because (1) the Latinx population share substantially differs between Harris County (45%) and the U.S. (20%), according to the U.S. Census Bureau's 2024 Population Estimates Program (PEP), and perhaps more importantly, (2) reliable information on arrestee ethnicity is not available at the national-level either.

**Table 2: Sex, Race, and Ethnicity Distribution of Misdemeanor Defendants**

| Year | Sex | | Race | | Ethnicity | |
|---|---|---|---|---|---|---|
| | Female | Male | Black | White | Latinx | Non-Latinx |
| 2015 | 12,189 | 36,875 | 18,986 | 28,465 | 20,266 | 28,871 |
| | (25%) | (75%) | (39%) | (59%) | (41%) | (59%) |
| 2016 | 10,921 | 36,362 | 18,109 | 27,491 | 20,386 | 26,958 |
| | (23%) | (77%) | (39%) | (59%) | (43%) | (57%) |
| 2017 | 9,646 | 32,875 | 16,219 | 24,819 | 18,516 | 24,064 |
| | (23%) | (77%) | (39%) | (59%) | (43%) | (57%) |
| 2018 | 10,789 | 33,746 | 17,262 | 25,589 | 19,803 | 24,802 |
| | (24%) | (76%) | (39%) | (58%) | (44%) | (56%) |
| 2019 | 10,569 | 31,791 | 15,952 | 24,761 | 19,700 | 22,753 |
| | (25%) | (75%) | (38%) | (60%) | (46%) | (54%) |
| 2020 | 8,529 | 27,863 | 13,892 | 21,214 | 17,035 | 19,406 |
| | (23%) | (77%) | (39%) | (59%) | (47%) | (53%) |
| 2021 | 9,017 | 30,501 | 15,404 | 22,663 | 18,499 | 21,093 |
| | (23%) | (77%) | (40%) | (58%) | (47%) | (53%) |
| 2022 | 9,331 | 29,569 | 15,243 | 22,148 | 18,294 | 20,661 |
| | (24%) | (76%) | (40%) | (58%) | (47%) | (53%) |
| 2023 | 10,243 | 30,445 | 15,959 | 23,163 | 19,582 | 21,180 |
| | (25%) | (75%) | (40%) | (58%) | (48%) | (52%) |
| 2024 | 10,369 | 31,989 | 16,724 | 23,949 | 20,315 | 22,087 |
| | (24%) | (76%) | (40%) | (57%) | (48%) | (52%) |
| 2025 | 10,563 | 31,324 | 17,075 | 23,114 | 19,733 | 22,199 |
| | (25%) | (75%) | (41%) | (56%) | (47%) | (53%) |

### 3.  Number of misdemeanor cases that belong to "carve-out" categories.

Under Local Rule 9, which became effective on February 16, 2019, all persons arrested for misdemeanors must "have unsecured bail amounts set initially at no more than $100 and be promptly released on a personal bond with or without other non-financial conditions as soon as practicable after arrest," except for those who belong to the following "carve-out" categories:

9.4.1 Individuals arrested and charged for protective order and bond condition violations.[11]

9.4.2 Individuals arrested and charged for assault or terroristic threat against family and intimate partners.

9.4.3 Individuals arrested and charged for repeat DWI within the past five years.

9.4.4 Individuals arrested and charged with any new offense while on any form of pretrial release.

9.4.5 Individuals arrested on a capias issued after a bond forfeiture or bond revocation.

9.4.6 Individuals arrested while on any form of community supervision for a Class A or B misdemeanor or a felony offense.

The first three carve-out categories concern the type of offense committed (such as domestic violence and repeat DWI), while the last three concern the person's status at the time of an arrest (such as pretrial release and community supervision). These categories are not mutually exclusive, and a single case may belong to more than one carve-out category. For example, a person arrested for a repeat DWI while under community supervision would belong to the third and sixth carve-out categories at the same time.

To understand the prevalence of the carve-out cases, we have developed a logic that determines whether a given case belongs to one of the carve-out categories, based on the available information on offense type, criminal history, pretrial release, bond failure, and community supervision, through extensive collaboration with the RAD over the past several years. To assess its accuracy, we compared the number of misdemeanor cases that belong to one of the carve-out categories according to our logic with the number of the cases in which the defendant was required to appear for the bail magistration hearing. The latter information comes from a key data element called the "early presentment" (EP) flag. Since the Consent Decree explicitly required those who do not belong to any of the carve-out categories to be eligible for a GOB and be released from pretrial detention without having to appear for magistration, the EP flag should be a reliable measure of whether a misdemeanor arrestee belonged to one of the carve-out categories or not

However, the EP flag also has important limitations. Specifically, (1) it cannot be used to determine the carve-out status of a case filed before 2019 (when the general order bond was first introduced) and (2) it contains no information on which carve-out category a person belongs to. For these reasons, we use our internal logic to identify the carve-out cases and compare their prevalence before and after the bail reforms. In any case, we acknowledge that the EP flag provides a valuable benchmark for our internal logic for the carve-out analysis.

Table 3 presents the share of carve-out misdemeanor cases by the year of case filing. For brevity, only the shares from odd years between 2015 and 2025 are included in the table. It is evident from the table that the share of misdemeanor cases that belong to one of the carve-out

---

[11] We note that noncompliance with conditions of pretrial release is likely more common than is reflected by the number of charges filed for alleged violations of bond conditions because not every alleged violation may result in a report of noncompliance.

categories noticeably increased from 2015 (10.9%) to 2021 (30.9%), but has declined since then, reaching 22.9 percent in 2025.

The biggest driver of this trend seems to be the fluctuation in cases involving for assault or terroristic threat against family and intimate partners (7.6% in 2015 to 15.8% in 2021 to 12.5% in 2025). Carve-out cases involving bond failures also play an important role, as arrests made while out on bond increased from 2.7 percent in 2015 to 11.8 percent in 2021, before declining to 7.3 percent in 2025. Cases involving protective order violations, repeat DWI, and arrests while on community supervision have all remained relatively rare over the analysis period.

**Table 3: Number of Carve-out Misdemeanor Cases by Year**

| Year | 2015 | 2017 | 2019 | 2021 | 2023 | 2025 |
|---|---|---|---|---|---|---|
| Total Case Count | 60,449 | 51,418 | 49,729 | 47,195 | 49,874 | 51,590 |
| Any Carve-out | 6,610 | 8,238 | 11,715 | 14,583 | 14,759 | 11,951 |
| | (10.9%) | (16.0%) | (23.6%) | (30.9%) | (29.6%) | (23.2%) |
| Carve-out Categories | | | | | | |
| Protective Order Violation | 262 | 314 | 500 | 1,105 | 973 | 835 |
| | (0.4%) | (0.6%) | (1.0%) | (2.3%) | (2.0%) | (1.6%) |
| Assault/terroristic Threat against Family and Partners | 4,624 | 4,618 | 6,387 | 7,457 | 8,003 | 6,470 |
| | (7.6%) | (9.0%) | (12.8%) | (15.8%) | (16.0%) | (12.5%) |
| Repeat DWI | 25 | 287 | 624 | 623 | 509 | 536 |
| | (0.04%) | (0.56%) | (1.25%) | (1.32%) | (1.02%) | (1.04%) |
| Arrest while out on Bond | 1,604 | 2,369 | 3,900 | 5,590 | 4,817 | 3,748 |
| | (2.7%) | (4.6%) | (7.8%) | (11.8%) | (9.7%) | (7.3%) |
| Arrest after Bond Failure | 118 | 535 | 900 | 1,289 | 1,983 | 1,411 |
| | (0.2%) | (1.0%) | (1.8%) | (2.7%) | (4.0%) | (2.7%) |
| Arrest while on Supervision | 308 | 717 | 398 | 288 | 334 | 220 |
| | (0.5%) | (1.4%) | (0.8%) | (0.6%) | (0.7%) | (0.4%) |

## 4. Duration of pretrial detention

Next, we examine the length of pretrial detention experienced by persons charged with misdemeanors by taking the time in days between booking and release dates. As in our previous reports, our focus is whether the length of *initial* pretrial detention has changed after recent misdemeanor bail reforms. As noted in our previous reports, the currently available booking and release data appear to be somewhat incomplete, especially for the cases filed in earlier years. To some extent, this data limitation is likely to be explained by the fact that, prior to the opening of the Joint Processing Center (JPC) in 2019, some arrestees could be released on bond before

reaching the Harris County Jail without leaving a booking record.[12] Even after 2019, it remains possible for some persons to post a pre-arranged bond without being booked at JPC.

Since the implementation of Local Rule 9 in 2019, many misdemeanor arrestees are now eligible for a general order bond, which allows them to be promptly released without having to appear before a bail magistrate and without leaving a formal booking record. We can identify such persons based on their bond records (that is, cases in which a general order bond was given without a corresponding booking record), and consider them as cases with zero days of booking, instead of cases with missing booking records. Our view is that this approach should enable us to better understand the impact of the misdemeanor bail reform on the length of initial pretrial detention. Cases lacking both booking *and* bond records are still considered as missing observations and excluded from our analysis. Based on this computation, we present in Table 4 the distribution of initial pretrial detention length at the case-level.

Table 4 reveals a clear disparity in pretrial detention length between misdemeanor cases filed before and after the bail reforms. In 2015 and 2016, misdemeanor defendants were detained for two days or less in approximately 75 percent of the time, whereas the shares of initial pretrial detention lasting three-to-seven days and more-than-seven-days were 13 percent and 14 percent, respectively. Then, the share of cases with short pretrial detention (two days or less) increased to 84 percent in 2017 (the year when the preliminary injunction became effective) and has remained stable since then. Likewise, the share of misdemeanor cases with initial pretrial detention lasting more than seven days has been largely stable at about 10 percent in recent years.

**Table 4: Distribution of Initial Pretrial Detention Duration, All Misdemeanor Cases**

| | Initial Pretrial Detention Length | | | | | | |
|------|-----------|--------|-----------|------|-----------|------|--------|
| Year | 0-2 Days | | 3-7 Days | | > 7 Days | | Obs. |
| 2015 | 42,412 | (73%) | 7,859 | (13%) | 8,100 | (14%) | 58,371 |
| 2016 | 42,673 | (74%) | 7,270 | (13%) | 7,804 | (14%) | 57,747 |
| 2017 | 41,901 | (84%) | 3,502 | (7%) | 4,720 | (9%) | 50,123 |
| 2018 | 44,343 | (86%) | 2,599 | (5%) | 4,802 | (9%) | 51,744 |
| 2019 | 42,348 | (87%) | 2,315 | (5%) | 3,855 | (8%) | 48,518 |
| 2020 | 35,586 | (85%) | 1,867 | (4%) | 4,239 | (10%) | 41,692 |
| 2021 | 39,103 | (86%) | 2,134 | (5%) | 4,428 | (10%) | 45,665 |
| 2022 | 37,971 | (84%) | 2,353 | (5%) | 5,105 | (11%) | 45,429 |
| 2023 | 40,904 | (84%) | 2,122 | (4%) | 5,436 | (11%) | 48,462 |
| 2024 | 42,310 | (83%) | 2,539 | (5%) | 6,293 | (12%) | 51,142 |
| 2025 | 40,445 | (84%) | 2,796 | (6%) | 4,629 | (10%) | 47,870 |

[12] Before 2019, law enforcement agencies would initially transport the arrestees to their local jail or substation and then transport them to the Harris County Jail, but if an individual had a bond amount set in the system, the person could post a surety bond from that location and get released before reaching the Harris County Jail. Since JPC opened in February 2019, all arrestees are transported by the arresting officer directly to the JPC.

**5. Initial bond decisions**

As shown above, the recent bail reforms in Harris County coincided with notable changes in the length of pretrial detention. However, to explore the impact of the bail reforms more directly, we would also need to directly examine important bond-related decisions, such as whether a person was released on a bond or not, the type and amount of bond approved, and whether these decisions systematically vary across different demographic groups.

We start our bond decision analysis by presenting in Figure 3 the share of misdemeanor cases in which defendants were released pretrial on a bond. The figure indicates that the bail reforms led to an increased share of misdemeanor pretrial release. Pretrial release was observed in approximately 50 percent of misdemeanor cases filed in 2015 and 2016. However, the share noticeably increased as the preliminary injunction and Local Rule 9 were adopted and implemented (68 percent in 2017 and 85 percent in 2019), and has remained approximately around 80 percent in each year since 2019. These changes may be viewed as suggestive evidence that the reforms increased pretrial liberty for many misdemeanor arrestees who, in the absence of the bail reforms, would have had to remain in jail due to their inability to post a financial bond.

**Figure 3: Share of Misdemeanor Cases in which Defendants Were Released on a Bond**

| Year | Pre-trial Release on Bond | Not Released |
|---|---|---|
| 2015 (N = 60449) | 49% | 51% |
| 2016 (N = 59101) | 54% | 46% |
| 2017 (N = 51418) | 68% | 32% |
| 2018 (N = 53231) | 72% | 28% |
| 2019 (N = 49729) | 85% | 15% |
| 2020 (N = 43462) | 81% | 19% |
| 2021 (N = 47195) | 83% | 17% |
| 2022 (N = 46888) | 83% | 17% |
| 2023 (N = 49874) | 84% | 16% |
| 2024 (N = 52838) | 82% | 18% |
| 2025 (N = 51590) | 79% | 21% |

The distribution of initial bond approval types, presented in Table 5, shows that the implementation of the bail reforms was followed by a large reduction in the use of secured bond (surety or cash), whose share fell from 86 percent in 2015 to 54 percent in 2017 and to 20 percent

in 2019. Since then, the share has somewhat continued to decline, but seems to have stabilized at around 15 percent. By contrast, the use of general order bonds became more common over the years. Misdemeanor arrestees were released on a general order bond about 50 percent of the time in the year when it was first introduced (2019), but the share has gradually risen over time, reaching above 60 percent in 2024 and 2025. Lastly, we note that roughly 85 percent of the initial bond approvals observed in 2025 involved unsecured bonds that do not require any up-front payments by the arrestees to secure pretrial release. This suggests the recent misdemeanor bail reforms substantially lowered the amount of financial burden required for a misdemeanor arrestee's pretrial release and likely helped to alleviate the gap in pretrial liberty between those who could and those who could not afford to pay the cost of secured bail.

### Table 5: Types of Initial Bond Approvals

| Year | Total | Secured Bond | | Personal Bond | | General Order Bond | |
|------|-------|--------|------|--------|------|--------|------|
| 2015 | 29,673 | 25,664 | (86%) | 4,009 | (14%) | N/A | |
| 2016 | 31,932 | 26,252 | (82%) | 5,680 | (18%) | N/A | |
| 2017 | 34,981 | 18,749 | (54%) | 16,232 | (46%) | N/A | |
| 2018 | 38,377 | 16,109 | (42%) | 22,268 | (58%) | N/A | |
| 2019 | 42,051 | 8,570 | (20%) | 11,378 | (27%) | 22,103 | (53%) |
| 2020 | 35,419 | 5,492 | (16%) | 10,714 | (30%) | 19,213 | (54%) |
| 2021 | 39,140 | 5,754 | (15%) | 11,565 | (30%) | 21,821 | (56%) |
| 2022 | 39,133 | 5,018 | (13%) | 12,121 | (31%) | 21,994 | (56%) |
| 2023 | 41,780 | 5,209 | (12%) | 11,901 | (28%) | 24,670 | (59%) |
| 2024 | 43,250 | 5,709 | (13%) | 10,685 | (25%) | 26,856 | (62%) |
| 2025 | 40,937 | 5,751 | (14%) | 7,329 | (18%) | 27,857 | (68%) |

To further explore the impact of the bail reforms on the financial costs associated with pretrial release, we now compare the bond amounts before and after the bail reforms in Table 6. The top panel of the table shows that, in the years prior to Local Rule 9 (that is, from 2015 to 2018), it was extremely rare to find bail magistrates setting the initial bond amounts below $500. In 2018, for example, initial bond amounts were set below $500 in about 1 percent of the time, whereas the bond amount was set between $500 and $2,999 in 86 percent of the time. This pattern drastically changed in 2019 (the year when Local Rule 9 was introduced), as the share of bonds set at $100 or less rose to 62 percent and the share of bonds set between $500 and $2,999 fell to 28 percent. These changes are in line with the changes made by Local Rule 9, which explicitly requires misdemeanor arrestees who do not belong to one of the carve-out categories to be released on "unsecured bail amounts set initially at no more than $100."

Prior to Local Rule 9, the misdemeanor bail system in Harris County was often criticized for preventing individuals from pretrial release because of their inability to pay the bond amount. Put differently, even for a person who was allowed to be released pretrial, if the set bond amount was too high, the person would not be able to post the bond and be released. Comparing the top and bottom panels of Table 6 suggests that this was likely the case for many misdemeanor arrestees during the early years. For example, there were 21,960 misdemeanor cases in 2016, in

which a person was allowed to be released on a bond of $3,000 or more, but such bonds were actually posted only in 6,907 cases. As noted above, most cases filed after 2019 now involve either personal bond or general order bonds, in which a person is not required to pay to be released but promises to pay only upon a violation of bond conditions. Accordingly, we find that virtually all bond approvals with $100 or less after 2019 are successfully posted.

Even for cases with higher bond amounts, the bond posting rate has also increased. When the bond amount set is between $500 and $2,999, the posting rate has increased from 75 percent in 2015 (22,948 out of 30,608) to 80 percent in 2024 (8,044 out of 10,099). Likewise, even among the cases with very high bond amounts set (that is, $3,000 or higher), the bond posting rate nearly doubled from 31 percent in 2015 (6,717 out of 21,632) to 57 percent in 2024 (2,365 out of 4,141). Of course, it is also noteworthy that the number of such cases has noticeably declined between 2015 (N=21,632) and 2024 (N=4,141).

