UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| MARANDA LYNN ODONNELL, ET AL. | § § | |
| *Plaintiffs,* | § § | |
| v. | § § | Case No. 4:16-cv-01414 |
| HARRIS COUNTY, TEXAS, ET AL. | § § § | |
| *Defendants.* | § § | |

**INTERVENOR'S OBJECTIONS TO THE NINTH REPORT OF THE COURT-APPOINTED MONITOR**

Intervenor, Ken Paxton, the Attorney General of Texas, files these objections to the Ninth Report of the Court-Appointed Monitor ("Report"), filed with the Court on March 4, 2026 (Dkt. 799-1).

## I.    OBJECTIONS

**A.    The Monitor violated Paragraph 118 of the Consent Decree.**

Paragraph 118 of the Consent Decree requires that the Monitor provide a draft of the Report to the parties and consider their comments before filing with the Court:

> 118. The Monitor will provide a copy of the reports to the Parties in draft form not more than 30 days after the end of each reporting period. The Parties will have 30 days to comment and provide such comments to the Monitor and all other Parties. The Monitor will have 14 days to consider the Parties' comments and make appropriate changes, if any, before filing the report with the Court.

Dkt. 708 at ¶118. The Monitor's duty to provide a copy of the report to the Parties is mandatory: the Monitor "will provide a copy of the reports to the Parties." *Id*. The Intervenor became a party[1]

---

[1] *See* the Consent Decree, Dkt. 708 at ¶1, defining "Parties" to collectively mean Plaintiffs and Defendants.

once the Court partially granted his motion to intervene (Dkt. 764), therefore, he was entitled to review the draft report before it was filed. The Monitor failed to comply with this mandate, notwithstanding his knowledge of the Attorney General's intervention. *See* Dkt. 799-1 at iii, 13; *see also* Exh. A.  Thus, the Report should not be relied upon for this independent reason.

**B.      The Report's flawed methods and analyses render it unreliable.**

At minimum, the Report suffers from the following methodical and analytical flaws that render it unreliable:

*i.*      *Admitted significant limitations*:  The Report acknowledges that the recidivism rate is limited to Harris County records only:

> **Our repeat arrest measures come from Harris County's criminal case records only, and may not present a full picture of repeat offenses by former misdemeanor arrestees**.  For example, **our repeat arrest measures do not include new offenses that were committed by former defendants but were not reported and/or charged**. Similarly, since some of these new cases filed eventually become dismissed or acquitted, our measure does not reveal whether the person was actually guilty or convicted of the offense in question. Also, **since our criminal case record data only cover Harris County, new arrests made in other jurisdictions are not observed in our data**.

Dkt. 799-1 at 49 (emphasis added).  The Monitor's sole reliance on Harris County's criminal case record data is a significant deficiency in its repeat offense analysis that renders the Report's conclusions on the impact of the Consent Decree on public safety unreliable.  This is a remarkable failure for a Report that aspires to set a national model for misdemeanor bail reform (Dkt. 799-1 at 18), with significant public safety implications.  Former misdemeanor arrestees released on General Order Bonds who subsequently reoffend in neighboring counties or in other jurisdictions are excluded from the analysis.  The Report offers no rationale for failure to track and include such data.  Because the size of that population is unknown, it can hardly be dismissed as inconsequential.

*ii.    The Study section of the Report is unreliable.*

1. *Significant limitation in failing to account for the impact of Covid-19.*    The Report acknowledges failure to control for the effects of Covid-19, a seismic event:

> The effects of Hurricane Harvey, fully contained within the Preliminary Injunction interval, were controlled using a dummy variable to isolate storm-related disruptions from the underlying policy effects of the Preliminary Injunction. **In contrast, because the Covid-19 period was ongoing when the last cases entered the study sample, a similar dummy control could not be applied**. Accordingly, **multivariate results for the Rule 9 interval are presented without Covid controls**; however, separate model estimates for the pre-Covid and Covid portions of Rule 9 are available upon request from the authors.

