**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| MARANDA LYNN ODONNELL, *et al.*, on behalf of themselves and all others similarly situated, | § § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. 4:16-cv-01414 (Consolidated Class Action) |
| v. | § § | |
| HARRIS COUNTY, TEXAS, *et. al.*, | § § | |
| Defendants. | § § § | |

**PLAINTIFFS' RESPONSE TO THE ATTORNEY GENERAL'S OBJECTIONS**
**TO THE NINTH REPORT OF THE INDEPENDENT MONITOR**

On March 3, 2026, the independent court-appointed Monitor filed its Ninth Report assessing the implementation of the *ODonnell* Consent Decree. Dkts. 798-1, 799-1. The Report concludes that the Consent Decree continues to prevent unconstitutional jailing of people facing misdemeanor charges, expanding pretrial release. Specifically, six years of monitoring show that the Consent Decree has expanded pretrial release, allowing tens of thousands of Harris County residents return to their children, families, homes, and jobs every year instead of being subjected to the deadly violence and neglect of the Harris County Jail, all without making any compromise as to public safety. Dkt. 799-1 ("Ninth Report") at vi–viii.

On March 19, 2026, the Attorney General of Texas—who has recently intervened in this case seven years after final judgment in order to seek termination of the Consent Decree—filed a set of "Objections" to the Monitor's Report. Dkt. 801. The objections are a grab-bag of assorted grievances, many of which have nothing to do with the Monitor's Report. None has merit.

I.      **The Attorney General's Objections to the Monitor's Report are Frivolous.**

The Attorney General claims that (a) he was improperly deprived of an opportunity to comment on the Monitor's draft report and that (b) the Report possesses methodological flaws that render it "unreliable." Dkt. 801 at 2–9. The first objection ignores the Consent Decree's text and the limited scope of the Attorney General's intervention. And it does not require the Monitor's empirical expertise to spot the holes in the second set of objections. None diminishes the reliability of the Report.

a.      <u>The Attorney General was not entitled to review a draft of the Report.</u>

The Monitor was under no obligation to provide the Attorney General with a draft of the Report in advance. Paragraph 118 of the Consent Decree instructs the Monitor to share preliminary drafts of his reports with all "Parties" to the Consent Decree. Dkt. 701-2 ("Consent Decree") ¶ 118. Paragraph 1 of the Consent Decree defines the "Parties" to which the Decree applies, and the Attorney General's name is absent. *Id.* ¶ 1. This makes sense. The Attorney General is participating in this case only to "make arguments that [] new state laws moot the consent decree or otherwise require its amendment." Dkt. 764 at 35. He has no role in implementing, monitoring, enforcing, or complying with the Consent Decree. He never consented to the Decree, and the Decree does not purport to bind him or apply to him in any way. Even if the Attorney General had been entitled to review a draft, the remedy for not providing the draft would not be disregarding the Report entirely, particularly in light of his baseless methodological objections. The objection is frivolous.

b.      <u>The Attorney General's methodological complaints are meritless.</u>

As for the Attorney General's objections to the Report itself, many are flatly inaccurate. For instance, he claims that the Report omits the specific year associated with certain costs, such as probation or private defense, Dkt. 801 at 4, ignoring that the relevant table states that all figures are expressed in 2020 dollars, Ninth Report at 97, and the sources from which each piece of

information is derived are all contained in the footnotes, *id.* at 98 n. 36 (citing sources used for probation costs); *id.* at 98 n. 27 (citing sources used for public defense costs). And he accuses the Report of "failing to account for" the costs associated with the more substantial bail hearings required by the Consent Decree, Dkt. 801 at 8, when it does precisely that, Ninth Report at 64–65 ("Factors Contributing to Cost Increases Under the Consent Decree"); *id.* at 58 (identifying "cost effects" of various factors over time, including trial court settings, prosecution, and indigent defense).

