12:53:18 ***(Tuesday, September 22, 2026, 1:00 p.m., U.S. District Judge Lee H. Rosenthal presiding.)***

**** * COURT CALLED TO ORDER * ****

THE COURT: Good afternoon. Go ahead and state your appearances, and you may be seated. 12:58:44

PLF. COUNSEL: Elizabeth Rossi for the plaintiffs.

PLF. COUNSEL: Jeremy Cutting for plaintiffs

PLF. COUNSEL: Travis Fife for the plaintiffs.

PLF. COUNSEL: Joe Grinstein for the plaintiffs.

12:58:50 PLF. COUNSEL: Allan Van Fleet for the 12 judges.

PLF. COUNSEL: Murray Fogler for the sheriff.

PLF. COUNSEL: Seth Hopkins for Harris County.

PLF. COUNSEL: Daniel Hu for Harris County.

MR. NWAOKORO: Joe Nwaokoro for the Attorney General.

12:59:01 MR.RUSSO: Joe Russo for four judges.

MS. OLALDE: Angela Olalde for four judges.

THE COURT: All right. Thank you very much. So I have been directed to decide abstention expeditiously. That is, therefore, the focus of today's hearing. That doesn't mean it's going to be the only thing addressed, but I think it is (12:59:22) where we need to start and probably end. So, I have a number of motions in front of me, but the motion to abstain is movant's, so I'd like to hear from them first.

MR.RUSSO: May we approach, Your Honor?

12:59:49 THE COURT: Please. Just please speak into the

microphone, everybody.

MR. RUSSO: May it please the Court, Your Honor, we're here today to address the foundations of the consent decree rather than its merit. That you'll notice in a lot of the briefing, particularly the response provided by plaintiffs in Harris County as well, there is a large discussion of the merits of the consent decree, how it's working, expenses and--

THE COURT: Well, before you get there, I want to give all sides an opportunity to address kind of the order of operations. I have this mandamus opinion. What does it require me to rule on and what does it require me to rule on first. So, if I rule on Younger first, if I decide I need to abstain, what then? If I decide I don't need to abstain, what then? Can I decide that I do need to abstain and yet continue with the inquiry by deciding if certain provisions of the consent decree are compatible with Younger while others might offend it. So, I need some assistance before we get into the details in deciding what to decide and what to decide first.

MR.RUSSO: Well, so, Your Honor, looking at the Court's mandate, they have directed you to consider plaintiff's or the movant's judges' motion for abstention expeditiously, but secondarily and apply and follow Daves II. And I'm sure the Court is well aware that the Daves II opinion from 2023 is more than just an abstention issue, it's certainly a mootness issue.

01:01:58 THE COURT: Right. So if I abstain, can I then decide mootness? Must I then decide mootness?

MR.RUSSO: The Court always has jurisdiction to determine whether it has jurisdiction. You are aware of that. 01:02:10 So, given that the manner in which we went up to the Fifth Circuit and came back down, it seems to us appropriate that the Court consider the abstention issue, but at the same time, Your Honor, the mootness issue is front -- right behind, right behind the Court's consideration. From our view, there were 01:02:33 two directives from *In Re: Goodhart*, which is consider our abstention motion and apply and follow Daves II, which is more than just the abstention.

THE COURT: So Daves II in your mind is mootness.

MR.RUSSO: It's both, yes, Your Honor, it addresses --

01:02:51 THE COURT: That's an additional component.

MR.RUSSO: Yes, it does, Your Honor, and fits squarely within this case. Of course, within Daves II, they directed specifically the O'Donnell -- overruled O'Donnell's prior rulings and from its own body and changed --

01:03:09 THE COURT: Yes, this case is kind of gone up and down and all around.

MR.RUSSO: It's quite the history. But for the Court's consideration, to the extent that we're discussing abstention, the one fact issue that we can talk about is this 01:03:26 waiver issue which the Court addressed at the end of its

01:03:31 opinion and the plaintiffs -- we've addressed, but plaintiffs have also addressed it in their response. Would you like to hear argument on that point or are we still wrestling with the process and procedures of decisions.

01:03:45 THE COURT: I think we have to talk about both. Go ahead.

MR.RUSSO: So, Your Honor, it's been our contention since *In Re: Goodhart* came down, and we maintain this position in our conferences with the Court, that we don't believe that 01:04:01 the mandate requires a Rule 60(b) analysis. But the backdrop to that is if Rule 60(b) applies --

THE COURT: Well, if I want to undo, modify or vacate the consent decree, is there a way to do that without going through 60(b)?

01:04:19 MR.RUSSO: The Court always has oversight over its own consent decrees and the case law is pretty clear on that.

THE COURT: But oversight requires a procedural mechanism to implement. What is the procedural mechanism and the requirements of that procedural mechanism, if not 60(b)?

01:04:38 MR.RUSSO: Well, because of the way that this case came back down, our view is that you had a duty to respond to the mandate --

THE COURT: I agree.

MR.RUSSO: -- which is deal with abstention, and the 01:04:46 Court didn't necessarily direct you to deal with Rule 60. Now,

01:04:50 if Rule -- not to hide from it, if Rule 60 is the device the Court uses, you reach the same result. But the question that plaintiffs are raising is do I have to do this equitable analysis, and that was far from the *In Re: Goodhart* opinion. 01:05:09 They, in fact, said discovery is not required on any of these issues related to what their mandate required. So, in terms of continuing discovery, there should be none.

THE COURT: Well, if I decide, if I decide abstention first, and I must, I think that's the order of operations, 01:05:33 abstention first. If I abstain, what authority do I have to do more?

MR.RUSSO: The authority, Your Honor, is to follow the opinion from *In Re: Goodhart*, follow the opinion from Daves which is this case should never have been decided at all in 01:05:53 this court. So --

THE COURT: There seems to be a little bit of an internal inconsistency there. If I abstain, usually that's followed by a period, as in full stop, right? So, if I abstain, then is an opinion on mootness advisory and, 01:06:14 therefore, not -- somebody in the Fifth Circuit may be able to do it, but it is less welcomed from the district judge.

MR.RUSSO: If the Court abstains and vacates the consent decree --

THE COURT: Wait, wait. If I abstain --

01:06:32 MR.RUSSO: I was clarifying the Court's question.

01:06:33 THE COURT: So, you think I should abstain and move on to the second prong, if you will, and vacate the consent decree.

MR.RUSSO: Yes, Your Honor.

01:06:41 THE COURT: And the authority to do that comes from?

MR.RUSSO: From both the mandate, which is applying Daves to its heart, which it removes -- that's why I started with we're discussing these foundation, the bedrock of the consent decree, both on abstention ground as the Court has 01:07:00 noted there is a mootness argument right behind it, which both of those concepts deal with what --

THE COURT: That is an alternative holding in Daves. Does the mandate require me to rule on the alternatives?

MR.RUSSO: The mandate, in all of its terms, require 01:07:22 the Court to abstain from this case.

THE COURT: And my question is what happens after that if I do abstain?

MR.RUSSO: Following Daves as the mandate states, dismiss this case, vacate the consent decree and dismiss. 01:07:40 That's what Daves did and that's what the Court has been directed to do under the mandate, we believe.

THE COURT: All right. Did you want to talk about waiver?

MR.RUSSO: Yes, Your Honor. So, the Fifth Circuit 01:07:58 coming back down addressed this issue of the judge's ability to

raise the question of abstention and whether they've waived it. They removed the question of entry of the consent decree back in 2019 and its impacts there. So, with the Court's view to look at these things, the consideration really should be from the entry of Daves, which is March 31st of 2023.

THE COURT: Some years after the consent decree.

MR.RUSSO: Yes, Your Honor. And forward and what was happening during that process. If I may approach the bench, I just have a demonstrative that lays out the timeline.

THE COURT: Hand it to my law clerk please. Do you have a copy for all counsel?

MR.RUSSO: Its making its way.

THE COURT: Go ahead.

MR.RUSSO: So, thank you, Your Honor. The document just basically lays out what our evidence shows if you're digging through the documents and the motion that we filed as well as our reply. It starts with our judges, four judges taking the bench and -- I'm sorry, three of their judges took the bench in January of '23.

THE COURT: How many of these judges are up for re-election in November?

MR.RUSSO: Three positions.

THE COURT: Judges Goodhart, Johnson, and Padilla, are all three of them?

MR.RUSSO: Yes, Your Honor.

01:09:37 THE COURT: Okay. So, just Garcia who is not, correct?

MR.RUSSO: Yeah, and that's where I was headed. So, Judge Garcia took the bench in January of 2025.

01:09:43 THE COURT: So, although the Fifth Circuit didn't order me to issue an opinion by a particular date, it seems clear that they want me to decide before these judges perhaps lose their seats.

MR.RUSSO: I believe that's correct, Your Honor. I 01:09:57 think that was where the Fifth Circuit was headed in terms of the expeditious consideration.

THE COURT: I think so too. Although they didn't explain why the election was raised to such a level of importance, but that's -- I think you and I agree on the reason 01:10:13 for that.

MR.RUSSO: Thank you, Your Honor. Yes, the Purcell issues and reverse Purcell issues.

THE COURT: Reverse Purcell.

MR.RUSSO: Did come up with voting rights, voting 01:10:23 cases, it's a sensitive issue.

THE COURT: This is an unusual application of those concerns, but go ahead.

MR.RUSSO: So, Your Honor, walking through this analysis or the evidence that we presented the Court with, 01:10:38 Daves II was issued in March of 2023. Shortly thereafter, with

the three judges who were recently elected, they received a letter from Mr. VanFleet who was representing at the time all of the county judges who were all Democrat and had consistent one position. Our judges, three of the judges took office, they received a letter from Mr. VanFleet saying, hey, I represent these individuals, I'll represent you, with a couple caveats which is can't take a position contrary to the rest of the group and if that happens, I can't represent you.

So, a few days later, April 6th -- I'm sorry, actually that letter was received in January, early January that Mr. VanFleet got in touch with our judges. Fast forward to after the Daves opinion being issued, our judges looked at the opinion and started raising questions about the impact of Daves in a judge's meeting. A few days later on April 6th, Mr. VanFleet removes himself from representing Judges Goodhart and Padilla, and so at that point habeas was withdrawn. So, from that point forward until my office was retained by the judges in October of 2025, they were unrepresented in terms of being able to bring a motion forward to the Court.

So, Judge Goodheart, giving the questions that she has about the impact of Daves, starts talking to the Texas Attorney General's Office to see whether they can offer representation to her --

THE COURT: May I ask a question here?

MR.RUSSO: Absolutely, Your Honor.

01:12:35 THE COURT: I understand that there are a timeline in which the judges seek representation without success. My question is why the judges couldn't proceed pro se? I think they're all lawyers. They're all members of the state bar?

01:12:54 MR.RUSSO: And mainly, as you might expect, the base of their practice is criminal law and they're not very well versed in civil law. Not only that, Your Honor, it seems a little strange that every party in this case has representation except for our judges. Even the county judges that are 01:13:18 together on their opinion, in other words, as long as you stay with us, as long as you're not of a different opinion, you get counsel, but once you do, you no longer have counsel. So, the idea of, well, represent yourself in this situation was not something the judges were comfortable with and that's their 01:13:38 testimony. They didn't feel -- they're not competent to do it, they would have been out on a limb --

THE COURT: You've answered the question.

MR.RUSSO: And so, they begin to ask the Texas AG's Office do you have any obligations to represent, what can you 01:13:52 do here, can you step in here? The AG was unable to do that.

Fast forward to the August of 2023 period, and if the Court most likely remembers, the Russell case was ongoing at the time --

THE COURT: I remember.

01:14:06 MR.RUSSO: -- relating to the felony judges and our

01:14:09 judges saw that that was happening, motions were filed. And the briefing schedule was laid out, eventually the Court issued its opinion in August of '23, the hope from our side was that that opinion would have some impact on the O'Donnell matter.
01:14:26 Of course, it didn't. So then by October of '23, they meet with the other judges to see if can we get on a consensus to talk about what's going on with state law and what's going on with Daves, but that didn't come to fruition.

So, after that they meet with the County Attorney's
01:14:49 Office and ask, We need counsel assigned for us. And the County Attorney's Office talked about the issue back and forth. And in our reply, we have laid out -- there are two statutes involved in this situation, Your Honor. First of all, under Texas Government Code 45.201, the County Attorney is the
01:15:21 primary attorney for any County offices, and that would include -- and the State of Texas, frankly, for ongoing cases. So, the reality is the County Attorney's Office has a duty at the front end of this thing to deal with County offices who are sued. And the Court is well aware this case, these defendants
01:15:40 were sued in their official capacity in which case it's their courtrooms effectively that are part of the case, which is another reason why the pro se representation is not a good idea.

Nevertheless, secondarily Texas local government code
01:15:58 157.901, requires a County to obtain counsel and pay for that

counsel in the event -- basically in the event that a conflict comes up.

Now, all that being said, when our four judges were asking for this issue to be put on a commissioner's agenda, that was pushed back to April of 2024 by the County's Office to get past the primaries. And once it made it to the agenda, as the Court might suspect, the County commissioners declined to represent our folks or to provide counsel for them. So, as of April 2024, they had asked for counsel specifically, they're denied by County Court, by Commissioners Court and that would continue, that state would continue until the AG ended up intervening.

In the meantime, our judges being without counsel, again broken up discussions with the AG's Office, reach out to colleagues in the State Senator's Office, what can we do to get representation or what can we do to deal with the state issues, the state bail issues and the application of Daves. That runs all the way through 2025. They get Judge Garcia comes on board, January 2025. There's a specific letter that Judge Goodhart -- that is in our files, Exhibit 1E, where she sent a letter to the Senator's aide, which I think his name is Coker, she lays out what she's been doing to try to find counsel in April of 2025. Eventually, due to ^ an arrestee who was released on G.O.B. who shot a deputy, Judge Goodhart then talks to the -- goes to the monitor and says, *Hey, this is an issue,*

01:18:12 *what's the legal authority for the consent decree to continue in place given that state law has changed and you've got Daves out there.* Of course, the monitor did not respond, said go back to the County Attorney. The County Attorney couldn't
01:18:27 provide an opinion on that at the time.

Eventually, the four judges put together a proposed modification to the consent decree and sent it to the monitors. That was in May 2025. That document was created from one of their staff attorneys for the judges, all 16 judges to
01:18:58 consider. There was no consensus to put it forward, but Judge Goodhart took that work product and moved it over to the monitors and said, *Hey, here are some issues that we need to deal with for state law.*

Eventually, the monitors chewed on it, they gathered
01:19:19 the troops at the exclusion of our judges, had discussions about how we're going to handle it, had discussions eventually with our judges, and in July of 2025, issues a letter saying -- basically declining to engage in any further conversations about the modification proposed, that you're just -- one of the
01:19:46 main points they made was you're a minority of judges, you're in the minority, you don't have enough people to get any changes done.

THE COURT: So, for the waiver analysis, if even one judge does not waive, is that enough?

01:20:05 MR.RUSSO: Yes, Your Honor, it is.

01:20:09

THE COURT: Because?

MR.RUSSO: Well, because each of these individuals have their own obligations to deal with their office and determine whether the consent decree was subject to a challenge under the abstention doctrine and/or mootness. And that's something that *In Re: Goodhart* hit on, which is the concern being that, oh, well, every time that somebody, an office flips over we're going to have this challenge and it's going to be an ongoing problem, whereas the Fifth Circuit said no, that's protected by the backdrop which is look at the facts related to the specific situation. So --

01:20:29

01:20:53

THE COURT: You mean the election?

MR.RUSSO: Not the election, no. The merits of that individual's arguments are considered on their own. In this case, what you have is because if you have three judges in the same position and then come January -- they've already been denied counsel, come January 25, another judge, the fourth judge comes on and she's in the exact same position, she's got all the same news and successes and failures in terms of obtaining counsel that the other three are going to have, so her waiver analysis should start from January, in our view.

01:21:13

01:21:37

Shortly after July of 2025 when the monitor declines to engage for modifications, the AG decides it's going to step in and files its intervention action in August, a month later in 2025. An interesting thing happens. At that point, our

01:22:10

01:22:15 judges go back to the County Attorney and say, well, now can we have counsel now, we've got another party, this case is gearing up a little bit more. And the Commissioner's Court decided yes, we will provide you with counsel on the condition that the
01:22:34 Court allows the AG to intervene. And of course, the Court issued an order in October, October 30th --

THE COURT: Allowing limited intervention.

MR.RUSSO: Yes, allowing the intervention which is when we were finally able to be engaged on the case and move
01:22:55 forward with our motion which is basically how we get here.

So, carefully when you read through the briefing or read through the responses of Harris County and the plaintiffs mention, *Well, the four judges didn't move for anything until December of '25.* And Your Honor, as again, the Court is aware,
01:23:15 the parties are setting up the schedule to file motions and it wasn't as though the four judges were sitting around for three months doing nothing.

THE COURT: So, couple questions about what you put forward. So, you say that only one judge is needed who did not
01:23:36 waive, right?

MR.RUSSO: I'm sorry. Can you restate that?

THE COURT: You just told me that as long as one judge doesn't waive, there's effectively no waiver, correct?

MR.RUSSO: I agree with that.

01:23:50 THE COURT: Okay. So, let's assume we get one new

01:23:53 office holder, fresh waiver clock. Does that mean that any time there's an election then a new judge, everything starts over again? That doesn't seem like a good way to operate.

MR.RUSSO: So that specifically was addressed by *In* 01:24:10 *Re: Goodhart* opinion in which -- if I can find it quickly.

THE COURT: The Fifth Circuit does cite a case for the proposition that democracy cannot bind the polity forever. Is that what you're looking for.

MR.RUSSO: Well, that, in addition to the comment that 01:24:32 the Court still has to look at the background facts behind every one of these challenges.

THE COURT: Looking at the politics of waiver, if you will, and the politics of not waiver, the effect of it, so we have a super majority of judges who favor the consent decree. 01:24:59 We have four judges who eventually take the position that it should never have been issued and it needs to be modified or vacated. What do I do with that? Ignore it?

MR.RUSSO: Well, according to *In Re: Goodhart*, you analyze whether waiver actually occurred.

01:25:22 THE COURT: Okay. But if just one judge who doesn't waive can raise at any time issues that would support an argument for waiver -- I mean for vacating the decree, even though a super majority of the judges continue to support the decree, does that have any place in the analysis?

01:26:02 MR.RUSSO: You're saying the fact that there's a

01:26:04 majority on one side and a minority on the other side. I don't think it does, and the reason is this, you have every single office has its own office head. Each one is sued in an individual capacity. And this is the problem with just
01:26:19 providing counsel to the majority, that the County is obligated to address all of the opinions of each office, otherwise we don't need to sue them all, we can just sue the majority and be done with it, but that's not the way it's ever been done under the law and that's not the right approach. At the end of the
01:26:38 day, each office needs to be protected and represented.

THE COURT: And if a majority of the judges continue to support the decree -- well, let's say it was flipped. A majority of the judges don't want the decree, democracy would then operate, in your system, in what you're advocating, to
01:27:15 address the problem that the Fifth Circuit recognized.

MR.RUSSO: I think I agree with what Your Honor is saying. I don't think our view of it changes. If you have one side -- if you have one judge who has an issue with the manner and operation of the decree and the foundation on which it is
01:27:37 based, which is what we have here, and again, Your Honor, this is a very odd situation where we have opinion from the Fifth Circuit saying yes and then an opinion from the Fifth Circuit saying no. I can't imagine we're going to see that very often. So, to some degree, a lot of this discussion is going to be
01:27:59 limited based by the particulars of this case, but

01:28:02 nevertheless, the sentence I was looking for is the one that reads, *"The decision whether to vacate or modify a consent decree turns on other factors such as changed circumstances or a change in the law."* And so, that analysis has to be done.
01:28:20 And we're also in--

THE COURT: That analysis would require a comparison of the consent decree provisions with the intervening state statutes, right?

MR.RUSSO: In many circumstances it would. In this
01:28:37 circumstance, it would not.

THE COURT: Why?

MR.RUSSO: Because this is an abstention problem, it's a mootness problem.

THE COURT: But I couldn't vacate the decree without
01:28:47 doing that. I can't decide mootness without figuring out if particular provisions of the state statute violate or offend particular -- make provisions of the consent decree offensive under state law, so how do I do that? I don't have the record before me to do that now.

01:29:11 MR.RUSSO: Your Honor, I don't know if that's true or not.

THE COURT: I don't see the briefing on that.

MR.RUSSO: Well, on the other issue, though, is that you have Daves on the exact same situation, the exact same
01:29:26 facts. That's what I think carries *In Re: Goodhart* through the

01:29:30 day is that they're very confident that the situation that they were looking at in Dallas was the exact same situation that was being applied to in Harris County.

THE COURT: I have a very detailed consent decree.

01:29:45 Right?

MR.RUSSO: Yes, Your Honor.

THE COURT: I don't recall the Dallas had the same consent decree.

MR.RUSSO: Well, to the extent that the consent decree 01:29:56 is modifying the way that the state law is having things run, there really are no issues for the Court to address.

THE COURT: I think the key words there are "to the extent." What do I have before me in the record that would define that extent?

01:30:22 MR.RUSSO: And the Court specifically is focused on what's the conflict or is there a conflict?

THE COURT: Or to put it another way, not just in terms of the statute, some of the cases that I have read with similar kinds of analyses required of them view abstention not 01:30:46 as a blanket rule, but as a decision that requires a much more focused analysis of whether certain provisions of, say, the consent decree do and do not violate Younger. Because not all the provisions by definition or necessarily violate Younger. So in the case of -- let me pull it out here -- *Joseph vs.* 01:31:19 *Ingram,* 275 F 3rd, 1253, Tenth Circuit considering consent

decrease that were challenged, under Younger says abstention is not a blanket issue here, it requires a provision by provision analysis. Does the same issue exist here? And if not, why not?

MR.RUSSO: It does not.

THE COURT: Second question, why?

MR.RUSSO: Because the fundamental problem in this case with abstention is the underlying existence or the existence of the underlying state action which determines bail and the ability of the arrestee --

THE COURT: You mean the statute.

MR.RUSSO: Statutorily.

THE COURT: S.B.

MR.RUSSO: Correct.

THE COURT: S.B. 9 and 6, is that what you're talking about?

MR.RUSSO: Actually, Your Honor, it's even before that. Daves II opinion again reversed what -- overturned what happened in O'Donnell, so it was their view, it didn't necessarily turn on S.B. 6 or S.B. 9, although those were in play and existed at the time. They overruled O'Donnell to say what was happening before and what we decided in the reviewing what state courts are doing for arrestee's benefit is the wrong way to handle this. And that's the entirety of the consent decree, Your Honor. The fact is that individuals who are

01:32:51 dealing in the state system with the right to bail have the ability to discuss those issues with their defense attorney and have the judge who is in front of them and seeing those facts determine what that bail should look like. And eventually, 01:33:05 that is what Daves turned on. And so for that reason, there's not going to be a room left, I guess I should say, room left in the consent decree if abstention applies the way Daves II said it should.

THE COURT: So if I find no waiver, and I find I must 01:33:26 abstain, what does that do to the rest of the issues if I stop there?

MR.RUSSO: I don't think the Court should stop there.

THE COURT: I should go on and decide mootness.

MR.RUSSO: I think the Court should -- I think the 01:33:43 Court can decide the abstention issue and vacate the consent decree and dismiss the case based upon Daves II's analysis of abstention. The Court could also do a mootness analysis and then your opinion would look a lot like Daves, I think, the result being vacating consent decree and dismissal of the case.

01:34:08 THE COURT: All right. Let me hear from the other side.

MR.RUSSO: Thank you, Your Honor.

MR. CUTTING: Good afternoon, Your Honor.

THE COURT: I have been told I should abstain by 01:34:53 mootness or dismiss. What's your take?

01:34:55 MR. CUTTING: I disagree.

THE COURT: Can you pull that mic up so you're talking more directly into it.

MR. CUTTING: How is that, Your Honor?

01:35:05 THE COURT: We'll find out.

MR. CUTTING: Yes, a lot to cover based on that. I would ask if the Court is amenable, my colleague Mr. Fife is prepared to handle the Court's questions about waiver and timeliness under Rule 60, and I'm ready to talk about Rule 60's

01:35:23 application, the mandate, things spinning out of that, if that's all right.

THE COURT: Okay.

MR. CUTTING: I believe Your Honor began by asking about what the critical decision points that we have to address

01:35:36 here today are.

THE COURT: And in what order.

MR. CUTTING: Yes. And this chart, I hope it's not overwhelming, but is meant to be a bit of a guide to that in how plaintiffs and non-movants generally in our brief conceive

01:35:53 of the decision points along the way.

THE COURT: After the Goodhart or before Goodhart?

MR. CUTTING: After Goodhart.

THE COURT: Good.

MR. CUTTING: No, our position is that this Court

01:36:04 should follow Goodhart's --

01:36:05 THE COURT: I have to.

MR. CUTTING: Of course. But it's also our position that this Court should not read things into Goodhart that are not a part of the decision, particularly of the mandate. The
01:36:14 mandate is clear. The mandate says to consider abstention and to follow Daves, and we submit that is exactly what this Court should do.

Before I begin talking a little bit more about Goodhart, I do just want to make a quick detour to the mootness
01:36:31 point. Mr. Russo is raising mootness here and it's the first I've heard of this argument that Goodhart actually^ -- that its mandate includes a mandate for this Court and to consider mootness. That is not how we read that mandate. As I said, it says consider Younger, follow Daves. Those together should
01:36:50 give a sense of what part of Daves the Court was contemplating. There is nothing in Goodhart that indicates it was actually saying apply law on mootness. And of course --

THE COURT: But mootness was an alternative holding in Daves.

01:37:06 MR. CUTTING: Of course, yes.

THE COURT: So, why isn't the instruction to follow Daves consistent with consideration of mootness?

MR. CUTTING: Well, because the Court was considering -- in this mandamus action, it was considering the
01:37:21 limited issue of deciding abstention. So, in that context it

was clear that it was referring to the abstention holding of Daves and rightly observed that that holding was made as a matter of law. We don't contest that at all. But just to speak a little bit more on mootness. We did address this briefly in our response brief in opposition, we believe that argument is improperly raised at this time before this Court. The Court asked for briefing specifically on the issue of abstention, that is what we discussed at the status conference. That is what opposing counsel --

THE COURT: That is what the Fifth Circuit told me to consider first.

MR. CUTTING: We think that is both what the mandate mandate said, it's also what the parties agreed to. We believe that it's improperly raised at this juncture, although of course, if the Court denies this motion based on Younger, the movants would continue to have the other arguments that they have raised including mootness and we would go on to address those, but it is inappropriate at this juncture.

Additionally, even if the mootness argument were raised, it would not excuse this Court from having to go through Rule 60 in order to reach its conclusion. Mootness is no different from abstention which is no different from any other issue in that when these issues are raised post judgment, they go through Rule 60. That is what the Supreme Court has said multiple times with no ambiguity whatsoever.

01:38:56 A case to bring to the Court's attention, cited in our brief is Coney Island Auto Parts, which is a Supreme Court case from the past term. In that case, slightly different facts, but I think it demonstrates a relevant lesson here which is 01:39:10 that a party sought to vacate a final judgment based on an argument under Rule 60(b)(4) that that judgment was void. The lower court found they had not complied with Rule 60(c)'s reasonable time requirement, which applies to Rule 60(b)(4), (5) and (6). And said to that you may be saying this judgment 01:39:35 is void, it may in fact have been void. They were alleging no service, no proper service in that case.

THE COURT: And of course, Daves didn't get into any of this because we did no final judgment.

MR. CUTTING: Exactly, nor could it. And yet the 01:39:48 Court said there unanimously We do not let you around the Rule 60 standard. Both 60(b) and 60(c), just because of the nature of the underlying argument you are raising. It may be a very serious one, like the judgment itself is void. That is about as serious as you could get, and yet that does not allow you to 01:40:11 circumvent the rule. And so, if that does not allow you to circumvent the rule, I think it really shows that neither does abstention and neither would mootness, although as I said, I don't think that is properly before the Court at this time or briefed.

01:40:23 THE COURT: So, your focus here is on the

01:40:28 tran-substantive nature of Rule 60 that we are so protective of the interest in finality that we are not going to let even the assertion of significant interest in the correctness of judgment override that.

01:40:45 MR. CUTTING: That is absolutely correct, Your Honor. Even if a grievous jurisdictional error, if it is not brought timely is no excuse for disrupting that interest in finality. That is the difference between a Rule 12 argument and a Rule 60 argument. And a lot of what we've been hearing so far this
01:41:04 afternoon pretends as though we were in a Rule 12 world, and we just aren't. That is different, we are in a Rule 60 world, it means no matter what. Of course, as Mr. Russo mentioned, this Court always has oversight authority, but as you observed, that happens through the mechanism of Rule 60, and there has been no
01:41:25 case cited in this proceeding that indicates anything else. There is no case in which a Court has gone around Rule 60 to modify or vacate a final judgment.

THE COURT: The Fifth Circuit doesn't address many of these aspects. They cite Rufo.

01:41:49 MR. CUTTING: They cite Rufo twice, Your Honor.

THE COURT: Which is obviously implicates the Rule 60 analysis.

MR. CUTTING: They mention equities in the case of the election, so we are just asking this Court to of course comply
01:42:01 with the mandate in Goodhart, even though we think it is wrong,

01:42:06 but also to apply other binding precedent, to apply Rule 60 including subsection C-1 which requires this Court to evaluate timeliness, to consider both steps of the Rule 60 analysis including whether Daves is a qualifying change in law, and if
01:42:21 it is and the consent decree is vacated, whether constitutional violations are likely to re-occur, and to look at what the evidence shows regarding the equities around vacatur.

We think doing all of this is fully consistent with the mandate in Goodhart and that the alternative -- alternate
01:42:41 interpretation advanced by the Attorney General and the four judges is wildly broad and unsupported by Goodhart's text. Their petition to the Fifth Circuit asks for an order requiring the Fifth Circuit -- excuse me, requiring this Court to move more quickly. It got that.

01:43:00 THE COURT: I'm here.

MR. CUTTING: This Court is definitely here complying with that, but they did not get more than that.

THE COURT: So you don't read the Fifth Circuit's opinion as all but ordering me to abstain.

01:43:11 MR. CUTTING: No, Your Honor. I think the Fifth Circuit's opinion, they could have done that very clearly. They elected not to. They said --

THE COURT: The mandamus was to rule quickly, not to rule a certain way.

01:43:24 MR. CUTTING: Rule quickly and to follow Daves. And I

01:43:26 think what the movants are trying to do is turn that follow Daves into much more than it actually is.

THE COURT: So, what do you think follow Daves means here?

01:43:34 MR. CUTTING: So, I think what follow Daves means, that's understood within the context of the Rule 60 inquiry, which as I mentioned, Goodhart implicitly embraces by citing Rufo which is the source of that inquiry. So, it says follow Daves, it also says Daves does not hinge upon factual 01:43:53 development or discovery.

Now, I probably -- we're probably on the same page in having to read that a few times, but the answer to how, what that means is this, the only reasonable way to read that sentence in Goodhart and consistent with binding case law from 01:44:11 Supreme Court and elsewhere is a reflection of what everyone agrees happened in Daves, which is that the Fifth Circuit decided the Middlesex factors in that case, meaning they assessed the Middlesex factors, they found all three had been met, and for that reason, because that was the only argument on 01:44:27 abstention presented to it, it found it as a matter of law that it needed to abstain, and it did. And it similarly explicitly overruled, although we have noted that there is some question about Daves's force given the mootness holding in that case. But putting that aside, we're accepting for the moment that 01:44:50 Goodhart has now said to apply Daves, certainly.