**Table 6: Distribution of Initial Bond Amount Set and Posted**

| | Initial Bond Amount Set | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Year | $100 or Less | | $101-$499 | | $500-$2,999 | | $3,000 or More | Obs. |
| 2015 | 7 | (0.01%) | 1 | (<0.01%) | 30,608 (59%) | 21,632 (41%) | 52,248 |
| 2016 | 16 | (0.03%) | 7 | (0.01%) | 32,615 (60%) | 21,960 (40%) | 54,598 |
| 2017 | 199 | (0.43%) | 16 | (0.03%) | 32,976 (71%) | 13,051 (28%) | 46,242 |
| 2018 | 531 | (1.17%) | 94 | (0.21%) | 38,891 (86%) | 5,918 (13%) | 45,434 |
| 2019 | 28,505 | (62%) | 322 | (0.70%) | 12,604 (28%) | 4,343 (9%) | 45,774 |
| 2020 | 25,738 | (66%) | 408 | (1.04%) | 8,432 (22%) | 4,585 (12%) | 39,163 |
| 2021 | 28,849 | (67%) | 463 | (1.07%) | 9,980 (23%) | 3,799 (9%) | 43,091 |
| 2022 | 28,793 | (67%) | 552 | (1.29%) | 10,160 (24%) | 3,386 (8%) | 42,891 |
| 2023 | 30,602 | (67%) | 519 | (1.14%) | 10,739 (24%) | 3,825 (8%) | 45,685 |
| 2024 | 33,139 | (69%) | 518 | (1.08%) | 10,099 (21%) | 4,141 (9%) | 47,897 |
| 2025 | 33,820 | (74%) | 442 | (0.97%) | 7,504 (16%) | 3,929 (9%) | 45,695 |
| | Initial Bond Amount Posted | | | | | | | |
| Year | $100 or Less | | $101-$499 | | $500-$2,999 | | $3,000 or More | Obs. |
| 2015 | 7 | (0.02%) | 1 | (<0.01%) | 22,948 (77%) | 6,717 (23%) | 29,673 |
| 2016 | 16 | (0.05%) | 6 | (0.02%) | 25,003 (78%) | 6,907 (22%) | 31,932 |
| 2017 | 167 | (0.48%) | 14 | (0.04%) | 28,389 (81%) | 6,411 (18%) | 34,981 |
| 2018 | 447 | (1.16%) | 57 | (0.15%) | 34,142 (89%) | 3,731 (10%) | 38,377 |
| 2019 | 27,786 | (66%) | 231 | (0.55%) | 10,483 (25%) | 3,551 (8%) | 42,051 |
| 2020 | 24,738 | (70%) | 306 | (0.86%) | 6,950 (20%) | 3,425 (10%) | 35,419 |
| 2021 | 27,985 | (71%) | 361 | (0.92%) | 8,446 (22%) | 2,348 (6%) | 39,140 |
| 2022 | 28,057 | (72%) | 427 | (1.09%) | 8,629 (22%) | 2,020 (5%) | 39,133 |
| 2023 | 29,959 | (72%) | 391 | (0.94%) | 9,034 (22%) | 2,396 (6%) | 41,780 |
| 2024 | 32,474 | (75%) | 367 | (0.85%) | 8,044 (19%) | 2,365 (5%) | 43,250 |
| 2025 | 32,964 | (81%) | 302 | (0.74%) | 5,317 (13%) | 2,354 (6%) | 40,937 |

The large increase in the number of people released on a bond, and more use of unsecured bonds over the years, may have led to important downstream consequences. For example, more people released pretrial may have mechanically increased the number of failure-to-appear and repeat arrest. To explore this issue, we now explore the patterns of bond forfeiture and revocation based on the updated data. (We also present several key statistics about repeat arrests by former misdemeanor defendants in a separate subsection below.)  An important limitation of our bond forfeiture and revocation measure (henceforth "bond failure") is that the information on *why* a bond was forfeited or revoked is not available. However, both bond forfeiture and revocation can be viewed as indicators that the bond "failed" due to non-appearance, a new offense committed while on bond, or other important violations. When constructing this measure of bond failure, we only include bond failures observed within one year of the bond approval date, to keep the same follow-up period for cases filed in different years. Without this restriction, bonds approved in January 2015 can be followed up for more than 10 years while those approved in December 2025 can only be followed up for a few weeks.

Moreover, based on the actual bond data, we confirmed that most bond failures take place within the first few months of the approval date. For example, among all misdemeanor cases filed in 2022, 50 and 95 percent of the bond failures that occurred took place within 37 and 363 days of the approval date, respectively. Since most bonds approved in 2025 cannot be followed up to one year yet, our analysis only focuses on years between 2015 and 2024.

Lastly, we emphasize that the bond failure rate presented below is defined as the number of bond failures divided by the number of bond postings. Cases in which a person was allowed to be released on a secured bond but remained detained because they could not post the bond are thus omitted from this analysis. We are primarily interested in how individuals behave once released on a bond (e.g., non-appearance and/or new arrest), which is unrelated to the prevalence of cases where people cannot "fail" their bond because they were never released in the first place. This sample restriction should have little impact on the bond failure rates for personal bonds and general order bonds, but its effect may be greater for secured bonds, where payment of the required bond amount is necessary for release.

We underscore, however, that bond-failure data may be a poor proxy for assessing non-appearance rates. Bond forfeiture and bond revocation all reflect discretionary judicial decisions about whether a person missed court or violated a bond condition and, separately, whether the person's reasons for doing so warranted a forfeiture, surrender, or revocation. Different judges will make different decisions given the same real-world facts. We also note that, beginning in December 2020, a new set of definitions were adopted as the Consent Decree's court appearance policy.

**Table 7: Count of Bond Failures within 365 Days, by Bond Types**

| Year | All Bonds Posted | All Bonds Failure | Cash/Surety Posted | Cash/Surety Failure | Personal Bond Posted | Personal Bond Failure | GOB Posted | GOB Failure |
|---|---|---|---|---|---|---|---|---|
| 2015 | 29,673 | 5,041 (17%) | 25,664 | 4,149 (16%) | 4,009 | 892 (22%) | N/A | |
| 2016 | 31,932 | 5,220 (16%) | 26,252 | 3,869 (15%) | 5,680 | 1,351 (24%) | N/A | |
| 2017 | 34,981 | 9,614 (27%) | 18,749 | 2,924 (16%) | 16,232 | 6,690 (41%) | N/A | |
| 2018 | 38,377 | 11,503 (30%) | 16,109 | 2,408 (15%) | 22,268 | 9,095 (41%) | N/A | |
| 2019 | 42,051 | 11,126 (26%) | 8,570 | 1,161 (14%) | 11,378 | 3,368 (30%) | 22,103 | 6,597 (30%) |
| 2020 | 35,419 | 8,195 (23%) | 5,492 | 772 (14%) | 10,714 | 2,809 (26%) | 19,213 | 4,614 (24%) |
| 2021 | 39,140 | 9,098 (23%) | 5,754 | 867 (15%) | 11,565 | 3,342 (29%) | 21,821 | 4,889 (22%) |
| 2022 | 39,133 | 10,085 (26%) | 5,018 | 739 (15%) | 12,121 | 3,847 (32%) | 21,994 | 5,499 (25%) |
| 2023 | 41,780 | 11,376 (27%) | 5,209 | 766 (15%) | 11,901 | 3,730 (31%) | 24,670 | 6,880 (28%) |
| 2024 | 43,250 | 10,863 (25%) | 5,709 | 813 (14%) | 10,685 | 3,004 (28%) | 26,856 | 7,046 (26%) |

Table 7 shows the one-year failure rate of initial bonds by the year of case filing and type of bond approval. The overall one-year failure rate increased between 2015 (17%) and 2018 (30%), but has gradually declined since then and remained stable at around 25 percent as of 2024. When considering each bond type separately, we find that the failure rate has been largely stable across all years considered, with the one possible exception of 2017 and 2018 during which the one-year failure rate for personal bonds reached above 40 percent. Among the misdemeanor bonds posted in 2024, surety and cash bonds had the lowest one-year failure rate (14 percent), followed by general order bonds (26 percent) and personal bonds (28 percent).

Next, we examine whether and how the bail reforms have influenced the pretrial release rates of different demographic groups, by comparing the rate of initial pretrial release across sex, race, and ethnic group in Table 8. The top panel shows the overall rate of pretrial release for each demographic group, and the bottom panel shows the rate of pretrial release on unsecured bonds such as personal bond and the general order bond.

From the top panel, we find that there were notable differences in the pretrial release rates by sex, race, and ethnicity prior to the bail reforms. In 2015, females were more likely to be released than males (57 percent vs. 47 percent), Whites more than Blacks (55 percent vs. 39 percent), and Latinx more than non-Latinx (59 percent vs. 44 percent). However, these gaps have

40

diminished over time, and since 2019, we observe very little difference in pretrial release rates across sex, racial, and ethnic groups. For example, among all misdemeanor cases filed in 2024, the female-male and Black-White differences in pretrial release rates narrowed to 3.7 and 3.1 percentage points, respectively.

A slightly different pattern emerges in the bottom panel which shows the rate of pretrial release on unsecured bonds. In 2015 and 2016, non-secured bonds were rarely approved, and there was little difference between Blacks and Whites, and Latinx and non-Latinx, in terms of the pretrial release on non-secured bonds. As the number of persons released on non-secured bonds increased in 2017, the rate of pretrial release on non-secured bonds differed by roughly 5 percentage points between females and males (35% vs. 31%), Blacks and Whites (35% vs. 29%), and Latinx and non-Latinx (29% vs. 33%). However, after the implementation of Local Rule 9 and the Consent Decree in 2019, these differences became more modest.

**Table 8: Initial Pretrial Release Rate by Sex, Race, and Ethnicity**

| Year | By Sex | | By Race | | By Ethnicity | |
|---|---|---|---|---|---|---|
| | Female | Male | Black | White | Latinx | Non-Latinx |
| (A) Pretrial Release on Any Bond | | | | | | |
| 2015 | 57% | 47% | 39% | 55% | 58% | 43% |
| 2016 | 64% | 51% | 45% | 60% | 62% | 48% |
| 2017 | 74% | 67% | 62% | 71% | 73% | 65% |
| 2018 | 77% | 71% | 67% | 75% | 77% | 69% |
| 2019 | 87% | 84% | 82% | 86% | 87% | 83% |
| 2020 | 83% | 81% | 79% | 83% | 84% | 79% |
| 2021 | 86% | 82% | 80% | 85% | 86% | 81% |
| 2022 | 85% | 83% | 81% | 85% | 86% | 81% |
| 2023 | 87% | 83% | 82% | 85% | 85% | 82% |
| 2024 | 85% | 81% | 80% | 83% | 84% | 80% |
| (B) Pretrial Release on PR/GOB | | | | | | |
| 2015 | 11% | 5% | 7% | 6% | 7% | 7% |
| 2016 | 15% | 8% | 11% | 9% | 9% | 10% |
| 2017 | 35% | 31% | 35% | 29% | 29% | 33% |
| 2018 | 46% | 41% | 46% | 40% | 39% | 44% |
| 2019 | 68% | 67% | 69% | 66% | 67% | 67% |
| 2020 | 69% | 69% | 68% | 69% | 71% | 67% |
| 2021 | 73% | 70% | 70% | 71% | 73% | 69% |
| 2022 | 73% | 73% | 72% | 73% | 74% | 71% |
| 2023 | 75% | 73% | 74% | 73% | 73% | 73% |
| 2024 | 74% | 70% | 71% | 71% | 72% | 70% |

## 6. Magistration hearing outcomes

41

As shown above, pretrial release for misdemeanor defendants has become more common in recent years, as persons charged with a misdemeanor were pretrial released on a bond in approximately 80 percent of the time in 2025. Moreover, many of these pretrial releases involve a general order bond, which allows eligible defendants to be released promptly without having to appear in the magistration hearing. However, misdemeanor defendants who belong to one of the carve-out categories and thus are not eligible for a general order bond still need to appear in front of a magistrate, who then determines the probable cause and makes an appropriate bail decision, that is, to approve a personal bond, secured bond, or deny a bail.

Below, we explore some of the key decisions made at the bail hearing, such as the type of bond approvals and requests, the set bond amounts, and the arrestee's indigency status. An important aspect of our magistration data is that it contains comprehensive information on both bond approvals (made by the magistrate) and requests (made by the defense counsel and ADAs). We also note that, the county adopted an electronic magistration form in March 2021, which has been used by all hearing officers since then. Thanks to it, a consistent record of all bond requests and decisions made during this timeframe has been maintained. Accordingly, our analysis focuses on roughly 140,000 misdemeanor magistration hearings that took place between March 10, 2021 and December 31, 2025. We also note that no bond decision is made for cases where the magistrate determines no probable cause exists. These cases are extremely rare (less than 0.2 percent of the total magistration hearings) and are omitted from the magistration hearing analysis.

We begin our analysis by presenting in Table 9 the patterns of bond requests made by the defense counsel and ADA, and the actual bond decision made by the magistrate. Several key patterns emerge from the table. First, the number of misdemeanor bail hearings has been mostly stable since 2022. With an exception of 2021 (as the data from the first two months are not available), roughly 30,000 magistration hearings took place each year each year between 2022 and 2025. Second, we note a sizable shift in the bond decisions made by the magistrates in recent years. Between 2021 and 2023, a personal bond was approved in approximately 70 percent of the time, but this share fell to 62 percent in 2024 and 51 percent in 2025. This change was accompanied by a rising share of secured bond approvals, which increased from 29 percent in 2023 to 38 percent in 2024 to 49 percent in 2025. The hearing officer can also explicitly deny a bail, but such instances remain rare (less than 1 percent of the time) during the analysis period.[13]

Third, defense counsel and ADAs frequently do not specify a bond request, but when requests are made, they often differ significantly.[14] For example, in 2023, defense counsel explicitly made a bond request in 38.9 percent of all magistration hearings (N=30,344), advocating for a personal bond 30.5 percent of the time and a secured bond 8.4 percent of the time. Conversely, ADAs made bond requests in 39.7 percent of the misdemeanor magistration

---

[13] The Texas Constitution limits when bail can be denied in a misdemeanor case. Tex. Con. Article I. Sec. 11b-c.

[14] The columns in Table 7 correspond to the four check boxes in the misdemeanor magistration form that correspond to the bail requests made by the defense counsel and ADA, namely, "Personal Bond Requested," "Secured Bail Requested," "DA Requested Denial of Bail," and "Defense/DA Made No Bail Request." The sum of these four shares often do not add up to 100 percent, because none of the four boxes is checked in some of the cases.

hearings from 2023, mostly requesting a secured bond (38.6 percent) and seldom requesting a personal bond (0.1 percent) or bond denial (1.0 percent). Lastly, we note that both defense counsel and ADA became more likely to make an explicit bond request in recent years. The defense counsel explicitly made a bond request (either a personal bond or secured bond) in 48.9 percent of the time in 2024 and 61.7 percent of the time in 2025. Similarly, ADAs made a bond request (personal bond, secured bond, or bond denial) in 48.9 percent of the time in 2024 and 62.1 percent of the time in 2025.

**Table 9: Bond Type Request and Outcome in Magistration Hearing**

| | Personal Bond | Secured Bond | Bail Denied | No Request Made | Obs. |
|---|---|---|---|---|---|
| (A) Year = 2021 | | | | | |
| Actual Outcome | 73.2% | 26.3% | 0.9% | | 21,458 |
| Defense Request | 38.5% | 7.1% | | 54.1% | 21,458 |
| ADA request | 0.3% | 43.4% | 2.3% | 50.4% | 21,458 |
| (B) Year = 2022 | | | | | |
| Actual Outcome | 78.6% | 21.1% | 0.3% | | 28,027 |
| Defense Request | 29.0% | 6.4% | | 49.3% | 28,027 |
| ADA request | 0.1% | 34.6% | 1.5% | 45.0% | 28,027 |
| (C) Year = 2023 | | | | | |
| Actual Outcome | 71.3% | 28.6% | 0.2% | | 30,344 |
| Defense Request | 30.5% | 8.4% | | 41.9% | 30,344 |
| ADA request | 0.1% | 38.6% | 1.0% | 35.8% | 30,344 |
| (D) Year = 2024 | | | | | |
| Actual Outcome | 62.1% | 37.7% | 0.2% | | 29,491 |
| Defense Request | 36.4% | 12.5% | | 30.9% | 29,491 |
| ADA request | 0.1% | 49.0% | 0.8% | 20.5% | 29,491 |
| (E) Year = 2025 | | | | | |
| Actual Outcome | 50.9% | 49.0% | 0.2% | | 25,843 |
| Defense Request | 46.8% | 14.9% | | 24.5% | 25,843 |
| ADA request | 0.3% | 61.5% | 0.3% | 12.7% | 25,843 |

Table 10 illustrates the distribution of bond amounts requested by the defense counsel and ADAs, along with the actual bond amount set by the magistrate. As in the bond types (personal or secured), the defense counsel and ADAs are noticeably different in terms of the bond amounts they request; defense counsels tend to make a request for lower bond amounts while ADAs asking for higher amounts, with the actual bond amount set by the magistrate falling in between these two extremes. For example, across all years considered, defense counsel requested a bond amount of $1,000 or less in approximately 75 percent of the cases, while ADAs did so in roughly 25 percent of the time.

The requested bond amounts from both parties also significantly diverge from the distribution of actual bond amounts set, where $1,000 roughly corresponds to the 50th percentile. We also note that, unlike the types of bond request, all three bond amount distributions (chosen by the magistrate, defense counsel, and ADA) have remained stable, even after 2023.

**Table 10: Distribution of Bond Amount Requests in Magistration Hearing**

|  | Bond Amount Set | Defense Request | ADA Request |
|---|---|---|---|
| (A) Year = 2021 (N = 21,458) |  |  |  |
| $100 or Less | 13.6% | 16.5% | 6.0% |
| $500 or Less | 42.3% | 50.2% | 20.0% |
| $1,000 or Less | 59.3% | 75.8% | 26.0% |
| $5,000 or Less | 94.1% | 97.8% | 80.6% |
| $10,000 or Less | 98.3% | 99.6% | 94.8% |
| (B) Year = 2022 (N = 28,027) |  |  |  |
| $100 or Less | 14.9% | 24.4% | 5.4% |
| $500 or Less | 42.4% | 56.6% | 17.3% |
| $1,000 or Less | 59.6% | 79.4% | 22.7% |
| $5,000 or Less | 93.5% | 97.6% | 71.2% |
| $10,000 or Less | 98.1% | 99.5% | 90.2% |
| (C) Year = 2023 (N = 30,344) |  |  |  |
| $100 or Less | 10.1% | 26.0% | 4.5% |
| $500 or Less | 37.8% | 54.4% | 15.8% |
| $1,000 or Less | 53.7% | 77.9% | 23.2% |
| $5,000 or Less | 92.8% | 96.8% | 69.9% |
| $10,000 or Less | 98.0% | 99.4% | 89.5% |
| (D) Year = 2024 (N = 29,491) |  |  |  |
| $100 or Less | 9.4% | 29.1% | 2.9% |
| $500 or Less | 36.9% | 72.6% | 15.3% |
| $1,000 or Less | 53.9% | 86.1% | 24.0% |
| $5,000 or Less | 91.2% | 97.9% | 69.3% |
| $10,000 or Less | 97.7% | 99.7% | 89.0% |
| (E) Year = 2025 (N = 25,843) |  |  |  |
| $100 or Less | 10.8% | 32.1% | 2.4% |
| $500 or Less | 33.9% | 63.2% | 14.1% |

| | | | |
|---|---|---|---|
| $1,000 or Less | 51.3% | 81.9% | 24.7% |
| $5,000 or Less | 90.1% | 97.2% | 73.5% |
| $10,000 or Less | 97.3% | 99.6% | 92.2% |

Under Local Rule 9, bail magistrates are required to review the arrestee's financial information collected through an affidavit and ask the person to sign it. They are also expected to determine the maximum amount of bail the arrestee can afford before making a final bond decision. Furthermore, an arrestee identified as indigent (defined as having an income at or below 200% of the federal poverty level, being a full-time student, homeless, institutionalized, or eligible for public assistance due to financial hardship) is presumed eligible for pretrial release without the imposition of payment or fees for their release from pretrial detention. Therefore, the determination of an arrestee's indigency status can have a substantial impact on the person's ultimate bond decisions.