Dkt. 799-1 at 96 (emphasis added).  This glaring failure is astonishing, especially as the Report admits that the Covid-19 pandemic ended in 2023.[2]  For a Consent Decree that the Monitor aspires to become a national model for bail reform, Dkt. 799-1 at 18, the Report failed to transparently demonstrate how it reached its conclusions but instead asked that the Monitor be contacted for "separate model estimates for the pre-Covid and Covid portions of Rule 9."  Dkt. 799-1 at 96, n. 32.  This is troubling and offends due process.  Nor is a cogent reason offered for failing to exclude the Covid-19 period once the Monitor determined that he could not control for the pandemic's effects.

2. *Period covered by the cost estimate*: The cost estimate is from January 1, 2015 to January 15, 2023.  Dkt. 799-1 at 57.  No explanation is provided on why the study is limited to 2023 and not through 2025, or what the effect of including those years would be.

3. *Table F2.  Cost Outcome Measures (Dkt. 799-1 at 97) is riddled with the following flaws*:

   i.    The Report states "[m]ost cost measures, summarized in Table F2, were derived from FY 2020 operational budgets and case counts for Harris County criminal justice departments" (Dkt. 799-1 at 97) but fails to specify which ones.  Nor does it explain

---

[2] Dkt. 799-1 at footnotes 32-33

why it relied on FY2020 budgets and case counts for a report submitted in March 2026.

ii.    The Report further states:

> Secured bond, private defense, and probation sentence costs were extrapolated from external reference materials, and case-level court fees/fines were provided by the District Clerk's Office. Because prosecutor cost data was unavailable, public defender rates were substituted. Where a single cost applied to multiple cases entering custody on the same date, the expense was prorated across all co-booked cases to avoid overstating per-case costs.

*Id*. The Report fails to state whether the secured bond, bond, private defense, and probation sentence costs that it extrapolated from external reference materials, and the case-level court fees and fines were also from FY 2020, or whether it used data from one year across several years. Additionally, the Report fails to explain why the prosecutor cost data remains unavailable since the Monitor's appointment in 2020 (six years ago) and the basis for using public defender rates as a substitute, or for assuming that the public defender rate would be equivalent to the prosecutor rate. It is also unclear whether these costs were for the same time period.

iii.   The Report claims that the Consent Decree "substantially reduced misdemeanor system costs in Harris County while strengthening due process protections," contending that "overall costs declined by 33%, yielding $1,191 in net savings per statistically comparable case." Dkt. 799-1 at 57. A review of Appendix F, however, reveals flawed methods, assumptions, and analysis. The Report focused on cost savings to Harris County and purported to exclude those borne by the State. For example, it notes that "[f]elony probation and prison costs were omitted because these functions are funded by the State of Texas rather than Harris County." *Id*. at 67, n. 24. However, as shown below, the Report impermissibly included costs borne by the State and felony-related

4

costs.

iv. *Secured Bond*: For this category, the Report relies on the website https://www.suretybonds.com/ for the cost of secured bond. Dkt. 799-1 at 97. There is one problem: SuretyBonds.com expressly disclaims provision of bail bonds: "***Please note*:** *SuretyBonds.com does not provide **bail bonds**, which are used to secure a defendant's release from jail."* See https://www.suretybonds.com/commercial/bail-agent-bonds (last accessed March 12, 2026).

v. *Bookings*: For this category, in providing the cost for unsecured, early presentment review of $241.30, the Report noted that early presentment was only used for misdemeanor cases between May 15, 2017 and February 15, 2019, yet included it in the cost for 2020.

vi. *Bond Hearings*: As in the Bookings category above, early presentment review cost of $37.54 is included for 2020 notwithstanding the Report's acknowledgement that early presentment was only used from May 15, 2017 to February 15, 2019.

vii. *Probation Sentences*: For this category, the Report relies on the "FY19 and FY20 Criminal and Juvenile Uniform Cost Report" for the reported cost of "$3.98/day of community supervision." Dkt. 799-1 at 98.[3] As observed above, the Report fails to explain why it depends on FY 2020 figures, especially when it concedes that in 2020 Harris County was in the throes of Covid-19, which impacted the data, and when the FY21 and FY22 Criminal and Juvenile Justice Uniform Cost Report is available.[4]

---

[3] *See* Dkt. 799-1 at 98, n. 36, citing Figure 7, p. 8 of Criminal and Juvenile Justice Uniform Cost Report, Fiscal Years 2019 and 2020 (January 2021).