Next, several of the Attorney General's other objections consist of pedantic nit-picking at well-explained study limitations. For example, the Attorney General asserts that the Report's multivariate regression cost analysis, which finds the Consent Decree has saved County taxpayers significant sums, "offends due process" by not completely controlling for the impact of Covid-19. Dkt. 801 at 3. But, "arguably, there are no certainties in science." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993). And the Report repeatedly acknowledges the pandemic's potential impact. *See, e.g.*, Ninth Report at 51 (noting Covid-19's potential impact on certain results and devising a method to check the findings); *id.* at 60–65 (cost tables breaking down the "Rule 9 Policy Interval" into pre- and post-Covid periods). Elsewhere, the Attorney General cavils that the Report provides "an inadequate explanation" for why certain analyses in the Report stop in 2023 or 2024, while others go through 2025. Dkt. 801 at 3, 8. But the Monitor provides sound explanations for concluding its analyses where it did. *See* Ninth Report at 39 ("Since most bonds approved in 2025 cannot be followed up to one year yet, our analysis [of one-year bond failure rates] only focuses on years between 2015 and 2024."); *id.* at 46 (explaining that the table of case disposition outcomes "focus[es] on cases filed between 2015 and 2024 because many cases filed

in 2025 are not undisposed yet"); *id.* at 57 (explaining that the cost study goes through January 2023 to allow for a 36-month follow-up period).

Finally, the Attorney General distorts the disclosure of study constraints—a standard practice in any empirical analysis—as undermining the Report's methodology. But disclosing the limits of available data, and being transparent about methodological choices made, only bolsters the Monitor's credibility. The Monitor analyzed hundreds of thousands of Harris County criminal case records and concluded that the reduction in pretrial detention due to the Consent Decree has not corresponded to any rise in the overall frequency of re-arrests. Ninth Report at viii. Of course, no study is without limits, and it is scientific best practice to disclose those limits. As the Report observes, "Our repeat arrest measures come from Harris County's criminal case records only, and may not present a full picture of repeat offenses by former misdemeanor arrestees." *Id.* at 49. The Attorney General jumps on this, asserting there is "no rationale" for not "track[ing] and includ[ing]" data from outside Harris County. Dkt. 801 at 2. He offers no reason to believe out-of-county rearrests constitute anything more than a rounding error, nor does he explain how the Monitor could have obtained a decade of criminal case data from each of the 254 other counties in Texas, to say nothing of other states or countries. The Report's limits are entirely reasonable.

Critically, at no point does the Attorney General call the Report's substantive findings into question. He does not disprove any of the Report's conclusions, or attach any evidence seeking to contradict them. Nor could he. The Report is consistent with a host of other studies analyzing the effects of increased pretrial release, including several studies specifically analyzing the use of cash bail in Harris County. *See* Paul Heaton, *The Effects of Misdemeanor Bail Reform*, Quattrone Center (2022), University of Pennsylvania Carey Law School, http://penn.link/bail (difference-in-differences analysis finding the Harris County preliminary injunction expanded the misdemeanor

pretrial release rate, reduced the conviction rate and sentence severity, and reduced the likelihood of future cases); Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711 (2017), https://tinyurl.com/mw8stws7 (instrumental variable analysis finding that detained misdemeanor defendants in Harris County are 25% more likely to plead guilty, 43% more likely to be sentenced to jail, receive jail sentences that are more than twice as long, and are more likely to commit future crimes).

The Attorney General's false assertions, inconsequential nit-picking, and harping on the ordinary constraints of empirical analysis are no basis for limiting, much less entirely disregarding, the information contained in the Monitor's Report.

**II.     The Attorney General Improperly Attacks the Monitor's Independence.**

The Attorney General attempts to call the Monitor's independence into question by alleging "personal bias." Dkt. 801 at 9, 10. But nothing he points to indicates bias, let alone could possibly warrant disqualification. This "attack on the Monitor's integrity, and by implication the court's integrity, is wholly unfounded and unprofessional." *Corey H. ex rel. Shirley P. v. Bd. of Educ. of City of Chicago*, No. 92 C 3409, 2012 WL 3961707, at *4 (N.D. Ill. Sept. 10, 2012).

a.     The Monitor has timely addressed proposals to alter the Consent Decree.