01:44:55 And Daves decided as a matter of law that the Middlesex factors were met and it overruled O'Donnell one, which similarly only considered the Middlesex factors and in that case found that they were not met. And so, there's no
01:45:10 doubt that Goodhart said follow Daves, that Daves's abstention holding was made as a matter of law without discovery or fact evidence, and that that overruled O'Donnell one. None of that is disputed here. But that then fits into the first step under Rufo and Rule 60(b)(5) because it is this Court's obligation to
01:45:35 decide a broader question in that first step under Rufo, because it needs to decide -- well, first it needs to decide whether the movants waived Younger.

It also needs to decide whether under Rule 60, Daves is a qualifying change in law, that is whether --

01:45:52 THE COURT: Is it just Daves or is it also the statutes, state statutes?

MR. CUTTING: Whether S.B. 6 and S.B. 9 are qualifying changes in law?

THE COURT: Yes.

01:46:02 MR. CUTTING: Well, no, as I said, I think that is a law -- that is an argument based on conflict with state law that is not before the Court right now. If that were before the Court, I think there would be some question about the interaction between the state law --

01:46:19 THE COURT: And I don't have a record to decide that,

01:46:21 which is the point I made to Mr. Russo.

MR. CUTTING: Absolutely. The Court would also need to decide whether Daves or Goodhart required this Court to abstain including by revisiting its 2016 holding, which this 01:46:34 part was never challenged, which found that bail hearings fall within a Sprint category -- excuse me, that bail hearings do not fall within a Sprint category, and considering whether irreparable harm presents application of Younger. So, those are two issues that relate to whether or not a Court can decide 01:46:53 to abstain that are outside the scope of what was considered in O'Donnell one and what was considered in Daves II.

So, this Court would still have to assess those in the first instance or when it comes to Sprint, it would actually be in the second instance. But certainly those aren't controlled 01:47:10 by Daves, and thus they aren't controlled by Goodhart.

THE COURT: So abstention is not controlled.

MR. CUTTING: Abstention is not controlled. What is controlled is the part that Daves dealt with, which is the Middlesex factor. So, Goodhart is instructing-- we read 01:47:24 Goodhart to be instructing this Court to say take Daves and add it to -- apply it as binding precedent. Revisit Younger, but use Daves and see if you get a different result. Now --

THE COURT: Get a different result than Daves did?

MR. CUTTING: Well, sure, or a different result than 01:47:41 you did in 2016. But see what the result is, let me put it

01:47:46 that way. Although I do think there's some force to the fact that the 2016 holding on the Sprint factors is now law of the case. But either way, the Court needs to consider add step one in Rufo, and this is well established by Rufo and Rufo remains 01:48:06 the controlling authority on this, whether Daves is a significant change in law and whether it applies on these facts and arguments. And certainly Daves, in accepting Daves as binding precedent, even though it happened much later, is kind of takes some arguments off the table. It resolves the 01:48:22 Middlesex factors, we are not arguing otherwise, but it also leaves some on the table because it did not have those issues before it.

This Court will also then need to proceed to step two and -- well, certainly will need to proceed to step two if it 01:48:39 finds that everything it considers weighs in favor of abstention. We would say that you should still go and look at the record for step two purposes, regardless of what you find in step one because I think it's particularly important here in a case that is likely to receive appellate review that the 01:48:58 record be complete, that it be clear, that it be as amenable as possible to a reasoned decision on appeal. And so we would ask the Court then continue, regardless of what it finds in step one, to look at the record and see, ask the question of whether vacating a consent decree would result in constitutional 01:49:18 violations. Here there is a voluminous record that says yes it

01:49:22 would. And also ask whether the equities weigh against vacatur, which we have testimony from the heads of every involved agency head in the Harris County post arrest system who have weighed in on this question decisively. So, these are 01:49:42 the questions for the Court.

THE COURT: So, when I first issued the O'Donnell opinion, it was based on, yes, a voluminous record, thousands literally of hours of bail hearings that showed constitutional violations repeatedly in dealing with the issue of bail grants 01:50:10 or denials to misdemeanor defendants. There was an ample factual record, there was a hundred-plus page decision and that received waves of appellate review. So, when you say look at the record, do I go back to that record? Do I look at the record after the ruminations of the Appellate Court? 01:50:44 Rumination in the original meaning of what a cow's stomach does to what goes in the front end when it gets chewed over and chewed over and it comes out with the result it did. So, when you say look at the record, what are you telling me to look at?

MR. CUTTING: I think the Court can certainly look to 01:51:07 the original record if it wishes to do so, but the way that we have been conceiving of it is more that the record that matters most is the record now before it, which is about whether vacating the consent decree risks creating or perpetuating the same constitutional violations that the consent decree was put 01:51:28 in place to address. And so, that requires looking at the

01:51:32 record we have submitted along with our response and opposition, but also matching it up to the record that the Court made before issuing its order on the preliminary injunction because that will show whether the similar
01:51:48 violations are, you know, the ones that plaintiffs and non-movants now say are likely to occur.

Also, certainly O'Donnell one to the extent it affirms this Court's findings of fact and also most of its conclusions of law and just narrows the injunction, that that also tells us
01:52:10 that the real issue here is about people not receiving constitutional bail determinations. And what that means is individualized, they need to be individualized and they need to be based -- they cannot result in arbitrary or unnecessary detention.

01:52:25 THE COURT: So, the consent decree itself sets out very specific findings, observations, that became embodied in the court order adopting the consent decree that set out and summarized the Court's earlier findings and injunction.

MR. CUTTING: That is exactly right, that is a
01:52:52 place -- that would be a logical place to start in assessing whether the constitutional violations the consent decree was meant to address might return without it.

THE COURT: So, I have two questions about that analysis. One, there's a kind of a ironic circularity about it
01:53:07 that I'm asked to abstain, unclear what that means about my

01:53:12 ability, if I do abstain, to vacate the consent decree. Having abstained, can I then rule on whether to vacate or modify something that the parties agreed to, then ask me to embody in a consent decree? First question.

01:53:35 Second question is that to examine whether the same inequities would occur, I would also have to take into account the changes, if any, that S.B. 6 and 9 would have implemented and what the relationship between what the consent decree requires and the statutes now require is. And again, I'm 01:54:05 concerned that I don't have a record adequate to do that. So, when you tell me to look at the record, I'm scratching my head as to what the relevant record is.

MR. CUTTING: Okay. Well, I will do my best to address that, Your Honor. First, I think that we depart from 01:54:24 Mr. Russo in conceding it as that within the Rufo two-step determination that you are actually deciding to abstain and then continuing to decide whether or not to vacate. It is that you are assessing -- the Court is assessing whether or not this change in law would apply here had it been the law back when 01:54:47 the case was filed. It is assessing the applicability of the law and the fact that it is significant.

THE COURT: Maybe I'm just not following you and I apologize if that's the case, but that takes me back to the question that I started with. The Fifth Circuit has told me 01:55:10 the first thing you need to do and do quickly is decide whether

01:55:14 or not you need to abstain. If I decide that I do need to abstain, does that end the inquiry, my inquiry?

MR. CUTTING: There's just no precedent for breaking out the Rule 50 analysis. Rufo says assess the change in law
01:55:34 and whether it warrants relief, and that is part of the same inquiry. So, certainly deciding abstention is part of that, but it is not a stopping point where you stop, you say okay I'm abstaining, I am voluntarily divesting of jurisdiction --

THE COURT: Not so voluntarily, let's be clear. But
01:56:00 I'm directed to decide abstention first. And if I understand what you're saying, and tell me if I've got it wrong, you're focusing on the third step, the Younger analysis, and you are asking me to look at the adequacy of the state procedures that would enable an accused in a state criminal case to raise in an
01:56:37 effective manner the constitutional issues regarding bail decisions. Is that what you're focusing on?

MR. CUTTING: Not quite, Your Honor.

THE COURT: Okay, reframe it for me.

MR. CUTTING: We take Daves holding as binding
01:56:52 precedent here.

THE COURT: Of course.

MR. CUTTING: And that resolves the Middlesex factors which you include adequacy of opportunity.

THE COURT: Yes.

01:56:59 MR. CUTTING: However, it does not, as I mentioned,

01:57:00 include whether Daves is a significant change in law in the first place because it did not make legal what the decree was designed to prevent, it does not include whether or not bail hearings fit in one of the Sprint categories and if you don't
01:57:14 fit in the Sprint categories, you do not pass go, you do not proceed to the Middlesex factors. And it does not address the great and irreparable harm exception which applies even if the Sprint categories and the Middlesex factors are met. So, we think there's more for the Court to do there, but it's not on
01:57:31 the third factor of the Middlesex test because that part is foreclosed by Daves.

THE COURT: I agree with that.

MR. CUTTING: So, all we are saying is that the Court needs to go through this analysis and apply Younger abstention
01:57:46 to the facts of this case, and that is consistent with what Goodhart is saying to do. The first step of proceeding here in figuring out whether or not to grant the requested relief is to go through Younger. We agree with that. But there is not -- the Court does not stop and abstain halfway through. Under
01:58:07 Rule 60, which again we've established I think is the only mechanism for considering this, it is not a Rule 12 world where you kind of consider abstention, then abstain or not, and then look to relief or some kind of remedy phase. It is bundled together under Rule 60, it all happens in the same inquiry. Of
01:58:27 course, there is an order to it and that is how you comply with

01:58:30 Goodhart, you first consider abstention, you then move on to considering constitutional violations and the equities under Rufo step two. But Rufo is crystal clear, this Court may not vacate a consent decree if doing so would create or perpetuate constitutional violations. 01:58:49 It does not say first it considers whether the argument being raised might deprive it of the case or deprive the jurisdiction and then only if it still retains jurisdiction does it do this. That is part of the test. It is fused together with the first part and there is no separating 01:59:11 them under Rule 60 under Rufo, that is not the way precedent indicates this proceeds.

THE COURT: So, what do I do with the phrase that has been haunting me for some time, "*This case never should have been filed in federal court*"?

01:59:27 MR. CUTTING: I don't think you need to do anything with that phrase, Your Honor. That is a statement of regret about perhaps issuing Daves later than the majority in Goodhart would have liked, but that is not -- or where it's stated from Daves rather, but that does not change again the fact that we 01:59:50 are in Rule 60 world now, we are not in Rule 12. And yes, Goodhart has opened the door to including Daves as law that this Court can apply in going through step one and then step two of Rufo, but it does not do more than that. And I don't think that phrase demands anything different. That is a 02:00:10 statement that we would disagree with anyways because, as we

02:00:15 said, there are different facts in this case and different arguments, and so we don't think Daves would actually foreclose them, but the fact of the matter is, Daves was not the law when this case was filed. This case proceeded under binding law at 02:00:30 that time and reached the correct result.

I do want -- I was a little confused during some of Mr. Russo's presentation. It seemed as though there was some ambiguity about allowing the Court could proceed under Rule 60, so I was relieved to hear that and I hope I wasn't 02:00:55 misunderstanding it. However, I did also hear the mandate from Goodhart mischaracterized as saying this Court needs to dismiss this case and vacate the consent decree. And I'll just point out the obvious here, that is not in the mandate and that is not in the case. It would have been very easy for the Goodhart 02:01:16 majority to say that. Now, if it had said that, it would mean that it was circumventing Rule 60 entirely and that would have been a extremely radical thing for an unpublished per curiam opinion to do, but either way, we look to the text of the decision, there's nothing in there that says that, so I do 02:01:38 object to that characterization of the mandate that this Court must follow.

I do want to just touch on Your Honor's question about state law, if that's not taking us off --

THE COURT: No, that's fine. Keep going.

02:01:59 MR. CUTTING: So, Your Honor's correct that there's no

02:02:00 record in place to assess conflicts between state law and the consent decree at that time. That argument is not before this case. However, that does not mean that state law is irrelevant in this case. In fact, the fact record that we have built and 02:02:17 submitted in this case, in this particular motion shows, and this is unrebutted evidence, showing that S.B. 9 literally requires the very constitutional violation that this case was brought to address. Without the consent decree in place, in a significant portion of cases, hearing officers will be forced 02:02:36 to impose secured money bail that may result in pretrial detention, even in situations where they have determined that detention is unnecessary. And so, that alone under Rufo cannot create or perpetuate constitutional violations limitation which is this Court's north star, it's the outer boundary of this 02:02:56 Court's equitable flexible modification authority, that is the outer boundary and that takes us past it. So, that is why S.B. 9 is relevant here.

As for whether state law more generally has an influence here, case law is clear that that does not have an 02:03:24 effect, that mere compliance with the law is not a reason for vacating consent decree nor do we submit that this law is synched up with federal law or that it is being fully complied with.

*(Pause.)*

02:04:01 So, the case I was looking for here, so the -- as I

02:04:05 said, the evidentiary record shows that state law currently requires the automatic application of secured money bail and, therefore, prohibits individualized consideration at a bail hearing. But also this case has never been about state law, it 02:04:21 has been about county practices. In fact, when this case was filed, there was state law requiring individualized consideration in bail cases. Now, obviously that state law was not being followed. And so, this record shows, unlike other counties, this county has a documented history of decades of 02:04:42 failing to provide individualized consideration to misdemeanor arrestees even when required by state law.

So, even taking at face value movant's argument that S.B. 6 requires individualized consideration, therefore you have nothing to worry about if you get rid of a consent decree, 02:04:59 and even pushing aside S.B. 9's obvious contradiction of that, that is not what this case is about and it's really about what is happening on the ground and what stands to happen if the consent decree is vacated. So, even if that state law actually did reflect federal law and S.B. 9 were not there, and even if 02:05:21 Harris County did not have this particular history of defying it, it would not excuse the Court from needing to look at the overall equities. And that is because just mere compliance with the law cannot justify vacatur, as the Fifth Circuit stated in Frazar v. Ladd, which is 457 F 3d, 432. There the 02:05:58 Fifth Circuit in 2006 said, *"If the Court wished the law to be*

02:06:01 *that consent decrees must be dissolved if defendants comply with federal law, it would have expressly stated so. It did not. A rule of law based on a single factor --"* and here a parenthetical *"--(compliance with federal law) is the opposite* 02:06:16 *of the Court's requirement of equitable flexibility. We hold that the District Court properly determined that the applicable legal standard in this case came from Rufo and Cooper."*

So, I say that to underscore that this Court does not need the record on S.B. 6 and S.B. 9 to decide this abstention 02:06:37 issue. That record will be important for the other argument that movants raise about a conflict with state law alleging that that is a circumstance requiring further relief or similar relief.

THE COURT: So I can decide and indeed must decide 02:06:53 abstention without deciding whether to vacate or modify the consent decree based on asserted conflicts with the state law.

MR. CUTTING: Absolutely, that is outside the scope both as a matter of what is raised in this motion and also it is not something that this Court need to or even should 02:07:17 consider as part of what the two steps of Rufo command here. That is absolutely correct.

THE COURT: So, did you want to talk about the waiver on the part of the judges, particularly focusing on Judge Garcia who didn't assume office until January of 2025?

02:07:39 MR. CUTTING: Absolutely. I'm going to cede the

02:07:42 podium to my colleague for that, but I just want to leave with a few big picture points.

THE COURT: Sure.

MR. CUTTING: The movants have asked this Court to 02:07:52 treat Goodhart as a permission slip to skip Rule 60 altogether. I think we've covered that there's no precedent whatsoever for that, and Goodhart even cites to Rufo, not around it. Rule 60 is the only door to relief that they seek.

The judges petitioned the Fifth Circuit for an order 02:08:07 saying speed up, and they got it, and that is exactly what this Court is now doing all while following Daves within that structure of Rule 60.

No Court has yet applied Rule 60 to this motion or this record. That is this Court's task, it is not this Court's 02:08:25 responsibility to attempt to read tea leaves and predict what the Fifth Circuit might do on eventual review of that decision. This Court is obligated to apply Rule 60 in the first instance, following the law as it currently stands, and making the factual findings required for a clear record and adequate 02:08:43 review on appeal. And so, this Court now has the record before it and that's precisely what it should do. And on this record, it should follow Goodhart and other binding law and deny the motion to vacate.

And I'll turn it over to Mr. Fife to talk more about 02:08:58 waiver and timeliness under Rule 60, unless Your Honor has any

02:09:01 questions before I sit down.

THE COURT: So, if I draw a bright line distinction between ruling on abstention and then ruling on mootness, I gather your argument is that at a minimum, you would want to 02:09:27 submit additional briefing on the mootness issues since you really didn't address it in what you filed so far, and that would only be a question if I did not abstain under Younger or if I did abstain and then went on to discuss mootness as if I had not abstained.

02:09:48 MR. CUTTING: I think you're correct on the first part which is that we would absolutely request a chance to brief that. That has not been briefed. I don't think -- as I said, big picture, I don't think it lands the Court in a different place from needing to go through Rufo's steps and consider the 02:10:05 equities and likelihood of constitutional violations, but it is a different case and there is not the record to see what if any conflicts exist there. And whether the Court could proceed through -- I do want to --

THE COURT: It's a messy procedural question. If I do 02:10:26 abstain, what does that do to my authority to then determine whether there's a conflict between a consent decree and state law that might support modification, if not vacatur, what do I do with my ability to consider, as you say, the Rule 60 factors including the equities?

02:10:51 MR. CUTTING: Our position remains, Your Honor, that

02:10:53 it would not be at step one that you are deciding to abstain. You are deciding that Younger fits those facts and arguments, but you would still proceed to step two. And the way we know that, we don't have a lot of Younger case in this posture and
02:11:12 that's because they're typically rejected, and we have noted that, you have noted that. This has been put back on the table by authorities, you know, above us, but just for the record, that's why there's so little case law there. We, of course, maintain that is the correct position on that Younger cannot be
02:11:30 raised post judgment. But here we are, we are treating it as though it can be properly raised and then treating it through the Rufo test.

Now, if the Court finds Rufo step one is met under the analysis we discussed, I won't belabor it, but then it still
02:11:50 needs to proceed to step two and analyze whether there are constitutional violations likely to occur and what the equities point towards. And so it is not abstaining at in between step one and step two, it is finding that circumstances of step one are fit and then it is going on to see whether -- and in fact,
02:12:09 abstaining is the wrong term for what any of the end point would be. It is either vacatur or nothing.

THE COURT: But how do I -- the Fifth Circuit has directed me to decide abstention, so I can't simply say you're using the wrong term.

02:12:25 MR. CUTTING: No, but it is abstention within the

context of Rule 60, it is still deciding it in the step one of Rufo, but that does not mean that the end point is this Court abstains. That has no meaning after a judgment. The end point is that the Court proceeds to step two to decide whether or not to vacate. And that is--

THE COURT: Because in this case abstention is essentially saying I can't enforce the consent decree. Is that what you're saying?

MR. CUTTING: It's not even that, Your Honor. It's maybe a parallel would be a party that tries to raise a change in subject -- law concerning subject matter jurisdiction as a change in law that should justify vacatur. Now, even if the Court at step one finds that that change is significant and that it applies or would have applied on that case's facts had it been decided prejudgement, the Court is not suddenly divested of jurisdiction and can't proceed to step two, it still proceeds to step two because we are in Rule 60 land, not in Rule 12 world, and it must decide whether the equities and the risk of constitutional violations, what type of a modification, if any, they support. And so that is -- if that is the way it proceeds with a Court that is essentially deciding subject matter jurisdiction within step one, certainly the same approach applies when we're deciding abstention within that step one part. Now, this is very --

THE COURT: The Fifth Circuit tells me I don't need

02:14:01 any facts, I don't need any discovery, but you're telling me that I have to include factors, the equities, risk of constitutional violations, which inherently require a record.

MR. CUTTING: That's right, Your Honor.

02:14:18 THE COURT: So that's a real inconsistency.

MR. CUTTING: Well, what it said is that Daves does not require any discovery or fact evidence and this also comes in the context of a case that was almost through with discovery at the point that the Fifth Circuit actually decided it. And 02:14:36 again, if Goodhart had meant to completely up end Rufo's standard, which of course is something that legally it could not do, but even if it had been trying to do that, it would not have hidden this proverbial elephant in a mouse hole by not even saying. It would say Rule 60 doesn't apply, it would say 02:14:56 we direct the Court to vacate the consent decree, it would say the Court needs to stop and, you know, it would direct it to say that and it would say what it meant about Rule 60. It does not say that. It cites Rule 60 approvingly, it talks about the equities, it talks about how a change in law alone is not 02:15:19 circumstances to justify vacatur. And so, I just reject a reading of Goodhart that insinuates that it is somehow completely undoing Rufo's 25-year-old standard.

THE COURT: All right. Let me hear from your colleague.

02:15:45 MR. CUTTING: Thank you, Your Honor.

02:15:46 THE COURT: And then I'll let the non-movants weigh in.

MR. FIFE: Good afternoon, Your Honor. Travis Fife for the plaintiffs.

02:16:02 The judges of Courts 2, 3, 14 and 16 waive Younger abstention via entry of the consent decree in an intentional course of conduct taken after entry of the consent decree. Now, *In Re: Goodhart* we admit forecloses the first theory of waiver on a wrong view that successors aren't bound by the 02:16:23 predecessor's waiver, but taking that as a given, even under Goodhart's conduct based waiver theory, these judges waived Younger twice over.

Number one, under Goodhart's reasoning, each one of them including Judge Garcia, Court 16, could have filed well 02:16:41 before November 2025. And number two, each of them affirmatively chose to recognize the monitor as an arm of this Court's jurisdiction and seek modification rather than vacatur.

THE COURT: So, the Fifth Circuit seems to rely heavily on the inability of the four judges to get their own 02:17:05 counsel, and really doesn't acknowledge the relevance much less importance of the additional points that you've mentioned. How do you advise that I ignore that?

MR. FIFE: And I think that that is just a virtue of how the waiver issue was teed up to the Fifth Circuit. So, as 02:17:25 we've discussed at status conferences over the last month, what

02:17:30 the Fifth Circuit said was under the four judges' version of facts, we don't see how they could have moved before November 2025. And the two bases for waiver that I just outlined are two ways that the record reflects that that, 02:17:48 quote, version of facts was wrong.

Now, I'd like to return to the second theory about seeking modification rather than vacatur as a form of waiver and just stick to the easiest path to find waiver which is what the Fifth Circuit said which is they could have moved well 02:18:06 before November 2025. There are two concrete ways they could have moved before. Number one, they could have hired outside counsel, and number two, as Your Honor suggested, they could have moved pro se. Now, in her deposition, Judge Goodhart stated that she felt it was unethical for her or her colleagues 02:18:27 to represent themselves, both under attorney ethical rules and under the judicial code of conduct. To be candid with the Court, I was surprised that that made it into their reply brief because Judge Goodhart is just obviously wrong on those issues.

Number one, on the attorney ethics rule, the duty of 02:18:47 competence under Rule 1.01 applies when an attorney takes appointment. It does not apply in pro se litigation, particularly where the person is already a defendant in the lawsuit.

Number two, on the Judicial Conduct Code, Cannon 4, 02:19:05 subsection G expressly authorizes judges who are bound by that

02:19:12 provision to represent themselves pro se. In fact, this is unnecessary because of the plain text of the statute, but a 1998 judicial ethics opinion from Texas, this is opinion number 226 that we'll include the full text of in our supplement says, quote, 02:19:34 *A judgment may always represent herself in a legal action*, end quote.

And so, it is just wrong that they couldn't have moved pro se. So when the Fifth Circuit says could they have moved in this court before November 2025, the answer is a resounding 02:19:51 no. And a quick note on this demonstrative, I actually think it's incredibly helpful because it takes them 23 entries and two full pages to finally get to we filed the motion with the Court to vacate on the basis of Younger at the very end of their chart. And so when the Court is reviewing this 02:20:12 demonstrative, which candidly I think you should, I would also tack on to each of these bullets a *and we chose not to move either before the monitor or the Court to vacate the consent decree on the basis of Younger.*

And following the Fifth Circuit, it's very plain. The 02:20:33 Fifth Circuit said on their version of facts they couldn't have moved until November 2025. Actually, the record shows they had a lot of options to move earlier, and under *In Re: Goodhart*, that constitutes waiver and that's all the Court needs to say about Younger abstention.

02:20:50 THE COURT: Does that apply to Judge Garcia as well?

02:20:52 MR. FIFE: Yes, Your Honor. She could have moved on January 1, 2025.

THE COURT: That's the day she assumed office.

MR. FIFE: Yes, Your Honor. And as the Court may or

02:21:04 may not remember, Judge Garcia was briefly a defendant in this original lawsuit from early 2016 through the 2016 election.

THE COURT: I think she was a participant starting in October of 2016.

MR. FIFE: Yes, Your Honor, when they created that

02:21:24 court that eventually she lost election for. But the point still stands that it's not as if she was taking office unaware of this case or being bound by it. And while we didn't depose Judge Garcia, one of the first questions we asked in the depositions of Judge Goodhart and Johnson was *When you took*

02:21:47 *office on 1/1/2023, were you aware that you were bound by the consent decree*, each of them said yes, full stop. And so, I think it is -- it would be a little incredulous to argue that Judge Garcia, a prior defendant, then came into office not knowing about the consent decree. And so, I think all you have

02:22:09 to do is say *In Re: Goodhart* says could they have filed before November 2025. Obviously under Texas law and the facts of this case, they could have. That's waiver, motion denied.

Now, if the Court has any other questions about that theory, I'm happy to address it. I think the Court can just

02:22:31 rest itself on they could move pro se, but the judges have made

02:22:34 a big controversy about, well, the county didn't want to allocate taxpayer funds to provide them counsel. And I would approach this question in two ways if I was the Court. The first is they cite this statute, local government code Texas -- 02:22:55 Local Government Code 157.901, which requires that County Commissioners pay for counsel where an official is, quote, sued by any entity.

Candidly, I think it's actually a complicated question of state law, whether the County has an obligation to pay for 02:23:12 someone to reopen an already closed matter. I think the Court shouldn't really get into that. They have manners of dealing with that under state law where they could mandamus the Commissioners Court to fulfill what they claim is their obligation. But even if that isn't -- but even if the 02:23:37 commissioners should have paid for counsel, that same provision of state law expressly recognizes that officials may choose to hire their own counsel. At subsection C, it says that a County official is not required to accept the counsel the County provides, meaning there are situations where an official 02:23:55 capacity defendant can and does choose their own counsel.

Now, I take the judge's point that they did not want to pay either with their own funds or some other source, but that is a choice that they made. Comity requires not only the Court to abstain in appropriate circumstances, which this isn't 02:24:16 for the reasons Mr. Cutting said, but it also under Hodory

02:24:19 requires the Court to respect the decisions and the cost benefit analysis of state officials. That cost benefit analysis that the judges of Courts 2, 3, 14 and 16 made was to not spend money to hire outside counsel and they are stuck with
02:24:37 that decision and no principle of comity or federalism requires you to perform a counterfactual analysis of what they could have and should have done if they actually wanted to raise Younger.

So, again, I think waiver here is just apply the plain
02:24:54 text of *In Re: Goodhart*, everyone agrees that it authorizes a conduct-based waiver or that it recognize a conduct-base waiver. They frame it in terms of, well, what was the judge's version of events, they couldn't file until November 2025. Actually, they could have. Three of these judges could have
02:25:14 filed 32 months earlier, and Judge Garcia could have filed eleven months earlier.

Now, I heard the Court's scepticism of our second theory of conduct-based waiver which is that by asking for modification of the decree the judges put their arguments up to
02:25:34 the federal court and the monitor to agree with. I don't want to abandon that theory because I think it's forceful, but I do just want to say that in addition to the waiver issue, I think another easy way out of this mess if the Court finds that Rule 60 applies is to just apply the reasonable time limit of Rule
02:25:55 60(c)(1). The four judges don't in their reply don't even

02:26:01 expressly address that issue. The Attorney General addresses it but through a candidly confusing equivocation of Rule 24's timeliness with the Court's futility holding on intervention and Younger abstention -- go ahead.

02:26:17 THE COURT: So, what would you view as a reasonable time for a Rule 60(c) analysis?

MR. FIFE: I think for the Attorney General, within 30 days from the issuance of Daves given he was litigating the issue in Daves and Russell. And, you know, we give him credit 02:26:38 for when he files to intervene, so if he gets that intervention filed within 30 days, you wouldn't hear anything from me. For the four judges, I think the time -- I think it's a little bit more complicated because of Goodhart's predecessor or successor. I think properly viewed, that the judges should 02:27:00 have moved as soon as possible after the Daves opinion issued. I think that Judge Garcia is in a difficult position to assess because Goodhart doesn't say anything about how the predecessor or successor issue relates to C-1, so I think properly viewed under cases like Salazar and the R.C. case out of Alabama we 02:27:25 cite in our brief, she is on -- it's the office that's on the clock, not her as an individual person or judge.

THE COURT: No, I mean I think if you make it individual specific, then you just keep resetting the clock.

MR. FIFE: Exactly. And I just think that that is 02:27:42 flatly inconsistent with the way the Supreme Court has treated

02:27:46 Rule 60(c)(1). Mr. Cutting quoted the Coney Island case which was unanimous in result in 8/1 in the majority opinion where the Court said even a void judgment we are going to enforce this time limit because the finality of judgments is so
02:28:05 important.

And the Rule 60 time limit isn't a -- you know, it's not something that this Court is imposing sua sponte. It's something that Congress through the Rules Enabling Act and the judiciary implemented to prevent what was a very confusing
02:28:25 amalgamation of common law writs and inherent authority proceedings that were causing chaos among the federal bench, and so I think that a proper view of this Court's role is to apply Rule 60(c)(1) under the factors and discretionary analysis we laid out in our brief and to say that the County
02:28:49 Court at Law of judge 16 waited two and a half years to raise Younger which is not within a reasonable time.

Again, we cosign the analysis of Salazar and R.C., the Alabama case on, you know, how their argument about changing political wins and things work and -- yeah, and so I'm happy to
02:29:20 continue discussing waiver, but I did just want to say there's another kind of clear offramp here, which is Rule 60 is the procedural vehicle, I don't know if I have to do all this equity stuff, but (c)(1) definitely applies.

THE COURT: But the advantage of the Rule 60 analysis
02:29:36 is that it doesn't bring into the equation the equitable

02:29:42 factors that may in turn rest on facts that are not before me
in the record.
MR. FIFE: Well, so yes, that is true. All of the --
the record is complete as it's going to be on timeliness. Many
02:29:59 of those facts are just docket entries that you have.
Now, I did want to make a slight addendum to how the
record discussion went before, which is I actually think that
that's a question for the moving party. Because similar to
Coney Island and the BLOM Bank case, the Supreme Court is now
02:30:16 in a unanimous BLOM Bank case and then an 8/1 Coney Island
opinion has kind of banged its hands on the podium.
THE COURT: Try gavel.
MR. FIFE: Bang the gavel, yes, we don't get one of
those, so I'm not used to --
02:30:34 THE COURT: I don't have one.
MR. FIFE: Well, they've banged the gavel repeatedly
in two straight terms that says Rule 60 is strenuous
extraordinary relief, so I think the question is for them,
where is the record.
02:30:47 THE COURT: So would it be inconsistent for me to say,
okay, I've looked through all this, I conclude that I must
abstain under Younger, but then hold that Rule 60 hasn't been
met, not a reasonable time.
MR. FIFE: With a very slight, and I'm not playing
02:31:11 semantics, I'll explain why it's substantive. But I think what

02:31:15 the Court would actually hold is if this case was filed today, I would abstain. But this case is already at final judgment, which means Rule 60 is the only procedural vehicle that can vacate the consent decree and they've failed the Rule 60 test
02:31:32 twice over. One, by filing the motion within an unreasonable time, and two, because the only record the Court has is the constitutional violations, the tens of thousands of violations that were occurring before the consent decree and the thousands that will occur if you vacate. And again, I think you can make
02:31:53 the (c)(1) point without even addressing the equities. I think --

THE COURT: Just unreasonable time, full stop.