Despite the importance of the person's indigency status at the magistration hearing, Table 11 shows that indigency status is frequently left unrecorded by the magistrate. The information is missing for about 40 percent of the magistration hearings in 2021 and 2022, although the figure improved to 24 percent in 2025. Nevertheless, the share of misdemeanor arrestees identified as indigent has seen a steady increase from 52 percent in 2021 to 63 percent. Combined with the high rate of personal bond approvals at the magistration hearing (Table 7), these findings imply that a significant number of misdemeanor arrestees in Harris County are likely low-income individuals who are unable to afford the amounts needed for release on secured bonds.

**Table 11: Indigency Status**

| Year | Indigent | Not Indigent | Unable to Determine | Missing Data | Obs. |
|---|---|---|---|---|---|
| 2021 | 51.8% | 4.3% | 5.9% | 38.0% | 21,458 |
| 2022 | 52.1% | 4.2% | 4.9% | 38.9% | 28,027 |
| 2023 | 60.3% | 6.1% | 4.1% | 29.5% | 30,344 |
| 2024 | 62.1% | 2.2% | 8.4% | 27.3% | 29,491 |
| 2025 | 62.9% | 1.4% | 11.6% | 24.1% | 25,843 |

## 7. Case dispositions

Recent academic studies find evidence that pretrial detention may significantly aggravate arrestees' eventual case disposition outcomes, as the detention may hamper their ability to gather supporting evidence and/or increase the pressure to accept an unfavorable plea deal to avoid continued detention and uncertainty associated with a future trial.[15] Given that Harris County's bail reforms substantially increased the likelihood of prompt pretrial release of misdemeanor

---

[15] Gupta, Arpit, Christopher Hansman, and Ethan Frenchman. "The heavy costs of high bail: Evidence from judge randomization." *Journal of Legal Studies* 45.2 (2016): 471-505.

arrestees, it is plausible that these reforms have also influenced the trends in misdemeanor case dispositions. We thus proceed to explore the patterns of misdemeanor case disposition outcomes before and after the implementation of these bail reforms.

Figure 4 presents the distribution of case dispositions by the year of case filing. For this analysis, we focus on cases filed between 2015 and 2024 because many cases filed in 2025 are not undisposed yet. In fact, even some of the cases filed in 2022 (6%), 2023 (7%), and 2024 (12%) still remain undisposed, which introduces some complexity to our interpretation of the data. Nevertheless, our data reveal a consistent decline in the share of cases resulting in a criminal conviction over time. Specifically, the conviction rate fell rapidly from 60 percent in 2015 to 27 percent in 2019, and has remained nearly constant at 21 percent since 2022. This declining trend in convictions also reflects a reduced prevalence of guilty pleas over the years, as more than 99 percent of these misdemeanor convictions result from a guilty plea.

By contrast, the combined rate of dismissal or acquittal surged from 31 percent in 2015 to 71 percent in 2023.  Figure 5 shows that these findings remain robust even after removing the undisposed cases from the analysis. We also note that the use of deferred adjudication, in which a person pleads guilty but the finding of guilt is not entered pending compliance with the conditions of the deferral agreement, has consistently declined over time. Among the disposed cases, its share fell from 8 percent in 2015 to 3 percent in 2024.

**Figure 4: Case Disposition Outcomes**



**Figure 5: Case Disposition Outcomes, Cases with Observed Disposition Only**

Another key disposition outcome we consider is the time it takes for misdemeanor cases to reach disposition ("time-to-disposition"). One potential concern with the bail reforms was that the reforms allowed many more misdemeanor arrestees to be released than before; if some of them fail to appear for subsequent court dates, this may cause a delay in the time-to-disposition. Of course, there have been several other factors that could have contributed to increased case backlogs during our analysis period, such as Hurricane Harvey which closed down the courthouse in 2017 and the Covid-19 pandemic which significantly slowed down all aspects of the criminal justice system between 2020 and 2022. We also note that the increases in the pretrial release rate during the early years of the analysis period may have reduced the prevalence of guilty pleas, thus resulting in longer time-to-disposition. Indeed, recent studies find evidence that pretrial detention can lead to an increase in the probabilities of conviction and guilty pleas, as well as the time-to-disposition.[16]

From the latest data, we observe noticeable changes in the distribution of time-to-disposition over the past years. The time-to-disposition seems to have steadily increased for many misdemeanor cases, as the share of cases disposed within 365 days fell from 92 percent in 2015 to 45 percent in 2020. However, this trend seems to have reversed since then, as the share of cases disposed within 365 days has increased for the last four consecutive years and is

---

[16] Stevenson, Megan T. "Distortion of justice: How the inability to pay bail affects case outcomes." *Journal of Law, Economics, and Organization* 34.4 (2018): 511-542.

currently above 80 percent. As shown in the figure, even when considering alternative time windows, such as 90 and 180 days, we again find that time-to-disposition for misdemeanor cases seems to have increased during the late 2010s, before clearly reversing its trend since 2020. Although the causes of this change are unclear, and the share of cases disposed within 365 days from the latest year is still below that from the pre-reform years (2015 and 2016), faster time-to-disposition is a clear sign of improvement for Harris County's misdemeanor system.

**Figure 6: Time in Days between Case Filing and Disposition**

### 8. Repeat arrests

In this section, we explore how misdemeanor defendants' repeat offense patterns in Harris County have changed over time. In doing so, we consider the following measures of repeat offense: 1) the share of *persons* charged with misdemeanors and then with a new offense within a year of the initial case filing date (person-level repeat offense), 2) the share of misdemeanor *cases* in which the same person was charged with a new crime (case-level repeat offense) within a year of the initial case filing date, and 3) the share of misdemeanor cases in which a new crime was filed against the same person before the current case was disposed (pretrial repeat offense). Each of these measures carries different interpretations and thus complements each other.

Consider the first two measures first. To obtain the case-level repeat-arrest rate, we follow all misdemeanor cases filed during a calendar year and compute the share of cases followed by a new criminal case filing within 365 days. To compute the person-level repeat-

48

arrest rate, we follow all misdemeanor cases filed against the same person during a calendar year and consider whether any of these cases was followed by a new criminal case filing within 365 days. The case-level rate should be higher than the person-level rate, as multiple cases filed against the same person on the same day will be double-counted under the case-level measure. For example, if a person was charged with two separate offenses on the same day and again charged for a new offense a month later, this is counted as two cases with a new case filed under the case-level measure but as a single person with a new case filed under the person-level measure. When computing these one-year repeat arrest measures, we remove cases filed in 2025, which cannot be followed up to one year yet.

Our repeat arrest measures come from Harris County's criminal case records only, and may not present a full picture of repeat offenses by former misdemeanor arrestees. For example, our repeat arrest measures do not include new offenses that were committed by former defendants but were not reported and/or charged. Similarly, since some of these new cases filed eventually become dismissed or acquitted, our measure does not reveal whether the person was actually guilty or convicted of the offense in question. Also, since our criminal case record data only cover Harris County, new arrests made in other jurisdictions are not observed in our data.

**Figure 7: Share of Misdemeanor Defendants with a New Case Filed within 365 Days**

Figure 7 reports the one-year repeat arrest rates at the person level. Despite the substantial changes in the misdemeanor bail system that took place in Harris County, we find that the repeat

arrest rate has remained remarkably stable over time. In each of the years considered, about 23 percent of misdemeanor defendants had a new criminal case filed against them within 365 days, with one possible exception in 2019 (21 percent). To explore the possibility that the type of new criminal charges against former arrestees may have changed over time, we also construct a one-year repeat arrest rate using a new felony case filed within 365 days as an outcome measure. Even with this alternative measure, we find that the one-year repeat arrest rate has been largely stable at around 12 percent throughout the analysis period.

Table 12 presents the rate of repeat arrest measured at the case-level. As noted above, the case-level repeat arrest rates are somewhat higher than the person-level rates, but even at the case-level, we observe that the repeat arrest rate has remained mostly stable, at about 27 percent. By contrast, the share of misdemeanor cases followed by another felony case within one year has modestly increased, from 12 percent in 2015 to 15 percent in 2024.

The third column of Table 12, below, presents our third measure of repeat offense, namely, the (case-level) rate of repeat arrest prior to the disposition of the initial case, which serves as an indicator of pretrial reoffending and thus carries significant implications for public safety. However, the interpretation of this metric is not as straightforward, because it can be affected by both actual changes in criminal risks of misdemeanor arrestees and variations in the time-to-disposition among misdemeanor cases over time. This concern can be particularly relevant in a setting like Harris County, where the timeframe for case disposition has seen considerable variability in recent years. Indeed, we find that the rate of repeat arrest before disposition closely mirrors the trends in case disposition times. Whereas only 9 percent of misdemeanor cases filed in 2015 were followed by another case before the initial case was disposed, this share escalated to 28 percent in 2020, later falling to 19 percent in 2024. Overall, the lengthening of time-to-disposition in Harris County seems to be a primary factor driving the increase in the rate of pretrial repeat arrest.

**Table 12: Count of Misdemeanor Cases with a New Case Filed Against Same Person**

| Year | Any New Case Filed within 365 Days | | New Felony Case Filed within 365 Days | | Any New Case Filed Before Disposition | | Obs. |
|---|---|---|---|---|---|---|---|
| 2015 | 16,422 | (27%) | 7,520 | (12%) | 5,220 | (9%) | 60,449 |
| 2016 | 16,047 | (27%) | 7,358 | (12%) | 5,281 | (9%) | 59,101 |
| 2017 | 13,680 | (27%) | 6,472 | (13%) | 7,286 | (14%) | 51,418 |
| 2018 | 13,756 | (26%) | 6,835 | (13%) | 9,383 | (18%) | 53,231 |
| 2019 | 11,910 | (24%) | 6,362 | (13%) | 11,110 | (23%) | 49,729 |
| 2020 | 11,231 | (26%) | 6,275 | (14%) | 11,495 | (28%) | 43,462 |
| 2021 | 12,459 | (26%) | 6,799 | (14%) | 11,413 | (25%) | 47,195 |
| 2022 | 12,536 | (27%) | 6,714 | (14%) | 10,138 | (23%) | 46,888 |
| 2023 | 13,478 | (27%) | 7,424 | (15%) | 9,457 | (20%) | 49,874 |
| 2024 | 14,629 | (28%) | 7,922 | (15%) | 8,964 | (19%) | 52,838 |

One important caveat of the repeat arrest analyses shown above is that the repeat arrest rate is likely influenced by both the characteristics of initial cases filed and the prevailing conditions within the criminal justice system. For example, the notably low one-year repeat arrest among misdemeanor cases filed in 2019, as shown in Figure 7, may suggest that persons arrested in 2019 had lower criminal risks than those arrested in other years, but perhaps a more likely explanation is the significant reduction in misdemeanor case filings in 2020 due to the widespread impact of the Covid-19 pandemic. Similarly, the observed gradual increase in repeat arrests leading to new felony charges over time could indicate a higher propensity among recent misdemeanor arrestees to commit serious felonies. Yet, this trend might also reflect an overall increase in felony case filings in Harris County, independent of the misdemeanor arrestee's previous history.

Given these complexities, a backward-looking measure of repeat arrest, which represents the share of *current criminal cases* that can be attributed to *former arrestees*, might offer additional insights. Specifically, our measure would track the number and proportion of criminal cases filed in a given year against individuals previously arrested for misdemeanors in the preceding year. Criminal cases filed in 2015 are omitted from the analysis, because we cannot determine whether they involve individuals charged in 2014 due to the data availability issue.

Table 13 presents the breakdown. Although the numbers of misdemeanor and felony cases filed against former misdemeanor arrestees have fluctuated somewhat over the years, the share of repeat arrests by these individuals has remained remarkably consistent. Throughout the analysis period, approximately 20 percent of misdemeanor cases each year were filed against individuals previously arrested for misdemeanors in the year before. Even more striking is the stability in the proportion of felony cases filed against former misdemeanor arrestees, which has consistently hovered at around 20 percent.

**Table 13. Number of Criminal Cases Filed Against Persons Charged with Misdemeanor Cases in the Previous Year**

| Year | Current Offense Type | Case Count | Former Misd. Arrestees | |
|---|---|---|---|---|
| 2016 | Misdemeanor | 59,101 | 12,066 | (20%) |
| 2017 | Misdemeanor | 51,418 | 10,016 | (19%) |
| 2018 | Misdemeanor | 53,231 | 9,916 | (19%) |
| 2019 | Misdemeanor | 49,729 | 8,323 | (17%) |
| 2020 | Misdemeanor | 43,462 | 7,267 | (17%) |
| 2021 | Misdemeanor | 47,195 | 8,104 | (17%) |
| 2022 | Misdemeanor | 46,888 | 8,599 | (18%) |
| 2023 | Misdemeanor | 49,874 | 9,345 | (19%) |
| 2024 | Misdemeanor | 52,838 | 10,427 | (20%) |
| 2025 | Misdemeanor | 51,590 | 10,294 | (20%) |
| 2016 | Felony | 36,628 | 7,655 | (21%) |
| 2017 | Felony | 33,788 | 6,994 | (21%) |
| 2018 | Felony | 35,195 | 6,983 | (20%) |

| 2019 | Felony | 36,268 | 7,323 | (20%) |
| 2020 | Felony | 39,675 | 8,037 | (20%) |
| 2021 | Felony | 41,894 | 8,248 | (20%) |
| 2022 | Felony | 40,999 | 8,205 | (20%) |
| 2023 | Felony | 46,852 | 9,696 | (21%) |
| 2024 | Felony | 49,516 | 10,348 | (21%) |
| 2025 | Felony | 43,789 | 9,255 | (21%) |

### 9. Assault or Terroristic Threat against Family and Intimate Partners

Below, we present a new analysis focusing on a subset of misdemeanor cases with substantial public safety implications: assault or terroristic threat against family and intimate partners. Prior research documents that domestic violence can generate persistent and harmful effects on victims and other family members and may escalate into a more serious criminal offense.[17] It is also noteworthy that the Harris County misdemeanor bail reforms classify domestic violence as a high-risk offense, as assault or terroristic threat against family and intimate partners is one of the three carve-out offenses that make defendants ineligible for prompt pretrial release via a general order bond. Using the same logic used in the carve-out analysis above, we identify assault or terroristic threat against family and intimate partners cases (hereafter, "domestic violence") and examine their prevalence, composition, bond decisions, and repeat arrest patterns.[18]

We begin by documenting the number of such cases, broken down by defendant sex, in Figure 8. The number of case filings against men and women follows a similar pattern over time, although men consistently account for a substantially larger share. In 2015, for instance, 3,958 domestic violence cases involved male defendants, compared to 646 involving female defendants. For both groups, counts rose through 2023, reaching 5,957 for men and 2,030 for women. Since then, the totals have declined noticeably. As of 2025, the ratio remains roughly three-to-one (4,872 vs. 1,590).

---

[17] *See* Bhuller, Manudeep, et al. "Domestic violence reports and the mental health and well-being of victims and their children." *Journal of Human Resources* 59.S (2024): S152-S186; Iyengar, Radha. "Does the certainty of arrest reduce domestic violence? Evidence from mandatory and recommended arrest laws." *Journal of Public Economics* 93.1-2 (2009): 85-98.

[18] Under Local Rule 9, the carve-out domestic violence cases are defined as "individual arrested and charged under Penal Code §22.01, against a person described in Penal Code §22.01(b)(2), or individuals arrested and charged under Penal Code §22.07(c)(l)." We use both the charge type (e.g., "assault-family member" and "terroristic threat family") and penal code (e.g., 22.01) in the case records data to identify misdemeanor cases that belong to this category.

**Figure 8: Count of Domestic Violence Cases, by Defendant Sex**



Next, we turn to initial bond outcomes by defendant sex. As discussed above, misdemeanor domestic violence became more common between 2015 and 2019. Although the magnitude is smaller, this period also coincided with a higher probability of pretrial release (via either secured or non-secured bond) for domestic violence cases involving both male and female defendants. For example, 47 percent of male defendants were released on bond in 2015, compared to 74 percent in 2019. Among female defendants, the corresponding share rose from 56 percent to 80 percent over the same period.

Disaggregating by bond type shows that this shift is driven primarily by the expanded use of non-secured bonds. Prior to the reforms (e.g., 2015–2016), very few defendants, male or female, were released on a non-secured bond. After 2017, however, these shared sharply increased, reaching nearly 60 percent for men and 75 percent for women by 2024. We also note that the rate of pretrial release (as well as pretrial release on a non-secured bond) for female defendants have been consistently higher than for male defendants over the year despite the substantial fluctuations in the pretrial release rates during this time period.