[4] *See* Criminal and Juvenile Justice Uniform Cost Report, Fiscal Years 2021 and 2022 (February 2023). Submitted to the 88th Texas Legislature, prepared by the Legislative Budget Board Staff, available at https://www.lbb.texas.gov/Documents/Publications/Policy_Report/7455_Uniform_Cost_Feb_2023.pdf.

Moreover, the reported $3.98 in the FY19 and FY20 Criminal and Juvenile Uniform Cost Report includes State cost and felonies, in contrast to the Report's purported limited focus on Harris County's cost and misdemeanors only. As shown below, the $3.98 cost is derived from including the State cost of $2.13 and the Local Cost of $1.85.[5] Additionally, the FY19 and FY20 Criminal and Juvenile Uniform Cost Report notes that the total cost was impacted by Covid-19.[6]

**FIGURE 7**
**COSTS PER DAY FOR COMMUNITY JUSTICE ASSISTANCE**
**DIVISION COMMUNITY SUPERVISION POPULATIONS**
**FISCAL YEARS 2019 AND 2020**

| POPULATION | 2019 | 2020 |
|---|---|---|
| Community Supervision | | |
| State Cost | $1.97 | $2.13 |
| Local Cost (Participant fees) | $1.91 | $1.85 |
| **Total** | **$3.88** | **$3.98** |

viii.  *Prosecution*:  As stated above, the Report fails to explain why "Public Defender rates were applied for Prosecutor costs,"  Dkt. 799-1 at 98, particularly when an article by Dottie Carmichael, a member of the Monitor's staff,[7] cited as an authority (*id.* at 99, n. 38), implicitly recognized the disparity in prosecutor and public defender costs:  "This is why parity between defense counsel and prosecutors has long been advocated by the American Bar Association.[8]"

---

[5] *See* Criminal and Juvenile Justice Uniform Cost Report, Fiscal Years 2019 and 2020 (January 2021).  Submitted to the 87th Texas Legislature, prepared by the Legislative Budget Board Staff, available at https://www.lbb.texas.gov/documents/publications/policy_report/6292_cjda_uniform_cost.pdf (last accessed March 12, 2026)

[6] *See* id. at p. 1, observing that the "reduction in the average daily population [because of the Covid-19 pandemic] increased the cost per day during fiscal year 2020, with expenditures remaining steady and some expenditures increasing as a result of the pandemic."

[7] *See* Dkt. 799-1 at 71 listing Ms. Carmichael as a member of the "Monitor Team."

[8] *See* Dottie Carmichael, et. al., *Guidelines for Indigent Defense Caseloads, Austin, TX: Texas Indigent Defense Commission* (Jan. 2015), p. 36 (available online at https://www.tidc.texas.gov/media/kzfd5tup/guidelines-for-indigent-defense-caseloads-01222015.pdf)

ix.   *Private Defense*:   Here, the Report relies on "Published sources" for different rates without any clear attribution.  As an initial matter, these three sources are for different years: 2015, 2020, and 2023, without any clarity as to how the numbers were derived, whether they were aggregated or applied for the same time period.