The Attorney General's first accusation of bias is not raised on his behalf. Instead, he claims, on behalf of the CCCL Judges, that the Monitor did not act quickly enough upon two proposals to modify the Consent Decree that he received in 2022 and 2025. Dkt. 801 at 9. Again, the Attorney General strays from his Court-assigned lane. Dkt. 764 at 35 (order allowing intervention to "make arguments that [] new state laws moot the consent decree or otherwise require its amendment"). But even if the Attorney General could raise grievances on someone else's behalf (he cannot), and even if the Attorney General's argument bore any relevance to the

5

Report he objects to (it does not), he misreads the Consent Decree and mischaracterizes the proceedings.

The basis of the Attorney General's objection is his claim that "[t]he Monitor had a ministerial duty to provide a recommendation to the Court within seven days." Dkt. 801 at 9. That is not the relevant text of the Consent Decree. In fact, the paragraph he cites, Paragraph 137, requires the parties "notify the Monitor *at least 21 days prior*" to any motion to modify the Consent Decree. Consent Decree ¶ 137 (emphasis added). And when a proposed modification would affect post-arrest policies including Local Rule 9, as both of these proposals would have, an initial response is due within 14 days. *Id.* ¶ 32. The Monitor's initial response can be to support the change, oppose the change, propose an alternative, or request more information. *Id.*

Applying the actual text of the Decree, the Monitor has consistently responded on time. In both instances cited by the Attorney General, the Parties and Monitor worked together in good faith to understand the proposal being made, the reason it was being put forward, and the unintended consequences it might have, all so the Monitor could make a reasoned decision. The Attorney General presents no evidence that the Parties or Monitor have not conducted themselves in good faith or that the Monitor's careful stewardship of the modification process did not follow the procedures laid out in the Consent Decree. Indeed, the parties who proposed modifications never complained that the Monitor's management of their proposals was unfair or sought relief from the Court. *See* Consent Decree ¶ 29 ("Any disputes about whether additional time should be afforded will be presented to the Court for resolution.").[1] The Attorney General's evidence-free claim that, years ago, the Monitor took too long to respond to a party's proposal is baseless.

---

[1] The CCCL Judges withdrew their 2022 proposal, Dkt. 801-2, after good faith discussions among the Parties. And the Four Judges' motion to vacate the Consent Decree, filed six months after the Monitor opposed their modification proposal, raises no claim of untimeliness. Dkt. 793 at 10–12.

   b.  The Monitor's academic writing is not evidence of personal bias against the Attorney General.

Lastly, the Attorney General levels a serious allegation at the Monitor, claiming he cannot "fully and fairly consider and report on the impact of the Consent Decree" because the lead Monitor supposedly does not like Texas law. Dkt. 801 at 10. His evidence for impugning the Monitor's integrity and years of work as an arm of the Court? A handful of cherry-picked statements from the lead Monitor's academic work explaining that cash bail systems "exacerbate" racial disparities in wealth and pretrial detention, and that "[r]eleasing people upon arrest or booking without waiting for a judicial officer to conduct a review is a far better outcome if the ultimate result will be release." Dkt. 801 at 10 (citing Brandon L. Garrett, *Models of Bail Reform*, 74 Fla. L. Rev. 879, 883 (2022). These common sense statements are unremarkable; they are consistent with the Court's own findings. *See* Dkt. 302 at 114 (finding that reliance on cash bail "exacerbates and perpetuates poverty because of course only people who cannot afford the bail assessed or to post a bond—people who are already poor—are held in custody pretrial," which in turn causes people to "lose their jobs, [] lose their housing, . . . abandon their education, . . . [or be] unable to make their child support payments."); *id.* (finding that reliance on cash bail "exacerbate[s] the racial disparities in pretrial detention and posttrial outcomes"); *id.* at 113 (finding that "pretrial detention because of inability to pay a financial condition of release increases the likelihood that misdemeanor defendants will commit future crimes or fail to appear"). None of them casts doubt on the Monitor's ability to implement and enforce the Consent Decree.