MR. FIFE: Candidly, Your Honor, we could all go have a coffee break and you could do this opinion in 30 minutes on
02:32:09 (c)(1). Shoot my shot.

But yes, that is I think -- now, I do just want to make one additional point which is that the Younger waiver issue, you can disagree with us on whether Rule 60 applies and still apply the straightforward Younger analysis that I
02:32:29 outlined before. And if the Court is open to it, I would love the opportunity to just briefly address our second waiver theory for the four judges under Goodhart and then very briefly on the Attorney General.

THE COURT: Okay.

02:32:46 MR. FIFE: So, the second theory was that by

02:32:49 continually requesting modification, that by continually requesting modification to correct purported conflicts with state law, the four judges sought to have those claims recognize this Court's continuing jurisdiction. Now, I
02:33:06 understand that the Fifth Circuit really focused on, well, could they have moved earlier. And again, I think that -- but if you look at the underlying cases there, they're citing the Dayton Schools case, they're citing Hodory, and the principle underlying those cases is comity does not apply when you
02:33:28 put your claims up for -- you have put the issues up for federal adjudication. And the two examples that we have cited favorably that the Court also cited favorably on waiver was Cradle of Liberty and Norton, again it's the E.D.N.Y. case. And in those cases, the government defendants, they stayed
02:33:53 state court proceedings and affirmatively said federal court sort this out for us. They paused the state proceedings to allow the federal court to go forward.

Now, I've recognized that in an obvious way that is not what happened here, but Daves I rejected any sort of bright
02:34:11 line rule for whether a party has waived Younger. And the context here is that it's not as if these judges were just waiting for some state court proceeding to unfold. Every single day they delayed was allowing themselves to be bound by the consent decree and this Court's jurisdiction. So again
02:34:34 going back to the demonstrative, I think our second theory is

02:34:37 that we would add did not move to vacate and allowed ourselves to be bound by the consent decree. And so when they're making these attempts to modify the consent decree, they're not saying get rid of it in the way that they are today. They're saying, 02:34:55 hey, 16 judges, let's get together and correct this thing and, you know, fulfill what we think S.B. 6 requires. We disagree. And that that is a request to continue this Court having jurisdiction and analogous to the Norton and Cradle of Liberty cases.

02:35:20 THE COURT: So your position is that all the judges waived?

MR. FIFE: Yes, via entry of the consent decree. And Judge Garcia on the second theory, so number one is in their characterization she just kind of joined the party with the 02:35:42 other three who, as we've outlined in our brief and the evidence we presented, were really trying to garner support for modification, not vacatur. So, on their telling, she joined those efforts and the only affirmative step she made was to send a formal request. Judge Goodhart sent it, but in her 02:36:04 deposition she said it was on behalf of all four of them, to modify the consent decree to allege -- to make it consistent with alleged conflicts in state law.

Now, I will spot them there is a lot of examples in the record of Judge Goodhart saying something to the effect of, 02:36:24 *Well, I was worried about Daves II, we talked amongst ourselves*

02:36:30 *about Daves II.* That, we do not dispute that. I think what it comes down to is a legal question of whether, you know, talking amongst yourselves or via e-mails or in phone calls with the Attorney General's Office can preserve an issue when all of 02:36:47 this other outside facing conduct is saying no we just want to modify. And I think when you look at the underpinnings of waiver, especially in this case of the thousands of hours of videos that you and my co-counsel watched and the immense amount of resources from everyone in the County and the 02:37:09 judiciary, waiver is designed to prevent unfair prejudice, and allowing them to have these what I would call not secret, but inside chats about their concerns about Daves II and outwardly just request modification, I think that that is the exact type of gamesmanship that waiver and prejudice that waiver is 02:37:34 designed to prevent.

Just quickly on the Attorney General, I would just deny his motion to reconsider under Rule 24. The Court already reached that as an independent ground and I just wouldn't even evaluate whether he waived Younger or not, but I'm obviously 02:37:53 happy to answer any questions the Court has about that.

THE COURT: Not right now.

MR. FIFE: Wonderful. Thank you, Your Honor.

THE COURT: Thank. Does it make more sense to have a response to what has been presented from the plaintiff so far 02:38:14 and then turn to the additional arguments that I think

02:38:17 Mr. VanFleet presented, Mr. Hu presented? You tell me what makes the most sense. Should I get all of your arguments out and then let the Attorney General and Mr. Russo respond?

MR. VANFLEET: Well, I do have a couple of points on waiver.

02:38:34

THE COURT: Come on up.

MR. VANFLEET: It maybe makes sense to wait for the other stuff. Your Honor, I wanted to make clear the Attorney General is incorrect that the 12 judges do not join in the waiver arguments. When they joined in the briefs with the plaintiffs in Harris County, that includes everything including waiver, and I believe both the four judges and the Attorney General, perhaps especially the Attorney General have waived the abstention arguments.

02:38:52

02:39:10 Two things came to mind on your questioning, Your Honor. One, what could the judges have done themselves. They could have done, as Judge Draper and I were discussing again, the first time we talked after she was appointed to the bench, she reached out to me in a phone call and said, *I want you to represent me too, how do I pay you.*

02:39:29

The other thing you raised is pro se representation. And that reminds me of the very first argument I had in the Fifth Circuit in 1980 before Chief Judge Brown, it's Henson versus Estelle 645 F 2nd 71. Unlike these four judges who are not only highly intelligent, highly educated members of the

02:39:57

02:40:02 bar, members of the bench, John Wesley Henson had an IQ of sub 90. I don't remember exactly. And I was appointed by the Fifth Circuit to try to revive his habeas petition which was pro se, which was handwritten and which was rejected by the
02:40:23 Southern District of Texas as being untimely. In the Fifth Circuit, despite his low IQ, his inability to get any kind of legal help except a prison jailhouse lawyer, they said too late is too late, it causes prejudice and no excuse for you, you are out of here.

02:40:47 I'll have some final points on the other parts.

THE COURT: All right. Mr. Hu.

MR. HU: Daniel Hu for Harris County. Just limited to the abstention question, just want to point out that the County agrees with the plaintiff's interpretation of Goodhart and we
02:41:04 join in their arguments. And then just two things on the waiver question, Section 157.901 that was discussed, that regards the Harris County taxpayers paying for legal representation, typically comes up more in the context of like when a deputy is sued as a defendant, not when someone
02:41:26 disagrees with a County policy and wants to challenge it or like in this case a consent decree.

And just two other -- one other minor fact. Judge Johnson, one of the plaintiffs is actually admitted to practice in this court and could have been representing herself pro se.
02:41:45 That's it, Your Honor.

02:41:45 THE COURT: I assume that later you'll want to argue some of the points you made about the effects on Harris County and its taxpayers if the consent decree were to be vacated?

MR. HU: Yes, Your Honor. I would like to do that at

02:42:02 the appropriate time.

THE COURT: All right. Thank you. All right. Am I going to hear next from the Attorney General on waiver or are we back to Mr. Russo?

MR. NWAOKORO: Mr. Russo, Your Honor, and I'll go

02:42:34 after him.

THE COURT: Mr. Russo, if I could start off with a question for you.

MR.RUSSO: Certainly.

THE COURT: So, looking at Rule 60(c), does a new

02:42:45 officeholder in your judgment when that new officeholder does take office, does that individual get a fresh start, a fresh clock to move to modify or vacate a consent decree that was previously entered?

MR.RUSSO: Yes.

02:43:06 THE COURT: Okay. So, any limiting principles? Ten years, 20 years, got a consent decree, fresh clock, move to vacate?

MR.RUSSO: That's an interesting question and why --

THE COURT: I thought so.

02:43:22 MR.RUSSO: It's very applicable because we're dealing

02:43:26 with a governmental entity here. And as the *In Re: Goodhart* noted and the City of Chicago case that this particularized question about barring future government officials from ever having a say in their own office is something that is not --
02:43:43 the Fifth Circuit is not -- this Court shouldn't live with either. You have to allow officials elected in the future to have a say in their own office, you can't bind them forever. So, and with respect to your first question is do they get a new clock, yes they do. But the question is at that point, how
02:44:02 do they go about challenging whatever situation there is. That's again *In Re: Goodhart* addressed that in the sentence I read earlier where they said it turns on this particular circumstances of the case at issue. So, I think all that is addressed in what the Fifth Circuit and the mandate the Fifth
02:44:28 Circuit provided to the Court.

THE COURT: All right. Go ahead.

MR.RUSSO: So, just to address a couple issues, I'll deal with the waiver arguments first. So, first counsel, actually second counsel, they presented two main arguments to
02:44:50 the Court which is first of all they could have filed before November 25th and they could have done so pro se. Your Honor, the idea or notion that these judges have to move forward pro se when everyone else in the case is represented, including their cohorts who just have a different opinion than they have,
02:45:10 is not something this Court should tolerate. The idea though

02:45:17 also is the County is deciding not to pay for their representation is -- the situation there is -- the party who I guess controlling the purse strings in that situation is actually opposed to the opinion and position. So, the fact 02:45:39 that the County declined representation in this instance is particularly problematic because the County in this instance again is opposing every opinion that the four judges want to pose. And so that conduct by itself is from our perspective problematic and should be viewed in this Court. And if you're 02:46:03 going to walk through an analysis of what's the reasonable time to bring your case, in every one of those cases, the question becomes, well, are there circumstances -- what are the circumstances behind that. One of those is we're talking to parties and having to deal with parties who don't want our 02:46:24 voices heard, and so that in and of itself presents a problem. Does the Court have a question?

THE COURT: But the judges had every First Amendment and other right to speak up, nothing that the other judges that I see in the record did do or could have done to squelch them.

02:46:52 MR. RUSSO: And here's the great thing, Your Honor, if they had something to say to the Court, they had a lawyer--

THE COURT: Half of my civil docket is pro se litigants and they're not lawyers much less judges. So, there's not a structural disadvantage that makes other cases 02:47:12 suspect.

02:47:12 MR.RUSSO: And in each one of those cases that you're referring to, I presume, tell me if I'm wrong, when you have pro se people representing themselves, they're representing themselves, which is not what is happening in this situation. 02:47:26 These are capacity defendants, and so this idea or notion that there's people that represent themselves independently pro se, this is a different situation.

THE COURT: So, your theory gives new officeholders a fresh 60(c) clock, but Goodhart says the mere transfer of power 02:47:47 from one officeholder to another is not enough to vacate a consent decree. Right?

MR.RUSSO: I agree with that.

THE COURT: So, how do we make those consistent?

MR.RUSSO: Well, we review the circumstances under 02:48:04 those particular situations. If the Court reviews the circumstances and determines on its own view is this individual's position timely and what's its merit.

THE COURT: All right.

MR.RUSSO: Move on?

02:48:26 THE COURT: Please.

MR.RUSSO: One other thing I want to mention, though, that *In Re: Goodhart* discusses in terms of the thought about what the Court was concerned with and what proof was in front of them, the second to last paragraph of *In Re: Goodhart* they 02:48:44 address this question of the four judges state in their motion

they apparently could not file the motion before November of 2025. And then it goes on, *"When as they represent they were finally able to obtain counsel independent from that of the other 12 Harris County Criminal Court at Law judges, all of whom support the consent decree's continuation."* Your Honor, that is still true. We still have a situation where these four judges were not represented until that day. So, the idea or notion that, well, Fifth Circuit just didn't have all the facts in front of them, it's not the merit as you might suspect. What the Fifth Circuit was looking at is did these people have representation separate and apart from their own represented courts, and the answer to that is an emphatic no, even under every piece of documentation that they filled the record with. So, to that extent, if *In Re: Goodhart* is correct in the statement that they thought that was the important fact, then that turns the day for the four judges in terms of waiver.

The issue of this notion that by discussing with the monitor and making an attempt to maybe get some resolution and that is somehow waiving arguments, there's no basis for that, Your Honor, either in the case law. In fact, there's a case we cited in our reply, if I can find it real quickly, where the parties actually engaged in discussion on a consent decree. And the Court held that -- see if I can find it. It's in our briefing. The Court held that that action in and of itself is not a waiver.

02:50:48 The other thing is *In Re: Goodhart* picked up on this issue of activity in its discussion of whether signing, by signing the consent decree prior officeholders could have itself waived on behalf of later parties, and they said there 02:51:08 citing to RTM, that even going through the entire case engaging in discovery, that is not waiver. So, the Fifth Circuit again in *In Re: Goodhart* has taken a pretty hard line on case activity and then conduct that constitutes waiver in terms of the abstention argument.

02:51:43 Turning quickly to sort of the Younger arguments, this idea that mootness is the first time that we've heard or talked about the mootness issue that counsel mentioned, it's been a while ago, but section three of our motion actually discusses the issue, that mootness is sort of the co-equal ground on 02:52:13 which to resolve this case under Daves II, and so it's not new, it's something that we are aware of, the Court is aware of it as well.

Struggling with this issue of how do I deal with abstention and mootness. Interestingly enough, as the Court is 02:52:31 aware, Daves II did the analysis and performed both and said we should abstain and then said the case is moot as well, so you know, Daves gives the Court some instruction on how to deal with both of those situations.

Let me look at my notes here. There were discussions 02:52:51 about plaintiff's counsel discussed this equity analysis, step

02:52:56 one and step two. From our perspective, Your Honor, and from the perspective of *In Re: Goodhart*, there really is no step two and they're not expecting one, which is why they concluded again O'Donnell one is this case. So, when they abstained and 02:53:19 overturned O'Donnell, that's in this case. And it goes on to say, Daves II does not hinge upon factual development or discovery, so I think the Court picked up on that, but the point is there's step one. Analyze abstention and we believe once you do that, you will find grounds to vacate the consent 02:53:43 decree and dismiss the case.

Plaintiffs counsel also makes a -- they're making the argument that vacating the consent decree is going to result in tons of constitutional violations and there's going to be all manner of problems.

02:54:05 THE COURT: And every Harris County taxpayer will be paying more.

MR.RUSSO: Every --

THE COURT: Every Harris County taxpayer will be paying more.

02:54:16 MR.RUSSO: Well, here is the principle that I want to make sure the Court is aware --

THE COURT: That's one of their arguments that you didn't mention.

MR.RUSSO: Right, we do have -- we objected to some of 02:54:25 the evidence, we don't think is pertinent by virtue of *In Re:*

*Goodhart* and we still think that's the case, meaning discovery is not necessary for determining abstention. But here is the important point that you didn't hear from counsel in terms of the use of this Middlesex County case. This Court should not assume that county officials are going to act in an unconstitutional basis. In fact, the opposite is true. The presumption is that government officials do the right thing.

THE COURT: That was a presumption that did not prevent the findings and conclusions that were entered in the original O'Donnell.

MR.RUSSO: And I completely understand --

THE COURT: That's the record.

MR.RUSSO: And I completely understand what the Court is saying, but to the extent that plaintiffs counsel is suggesting that the Court should believe that at this point in time if the consent decree goes away, that Harris County is going to start engaging in constitutionally violative practices. Middlesex County is very clear, that's not the Court's presumption. You presume that the County acts in good faith rather than numerous constitutional violations are going to be -- going to happen. And in fact, as we talked about before, the changes in Texas law were designed to deal with most of the issues that this case was originally brought to correct. And that still remains a backstop, Your Honor, if the consent decree exists or doesn't exist. As does the fact that

02:56:06 County judges themselves have the ability to control the local rules and the manner in which bail is conducted, as long as it's within boundaries of state law, which again --

THE COURT: And the Constitution.

02:56:18 MR.RUSSO: As long as it's within the boundaries of state law and the federal Constitution. And just so we're clear, there is no challenge to the constitutionality of S.B. 6 or S.B. 9 with the manner in which those statutes are being operated. And as I said before, there are 253 counties outside 02:56:37 of this one which are using Texas law to handle bail, and that's where this case -- that's where Harris County ends up, back with the rest of the state.

THE COURT: So, you're asking me to modify or vacate the consent decree.

02:57:00 MR.RUSSO: Yes.

THE COURT: Are you framing that request procedurally here in this federal court under Rule 60?

MR.RUSSO: If the Court feels like -- our view is the Court is under mandate to do it.

02:57:20 THE COURT: Well, I've got a find a procedural mechanism to effectuate the mandate.

MR.RUSSO: The discussion earlier was that -- our view is the mandate is the procedure. Just as if the case had just started. Look at what this case looks like, given Daves, 02:57:40 during the foundational putting this consent decree together,

02:57:45 should the Court have --

THE COURT: Abstained.

MR.RUSSO: -- abstained. And that from our perspective Rule 60 is not required, although again, Judge, we

02:57:59 are adamant that even if you apply Rule 60, Rule 60(b)5, (b)6, you're going to reach -- you should reach the same result. There is absolutely no reason to engage in any equity analysis under Rule 60(b) or under the mandate that's been presented to the Court. And so --

02:58:25 THE COURT: All right. Thank you. I didn't mean to cut you off. Had you finished?

MR.RUSSO: I was going to ask the Court if you had any additional questions for us on the waiver question. We didn't really get into the standard, but waiver is intentional

02:58:43 relinquishment of a known right.

THE COURT: I know what the standard is.

MR.RUSSO: Necessity to prove all that, so with that, we're concluded.

THE COURT: Thank you.

02:59:03 MR. NWAOKORO: Good afternoon, Your Honor. Joe Nwaokoro for the Attorney General. I don't agree with a lot of with Mr. Fife, but I agree with him on one thing, this can take 30 minutes. We should be quick. And as a matter of fact, that was our position at the beginning. When they went into we need

02:59:24 to have month long discovery and here we are over a year later

02:59:29 since we filed our motion to intervene.

I would like to point the Court as far as the questions go, I would like to remind the Court that *In Re: Goodhart* was well aware of the post judgment posture of this

02:59:44 case. I direct the Court's attention to the last paragraphs of page three of the opinion where they recognize the question that the Court had about how to reconcile the abstention issue with Rule 60. And their response was kind of terse which is I guess why we're here today. And they say follow Daves. And I

03:00:14 think the fundamental issue here with my friends on the other side is, first, they don't think Daves II was properly decided. And I understand. I mean, some of the plaintiffs counsel here worked on the Daves II litigation and they don't seem to have given up. And the second issue is they seem to be paying lip

03:00:37 service to *In Re: Goodhart*, which they believe was egregiously decided, but if you are to follow *In Re: Goodhart*, Your Honor, and we have -- the Court has a mandate to follow not just the letter, but also the spirit of the law. Collins versus Department of Treasury, 83 F. 4th, 970. The Court has a duty

03:00:59 to implement both the letter and the spirit of the mandate. And the question is what is the spirit of that mandate. And listening to plaintiff's and the non-movants, it is all Rule 60(b) analysis.

Part of the question there is this, and there's a big

03:01:18 distinction because when you look at the cases that they have

03:01:21 cited, first of all, none of them comes really close to the issue at hand. The panel was well aware of Joseph Ingram when they issued the mandate. The Court was well aware of some of the cases they've cited are not simply cases they've cited in
03:01:34 -- none of them comes close to the issues we have here.

THE COURT: Very unusual case, I agree with that.

MR. NWAOKORO: This is an instance to show bail reform case, this is not the run-of-the-mill judgment in which you recognize, okay, there's a post judgment issue, what do we do
03:01:53 now, there's a finality. There's an ongoing monitoring, okay? And everything they have is about equities. And if you look at Daves II, Daves II starts by saying in the discussion on mootness -- if Your Honor gives me a second. Daves II in its discussion of mootness, page 63, says after discussing Younger,
03:02:22 says that explains why federal courts must ^ from invoking equity to interfere with ongoing state criminal proceedings where plaintiffs have adequate opportunities to raise constitutional issues.

Along with that, about 60 analyses here, it's nothing
03:02:41 here but equity, equity, equity. So I agree with Mr. Russo. When the Fifth Circuit came down with its decision with its mandate relating to Younger, the Court should also consider mootness and even if it didn't, it can also do it sua sponte on its own, the Court needs to determine that it has jurisdiction
03:03:04 all the time. There's a discussion here about mootness and

03:03:07 60(b) needing a record, but these are issues that Daves II have already addressed. Daves II looking at-- and I listen to my colleague on the other side talking about the record needed to develop mootness, etc. Daves foreclosed all of that. S.B. 03:03:23 6 -- it was interesting hearing him talk about S.B. 9, but S.B. 6, the bail reform case, the same case at issue in Daves, S.B. 6 is still there and there's no discussion about it. And following Daves means of course following the spirit and intent of the mandate and that means complying with what Daves has 03:03:47 stated.

Now, that is by way of a preamble, Your Honor. If I may, I will take a step back because we've not been allowed to intervene to raise Younger yet, so I will start with my reconsideration motion if that is okay or would you prefer that 03:04:05 I go into the waiver, Your Honor?

THE COURT: I think I am obligated to decide the Younger issue. Let's start and stop with that.

MR. NWAOKORO: Okay. So, as far as Younger goes, they have alleged, of course, that there's been a waiver of Younger. 03:04:19 As far as the state goes, all they have is really implied conduct and all of that has been rejected by *In Re: Goodhart*. A waiver by a state has to be explicit. It also has to be unequivocal. The unambiguous aspect seems to be lost, it has to be unequivocal. And my friends with Harris County also in 03:04:47 their briefing, they stated that you cannot assert Younger by

03:04:51 meetings and e-mails. Well, that also points the other way. You also cannot waive Younger by meetings and e-mails. And the cases that they've cited, Cradle of Liberty, miles away from the case here. The City of Philadelphia which requested merits

03:05:13 on that case. Here, the Attorney General, first of all, we are not -- we did not intervene. Left to them, we waived Younger by intervening, we waive Younger by not intervening. They claim we waive Younger by intervening because we are bound. Well, that premise came up by the Court in *In Re: Goodhart*

03:05:33 which stated that consent by predecessors is not binding on successors, and there's no reason to extend that even to the states. If that is not binding on counter officials, how could it even be binding on the state that was a non-party throughout this. And what the state has or hasn't done in other cases --

03:05:54 but they tried to have it both ways. They raise the issue about express enforcement in Daves and Russell. When we respond to that, they say woe, woe, woe, that is beside the point, doesn't matter about this case.

Well, the state has been consistent in challenging the

03:06:14 federal oversight, and I cite in Younger, in Daves, and in this case, and as soon as we got the opportunity we moved to intervene, so we have not waived that and they have no evidence, all they have is supposition. And actually what you're going to have is a redirection into 60(c)(1). Well,

03:06:35 they cite not a single case supporting important 60(b) standard

03:06:39 to the timeliness of Younger.

And one thing also they seem to forget, under Rufo, the Court has to apply a flexible standard and we have cases again stating that timeliness is the timing contextually.

03:06:56 There is no straight timeline, so the state has timely intervened to raise Younger. We have not waived Younger at any point. We have not enclosed to any evidence of Younger. All you have would be silence -- a straight handwritten note that one of the judges had, but none of them under binding Fifth

03:07:24 Circuit precedent is enough to waive Younger.

And the last thing I will state, Your Honor, will be one of the questions again you have and I see you're wrestling with that notwithstanding the mandate is this, Younger following Daves mandates dismissal. And to the extent that the

03:07:50 Court needs a procedural device, I think we've also outlined that in our briefing, 60(b)5 gives you that outlet. It can no longer be equitable to continue to enforce or to apply a consent decree judgment that the Court should have abstained from in the first place. And Daves and Goodhart have all

03:08:15 directed that this Court case should not be brought in the federal court in the first place.

THE COURT: Thank you.

MR. NWAOKORO: Thank you, Your Honor.

THE COURT: Response?

03:08:36 MR. FIFE: Thank you, Your Honor. Travis Fife again

03:08:38 for plaintiffs. I'll address waiver and timeliness. Mr. Cutting will address equities and then we are hopeful that our colleagues at the county can present some of the taxpayer costs. I just want to start with a recognition that a lot of 03:08:53 the discussion today has been exceptionally technical and very detailed focused and that is well and good. These issues are important, let's be rigorous about them, but if we take a step back I want to really focus on Your Honor's question about, well, if a new judge was appointed tomorrow, does that restart 03:09:12 all of these clocks. And I didn't hear a clear answer from Mr. Russo on what is the limiting principle. The reality is is that the federal court system as created by Congress and the rules adopted by the judiciary set time limits when you have to file motion to dismiss, when you have to file a notice of 03:09:30 appeal, when you have to file a petition for writ of certiorari. On movants view, they can make those arguments or they can file a notice of appeal or challenge a judgment whenever they want and as long as they have an abstention or jurisdictional hook to make those arguments. That is exactly 03:09:50 what the Supreme Court in a 8/1 opinion about Justice Alito rejected in Coney Island. Justice Alito gave the example of the federal rules of appellate procedure which has a jurisdictional clock of 30 days.

Now, it is just incredulous to say that these judges 03:10:10 can move whenever and however they want without any regards for

the time and the reliance interest that their conduct and the pendency of the consent decree generated from other parties. We're talking tens of millions of dollars, I think the estimate Mr. Hu will present is around 33 million. We're talking about 30,000 people who are processed through the system every year and in their view, they can wait for as long as they want with no limiting principle. Rule 60(c)(1) does not countenance that regime, and as the Court has expressed through its questions today, that regime is absurd and contrary to the system that Congress and the judiciary have created to resolve civil litigation.

There's a number of smaller points there. First, they continually conflate (c)(1) timeliness with waiver. Those are different standards. As I explained, Rule (c)(1) is akin to Rule Four of the Rules of Appellate Procedure that says if you want to challenge this judgment, do so in a reasonable time. Their failure to do so, their Younger argument might be the best most obviously correct argument in the federal court system. It's not. Rule 61 applies collaterally to that. You don't have to say anything about the merits of their Younger argument, just like a Court of Appeals that dismisses for lack of jurisdiction for failure to timely appeal doesn't say anything about the underlying merits of the appeal.

Waiver, on the other hand, is about intentional relinquishment of the right. I frankly agree that in some ways

03:11:53 as I said I --

THE COURT: A much harder case.

MR. FIFE: Yes, I think there are ways out, but I do think (c)(1) is just as clear as the sky is blue.

03:12:06 And the next issue that came up was that whether it applies to the seat or the individual official. I heard Mr. Russo say yes it applies to the seat, but maybe I missed it, I didn't hear a case or any sort of legal authority that supports that. As Your Honor said, as Your Honor quoted *In Re:* 03:12:28 *Goodhart* doesn't require that rule and it would be hugely destabilizing to adopt it in the context of a rule of civil procedure that is designed to, A, preserve the finality of judgments and, B, avoid a mash-up of different common law writs and that's designed to streamline post judgment procedures.

03:12:52 The other thing I would say is, again, I would just follow the approach in Salazar and R.C., the Alabama case, both of which don't totally ignore the change in politics, but filter it in to a context based analysis of the Rule 60(c)(1) analysis. And here it is undisputed that the judges of courts 03:13:22 2, 3, 14 and 16 knew about Daves when it issued and didn't move until December 11th, 2025. That is facially untimely under Rule 60(c)(1). The most comprehensive treatment of thr rule that we found was Norglass case which cites a number of courts both from the Fifth Circuit and a case from the Fourth Circuit 03:13:48 that affirmed denial of Rule 60 motion after three to four

03:13:52 months.

Moving a little -- I think it makes sense to address this attorney issue that Mr. Russo raised. Number one, I didn't hear a response to whether they had the legal capacity 03:14:09 to move pro se, so we rest on our arguments there, they could have. In addition as Mr. Hu pointed out and Judge Goodhart admitted at her deposition, they were never prohibited from hiring outside counsel. And, I take Mr. Russo's point that there are ticky-tacky differences between the pro se litigant 03:14:32 cases that we cite in our brief and this situation. But I think the upshot of the rules that we have identified is that inability to find a lawyer and inability to find a lawyer and failure to act appropriately as a pro se party does not excuse ignorance of the rules of civil procedure. We have identified 03:14:59 cases that involve naming the wrong defendant, that involve trying to toll the statute of limitations, failure to exhaust, and in what I think is one of the more compelling cases, United States against Fowler. There, the criminal defendant delayed finding an appointed attorney -- or paying for an attorney 03:15:18 because he wasn't found to qualify for appointed counsel. And Mr. Fowler and an attorney in Utah on his behalf actually asked the Court for a continuance and said I need more time, I can't get up to speed this quickly and the Court said no, and forced Mr. Fowler to endure a federal criminal prosecution without a 03:15:39 lawyer because of his delay. And so I take Mr. Russo's point

03:15:44 that there are complicated issues in this case, but as a matter of law, their failure to move pro se or hire their own lawyer does not excuse their untimeliness under Rule 61 or their waiver of Younger by failing to move earlier.

03:16:00 And again, I just want to reiterate that as the Court has picked up on, I take it that County Court at Law 16 is probably our hardest case on waiver or our defendant on waiver and I think the answer there is just to follow In Re: Goodhart. And for the reasons I've just explained, she could have moved 03:16:21 on January 1, 2025, instead she allowed herself to be bound by the consent decree for eleven months and that is inconsistent with an intent to assert Younger abstention and constitutes waiver.

THE COURT: Let me ask you a question. Not a ruling, 03:16:41 not even hinting at a ruling, but assume that the Court decides abstention is the result.

MR. FIFE: Yes.

THE COURT: Assume that the Rule 60 requirements have not been met, not.

03:16:56 MR. FIFE: Yes.

THE COURT: What happens to the consent decree?

MR. FIFE: It remains in place and I would just -- to write that opinion I would really just unanimous BLOM Bank case that says Rule 60 is the vehicle, 8/1 Coney Island case that 03:17:15 says timeliness means what it says and even for a void

03:17:19 judgment, you still have to satisfy Rule 60(c)(1). And the other piece that I haven't noted that in this example I want to make really, really clear is that when you look at the Norglass case or even implicit in the court, it's more clear in Norglass

03:17:40 and Clark against Davis, but the burden is on them to prove timeliness, and actually I would ask the Court to look at the Bissonnet ^ case that they identify and in that bees net ^ case, the District Court actually treats timeliness as a threshold issue, so before it even looks at the merits of

03:18:04 modification or vacatur it asks was Rule 60 -- was this motion timely. And then under the binding precedent of Norglass, the resounding answer for their motion is no it is not. There's one other point I wanted to make on timeliness.

So I think that the way that Your Honor just described

03:18:38 possible decision it would be a holding in three parts, it would be Rule 60 is the procedural vehicle, I follow Daves II and abstention should have applied, but they brought this motion under -- in an unreasonable amount of time under Rule 60(c)(1), motion denied.