**Table 14: Types of Initial Bond Postings in DV Cases, by Gender**

| Year | Male Defendants | | | Female Defendants | | |
|---|---|---|---|---|---|---|
| | Any Bond Posted | Non-Secured Bond | Secured Bond | Any Bond Posted | Non-Secured Bond | Secured Bond |
| 2015 | 1,842 | 41 | 1,801 | 359 | 19 | 340 |
| | (47%) | (1%) | (46%) | (56%) | (3%) | (53%) |
| 2016 | 1,846 | 115 | 1,731 | 369 | 37 | 332 |
| | (46%) | (3%) | (43%) | (57%) | (6%) | (51%) |
| 2017 | 2,385 | 1,271 | 1,114 | 424 | 244 | 180 |
| | (60%) | (32%) | (28%) | (67%) | (38%) | (28%) |
| 2018 | 3,127 | 2,439 | 688 | 893 | 769 | 124 |
| | (60%) | (47%) | (13%) | (68%) | (58%) | (9%) |
| 2019 | 3,702 | 3,127 | 575 | 1,078 | 965 | 113 |
| | (74%) | (62%) | (11%) | (80%) | (71%) | (8%) |
| 2020 | 4,066 | 3,465 | 601 | 1,322 | 1,197 | 125 |
| | (75%) | (64%) | (11%) | (85%) | (77%) | (8%) |
| 2021 | 4,317 | 3,672 | 645 | 1,379 | 1,262 | 117 |
| | (74%) | (63%) | (11%) | (85%) | (78%) | (7%) |
| 2022 | 4,146 | 3,559 | 587 | 1,386 | 1,260 | 126 |
| | (73%) | (63%) | (10%) | (81%) | (74%) | (7%) |
| 2023 | 4,340 | 3,781 | 559 | 1,662 | 1,547 | 115 |
| | (73%) | (63%) | (9%) | (82%) | (76%) | (6%) |
| 2024 | 3,750 | 3,139 | 611 | 1,528 | 1,411 | 117 |
| | (68%) | (57%) | (11%) | (81%) | (75%) | (6%) |
| 2025 | 2,953 | 2,226 | 727 | 1,218 | 1,091 | 127 |
| | (61%) | (46%) | (15%) | (77%) | (69%) | (8%) |

We next examine whether the changes in the number of domestic violence cases and their pretrial release rates were accompanied by similar shifts in repeat offending. To this end, Panel (A) of Table 15 reports two case-level recidivism measures: (1) any new criminal case filed and (2) a new arrest involving domestic violence within one year of the initial case filing date. As discussed earlier, the overall one-year repeat arrest rate has remained very stable at approximately 27 percent throughout the analysis period. By contrast, the share of repeat arrest due to domestic violence rose from 2.9 percent in 2015 to 4.4 percent in 2022, before declining to 3.6 percent in 2024. These movements follow a broadly similar, inverted U-shaped pattern as the total number of misdemeanor domestic violence cases.

Panel (B) of Table 15 refines the analysis by focusing on the cases in which the initial charge involved misdemeanor domestic violence. Although the number of such cases nearly doubled between 2015 and 2024, the case-level repeat arrest rate remained remarkably steady. Over the ten-year period examined, the overall repeat arrest rate fluctuated within a narrow range of 24 to 27 percent, while the domestic violence–specific repeat rate ranged between 6.5 percent

(2023) and 7.7 percent (2020). Taken together, these results suggest that the substantial increase in domestic violence case count, and the concurrent rise of pretrial release rates, was not accompanied by a similar increase in repeat offending among this group.

**Table 15: Share of Misdemeanor Cases with a New Case Filed Against Same Person: Domestic Violence Cases**

| Year | Case Count | New Arrest within One Year | | New DV Arrest within One Year | |
|---|---|---|---|---|---|
| (A) All Misdemeanor Cases | | | | | |
| 2015 | 60,449 | 16,422 | (27%) | 1,724 | (2.9%) |
| 2016 | 59,101 | 16,047 | (27%) | 1,661 | (2.8%) |
| 2017 | 51,418 | 13,680 | (27%) | 1,770 | (3.4%) |
| 2018 | 53,231 | 13,756 | (26%) | 1,994 | (3.7%) |
| 2019 | 49,729 | 11,910 | (24%) | 1,843 | (3.7%) |
| 2020 | 43,462 | 11,231 | (26%) | 1,930 | (4.4%) |
| 2021 | 47,195 | 12,459 | (26%) | 1,990 | (4.2%) |
| 2022 | 46,888 | 12,536 | (27%) | 2,075 | (4.4%) |
| 2023 | 49,874 | 13,478 | (27%) | 1,910 | (3.8%) |
| 2024 | 52,838 | 14,629 | (28%) | 1,895 | (3.6%) |
| (B) Misdemeanor DV Cases Only | | | | | |
| 2015 | 4,624 | 1,194 | (26%) | 312 | (6.7%) |
| 2016 | 4,704 | 1,246 | (26%) | 324 | (6.9%) |
| 2017 | 4,618 | 1,202 | (26%) | 306 | (6.6%) |
| 2018 | 6,571 | 1,596 | (24%) | 474 | (7.2%) |
| 2019 | 6,387 | 1,590 | (25%) | 470 | (7.4%) |
| 2020 | 6,990 | 1,865 | (27%) | 536 | (7.7%) |
| 2021 | 7,457 | 2,020 | (27%) | 512 | (6.9%) |
| 2022 | 7,375 | 1,903 | (26%) | 563 | (7.6%) |
| 2023 | 8,003 | 1,924 | (24%) | 519 | (6.5%) |
| 2024 | 7,399 | 1,779 | (24%) | 509 | (6.9%) |

Finally, given the large increase in the pretrial release rates of domestic violence defendants, we further break down the misdemeanor domestic violence cases into two groups, namely, those in which a bond was posted (pretrial released) and those in which no bond was posted (not pretrial released), and compare their subsequent arrest rates. We find that both the overall repeat arrest rate and the domestic violence-specific repeat rate have been consistently higher among cases that did not involve a bond filing. For example, among cases filed in 2024 in which a bond was not posted, 28 percent were followed by another criminal case within one year and 9.7 percent by another misdemeanor domestic violence case. The corresponding figures for cases with a bond posting were 23 percent and 5.8 percent, respectively.

We also note that repeat arrest patterns for both groups did not change much despite substantial changes over time in the number of domestic violence cases and the share involving bond postings. For instance, cases with a bond filing became much more common in 2024 (5,283 out of 7,399) than in 2017 (2,810 out of 4,618). Yet the overall repeat arrest rate was the same in 2017 and 2024, at 23 percent, and the domestic violence-specific rate changed only marginally, from 5.7 percent to 5.8 percent.

**Table 16. Number of Misdemeanor Cases with New Cases Filed by Bond or No Bond Filed: Domestic Violence Cases Only**

| Year | Bond Filed | Case Count | New Case Filed Within 365 Days | | New DV Case Filed Within 365 Days | |
|------|-----------|-----------|----------|--------|--------|--------|
| 2015 | No  | 2,417 | 769   | (32%) | 200 | (8.3%)  |
| 2016 | No  | 2,485 | 845   | (34%) | 228 | (9.2%)  |
| 2017 | No  | 1,808 | 543   | (30%) | 146 | (8.1%)  |
| 2018 | No  | 2,546 | 738   | (29%) | 240 | (9.4%)  |
| 2019 | No  | 1,602 | 491   | (31%) | 159 | (9.9%)  |
| 2020 | No  | 1,597 | 553   | (35%) | 186 | (11.6%) |
| 2021 | No  | 1,752 | 621   | (35%) | 182 | (10.4%) |
| 2022 | No  | 1,834 | 591   | (32%) | 214 | (11.7%) |
| 2023 | No  | 1,988 | 531   | (27%) | 182 | (9.2%)  |
| 2024 | No  | 2,116 | 586   | (28%) | 205 | (9.7%)  |
| 2015 | Yes | 2,207 | 425   | (19%) | 112 | (5.1%)  |
| 2016 | Yes | 2,219 | 401   | (18%) | 96  | (4.3%)  |
| 2017 | Yes | 2,810 | 659   | (23%) | 160 | (5.7%)  |
| 2018 | Yes | 4,025 | 858   | (21%) | 234 | (5.8%)  |
| 2019 | Yes | 4,785 | 1,099 | (23%) | 311 | (6.5%)  |
| 2020 | Yes | 5,393 | 1,312 | (24%) | 350 | (6.5%)  |
| 2021 | Yes | 5,705 | 1,399 | (25%) | 330 | (5.8%)  |
| 2022 | Yes | 5,541 | 1,312 | (24%) | 349 | (6.3%)  |
| 2023 | Yes | 6,015 | 1,393 | (23%) | 337 | (5.6%)  |
| 2024 | Yes | 5,283 | 1,193 | (23%) | 304 | (5.8%)  |

## IV.  Cost Study and Project Management

This section of the Monitor report considers two responsibilities performed by the Public Policy Research Institute (PPRI) at Texas A&M University. In Part A, we present results of analyses evaluating the cost impacts of policy changes leading up to the Consent Decree.  Part B offers an update on milestone attainment for Consent Decree implementation.

## A.  Cost Impacts of the Consent Decree

To estimate the cost effects of the ODonnell Consent Decree, cases with Class A or B misdemeanor charges entering custody between January 1, 2015 and January 15, 2023 were tracked for 36 months after the initial bond or booking date.  Within that three-year follow-up period, 98% of cases in the 370,989-case sample reached final disposition, allowing complete information on their processes and outcomes. Ordinary least squares (OLS) regression was used to estimate the effects of four major ODonnell-related policy regimes on misdemeanor case processing costs, controlling for other plausible explanatory factors.[19] Multivariate regression was also used to assess policy impacts on future offending. Appendix F details the elements of the model: (1) policy milestones hypothesized to drive cost effects (i.e., independent variables), (2) cost outcomes (i.e., dependent variables), and (3) control variables that hold constant other influential factors.

In the sections that follow, detailed results are presented in three parts:  Factors contributing to cost reductions, factors contributing to cost increases, and evidence of effects of bond reform on public safety. Findings show that policy changes implemented under the ODonnell litigation substantially reduced misdemeanor system costs in Harris County while strengthening due process protections. As shown in Table 17, overall costs declined by 33%, yielding $1,191 in net savings per statistically comparable case – even as justice-related investments increased by $544 per case, a 57% rise over the pre-reform baseline.  Importantly, these constitutional and fiscal gains were achieved without compromising public safety. After controlling for case and defendant characteristics, the likelihood of any new charges within three years declined by 5%, the average number of re-arrests fell by 12%, and the costs associated with repeated criminal involvement dropped by $310 per case. Together, these results demonstrate that reforms advancing fairness and constitutional protections also generated significant financial and public safety benefits.

---

19.    A multivariate framework isolates the unique effect of the policy intervention net of other factors. For example, from the pre-ODonnell baseline to the Rule 9 period, the share of defendants with charges in the past three years increased by 50%, and the proportion meeting carveout criteria rose by 89%. The OLS model isolates the effects of these substantial shifts in case mix from the effects of policy changes, producing more accurate and unbiased estimates of the Consent Decree's impact and allowing policy-related cost and re-arrest differences to be interpreted with greater precision and validity.

**Table 17. Adjusted[20] Cost Effects per Case (p<0.05)**

| | Pre-Reform Baseline (n=131,841) | | | | Total Change from Baseline to Rule 9/Covid | | |
| | | Preliminary Injunction (n=54,186) | | | | | |
| | | | Amended Injunction (n=25,770) | | | | |
| | | | | Rule 9/ Covid (n=159,192) | | | |
| | Adjusted Mean | Change from Baseline | Change from Prelim. Injunction | Change from Amended Injunction | Adjusted Mean at Rule 9 | Net Change from Baseline | % Change from Baseline |
|---|---|---|---|---|---|---|---|
| NET COST EFFECT | $3,633 | ($565) | ($60) | ($566) | $2,442 | ($1,191) | -33% |
| COST REDUCTIONS | | | | | | | |
| Secured Bond | $320 | ($213) | ($40) | ($63) | $4 | ($316) | -99% |
| Bookings | $299 | ($36) | ($26) | ($23) | $214 | ($85) | -28% |
| Pretrial Screenings | $54 | $3 | ($2) | ($21) | $34 | ($20) | -37% |
| Bond Hearings | $75 | ($23) | $17 | ($28) | $41 | ($34) | -45% |
| Pretrial Detention | $425 | ($152) | $98 | ($90) | $281 | ($144) | -34% |
| Jail Sentences | $1,103 | ($354) | ($134) | ($349) | $266 | ($837) | -76% |
| Probation Sentences | $136 | ($27) | ($57) | ($17) | $35 | ($101) | -74% |
| Court Fees/Fines | $261 | ($69) | ($63) | ($66) | $63 | ($198) | -76% |
| COST INCREASES | | | | | | | |
| Trial Court Settings | $172 | $58 | $28 | $8 | $266 | $94 | 55% |
| Prosecution | $441 | $164 | $75 | $44 | $724 | $283 | 64% |
| Indigent Defense | $104 | $55 | $19 | $56 | $234 | $130 | 125% |
| Private Defense | $243 | $29 | $25 | ($17) | $280 | $37 | 15% |

---

[20] "Adjusted" results are estimates generated from multivariate OLS regression models that control for case and defendant characteristics. All findings reported are statistically significant at the p<0.05 level; insignificant findings are indicated by "NS." Additional details on model specification and variables are available upon request from the authors.

**Table 18. Adjusted[21] Three-Year Re-Arrest Effects per Case (p<0.05)**

| | Pre-Reform Baseline (n=131,841) | | | | Total Change from Baseline to Rule 9/Covid | | |
| | | Preliminary Injunction (n=54,186) | | | | | |
| | | | Amended Injunction (n=25,770) | | | | |
| | | | | Rule 9/ Covid (n=159,192) | | | |
| | Adjusted Mean | Change from Baseline | Change from Prelim. Injunction | Change from Amended Injunction | Adjusted Mean at Rule 9 | Net Change from Baseline | % Change from Baseline |
|---|---|---|---|---|---|---|---|
| **% CASES WITH ANY RE-ARREST** | | | | | | | |
| Any Re- Arrest | 39% | (2%) | 0% | NS | 37% | (2%) | -5% |
| Any Misd.- Only Rearrest | 15% | (2%) | 0% | NS | 13% | (2%) | -13% |
| Any Felony Rearrest | 24% | (1%) | 0% | NS | 23% | (1%) | -4% |
| **NUMBER OF RE-ARRESTS PER CASE** | | | | | | | |
| Mean Number of Re-Arrests | 0.93 | (0.09) | (0.06) | 0.04 | 0.82 | (0.11) | -12% |
| Misdemeanor-Only Rearrests | 0.55 | (0.07) | (0.08) | 0.04 | 0.44 | (0.11) | -20% |
| Felony Rearrests | 0.37 | (0.02) | 0.01 | NS | 0.36 | (0.01) | -3% |
| **RE-ARREST COST/CASE** | | | | | | | |
| Case Processing Costs | $7,760 | ($310) | NS | NS | $7,450 | ($310) | -4% |

### 1. Factors Contributing to Cost Reductions Under the Consent Decree

The $1,191 reduction in costs per statistically comparable misdemeanor case under the Consent Decree was driven by structural changes at every stage of case processing. By replacing wealth-based detention with risk-based release, the reforms reduced expenditures on bonds, booking, hearings, detention, and downstream sentencing—while improving fairness and case outcomes.

### a) Dramatic Reductions in Secured Bonds

Before the ODonnell reforms, 89% of misdemeanor cases were assigned secured bonds averaging $3,475, without consideration of defendant risk or ability to pay. By requiring risk-

---

[21] *Supra*.

based release, the Preliminary Injunction cut both secured bond usage and average bond amounts in half (Table 19). Under Rule 9 when unsecured release became presumptive, secured bonds fell further, required for just 23% of cases at roughly one-third of their pre-reform dollar value. With these changes, bond-related costs for statistically similar releasees declined by 99%, from $320 per case at baseline to just $4 under Rule 9 (Table 17).  In addition to reducing defendants' financial burdens, expanding unsecured release also alleviated cost pressures in other sectors of the county's criminal justice system.

**Table 19. Secured Bond Rates and Amounts**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Secured Bond Set | 89% | 46% | 52% | 23% | 21% |
| Secured Bond Posted | 54% | 36% | 39% | 18% | 16% |
| Secured Bond Cases | (n=117,402) | (n=24,810) | (n=13,394) | (n=11,414) | (n=23,245) |
| Avg. Secured Bond Amount Set | $3,475 | $1,806 | $1,399 | $1,099 | $2,180 |
| Avg. Secured Bond Amount Made | $2,149 | $1,224 | $1,124 | $911 | $1,937 |

### b)  Faster and Less Costly Booking

After ODonnell reforms, even though booking rates remained stable or increased, booking costs declined from $299 to $214 per case (Table 17). The reason was improved processing efficiency for the growing volume of personal bonds and GOBs which clear the Joint Processing Center significantly faster than secured bonds.  After Rule 9, the majority of cases were GOBs, completing booking in roughly one-third the time required for secured bonds. The shift toward unsecured release (Table 20) therefore reduced time-in-custody and processing costs for statistically similar cases by 28% from the pre-reform baseline.

**Table 20. Booking Rates by Bond Types**

| All Cases… | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Booked | 77% | 81% | 78% | 90% | 91% |
| Booked with Secured Bond | 68% | 29% | 34% | 15% | 14% |

| | | | | | |
|---|---|---|---|---|---|
| Booked with Personal Bond | 9% | 51% | 43% | 22% | 28% |
| Booked with GOB Bond | 0% | 0% | 0% | 53% | 49% |
| Unbooked | 23% | 19% | 22% | 10% | 9% |

### c) Streamlined Pretrial Screening

Before Rule 9, Pretrial Services prepared detailed screening reports for roughly 80% of booked defendants (Table 21), at a cost of $54 per comparable case (Table 17). Rule 9 eliminated full reports for the 53% of low-risk cases eligible for automatic GOB release.  By reserving pretrial assessment for high-risk cases, screening costs declined by more than one-third to $34 per statistically similar case without compromising release decision quality.

**Table 21. Non-GOB vs GOB Pretrial Report Requirements**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | During Covid (n=110,378) |
| Pretrial Report (Secured or Personal Bonds) | 77% | 81% | 78% | 37% | 42% |
| No Pretrial Report (GOB Bonds) | 0% | 0% | 0% | 53% | 49% |

### d) Fewer Bond Hearings

Prior to the ODonnell reforms, nearly 70% of cases required a bond hearing (Table 22). However, new pathways for unsecured release, including early presentment and presumptive GOB release, substantially reduced the need for judicial hearings.  Bond hearings declined to 36% of cases under Rule 9, and hearing-related costs fell by 45%, from $75 to $41 per statistically comparable case (Table 17). These changes confirmed that many low-risk defendants can be safely released without formal adversarial proceedings.