Further, the Report engages in circular reasoning, relying on a dated article lead-authored by a member of the Monitor's staff, Ms. Carmichael based on 2014 data.  Dkt. 799-1 at 99 n. 38.   Additionally, the article does not provide any compensation range for misdemeanors.  Even if it did, it is unclear whether and to what extent the Report used such data for subsequent years.  The second source cited by the Report, the State Bar of Texas 2023 Income Report, provides income ranges by demographic (including gender and years of experience) and metropolitan area.[9]  It is unclear how the Report extrapolated the cost of private defense from such data, given the wide-ranging variables, and considering that a criminal defendant in Harris County might be represented by counsel based in other counties and outside the Houston metropolitan area.  Nor is it clear whether and why the Report is using such 2023 data for 2020.  The Report cites as its third source the Harris County 2020 Practice Time Report, reported to the Texas Indigent Defense Commission.  Dkt. 799-1 at 99, n. 38.  Consistent with the foregoing concerns above as to why the Report selected and uses dated data (data from 2020), the Texas Indigent Defense Commission contains Harris County data through FY 2023.[10]

---

[9] *See* State Bar of Texas, 2023 Income Report, available at https://www.texasbar.com/AM/Template.cfm?Section=Archives&Template=/CM/ContentDisplay.cfm&ContentID=66422.
[10] *See* https://tidc.tamu.edu/public.net/Reports/AttorneyCaseLoad.aspx (showing data through FY 2023).

4. *The Report excluded salient data*:

The Report conceded that "certain components of misdemeanor case processing became more resource-intensive," Dkt. 799-1 at 64, with little effort to quantify those costs; instead, it swept them aside as "the operational costs of a process that affords greater access to counsel and meaningful defense." *Id*. As the Report acknowledges, the Consent Decree has resulted in increased court settings, longer case duration, higher bond failure rates, and increased legal expenses. *Id*. at 64-65. In failing to account for these costs, the Report paints a misleading picture that dismisses associated costs in an effort to feed a pre-ordained narrative.

Additionally, because the Report relied solely on Harris County data and did not consider data from other jurisdictions, the total cost associated with implementing the Consent Decree is unknown. The recidivism rate and cost to re-arrest and prosecute in other jurisdictions have not been considered. Hence, what might be touted as a savings to Harris County could be to the significant detriment of other counties and to the State of Texas.

5. *Inclusion of irrelevant cases:* "Cases lacking both booking *and* bond records are still considered as missing observations and excluded from our analysis." Dkt. 799-1 at 35. Thus, the Report excluded cases that omitted both booking and bond records but included them if they had either. Such an approach is flawed because, as has been observed, it will result in including irrelevant cases, such as when bond did not apply because the defendant was already in jail, or bond applied but the defendant did not pay and was in jail. Dkt. 727-2 at 10.[11]

6. *Inconsistent time period:* Some of the data in the Report are through 2024, while others are to 2025 with an inadequate explanation for limiting certain studies to 2024 and others to 2025.

---

[11] There are other errors in the Report. For example, the Year 7 Statement of Work incorrectly refers to the proposed workplan for 2026-27 as the "Year 6 Statement of Work." Dkt. 799-1 at 84. It refers to the "2025-26 contract year," Dkt. 799-1 at 87, instead of "2026-27 contract year, and the forthcoming report to be submitted on March 3, 2027, as the "Ninth Monitor Report." *Id*. at 88.

8

**C.      The Monitor violated Paragraph 137 of the Consent Decree.**

Paragraph 137 of the Consent Decree provides a mechanism for modification, requiring the Monitor to provide a recommendation to the Court not later than seven days after the filing of a request by a party.  Dkt. 708 at 51, ¶137.  In her email of May 30, 2025, Judge Paula Goodhart, on behalf of four CCCL judges, expressly requested modification of the Consent Decree: "Please find attached a **request to modify the federal consent decree** in *Maranda Lynn Odonnell, et al. v. Harris County Texas et al*." Dkt. 740-2 (emphasis added).  The Monitor had a ministerial duty to provide a recommendation to the Court within seven days, but failed to do so.  Nothing in the Consent Decree gives the Monitor discretion to gate-keep proposals or assume the role of the Court.  Nonetheless, the Report concedes that the Monitor deemed the request "premature" and determined that it lacked "consensus among their colleagues," Dkt. 799-1 at 12, notwithstanding that the four CCCL judges, including Judge Goodhart, were then *pro se* while the other twelve CCCL judges were represented by counsel.[12]  The Monitor exceeded his mandate and breached the Consent Decree by failing to present the request to amend the Consent Decree to the Court.