Indeed, the Attorney General misunderstands the Monitor's role. The Monitor will not decide the Attorney General's motion to vacate the Consent Decree; that job belongs to the Court. The lead Monitor's supposed policy "preference[s]," Dkt. 801 at 10, are irrelevant unless they inhibit his ability to fulfill his court-assigned role; that is, to assess the Parties' compliance with

the Court's order, *see, e.g.*, *United States v. Tennessee*, No. CIV. 92-2062 D/P, 2010 WL 1212076, at *12–13 (W.D. Tenn. Feb. 16, 2010) ("Dr. Ray's primary responsibility as court monitor is to ensure that the State complies with the court's orders."), *report and recommendation adopted*, No. CIV. 92-2062, 2010 WL 1212077 (W.D. Tenn. Mar. 23, 2010). The Monitor can be disqualified only for good cause. *See* Consent Decree ¶ 107.[2] There is nothing to suggest that standard is met, or that the lead Monitor cannot carry out the task assigned to him by the Court.

The Attorney General may be concerned that the Monitor's careful work could undermine his arguments to vacate the Consent Decree. But disagreement with the Attorney General or any other party is not evidence supporting disqualification. When a monitor's duty is to oversee a consent decree enacted to protect the rights of a vulnerable plaintiff class, as it is here, "it is understandable that her actions in connection with her duties as court monitor may appear to be adversarial to the State and supportive of [the plaintiffs]." *Tennessee*, 2010 WL 1212076, at *12–13; *see also id.* ("That Dr. Ray's interests as court monitor overlap with those of [the plaintiffs] does not render her impermissibly aligned with these parties."). The Monitor's attempts to fulfill those duties are to be commended, and certainly do not amount to "personal bias." As one court stated, "[t]hat [the monitor] has disagreed with [defendants] on a number of occasions . . . is wholly insufficient to support the unseemly and unprofessional personal attacks lately leveled by [defendants]' counsel." *Corey H.*, 2012 WL 3961707, at *4. Such blatantly frivolous accusations of bias are "beyond the bounds of legitimate advocacy." *Id.*

---

[2] The Attorney General fails to demonstrate that the standard governing judicial disqualification, 28 U.S.C. § 455, applies to the Monitor through Federal Rule of Procedure 53. Dkt. 801 at 10. The Monitor was not appointed pursuant to Rule 53 and neither provision applies. *See, e.g.*, *Tennessee*, 2010 WL 1212076, at *12 (concluding monitor is not governed by Rule 53 or 28 U.S.C. § 455).

***

For the foregoing reasons, the Court should deny the Attorney General's objections in their

entirety.

Date: April 2, 2026                                        Respectfully Submitted,

/s/ Jeremy D. Cutting
Alec George Karakatsanis                                  Neal S. Manne
alec@civilrightscorps.org                                 Texas Bar No. 12937980
Elizabeth Rossi                                           nmanne@susmangodfrey.com
elizabeth@civilrightscorps.org                            Joseph S. Grinstein
Jeremy D. Cutting                                         Texas Bar No. 24002188
cody@civilrightscorps.org                                 Abbey E. McNaughton
CIVIL RIGHTS CORPS                                        Texas Bar No. 2411675
1601 Connecticut Ave NW, Suite 800                        SUSMAN GODFREY L.L.P.
Washington, DC 20009                                      11000 Louisiana Street, Suite 5100
Telephone: (202) 681-2721                                 Houston, Texas 77002
                                                          Telephone: (713) 651-9366


Dustin Rynders                                            Morgan McCollum
Texas Bar No. 24048005                                    mmccollum@susmangodfrey.com
dustin@texascivilrightsproject.org                        SUSMAN GODFREY L.L.P.
Travis Fife                                               One Manhattan West
Texas Bar No. 24126956                                    New York, NY 10001
travis@texascivilrightsproject.org                        Telephone: (212) 336-8330
Kirsten Budwine
Texas Bar No. 24140263
kirsten@texascivilrightsproject.org
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251
Telephone: (512) 474-5073


*Attorneys for Plaintiffs*

9

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of April, 2026, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case filing system of the Court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Jeremy D. Cutting*
Jeremy D. Cutting