03:19:04 I do -- if the Court is interested at all, I do just want to address some of what the Attorney General said.

So the Attorney General mentions that -- and Mr. Cutting will handle his points on rule 60(b) and the equities. The Attorney General is really using his non party

03:19:27 status in a way that is to be charitable highly suspect. So he

03:19:36 simultaneously claims that he couldn't have waived Younger because he was never a party, but also says that he's not bound by the decisions of any of the parties to the litigation. Now, I think there are really strong arguments why he waived Younger
03:19:53 but that type of gamesmanship with his non-party status and the huge amount of time that he was in office, I would just say untimely under rule 24, motion to reconsider denied, he doesn't have standing to raise Younger.

Now, on the waiver issue, sorry --

03:20:13 THE COURT: Standing?

MR. FIFE: He is not considered a party for that purpose because he was denied leave to intervene, so he does not have party status to assert a Rule 60 motion asserting Younger. Because of course Rule 60 only applies to parties who
03:20:32 seek relief from final judgment.

Apologies, that was messy.

The one point I'd make on the merits of waiver is the Attorney General, his consistent referring is twofold, number one he says he has consistently disagreed with the consent
03:20:52 decree that's no surprise. But there's a difference between disagreeing because you don't think the federal court has the power to reach the issue and affirmatively asking the federal court to resolve have the merits in your side -- on your side. Read the two Fifth Circuit amicus briefs that he led and point
03:21:12 one in both of those is this court got the 14th Amendment

03:21:17 question wrong. And nowhere in there does he mention comity or -- sorry nowhere in there does he mention Younger abstention. And of course even if he as a non party raised these issues, he still doesn't explain why he didn't intervene
03:21:36 after November 2018 when he knew the case was going to be settled. And so completely agree with you that waiver for Judge Garcia can be tough there's some complicated questions of law there, I think by comparison the Attorney General's waiver is incredibly clear and excusing that waiver here would be
03:21:58 severely prejudicial to the parties who built this consent decree when the Attorney General knew it was happening and so like Judge Goodhart said in her notes he dropped the ball. Any questions, Your Honor, otherwise I turn it to Mr. Cutting.

THE COURT: Mr. Cutting.

03:22:18 MR. CUTTING: Hello again, Your Honor. I will try and be brief, with no promises. Just very briefly on the mootness point I think we've fairly well covered this. Mootness was not addressed in Goodhart. Goodhart says consider Younger. It does not say consider mootness. To the extent defendant says
03:22:53 Daves II -- that is understood in the context of that mandate saying consider Younger and follow Daves II, you could still comply with that mandate even if you read it what I would say is overly broad to include mootness by just considering later when that motion is properly raised and before the Court. It
03:23:12 is not part of what the Court should be considering at this

03:23:15 moment.

I do want to make one friendly amendment to my co-counsel's response to your hypothetical about if this court were to find Rule -- if I'm understanding correctly, were to

03:23:29 find that Rule 60 applies which we believe is inescapable conclusion based on binding case law unaffected by Goodhart, and it then found that abstention should have applied at Rufo step one, but it also found the motion was untimely and so it denied it. Am I understanding the Court's hypothetical

03:23:47 correctly?

THE COURT: I think so.

MR. CUTTING: Okay. One amendment I would make is that the Court is still obligated to proceed to step two under that hypothetical and make findings about whether or not

03:23:58 constitutional violations would occur. And that is because there is no procedure within Rule 60 or precedent for splitting Rule 60 and bifurcating it in the way that the Court has at times asked questions about or the way that movants appear to be suggesting. We know that that there is no precedent for

03:24:23 bifurcation because we know both from the statements such as BLOM Banks, statements that it is Rule 60(b) standard and only Rule 60(b) standard that applies when a party seeks relief from final judgment, other cases such as Cook v. Berm ham news ^ that state the exclusivity of Rule 60 and once you're under

03:24:40 Rule 60 we then have cases like BLOM bank but also Coney Island

03:24:46 auto that shows what happens when a party does try and dissect that standard at the 60(b) standard and take it into multiple parts and kind of tackle one part at a time, and courts as recently as this past term reject that out of hand unanimously
03:25:03 and say that is not the way Rule 60 works. Because it needs to be considered all at once as part of the same consideration and yielding one result, not two piecemeal results, that there is just no precedent for that, there is no case that has ever done that that we've seen. This Court needs to consider the
03:25:25 constitutional violations and the equities regardless of what it finds on step one. And that is consistent with Goodhart's mandate.

Earlier the Court said, perhaps paraphrasing, that Goodhart had instructed it to decide abstention first. I don't
03:25:43 think that's what the mandate says. The mandate is that this Court should consider Younger on an expedited basis. It is absolutely doing that within the confines of the Rule 60 analysis. When it proceeds through step one and step two of that analysis. So that is fully compliant with Goodhart. So
03:26:01 again, this Court need do nothing more than apply Goodhart in binding law and apply the Rule 60 framework, but it needs to apply the entirety of the Rule 60 framework. That framework is not divisible and cannot be bifurcated.

I want to talk for a moment -- well first I want to
03:26:23 talk for a moment about just to note that as we indicated in

03:26:27 the chart that we provided as a demonstrative, there are a lot of different ways this Court can find in our favor and deny the motion. We would encourage the Court to support appellate review wherever possible by considering and making findings on 03:26:44 each path or any path that it is as implicated in order to really assist the Appellate Courts with that task. So, even if the Court were to find that the judges have waived or that their motion under Rule 60 wasn't timely, we would suggest the Court still reach a finding under Rule 60 Rufo analysis.

03:27:09 I do want to take just a moment of court's time to talk about the record. So our friends on the other side said that there was a presumption that county officials, that government officials would behave in compliance with the law, that's really a red herring that is really neither here nor 03:27:28 there. We are here as Your Honor pointed out first off of a record of initial violations going back decades in this county. Those pressures, those cultural forces and pressures as former judge and current chief public defender Genesis Draper pointed out in her declaration, those forces still exist, and without 03:27:51 the consent decree they are going to cause resumed constitutional violations. That, in conjunction with doing something that this county has never done before which is asking the third largest county in the country to detain everyone who is arrested until they can be provided with a 03:28:10 constitutionally compliant individualized bail hearing cannot

03:28:15 do that, it has never done that. It used to be that the way pre-hearing release was handled was through access to money. This Court changed that, the consent decree changed that. There is a new system that actually makes sense and still 03:28:30 offers the same essential release valves to this overburdened system and that's something that all of these declarants in the record have spoken to. But this -- we are not relying on a presumption that county officials will not behave in accordance with state law. We are submitting a record that shows that 03:28:53 whatever anyone's intention, the pressures will result in the same types of constitutional violations that this consent decree was put in place to stop. So, for example, the evidence is quite extensive and we recommend looking through all of it but just to briefly summarize, there is no plan to absorb the 03:29:23 28,000 additional cases that will be forced into the system without the decree in place and there will be a reversion to perfunctory hearings and non-individualized unaffordable secured bail except for indigent arrestees. That is exactly what O'Donnell one condemned, and of course this Court.

03:29:40 For instance chief hearing officer Diggs predicts that the inevitable result of adding those cases each year to hearing dockets will leave hearing officers and justice system partners without enough time or information to make the individualized decisions required by the Constitution. In an 03:30:11 effort to keep up, hearing officers will be forced to make

03:30:14 quick, less rigorous bail decisions resulting in inevitable increase in arbitrary and unconstitutional detention. The bail division chief Bingham predicts that hearing officers quote will impose unaffordable bail announcing cases where detention 03:30:28 is not justified. Former judge and now chief public defender Draper puts it as, quote, because the cultural and political forces that led to the prevalence of money bail prior to the consent decree are still active, the hearing officers are likely to revert to past practices of reflexibly imposing 03:30:44 unaffordable secured bond where pretrial detention is unsupported by evidence, in short the old unconstitutional system will reemerge. Court appointed monitors concluded similarly, stated in their response to these same judges proposal to end pre-hearing release, quote we have serious 03:31:05 constitutional concerns of what is being proposed.

So we are not relying on any presumption this is not something that is -- for presumption to influence. ^ This is unrebutted record and what is lacking from movants objection to it is any evidence to the contrary. And at the risk of 03:31:24 repeating ourselves too much, it is their burden on this motion. I know it may not always feel that way, but it is. So and again this all adds to S.B. 9 which as I mentioned earlier also requires constitutional violations of the very type this consent decree was geared toward preventing.

03:31:47 So that alone is enough to find to deny vacatur under

03:31:55 Rufo's second step. However and again even in a chance on replie, movants continue not to identify any case where a court has vacated a consent decree or even a final judgment in the face of a record like that. And one example of the way this
03:32:16 consideration can play out while it's not identical as this one but is instructive is Rufo itself. So after that case was remanded from the Supreme Court, the First Circuit considered the sheriff's motion to modify the consent decree based on a change in law. The sheriff was asserting that the Supreme
03:32:35 Court's decision in Bell v wol fish which ^ rejected a constitutional challenge to the practice of putting two detainees in the same jail cell. That that meant he should be able to modify the decree to permit double celling. However, the District Court denied the motion and the First Circuit
03:32:53 affirmed reasoning that permitting double celling could lead to conditions such as increased violence, disease transmission that would themselves become unconstitutional. The Court rejected the argument that double celling is never unconstitutional as too simplistic, emphasizing that the
03:33:11 sheriff had not met his burden to show minimal risk the constitutional violation would recur. As the Court said, it is far from clear on the record before us that the immediate plans proposed by the sheriff are constitutional let alone any perspective next steps that might follow from the complete
03:33:27 vacation of the consent decree.

03:33:29 That is this the north star for this court to follow is whatever happens this Court cannot take action on this consent decree that exposes class members to significant risk of recurring violations. And then the equities further
03:33:49 militate against vacatur and I won't spend too much time on this because I know Mr. Hu is planning on addressing some of the cost information. But the equities are incredibly powerful here. So even if the movants could show that there is relatively little or no likelihood of return of original
03:34:11 constitutional violations we have the sheriff, the district attorney, chief public defender, and 12 of the 16 county court of law judges and monitors all vociferously opposing vacatur and they quantified catastrophic financial costs as Mr. Hu will detail and also public safety harms that will result. To the
03:34:32 extent this court reaches the equities given the constitutional concerns, I outlined Rufo requires deference to these local administrators views and movants four judges out of 16 are the outliers not the definitive voice of this local government. Again movants offer zero evidence rebutting this. They cannot
03:34:54 carry a burden they have never attempted to shoulder and the Court should leave it at that. And like I said, no matter what the Court should proceed to the second part of the Rule 60 analysis it is part and parcel of the same and I think Rufo makes that clear as well as many cases interpreting it.

03:35:21 Unless Your Honor has --

03:35:22 THE COURT: I do have one question. And I think I asked this of Mr. Russo and I wanted your response. Goodhart contains the following language, *"To be clear this does not mean that mere transfer power from one officeholder to another* 03:35:39 *is enough to vacate a consent decree as the plaintiffs suggest."* Did the plaintiffs suggest that?

MR. CUTTING: I don't recall whether we did or not, I think to the extent that statement is relevant seems to suggest an appreciation that there are equitable considerations at play 03:36:00 and whether or not to vacate a consent decree and is in line with Goodhart's citing of Rufo in that regard. We have acknowledged that that -- we think that holding on the general effect of --

THE COURT: A new officeholder.

03:36:17 MR. CUTTING: A new officeholder and official capacity waiver is egregiously wrong and will not ultimately carry the day, but even that statement seems to acknowledge something other than a mere transfer of office.

THE COURT: This says that a mere transfer is not 03:36:36 enough.

MR. CUTTING: Exactly. No, I think what I am perhaps stumbling trying to articulate is I believe it's saying that a transfer in office is enough to negate a waiver, even an express waiver, however it does not on its own justify vacatur. 03:37:01 You still have to go through Rufo in order to do that. That's

03:37:05 how I read that.

THE COURT: All right. Thank you. That's helpful.

MR. CUTTING: Goodhart being properly construed does not support much less require the radical analysis that movants 03:37:18 proposed here. We would urge the Court to deny the motion and as our demonstrative suggests, there are a number of ways it can do that and we would urge it to reach as many of them as possible and to make factual findings wherever possible.

THE COURT: When you say deny the motion, there are 03:37:34 several motions as you point out.

MR. CUTTING: I refer -- at this point I am referring to the four judges motion -- actually, I believe it was styled as a renewed request for Younger abstention, however, I believe it is effectively a motion to vacate. And that of course is 03:37:56 conditionally joined by the Attorney General pending consideration of his renewed -- motion for reconsideration of his motion to intervene, we oppose intervention as we have explained. That is our position on those motions.

THE COURT: Thank you. All right.

03:39:07 (Setting up exhibit demonstrative)

MR. HU: It's in our brief. As Mr. Cutting noted, Rufo step two equitable analysis may be appropriate in looking at the motion for, renewed motion for abstention. I'd like to address two points, one of them is the cost to Harris County 03:40:09 should the consent decree be vacated.

03:40:12 THE COURT: Excuse me, Mr. Russo.

MR.RUSSO: Can we make sure we have a copy of that document?

THE COURT: They said it's in their brief, can you
03:40:20 give docket entry.

MR. HU: It's in the text of the brief itself.

THE COURT: Docket entry and page number if you have it handy?

(885 - 14 is the declaration where the chart is page.)

03:40:40 MR. NWAOKORO: Your Honor, for the record, we objected to all these exhibits and this evidence.

THE COURT: Certainly going to consider this exhibit. I think it's relevant, whether it carries anybody's day or not is a separate issue. Go ahead.

03:40:56 MR. HU: I want to address two points on the part of Harris County one the cost to Harris County taxpayers if consent decree were vacated and second is public safety. On the public safety aspect is shown in furg son declaration which we and plaintiffs have put in the record if consent decrease
03:41:15 vacated we're looking at 28 approximately 28,000 people a year who will be going through the diswroint processing center of course that will vary depending on arrests and things like that but based on the numbers from the monitor report we're looking at about 28,000 people a year. What is that going to mean.
03:41:33 Without general order bonds it's going to mean more people in

03:41:37 the processing center taking a longer time and more importantly right now as the sheriff put forth in his declaration there is a focus on processing people who are charged with felonies. If you have all of these folks that are charged with misdemeanors
03:41:55 crowded in there as well, the joint process is center only has capacity of 200 people there's more likelihood for potential for some altercations but also in the processing as people are trying to get through the shear numbers there is the possibility that something could be missed, more felons could
03:42:16 potentially be released, things could be over looked more importantly 48 hour rule which the Court is aware of may people may be held to that point where they may have to be released because they've been in custody for 48 hours, so that is one of the public safety concerns if the consent decree were vacated.

03:42:36 Another concern is the cost to the taxpayers of Harris County and this chart just sort of summarizes my argument, first off we look at the sheriff's office, not only costs for the joint processing center but there will be additional security personnel additional people have to be held. what
03:42:55 does that mean, additional facilities may have to be used. For example, right now it is the goal of Harris County to stop out sourcing in other words sending people who would otherwise be placed in Harris County jail to a facility in Louisiana. If we're looking at 28,000 more people a year in custody, the
03:43:15 jails Harris County jail will probably have to be used to house

03:43:19 some of those people, what that means is at the cost of about $4.6 million the contract to keep people outsourced in Louisiana will continue. This is in the Mills affidavit which is part of our submission. In addition at the joint processing 03:43:36 center Harris health provides a clinic, this is very important because people coming in the joint processing center often have overlooked acute medical neeth that have to a be addressed more people will be needed to staff that clinic to the cost of approximately $4 million a year, $4.4 million a year. There 03:43:54 will be additional need for staff by district attorney, the county courts, the courts are anticipating instead of running one court a day with misdemeanor bond hearings, they're going to have to go to two running at the same time, have additional -- five additional hearing officers. In addition 03:44:14 the district clerk's office will have to staff that court so we're looking at 59 9,000 dollars for the district clerk. The county courts about $1.2 million, the district attorney of course will need additional staff. Pretrial services will have to have additional staff because right now with gin order bonds 03:44:38 people that are getting general order bonds do not go to pretrial services. Now you're they're going to have to open a case for every single person coming into the joint processing center. 28,000 more cases, 42 additional people having to do that, the cost of approximately $4.2 million. And then finally 03:44:59 the public defender will need additional resources to deal with

03:45:04 this surgeon, approximately $2.4 million and because people are held in custody longer cases will go over to the manage assigned counsel another 2.9 million dollars totaling out to ref rust mess of $32.8 million to the taxpayers of Harris
03:45:23 County if the consent decree were vacated.

Finally I notice that Judge Draper is here in the courtroom with me and I don't know -- I realize this is not an evidentiary hearing but if the court would like to hear from her to personally tell what you this can do to both her office
03:45:42 and as a former county court of law judge I'll be happy to ask her as an officer to come up and tell you that.

THE COURT: I appreciate your offer on behalf of Judge Draper. Couple questions. I am told by the Court that sent it back that this is not a fact based determination. What do I do
03:46:12 with these facts if I am instructed that facts are not germane to the inquiry that I have to conduct on abstention.

MR. HU: We would disagree that we believe there are some facts as Mr. Cutting has pointed out you have to get to the Rufo step two factors in connection with using Rule 60 as
03:46:36 the vehicle to consider abstention.

THE COURT: In order to apply, Daves do I need facts?

MR. HU: I think you do, for two reasons. One is to the extent you have to look at mootness, we would welcome the opportunity to present briefing and argument on the question of
03:46:57 mootness. Also looking at Daves, Daves was of course a

03:47:04 situation that took place before consent decree, before an agreement. There's a lot to be covered that Daves wouldn't cover, in other words, Daves didn't need a much developed record, here it's different.

03:47:20 THE COURT: Third, going back to the sentence that I earlier describe, this case never should have been brought in federal court, isn't the state court equally able to consider the constitutional challenges and the equitable factors that you have presented in these numbers.

03:47:44 MR. HU: I suppose perhaps going forward but when you look at what has changed in the law since that time, I think it remains with this court especially because you can't do a class action in state court in a criminal context like you have here so I guess the answer to the question is no really the state 03:48:02 courts can't do it because you have class action vehicle.

THE COURT: Although a class action asserting constitutional violations under the Texas Constitution as well as the federal Constitution could be filed in the Harris County state courts, correct.

03:48:29 MR. HU: I suppose it could, although if it's a question of the federal Constitution I believe the jurisdiction would be proper in this court.

THE COURT: It could be removed, probably.

MR. HU: Correct.

03:48:40 THE COURT: Which raises the question of how you --

03:48:44 how I implement the statement, well, it could have been -- should have been filed in state court, if a federal constitutional challenge would have resulted in removal there's a kind of a circularity in that, the way a understand it.

03:49:06 MR. HU: At the end of the day if the case is removed it's removed and it could have been brought in state court but it more properly lies before this court.

THE COURT: And as I think a dissent pointed out, it wasn't. All right. Did you want to respond?

03:49:29 (Mr. NWaokoro.)

SPEAKER2: Thank you Your Honor I was trying to see if we could get a straight answer from Mr. Hu, I think the answer to your response to your first question was perhaps going forward. And then the second one he says I suppose it could. 03:49:47 So I would read that to mean yes, of course he would probably disagree with me. But a couple of points that I would like to respond to Your Honor and I think that is the issue here. This is 60(b) heavy, all this is 60(b) and their approach is inconsistent not only with the briefing before this court but 03:50:05 also in what they're saying what they told the U.S. Supreme Court Harris County stated this is a sequential step, sequential. The plaintiff said the same thing. In this hearing they are lumping everything together. And if you look at the 60c one analysis, that takes into the facts, that is 03:50:27 inconsistent. The road map that Mr. Cutting has showed you is

03:50:30 a road map to nowhere. All it takes you is far far away from In Re: Goodhart because it's inviting you to revisit the facts to analyze inequities look at facts relating timeliness and that is an inquiry that this court that is an inquiry that dee
03:50:51 man date has expressly told this court not to do. It doesn't hinge on factual development.

In their response to the waiver issue, they stated essentially that the Attorney General waived by waiting by delay. In In Re: Goodhart foreclosed that he stated that the
03:51:16 four judges merely by waiting over two years wasn't enough and so we are reciting same arguments same issues that the court has already foreclosed, so you don't have a precise measurement of time that would implicate waiver, that has been addressed so the timeliness issue has been addressed. They also arguing
03:51:37 that the Attorney General was not even a party. Again they are trying to relitigate the order that this court granted on October 30, 2025. The mechanism for us would have been on the two issues of mootness and conflict with state law is ^ ^ 60 (b)(5), 60(b)6 and that is stated in the court's order. If
03:52:01 they are saying now that there is a timeliness issue to raise 60(b) then naturally that would affect those other 60(b) related motions. Now they try to confusion tas to how that window apply what they are saying they are invoking rule 24 timeliness, Rule 60c and trying to ascertain whether or not
03:52:26 waiver under Younger is timely. And again they cite not a

03:52:30 single case, not a single authority to support that. And as far as the burden goes in terms of waiver, let's not forget that they bear the burden by proving that a preponderance of the evidence and there is no waiver here.

03:52:47 I would like to go through again the elements of Younger.

THE COURT: I think I know the elements of Younger. Thank you.

SPEAKER2: Two things Your Honor would be the 03:52:58 objection -- pretrial bail, that is clearly within sprint's first category. And irreparable harm exception Daves foreclosed that issue I'm surprised they're still raising this objection because this has been dealt with. So the point again I'm making is delay is not waiver, Fifth Circuit has clearly 03:53:20 foreclosed that issue. The conduct base waiver that they keep drumming up again the Court has also dispensed with that issue, it has to be express it has to be explicit and they have to prove it by preponderance of the evidence.

The other point I will make is I will take the Court 03:53:45 back to Daves when Mr. Cutting was discussing contusion Al violations in relation to rule S.B. 9, this is not new. We have seen this before. If you look at Daves and that's at page 635, the same argument was made about S.B. 6, and the Court cited the plaintiff's position there that Dallas County's bail 03:54:15 practices allegedly remain unconstitutional irrespective of

03:54:20 S.B. 6 and irrespective of the existence of bail schedules. That is the same argument that has been rehashed here in light of S.B. 9. And the same result should apply when In Re: Goodhart says follow Daves II the issues they are raising are 03:54:40 going to equities going into facts that is far far away from what In Re: Goodhart has ordered this court to do. And they speak about unrebutted record, well, as a threshold matter we have objected and we continue to object to any evidence that they are trying to introduce in this. The monitor's report is 03:55:00 challenged. The Harris County's record wi which they incorporated in their brief is challenged. Not only on the basis of relevance but also these are really undisclosed ex part opinion dressed up as lay opinion so we have outlined in our briefing various reasons why, besides relevance, why this 03:55:24 should not even be considered so to say that all of this has been unrebutted is inaccurate.

And I would close on a couple of points Your Honor and that is the reconsideration motion, motion is still pendinging we believe we should be allowed to join in Younger there is 03:55:51 nothing flowing from the four judges through us. And again they cannot be challenging the four judges on the one hand and state that there is adequate representation. There is not. And I think that issue is also foreclosed by U.S. and Fifth Circuit precedent that I think burger is on point on this issue 03:56:11 so the state interest is not being represented by the counter

officials and the state interest does not turn on who sits on a county court of law, our interest is a jury. To the extent that they have a timeliness objection, well, we move to reconsider, we In Re: Goodhart is again intervening change in law that the Court should respectfully consider, again In Re: Goodhart has really under cut if I may respectfully state so Your Honor the basis for interest which you had denied intervention in the first place. Thank you.

THE COURT: Thank you. Mr. Hu. If I understand you correctly these costs would be simply based on vacating the decree, not on -- well you tell me does it assume.

MR. CUTTING: The assumption for these costs Your Honor is that the (Mr. Hu.) the decree would be vacated, rule nine would go away in its current form and so there would be this additional number of folks needing full imagines straition.

THE COURT: What about S.B. 9.

MR. HU: Yes S.B. 9 it would be assuming they would go into effect.

THE COURT: All right. Just one other clarification. Obviously the role of this information given the unusual nature of the mandate is something I have to think about very carefully.

MR. HU: Yes, Your Honor, and just to address a point from the A.G., these were prepared by the Harris County's

03:57:58 office of management budget and with of course input from all the department heads, so this is not an expert issue, this is something that the budget people routinely do as a matter of their day to day job.

03:58:10 THE COURT: Thank you ( ^ ^.)

MR. VANFLEET: Your Honor, throughout these proceedings the 12 judges have taken a back seat as have I. Three points, one I want to make absolutely clear 12 judges absolutely support the analyses that you seen presented by the 03:58:34 plaintiffs and Harris County with respect to what would happen if this is vacated and particularly the GOBs go away. In our brief, the judges state very succinctly what the plaintiffs in Harris County have brought to you in detail in documents and in declarations by the people who are most intimate with the 03:58:55 criminal justice processing in this county. Second point. I want to go back to the willies you expressed at the beginning of this hearing about issuing an advisory opinion, right. That's not just your personal prudence, it's grounded in article three. Article three doesn't really allow to you say 03:59:22 oh gee back then I should have abstained anticipating what the law might become. You don't get to do that under article three, a federal court has to do something. And what Mr. Russo admitted in response to your question is that the something he wants you to do is vacate this final judgment, this consent 03:59:50 decree, and the United States Congress and the Supreme Court

03:59:55 has said there is one way to do that, that is Rule 60, with all it implies, with all that has gone here.

Finally, a word on finality. My constitutional history professor told us that chief justice VIN sent said of 04:00:18 his court, we're not final because we are invincible, we're invincible because we're final. This court is not final nor is is a divided panel of the Fifth Circuit. Whatever you decide here is going to go up and it's going to go up again. The 12 judges pray that when it goes up it is in a posture of what you 04:00:50 believe is the correct decision, the right decision under law. Thank you.

THE COURT: All right. So we still have briefs that are to be submitted, Thursday is the deadline. And we have not really had briefing on a few of the issues that have been aired 04:01:21 today.

I am curious as to whether the defendants, the movants think that there are provisions of the consent decree that do not violate Younger. I don't know what your answer to that would be. And the O'Donnell plaintiffs have not addressed 04:02:49 mootness in their briefs, so I need your briefs to address that. I want the briefs to very systematically layout and this may be the stuff of flow charts, the order of operations. If I do abstain, what, if I don't abstain, what. And the what is what happens to the consent decree. So specific guidance 04:03:21 building off of what you've argued today would be very helpful.

04:03:30 So mootness, limiting principles for Rule 60c, and the order of operations are specific points I'd like both sides to engage in. All of this of course is against the back drop of the Fifth Circuit's instruction that I resolve abstention swiftly
04:04:01 and in any event well in advance of the election because the movants may no longer have their offices after the election. So, you have your assignments and then I have mine yes, sir.

SPEAKER2: Your Honor just as to whether or not there are provisions of the consent decree.

04:04:31 THE COURT: I didn't understand.

SPEAKER2: I think you began by asking if there are provisions of the consent decree that do not violate state law, is that what you are asking.

THE COURT: Yes.

04:04:42 SPEAKER2: Okay. Your Honor wouldn't that take us away from the Younger analysis.

THE COURT: I think it's actually part and parcel or could be, so I need to have your understanding of whether and cite you back to the case that we discussed earlier in which
04:05:03 the circuit court remanded to the district court for a specific analysis on whether there were provisions of the consent decree that did offend Younger or that did not offend Younger, and to have instead of a blanket analysis a precision approach. You may also argue in the alternative that a blanket analysis be
04:05:28 the appropriate way to go, but I do want your approach to what

04:05:35 a more focused Younger approach analysis would be.

SPEAKER2: Thank you for clarifying.

MR. CUTTING: Your Honor I was just hoping to clarify this mootness argument you envision that as part of the
04:05:48 existing post hearing brief or stand alone brief addressing hypothetical (Cutting.) motion to vacate based on mootness.

THE COURT: I don't like stand alone briefs on specific issues because that is often a way to avoid page limits so one brief.

04:06:06 MR. CUTTING: One brief okay (Mr. Cutting.

MR. CUTTING: But it's covering an entirety of of a response to a hypothetical motion to vacate based on mootness.

THE COURT: I'm not sure it's so hypothetical but yes.

MR. CUTTING: The only motion that was filed following
04:06:23 Goodhart was the motion to abstain on the basis or renew request for Younger nothing about mootness.

THE COURT: But Dave east obviously analyzed mootness and so I would like to have your take on it because the Fifth Circuit told me to abstain and follow Dave east.

04:06:45 MR. CUTTING: Thank you Your Honor (Mr. Cutting.

THE COURT: And that's part of Dave east. That may be a crude approach, but I'm trying to make sure that I attend to all the aspects of the Fifth Circuit's instructions on the remand. You still look puzzled.

04:07:09 MR. CUTTING: No Your Honor I'm just thinking through

04:07:14 a response to what sounds like an entire new motion to vacate in two days but we'll find a way.

THE COURT: I take your point that yes the motion to vacate was based on abstention and that's what I have to deal with first but I would like since you haven't talked about mootness and the Fifth Circuit did talk about mootness both in what it told me to consider, Dave east, which talks about mootness, I don't want to leave it unattended or unaddressed. I don't think it's as hypothetical as you --

04:08:03 MR. CUTTING: Understood.

THE COURT: You may convince me that it is because the Fifth Circuit reading through all of the various instructions in the Goodhart opinion it said to follow Dave east, to comply with Dave east and to deal with abstention. I'm trying to do both.

THE COURT: Have both sides analysis on what it would look like to do both.

MR. CUTTING: (Mr. Cutting) one small note of clarification Your Honor.

04:08:56 THE COURT: Sure.

MR. CUTTING: Are you construing the four judges renewed motion as raising mootness and if so under what provision of 60(b) or is it just a stand alone issue that we should be sure to address.

04:09:17 THE COURT: I think it's a stand-alone issue.

04:09:19 MR. CUTTING: More as to whether Goodhart -- what Goodhart demands with regard to mootness.

THE COURT: Exactly. Exactly. And it may be that that doesn't come up until we rule on abstention which is what
04:09:34 they've told me to do expeditiously, and which takes us back to the question we started with, the order of operations, once I real on abstention if I decide that I do need to abstain, what happens. If I don't abstain, what happens what do I need to do next or in addition.

04:09:52 MR. CUTTING: Understood.

THE COURT: Years ago when we were -- my law clerk and I working through all of those videos and working on O'Donnell, it -- we had a discussion in which we observed to each other that the case was an entire federal courts class an entire
04:10:16 civil procedure class and an entire civil rights class and I'm leaving out some, and it's still true.

MS. ROSSI: Local government law.

THE COURT: True. And the limits of appellate procedure, or the lack of limits. I think it is still true.
04:10:43 There's a lot to go through, so and with the added challenge of doing it expeditiously. So, thank you to all sides for your work in getting us to the next stages. And the briefs on all sides were very good and I appreciate that.

THE COURT: You are all excused.

04:11:28 (4:11 p.m.)