**Table 22. Bond Hearings vs. Alternative Release Processes**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Bond Hearing | 61% | 26% | 32% | 11% | 11% |

| | | | | | |
|---|---|---|---|---|---|
| + Secured Bond | | | | | |
| Bond Hearing + Personal Bond | 8% | 14% | 14% | 21% | 27% |
| No Bond Hearing + Secured Bond | 28% | 20% | 20% | 13% | 10% |
| No Bond Hearing +Early Presentment Bond | 0% | 19% | 32% | 0% | 0% |
| No Bond Hearing + Sheriff's Bond | 0% | 20% | 1% | 0% | 0% |
| No Bond Hearing + GOB Bond | 0% | 0% | 1% | 54% | 49% |

### e) Shorter and Less Coercive Pretrial Detention

Under wealth-based detention, nearly one-quarter of defendants remained in custody three days after arrest, and average initial detention exceeded five days (Table 23). The Preliminary Injunction shifted release criteria to risk and imposed a 24-hour release determination.  As a result, three-day detentions fell by two-thirds, 90% of cases were released by day two, and pretrial detention costs declined by one-third, from $425 to $273 per comparable case (Table 17). Although some gains fluctuated under the Amended Injunction, pretrial detention costs ultimately stabilized 34% below baseline, yielding $144 in net savings per case under Rule 9. Importantly, reforms also eliminated pressure to plead guilty from jail, and detention-coerced pleas fell from 36% of cases before reform to just 4% under Rule 9.

### Table 23. Pretrial Detention Length

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Detained Less Than One Day | 15% | 27% | 27% | 23% | 28% |
| Detained 3+ Days | 23% | 8% | 13% | 10% | 11% |
| Avg. Initial Jail Days | 5.1 | 3.5 | 5.0 | 4.9 | 6.6 |
| Initial Jail Days - 90th Percentile | 9.0 | 2.0 | 4.0 | 2.0 | 3.0 |

### f) Fewer Guilty Pleas and More Dismissals

As pretrial liberty expanded, defendants were better able to contest charges. Overall guilty plea rates fell from 58% before reform to 26% under Rule 9. Guilty pleas entered within seven days of custody dropped from 23% to 2%, and dismissals rose from 33% to 67% of dispositions (Table 24).  Because court costs are not assessed in dismissed cases, average fees and fines

declined by 76%, from $261 to $63 per comparable case (Table 17), directly easing defendants' financial burdens.

**Table 24. Plea and Dismissal Dispositions**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Plea of Guilty | 58% | 43% | 34% | 26% | 23% |
| Plea of Guilty–Within 7 Days of Custody | 23% | 6% | 5% | 2% | 1% |
| Plea of Guilty–In Initial Detention | 36% | 13% | 12% | 4% | 3% |
| Dismissed | 33% | 51% | 60% | 67% | 69% |

### g)  Reduced Jail and Probation Sentences

Downstream sentencing costs also declined after the ODonnell reforms. With greater pretrial liberty and due process, the share of cases resulting in a jail sentence fell by 31 percentage points under Rule 9, and average jail terms shortened by ten days (Table 25). Jail-related costs decreased by $837 per comparable case, and probation costs fell by $101 per case—each representing roughly a 75% reduction (Table 17).  By enabling appropriate defendants to remain free pretrial, bond reform improved advocacy, reduced unnecessary incarceration, and lowered sentencing expenditures.

**Table 25. Jail, Probation, and Fee/Fine Sanctions**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Jail Sentence | 54% | 38% | 32% | 23% | 23% |
| Avg. Jail Sentence Days/Case | 15.4 | 11.1 | 9.7 | 6.4 | 5.1 |
| Probation Sentence | 6% | 6% | 3% | 4% | 3% |
| Avg. Probation Sentence Days/Case | 28.2 | 24.8 | 15.2 | 16.9 | 15.7 |

| Avg. Court Fees and Fines/Case | $246 | $183 | $138 | $115 | $106 |
|---|---|---|---|---|---|

### 2. Factors Contributing to Cost Increases Under the Consent Decree

While the Consent Decree generated substantial net savings, certain components of misdemeanor case processing became more resource-intensive as pretrial liberty expanded and adversarial engagement deepened. Increased court activity and attorney involvement reflect not system inefficiency, but the operational costs of a process that affords greater access to counsel and meaningful defense.

### a)  Increased Court Settings and Longer Case Duration

As more defendants were released on affordable or unsecured bonds, they were better positioned to contest charges rather than resolve cases quickly from custody. This shift led to more active litigation, more court appearances, and longer case timelines.  The average number of court settings rose by 92%, from 5.0 per case before reform to 9.6 after Rule 9.  At the same time, average case duration more than tripled—from 126 days at baseline to 391 days (Table 26). For statistically comparable cases, court appearance costs increased by 55%, or $94 per case, relative to the pre-reform period (Table 17).

**Table 26. Factors Affecting Number of Trial Court Settings**

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
|---|---|---|---|---|---|
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Avg. Court Settings/Case | 5.0 | 7.5 | 8.3 | 9.6 | 8.9 |
| Avg. Case Duration (Days) | 126 | 253 | 295 | 391 | 338 |
| Initial Bond Failure | 10% | 27% | 19% | 23% | 26% |
| Avg. Settings - No Bond Failure | 4.7 | 6.9 | 7.7 | 8.8 | 7.8 |
| Avg, Settings – With Bond Failure | 8.0 | 9.1 | 10.7 | 12.1 | 12.1 |

### b)  Higher Bond Failure Rates and Additional Settings

Expanded pretrial liberty also increased opportunities for missed court appearances. Initial bond failures more than doubled—from 10% of cases before reform to 23% under Rule 9, peaking at 27% during the Preliminary Injunction period (Table 26).  Cases involving bond failure required substantially more court activity, adding an average of 3.2 additional settings per case across policy intervals. During the early reform years, missed appearances were also influenced by external disruptions, including rule changes and Hurricane Harvey, which made

compliance more difficult for some defendants.  Thus, rising court costs reflect multiple dynamics: greater access to release, more contested proceedings, longer timelines, and increased bond failure rates. In a system that prioritizes pretrial liberty and due process, these added court costs represent the operational footprint of broader access to justice.

### c) Expanded Prosecutorial and Defense Involvement

Legal expenses rose in tandem with increased courtroom activity (Table 17). Prosecution costs for statistically comparable cases increased from $441 at baseline to $724 under Rule 9—a 64% rise.  Defense costs also increased. Court-appointed representation went from $104 per case before reform to $234 after Rule 9 (a 125% increase), while private defense costs increased more modestly, from $243 to $280 (15%). Importantly, the overall rate of attorney appointment remained stable at approximately 56–58% of misdemeanor cases across all policy periods (Table 26). The cost increase therefore stemmed primarily from greater attorney participation in more frequent court settings rather than from expanded appointment rates.  After Rule 9, attorneys participated in roughly twice as many court appearances per case compared to the pre-reform era.

### Table 26. Attorney Appointment Rates

| All Cases | Pre-Reform (n=131,841) | Preliminary Injunction (n=54,186) | Amended Injunction (n=25,770) | Rule 9 Policy Interval | |
| --- | --- | --- | --- | --- | --- |
| | | | | Before Covid (n=44,814) | After Covid (n=110,378) |
| Any Appointed Defense Attorney | 58% | 57% | 56% | 56% | 57% |
| Public Defender Counsel | 5% | 6% | 5% | 7% | 9% |
| Private Appointed Counsel | 53% | 50% | 50% | 45% | 22% |
| Managed Assigned Counsel | 0% | 0% | 1% | 3% | 25% |
| Private Counsel | 43% | 43% | 44% | 45% | 44% |

### d) Investments in Defense System Quality

Some increases in defense costs also reflect deliberate system improvements. In 2017, the Public Defender's Office began representing clients at bond hearings, expanding early-stage advocacy. In 2022, the Managed Assigned Counsel program was introduced to supervise and support private appointed attorneys.  These reforms improved the structure and quality of indigent defense representation. While they increased per-case costs, they marked a shift from minimal, expedited case handling toward more substantive and professionally supported advocacy.

### 3.  Public Safety Effects of the Consent Decree

One of the most persistent concerns surrounding bond reform is whether expanding unsecured release increases the risk of new criminal activity. If secured bonds enhanced public safety, re-arrest rates would have been lowest during the pre-reform era, when 89% of defendants faced financial conditions for release. The data show the opposite pattern.

### a)  Fewer Arrests Followed by Future Criminal Charges

Before reform, 15% of statistically similar misdemeanor arrests were followed by a new misdemeanor-only arrest within three years, and 24% were followed by at least one felony arrest (Figure 9). After implementation of risk-based release policies, both measures declined by one to two percentage points—a modest but statistically significant reduction.  These improvements occurred even as use of secured bonds was largely replaced by unsecured release under Rule 9. In other words, as financial bonds became the exception rather than the norm, the likelihood of subsequent criminal justice contact among comparable defendants declined.

**Figure 9. Adjusted[22] Share of Arrests Followed by**
**Any Re-Arrest Within Three Years**

### b)  Declines in the Volume of Re-Arrests

In addition to examining whether any re-arrest occurred, the analysis assessed the volume of new arrests per 100 initial arrests. Among statistically similar cases, misdemeanor re-arrests declined by 27%—from 55 re-arrests per 100 arrests in the pre-reform period to 40 after reform implementation (Figure 10). Although misdemeanor re-arrests rose slightly for cases arrested during COVID, the overall post-reform level remained substantially below baseline. Felony re-arrests declined more modestly—from 37 to 36 per 100 arrests—and remained unchanged under Rule 9.

---

[22] *Ibid*, Note 21

**Figure 10. Adjusted[23] Number of Re-Arrests Within Three Years Per 100 Arrests**

### c) Declines in the Costs of Re-Arrest

Beyond reducing the frequency and volume of re-arrests, bond reform also lowered their financial impact. Before reform, re-arrest-related[24] costs to Harris County and defendants averaged $7,760 per statistically comparable case. Just as the largest declines in future violations occurred during the Preliminary Injunction period, costs for those cases also fell by 4% to $7,450, remaining stable thereafter. Overall, the ODonnell litigation produced a 4% decline in re-arrest costs with net savings of $310 per case.

### 4. Conclusion

Taken together, the evidence shows that the Consent Decree reshaped Harris County's misdemeanor system in ways that reduced overall costs, strengthened procedural fairness, and maintained public safety. Cost reductions were driven by replacing wealth-based detention with risk-based release, streamlining booking and screening, reducing unnecessary hearings and detention, and moderating downstream sentencing. Although courtroom activity and attorney involvement increased as defendants gained meaningful access to adversarial process, these investments reflect a more constitutionally sound system—not inefficiency. Importantly, the reforms did not compromise safety: re-arrest rates and volumes declined, and the costs of repeated criminal involvement fell as well. In sum, the ODonnell reforms demonstrate that a risk-based pretrial framework can improve justice, enhance community outcomes, and deliver measurable fiscal benefits simultaneously.

### B. Project Management

PPRI is also charged with maintaining information necessary to manage the monitorship and assure careful tracking of Consent Decree implementation. The project management function is the operational center of the monitorship, receiving real-time progress updates from

---

[23] *Ibid*, Note 21

[24] Re-arrest costs included bond, booking, pretrial screening, bond hearings, pretrial detention, jail (not prison) sentences, court fees and fines, court operations, prosecution, and defense representation. Felony probation and prison costs were omitted because these functions are funded by the State of Texas rather than Harris County.

the Parties, integrating their work into a comprehensive plan, and communicating status information back to all sectors involved.  A status summary of Consent Decree requirements due in this reporting period is presented in Appendix G.

APPENDIX

*A. The Monitorship Structure*

**1. Monitorship Goals**

As described in our first report, the ODonnell lawsuit laid bare in stark terms the failings of a money bail system in terms of racial, ethnic and socioeconomic fairness, wise use of taxpayer dollars, prevention of the needless suffering of vulnerable people, and the promotion of public safety. After three years of litigation, the parties reached a settlement embodied in a landmark Consent Decree, ordered on November 21, 2019.[25] The ODonnell Consent Decree represents the first federal court-supervised remedy governing bail.  The Consent Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of people arrested for misdemeanor offenses.[26]

First, under the Consent Decree, <u>people arrested for low-level misdemeanors are promptly released</u>.  The Consent Decree incorporates the new Harris County Criminal Courts at Law (CCCL) Rule 9, which sets out bail policies.[27]  Persons arrested for misdemeanors that do not fall within a set list of carve-out offenses must be promptly released under General Order Bonds.  Allowing this group to be quickly released without paying allows them to return to their jobs, take care of their children, and avoid the trauma and danger of incarceration.

Second, the Consent Decree has brought about more rigorous bail hearings with greater attention paid to the issues that matter—whether a person should be released and on what least-restrictive conditions—though much work remains to ensure that the hearings and the recorded findings comply with Rule 9 and the Consent Decree. Persons arrested for misdemeanors that fall within the list of carve-out offenses must receive a magistration hearing, complying with Rule 9, at which there must be clear and convincing evidence supporting the pretrial conditions set (including posting a money bond) and any decision to detain a person.  All misdemeanor arrestees have access to a public defender to represent them at that hearing. Counsel has access to the client and information needed to prepare for the hearing. New trainings on the Consent Decree policies are being conducted. Completed work to study indigent defense in misdemeanor cases will inform plans and standards for misdemeanor representation, including to ensure that defense lawyers have access to social workers, investigators, and other support staff necessary to provide effective representation to people arrested for misdemeanor offenses.

Third, following this pretrial stage, misdemeanor arrestees now benefit from a defined set of court-appearance rules that, with limited exceptions, is uniform among the 16

---

[25] Consent Decree, ODonnell et al v. Harris Cty., No. 16-cv-01414 (S.D. Tex. Nov. 21, 2019), ECF 708 [hereinafter, Consent Decree].

[26] *Id*. at ¶12 (noting "[T]he terms of this Consent Decree are intended to implement and enforce fair and transparent policies and practices that will result in meaningful, lasting reform…").

[27] Rules of Court, Harris County Criminal Courts at Law, Rule 9 (as amended through April 22, 2020), at http://www.ccl.hctx.net/attorneys/rules/Rules.pdf; Consent Decree ¶ 30.

misdemeanor courts. The Consent Decree sets out a new process for waiving or rescheduling appearances.  People can change some court dates so they can make it to court without undue hardship due to illness, lack of childcare and other issues. Further, a new court notification system is to be built by Harris County. New work will study the causes of non-appearance and improve the ability to address those causes.

Fourth, the Consent Decree provides that robust data will be made available, including regarding misdemeanor pretrial release and detention decisions and demographic and socioeconomic information regarding each misdemeanor arrestee, as well as prior data dating back to 2009.[28] The Consent Decree provides for public meetings and input, Harris County reports to be published every sixty days, and for Harris County to make information available online regarding the implementation of the Decree.[29]

Finally, the Consent Decree calls for a Monitor, with a set of responsibilities to evaluate compliance with the Decree and to approve a range of decisions to be made as the Decree is implemented.  After applying to serve as Monitor, and proposing to conduct the work described below, we started our work upon our appointment on March 3, 2020.  As we will describe below, remarkable changes have occurred in the Harris County misdemeanor system since the adoption of Rule 9 and then the Consent Decree.  Key elements of the Consent Decree have now been implemented. Important work also remains, and all involved look forward to the work to come, as we build a model misdemeanor pretrial system in Harris County.

The principal task of this Monitorship, as set out in the Consent Decree, is to report to the Court as we oversee and support Harris County officials implementing a new pretrial justice system. This system is intended to restore the public's trust, safeguard constitutional rights, and accomplish the aims of bail: to maximize pretrial release while keeping the community safe and promoting the integrity of the judicial proceedings by preventing persons from fleeing justice. Thus, as the Consent Decree summarizes in its Introduction, this Decree: "is intended to create and enforce constitutional and transparent pretrial practices and systems that protect due process rights and equal protection rights of misdemeanor arrestees."[30]  From the Consent Decree, we distilled nine guiding principles:

(1) **Transparency** – A transparent system keeps the public informed about how and why the system operates as it does—what rules and procedures apply and how effectively the system is meeting its goals.

(2) **Accountability** – We view accountability as part of an ongoing process of systemic evaluation and improvement with community participation.

(3) **Permanency** – We must not only evaluate progress, but also ensure that the administrative measures, policies, and processes can work well long-term.

---

[28] Consent Decree, *supra*, at ¶83-85.
[29] *Id.* at ¶87-88.
[30] Consent Decree, supra, at ¶1.

(4) **Protecting constitutional rights** – We must protect civil and human rights, including the constitutional rights of arrestees.

(5) **Racial, ethnic, and socioeconomic fairness** – We must continue to measure and remedy disparities concerning racial, ethnic, and socioeconomic unfairness in pretrial detention.

(6) **Public safety and effective law enforcement** – We must seek to manage risk and improve public safety.

(7) **Maximizing liberty** – We must seek to maximize pretrial liberty and to minimize criminal legal involvement of people in Harris County.

(8) **Cost and process efficiency** – We will work to measure the wide range of costs implicated by the pretrial misdemeanor system to advise on the most cost-effective means for realizing the goals of a just system.

(9) **Evidence-based, demonstrated effectiveness** – In our approach to all of these goals, we should establish a system that is self-monitoring and can make ongoing improvements.

Thus, this Monitorship reflects a belief that an efficient and effective system, operated on the basis of relevant information and empirical data, will promote social justice while also meeting the goals of law enforcement and public safety.

## 2. The Monitor Team

Our interdisciplinary team includes experts in law, social science, behavioral health, economic analysis, indigent defense, and project management. Team biographies are included in Appendix B. The team includes:

- Monitor, Professor Brandon L. Garrett (Duke University School of Law)

- Deputy Monitor, Sandra Guerra Thompson (University of Houston Law Center)

- Dottie Carmichael, David Shi, and Andrea Sesock (Public Policy Research Institute at Texas A&M University)

- Songman Kang (Sungkyunkwan University)

Our full organization chart is also included in Appendix C.

### 3. Consent Decree Authority

This Report contains the Monitor's review of compliance for the sixth year that the Monitor has been in place. The Consent Decree provides in Paragraph 115 that such reports shall be conducted every six months for the first three years of the decree:

> The Monitor will conduct reviews every six (6) months for the first three years the Monitor is in place and annually for each year thereafter that the Monitor is in place to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree.