This was not the first time the Monitor ignored a requested change. Before the 2025 request, by letter dated March 31, 2022, all of the CCCL judges proposed changes to comply with Senate Bill 6, recommending a "Fast Track Bond to replace the current General Order Bond that is given to all misdemeanor arrestees who are not in the carve-out categories specified in Rule 9.4.1-9.4.6." *See* Exh. B.  That letter put the Monitor on notice that existing procedures conflicted with Senate Bill 6 and warranted amending the Consent Decree, yet no action was taken.  It appears that, as further discussed below, the Monitor has a personal bias that undermines the Report.

---

[12] All the CCCL judges were represented by the same counsel from 2019 until 2023.

**D.      The Monitor's personal bias renders the Report unreliable.**

After his appointment, the Monitor published a law review article in the same year he ignored the CCCL Judges' request to modify the Consent Decree to bring its procedures into compliance with State law; the Monitor's article evinces a critical view of Texas law, deeming SB 6 as "*increasing* the role of cash bonds pretrial." *See* Brandon L. Garrett, *Models of Bail Reform*, 74 Fla. L. Rev. 879, 883 (2022) (emphasis in original).  He opposes cash bail, claiming that "there is evidence that both race and poverty play a crucial role: the dramatic racial disparities in pretrial jail populations may result from racial disparities in wealth and access to credit, all of which cash bail systems exacerbate." *Id*. at 916.  He contends that "[r]eleasing people upon arrest or booking without waiting for a judicial officer to conduct a review is a far better outcome if the ultimate result will be release," *id*. at 903, and concludes that "[b]ail reform must limit the influx of cases by focusing diversion and support efforts outside of the criminal justice system.  To fully reform the bail system, the need to consider bail decisions should itself be minimized." *Id.* at 931. Thus, in his view, the proper procedure flatly contradicts Texas's edict that magistrates must conduct an individualized review when considering bail.  His personal bias and bail reform agenda evoke a preference for policies *contrary* to Texas law, and his report evidences this bias in its failure to fully and fairly consider and report on the impact of the Consent Decree, rendering his analysis unreliable.

Furthermore, as a quasi-judicial officer, the Monitor is subject to 28 U.S.C. § 455 and must be impartial.[13]  Indeed, Rule 53(b)(3)(A) of the Federal Rules of Civil Procedure provides that the Court may issue an appointing order only after "the master files an affidavit disclosing whether

---

[13] The monitor is a "special master, albeit by another name." *Juan F. v. Weicker*, 37 F.3d 874, 880 (2d Cir. 1994). *See United States v. Apple Inc*., 787 F.3d 131, 138 (2d Cir. 2015 ("As an appointee of the court pursuant to Rule 53, the monitor is subject to the same grounds for disqualification as 'would require disqualification of a judge under 28 U.S.C. § 455.'")

there is any ground for disqualification under 28 U.S.C. §455." Fed. R. Civ. P. 53(b)(3).  The record does not reflect that the Monitor has filed the requisite affidavit in this case more than six years after his appointment.  *See* Dkts. 712, 714.

## II.    CONCLUSION

For the above reasons, the Attorney General respectfully requests that the Court sustain his objections.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

AUSTIN KINGHORN
Deputy Attorney General for Civil Litigation

KIMBERLY GDULA
Chief – General Litigation Division

*/s/Joe Nwaokoro*
JOE NWAOKORO
Attorney-in-charge
Texas Bar No. 24032916
Southern Dist. No. 30168
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2120 | FAX: (512) 320-0667
Joe.Nwaokoro@oag.texas.gov

COUNSEL FOR THE ATTORNEY GENERAL
OF TEXAS

11

**CERTIFICATE OF SERVICE**

I certify that on this March 19, 2026, a true and correct copy of the foregoing document was filed and served via the Court's CM/ECF system to all counsel of record.


/s/ Joe Nwaokoro
Joe Nwaokoro
Assistant Attorney General