**MR. CUTTING: [65]**
**MR. FIFE: [21]** 47/3 47/23 50/1 50/4 50/9 53/7 53/24 55/3 55/13 55/16 55/24 56/13 56/25 58/12 59/22 76/25 79/3 81/17 81/20 81/22 83/11
**MR. HU: [13]** 61/12 62/4 93/21 94/6 94/15 97/17 97/22 98/10 98/20 98/24 99/5 103/18 103/24
**MR. NWAOKORO: [7]** 1/14 62/9 71/20 73/7 74/18 76/23 94/10
**MR. RUSSO: [2]** 2/2 64/20
**MR. VANFLEET: [3]** 60/4 60/7 104/6
**MR.RUSSO: [82]**
**MS. OLALDE: [1]** 1/16
**MS. ROSSI: [1]** 109/17
**PLF. COUNSEL: [8]** 1/6 1/7 1/8 1/9 1/10 1/11 1/12 1/13
**SPEAKER2: [6]** 99/11 101/9 106/8 106/11 106/15 107/2
**THE COURT: [199]**

**$**

**$1.2 [1]** 96/17
**$1.2 million [1]** 96/17
**$2.4 [1]** 97/1
**$2.4 million [1]** 97/1
**$32.8 [1]** 97/4
**$32.8 million [1]** 97/4
**$4 [1]** 96/9
**$4 million [1]** 96/9
**$4.2 [1]** 96/24
**$4.2 million [1]** 96/24
**$4.4 [1]** 96/9
**$4.4 million [1]** 96/9
**$4.6 [1]** 96/2
**$4.6 million [1]** 96/2

**'**

**'23 [3]** 7/19 11/3 11/5
**'25 [1]** 15/14
**'s [1]** 25/7

**1**

**1.01 [1]** 48/20
**1/1/2023 [1]** 50/15
**11th [1]** 79/21
**12 [12]** 1/10 26/8 26/10 36/21 37/20 45/18 60/9 66/4 91/11 104/7 104/8 105/8
**1253 [1]** 19/25
**14 [4]** 47/5 52/3 79/20 94/9
**14th [1]** 83/25
**157.901 [3]** 11/25 51/5 61/16
**16 [10]** 13/9 47/5 47/14 52/3 54/15 58/5 79/20 81/6 91/11 91/17
**1980 [1]** 60/23
**1998 [1]** 49/3
**1:00 [1]** 1/1
**1E [1]** 12/20

**2**

**2.9 [1]** 97/3
**20 [1]** 62/21
**200 [1]** 95/6
**2006 [1]** 40/25
**2016 [6]** 30/4 30/25 31/2 50/6 50/6 50/8
**2018 [1]** 84/5
**2019 [1]** 7/3
**2023 [5]** 2/23 7/5 8/25 10/21 50/15
**2024 [2]** 12/5 12/9
**2025 [22]**
**2026 [1]** 1/1
**22 [1]** 1/1
**226 [1]** 49/4
**23 [1]** 49/11
**24 [3]** 59/17 83/7 100/23
**24's [1]** 53/2
**25 [1]** 14/17
**25-year-old [1]** 46/22
**253 [1]** 70/9
**25th [1]** 63/21
**275 [1]** 19/25
**28 [1]** 94/20
**28,000 [5]** 88/15 94/20 94/24 95/24 96/23
**2nd [1]** 60/24

**3**

**30 [6]** 53/7 53/11 56/14 71/23 77/23 100/17
**30,000 [1]** 78/5
**30th [1]** 15/6
**31st [1]** 7/5
**32 [1]** 52/15
**33 million [1]** 78/4
**3d [1]** 40/24
**3rd [1]** 19/25

**4**

**42 [1]** 96/23
**432 [1]** 40/24
**45.201 [1]** 11/14
**457 [1]** 40/24
**48 [2]** 95/11 95/13
**4:11 [1]** 109/25
**4th [1]** 72/19

**5**

**50 [1]** 35/4
**59 [1]** 96/16

**6**

**60 [108]**
**60's [1]** 22/9
**60c [3]** 99/24 100/24 106/1
**61 [2]** 78/19 81/3
**63 [1]** 73/14
**635 [1]** 101/23
**645 [1]** 60/24
**6th [2]** 9/9 9/14

**7**

**71 [1]** 60/24

**8**

**8/1 [4]** 54/2 55/10 77/20 81/24
**83 [1]** 72/19
**885 [1]** 94/9

**9**

**9's [1]** 40/15
**9,000 [1]** 96/16
**90 [1]** 61/2
**970 [1]** 72/19

**A**

**A.G [1]** 103/25
**abandon [1]** 52/21
**ability [6]** 6/25 20/10 21/2 34/1 43/23 70/1
**able [6]** 5/20 9/19 15/9 66/3 90/13 98/7
**about [90]**
**above [1]** 44/7
**absolutely [11]** 9/25 26/5 30/2 41/17 41/21 41/25 43/11 71/7 86/17 104/8 104/9
**absorb [1]** 88/14
**abstain [39]**
**abstained [7]** 34/2 43/9 68/4 71/2 71/3 76/18 104/20
**abstaining [3]** 35/8 44/17 44/20
**abstains [2]** 5/22 45/3
**abstention [69]**
**absurd [1]** 78/9
**accept [1]** 51/18
**accepting [2]** 28/24 31/7
**access [1]** 88/2
**accordance [1]** 88/8
**according [1]** 16/18
**account [1]** 34/6
**accused [1]** 35/14
**acknowledge [2]** 47/20 92/17
**acknowledged [1]** 92/12
**act [3]** 54/8 69/5 80/13
**action [9]** 14/24 20/9 23/24 49/6 66/24 91/2 98/13 98/15 98/16
**active [1]** 89/8
**activity [2]** 67/2 67/8
**acts [1]** 69/19
**actually [30]**
**acute [1]** 96/7
**adamant [1]** 71/5
**add [3]** 30/20 31/3 58/1
**added [1]** 109/20
**addendum [1]** 55/6
**adding [1]** 88/21
**addition [6]** 16/9 52/22 80/6 96/4 96/14 109/9
**additional [18]** 3/15 43/5 47/21 56/17 59/25 71/13 88/15 95/18 95/19 95/20 96/10 96/14 96/14 96/18 96/19 96/23 96/25 103/15
**Additionally [1]** 24/19
**address [29]**
**addressed [14]** 1/20 3/25 4/1 4/2 6/25 16/4 63/11 63/14 74/2 84/18 96/7 100/13 100/14 105/19
**addresses [2]** 3/14 53/1
**addressing [3]** 56/10 91/6 107/5
**adds [1]** 89/22
**adequacy [2]** 35/13 35/23
**adequate [4]** 34/10 42/19 73/17 102/22
**adjudication [1]** 57/11
**administrators [1]** 91/17
**admit [1]** 47/8
**admitted [3]** 61/23 80/7 104/23
**adopt [1]** 79/11
**adopted [1]** 77/13
**adopting [1]** 33/17
**advance [1]** 106/5
**advanced [1]** 27/10
**advantage [1]** 54/24
**advise [1]** 47/22
**advisory [2]** 5/19 104/17
**advocating [1]** 17/14
**affect [1]** 100/21
**affidavit [1]** 96/3
**affirmative [1]** 58/18
**affirmatively [3]** 47/16 57/15 83/22
**affirmed [2]** 79/25 90/15
**affirms [1]** 33/7
**after [18]** 6/16 7/6 9/11 11/9 14/22 22/21 22/22 32/14 45/3 47/7 53/15 60/18 62/10 73/14 79/25 84/5 90/6 106/6
**afternoon [5]** 1/4 21/23 26/10 47/3 71/20
**AG [4]** 10/20 12/11 14/23 15/5
**AG's [2]** 10/18 12/14
**again [41]**
**against [5]** 32/1 80/18 82/5 91/5 106/3
**agency [1]** 32/3
**agenda [2]** 12/4 12/6
**ago [2]** 67/13 109/11
**agree [14]** 4/23 8/14 15/24 17/16 36/12 36/18 52/20 65/12 71/21 71/22 73/6 73/20 78/25 84/6
**agreed [2]** 24/13 34/3
**agreement [1]** 98/2
**agrees [3]** 28/16 52/10 61/14
**ahead [7]** 1/4 4/6 7/13 8/22 53/4 63/16 94/14
**aide [1]** 12/21
**aired [1]** 105/14
**akin [1]** 78/14
**AI [1]** 101/20
**Alabama [3]** 53/19 54/18 79/16
**Alito [2]** 77/20 77/21
**all [89]**
**Allan [1]** 1/10
**allege [1]** 58/21
**alleged [2]** 58/22 74/19
**allegedly [1]** 101/25
**alleging [2]** 25/10 41/11
**allocate [1]** 51/2
**allow [5]** 25/19 25/20 57/17 63/6 104/19
**allowed [4]** 58/1 74/12 81/10 102/19
**allowing [5]** 15/7 15/8 38/8 57/23 59/11
**allows [1]** 15/5
**almost [1]** 46/8
**alone [8]** 39/12 46/19 89/25 90/23 107/5 107/7 108/23 108/25
**along [3]** 22/20 33/1 73/19
**already [7]** 14/16 48/22 51/10 56/2 59/17 74/2 100/12
**also [49]**
**altercations [1]** 95/7
**alternate [1]** 27/9
**alternative [4]** 6/12 23/18 27/9 106/24
**alternatives [1]** 6/13
**although [10]** 8/5 8/12 20/20 24/14 25/22 28/22 31/1 71/4 98/16 98/20
**altogether [1]** 42/5
**always [5]** 3/3 4/15

## A

**always... [3]** 26/13 49/5 89/21
**am [9]** 35/8 62/6 74/16 85/9 92/21 93/11 97/13 97/15 105/16
**amalgamation [1]** 54/10
**ambiguity [2]** 24/25 38/8
**amenable [2]** 22/7 31/20
**amendment [4]** 64/17 83/25 85/2 85/12
**amicus [1]** 83/24
**among [1]** 54/11
**amongst [2]** 58/25 59/3
**amount [3]** 59/9 82/18 83/6
**ample [1]** 32/10
**analogous [1]** 58/8
**analyses [3]** 19/19 73/19 104/9
**analysis [47]**
**analyze [4]** 16/19 44/15 68/8 100/3
**analyzed [1]** 107/17
**Angela [1]** 1/16
**announcing [1]** 89/4
**another [10]** 11/22 14/17 15/2 19/17 52/23 54/21 65/10 92/4 95/15 97/3
**answer [11]** 28/12 49/9 59/20 66/12 77/10 81/8 82/12 98/14 99/12 99/12 105/18
**answered [1]** 10/17
**anticipating [2]** 96/11 104/20
**any [39]**
**anybody's [1]** 94/13
**anyone's [1]** 88/10
**anything [8]** 15/13 26/15 37/15 37/24 53/11 53/17 78/20 78/23
**anyways [1]** 37/25
**apart [1]** 66/11
**Apologies [1]** 83/16
**apologize [1]** 34/23
**apparently [1]** 66/1
**appeal [6]** 31/21 42/20 77/15 77/17 78/22 78/23
**Appeals [1]** 78/21
**appear [1]** 85/18
**appearances [1]** 1/5
**appellate [8]** 31/19 32/12 32/14 77/22 78/15 87/3 87/6 109/18
**applicability [1]** 34/20
**applicable [2]** 41/6 62/25
**application [5]** 8/21 12/17 22/10 30/8 40/2
**applied [5]** 19/3 42/13 45/14 82/17 85/7
**applies [17]** 4/11 21/7 25/8 31/6 36/7 45/14 45/23 48/20 52/24 54/23 56/18 78/19 79/6 79/7 83/14 85/5 85/22
**apply [28]**
**applying [1]** 6/6
**appointed [6]** 60/18 61/2 77/9 80/19 80/20 89/12
**appointment [1]** 48/21
**appreciate [2]** 97/12 109/23
**appreciation [1]** 92/9
**approach [11]** 1/24 7/8 17/9 45/23 51/3 79/16 99/18 106/23 106/25 107/1 107/22
**appropriate [5]** 3/6 51/24 62/5 93/22 106/25
**appropriately [1]** 80/13
**approvingly [1]** 46/18
**approximately [4]** 94/20 96/9 96/24 97/1
**April [5]** 9/9 9/14 12/5 12/9 12/23
**April 2024 [1]** 12/9
**April 6th [2]** 9/9 9/14
**arbitrary [2]** 33/13 89/2
**are [131]**
**aren't [4]** 26/11 30/14 30/15 47/9
**argue [3]** 50/17 62/1 106/24
**argued [1]** 105/25
**arguing [2]** 31/10 100/14
**argument [30]**
**arguments [22]**
**arm [1]** 47/16
**around [7]** 3/21 15/16 25/15 26/16 27/7 42/7 78/4
**arrest [1]** 32/3
**arrested [1]** 87/24
**arrestee [2]** 12/23 20/10
**arrestee's [1]** 20/23
**arrestees [2]** 40/11 88/18
**arrests [1]** 94/22
**article [3]** 104/19 104/19 104/21
**articulate [1]** 92/22
**as [168]**
**ascertain [1]** 100/24
**aside [2]** 28/24 40/15
**ask [12]** 9/24 10/18 11/10 22/7 31/21 31/23 32/1 34/3 71/12 81/14 82/6 97/10
**asked [8]** 12/9 24/7 33/25 42/4 50/13 80/21 85/18 92/2
**asking [10]** 12/4 22/13 26/24 35/13 52/18 70/13 83/22 87/23 106/11 106/13
**asks [2]** 27/12 82/10
**aspect [2]** 74/23 94/18
**aspects [2]** 26/19 107/23
**assert [3]** 74/25 81/12 83/13
**asserted [1]** 41/16
**asserting [3]** 83/13 90/9 98/16
**assertion [1]** 26/3
**assess [4]** 30/12 35/4 39/1 53/16
**assessed [1]** 28/18
**assessing [4]** 33/20 34/18 34/18 34/20
**assigned [2]** 11/10 97/3
**assignments [1]** 106/7
**assist [1]** 87/6
**assistance [1]** 2/17
**assume [7]** 15/25 41/24 62/1 69/5 81/15 81/18 103/11
**assumed [1]** 50/3
**assuming [1]** 103/18
**assumption [1]** 103/12
**at [105]**
**attempt [2]** 42/15 66/18
**attempted [1]** 91/20
**attempts [1]** 58/3
**attend [1]** 107/22
**attention [2]** 25/1 72/5
**attorney [40]**
**Attorney's [3]** 11/9 11/11 11/17
**attorneys [1]** 13/9
**August [3]** 10/21 11/3 14/24
**authorities [1]** 44/7
**authority [11]** 5/10 5/12 6/5 13/1 26/13 31/5 39/15 43/20 54/10 79/8 101/1
**authorizes [2]** 48/25 52/10
**auto [2]** 25/2 86/1
**automatic [1]** 40/2
**avoid [2]** 79/13 107/8
**aware [13]** 2/23 3/4 11/19 15/14 50/15 67/16 67/16 67/20 68/21 72/4 73/2 73/3 95/11
**away [7]** 69/16 75/3 100/1 102/5 103/14 104/11 106/16

## B

**back [27]**
**backdrop [2]** 4/10 14/10
**background [1]** 16/10
**backstop [1]** 69/24
**bail [28]**
**ball [1]** 84/12
**Bang [1]** 55/13
**banged [2]** 55/11 55/16
**bank [4]** 55/9 55/10 81/23 85/25
**Banks [1]** 85/21
**bar [2]** 10/4 61/1
**barring [1]** 63/3
**base [3]** 10/5 52/11 101/15
**based [23]**
**bases [1]** 48/3
**basically [4]** 7/15 12/1 13/18 15/10
**basis [8]** 49/13 49/18 66/19 69/6 86/16 102/12 103/7 107/15
**be [124]**
**bear [1]** 101/3
**became [1]** 33/16
**because [62]**
**become [2]** 90/17 104/21
**becomes [1]** 64/12
**bedrock [1]** 6/8
**been [49]**
**bees [1]** 82/7
**before [44]**
**began [2]** 22/13 106/11
**begin [2]** 10/18 23/8
**beginning [2]** 71/24 104/16
**behalf [4]** 58/20 67/4 80/21 97/12
**behave [2]** 87/13 88/8
**behind [5]** 3/8 3/9 6/10 16/10 64/13
**being [16]** 9/12 9/18 12/3 12/13 14/7 19/3 21/19 37/6 39/22 40/8 50/12 61/5 70/8 89/15 93/3 102/25
**belabor [1]** 44/14
**believe [18]** 4/9 6/21 8/9 22/13 24/5 24/13 60/12 68/8 69/15 72/15 85/5 92/22 93/12 93/13 97/17 98/21 102/19 105/10
**Bell [1]** 90/10
**bench [7]** 7/8 7/18 7/19 8/4 54/11 60/18 61/1
**benefit [3]** 20/23 52/2 52/2
**Berm [1]** 85/23
**beside [1]** 75/17
**besides [1]** 102/14
**best [2]** 34/13 78/18
**between [9]** 26/8 29/24 34/8 39/1 43/3 43/21 44/17 80/9 83/20
**bifurcated [1]** 86/23
**bifurcating [1]** 85/17
**bifurcation [1]** 85/20
**big [4]** 42/2 43/13 51/1 72/24
**bind [2]** 16/7 63/7
**binding [14]** 27/1 28/14 30/21 31/8 35/19 38/4 42/22 75/10 75/12 75/13 76/9 82/11 85/6 86/21
**Bingham [1]** 89/3
**Bissonnet [1]** 82/7
**bit [6]** 5/16 15/3 22/18 23/8 24/4 53/12
**blanket [4]** 19/20 20/2 106/23 106/24
**BLOM [5]** 55/9 55/10 81/23 85/21 85/25
**blue [1]** 79/4
**board [1]** 12/19
**body [1]** 3/19
**bond [2]** 89/10 96/12
**bonds [3]** 94/25 96/19 96/20
**both [25]**
**bound [9]** 47/9 48/25 50/12 50/15 57/23 58/2 75/8 81/10 83/2
**boundaries [2]** 70/3 70/5
**boundary [2]** 39/14 39/16
**break [1]** 56/14
**breaking [1]** 35/3
**brief [19]** 22/19 24/5 25/2 43/11 48/17 53/20 54/14 58/15 80/10 84/16 93/21 94/4 94/6 102/11 104/12 107/5 107/5 107/9 107/10
**briefed [2]** 25/24 43/12
**briefing [13]** 2/5 11/2 15/11 18/22 24/7 43/5 66/24 74/25 76/16 97/24 99/19 102/14 105/14
**briefly [6]** 24/5 50/5 56/21 56/22 84/16 88/14
**briefs [8]** 60/10 83/24 105/12 105/20 105/20 105/21 107/7 109/22
**bright [2]** 43/2 57/19
**bring [4]** 9/19 25/1 54/25 64/11
**broad [2]** 27/11 84/23
**broader [1]** 29/10
**broken [1]** 12/14

**B**

**brought [8]** 26/6 39/8 69/23 76/20 82/17 98/6 99/6 104/13
**Brown [1]** 60/23
**budget [2]** 104/1 104/3
**building [1]** 105/25
**built [2]** 39/4 84/10
**bullets [1]** 49/16
**bundled [1]** 36/23
**burden [6]** 82/5 89/20 90/20 91/20 101/2 101/3
**burger [1]** 102/24
**but [138]**

**C**

**C-1 [2]** 27/2 53/18
**call [2]** 59/11 60/19
**CALLED [1]** 1/3
**calls [1]** 59/3
**came [9]** 3/6 4/8 4/21 41/7 50/18 60/15 73/21 75/9 79/5
**can [46]**
**can't [11]** 9/7 9/8 17/23 18/15 44/23 45/7 45/16 63/7 80/22 98/12 98/15
**candid [1]** 48/16
**candidly [4]** 49/15 51/8 53/2 56/13
**Cannon [1]** 48/24
**cannot [12]** 16/7 33/13 39/12 40/23 44/9 74/25 75/2 86/23 87/25 91/2 91/19 102/21
**capacity [7]** 11/20 17/4 51/20 65/5 80/4 92/15 95/6
**carefully [2]** 15/11 103/23
**carries [2]** 18/25 94/13
**carry [2]** 91/20 92/16
**case [126]**
**case's [1]** 45/14
**cases [30]**
**catastrophic [1]** 91/13
**categories [3]** 36/4 36/5 36/8
**category [3]** 30/6 30/7 101/11
**cause [1]** 87/20
**causes [1]** 61/8
**causing [1]** 54/11
**caveats [1]** 9/7
**cede [1]** 41/25
**cell [1]** 90/12
**celling [3]** 90/13 90/15 90/18
**center [7]** 94/21 95/1 95/5 95/18 96/5 96/6 96/23
**certain [3]** 2/15 19/21 27/24
**certainly [11]** 2/24 28/25 30/14 31/7 31/14 32/19 33/7 35/6 45/22 62/13 94/12
**certiorari [1]** 77/16
**challenge [9]** 14/4 14/8 61/20 70/7 77/17 78/16 90/11 99/3 109/20
**challenged [4]** 20/1 30/5 102/10 102/11
**challenges [2]** 16/11 98/8
**challenging [3]** 63/10 75/19 102/21
**chance [2]** 43/11 90/1
**change [15]** 18/4 27/4 29/14 31/6 34/19 35/4 36/1 37/19 45/10 45/12 45/13 46/19 79/17 90/9 103/4
**changed [6]** 3/19 13/2 18/3 88/3 88/3 98/11
**changes [5]** 13/22 17/17 29/18 34/7 69/22
**changing [1]** 54/18
**chaos [1]** 54/11
**characterization [2]** 38/20 58/14
**charged [2]** 95/3 95/4
**charitable [1]** 82/25
**chart [5]** 22/17 49/14 87/1 94/9 95/16
**charts [1]** 105/22
**chats [1]** 59/12
**chewed [3]** 13/14 32/16 32/17
**Chicago [1]** 63/2
**chief [7]** 60/23 87/18 88/20 89/3 89/5 91/11 105/4
**choice [1]** 51/23
**choose [2]** 51/16 51/20
**chose [2]** 47/16 49/16
**circuit [55]**
**Circuit's [4]** 27/18 27/21 106/4 107/23
**circularity [2]** 33/24 99/4
**circumstance [2]** 18/10 41/12
**circumstances [10]** 18/3 18/9 44/18 46/20 51/24 63/13 64/12 64/13 65/14 65/16
**circumvent [2]** 25/20 25/21
**circumventing [1]** 38/16
**cite [10]** 16/6 26/19 26/20 51/4 53/20 75/20 75/25 80/10 100/25 106/19
**cited [10]** 25/1 26/15 57/11 57/12 66/21 73/1 73/4 73/4 75/3 101/24
**cites [3]** 42/7 46/18 79/23
**citing [5]** 28/7 57/7 57/8 67/5 92/11
**City [2]** 63/2 75/4
**civil [7]** 10/7 64/22 78/10 79/11 80/14 109/15 109/15
**claim [2]** 51/13 75/8
**claims [3]** 57/3 57/10 83/1
**clarification [2]** 103/20 108/19
**clarify [1]** 107/3
**clarifying [2]** 5/25 107/2
**Clark [1]** 82/5
**class [7]** 91/3 98/12 98/15 98/16 109/14 109/15 109/15
**clear [22]**
**clearly [3]** 27/21 101/10 101/14
**clerk [3]** 7/10 96/16 109/11
**clerk's [1]** 96/15
**clinic [2]** 96/5 96/8
**clock [8]** 16/1 53/21 53/23 62/17 62/21 63/9 65/9 77/23
**clocks [1]** 77/10
**close [3]** 73/1 73/5 102/17
**closed [1]** 51/10
**co [3]** 59/8 67/14 85/3
**co-counsel [1]** 59/8
**co-counsel's [1]** 85/3
**co-equal [1]** 67/14
**code [6]** 11/14 11/24 48/16 48/24 51/4 51/5
**coffee [1]** 56/14
**cohorts [1]** 63/24
**Coker [1]** 12/21
**collaterally [1]** 78/19
**colleague [4]** 22/7 42/1 46/24 74/3
**colleagues [3]** 12/15 48/14 77/3
**Collins [1]** 72/18
**come [7]** 8/19 11/8 14/16 14/17 60/6 97/11 109/4
**comes [11]** 6/5 12/2 12/18 14/18 30/13 32/17 46/7 59/2 61/18 73/1 73/5
**comfortable [1]** 10/14
**coming [3]** 6/25 96/6 96/22
**comity [4]** 51/23 52/5 57/9 84/1
**command [1]** 41/20
**comment [1]** 16/9
**commissioner's [2]** 12/4 15/3
**commissioners [5]** 12/7 12/10 51/6 51/13 51/15
**common [2]** 54/10 79/13
**comparison [2]** 18/6 84/8
**compatible [1]** 2/16
**compelling [1]** 80/17
**competence [1]** 48/20
**competent [1]** 10/15
**complete [3]** 31/20 55/4 90/24
**completely [5]** 46/10 46/22 69/11 69/13 84/6
**compliance [4]** 39/20 40/22 41/4 87/13
**compliant [2]** 86/19 87/25
**complicated [4]** 51/8 53/13 81/1 84/7
**complied [2]** 25/7 39/22
**comply [5]** 26/24 36/25 41/1 84/22 108/13
**complying [2]** 27/16 74/9
**component [1]** 3/15
**comprehensive [1]** 79/22
**conceding [1]** 34/15
**conceive [1]** 22/19
**conceiving [1]** 32/21
**concepts [1]** 6/11
**concern [2]** 14/6 95/15
**concerned [2]** 34/10 65/23
**concerning [1]** 45/11
**concerns [5]** 8/22 59/12 89/15 91/16 95/14
**conclude [1]** 55/21
**concluded [3]** 68/3 71/18 89/12
**conclusion [2]** 24/21 85/6
**conclusions [2]** 33/8 69/9
**concrete [1]** 48/10
**condemned [1]** 88/19
**condition [1]** 15/4
**conditionally [1]** 93/15
**conditions [1]** 90/16
**conduct [14]** 47/7 47/11 48/16 48/24 52/11 52/11 52/18 59/5 64/8 67/8 74/21 78/1 97/16 101/15
**conduct-base [1]** 52/11
**conduct-based [2]** 52/11 52/18
**conducted [1]** 70/2
**Coney [7]** 25/2 54/1 55/9 55/10 77/21 81/24 85/25
**conference [1]** 24/8
**conferences [2]** 4/9 47/25
**confident [1]** 19/1
**confines [1]** 86/17
**conflate [1]** 78/13
**conflict [7]** 12/1 19/16 19/16 29/21 41/11 43/21 100/18
**conflicts [5]** 39/1 41/16 43/17 57/2 58/22
**confused [1]** 38/6
**confusing [2]** 53/2 54/9
**confusion [1]** 100/22
**Congress [4]** 54/8 77/12 78/10 104/25
**conjunction [1]** 87/21
**connection [1]** 97/19
**consensus [2]** 11/6 13/10
**consent [105]**
**consider [26]**
**consideration [12]** 3/9 3/23 7/4 8/11 23/22 40/3 40/7 40/10 40/13 86/6 90/5 93/16
**considerations [1]** 92/9
**considered [8]** 14/14 29/3 30/10 30/11 83/11 86/6 90/7 102/15
**considering [9]** 19/25 23/24 23/24 30/7 36/21 37/2 84/23 84/25 87/4
**considers [2]** 31/15 37/5
**consistent [10]** 9/3 23/22 27/8 28/14 36/15 58/21 65/13 75/19 83/18 86/11
**consistently [1]** 83/19
**constitutes [3]** 49/23 67/8 81/12
**Constitution [6]** 70/4 70/6 88/24 98/17 98/18 98/21
**constitutional [34]**
**constitutionality [1]** 70/7
**constitutionally [2]** 69/17 87/25
**construed [1]** 93/3
**construing [1]** 108/21
**contains [1]** 92/3
**contemplating [1]** 23/15
**contention [1]** 4/7
**contest [1]** 24/3
**context [10]** 23/25 28/6 45/1 46/8 57/21 61/18 79/11 79/18 84/20 98/13
**contextually [1]** 76/4

## C

**continually [3]** 57/1 57/1 78/13
**continuance [1]** 80/22
**continuation [1]** 66/5
**continue [14]** 2/14 12/11 12/11 13/1 16/23 17/11 24/16 31/22 54/20 58/7 76/17 90/2 96/3 102/8
**continuing [3]** 5/7 34/17 57/4
**contract [1]** 96/2
**contradiction [1]** 40/15
**contrary [3]** 9/7 78/9 89/19
**control [1]** 70/1
**controlled [5]** 30/14 30/15 30/16 30/17 30/18
**controlling [2]** 31/5 64/3
**controversy [1]** 51/1
**contusion [1]** 101/20
**conversations [1]** 13/18
**convince [1]** 108/11
**Cook [1]** 85/23
**Cooper [1]** 41/7
**copy [2]** 7/11 94/2
**correct [18]** 8/2 8/9 15/23 20/14 26/5 38/5 38/25 41/21 43/10 44/9 57/2 58/5 66/14 69/24 78/18 98/19 98/24 105/10
**correctly [3]** 85/4 85/10 103/10
**correctness [1]** 26/3
**cosign [1]** 54/17
**cost [9]** 52/1 52/2 91/7 93/24 94/16 95/15 96/1 96/8 96/24
**costs [5]** 77/4 91/13 95/17 103/10 103/12
**could [52]**
**couldn't [7]** 10/3 13/4 18/14 49/7 49/20 52/13 83/1
**counsel [38]**
**counsel's [1]** 85/3
**countenance [1]** 78/7
**counter [2]** 75/12 102/25
**counterfactual [1]** 52/6
**counties [2]** 40/9 70/9
**country [1]** 87/23
**county [76]**
**County's [4]** 12/5 101/24 102/10 103/25
**couple [7]** 9/6 15/18 60/4 63/17 97/13 99/16 102/17
**course [28]**
**court [254]**
**court's [27]**
**courtroom [1]** 97/7
**courtrooms [1]** 11/21
**courts [15]** 20/23 47/5 52/3 66/12 73/15 79/19 79/23 86/3 87/6 96/11 96/11 96/17 98/15 98/19 109/14
**cover [2]** 22/6 98/3
**covered [3]** 42/6 84/17 98/2
**covering [1]** 107/11
**cow's [1]** 32/15
**Cradle [3]** 57/13 58/8 75/3
**create [2]** 37/4 39/13
**created [4]** 13/8 50/9 77/12 78/10
**creating [1]** 32/23
**credit [1]** 53/9
**criminal [8]** 10/6 35/14 66/4 73/16 80/18 80/24 98/13 104/15
**critical [1]** 22/14
**crowded [1]** 95/5
**crude [1]** 107/22
**crystal [1]** 37/3
**cultural [2]** 87/17 89/6
**curiam [1]** 38/17
**curious [1]** 105/16
**current [2]** 87/18 103/14
**currently [2]** 40/1 42/18
**custody [3]** 95/13 95/24 97/2
**cut [2]** 71/11 103/6
**Cutting [15]** 1/7 51/25 54/1 77/2 82/23 84/13 84/14 93/21 97/18 99/25 101/20 107/6 107/10 107/20 108/18