Further, the Consent Decree states in Paragraph 117:

> Every six (6) months for the first three years after the Monitor is appointed and annually for each year thereafter, the Monitor will file with the Court, and the County will publish, written public reports regarding the status of compliance with this Consent Decree, which will include the following information:
>
> a. A description of the work conducted by the Monitor during the reporting period;
>
> b. A description of each Consent Decree requirement assessed during the reporting period, indicating which requirements have been, as appropriate, incorporated into policy (and with respect to which pre-existing, contradictory policies have been rescinded), the subject of training, and carried out in actual practice;
>
> c. The methodology and specific findings for each compliance review conducted;
>
> d. For any requirements that were reviewed or audited and found not to have been implemented, the Monitor's recommendations regarding necessary steps to achieve compliance;
>
> e. A projection of the work to be completed during the upcoming reporting period;
>
> f. A summary of any challenges or concerns related to the County, CCCL Judges, and Sheriff achieving full and effective compliance with this Consent Decree;
>
> g. Whether any of the definitions in the Consent Decree need to be updated, and whether any additional terms need to be defined;
>
> h. For each requirement of the Consent Decree that is assessed whether the requirement is producing the desired outcomes of:
>
>> i. Maximizing pretrial liberty;
>> ii. Maximizing court appearance; and
>> iii. Maximizing public safety; and

72

i. The feasibility of conducting an estimated accounting of the cost savings to the County through any reductions in pretrial detention, including comparing estimated costs of jailing misdemeanor arrestees prior to trial for each year the Monitor is in place relative to the costs of jailing misdemeanor arrestees prior to trial in each of 2015, 2016, and 2017 and order an accounting if feasible.

Paragraph 118 adds:

The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Our Monitor Work Plans are divided into three Deliverables and we describe each of the subjects detailed in Paragraph 117. As in our earlier reports, we have divided this report into three parts, reflecting the main components of our work and addressing each subject set out in the Consent Decree: Policy Assessment and Reporting; Cost Study and Project Management; and Community Outreach, Participation, and Working Group.

### B. Community Work Group

The Monitor Team relies on the guidance of a Community Work Group (CWG), a dedicated group of community leaders who represent a diverse set of perspectives and specializations. The CWG meets on a quarterly basis with the Monitor Team, as well as with various county officials responsible for the implementation of the Consent Decree.



**Hiram A. Contreras** served for 36 years with the Houston Police Department. He retired as Assistant Chief of Police in March 1998. While ascending the police ranks, Mr. Contreras' assignments included the Auto Theft, Juvenile, Recruiting, Planning and Research, Northeast Patrol and Major Offenders. He was promoted to the rank of Assistant Chief July 1991. In the same year as a result of a court ruling, he became the only Latinx person to attain the rank of Deputy Chief. This was retroactive as of March 1986. As Assistant Chief he directed the Professional Development Command. At retirement he was directing the Special Investigation Command. In his career with HPD, Mr. Contreras established the first HPD storefront in the city and initiated the Culture Awareness Program. In collaboration with the U.S. Marshal's Service, he initiated the Gulf Coast Violent Offenders Task Force. As commander of the Special Investigations Command, he coordinated HPD's participation with the Department of Justice High-Intensity Drug Trafficking Area Program. Also, he coordinated the International Symposium on the Police Administration and Problems in Metropolitan Cities with the Istanbul Police Department in Istanbul, Turkey. As Assistant Chief, Mr. Contreras, at the request of the Police Executive Research Forum, participated in police promotional assessment centers in Chicago, Denver, and San Francisco. Nominated by President William J. Clinton, Mr. Contreras

became U.S. Marshal for the Southern District of Texas in 1998 and served until 2002. His consulting business, Art Contreras & Associates – LLC, specializes in human resource and marketing principles.



**Katharina Dechert** serves as the Houston Policy & Advocacy Manager for the Tahirih Justice Center, leading the development and advancement of Tahirih's local and state-wide advocacy projects and campaigns to transform the policies and practices that impact immigrant survivors of gender-based violence. Katharina joined Tahirih in 2016 as a legal advocate, supporting survivors in their immigration journey and later working as a Department of Justice Fully Accredited Representative, qualified to represent immigrant survivors before both U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, which includes the immigration courts and the Board of Immigration Appeals. She has experience working with human rights defenders in Guatemala, as well as previous internships working to advance asylum policy in Ecuador and increase access to justice for survivors of human rights violations at the International Criminal Court - Secretariat of the Trust Fund for Victims. She is a graduate of Wellesley College and prior to joining Tahirih, obtained her Master of International Studies in Peace and Conflict Resolution as a Rotary Peace Fellow at the University of Queensland in Brisbane, Australia.



**J. Allen Douglas** is the executive director of the Downtown Redevelopment Authority (DRA). In addition, he performs the duties of general counsel for the organization and its related entities Central Houston and the Downtown District. Prior to joining the DRA, Allen practiced law for more than 20 years, beginning his career as a law clerk at Ahmad, Zavitsanos, Anaipakos, Alavi & Mensing P.C. in Houston. He worked for the United States Court of Appeals, Sixth Circuit and the United States District Court, Northern District of Ohio in Cleveland, Ohio. Most recently he was an associate attorney at Littler Mendelson, P.C. and assistant county attorney with the Harris County Attorney's office where he focused on appellate labor, employment, and civil rights cases. Allen has also served as vice-chair of the Midtown Management District's board of directors since June 2015, as well as chair of the organization's Urban Planning Committee.



**Tara Grigg Green** (formerly Garlinghouse) is the Co-Founder and Executive Director of Foster Care Advocacy Center. Prior to founding Foster Care Advocacy Center, Tara was a Staff Attorney and Skadden Fellow in the Houston office of Disability Rights Texas. There, she helped develop the Foster Care Team to provide direct representation to foster children with disabilities in state child welfare cases, special education litigation and Medicaid appeals. She authored an Amicus Brief in *M.D. v. Abbott*—class action litigation seeking to reform the Texas foster care system—cited by the Fifth Circuit in affirming the State's liability. She has consulted on child welfare policy issues for organizations such as Casey Family Programs, the ABA Center on

Children and the Law, the Texas Children's Commission, and the United States Children's Bureau. Tara has published law review articles and research papers on the constitutional rights of children and families and quality legal representation in child welfare proceedings. Her passion for this field comes from her family's experience as a foster family caring for over one hundred foster children. She has received many awards and was recently named the National Association of Counsel for Children's Outstanding Young Lawyer. Tara clerked for the Hon. Micaela Alvarez of the U.S. Southern District of Texas in McAllen. She holds a J.D. from the University of Pennsylvania Law School where she was a Toll Public Interest Scholar, a M.P.P. from the Harvard Kennedy School of Government where she was a Taubman Fellow, and a B.A. from Rice University.



Oudrey Hervey is a retired Navy Commander with 29 years of progressive experience in leadership, Strategic HR, and Executive-level management. He has managed or provided expert advice in Global HR, Executive Coaching, Learning & Development, Diversity, Equity & Inclusion, Policy Design, Emergency Preparedness, Interagency Coordination, Project Management, Federal Grants Mgt., and stakeholder engagement. He has trained over 5,000 people in a multinational environment regarding various topics of individual and institutional excellence. He holds an M.A. degree in National Security and a M.S. degree in Public Service, which together provide him with the ability to work effectively and professionally across the public, private, and federal landscape. Additionally, he held leadership positions in public, nonprofit, and private organizations where he produced outcomes that increased revenue, alleviated poverty, and built institutional capacity. Oudrey is a certified Global Professional in Human Resources, a Society of Human Resource Management Senior Certified Professional, and a trained Evidence-Based Coach. He is a thought leader and change agent, with a passion for veteran inclusion, affordable housing, and strategic problem solving through a systems-thinking lens. He is a member of the Houston Housing Collaborative and former Vice Chair of the Harris County Housing Policy Advisory Committee.

Oudrey is a Human Development PhD student, beach cruiser enthusiast, recreational boater, and USCG licensed Master of 100-ton vessels.



**Frances E. Isbell** is the former Chief Executive Officer of Healthcare for the Homeless – Houston (HHH), a Federally Qualified Health Center providing care for 8,500 people annually. As the inaugural CEO of Healthcare for the Homeless – Houston, Ms. Isbell was instrumental in bringing together a large number of community-based agencies, healthcare clinicians, educational institutions, and public organizations to forge a common strategic plan to effectively address the health needs of people experiencing homelessness. The primary aim of this consortium is to increase access to quality healthcare while concurrently reducing costly and ineffective service duplication. Ms. Isbell has received numerous local and national awards and recognitions for her work, and two of HHH's programs have been cited as a national best practice. Previous to this position, Ms. Isbell had a private practice in therapeutic counseling and taught Sociology at Houston Community College, North Harris College, and Sam Houston State University. She also has worked as a consultant in

organizational development and has worked in clinical administration within large hospital systems. Ms. Isbell holds undergraduate and graduate degrees in Social Rehabilitation/Pre-Law and Behavioral Sciences, respectively.



**Jay Jenkins** is the Harris County Project Attorney at the Texas Criminal Justice Coalition. Since joining TCJC in 2014, he has promoted broad youth and adult justice reforms in Houston and the surrounding areas. Jay received his J.D. from Northwestern University School of Law, graduating *magna cum laude* in 2009. While at Northwestern, he worked at the Bluhm Legal Clinic's Children and Family Justice Center, focusing on a number of youth justice issues. In his third year, Jay was the lone law student at the newly formed Juvenile Post-Dispositional Clinic, where he promoted policy reform throughout Chicago while also advocating on behalf of juvenile clients. Jay was admitted to practice law in the State of Illinois and worked as a civil litigator in the private sector for three years. At TCJC, Jay has researched and pursued reforms related to over-policing and prosecution, while also reimagining the local bail system and supporting indigent defense, and he was instrumental in the development of a first-of-its-kind data dashboard that visualizes more than one million criminal case outcomes in Harris, Dallas, Bexar, and Travis Counties. Jay additionally serves as co-founder and President of the Convict Leasing and Labor Project, which launched in 2018 to expose the history of the convict leasing system and its connection to modern prison slavery.



**Terrance "TK" Koontz** currently serves as Statewide Training Coordinator for the Texas Organizing Project. His path to service began after he was arrested in 2010. While sitting in the Harris County Jail, he witnessed the mistreatment of black and brown people and realized that the criminal justice system was essentially about class and racial oppression. Koontz walked away as a convicted felon. Since that time, he has worked without cease to reestablish his life by fighting as an activist and organizing for criminal justice reform. His passion for criminal justice reform is rooted in his experience growing up in communities that were plagued with crime, poverty, and over-policing. In 2015, after the death of Sandra Bland, Koontz became heavily involved in the criminal justice reform movement. He served on the Harris County Criminal Justice Coordinating Council and led a field team of the Texas Organizing Project that mobilized voters in Fort Bend County that helped to elect Brian Middleton, the first African American D.A. in Fort Bend County history. He also served in the office of Harris County Precinct One Commissioner Rodney Ellis as a Community Engagement Coordinator. He has become a highly influential advocate for change in Houston and surrounding areas and has committed his life to criminal justice reform, social reform, and community service. Koontz hopes to continue to play a major role in creating second-chance opportunities for ex-offenders, specifically as it relates to housing and career opportunities.



**Becky Landes** has been an active participant in the Houston nonprofit community since moving to the area in 1988. Since 2016, she has served in the role of Chief Executive Officer at The Beacon. The Beacon's mission is to provide essential and next-step services to restore hope and help end homelessness in Houston.

Since beginning her career, Becky has maintained a lively interest in building community capacity to deliver successful programs that address the needs of those most vulnerable community members and to support them to move forward in meeting their goals. Following college graduation, her time as a Peace Corps volunteer overseas sparked a passion to continue working in the helping professions. She has experience managing federal, state, and local collaborative projects, serving a myriad of individuals from infants to seniors.

Becky holds a Master of Science in Counseling from the University of Houston, Clear Lake and a Bachelor of Arts degree from the College of William and Mary in Virginia. Becky has served on the Continuum of Care (CoC) Steering Committee for the Greater Houston homeless response system known as The Way Home and has enjoyed serving on two local nonprofit boards.



**Johnny N. Mata** currently serves as the Presiding Officer of the Greater Houston Coalition for Justice, a coalition of 24 diverse civil rights organizations. Through the coalition, Mr. Mata has supported changes in policing use-of-force policies and called for the creation of a citizen review board. He led the effort to reform the Texas grand jury selection process and has strived to improve relations between the police and communities of color. He has also advocated for bail bond reform, victim's rights, protecting the voices of residents affected by community development, and promoting the hiring of Latinx educators and administrators. He served two terms as Texas State Director of the League of Latin American Citizens (LULAC) and six terms as a District Director of LULAC. He worked for 32 years as a community director and human resources professional with the Gulf Coast Community Services Association. He organized the community to create the Latino Learning Center and served as a founding board member. Mr. Mata has received the NAACP President's Award, the OHTLI Award from the Republic of Mexico, the Hispanic Bar Association Lifetime Achievement Award, the Willie Velasquez-KTMD Telemundo Channel 48 Hispanic Excellence Award, Antioch Baptist Church Martin L. King Justice Award, and numerous others. The Houston Community College System awarded him an honorary Associate in Arts Degree in recognition of his achievements in promoting education in the Latinx community.



**Maureen O'Connell**, M.S.W., founded Angela House in 2001 to serve women coming out of incarceration. She thought it unconscionable that they had so many obstacles and so few opportunities to build a stable life and escape the cycle of recidivism. Sister Maureen created a successful program that has empowered hundreds of women using a standard of care other programs could emulate. Her wide range of experiences prepared her to create this successful ministry: 13 years as a Chicago police officer and police chaplain; 16 years as Clinical

Services Coordinator at The Children's Assessment Center in Houston and Victim's Assistance Coordinator for the Archdiocese of Galveston-Houston; and more than 40 years as a Dominican Sister, a religious order known for its commitment to social justice. She developed a program of interventions focused on trauma-informed counseling, addiction recovery, employment readiness and personal and spiritual growth. Sister Maureen served as Executive Director of Angela House for 17 years, retiring in 2018 and joining the Board of Directors in 2019.

 **Timothy N. Oettmeier** most recently served as Executive Assistant Chief of Police before retiring after 42 years of public service as a police officer. As Executive Assistant Chief of Police, he was assigned to the Investigative Operations Command supervising the Special Investigations Command consisting of Auto Theft, Gang, Major Offenders, Narcotics, Vehicular Crimes, and Vice Divisions; the Criminal Investigations Command consisting of the Burglary and Theft, Homicide, Investigative First Responder, Juvenile, Robbery, and Special Victims Divisions; and the Technology Services Command. He was a principal architect for implementing community policing throughout the agency. He received his Ph.D. in Police Administration from Sam Houston State University in 1982. He helped oversee national police research initiatives by the National Institute of Justice on fear reduction, organizational change, cultural diversity, measuring what matters, and training. He authored department reports, and articles for textbooks and journals on police management issues. Early in his career, the 100 Club of Houston recognized him as an Officer of the Year. Tim was the recipient of the prestigious Police Executive Research Forum's national Gary P. Hayes Award for outstanding initiative and commitment to improving police services. He received Lifetime Achievement Awards from the Houston Police Department, the State of Texas, and from the 100 Club of Houston.

*C. Monitor Team Bios*

**University of Houston Law Center**

**Sandra Guerra Thompson** is the Newell H. Blakely Chair at the University of Houston Law Center. She chaired committees for the transition teams of Houston Mayor Sylvester Turner in 2016 and Harris County District Attorney Kim Ogg in 2017. In 2012, Houston Mayor Annise Parker appointed her as a founding member of the Board of Directors of the Houston Forensic Science Center, Houston's independent forensic laboratory which replaced the former Houston Police Department Crime Laboratory. In 2015, she became the Vice Chair for this Board and served until 2019. In 2009, she was appointed by Governor Perry as the representative of the Texas public law schools on the Timothy Cole Advisory Panel on Wrongful Convictions. Her scholarly articles address issues such as pretrial hearings and prosecutorial ethics, the causes of wrongful convictions, forensic science, sentencing, jury discrimination, and police interrogations. Thompson is an elected member of the American Law Institute and was appointed to the Board of Advisors for the Institute's sentencing reform project. Since 2019, she is an elected member of the Council of the International Association of Evidence Science.

**Duke University**

**Brandon L. Garrett** is the L. Neil Williams Professor of Law at Duke University School of Law, where he has taught since 2018. He was previously the Justice Thurgood Marshall Distinguished Professor of Law and White Burkett Miller Professor of Law and Public Affairs at the University of Virginia School of Law, where he taught since 2005. Garrett has researched use of risk assessments by decisionmakers as well as large criminal justice datasets, examining how race, geography and other factors affect outcomes. Garrett will contribute to research design, data analysis plans, and analysis of legal and policy implications of findings, as well as engagement with policymakers. Garrett's research and teaching interests include criminal procedure, wrongful convictions, habeas corpus, scientific evidence, and constitutional law. Garrett's work, including several books, has been widely cited by courts, including the U.S. Supreme Court, lower federal courts, state supreme courts, and courts in other countries. Garrett also frequently speaks about criminal justice matters before legislative and policymaking bodies, groups of practicing lawyers, law enforcement, and to local and national media. Garrett has participated for several years as a researcher in the Center for Statistics and Applications in Forensic Science (CSAFE), as well as a principal investigator in an interdisciplinary project examining eyewitness memory and identification procedures. Garrett founded and directs the Wilson Center for Science and Justice at Duke.

**Texas A&M University**

**Dottie Carmichael Ph.D.** is a Research Scientist at the Public Policy Research Institute at Texas A&M University. Since the passage of the Fair Defense Act in 2001, Dr. Carmichael has collaborated in a program of research sponsored by the Texas Indigent Defense Commission to advance high-quality, evidence-based practice. Her research aims to help jurisdictions balance costs and quality in indigent defense delivery systems. Moreover, she is knowledgeable and

experienced in the operation of local governments.  Beyond a number of statewide projects, Dr. Carmichael has conducted qualitative and quantitative research in more than thirty jurisdictions including all of the state's major urban areas.

Her work has informed criminal justice and court policy in at least the past six bi-annual state legislatures.  Most recently, her investigation of costs and case outcomes in jurisdictions using financial- vs. risk-based pretrial release was a significant resource in efforts to pass bail reform legislation in 2017 and 2019.  In addition to leading the state's first defender caseload studies for adult, juvenile, and appellate cases, Dr. Carmichael has evaluated cost- and quality impacts of public defenders, interdisciplinary holistic defenders, the state's regional capital defender office, Innocence Projects operated in publicly-funded law schools, and the school-to-prison pipeline.