## D

**Dallas [3]** 19/2 19/7 101/24
**Daniel [2]** 1/13 61/12
**date [2]** 8/6 100/5
**Dave [6]** 107/17 107/19 107/21 108/7 108/13 108/14
**Daves [105]**
**Daves's [2]** 28/23 29/5
**Davis [1]** 82/5
**day [12]** 17/10 19/1 50/3 57/23 66/7 66/16 92/17 94/13 96/12 99/5 104/4 104/4
**days [6]** 9/9 9/14 53/8 53/11 77/23 108/2
**Dayton [1]** 57/8
**deadline [1]** 105/13
**deal [15]** 4/24 4/25 6/11 11/18 12/16 13/13 14/3 63/18 64/14 67/18 67/22 69/22 96/25 108/4 108/14
**dealing [4]** 21/1 32/9 51/11 62/25
**dealt [2]** 30/18 101/13
**decades [2]** 40/9 87/16
**December [2]** 15/14 79/21
**December 11th [1]** 79/21
**decide [35]**
**decided [9]** 5/14 15/3 20/22 28/17 29/1 45/15 46/9 72/11 72/16
**decides [2]** 14/23 81/15
**deciding [12]** 2/15 2/18 23/25 34/16 35/6 41/15 44/1 44/2 45/1 45/22 45/23 64/1
**decision [15]** 18/2 19/20 22/14 22/20 23/4 31/21 32/11 38/19 42/16 52/5 73/21 82/15 90/10 105/10 105/10
**decisions [6]** 4/4 35/16 52/1 83/3 88/24 89/1
**decisively [1]** 32/4
**declarants [1]** 88/6
**declaration [4]** 87/19 94/9 94/18 95/2
**declarations [1]** 104/14
**declined [2]** 12/7 64/5
**declines [1]** 14/22
**declining [1]** 13/18
**decrease [2]** 20/1 94/19
**decree [111]**
**decree's [1]** 66/5
**decrees [2]** 4/16 41/1
**dee [1]** 100/4
**defendant [9]** 48/22 50/5 50/18 51/20 61/19 80/15 80/18 81/7 84/19
**defendants [6]** 11/19 32/10 41/1 57/14 65/5 105/16
**defender [4]** 87/18 89/5 91/11 96/25
**defense [1]** 21/2
**deference [1]** 91/16
**define [1]** 19/14
**definitely [2]** 27/16 54/23
**definition [1]** 19/23
**definitive [1]** 91/18
**defying [1]** 40/20
**degree [1]** 17/24
**delay [3]** 80/25 100/9 101/14
**delayed [2]** 57/23 80/18
**demands [2]** 37/24 109/2
**democracy [2]** 16/7 17/13
**Democrat [1]** 9/3
**demonstrates [1]** 25/4
**demonstrative [7]** 7/9 49/10 49/15 57/25 87/1 93/6 93/20
**denial [1]** 79/25
**denials [1]** 32/10
**denied [9]** 12/10 14/17 50/22 82/19 83/7 83/12 85/9 90/14 103/7
**denies [1]** 24/15
**deny [6]** 42/22 59/17 87/2 89/25 93/5 93/9
**depart [1]** 34/14
**department [2]** 72/19 104/2
**depending [1]** 94/22
**depose [1]** 50/12
**deposition [3]** 48/13 58/20 80/7
**depositions [1]** 50/14
**deprive [2]** 37/6 37/7
**deputy [2]** 12/24 61/19
**describe [1]** 98/6
**described [1]** 82/14
**designed [6]** 36/3 59/10 59/15 69/22 79/12 79/14
**despite [1]** 61/6
**destabilizing [1]** 79/11
**detail [2]** 91/14 104/13
**detailed [2]** 19/4 77/6
**details [1]** 2/18
**detain [1]** 87/23
**detainees [1]** 90/12
**detention [6]** 33/14 39/11 39/12 89/2 89/4 89/10
**determination [2]** 34/16 97/14
**determinations [1]** 33/11
**determine [5]** 3/4 14/4 21/4 43/20 73/24
**determined [2]** 39/11 41/6
**determines [2]** 20/9 65/16
**determining [1]** 69/2
**detour [1]** 23/9
**develop [1]** 74/4
**developed [1]** 98/3
**development [3]** 28/10 68/6 100/6
**device [2]** 5/1 76/15
**did [36]**
**didn't [26]**
**difference [2]** 26/8 83/20
**differences [1]** 80/9
**different [19]** 10/11 24/22 24/22 25/3 26/11 30/22 30/23 30/24 37/24 38/1 38/1 43/13 43/16 63/24 65/7 78/14 79/13 87/2 98/4
**difficult [1]** 53/16
**digging [1]** 7/16
**Diggs [1]** 88/20
**direct [4]** 4/25 46/15 46/16 72/5
**directed [7]** 1/18 2/20 3/17 6/21 35/10 44/23 76/20
**directives [1]** 3/10
**directly [1]** 22/3
**disadvantage [1]** 64/24
**disagree [6]** 22/1 37/25 56/18 58/6 97/17 99/16
**disagreed [1]** 83/19
**disagreeing [1]** 83/21
**disagrees [1]** 61/20
**discovery [11]** 5/5 5/7 28/10 29/6 46/1 46/7 46/8 67/6 68/7 69/1 71/25
**discretionary [1]** 54/13
**discuss [2]** 21/2 43/8
**discussed [6]** 24/8 44/14 47/25 61/16 67/25 106/19
**discusses [2]** 65/22 67/13
**discussing [7]** 3/23 6/8 54/20 60/17 66/17 73/14 101/20
**discussion [12]** 2/6 17/24 55/7 66/22 67/2 70/22 73/12 73/14 73/25 74/7 77/5 109/13
**discussions [4]** 12/14 13/15 13/16 67/24
**disease [1]** 90/16
**dismiss [7]** 6/19 6/19 21/16 21/25 38/11 68/10 77/14
**dismissal [2]** 21/19 76/14
**dismisses [1]** 78/21
**dispensed [1]** 101/16
**dispute [1]** 59/1
**disputed [1]** 29/8
**disrupting [1]** 26/7
**dissect [1]** 86/1
**dissent [1]** 99/8
**dissolved [1]** 41/1
**distinction [2]** 43/2 72/25
**district [12]** 1/1 5/21 41/6 61/5 82/8 90/14 91/10 96/10 96/15 96/16 96/17 106/20
**diswroint [1]** 94/21
**divested [1]** 45/16
**divesting [1]** 35/8

D

**divided [1]** 105/7
**divisible [1]** 86/23
**division [1]** 89/3
**do [130]**
**docket [4]** 55/5 64/22 94/5 94/7
**dockets [1]** 88/22
**doctrine [1]** 14/5
**document [3]** 7/14 13/8 94/3
**documentation [1]** 66/13
**documented [1]** 40/9
**documents [2]** 7/16 104/13
**does [59]**
**doesn't [18]** 1/19 15/23 16/3 16/20 26/18 46/14 47/20 53/17 54/25 69/25 75/18 78/22 79/10 83/7 84/4 100/5 104/19 109/4
**doing [10]** 12/22 15/17 18/15 20/23 27/8 37/4 42/11 86/17 87/21 109/21
**dollars [3]** 78/3 96/16 97/3
**don't [53]**
**done [14]** 13/22 17/8 17/8 18/4 27/21 52/7 60/16 60/17 63/21 64/19 75/14 86/8 87/22 88/1
**door [2]** 37/21 42/8
**double [3]** 90/13 90/15 90/18
**doubt [1]** 29/5
**down [8]** 3/6 3/20 4/8 4/21 6/25 43/1 59/2 73/21
**Draper [5]** 60/17 87/18 89/6 97/6 97/13
**draw [1]** 43/2
**dressed [1]** 102/13
**drop [1]** 106/3
**dropped [1]** 84/12
**drumming [1]** 101/16
**due [1]** 12/23
**during [3]** 7/8 38/6 70/25
**duty [4]** 4/21 11/17 48/19 72/19

E

**e-mails [3]** 59/3 75/1 75/2
**E.D.N.Y [1]** 57/13
**each [12]** 14/2 17/3 17/6 17/10 47/13 47/15 49/16 50/16 65/1 87/5 88/21 109/13
**earlier [12]** 33/18 49/22 52/15 52/16 57/6 63/12 70/22 81/4 86/13 89/22 98/6 106/19
**early [2]** 9/10 50/6
**easiest [1]** 48/8
**east [6]** 107/17 107/19 107/21 108/7 108/13 108/14
**easy [2]** 38/14 52/23
**educated [1]** 60/25
**effect [5]** 16/13 39/20 58/24 92/13 103/19
**effective [1]** 35/15
**effectively [3]** 11/21 15/23 93/14
**effects [1]** 62/2
**effectuate [1]** 70/21
**effort [1]** 88/25
**efforts [1]** 58/18
**egregiously [2]** 72/15 92/16
**either [7]** 31/3 38/18 44/21 49/17 51/22 63/6 66/20
**elected [3]** 9/1 27/22 63/6
**election [10]** 7/21 8/13 14/12 14/13 16/2 26/24 50/6 50/10 106/5 106/6
**elements [2]** 101/5 101/7
**elephant [1]** 46/13
**eleven [2]** 52/16 81/11
**Elizabeth [1]** 1/6
**else [2]** 26/15 63/23
**elsewhere [1]** 28/15
**embodied [1]** 33/16
**embody [1]** 34/3
**embraces [1]** 28/7
**emphasizing [1]** 90/19
**emphatic [1]** 66/12
**enable [1]** 35/14
**Enabling [1]** 54/8
**enclosed [1]** 76/7
**encourage [1]** 87/3
**end [14]** 1/21 3/25 11/18 17/9 32/16 35/2 44/20 45/2 45/3 46/10 49/6 49/13 89/14 99/5
**ended [1]** 12/11
**ends [1]** 70/11
**endure [1]** 80/24
**enforce [3]** 45/7 54/3 76/17
**enforcement [1]** 75/16
**engage [4]** 13/18 14/23 71/7 106/2
**engaged [2]** 15/9 66/22
**engaging [2]** 67/5 69/17
**enough [11]** 13/21 13/24 65/10 67/19 76/10 88/23 89/25 92/5 92/20 92/23 100/10
**entered [2]** 62/18 69/9
**entire [5]** 67/5 108/1 109/14 109/14 109/15
**entirely [1]** 38/16
**entirety [3]** 20/24 86/22 107/11
**entity [2]** 51/7 63/1
**entries [2]** 49/11 55/5
**entry [7]** 7/2 7/5 47/6 47/7 58/12 94/5 94/7
**envision [1]** 107/4
**equal [1]** 67/14
**equally [1]** 98/7
**equation [1]** 54/25
**equitable [8]** 5/3 39/15 41/5 54/25 76/17 92/9 93/22 98/8
**equities [20]** 26/23 27/7 32/1 37/2 40/22 43/15 43/24 44/16 45/18 46/2 46/19 56/10 73/11 77/2 82/24 86/10 91/4 91/7 91/15 102/5
**equity [7]** 54/23 67/25 71/7 73/16 73/20 73/20 73/20
**equivocation [1]** 53/2
**error [1]** 26/6
**especially [3]** 59/7 60/13 98/12
**essential [1]** 88/5
**essentially [3]** 45/7 45/21 100/8
**established [2]** 31/4 36/20
**Estelle [1]** 60/24
**estimate [1]** 78/3
**etc [1]** 74/4
**ethical [1]** 48/15
**ethics [2]** 48/19 49/3
**evaluate [2]** 27/2 59/19
**even [49]**
**event [3]** 12/1 12/1 106/5
**events [1]** 52/13
**eventual [1]** 42/16
**eventually [8]** 11/2 12/23 13/6 13/14 13/16 16/15 21/4 50/10
**ever [3]** 17/8 63/3 86/8
**every [15]** 10/8 14/7 16/11 17/2 32/2 57/22 64/7 64/11 64/17 66/13 68/15 68/17 68/18 78/5 96/22
**everybody [1]** 2/1
**everyone [5]** 28/15 52/10 59/9 63/23 87/24
**everything [5]** 16/2 31/15 60/11 73/11 99/23
**evidence [18]** 7/15 8/24 27/7 29/7 39/6 46/7 58/16 68/25 75/23 76/7 88/12 89/11 89/19 91/19 94/11 101/4 101/18 102/8
**evidentiary [2]** 40/1 97/8
**ex [1]** 102/12
**exact [5]** 14/18 18/24 18/24 19/2 59/13
**exactly [11]** 23/6 25/14 33/19 42/10 53/24 61/2 77/19 88/18 92/21 109/3 109/3
**examine [1]** 34/5
**example [5]** 77/21 82/2 88/12 90/4 95/21
**examples [2]** 57/11 58/23
**except [3]** 10/9 61/7 88/18
**exception [2]** 36/7 101/11
**exceptionally [1]** 77/5
**exclusion [1]** 13/15
**exclusivity [1]** 85/24
**excuse [9]** 24/20 26/7 27/13 30/6 40/21 61/8 80/13 81/3 94/1
**excused [1]** 109/24
**excusing [1]** 84/9
**exhaust [1]** 80/16
**exhibit [3]** 12/20 93/20 94/12
**exhibits [1]** 94/11
**exist [4]** 20/3 43/17 69/25 87/19
**existed [1]** 20/21
**existence [3]** 20/8 20/9 102/1
**existing [1]** 107/5
**exists [1]** 69/25
**expect [1]** 10/5
**expecting [1]** 68/3
**expedited [1]** 86/16
**expeditious [1]** 8/11
**expeditiously [4]** 1/18 2/21 109/5 109/21
**expenses [1]** 2/7
**expert [1]** 104/2
**explain [3]** 8/13 55/25 84/4
**explained [3]** 78/14 81/9 93/18
**explains [1]** 73/15
**explicit [2]** 74/22 101/17
**explicitly [1]** 28/21
**exposes [1]** 91/3
**express [3]** 75/16 92/24 101/17
**expressed [2]** 78/8 104/16
**expressly [5]** 41/2 48/25 51/16 53/1 100/5
**extend [1]** 75/11
**extensive [1]** 88/13
**extent [13]** 3/23 19/9 19/13 19/14 33/7 66/14 69/14 76/14 84/19 91/15 92/8 97/23 103/2
**extraordinary [1]** 55/18
**extremely [1]** 38/17

F

**face [2]** 40/12 90/4
**facially [1]** 79/21
**facilities [1]** 95/20
**facility [1]** 95/23
**facing [1]** 59/5
**fact [26]**
**factor [3]** 30/19 36/10 41/3
**factors [16]** 18/3 28/17 28/18 29/2 29/3 31/2 31/10 35/22 36/6 36/8 43/23 46/2 54/13 55/1 97/19 98/8
**facts [26]**
**factual [6]** 28/9 32/11 42/19 68/6 93/8 100/6
**failed [1]** 56/4
**failing [2]** 40/10 81/4
**failure [5]** 78/17 78/22 80/13 80/16 81/2
**failures [1]** 14/19
**fairly [1]** 84/17
**faith [1]** 69/20
**fall [2]** 30/5 30/7
**far [13]** 5/4 26/9 43/6 59/24 72/2 74/18 74/20 90/22 100/1 100/1 101/2 102/5 102/5
**Fast [2]** 9/11 10/21
**favor [3]** 16/14 31/15 87/2
**favorably [2]** 57/12 57/12
**federal [27]**
**federalism [1]** 52/5
**feel [2]** 10/15 89/21
**feels [1]** 70/18
**felonies [1]** 95/3
**felons [1]** 95/9
**felony [1]** 10/25
**felt [1]** 48/14
**few [5]** 9/9 9/14 28/12 42/2 105/14
**Fife [6]** 1/8 22/7 42/24 47/3 71/22 76/25
**Fifth [54]**
**figuring [2]** 18/15 36/17
**file [7]** 15/15 52/13 66/1 77/14 77/14 77/15 77/17
**filed [19]** 7/16 11/1 34/20 37/14 38/4 40/6 43/6 47/14 49/12 50/20 52/15 52/15 53/11 56/1 63/20 72/1 98/18 99/2 107/14

F
files [3] 12/20 14/24 53/10
filing [1] 56/5
filled [1] 66/13
filter [1] 79/18
final [12] 25/5 25/13 26/17 56/2 61/10 83/15 85/23 90/3 104/24 105/5 105/6 105/6
finality [6] 26/2 26/7 54/4 73/10 79/12 105/3
finally [6] 15/9 49/12 66/3 96/24 97/6 105/3
financial [1] 91/13
find [19] 12/22 16/5 21/9 21/9 22/5 31/17 48/8 66/21 66/23 68/9 70/20 80/12 80/12 85/4 85/5 87/2 87/7 89/25 108/2
finding [3] 44/18 80/19 87/9
findings [8] 33/8 33/16 33/18 42/19 69/9 85/14 87/4 93/8
finds [6] 31/15 31/22 44/13 45/13 52/23 86/11
fine [1] 38/24
finished [1] 71/11
first [52]
fish [1] 90/10
fit [3] 36/4 36/5 44/19
fits [3] 3/16 29/8 44/2
five [1] 96/14
flatly [1] 53/25
Fleet [1] 1/10
flexibility [1] 41/5
flexible [2] 39/15 76/3
flipped [1] 17/12
flips [1] 14/7
flow [1] 105/22
flowing [1] 102/20
focus [4] 1/19 25/25 77/8 95/3
focused [5] 19/15 19/21 57/5 77/6 107/1
focusing [3] 35/12 35/16 41/23
Fogler [1] 1/11
folks [3] 12/8 95/4 103/15
follow [28]
followed [2] 5/18 40/8
following [10] 6/18 34/22 42/11 42/18 49/19 74/8 74/8 76/14 92/3 107/14
force [2] 28/23 31/1
forced [4] 39/9 80/23 88/15 88/25
forceful [1] 52/21
forces [3] 87/17 87/19 89/7
foreclose [1] 38/2
foreclosed [7] 36/11 74/4 100/9 100/12 101/12 101/15 102/23
forecloses [1] 47/8
forever [2] 16/7 63/7
forget [2] 76/2 101/2
form [2] 48/7 103/14
formal [1] 58/19
former [3] 87/17 89/5 97/10
forth [2] 11/11 95/2
forward [12] 7/7 9/11 9/17 9/19 10/21 13/10 15/10 15/19 57/17 63/22 98/10 99/14
found [9] 25/7 28/18 28/20 29/4 30/5 79/23 80/20 85/7 85/8
foundation [2] 6/8 17/19
foundational [1] 70/25
foundations [1] 2/3
four [30]
fourth [2] 14/17 79/24
Fowler [3] 80/18 80/21 80/24
frame [1] 52/12
framework [3] 86/21 86/22 86/22
framing [1] 70/16
frankly [2] 11/16 78/25
Frazar [1] 40/24
fresh [5] 16/1 62/16 62/16 62/21 65/9
friendly [1] 85/2
friends [3] 72/10 74/24 87/11
front [7] 1/22 3/8 11/18 21/3 32/16 65/23 66/9
fruition [1] 11/8
fulfill [2] 51/13 58/6
full [6] 5/18 49/4 49/12 50/16 56/12 103/15
fully [3] 27/8 39/22 86/19
fundamental [2] 20/7 72/10
funds [2] 51/2 51/22
furg [1] 94/18
further [3] 13/18 41/12 91/4
fused [1] 37/9
futility [1] 53/3
future [2] 63/3 63/6

G
G.O.B [1] 12/24
gamesmanship [2] 59/14 83/5
Garcia [13] 8/1 8/4 12/18 41/24 47/14 49/25 50/5 50/13 50/18 52/15 53/16 58/13 84/7
garner [1] 58/16
gather [1] 43/4
gathered [1] 13/14
gave [1] 77/21
gavel [3] 55/12 55/13 55/16
geared [1] 89/24
gearing [1] 15/2
gee [1] 104/20
general [24]
General's [3] 9/22 59/4 84/8
generally [2] 22/19 39/18
generated [1] 78/2
Genesis [1] 87/18
germane [1] 97/15
get [33]
gets [2] 32/16 53/10
getting [2] 96/20 109/22
gin [1] 96/19
give [4] 2/8 23/15 53/9 94/5
given [9] 3/5 13/2 28/23 47/10 53/8 70/24 72/14 91/15 103/21
gives [4] 65/8 67/22 73/13 76/16
giving [1] 9/20
go [38]
goal [1] 95/21
GOBs [1] 104/11
goes [9] 12/25 32/16 66/2 68/5 69/16 74/18 74/20 101/2 105/9
going [48]
gone [3] 3/20 26/16 105/2
good [10] 1/4 11/22 16/3 21/23 22/23 47/3 69/19 71/20 77/6 109/23
Goodhart [91]
Goodhart's [7] 22/25 27/11 47/11 47/13 53/13 86/11 92/11
Goodheart [1] 9/20
got [11] 9/11 13/2 14/18 15/2 27/14 35/11 42/10 62/21 70/20 75/21 83/25
government [10] 11/14 11/24 51/4 51/5 57/14 63/3 69/7 87/13 91/18 109/17
governmental [1] 63/1
grant [1] 36/17
granted [1] 100/16
grants [1] 32/9
great [2] 36/7 64/20
grievous [1] 26/6
Grinstein [1] 1/9
ground [4] 6/9 40/17 59/18 67/14
grounded [1] 104/18
grounds [1] 68/9
group [1] 9/8
guess [4] 21/6 64/3 72/9 98/14
guidance [1] 105/24
guide [1] 22/18

H
habeas [2] 9/16 61/3
had [31]
half [2] 54/15 64/22
halfway [1] 36/19
ham [1] 85/23
hand [5] 7/10 73/2 78/24 86/4 102/21
handle [5] 13/16 20/24 22/8 70/10 82/23
handled [1] 88/2
hands [1] 55/11
handwritten [2] 61/4 76/8
handy [1] 94/8
happen [3] 40/17 69/21 104/10
happened [4] 20/19 28/16 31/8 57/19
happening [6] 7/8 11/1 20/22 40/17 65/4 84/11
happens [11] 6/16 9/8 14/25 26/14 36/24 81/21 86/1 91/2 105/24 109/8 109/8
happy [4] 50/24 54/19 59/20 97/10
hard [1] 67/7
harder [1] 79/2
hardest [1] 81/7
harm [3] 30/8 36/7 101/11
harms [1] 91/14
Harris [32]
has [85]
hasn't [2] 55/22 75/14
haunting [1] 37/13
have [232]
haven't [2] 82/2 108/5
having [8] 19/10 24/20 28/12 34/1 58/7 63/4 64/14 96/23
he [29]
he's [1] 83/2
head [3] 17/3 32/3 34/11
headed [2] 8/3 8/10
heads [2] 32/2 104/2
health [1] 96/5
hear [13] 1/23 4/3 21/20 38/9 38/10 46/23 53/11 62/7 69/3 77/10 79/8 80/4 97/8
heard [5] 23/11 52/17 64/15 67/11 79/6
hearing [19] 1/19 26/9 39/9 40/4 74/5 87/25 88/2 88/20 88/22 88/22 88/25 89/3 89/8 89/14 96/14 97/8 99/23 104/17 107/5
hearings [6] 30/5 30/6 32/8 36/4 88/17 96/12
heart [1] 6/7
heavily [1] 47/19
heavy [1] 99/18
held [5] 66/23 66/24 95/12 95/19 97/2
Hello [1] 84/15
help [1] 61/7
helpful [3] 49/11 93/2 105/25
Henson [2] 60/23 61/1
her [13] 9/23 14/21 48/13 48/14 48/14 53/21 58/19 80/7 84/12 87/19 97/9 97/9 97/11
here [65]
here's [1] 64/20
herring [1] 87/14
herself [3] 49/5 61/24 81/10
hey [4] 9/5 12/25 13/12 58/5
hidden [1] 46/13
hide [1] 5/1
highly [3] 60/25 60/25 82/25
him [4] 53/9 62/10 71/22 74/5
himself [1] 9/15
hinge [3] 28/9 68/6 100/6
hinting [1] 81/15
hire [3] 51/17 52/4 81/2
hired [1] 48/11
hiring [1] 80/8
his [16] 12/21 59/17 61/3 61/6 61/6 80/21 80/25 82/23 82/24 83/5 83/18 90/20 93/16 93/17 95/2 105/5
history [4] 3/22 40/9 40/20 105/4
hit [1] 14/6
Hodory [2] 51/25 57/8
hold [3] 41/5 55/22 56/1
holder [1] 16/1
holding [12] 6/12 23/18 24/1 24/2 28/23 29/6 30/4 31/2 35/19 53/3 82/15 92/12
hole [1] 46/13
Honor [90]
Honor's [3] 38/22 38/25 77/8
hook [1] 77/19
hope [3] 11/3 22/17 38/9
hopeful [1] 77/2
hoping [1] 107/3

**H**

**Hopkins [1]** 1/12
**hour [1]** 95/11
**hours [3]** 32/8 59/7 95/13
**house [1]** 95/25
**how [29]**
**however [8]** 35/25 38/10 39/3 77/25 90/1 90/13 92/24 93/13
**Hu [11]** 1/13 60/1 61/11 61/12 78/4 80/6 91/6 91/13 99/12 103/9 103/13
**huge [1]** 83/6
**hugely [1]** 79/10
**hundred [1]** 32/11
**hundred-plus [1]** 32/11
**hypothetical [7]** 85/3 85/9 85/14 107/6 107/12 107/13 108/9

**I**

**I'd [5]** 1/23 48/6 83/17 93/23 106/2
**I'll [10]** 9/6 38/12 42/24 47/1 55/25 61/10 62/9 63/17 77/1 97/10
**I'm [27]**
**I've [6]** 23/11 35/11 55/21 57/18 70/20 81/9
**idea [7]** 10/13 11/23 63/22 63/25 65/5 66/7 67/11
**identical [1]** 90/5
**identified [2]** 80/11 80/14
**identify [2]** 82/7 90/2
**if [153]**
**ignorance [1]** 80/14
**ignore [3]** 16/17 47/22 79/17
**II [26]**
**II's [1]** 21/16
**imagine [1]** 17/23
**imagines [1]** 103/15
**immediate [1]** 90/22
**immense [1]** 59/8
**impact [3]** 9/13 9/21 11/4
**impacts [1]** 7/3
**implement [3]** 4/18 72/20 99/1
**implemented [2]** 34/7 54/9
**implicate [1]** 100/13
**implicated [1]** 87/5
**implicates [1]** 26/21
**implicit [1]** 82/4
**implicitly [1]** 28/7
**implied [1]** 74/20
**implies [1]** 105/2
**importance [2]** 8/14 47/21
**important [8]** 31/18 41/10 54/5 66/15 69/3 75/25 77/7 96/5
**importantly [2]** 95/1 95/11
**impose [2]** 39/10 89/4
**imposing [2]** 54/7 89/9
**improperly [2]** 24/6 24/14
**in [468]**
**inability [4]** 47/19 61/6 80/12 80/12
**inaccurate [1]** 102/16
**inappropriate [1]** 24/18
**include [7]** 11/16 35/23 36/1 36/3 46/2 49/4 84/23
**includes [2]** 23/12 60/11
**including [9]** 24/17 27/2 27/4 30/4 37/21 43/24 47/14 60/11 63/23
**inconsistency [2]** 5/17 46/5
**inconsistent [5]** 53/25 55/20 81/11 99/19 99/25
**incorporated [1]** 102/11
**incorrect [1]** 60/9
**increase [1]** 89/2
**increased [1]** 90/16
**incredibly [3]** 49/11 84/9 91/7
**incredulous [2]** 50/17 77/24
**indeed [1]** 41/14
**independent [2]** 59/18 66/3
**independently [1]** 65/6
**indicated [1]** 86/25
**indicates [3]** 23/16 26/15 37/11
**indigent [1]** 88/18
**individual [5]** 17/4 53/21 53/23 62/16 79/6
**individual's [2]** 14/14 65/17
**individualized [9]** 33/12 33/12 40/3 40/6 40/10 40/13 87/25 88/17 88/24
**individuals [3]** 9/6 14/2 20/25
**inequities [2]** 34/6 100/3
**inescapable [1]** 85/5
**inevitable [2]** 88/21 89/1
**influence [2]** 39/19 89/17
**information [3]** 88/23 91/7 103/21
**Ingram [2]** 19/25 73/2
**inherent [1]** 54/10
**inherently [1]** 46/3
**initial [1]** 87/16
**injunction [3]** 33/4 33/9 33/18
**input [1]** 104/1
**inquiry [10]** 2/15 28/6 28/8 35/2 35/2 35/6 36/24 97/16 100/4 100/4
**inside [1]** 59/12
**insinuates [1]** 46/21
**instance [7]** 30/13 30/14 42/17 64/5 64/6 73/7 88/20
**instead [3]** 81/10 96/11 106/23
**instructed [2]** 86/14 97/15
**instructing [2]** 30/19 30/20
**instruction [3]** 23/21 67/22 106/4
**instructions [2]** 107/23 108/12
**instructive [1]** 90/6
**intelligent [1]** 60/25
**intent [2]** 74/8 81/12
**intention [1]** 88/10
**intentional [3]** 47/6 71/14 78/24
**interaction [1]** 29/24
**interest [8]** 26/2 26/3 26/7 78/1 102/25 103/1 103/2 103/7
**interested [1]** 82/20
**interesting [3]** 14/25 62/23 74/5
**Interestingly [1]** 67/19
**interfere [1]** 73/16
**internal [1]** 5/17
**interpretation [2]** 27/10 61/14
**interpreting [1]** 91/24
**intervene [9]** 15/5 53/10 72/1 74/13 75/6 75/22 83/12 84/4 93/17
**intervened [1]** 76/6
**intervening [6]** 12/12 18/7 75/7 75/7 75/8 103/4
**intervention [7]** 14/24 15/7 15/8 53/3 53/10 93/17 103/8
**intimate [1]** 104/14
**into [22]**
**introduce [1]** 102/9
**invincible [2]** 105/5 105/6
**inviting [1]** 100/2
**invoking [2]** 73/15 100/23
**involve [2]** 80/15 80/15
**involved [2]** 11/13 32/3
**IQ [2]** 61/1 61/6
**ironic [1]** 33/24
**irrelevant [1]** 39/3
**irreparable [3]** 30/8 36/7 101/11
**irrespective [2]** 101/25 102/1
**is [574]**
**Island [7]** 25/2 54/1 55/9 55/10 77/21 81/24 85/25
**isn't [5]** 23/21 51/14 51/24 54/6 98/7
**issuance [1]** 53/8
**issue [62]**
**issued [9]** 8/25 9/12 11/2 15/6 16/16 32/6 53/15 73/3 79/20
**issues [31]**
**issuing [3]** 33/3 37/17 104/17
**it [333]**
**it's [70]**
**its [29]**
**itself [9]** 25/18 33/15 50/25 64/8 64/15 66/24 67/4 90/6 94/6

**J**

**jail [3]** 90/12 95/23 95/25
**jailhouse [1]** 61/7
**jails [1]** 95/25
**January [11]** 7/19 8/4 9/10 9/10 12/19 14/16 14/17 14/21 41/24 50/2 81/10
**January 1 [2]** 50/2 81/10
**January 2025 [1]** 12/19
**January 25 [1]** 14/17
**Jeremy [1]** 1/7
**job [1]** 104/4
**Joe [4]** 1/9 1/14 1/15 71/20
**John [1]** 61/1
**Johnson [3]** 7/23 50/14 61/23
**join [3]** 60/9 61/15 102/19
**joined [4]** 58/14 58/17 60/10 93/15
**joint [5]** 95/5 95/18 96/4 96/6 96/22
**Joseph [2]** 19/24 73/2
**judge [46]**
**judge's [4]** 6/25 9/14 51/21 52/12
**judges [91]**
**judges' [2]** 2/21 48/1
**judgment [26]**
**judgments [2]** 54/4 79/13
**judicial [3]** 48/16 48/24 49/3
**judiciary [4]** 54/9 59/10 77/13 78/10
**July [2]** 13/17 14/22
**juncture [2]** 24/14 24/18
**jurisdiction [15]** 3/3 3/4 35/8 37/7 37/8 45/11 45/16 45/22 47/17 57/4 57/24 58/8 73/24 78/22 98/21
**jurisdictional [3]** 26/6 77/19 77/23
**jury [1]** 103/2
**just [88]**
**justice [5]** 77/20 77/21 88/22 104/15 105/4
**justified [1]** 89/5
**justify [4]** 40/23 45/12 46/20 92/24