Dr. Carmichael's research was cited in Supreme Court Justice David Suter's majority opinion in the landmark 2008 *Rothgery v. Gillespie County* decision. She also led the PPRI research team for the 2010 *Breaking Schools' Rules* report which was subsequently cited by President Obama announcing his "My Brothers Keeper" initiative, and by US Dept. of Education Secretary Arne Duncan and Attorney General Eric Holder announcing new programs and data requirements relating to school discipline.

**David (Dongwei) Shi**, ABD, MS, is a Senior Research Associate at the Public Policy Research Institute at Texas A&M University. Mr. Shi is currently completing a PhD in public policy and administration at the Martin School of Public Policy and Administration at the University of Kentucky, and has earned a M.S. in economics at the University of Wisconsin-Madison in 2018. He is trained in the latest experimental and quasi-experimental research methodologies, and has extensive experience with programming, statistical analysis, data management and analysis of large and complex data sets across different areas including criminal justice.

**Sungkyunkwan University**

**Songman Kang** is an associate professor of economics at Sungkyunkwan University in Seoul, South Korea. He earned his B.A. in Economics from the University of Pennsylvania in 2005, and his Ph.D. in Economics from Duke University in 2012. After completing his Ph.D., he worked as a postdoctoral research associate at the Sanford School of Public Policy at Duke University. Kang is an applied microeconomist with extensive research experience in economic inequality, education, and criminal justice policy. He has published several research papers in prestigious academic journals, including *American Economic Journal: Applied Economics*, *Journal of Econometrics*, *Journal of Population Economics*, and *Journal of Quantitative Criminology*. Kang's recent research, published in *Journal of Law, Economics, and Organization*, investigated the causal effect on local crime of the Secure Communities program, an interior immigration enforcement policy first adopted in Harris County in 2008 and eventually implemented nationwide in 2013. Kang has also received several honors and grants, including Wigong Award from the Korean Law and Economics Association in 2021, and was selected as the Junior Fellow of NBER Economics of Crime Working Group in 2012-2013.

*D. Organizational Chart*



*E. Year 7 Statement of Work*

# Monitoring Pretrial Reform in Harris County

## Monitoring Plan: Year 7

### March 2026

**Brandon L. Garrett, JD, Monitor**
*David W. Ichel Distinguished Professor of
Law Director, Wilson Center for Science and
Justice Duke University School of Law
210 Science Drive
Durham, NC  27708
(919) 613-7090
bgarrett@law.duke.edu*

**Sandra Guerra Thompson, JD, Deputy Monitor**
*Newell H. Blakely Chair
and Criminal Justice Institute Director
University of Houston Law Center
4170 Martin Luther King
Boulevard Houston, TX
77204-6060 (713) 743-2134
sgthompson@Central.uh.edu*

**Team Members:**
**Dottie Carmichael, PhD, Research Scientist**
*dottie@ppri.tamu.edu*
**David Shi, PhD, Senior Research Associate**
**Andrea Sesock, Project Coordinator**
*Texas A&M University
Public Policy Research Institute
Research Scientist
4476 TAMU
College Station, Texas 78743-7746
(979) 854-8800*

**Songman Kang, PhD, Consultant**
*Sungkyunkwan University*
Seoul, Korea

Provided to:

**Representative of Plaintiff Class:**

> **Elizabeth Rossi, Plaintiffs' Counsel, elizabeth@civilrightscorps.org**
> **Cody Cutting, Plaintiffs' Counsel, cody@civilrightscorps.org**
> **Travis Fife, Plaintiffs' Counsel, travis@texascivilrightsproject.org**

**Representatives of Harris County:**

> **Rachel Fraser, Assistant County Attorney,**
> **Rachel.Fraser@cao.hctx.net;**
> **Michael Giordanelli, Office of Justice and Safety,**
> **Amanda.Marzullo@harriscountytx.gov**

**Representative of County Criminal Court at Law Judges:**

> **Allan Van Fleet, Counsel for 12 County Criminal Court at Law**
> **Judges, allanvanfleet@gmail.com**

> **Joseph R. Russo, Jr. Counsel for 4 County Criminal Court at Law Judges,**
> JRusso@greerherz.com

**Representative of Harris County Sheriff's Office:**

> **Major Matt Ferguson**
> **Arlisa Certain, arlisa.certain@harriscountytx.gov**

## *Introduction*

On March 3, 2020, Professor Brandon L. Garrett at Duke University School of Law, as Monitor, and Professor and Sandra Guerra Thompson, University of Houston Law Center, as Deputy Monitor, with the support team members at the Public Policy Research Institute at Texas A&M University, as well as the Center for Science and Justice (CSJ) at Duke University, were appointed to serve as the Monitor Team for the *ODonnell* Consent Decree.

In January 2019, after an initial preliminary injunction order, which took effect June 6, 2017, and following an appeal, Harris County, the misdemeanor judges, and the sheriff promulgated new bail rules, requiring the prompt post-arrest release on unsecured bonds of the vast majority of people arrested for misdemeanor offenses. Pursuant to the rules, everyone else is afforded a bail hearing with counsel, and most are then also ordered released. These rules provided the foundation for the global Consent Decree, which the parties agreed to in July 2019 and which Chief Judge Rosenthal approved on November 21, 2019. The resulting Consent Decree builds upon the county's new pretrial justice system, so as to bring about lasting change in Harris County. The Decree sets forth a blueprint for creating a constitutional and transparent pretrial system to protect the due process and equal protection rights of misdemeanor arrestees. Under the terms of the Consent Decree, the Monitor will serve a key role in bringing each of the component parts together to ensure a holistic and collaborative approach towards pretrial reform. This new system has the potential to become a model for jurisdictions around the country.

The submission to Court has included a Proposal and Budget for each year of work since May 1, 2020. These annual documents have described team members, timelines, an organization chart, and a budget for all participants. The current Work Plan submitted herein describes the sixth year of our work, set out in quarterly deliverables, with a budget of approximately $606,412. As with our prior work plans, this Year 6 Statement of Work is divided into three Deliverables: (1) Policy Assessment and Reporting; (2) Cost Study and Project Management; (3) Community Outreach, Participation, and Working Group.

**Task I: Policy Assessment and Reporting**

This Deliverable describes the tasks associated with reviewing and providing input, and then reporting to the parties and the Court, regarding policies associated with the adoption of Rule 9 and the ODonnell Consent Decree. A central goal of the Monitorship will be to ensure that constitutional rights are safeguarded permanently, through the new systems put into place. In Year 6, the Monitor will be producing reports, including: a year-end Monitor Report. The Monitor will be analyzing data from the county and reporting on these data in that report and to the parties. The Monitor will be providing feedback on a series of tasks that the parties must accomplish, as per deadlines set out in the Consent Decree.

**Task I:1. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, help ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:2. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, help ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:3. Provide Feedback on County Plans and Assessments**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

**Task I:4. Complete Year-end Report**

Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.

Analyze data, including jail data, court data, hearing videos, and judicial opinions.

Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).

Review results of research by outside vendors. Monitor will also prepare its own findings, including for potential academic publication.

Consult with Harris County concerning data variables collected by the County, helps ensure the County data concerning misdemeanor pretrial conditions are public; raw data is available for download; and review any reports generated by the County.

Incorporate work into year-end Monitor Report.

**Project Timeline and Staffing.**

This work will be conducted between March 3, 2026 and March 2, 2027.

**Monitor Team Personnel:**

- **Prof. Brandon Garrett** (Duke Law School)

- **Prof. Songman Kang**.

- **Research assistants** (Duke Law School and University of Houston Law Center)

   **Travel:**

- <u>Travel</u>: travel to Houston Team Members.

## Task II: Cost Study and Project Management

The cost impacts of bail reform in Harris County are being evaluated by the Public Policy Research Institute (PPRI), a leading interdisciplinary government and social policy research organization at Texas A&M University.  There are a range of costs in the pretrial context – not only costs to the system relating to detention, court appearances, prosecution, indigent defense, pretrial services, monitoring, and re-arrest/recidivism, but also costs to the defendant, families, and the community due to loss of freedom, loss of housing, loss of earnings, loss of benefits of spousal/partner assistance, and harm to physical and behavioral health due to pretrial detention.  The PPRI team will assist the Monitor to understand relevant costs, assess change over time, and help identify cost-effective methods of realizing priorities under the Decree.  PPRI will also lead the project management efforts of the team.  Tasks and deliverables are described below.

## Task II:1. Acquire and Validate Cost Data

PPRI will continue to work with OJS and Monitor team colleagues to acquire, merge, and prepare datasets needed for analysis and statistical modeling. Data development and validation is a constant demand requiring ongoing close monitoring to ensure data quality.   Examples of complex quantitative acquisition and validation efforts have included mental health and homelessness data, geo-location data, booking data, pretrial supervision data, carveout case designation, and court date notification data.  In addition, considerable time and attention is invested in qualitative data collection to understand the meaning of variables and the underlying processes for accurate interpretation of statistical results.  During the 2025-26 contract year PPRI will continue to collaborate to pursue these objectives.  Resulting data products will be used to produce more robust quantitative and qualitative estimates of system, defendant, and victim costs and to demonstrate how these costs have changed in amount and composition since the implementation of the Consent Decree.

## Task II:2.  Conduct Cost Data Analysis

Cost-related findings based on both existing and newly available data elements will be studied over the course of the year in order to strengthen and calibrate the bail reform process.  Analyses determined by the Monitors with input from the Parties and other stakeholders will assess general misdemeanor case processing costs as well as specific cost impacts of changes under the Consent Decree.  Results will quantify the relative contributions of independent cost centers and the impact of programs or practices within and between departments.  Reports will summarize major findings, offer recommendations, and propose future directions for continued investigation in support of Consent Decree objectives.  Findings will be shared at stakeholder meetings, in written reports, and in academic publications.

## Task II:3.  Project Management

In their project management role PPRI will facilitate information-sharing and coordination of activities among members of the monitor team and other stakeholder implementing the Consent Decree.  We will assist the Monitor with managing a rolling an agenda of topics for meetings of the Parties, maintain progress notes recording accomplishments and obstacles toward implementing

87

Consent Decree requirements, collaborate with Harris County staff to document attainment of tasks and timelines, memorialize key work products, and regularly report progress to the Parties, the Federal Court, and the public through status reports on Consent Decree milestones. Costs for this continuous support function will be apportioned evenly across billing for other deliverables over the course of the year.

**Task II:4.  Produce Ninth Cost Analysis Report**

For the Ninth Monitor Report to be submitted March 3, 2027, PPRI will further expand and integrate analysis centering on cost aspects of the Consent Decree.  Working with the Monitors, we will identify a menu of informative and useful potential targets for cost-related research based on developments in meetings/calls with key stakeholders, formal plans for system changes generated from within the county and by outside researchers, results of data analyses conducted by the Monitoring team, the academic research literature, and other sources as appropriate.

**Project Timeline and Staffing**

This work will be conducted between March 3, 2026 and March 2, 2027.
- **Texas A&M, Public Policy Research Institute (PPRI)** will conduct a multi-year evaluation
- **Dottie Carmichael** (Director and Research Scientist, Texas A&M University, PPRI)
- **David Shi** (Senior Research Associate)
- **Andrea Sesock** (Project Coordinator)
- Travel: to Houston for Texas A&M University Team Members

**Task III: Community Outreach, Participation, and Working Group**

The Monitor Team recognizes that the permanence of the Consent Decree's implementation will turn on its acceptance by local community leaders and stakeholders.  The Monitor Team will convene a Community Working Group, whose composition is detailed in the Monitor's Proposal to Harris County, that would advise the Monitor Team as well as assist in keeping the community informed of the County's progress in implementing the Consent Decree.

**Task III:1. Continued Public Outreach and Participation**

Convene meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to maintain Monitor website, to provide all Monitorship-related documents to the public, an overview of the goals and process, a calendar with relevant dates, answers to common questions concerning pretrial process under the Consent Decree, and a way for members of the public to share information, including anonymously, with the Monitor.

**Task III:2. Continued Public Outreach and Participation**

Convene meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

The Monitor Team will review County's plan for upcoming public meetings, in consultation with the Community Working Group, to ensure that fully transparent, representative, local, and robust participation is sought and achieved.

Continue to update Monitor website.

### Task III:3. Convene CWG and Solicit Additional Public Input

Convene meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Continue to update Monitor website.

### Task III:4. Public Meeting, Ninth Monitor Report

Convene meetings of the Community Working Group (CWG).

Continue to reach out, with the guidance of the CWG, to local organizations to introduce themselves and offer to meet with community groups interested in learning more about the Consent Decree.

Fourth public meeting convened.

Incorporate work into upcoming Monitor Report.

Continue to update Monitor website.

### Project Timeline and Staffing

This work will be conducted between March 3, 2026 and March 2, 2027.

- **Sandra Guerra Thompson** (University of Houston Law Center)

**Houston Meeting Costs:**

- Administrative support, food, publicity, space
- Travel: to Houston for Prof. Thompson

**Deliverables**

| Deliverable I | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| <u>Task 1:1.</u><br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br><u>Task II:1.</u><br><br>The Monitor Team (PPRI) continues work to acquire, clean, link, and prepare datasets and county department budget records for cost analysis.<br><br>Ongoing statistical and qualitative analysis will be conducted in preparation for the cost analysis report.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br><u>Task III:1.</u><br><br>Monitoring Plan re: outreach and participation for the second year.<br><br>Convene monthly meetings of Community Working Group (CWG). | June 1, 2026 | $194,164 |

84

| | | |
|---|---|---|
| Begin set up of Houston office.<br><br>Continue to maintain Monitor website. | | |

| Deliverable 2 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:2.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into Monitor Report.<br><br>Task II:2.<br><br>The Monitor Team (PPRI) conducts ongoing research analysis on topics determined in collaboration with the Monitors, the Parties, and other stakeholders. Resulting work products include presentations, reports, and publications.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:2.<br><br>Continue Community Outreach. | August 20, 2026 | $147,899 |

92

| | | |
|---|---|---|
| Convene monthly meetings of the Community Working Group (CWG).<br><br>Review County's plan for upcoming public meetings.<br><br>Incorporate work into Ninth Monitor Report. Updates<br><br>to Monitor website. | | |

| Deliverable 3 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:3.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Task II:3.<br><br>The Monitor Team (PPRI) facilitates information-sharing and coordination of activities among ODonnell stakeholders relating to progress under the Consent Decree.  Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status. | November 28, 2026 | $112,387 |

93

| | | |
|---|---|---|
| Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress on Monday.com, and reporting status.<br><br>Task III:3.<br><br>Outreach to share results of Ninth Monitor Report.<br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Updates to Monitor website | | |

| Deliverable 4 | Estimated Delivery Dates | Billable Amount |
|---|---|---|
| Task I:4.<br><br>Continue to conduct regular meetings/calls with the parties to discuss progress under Consent Decree.<br><br>Analyze data, including jail data, court data, hearing videos, and judicial opinions.<br><br>Review plans to develop systems and structures to deliver effective indigent defense services (e.g., investigation, mitigation).<br><br>Review results of research by outside vendors to study topics such as causes of nonappearance, indigent defense, court forms.<br><br>Consult with Harris County concerning data variables collected by the County, including data regarding court nonappearances; helps ensure the County develops a data website so that misdemeanor pretrial conditions are public; raw data is available for download; and reviews first of the 60-day reports generated by the County.<br><br>Incorporate work into year-end Monitor Report.<br><br>Task II:4. | March 2, 2027 | $151,962 |

94

| | | |
|---|---|---|
| The Monitor Team (PPRI) produces the Ninth Cost Analysis Report reflecting informative and useful targets for research developed in collaboration with the Monitor and Deputy Monitor, and with input from key stakeholders such as the Parties and the Community Working Group.<br><br>Project management support includes preparing meeting agendas, keeping notes, tracking Consent Decree progress, and reporting status.<br><br><u>Task III:4.</u><br><br>Convene monthly meetings of the Community Working Group (CWG).<br><br>Third public meeting convened.<br><br>Continued outreach, with the guidance of the CWG, to local organizations and community groups.<br><br>Incorporate work into Ninth Monitor Report. Updates to<br><br>Monitor website. | | |

Total Year 6 Budget: $606,412

## F. Cost Evaluation Methods

*Policy Intervals*

While Rule 9 was the central reform under the Consent Decree, other court-ordered policy changes occurred before the settlement. Table F-1, below, presents the full set of intervals examined with a summary of pivotal policy developments. Their cost effects were evaluated using dummy variables marking the policy regime in effect at the time a case entered custody.[31] Overlaying these formal policy transitions, Harris County case processes were also shaped by two major non-policy disruptions: Hurricane Harvey and Covid-19. The effects of Hurricane Harvey, fully contained within the Preliminary Injunction interval, were controlled using a dummy variable to isolate storm-related disruptions from the underlying policy effects of the Preliminary Injunction. In contrast, because the Covid-19 period was ongoing when the last cases entered the study sample,[32] a similar dummy control could not be applied. Accordingly, multivariate results for the Rule 9 interval are presented without Covid controls; however, separate model estimates for the pre-Covid and Covid portions of Rule 9 are available upon request from the authors.

**Table F-1.** Major Policy Events Impacting Pretrial Case Processing Costs

| | Start Date | End Date | Misdemeanor Policy Impacts |
|---|---|---|---|
| FORMAL POLICY INTERVALS | | | |
| Pre-reform Baseline | 1/1/15 | 5/14/17 | • Pretrial release was determined by ability to pay the scheduled bond amount.<br>• 89% of cases entering custody paid a secured bond. |
| Preliminary Injunction | 5/15/17 | 7/29/18 | • Individualized risk determination within 24 hours of arrest was required for pretrial detention.<br>• Most defendants signing an affidavit of inability to pay secured bond or detained at 24 hours without a bond hearing qualified for unsecured release.<br>• Secured bond declined to 46% of cases entering custody. |
| Amended Preliminary Injunction | 7/30/18 | 2/15/19 | • Indigent defendants could be detained on unaffordable secured bond if grounds were provided on the record and an adversarial review hearing was held within one business day.<br>• Time allowed for individualized risk determination was<br>• extended from 24 to 48 hours after arrest.<br>• Secured bond increased to 52% of cases |

---

31.    Results for each policy interval were estimated while keeping dummy indicators for all preceding intervals active in the model. This approach controls for the lingering effects of earlier regimes and isolates the marginal impact of the policy in place at the time of custody.