**K**

**keep [5]** 38/24 53/23 88/25 96/2 101/15
**key [1]** 19/12
**kind [13]** 2/9 3/20 31/8 33/24 36/22 36/23 54/21 55/11 58/14 61/6 72/8 86/3 99/4
**kinds [1]** 19/19
**knew [3]** 79/20 84/5 84/11
**know [20]** 18/20 33/5 44/3 44/7 46/16 53/9 54/6 54/18 54/22 58/6 59/2 67/22 71/16 85/19 85/20 89/21 91/6 97/7 101/7 105/18
**knowing [1]** 50/19
**known [1]** 71/15

**L**

**lack [2]** 78/21 109/19
**lacking [1]** 89/18
**Ladd [1]** 40/24
**laid [3]** 11/2 11/12 54/14
**land [1]** 45/17
**lands [1]** 43/13
**language [1]** 92/3
**large [1]** 2/6
**largest [1]** 87/23
**last [4]** 47/25 65/24 72/5 76/11
**late [2]** 61/7 61/8
**later [9]** 9/9 9/14 14/24 31/8 37/17 62/1 67/4 71/25 84/23
**law [98]**
**lawsuit [2]** 48/23 50/6
**lawyer [6]** 61/7 64/21 80/12 80/12 80/25 81/2
**lawyers [2]** 10/4 64/23
**lay [1]** 102/13

L
layout [1] 105/21
lays [3] 7/9 7/15 12/22
lead [1] 90/15
leave [5] 42/1 83/12 88/22 91/21 108/8
leaves [2] 31/11 42/15
leaving [1] 109/16
led [2] 83/24 89/7
Lee [1] 1/2
left [3] 21/6 21/6 75/6
legal [9] 13/1 36/2 41/7 49/5 59/2 61/7 61/17 79/8 80/4
legally [1] 46/11
less [5] 5/21 47/20 64/23 89/1 93/4
lesson [1] 25/4
let [11] 19/24 21/20 25/15 26/2 30/25 46/23 47/1 60/3 67/24 81/14 90/23
let's [7] 15/25 17/12 35/9 58/5 74/17 77/7 101/2
letter [8] 9/2 9/5 9/10 12/19 12/21 13/17 72/18 72/20
level [1] 8/13
Liberty [3] 57/13 58/8 75/3
lies [1] 99/7
light [1] 102/2
like [32]
liked [1] 37/18
likelihood [3] 43/15 91/9 95/6
likely [6] 10/22 27/6 31/19 33/6 44/16 89/9
limb [1] 10/16
limit [3] 52/24 54/4 54/6
limitation [1] 39/13
limitations [1] 80/16
limited [4] 15/7 17/25 23/25 61/12
limiting [4] 62/20 77/11 78/7 106/1
limits [4] 77/13 107/9 109/18 109/19
line [4] 43/2 57/20 67/7 92/10
lip [1] 72/14
listen [1] 74/2
listening [1] 72/22
literally [2] 32/8 39/6
litigant [1] 80/9
litigants [1] 64/23
litigating [1] 53/8
litigation [4] 48/21 72/13 78/11 83/3
little [11] 5/16 10/8 15/3 23/8 24/4 38/6 44/8 50/17 53/12 80/2 91/9
live [1] 63/5
local [7] 11/24 51/4 51/5 70/1 91/16 91/18 109/17
logical [1] 33/20
long [8] 10/10 10/11 15/22 70/2 70/5 71/25 77/18 78/6
longer [5] 10/12 76/17 95/1 97/2 106/6
look [34]
looked [3] 9/12 55/21 95/10
looking [17] 2/19 16/8 16/12 18/1 19/2 32/25 39/25 62/14 66/10 74/2 88/13 93/22 94/20 94/23 95/24 96/16 97/25
looks [2] 70/24 82/9
lose [1] 8/8
lost [2] 50/10 74/23
lot [13] 2/4 17/24 21/18 22/6 26/9 44/4 49/22 58/23 71/21 77/4 87/1 98/2 109/20
Louisiana [2] 95/23 96/3
love [1] 56/20
low [1] 61/6
lower [1] 25/7
lumping [1] 99/23

M
made [13] 12/6 13/20 24/2 29/6 30/1 33/3 48/17 50/25 51/23 52/3 58/18 62/2 101/23
mails [3] 59/3 75/1 75/2
main [2] 13/20 63/19
mainly [1] 10/5
maintain [2] 4/8 44/9
majority [10] 16/14 16/23 17/1 17/5 17/7 17/11 17/13 37/17 38/15 54/2
make [27]
makes [7] 60/2 60/7 64/24 68/11 80/2 88/4 91/24
making [7] 7/12 42/18 58/2 66/18 68/11 87/4 101/14
man [1] 100/5
manage [1] 97/2
management [1] 104/1
mandamus [4] 2/10 23/24 27/23 51/12
mandate [41]
mandates [1] 76/14
manner [6] 3/5 17/18 35/15 68/14 70/2 70/8
manners [1] 51/11
many [6] 7/20 18/9 26/18 55/4 91/24 93/7
map [2] 99/25 100/1
March [2] 7/5 8/25
March 31st [1] 7/5
mash [1] 79/13
mash-up [1] 79/13
matching [1] 33/2
matter [17] 11/4 24/3 26/12 28/20 29/1 29/6 38/3 41/18 45/11 45/22 51/10 71/23 75/18 81/1 91/21 102/7 104/3
matters [1] 32/21
may [31]
May 2025 [1] 13/8
maybe [5] 34/22 45/10 60/7 66/18 79/7
me [49]
mean [16] 1/19 14/12 16/1 16/22 20/11 38/15 39/3 45/2 53/22 71/10 72/12 92/4 94/24 94/25 95/20 99/15
meaning [5] 28/17 32/15 45/3 51/19 69/1
means [11] 26/12 28/3 28/5 28/13 33/11 33/25 56/3 74/8 74/9 81/25 96/1
meant [5] 22/18 33/22 46/10 46/17 90/12
meantime [1] 12/13
measurement [1] 100/12
mechanism [7] 4/18 4/18 4/19 26/14 36/21 70/21 100/17
medical [1] 96/7
meet [2] 11/5 11/9
meeting [1] 9/14
meetings [2] 75/1 75/2
members [4] 10/4 60/25 61/1 91/3
mention [6] 15/13 26/23 65/21 68/23 84/1 84/2
mentioned [6] 26/12 28/7 35/25 47/21 67/12 89/22
mentions [1] 82/22
mere [6] 39/20 40/22 65/9 92/4 92/18 92/19
merely [1] 100/10
merit [3] 2/4 65/17 66/9
merits [8] 2/7 14/13 75/4 78/20 78/23 82/9 83/17 83/23
mess [2] 52/23 97/4
messy [2] 43/19 83/16
met [8] 28/19 29/2 29/4 36/8 44/13 55/23 81/19 90/20
mic [1] 22/2
microphone [1] 2/1
Middlesex [12] 28/17 28/18 29/2 29/3 30/19 31/10 35/22 36/6 36/8 36/10 69/4 69/18
might [11] 2/16 10/5 12/7 33/22 37/6 42/16 43/22 66/9 78/17 90/24 104/21
miles [1] 75/3
militate [1] 91/5
mill [1] 73/8
million [9] 78/4 96/2 96/9 96/9 96/17 96/24 97/1 97/3 97/4
millions [1] 78/3
Mills [1] 96/3
mind [2] 3/13 60/15
mine [1] 106/7
minimal [1] 90/20
minimum [1] 43/4
minor [1] 61/22
minority [3] 13/20 13/21 17/1
minutes [2] 56/14 71/23
mischaracterized [1] 38/11
misdemeanor [3] 32/10 40/10 96/12
misdemeanors [1] 95/4
missed [2] 79/7 95/9
misunderstanding [1] 38/10
modification [13] 13/7 13/19 39/15 43/22 45/20 47/17 48/7 52/19 57/1 57/2 58/17 59/13 82/10
modifications [1] 14/23
modified [1] 16/16
modify [12] 4/12 18/2 26/17 34/2 41/15 58/3 58/21 59/6 62/17 70/13 90/8 90/13
modifying [1] 19/10
moment [5] 28/24 85/1 86/24 86/25 87/10
money [5] 39/10 40/2 52/4 88/2 89/7
monitor [8] 12/25 13/3 14/22 47/16 49/17 52/20 66/18 94/23
monitor's [1] 102/9
monitoring [1] 73/10
monitors [5] 13/7 13/12 13/14 89/12 91/12
month [3] 14/24 47/25 71/25
months [5] 15/17 52/15 52/16 80/1 81/11
moot [1] 67/21
mootness [56]
more [36]
most [8] 10/22 32/22 33/8 60/2 69/23 78/18 79/22 104/14
motion [52]
motions [6] 1/22 11/1 15/15 93/10 93/18 100/22
mouse [1] 46/13
movant's [3] 1/23 2/21 40/12
movants [19] 22/19 24/16 28/1 29/12 33/6 41/11 42/4 47/1 72/22 77/16 85/18 89/18 90/2 91/8 91/17 91/19 93/4 105/16 106/6
move [19] 6/1 15/9 15/13 27/13 37/1 49/16 49/22 50/25 58/1 62/17 62/21 63/22 65/19 77/25 79/20 80/5 81/2 81/4 103/3
moved [13] 13/11 48/2 48/9 48/11 48/13 49/7 49/8 49/21 50/1 53/15 57/6 75/21 81/9
moving [2] 55/8 80/2
Mr [8] 9/2 9/5 9/10 9/14 22/7 42/24 62/11 71/22
Mr. [43]
Mr. Cutting [13] 51/25 54/1 77/2 82/23 84/13 84/14 93/21 97/18 99/25 101/20 107/10 107/20 108/18
Mr. Fowler [2] 80/21 80/24
Mr. Hu [9] 60/1 61/11 78/4 80/6 91/6 91/13 99/12 103/9 103/13
Mr. NWaokoro [1] 99/10
Mr. Russo [14] 23/10 26/12 30/1 34/15 60/3 62/8 62/9 73/20 77/11 79/7 80/3 92/2 94/1 104/22
Mr. Russo's [3] 38/7 80/8 80/25
Mr. VanFleet [1] 60/1
much [11] 1/17 19/20 28/2 31/8 47/20 64/23 79/2 89/20 91/5 93/4 98/3
multiple [2] 24/25 86/2
Murray [1] 1/11
must [9] 3/2 5/9 21/9 38/21 41/1 41/14 45/18 55/21 73/15
my [24]

N
name [1] 12/21

## N

**naming [1]** 80/15
**narrows [1]** 33/9
**naturally [1]** 100/21
**nature [3]** 25/16 26/1 103/21
**necessarily [3]** 4/25 19/23 20/20
**necessary [1]** 69/2
**Necessity [1]** 71/17
**need [33]**
**needed [4]** 15/19 28/21 74/3 96/8
**needing [4]** 40/21 43/14 74/1 103/15
**needs [16]** 16/16 17/10 29/11 29/11 29/13 31/3 36/14 38/11 44/15 46/16 49/23 73/24 76/15 86/5 86/9 86/21
**neeth [1]** 96/7
**negate [1]** 92/23
**neither [3]** 25/21 25/22 87/14
**net [1]** 82/7
**never [12]** 5/14 16/16 30/5 37/13 40/4 80/7 83/2 87/22 88/1 90/18 91/20 98/6
**nevertheless [2]** 11/24 18/1
**new [13]** 15/25 16/2 62/14 62/15 63/9 65/8 67/15 77/9 88/4 92/14 92/15 101/21 108/1
**news [2]** 14/19 85/23
**next [5]** 62/7 79/5 90/24 109/9 109/22
**nine [1]** 103/14
**no [62]**
**non [9]** 22/19 33/6 47/1 72/22 75/13 82/24 83/5 84/3 88/17
**non-individualized [1]** 88/17
**non-movants [4]** 22/19 33/6 47/1 72/22
**non-party [2]** 75/13 83/5
**none [5]** 5/7 29/7 73/1 73/5 76/9
**nor [4]** 25/14 39/21 87/14 105/6
**Norglass [4]** 79/23 82/3 82/4 82/11
**north [2]** 39/14 91/1
**Norton [2]** 57/13 58/8
**not [248]**
**note [4]** 49/10 76/8 86/25 108/18
**noted [7]** 6/10 28/22 44/5 44/6 63/2 82/2 93/21
**notes [2]** 67/24 84/12
**nothing [10]** 15/17 23/16 38/19 40/14 44/21 64/18 73/19 86/20 102/20 107/16
**notice [4]** 2/4 77/14 77/17 97/6
**notion [4]** 63/22 65/5 66/8 66/17
**notwithstanding [1]** 76/13
**November [11]** 7/21 47/15 48/3 48/10 49/9 49/21 50/21 52/13 63/21 66/1 84/5
**November 2018 [1]** 84/5
**November 2025 [7]** 47/15 48/3 48/10 49/9 49/21 50/21 52/13
**November 25th [1]** 63/21
**now [46]**
**nowhere [3]** 84/1 84/2 100/1
**number [16]** 1/21 47/13 47/15 48/11 48/12 48/19 48/24 49/3 58/13 78/12 79/23 80/3 83/18 93/6 94/7 103/15
**numbers [3]** 94/23 95/8 98/9
**numerous [1]** 69/20
**Nwaokoro [3]** 1/14 71/21 99/10

## O

**O'Donnell [15]** 3/18 11/4 20/19 20/21 29/2 29/7 30/11 32/6 33/7 68/4 68/5 69/10 88/19 105/19 109/12
**O'Donnell's [1]** 3/18
**object [2]** 38/20 102/8
**objected [3]** 68/24 94/10 102/8
**objection [4]** 89/18 101/10 101/13 103/3
**obligated [4]** 17/5 42/17 74/16 85/13
**obligation [3]** 29/9 51/9 51/14
**obligations [2]** 10/19 14/3
**observations [1]** 33/16
**observed [3]** 24/2 26/13 109/13
**obtain [2]** 11/25 66/3
**obtaining [1]** 14/20
**obvious [3]** 38/13 40/15 57/18
**obviously [8]** 26/21 40/7 48/18 50/21 59/19 78/18 103/21 107/17
**occur [6]** 27/6 33/6 34/6 44/16 56/9 85/15
**occurred [1]** 16/19
**occurring [1]** 56/8
**October [6]** 9/18 11/5 15/6 15/6 50/8 100/17
**October 30 [1]** 100/17
**October 30th [1]** 15/6
**odd [1]** 17/21
**off [7]** 31/9 38/23 62/11 71/11 87/15 95/17 105/25
**offend [4]** 2/17 18/16 106/22 106/22
**offensive [1]** 18/17
**offer [3]** 9/22 91/19 97/12
**offers [1]** 88/5
**office [34]**
**officeholder [6]** 62/15 62/15 65/10 92/4 92/14 92/15
**officeholders [2]** 65/8 67/3
**officer [2]** 88/20 97/11
**officers [6]** 39/9 88/22 88/25 89/3 89/8 96/14
**offices [3]** 11/15 11/18 106/6
**official [6]** 11/20 51/6 51/18 51/19 79/6 92/15
**officials [11]** 51/16 52/2 63/3 63/6 69/5 69/7 75/12 87/12 87/13 88/8 103/1
**offramp [1]** 54/21
**often [3]** 17/23 96/6 107/8
**oh [2]** 14/7 104/20
**okay [17]** 8/1 15/25 16/20 22/12 34/13 35/7 35/18 55/21 56/24 62/20 73/9 73/10 74/14 74/18 85/12 106/15 107/10
**Olalde [1]** 1/16
**old [2]** 46/22 89/11
**on [210]**
**once [6]** 10/12 12/6 68/9 85/24 86/6 109/6
**one [94]**
**ones [1]** 33/5
**ongoing [5]** 10/22 11/16 14/9 73/10 73/16
**only [22]**
**open [2]** 56/20 96/21
**opened [1]** 37/21
**operate [2]** 16/3 17/14
**operated [1]** 70/9
**operation [1]** 17/19
**operations [5]** 2/10 5/9 105/22 106/2 109/6
**opinion [40]**
**opinions [1]** 17/6
**opportunities [1]** 73/17
**opportunity [5]** 2/9 35/23 56/21 75/21 97/24
**oppose [1]** 93/17
**opposed [1]** 64/4
**opposing [3]** 24/9 64/7 91/12
**opposite [2]** 41/4 69/6
**opposition [2]** 24/5 33/2
**options [1]** 49/22
**or [116]**
**order [23]**
**ordered [1]** 102/6
**ordering [1]** 27/19
**original [5]** 32/15 32/20 50/6 69/10 91/9
**originally [1]** 69/23
**other [46]**
**others [1]** 2/16
**otherwise [4]** 17/6 31/10 84/13 95/22
**our [65]**
**ourselves [3]** 58/1 58/25 89/20
**out [39]**
**outer [2]** 39/14 39/16
**outlet [1]** 76/16
**outliers [1]** 91/18
**outlined [6]** 48/4 56/20 58/15 76/15 91/16 102/13
**outside [7]** 30/10 41/17 48/11 52/4 59/5 70/9 80/8
**outsourced [1]** 96/2
**outwardly [1]** 59/12
**over [14]** 4/15 13/11 14/8 16/3 32/16 32/17 42/24 47/12 47/25 56/5 71/25 95/10 97/2 100/10
**overall [1]** 40/22
**overburdened [1]** 88/5
**overlooked [1]** 96/7
**overly [1]** 84/23
**override [1]** 26/4
**overruled [5]** 3/18 20/21 28/22 29/2 29/7
**oversight [4]** 4/15 4/17 26/13 75/20
**overturned [2]** 20/18 68/5
**overwhelming [1]** 22/18
**own [16]** 3/19 4/15 14/3 14/14 17/3 47/19 51/17 51/20 51/22 63/4 63/7 65/16 66/11 73/24 81/2 92/24

## P

**p.m [2]** 1/1 109/25
**Padilla [2]** 7/23 9/16
**page [8]** 28/11 32/11 72/6 73/14 94/7 94/9 101/22 107/8
**pages [1]** 49/12
**paid [1]** 51/15
**panel [2]** 73/2 105/7
**paragraph [1]** 65/24
**paragraphs [1]** 72/5
**parallel [1]** 45/10
**paraphrasing [1]** 86/13
**parcel [2]** 91/23 106/17
**parenthetical [1]** 41/4
**part [26]**
**participant [1]** 50/7
**particular [7]** 8/6 18/16 18/17 39/5 40/20 63/12 65/15
**particularized [1]** 63/2
**particularly [7]** 2/5 23/4 31/18 41/23 48/22 64/6 104/11
**particulars [1]** 17/25
**parties [11]** 15/15 24/13 34/3 64/14 64/14 66/22 67/4 78/2 83/3 83/14 84/10
**partners [1]** 88/23
**parts [4]** 25/2 61/10 82/15 86/3
**party [19]** 10/8 15/2 25/5 45/10 55/8 57/20 58/14 64/2 75/13 80/13 82/24 83/2 83/5 83/11 83/13 84/3 85/22 86/1 100/15
**pass [1]** 36/5
**past [5]** 12/6 25/3 39/16 86/4 89/9
**path [3]** 48/8 87/5 87/5
**Pause [1]** 39/24
**paused [1]** 57/16
**pay [6]** 11/25 51/6 51/9 51/22 60/20 64/1
**paying [5]** 61/17 68/16 68/19 72/14 80/19
**pendency [1]** 78/2
**pending [1]** 93/15
**pendinging [1]** 102/18
**people [25]**
**per [1]** 38/17
**perform [1]** 52/6
**performed [1]** 67/20
**perfunctory [1]** 88/17
**perhaps [7]** 8/7 37/17 60/13 86/13 92/21 98/10 99/13
**period [2]** 5/18 10/21
**permission [1]** 42/5
**permit [1]** 90/13
**permitting [1]** 90/15
**perpetuate [2]** 37/4 39/13
**perpetuating [1]** 32/23
**person [3]** 48/22 53/21 96/22
**personal [1]** 104/18

## P

**personally [1]** 97/9
**personnel [1]** 95/19
**perspective [5]** 64/8 68/1 68/2 71/4 90/24
**pertinent [1]** 68/25
**petition [3]** 27/12 61/3 77/15
**petitioned [1]** 42/9
**phase [1]** 36/23
**Philadelphia [1]** 75/4
**phone [2]** 59/3 60/19
**phrase [3]** 37/12 37/16 37/24
**picked [3]** 67/1 68/7 81/6
**picture [2]** 42/2 43/13
**piece [2]** 66/13 82/2
**piecemeal [1]** 86/7
**place [16]** 13/2 16/24 32/25 33/20 33/20 36/2 39/1 39/8 43/14 76/19 76/21 81/22 88/12 88/16 98/1 103/8
**placed [1]** 95/23
**plain [3]** 49/2 49/19 52/9
**plaintiff [2]** 59/24 99/22
**plaintiff's [5]** 2/20 61/14 67/25 72/22 101/24
**plaintiffs [25]**
**plan [1]** 88/14
**planning [1]** 91/6
**plans [1]** 90/22
**play [3]** 20/21 90/5 92/9
**playing [1]** 55/24
**please [5]** 1/25 1/25 2/2 7/10 65/20
**plus [1]** 32/11
**podium [2]** 42/1 55/11
**point [40]**
**pointed [5]** 80/6 87/15 87/18 97/18 99/8
**points [17]** 13/20 22/14 22/20 42/2 47/21 60/4 61/10 62/2 75/1 78/12 82/23 93/24 94/15 99/16 102/17 104/8 106/2
**policy [1]** 61/20
**political [2]** 54/19 89/6
**politics [3]** 16/12 16/13 79/17
**polity [1]** 16/7
**portion [1]** 39/9
**pose [1]** 64/8
**position [17]** 4/8 9/4 9/7 14/16 14/18 16/15 22/24 23/2 43/25 44/9 53/16 58/10 64/4 65/17 71/24 93/18 101/24
**positions [1]** 7/22
**possibility [1]** 95/9
**possible [6]** 31/21 53/15 82/15 87/4 93/8 93/8
**post [7]** 24/23 32/3 44/10 72/4 73/9 79/14 107/5
**posture [3]** 44/4 72/4 105/9
**potential [1]** 95/6
**potentially [1]** 95/10
**power [3]** 65/9 83/22 92/4
**powerful [1]** 91/7
**practice [3]** 10/6 61/23 90/11
**practices [4]** 40/5 69/18 89/9 101/25
**pray [1]** 105/9
**pre [2]** 88/2 89/14
**pre-hearing [2]** 88/2 89/14
**preamble [1]** 74/11
**precedent [13]** 27/1 30/21 31/8 35/3 35/20 37/10 42/6 76/10 82/11 85/16 85/19 86/8 102/24
**precise [1]** 100/12
**precisely [1]** 42/21
**precision [1]** 106/23
**predecessor [2]** 53/13 53/17
**predecessor's [1]** 47/10
**predecessors [1]** 75/10
**predict [1]** 42/15
**predicts [2]** 88/20 89/3
**prefer [1]** 74/14
**prejudgement [1]** 45/15
**prejudice [3]** 59/10 59/14 61/8
**prejudicial [1]** 84/10
**preliminary [1]** 33/3
**premise [1]** 75/9
**prepared [2]** 22/8 103/25
**preponderance [2]** 101/3 101/18
**present [3]** 77/3 78/4 97/24
**presentation [1]** 38/7
**presented [10]** 8/24 28/20 58/16 59/24 60/1 60/1 63/19 71/8 98/9 104/9
**presents [2]** 30/8 64/15
**preserve [2]** 59/4 79/12
**presiding [1]** 1/2
**pressures [3]** 87/17 87/17 88/10
**presume [2]** 65/2 69/19
**presumption [7]** 69/7 69/8 69/19 87/12 88/8 89/16 89/17
**pretends [1]** 26/10
**pretrial [5]** 39/10 89/10 96/18 96/21 101/10
**pretty [2]** 4/16 67/7
**prevalence [1]** 89/7
**prevent [5]** 36/3 54/9 59/10 59/15 69/9
**preventing [1]** 89/24
**previously [1]** 62/18
**primaries [1]** 12/6
**primary [1]** 11/15
**principle [5]** 52/5 57/8 68/20 77/11 78/7
**principles [2]** 62/20 106/1
**prior [4]** 3/18 50/18 67/3 89/7
**prison [1]** 61/7
**pro [19]** 10/3 11/22 48/13 48/21 49/1 49/8 50/25 60/21 61/4 61/24 63/21 63/22 64/22 65/3 65/6 80/5 80/9 80/13 81/2
**probably [7]** 1/21 28/11 28/11 81/7 95/25 98/23 99/15
**problem [7]** 14/9 17/4 17/15 18/12 18/13 20/7 64/15
**problematic [2]** 64/6 64/9
**problems [1]** 68/14
**procedural [9]** 4/17 4/18 4/19 43/19 54/22 56/3 70/20 76/15 82/16
**procedurally [1]** 70/16
**procedure [8]** 70/23 77/22 78/15 79/12 80/14 85/16 109/15 109/19
**procedures [3]** 4/4 35/13 79/14
**proceed [11]** 10/3 31/13 31/14 36/6 38/8 43/17 44/3 44/15 45/16 85/13 91/22
**proceeded [1]** 38/4
**proceeding [3]** 26/15 36/16 57/22
**proceedings [5]** 54/11 57/15 57/16 73/16 104/7
**proceeds [5]** 37/11 45/4 45/17 45/21 86/18
**process [3]** 4/4 7/8 95/5
**processed [1]** 78/5
**processing [9]** 94/21 95/1 95/3 95/7 95/18 96/4 96/6 96/22 104/15
**product [1]** 13/11
**professor [1]** 105/4
**prohibited [1]** 80/7
**prohibits [1]** 40/3
**promises [1]** 84/16
**prong [1]** 6/2
**proof [1]** 65/23
**proper [3]** 25/11 54/12 98/22
**properly [9]** 25/23 41/6 44/11 53/14 53/18 72/11 84/24 93/3 99/7
**proposal [1]** 89/14
**proposed [5]** 13/6 13/19 89/15 90/23 93/5
**proposition [1]** 16/7
**prosecution [1]** 80/24
**protected [2]** 14/10 17/10
**protective [1]** 26/1
**prove [3]** 71/17 82/5 101/18
**proverbial [1]** 46/13
**provide [5]** 12/8 13/5 15/4 40/10 51/2
**provided [4]** 2/5 63/15 87/1 87/24
**provides [2]** 51/19 96/5
**providing [1]** 17/5
**proving [1]** 101/3
**provision [5]** 20/2 20/2 49/1 51/15 108/23
**provisions [10]** 2/15 18/7 18/16 18/17 19/21 19/23 105/17 106/9 106/12 106/21
**prudence [1]** 104/18
**public [8]** 87/18 89/5 91/11 91/14 94/17 94/18 95/14 96/25
**pull [2]** 19/24 22/2
**Purcell [3]** 8/16 8/17 8/18
**purported [1]** 57/2
**purpose [1]** 83/12
**purposes [1]** 31/17
**purse [1]** 64/3
**pushed [1]** 12/5
**pushing [1]** 40/15
**put [14]** 12/4 13/6 13/10 15/18 19/17 30/25 32/24 44/6 52/19 57/10 57/10 88/12 94/19 95/2
**puts [1]** 89/6
**putting [3]** 28/24 70/25 90/11
**puzzled [1]** 107/24

## Q

**qualify [1]** 80/20
**qualifying [3]** 27/4 29/14 29/17
**quantified [1]** 91/13
**question [50]**
**questioning [1]** 60/15
**questions [18]** 9/13 9/20 15/18 22/8 32/5 33/23 43/1 50/13 50/23 59/20 71/13 72/3 76/12 78/8 84/7 84/13 85/18 97/13
**quick [4]** 23/9 49/10 71/23 89/1
**quickly [9]** 16/5 27/14 27/23 27/25 34/25 59/16 66/21 67/10 80/23
**quite [3]** 3/22 35/17 88/13
**quote [7]** 48/5 49/5 49/6 51/6 89/3 89/6 89/14
**quoted [2]** 54/1 79/9

## R

**R.C [3]** 53/19 54/17 79/16
**radical [2]** 38/17 93/4
**raise [13]** 7/1 16/21 35/14 41/11 45/10 52/7 54/15 73/17 74/13 75/15 76/6 83/8 100/20
**raised [14]** 8/13 24/6 24/14 24/17 24/20 24/23 37/6 41/18 44/10 44/11 60/21 80/3 84/3 84/24
**raises [1]** 98/25
**raising [7]** 5/3 9/13 23/10 25/17 101/12 102/4 108/22
**rather [5]** 2/4 37/19 47/17 48/7 69/20
**re [36]**
**re-election [1]** 7/21
**re-occur [1]** 27/6
**reach [8]** 5/2 12/14 24/21 71/6 71/6 83/22 87/9 93/7
**reached [3]** 38/5 59/18 60/19
**reaches [1]** 91/15
**read [15]** 15/11 15/12 19/18 23/3 23/13 27/18 28/12 28/13 30/19 42/15 63/12 83/24 84/22 93/1 99/15
**reading [2]** 46/21 108/12
**reads [1]** 18/2
**ready [1]** 22/9
**real [4]** 33/10 46/5 66/21 109/7
**reality [2]** 11/17 77/11
**realize [1]** 97/7
**really [27]**