32.    The Centers for Disease Control declared an end to the COVID-19 public health emergency on May 11, 2023 (https://www.hhs.gov/about/news/2023/05/09/fact-sheet-end-of-the-covid-19-public-health-emergency.html), but cases eligible for inclusion in the study sample end on January 15, 2023.

| | | | |
|---|---|---|---|
| Rule 9 | 2/16/19 | 3/12/20 | • Most defendants became eligible for prompt pretrial release on GOBs.<br>• Carveout cases receive an individualized risk determination within 48 hours of arrest.<br>• Secured bond fell to just 23% of cases entering custody. |
| NON-POLICY-RELATED DISRUPTIONS | | | |
| Hurricane Harvey | 8/17/17 | 6/23/18 | • Storm damage closed the CCCL courts requiring relocations, schedule changes, delayed trials, and case backlogs.  Non-appearance increased; bond failures tripled. |
| COVID-19 Start | 3/13/20 | 1/15/23[33] | • Carveout cases increased from 29% to 37% of cases, adding strain to pretrial processing.<br>• Pandemic-related precautions like suspension of in-person trials, remote hearings, and socially distanced jury trials further exacerbated case backlogs. |

*Cost and Re-Arrest Outcome Measures*

Both cost and re-arrest outcomes were hypothesized to be affected by *ODonnell*-related policy changes. Most cost measures, summarized in Table F2, were derived from FY 2020 operational budgets and case counts for Harris County criminal justice departments. Secured bond, private defense, and probation sentence costs were extrapolated from external reference materials, and case-level court fees/fines were provided by the District Clerk's Office. Because prosecutor cost data was unavailable, public defender rates were substituted. Where a single cost applied to multiple cases entering custody on the same date, the expense was prorated across all co-booked cases to avoid overstating per-case costs.

**Table F2.** Cost Outcome Measures

| Cost | Source | Cost per Case (in 2020 dollars) |
|---|---|---|
| Secured Bond | https://www.suretybonds.com/ | 10% of secured bond principal/case |
| Bookings | Sheriff's Office | Cost/booking:<br>• Secured bond: $482.15<br>• Unsecured, in-person bond hearing: $381.09<br>• Unsecured, early presentment review:[34] $241.30<br>• GOB: $183.53 |

---

33.    The Centers for Disease Control declared an end to the COVID-19 public health emergency on May 11, 2023, but eligible cases end on January 15, 2023.

34.    In an early presentment review, the Pretrial Services Department identified low-risk cases for a personal bond determination by a hearing officer prior to a bond hearing.  Early presentment was only used for misdemeanor cases during the Preliminary and Amended Injunction policy intervals between May 15, 2017 and February 15, 2019.

| Pretrial Screenings | Pretrial Services Department | Cost/screening:<br>• GOB bond: $13.83<br>• Other bonds: $83.00<br>• Cases filing bond prior to booking: $0 |
|---|---|---|
| Bond Hearings | Office of Court Management, Prosecutor's Office, Public Defender's Office | Cost/bond hearing:<br>• No public defender (before 7/13/17): $115.54<br>• With public defender (after 7/13/17): $138.93<br>• Early presentment review:[35] $37.54 |
| Pretrial Detention | Sheriff's Office | $73.82/jail day |
| Jail Sentences | Sheriff's Office | $73.82/jail day |
| Probation Sentences | FY19 and FY20 Criminal and Juvenile Uniform Cost Report[36] | $3.98/day of community supervision |
| Court Fees/Fines | District Clerk's Office | Varies per case |
| Trial Court Settings | Office of Court Management | $60.39/court setting |
| Prosecution | Due to unavailable data, Public Defender rates were applied for Prosecutor costs | Cost/court setting:<br>• Regular non-mental health setting: $126.66<br>• Reset non- mental health setting: $63.33<br>• Regular mental health setting: $151.99<br>• Reset mental health setting: $76.00 |
| Indigent Defense | Office of Court Management, FY20 Harris County Indigent Defense Expenditure Report[37] | Cost/court setting:<br>Public Defender<br>• Regular non-mental health setting: $126.66<br>• Reset non- mental health setting: $63.33<br>• Regular mental health setting: $151.99<br>• Reset mental health setting: $76.00<br>Assigned Counsel<br>• Regular non-mental health setting: $43.84<br>• Reset non- mental health setting: $21.92<br>• Regular mental health setting: $52.61<br>• Reset mental health setting: $26.30 |

---

[35].    *Id.*

[36].    Criminal and Juvenile Justice Uniform Cost Report, Fiscal Years 2019 and 2020 (January 2021). Submitted to the 87th Texas Legislature, prepared by the Legislative Budget Board Staff. at Figure 7, p.8.

[37].    See https://tidc.tamu.edu/public.net/Reports/ExpenditureReportResults.aspx.

|  |  | Managed Assigned Counsel<br>• Regular non-MH setting: $72.63<br>• Reset non-MH setting: $36.31<br>• Regular MH setting: $87.16<br>• Reset MH setting: $43.58 |
|---|---|---|
| Private Defense | Published sources[38] | Cost/court setting:<br>• Regular non-mental health setting: $132.81<br>• Reset non- mental health setting: $66.41<br>• Regular mental health setting: $159.37<br>• Reset mental health setting: $79.69 |

In addition to measuring cost impacts, two re-arrest outcomes were also constructed to evaluate whether pretrial release policies were associated with changes in future offending. These included (1) a binary indicator of any re-arrest within three years of custody, and (2) a count of new arrests during the same three-year period. Re-arrests for statistically similar cases were compared across policy intervals using the same multivariate methods as for cost outcomes. Results for the Rule 9 interval were separated before and after the COVID-19 start date to more clearly illustrate pandemic-related effects.

*A. Control Variables*

The final components of the regression models are the control variables, which are included to reduce confounding from factors unrelated to the policies under study. These controls help isolate the effects of the policy intervals on both costs and re-arrest outcomes net of differences in case characteristics, defendant histories, and other contextual influences. Standard diagnostic tests were conducted to ensure that the control variables were not excessively correlated with one another, as multicollinearity can inflate standard errors and reduce the precision of estimates. In addition to reviewing a correlation matrix, variance inflation factor (VIF) tests were performed as a complementary assessment. No VIF values approached thresholds associated with problematic multicollinearity. Table F3 summarizes each control variable and its operationalization.

**Table F3.** Control Variables

|  |  |
|---|---|
| DEFENDANT CHARACTERISTICS | |
| Age 30 or younger | Over age 30 |
| Female | Male |
| Black Race | White Race |
| Other Non-White Race | |
| Hispanic Ethnicity | Not Hispanic Ethnicity |
| Homeless | Not Homeless |

---

[38]. Dottie Carmichael, et. al., *Guidelines for Indigent Defense Caseloads, Austin, TX: Texas Indigent Defense Commission* (Jan. 2015), https://www.tidc.texas.gov/media/kzfd5tup/guidelines-for-indigent-defense-caseloads-01222015.pdf; State Bar of Texas, *2023 Income Report* 2 https://www.texasbar.com/AM/Template.cfm?Section=Archives&Template=/CM/ContentDisplay.cfm&ContentID=66422; Harris County 2020 Practice Time Report reported to the Texas Indigent Defense Commission https://tidc.tamu.edu/public.net/Reports/AttorneyCaseLoad.aspx.

| | |
|---|---|
| Mentally Ill | Not Mentally Ill |
| CRIMINAL CASE ATTRIBUTES | |
| Any Charges in Past 3 Years | No Charges I Past 3 Years |
| Any Bond Failure in Past 3 Years | No Bond Failure in Past 3 Years |
| Carveout Case | Not Carveout |
| Appointed Attorney | No Appointed Attorney |
| NIBRS[39] OFFENSE CATEGORY | |
| Drug Offense | National Incident Based Reporting System (NIBRS) Group B Offenses |
| Theft Offense | |
| Burglary Offense | |
| Weapon Offense | |
| Assault Offense | |
| Driving While Intoxicated Offense | |
| Other NIBRS Group A Offense | |

---

39. See *supra* note 52, describing NIBRS data.

## G. Consent Decree Tasks and Milestones

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 7 | 38 | 10/1/2025 Done | **Provide FY 25-26 PDO allocation > FY 19-20 approved budget -** The County will provide funding and staffing at or above the Public Defender Office's FY 19-20 approved budget to meet obligations for zealous and effective misdemeanor representation at bail hearings and at other stages of the process. | STATUS:  Done<br><br>PDO Budget Approved by Commissioner's Court September 2025. |
| 7 | 41a | 12/15/2020 *In Progress* | **Provide support staff for private apptd. counsel at bail hearing -** CCCL Judges will establish a process, approve, and provide funding for qualified support staff to assist private appointed counsel at bail hearings. | STATUS:  In Progress<br><br>The Managed Assigned Counsel officially began serving all 16 misdemeanor courts as of December 27, 2021, however, are not yet attending bail hearings.  In August 2022, the MAC provide a recommendation to the judiciary should they eventually delegate appointment authority over to the MAC.<br><br>Status will be changed to "Done" once the requirements of ¶ 41b and 43b have been met. |
| 7 | 41b | 3/1/2021 (Extended) *In Progress* | **Fund at least min. holistic defense staff recommended by expert -** Based on the expert's written report and recommendations, in consultation with the Monitor, the County must fund the minimum number of recommended holistic defense support staff. | STATUS:  In Progress<br><br>Funding for holistic defense staff was being provided as part of the Managed Assigned Counsel office grant from the TIDC (212-20-D06).  The NAPD report recommendations were submitted to the Commissioner's Court 8/10/21. In August 2022, the MAC provide a recommendation to the judiciary should they eventually delegate appointment authority over to the MAC but they are not yet attending bail hearings.  They currently have 20-30 cases per social worker and would like an additional social worker and social worker supervisor but would need additional funding to do so.  A supervisor would allow for expanded services.  Previous attempts for budget increases have been denied by the County.<br><br>Status will be changed to "Done" once Harris County Budget Management agrees with OJS, PDO, and MAC on the number of support staff positions to be hired. |
| 7 | 43 and 44 | 12/15/2020 (Extended) *TBD* | **Develop written plan for essential defense counsel supports -** Defendants must develop a written plan to ensure defense counsel have space to confer with clients before a bail hearing, have access to essential support staff by phone or video conference, can call witnesses and prevent/confront evidence, and can promptly discover information presented to the presiding judicial officer.  The plan will be reviewed by the Monitor with input from Class Counsel, and implemented within a reasonable timeline. | STATUS:  In Progress<br><br>Harris County is working collectively with several agencies on a plan.  The plan will incorporate recommendations from the NAPD Holistic Defense assessment (¶ 41b) completed on 7/7/21.  Many of the recommendations have already been implemented.  Budget cuts in September 2022 hindered the implementation of other recommendations.  The County continues to work on how they can move forward with developing a plan.<br><br>Status will be changed to "Done" once a written plan is in place. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 8C | 54 | 3/1/2022 (Extended) *Nearly Done* | **Allocate $850,000 Year 3 to support court appearance per mitigation plan timeline and budget** - After study concludes, absent good cause for a lesser amount, County must allocate at least $850,000/year toward mitigating causes of nonappearance. County will consult with researchers to determine a reasonable timeline and a budget for implementing the first three years of the plan.  To establish good cause, County submits purported cause to the Monitor; Monitor notifies Class Counsel; Monitor makes a determination; Either Party may file a motion to the Court if they disagree with the Monitor's determination. | **STATUS: Nearly Done.**  Harris County has allocated the required $850,000 annually for the past three fiscal years and is currently in Year 3 of 7 following approval of the Nonappearance / Section 55 Plan in 2023. While funding has been consistently appropriated, implementation of the Plan's recommendations remains ongoing. Completed initiatives include the launch of myharriscountycase.com, funding of the CARP Misdemeanor Program, and expansion of the Justice Navigators Program. The County is currently finalizing remaining components, including educational videos, procurement of kiosks and charging stations, and ongoing marketing and outreach.  Will be marked as Done once the completion of recommendations for the Nonappearance Plan is complete. |
| 10 | 78 and 79 | Done | **Deliver Year 5 Refresher Consent Decree Training** - Defendants will implement the Training Plan on an annual basis with updates and improvements subject to review and approval by the Monitor and Class Counsel. | **STATUS: Done**  The required refresher Consent Decree training was offered twice to ensure broad judge and attorney participation. The course was available online from October 15 to November 15, 2025, and again from December 15, 2025, to February 2, 2026. The training was self-paced and accessible online to allow attorneys to complete it on their own schedules. |
| 9 | 81, 82, 84, and 85 | 8/30/2020 *Nearly Done* | **Provide data for Monitor to evaluate Consent Decree implementation** - Defendants will consult with the Monitor to systematically collect, preserve, and integrate data variables sufficient to permit tracking, analysis, and reporting required by the Consent Decree.  Will include all existing data relating to misdemeanor cases from 2009 through the present (¶ 84); data variables  specified in ¶ 85 to permit tracking, analysis, and reporting of information for each misdemeanor  arrestee; and all variables required to generate reports required by ¶ 87 and  ¶89. If collection or maintenance of any required data variables is cost prohibitive or infeasible, Defendants may submit a request for exemption to the Monitor. | **STATUS: Nearly Done**  OJS staff are currently integrating data variables from multiple Harris County offices required to permit tracking, analysis, and reporting required by the Consent Decree. Existing data for cases from 2009 through the present are currently available to the Monitor team.  Status will be changed to "Done" after all variables specified in ¶ 85 are available. Monitors are still waiting on #S: Any conditions of release or supervision imposed by a judicial officer, the date each was imposed, and the amount of any fees assessed. |
| 11 | 83 | 11/15/2020 (Extended) *Nearly Done* | **Make Consent Decree data publicly available** - The County will make the raw data that the Defendants are required to collect and maintain under this Consent Decree available for ready public access in a usable format (e.g. an Excel spreadsheet). | **STATUS:  Nearly Done**  The ODonnell Public Dashboard went live 9/8/2022 with automated reports of some of the data measures specified in ¶ 89.  The OJS data team is in process of adding 6 more measures.  Status will be changed to Done after adding additional data measures in ¶ 89 and raw data downloads are |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| | | | | posted on the existing public Consent Decree website described in ¶ 90. |
| 9 | 88, 89 | 8/30/2020 *Nearly Done* | **Develop web-based Data Platform** - The County will develop a web-based Data Platform that organizes, integrates, analyzes, and presents the information required by ¶ 89 into a public -facing interface.  The County may engage a TA provider with expertise in data analytics to create the Data Platform. | **STATUS: Nearly Done** <br><br> The ODonnell Public Dashboard went live 9/8/2022 with automated reports of some of the data measures specified in ¶ 89.  The OJS data team is in the process of adding 6 more measures. <br><br> Status will be changed to Done after adding additional data measures in ¶ 89 and raw data downloads are posted on the existing public Consent Decree website described in ¶ 90. |
| 12 | 92 | 5/19/2025 Done | **Conduct Year 5 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90). Defendants and community groups will determine meeting parameters with approval by the Monitor.  Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: Done** <br><br> An in-person public meeting was held on 3/20/2025 at the Tracey Gee Community Center from 6:00 p.m. to 8:00 p.m. A second public meeting was held on 3/21/2025 at the Harris County Administration Building from 12:30 p.m. to 2:00 p.m. and was conducted in a hybrid in-person and online format. |
| 12 | 92 | 11/21/2025 Done | **Conduct Year 5.5 Public Meeting** - Regular public meetings will be held at least once every six months in at least two geographic locations accessible to the maximum number of residents and including HCTX Consent Decree website simulcast (Sec. 90).  Defendants and community groups will determine meeting parameters with approval by the Monitor. Knowledgeable representatives of each Defendant group and the Monitor must be present and report on CD implementation including areas of success and for improvement. | **STATUS: Done** <br><br> An in-person public meeting was held on 11/10/2025 at Crossover Fellowship Church (ReGEN Building) from 6:30 p.m. to 8:00 p.m. A second public meeting was held on 11/11/2025 at the Harris County Administration Building from 12:00 p.m. to 1:30 p.m. and was conducted in a hybrid in-person and online format. |
| 13 | 93, 94 | 5/2/2025 *Done* | **Year 6 review of posted policies -** Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS: Done** <br><br> Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website. |
| 13 | 93, 94 | 11/2/2025 *Done* | **Year 6.5 review of posted policies -** Every six months, defendants will review policies posted at the JPC and the CJC and update as necessary. | **STATUS: Done** <br><br> Key policies agreed by the Defendants are currently posted at the JPC & CJC and on the HCTX ODonnell Consent Decree website. |

| Section | ¶ | Due Date | Milestones | Status |
|---|---|---|---|---|
| 14 | 103 | 3/3/2026 *Nearly Done* | **Monitor's Budget: Year 7 -** The Monitor will submit a proposed budget annually. The County will fund the Monitor at a reasonable rate. | **STATUS: Nearly Done**<br><br>Monitor's budget Year 7 will be submitted to the county by March 3, 2026. |
| 14 | 116 | 3/3/2026 *Nearly Done* | **Monitoring Plan: Year 7 -** In coordination with the Parties, the Monitor will prepare an annual Monitoring Plan to be made public and published on the County's Consent Decree Website (see Sec. 90).  The Plan must delineate requirements of the Consent Decree to be assessed for compliance, identify the proposed methodology, and create a schedule with target dates for conducting reviews or audits. | **STATUS: Nearly Done**<br><br>Monitor's Year 7 plan will be submitted to the county by March 3, 2026. |
| 14 | 115, 118 | 1/18/2026 *Done* | **Submit Draft Monitor's Report:  Year 6 -** Every six months for the first three years, and annually thereafter, Monitor will provide a draft Monitor's Report (including the information specified in Sec. 117) for review by the Parties.  Monitor's Report will present results of reviews to determine whether the County, CCCL Judges, and Sheriff have substantially complied with the requirements of this Consent Decree. Parties will have 30 days to comment; Monitor will have 14 days to consider the Parties' comments before filing the report with the court. | **STATUS: Done**<br><br>The year 6 draft monitor report was submitted on 1/18/2026. |
| 14 | 117 | 3/3/2026 *Nearly Done* | **Publish Monitor's Report:  Year 6 -** Monitor will file with the Court, and the County will publish, written public reports on compliance, which will include the information specified in Sec. 117. | **STATUS: Nearly Done**<br><br>The final year 6 monitor report will be submitted on 3/3/2026. |