**R**

**reason [8]** 8/14 11/22 17/2 21/5 28/19 39/20 71/7 75/11
**reasonable [8]** 25/8 28/13 52/24 53/5 54/16 55/23 64/10 78/16
**reasoned [1]** 31/21
**reasoning [2]** 47/13 90/15
**reasons [4]** 51/25 81/9 97/22 102/14
**rebutting [1]** 91/19
**recall [2]** 19/7 92/7
**receive [1]** 31/19
**received [4]** 9/1 9/5 9/10 32/12
**receiving [1]** 33/10
**recently [2]** 9/1 86/4
**reciting [1]** 100/11
**recognition [1]** 77/4
**recognize [5]** 47/16 52/11 57/4 72/6 73/9
**recognized [2]** 17/15 57/18
**recognizes [1]** 51/16
**recommend [1]** 88/13
**reconcile [1]** 72/7
**reconsider [3]** 59/17 83/7 103/4
**reconsideration [3]** 74/14 93/16 102/18
**record [59]**
**recur [1]** 90/21
**recurring [1]** 91/4
**red [1]** 87/14
**redirection [1]** 75/24
**reemerge [1]** 89/12
**ref [1]** 97/4
**refer [1]** 93/11
**referring [4]** 24/1 65/2 83/18 93/11
**reflect [1]** 40/19
**reflection [1]** 28/15
**reflects [1]** 48/4
**reflexibly [1]** 89/9
**reform [2]** 73/7 74/6
**reframe [1]** 35/18
**regard [2]** 92/11 109/2
**regarding [2]** 27/7 35/15
**regardless [3]** 31/17 31/22 86/10
**regards [2]** 61/17 77/25
**regime [2]** 78/8 78/9
**regret [1]** 37/16
**rehashed [1]** 102/2
**reiterate [1]** 81/5
**reject [2]** 46/20 86/4
**rejected [7]** 44/5 57/19 61/4 74/21 77/21 90/10 90/18
**relate [1]** 30/9
**related [3]** 5/6 14/10 100/22
**relates [1]** 53/18
**relating [3]** 10/25 73/22 100/3
**relation [1]** 101/21
**relationship [1]** 34/8
**relatively [1]** 91/9
**release [3]** 88/2 88/5 89/14
**released [3]** 12/24 95/10 95/12
**relevance [3]** 47/20 102/12 102/14
**relevant [5]** 25/4 34/12 39/17 92/8 94/13
**reliance [1]** 78/1
**relief [9]** 35/5 36/17 36/23 41/12 41/13 42/8 55/18 83/15 85/22
**relieved [1]** 38/9
**relinquishment [2]** 71/15 78/25
**relitigate [1]** 100/16
**rely [1]** 47/18
**relying [2]** 88/7 89/16
**remain [1]** 101/25
**remains [5]** 31/4 43/25 69/24 81/22 98/12
**remand [1]** 107/24
**remanded [2]** 90/7 106/20
**remedy [1]** 36/23
**remember [3]** 10/24 50/5 61/2
**remembers [1]** 10/22
**remind [1]** 72/3
**reminds [1]** 60/22
**removal [1]** 99/3
**removed [4]** 7/2 98/23 99/5 99/6
**removes [2]** 6/7 9/15
**renew [1]** 107/15
**renewed [4]** 93/13 93/16 93/23 108/22
**reopen [1]** 51/10
**repeatedly [2]** 32/9 55/16
**repeating [1]** 89/20
**replie [1]** 90/2
**reply [5]** 7/17 11/12 48/17 52/25 66/21
**report [2]** 94/23 102/9
**represent [12]** 9/6 9/6 9/8 10/13 10/19 12/8 48/15 49/1 49/5 60/20 65/6 66/2
**representation [11]** 9/22 10/2 10/8 11/22 12/16 60/21 61/18 64/2 64/5 66/11 102/22
**represented [5]** 17/10 63/23 66/7 66/11 102/25
**representing [5]** 9/2 9/15 61/24 65/3 65/3
**request [7]** 43/11 58/7 58/19 59/13 70/16 93/13 107/16
**requested [2]** 36/17 75/4
**requesting [2]** 57/1 57/2
**require [10]** 2/11 2/11 6/13 6/14 18/6 34/9 46/3 46/7 79/10 93/4
**required [9]** 5/5 5/6 19/19 30/3 40/11 42/19 51/18 71/4 88/24
**requirement [2]** 25/8 41/5
**requirements [2]** 4/19 81/18
**requires [18]** 4/10 4/17 11/25 19/20 20/2 27/2 32/25 34/9 39/7 40/2 40/13 51/5 51/23 52/1 52/5 58/6 89/23 91/16
**requiring [4]** 27/12 27/13 40/6 41/12
**resetting [1]** 53/23
**resolution [1]** 66/18
**resolve [4]** 67/15 78/10 83/23 106/4
**resolves [2]** 31/9 35/22
**resounding [2]** 49/9 82/12
**resources [2]** 59/9 96/25
**respect [3]** 52/1 63/8 104/10
**respectfully [2]** 103/5 103/6
**respond [6]** 4/21 13/3 60/3 75/17 99/9 99/17
**response [16]** 2/5 4/2 24/5 33/1 59/24 72/8 76/24 80/4 85/3 89/13 92/2 99/13 100/7 104/23 107/12 108/1
**responses [1]** 15/12
**responsibility [1]** 42/15
**rest [6]** 9/7 21/10 50/25 55/1 70/12 80/5
**restart [1]** 77/9
**restate [1]** 15/21
**result [20]** 5/2 21/19 30/22 30/23 30/24 30/25 31/24 32/17 33/13 38/5 39/10 54/2 68/12 71/6 81/16 86/7 88/10 88/21 91/14 102/3
**resulted [1]** 99/3
**resulting [1]** 89/1
**results [1]** 86/7
**resumed [1]** 87/20
**retained [1]** 9/17
**retains [1]** 37/7
**return [3]** 33/22 48/6 91/9
**reverse [2]** 8/17 8/18
**reversed [1]** 20/18
**reversion [1]** 88/16
**revert [1]** 89/9
**review [6]** 31/19 32/12 42/16 42/20 65/14 87/4
**reviewing [2]** 20/22 49/14
**reviews [1]** 65/15
**revisit [2]** 30/21 100/2
**revisiting [1]** 30/4
**revive [1]** 61/3
**rid [2]** 40/14 58/4
**right [41]**
**rightly [1]** 24/2
**rights [2]** 8/19 109/15
**rigorous [2]** 77/7 89/1
**risk [5]** 45/19 46/2 89/19 90/20 91/3
**risks [1]** 32/23
**road [2]** 99/25 100/1
**role [2]** 54/12 103/21
**room [2]** 21/6 21/6
**Rosenthal [1]** 1/2
**Rossi [1]** 1/6
**routinely [1]** 104/3
**RTM [1]** 67/5
**Rufo [31]**
**Rufo's [4]** 43/14 46/10 46/22 90/1
**rule [131]**
**rules [8]** 48/15 54/8 70/2 77/13 77/22 78/15 80/11 80/14
**ruling [4]** 43/3 43/3 81/14 81/15
**rulings [1]** 3/19
**Rumination [1]** 32/15
**ruminations [1]** 32/14
**run [2]** 19/10 73/8
**running [2]** 96/11 96/13
**runs [1]** 12/17
**Russell [3]** 10/22 53/9 75/16
**Russo [16]** 1/15 23/10 26/12 30/1 34/15 60/3 62/8 62/9 62/11 73/20 77/11 79/7 80/3 92/2 94/1 104/22
**Russo's [3]** 38/7 80/8 80/25
**rust [1]** 97/4

**S**

**S.B [28]**
**safety [4]** 91/14 94/17 94/18 95/14
**said [52]**
**Salazar [3]** 53/19 54/17 79/16
**same [32]**
**satisfy [1]** 82/1
**saw [1]** 11/1
**say [48]**
**saying [27]**
**says [29]**
**scepticism [1]** 52/17
**schedule [2]** 11/2 15/15
**schedules [1]** 102/1
**Schools [1]** 57/8
**scope [2]** 30/10 41/17
**scratching [1]** 34/11
**se [19]** 10/3 11/22 48/13 48/21 49/1 49/8 50/25 60/21 61/4 61/24 63/21 63/23 64/22 65/3 65/6 80/5 80/9 80/13 81/2
**seat [3]** 79/6 79/7 104/7
**seated [1]** 1/5
**seats [1]** 8/8
**second [19]** 6/2 20/6 30/14 34/5 48/6 52/17 56/21 56/25 57/25 58/13 63/19 65/24 72/14 73/13 90/1 91/22 94/17 99/14 104/15
**secondarily [2]** 2/22 11/24
**secret [1]** 59/11
**section [2]** 61/16 67/13
**secured [4]** 39/10 40/2 88/18 89/10
**security [1]** 95/19
**see [14]** 9/22 11/6 17/23 18/22 30/22 30/25 31/23 43/16 44/19 48/2 64/19 66/23 76/12 99/11
**seeing [1]** 21/3
**seek [4]** 10/2 42/8 47/17 83/15
**seeking [1]** 48/7
**seeks [1]** 85/22
**seem [4]** 16/3 72/13 72/14 76/2
**seemed [1]** 38/7
**seems [8]** 3/6 5/16 8/6 10/7 47/18 74/23 92/8 92/17
**seen [3]** 86/9 101/22 104/9
**semantics [1]** 55/25
**Senator's [2]** 12/15 12/21
**send [1]** 58/19
**sending [1]** 95/22
**sense [6]** 23/15 59/23 60/2 60/7 80/2 88/4
**sensitive [1]** 8/20
**sent [5]** 12/20 13/7 58/19 97/13 105/4
**sentence [4]** 18/1 28/14 63/11 98/5
**separate [2]** 66/11

**S**

**separate... [1]** 94/14
**separating [1]** 37/9
**September [1]** 1/1
**September 22 [1]** 1/1
**sequential [2]** 99/21 99/22
**serious [3]** 25/18 25/19 89/14
**service [3]** 25/11 25/11 72/15
**services [2]** 96/18 96/21
**set [2]** 33/17 77/13
**Seth [1]** 1/12
**sets [1]** 33/15
**setting [2]** 15/15 93/20
**settled [1]** 84/6
**several [1]** 93/10
**severely [1]** 84/10
**she [18]** 9/20 12/20 12/22 48/14 50/1 50/3 50/7 50/10 50/11 53/20 58/14 58/17 58/18 58/20 60/18 60/19 81/9 81/10
**she's [3]** 12/22 14/18 14/18
**shear [1]** 95/8
**sheriff [6]** 1/11 90/9 90/20 90/23 91/10 95/2
**sheriff's [2]** 90/8 95/17
**Shoot [1]** 56/15
**short [1]** 89/11
**Shortly [2]** 8/25 14/22
**shot [2]** 12/24 56/15
**should [55]**
**shoulder [1]** 91/20
**shouldn't [2]** 51/11 63/5
**show [4]** 33/4 73/7 90/20 91/8
**showed [2]** 32/8 99/25
**showing [1]** 39/6
**shown [1]** 94/18
**shows [9]** 7/15 25/21 27/7 39/5 40/1 40/8 49/21 86/1 88/9
**side [10]** 11/3 17/1 17/1 17/18 21/21 72/11 74/3 83/23 83/23 87/11
**sides [5]** 2/9 106/2 108/16 109/21 109/23
**significant [7]** 26/3 31/6 34/21 36/1 39/9 45/13 91/3
**signing [2]** 67/2 67/3
**silence [1]** 76/8
**similar [4]** 19/19 33/4 41/12 55/8
**similarly [3]** 28/21 29/3 89/13
**simplistic [1]** 90/19
**simply [3]** 44/23 73/4 103/10
**simultaneously [1]** 83/1
**since [5]** 4/8 43/5 72/1 98/11 108/5
**single [7]** 17/2 41/3 57/23 75/25 96/22 101/1 101/1
**sir [1]** 106/7
**sit [1]** 43/1
**sits [1]** 103/1
**sitting [1]** 15/16
**situation [15]** 10/13 11/13 14/11 17/21 18/24 19/1 19/2 63/10 64/2 64/3 65/4 65/7 66/6 80/10 98/1
**situations [4]** 39/11 51/19 65/15 67/23
**skip [1]** 42/5
**sky [1]** 79/4
**slight [2]** 55/6 55/24
**slightly [1]** 25/3
**slip [1]** 42/5
**small [1]** 108/18
**smaller [1]** 78/12
**so [210]**
**some [33]**
**somebody [2]** 5/20 14/7
**somehow [2]** 46/21 66/19
**someone [2]** 51/10 61/19
**something [21]** 10/14 14/6 34/3 41/19 46/11 54/7 54/8 58/24 63/4 63/25 64/21 67/16 87/22 88/6 89/17 92/17 95/9 103/22 104/3 104/22 104/23
**son [1]** 94/18
**soon [2]** 53/15 75/21
**sorry [5]** 7/18 9/9 15/21 83/9 84/2
**sort [6]** 57/16 57/19 67/10 67/14 79/8 95/16
**sought [2]** 25/5 57/3
**sounds [1]** 108/1
**source [2]** 28/8 51/22
**sourcing [1]** 95/22
**Southern [1]** 61/5
**speak [4]** 1/25 24/4 64/18 102/7
**specific [8]** 12/19 14/11 33/16 53/23 105/24 106/2 106/20 107/8
**specifically [5]** 3/18 12/9 16/4 19/15 24/7
**speed [2]** 42/10 80/23
**spend [2]** 52/4 91/5
**spinning [1]** 22/10
**spirit [4]** 72/18 72/20 72/21 74/8
**splitting [1]** 85/16
**spoken [1]** 88/7
**sponte [2]** 54/7 73/23
**spot [1]** 58/23
**Sprint [7]** 30/6 30/7 30/13 31/2 36/4 36/5 36/8
**sprint's [1]** 101/10
**squarely [1]** 3/16
**squelch [1]** 64/19
**staff [6]** 13/9 96/8 96/10 96/15 96/18 96/19
**stages [1]** 109/22
**stand [4]** 107/5 107/7 108/23 108/25
**stand-alone [1]** 108/25
**standard [12]** 25/16 41/7 46/11 46/22 71/14 71/16 75/25 76/3 85/21 85/22 86/2 86/2
**standards [1]** 78/14
**standing [2]** 83/8 83/10
**stands [3]** 40/17 42/18 50/11
**star [2]** 39/14 91/1
**start [9]** 1/21 14/21 33/20 62/11 62/16 69/17 74/13 74/17 77/4
**started [5]** 6/7 9/13 34/24 70/24 109/6
**starting [1]** 50/7
**starts [4]** 7/17 9/21 16/2 73/12
**state [71]**
**stated [12]** 37/18 40/24 41/2 48/14 74/10 74/25 75/10 89/13 99/21 100/7 100/9 100/19
**statement [6]** 37/16 37/25 66/15 92/8 92/17 99/1
**statements [2]** 85/20 85/21
**states [4]** 6/18 75/12 80/18 104/25
**stating [1]** 76/4
**status [5]** 24/8 47/25 82/25 83/5 83/13
**statute [6]** 18/16 19/18 20/11 49/2 51/4 80/16
**statutes [6]** 11/12 18/8 29/16 29/16 34/9 70/8
**Statutorily [1]** 20/12
**stay [1]** 10/10
**stayed [1]** 57/14
**step [46]**
**steps [4]** 27/3 41/20 43/14 90/24
**stick [1]** 48/8
**still [31]**
**stomach [1]** 32/15
**stop [11]** 5/18 21/10 21/12 35/7 36/19 46/16 50/16 56/12 74/17 88/12 95/21
**stopping [1]** 35/7
**straight [4]** 55/17 76/5 76/8 99/12
**straightforward [1]** 56/19
**straition [1]** 103/16
**strange [1]** 10/8
**streamline [1]** 79/14
**strenuous [1]** 55/17
**strings [1]** 64/3
**strong [1]** 83/4
**structural [1]** 64/24
**structure [1]** 42/12
**Struggling [1]** 67/18
**stuck [1]** 52/4
**stuff [3]** 54/23 60/8 105/22
**stumbling [1]** 92/22
**styled [1]** 93/12
**sua [2]** 54/7 73/23
**sub [1]** 61/1
**subject [4]** 14/4 45/11 45/11 45/22
**submission [1]** 96/4
**submit [3]** 23/6 39/21 43/5
**submitted [3]** 33/1 39/5 105/13
**submitting [1]** 88/9
**subsection [3]** 27/2 48/25 51/17
**substantive [2]** 26/1 55/25
**success [1]** 10/2
**successes [1]** 14/19
**successor [2]** 53/14 53/18
**successors [2]** 47/9 75/11
**succinctly [1]** 104/12
**such [5]** 8/13 18/3 85/20 85/23 90/16
**suddenly [1]** 45/15
**sue [2]** 17/7 17/7
**sued [5]** 11/19 11/20 17/3 51/6 61/19
**suggest [4]** 87/8 92/6 92/6 92/8
**suggested [1]** 48/12
**suggesting [2]** 69/15 85/19
**suggests [1]** 93/6
**summarize [1]** 88/14
**summarized [1]** 33/18
**summarizes [1]** 95/16
**super [2]** 16/14 16/23
**supplement [1]** 49/4
**support [11]** 16/21 16/23 17/12 43/22 45/20 58/16 66/5 87/3 93/4 101/1 104/9
**supporting [1]** 75/25
**supports [1]** 79/9
**suppose [3]** 98/10 98/20 99/14
**supposition [1]** 75/23
**Supreme [10]** 24/24 25/2 28/15 53/25 55/9 77/20 90/7 90/9 99/20 104/25
**sure [9]** 2/22 30/24 42/3 68/21 94/2 107/13 107/22 108/20 108/24
**surgeon [1]** 97/1
**surprise [1]** 83/20
**surprised [2]** 48/17 101/12
**suspect [4]** 12/7 64/25 66/9 82/25
**swiftly [1]** 106/4
**synched [1]** 39/22
**system [12]** 17/14 21/1 32/3 77/12 78/5 78/9 78/19 88/4 88/6 88/15 88/22 89/12
**systematically [1]** 105/21

**T**

**table [3]** 31/9 31/11 44/6
**tack [1]** 49/16
**tackle [1]** 86/3
**tacky [1]** 80/9
**take [21]** 9/7 16/15 21/25 30/20 34/6 35/19 51/21 62/16 71/22 74/12 77/7 80/8 80/25 81/6 86/2 87/10 91/2 101/19 106/15 107/18 108/3
**taken [3]** 47/7 67/7 104/7
**takes [8]** 31/9 34/23 39/16 48/20 49/11 99/24 100/1 109/5
**taking [6]** 7/18 38/23 40/12 47/10 50/11 95/1
**talk [12]** 3/24 4/5 6/22 11/7 22/9 41/22 42/24 74/5 86/24 86/25 87/11 108/6
**talked [6]** 11/11 58/25 60/18 67/11 69/21 108/5
**talking [9]** 9/21 20/15 22/2 23/8 59/2 64/13 74/3 78/3 78/4
**talks [4]** 12/24 46/18 46/19 108/7
**tas [1]** 100/22
**task [2]** 42/14 87/6
**taxpayer [4]** 51/2 68/15 68/18 77/3
**taxpayers [5]** 61/17 62/3 94/16 95/15 97/4
**tea [1]** 42/15
**technical [1]** 77/5

## T

**teed [1]** 47/24
**tell [7]** 34/11 35/11 60/1 65/2 97/9 97/11 103/11
**telling [3]** 32/18 46/1 58/17
**tells [2]** 33/9 45/25
**Ten [1]** 62/20
**tens [2]** 56/7 78/3
**Tenth [1]** 19/25
**term [4]** 25/3 44/20 44/24 86/4
**terms [13]** 5/6 6/14 8/10 9/18 14/19 19/18 52/12 55/17 65/22 66/16 67/8 69/3 101/2
**terse [1]** 72/8
**test [4]** 36/10 37/8 44/12 56/4
**testimony [2]** 10/15 32/2
**Texas [12]** 9/21 10/18 11/14 11/16 11/24 49/3 50/21 51/4 61/5 69/22 70/10 98/17
**text [6]** 27/11 38/18 49/2 49/4 52/10 94/6
**than [15]** 2/4 2/24 3/12 27/17 28/2 30/23 30/24 37/17 37/23 47/17 48/7 63/24 69/20 86/20 92/18
**thank [24]**
**that [856]**
**that's [54]**
**their [60]**
**them [29]**
**themselves [9]** 48/15 49/1 57/23 60/16 65/3 65/4 65/6 70/1 90/17
**then [52]**
**theory [11]** 47/8 47/11 48/6 50/24 52/18 52/21 56/22 56/25 57/25 58/13 65/8
**there [100]**
**there's [38]**
**thereafter [1]** 8/25
**therefore [4]** 1/19 5/20 40/3 40/13
**these [41]**
**they [156]**
**they're [20]** 10/4 10/4 10/6 10/15 12/9 19/1 44/5 57/7 57/8 58/2 58/3 58/4 64/23 65/3 68/3 68/11 96/12 96/21 99/20 101/12
**they've [9]** 7/1 14/16 55/16 56/4 73/4 73/4 75/3 95/13 109/5
**thing [16]** 1/20 11/18 14/25 34/25 38/17 58/5 60/21 64/20 65/21 67/1 69/7 71/22 76/2 76/11 79/15 99/22
**things [10]** 7/4 19/10 22/10 23/3 54/19 60/15 61/15 94/22 95/10 101/9
**think [120]**
**thinking [1]** 107/25
**third [4]** 35/12 36/10 87/23 98/5
**this [276]**
**those [38]**
**though [10]** 15/16 16/23 18/23 26/10 26/25 31/8 38/7 44/11 63/25 65/21
**thought [3]** 62/24 65/22 66/15
**thousands [4]** 32/7 56/7 56/8 59/7
**thr [1]** 79/22
**three [19]** 7/18 7/22 7/24 9/1 9/4 14/15 14/20 15/16 28/18 52/14 58/15 67/13 72/6 79/25 82/15 104/8 104/19 104/19 104/22
**threshold [2]** 82/9 102/7
**through [38]**
**throughout [2]** 75/13 104/6
**Thursday [1]** 105/13
**thus [1]** 30/15
**ticky [1]** 80/9
**ticky-tacky [1]** 80/9
**time [43]**
**timeline [3]** 7/9 10/1 76/5
**timeliness [18]** 22/9 27/3 42/25 53/3 55/4 76/1 76/4 77/1 78/13 81/25 82/6 82/8 82/13 100/3 100/14 100/20 100/24 103/3
**timely [7]** 26/7 65/17 76/5 78/22 82/11 87/8 100/25
**times [3]** 24/25 28/12 85/18
**timing [1]** 76/4
**today [9]** 2/3 22/15 56/1 58/4 72/9 77/5 78/9 105/15 105/25
**today's [1]** 1/19
**together [8]** 10/10 13/6 23/14 36/24 37/9 58/5 70/25 99/23
**told [11]** 15/22 21/24 24/10 34/24 97/13 99/20 100/5 105/4 107/19 108/7 109/5
**tolerate [1]** 63/25
**toll [1]** 80/16
**tomorrow [1]** 77/9
**tons [1]** 68/13
**too [7]** 8/12 60/20 61/7 61/8 89/20 90/19 91/5
**took [6]** 7/18 8/4 9/4 13/11 50/14 98/1
**totaling [1]** 97/3
**totally [1]** 79/17
**touch [2]** 9/11 38/22
**tough [1]** 84/7
**toward [1]** 89/24
**towards [1]** 44/17
**tran [1]** 26/1
**tran-substantive [1]** 26/1
**transfer [5]** 65/9 92/4 92/18 92/19 92/23
**transmission [1]** 90/16
**Travis [3]** 1/8 47/3 76/25
**Treasury [1]** 72/19
**treat [1]** 42/5
**treated [1]** 53/25
**treating [2]** 44/10 44/11
**treatment [1]** 79/22
**treats [1]** 82/8
**tried [1]** 75/15
**tries [1]** 45/10
**troops [1]** 13/15
**true [7]** 18/20 55/3 66/6 69/6 109/16 109/18 109/19
**try [6]** 12/22 55/12 61/3 84/15 86/1 100/22
**trying [12]** 28/1 46/12 58/16 80/16 92/22 95/8 99/11 100/16 100/24 102/9 107/22 108/14
**Tuesday [1]** 1/1
**turn [7]** 20/20 28/1 42/24 55/1 59/25 84/13 103/1
**turned [1]** 21/5
**Turning [1]** 67/10
**turns [3]** 18/3 63/12 66/16
**twice [3]** 26/20 47/12 56/5
**two [50]**
**two-step [1]** 34/15
**twofold [1]** 83/18
**type [4]** 45/19 59/13 83/5 89/23
**types [1]** 88/11
**typically [2]** 44/5 61/18

## U

**U.S [3]** 1/1 99/20 102/23
**ultimately [1]** 92/16
**unable [1]** 10/20
**unaddressed [1]** 108/8
**unaffected [1]** 85/6
**unaffordable [3]** 88/17 89/4 89/10
**unambiguous [1]** 74/23
**unanimous [3]** 54/2 55/10 81/23
**unanimously [2]** 25/15 86/4
**unattended [1]** 108/8
**unaware [1]** 50/11
**unclear [1]** 33/25
**unconstitutional [6]** 69/6 89/2 89/11 90/17 90/19 101/25
**under [63]**
**underlying [6]** 20/8 20/9 25/17 57/7 57/9 78/23
**underpinnings [1]** 59/6
**underscore [1]** 41/8
**understand [9]** 10/1 35/10 57/5 69/11 69/13 72/12 99/4 103/9 106/10
**understanding [3]** 85/4 85/9 106/18
**understood [4]** 28/6 84/20 108/10 109/10
**undisclosed [1]** 102/12
**undisputed [1]** 79/19
**undo [1]** 4/12
**undoing [1]** 46/22
**unequivocal [2]** 74/23 74/24
**unethical [1]** 48/14
**unfair [1]** 59/10
**unfold [1]** 57/22
**United [2]** 80/17 104/25
**unless [2]** 42/25 91/25
**unlike [2]** 40/8 60/24
**unnecessary [3]** 33/13 39/12 49/2
**unpublished [1]** 38/17
**unreasonable [3]** 56/5 56/12 82/18
**unrebutted [4]** 39/6 89/18 102/7 102/16
**unrepresented [1]** 9/18
**unsupported [2]** 27/11 89/11
**until [10]** 9/17 12/11 15/13 41/24 49/21 52/13 66/7 79/21 87/24 109/4
**untimeliness [1]** 81/3
**untimely [4]** 61/5 79/21 83/7 85/8
**unusual [3]** 8/21 73/6 103/21
**up [39]**
**upon [3]** 21/16 28/9 68/6
**upshot [1]** 80/11
**urge [2]** 93/5 93/7
**us [17]** 3/6 10/11 11/10 33/9 38/23 39/16 44/7 56/18 57/16 71/13 90/22 100/17 102/20 105/4 106/15 109/5 109/22
**use [2]** 30/22 69/4
**used [4]** 55/14 88/1 95/20 95/25
**uses [1]** 5/2
**using [4]** 44/24 70/10 82/24 97/19
**usually [1]** 5/17
**Utah [1]** 80/21

## V

**vacate [35]**
**vacated [12]** 16/17 27/5 40/18 62/3 90/3 93/25 94/17 94/20 95/14 97/5 103/13 104/11
**vacates [1]** 5/22
**vacating [7]** 16/22 21/19 31/24 32/23 39/21 68/12 103/10
**vacation [1]** 90/25
**vacatur [15]** 27/7 32/2 40/23 43/22 44/21 45/12 46/20 47/17 48/7 58/17 82/10 89/25 91/5 91/12 92/24
**value [1]** 40/12
**valves [1]** 88/5
**Van [1]** 1/10
**VanFleet [5]** 9/2 9/5 9/11 9/15 60/1
**various [2]** 102/14 108/12
**vary [1]** 94/22
**vehicle [6]** 54/22 56/3 81/24 82/16 97/20 98/15
**versed [1]** 10/7
**version [4]** 48/1 48/5 49/20 52/13
**versus [2]** 60/24 72/18
**very [30]**
**via [3]** 47/6 58/12 59/3
**videos [2]** 59/8 109/12
**view [15]** 3/9 4/21 7/3 14/21 17/17 19/19 20/19 47/9 53/5 54/12 65/16 70/18 70/22 77/16 78/6
**viewed [3]** 53/14 53/18 64/9
**views [1]** 91/17
**VIN [1]** 105/4
**violate [5]** 18/16 19/22 19/23 105/18 106/12
**violation [2]** 39/7 90/21
**violations [27]**

V
violative [1] 69/17
violence [1] 90/16
virtue [2] 47/23 68/25
vociferously [1] 91/12
voice [1] 91/18
voices [1] 64/15
void [6] 25/6 25/10 25/10 25/18 54/3 81/25
voluminous [2] 31/25 32/7
voluntarily [2] 35/8 35/9
voting [2] 8/19 8/19

W
wait [4] 5/24 5/24 60/7 78/6
waited [1] 54/15
waiting [3] 57/22 100/8 100/10
waive [9] 13/24 15/20 15/23 16/21 47/5 75/2 75/7 75/8 76/10
waived [15] 7/1 29/12 47/11 57/20 58/11 59/19 60/13 67/4 75/6 75/22 76/6 83/1 83/4 87/7 100/8
waiver [73]
waiving [1] 66/19
walk [1] 64/10
walking [1] 8/23
want [47]
wanted [4] 52/7 60/8 82/13 92/2
wants [2] 61/20 104/24
warrants [1] 35/5
was [144]
wasn't [6] 15/16 38/9 80/20 87/8 99/9 100/10
watched [1] 59/8
waves [1] 32/12
way [39]
ways [8] 48/4 48/10 51/3 75/15 78/25 79/3 87/2 93/6
we [197]
we'll [3] 22/5 49/4 108/2
we're [24]
we've [12] 4/1 15/2 26/9 36/20 42/6 47/25 58/15 67/11 74/12 76/15 84/17 86/9
weigh [2] 32/1 47/1
weighed [1] 32/4
weighs [1] 31/15
welcome [1] 97/23
welcomed [1] 5/21
well [64]
went [4] 3/5 43/8 55/7 71/24
were [44]
Wesley [1] 61/1
what [171]
what's [7] 11/7 11/7 13/1 19/16 21/25 64/10 65/17
whatever [4] 63/10 88/10 91/2 105/7
whatsoever [2] 24/25 42/6
when [56]
whenever [2] 77/18 77/25
where [27]
whereas [1] 14/9
wherever [2] 87/4 93/8
whether [59]
which [94]
while [5] 2/16 42/11 50/12 67/13 90/5
who [31]
whom [1] 66/5
why [19] 6/7 8/13 10/3 11/22 18/11 20/3 20/6 23/21 39/16 44/8 55/25 62/23 68/3 72/9 73/15 83/4 84/4 102/14 102/14
wi [1] 102/10
wildly [1] 27/11
will [47]
willies [1] 104/16
window [1] 100/23
wins [1] 54/19
wished [1] 40/25
wishes [1] 32/20
withdrawn [1] 9/16
within [19] 3/17 3/17 28/6 30/6 30/7 34/15 42/11 44/25 45/22 45/23 53/7 53/11 54/16 56/5 70/3 70/5 85/16 86/17 101/10
without [16] 4/13 10/2 12/13 18/14 18/15 29/6 33/22 39/8 41/15 56/10 77/25 80/24 87/19 88/16 88/23 94/25
woe [3] 75/17 75/17 75/17
wol [1] 90/10
won't [2] 44/14 91/5
Wonderful [1] 59/22
word [1] 105/3
words [4] 10/10 19/12 95/22 98/3
work [3] 13/11 54/19 109/22
worked [1] 72/13
working [3] 2/7 109/12 109/12
works [1] 86/5
world [5] 26/10 26/11 36/21 37/20 45/18
worried [1] 58/25
worry [1] 40/14
would [119]
wouldn't [4] 53/11 59/18 98/2 106/15
wrestling [2] 4/3 76/12
writ [1] 77/15
write [1] 81/23
writs [2] 54/10 79/13
wrong [13] 20/23 26/25 35/11 44/20 44/24 47/9 48/5 48/18 49/7 65/2 80/15 84/1 92/16

Y
yeah [2] 8/3 54/19
year [9] 46/22 71/25 78/5 88/21 94/20 94/24 95/24 96/9 96/9
years [6] 7/6 54/15 62/21 62/21 100/10 109/11
yes [44]
yet [5] 2/14 25/14 25/19 42/13 74/13
yielding [1] 86/7
you [231]
you'll [2] 2/4 62/1
you're [25]
you've [4] 10/17 13/2 47/21 105/25
Younger [72]
your [126]
yourself [1] 10/13
yourselves [1] 59/3

Z
zero [1] 91/19